## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

| | | |
|---|---|---|
| PHILLIP CALLAIS, LLOYD PRICE, | ) | |
| BRUCE ODELL, ELIZABETH ERSOFF, | ) | |
| ALBERT CAISSIE, DANIEL WEIR, | ) | |
| JOYCE LACOUR, CANDY CARROLL | ) | |
| PEAVY, TANYA WHITNEY, MIKE | | ) |
| JOHNSON, GROVER JOSEPH REES, | ) | |
| ROLFE MCCOLLISTER, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| NANCY LANDRY, IN HER OFFICIAL | ) | |
| CAPACITY AS LOUISIANA | ) | |
| SECRETARY OF STATE, | ) | |
| | ) | |
|     Defendant. | ) | |

## COMPLAINT

**Violations of Civil Rights Protected by the Fourteenth and Fifteenth Amendments
of the United States Constitution; 42 U.S.C. § 1983;
Three-Judge Court Requested Under 28 U.S.C. § 2284**

### I.  Introduction

1.  In a matter of eight days, a bill to redistrict all the congressional districts of the State of Louisiana, SB8, was introduced in the Louisiana Senate, went through Senate committee hearings, passed by a vote in the Senate, was transferred to the Louisiana House of Representatives, went through House committee hearings and amendments, was passed by a vote

1

in the House, went back to the Senate with amendments and passed by a vote, was sent to the Governor's desk, and was signed by the Governor.

2.      From start to finish the State's purpose was clear: segregate voters based entirely on their races and create two majority-African American voting districts and four majority non-African American districts, without regard for any traditional redistricting criteria. SB8's sponsors and many other lawmakers expressly stated their intent was to maximize the voting strength of African American voters by stripping them from their communities in far-flung regions of Louisiana and consolidating them into two districts that stretched hundreds of miles in length and dwindled to less than a mile in width. In doing so, the State engaged in textbook racial gerrymandering and violated the U.S. Constitution.

3.      The State's new map divides its congressional districts into six bizarre shapes:[1]



4.      The State of Louisiana has tried this redistricting strategy before. Not long ago, the State, after years of litigation and several trips to the Supreme Court, enacted a map remarkably similar to the one in SB8:

---

[1] This official map can be found along with the text of the enacted statute and reports for SB8/Congress Act 2 on the Louisiana Government Redistricting website: https://redist.legis.la.gov/2024_Files/2024CONGRESSACT2.



*Hays v. Louisiana*, 936 F. Supp. 360, 374 app. III (W.D. La. 1996). That map too had two majority-minority districts: District 2 and District 4. District 4 was long and narrow and slashed from the Northwest corner of Louisiana down to Southeastern Baton Rouge. But the Court recognized the map for what it was: an unconstitutional racial gerrymander. *Hays v. Louisiana* "presents us with what we in Louisiana call a 'Goose' case," meaning it is almost factually identical to the case before this Court today. *Id*. at 368. Like District 4 of the past, District 6 in SB8 today "is approximately 250 miles long." *Id*. "The District thinly links minority neighborhoods of several municipalities from Shreveport in the northwest to Baton Rouge in the southeast (with intermittent stops along the way at Alexandria, Lafayette, and other municipalities), thereby artificially fusing numerous and diverse cultures, each with its unique identity, history, economy, religious preference, and other such interests." *Id*. The resemblances between the past and present State actions are extraordinary. Only here, the facts are far worse for the State.

5.     Here, the State has engaged in explicit, racial segregation of voters and intentional discrimination against voters based on race. The State has drawn lines between

neighbors and divided communities. In most cases, the lines separate African American and non-African American voters from their communities and assign them to Districts with dominating populations far away. In the matter of a mile, a person can travel in a straight line from a majority-non-African American district to a majority-African American district and then back to a majority-non-African American one. The State has not even tried to cover its motives or offer race-neutral reasons for the map. *Cf. id*. at 369. Legislators have openly admitted that the sole purpose behind the configuration of these bizarre districts was to create "two congressional districts with a majority of Black voters" with "over 50% Black voting age population,"[2] without considering any traditional criteria such as compactness or communities of interest, so Louisiana would have "two majority-minority districts that perform."[3] But the State has conceded that it is "impossible" that "a second majority-minority district can be drawn without impermissibly resorting to mere race as a factor,"[4] that any attempt to do so with Louisiana's African American voters dispersed throughout the State is only doable as an unconstitutional "racial gerrymander,"[5] and that "attempting to pick out only those census blocks over 50% population and excluding to the extent possible blocks of less than 50% Black population" on a map demonstrates "the exact type of evidence of racial intent that dooms legislative action."[6] These statements confirm that the State has violated the U.S. Constitution by enacting SB8 in at least two ways. First, the State has violated the Equal Protection Clause of the Fourteenth Amendment by enacting racially gerrymandered districts. And second, the State has violated the Fourteenth and Fifteenth Amendments by intentionally discriminating against voters and abridging their votes based on racial classifications across the State of Louisiana. Accordingly, Plaintiffs respectfully ask the Court for declaratory and injunctive relief.

## I.     Jurisdiction

---

[2] See the introductory statements of Senator Glen Womack and Representative Beau Beaullieu on the Senate and House floors, respectively. Louisiana State Senate, *Senate Chamber 1ES Day 3* (Jan. 17, 2024), https://senate.la.gov/s_video/VideoArchivePlayer.aspx?v=senate/2024/01/011724SCHAMB [hereinafter Senate Archive]; Louisiana State House of Representatives, *House Chamber Day 5, 1ES – SINE DIE* (Jan. 19, 2024), https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/0119_24_1ES_Day5 [hereinafter House Archive].

[3] See statement of Senator Gary Carter quoting Congressman Troy Carter during the Senate debate. Senate Archive, *supra*.; *see also* statement of Senator Royce Duplessis, *id*., and statement of Representative C. Denise Marcelle, House Archive, *supra*.

[4] *Intervenor-Defendant the State of Louisiana's Combined Opposition to Plaintiffs' Motions for Preliminary Injunction* at 15, *Robinson v. Ardoin*, No. 3:22-cv-00211-SDD-SDJ (M.D. La. Apr. 29, 2022), ECF 108.

[5] *Id*. at 13-15.

[6] *Id*. at 14-15.

1.     This Court has jurisdiction under 42 U.S.C. §§ 1983 and 1988, as well as 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

2.     Plaintiffs are entitled to have their case decided by a three-judge district court panel because this action challenges "the constitutionality of the apportionment of congressional districts." 28 U.S.C. § 2284(a).

3.     Venue is proper in this district because a "substantial part of the events or omissions giving rise to the claim occurred" here. 28 U.S.C. § 1391(b)(2). Specifically, Plaintiff-voters suffered a violation of their rights under the Fourteenth and Fifteenth Amendments in this district.

4.     This Court has authority to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

## I.     Parties

1.     Plaintiff Albert Caissie, Jr., is a non-African American voter who resides in Monroe, Louisiana and Ouachita Parish. He resided at the same address before SB8 was enacted. He plans to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 5. SB8 now places his address in District 5.

2.     Plaintiff Phillip Callais is a non-African American voter who resides in Brusly, Louisiana and West Baton Rouge Parish. He resided at the same address before SB8 was enacted. He plans to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 2. SB8 now places his address in District 6.

3.     Plaintiff Elizabeth Ersoff is a non-African American voter who resides in Shreveport, Louisiana and Caddo Parish. She resided at the same address before SB8 was enacted. She plans to vote in the 2024 congressional election. Prior to the enactment of SB8, her address was in congressional District 4. SB8 now places her address in District 6.

4.     Plaintiff Grover Joseph Rees is a non-African American voter who resides in Lafayette, Louisiana and Lafayette Parish. He resided at the same address before SB8 was enacted. He plans to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 3. SB8 now places his address in District 6.

5.     Plaintiff Lloyd Price is a non-African American voter who resides in DeVille, Louisiana and Rapides Parish. He resided at the same address before SB8 was enacted. He plans

to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 5. SB8 now places his address in District 6.

6.      Plaintiff Rolfe McCollister is a non-African American voter who resides in Baton Rouge, Louisiana and East Baton Rouge Parish. He resided at the same address before SB8 was enacted. He plans to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 6. SB8 now places his address in District 5.

7.      Plaintiff Candy Carroll Peavy is a non-African American voter who resides in Shreveport, Louisiana and Caddo Parish. She resided at the same address before SB8 was enacted. She plans to vote in the 2024 congressional election. Prior to the enactment of SB8, her address was in congressional District 4. SB8 now places her address in District 4.

8.      Plaintiff Mike Johnson is a non-African American voter who resides in Shreveport, Louisiana and Caddo Parish. He resided at the same address before SB8 was enacted. He plans to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 4. SB8 now places his address in District 4.

9.      Plaintiff Bruce Odell is a non-African American voter who resides in Lafayette, Louisiana and Lafayette Parish. He resided at the same address before SB8 was enacted. He plans to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 3. SB8 now places his address in District 3.

10.     Plaintiff Joyce LaCour is a non-African American voter who resides in Gonzales, Louisiana and Ascension Parish. She resided at the same address before SB8 was enacted. She plans to vote in the 2024 congressional election. Prior to the enactment of SB8, her address was in congressional District 6. SB8 now places her address in District 2.

11.     Plaintiff Tanya Whitney is a non-African American voter who resides in Sorrento, Louisiana and Ascension Parish. She resided at the same address before SB8 was enacted. She plans to vote in the 2024 congressional election. Prior to the enactment of SB8, her address was in congressional District 6. SB8 now places her address in District 1.

12.     Plaintiff Daniel Weir, Jr., is a non-African American voter who resides in Meraux, Louisiana and St. Bernard Parish. He resided at the same address before SB8 was enacted. He plans to vote in the 2024 congressional election. Prior to the enactment of SB8, his address was in congressional District 1. SB8 now places his address in District 1.

13.     Defendant is Secretary of State Nancy Landry. She is only sued in her official capacity. As Secretary of State, she is "the chief election officer of the state." La. Const. art. 4, § 7; La. R.S. § 18:421. The State Constitution requires her to "prepare and certify the ballots for all elections, promulgate all election returns, and administer the election laws, except those relating to voter registration and custody of voting machines." La. Const. art. 4, § 7. Her oversight of elections extends to federal congressional elections. La. R.S. §§ 18:452, 18:462. She opens and determines whether potential candidates qualify to run in federal congressional elections before placing their names on the ballot, and she holds and conducts the elections. *Hall v. Louisiana*, 974 F. Supp. 2d 978, 993 (M.D. La. 2013); *Johnson v. Ardoin*, No. CV 18-625-SDD-EWD, 2019 WL 2329319, at *3 (M.D. La. May 31, 2019).

14.     Each Plaintiff is a registered voter who has a right to vote and plans to vote in the 2024 congressional election.

15.     Plaintiffs have standing to challenge SB8 because the law classifies and segregates them into distinct districts based on their races for purposes of voting. *See North Carolina v. Covington*, 138 S. Ct. 2548, 2552-54 (2018) (per curiam) (holding that plaintiffs can establish a cognizable injury by showing "they had been placed in their legislative districts on the basis of race"); *see also Miller v. Johnson*, 515 U.S. 900, 911 (1995); *Shaw v. Reno (Shaw I)*, 509 U.S. 630, 650 (1993); *Harding v. Cnty of Dallas, Tex.*, 948 F.3d 302 (5th Cir. 2020). They all reside in racially gerrymandered districts. Plaintiffs have thereby suffered a constitutional injury that is traceable to the challenged law and redressable by this Court.

16.     Plaintiffs also have standing because they suffered unlawful, intentional discrimination based on race when the State used a racial quota to create two majority-African American districts. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 1 (2023); *Adarand Constructors v. Pena*, 515 U.S. 200 (1995); *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

17.     Plaintiffs also have standing because they have suffered an abridgement of their rights to vote. *Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 917 (1996); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

18.     These injuries are traceable to SB8, which directly and intentionally caused these injuries.

19.     These injuries are also redressable by this Court because this Court can declare this map invalid and enjoin its use, and thereby stop the constitutional harm and unlawful racial discrimination. This Court can also reshape each district to remedy the violation of Plaintiffs' constitutional rights.

## I.     Statement of Facts

1.     During its 2021 legislative session, the Louisiana State Legislature received the 2020 decennial census data and learned that the State of Louisiana would continue to have six congressional districts.

2.     The census data revealed that 29.87% of the Louisiana voting age population was non-Hispanic African American and 31.25% of the voting age population was African American.

3.     The Louisiana Legislature then adopted a joint rule to establish redistricting criteria. La. Leg. J.R. 21A. From October 2021 to January 2022, the Legislature held public meetings to solicit comments on redistricting maps. Then after this extensive process, the Legislature convened. On February 1, 2022, both Chambers presented identical redistricting bills. After weeks of deliberation and debate, the bills passed in each Chamber. Louisiana Governor John Bel Edwards vetoed the two bills, but the Legislature overrode the veto for the House bill, and it became law on March 30, 2022.

4.     On March 9, 2022, some voters filed a lawsuit against the Louisiana Secretary of State and sought a preliminary injunction. The State of Louisiana intervened.

5.     On April 29, 2022, the State, through then-Attorney General Jeff Landry's Office, argued before the district court in opposition to the preliminary injunction: "No sufficiently numerous and geographically compact second majority-minority district can be drawn in Louisiana." *Intervenor-Defendant the State of Louisiana's Combined Opposition to Plaintiffs' Motions for Preliminary Injunction* at 6, *Robinson v. Ardoin*, No. 3:22-cv-00211-SDD-SDJ (M.D. La. Apr. 29, 2022), ECF 108 [hereinafter *State Motion*]. It went on to say: "The minority population in Louisiana is not compact" when accounting for the necessary "traditional districting principles." *Id*. at 11. Rather, to draw two districts with a certain African American voting age population percentage, you "had to ignore any conception of communities of interest." *Id*. at 8; *see id*. ("The fact that so many communities of interest were either divided among the Congressional districts or paired with unlikely and dissimilar larger cities begs the

question of whether the distribution of African Americans are truly compact enough to create a second majority-minority Congressional district."). The State also claimed, "no constitutional second majority-minority congressional district is *possible* in Louisiana" and any attempt to create one would be an unconstitutional "racial gerrymander." *Id*. at 13 (emphasis added). The State also said plaintiffs presented "the exact type of evidence of racial intent that dooms legislative action." *Id*. at 14-15. In sum, the State repeatedly stressed that it was "impossible . . . to demonstrate that a second majority-minority district can be drawn without impermissibly resorting to mere race as a factor." *Id*. at 15; *see also id*. at 7 ("again, . . . you cannot create two legally sufficient BVAP congressional districts"). In doing so, the State admitted that it could not create two majority-African American districts without violating the U.S. Constitution. *Id*.

6.     SB8 did exactly that by creating two majority-African American districts.

7.     The State also acknowledged the limits of Section 2 of the Voting Rights Act in the briefing, arguing that, "it is well established that when a plaintiff brings a claim under Section 2, there is 'nothing in [Section 2 that] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *Id*. at 10-11 (citing 52 U.S.C. § 10301(b); *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986)).

8.     The State also argued that maps proposed by the plaintiffs in that case, creating majority-African American districts composed of African American voters in cities 152 and 157 miles apart, demonstrated that the districts were not compact. *Id*. at 12.

9.     SB8 later created majority-African American districts with African American voters in cities 250 miles apart.

10.     Despite the State's arguments and admissions, the United States District Court for the Middle District of Louisiana granted a preliminary injunction. But the District Court did not issue a final order. The case never advanced to the merits. At no point did any court—not the Middle District of Louisiana, the United States Court of Appeals for the Fifth Circuit, or the Supreme Court of the United States—issue a final order on the merits.

11.     Defendant Nancy Landry was elected to serve as Louisiana Secretary of State in November 2023 and assumed office on January 8, 2024.

12.     Jeff Landry, who previously defended the State as Attorney General, was elected to serve as Louisiana Governor in November 2023 and assumed office on January 8, 2024.

13.    On the Governor's very first day in office, he called a special legislative session specifically to redistrict Louisiana's congressional districts.

14.    On January 15, 2024, the Governor opened the session with a few remarks. He said he called the Legislature to the redistricting special session to perform "[a] job that our own laws direct us to complete" and "a job that our individual oaths promised we would perform." Office of the Governor, *Governor Jeff Landry Opens First Special Session on Court Ordered Redistricting* (Jan. 16, 2024), https://gov.louisiana.gov/news/governor-jeff-landry-opens-first-special-session-on-court-ordered-redistricting. He said he gathered the Legislature to "seek to amplify the voice of the few." *Id.*

15.    During that special session, Senator Glen Womack introduced SB8, a bill to redistrict Louisiana's congressional districts, with the stated goal of creating two majority-African American districts.

16.    SB8 repealed La. R.S. § 18:1276—the State's congressional redistricting map enacted on March 30, 2022.

17.    SB8's final map created two majority-African American districts, Districts 2 and 6, and four majority-non-African American districts, Districts 1, 3, 4, and 5.

18.    The map was drawn on the presumption that African American voters in Louisiana all share the same interests and issues because of their race, regardless of where they geographically reside, and even though Louisiana's African American residents are dispersed throughout the State, living in integrated parishes and cities throughout Louisiana.

19.    That map, as laid out in the legislative reports, is included here:



20.     A map of the dispersion of these African American voters is included here, with the highest numbers of African American voters located first in New Orleans, then Baton Rouge, and finally in Shreveport.



21.     SB8's map did not resemble any alternative maps presented in the prior litigation.

22.     SB8's enacted District 6 stretches in a familiar slash mark, reminiscent of the rejected map in *Hays*, from the top Northwest corner of the State in Shreveport, diagonally to central Alexandria, and then further down to Baton Rouge in the Southeast. It also takes an abrupt detour even further South to Lafayette in the heart of Acadiana to pick up African American voters.

23.     SB8 drew Districts 6 and 2 to "connect the dots" of areas with large numbers of African American voters. A map depicting the areas with the highest numbers of African American voters alongside SB8's district lines illustrates this point.





24.     Baton Rouge and Shreveport are roughly 250 miles apart. They are not only separated by distance but also by culture, industry, topography, and even common natural disasters. The geographic, economic, and cultural gulf between Shreveport in the North and Lafayette in the South looms just as large.

25.     In Rapides Parish, District 6 dwindles down to a narrow width of 2.5 miles before continuing its snake upward toward Shreveport.

26.     District 6's appendages are also extremely narrow. It dwindles down to a width of less than a mile—4,384.17 feet—wide in East Baton Rouge Parish between I-10 and the juncture of Perkins Road and Dawson Creek. Another slice of District 6 at the bottom of East Baton Rouge Parish between Burbank Drive and the Iberville Parish line is only 1.82 miles wide. Another appendage between St. Landry Parish and Lafayette Parish is only 2.95 miles wide. In North De Soto Parish, District 6 carves out a 1.9-mile-wide sliver between Wallace Lake and Linwood Avenue.

27.     District 6 cuts through and divides many parishes, including Caddo, De Soto, Rapides, Lafayette, Avoyelles, and East Baton Rouge Parishes—six out of the ten parishes in District 6.

28.     District 2 divides even more parishes: Ascension, Assumption, Terrebonne, St. Charles, Jefferson, St. Bernard, and Orleans—seven out of the nine parishes in District 2.

29.     The map also intentionally created four majority-non-African American districts and excluded African American voters in Districts 1, 3, 4, and 5.

30.     These districts too were gerrymandered based on race.

31.     District 5 barely satisfies the contiguity requirement. A minuscule land bridge only 1.2 miles wide at the juncture of West Feliciana and Avoyelles Parishes unites District 5's Northern and Southern arms, which threaten to break in half from erosion. It is only contiguous by virtue of the Mississippi River; the surrounding shores and an island are uninhabited. These two halves are unconnected by road, bridge, ferry, trail, or path. Any unity or community of interest is pure myth.

32.     District 5 and District 6 divide Baton Rouge purely based on race. The areas of Baton Rouge with predominantly non-African American populations were drawn to fall under District 5, which was designed to be a majority-non-African American District. The areas of Baton Rouge with predominantly African American populations were drawn to fall under District 6, which was designed to be a majority-African American District.

33.     District 4 is nearly cut in half by District 6.

34.     None of these six districts are compact. When measured on the Polsby-Popper Scale of 0 to 1, with a score of 0 indicating absolutely no compactness and 1 indicating total compactness, all six districts barely rise above 0. District 6 is the worst, with a score of 0.05 compactness. But Districts 4 and 5 both have a staggering score of 0.08 compactness. District 2 has a score of 0.11. And the State's most compact districts, District 1 and District 3, have scores of 0.16 and 0.19, respectively. The mean of all six districts was 0.11 for compactness.

35.     These compactness scores are lower than the scores for the State's 2022 enacted map.

36.     Of special concern, SB8 divided communities of interest. Some residents in Shreveport, for example, were carved out of District 4 from their neighbors to join residents in

East Baton Rouge, a city 250 miles away with its own ideals, values, culture, economics, and concerns, solely because they are the same race as those people in East Baton Rouge.

37.     SB8 also stripped Lafayette residents from their community of interest in Southern Louisiana and forced them into the same district as residents of Shreveport in Northern Louisiana. Lafayette is the core city of "Acadiana," a region also known as Cajun Country and home to most of the State's Francophone population, many of whom identify as Cajuns or Creoles. Residents of Lafayette and Southern Louisiana pride themselves on their unique, rich culture with its French and Spanish roots. Southern Louisiana is organized around sugar cane farming, fishing, and more recently the oil industry. Northern Shreveport has more in common culturally, socially, economically, and agriculturally with neighboring Texas than with Southern Louisiana. The only reason to include these two disparate cities in one district and divide both from their cultural regions is race.

38.     SB8 significantly altered the percentages of voting age populations in each district along racial lines, demonstrating the State's sole purpose to consolidate African American voters into two districts.

39.     The voting age population ("VAP") percentages for the previously enacted districts were:[7]

| District | African American VAP % | Non-African American VAP % |
|----------|------------------------|----------------------------|
| 1 | 13.482% | 86.518% |
| 2 | 58.650% | 41.350% |
| 3 | 24.627% | 75.373% |
| 4 | 33.820% | 66.180% |
| 5 | 32.913% | 67.087% |
| 6 | 23.861% | 76.139% |

40.     The voting age population percentages for SB8's enacted districts are:[8]

| District | African American VAP % | Non-African American VAP % |
|----------|------------------------|----------------------------|
| 1 | 12.692% | 87.308% |

---

[7] This data comes from the official Report for Congress Act 5 (HB1) on the Louisiana Redistricting website. *See Report – Congressional Districts by Parish – Pop (2020), VAP (2020) and Registration (12-2022)*, Louisiana Redistricting, https://redist.legis.la.gov/2023_07/2023CONGRESSACT5.
[8] This data comes from the official Report for Congress Act 2 (SB8) on the Louisiana Redistricting website. *See Report – Congressional Districts by Parish – Pop (2020), VAP (2020), and Registration (12-2023)*, Louisiana Redistricting, https://redist.legis.la.gov/2024_Files/2024CONGRESSACT2.

| 2 | 51.007% | 48.993% |
| 3 | 22.568% | 77.432% |
| 4 | 20.579% | 79.421% |
| 5 | 26.958% | 73.042% |
| 6 | 53.990% | 46.010% |

41.    The biggest change was in District 6, where the African American VAP percentage increased sharply by 30%, from 23.861% to 53.990%, even though District 6 previously held the second lowest African American VAP and the second highest non-African American VAP. The non-African American VAP in District 6 decreased proportionately.

42.    SB8 decreased the African American VAP percentage in every district except District 6. In District 2, African Americans still held a majority of the VAP at 51%.

43.    SB8 increased the non-African American VAP percentage in every district except District 6, where it dramatically decreased, so non-African Americans went from the majority to the minority.

44.    SB8 gave African Americans a majority, as measured by the BVAP criterion, in Districts 2 and 6.

45.    Senator Womack was the author of SB8. He first introduced SB8 in the Senate on January 15, 2024. SB8 then went to the Committee on Senate and Governmental Affairs. On January 17, 2024, it was presented on the Senate floor again for a third reading and final passage.

46.    During that third reading and final passage on January 17, 2024, several Senators debated and spoke on the bill. Senator Womack, author and sponsor of SB8, stated the bill intentionally created "two congressional districts with a majority of Black voters." Senate Archive, *supra*, at 8:47-8:54. He went on to discuss "the boundaries of District 2 and District 6 on your map," and emphasized that both were "over 50% Black voting age population." *Id*. at 9:20-9:35. He went on to state: "Given the State's current demographics, there is not enough high Black population in the Southeast portion of Louisiana to create two majority Black districts and to also comply with the U.S. Constitution's one-person one-vote requirement. That is the reason why District 2 is drawn around Orleans parish while District 6 includes the Black population of East Baton Rouge Parish and travels up the I-49 corridor to include Black population in Shreveport." *Id*. at 9:35-10:00.

47.     Senator Womack repeated throughout his remarks that his primary goal in drafting SB8 was to create two majority-African American districts. He repeatedly referred to District 2 and District 6 as the "minority" or "Black" districts. *Id*. at 9:00-10:40, 16:35-16:43, 18:15.

48.     Senator Womack did not identify any traditional redistricting criteria, such as compactness or communities of interest, as part of his analysis in crafting SB8 and selecting the district lines. In fact, he disavowed that he had complied with traditional redistricting criteria.

49.     Senator Jay Morris asked Senator Womack about the two majority-minority districts: "Among the factors that you considered, was the community of interest of the district something that was considered in coming up with this version of the map that we have before us? . . . You didn't consider the community of interests of people having something in common with one another within the district?" *Id*. at 11:10-11:53. Senator Womack then responded: "No, I didn't because it was, we had to draw two districts and that's the only way we could get two districts . . . ." *Id*. at 11:54-12:05. Senator Womack also denied that he considered agriculture as a community of interest in District 6. *Id*. at 12:09-12:48.

50.     Senator Womack repeatedly referred to the 250 miles between Baton Rouge and Shreveport in District 6 as merely a "corridor." *Id*. at 9:55-10:00, 12:50-12:55.

51.     Senator Morris also asked Senator Womack when referring to District 6: "Would you say the heart of the district is Northeast Louisiana, North Central Louisiana?" *Id*. at 12:50-13:05. Senator Womack responded: "I wouldn't say the heart of that district is that way." *Id*. at 13:05-13:20. He went on to state District 6 simply "had to be drawn like it had to be drawn to pick that up." *Id*. at 13:05-13:20. Senator Morris asked again: "So is there a heart of the district?" *Id*. at 13:20-13:25. Senator Womack said: "I don't think it has a heart of the district." *Id*. at 13:25-13:35. In doing so, Senator Womack stated that there was no tie or common interest between the Northern region of District 6 and its other regions. Race was the only reason District 6 extended into far-flung regions of Louisiana.

52.     When Senator Morris raised other concerns about the districts, Senator Womack agreed that these issues were valid but said: "Where we had to draw two minority districts, that's the way the numbers worked out. You've worked with redistricting before and you have to work everyone around that the best you can." *Id*. at 18:08-18:30.

53.     Senator Gary Carter then rose to speak. *Id*. at 24:30. He raised concerns about the "current African American voting age population in District 2" because it was now only "51%." *Id*. at 24:30-25:10. He had "serious concerns" with whether "District 2 continues to perform as an African American district." *Id*. at 25:10-25:25. But despite those concerns about African American "perform[ance]" in District 2, he supported the legislation. *Id*. In making these comments, Senator Carter demonstrated that he was especially concerned about ensuring a certain percentage of the population was African American in District 2. Senator Carter also read and endorsed a statement on the Senate floor from Congressman Troy Carter, who currently represents District 2 in the U.S. House of Representatives. He said: "My dear friends and colleagues, as I said on the steps of the Capitol, I will work with anyone who wants to create two majority-minority districts. I am not married to any one map. I have worked tirelessly to create two majority-minority districts that perform. That's how I know that there may be better ways to craft both of these districts. There are multiple maps that haven't been reviewed at all. However, the Womack map creates two majority-minority districts and therefore I am supportive of it, and I urge my former colleagues and friends to vote for it while trying to make both districts stronger with appropriate amendment. We do not want to jeopardize this rare opportunity to give African American voters the equal representation they rightly deserve." *Id*. at 26:00-27:00.

54.     Senator Katrina Jackson also said on the floor that she supported SB8. *Id*. at 28:00. She stated, "I don't think we're in the hands of a heavy-handed judge." *Id*. at 29:50-30:00. "There is nothing that says that a second African American serving in Congress in Louisiana will not help the masses. If we think that, then we think that we're less than or better than a person based on race. If anyone in this chamber could articulate a reason why they believe that any African American that sits before you today wouldn't go before you with the same heart and zeal and vigor and heart for the people, then maybe we can say that there's not an African American in this State that's not going to stand before Congress and represent us. But I literally do not believe that there's a colleague in here that looks across this Chamber at any member of the Black Caucus that does not believe that we would not go to Congress and represent the State of Louisiana. And so I stand in support with reluctancy of having to talk to my constituents after this vote but with carrying the spirit of fairness that they asked me to carry in the last redistricting session." *Id*. at 30:00-32:08.

55.     Senator Jackson also stated that her "constituents and a lot of constituents in North Louisiana are experiencing ice . . . and so a lot of them don't even know that we're down here right now passing maps and so this is the first time in a long time that I am probably going to vote for something that I haven't vetted through my constituency." *Id*. at 28:00-29:30. She went on to state that she, along with "Representative Fisher [and] Representative Morrell will have a zoom community meeting to catch them up on what they have lost while they were at home." *Id*. at 28:00-29:30.

56.     Senator Royce Duplessis spoke next, stating that SB8 "was much more than lines on a map." *Id*. at 32:30-33:00. He said SB8 "was about one-third of this State going underrepresented for too long." *Id*. at 33:00-34:15. "So I think it's important that we keep the focus on why we're here today." *Id*. at 34:15-34:35. His reference to one-third of the State was a reference to the African American population. He went on to state: "Just like Senator Carter, I'm not thrilled with what's happening in District 2 and the way it's lowering the numbers," referring to the numbers of African American voters Senator Carter discussed. *Id*. at 34:40-34:52. Senator Duplessis discussed how he had created a map with Senator Price that "we thought performed better." *Id*. at 34:52-35:00. He stated he would support SB8 "because he thought it was time to give people of this State fair representation." *Id*. at 35:25-35:32.

57.     Senator Thomas Pressly also rose in opposition, stating that Northwest Louisiana was "unique from the rest of our State, and I believe that commonalities of interest are important." *Id*. at 35:55-36:40. He explained the strong cultural, industrial, and agricultural differences between Northwest Louisiana and Baton Rouge, as well as the different natural disasters facing the two regions. *Id*. at 37:14. He stated: "I cannot support a map that puts Caddo Parish and portions of my district, which is over 220 miles from here, in a district that will be represented by someone in East Baton Rouge Parish that may or may not have ever even been to Northwest Louisiana and certainly doesn't understand the rich culture, rich important uniqueness of our area of the State." *Id*. at 36:55-37:23. He went on: "When we look at Louisiana we often talk about North and South. And that division is true. It's real. I think all of us acknowledge that. The I-10 corridor has unique needs. When we think of the challenges you face with storms, often you think of hurricanes. In North Louisiana we think of tornadoes and ice storms. When you look at the important regions of our States and the diverse industries that we have . . . that is something that we must keep in mind as we continue through this process." *Id*. at 37:23-38:14.

He said: "I am concerned with the important part of this State—Northwest Louisiana—not having the same member of Congress." *Id*. at 38:14-38:29. He said it made no sense to create two congressional districts and draw District 6 and District 4 "along a line that's based purely on race." *Id*. at 38:29-38:40.

58.     SB8 passed in the Louisiana Senate on January 17, 2024, by a vote of 27-11.

59.     SB8 was then transferred and presented in the Louisiana House of Representatives on January 17, 2024. SB8 went to the Committee on House and Governmental Affairs that same day.

60.     Then, on January 19, 2024, Representative Beau Beaullieu, as the bill sponsor, presented SB8 to the House of Representatives for debate and final passage. During his opening remarks, Representative Beaullieu stated that SB8 created "two congressional districts with a majority of Black voters." House Archive, *supra*, at 2:48:25-2:48:31. Like Senator Womack, he discussed, "the boundaries for District 2 and District 6," and emphasized that "both of which are over 50% Black voting age population or BVAP." *Id*. at 2:49:00-2:49:13. He went on to state: "Given the State's current demographics, there is not a high enough Black population in the Southeast portion of Louisiana to create two majority Black districts and to also comply with the U.S. Constitution's one-vote one-person requirement. That is the reason why District 2 is drawn around Orleans Parish, why District 6 includes the Black population of East Baton Rouge Parish and travels up the I-49 corridor and the Red River to include Black population in Shreveport." *Id*. at 2:49:19-2:49:49.

61.     Representative C. Denise Marcelle also expressed that the goal was to get "a second congressional district." *Id*. at 2:43:25-2:43:30.

62.     Only one Representative asked Representative Beaullieu a question after his presentation. Representative Beryl Amedee asked, "Is this bill intended to create another Black district?" Representative Beaullieu responded: "Yes, ma'am." *Id*. at 2:51:00-2:51:17.

63.     Representative Mike Bayham then rose in opposition of SB8. *Id*. at 2:51:30. He stated: "St. Bernhard [Parish] has never been split into two congressional districts." *Id*. at 2:52:07-2:52:10. "Looking at these precincts, and I know every precinct, I've campaigned in every precinct in St. Bernhard, we have two precincts, for example, that are in the second congressional district. One, Precinct 24, gave President Trump 75% of the vote. Precinct 25 gave President Trump 69% of the vote. Those are in the second district. And the first district is

Precinct 44 which gave President Biden 83% of the vote. Precinct 45 gave President Biden 85% of the vote. It seems like these precincts were just thrown together like a mechanical claw machine just grabbing people and dropping them off." *Id.* at 2:52:17-2:23:05. St. Bernhard Parish is divided between District 1 and 2. He went on to state: "We are being told that we have to redraw all of this in a period of less than eight days. That is not how you make sausage. That's how you make a mess. I cannot in good conscience vote for this bill that divides my community and I will stand by that for my community." *Id.* 2:53:10-2:53:33.

64.     No other representatives spoke.

65.     SB8 then went to a vote, and it passed in the Louisiana House of Representatives by a vote of 86-16 on January 19, 2024.

66.     SB8 was then sent to the Senate with House amendments, and it passed by a vote of 27-11 on January 19, 2024.

67.     Even before the special session, legislators voiced their intent to create two majority-African American districts. When he received the Governor's call for the special legislative session on January 8, 2024, Representative Matthew Willard told the press: "The math is clear. A third of six is two. And so we look forward to beginning that redistricting session and walking away with two majority-minority African-American congressional districts." *See* Sabrina Wilson, *Gov. Landry calls special session on redistricting as new legislature takes office*, Fox 8 (Jan. 8, 2024), https://www.fox8live.com/2024/01/09/gov-landry-calls-special-session-redistricting-new-legislature-takes-office/. He also told the public: "We'll be doing everything we can to make sure that we are not diluting the voices of Black voters in Louisiana and to get those two majority-minority seats." *Id.* Representative Willard had recently received a new leadership role in the House as the chair of the House Democratic Caucus, where in his words, he "lead[s] the caucus of 32 members." *Id.*

68.     Other elected officials in Louisiana remarked on the purpose of the bill to create two majority-African American districts and four majority-non-African American districts.

69.     Congressman Troy Carter of the U.S. House of Representatives held a press conference on January 15, 2024, where he stated: "For nearly two years, I have consistently called for the creation of a second majority-minority district. . . . This is our responsibility, not the judiciary. . . . I stand here with my friends from the Legislative Black Caucus, the NAACP, Urban League of Louisiana, and civil rights leaders to firmly state that we are unified and ready

to work with anyone who is working to create a map that establishes two majority-minority districts that give Black candidates a meaningful opportunity to win." Press Release, *Congressman Troy Carter Demands Fair Congressional Maps* (Jan. 15, 2024), https://troycarter.house.gov/media/press-releases/congressman-troy-carter-demands-fair-congressional-maps. The press conference was an effort to express his "commitment to work with the Louisiana Legislature and Governor Landry to develop a constitutional map that contains two majority-minority congressional districts." *Id*.

70.     As the current Congressman for District 2, Congressman Carter's voice was especially important for the passage of SB8. His statements were read on the Senate floor right before the vote for SB8's final passage.

71.     Other officials made similar comments. For example, Tres Bernhard, adviser to Congressman Carter, told the Illuminator: "This historical moment is about creating two seats that a Black person can win . . . . And that's what this is about. It's not about a Democratic seat, it's about creating two seats that a Black person can win." *Id*.

72.     After both Houses passed SB8 on Friday, January 19, 2024, the bill went to the Governor's desk.

73.     The following Monday, January 22, 2024, the Governor signed SB8 into law. Upon his signature, SB8 went into effect and repealed the 2022 redistricting law.

74.     The entire process—from the first introduction of SB8 until the Governor signed it into law—took only eight days.

### Count I: Racial Gerrymandering in Violation of the Fourteenth Amendment

**75.**     The above paragraphs are hereby incorporated by reference as if set forth fully herein.

76.     The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. States must "govern impartially [and] not draw distinctions between individuals solely on differences that are irrelevant to a legitimate governmental objective." *Id*.

77.     The Equal Protection Clause forbids racial gerrymandering. The State "may not separate its citizens into different voting districts on the basis of race." *Miller*, 515 U.S. at 911. Racial gerrymandering and segregation harm all voters, regardless of race.

78.     To prevail on a racial gerrymandering claim, plaintiffs must show race was the predominant factor the State considered when creating the challenged districts.

79.     Plaintiffs can rely on either circumstantial evidence of a district's shape and demographics or more direct evidence of legislative purpose to show that race was the predominant factor governing the State's line-drawing decisions. *Covington*, 138 S. Ct. at 2553.

80.     Here, Plaintiffs have presented sufficient direct and circumstantial evidence to show the State's consideration of race predominated over its consideration of traditional redistricting criteria when it created all six districts. The evidence demonstrates that race was not just the State's predominant factor. Race was the State's sole factor.

81.     First, Plaintiffs have presented sufficient direct evidence of the State's purpose to draw all six districts predominantly based on the race of voters.

82.     Immediately prior to SB8's passage, bill sponsors and other legislators on the Senate and House floors stated that the lines were drawn purely based on race.

83.     Both SB8 sponsors, Senator Womack and Representative Beaullieu, separately stated that the goal was to create "two congressional districts with a majority of Black voters." Senate Archive, *supra*; House Archive, *supra*. They drew "the boundaries for District 2 and District 6" to include "over 50% Black voting age population." Senate Archive, *supra*; House Archive, *supra*. And they stated that the districts were drawn *solely* with that goal in mind: "Given the State's current demographics, there is not a high enough Black population in the Southeast portion of Louisiana to create two majority Black districts and to also comply with the U.S. Constitution's one-vote one-person requirement. *That is the reason why* District 2 is drawn around Orleans Parish, *why* District 6 includes the Black population of East Baton Rouge Parish and travels up the I-49 corridor and the Red River to include Black population in Shreveport." Senate Archive, *supra* (emphasis added); *see also* House Archive, *supra*.

84.     The one question Representative Beaullieu was asked after presenting SB8 was: "Is this bill intended to create another Black district?" He answered: "Yes." House Archive, *supra*.

85.     The bill sponsors "purposefully established a racial target"—*i.e.* an African American voting majority in two districts—and they were "not coy in expressing that goal." *Cooper v. Harris*, 581 U.S. 285, 299-300 (2017). They "repeatedly told [] colleagues that [the

districts] had to be majority-minority." *Id*. at 299. Their statements show that race predominated over other traditional criteria.

86.     Additionally, SB8 sponsor Senator Womack conceded that he did not consider communities of interest or other traditional redistricting criteria when selecting this map. He never mentioned compactness. In fact, he acknowledged the odd shape of District 6 when addressing "why" it narrowly "travels up the I-49 corridor and the Red River." Senate Archive, *supra*. He also said that District 6 simply "had to be drawn like it had to be drawn to pick [] up" African Americans. *Id*.

87.     Other Senators and Representatives identified race as the chief districting criterion in creating all six districts. *See Shaw II*, 517 U.S. at 906–07; *Miller*, 515 U.S. at 917–18. For example, Senator Pressly said the lines were drawn "based purely on race." Senate Archive, *supra*. Senator Duplessis said the "focus of why we're here today" was to increase African Americans' voting power. *Id*. Senator Carter relayed Congressman Carter's statement that the singular goal was to create "two majority-minority districts." *Id*. Senator Carter and Senator Duplessis discussed the importance of how District 2 would "perform" as an African American majority district. *Id*. Representative Marcelle expressed the goal to get "a second congressional district." House Archive, *supra*.

88.     Many also stated that the goal was to reach a certain threshold percentage of African American voters in two districts, so that African Americans would hold the VAP majority in those districts. Senator Carter, for example, stated that he was concerned about District 2 only having a "51%" African American majority, but because SB8 reached the threshold majority, he would vote in favor of SB8. Senate Archive, *supra*. Senator Duplessis expressed the same sentiment about the "the numbers." *Id*.

89.     Several senators and representatives in addition to SB8's sponsors expressed that SB8 did not conform to any traditional redistricting criteria. Senator Pressly stated that the line between District 4 and District 6 was "purely based on race," and did not account for the "commonalities of interest" of people in Northwest Louisiana and the "unique," "rich culture," "industries," and even natural disasters that distinguished the region from the rest of the State. Senate Archive, *supra*. Representative Bayham also raised concerns about the failure to abide by traditional redistricting criteria. He said the distinction between voters who were split between District 1 and District 2 did not even divide on partisan lines. Rather the line-drawing seemed

"like a mechanical claw machine just grabbing people and dropping them off." House Archive, *supra*. Senator Morris also raised concerns about whether there were any "communities of interest" considered, a concern that was answered negatively by Senator Womack. Senate Archive, *supra*. No traditional redistricting factors account for these decisions. Only racial considerations drove this line-drawing.

90.     The Governor's statements prior to the legislative session also indicate that the goal was to redistrict race-based lines. Speaking on behalf of the State while serving as Attorney General, he said that it was "impossible" for the State to create a second majority-African American district without violating the U.S. Constitution and traditional criteria, "without impermissibly resorting to mere race as a factor" and without engaging in an unconstitutional "racial gerrymander." *State Motion*, *supra*, at 13-15. These filings from "a state official," not to mention one of the key lawmakers in enacting SB8, is "powerful evidence" that the State "subordinated traditional districting principles to race when it ultimately enacted a plan creating [the] majority-black districts." *Miller*, 515 U.S. at 919.

91.     Second, circumstantial evidence establishes that the State flouted traditional redistricting criteria, including compactness, contiguity, and cohesiveness of communities of interest, to draw all six districts based purely on race.

92.     All the districts are "narrow and bizarrely shaped." *Allen v. Milligan*, 599 U.S. 1, 28 (2023) (quoting *Bush v. Vera*, 517 U.S. 952, 965 (1996) (plurality)).

93.     The districts are not compact. *Shaw I*, 509 U.S. at 646–48. District 6, for example, is a narrow diagonal line that runs along the Interstate 49 corridor akin to North Carolina's infamous slash district that stretched approximately 160 miles along the Interstate 85 corridor and was struck down as an unconstitutional racial gerrymander by the Supreme Court in *Shaw*. *Id.* at 635. District 6 stretches at least 250 miles between its appendages in Shreveport and Baton Rouge, cities in opposite corners of the State. *Cf. Hays*, 936 F. Supp. at 370 (It "meanders for roughly 250 miles from the northwestern corner of the state to the southeast, dividing parishes and municipalities while surgically agglomerating pockets of minority populations along the way."). It then plunges South to the heart of Cajun Country in Lafayette to encompass African American voters there. In Rapides Parish, it dwindles down to a narrow width of 2.5 miles before continuing its snake upward toward Shreveport. It has a compactness score of 0.05, with 0 being a total lack of compactness and 1 being total compactness. The sole goal behind District

6's narrow line across Louisiana is obvious: maximize the African American vote. The other districts fare no better. Their compactness scores are all extremely low. The Northern and Southern portions of District 5, for example, are barely connected. District 5 is *only 1.2 miles wide* at the juncture of West Feliciana and Avoyelles Parishes and is only contiguous by virtue of the Mississippi River; the surrounding shores and an island are uninhabited. They are unconnected by road, bridge, ferry, trail, or path. District 4 is nearly cut in half, and it extends from Northern to Southern Louisiana, despite the diverging interests of these two regions. Both District 4 and District 5 have compactness scores of 0.08. District 2 only has a compactness score of 0.11. District 1 and District 3 only reach scores of 0.16 and 0.19, respectively. All the shapes are bizarre. The goal of the districts is clear from their shapes: gerrymander and segregate voters purely based on race.

94.    The districts also separate communities of interest and unite disparate groups of people with nothing in common apart from race. District 6 carves out a long, narrow peninsula into District 4, splicing several parishes and communities of interest. For example, the cultural and industrial unity of people in Caddo Parish and Northwest Louisiana far outweighs any unity between the sliver of people dissected from Caddo Parish and part of the population in East Baton Rouge, hundreds of miles away. Northern and Southern Louisiana have very distinct cultures. Race is the only reason to create districts crisscrossing the State.

95.    The harm is felt by African American and non-African American voters alike, who no longer can influence their communities. *See Gomillion v. Lightfoot*, 364 U.S. 339 (1960). Instead, both sets of voters are separated from their communities and thrust into districts with other voters hundreds of miles away, with whom they have little in common apart from race. The result is they do not have the same power to appeal to their congressional representatives—some of whom may have no knowledge of their region or culture.

96.    The districts cut through many parishes. *Bush v. Vera*, 517 U.S. 952, 974 (1996) (plurality opinion); *Cooper*, 581 U.S. at 301 n.3 (finding a "conflict with traditional redistricting principles" where the legislature "split[] numerous counties and precincts"). District 2 severs seven of the nine parishes it touches. District 6 splinters six out of the ten parishes it cuts through.

97.     The legislators' comments and map show that race was not just the predominant purpose. Race was the sole purpose behind SB8. Plaintiffs have thereby satisfied their burden to show that race predominated over other traditional districting criteria.

98.     Since Plaintiffs have satisfied their burden, the State has the burden to satisfy strict scrutiny, meaning the State must show it drew the challenged districts in pursuit of a compelling state interest, and the resulting districts were narrowly tailored to achieve that interest. *Shaw II*, 517 U.S. at 908.

99.     First, the State must show it enacted these maps pursuant to a compelling state interest. The Supreme Court has assumed (but never held) that compliance with Section 2 of the Voting Rights Act ("VRA") can be a compelling interest, but a State's "ostensible effort to comply with the Voting Rights Act" does not allow for racial gerrymandering. *Covington*, 138 S. Ct. at 2550.

100.    To satisfy strict scrutiny, the State must first show that the compelling interest applies—that the VRA is indeed triggered by Louisiana's demographics, voting trends, and other factors. Only if the answer is "yes" may the State proceed to its second burden, meeting the narrow tailoring requirement by presenting actual "evidence or analysis supporting [the] claim that the VRA require[s]" creation of the districts as drawn on a district-by-district basis. *Wis. Legislature v. Wis. Elecs. Comm'n*, 595 U.S. 398, 403 (2022); *Bethune-Hill v. Va. State Bd. of Elecs*., 580 U.S. 178, 191-92 (2017). The State must have a strong basis in evidence or good reasons as to why it drew the districts it did. Courts will not "approve a racial gerrymander whose necessity is supported by no evidence" and that proceeds on a legally mistaken view of the VRA. *Cooper*, 581 U.S. at 306.

101.    Should the State rely on the VRA, it will fail at step 1. VRA Section 2 "never require[s] adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 30; *see also Hays*, 936 F. Supp. at 370 ("Reduced to its essentials, the VRA simply does not *require* the enactment of a second majority-minority district in Louisiana.").

102.    The State has already conceded that it did not abide by traditional redistricting criteria. The State has previously admitted it is "impossible" that "a second majority-minority district can be drawn without impermissibly resorting to mere race as a factor," that any attempt to do so would be an unconstitutional "racial gerrymander," and that attempts to slice voters into districts that could create such a map demonstrate "the exact type of evidence of racial intent that

dooms legislative action." *State Motion*, *supra*, at 13-15. These statements alone show that the State did not abide by traditional redistricting criteria. *Miller*, 515 U.S. at 919.

103.     Second, even if the State could surmount these hurdles, it will fail at step 2. The legislators' statements also show that they failed to comply with any traditional redistricting criteria. Senator Womack, SB8's author and sponsor, said so himself. *See supra* ¶¶ 69-75.

104.     Additionally on step 2, the maps themselves show that the State violated traditional districting criteria. *Milligan*, 599 U.S. at 27 (quoting *Shaw*, 509 U.S. at 647); *see supra* ¶¶ 114-19.

105.     The VRA is only satisfied if the State demonstrates that each minority-majority district complies with all three of the *Thornburg v. Gingles*, 478 U.S. 30 (1986), factors: (1) a "sufficiently large and geographically compact" minority, that is (2) "politically cohesive," and (3) subject to majority bloc voting that usually defeats the minority group's preferred candidate. *Id*. at 49-51.

106.     The State cannot even satisfy the first *Gingles* factor—*i.e.* a showing of a "sufficiently large and geographically compact" minority. *Id*. at 50. These districts are plainly not compact. *See supra* ¶ 116; *Hays*, 936 F. Supp. at 370.

107.     The State's failure to comply with traditional redistricting principles or the *Gingles* factors demonstrates that the districts it drew were not narrowly tailored to serve any compelling interest. *Cooper*, 581 U.S. at 306. Thus, the State cannot satisfy strict scrutiny.

108.     Accordingly, Plaintiffs are entitled to relief.

## Count II: Plaintiffs' Votes Are Abridged in Violation of the Fourteenth and Fifteenth Amendments

109.     The above paragraphs are hereby incorporated by reference as if set forth fully herein.

110.     The Fifteenth Amendment states: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. The Fifteenth Amendment "right to vote" may "be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *LULAC v. Edwards Aquifer Auth.*, 937 F.3d 457, 462 (5th Cir. 2019) (quoting *Reynolds v. Sims*,

377 U.S. 533, 555 (1964)). States cannot abridge the right to vote by using racial criteria. *Shaw I*, 509 U.S. at 640-41.

111.    This legislation has abridged Plaintiffs' right to vote based solely on their race. While Plaintiffs recognize that no group of voters is entitled to proportional representation under the U.S. Constitution and the application of traditional race-neutral criteria may result in an underrepresentation or overrepresentation of racial, religious, or political groups, the Constitution clearly protects all racial groups from representational schemes which have as their sole purpose the intentional overrepresentation of voters of a particular race over all other voters in a jurisdiction. *See Gomillion v. Lightfoot*, 364 U.S. 339 (1960).[9] A claim that an election scheme is based predominantly on such discriminatory racial intent and results in the intended harm is actionable.

112.    Here, as in *Gomillion*, SB8 imposes an obvious racial preference which abridges the ability of non-African American voters to engage in the normal compromises and influence that would exist in districts drawn consistent with traditional redistricting principles. The State has chosen to intentionally gerrymander for the sole purpose of providing a racial minority a greater proportion of congressional districts than their citizen voting age population. Each Plaintiff experiences this injury in his or her own district. African Americans constitute a little more than 29% of the citizen voting age population. The redistricting intentionally creates two majority-African American districts of the six districts, or slightly more than 33%. Using a mandatory racial quota to not only approach, but to exceed, the African American share of the citizen voting age population, constitutes an additional concrete harm to all non-African American voters, unseen in previous racial gerrymandering cases.[10]

113.    Turning to the Fourteenth Amendment, the Equal Protection Clause prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S.

---

[9] Justice Stevens dissented in *Shaw* and *Miller v. Johnson* because he found the stereotyping harm in both to be insufficient, concluding that "[n]either in *Shaw* itself nor in the cases decided today has the Court coherently articulated what injury this cause of action is designed to redress." *Miller v. Johnson*, 515 U.S. 900, 929 (1995) (Stevens, J., dissenting). Justice Stevens explained that the plaintiffs in those cases had made no showing of "vote dilution… to an identifiable group of voters" nor under the facts of the case were they capable of so doing. *Id.* (Stevens, J., dissenting). Louisiana's current redistricting scheme obviates Justice Stevens's concerns about the missing harm to plaintiffs in prior redistricting challenges.
[10] The racial gerrymandering cause of action in Count I is the same cause of action in the seminal case *Shaw v. Reno* and all its progeny, including *Hays*. The harm in those cases, and in this one, arises from stereotyping based on race and is felt by all voters in racially gerrymandered districts. In those earlier racial gerrymandering cases, the percentage of the challenged majority-minority gerrymandered districts compared to total districts was still less than the percentage of minority's proportion of the citizen voting age population.

Const. amend XIV, § 1. The Equal Protection Clause requires States to draw legislative districts so that citizens' votes are counted equally. *Baker v. Carr*, 369 U.S. 186 (1962). Thus, the Clause prohibits a State from gerrymandering in such a way that the State dilutes the votes of one class of voters and thereby treats voters unequally under its laws. *Shaw I*, 509 U.S. at 640-41.

114.    As previously stated, the statements of lawmakers leave no doubt that race was not only the predominant reason for the passage of the current redistricting scheme. Race was the sole reason. No further proof of invidious discriminatory intent is necessary. However, sufficient circumstantial evidence also proves such intent. *See Rogers v. Lodge*, 458 U.S. 613 (1982).

115.    The harm to all non-African American voters is the same harm described in other non-election law claims where States use racial quotas to discriminate against races or ethnicities outside the target group. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 1 (2023); *Adarand Constructors v. Pena*, 515 U.S. 200 (1995); *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

116.    SB8 gave African American voters the majority in two congressional districts, where they previously held the majority in one, by consolidating them into these two districts from across the State. This required displacing other racial groups from the territories of Districts 2 and 6, and forcing them into adjoining portions of Districts 1, 3, 4, and 5. Had traditional districts been drawn that did not "bear[] more heavily on one race than another," *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976), these non-African American voters would have constituted a majority in five of Louisiana's six districts. But because the State acted with discriminatory intent and developed racial quotas, it injured non-African American voters by costing them one district.

117.    SB8 was created by means of an irregular procedure. It was the first legislative session after the Governor assumed office. In fact, on the Governor's *first* day in office—January 8, 2024—he called for the legislative special session to focus exclusively on redistricting. The legislative session was a special one and SB8 was passed by both Chambers and signed by the Governor in a matter of eight days. There was little debate, and the entire process was rushed to create two majority-African American districts and reduce the existing five majority-non-African American districts to four. While the Legislature had previously spent

months after the 2020 census travelling across the State and soliciting public input, legislators did not even have time to *inform* their constituents about the redistricting bill or special session—much less ask their constituents for their opinions and provide proper representation on their behalf. *See* Senate Archive, *supra*, at 28:00-29:30. The entire session was a whirlwind. The historical background of the challenged decision and the sequence of events leading up to the challenged action show that SB8's maps were drawn specifically to form two majority-African American districts and reduce the number of majority-non-African American districts from five to four districts.

118.    The viewpoints expressed by legislators and other decision makers show that they intended to abridge the votes of non-African American voters and that they were motivated by race when they configured the districts. *United States v. Brown*, 561 F.3d 420, 433-34 (5th Cir. 2009). The legislators claimed they drew these districts to allow for two majority-African American districts and four majority-non-African American districts, where there had previously been five, even though these legislators were fully aware that they were violating all traditional redistricting criteria and creating a racial quota based on super-proportional representation at the expense of other voters.

119.    For the reasons previously stated, this discrimination cannot satisfy strict scrutiny.

120.    Thus, Plaintiffs are entitled to relief on Count II.

## **Prayer for Relief**

WHEREFORE Plaintiffs pray that this Court "immediately notify the chief judge of the circuit, who shall designate two other judges" so that "[t]he judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding." 28 U.S.C. § 2284(b)(1). Plaintiffs pray that this Court issue a declaratory judgment that SB8 is unconstitutional under the Fourteenth and Fifteenth Amendments, issue an injunction barring the State of Louisiana from using SB8's map of congressional districts for any election, and institute a congressional districting map that remedies these violations. Plaintiffs also request all fees and costs recoverable under 42 U.S.C. § 1988.

Dated this 31st day of January, 2024   Respectfully submitted,

        **PAUL LOY HURD, APLC**
        */s/ Paul Loy Hurd*
        Paul Loy Hurd
        Louisiana Bar No. 13909
        Paul Loy Hurd, APLC
        1896 Hudson Circle, Suite 5
        Monroe, Louisiana 71201
        Tel.: (318) 323-3838
        paul@paulhurdlawoffice.com
        *Attorney for Plaintiffs*


        *And*

       **GRAVES GARRETT GREIM LLC**
        */s/ Edward D. Greim*
        Edward D. Greim
        Missouri Bar No. 54034
        *Pro Hac Vice Pending*
        GRAVES GARRETT GREIM LLC

        1100 Main Street, Suite 2700
        Kansas City, Missouri 64105
        Tel.: (816) 256-3181
        Fax: (816) 256-5958
        edgreim@gravesgarrett.com
        *Attorney for Plaintiffs*