**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION**

| | |
|---|---|
| PHILLIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| Plaintiffs, | |
| v. | District Judge David C. Joseph<br>Circuit Judge Carl E. Stewart<br>District Judge Robert R. Summerhays |
| NANCY LANDRY, IN HER OFFICIAL CAPACITY AS LOUISIANA SECRETARY OF STATE, | Magistrate Judge Kayla D. McClusky |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

I. Louisiana unsuccessfully tried this redistricting strategy after the 1990 census. ..... 3

II. Louisiana enacted an initial redistricting map after the 2020 census. ..... 3

III. Louisiana rushed to pass a new congressional redistricting map. ..... 5

IV. SB8 segregated voters based on race. ..... 6

V. Lawmakers admitted they intentionally drew districts along race-based lines. ..... 6

VI. Plaintiffs filed this lawsuit. ..... 12

ARGUMENT ..... 12

I. Plaintiffs are likely to prevail on the merits. ..... 12

a. *Hays* decides this case. ..... 12

b. Plaintiffs are likely to succeed on Count I. ..... 13

i. Race was the predominant purpose behind the State's redistricting. ..... 14

1. Direct Evidence ..... 15

2. Circumstantial Evidence ..... 18

ii. The State's racial gerrymandering cannot survive this Court's strict scrutiny. ..... 24

c. Plaintiffs are likely to succeed on Count II. ..... 26

II. Plaintiffs will suffer irreparable injury absent injunctive relief. ..... 30

III. The balance of equities weighs in Plaintiffs' favor. ..... 31

IV. The preliminary injunction does not weigh against the public interest. ..... 31

V. Conclusion: Plaintiffs are entitled to an injunction of SB8 and issuance of a new map. 32

CERTIFICATE OF SERVICE 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) ........ 25

*Allen v. Milligan*,
599 U.S. 1 (2023) ........ 14, 20, 25, 26

*Alternative Political Parties v. Hooks*,
121 F.3d 876 (3d Cir. 1997) ........ 30

*Bethune-Hill v. Va. State Bd. of Elecs.*,
580 U.S. 178 (2017) ........ 14, 17, 18, 25

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ........ 30

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ........ 30, 31

*Bush v. Vera*,
517 U.S. 952 (1996) ........ 21

*Cooper v. Harris*,
581 U.S. 285 (2017) ........ 21-25

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F. 2d 328 (5th Cir. unit B 1981) ........ 30

*DeLeon v. Abbott*,
791 F.3d 619 (5th Cir. 2015) ........ 30

*DeLeon v. Perry*,
975 F. Supp. 2d 632 (W.D. Tex. 2014) ........ 30

*Fusilier v. Landry,*
963 F.3d 447 (5th Cir. 2020) ........ 28, 29

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960) ........ 27, 28, 29, 31

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) ..... 32

*Hays v. Louisiana*,
839 F. Supp. 1188 (W.D. La. 1993) ..... 3

*Hays v. Louisiana*,
936 F. Supp. 360 (W.D. La. 1996) ..... *passim*

*Ingebrigtsen v. Jackson Pub. Sch. Dist.*,
88 F.3d 274 (5th Cir. 1996) ..... 31

*Johnson v. DeGrandy*,
512 U.S. 997 (1994) ..... 25

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ..... 30

*Louisiana v. United States,*
380 U.S. 145 (1965) ..... 32

*LULAC v. Edwards Aquifer Auth.*,
937 F.3d 457 (5th Cir. 2019) ..... 27

*Miller v. Johnson*,
515 U.S. 900 (1995) ..... *passim*

*Missouri v. Biden*,
83 F.4th 350 (5th Cir. 2023) ..... 12

*Navajo Nation v. San Juan Cnty.*,
2:12- CV-00039, 2017 WL 6547635 (D. Utah Dec. 21, 2017) ..... 32

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ..... 30

*Opulent Life Church v. City of Holly Springs, Miss.*,
697 F.3d 279 (5th Cir. 2012) ..... 30

*Reno v. Bossier Parish Sch. Bd.*,
520 U.S. 471 (1997) ..... 28, 30

*Reynolds v. Sims*,
377 U.S. 533 (1964) ..... 32

*Shaw v. Reno* (*Shaw I*),
509 U.S. 630 (1993) ........ 21, 26, 28, 31

*Shaw v. Hunt* (*Shaw II*)
517 U.S. 899 (1996) ........ 15, 24

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
600 U.S. 181 (2023) ........ 2, 27

*United States v. City of Cambridge*,
799 F.2d 137 (4th Cir. 1986) ........ 30

*United States v. Hays* (*Hays II*),
515 U.S. 737 (1995) ........ 3

*United States v. Paradise*,
480 U.S. 149 (1987) ........ 32

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ........ 32

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........ 28, 29

*Washington v. Davis*,
426 U.S. 229 (1976) ........ 29

*Wenner v. Tex. Lottery Comm'n*,
123 F.3d 321 (5th Cir. 1997) ........ 32

*Williams v. Salerno*,
792 F.2d 323 (2d Cir. 1986) ........ 30

*Wis. Legislature v. Wis. Elecs. Comm'n*,
595 U.S. 398 (2022) ........ 25

*Wright v. Sumter Cnty. Bd. of Elecs. & Registration*,
361 F. Supp.3d 1296 (M.D. Ga. 2018) ........ 32

**Constitutional Provisions**

U.S. Const. amend. XV, § 1 ........ 27

42 U.S.C. § 1983 ........ 12

52 U.S.C. § 10101 ........ 24

**Other Authorities**

LA State Senate*, Senate Chamber 1ES Day 3* (Jan. 17, 2024),
https://senate.la.gov/s_video/VideoArchivePlayer.aspx?v=senate/2024/01/011724SCHAMB ..... *passim*

LA State House of Representatives, House Chamber Day 5, 1ES – SINE DIE (Jan. 19, 2024),
https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/0119_24_1ES_Day5 ..... 10, 11, 15, 16, 17, 26

## INTRODUCTION

Thirty years ago, a three-judge panel of this very Court invalidated a racial gerrymander eerily similar to SB8, the redistricting map Plaintiffs challenge here. The circumstances were nearly identical. While defending Voting Rights Act ("VRA") litigation, the State quickly passed a new map to add a second majority-African American district out of seven total. The VRA, it said, compelled the new district, which slashed the State in half for hundreds of miles, from Baton Rouge to Shreveport. The original majority-minority district focused on Orleans Parish. This Court found that the district from Baton Rouge to Shreveport was an unconstitutional racial gerrymander. *Hays v. Louisiana*, 936 F. Supp. 360, 367 (W.D. La. 1996).

The only difference now is that Louisiana has just six districts. In eight days, the State drew and passed a congressional redistricting bill with the sole purpose of drawing districts and segregating voters based on race. A map of the district lines around dots representing high populations of African American voters shows that the State created an intentional racial hedge.






**Ex. A at 23**.[1] In viewing its citizens through a purely racial lens, the State's gerrymander reduces each individual to a racial stereotype who is then expected to vote to achieve a race-based outcome. Not only is such treatment a grave affront to the God-given freedom and dignity of each Louisiana voter, it also violates the Fourteenth Amendment's guarantee of equal protection. Where, as here, race predominates in the State's line-drawing and the State cannot satisfy strict scrutiny, the "most rigorous and exacting standard of constitutional review," Plaintiffs will prevail on a racial gerrymandering claim. *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

The State did not merely allow race to predominate, it intentionally fixed an explicit racial quota of two African American districts. Even worse than its 1993 effort, Louisiana tried to guarantee one racial group a percentage of the Congressional delegation that exceeds its actual share of the voting population, and to ensure that, by this same degree, all other racial groups would be under-represented. Such intentional discrimination has no place under the Fourteenth and Fifteenth Amendments. In our democracy, there can be no excuse for burdening citizens based on their race. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023).

The current map cannot stand. Plaintiffs ask that this Court issue a preliminary injunction that (1) enjoins Defendant Secretary of State Nancy Landry from using the current map to qualify candidates and carry out elections and (2) orders Defendant to enforce a new map—Plaintiffs' Illustrative Map or another map that does not contravene the Fourteenth or Fifteenth Amendments—to remedy these constitutional injuries. **Ex. A at 12** (Plaintiffs' Illustrative Map).

[1] Citations to "Ex." refer to Exhibits listed in the Declaration of Edward D. Greim.

## BACKGROUND

### I. Louisiana unsuccessfully tried this redistricting strategy after the 1990 census.

In the early 1990s, the Louisiana Legislature tried to create a second majority-African American district out of its seven congressional districts. *United States v. Hays* (*Hays II*), 515 U.S. 737, 740 (1995). One encircled New Orleans and the other formed a "Z" slashing across Northern Louisiana, turning south, and then jutting east toward Baton Rouge. *Id.* at 741; *Hays v. Louisiana*, 839 F. Supp. 1188, 1199 (W.D. La. 1993). Several voters challenged the scheme. While the appeal was pending before the Supreme Court, the Legislature repealed that original map and enacted a map remarkably similar to the one in SB8. *Hays*, 936 F. Supp. at 374 app. III.

1993 Map 2024 Map[2]




The 1993 map too had two majority-African American districts. *Id*. at 364. One encircled New Orleans; the other was long and narrow and slashed 250 miles from Shreveport down to Southeastern Baton Rouge. *Id*. But the district court recognized the scheme as an unconstitutional racial gerrymander and determined that it had no choice but to issue a remedial map. *Id*. at 372.

### II. Louisiana enacted an initial redistricting map after the 2020 census.

Thirty years later, the Legislature dusted off the same playbook. Its first congressional redistricting attempt with the 2020 decennial Census data began in 2021. **Ex. B, C, D, E, F**. From

[2] See Exhibit P for enlarged view of SB8's enacted map.

October 2021 to January 2022, the Legislature held public meetings to solicit comments on redistricting maps. **Ex. D; Ex. A at 4**. After this extensive process, on February 1, 2022, the House of Representatives presented a redistricting bill. **Ex. B, E**. After weeks of deliberation and debate, the bill passed in both Chambers. **Ex. B**. The Legislature overrode a gubernatorial veto on March 30, 2022, and it became law. **Ex. B**. The plan created five majority-non-African American districts and one majority-African American district based on Census data revealing that 29.87% of the Louisiana voting age population ("VAP") was non-Hispanic African American and 31.25% of the Louisiana VAP was African American. **Ex. C, F, G**. A group of voters challenged the bill in court. **Ex. H at 1**. The State of Louisiana intervened. ***Id***.

On April 29, 2022, the State, through then-Attorney General Jeff Landry's Office, argued before the district court in opposition to the plaintiffs' preliminary injunction motion: "No sufficiently numerous and geographically compact second majority-minority district can be drawn in Louisiana." ***Id.* at 6**. It went on to say: "The minority population in Louisiana is not compact" when accounting for the necessary "traditional districting principles." ***Id.* at 11**. Rather, to draw two districts with a certain African American VAP percentage, you "had to ignore any conception of communities of interest." ***Id.* at 8; *see id.*** ("The fact that so many communities of interest were either divided among the Congressional districts or paired with unlikely and dissimilar larger cities begs the question of whether the distribution of African Americans are truly compact enough to create a second majority-minority Congressional district."). The State recognized that "no constitutional second majority-minority congressional district is *possible* in Louisiana" and any attempt to create one would be an unconstitutional "racial gerrymander." ***Id.* at 13** (emphasis added). As a corollary, the State recognized that the plaintiffs in that case—whose aim was precisely to mandate the creation of two majority-minority districts—presented "the exact type of

evidence of racial intent that dooms legislative action." ***Id*. at 14-15**. In sum, the State repeatedly stressed that it was "impossible . . . to demonstrate that a second majority-minority district can be drawn without impermissibly resorting to mere race as a factor." ***Id*. at 15; *see also id*. at 7** ("again, . . . you cannot create two legally sufficient BVAP congressional districts"). The State thereby admitted that it could not create two majority-minority districts without violating the Constitution.

The State also addressed the plaintiffs' proposed maps, which created majority-African American districts composed of African American voters in cities 152 and 157 miles apart. Citing these statistics, the State admitted that the districts were not compact. ***Id*. at 12**. Soon after, however, in SB8, the State created majority-African American districts with African American voters in cities at least 230 miles apart. **Ex. A at 26**.

Neither the district court nor the United States Court of Appeals for the Fifth Circuit ever issued a final order on the merits.

**III. Louisiana rushed to pass a new congressional redistricting map.**

The Attorney General, who had litigated on behalf of Louisiana, was elected Governor and assumed his new office on January 8, 2024. **Ex. I, J**. On that very day, he called for the legislative special session to focus on redistricting. **Ex. I, J**. A week later, the Governor opened the session by calling upon the Legislature to perform "[a] job that our own laws direct us to complete" and "a job that our individual oaths promised we would perform." **Ex. K, L**. At the beginning of the session, on January 15, 2024, Senator Glen Womack introduced SB8. **Ex. L, M**. Four days later, it passed both Houses, and the Governor voiced his approval. **Ex. L, N, O**. The following Monday, he signed it into law. **Ex. L**.

**IV. SB8 segregated voters based on race.**

SB8 repealed the prior redistricting law—which had been effective for the 2022 election—and enacted a new one. **Ex. N**. It created two majority-African American districts, Districts 2 and 6, and four majority-non-African American districts, Districts 1, 3, 4, and 5. **Ex. Q**. While all district lines were redrawn, the biggest change was to District 6. **Ex. A, P, Q**. It saw a 30% increase in African American voters, and a proportionate decrease in non-African American voters. **Ex. A, F, Q**. SB8 packed non-African American voters predominantly into District 1, 3, 4, and 5; as a result, majorities they held in these districts became massive super-majorities. **Ex. A, F, Q**.

SB8 drew Districts 6 and 2's tendrils specifically to capture areas with large numbers of African American voters. **Ex. A at 23**; **Ex. P, S-CC**. District 6, for example, stretches in a slash mark from the top northwest corner of the State in Shreveport, diagonally to central Alexandria, and then further down to Baton Rouge in the southeast. **Ex. A, P**. Midway, it abruptly detours even further south to Lafayette in the heart of Acadiana solely to pick up African American voters. **Ex. A, P**. These are all areas with high numbers of African American voters. **Ex. A at 11, 22-23**.

**V. Lawmakers admitted they intentionally drew districts along race-based lines.**

Shortly after the Governor called the special session, legislators made clear that their purpose was to somehow draw two African American-majority districts. Louisiana Representative Matthew Willard, for example, told the press: "[W]e look forward to beginning that redistricting session and walking away with two majority-minority African-American congressional districts." **Ex. DD**. He also told the public: "We'll be doing everything we can to make sure that we are not diluting the voices of Black voters in Louisiana and to get those two majority-minority seats." **Ex. EE**. Rep. Willard had recently received a new leadership role in the House as the chair of the House Democratic Caucus, where in his words, he "lead[s] the caucus of 32 members." **Ex. DD**.

An influential voice, U.S. Representative Troy Carter, the Congressman for District 2, made similar comments. **Ex. FF**. From beginning to end, his voice was especially important for SB8's passage. Later, just before the vote for SB8's final passage, his remarks were read on the Senate floor. Louisiana State Senate, *Senate Chamber 1ES Day 3*, at 26:00-27:00 (Jan. 17, 2024), https://senate.la.gov/s_video/VideoArchivePlayer.aspx?v=senate/2024/01/011724SCHAMB [hereinafter Senate Archive].

During SB8's third reading and final passage, several Senators spoke on the bill. Sen. Womack opened the discussion by presenting SB8 and answering legislators' questions. He said SB8 intentionally created "two congressional districts with a majority of Black voters." *Id*. at 8:47-8:54. He went on to discuss "the boundaries of District 2 and District 6 on your map," and emphasized that both were "over 50% Black voting age population." *Id*. at 9:20-9:35. He went on to state:

> Given the State's current demographics, there is not enough high Black population in the Southeast portion of Louisiana to create two majority Black districts and to also comply with the U.S. Constitution's one-person one-vote requirement. That is the reason why District 2 is drawn around Orleans parish while District 6 includes the Black population of East Baton Rouge Parish and travels up the I-49 corridor to include Black population in Shreveport.

*Id*. at 9:35-10:00. Sen. Womack repeatedly referred to the 250 miles between Baton Rouge and Shreveport in District 6 as merely a "corridor." *Id*. at 9:55-10:00, 12:50-12:55.

Sen. Womack repeated throughout his remarks that his primary goal in drafting SB8 was to create two majority-African American districts. He repeatedly referred to District 2 and District 6 as the "minority" or "Black" districts. *Id*. at 9:00-10:40, 16:35-16:43, 18:15.

In an important exchange, Sen. Womack disavowed that he had complied with traditional redistricting criteria. Sen. Jay Morris first asked Sen. Womack about the two majority-minority districts: "Among the factors that you considered, was the community of interest of the district

something that was considered in coming up with this version of the map that we have before us? . . . You didn't consider the community of interests of people having something in common with one another within the district?" *Id*. at 11:10-11:53. Sen. Womack then responded: "No, I didn't because it was, we had to draw two districts and that's the only way we could get two districts . . . ." *Id*. at 11:54-12:05. Sen. Womack also denied that he considered agriculture as a community of interest in District 6. *Id*. at 12:09-12:48.

Sen. Morris also asked Sen. Womack when referring to District 6: "Would you say the heart of the district is Northeast Louisiana, North Central Louisiana?" *Id*. at 12:50-13:05. Sen. Womack responded: "I wouldn't say the heart of that district is that way." *Id*. at 13:05-13:20. He went on to state District 6 simply "had to be drawn like it had to be drawn to pick that up." *Id*. at 13:05-13:20. Sen. Morris asked again: "So is there a heart of the district?" *Id*. at 13:20-13:25. Sen. Womack said: "I don't think it has a heart of the district." *Id*. at 13:25-13:35. Sen. Womack recognized there was no tie or common interest between the district's northern and southern regions. Race was the only reason it extended into far-flung regions of Louisiana.

Sen. Womack, sympathizing with a colleague's concerns, admitted: "Where we had to draw two minority districts, that's the way the numbers worked out. You've worked with redistricting before and you have to work everyone around that the best you can." *Id*. at 18:08-18:30.

Sen. Gary Carter next raised concerns about the "current African American voting age population in District 2" because it was now only "51%." *Id*. at 24:30-25:10. He had "serious concerns" with whether "District 2 continues to perform as an African American district." *Id*. at 25:10-25:25. But despite those concerns about African American "perform[ance]" in District 2, he supported the legislation. *Id*. In making these comments, Sen. Carter demonstrated that he was especially concerned about ensuring a certain percentage of the population was African American

in District 2. Sen. Carter also read and endorsed a statement from Congressman Troy Carter, who currently represents District 2 in the U.S. House of Representatives. He said: “My dear friends and colleagues, as I said on the steps of the Capitol, I will work with anyone who wants to create two majority-minority districts. I am not married to any one map. I have worked tirelessly to create two majority-minority districts that perform. That’s how I know that there may be better ways to craft both of these districts. There are multiple maps that haven’t been reviewed at all. However, the Womack map creates two majority-minority districts and therefore I am supportive of it, and I urge my former colleagues and friends to vote for it while trying to make both districts stronger with appropriate amendment. We do not want to jeopardize this rare opportunity to give African American voters the equal representation they rightly deserve.” *Id*. at 26:00-27:00.

Sen. Royce Duplessis affirmed his intent that SB8 “was about one-third of this State going underrepresented for too long.” *Id*. at 33:00-34:15. “So I think it’s important that we keep the focus on why we’re here today.” *Id*. at 34:15-34:35. His reference to one-third of the State was a reference to the African American population. He went on to state: “Just like Senator Carter, I’m not thrilled with what’s happening in District 2 and the way it’s lowering the numbers,” referring to the numbers of African American voters Sen. Carter discussed. *Id*. at 34:40-34:52. Sen. Duplessis discussed how he had created a map with Sen. Price that “we thought performed better.” *Id*. at 34:52-35:00. He stated he would support SB8 “because he thought it was time to give people of this State fair representation.” *Id*. at 35:25-35:32.

Sen. Thomas Pressly rose in opposition, stating that Northwest Louisiana was “unique from the rest of our State, and I believe that commonalities of interest are important.” *Id*. at 35:55-36:40. He stated: “I cannot support a map that puts Caddo Parish and portions of my district, which is over 220 miles from here, in a district that will be represented by someone in East Baton Rouge

Parish that may or may not have ever even been to Northwest Louisiana and certainly doesn't understand the rich culture, rich important uniqueness of our area of the State." *Id*. at 36:55-37:23. He went on: "When we look at Louisiana we often talk about North and South. And that division is true. It's real. I think all of us acknowledge that. The I-10 corridor has unique needs. When we think of the challenges you face with storms, often you think of hurricanes. In North Louisiana we think of tornadoes and ice storms. When you look at the important regions of our States and the diverse industries that we have . . . that is something that we must keep in mind as we continue through this process." *Id*. at 37:23-38:14. He said: "I am concerned with the important part of this State—Northwest Louisiana—not having the same member of Congress." *Id*. at 38:14-38:29. He said it made no sense to create two congressional districts and draw District 6 and District 4 "along a line that's based purely on race." *Id*. at 38:29-38:40.

SB8 passed the Senate on January 17, 2024, by a vote of 27-11. **Ex. L**. That same day, it was presented in the House and assigned to committee. ***Id.*** Two days later, Rep. Beau Beaullieu, its sponsor, presented SB8 to the House for debate and final passage. ***Id.*** In his opening remarks, Rep. Beaullieu stated that SB8 created "two congressional districts with a majority of Black voters." Louisiana State House of Representatives, House Chamber Day 5, 1ES – SINE DIE, at 2:48:25-2:48:31 (Jan. 19, 2024), https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/0119_24_1ES_Day5 [hereinafter House Archive]. Like Sen. Womack, he discussed "the boundaries for District 2 and District 6," and emphasized that "both" "are over 50% Black voting age population or BVAP." *Id*. at 2:49:00-2:49:13. Like Sen. Womack, he went on to admit:

> Given the State's current demographics, there is not a high enough Black population in the Southeast portion of Louisiana to create two majority Black districts and to also comply with the U.S. Constitution's one-vote one-person requirement. That is the reason why District 2 is drawn around Orleans Parish, why District 6 includes

> the Black population of East Baton Rouge Parish and travels up the I-49 corridor and the Red River to include Black population in Shreveport.

*Id*. at 2:49:19-2:49:49.

Rep. C. Denise Marcelle agreed that the goal was to get "a second congressional district." *Id*. at 2:43:25-2:43:30. The only colleague to question Rep. Beaullieu confirmed this. When Rep. Beryl Amedee asked, "Is this bill intended to create another Black district?" Rep. Beaullieu responded: "Yes, ma'am." *Id*. at 2:51:00-2:51:17.

Rep. Mike Bayham then rose in opposition, declaring that "St. Bernhard [Parish] has never been split into two congressional districts." *Id*. at 2:52:07-2:52:10. He continued:

> Looking at these precincts, and I know every precinct, I've campaigned in every precinct in St. Bernhard, we have two precincts, for example, that are in the second congressional district. One, Precinct 24, gave President Trump 75% of the vote. Precinct 25 gave President Trump 69% of the vote. Those are in the second district. And the first district is Precinct 44 which gave President Biden 83% of the vote. Precinct 45 gave President Biden 85% of the vote. It seems like these precincts were just thrown together like a mechanical claw machine just grabbing people and dropping them off.

*Id*. at 2:52:17-2:23:05. St. Bernhard Parish is divided between District 1 and 2. Rep. Bayham concluded: "We are being told that we have to redraw all of this in a period of less than eight days. That is not how you make sausage. That's how you make a mess. I cannot in good conscience vote for this bill that divides my community and I will stand by that for my community." *Id*. at 2:53:10-2:53:33. No other representatives spoke. *Id*.

SB8 passed the House by a vote of 86-16 on January 19, 2024. **Ex. L**. The same day, it returned to the Senate with amendments, where it passed by a vote of 27-11, and went to the Governor's desk. **Ex. L**. The Governor publicly approved it and signed it into law the following Monday, January 22, 2024, and it became immediately effective. **Ex. L, N, O**.

**VI. Plaintiffs filed this lawsuit.**

On January 31, 2024, Plaintiffs, voters from all six of the newly enacted congressional districts who plan to vote in the 2024 congressional election, sued the Louisiana Secretary of State in her official capacity under 42 U.S.C. § 1983, challenging the newly enacted congressional districts as unconstitutional under the Fourteenth and Fifteenth Amendments and seeking declaratory and injunctive relief. **Dkt. 1; Ex. GG-RR**. Plaintiffs now request a preliminary injunction, asking this Court to stop the irreparable harm and violation of their constitutional rights and to institute a new map to remedy these constitutional violations.

## ARGUMENT

Plaintiffs "seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) there is a 'substantial threat' they will suffer an 'irreparable injury' otherwise, (3) the potential injury 'outweighs any harm that will result' to the other side, and (4) an injunction will not 'disserve the public interest.'" *Missouri v. Biden*, 83 F.4th 350, 373 (5th Cir. 2023) (quoting *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018)). Plaintiffs can establish all four factors, and they respectfully request the Court to enter an injunction to stop the use of SB8 and institute Plaintiffs' proposed remedial map.

**I. Plaintiffs are likely to prevail on the merits.**

Plaintiffs are likely to succeed on the merits of both Count I and II. **Dkt. 1.**

**a. *Hays* decides this case.**

*Hays* "presents us with what we in Louisiana call a 'Goose' case," meaning it is almost factually identical to the case before this Court today. *Hays*, 936 F. Supp. at 368. Louisiana is right back where it was 30 years ago. Like the slash district of 1993, District 6 in SB8 today "is approximately 250 miles long." *Id*. "The District thinly links minority neighborhoods of several

municipalities from Shreveport in the northwest to Baton Rouge in the southeast (with intermittent stops along the way at Alexandria, Lafayette, and other municipalities), thereby artificially fusing numerous and diverse cultures, each with its unique identity, history, economy, religious preference, and other such interests." *Id*.

In 1993, as now, the Legislature's racial gerrymandering was not confined to one district. *Cf. id*. at 364 n.17. Abutting districts received super-majority non-African American populations and "disproportionately small" African American populations, thereby "minimiz[ing] the influence" of those African American voters in the super-majority districts. *Cf. id*.

There, as here, there is not only circumstantial evidence of intentional racial segregation based on the map—there is *direct evidence* of statements from legislators in *both* chambers, made as SB8 was being passed, that their intent was to create racially gerrymandered districts. *Cf. id*. at 368-69. In 1993, as now, this is the State's *second* attempt to create a congressional map based on one Census in the face of an impending congressional election. *Cf. id*. at 364.

Finally, there, as here, this Court cannot remedy the map by ordering yet another do-over. *Cf. id*. at 371-72. Election procedures start too soon, and the likelihood of another constitutional violation is too high. History is repeating itself, and Louisiana must answer for its persistent unconstitutional actions. The State failed to create a redistricting map thirty years ago and has already failed twice this census cycle. How many more years will it take for these unconstitutional racial gerrymanders to cease? Absent action from this Court, there is no end in sight to this madness. Like this Court did thirty years ago, the Court must issue its own map. *Cf. id*. at 371-72.

**b. Plaintiffs are likely to succeed on Count I.**

Plaintiffs are likely to succeed on Count I, racial gerrymandering in violation of the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment provides: "No

State shall . . . deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause forbids States from racial gerrymandering—that is, "separat[ing] its citizens into different voting districts on the basis of race." *Miller*, 515 U.S. at 911. That is because "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* (quoting *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 602 (1990) (O'Connor, J., dissenting)). To protect this guarantee, race-based redistricting is subject to strict scrutiny. *Bethune-Hill v. Va. State Bd. of Elecs*., 580 U.S. 178, 187 (2017).

To trigger strict scrutiny, plaintiffs must first demonstrate that "race was the predominant factor" behind redistricting decisions. *Id*. Then, the burden shifts to the State to satisfy strict scrutiny, the "most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920. The State can only meet this "rigorous and exacting standard" if it can prove both that it has a compelling interest in segregating voters based on race and that its racially drawn map is narrowly tailored to achieve that interest. *Id.*

**i. Race was the predominant purpose behind the State's redistricting.**

To show that race predominated in the State's calculus, Plaintiffs must show that the State subordinated other traditional redistricting factors—such as compactness, contiguity, respect for communities of interest, natural geographic boundaries, and parish lines—to racial considerations. *Cooper v. Harris*, 581 U.S. 285 (2017); *Allen v. Milligan*, 599 U.S. 1, 35 (2023).

Plaintiffs can rely on "circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose" or a mix of both to show race was the predominant factor behind the Legislature's districting decisions. *Bethune-Hill*, 580 U.S. at 187. Plaintiffs do not need to present a specific type of direct or circumstantial evidence. *Cooper*, 581

U.S. at 319 n.4. Here, Plaintiffs have presented sufficient direct and circumstantial evidence that race was not only the State's predominant purpose behind SB8—race was the State's sole purpose.

**1. Direct Evidence**

First, Plaintiffs have presented direct evidence "that the State's [decisionmakers] purposefully established a racial target." *Cooper*, 581 U.S. at 299. SB8's author, sponsor, and other lawmakers expressly stated that attaining a certain racial percentage within the districts was the nonnegotiable goal. *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 906–07 (1996). The legislators "were not coy in expressing that goal" and instead "repeatedly told their colleagues that [the two districts] had to be majority-minority." *Cooper*, 581 U.S. at 299. Both SB8 author Sen. Womack and sponsor Rep. Beaullieu separately stated that the goal was to create "two congressional districts with a majority of Black voters." Senate Archive, *supra*; House Archive, *supra*. They claimed they drew "the boundaries for District 2 and District 6" to include "over 50% Black voting age population." Senate Archive, *supra*; House Archive, *supra*. They said they drew solely with that goal in mind:

> Given the State's current demographics, there is not a high enough Black population in the Southeast portion of Louisiana to create two majority Black districts and to also comply with the U.S. Constitution's one-vote one-person requirement. *That is the reason why* District 2 is drawn around Orleans Parish, *why* District 6 includes the Black population of East Baton Rouge Parish and travels up the I-49 corridor and the Red River to include Black population in Shreveport.

Senate Archive, *supra* (emphasis added); *see also* House Archive, *supra*. The one question Rep. Beaullieu was asked after presenting SB8 was: "Is this bill intended to create another Black district?" He answered: "Yes." House Archive, *supra*.

Other lawmakers expressed that the goal was to reach a threshold majority of African American voters in two districts. Sen. Duplessis called it the "focus of why we're here today." *Id*. Sen. Carter, for example, stated that he was concerned about District 2 only having a "51%" African American majority, but because the district reached the threshold majority, he approved it.

Senate Archive, *supra*. Sen. Duplessis expressed the same sentiment about "the numbers." *Id*. Sen. Carter relayed Congressman Carter's statement that the singular goal was to create "two majority-minority districts." *Id*. Sen. Carter and Sen. Duplessis discussed the importance of how District 2 would "perform" as an African American majority district. *Id*. Rep. Marcelle discussed the goal to get "a second congressional district." House Archive, *supra*.

Lawmakers made clear that they did not consider traditional redistricting criteria when fixing these racial quotas. In fact, Sen. Womack disavowed that he had complied with traditional redistricting criteria when drafting SB8. Sen. Jay Morris asked Sen. Womack about the two majority-minority districts: "Among the factors that you considered, was the community of interest of the district something that was considered in coming up with this version of the map that we have before us? . . . You didn't consider the community of interests of people having something in common with one another within the district?" Senate Archive, *supra*, at 11:10-11:53. Sen. Womack responded: "No, I didn't because it was, we had to draw two districts and that's the only way we could get two districts . . . ." *Id*. at 11:54-12:05; *see also id*. at 12:09-12:48. Sen. Womack repeatedly referred to the hundreds of miles between Baton Rouge and Shreveport in District 6 as merely a "corridor." *Id*. at 9:55-10:00, 12:50-12:55. He also admitted: "I don't think it has a heart of the district." *Id*. at 13:25-13:35. District 6, he said, simply "had to be drawn like it had to be drawn to pick that up," referring to African American voters in Northern Louisiana. *Id*. at 13:05-13:20. These remarks show the Legislature found no tie or common interest between the district's northern region and its southeastern and Acadiana regions. When Sen. Morris raised traditional redistricting criteria concerns, Sen. Womack sympathized but said: "Where we had to draw two minority districts, that's the way the numbers worked out. You've worked with redistricting before and you have to work everyone around that the best you can." *Id*. at 18:08-18:30.

Neither Sen. Womack nor Rep. Beaullieu (the two sponsors) mentioned compactness in their discussions. It was wholly absent from every proponents' discussion of the bill. Only critics flagged compactness as a special concern. Both sponsors acknowledged the odd shape of District 6 when addressing "why" it narrowly "travels up the I-49 corridor and the Red River." Senate Archive, *supra*.; House Archive, *supra*.

Like the two sponsors, other key legislators admitted that SB8 was based on race, not traditional redistricting criteria. Sen. Pressly stated that the line between District 4 and District 6 was "purely based on race," and did not account for the "commonalities of interest" of people in Northwest Louisiana and the "unique," "rich culture," "industries," and even natural disasters that distinguished the region from the rest of the State. Senate Archive, *supra*. Rep. Bayham also raised concerns about the failure to abide by traditional redistricting criteria. He said the divide between voters in Districts 1 and 2 did not even split on partisan lines. Rather the line-drawing seemed "like a mechanical claw machine just grabbing people and dropping them off." House Archive, *supra*. When Sen. Morris asked whether "communities of interest" were considered, Sen. Womack answered negatively. Senate Archive, *supra*. Traditional redistricting factors were disregarded.

Even if the State had considered race-neutral factors, the record reveals that those "considerations only came into play *only after* the race-based decision had been made." *Bethune-Hill*, 580 U.S. at 189 (quotation omitted) (emphasis added). Race predominated in the decision.

The State also conceded previously that the State could not comply with traditional redistricting criteria by creating two majority-African American districts. *Cf. Miller*, 515 U.S. at 919 (noting that an attorney general's objection to creating "three majority-black districts on the ground that to do so the State would have to 'violate all reasonable standards of compactness and contiguity'" was "powerful evidence that the legislature subordinated traditional districting

principles to race when it ultimately enacted a plan creating three majority-black districts"). Speaking on behalf of the State while serving as Attorney General, Governor Landry said it was "impossible" for the State to create a second majority-African American district without violating the U.S. Constitution and traditional redistricting criteria, "without impermissibly resorting to mere race as a factor" and without engaging in an unconstitutional "racial gerrymander." **Ex. H at 13-15**. These filings from "a state official," not to mention one of the key lawmakers in enacting SB8, is "powerful evidence" that the State "subordinated traditional districting principles to race when it ultimately enacted a plan creating [the] majority-black districts." *Miller*, 515 U.S. at 919.

**2. Circumstantial Evidence**

Even without this abundant direct evidence, plentiful circumstantial evidence establishes that the State did not abide by traditional redistricting criteria, including compactness, contiguity, and cohesiveness of communities of interest, but instead drew all six districts based on race.

The State engaged in racial gerrymandering across all six districts, just as it did in all seven districts in 1993. *Cf. Hays*, 936 F. Supp. at 364 n.17 (noting that the racial gerrymandering pervaded in all districts because the Legislature pushed predominately African American "neighborhoods into the majority-minority district" and non-African American ones into the adjoining districts, which required "splitting parishes, splitting precincts, splitting metropolitan areas, and combining distant and disparate geographical, economic, social, religious and cultural groups and areas"). "Districts share borders, after all, and a legislature may pursue a common redistricting policy toward multiple districts." *Bethune-Hill*, 580 U.S. at 192.

First, the very shape of the districts show that the State simply tried to "connect the dots" of African American voters in Districts 2 and 6 and exclude as many African American voters in Districts 1, 3, 4, and 5. **Ex. A at 22-23**. The largest concentrations of African American voters are

in New Orleans, Baton Rouge, and Shreveport. ***Id.* at 22**. The district lines show the State's purpose was to pack as many African American voters as possible into Districts 2 and 6. ***Id.* at 23**.




***Id.*** District 6 stretches just far enough to reach African American voters in Northwest Shreveport and Southeast Baton Rouge, not one block further. District 6 takes a sudden detour from its narrow diagonal trek to barely encircle African American voters in Lafayette in the heart of District 3 and Acadiana—a distinct region of Louisiana. A closer view of the lines drawn around the major pockets of African American voters in District 6 demonstrates the intentional gerrymandering.

Shreveport Baton Rouge Lafayette Alexandria




***Id.*** Other areas with high African American populations, for example, De Soto Parish, were also exactly carved in. ***Id.* at 23-26; Ex. W**. The legislature's precise tracing around the dots to include as many African American voters as possible and as few non-African American voters as possible demonstrates that it intentionally drew these lines purely based on race.

Second, all the districts are "narrow and bizarrely shaped," demonstrating that the singular goal was to segregate voters by race. *Milligan*, 599 U.S. at 28 (quoting *Bush v. Vera*, 517 U.S. 952, 965 (1996) (plurality)).

District 6, for example, is a narrow diagonal line that runs along the Interstate 49 corridor. Compared to North Carolina's infamous slash district that stretched approximately 160 miles along the Interstate 85 corridor and was struck down as an unconstitutional racial gerrymander by the Supreme Court in *Shaw*, this is an easy case. *Id.* at 635. District 6 stretches at least 230 miles between its appendages in Shreveport and Baton Rouge, cities in opposite corners of the State. **Ex. A at 26**. *Cf. Hays*, 936 F. Supp. at 370 (It "meanders for roughly 250 miles from the northwestern corner of the state to the southeast, dividing parishes and municipalities while surgically agglomerating pockets of minority populations along the way."). It then plunges South to the heart of Cajun Country in Lafayette to encompass African American voters there. In Rapides Parish, it dwindles to a width of 2.7 miles before continuing its snake upward toward Shreveport. **Ex. A at 26**. In DeSoto Parish, it is only 1.9 miles wide. ***Id.***; *cf. Miller*, 515 U.S. at 917 ("[I]t was 'exceedingly obvious' from the shape of the Eleventh District, together with the relevant racial demographics, that the drawing of narrow land bridges to incorporate within the district outlying appendages containing nearly 80% of the district's total black population was a deliberate attempt to bring black populations into the district."). District 6's appendages are also sinuous, some just a few blocks wide. **Ex. A at 24-26**. Each twist and turn tightly encircles African American voters.

Districts 5 and 4 are equally bizarre. Like a crooked hourglass, District 5's massive northern and southern portions touch only at a narrow impassible "land bridge[]" demonstrating that this district was an intentional racial gerrymander. *Miller v. Johnson*, 515 U.S. 900, 917 (1995). District

4 is nearly halved by District 6; it extends from northern to southern Louisiana, despite the diverging interests of these two regions. **Ex. P**.

It would be difficult to draw less compact districts. *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 646–48 (1993). District 6 has a compactness score of 0.05, with 0 measuring total non-compactness and 1, total compactness. **Ex. A at 16-17**. Both Districts 4 and 5 score 0.08. ***Id.* at 17**. District 2 scores just 0.11. ***Id.*** District 1 and District 3 score 0.16 and 0.19, respectively. ***Id.***

The districts also slice and divide many parishes. *Bush v. Vera*, 517 U.S. 952, 974 (1996) (plurality opinion); *Cooper*, 581 U.S. at 301 n.3 (finding a "conflict with traditional redistricting principles" from "split[] numerous counties and precincts"). The plan split (16) parishes into thirty-four (34) parts. ***Id.* at 10, 14**. The splits affected 2,930,650 people who reside in all districts, or 63% of the State's total population. ***Id.* at 10, 14**.

The districts also separate communities of interest and unite disparate groups of people with nothing in common apart from race. Communities of interest are often defined geographically, such as by parishes, cities, and towns. ***Id.* at 6-7**. They also cluster around groups with a common culture, values, economy, religion, or local tradition. ***Id.* at 7**. Importantly, communities of interest are determined by the people. ***Id.* at 5**. Here, the Legislature ignored traditional communities of interest and instead presumed that African American voters all share the same interests and issues because of their race. The Legislature thereby created and defined its own community of interest based solely on racial characteristics. Cities as culturally and economically diverse as Shreveport, Alexandria, Baton Rouge, and Lafayette are linked together only based on race. Senate Archive, *supra* (Sen. Pressly); **Ex. MM**; *cf. Miller*, 515 U.S. at 908-09 (noting that one district "centered around four discrete, widely spaced urban centers that ha[d] absolutely nothing to do with each other, and stretch[ed] the district hundreds of miles across rural counties and narrow swamp

corridors" was a geographic "monstrosity"). The rural areas between these cities are treated as mere land bridges to reach pockets of African American voters, rather than important areas with their own unique ideals, values, cultures, and economic needs. **Ex. A at 21-23, 26**. The disparate needs of Northern and Southern Louisiana are especially stark. Among other things, the South faces hurricanes; the North deals with tornadoes and ice storms. Senate Archive, *supra* (Sen. Pressly). These areas also have divergent industries, agriculture, and economies. *Id.*; **Ex. MM**.

Not only does the map unite different communities of interest, but it also *divides* a larger number of communities of interest. SB8 split 83 municipalities, or over 1.55 million people, as well as dozens of parishes. **Ex. A at 15**. One example is where District 6 carves out a long, narrow peninsula in District 4 even though the cultural and industrial unity of people in Caddo Parish and Northwest Louisiana is incredibly strong. Senate Archive, *supra* (Sen. Pressly).

Additionally, the dramatic changes in percentages of voters by race across districts demonstrates that these fluctuations were not random—they were intentional choices to segregate voters based on race. *Cooper*, 581 U.S. at 310. The chart below records the percentage of African American and non-African American VAP for each district under the 2022 map and the current map, as enacted under SB8. **Ex. F, Q**.

| District | 2022 African American | 2022 Non-African American | SB8 African American | SB8 Non-African American |
|---|---|---|---|---|
| 1 | 13.482% | 86.518% | 12.692% | 87.308% |
| 2 | 58.650% | 41.350% | 51.007% | 48.993% |
| 3 | 24.627% | 75.373% | 22.568% | 77.432% |
| 4 | 33.820% | 66.180% | 20.579% | 79.421% |
| 5 | 32.913% | 67.087% | 26.958% | 73.042% |

| 6 | 23.861% | 76.139% | 53.990% | 46.010% |
|---|---|---|---|---|

In all four majority non-African American districts, racial disparities grew more dramatic. For example, in District 4, the percentage of non-African American voters shot up 13% and the percentage of African American voters decreased proportionally, creating a severe gap between non-African American and African American voters. *Cf. Cooper*, 581 U.S. at 310 (finding that an increase in BVAP of less than 7% was a "sizable jump"). The gap between African American and non-African American voters also grew in Districts 1, 3, and 5. Now all four majority-non-African American districts are super-majority districts, with non-African American voters holding roughly 87%, 79%, 77%, and 73% of the VAP in every single one, and African American voters comprising only 12%, 22%, 20% and 27% of those districts. The State's goal was to create non-African American super-majorities and to exclude African American voters, "minimizing the *influence*" of African American voters in those districts. *Hays*, 936 F. Supp. at 365 n.17 ("Racial minority political influence in the resulting super-majority districts . . . is either lost or significantly diminished because office holders and office seekers no longer need to heed the voices of the minority residents . . . once their influence has been gerrymandered away.").

The changes in District 2 and District 6 also demonstrate the State's racial gerrymandering. District 6 was the most dramatic, swinging from a non-African American majority district to an African American majority district by decreasing and increasing those VAPs by 30%, over *four times greater* than the "sizable jump" observed by the Supreme Court in *Cooper v. Harris*. 581 U.S. at 311. District 2, where the African American population decreased, still demonstrates a racial gerrymander. There, the African American population decreased but held the majority at 51%, a number that both Sen. Carter and Sen. Duplessis noted as sufficient to create a majority-African American district. This choice was deliberate. *Cf. Cooper*, 581 U.S. at 311 (noting the

State's deliberate decision to increase a district's BVAP to 50.7% so African Americans would hold a majority indicated racial gerrymandering).

Finally, Plaintiffs have presented an alternative map, which "is helpful but not necessary to meet [their] burden" to show racial predominance. *Cooper*, 581 U.S. at 319. That map includes markedly more compact districts that actually trace communities of interest. **Ex. A. at 28**. At the same time, it retains the core of District 2, which has long elected African Americans around Orleans Parish and its environs. ***Id***.

**ii. The State's racial gerrymandering cannot survive this Court's strict scrutiny.**

Since Plaintiffs have satisfied their burden to show race predominated in the State's decision, the State has the burden to satisfy strict scrutiny, meaning the State must show it segregated voters based on race by drawing these districts in pursuit of a compelling state interest, and the resulting segregated districts were narrowly tailored to achieve that compelling interest. *Shaw II*, 517 U.S. at 908. This analysis proceeds in two steps.

First, the State must show it enacted these maps pursuant to a compelling state interest. Only if the State identifies a compelling interest may the State proceed to its second burden, the even more rigorous narrow tailoring requirement.

The Supreme Court has assumed (but never decided) that satisfaction of the Voting Rights Act of 1965, 52 U.S.C. § 10101 ("VRA") is a compelling interest. But to show the racially gerrymandered districts were narrowly tailored to satisfy the VRA without violating the Constitution, the State must present actual "evidence or analysis supporting [the] claim that the VRA *require*[*s*]" the districts as drawn on a district-by-district basis. *Wis. Legislature v. Wis. Elecs. Comm'n*, 595 U.S. 398, 403 (2022) (emphasis added); *see also Bethune-Hill v. Va. State Bd. of*

*Elecs.*, 580 U.S. 178, 191-92 (2017). Not any evidence or analysis suffices. The Supreme Court has required "a strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018) (citing *Bethune-Hill*, 580 U.S. at 191-92). Courts will not approve a racial gerrymander that proceeds on a legally mistaken view of the VRA. *Cooper*, 581 U.S. at 306. If the State relies on the VRA, its claim will fail for at least two reasons.

First, the State did not engage in "a strong . . . pre-enactment analysis with justifiable conclusions" before it segregated voters into race-based districts. *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). This analysis must be district-by-district. *Bethune-Hill*, 580 U.S. at 191. So even if the State was under the mistaken belief that it could create two majority-African American and four majority-non-African American districts and comply with traditional redistricting criteria, the State's failure to engage in a strong pre-enactment analysis with justifiable conclusions as to each of the specific districts enacted in SB8 dooms the State's case.

Second, the State proceeded on a mistaken understanding of the VRA. *Cooper*, 581 U.S. at 305. VRA Section 2 "never require[s] adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 30 (citation omitted); *see also Cooper*, 581 U.S. at 305; *Hays*, 936 F. Supp. at 370 ("[T]he VRA simply does not require the enactment of a second majority-minority district in Louisiana."). And even if these districts did not violate traditional criteria, VRA Section 2 never requires the State "to maximize the number of reasonably compact majority-minority districts." *Johnson v. DeGrandy*, 512 U.S. 997, 1022 (1994).

That's because the VRA should never compel a state to violate the Constitution, and a state's attempt to "concentrate[] a *dispersed* minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions" and create a "reapportionment plan that includes in one district individuals who

belong to the same race, *but who are otherwise separated by geographical and political boundaries*," presents "serious constitutional concerns." *Milligan*, 599 U.S. at 27 (quoting *Shaw I*, 509 U.S. at 647). VRA claims are rarely successful today because "minority populations' geographic diffusion" across States and integration of various racial groups often prevents creation of "an additional majority-minority district" that satisfies the compactness requirement. *Milligan*, 599 U.S. at 29. African Americans are a dispersed minority across the State of Louisiana. **Ex. A at 22**. The State's attempt to force this dispersed group into two districts fails constitutional scrutiny.

Additionally, the State has already conceded that it did not abide by traditional redistricting criteria. It admitted that after the 2020 Census, it is "impossible" that "a second majority-minority district can be drawn without impermissibly resorting to mere race as a factor," that any attempt to do so would be an unconstitutional "racial gerrymander," and that attempts to slice voters into districts that could create such a map demonstrate "the exact type of evidence of racial intent that dooms legislative action." **Ex. H. at 13-15**. These statements alone (even without legislators' countless statements that they ignored traditional criteria, *see* Senate Archive, *supra*; House Archive, *supra*) show that the State did not follow traditional criteria. *Miller*, 515 U.S. at 919. SB8 is simply not narrowly tailored to meet any alleged interest in complying with the VRA.

**c. Plaintiffs are likely to succeed on Count II.**

Plaintiffs are also likely to succeed on Count II—intentional discrimination in violation of the Fourteenth and Fifteenth Amendments. The Supreme Court has recently reiterated that the Equal Protection Clause forbids not just *Shaw*-style racial classifications, it prohibits *all* discrimination:

> These decisions reflect the "'core purpose' of the Equal Protection Clause: "do[ing] away with *all* governmentally imposed discrimination based on race." *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (footnote omitted)…

> Eliminating racial discrimination means eliminating *all of it*. And the Equal Protection Clause, we have accordingly held, applies "without regard to any differences of race, of color, or of nationality"—it is "*universal* in [its] application." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). For "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289–290 (1978) (opinion of Powell, J.). "If both are not accorded the same protection, then it is not equal." *Id*. at 290.

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206 (2023) (emphases added). The election context is no different.

The Fifteenth Amendment only reinforces these decisions in the election context, as it expressly prohibits discrimination between voters based on race and abridgement of voting rights based on race. *Gomillion v. Lightfoot*, 364 U.S. 339, 342 (1960); U.S. Const. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude."). The Fifteenth Amendment "right to vote" may "be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *LULAC v. Edwards Aquifer Auth*., 937 F.3d 457, 462 (5th Cir. 2019) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). In doing so, the "Fifteenth Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Gomillion*, 364 U.S. at 342 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)).

SB8 has discriminated against Plaintiffs based solely on race. Plaintiffs recognize that no group of voters is entitled to proportional representation under the U.S. Constitution, and the application of traditional race-neutral criteria may often result in the mathematical underrepresentation or overrepresentation of racial, religious, or political groups. But the Constitution clearly protects all racial groups from representational schemes which have as their sole purpose a discriminatory quota that imposes an intentional overrepresentation of voters of a

particular race over all other voters in a jurisdiction. *See Gomillion*, 364 U.S. 339.[3] A claim that an election scheme is based predominantly on such discriminatory racial intent and results in the intended harm is actionable under the Fourteenth and Fifteenth Amendments. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997); *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020).

As shown above, the legislators' statements alone prove discriminatory intent. Legislators admitted they intentionally drew these districts to create precisely two majority-African American districts, even while fully aware that this violated all traditional redistricting criteria and enforced a racial quota based on super-proportional representation at the expense of other voters. This cut the majority-non-African American districts from five to four. In doing so, the State sought to "*substantially disadvantage[] certain voters in their opportunity to influence the political process effectively*." *Shaw I*, 509 U.S. at 663 (White, J., dissenting). That intent alone sufficiently shows discrimination.

Circumstantial evidence also shows discriminatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). For example, the history of SB8, the whirlwind session that led to its passage, the special nature of the session announced on the Governor's first day in office, contemporaneous viewpoints expressed by SB8's key decisionmakers (discussed at length), and its known discriminatory impact all show that SB8 was passed with discriminatory intent. *Id*. at 266-68; *Fusilier*, 963 F.3d at 463. SB8 was created by means of an irregular procedure. It was the first legislative session after the Governor assumed office, it was a special session to focus exclusively on redistricting, and it was announced by the Governor on his very first day in

[3] Justice Stevens dissented in *Shaw* and *Miller* because he found the stereotyping harm in both to be insufficient, concluding that "[n]either in *Shaw* itself nor in the cases decided today has the Court coherently articulated what injury this cause of action is designed to redress." *Miller*, 515 U.S. at 929 (Stevens, J., dissenting). Justice Stevens explained that plaintiffs in those cases had made no showing of "vote dilution … to an identifiable group of voters" nor could they under the facts. *Id.* (Stevens, J., dissenting). Louisiana's current redistricting scheme obviates Justice Stevens's concerns about the missing harm in prior redistricting challenges.

office. SB8 was introduced, passed by both Chambers, and signed by the Governor in a matter of eight days. There was little debate, and the entire process was rushed to create two majority-African American districts and reduce the existing five majority-non-African American districts to four. While the Legislature had spent months travelling across the State and soliciting public input for the prior redistricting law, legislators did not even have time to inform their constituents about the redistricting bill or special session—much less ask their constituents for their opinions and provide proper representation on their behalf. *See* Senate Archive, *supra*, at 28:00-29:30.

Likewise, SB8 had a discriminatory impact and discriminatory effect on Plaintiffs. **Ex. GG-RR**. SB8 undoubtedly "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Here, as in *Gomillion*, SB8 imposes an obvious racial preference which hampers the ability of non-African American voters to engage in the typical compromises and influence that would exist in districts drawn consistent with traditional redistricting principles.

Here, the percentage of majority-minority gerrymandered districts compared to total districts is greater than the percentage of the minority's proportion of the citizen VAP. African Americans constitute a little more than 29% of the citizen VAP. The redistricting intentionally creates two majority-African American districts of the six districts, or slightly more than 33%. Although this gap is not large, the size of the gap is not the point. Instead, it is the intentional creation of the gap that works an injury.[4] Using a mandatory racial quota to not only approach, but to exceed, the African American share of the citizen VAP is an additional concrete harm to all non-

[4] To the extent any such intentional discrimination could ever be excused by means-end analysis, the State cannot meet strict scrutiny here for the reasons discussed in point I.A.

African American voters, amounting to the application of affirmative action in redistricting, unseen in previous racial gerrymandering cases.[5] *Cf. Students for Fair Admissions, Inc*., 600 U.S. 181.

**II. Plaintiffs will suffer irreparable injury absent injunctive relief.**

Plaintiffs have suffered and will suffer a loss of constitutional rights when they cast their ballots in the 2024 election. Such harm is irreparable without immediate equitable relief. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[T]he loss of constitutional freedoms . . . 'unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burn*s, 347 U.S. 373 (1976))); *see also Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024); *Opulent Life Church v. City of Holly Springs, Miss*., 697 F.3d 279, 294 (5th Cir. 2012); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F. 2d 328, 338 (5th Cir. unit B 1981); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom.*, *DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."). Racial gerrymandering and discriminatory voting laws create irreparable injuries to voters, requiring "immediate relief." *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986); *see also*, *e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *cf. Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997). After all, "once the election occurs, there can be no do-over and redress" for Plaintiffs. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). This Court must act now.

[5] The harm in *Shaw v. Reno* and all its progeny, including *Hays*, arises from stereotyping based on race and is felt by all voters in racially gerrymandered districts. That harm is present in this case as well. But in those earlier racial gerrymandering cases, the percentage of the challenged majority-minority gerrymandered districts compared to total districts was still less than the percentage of the minority's proportion of the citizen VAP. Here, the reverse is true. Thus, Plaintiffs experience an additional harm by virtue of their race.

**III. The balance of equities weighs in Plaintiffs' favor.**

The equities favor Plaintiffs. This racial gerrymander violates the constitutional rights of all Louisiana voters of all races who have been stereotyped and districted based on their race and presumed voting characteristics, masking their actual preferences and reducing their influence in their communities. *See Gomillion*, 364 U.S. 339. SB8 separates both sets of voters from their communities and puts them in districts with other voters hundreds of miles away, with whom they have little in common apart from race. **Ex. A, MM**. The result is they do not have the same power to appeal to their representatives—some of whom may have no knowledge of their region or culture. The harms to all voters go even deeper; when the State engages in race-based redistricting, it stereotypes all voters "as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Miller*, 515 U.S. at 912 (quoting *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 604 (1990) (O'Connor, J., dissenting)); *see also Shaw I*, 509 U.S. at 647; *Students for Fair Admissions*, 600 U.S. at 220-21 (quoting *Miller*, 515 U.S. at 911-12, and *Shaw I*, 509 U.S. at 647).

Compared to this, the State's interests are minimal. Any interest in enforcing a redistricting law that violates constitutional rights is "illegitimate." *See BST Holdings*, 17 F.4th at 618. That's especially true in the election context, given that elections are at the heart of democracy and meant to reflect the people's true democratic choice. Moreover, Plaintiffs' requested remedy gives Defendant adequate time to enforce the new map in advance of the 2024 congressional election.

**IV. The preliminary injunction does not weigh against the public interest.**

Finally, a preliminary injunction is in the public interest. *See Ingebrigtsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation"); *DeLeon*,

791 F.3d 619 ("[A] preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Prohibiting the Defendant Secretary from implementing SB8 during the pendency of this litigation before election processes begin would merely "freeze[] the status quo," precisely the purpose of a preliminary injunction. *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

**V. Conclusion: Plaintiffs are entitled to an injunction of SB8 and issuance of a new map.**

Because Plaintiffs are very likely to succeed on their claims, the remedy is clear: This Court should enjoin use of this map and issue one that remedies Plaintiffs' rights in advance of the election. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to [e]nsure that no further elections are conducted under the invalid plan."); *Louisiana v. United States,* 380 U.S. 145, 154 (1965) (noting that in the face of racial discrimination, a district court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future"); *United States v. Paradise*, 480 U.S. 149, 184 (1987) (noting it is within a district court's discretion to craft remedies for racial discrimination). Indeed, it would be unusual for a court to not take appropriate action to ensure no elections are conducted under an unconstitutional districting plan. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elecs. & Registration*, 361 F. Supp.3d 1296, 1305 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *Navajo Nation v. San Juan Cnty.*, 2:12- CV-00039, 2017 WL 6547635, at *19 (D. Utah Dec. 21, 2017), *aff'd*, 929 F.3d 1270 (10th Cir. 2019) (same).

Injunctive relief should be two-fold. First, the Court should strike down the current map as unconstitutional and enjoin Defendant Secretary of State Nancy Landry from enforcing it. Second, the Court should issue a remedial map for Defendant to use to qualify candidates and carry out the election. Plaintiffs are entitled to this requested relief under either Count I or Count II. Like *Hays*, the State's record here leaves no doubt that it would not follow traditional redistricting criteria and avoid intentional race-based discrimination by enacting a new map. *Hays*, 936 F. Supp. at 372; *see also Hays v. Louisiana*, 862 F. Supp. 119, 124-25 (W.D. La. 1994). Thus, Plaintiffs urge this Court to adopt Illustrative Plan 1. **Ex. A at 12**.

Dated this 7th day of February, 2024

Respectfully submitted,

**PAUL LOY HURD, APLC**
*/s/ Paul Loy Hurd*
Paul Loy Hurd
Louisiana Bar No. 13909
Paul Loy Hurd, APLC
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com
*Attorney for Plaintiffs*

**GRAVES GARRETT GREIM LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Pro Hac Vice Pending*
Jackson Tyler
Missouri Bar No. 73115
*Pro Hac Vice Pending*
Matthew Mueller
Missouri Bar No. 70263
*Pro Hac Vice Pending*
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I do hereby certify that, on this 7th day of February 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record. Additionally, copies of all pleadings and other papers filed in this action to date or to be presented to the Court at the hearing have been mailed to the adverse party.

*/s/ Paul Loy Hurd*
Paul Loy Hurd