# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF LOUISIANA

PHILLIP CALLAIS, *et al.*
PLAINTIFFS

C.A. No.

v.

NANCY LANDRY, in her
official capacity as Secretary
of State for Louisiana
DEFENDANT

-----------------------------------------------------------------

EXPERT REPORT OF

Michael C. Hefner

ON BEHALF OF PLAINTIFFS

February 5, 2024

**TABLE OF CONTENTS**

Introduction                ……………………………………………    3

Factual Background          ……………………………………………    4

Methodology                ……………………………………………    5

What Defines a Community of Interest    …………………….………    5

Preservation of Communities of Interest in Redistricting  ………    6

Parishes and Municipalities as Communities of Interest…..………    7

Parish Level ……………………………..…………………….    8

Municipal Level …………………………………………………    15

Compactness   …………………….…………………………………    16

Preservation of Core Districts  ……………………………………    18

Racial Considerations  …………………………………………    21

Conclusions      ………………………………………………..    27

Certification      ………………………………………………..    28

Appendix        ………………………………………………...    29

**EXPERT WITNESS REPORT OF MICHAEL C HEFNER**

## I.  Introduction

This report has been prepared at the request of Paul Loy Hurd, APLC and Graves Garrett Greim LLC, the firms representing the Plaintiffs in this complaint.  Geographic Planning & Demographic Services, LLC was retained by the law firms as an expert to determine the application of certain traditional redistricting criteria in the drafting of  the Enacted 2024 Congressional Plan as adopted by the Louisiana Legislature in January 2024.

My rate for this case is $325 per hour. I have testified previously in the cases of *Terrebonne Parish Branch NAACP, et. al v. Piyush Jindal*, CA No. 3:14-cv-69-JJB-SCR and *Keith Kishbaugh vs The City of Lafayette Government, Lafayette Parish Government, and Lafayette City-Parish Government and Theresa D. Thomas, et. al v. St. Martin Parish School Board.*  I have not published any publications within the past ten years.

I am an expert in demography and have been practicing in a professional capacity in that field since 1990. As a life-long resident of Louisiana, I am very familiar with the State of Louisiana and many of the parishes and communities within.  Since my early years, I have traveled to many of the various parts of the State leading bicycling tours as well as my own private cycling destinations. In my official capacity as a demographer and a specialist in redistricting, my work has taken me to most of the parishes and communities in the State.

Projects ranged from parish and regional housing studies, school attendance zone configurations, student assignment work for school desegregation cases, student population projection studies, site location analysis, private marketing studies, economic development studies, technical assistance with demographics and grant submissions, and numerous election district redistricting projects.  All those projects involved an intensive study of the areas being served.  The studies encompassed researching news articles, historical publications, demographics, community characteristics, and interviews with local citizens.  This level of research better prepared me for the work being done on behalf of the client and produced a quality product that was more responsive to their needs. That experience has well prepared me to serve as an expert witness in this case regarding communities of interest and other applicable redistricting criteria with the newly enacted Congressional  plan.

A full description of my qualifications is found in Appendix Exhibit 2 in accordance with 28 U.S.C. §1746, 26(a)(2)(B), the Fed. R. Civ. Proc. and Rules 702 and 703, the Fed R. of Ev.

## A.  Factual Background

On August 12, 2021, the U.S. Census Bureau released the PL 94-171 redistricting file based on the 2020 census.  The Louisiana Legislature then embarked upon a State-wide tour of each of the regions of the State to gather citizen input prior to convening the legislative session to take up State-wide and Congressional redistricting.

On or about February 18, 2022, the Legislature voted to approve the Congressional district plan under HB 1/SB 5 (HB1).  The Governor vetoed the plan stating that a second majority African American Congressional district needed to be created to match the African American State-wide proportionality.

The Legislature subsequently overrode the veto thus putting the HB1 Congressional plan in to effect.  The plan was then challenged, and the subsequent trial was suspended pending the decision of the U.S. Supreme Court in the Alabama Congressional Case.[1]

Upon that decision and after appeals before the 5th Circuit Court, the trial on the Louisiana plan was resumed.  The District Court imposed a deadline for the Louisiana Legislature to draft and approve a new plan that contained a second majority-minority African American congressional district.  Failure to do would cause the Court to draft its own plan.

During a special session called by newly elected Governor Jeffery Landry, the Louisiana Legislature adopted a new Congressional plan under Senate Bill 8 (SB8) that created a second majority-minority African American district out of Congressional District 6. After the new plan was signed into law by the Governor, the Plaintiffs then filed their complaint against the plan.

This report will analyze the effects of the new SB8 plan on communities of interest, district compactness, and the preservation of core districts.[2]  All three are redistricting criteria traditionally used for redistricting purposes.[3] The use of race in the SB8 plan will also be provided in the analysis.

---

[1] *Allen, Alabama Secretary of State, et. al. v Milligan, et. al.,* No. 21-1086, (U.S.S.C., June 8, 2023)

[2] Traditional redistricting criteria consist of: Compactness, Contiguity, Preservation of counties and other political subdivisions, Preservation of Communities of Interest, Preservation of Prior Core Districts, and avoid pairing of incumbents. In this report, there are no issues with Contiguity, One-Man One Vote, or Incumbency.

[3] The Louisiana Legislature set for rules for redistricting, among which are "that all plans shall respect the recognized political boundaries and natural geography of this state, to the extent practicable", and "In order to minimize voter confusion, due consideration shall be given to traditional district alignments". *Committee Rules for Redistricting*, Committee on House and Governmental Affairs, January 19, 2011.

4

### B.  Methodology

**Plan Review and Analysis**

The election plan was reviewed using the latest 2020 Census Data in the PL:94-171 file as released to Louisiana on August 12, 2021, for redistricting purposes.  Both the U.S. Department of Justice and the State of Louisiana specify this file to be used in the absence of any approved special census counts.

The precinct geography used for the plan review was based on the 2024 state-wide precincts in effect as of the time of the SB8 plan approval. This precinct file represented the latest precinct geography as per mergers and splits from parish governing authority redistricting.

Evaluations of the SB8 2024 Enrolled plan and the Illustrative Plan 1 submitted by the Plaintiffs were reviewed in the context of customary traditional redistricting criteria as described in Section 2 of the Voting Rights Act but more specifically to the charge: the preservation of communities of interest, compactness, and preservation of prior core districts.[4]  The use of race in the SB8 plan was charged as well. To provide additional comparisons, the HB1 2022 enacted plan was also reviewed.  That plan was in effect for the last Congressional election.

**Technical Specifications**

GIS Software:    Maptitude for Redistricting ver. 2023, Caliper Corporation.
                 ArcPro ver. 3.2.1, ESRI, Inc.

Election Data:   Louisiana Secretary of State Election databases.

Base Maps:       U.S. Census Bureau TIGER 2020 Line File, Enhanced Caliper Street file, precinct geography updated as found on the Louisiana Legislative Website

## II.  What Defines a Community of Interest?

Communities of interest are formed by people, often within a geographic or a defined area, who self-identify themselves with others who share similar traits based on political issues, culture, economic, occupation, religion, or local traditions.[5] That commonality results in interests and concerns that affect the group as a whole.

---

[4] The Louisiana Legislature adopted Joint Rule 21 and HCR 90 of the 2021 Regular Legislative Session that established the redistricting criteria to be used for State-level redistricting purposes. https://legiscan.com/LA/text/HCR90/2021.

[5] Duda, Jeremy "The Redistricting Conundrum: Just What is a Community of Interest?", AZ Mirror, December 2, 2021. https://www.azmirror.com/2021/12/03/the-redistricting-conundrum-just-what-is-a-community-of-interest/

Because of that self-identification, there is no set standard for a community of interest. Criteria that bind people together into a cohesive unit vary from one group to another as are set by the group. The specificity of the issues shared by a community of interest also can vary by level of geography.

As an example, parents of students attending a particular high school can constitute a community of interest centered around school issues and may be very specific.  This would be an important consideration for a school board redistricting plan. Larger geographic areas, such as precincts, may have communities that are connected by issues in their neighborhood and surrounding areas.  In fact, precincts often encompass neighboring neighborhoods within the specific geographic boundary of a precinct, and they gather to vote at a specific location. Aggregation of precincts that share common interests is a consideration for parish-level redistricting.

Likewise, parish-level geography may take a more generalized approach to issues that affect the parish itself. A collection of parishes constitutes a region that may have in common issues at a state-wide or national interest. The larger the geography, the broader and  more generalized are the cohesive characteristics that bind people into a community of interest.

A good example of a regional community of interest is where parishes that share similar political concerns are grouped together into a Congressional district.  That allows a more homogenous representation of that area in Congress when it comes to national issues and gives voice to those residents.[6]  Many states formally recognize the importance of maintaining communities of interest when it comes to redrawing the election districts after each census.[7]  While Louisiana does not have an adopted definition when it comes to communities of interest, many other states do.[8]  A review of those guidelines helps illuminate the definition and importance of communities of interest.[9]

## III.   Preservation of Communities of Interest in Redistricting

Preservation of communities of interest is one of the seven traditional redistricting criteria used when designing election districts. It is closely related to the compactness and preservation of core districts redistricting criteria. From a representation perspective, keeping communities of interest together allows

---

[6] Buchler, Justin. "Competition, representation, and Redistricting: The Case against Competitive Congressional Districts." Journal of Theoretical Politics 17, no. 4: 431-463.

[7] "Communities of Interest", Brennan Center for Justice, November 2010. https://www.brennancenter.org/sites/default/files/analysis/6%20Communities%20of%20Interest.pdf

[8] The Louisiana Legislature adopted Joint Rule 21 and HCR 90 of the 2021 Regular Legislative Session has a provision elevating the preservation of the communities of interest within the same district above that of respecting established boundaries of parishes, municipalities, other political subdivisions, and natural boundaries of the State. *(See also FN 3).*

[9] Id.

6

those persons to have a voice in affairs that affect them. When an election plan splits apart those communities, those voices are submerged, resulting in a disenfranchisement in the electoral process and for representation on issues that affect them.

Because modern day redistricting software is so powerful and robust with features that can quickly calculate demographic and plan boundary changes, a demographer drawing an election plan can easily become focused on the mathematical perfection or a specific objective of a plan. Use of specifically defined characteristics such as precinct and parish boundaries, total population counts, racial makeup, and voting age populations often dominate the attention of the mapmaker because they are easy to quantify.  Inclusion and exclusion of persons within a particular district can be readily ascertained on the effectiveness of the desired objectives of the mapmaker.

Because communities of interest are not always clearly defined, they are quite easy to overlook, particularly when inclusion of an area that some see having nebulous characteristics complicates the mathematics of a plan.  Without local knowledge, it can be difficult to readily identify areas that share common issues, culture, economics, and even religion.

However difficult it may be to factor in communities of interest in pursuing a mathematically based plan, failure to do so can exert a tremendous obstacle to the effectiveness of an election plan once enacted. This can be especially true with a state's Legislative or Congressional plan.

Since *Miller v Johnson*, the Supreme Court has recognized the importance of communities of interest as a race-neutral criteria in redistricting.[10] This approach can ensure that the interests and values shared by a community are represented and given a voice in the elected body.[11]

## IV.    Parishes and Municipalities as Communities of Interest

For this analysis, two levels of communities of interest will be used.  Parishes and municipalities both form political units that are cohesive in the many common issues that bring them together.[12]

---

[10] Miller v. Johnson, 515 U.S. 900 (1995).

[11] "*Now is the time to draw districts that give a voice to minority voters who share a certain community of interest. Instead of simply gathering Black or Hispanic voters into a bizarrely-shaped district in in order to elect a representative who shares their skin color, districts should be drawn today to ensure that the voters' mutual interests, which have been shaped by their share conditions and history, are aggregated in the legislature.*" M. Malone, Stephen J. "Recognizing Communities of Interest in a Legislative Apportionment Plan." Virginia Law Review, vol. 83, no. 2, 1997, pp. 461–92, https://doi.org/10.2307/1073783.

[12] *See FN 3.*

Municipalities are even more focused around common interests.  As compared to a parish, the fewer number of people within the more concise geography such as a village, town, or city, makes it even more important to preserve the strength of their voice when it comes to legislative matters.

The effects of the adopted SB8 Congressional plan and the Plaintiffs Illustrative Plan 1 on those two areas will be compared as well as the prior HB1 2022 enacted plan.   The first analysis will be at the parish level. The second analysis will be at the municipal level.

## A.  Parish Level

A plan drawn in a race-neutral manner should have few split parishes.  While it is inevitable that some parishes may be split to balance the number of persons in each congressional district, the availability of a large number of geographical units (parishes) and population allows the one-man, one-vote requirement to be met with very few parish splits if done in a race-neutral way.

Splitting a parish divides a population that holds common interests among two or more congressional districts.  This can detrimentally affect the voice those residents have on those issues in common when reaching out to their elected representative. The more parishes that are split within a congressional district, the more those voices are diminished since they rarely represent a majority of voters in any given congressional district. It is only natural that areas within a congressional district with a larger and cohesive population will drown out those populations split among multiple districts.

A map of the parishes in Louisiana is shown below. This part of the analysis will focus on those parishes and how they have been used in the three congressional plans.

8

**MAP 1- Louisiana Parishes**



### Senate Bill 8 2024 Enacted Plan

The SB8 plan enacted in January divides a number of parishes across the State. In particular, Congressional District 6 was drawn to connect part of East Baton Rouge Parish with the central part of Caddo Parish in Shreveport. Colloquially referred to as the "slash district" this district was drawn as the second majority-minority African American district. The bizarre shape of the district in context with the other congressional districts is striking. Map 2 shows the SB8 plan as enacted with the parish boundaries overlaid. Congressional District 6, the second majority-minority district that was created under this plan, is shown in purple.

9

**MAP 2 – SB8 2024 Enacted Plan**



As readily apparent, CD 6 now bisects the State diagonally from Baton Rouge to Shreveport.  It nearly divides CD 4 in half, with that district having to loop around to the north and west of Shreveport to maintain contiguity.

From a communities of interest redistricting criteria, the SB8 enacted plan split a large number of parishes. Sixteen (16) parishes were split into thirty-four (34) parts to create a plan that contained a second minority district.  The splits affected 2,930,650 persons or 63% of the State's 2020 Census Population.[13]

As a comparison, this plan configuration differs radically from the earlier HB1 plan enacted in 2022 and was used for the last Congressional election.  In that plan, the traditional core districts were retained as well as the one majority-minority district (CD 2).  The number of split parishes was less than SB8, with thirteen (13) parishes split into thirty (30) parts. This represented 2,045,200 persons, or 44% of the State's 2020 population.

---

[13] The 2020 Census Count for Louisiana was 4,657,757 persons.

10

Map 3 illustrates the HB1 plan enacted in 2022 as a red outline superimposed on the SB8 districts. The concentrations of African American voting age populations as they are distributed across the State are also shown.

In comparing the two maps, you can see where the focus on race in the SB 8 plan to create a second majority-minority district significantly changed the configuration of Congressional Districts 3, 4, 5, and 6. Only Districts 1 and 2 stayed anywhere close to their previous configuration.  In the HB1 plan CD 2 represented the largely African American population between New Orleans and Baton Rouge along the Mississippi River industrial corridor.

The SB8 enacted plan completely revised CD 6 to design it to stretch from Baton Rouge to Shreveport. This was necessary to tie in the pockets of African American voting age populations to create the second majority minority district.[14] In doing so, it split far more parishes than otherwise necessary.

**Map 3 – SB8 Enacted Plan with HB1 Plan Outlined**



---

[14] The voting age population (VAP) are those respondents to the 2020 Census who were 18 years of age and older and were eligible to register to vote.

11

The Illustrative Plan 1 proffered by the Plaintiffs is much more efficient.   As a plan drawn in a race-neutral manner, it divides only nine (9) parishes into twenty (20) parts and affects 1,523,411 persons or 33% of the State's population.  This is nearly half of what the SB8 enacted plan affects.  Map 4 shows a map of  Illustrative Plan 1.  Table 1 provides the demographics of the plan.

**Map 4– Plaintiffs' Illustrative Plan 1**



**Table 1 – Illustrative Plan 1 Demographics**

| Louisiana Congressional Districts Plaintiffs' Illustrative Plan 1 Demographics | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | TOT_POP | Deviation | % Deviation | TOT_WHITE | % TOT_WHITE | TOT_BLACK | % TOT_BLACK | VAP_TOTAL | VAP_WHITE | % VAP_WHITE | VAP_BLACK | % VAP_BLACK |
| District 1 | 776271 | -22 | 0.0% | 547649 | 70.5% | 108170 | 13.9% | 603640 | 440965 | 73.1% | 76145 | 12.6% |
| District 2 | 776280 | -13 | 0.0% | 268636 | 34.6% | 415473 | 53.5% | 599913 | 224336 | 37.4% | 307901 | 51.3% |
| District 3 | 776261 | -32 | 0.0% | 508437 | 65.5% | 204617 | 26.4% | 586481 | 398509 | 67.9% | 143574 | 24.5% |
| District 4 | 776310 | 17 | 0.0% | 449099 | 57.9% | 266586 | 34.3% | 595679 | 357794 | 60.1% | 193797 | 32.5% |
| District 5 | 776294 | 1 | 0.0% | 450031 | 58.0% | 283509 | 36.5% | 592815 | 357703 | 60.3% | 202994 | 34.2% |
| District 6 | 776341 | 48 | 0.0% | 433800 | 55.9% | 264764 | 34.1% | 592020 | 345204 | 58.3% | 191358 | 32.3% |

Illustrative Plan 1 retains the core districts but splits fewer parishes in creating a balanced plan with one majority-minority district in the traditional CD 2.  In Map 5, the Illustrative Plan is shown with the HB1 2022 enacted plan outlined.  The similarities with the core districts of the prior HB1 2022 plan are clearly seen.

12

**Map 5– Illustrative Plan 1 with HB1 Enacted Plan Outlined**



The Illustrative Plan is shown in Map 6 with the SB8 2024 enacted plan outlined. The effect of drawing a plan specifically to create a second majority-minority district is evident.  Illustrative Plan 1 is shown in color with the SB8 enacted plan outlined in black and labeled with white circles.

13

**Map 6 – Illustrative Plan 1 with SB 8 Enacted Plan Outlined**



The following table summarizes the parish-level splits among the three plans.

**Table 2- Summary of Parish- Level Splits**

| | Louisiana Congressional Plan Comparison<br>Communities of Interest Analysis-Split Parish Comparisons | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **HB1 (2022 Enacted)** | | **SB8 (2024 Enacted)** | | **Illustrative Plan 1** | | | |
| **District** | **Number of Split Parish Parts** | **Split Population** | **Number of Split Parish Parts** | **Split Population** | **Number of Split Parish Parts** | **Split Population** | | |
| CD1 | 5 | 444,419 | 8 | 488,242 | 4 | 444,422 | | |
| CD2 | 9 | 756,125 | 6 | 662,367 | 7 | 640,023 | | |
| CD3 | 2 | 95,006 | 3 | 342,803 | 1 | 43,225 | | |
| CD4 | 1 | 7,473 | 5 | 292,806 | 2 | 45,158 | | |
| CD5 | 2 | 108,172 | 6 | 536,204 | 4 | 173,305 | | |
| CD6 | 11 | 634,005 | 6 | 608,228 | 2 | 177,278 | | |
| **Total Splits/Pop** | 30 | 2,045,200 | 34 | 2,930,650 | 20 | 1,523,411 | | |
| **Split Parishes** | 13 | | 16 | | 9 | | | |
| **Zero Pop Parishes** | 0 | | 0 | | 1 | 20 | | |

14

## B.  Municipal Level

Municipalities are even more intimate among their populations when it comes to common interests. Municipalities are often formed around religion, economic, political, education, tradition, or other concerns. These core interests bind those citizens together.

When municipalities are divided into two or more State-level election districts, the voices of those citizens are submerged among the louder and more numerous voices in whole communities.  This disenfranchises voters and diminishes their ability to compete for the attention of their representatives and in competing for scarce resources.

The SB8 2024 enacted plan splits more municipalities than either the prior HB1 plan or the Illustrative Plan 1.  The primary focus on creating the second majority minority district cast aside considerations of maintaining intact as many municipalities as possible.  Like with the parish analysis, SB8 causes more harm to municipal citizens than either of the HB1 or Illustrative plans.

The following table shows the number of municipalities that are split under each plan analyzed and the number of persons affected.

**Table 3 – Summary of Split Municipalities**

| | Louisiana Congressional Plan Comparison Communities of Interest Analysis-Split Municipality Comparisons | | | | | |
|---|---|---|---|---|---|---|
| | **HB1 (2022 Enacted)** | | **SB8 (2024 Enacted)** | | **Illustrative Plan 1** | |
| **District** | **Number of Split Municipalities** | **Split Population** | **Number of Split Municipalities** | **Split Population** | **Number of Split Municipalities** | **Split Population** |
| **CD1** | 14 | 329,382 | 14 | 296,863 | 13 | 344,157 |
| **CD2** | 19 | 503,298 | 12 | 402,112 | 19 | 394,549 |
| **CD3** | 5 | 15,115 | 15 | 195,800 | 6 | 10,700 |
| **CD4** | 4 | 11,400 | 15 | 114,335 | 2 | 2,137 |
| **CD5** | 3 | 16,829 | 12 | 156,087 | 10 | 63,443 |
| **CD6** | 19 | 221,258 | 15 | 390,415 | 4 | 21,299 |
| **Total Splits/Pop** | 64 | 1,097,282 | 83 | 1,555,612 | 54 | 836,285 |
| **Whole Municipalities** | 459 | | 447 | | 464 | |
| **Zero Pop Municipalities** | 2 | | 3 | | 2 | |

The SB8 enacted plan split eighty-three (83) municipalities with 447 remaining whole. The number of persons represented by the splits was 1,555,612. The prior enacted HB1 plan split sixty-four (64)

15

municipalities while keeping 459 intact.  This was nineteen (19) fewer splits than SB8 and twelve (12) more whole municipalities.

Illustrative Plan 1, by comparison, is far more cognizant of maintaining municipal integrity.  That plan divided only fifty-four municipalities which represented 836,285 persons.  This is twenty-nine (29) fewer split municipalities than SB8 with roughly half of the citizens affected by being split into two or more congressional districts.  Overall, the Illustrative Plan 1 retains 464 whole communities, seventeen (17) more than SB8.

# V. Compactness

Compactness works together with preservation of communities of interest.  A compact district is much less likely to divide communities of interest in the drafting of a plan.  Conversely, districts that are not compact, and indeed, are drawn out and elongated in order to achieve some pre-determined objective in a plan, typically split more communities of interest than would otherwise be necessary.

In this case, the compactness of a district goes to the heart of whether it is feasible to create a second majority-minority district.  The minority population not only needs to be numerous enough, but also compact enough to create a district using traditional redistricting principals.[15]

To assist with compact analysis of a plan, there are several mathematical models that can be used.  One of the most popular is the Polsby-Popper model. This model is most used to evaluate the compactness of a district but accounts for the degree to which a district has been gerrymandered. Under this model, a score of "0.0" is least compact, and a score of "1.0" is most compact.[16]

To assist with the compactness analysis, Table 4 was created to illustrate the Polsby-Popper scores for the three plans analyzed in this report.

---

[15] Thornburg v. Gingles, 478 U.S. 30 (1986)

[16] Belottie, P., Buchannan, A., Ezazipour, S. "Political Districting to Optimize the Polsby-Popper Compactness Score" https://austinlbuchanan.github.io/files/Political_Districting_to_Optimize_Polsby_Popper_Compactness_OO_style. pdf

16

**Table 4 – Polsby-Popper Compactness Scores**

| Louisiana Congressional Plan Comparison Polsby-Popper Compact Scores | | | | | | | |
|---|---|---|---|---|---|---|---|
| Plan | CD1 | CD2 | CD3 | CD4 | CD5 | CD6 | Plan Mean |
| HB1 Enacted Plan 2022 | 0.16 | 0.06 | 0.29 | 0.16 | 0.12 | 0.07 | 0.14 |
| SB8 Enacted Plan 2024 | 0.16 | 0.11 | 0.19 | 0.08 | 0.08 | 0.05 | 0.11 |
| Plaintiffs Illustrative Plan 1 | 0.19 | 0.13 | 0.32 | 0.3 | 0.12 | 0.33 | 0.23 |
| Scores closer to 1.0 are more compact. | | | | | | | |

## SB8 2024 Enacted Plan as Compared to the Prior HB1 2022 Enacted Plan

Congressional District 2 has historically represented the large concentration of African Americans between New Orleans and Baton Rouge as connected through those African American populations who reside in the Mississippi River parishes between those two cities.  The district is numerous and compact enough to create a district using traditional redistricting principals.[17]

The compactness scores in CD 2 changed between the HB1 and SB8 plans.  Because CD 2 was shifting African American population over to CD 6 in SB8, it became a bit more geographically concentrated and therefore more compact.

In the SB8 2024 enacted plan, the 6th Congressional district was drawn to connect the African American population in Caddo Parish with the remainder of the African American population in the East Baton Rouge area.  Those two areas are the only areas with substantially enough African American population to create the majority-minority district.  Along the way, the district meanders to loop in the African American population in northeast Lafayette Parish, northeast Rapides Parish, east DeSoto Parish, and south Avoyelles Parish to increase the minority population counts.

But due to the racial gerrymandering necessary to create CD 6 as a second majority-minority district in the SB8 plan, the compactness scores go down in CD 3, CD 4, CD 5, and CD 6.  Four out of six districts are less compact in SB8 as compared to the prior enacted HB1 plan.  Only CD 1 has an unchanged compact score.

The reduction in compactness for the individual districts in SB8 over HB1 reduces the overall compactness score. The mean score for SB8 is 0.11, a reduction of 0.03 in the Polsby-Popper score.

---

[17] See FN2.

17

**SB8 2024 Enacted Plan as Compared to Plaintiffs' Illustrative Plan 1**

When comparing SB8 to the Plaintiffs' Illustrative Plan 1, the race-centric focus and the machinations necessary to create a second majority-minority district are evident in the Polsby-Popper scores.  When applying traditional redistricting criteria in a race neutral manner, it is shown that state-wide districts can be drawn more compact.

In all six congressional districts, Illustrative Plan 1 is considerably more compact than the SB8 enacted plan. In CD 4 and CD 6, the differences are striking.

The lack of compactness, especially in CD 6, lends credence that the African American population outside of CD 2 are not sufficiently concentrated enough to create a second majority-minority district using traditional redistricting criteria.  The elongated stretching of CD 6 across the State was necessary to bring those disparate African American clusters together into one district so as to have a minority population greater than 50%. That stretching brings the compactness score in CD 6 to just above "0".  Of the six congressional districts, CD 6 is the least compact.

By drawing a plan that does not use race as the primary characteristic, it is possible to draw districts that are much more compact.  Plaintiffs' Illustrated Plan 1 is 48% more compact than the enacted SB8 plan. CD 6 in the Illustrative Plan is 15% more compact than in the SB8 plan.

## VI.    Preservation of Core Districts

Traditional redistricting criteria call for minimizing the changes in the core districts that were previously in effect.  This is to reduce voter confusion and maintain continuity of representation over time.[18]

When the SB8 plan was adopted by the Legislature, it departed radically from the prior HB1 plan enacted in 2022. The departure was rationalized on the presumption that a second majority-minority district was necessary in the Congressional plan. A comparison to the prior HB1 plan to the SB8 plan is shown in Map 7.  The SB8 districts are colored with the HB1 districts outlined in purple.

---

[18] "Redistricting Criteria" National Conference of State Legislatures, July 16, 2021.
https://www.ncsl.org/redistricting-and-census/redistricting-criteria

18

**Map 7 – Comparison of SB8 Enacted Plan with HB1 Enacted Plan (2022)**



The SB8 map bears very little resemblance to the earlier HB1 enacted plan. The configuration for CD 6, is radically different.  Previously it represented the area from north Baton Rouge, thence around westerly and southerly to Lafourche and Terrebonne Parishes.  Under the 2024 enacted plan, CD 6 now stretches from north Baton Rouge diagonally across the State into Shreveport.

Plaintiffs' Illustrated Plan 1 shows that a congressional district configuration can be drawn that closely aligns with the prior core districts and makes as little changes as needed to rebalance the population and satisfy other redistricting criteria. Map 8 shows how Illustrative Plan 1 compares to the prior HB1 2022 enacted plan.

19

**Map 8 – Illustrative Plan 1 with HB1 Enacted Plan (2022) Outlined**



Plaintiffs Illustrative Plan 1 improves over the prior enacted plan by minimizing the contours of the districts. The boundaries are cleaner and easier to follow.

Alternatively, the Illustrative Plan 1 greatly improves over the district boundaries in the SB8 enacted plan. Map 9 shows the differences between the two plans.

**MAP 9 – Illustrative Plan 1 with SB8 Enacted Plan (2024) Outlined**



As with the earlier enacted plan, Illustrative Plan 1 is much more aligned with the core election districts.   Due to the emphasis on creating a second majority-minority district, SB8 had to radically depart from the core districts to achieve the objective. This runs counter to the intent of the preservation of core districts redistricting criteria.

## VII.   Race Considerations

The awareness of race is part and parcel of drawing any new redistricting plan.  But where race is the sole or primary consideration of whether to put a person in or out of a district, then that plan becomes a racially driven plan.  The intricacies of placing people in and out of districts typically become contorted and are reflected in the boundary lines of the plan.

The use of Geographic Information System software provides a great deal of power to the mapmaker to achieve certain objectives with a redistricting plan.  Because of that, it is important for the mapmaker to adhere to traditional redistricting criteria in drawing a plan.

As noted earlier in this report, the widely advertised reason for a new congressional plan was for the sole purpose of creating a second majority-minority district.  The Legislature responded to this demand from the Court and others accordingly and adopted the SB8 plan in January 2024.

21

While in the aggregate, it appears that the State has a sufficient number of African American voting age population to justify a second majority-minority district, the issue is the geographical dispersion of that population. Once outside the New Orleans to Baton Rouge corridor, the number of concentrated predominately African American communities are far fewer and become separated by significant distances.

The following map shows the distribution of the African American voting age population in the State. The clusters of African Americans are shown in thematic colors corresponding to the density.

**Map 10 – Heat Map of African American Voting Age Population (2020 Census)**



Map 10   clearly show the geographic challenge in trying to connect enough African American populations "dots" in CD 6 to make it a majority-minority district.  Once outside the CD 2 district along the Mississippi River corridor, the densities of the African American voting age populations are less and further apart.

The following map shows how the mapmaker stretched CD 6 across the State to capture what significant African American clusters it could to create a district with more than fifty percent (50%+) African American voting age population.

22

**Map 11 – SB 8 Plan with African American Populations**




Because of the challenge in meeting that race objective, the SB8 plan had to include or exclude persons based on their racial characteristics. This technique can be easily seen in the next series of maps.

Each maps shows the details of how the district boundaries were created by using the racial profile of the precincts in each respective area to either include or exclude. The precincts that are majority African American in each map are shown with a hatch pattern. With that distinction it is easy to see why certain precincts were included or excluded. When examined more closely here at the parish-level, it can be readily seen where CD 6 was carefully drafted to include as many majority African American precincts as possible, while minimizing or excluding where possible, those with more White populations.

23

**Map 11 – East Baton Rouge Parish**



**Map 12 – Lafayette Parish**



24

**Map 13 – Alexandria Area in Rapides Parish**



**Map 14 – Mansfield Area in DeSoto Parish**



25

**Map 15 – Shreveport Area in Caddo Parish**



The plan was careful to capture the majority-minority precincts with a sizable African American voting age population while including only those non-minority districts necessary to make the connections from one majority-minority area to another. More evident of that is the tenuous connections made as CD 6 crosses the state along its 230-mile length .

In north Lafayette Parish, the district is only 3 miles wide. In Rapides Parish, the district narrows down to 2.7 miles.  In DeSoto Parish, the district is 1.9 miles wide.  This compares unfavorably to the width of the district, being some 54 miles wide around the Natchitoches area and 59 miles wide from Lafayette to Avoyelles Parishes.

The long narrow and undulating shape of the district, when seen in the context of the location of the African American populations, strongly indicates that race considerations were primary when drawing the district and deciding who to put in or put out. Of course, the media reports, comments from Legislators, and rulings from judicial branch all focused on the creation of a second minority district, with little regards on what it would take to create such a district so it should not come as a surprise.

26

# VIII.    Conclusions and Opinions

The Senate Bill 8 Enacted Plan, as adopted in January 2024, does not comply with several traditional redistricting criteria. This is driven by the necessity of achieving the stated objectives with the new plan. Contemporary media reports, comments from Legislators, and rulings from judicial branch all focused on a purported requirement to create a second minority district.

Modern redistricting software possesses considerable power to quickly evaluate the effects of moving populations in and out of prospective districts. It is very easy to get focused on a pre-determined outcome and employ the power of the software to try and achieve it.

Efforts by the Legislature to use this tool to establish a second majority African American Congressional District in proportion to the overall State ratio resulted in a plan configuration that broke up both major and minor communities of interest as one of several issues.

The fact that so many communities of interest were either divided among the Congressional districts or paired with unlikely and dissimilar larger cities begs the question of whether the distribution of African Americans are compact enough to create a second majority-minority Congressional district.  In the Statewide aggregate, the ratio may suggest that it is.  But the actual distribution of the African American population tells a different story when it takes extreme and race-centric measures to arrive at even bare minimum majority configuration using the most generous definition of race aggregation.

Considering the extent to which disparate communities of interest are paired together under the 2024 Enacted plan and the splitting of other small towns and cities, the only reasonable opinion to reach is that the SB8 plan, as adopted by the Legislature, was designed specifically to reach a pre-determined minimal mathematical racial threshold that could result in the creation of a second majority African American Congressional district. This was the stated result the Legislature and others were seeking. And that is what the mapmaker of SB8 plan provided.

In my opinion, the process used by the mapmaker to meet those goals subrogated other traditional redistricting principals. As analyzed *supra*, communities of interest were unnecessarily divided because of race. The use of race as a primary, if not the sole consideration in the drawing of CD 6 as a second majority-minority district resulted in far fewer compact districts.  The redistricting principal of preservation of core election districts was completely disregarded due to the need to draw a second district with over fifty percent African American voting age population. As shown in Section VII., it was clear that certain precincts were included or excluded in any given district due to the racial characteristics predominate in the precinct. The effort elevated the racial component in designing a plan above the other traditional redistricting criteria.

The Plaintiffs' Illustrative Congressional Plan 1 shows that a reasonable plan can be drawn in a race-neutral manner and respects the use of traditional redistricting principals.  That plan preserves more communities of interest, provides for more compact election districts, preserves the core election districts, including the traditional majority-minority CD 2, and balances the population within each district well within one percent (1%) of each other.

The Illustrative Plan may not lead to the outcome some were looking for but based on the analysis of the 2024 enacted plan, but by properly applying traditional redistricting criteria results in a plan with more cohesive areas of representation, compact districts, and preservation of communities of interest far better than the current plan.

## IX.    Certification

The opinions expressed above are sworn, under penalty of perjury, to be true and based on the facts and criteria available to the expert witness as of the time of this report. This expert reserves the right to supplement this report as new information becomes available or as requested by the Plaintiffs.

Signed this 5th day of February 2024.

s/s _____

Michael C. Hefner, Esq.
Expert Witness for the Plaintiffs

28

# APPENDIX

**Exhibit 1**

## Michael C. Hefner

### *Vitae of Reapportionment, Economic, & Demographic Work Experience*

### 1.0      Qualifications

### *1.1      Demographic, Reapportionment and Economic Development Experience*

Mike Hefner is the Chief Demographer and owner of Geographic Planning and Demographic Services, LLC. He has extensive experience working with specialized demographics, census counts from the Census Bureau and use of the Bureau's TIGER Line Files, dating back to 1990.  These computer-generated map files are used to enumerate the Census as well as serving as the base map for reapportionments and other demographic uses.

Hefner served as the Economic Development Manager and later became the Assistant Director of the Evangeline Economic and Planning District from 1990-1995.  Among other things, EEPD was the Census Data Center Affiliate for District 4.  During that time, he served as the Census Bureau's liaison for the 8 Parish Acadiana area.  He and staff from the Imperial Calcasieu Planning District were the first in the State to use the Census Bureau's TIGER Line Files and related census data on PC-based computers.  He was also among the first in the State to fully computerize the functions of reapportioning based on PCs. During this time he also provided extensive assistance to other Planning and Development Districts statewide in use of the TIGER Line Files, the 1990 Census data, and reapportionment through the use of PC computers.

Hefner also provides demographic services under contract to the newly renamed Acadiana Regional Development District.  His experience, combined with his familiarity of the service area of the District, provides the district with a comprehensive source of demographic and economic data.

From 1995 to 1999, Hefner served as the Executive Director of the Enterprise Center of Louisiana.  In that capacity, he provided hundreds of hours of assistance to entrepreneurs starting or expanding a business. In addition, he provided economic development assistance to municipalities and parish entities throughout the eight parish Acadiana Area.  He also served as President of the Louisiana Business Incubator Association.

Hefner also served on the Lafayette Parish School Board, having first been appointed to the Board in 1986 to fill the unexpired term of his father-in-law, E. Lloyd Faulk.  He was elected to the Board in 1990 and re-elected in the elections of 1994, 1998, 2002 and 2006.  He has served in the capacity of President and Vice President of the Board.  Hefner chose not to run for re-election in 2010 due to anticipated schedule conflicts arising from 2010 redistricting projects.

### *1.2      Legal Qualifications*

In connection with the 1990 Census, Hefner was certified as an expert witness in the United States District Court Western District of Louisiana and testified when the Evangeline Parish School Board defended a Section 2 suit brought against their reapportionment plan by a citizen of the parish.  The citizen filed suit against a Parish School Board on the plan after they had adopted and received Justice Department Section 5 approval. The plan was successfully defended.

For the 2000 Census, Hefner was retained by the Attorney General of the State of Louisiana and the Department of Elections to develop alternative plans and provide expert testimony in the case of City of Baker School Board vs. State of Louisiana.  The case was heard in the 19th Judicial Circuit Court and

30

Hefner was the sole witness presented by the State. That case was ruled in favor of the State at both the district court and the Appellate Court.

After the 2000 census redistricting the redistricting plan for St. Landry Parish School Board was challenged under Section 2 of the Voting Rights Act.  Hefner served as the expert witness for the defendants.  The case was resolved among the parties based on some suggested modifications by Hefner.

Hefner currently serves as an expert witness in demography and reapportionment for the Louisiana Department of Justice.  Recent cases involve the method of election for the five judicial seats in the 32nd JDC in Terrebonne Parish and in the 40th JDC.  Hefner's earlier work in the Terrebonne 32nd JDC case on behalf of the Louisiana Secretary of State played a large part in successfully dismissing the Secretary as a defendant in the case. Hefner is also providing expert witness services in a case concerning the minority representation in the current Louisiana Congressional Districts.

Hefner is currently certified as an Expert Witness in reapportionment and demography for the U.S. District Court Western District of Louisiana, the Middle District of Louisiana, and the 15th and 19th District Courts in Louisiana.  Most recently, Hefner was reaffirmed as an expert in reapportionment and demography in the 15th Judicial District Court in the case of Keith Kishbaugh vs The City of Lafayette Government, Lafayette Parish Government, and Lafayette City-Parish Government.

Hefner also provided expert witness services in the area of demographics for St. Bernard Parish (Defendant) as well as for the Burlington Northern and Santa Fe litigation (Defendant).  The BNSF litigation involved demographics of the population using a plume analysis.  The St. Bernard Parish case involved determining the number of persons and households in the collection area using a variety of sources.

Hefner has never been rejected as an expert witness in any case.  His qualifications have survived several *Daubert* challenges.

Hefner completed his legal education and received his Juris Doctorate in law in January 2008.  He successfully passed the California Bar exam and is a member in good standing with the California Bar.

**2.0    Past Reapportionment, Economic Development, Demographic & Mediation/Facilitation Work**

*2.1    Reapportionment, Demography & Economic Development*

After the 1990 Census, Hefner provided Technical Assistance Services to some 22 governmental entities for reapportionment.  In addition, some half dozen was performed directly whereby the full scope of the reapportionment process was conducted.  Much of the Technical Assistance comprised of drawing up a number of possible plans with the associated data for consultants and governmental staff working on reapportionment or providing detailed demographic data at the precinct and/or census block level.

With the release of the 2000 Census, Hefner had been primarily involved in performing analyzing population trends in connection with the reapportionment services to over 41 jurisdictions throughout Louisiana.

For the 2010 Census, Hefner successfully completed redistricting plans for over 73 jurisdictions.  Hefner has also performed a number of market analyses for private companies and site location analysts.

Hefner is currently serving on a legislative committee charged with reviewing redistricting statutes. He was appointed by the Louisiana Secretary of State to represent demographers.

31

Additionally, population census counts, updates, and projections have been conducted for several municipal governments, water, fire, and wastewater districts.  The projections have withstood state reviews and court scrutiny as well as U.S. Department of Justice review where applicable.

During his tenure at the Evangeline Economic and Planning District, Hefner provided numerous economic and site location analyses for major corporations looking to locate or expand in south central Louisiana.  Nearly every municipality, water district, wastewater district, and Parish government in the 8 parish Acadiana area was the recipient of one or more demographic studies performed at their request.

In addition, Hefner performed Economic Needs Assessments for each of the 8 Parishes in the District annually and developed reports of the findings to the U.S. Department of Commerce.  Many of these assessments were used to help secure millions of dollars in infrastructure grants.

## 2.2    *School Demographic Work*

In the highly specialized area of school demographics, Hefner has provided demographic services to the Lafayette Parish School Board, the St. Landry Parish School Board, the Pointe Coupee Parish School Board, the St. John the Baptist School Board, the Vermilion Parish School Board, the Bossier Parish School Board, the E. Feliciana Parish School Board, the Evangeline Parish School Board, the Union Parish School Board, the Ouachita Parish School Board, Monroe City School Board, the W. Baton Rouge Parish School Board, the DeSoto Parish School Board, the Jackson Parish School Board, the Lincoln Parish School Board, the St. Martin Parish School Board, the St. Mary Parish School Board, the Concordia Parish School Board, and the U.S. Department of Justice.  For the Lafayette, Bossier, St. Martin, St. Mary, E. Feliciana, Vermilion, Evangeline, Union, Ouachita, Monroe City, DeSoto, W. Baton Rouge Parish School Boards as well as for the U.S. Department of Justice, much of the demographic work has concentrated on general population trends, student demographics, analyzing, and/or constructing school attendance zones in connection with their respective desegregation cases.

Recent efforts in St. Landry, Concordia, Evangeline, Monroe City, Union, DeSoto, Ouachita, St. John the Baptist, St. Martin, St. Mary, and Bossier have centered on modification of their school attendance zones as they relate to their school facilities in order to meet the mandates of their respective desegregation litigation.  Pointe Coupee was a combined project of consolidating schools, redrawing attendance zones, and a complete redesign of their bus transportation system and a complete audit of their contract bus routes. The U.S. Department of Justice project involved the student assignment plan for the Avoyelles Parish School Board and Morehouse Parish School Board.

To date the school districts in Ouachita, Evangeline, St. Landry, Avoyelles, and Morehouse Parishes have received Unitary Status based on the student assignment work conducted by Hefner.  Union has recently received Unitary Status.

The use of computer GIS software has been extensively used to help with these efforts and provides the maximum opportunity to rapidly assess a number of different school district configurations or to analyze existing zones.  Hefner is one of the few, if not the only one in the State currently using specialized GIS software for these educational-related activities.

## 2.3    *Mediation/Facilitation*

Hefner has extensive mediation and facilitation experience.  For the Federal courts, he was one of the representatives from the School Board chosen to facilitate an agreement regarding the District's dress code and the exercise of religious customs of students attending Lafayette Parish Public Schools.  A successful agreement was reached thereby avoiding a costly court hearing and trial.

32

Hefner also facilitated the Consent Decree response in the <u>Alfreda Trahan v. Lafayette Parish School Board</u> desegregation case.  After the court ruling of May 19, 2002, Judge Richard Haik ordered the Board to develop a new desegregation plan within 6 weeks.  Hefner was chosen by the Board President to facilitate the development of that plan.  Street wisdom at that time said it would take over a year for the Board to develop a plan and one could never be developed that all parties would agree to.  By bringing all parties together from the beginning, a plan was developed within 5 weeks that all parties to the desegregation suit signed off on and the plan was later accepted by Judge Haik.

Hefner also exercised mediation and facilitation skills during many of the reapportionment projects undertaken during the past two censuses.  Competing interests often came to the surface during many of the reapportionment discussions, which had to be successfully mediated in order to come reach agreement on a plan that would meet community and legal criteria.  Many reapportionment projects conducted after the 2000 and 2010 censuses required mediation among elected officials as well as among some community leadership.  All reapportionment projects conducted by Hefner received Section 5 approval from the U.S. Department of Justice on the first submission prior to the *Shelby* ruling.

### 2.4      *Government Demographic, GIS, Reapportionment Projects, Expert Witness Testimony:*

Acadia Parish Police Jury (reapportionment 2000, 2010, 2020 precinct mergers, 2021 prospective precincts).
Acadia Parish School Board (reapportionment 2000, 2010, 2020).
Acadia Parish Police Jury (parish wide GIS project).
Allen Parish Police Jury (reapportionment 2020).
Allen Parish School Board (reapportionment 2020).
Ascension Parish School Board (student attendance boundaries, school site selection, reapportionment 2020)
Ascension Parish Council (reapportionment 2020)
Avoyelles Parish Police Jury (reapportionment 2020).
Bossier Parish School Board (new school zones, student pop projections, school site planning).
Bossier Parish School Board (grade realignments/school zone modification project).
Bossier Parish School Board (school desegregation expert witness services).
Bossier Parish School Board (reapportionment 2010, 2020).
Bossier Parish Police Jury (reapportionment 2020).
Cameron Parish School Board (Reapportionment 2010).
Central Community School System (5/10 Year student projection report, reapportionment 2020)
DeSoto Parish Police Jury (Precinct mergers and consolidations, 2021 prospective precincts, 2020 redistricting, 2023 precinct mergers).
Concordia Parish School Board (desegregation-student assignment, transportation).
DeSoto Parish School Board (desegregation plan review, student projections, plan modification,  USDoJ plan review, expert witness services, 2020 redistricting).
East Baton Rouge Parish School Board (Five-year student projection reports 2017, 2018, redistricting 2020).
East Baton Rouge Metro Council (redistricting 2020).
Evangeline Parish Police Jury (reapportionment 2000, 2010, 2020, Census update, precinct mergers).
Evangeline Parish School Board (reapportionment 1990, 2000, 2010, 2020).
Evangeline Parish School Board (School Consolidations, student projections, student assignment plans, and expert witness services).
E. Feliciana Parish Police Jury (Precinct realignments, 2021 Prospective Precincts, 2020 redistricting).

33

E. Feliciana Parish School Board (change in board composition, 12-year student population projections, 2020 redistricting).

Lafayette Parish School Board/Consolidated Council (TA) (reapportionment 2000, 2010, 2020).

Lafayette Parish School Board (30-year study of Parish demographic shifts by race, comprehensive student assignment plan, 2017 five-year student projection report with 2023 update).

Lafayette Consolidate Government (City of Lafayette & Lafayette Parish council reapportionments for charter revision, expert witness testimony).

Livingston Parish Police Jury (precinct realignments).

Iberia Parish HRC Council (reapportionment 1990, 2000, 2010, 2020, precinct mergers, 2021 prospective precincts).

Iberia Parish School Board (reapportionment 2000, 2010, 2020).

Iberia Parish School Board (student assignment plan 2018, 2019, 2023).

Iberia Parish HRC Council (Membership reduction plans).

Iberville Parish Police Jury (precinct realignments).

Jackson Parish School Board (student assignment plans, basic student projection report, expert witness services).

Madison Parish (Precinct realignments).

Monroe City School Board (Student projections and Zone Alignments 2010-2012, 2020, 2022).

Ouachita Parish School Board (Unitary Status *Green* factor review and expert witness services).

Plaquemine Parish Police Jury (precinct realignments).

Pointe Coupee Parish Police Jury (election districts for new Home Rule Charter implementation, precinct mergers, 2021 prospective precincts, 2020 redistricting).

Pointe Coupee Parish School Board (reapportionment 2000, 2010, 2020).

Pointe Coupee Parish School Board (transportation routing/school consolidation/zone boundary changes, bus audits).

Richland Parish School Board (student assignment plans).

St. Bernard Parish Government (residential housing study)

St. John the Baptist School Board (5/10 year student census projections).

St. Landry Parish Police Jury (reapportionment 2000, 2010 for new Home Rule Charter, 2020 redistricting).

St. Landry Parish Council (precinct realignments, Census LUCA updates, precinct mergers, 2021 prospective precincts).

St. Landry Parish School Board (reapportionment 2000, 2010, 2020).

St. Landry Parish School Board (student assignment plans, bus transportation plan, student population projection report, expert witness services).

St. James Parish School Board (student assignment, school attendance boundaries, 5-Year projection report, reapportionment 2010, 2020).

St. James Parish Council (Housing study).

St. John the Baptist Parish School Board (10-year student projection report)

St. Martin Parish HRC Council (reapportionment 2000, 2010, 2020).

St. Martin Parish School Board (reapportionment 2000, 2010, 2020).

St. Martin Parish School Board (2016 student assignment plans, expert witness services).

St. Martin Parish HRC Government (parish wide GIS project, Census LUCA updates).

St. Martin Parish Government (precinct realignments and mergers, 2021 prospective precincts).

St. Mary Parish HRC Council (reapportionment 2000 and 2010).

St. Mary Parish HRC Council (precinct realignments).

34

St. Mary Parish School Board (2010, 2020 reapportionment, student assignment plans, expert witness services).

State of Louisiana-Secretary of State (alternative reapportionment plans, demographic and reapportionment expert witness services).

State of Louisiana-Louisiana Department of Justice (32nd JDC, 40JDC demographic and reapportionment expert witness services.)

State of Louisiana-Louisiana Department of Justice (2022 Congressional Districts reapportionment expert witness services.)

Tangipahoa Parish School Board (5/10 Year Student Projection Report).

City of Scott (reapportionment 1990, 2000, 2010, 2020 Census LUCA update).

City of Eunice (reapportionment 1990, 2000, 2010, 2020).

City of Broussard (reapportionment 2000, 2010, 2020).

City of Broussard (50-year population study).

City of Breaux Bridge (reapportionment 2010, 2020).

City of Crowley (reapportionment 1990, 2000, 2010, 2020).

City of Donaldsonville (reapportionment 2020).

City of Marksville (reapportionment 2010, 2020).

City of Rayne (reapportionment 2000, 2010, 2020).

City of Church Point (reapportionment 2000, 2010, 2020).

City of Opelousas (reapportionment 2010, 2020).

City of Central (reapportionment 2020).

City of Ville Platte (reapportionment 2010, 2020).

City of Zachary (2010, 2020 reapportionment).

Town of Sunset (reapportionment 2000, 2010, 2020).

Town of Mamou (reapportionment 2000, 2010, 2020).

Town of Washington (reapportionment 2000, 2010, 2020).

Town of Bunkie (reapportionment 2000, 2010, 2020).

Town of Cottonport (reapportionment 2000, 2010, 2020).

Town of Kinder (reapportionment 2000, 2010, 2020).

Town of Tallulah (reapportionment 2000).

Town of Springhill (reapportionment 2010, 2020).

Town of St. Francisville (reapportionment 2020).

Tucson Independent School District No. 1, Tucson AZ (Desegregation Initiatives and Review).

City of Youngsville (census update 2004, 2014, reclassification as a City in 2004, 30-Year Demographic Projection).

Union Parish School Board (student assignment plan for Union Parish Deseg case, expert witness services).

U.S. Department of Justice (student assignment plan for Avoyelles Parish Schools, expert witness services).

U.S. Department of Justice (student assignment plan review for Morehouse Parish, expert witness services).

Vermilion Parish School Board (school rezoning, parish-wide street and address updates, student population projection report, 2020).

Vermilion Parish School Board (reapportionment 2000, 2010, 2020).

Webster Parish School Board (school attendance plan, expert witness services).

W. Feliciana Parish HRC Council (Precinct mergers, 2021 prospective precincts, redistricting 2020).

W. Feliciana Parish Police Jury (redistricting plan for Home Rule Charter compliance).

35

W. Feliciana Parish School Board (Twelve-year student projection report 2018, Report Update 2019).
W. Baton Rouge Parish School Board (5-year student projection, redistricting 2010, 2020)
Winona-Montgomery Consolidated School District (School desegregation-Transportation bus route analysis).

**1990 Census Reapportionments:**

City of Crowley
City of Scott
City of Eunice
Evangeline Parish School Board
Iberia Parish Council (TA)

Several Private Consultants *(primarily city engineers doing redistricting plans)*
Vermilion Parish Police Jury (TA)
Lafayette Parish School Board (TA)
Town of Ville Platte (TA)
City of Breaux Bridge (TA)
Town of St. Martinville (TA)

### 3.0     Educational Background

- Graduated from Concord Law School earning a Juris Doctorate in law. Successfully passed the February 2008 administration of the California Bar exam. Member of the California Bar, Bar #257492.

- Commissioned as a Louisiana Notary Public, May 2015.

- Completed Public Service course sessions at the Leadership Institute, Greensboro, NC March 1993

- Graduated from the Basic Economic Development Course, University of Kansas, 1992

- Completed Leadership Lafayette, Class II, 1987

- Graduated from University of Southwestern Louisiana 1978, Degree in Business Administration, Marketing

- Graduated from Our Lady of Fatima High School, 1974

### 4.0     Community Leadership

- Member of the Lafayette Parish School Board, District 5, 1986, 1990 to 2010. Did not seek reelection due to meeting conflicts anticipated with redistricting.

- Past Chairman and director on the Board of Directors for Goodwill Industries.

- Director CADENCE non-profit board.

- Past Chairman of the Lafayette Parish Industrial Development Board

- Past Chairman of the Louisiana Business Incubation Association

- Past Chairman Citizens for Public Education

36

- One of the charter founders of the Lafayette Public Education Foundation, past member.

**5.0    Contact Information:**

*Mike Hefner*
*Chief Demographer*
*Geographic Planning and Demographic Services, LLC*
*905 Golden Grain Rd.*
*Duson, LA  70529*
*(337) 873-4244 (Home Office)*
*(337) 739-4499 (cell/text)*

mhefner@cox.net

Cal. Bar #257492

37