IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

| | |
|---|---|
| PHILLIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| | District Judge David C. Joseph |
| *Plaintiffs,* | Circuit Judge Carl E. Stewart |
| | District Judge Robert R. Summerhays |
| v. | Magistrate Judge Kayla D. McClusky |
| NANCY LANDRY, in her official capacity as Secretary of State of Louisiana, | |
| *Defendant.* | |

**INTERVENOR-DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................ 3

LEGAL STANDARD .................................................................................................................. 4

ARGUMENT ............................................................................................................................... 6

    I.    Both of Plaintiffs' Claims Fail on the Merits ......................................................... 7

        A.    Plaintiffs' Racial Gerrymandering Claim Fails in Light of *Robinson* ............................... 7

        B.    Plaintiffs' Discriminatory Intent Claim Fails Because the State Undisputedly Sought to Comply with Court Orders While Maintaining Its Constitutionally Delegated Role in Redistricting ..................................................................................................... 10

    II.    In All Events, the *Purcell* Doctrine Precludes the Enactment of a Remedial Map Before the November 2024 election ............................................................................. 12

    III.    Plaintiffs Will Not Suffer Irreparable Harm if Injunctive Relief is Delayed ................ 15

    IV.    The Balance of Equities and Public Interest Weigh Against Plaintiffs ........................... 15

CONCLUSION ......................................................................................................................... 18

CERTIFICATE OF SERVICE .................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ................................................................. *passim*

*Advance'd Temporaries, Inc. v. A.L. Expansion Inc.,*
  108 F.3d 333 (5th Cir. 1997) ............................................................. 4

*Ala. Legis. Black Caucus v. Alabama,*
  575 U.S. 254 (2015) ...................................................................... 8

*Allen v. Milligan,*
  599 U.S. 1 (2023) ......................................................................... 1

*Ardoin v. Robinson,*
  142 S. Ct. 2892 (2022) ................................................................... 3

*Ardoin v. Robinson,*
  143 S. Ct. 2654 (2023) ................................................................ 4,16

*Bethune-Hill v. Va. State Bd. of Elections,*
  580 U.S. 178 (2017) ................................................................... 8, 9

*Bush v. Vera,*
  517 U.S. 952 (1996) ................................................................ *passim*

*Chapman v. Meier,*
  420 U.S. 1 (1975) ................................................................... 16, 17

*Connor v. Finch,*
  431 U.S. 407 (1977) ..................................................................... 17

*Cooper v. Harris,*
  581 U.S. 285 (2017) ................................................................. 7, 8, 9

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
  76 F.4th 425 (5th Cir. 2023) ............................................................ 5

*Democratic Nat'l Comm. v. Wis. State Legis.,*
  141 S. Ct. 28 (2020) ..................................................................... 2

*Elrod v. Burns,*
  427 U.S. 347 (1976) ..................................................................... 5

*Fund for Louisiana's Future v. La. Bd. of Ethics,*
  17 F. Supp. 3d 562 (E.D. La. 2014) ..................................................... 5

*Grace, Inc. v. City of Miami,*
  2023 U.S. App. LEXIS 20292 (11th Cir. Aug. 4, 2023) .................................................... 4

*Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ............................................................................................ 15

*Hunter v. Underwood,*
  471 U.S. 222 (1985) .......................................................................................................... 11

*In re Landry,*
  83 F.4th 300 (5th Cir. 2023) ................................................................................. 6, 13, 16

*Libertarian Party v. Rednour,*
  108 F.3d 768 (7th Cir. 1997) ............................................................................................ 15

*Lionhart v. Foster,*
  100 F. Supp. 2d 383 (E.D. La. 1999) .............................................................................. 5

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .......................................................................................................... 15

*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) ........................................................................................................ 2

*Miller v. Johnson,*
  515 U.S. 900 (1995) .................................................................................................. *passim*

*Mont. Med. Ass'n v. Knudsen,*
  591 F. Supp. 3d 905 (D. Mont. 2022) .............................................................................. 4

*N.C. State Conf. of the NAACP v. McCrory,*
  831 F.3d 204 (4th Cir. 2016) ..................................................................................... 11, 12

*Nken v. Holder,*
  556 U.S. 418 (2009) .......................................................................................................... 5

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) .......................................................................................................... 10

*Pisano v. Strach,*
  743 F.3d 927 (4th Cir. 2014) ............................................................................................ 15

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) .......................................................................................................... 6, 12

*Reno v. Bossier Par. Sch. Bd.,*
  520 U.S. 471 (1997) .......................................................................................................... 7

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ..................................................................................... 17

*Robinson v. Ardoin,*
    2023 WL 6886438 (U.S. Oct. 19, 2023) ...................................................... 15

*Robinson v. Ardoin,*
    37 F.4th 208 (5th Cir. 2022) ......................................................................... 3

*Robinson v. Ardoin,*
    86 F.4th 574 (5th Cir. 2023) ..................................................................... 2, 3

*Robinson v. Ardoin,*
    605 F. Supp. 3d 759 (M.D. La. 2022) ................................................... 2, 3, 6

*Robinson v. Ardoin,*
    2022 WL 1154607 (W.D. La. Apr. 19, 2022) ............................................... 3

*Shaw v. Hunt,*
    517 U.S. 899 (1996) ..................................................................................... 10

*Storer v. Brown,*
    415 U.S. 724 (1974) ..................................................................................... 15

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) ..................................................................................... 15

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ................................................................. 10, 11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ............................................................................. 10, 11

*Wise v. Lipscomb,*
    437 U.S. 535 (1978) ..................................................................................... 17

**Statutes**

La. R.S. § 18:467(2) ......................................................................................... 14,16

**Rules**

Fed. R. Civ. P. 65 ............................................................................................... 4, 5

**Other**

U.S. Const. amend XIV ................................................................................... *passim*

U.S. Const. amend XV..................................................................................... 1, 4

**INTERVENOR-DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION[1]**

The world of litigation stemming from the intersection of §2 of the Voting Rights Act of 1965 ("VRA") and of the Fourteenth Amendment has been in turmoil for years. The Supreme Court's recent decision in *Allen v. Milligan*, 599 U.S. 1 (2023), did little to resolve the tension between the constitutional command *not to take* government action on the basis of race and the statutory requirement—as interpreted by the Supreme Court—*to take* government action on the basis of race. *See Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018) ("Since the Equal Protection Clause restricts consideration of race and the VRA demands consideration of race, a legislature attempting to produce a lawful districting plan is vulnerable to 'competing hazards of liability.'" (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (O'Connor, J., plurality op.))). That tension is squarely implicated here.

Under these circumstances, Plaintiffs cannot carry their burden of showing that the passage of SB 8 (or, the "New Law") violated the Constitution. Section 2 of the VRA has always lived in tension with the Fourteenth and Fifteenth Amendments. *See Abbott*, 138 S. Ct. at 2315 (referring to the competing demands of the VRA and Fourteenth Amendment as a "legal obstacle course"). The former generally mandates that a map-drawing body consider race during the drafting process, and the latter generally prohibits the very same consideration. *Id.* (quoting *Vera*, 517 U.S. at 977 (O'Connor, J., plurality op.)). This was the needle that the Louisiana Legislature was forced

---

[1] Counsel for the State conferred with counsel for Secretary Landry this morning pursuant to this Court's Order at ECF No. 79. Given that the State's Response is due the same day that the Court granted its intervention, the parties conferred and have made every effort to avoid duplicative argument.

to thread when it passed SB 8—and it did so successfully by complying with both the VRA and the Constitution.

Specifically, the State had every reason in the world to believe that race-conscious redistricting was required by § 2 of the VRA—namely, a preliminary injunction from the Middle District of Louisiana against HB 1 (or, the "Old Law) mandating the creation of a second majority-Black district. *See generally Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022). Moreover, although it vacated that injunction on procedural grounds, the Fifth Circuit went out of its way to *approve* the merits portion of the district court's preliminary-injunction analysis. *See Robinson v. Ardoin*, 86 F.4th 574, 583–84 (5th Cir. 2023) (holding that the district court did not err in its finding that plaintiffs were likely to succeed on the merits of their § 2 claim against the Old Law). In so doing, the Fifth Circuit gave the Louisiana Legislature a narrow window of time to either (1) adopt a new law or (2) decline to do so and proceed to a trial on the merits of the Old Law. *Id.* at 601–02.

With that writing on the wall, the Governor answered the federal courts' directives by calling a special session, and the Legislature passed SB 8—a new congressional map containing a second majority-Black district. The State, of course, never intended to dilute the votes of non-Black Louisianans. Instead, the State's overwhelming interest was in (a) complying with combined decisions from the Middle District and Fifth Circuit while (b) maintaining the State's constitutional prerogative to draw its own congressional districts, as opposed to having a federal court usurp that power from Louisianans' elected representatives. *See Miller v. Johnson*, 515 U.S. 900, 934–35 (1995) (Ginsburg, J., dissenting) ("[F]ederalism and the slim judicial competence to draw district lines weigh heavily against judicial intervention in apportionment decisions; as a rule, the task should remain within the domain of state legislatures."). The New Law thus not only satisfies strict scrutiny but also was the best result that could be achieved for Louisianans given the current state of § 2

jurisprudence—at least as far as the federal judiciary has applied it to Louisiana in the post-*Milligan* legal regime. Consequently, Plaintiffs' claims fail.

## INTRODUCTION

This case arises out of the State of Louisiana's efforts to redistrict its congressional districts following the decennial census. In February of 2022, the Louisiana Legislature passed HB 1 and SB 5, enacting new congressional districts. Then-Governor Edwards vetoed the bills in March of 2022, but the Legislature overrode his veto, and the congressional district map created by HB 1 went into effect. Litigation followed.

Two separate complaints challenged HB 1 under § 2 of the VRA. These complaints were consolidated. *See* Complaint, *Robinson v. Ardoin*, No. 3:22-cv-211 (M.D. La. Mar. 30, 2022), ECF No. 1, *consolidated with* Complaint, *Galmon v. Ardoin*, No. 3:22-cv-214 (M.D. La Mar. 30, 2022), ECF No. 1. The State, as well as the then-Speaker and then-President Pro Tempore of the Louisiana Legislature, intervened. *Robinson v. Ardoin*, No. 3:22-cv-211, 2022 WL 1154607 (W.D. La. Apr. 19, 2022). The plaintiffs filed motions for preliminary injunctions. After expedited briefing and a hearing, the United States District Court for the Middle District of Louisiana granted a preliminary injunction enjoining Louisiana's congressional map. *See generally Robinson*, 605 F. Supp. 3d 759. This order was subsequently stayed by the United States Supreme Court while *Milligan* was pending and then later returned to the lower courts following the Supreme Court's *Milligan* decision.

The State appealed the preliminary-injunction ruling to the Fifth Circuit. Although the Fifth Circuit denied a stay pending appeal, *see Robinson v. Ardoin*, 37 F.4th 208, 215 (5th Cir. 2022), the Supreme Court granted one. *See Ardoin v. Robinson*, 142 S. Ct. 2892 (2022). After the Supreme Court lifted the stay, *see Ardoin v. Robinson*, 143 S. Ct. 2654 (2023), the Fifth Circuit held that the district court had not erred in concluding that the plaintiffs were likely to succeed on the merits of their § 2 challenge to HB1. *Robinson*, 86 F.4th at 583. But the Fifth Circuit also vacated the district

court's preliminary injunction on procedural grounds and gave the Legislature an opportunity to enact a new congressional districting map; if the Legislature did not enact a new map, the case would proceed to trial on the merits of the Old Law. *See id.* at 601–02.

In the wake of the Fifth Circuit's decision, the new Governor of Louisiana, Jeff Landry, called a special legislative session to consider enacting a new congressional districting map. The Legislature introduced and passed SB 8. The New Law created a new congressional districting map with a second majority-Black district, which, according to the district court and Fifth Circuit, was required by the VRA. On January 22, 2024, Governor Landry signed SB 8 into law.

Nine days later, Plaintiffs filed their Complaint alleging that the New Law violated Plaintiffs' Fourteenth and Fifteenth Amendment rights. *See* ECF No. 1. The State moved to intervene, which this Court granted. *See* ECF No. 53; *see also* ECF No. 79. On February 7, 2024, Plaintiffs filed a Motion for Preliminary Injunction, seeking to enjoin the implementation of the New Law and to order the Louisiana Secretary of State to implement Plaintiffs' own remedial congressional map. *See* ECF No. 17. Two weeks later, this Court issued a Scheduling Order setting April 8–9, 2024, as trial dates for a "Preliminary Injunction Hearing Combined with Trial on the Merits." ECF No. 63 (capitalization normalized).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Fed. R. Civ. P. 65(a)(2). The Court consolidated Plaintiffs' requested Preliminary Injunction with a trial on the merits. ECF No. 63 at 1. This consolidation resulted

from Plaintiffs' Motion for a Case Management Conference and Expedited Schedule, ECF No. 43 at 2, which the Secretary did not oppose, and neither does the State.

The permanent injunction standard is "applicable when the court 'advance[s] the trial on the merits and consolidate[s] it with the hearing' on a motion for preliminary injunction." *Mont. Med. Ass'n v. Knudsen*, 591 F. Supp. 3d 905, 912 (D. Mont. 2022) (quoting Fed. R. Civ. P. 65(a)(2)); *see also Advance'd Temporaries, Inc. v. A.L. Expansion Inc.*, 108 F.3d 333 (5th Cir. 1997) (affirming where "[t]he district court consolidated [a] motion for preliminary injunction with the trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2)" and "[a] bench trial ensued," whereafter "the district court entered judgment imposing a permanent injunction"); *Fund for Las. Future v. La. Bd. of Ethics*, 17 F. Supp. 3d 562, 568 (E.D. La. 2014) (explaining that a permanent injunction is the appropriate standard where a full merits trail has occurred, including one conducted under Rule 65(a)(2)).

To obtain a permanent injunction, a plaintiff must demonstrate "(1) actual success on the merits; (2) that it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in that party's favor; and (4) that an injunction is in the public interest." *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023). Additionally, the third and fourth factors are merged here, as the State is an opposing party. *See Nken v. Holder*, 556 U.S. 418, 420 (2009) ("The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party.").

Although the standard for seeking a permanent injunction largely mirrors the preliminary injunction standard, the key difference for a permanent injunction is that a plaintiff must demonstrate *actual success* on the merits, not just a *likelihood* of success. *Lionhart v. Foster*, 100 F. Supp. 2d 383, 385–86 (E.D. La. 1999). Because Plaintiffs must first demonstrate actual success on the merits, the State's briefing addresses the merits separate from the remaining permanent injunction

5

analysis and addresses the equitable arguments in the context of any potential remedial-phase or pre-2024-election injunction along with its *Purcell* arguments.

## ARGUMENT

Both of Plaintiffs' claims fail. First, Plaintiffs' racial gerrymandering claim fails on strict-scrutiny review because the State had every reason to believe that, at the time it enacted the New Law, the VRA—by the federal judiciary's own lights—required racially conscious districting. To be sure, the State vehemently disagreed and defended the Old Law. But the courts saw things differently. Indeed, the Middle District's merits analysis, affirmed by the Fifth Circuit, mandated a second majority-Black district, or else the State's failure to do so would illegally dilute Black voting strength under the VRA. *See generally Robinson*, 605 F. Supp. 3d 759. Because the State thereafter sensibly complied, strict scrutiny is easily satisfied here.

Second, Plaintiffs' discriminatory intent claim fails because Plaintiffs cannot rebut the presumption of good faith afforded to legislative action. Here, the Legislature expressed a desire (1) to comply with court opinions mandating (under the VRA) the use of race consciousness to implement a second majority-Black congressional district in Louisiana and (2) to maintain its constitutional role in redistricting by redrawing Louisiana's congressional map, as opposed to having a court-drawn map imposed on the State. Neither reason shows that racial discrimination was the *intent*—as opposed to the unsought consequence—of the Legislature's attempt to conform Louisiana's laws to the courts' directives. Indeed, "fundamental concerns of federalism mandate that states be given some leeway so that they are not trapped between [the Fourteenth Amendment and VRA's] competing hazards of liability." *Vera*, 517 U.S. at 977 (O'Connor, J., plurality op.). For that reason alone, Plaintiffs' racial intent claim is meritless.

In all events, moreover, there is no reason to rush proceedings: Even if the Court were to find for Plaintiffs, the *Purcell* doctrine would preclude the implementation of any remedial map

prior to the November 2024 election. Rushing to remedial proceedings would generate massive voter confusion and require the State to come up with a *third* congressional districting map in 2024 alone, all on the eve of an election. This is exactly what *Purcell* prevents. Thus, even if Plaintiffs suffer harm from SB 8, the State would be entitled to a non-illusory amount of time to remedy such harm, *see In re Landry*, 83 F.4th 300, 304 (5th Cir. 2023), and to do so in a way that does not throw the entire 2024 election into chaos, *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)— which cannot actually happen in time for the November 2024 election. Because no remedy (if one were even needed) could be implemented for this election cycle, *Purcell* counsels in favor of litigation in the ordinary course, not breakneck speed.

## I.   BOTH OF PLAINTIFFS' CLAIMS FAIL ON THE MERITS.

### A.   Plaintiffs' Racial Gerrymandering Claim Fails in Light of *Robinson*.

To prevail on their claims, Plaintiffs must satisfy a demanding burden of proof and overcome a strong presumption of good faith afforded to the State. Plaintiffs fail on both accounts. "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott*, 138 S. Ct. at 2311 (citing *Reno* v. *Bossier Par. Sch. Bd.*, 520 U. S. 471, 481(1997)). Additionally, "[i]n redistricting cases, the 'good faith of [the] state legislature must be presumed." *Id.* (citing *Miller*, 515 U.S. at 915).

Courts undertake a "two-step analysis" when evaluating whether a districting map is an impermissible racial gerrymander pursuant to the Fourteenth Amendment. *Cooper v. Harris*, 581 U.S. 285, 291 (2017). The first step requires the plaintiff to "prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* (internal citations omitted). The second step requires that, "if racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 292. In this step, the State has the burden to demonstrate that "its race-based

sorting of voters serves a compelling interest and is narrowly tailored to that end." *Id.* (internal citations omitted). Courts have consistently presumed that complying with the VRA constitutes a "compelling interest." *Id.* To fulfill the "narrowly tailored" requirement, the State must show "that it had 'a strong basis in evidence' for concluding that the statute required its action." *Id.* (internal citations omitted).

Importantly, the "strong basis in evidence" standard does not require that the State be completely certain that a contested map constitutes a violation of the VRA before implementing changes. (Of course, the State itself vigorously, but ultimately unsuccessfully, disputed that no such violation existed.) Rather, this standard "gives States 'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Id.* at 293 (citing *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 195–96 (2017)). In essence, the inquiry is not whether the VRA *actually* requires a second majority-Black district, but rather, whether the Legislature had "good reason to believe" the VRA, as interpreted by the federal courts, required the second majority-Black district at the time the Legislature drew the map.

Here, the State can easily demonstrate that "it had 'a strong basis in evidence' for concluding that the" VRA "required its action," *see id.* at 292 (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)), because both the Middle District and Fifth Circuit insisted it did. Further, the evidence shows that the State "actual[ly] consider[ed]" whether the VRA required another majority-Black district and had a "strong basis in evidence" for determining that "all the *Gingles* preconditions were met." *See id.* at 301–02 (quoting *Vera*, 517 U.S. at 978 (O'Connor, J., plurality op.). Plaintiffs' contention that the State did not engage in "a strong showing of a pre-enactment analysis with justifiable conclusions," ECF No 17-1 at 32 (citing *Abbott*, 138 S. Ct. at 2335), completely ignores the procedural history behind the New Law. That history demonstrates that the *Robinson* district court and the Fifth Circuit considered the Old Law and found that

Plaintiffs were likely to succeed on the merits of their VRA challenge. Plaintiffs' contention also ignores the battle of the experts that occurred in the *Robinson* district court before the court concluded that the VRA likely mandated creation of a second majority-Black district. It is hard to imagine a "strong[er] basis in evidence," *Cooper*, 581 U.S. at 301–02 (quoting *Vera*, 517 U.S. at 978 (O'Connor, J., plurality op.)), than a district court decision, which was premised on competing experts and affirmed on the merits by the Fifth Circuit.

Similarly unpersuasive is Plaintiffs' citing of the State's arguments from the preliminary injunction proceeding in *Robinson. See* ECF No. 1 at 8–9. While the State argued that the Old Law did not violate § 2, the *Robinson* district court rejected these arguments, and the Fifth Circuit blessed that rejection in a unanimous panel decision (which that court declined to rehear en banc). Much as the State might disagree with that outcome, it is the courts' opinion that carries the day—not the losing party's arguments. Accordingly, the State enacted the New Law on the directive of the *Robinson* district court's opinion and the Fifth Circuit panel's opinion substantively affirming it.

Moreover, Plaintiffs' complaint that "[t]he [*Robinson*] case never advanced to the merits" does not move the needle for them. *Id.* at 9. Indeed, their argument blinks reality of the district court's preliminary injunction reasoning on the merits factor, which the Fifth Circuit unanimously affirmed. The State was not required to sit back and wait for the ministerial entry of a final judgment on the merits when the judicial writing was already on the wall. Rather, the Supreme Court has held that the States must be given "'breathing room' to adopt reasonable [§ 2] compliance measures" even if, "in perfect hindsight," such measures are later considered unnecessary. *Cooper*, 581 U.S. at 292 (quoting *Bethune*, 580 U.S. at 195–96). Put differently, the inquiry is not about what the VRA *actually requires*, but what the State had a *strong basis to believe* it

9

required. *See supra* p. 8. And that standard is easily satisfied here in light of the district court's and Fifth Circuit's decisions.

### B. Plaintiffs' Discriminatory Intent Claim Fails Because the State Undisputedly Sought to Comply with Court Orders While Maintaining Its Constitutionally Delegated Role in Redistricting.

Plaintiffs face (and fail to satisfy) a heavy burden of proof on their intentional-discrimination claim as well. Again, to prevail on their intentional-discrimination claim, Plaintiffs must overcome that fact that, "[i]n redistricting cases, the 'good faith of [the] state legislature must be presumed." *Abbott*, 138 S. Ct. at 2311 (citing *Miller*, 515 U. S. at 915). This requires them to prove that "a discriminatory purpose has been a motivating factor in the decision" to adopt the New Law. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). And "[w]here the court is asked to identify the intent of an entire state legislature, as opposed to a smaller body, the charge becomes proportionately more challenging." *Veasey v. Abbott*, 830 F.3d 216, 233 (5th Cir. 2016).

As an initial matter, the *Arlington Heights* standard does not apply to redistricting because its central inquiry (racial intent) is already subsumed in the *Shaw* standard for racial gerrymandering claims (addressing whether race was predominant in the drawing of the map). *Compare Arlington Heights*, 429 U.S. at 266 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."), *with Shaw v. Hunt*, 517 U.S. 899, 905 (1996) ("The plaintiff bears the burden of proving the race-based motive and may do so either through 'circumstantial evidence of a district's shape and demographics' or through 'more direct evidence going to legislative purpose.'" (quoting *Miller*, 515 U.S. at 916)). Both claims center on the racial intent, or lack thereof, of the map drawer. Thus,

an *Arlington Heights* (racial intent) claim—when brought with a *Shaw* (racial gerrymandering) claim—is at best redundant and at worst totally inapplicable in the redistricting context.

Even if *Arlington Heights* applies here, "'[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences . . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable [minority] group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (internal citation omitted); *accord Veasey*, 830 F.3d at 231 (relying on *Feeney* in considering a discriminatory intent claim under § 2 and recognizing that "[l]egislators' awareness of a disparate impact on a protected group is not enough: the law must be passed because of that disparate impact"); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (similar); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking."). Plaintiffs have not met their burden to prove discriminatory purpose under this demanding standard.

As explained above, it is clear that the Legislature, in passing the New Law, sought (1) to comply with the VRA as interpreted in the *Robinson* litigation and (2) to maintain its constitutionally delegated role in redistricting. *See supra* § I.A. Indeed, the Governor himself, in calling the Special Session that resulted in the New Law, explained that he wanted to take the districting process out of the hands of the Middle District and place it back with Louisiana's duly elected representatives.[2] Plaintiffs' claim that supposed legislative intent to create a second majority-Black district "alone prove[s] discriminatory intent" thus fails; VRA compliance as interpreted in *Robinson*—not racial

---

[2] *Governor Jeff Landry Opens First Special Session on Court Ordered Redistricting*, Office of the Governor (Jan. 16, 2024) https://gov.louisiana.gov/news/governor-jeff-landry-opens-first-special-session-on-court-ordered-redistricting ("We are here today because the Federal Courts have ordered us to perform our job … These maps will satisfy the Court and ensure that the congressional districts of our State are made right here in the Legislature and not by some heavy-handed member of the Federal Judiciary. We do not need a federal judge to do for us what the people of Louisiana have elected YOU to do. You are the voice of the people.") (cleaned up).

gerrymandering for its own sake without adequate justification—was the driving motivation behind the New Law. ECF No. 17-1 at 35.

Here, Plaintiffs are required to show that the *intent* of creating a second majority-Black district was to discriminate on the basis of race and not merely a resulting consequence. *Arlington Heights*, 429 U.S. 265–66; *McCrory*, 831 F.3d at 220. And Plaintiffs give only the shortest shrift to the notion that VRA compliance satisfies strict scrutiny. See ECF No. 17-1 at 36 n.4 (spending one footnote to address the fact that a good faith effort to comply with the VRA is sufficient to satisfy struct scrutiny).

To reiterate, the State complied with what the Fifth Circuit and Middle District said the VRA required here—namely, the creation of a second majority-Black district. This is enough to satisfy strict scrutiny, *supra* § I.A., and Plaintiffs have not shown that the State's desired VRA compliance was pretextual. Put differently, Plaintiffs have failed to rebut the presumption of legislative good faith. *Miller*, 515 U.S. at 916. Thus, just as their *Shaw* claim failed, so too does their *Arlington Heights* claim.

## II.    In All Events, the *Purcell* Doctrine Precludes the Enactment of a Remedial Map Before the November 2024 election.

Even if the Court were inclined to grant Plaintiffs' request for a preliminary injunction, moreover, that fact would have no bearing on the November 2024 election. That is because the *Purcell* doctrine prohibits the injunction of the New Law and subsequent implementation of another revised districting map prior to the 2024 elections. In *Purcell*, the Supreme Court emphasized that "[c]ourt orders affecting elections, *especially conflicting orders,* can [] result in voter confusion and consequent incentive to remain away from the polls. As an election draws nearer, that risk will increase." 549 U.S. at 4–5 (emphasis added). This doctrine "not only prevents voter confusion but also prevents election administrator confusion," *DNC v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020)

(Kavanaugh, J., concurring), as state and local officials "need substantial time to plan for elections" and handle "significant logistical challenges," *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). For this reason, the Supreme Court "has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and [] has often stayed lower federal court injunctions that contravene that principle." *Id.*

If any court order "affecting elections" can result in voter confusion in the run-up to an election, then a total of *three* congressional maps on the books in 2024 alone would certainly produce rampant voter confusion throughout the State. Specifically, the courts have already forced the State to abandon its Old Law (Map Number One) and enact the New Law (Map Number Two). Any further changes to the State's districting composition (Map Number Three)—just months from Election Day—would inevitably result in chaos and voter confusion. Put plainly, three maps is a recipe for voter confusion and disenfranchisement.

Not only that, but it also would be a logistical nightmare (and perhaps impossibility) for the State to undergo *another* redistricting map process this year. The Court has scheduled a trial for April 8–9, 2024. ECF No. 63 at 1. Assuming this three-judge Panel completed the herculean feat of issuing a ruling, say, 45 days after that trial concluded—including any possible dissenting or concurring opinions—that would mean the earliest the Louisiana Legislature could be notified of the need to enact a remedy would be May 26, 2024. But the Regular Legislative Session ends, at the latest, on June 3, 2024. *See 2024 Sessions Information*, Louisiana State Legislature (last visited Feb. 18, 2024) https://legis.la.gov/legis/home.aspx ("The 2024 Regular Legislative Session will convene at noon on Monday, March 11, 2024. Final Adjournment no later than 6:00 pm on Monday, June 3, 2024."). Consequently, the Legislature would have eight days to enact a new map, which is not the sort of reasonable amount of time to which a State is entitled. *See In re Landry*, 83 F.4th at 306 (granting the State's petition for a writ of mandamus where "the district court

prescribed an impossibly short timetable for [remedial] state legislative action amounting to only five legislative days").

Moreover, the congressional candidate qualifying period begins on July 17, 2024, *see* La. R.S. § 18:467(2), followed by the 2024 Louisiana congressional primary elections on November 5, 2024. The Secretary is on record—in testimony before the legislature, before the Middle District, and before the Fifth Circuit—explaining that final congressional maps must be set by *the middle of May* (*i.e.*, before even a reasonable time for the Court to enter its liability decision) to meet statutory deadlines, ensure implementation in the State's voter registration systems, and enable voters to be properly assigned to new districts.[3] If the New Law is struck down, the State would not be able to comply with its statutory implementation duties and deadlines, and for that additional reason, voter confusion and candidate confusion inevitably would ensue.

The burden is on Plaintiffs to show that their requested preliminary injunction and remedial map would not result in widespread confusion. *See Grace, Inc. v. City of Miami*, 2023 U.S. App. LEXIS 20292, at *7–8 (11th Cir. Aug. 4, 2023) ("Because of the [State]'s 'extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws,' the plaintiffs must make the showing that the remedial plan is feasible without significant costs, confusion, or

---

[3] Just this month, a district court in Montana ordered new elections for two city council districts where local officials did not properly place voters in the correct city council districts. See e.g. https://montanafreepress.org/2024/02/22/flathead-county-kalispell-city-council-election-redo-decision/ (Visited February 25, 2024).

hardship."); *see also id.* ("[T]he absence of chaos is hardly acceptable under *Purcell*."). Plaintiffs fail to meet this burden.

### III.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS DELAYED.

Plaintiffs have also failed to establish likely irreparable harm. Plaintiffs cannot claim "general" harm as a result of the New Law because "proper application of the Constitution and laws, and seeking relief that no more directly tangibly benefits [the plaintiffs] than it does the public at large[,] does not state an Article III case or controversy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 574 (1992). As such, these five Plaintiffs cannot establish the harm—let alone the requisite "irreparable harm"—needed to obtain injunctive relief. Although the Plaintiffs may contend that "the loss of constitutional freedoms . . . 'unquestionably constitutes irreparable injury,'" *Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), there is no proof of any such loss for the five named plaintiffs.

### THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST PLAINTIFFS.

The balance of equities and public interest—which merge here, *see supra* pp. 5–6—disfavor injunctive relief, particularly for the 2024 election cycle.

*First*, "[s]tates have not only an interest, but also a duty to ensure that the electoral process produces order rather than chaos." *Libertarian Party v. Rednour*, 108 F.3d 768, 774 (citing *Storer v. Brown*, 415 U.S. 724, 729 (1974)); *accord Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (recognizing the states' "'compelling' interests in avoiding voter confusion, preserving the integrity of the election process, and maintaining a stable political system."); *Pisano v. Strach*, 743

F.3d 927, 937 (4th Cir. 2014) ("Indeed, states have an interest 'in ensuring orderly, fair, and efficient procedures for the election of public officials.'" (citation omitted)).

And the public has a strong interest in having finalized, VRA-compliant district maps for the 2024 election. The Supreme Court acknowledged this interest when it denied the State's request for a stay of the remedial process, stating that it had "previously emphasized" that the *Robinson* "litigation should be resolved 'in advance of the 2024 congressional elections in Louisiana.'" *Robinson v. Ardoin*, No. 23A281, 2023 WL 6886438, at *1 (U.S. Oct. 19, 2023) (Jackson, J., concurring) (citing *Ardoin v. Robinson*, 143 S. Ct. 2654 (2023)). Thus, even if a preliminary injunction were supplemented by a court-ordered remedial map, as Plaintiffs urge, the balance of equities still weighs in the State's favor because it is the role of the State Legislature—and not the courts—to enact districting maps. *Chapman v. Meier*, 420 U.S. 1, 27 (1975).

An injunction at this point—less than 150 days before the congressional candidate qualifying period, which begins on July 17, 2024, *see* La. R.S. § 18:467(2)—would throw Louisiana's districting maps and elections into chaos. This would create widespread confusion among voters and candidates, disrupt the electoral process, and potentially undermine public trust in the fairness of the elections. The logistical challenges of implementing new laws and the likelihood of legal battles would compound that chaos further.

To provide timeline context, the Louisiana Legislature's regular session does not convene until March 11, 2024, and concludes, at the latest, on June 3, 2024, which would be the first opportunity for the Legislature to consider drafting a *third* new congressional map in as many years. *See* https://legis.la.gov/legis/home.aspx. The Supreme Court has recognized that the Legislature unequivocally maintains the duty of enacting districting maps. *See Miller*, 515 U.S. at 915; *Chapman*, 420 U.S. at 27 ("Federal-court review of districting legislation represents a serious intrusion on the

16

most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" (quoting *Chapman*, 420 U.S. at 27)).

Given the requisite meetings, *drafting* period, and legislative voting period, the Legislature would be pressed with the impossible task of producing a new map in time to be used for the 2024 elections. *See In re Landry*, 83 F.4th at 307–08 ("If this were ordinary litigation, this court would be most unlikely to intervene in a remedial proceeding for a preliminary injunction. Redistricting litigation, however, is not ordinary litigation. Of course, the law as set forth by the Supreme Court's interpretation of the Constitution and section 2 must be vindicated. But the remedy necessarily involves the exercise of discretion by federal courts whose judgments will interfere with a primary constitutional structural device of self-government: making decennial districting choices about representation in legislative bodies.").

In sum, an injunction prior to the 2024 elections would wreak havoc on the 2024 elections in Louisiana and threaten voting rights statewide. Thus, the loss of voting rights and orderly elections would come *as a result of granting* a preliminary injunction, rather than as a result of denying it. The absence of a preliminary injunction would prevent harm to all Louisiana voters. Consequently, the balance of the equities weighs in favor of denying the preliminary injunction.

*Second*, the public interest also strongly favors maps drawn by the people's elected representatives and not judicially enacted legislative maps. "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" *Miller*, 515 U.S. at 915 (quoting *Chapman*, 420 U.S. at 27). In fact, "[t]he [Supreme] Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (citing *Connor v. Finch*, 431 U.S. 407, 414–15 (1977)). "When a federal court declares an existing apportionment

scheme unconstitutional, it is therefore appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Id.* at 540; *see also Reynolds*, 377 U.S. at 586 ("[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."). But rather than request that this Court follow Supreme Court precedent, Plaintiffs instead ask this Court to issue a court-ordered "remedial map" to "carry out the elections." ECF No. 17-1 at 40. This is plainly against the public interest.

*     *     *     *

In sum, a permanent injunction of the New Law in advance of the 2024 election would create an impossible challenge for the State to carry out congressional elections, leaving no secure path for the State to navigate between conflicting federal court directives. Both the *Purcell* doctrine and the ordinary preliminary-injunction factors thus cut against Plaintiffs' request for an injunction.

## CONCLUSION

For the reasons set forth herein, the State respectfully requests that the Court deny the Plaintiffs' Motion for Preliminary Injunction. Alternatively, if the Court is inclined to grant Plaintiffs' request, the State requests that the Court delay implementation of any new map until after the 2024 election cycle concludes.

Dated: February 27, 2024

Jason B. Torchinsky (DC 976033)*
Phillip M. Gordon (DC 1531277)*

Respectfully Submitted,

*/s/ Morgan Brungard*
Morgan Brungard (LSBA No. 40298)

Brennan A.R. Bowen (AZ 036639)*
Holtzman Vogel Baran
Torchinsky & Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
(540) 341-8808 phone
(540) 341-8809 fax
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
bbowen@holtzmanvogel.com

*pro hac vice motion forthcoming*

Deputy Solicitor General
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
BrungardM@ag.louisiana.gov

*Counsel for Intervenor-Defendant State of Louisiana*

**CERTIFICATE OF SERVICE**

I do hereby certify that, on this 27th day of February 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

*/s/ Morgan Brungard*
Morgan Brungard