**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION**

PHILLIP CALLAIS, LLOYD PRICE,
BRUCE ODELL, ELIZABETH ERSOFF,
ALBERT CAISSIE, DANIEL WEIR,
JOYCE LACOUR, CANDY CARROLL
PEAVY, TANYA WHITNEY, MIKE
JOHNSON, GROVER JOSEPH REES,
ROLFE MCCOLLISTER,

    *Plaintiffs*,

    v.

NANCY LANDRY, in her official capacity
as Secretary of State for Louisiana,

    *Defendant*.

Civil Action No. 3:24-cv-00122

Judge David C. Joseph

Circuit Judge Carl E. Stewart

Judge Robert R. Summerhays

*ROBINSON* **PLAINTIFFS' AMICUS BRIEF
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

    Louisiana has a long history of disenfranchising and discriminating against Black voters. ................................................................................................................... 3

    The Louisiana Legislature enacts HB1 over a gubernatorial veto. ...................................... 3

    The district court enjoins HB1 as likely violating the VRA. .............................................. 5

    The Fifth Circuit denies a stay pending appeal, but the Supreme Court stays the preliminary injunction pending Allen v. Milligan. .................................................. 6

    The Fifth Circuit agrees that HB1 likely violates the VRA, but vacates the injunction because there was adequate time for a trial before the 2024 election. ............................................................................................................... 7

    Governor Landry calls a Special Session to enact a new congressional map. ..................... 8

    Senator Womack describes the political rationale behind SB8. ......................................... 9

    Senator Womack describes traditional redistricting principles guiding SB8. .................. 11

    The Callais Plaintiffs sue. ............................................................................................. 13

ARGUMENT ................................................................................................................... 14

I.    Plaintiffs are not likely to succeed on the merits of their claims. ...................................... 14

    A.    The State and the Legislature had a strong basis in evidence to believe Section 2 required a second majority-Black district. ............................................. 15

    B.    Race was not the predominant factor in the enactment of SB8; the legislative record shows that the Legislature enacted SB8 to comply with the VRA, *and* the contours of the map were driven by politics, not race. ............ 17

    C.    SB8 was drawn to further the State's compelling interest in complying with Section 2 of the VRA. ................................................................................ 23

    D.    Plaintiffs are unlikely to prevail on their intentional vote dilution claim under the Fourteenth and Fifteenth Amendments. ................................................. 29

II.    Plaintiffs will not suffer irreparable injury absent an injunction. ..................................... 33

III.    The balance of equities and public interest weigh against injunctive relief. ................... 33

IV.    Plaintiffs' proposed remedial map violates the VRA and should be rejected. ................ 34

CONCLUSION ................................................................................................................. 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott* v. *Perez*,
    138 S. Ct. 2305 (2018)..........................................................................................21, 26

*Addy* v. *Newton Cnty.*,
    2 F. Supp. 2d 861 (S.D. Miss. 1997).........................................................24, 25, 26

*Alabama Legislative Black Caucus* v. *Alabama*,
    575 U.S. 254 (2015).................................................................................................15

*Allen* v. *Milligan*,
    599 U.S. 1 (2023)............................................................................................ *passim*

*Ardoin* v. *Robinson*,
    142 S. Ct. 2892 (2022).............................................................................................6

*Ardoin* v. *Robinson*,
    143 S. Ct. 2654 (2023).............................................................................................7

*Backus* v. *South Carolina*,
    857 F. Supp. 2d 553 (D.S.C.)...........................................................................29, 30

*Benisek* v. *Lamone*,
    138 S. Ct. 1942 (2018)...........................................................................................14

*Bethune-Hill* v. *Virginia State Bd. of Elections*,
    580 U.S. 178 (2017)..............................................................................16, 17, 24, 27

*Bush* v. *Vera*,
    517 U.S. 952 (1996).............................................................................................6, 27

*Clark* v. *Calhoun Cnty., Miss.*,
    88 F.3d (5th Cir. 1996) ........................................................................15, 16, 23, 24

*Clarke* v. *Commodity Futures Trading Comm'n*,
    74 F.4th 627 (5th Cir. 2023) ..................................................................................33

*Cooper* v. *Harris*,
    581 U.S. 285 (2017)...............................................................................................14

*Easley* v. *Cromartie*,
    532 U.S. 234 (2001).........................................................................................17, 18

*Fusilier* v. *Landry*,
   963 F.3d 447 (5th Cir. 2020) ............................................................30, 31, 32

*Galmon* v. *Ardoin*,
   No. 3:22-cv-00214-SDD-SDJ (M.D. La.) ...............................................5

*Hall* v. *Louisiana*,
   108 F. Supp. 3d 419 (M.D. La. 2015) ..........................................15, 29, 30

*Holmes* v. *BellSouth Telecommunications, LLC*,
   2023 WL 5610359 (W.D. La. Aug. 29, 2023) ...........................................33

*Lake Charles Diesel, Inc.* v. *General Motors Corp.*,
   328 F.3d 192 (5th Cir. 2003) .......................................................................14

*League of United Latin Am. Citizens* v. *Abbott*,
   2022 WL 4545757 (W.D. Tex. Sept. 28, 2022) ..........................................29

*League of United Latin Am. Citizens* v. *Perry*,
   548 U.S. 399 (2006) ...............................................................24, 25, 27

*Major* v. *Treen*,
   574 F. Supp. 325 (E.D. La. 1983) ................................................................3

*Nken* v. *Holder*,
   556 U.S. 418 (2009) ...............................................................................14, 33

*Patino* v. *City of Pasadena*,
   230 F. Supp. 3d 667 (S.D. Tex. 2017) .......................................................32

*Prejean* v. *Foster*,
   227 F.3d 504 (5th Cir. 2000) .......................................................................24

*Purcell* v. *Gonzalez*,
   549 U.S. 1 (2006) (per curiam) ...................................................................34

*Robinson* v. *Ardoin*,
   37 F.4th 208 (5th Cir. 2022) .......................................................... *passim*

*Robinson* v. *Ardoin*,
   605 F. Supp. 3d 759 (M.D. La. 2022) ............................................ *passim*

*Robinson* v. *Ardoin*,
   86 F.4th 574 (5th Cir. 2023) .......................................................... *passim*

*Shaw* v. *Hunt*,
   517 U.S. 899 (1996) ......................................................................................27

*Theriot* v. *Par. of Jefferson*,
   966 F. Supp. 1435 (E.D. La. 1997) ........................................................................24

*Theriot* v. *Par. of Jefferson*,
   No. CIV. A. 95-2453, 1996 WL 637762 (E.D. La. Nov. 1, 1996) ...................................16, 26

*Thomas* v. *School Board St. Martin Parish*,
   544 F. Supp. 3d 651 (W.D. La. 2021) ....................................................................22

*Thornburg* v. *Gingles*,
   478 U.S. 30 (1986) .............................................................................................5

*VAYLA New Orleans.* v. *Tom Schedler*,
   3:16-cv-305-BAJ-RLB (M.D. La. 2016) .................................................................30

*Veasey* v. *Abbott*,
   830 F.3d 216 (5th Cir. 2016) ................................................................................31

*Village of Arlington Heights* v. *Metro Housing Development Corp.*,
   429 U.S. 252 (1977) ...............................................................................15, 29, 31

*York* v. *City of St. Gabriel*,
   89 F. Supp. 3d 843 (M.D. La. 2015) ......................................................................30

**Statutes**

Voting Rights Act of 1965 ..................................................................................... *passim*

**Legislative Materials**

La. Committee on House and Governmental Affairs (Jan. 18, 2024), available at
   https://redist.legis.la.gov/default_video?v=house/2024/jan/0118_24_HG_P2 .......................11

La. Committee on House and Governmental Affairs (Jan. 15, 2024), available at
   https://redist.legis.la.gov/default_video?v=house/2024/jan/0115_24_HG.............................8

La. Committee on Senate and Governmental Affairs (Jan. 16, 2024), available at
   https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011624S
   G2..........................................................................................................10, 20, 23

La. House of Representatives Floor Debate (Jan. 19, 2024), available at
   https://www.house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/202
   4/jan/0119_24_1ES_Day5 ....................................................................................19

La. Senate Chamber, at 11:10 – 12:08 (Jan. 17, 2024),
   https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011724S
   CHAMB ...........................................................................................................12

## PRELIMINARY STATEMENT

This case asks whether the State of Louisiana was justified in enacting a congressional districting plan with two majority-Black districts after multiple federal courts held that a plan with only one district violated Section 2 of the Voting Rights Act of 1965 ("VRA"). And it asks whether, in carrying out that statutory mandate, the State has the flexibility to elevate political considerations over traditional redistricting concerns such as compactness and maintaining whole parishes, while still ensuring compliance with Section 2. In light of the robust evidentiary record developed in the Section 2 litigation in *Robinson* v. *Ardoin*, currently pending in the Middle District of Louisiana, the rulings of the district court and the Fifth Circuit in that litigation, and a complete accounting of the legislative record supporting SB8, the answer to both questions is indisputably, "yes." *See Robinson* v. *Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022) ("*Robinson I*"); *Robinson* v. *Ardoin*, 37 F.4th 208 (5th Cir. 2022) ("*Robinson II*"); *Robinson* v. *Ardoin*, 86 F.4th 574 (5th Cir. 2023) ("*Robinson III*"). Accordingly, the preliminary injunction must be denied.

Decades of case law establish that heeding the requirements of the VRA is both mandatory and constitutional. Even though the 2020 census revealed that almost all of Louisiana's population growth was driven by minority populations, in 2022 the State enacted a congressional map ("HB1") that diluted Black voting strength by "packing" large numbers of Black voters into a single majority-Black congressional district and "cracking" the State's remaining Black voters among the five remaining districts, all of which were majority white. The congressional map Plaintiffs seek would do the same. But the district court in *Robinson* and two unanimous panels of the Fifth Circuit concluded that Section 2 likely requires Louisiana to adopt a congressional district map that includes two districts in which Black voters have an opportunity to elect their candidates of choice. *Robinson I*, 605 F. Supp. 3d at 766; *Robinson II*, 37 F.4th at 215; *Robinson III*, 86 F.4th at 583.

In this case, Plaintiffs seek to vitiate the effect of these rulings and foist on Louisiana a congressional map materially identical to the one challenged in *Robinson* that unlawfully diluted the votes of Black voters. Louisiana has already gone through one election under a map that violates Section 2, and Plaintiffs must not be permitted, in this collateral litigation, to disrupt the orderly implementation of a lawful plan in advance of the 2024 election. Under clearly established Supreme Court precedent, Plaintiffs are exceedingly unlikely to prevail on their Fourteenth and Fifteenth Amendment claims. The litigation and legislative record amply demonstrate that the Legislature had a strong basis in evidence for creating a second district to provide Black Louisianans an opportunity to elect candidates of their choice, and that politics, not race, drove the particular line-drawing decisions that led to SB8's final district configuration. In light of this record, it is clear that race did not predominate in the creation of SB8, and even if it did, it was justified by the State's need to comply with the VRA and the rulings of two federal courts.

Plaintiffs' intentional discrimination argument fails for the same reasons. There is no evidence that the Legislature was driven by animus toward Plaintiffs or the class of "non-African American" voters whose interests they purport to represent. There is likewise no evidence that SB8 has the effect of diluting Plaintiffs' votes on account of their non-African American status.

Moreover, Plaintiffs cannot establish irreparable injury, and the balance of the equities and public interest weigh heavily against injunctive relief. Here, the only risk of irreparable injury lies with the *Robinson* Amici and Black Louisianians, who would suffer vote dilution in yet another election if this Court imposes Plaintiffs' illustrative map. Such a result would harm all Louisiana voters, including Plaintiffs, by resulting in an election under congressional districts that likely violate the law. The public's expectations for the 2024 election are finally settled through the acts of their elected representatives after hard-fought litigation about what the law requires. The process

that led to SB8 is exactly the process that the Fifth Circuit contemplated when it remanded the *Robinson* case to the district court and imposed a deadline for the Legislature to come into compliance with Section 2. Plaintiffs must not be allowed to disrupt that orderly process through a last-minute collateral attack. Plaintiffs' preliminary injunction motion should be denied.

## FACTUAL BACKGROUND

### *Louisiana has a long history of disenfranchising and discriminating against Black voters.*

As the *Robinson* district court found, "[t]here is no sincere dispute" about "Louisiana's long and ongoing history of voting-related discrimination." *Robinson I*, 605 F. Supp. 3d at 848. Although nearly one-third of Louisiana's voting-age citizens are Black, the State's congressional districting maps included no majority-Black districts until the 1980s. Only after a federal court held that the State's prior congressional district map violated the VRA did the State adopt a map with one majority-Black district. *See Major* v. *Treen*, 574 F. Supp. 325 (E.D. La. 1983).

As the *Robinson* court also found, voting in Louisiana is starkly polarized by race, and, except in majority-Black districts, white voters in Louisiana have consistently voted as a bloc to defeat the candidates preferred by Black voters. *Robinson I*, 605 F. Supp. 3d at 839–844. No Black candidate has been elected to statewide office since Reconstruction; Louisiana has never elected a Black candidate to Congress from a non-majority-Black district; and Black Louisianians are substantially underrepresented in both houses of the State legislature. *Id*. at 845–46.

### *The Louisiana Legislature enacts HB1 over a gubernatorial veto.*

The 2020 census revealed that Louisiana's population increased since 2010, that this growth was driven almost entirely by growth in minority populations, and that Black citizens represent approximately 33.1% of the State's total population and 31.2% of its voting age population. *Id*. at 851. The census also showed that the State's congressional apportionment remained unchanged from 2010 at six congressional seats. *Id*. at 767. Consistent with its

constitutional obligation to ensure that its congressional districts are as equal in population as possible, the State undertook its decennial redistricting process to redraw its district maps. *Id*. at 769–70.

Between October 2021 and January 2022, the Legislature held public hearings across the State to solicit views about congressional redistricting. Voter after voter urged the Legislature to enact a map including two districts in which Black voters would have the same opportunity as white voters to elect their candidates of choice. Voters and Louisiana-based voting rights organizations also provided detailed analysis showing that the adoption of a plan with two districts in which Black voters had an equal opportunity to elect their candidates of choice was required by the VRA.[1] Multiple proposals for district maps with two majority-Black districts, including maps resembling SB8, were presented to the Legislature.[2]

The Legislature rejected these plans and adopted HB1. Like its predecessors, HB1 had one majority-Black district stretching from New Orleans to Baton Rouge. HB1 also provided for five districts with large white voting age majorities. Then-Governor Edwards vetoed HB1 on the ground that it "violate[d] Section 2 . . . and further is not in line with the principle of fundamental fairness." The Legislature overrode the Governor's veto and HB1 became law.[3]

---

[1] Email Testimony of Michael Pernick submitted to the Monroe, La. Redistricting Roadshow (Oct. 18, 2021), https://redist.legis.la.gov/2020_Files/MtgFiles/Email Testimony - Michael Pernick, NAACP Legal Defense & Educational Fund, Inc., & others.pdf.

[2] *See* H.B. 4, 1st Spec. Sess. (La. 2022); H.B. 5, 1st Spec. Sess. (La. 2022); H.B. 7, 1st Spec. Sess. (La. 2022); H.B. 8, 1st Spec. Sess. (La. 2022); H.B. 9, 1st Spec. Sess. (La. 2022); H.B. 12, 1st Spec. Sess. (La. 2022); S.B. 2, 1st Spec. Sess. (La. 2022); S.B. 4, 1st Spec. Sess. (La. 2022); S.B. 6, 1st Spec. Sess. (La. 2022); S.B. 9, 1st Spec. Sess. (La. 2022); S.B. 10, 1st Spec. Sess. (La. 2022); S.B. 11, 1st Spec. Sess. (La. 2022); S.B. 16, 1st Spec. Sess. (La. 2022); S.B. 18, 1st Spec. Sess. (La. 2022); Amendment #88 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #99 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #153 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #62 to S.B. 2, 1st Spec. Sess. (La. 2022); Amendment.

[3] March 9, 2022 Letter from Governor John Bel Edwards to Hon. Clay J. Schexnayder, https://gov.louisiana.gov/assets/docs/Letters/SchexnayderLtr20220309VetoHB1.pdf.

*The district court enjoins HB1 as likely violating the VRA.*

Immediately after the veto override, the *Robinson* and *Galmon*[4] plaintiffs—voting rights organizations and individual Black voters from across the state—commenced actions in the U.S. District Court for the Middle District of Louisiana against the Secretary of State challenging HB1 on the ground that it dilutes the voting strength of the state's Black voters in violation of Section 2 and moved for preliminary injunctions against the plan's implementation. The Attorney General and the leaders of both houses of the Legislature intervened as defendants, and the Legislative Black Caucus intervened as a plaintiff. In May 2022, the district court held a five-day evidentiary hearing on the plaintiffs' preliminary injunction motions. The parties presented testimony from seven fact witnesses and fourteen experts and made extensive pre- and post-hearing written submissions. *Robinson I*, 605 F. Supp. 3d at 768–69.

On June 6, 2022, Judge Dick issued a 152-page Ruling and Order granting plaintiffs' motion for a preliminary injunction. *Id.* at 766. The court concluded that the plaintiffs were substantially likely to prevail on each of the preconditions for establishing Section 2 liability under *Thornburg* v. *Gingles*, 478 U.S. 30 (1986), and, as *Gingles* also requires, with regard to the totality of the circumstances. The court considered and squarely rejected the arguments Plaintiffs urge here that the first *Gingles* precondition—namely, a showing that the Black population is sufficiently large and geographically compact to constitute a majority in a single member district that is reasonably compact and drawn in conformity with traditional redistricting principles—cannot be established; that the illustrative maps plaintiffs presented showing two majority-Black districts were unconstitutional racial gerrymanders; and that the *Hays* cases from the 1990s precluded enactment of a congressional map with two majority-Black districts. *Id.* at 820–39.

---

[4] *Galmon* v. *Ardoin*, No. 3:22-cv-00214-SDD-SDJ (M.D. La.).

In granting the preliminary injunction, the court provided the Louisiana Legislature an opportunity to adopt a remedial plan that included two majority-Black districts. *Id.* at 766. The court emphasized the Supreme Court's direction that "[s]tates retain broad discretion in drawing districts to comply with the mandate of § 2," and that the State is not required to "draw the precise compact district that a court would impose in a successful § 2 challenge." *Id.* at 857 (quoting *Shaw* v. *Hunt*, 517 U.S. 899, 917 n.9 (1996), and *Bush* v. *Vera*, 517 U.S. 952, 978 (1996)); *see also id.* at 857–58 (nothing that "deference is due to [the State's] reasonable fears of, and to their reasonable efforts to avoid, § 2 liability") (quoting *Vera*, 517 U.S. at 978).

***The Fifth Circuit denies a stay pending appeal, but the Supreme Court stays the preliminary injunction pending* Allen *v.* Milligan.**

The defendants in *Robinson*—two of which are Defendants here—filed notices of appeal and moved for a stay pending appeal. On June 12, 2022, a Fifth Circuit motions panel unanimously denied the *Robinson* defendants' motion, concluding that the defendants had "not met their burden of making a strong showing of likely success on the merits." *Robinson II*, 37 F.4th at 215. The panel squarely rejected defendants' arguments that "complying with the district court's order [to adopt a plan with two majority-Black districts] would require the Legislature to adopt a predominant racial purpose." *Id.* at 222–24*; see also id.* at 215 (noting that the district court's order on appeal "requires the Louisiana Legislature to enact a new congressional map with a second black-majority district"); *id* at 223 ("[T]he defendants have not overcome the district court's factual findings indicating that the [plaintiffs'] illustrative maps are not racial gerrymanders.").

The Supreme Court subsequently ordered that the case be "held in abeyance pending this Court's decision" in *Allen* v. *Milligan* (then-named *Merrill* v. *Milligan*), a case involving a challenge to Alabama's congressional district map under Section 2 of the VRA. *See Ardoin* v. *Robinson*, 142 S. Ct. 2892 (2022). On June 8, 2023, the Court issued its decision in *Milligan*,

upholding the lower court's preliminary injunction against the Alabama map and strongly reaffirming the *Gingles* framework. *See Allen* v. *Milligan*, 599 U.S. 1, 17 (2023). The Court thereafter lifted the stay in *Robinson* and remanded "for review in the ordinary course and in advance of the 2024 congressional elections in Louisiana." *Ardoin* v. *Robinson*, 143 S. Ct. 2654 (2023).

**The Fifth Circuit agrees that HB1 likely violates the VRA, but vacates the injunction because there was adequate time for a trial before the 2024 election.**

On November 10, 2023, the merits panel of the Fifth Circuit issued a unanimous opinion endorsing the *Robinson* court's ruling that plaintiffs were likely to succeed on the merits of their Section 2 claim. *Robinson III*, 86 F.4th at 583. The court concluded that a redistricting objective to establish two majority-Black districts "does not automatically constitute racial predominance." *Id.* at 594 (citing *Milligan*, 599 U.S. at 32–33). The court rejected the defendants' argument that, because the plaintiffs' proposed illustrative maps were "designed with the goal of at least 50 percent [Black Voting Age Population]," they were impermissible racial gerrymanders. *Id.* at 593. The court reasoned that "[a]ttempting to reach the needed 50 percent threshold does not automatically amount to racial gerrymandering." *Id*. at 594. The "target of reaching a 50 percent BVAP was considered alongside and subordinate to the other race-neutral traditional redistricting criteria *Gingles* requires," including consideration of "communities of interest, political subdivisions, parish lines, culture, religion, etc." *Id.* at 595. The court concluded that "[t]he district court's preliminary injunction . . . was valid when it was issued." *Id.* at 599.

The Fifth Circuit nevertheless vacated the preliminary injunction on the ground that "[f]or the 2024 Louisiana elections calendar . . . there is no imminent deadline," and because a trial on the merits could be held before that election, a preliminary injunction "is no longer required to prevent the alleged elections violation." *Id.* at 600. The court allowed the Legislature until January

15, 2024, to enact a new congressional redistricting plan and directed that "[i]f no new plan is adopted, then the district court is to conduct a trial and any other necessary proceedings to decide the validity of the H.B. 1 map, and, if necessary, to adopt a different districting plan for the 2024 election." *Id.* at 601–02. The district court subsequently extended that deadline, at the defendants' request, to January 30, 2024. *Robinson I*, ECF No. 330. The Fifth Circuit denied defendants' motion for reconsideration en banc. *Robinson III*, ECF No. 363.

***Governor Landry calls a Special Session to enact a new congressional map.***

On January 8, 2024, newly inaugurated Governor Landry called the Legislature into an extraordinary session to, *inter alia*, "legislate relative to the redistricting of the Congressional districts of Louisiana."[5] One week later, the Legislature convened. Prior to the commencement of session, the Committee on House and Governmental Affairs met for an informational briefing from committee staff and the Attorney General on the requirements for the redistricting process and legal process that led to the special session.[6] The briefing emphasized population shifts reported in the last census, traditional redistricting principles, and the court record in *Robinson*.[7]

In a speech to the Legislature, Governor Landry explained that the purpose of the Special Session was to approve a new Congressional district map that satisfied the VRA and that was chosen by the Legislature rather than the courts. He averred that the State had "exhausted all legal remedies" to defend HB1.[8] He implored the legislators to "join [him] in adopting the redistricting maps proposed," stating the "maps will satisfy the court and ensure that the congressional districts

---

[5] Proclamation 01 JML 2024, Call and Convene the Legislature of Louisiana into Extraordinary Session (Jan. 8. 2024), available at https://www.gov.louisiana.gov/assets/ExecutiveOrders/2024/JML-Proclamation-01.pdf.

[6] *See generally* La. Committee on House and Governmental Affairs Meeting (Jan. 15, 2024), available at https://redist.legis.la.gov/default_video?v=house/2024/jan/0115_24_HG ("Ex. 1").

[7] *Id*.

[8] Office of the La. Governor, Governor Jeff Landry Opens First Special Session on Court Ordered Redistricting (Jan. 16, 2024), https://gov.louisiana.gov/news/governor-jeff-landry-opens-first-special-session-on-court-ordered-redistricting.

of our State are made right here in the Legislature and not by some heavy-handed member of the federal judiciary."[9]

Seven bills were filed to reconfigure the congressional district lines. Six of those bills provided for two majority-Black districts.[10] SB8, the bill ultimately enacted, provides for a bare majority of Black voters in two districts, CD2 and CD6. An alternative bill, SB4, mirrored a map proposed as a remedial plan by the Plaintiffs in the *Robinson* litigation, which included Black voting age majorities in CD2 and CD5, was substantially identical to maps the district court had held were consistent with traditional redistricting principles and were not predominantly motivated by race or unconstitutional racial gerrymanders.[11]

***Senator Womack describes the political rationale behind SB8.***

The legislative record reflects that the Legislature's primary purpose in enacting SB8 was politics rather than race. Senator Womack, the lead Senate sponsor of SB8, described the bill as the "product of a long, detailed process" to achieve "several goals."[12] First among these goals, Senator Womack stated, was to ensure that his congressional representative, Julia Letlow, "remains both unpaired with any other incumbents and in a congressional district that should

---

[9] *Id.*

[10] *See* H.B. 2, 1st Spec. Sess. (La. 2024); H.B. 5, 1st Spec. Sess. (La. 2024); H.B. 14, 1st Spec. Sess. (La. 2024); H.B. 19, 1st Spec. Sess. (La. 2024); S.B. 4, 1st Spec. Sess. (La. 2024); S.B. 8, 1st Spec. Sess. (La. 2024); S.B. 10, 1st Spec. Sess. (La. 2024).

[11] *Robinson I*, 605 F. Supp. 3d at 838 ("There is *no factual evidence* that race predominated in the creation of the illustrative maps in this case . . . Plaintiffs' expert witnesses William Cooper and Anthony Fairfax explicitly and credibly testified that they did not allow race to predominate over traditional districting principles as they developed their illustrative plans."); *see also Robinson II*, 86 F.4th at 592 ("The district court reviewed the evidence before it and made a factual finding as to what the evidence showed, acknowledging throughout its decision the State's omission of contrary testimony. It concluded that the facts and evidence demonstrated the Plaintiffs were substantially likely to prove the geographic compactness of the minority population . . . There was no clear error by the district court when it found the illustrative maps created a different community of interest and the first *Gingles* precondition was met.").

[12] *See* La. Committee on Senate and Governmental Affairs Meeting (Jan. 16, 2024) ("Ex. 2"), Part II available at https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011624SG2 (starting around 30:17).

continue to elect a Republican to Congress for the remainder of this decade."[13] In this critical way, Senator Womack and other legislators acknowledged, SB8 differed from SB4 (a bill that, as noted, resembled a map proposed by the *Robinson* plaintiffs), which created a new majority-Black district in CD5 which Representative Letlow currently serves.[14] Instead, SB8 created a new majority-Black district in CD6, the district currently held by Congressman Garrett Graves.[15]

Senator Womack further emphasized the political goal of maintaining four "safe Republican seats," and ensuring that the seats currently held by Speaker of the U.S. House of Representatives Mike Johnson and U.S. House Majority Leader Steve Scalise "will have solidly Republican districts at home so that they can focus on . . . national leadership."[16] Senator Womack stated that he "considered a number of different map options" to comply with the federal courts' directives to abide by Section 2, but decided to sponsor SB8 because he believed it best "accomplished the political goals" he believed are "important" for his "district, for Louisiana, and for our country."[17] Senator Womack expanded upon his motivations and the mapping process during questioning from committee members. After acknowledging that SB8 split more parishes than SB4, Senator Womack noted that political considerations were prioritized in balancing other principles, like parish splits: "It was strictly—politics drove this map." [18]

Other legislators were similarly clear about their primary motivation—the safe political futures of select Republican incumbents. While House Speaker Johnson, Majority Leader Scalise, and Representatives Letlow and Higgins were all named during the process,[19] Representative

---

[13] *Id.*
[14] *Id.*
[15] *See* S.B. 8, 1st Spec. Sess. (La. 2024).
[16] *See* Ex. 2 at 31:18 – 31:54 (Jan. 16, 2024).
[17] *Id.* at 33:55 – 34:23.
[18] *Id.* at 34:30 – 35:44.
[19] *See, e.g.*, La. Committee on House and Governmental Affairs, at 26:00 – 26:32 (Jan. 18, 2024), https://redist.legis.la.gov/default_video?v=house/2024/jan/0118_24_HG_P2 ("Ex. 4").

Graves was conspicuously left out of the on-the-record statements by proponents of SB8—consistent with the widely reported accusations that the Governor and allies in the Legislature were motivated to pass a map that would undermine Representative Graves' political future in retaliation for his support of political opponents of both Majority Leader Scalise in his brief candidacy for Speaker of the House and Governor Landry in his recent campaign for Governor.[20]

Senator Womack expressly stated that race was "not the predominant factor" in adopting SB8 but was instead a "secondary consideration."[21] When asked if he analyzed whether the majority-Black districts in SB8 would perform for Black voters, he responded that he conducted no such analysis, but added that he knew how the districts would perform on party lines: "Our analysis is on party, not race."[22] And when asked why the map joined Shreveport and Baton Rouge, Senator Womack stated, "we had to draw two districts, and that's the only way we could get two districts … one of the ways we could get two districts and still protect our political interest."[23]

***Senator Womack describes traditional redistricting principles guiding SB8.***

Senator Womack and other proponents of SB8 also highlighted the shared interests of Louisianians united in the new configuration of CD6, highlighting the communities tied together by the Red River and I-49.[24] Legislators emphasized the shared industry and commerce,

---

[20] *See, e.g.*, Tyler Bridges, *Rep. Garret Graves was on top. Now he's fighting for his political life. What happened?*, NOLA.COM (Jan. 20, 2024), https://www.nola.com/news/politics/rep-garret-graves-sees-fortunes-fall-steeply/article_c4592922-b721-11ee-bba8-c3fe4cd6a7ad.html ("After deciding not to run himself for governor, Graves ran afoul of Landry by backing the bid of Stephen Waguespack, an ally who was then the head of the Louisiana Association of Business and Industry…Apart from payback, Landry has an additional reason to want to sideline Graves, political insiders say. As a sitting congressman with an ability to raise money, Graves could be a formidable challenger to Landry's re-election in 2027. Graves, meanwhile, upset Scalise by not publicly supporting his bid to be speaker in October after McCarthy resigned.").

[21] Ex. 2

[22] Ex. 2 at 38:50 – 43:16.

[23] Meeting of the Louisiana State Senate at 11:10 – 12:08 (Jan. 17, 2024), https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011724SCHAMB ("Ex. 3").

[24] Ex. 2 at 38:08 – 38:24.

educational institutions, agriculture, cattlemen, farms, row crops, and healthcare centers common to the regions connected in CD6 under SB8.[25] During debate in the Committee on House and Governmental Affairs following Senator Womack's introduction of SB8, for example, Representative Ed Larvadain stated his initial preference for the alternative map presented by the *Robinson* plaintiffs, but voiced support for SB8 due to the communities of interest it ties together. Representative Larvadain, who represents communities in Alexandria at the heart of SB8's CD6, detailed communities connected throughout the district in an exchange with Senator Womack:

> **REPRESENTATIVE LARVADAIN**: Okay. Now, when you look at the community of interest, I'm in Rapides. My district is cut up in two spots. I'm in District 4 and District 6. I know in the community of interest, you've got Rapides and Natchitoches, and I think that you've got the Creole Nation, you've got Northwestern State University. A lot of my students in my district attend those, so that's a community of interest. Would you agree?

> **SENATOR WOMACK**: I agree.

> **REPRESENTATIVE LARVADAIN**: When you look at Natchitoches, there's a community of interest with Natchitoches and Caddo. You've got lumber companies in that Natchitoches area. A lot of people work. RoyOMartin has a big plant at Natchitoches, and a lot of folks in my area work there. RoyOMartin is from Alexandria, and a lot of folks work in DeSoto where you have a lot of timber. And would you agree with that?

> **SENATOR WOMACK**: I agree.

> **REPRESENTATIVE LARVADAIN**: You look at St. Landry. St. Landry has -- Opelousas has a nice size, medium sized hospital. So those folks in Pointe Coupee, they will go to St. Landry to get the medical care and so forth in Opelousas area. Would you agree with that?

> **SENATOR WOMACK**: I agree.

> **REPRESENTATIVE LARVADAIN**: And you look at West Baton Rouge, East Baton Rouge Parish.

---

[25] *See, e.g.*, Ex. 4 (starting at 3:52) ("[T]he map that I presented goes along the Red River. It's the I49 corridor. We have commerce through there. We have a college through there. We have a lot of ag[riculture], cattlemen, as well as farm, row crop, and a lot of people up through that corridor come back to Alexandria using that corridor for their healthcare.").

[…]

**REPRESENTATIVE LARVADAIN:** And it goes all the way to the great City of Shreveport?

**SENATOR WOMACK:** Right. Where our LSU hospital is.

**REPRESENTATIVE LARVADAIN:** The hospital is vital because in Alexandria, we had Huey P Long [Medical Center]. You're familiar with that, and Jindal shut my Huey P. Long, so my folks in Rapides have to go to LSU. So that's a community of interest.[26]

Despite numerous amendments offered to SB8 through the week-long session, only a handful were accepted.[27] Right before final passage on the last day of the special session, the House of Representative stripped away an amendment to the bill accepted in House and Governmental Affairs that increased the BVAP in both CD2 and CD6.[28] Reflecting the version endorsed by the Governor over amendments and alternatives, SB8 passed 86-16 in the House,[29] and was accepted by concurrence in the Senate, 27-11, on January 19, 2024.[30] Governor Landry signed the map into law as Act 2 on January 22, 2024.[31]

**The Callais Plaintiffs sue.**

Almost immediately after the enactment of SB8, Plaintiffs, a group of "non-African American" voters, filed the present suit attacking SB8 as a racial gerrymander and raising the exact legal issue that the *Robinson* court has already answered in the affirmative: whether Section 2

---

[26] *Id.* at 20:50 – 28:38.

[27] *See, e.g.*, S.B. 8, 1st Spec. Sess. (La. 2024) House Floor Amendment #83 Beaullieu Adopted; S.B. 8, 1st Spec. Sess. (La. 2024) House Committee Amendment #74 H&G Adopted; S.B. 8, 1st Spec. Sess. (La. 2024) House Committee Amendment #68 H&G Draft; S.B. 8, 1st Spec. Sess. (La. 2024) House Committee Amendment #70 H&G Draft; S.B. 8, 1st Spec. Sess. (La. 2024) Senate Committee Amendment #48 S&G Adopted; S.B. 8, 1st Spec. Sess. (La. 2024) Senate Committee Amendment #38 S&G Draft; S.B. 8, 1st Spec. Sess. (La. 2024) Senate Committee Amendment #34 S&G Draft; S.B. 8, 1st Spec. Sess. (La. 2024) Senate Committee Amendment #31 S&G Draft.

[28] Piper Hutchinson, *Louisiana House committee alters, advances congressional map with 2nd Black district*, Louisiana Illuminator (Jan. 18, 2024), https://lailluminator.com/2024/01/18/louisiana-house-committee-alters-advances-congressional-map-with-2nd-black-district/.

[29] Vote on Final Passage, S.B. 8, 1st Spec. Sess. (Jan. 19, 2024).

[30] Concurrence Vote, S.B. 8, 1st Spec. Sess. (Jan. 19, 2024).

[31] Act 2, 1st Spec. Sess. (La. 2024).

requires Louisiana to have a second congressional district where Black voters can elect a candidate of choice. Compl., ECF No. 1 at 22–28. Plaintiffs also asked this Court to enjoin SB8 and reinstate a map with a single district in which Black voters could elect a candidate of their choosing. Mot., ECF No. 17 at 2. Plaintiffs' Illustrative Map 1 closely resembles Louisiana's 2022 map, which has been held to likely violate the *Robinson* plaintiffs' rights under Section 2 of the VRA. *Robinson I*, 605 F. Supp. at 766; *Robinson II*, 37 F.4th at 215; *Robinson III*, 86 F.4th at 583.

## ARGUMENT

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek* v. *Lamone*, 585 U.S. 155, 158 (2018). To obtain a preliminary injunction, the movant must establish four elements: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Robinson III*, 86 F.4th at 587. The balance of the equities and the public interest "merge" as factors in the preliminary injunction analysis "when the Government is the opposing party." *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). Plaintiffs "clearly carr[y] the burden of persuasion on all four elements," and must meet that burden with respect to each element in order for a preliminary injunction to issue. *Lake Charles Diesel, Inc.* v. *General Motors Corp.*, 328 F.3d 192, 195 (5th Cir. 2003).

## I.    Plaintiffs are not likely to succeed on the merits of their claims.

The Supreme Court has imposed a "high bar to racial gerrymandering challenges." *Robinson III*, 86 F.4th at 595; *Cooper* v. *Harris*, 581 U.S. 285, 291 (2017). To meet that high bar, Plaintiffs must prove that "race was the predominant factor" motivating the Louisiana Legislature to pass SB8. *Id.* That requires a showing that the Legislature "'subordinated' other [traditional districting] factors," including compactness, respect for political subdivisions, political influences,

14

and communities of interest, to race. *Id.* "Strict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Vera*, 517 U.S., at 958 (O'Connor, J., principal opinion); *cf. Milligan*, 599 U.S. at 30 (Roberts, C.J., plurality opinion) (holding that "race consciousness does not lead inevitably to impermissible race discrimination," and that in fact "Section 2 itself 'demands consideration of race.'") (citations omitted).

Even where race is the predominant factor, a racial gerrymandering claim will not succeed if strict scrutiny is satisfied, as it is here. Strict scrutiny is satisfied if "the State's decision to draw [an additional majority-Black district] [wa]s narrowly tailored to the compelling interest of compliance with the VRA." *Walen*, 2023 WL 7216070, at *10.

To prevail on an intentional vote dilution claim under the Fourteenth and Fifteenth Amendments, Plaintiffs must show that the redistricting plan (i) has a discriminatory effect and (ii) was enacted with a discriminatory purpose. *Hall* v. *Louisiana*, 108 F. Supp. 3d 419, 439 (M.D. La. 2015). This is a fact-intensive standard. *See Vill. of Arlington Heights* v. *Metro Housing Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

Plaintiffs cannot establish a likelihood of proving any of these necessary components of their claims, and their preliminary injunction must be denied.

A.   **The State and the Legislature had a strong basis in evidence to believe Section 2 required a second majority-Black district.**

A race-conscious redistricting plan requires a "strong basis in evidence" for concluding that it otherwise would be vulnerable to a Section 2 vote dilution claim. *Alabama Legislative Black Caucus* v. *Alabama*, 575 U.S. 254, 278 (2015); *Clark* v. *Calhoun Cnty., Miss.*, 88 F.3d 1393, 1405–06 (5th Cir. 1996). Evidence sufficient to provide the requisite "strong basis" for the use of race in redistricting need not conclusively establish that a Section 2 violation would occur without it. The "strong basis" standard

> does not require the State to show that its action was actually . . . necessary to avoid a statutory violation, so that, but for its use of race, the State would have lost in court. Rather, the requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to satisfy the Voting Rights Act, even if a court does not find that the actions were necessary for statutory compliance.

*Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U.S. 178, 194 (2017) (cleaned up).

Here, the decisions by the district court and two unanimous Fifth Circuit panels in *Robinson* provided the State with much more than required to give it a strong basis, supported by ample and substantial evidence and thorough analysis, to conclude that the VRA required it to adopt a congressional map with two majority-Black districts. The district court, based on evidence presented during a five-day hearing, concluded in a 152-page opinion that the plaintiffs were substantially likely to establish each of the *Gingles* preconditions and prove Section 2 liability in the totality of the circumstances. *See Robinson I*, 605 F. Supp. 3d at 766. Two unanimous panels of the Fifth Circuit—*first*, denying the State's motion to stay pending appeal, *see Robinson II*, and *second*, by the full merits panel, *see Robinson III* at 600-601—agreed with the district court's findings. *See Theriot* v. *Par. of Jefferson*, 1996 WL 637762, at *1 (E.D. La. Nov. 1, 1996) (where "copious litigation and appeals" finding that each *Gingles* precondition was satisfied provided the state with "a strong basis in evidence to believe a black-majority district was reasonably necessary to comply with Section 2 and thus provided a compelling interest in [an additional] majority-minority district"); *see also Clark*, 88 F.3d at 1408 (holding that there was a strong basis in evidence for concluding a VRA-compliant map was necessary where court had "already found that the three *Gingles* preconditions exist[ed] [t]here").

Plaintiffs make no effort to show that the *Gingles* preconditions are not satisfied. They do not even cite *Gingles*. Instead, despite this "copious" litigation record, *Theriot*, 1996 WL 637762, at *1, Plaintiffs attempt to revisit arguments already decided and squarely rejected in *Robinson*,

including whether, using 2020 census data, a sufficiently numerous and geographically compact second majority-Black district can be drawn in Louisiana, and whether drawing such a district would require the State to impermissibly use race as the predominant factor. ECF No. 17-1 at 25–26. Plaintiffs extensively cite legal arguments—which Plaintiffs call "admissions," despite their rejection by the courts—from the State's *briefing* on the preliminary injunction in *Robinson* to assert it is "impossible" to draw a second majority-Black district "without impermissibly resorting to mere race as a factor." ECF No. 17-1 at 26. But the district court and the Fifth Circuit rejected those arguments. *Robinson I*, 605 F. Supp. 3d at 827; *Robinson II*, 37 F.4th at 222. In these circumstances, the Legislature had a more than strong basis in evidence to conclude that the VRA required a congressional redistricting plan with two districts in which Black Louisianans could elect candidates of their choice.

**B.     Race was not the predominant factor in the enactment of SB8; the legislative record shows that the Legislature enacted SB8 to comply with the VRA, *and* the contours of the map were driven by politics, not race.**

"Electoral districting is a most difficult subject for legislatures, requiring a delicate balancing of competing considerations, [and] differs from other kinds of state decision making in that the legislature always is aware of race when it draws district lines, just as it is aware of ... a variety of other demographic factors." *Bethune Hill*, 580 U.S. at 187. "[T]he legislature 'must have discretion to exercise the political judgment necessary to balance competing interests,' and courts must 'exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race.'" *Easley* v. *Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Miller* v. *Johnson*, 515 U.S. 900, 915–16 (1995)) (emphasis in original). "Caution is especially appropriate . . . where the State has articulated a legitimate political explanation for its districting decision." *Id*. at 242; *see also Robinson I*, 605 F. Supp. 3d at 856–58; *Robinson III*, 86 F.4th at 601.

To prevail on their claim that SB8 made unconstitutional use of race in establishing district lines, "[r]ace must not simply have been *a* motivation for the drawing of a majority-minority district, but the '*predominant factor*' motivating the legislature's districting decision." *Easley*, 532 U.S. at 241 (emphases in original) (cleaned up). A district's unusual shape is not conclusive evidence of a racial gerrymander. Where a district's shape can be explained by other districting considerations, such as politics, it carries little to no weight as evidence of racial gerrymandering. *Cromartie*, 532 U.S. at 243–53.

Likewise, stray comments by legislators—even the chief sponsor of the redistricting plan—that race factored into a plan's overall configuration must not be viewed in isolation but must be considered in context and in light of the entire legislative record. *Id.* at 253-54. In *Cromartie*, for example, the Supreme Court reversed the district court's finding that race predominated and rejected the court's fact-finding from the legislative record. *Id.* Where the district court had relied on the bill sponsor's statement that the challenged plan achieved "racial and partisan balance," the Supreme Court, reviewing that comment in context, concluded that it merely demonstrated that race was one consideration among many and did not establish racial predominance. *Id.*

As in *Cromartie*, the legislative record here, viewed as a whole, demonstrates that the legislature's configuration of CD6 was overwhelmingly driven by political rather than racial considerations. Indeed, contrary to Plaintiffs' telling, the legislative record on SB8 makes clear that non-racial motivations were centered in the development of the plan. Concerns over legislative control of the redistricting process—a desire for the Legislature to draw a Section 2-compliant map on their own terms, rather than accept districts imposed by the judiciary—echoed from the

Governor's speech to the final passage of SB8.[32] Maintaining control over the process was a first and essential display of power for the newly elected Governor and state legislative leadership after securing a partisan sweep of statewide political offices and a supermajority in the Legislature.[33] This incentive was coupled with a clear list of motivating factors for the particular configuration of SB8, in which race figured as a distant and distinctly secondary factor, namely:

1.    To ensure Representative Letlow remains unpaired with other incumbents and in a district that will continue to elect a Republican to Congress;[34]

2.    To maintain four Republican seats, with special effort to ensure Speaker Johnson and Majority Leader Scalise are in "safe Republican seats";[35]

3.    To connect the communities with shared interests along the Red River and I-49 corridor, which share commerce, a college, agriculture, cattlemen, farms, row crops, and healthcare centers, among other connective tissue;[36] and

4.    To comply with the Fifth Circuit's and District Court's decisions concerning the requirements of Section 2, while still accomplishing "the political goals" stated above.[37]

---

[32] *See, e.g.*, Office of the Governor, *Governor Jeff Landry Opens First Special Session on Court Ordered Redistricting* (Jan. 16, 2024), https://gov.louisiana.gov/news/governor-jeff-landry-opens-first-special-session-on-court-ordered-redistricting ("We do not need a federal judge to do for us what the people of Louisiana have elected you to do for them. You are the voice of the people, and it is time that you use that voice."); Liz Murrill (@AGLizMurrill), Twitter (Jan. 16, 2024, 4:53 PM), https://twitter.com/AGLizMurrill/status/1747376599446516056 ("[W]e have a federal judge holding her pen in one hand and a gun to our head in the other."); La. House of Representatives Floor Debate (Jan. 19, 2024) available at https://www.house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/0119_24_1ES_Day5 ("Ex. 5") (starting at 2:48:44) ("If we don't act, it's very clear that the federal court will impose the plaintiff's proposed map on our state and we don't want that.").

[33] *See, e.g.*, *id*, *see also* Piper Hutchinson, *Louisiana's special session on election matters: Winners and losers*, La. ILLUMINATOR (Jan. 20, 2024), https://lailluminator.com/2024/01/20/louisianas-special-session-on-election-matters-winners-and-losers/ (Highlighting the fact that "Louisiana's brand-new governor got the congressional map he asked for with two majority Black districts," as an important win given the "gamble" he took on other priorities during the session; also noting "Senate President Cameron Henry, R-Metairie, is clearly running the show at the Capitol," and that the Senate "got its own way in almost everything, including a congressional map its senator sponsor drew.").

[34] *See* Ex. 2 (starting around 30:17); Ex. 4 (starting at 1:44); Ex. 5 (starting at 2:46:00).

[35] *See* Ex. 2 (starting around 31:18); *see also* Ex. 4 (starting at 3:01).

[36] Ex. 2 (starting at 33:50).

[37] *Id.* (starting at 33:50).

In light of this record, Plaintiffs' contention that race predominated in the drawing of SB8 does not withstand scrutiny. Plaintiffs point to statements by legislators that SB8 was adopted to create a second majority-Black congressional district in order to comply with the VRA. But the courts have been clear that a state's effort to comply with Section 2 does not entail that race was the predominant factor in any possible map. *See Allen*, 599 U.S. at 32–33 (plurality opinion) (concluding that race had not predominated in an illustrative plan's creation of a second majority-Black district to support plaintiffs' Section 2 claim); *Robinson III*, 86 F.4th at 595 (evidence that map drawer had the goal of reaching a particular target Black voting age population to comply with Section 2, which was balanced with other, non-racial considerations, was insufficient to establish racial predominance). Race was not—and did not need to be—the Legislature's primary consideration for it to achieve two majority-Black districts. *See Cromartie*, 532 U.S. at 253 (comments by legislators that race was part of the legislature's calculus "says little or nothing about whether race played a *predominant* role comparatively speaking.") (emphasis in original).

Moreover, Plaintiffs mischaracterize the testimony they rely on for this point. For example, Plaintiffs cite Senate Womack's statement that SB8's unusual configuration "was the only way we could get two districts …," trailing off with an ellipsis. Mem. at 8. What they elide is the critical context of Senator Womack's statement: that SB8 "was the only way we could get two districts … *and still protect our political interest*."[38]

Plaintiffs' other citations of the legislative record are similarly misleading. For example, Plaintiffs' assertion that "[r]ace was the only reason [CD6] extended into far-flung regions of Louisiana," Mem. at 8, ignores the significant testimony about the economic, social, and community ties among the communities drawn together in the district. For example, Plaintiffs

---

[38] Ex. 3 (starting at 10:30 (emphasis added)).

assert that Senator Womack disavowed that CD6 comprised a community of interest, and "denied that he considered agriculture a community of interest." *Id.* But whether characterized as a "community of interest" or as a "positive of going up that corridor," as Senator Womack explained his thought process in configuring CD6 to encompass "your timberland, your ag[riculture], your hospitals,"[39] it provides a non-racial explanation for the configuration of CD 6 that Plaintiffs completely ignore. Plaintiffs also ignore the extended colloquy between Representative Larvadain and Senator Womack about the numerous educational, healthcare, economic, employment, and other ties binding the communities in CD6. *See supra* pp. 12–13.[40]

Plaintiffs contend that CD6's peculiar shape in SB8 is explainable only by race. Even accepting that SB8 violates traditional redistricting principles—which Amici do not concede[41]—Plaintiffs' argument that race was the reason is belied by the legislative record. *See* Mem. at 18-24. As the Supreme Court made clear in *Cromartie*, it is not the fact of a district's shape that alone establishes racial predominance, but the reasons for choosing a bizarre district configuration. 532 U.S. at 238. Here, the evidence is plain that (1) the legislature had predominantly political reasons for choosing to configure CD6 the way it did, and (2) it could have achieved the goal of creating a second majority-Black district with a more compact district configuration that split fewer parishes and municipalities. With respect to the second point, in the First Extraordinary session,

---

[39] *Id.* (starting at 12:20).
[40] Even the statements of opponents of SB8 on which plaintiffs rely do not establish that race predominantly explains the plan's district configuration. For example, Plaintiffs point to Rep. Bayham's discontent over the split of St. Bernard Parish and his statement that the boundary did not appear to split voters in the parish "on partisan lines." Mem. at 17. But nowhere did Rep. Bayham suggest that race provides a better explanation of the split—it didn't. He simply did not want his parish split at all. Ex. 5 (starting at 2:50:00).
[41] CD6 and other districts in SB8 are no less compact than districts around the country that have been upheld as appropriate exercises of the states' obligation to avoid minority vote dilution and comply with the VRA. For example, in *Abbott* v. *Perez*, the Supreme Court uphold "a viable opportunity district along the I–35 corridor." 585 U.S. 579, 615-16 (2018). Moreover, in the racial gerrymandering context, the courts have given the term a more expansive definition than in the Section 2 context, including such consideration as protecting incumbents and partisanship. *See*, *e.g.*, *Cromartie*, 532 U.S. at 248.

the Legislature had opportunities to adopt a map—for example, in SB4, which mirrored the *Robinson* Amici's proposed remedial map—that would have created two majority-Black districts *and* fared better than SB8 on traditional principles like parish splits, population deviation, and compactness, among others.[42] Instead, the Legislature favored the configuration in SB8 for the conspicuous political objective to defend Representative Letlow and other specific Republican incumbents at the expense of Representative Graves. The sponsor of the bill was candid that "politics drove this map" while race was a "secondary consideration" and "not the predominant factor."[43] Given that the Legislature could have selected a plan that achieved the same VRA-compliance goals as SB8 in a form that better adhered to traditional redistricting principles, but chose not to so as to achieve explicitly political (and non-racial) goals, an honest reading of the legislative record establishes that choice of the purportedly "bizarre" configuration of districts in SB8 was driven by politics, not race.

Plaintiffs' reliance on Mr. Hefner's report to support their contention that SB8 elevates race over traditional redistricting principles is misplaced. *See* ECF No. 17-1 at 25. Mr. Hefner's analysis is far from comprehensive.[44] On the contrary, it contains no analysis of communities of interest, other than a numerical count of parish and municipality splits. Mr. Hefner's report also differs markedly from a report he submitted in the *Robinson* litigation, where he defended the "regional communit[y] of interest" along the Red River Valley—a community that the drafters of SB8 expressly sought to unite—stating that "[c]ultural links along the Red River Valley . . . has

---

[42] *See, e.g.*, H.B. 5, 1st Spec. Sess. (La. 2024); S.B. 4, 1st Spec. Sess. (La. 2024). Both HB5 and SB4 split only 11 parishes, had a deviation of 67, and fared better than SB8 on both subjective and objection measures of compactness (e.g. the eyeball test, Polsby-Popper, etc.).

[43] *See* Ex. 2 (starting around 34:30).

[44] More than one court has found Mr. Hefner's testimony to be unhelpful. *See, e.g., Terrebonne*, 274 F. Supp. 3d at 422 (rejecting Hefner's opinion because he failed to provide any objective basis for his analysis and rejecting Hefner's opinion that the mapmaker's illustrative plan was a racial gerrymander); *Thomas* v. *School Board St. Martin Parish*, 544 F. Supp. 3d 651, 688, 689 (W.D. La. 2021) (court considered Hefner's opinions to be "weak" and "based on unreliable data").

[sic] commonality with the northern part of the Acadiana Region as the Red River connected to the Atchafalaya River at its juncture with the Mississippi River and form[s] an important water transportation route." *Robinson I*, ECF No. 108-3 at 33. Likewise, his analysis of SB8's treatment of majority-Black precincts at best establishes that race was a consideration, as it must be in a map that is intended to comply with the VRA. *See, e.g.*, *Milligan*, 599 U.S. at 30 ("Section 2 itself demands consideration of race.") (internal quotations omitted). It does not establish that, given the Section 2 violation the *Robinson* Amici demonstrated, race was used impermissibly.

Thus, Plaintiffs' assertion that SB8 was configured "solely with that goal [of creating two majority-Black districts] in mind," Mem. at 15, is false and unsupported by the legislative record. The record as a whole and the circumstances surrounding the passage of SB8 demonstrate that race was just one of several factors, which also include politics, social and economic ties, and other considerations, that the Legislature considered in adopting the new plan. Plaintiffs' evidence fails to establish that race predominated over these other considerations, and their racial gerrymandering claim must fail. *See Cromartie*, 532 U.S. at 257 (racial gerrymandering claim fails where plaintiff "has not successfully shown that race, rather than politics, predominantly accounts for the result"). "Strict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Vera*, 517 U.S., at 958 (O'Connor, J., principal opinion).

## C.   SB8 was drawn to further the State's compelling interest in complying with Section 2 of the VRA.

Even if Plaintiffs could succeed in showing that race predominated the map-drawing process—and they cannot—SB8 survives strict scrutiny because the Legislature adopted it to further the State's compelling interest in complying with the VRA and used race no more than necessary to achieve that goal. "[C]ompliance with Section 2 constitutes a compelling governmental interest," *Clark*, 88 F.3d at 1405, sufficient to "justif[y] the predominant use of race

in redistricting" so long as it is narrowly tailored to that goal, *Bethune Hill*, 580 U.S. at 193; *see also Prejean* v. *Foster*, 227 F.3d 504, 515–19 (5th Cir. 2000). As explained above, the State and Legislature had a compelling basis in evidence to conclude that Section 2 required them to create a second district in which Black voters would have an opportunity to elect candidates of their choice, and indeed, that this second opportunity district had to be majority Black. *See supra* Sec. I. A.

The Legislature's use of race in SB8 is narrowly tailored to satisfy that legal obligation. A VRA-compliant map is narrowly tailored where it, like SB8, "substantially address[es]" the purported Section 2 violation and does not subordinate traditional redistricting principles "*for predominantly racial reasons.*" *Clark*, 88 F.3d at 1407–08 (quoting *Bush*, 517 U.S. at 994 (O'Connor, J., concurring)) (emphasis added). Courts, including the Fifth Circuit, have consistently held that a map will be narrowly tailored so long as it "does not 'subordinate traditional districting principles *to race* substantially *more than is 'reasonably necessary'* to avoid § 2 liability.'" *Clark*, 88 F.3d at 1407 (quoting *Vera*, 517 U.S. at 979) (emphases added); *see also, e.g.*, *Addy* v. *Newton Cnty.*, 2 F. Supp. 2d 861, 862–64 (S.D. Miss. 1997), *aff'd*, 184 F.3d 815 (5th Cir. 1999); *Theriot* v. *Par. of Jefferson*, 966 F. Supp. 1435, 1447–48 (E.D. La. 1997).

Importantly, the teaching of these cases is *not* that congressional maps may never deviate from the bounds of traditional restricting principles. Once a state has the requisite strong basis in evidence that the VRA mandates an additional majority-minority district, it is not obligated to choose the most compact map that satisfies the VRA. To be sure, Section 2 "never *require[s]* adoption of districts that violate traditional redistricting principles," *Milligan*, 599 U.S. at 30 (emphasis added), but it is also true that "Section 2 *does not forbid* the creation of a noncompact majority-minority district." *League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399, 430

(2006) ("*LULAC*") (emphasis added). In *Addy* v. *Newton County*, for example, the district court found that there was "no equal protection violation since the decision as to where to place the district lines was driven by politics, not race." 2 F. Supp. 2d at 863–64 (quoting *Theriot* v. *Par. of Jefferson*, 1997 WL 204919, at *13–14 (E.D. La. 1997)). The parish leadership there, who redrew their maps in response to a successful Section 2 challenge, faced a choice between two potential remedial maps, one that created a "east-west" majority-minority district and another that created a "north-south" district. The court found that the legislators selected the map with the north-south configuration "to protect their own seats and to undermine the chance of [another legislator's] reelection … by placing him in the majority-minority district," and "to the extent the [Parish] may have sacrificed a degree of compactness by selecting the north-south rather than east-west location for the majority-minority district, it did so exclusively for political, not racial reasons." *Id.*

Here, SB8 substantially addresses the likely Section 2 violation found by Judge Dick and the Fifth Circuit because, consistent with those rulings, it includes two majority-Black districts in which the BVAP is only slightly above 50% and is no higher than necessary to create the electoral opportunities Section 2 requires. Moreover, the fact that the districts in SB8 are not as compact as HB1 or other alternatives and that it splits more parishes and municipalities is not evidence that it is insufficiently narrowly tailored.

The record establishes that, here, creating a second majority-Black district did not *require* deviating from traditional redistricting principles—as evidenced by SB4, which was substantially similar to plans offered by the plaintiffs in the *Robinson* litigation that the courts found compact and reasonably configured. SB8 thus does not subordinate traditional redistricting principles *to race* more than necessary to avoid Section 2 liability. Rather, as in *Addy*, the Legislature *chose* to subordinate compactness and other considerations in adopting SB8 to political considerations, not

racial ones—to protect the seats of specific Republican congresspeople and to thwart the potential reelection of Representative Graves by placing him in the new majority-Black district. *See supra* pp. 9–11. In other words, SB8's sacrifice of certain redistricting principles "was not predominantly attributable to gerrymandering that was racially motivated and/or achieved by the use of race as a proxy, but instead was a case of predominantly, nonracial, political motivations." *Addy*, 2 F. Supp. 2d at 862–64 (citations omitted).[45]

Plaintiffs' remaining arguments are unavailing. Plaintiffs argue—incorrectly—that compliance with the VRA is not a compelling interest here because the Legislature did not engage in a "pre-enactment analysis." PI at 5. This argument ignores more than two years of litigation which resulted in a robust evidentiary record and multiple court rulings showing that Section 2 likely required a second Black-opportunity district and that such a district could be achieved without violating the Constitution. The legislature was permitted to rely on that litigation record. *See Theriot*, 1996 WL 637762, at *1 (finding "a 'strong basis in evidence' to believe a black-majority district was 'reasonably necessary' to comply with Section 2" based on previous Section 2 litigation record) (citation omitted); *see also Abbott* v. *Perez*, 585 U.S. 579, 616 (2018) (where legislature adopted new districting map to resolve VRA litigation, evidence from litigation record could provide "good reasons" to use race in remedial map). Plaintiffs' argument also ignores the extensive record from the 2020 redistricting public hearings and the 2024 special session analyzing a second majority-Black district.[46]

---

[45] Furthermore, this is not a case where the map was drawn as a partisan gerrymander, so there can be no allegation that the Legislature used political party as a proxy for race. The political motivation here was not a desire to accrete power to a specific party but to protect some Congressional members over others--the Legislature apparently choose SB8 over other options as an act of political retribution to make it harder for Representative Graves to be reelected to Congress. There is nothing in the Constitution that prevents elected officials from carrying out personal political agenda in redistricting decisions.

[46] *See* Ex. 2.

Plaintiffs' reliance on *Wisconsin Legislature* and *Bethune-Hill* for the proposition that the State must show that the VRA requires the specific map it adopts "on a district-by-district" basis is misplaced. *See* ECF No. 17-1 at 24. The law does not require the State to show that the VRA specifically required *each district* exactly as the legislature drew it. Neither *Bethune-Hill* nor *Wisconsin Legislature* suggest that compliance with the VRA satisfies the Fourteenth Amendment only if the State establishes that the VRA requires the specific map it adopts. *Cf. LULAC*, 548 U.S. at 429–30 (state's remedial map creating majority-Latino district that excluded plaintiffs would not violate Section 2 if including plaintiffs would require excluding other Latinos). Rather, the courts have been clear that a state has "leeway" in how it chooses to comply with Section 2. *Bush*, 517 U.S. at 977. To be sure, the state may not justify unlawful vote dilution in one part of the state by creating a remedial district in a different place. *See Shaw* v. *Hunt*, 517 U.S. at 917 ("The vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State."). But here, the district court in *Robinson* found a likely violation of Section 2 based on an illustrative map that included the cities of Baton Rouge, Lafayette, and Alexandria, which are also included in the new majority Black district in SB8. *Robinson I*, 605 F. Supp. 3d at 766. The *Robinson* record also included evidence of racial polarization in the 2022 plan's CD4, which included Caddo, DeSoto, and Natchitoches Parishes. 2. *See Robinson I*, ECF No. 41-3 at Ex. 2.[47] The State thus had every reason to believe that a new majority-Black district drawing these areas together was sufficiently tied to the demonstrated Section 2 violation to be within the leeway the Constitution affords. *Cf. LULAC*, 548 U.S. at 429 (where state must choose among voters "with a VRA right" because all cannot be drawn into majority-minority districts, it cannot be faulted for its choices).

---

[47] HB1 Enrolled Map, available at https://www.legis.la.gov/legis/ViewDocument.aspx?d=1248568.

Finally, Plaintiffs argue this Court should enjoin SB8 and draw a remedial map because another three-judge court struck down a map with two majority-Black districts 30 years ago in the *Hays* litigation. But here, as in *Robinson I*, the "invocation of *Hays* is a red herring." *Robinson I* at 834. The *Hays* court never held that two majority-Black districts are *per se* invalid or could never be required by the VRA. Both the district court and the Fifth Circuit in *Robinson* rejected this very argument. *Robinson I* at 834 (rejecting similar assertions by the State that the "*Hays* maps [were] instructive, applicable or otherwise persuasive" or "useful comparators" in any way). The district court in *Robinson* firmly stated that *Hays* "is not a magical incantation with the power to freeze Louisiana's congressional maps in perpetuity." *Id.* More important, here the district court and the Fifth Circuit held—based on conditions as they exist in Louisiana today, not 30 years ago—that a congressional plan with one majority-Black district likely violates the VRA and rejected the State's argument that creating a second majority-Black district necessarily entailed racial gerrymandering. *Robinson III* at 593–94.

Further, any comparison between SB8 and the maps at issue in *Hays* is inapposite. Plaintiffs assert that *Hays* is "factually identical to the case before this Court." ECF No. 17-1 at 12. That is simply inaccurate. Whatever the superficial resemblance between SB8 and the Hays map, the process that led to SB8 was entirely different. In the *Hays* cases, the court concluded that race predominated because the cartographer on numerous occasions admitted that he "concentrated virtually exclusively on racial demographics and *considered essentially no other factor* except the ubiquitous constitutional 'one person-one vote' requirement." *Hays* v. *State*, 936 F. Supp. 360, 368 (W.D. La. 1996) (emphasis added). Similarly, in *Hays*, the court concluded that the proffered justifications for the district's shape were "patently post-hoc rationalizations," explaining that "neither the Red River nor socio-economic factors were relied on by legislators at the time of the

28

drawing of the district." *Id.* at 369. Here, however, Plaintiffs provide no evidence that legislators, having resolved to remedy the Section 2 violation, concentrated on anything other than "political interest" and the social and economic factors that provided a "positive of going up that [Red River] corridor."[48]

### D. Plaintiffs are unlikely to prevail on their intentional vote dilution claim under the Fourteenth and Fifteenth Amendments.

Plaintiffs are also unlikely to succeed on their claim of intentional vote dilution under the Fourteenth and Fifteenth Amendments. To prevail on that claim, Plaintiffs must show that redistricting plan (i) has a discriminatory effect and (ii) was enacted with a discriminatory purpose. *Hall*, 108 F. Supp. 3d at 439.[49] This is a fact-intensive standard. *See Vill. of Arlington Heights*, 429 U.S. at 266–68. Plaintiffs' misguided legal arguments and utter lack of factual support are far from what is required to demonstrate likelihood of success on the merits of their intentional discrimination claim.

*First*, Plaintiffs cannot establish that the enactment of SB8 has a discriminatory effect on themselves and other "non-African American" voters. "To prove discriminatory effect, a plaintiff must show that the redistricting scheme impermissibly dilutes the voting rights of the racial minority. Broadly speaking, this requires proof that the racial minority's voting potential has been minimized or cancelled out or the political strength of such a group adversely affected." *Backus* v. *South Carolina*, 857 F. Supp. 2d 553, 567–70 (D.S.C.) (cleaned up), *aff'd*, 568 U.S. 801 (2012). In evaluating claims of intentional vote dilution, courts analyze whether bloc voting occurs along racial lines; whether the group is excluded from the political process; whether minority voter

---

[48] Ex. 3 (starting at 10:30).

[49] Because Plaintiffs do not distinguish their Fourteenth and Fifteenth Amendment claims, these arguments in opposition to their preliminary injunction motion apply equally to their claims under both Amendments. *See League of United Latin Am. Citizens* v. *Abbott*, 2022 WL 4545757, at *1 n.7 (W.D. Tex. Sept. 28, 2022) (applying same arguments to Fourteenth and Fifteenth Amendments).

registration is low; whether elected officials are unresponsive to the needs of the group; and whether the group occupies depressed socioeconomic status because of inferior education or employment and housing discrimination. *See York* v. *City of St. Gabriel*, 89 F. Supp. 3d 843, 864 (M.D. La. 2015); *Hall*, 108 F. Supp. 3d at 439; *Backus*, 857 F. Supp. at 568.

Plaintiffs cannot plausibly allege, much less establish, that any of these factors weighs in their favor. At the outset, proof of intentional discrimination requires evidence of discrimination against an "identifiable group," *Fusilier* v. *Landry*, 963 F.3d 447, 463 (5th Cir. 2020), and Plaintiffs have not offered any evidence that "non-African Americans"—a term which, as the Plaintiffs use it, encompasses every person in Louisiana who is not Black, including Latino, Asian, and Native American, as well as white Louisianians—form a cohesive racial group whose members share a common experience of discrimination. Plaintiffs have offered no evidence that non-Black voters—the vast majority of whom are white—are excluded from the political process or have elected representatives who are unresponsive to their needs; no evidence that non-Black Louisianians as a group suffer from low socioeconomic status or face discrimination in other areas of life; and no evidence that non-Black voters form a cohesive voting bloc whose distinctive voice is minimized as a result of bloc voting by Black voters.[50] Indeed, the district court and Fifth Circuit rulings in *Robinson* prove the opposite: that *Black* voters face barriers to participation and bloc voting by white voters that thwarts their electoral opportunities. *See Robinson I* at 839, 844–45,

---

[50] There is, of course, substantial evidence that other non-white Louisianians—in addition to Black people—have been subject to voting and other forms of discrimination in Louisiana. *See, e.g.*, *VAYLA New Orleans* v. *Tom Schedler*, 3:16-cv-305-BAJ-RLB (M.D. La. 2016) (alleging discrimination in voter registration against foreign-born voters); Letter from Jean Charles Choctaw Nation to U.S. Department of Housing and Urban Development re Complaint Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 40 C.F.R. Part 7 against the Louisiana Division of Administration (Dec. 21, 2023), *available at* https://earthrights.org/wp-content/uploads/2023/12/IDJC-Resettlement-Title-VI-Complaint-for-website.pdf (alleging discrimination against Native Americans in management of the Isle de Jean Charles Resettlement Program)

846–48. Accordingly, Plaintiffs are unlikely to prove that SB8 has had a discriminatory impact on non-Black voters or in any way diluted their voting power.

*Second*, Plaintiffs cannot establish SB8 was enacted with intent or purpose to discriminate against the misleadingly labeled category of "non-African American" voters. "Discriminatory intent implies more than intent as volition or intent as awareness of consequences . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Fusilier*, 963 F.3d at 463–65 (citation and quotations omitted). In order to determine whether a particular decision was made with discriminatory intent, courts consider the non-exhaustive factors set forth in *Arlington Heights*, including (i) the historical background of the decision; (ii) the sequence of events leading up to the challenged action; (iii) departures from the normal decision-making process; and (iv) legislative history, including contemporaneous viewpoints expressed by the decisionmakers. 429 U.S. at 266–68; *see also Veasey* v. *Abbott*, 830 F.3d 216, 231 (5th Cir. 2016). Plaintiffs fail to analyze any *Arlington Heights* factors, cite any cases that support their position, or point to any evidence even suggesting that SB8 was enacted with an intent to discriminate against "non-African American" voters. An analysis of those *Arlington Heights* factors shows they uniformly weigh against a finding of discriminatory intent.

In evaluating claims of discriminatory intent, courts weigh the historical background of the decision, including recent or contemporary examples of State-sponsored discrimination. *Veasey*, 830 F.3d at 239. Here, Plaintiffs do not—and cannot—point to any examples of institutional discrimination against non-Black voters as an identified group. Plaintiffs have likewise cited no evidence that there is a history of non-Black voters being subject to voting discrimination because they are not Black, such as being purged from voter rolls, or any evidence of official discrimination

in other areas of life against non-Black Louisianians as a whole. *Cf. id.* at 239–40 ("contemporary history" of state-sponsored discrimination included Texas's attempt to purge minorities from the voter rolls); *Patino* v. *City of Pasadena*, 230 F. Supp. 3d 667, 721–28 (S.D. Tex. 2017) (disparate treatment of Latinos by police was contemporary evidence of discrimination).[51]

In addition, none of the events leading up to the enactment of SB8 suggest that legislators enacted the map because of—rather than in spite of—its potential adverse effect on non-Black voters. Rather, the sequence of events makes explicit the inclusion of congressional redistricting in the special session call was specifically in response to the *Robinson* litigation. And while the legislative process that led to the enactment of SB8 was abbreviated, that timeline was driven by the litigation and the need to adopt a new map in time for the 2024 federal election, so Louisiana voters would not have to endure a second congressional election under a map that violated the VRA. And indeed, the relevant process cannot be limited to the 2024 special session but must also consider that the Legislature had already taken extensive time in both 2021 and 2022 to consider redistricting and hold roadshows that heard public testimony from around the state.

The legislative history also reveals that there was no intent to enact SB8 "because of" any potential adverse effect on non-Black voters. As explained *supra*, legislators were driven primarily by an intent to protect their partisan advantage while also complying with federal law and court orders from the *Robinson* district court and Fifth Circuit. The legislators must be afforded the presumption of good faith and Plaintiffs point to no evidence to overcome that presumption. *Fusilier*, 963 F.3d at 464–66 (reversing the district court's finding of legislative discriminatory intent based in part on the finding that the district court did not afford legislators the presumption of good faith).

---

[51] Again, there is no lack of discrimination in Louisiana against voters of color who are non-Black, a fact that Plaintiffs' use of the term "non-African American" elides.

## II.    Plaintiffs will not suffer irreparable injury absent an injunction.

Plaintiffs have not satisfied their burden of demonstrating that they would suffer an irreparable harm absent a preliminary injunction, which this Court has explained is the "most essential" prerequisite for a preliminary injunction. *Holmes* v. *BellSouth Telecommunications, LLC*, 2023 WL 5610359, at *2 (W.D. La. Aug. 29, 2023). "[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). A hypothetical constitutional injury arising from an electoral map designed to remediate a likely Section 2 violation, with no clear evidence of racial predominance or racial discrimination, does not satisfy the irreparable injury requirement.

## III.    The balance of equities and public interest weigh against injunctive relief.

The balance of the equities and the public interest "merge" as factors in the preliminary injunction analysis "when the Government is the opposing party." *Nken*, 556 U.S. at 435. "When addressing these factors, courts must balance the competing claims of injury and must consider the effects on each party of the granting or withholding of the requested relief." *Clarke* v. *Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023) (citation and quotation omitted). The district court and Fifth Circuit in *Robinson* made clear that the Amici and other Louisiana voters face irreparable harm if the Court imposes a new map with only one majority-Black district or allows another election to be held under HB1—an injury they have already suffered in one congressional election under a dilutive map. The courts have already held that the HB1 likely violates Section 2, diluting the votes of the *Robinson* Amici. *See Robinson I*; *Robinson II*; *Robinson III*. Given that "protecting voting rights is quite clearly in the public interest, while allowing elections to proceed under a map that violates federal law most certainly is not," *Robinson I* at 852, the balance of the equities weighs against an injunction. Plaintiffs' invocation of *Students*

*for Fair Admissions, Inc.* v. *President & Fellows of Harvard College* ("*SFFA*"), ECF No. 17-1 at 26–27, should be rejected for the same reason the Fifth Circuit rejected the analogy to *SFFA* in *Robinson*. *See* 86 F.4th at 593 (holding that *SFFA* decision on university admissions was a "tough analogy" in the context of the VRA); *see also Milligan*, 599 U.S. at 32-33 (affirming use of race conscious districting to remedy proven Section 2 violation).

The public interest plainly weighs against an injunction that would undo a remedial redistricting plan that was enacted to resolve litigation in another court that found that a map materially indistinguishable from the one Plaintiffs proffer violated the VRA.[52]

## IV. Plaintiffs' proposed remedial map violates the VRA and should be rejected.

Even if Plaintiffs were somehow able to establish that they are likely to succeed on their claims and that the equities favor enjoining SB8—and they have not—this Court must implement a map that complies with Section 2 of the VRA. After nearly two years of litigation, the district court and two unanimous panels of the Fifth Circuit have concluded that any congressional districting plan without two districts that provide Black voters an opportunity to elect their candidates of choice likely violates Section 2 and denies Black voters their right to participate equally in the political process. Nothing in the intervening time since these court rulings disturbs that fundamental conclusion. Yet, instead of making any effort to propose a map that complies with the district court and Fifth Circuit decisions, Plaintiffs here proffer a map that returns Louisiana to the state of affairs that led to the *Robinson* litigation in the first place.

For the same reasons those courts found HB1 to likely violate Section 2, Plaintiffs' Illustrative Plan 1, which includes only one district where Black voters have the opportunity to

---

[52] Given the timing of the litigation, there is also a concern that the court could adequately litigate both a liability and remedial phase in time to prevent the type of voter confusion that *Purcell* and its progeny warn courts against. *See generally Purcell* v. *Gonzalez*, 549 U.S. 1 (2006) (per curiam).

elect a candidate of choice, does not comply with Section 2. This Court should not impose it on Louisianians. Instead, the procedure contemplated by the Fifth Circuit in the *Robinson* should be followed: this Court should stay this case in favor of remedial proceedings before the *Robinson* court to adopt a VRA-compliant remedial map, as the Fifth Circuit directed in the event that the Legislature failed to enact a lawful map.

In the alternative, the Court should adopt the *Robinson* Amici's proposed remedial map or one of their illustrative maps. The district court in *Robinson* held that the *Robinson* Amici's illustrative maps from the *Robinson* litigation (which were substantially similar to their proposed remedial plan) conform to traditional redistricting principles and were not drawn with race as the predominant factor. Plaintiffs offer no evidence to the contrary; indeed, neither Plaintiffs nor Mr. Hefner even mentions or analyzes any of those maps.  Amici's plan has already passed constitutional muster in the Fifth Circuit and the Middle District based upon an extensive evidentiary record, including cross-examination of the map drawer. Unlike Plaintiffs' Illustrative Map 1, which has not had the benefit of any court scrutiny, Amici's plan can be implemented without further ado.

Regardless of how this Court chooses to proceed, it must ensure Louisiana's congressional map provides Black voters an opportunity to elect candidates of their choice in two districts.

## **CONCLUSION**

For all of the reasons above, the Amici respectfully request that this Court deny the motion for a preliminary injunction.


DATED: February 27, 2024                    Respectfully submitted,

By: /s/ *Tracie L. Washington*
Tracie L. Washington
LA. Bar No. 25925
Louisiana Justice Institute
8004 Belfast Street
New Orleans, LA 70125
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

*Counsel for Amici Dorothy Nairne, Martha Davis, Clee Earnest Lowe, and Rene Soule*

By: /s/ *John Adcock*
John Adcock
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Tel: (504) 233-3125
jnadcock@gmail.com

*Counsel for Amici*

Stuart Naifeh (admitted pro hac vice)
Kathryn Sadasivan (admitted pro hac vice)
Victoria Wenger (admitted pro hac vice)
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
vwenger@naacpldf.org

R. Jared Evans
LA. Bar No. 34537
I. Sara Rohani (admitted *pro hac vice*)
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Sarah Brannon (pro hac vice forthcoming)
Megan C. Keenan (pro hac vice forthcoming)
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

Robert A. Atkins (admitted pro hac vice)
Yahonnes Cleary (admitted pro hac vice)
Jonathan H. Hurwitz (admitted pro hac vice)
Amitav Chakraborty (admitted pro hac vice)
Adam P. Savitt (admitted pro hac vice)
Arielle B. McTootle (admitted pro hac vice)
Robert Klein (admitted pro hac vice)
Neil Chitrao (admitted pro hac vice)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com
amctootle@paulweiss.com
rklein@paulweiss.com
nchitrao@paulweiss.com

Sophia Lin Lakin (pro hac vice forthcoming)
Dayton Campbell-Harris (pro hac vice forthcoming)*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org

mkeenan@aclu.org

Nora Ahmed
NY Bar No. 5092374 (pro hac vice forthcoming)
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

dcampbell-harris@aclu.org

T. Alora Thomas-Lundborg (pro hac vice forthcoming)
Daniel Hessel (admitted pro hac vice)
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

*Additional counsel for Amici*

*Practice is limited to federal court.