**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| **PHILLIP CALLAIS,** *et al.*, | |
| **Plaintiffs,** | |
| **vs.** | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| **NANCY LANDRY, in her official capacity as Louisiana Secretary of State,** | |
| **Defendant.** | |

*GALMON* **AMICI'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.    H.B. 1 ...................................................................................................... 2

    A.    A federal court preliminarily enjoins the congressional map. ..................... 2

    B.    Defendants fail to rebut the district court's findings and conclusions. ........................ 6

II.    S.B. 8 ..................................................................................................... 8

LEGAL STANDARD ...................................................................................................... 15

ARGUMENT .................................................................................................................. 15

I.    Plaintiffs cannot prevail on the merits of their claims. ................................... 15

    A.    The Legislature had "good reason" to believe a second majority-Black congressional district was required by the VRA. ........................................ 16

    B.    Politics, not race, was S.B. 8's predominant motive. .................................... 19

        1.    Direct evidence of the Legislature's motives confirms that political considerations predominated. ................................................. 19

        2.    Plaintiffs' circumstantial evidence of the Legislature's motives does not show that racial considerations predominated. .................................. 23

II.    The balance of equities and public interest disfavor injunctive relief. ........................... 24

CONCLUSION ............................................................................................................... 25

CERTIFICATE OF SERVICE ......................................................................................... 27

i

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Allen v. Milligan*,
  599 U.S. 1 (2023) ...................................................................................7, 19

*Amoco Prod. Co. v. Village of Gambell*,
  480 U.S. 531 (1987) ...................................................................................15

*Ardoin v. Robinson*,
  142 S. Ct. 2892 (2022) ...................................................................................6

*Ardoin v. Robinson*,
  143 S. Ct. 2654 (2023) ...........................................................................6, 7, 17

*Bush v. Vera*,
  517 U.S. 952 (1996) ...........................................................................16, 19, 22

*Clark v. Calhoun County*,
  88 F.3d 1393 (5th Cir. 1996) ...................................................................16

*Cooper v. Harris*,
  581 U.S. 285 (2017) ...........................................................................16, 17, 19

*Easley v. Cromartie*,
  532 U.S. 234 (2001) ...................................................................................15, 19

*Hays v. Louisiana*,
  839 F. Supp. 1188 (W.D. La. 1993), *vacated sub nom. Louisiana v. Hays*,
  512 U.S. 1230 (1994) ...................................................................................5

*Hays v. Louisiana*,
  936 F. Supp. 360 (W.D. La. 1996) ...................................................................5

*In re Landry*,
  83 F.4th 300 (5th Cir. 2023) ...................................................................7, 17

*Robinson v. Ardoin*,
  37 F.4th 208 (5th Cir. 2022) ...................................................................6, 17

*Robinson v. Ardoin*,
  605 F. Supp. 3d 759 (M.D. La. 2022), *preliminary injunction vacated*,
  86 F.4th 574 (5th Cir. 2023) ...................................................................*passim*

*Robinson v. Ardoin*,
  86 F.4th 574 (5th Cir. 2023), *reh'g en banc denied* ...................................8, 17, 24

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019) ...................................................................................23

*Terrebonne Par. Branch NAACP v. Jindal*,
    274 F. Supp. 3d 395 (M.D. La. 2017), *rev'd on other grounds sub nom.*
    *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) ...................................................23

*Theriot v. Parish of Jefferson*,
    185 F.3d 477 (5th Cir. 1999) ................................................................16, 19, 22, 24

*Thomas v. Sch. Bd. St. Martin Par.*,
    544 F. Supp. 3d 651 (W.D. La. 2021), *rev'd in part on other grounds sub nom.*,
    *Borel ex rel. AL v. Sch. Bd. St. Martin Par.*, 44 F.4th 307 (5th Cir. 2022).............................23

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)....................................................................................................5, 16

*United States v. Hays*,
    515 U.S. 737 (1995)....................................................................................................25

*VRC LLC v. City of Dallas*,
    460 F.3d 607 (5th Cir. 2006) .................................................................................15, 25

**Statutes**

52 U.S.C. § 10301(a) ......................................................................................................16

Voting Rights Act .................................................................................................. *passim*

**Legislative Materials**

La. House of Reps., House Comm. on House & Governmental Affairs, 51st
    Extraordinary Session of the Legis., Day 4 (Jan. 18, 2024),
    https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/
    0118_24_HG_P2...................................................................................................... *passim*

La. House of Reps., House Floor, 51st Extraordinary Session of the Legis., Day 5
    (Jan. 19, 2024),
    https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/
    0119_24_1ES_Day5 ...............................................................................................10, 18, 20

La. Senate, Senate Chamber, 51st Extraordinary Session of the Legis., Day 3 (Jan.
    17, 2024),
    https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011724S
    CHAMB.............................................................................................................. *passim*

La. Senate, Senate Comm. on Senate & Governmental Affairs, 51st Extraordinary
    Session of the Legis., Day 2 (Jan. 16, 2024),
    https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011624S
    G2..................................................................................................................... *passim*

## INTRODUCTION

Plaintiffs' motion for preliminary injunction tells a curious—indeed, nonsensical—tale. In their version of events, through 2022 and 2023 the State of Louisiana, represented by then-Attorney General Jeff Landry, stridently resisted claims that the state's congressional plan must include a second Black-opportunity district. But then suddenly in January 2024, for apparently no reason other than raw racial preference, now-Governor Jeff Landry called a special legislative session on the day he assumed office to push through S.B. 8, a new congressional plan with two majority-Black districts. Why the sudden change, seemingly completely out of character? What Plaintiffs present as a troubling mystery that can be resolved only by inferring flagrantly unlawful conduct is, in fact, easily explicable by the public record. Louisiana enacted S.B. 8 because litigation in the Middle District of Louisiana made clear that Section 2 of the Voting Rights Act requires two Black-opportunity districts in Louisiana, and the Governor and his legislative allies acted quickly to ensure the new districting configuration would protect favored incumbents and serve their other political goals. Because the Constitution does not forbid redistricting efforts that aim to comply with federal law and obtain political advantage, Plaintiffs cannot succeed on the merits of their claims.

The equities also weigh against an injunction. Most Plaintiffs do not reside in the district that they challenge, and it would be grossly inequitable to compel the *Galmon* Amici to vote in congressional districts that *again* fail to comply with the Voting Rights Act, as Plaintiffs propose. The Court should deny the motion.

# BACKGROUND

I. **H.B. 1**

A. **A federal court preliminarily enjoins the congressional map.**

Following publication of the 2020 census results, Louisiana's Legislature enacted H.B. 1, the state's new congressional districting plan, on March 30, 2022. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 768 (M.D. La. 2022), *preliminary injunction vacated*, 86 F.4th 574 (5th Cir. 2023). That same day, Edward Galmon, Sr., Ciara Hart, Norris Henderson, and Tramelle Howard sued the Secretary of State in the Middle District of Louisiana, challenging the new plan as a violation of Section 2 of the Voting Rights Act because it failed to include a second district in which Black voters would have an opportunity to elect their preferred candidates. *Id.* That action was joined with a parallel suit brought by other Black voters and civic organizations, and the consolidated plaintiffs moved for a preliminary injunction. *Id.* at 769. The Legislature's presiding officers and the State of Louisiana, represented by then-Attorney General Jeff Landry, intervened to defend the map. *Id.* at 768–69.

During the five-day preliminary injunction hearing held in May 2022, the consolidated plaintiffs introduced seven illustrative maps and the testimony of two expert map-drawers (Mr. Bill Cooper and Mr. Anthony Fairfax) demonstrating that Black voters in Baton Rouge could be unpacked from the New Orleans-based CD-2, where they were assigned by H.B. 1, and grouped into a newly configured CD-5 with a sufficiently large and geographically compact Black community bounded to the west by St. Landry Parish and to the north by delta parishes along the Mississippi River. *Id.* at 778–85. Plaintiffs also offered testimony from two experts (Dr. Max Palmer and Dr. Lisa Handley) demonstrating that voting in Louisiana is racially polarized, that White voters regularly defeated Black voters' preferred candidates outside of majority-Black CD-

2

2, and that Black voters would have an opportunity to elect their candidates of choice in the illustrative maps' new CD-5. *Id.* at 797–804. Plaintiffs offered two fact witnesses (Mr. Chris Tyson and Mr. Charles Cravins) who testified that the illustrative CD-5 configurations protected critical communities of interest. *Id.* at 789–91. And plaintiffs offered six other witnesses (expert witnesses Dr. Traci Burch, Dr. Allan Lichtman, and Dr. Blakeslee Gilpin, and fact witnesses Mr. Mike McClanahan, Dr. Dorothy Nairne, and Ms. Ashley Shelton) who testified that factors considered in the totality-of-circumstances inquiry supported a finding that H.B. 1 violated Section 2. *Id.* at 806–15.

The district court credited all of this extensive testimony. *Id.* at 826–27 (Mr. Cooper's reports were "clear, substantiated by unrefuted empirical and statistical data, methodologically sound, and therefore reliable," and "[h]is testimony was candid, forthright and indicative of an in-depth comprehension of redistricting, demographics, and census data"); *id.* at 827 ("[Mr.] Fairfax's thirty years of experience in preparing redistricting plans make him well-qualified, in the Court's view, and his report and supplemental reports are extremely thorough and methodologically sound."); *id.* at 841 ("The Court credits Dr. Palmer's opinions and conclusions, finding that his methods were sound and reliable. His testimony was clear and straightforward, raising no issues that would cause the Court to question his credibility."); *id.* ("Dr. Handley's extensive expertise in the area of redistricting and voting rights is reflected in her CV and was apparent from her testimony, which was thorough, careful, well-supported by data, facts and soundly reasoned."); *id.* at 829 (finding testimony of Mr. Tyson and Mr. Cravins "contributed meaningfully to an understanding of communities of interest"); *id.* at 844–51 (reviewing testimony and concluding "the totality of the circumstances weighs in favor of Plaintiffs' request for relief").

The three sets of defendants collectively offered seven expert witnesses to dispute elements of plaintiffs' claims. Mr. Thomas Bryan challenged the numerosity and compactness of the Black population identified by plaintiffs, *id.* at 791–94; Dr. Christopher Blunt testified that any congressional map in Louisiana containing a second Black-opportunity district would necessarily require racial gerrymandering, *id.* at 794–95; Dr. M.V. Hood III testified that H.B. 1 deviated less than plaintiffs' illustrative maps from Louisiana's previous congressional districting plan, *id.* at 795–97; Dr. Alan Murray testified that Black and White voters are not "similarly geospatially distributed" in Louisiana, *id.* at 797; Dr. Jeffrey Lewis testified that congressional districts with less than 50% Black voting-age population could still provide Black voters an opportunity to elect their candidate of choice, *id.* at 805–06; Dr. Tumulesh Solanky testified that East Baton Rouge Parish votes more strongly than other parishes for minority-preferred candidates, *id.* at 806; and Dr. John Alford testified that polarized voting in Louisiana is attributable to partisanship, not race, *id.* at 840.[1] The district court did not find any of this testimony persuasive. *Id.* at 824 (finding "[Mr.] Bryan's conclusions are unsupported by the facts and data in this case and thus wholly unreliable"); *id.* at 825 (finding Dr. Blunt's "opinions merit little weight"); *id.* (finding Dr. Hood's testimony was "unilluminating"); *id.* at 826 (finding Dr. Murray's testimony was "untethered to the specific facts of this case and the law applicable to it"); *id.* at 843 (finding Dr. Lewis's testimony was "simply unsupported by sufficient data and is accordingly unreliable"); *id.* at 841 (finding Dr. Solanky's opinions were "unhelpful and do not inform the Court's analysis"); *id.* at 840 (finding "Dr. Alford's opinions border on *ipse dixit*").

---

[1] Defendants also offered expert reports from Dr. Jeff Sadow and Mr. Mike Hefner, but Defendants chose not to present testimony from either expert at the hearing. *See Robinson*, 605 F. Supp. 3d at 815.

4

On this robust record, the court concluded that the plaintiffs were likely to prevail on their claim that H.B. 1 violated Section 2 of the VRA by failing to include a second district in which Black voters have the opportunity to elect their candidates of choice. *Id.* at 851. Reviewing the three preconditions for a Section 2 claim that the Supreme Court identified in *Thornburg v. Gingles*, 478 U.S. 30 (1986), the district court found that (1) Louisiana's Black population is sufficiently large and compact to constitute a majority in a second congressional district, *Robinson*, 605 F. Supp. 3d at 820–21; (2) Black voters in Louisiana are politically cohesive, *id.* at 839–41; and (3) White voters vote sufficiently as a bloc to usually defeat Black voters' preferred candidates, *id.* at 841–44. The court reviewed factors relevant to the totality-of-circumstances analysis and found that the two factors *Gingles* deemed most important—the extent of racially polarized voting, and the extent to which Black candidates have been elected to public office, *see Gingles*, 478 U.S. at 48 n.15—weigh "heavily in favor of Plaintiffs," *Robinson*, 605 F. Supp. 3d at 845–46. Of the remaining factors, the court found three favored plaintiffs, one favored defendants, and four were neutral or inapplicable. *Id.* at 846–851. Considering all of these factors together, the court concluded that the totality of circumstances weighed in favor of plaintiffs' request for relief. *Id.* at 851.

The district court also devoted extensive analysis to defendants' argument that racial considerations would necessarily predominate in a Louisiana congressional districting map that included a second Black-opportunity district. *See id.* at 831–39. The court reviewed the 1990s *Hays* litigation, where Louisiana congressional plans then in effect were deemed to be unconstitutional racial gerrymanders, *see Hays v. Louisiana*, 839 F. Supp. 1188 (W.D. La. 1993) ("*Hays I*"), *vacated sub nom. Louisiana v. Hays*, 512 U.S. 1230 (1994); *Hays v. Louisiana*, 936 F. Supp. 360 (W.D. La. 1996) ("*Hays II*"), and rejected the notion "that because a map with two

majority-Black districts was previously invalidated by a court, there can never be an acceptable map with two Black districts." *Robinson*, 605 F. Supp. 3d at 832. The court recognized that Louisiana's population "has increased significantly since the 1990 census that informed the *Hays* map[s]," and thus "*Hays*, decided on census data and demographics 30 years ago, is not a magical incantation with the power to freeze Louisiana's congressional maps in perpetuity." *Id.* at 834. And, citing Supreme Court precedent, the court recognized that some consideration of race by map-drawers is necessary to comply with the VRA, and efforts to comply with the VRA, in turn, "may justify the consideration of race in a way that would not otherwise be allowed." *Id.* at 835 (quoting *Abbott v. Perez*, 585 U.S. 579, 587 (2018)).

Having found the equitable balance also favored plaintiffs, the court preliminarily enjoined H.B. 1 and offered the Legislature "an opportunity to enact a new map that is compliant with Section 2 of the Voting Rights Act." *Id.* at 852–58. The Legislature, however, did not take any meaningful steps to enact a new map.

**B.      Defendants fail to rebut the district court's findings and conclusions.**

The defendants appealed the district court's order but could not persuade any judge that the Section 2 holding was likely in error. First, a Fifth Circuit motions panel declined to stay the injunction, finding that "[n]one of the defendants' merits challenges to the district court's order carries the day." *Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022). The panel specifically rejected the argument that plaintiffs' illustrative maps "prioritized race so highly as to commit racial gerrymandering, or that complying with the district court's order would require the Legislature to adopt a predominant racial purpose." *Id.* at 222. Because it had already docketed a similar appeal out of Alabama, however, the Supreme Court stayed the Louisiana injunction for a full year while it adjudicated the Alabama dispute. *See Ardoin v. Robinson*, 142 S. Ct. 2892 (2022)

(mem.) (granting stay); *Ardoin v. Robinson*, 143 S. Ct. 2654 (2023) (mem.) (vacating stay). In the Alabama litigation, the Supreme Court rejected Alabama's contention that drawing a second Black-opportunity district would constitute a racial gerrymander in violation of the Equal Protection Clause. *Allen v. Milligan*, 599 U.S. 1, 41–42 (2023). While the State of Louisiana and Secretary of State had previously insisted that the Alabama litigation presented "an identical issue to the one [in Louisiana]—i.e., when does Section 2 of the Voting Rights Act command the creation of additional majority-minority districts," Madduri Decl., Ex. 1 at 39,  after the *Allen* decision came down, they asked the high court to set the Louisiana appeal for merits briefing and oral argument, previewing various alleged errors in the district court's legal reasoning. *See* Madduri Decl., Ex. 2. The Supreme Court declined, *Ardoin*, 143 S. Ct. at 2654. Again, the Legislature did not take any steps to enact a new map during this period.

After the stay lifted and remedial proceedings resumed in the district court, Attorney General Landry petitioned the Fifth Circuit to issue a writ of mandamus requiring the district court to advance proceedings to trial on the merits because, he argued, the preliminary injunction was substantively and procedurally flawed. *See* Madduri Decl., Ex. 3. The Fifth Circuit issued the writ—but not for the reasons the Attorney General enumerated, and not to provide the relief the Attorney General requested. *See In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023). Instead, the court determined the Legislature deserved a further opportunity "to comply with" the district court's ruling that the VRA requires a second Black-opportunity congressional district in Louisiana, and, to provide the Legislature additional time to exercise that prerogative, the court vacated an approaching preliminary injunction remedial-phase hearing scheduled in the district court. *Id.* at 307–08.

Shortly thereafter, a different Fifth Circuit panel hearing defendants' appeal of the preliminary injunction determined that the "district court did not clearly err in its necessary fact-findings nor commit legal error in its conclusions that the Plaintiffs were likely to succeed on their claim that there was a violation of Section 2 of the Voting Rights Act." *Robinson v. Ardoin*, 86 F.4th 574, 583 (5th Cir. 2023), *reh'g en banc denied* Madduri Decl., Ex. 4. But because the next congressional elections were no longer imminent, the Fifth Circuit concluded that the urgency of adopting a new map had lifted. *Id.* at 600–01. The court vacated the preliminary injunction and remanded to the district court with instructions to provide the Legislature additional time to enact a new remedial congressional districting plan before commencing trial. *Id.* at 601–02. The district court invited the Legislature to remedy the VRA violation by January 30, 2024; should it do so, the court said, "a trial on the merits" of any challenges to that new map "shall be held commencing on March 25, 2024." Madduri Decl., Ex. 5 at 3.

II.    **S.B. 8**

After both the district court and the Fifth Circuit made clear that Section 2 required a second Black-opportunity district, and that the new district would have to be drawn either by the Legislature or by the federal court, Governor-elect Landry and other state leaders opted to take advantage of the opportunity to redraw Louisiana's congressional map in a way that would advance their own political interests. On January 8, 2024, Governor Landry assumed office and immediately issued a "court[-]required call for a redistricting special session." Madduri Decl., Ex. 6. At the start of the special session, he explained that he had done everything he could to "dispose of [the] litigation" in the Middle District, including several appeals to the Fifth Circuit and to the U.S. Supreme Court, and acknowledged there was no reasonable likelihood that H.B. 1's creation of only a single Black-opportunity district could be shown to satisfy Section 2. Madduri Decl., Ex.

7. His office had "exhausted ALL legal remedies," Governor Landry explained, "and we have labored with this issue for far – too – long." *Id.* He called upon the legislature to adopt a new redistricting map that would "satisfy the Court and ensure that the congressional districts of our State are made right here in the Legislature and not" by a federal judge. *Id.* (cleaned up). Warning that the federal court was likely to adopt a new map itself if the Legislature failed to act, he urged the Legislature to "heed the instructions of the Court, take the pen out of the hand of non-elected Judges and place it in your hand." *Id.* Legislators introduced several different mapping configurations during the special session, but Louisiana's political powers quickly coalesced around S.B. 8, a proposed map sponsored by Senator Glen Womack, which met their specific political objectives of protecting favored congressional incumbents while ousting Congressman Garret Graves.

Senator Womack frequently reiterated that S.B. 8 was "the product of a long, detailed process and achieves several goals" as he advocated for the plan before the Senate & Governmental Affairs Committee, on the Senate floor, and before the House & Governmental Affairs Committee, before tagging Representative Gerald "Beau" Beaullieu to carry the bill on the House floor. La. Senate, Senate Comm. on Senate & Governmental Affairs, 51st Extraordinary Session of the Legis., Day 2, at 30:30–30:40 (Jan. 16, 2024) ("Senate Comm.").[2] The first goal was the protection of Congresswoman Julia Letlow's seat in the congressional district comprising northeastern Louisiana—a seat that would likely be jeopardized if the federal court adopted any of the plaintiffs' illustrative maps, which would draw Congresswoman Letlow into the new Black-opportunity district. Senator Womack noted that Congresswoman Letlow sits on the Appropriations and Agriculture Committees, which are a "big part of [Senator Womack's] district," and S.B. 8 would

---

[2] *Available at* https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011624SG2.

ensure that Congresswoman Letlow "remains both unpaired with any other incumbents and in a congressional district that should continue to elect a Republican to Congress for the remainder of this decade." Senate Comm., 30:38–31:17; La. House of Reps., House Comm. on House & Governmental Affairs, 51st Extraordinary Session of the Legis., Day 4, at 1:43–3:08 (Jan. 18, 2024) ("House Comm.")[3]; La. Senate, Senate Chamber, 51st Extraordinary Session of the Legis., Day 3, at 5:30–6:19 (Jan. 17, 2024) ("Senate Floor")[4]; La. House of Reps., House Floor, 51st Extraordinary Session of the Legis., Day 5, at 2:46:02–2:46:53 (Jan. 19, 2024) ("House Floor").[5]

By saving Congresswoman Letlow's seat, Republicans could instead sacrifice the seat held by Congressman Graves, who had antagonized Louisiana's key political powerbrokers, including now-Governor Jeff Landry and Congressman and Majority Leader Steve Scalise, by endorsing their rivals in 2023. *See* Madduri Decl., Ex. 8. Congressman Graves first provoked Governor Landry when he chose to back the gubernatorial bid of rival Stephen Waguespack—in fact, Congressman Graves supplied the first major endorsement for Waguespack's campaign, which launched only after Graves decided not to run for governor himself. *See* Madduri Decl., Exs. 9, 10. Then, during House Majority Leader Steve Scalise's bid for Speaker of the House, Graves praised rival Jim Jordan and undercut Scalise, allegedly spreading disparaging information about Scalise's cancer diagnosis and surfacing controversial comments Scalise had made in the past. *See* Madduri Decl., Exs. 11, 12, 13. By placing Congressman Graves, rather than Congresswoman Letlow, in

---

[3] *Available at*
https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/0118_24_HG_P2.

[4] *Available at*
https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011724SCHAMB.

[5] *Available at*
https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/0119_24_1ES_Day 5.

the new Black-opportunity district, Louisiana's Republican leadership found in S.B. 8 a mechanism to protect an ally and oust an enemy.

S.B. 8's second, related goal was preserving four "safe Republican seats." Senate Comm., 31:17–31:28. Senator Womack emphasized that "Louisiana's Republican presence in the United States Congress has contributed tremendously to the national discourse, and I'm very proud that both Speaker of the U.S. House of Representatives Mike Johnson and U.S. House Majority Leader Steve Scalise are both from our great state." Senate Comm., 31:28–31:43. S.B. 8 was crafted to ensure that both Speaker Johnson and Majority Leader Scalise "will have solidly Republican districts at home so that they can focus on the national leadership that we need in Washington, D.C." Senate Comm., 31:43–31:53. Extolling S.B. 8's national political benefits, Senator Womack explained that the new map ensured that "the conservative principles retained by the majority of those in Louisiana will continue to extend past our boundaries to our nation's capital." Senate Comm., 31:53–32:06.

Third, Senator Womack explained that he gave careful consideration to protecting communities of interest when drawing S.B. 8's new minority-opportunity district, CD-6. This district, he said, is a commerce district: it is comprised of a corridor that "runs up Red River, which is barge traffic commerce," and traces "I-49, which goes from Lafayette to Shreveport, which is also a corridor for our state that is very important to our commerce." Senate Floor, 7:12–7:42. He also touted collegiate ties along the corridor, and industrial connections, including agriculture, row crop, and cattle, along the Red River. Senate Floor, 7:42–7:59; House Comm., 3:55–4:21. Representative Ed Larvadain III identified—and Senator Womack agreed—that Rapides and Natchitoches Parishes, both in CD-6, share a community of interest involving the Creole Nation and Northwestern State University, where students from surrounding parishes attend. House

Comm., 21:22–21:51. CD-6 also protects lumber and timber interests by linking De Soto and Caddo Parishes, where this work is prominent, with a major plant in Natchitoches and corporate offices in Alexandria. House Comm., 21:51–22:18. And CD-6 protects a healthcare-related community of interest, as many residents of the new district rely on the same hospitals in Alexandria or St. Landry for their medical needs. Senate Floor, 7:58–8:15; House Comm., 3:50–4:23; House Comm., 22:19–22:41. Senator Womack also considered communities of interest in crafting S.B. 8's other districts. Senate Comm., 49:58–50:22. In CD-4, for example, his plan kept together major military installations. Senate Comm., 50:22–50:47.

Fourth, Senator Womack believed that S.B. 8 "respond[s] appropriately to the ongoing federal Voting Rights Act case in the Middle District of Louisiana." Senate Comm., 32:05–32:18. Senator Womack cited the prolonged litigation in the Middle District, highlighting the preliminary injunction order finding a likely Section 2 violation and the fact that none of the State's subsequent appeals had been successful. Senate Comm., 32:18–32:49. He explained to his fellow legislators that "we are here now because of the federal court's order that we have a first opportunity to act [and the] court's order that we must have two majority black voting age population districts." Senate Comm., 32:49–33:03.

Senator Womack noted that S.B. 8 was a different configuration than any that plaintiffs in the Middle District case had proposed, and, after he had "carefully considered a number of different map options," he had selected S.B. 8's design because "this is the only map I reviewed that accomplished the political goals I believe are important for my district, for Louisiana, for my country." Senate Comm., 33:40–34:01; *see also* House Comm., 18:14–18:47. Plaintiffs in the Middle District litigation submitted numerous potential configurations to illustrate that a second minority-opportunity district could be drawn while respecting traditional redistricting principles,

12

and many of the alternatives proposed during the special session—including S.B. 4 by Senator Ed Price, H.B. 5 by Representative Denise Marcelle, and H.B. 2 by Representative Wilford Carter—created districts that were more compact and split fewer parishes than S.B. 8. Crucially, however, none of these other configurations would accomplish the goals of "protecting Congresswoman Letlow's seat, maintaining strong districts for Speaker Johnson and Majority Leader Scalise, [and] ensuring four Republican districts" as Senator Womack had prioritized. Senate Comm., 33:40–34:24. Ultimately, Representative Marcelle accepted the Legislature's preference for S.B. 8 over her own proposal, recognizing that for "political reasons, we are [] where we are today." House Comm., 9:00–9:12. Representative Candace Newell similarly observed that "[t]his isn't the best map that has come before us . . . there were two other maps that were presented that were stronger" and didn't have as many parish splits, but "the politics of those two individuals that submitted those two maps I guess have led us to having to work with [S.B. 8]." House Comm., 13:35–14:42.

Senator Womack was clear throughout the legislative process that his primary objective in crafting S.B. 8 and rejecting alternatives was political. When asked why he chose his configuration instead of the more compact S.B. 4, for example, Senator Womack answered, "It was strictly politics [that] drove this map." Senate Comm., 34:51–35:38 (citing the protection of Speaker Johnson, Majority Leader Scalise, and Congresswoman Letlow's seats); *see also* Senate Floor, 11:33–11:44 ("This map was strictly drawn from the political aspect."); House Comm., 25:53–25:56, 26:14–26:36 (Senator Womack agreeing that "this is more of a political map" and that the "primary driver" was protection of the Republican delegation, specifically Congressmembers Johnson, Scalise, Letlow, and Higgins). When asked specifically whether race was the predominant factor in CD-6's configuration, Senator Womack replied, "No, it's not the predominant factor"; instead, the fact that the two top-ranking members of the U.S. House of

Representatives are from Louisiana weighed heavily in his decision to draw the map as he had, as did Congresswoman Letlow's role on the House Committees for Agriculture and Appropriations, all of which represented "a lot of muscle" for the state of Louisiana. Senate Comm., 35:58–37:15.

Other legislators echoed the importance of the political priorities presented by Senator Womack. On the Senate floor, for example, Senator Jeremy Stine remarked that the map "safeguards the positions of pivotal figures, the United States Speaker of the House, the Majority Leader, and notably the sole female member of our congressional delegation. Her role is not merely symbolic. She's a linchpin in the Appropriations [and] Education and [the] Workforce Committees, which are vital to the prosperity and wellbeing of our state." Senate Floor, 22:55–23:27. He also stressed that it was crucial for the legislature to pass the map to prevent a court-imposed map that would ignore these political objectives. Senate Floor, 23:27–24:25.

Amendments to S.B. 8 were also adopted for political reasons. For example, Senator Heather Cloud, speaking in support of an amendment adopted in the Senate committee, explained that the amendment "further protects Congresswoman Julia Letlow," and "politically, this map does a great job protecting Speaker Johnson and Congresswoman Julia Letlow as well as Majority Leader Scalise." Senate Comm., 46:20–47:22; *see also* Senate Comm., 47:22–48:51 (agreeing that her motivations were to protect specific incumbents).

Ultimately, Senator Womack explained, S.B. 8 was "politically drawn to protect our members of Congress" and to comply with the federal court's Section 2 findings. House Comm., 10:07–10:45. The Legislature and Governor agreed with Senator Womack's transparent political objectives, which could be accomplished only by enacting a new map before the court commenced its own, necessarily *apolitical*, remedial process. The Legislature passed S.B. 8 on January 19, and the Governor signed it into law on January 22. Madduri Decl., Ex. 14.

Nine days later, Plaintiffs filed the present lawsuit challenging S.B. 8 as a racial gerrymander and, in so doing, raising many of the same arguments considered and rejected by the Middle District and the Fifth Circuit in the course of the Section 2 litigation. Compl., ECF No. 1. On February 21, 2024, this Court ordered that a hearing on Plaintiffs' preliminary injunction motion would be consolidated with trial on the merits. Scheduling Order, ECF No. 63.

## LEGAL STANDARD

The party seeking a permanent injunction must establish "(1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).

## ARGUMENT

### I.      Plaintiffs cannot prevail on the merits of their claims.

Plaintiffs' motion fails to substantiate either of their two claims, which turn on allegations that the Legislature unconstitutionally elevated racial considerations in enacting S.B. 8. *See* Compl. at 22–31. The Supreme Court has warned that the burden of proof on plaintiffs who bring constitutional challenges to their district's racial composition "is a demanding one." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (cleaned up). Plaintiffs must show that race was not simply "*a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Id.* (cleaned up). And even if racial considerations did predominate, the constitutional challenges still fail if the state had "good

15

reasons" for concluding that the VRA required those considerations. *Cooper v. Harris*, 581 U.S. 285, 293 (2017). These principles doom Plaintiffs' claims. The Legislature correctly understood that a U.S. District Court, affirmed in every relevant part by the Fifth Circuit, had determined that Section 2 *required* any newly enacted congressional map to include a second Black-opportunity district. And having decided to remedy the Section 2 violation itself, the Legislature chose a districting configuration in which political—not racial—considerations predominated.

### A. The Legislature had "good reason" to believe a second majority-Black congressional district was required by the VRA.

Second 2 prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right . . . to vote on account of race." 52 U.S.C. § 10301(a). The Supreme Court has construed this provision to ban the "[d]ilution of racial minority group voting strength," which "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46 n.11. The Constitution permits map-drawers to consider race to ensure compliance with Section 2. *See Cooper*, 581 U.S. at 292–93; *Bush v. Vera*, 517 U.S. 952, 976–77 (1996) (plurality op.); *id.* at 990–92 (O'Connor, J., concurring) ("States have a compelling interest in complying with the [Section 2] results test[.]")[6]; *Theriot v. Parish of Jefferson*, 185 F.3d 477, 488 (5th Cir. 1999).

Notably, states need not prove that the VRA actually required the minority-opportunity district before adopting it. Rather, the state must establish only "that it had 'good reasons' to think that it would transgress the Act if it did *not* draw race-based district lines." *Cooper*, 581 U.S. at

---

[6] "On this point, at least four other Justices agreed with Justice O'Connor." *Clark v. Calhoun County*, 88 F.3d 1393, 1405 (5th Cir. 1996) (citing dissenting opinions of Stevens and Souter, J.J., joined by Ginsburg and Breyer, J.J.).

293 (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). This standard "gives states 'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Id.* (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 196 (2017)).

The Middle District litigation provided those good reasons here. The parties, including Jeff Landry and the Legislature's presiding officers in their official capacities, extensively litigated the State's Section 2 responsibilities. In a week-long trial-like hearing before the district court, twenty different witnesses testified about the merits, and the court issued 152 pages of meticulous findings of fact and conclusions of law, ultimately holding that H.B. 1's inclusion of only a single Black-opportunity district likely violated Section 2. *See Robinson*, 605 F. Supp. 3d at 766–858; *Robinson*, 37 F.4th at 215. The State challenged the district court's merits reasoning before a Fifth Circuit motions panel, Fifth Circuit mandamus panel, Fifth Circuit merits panel (and sought en banc rehearing), and the United States Supreme Court—and not a single judge or justice indicated that the Section 2 holding was likely in error. *See Robinson*, 37 F.4th at 227; *In re Landry*, 83 F.4th at 305; *Robinson*, 86 F.4th at 583; *Ardoin*, 143 S. Ct. at 2654.

Thus, it is entirely irrelevant that, because of S.B. 8's enactment, the district court never reached a final judgment formally holding the State liable for a Section 2 violation; what is controlling here is that the State had *good reason* to believe that such a judgment would follow if the Legislature did not enact a remedial map, even if a second Black-opportunity district may have proved, "in perfect hindsight, not to have been needed." *Cooper*, 581 U.S. at 293. Race-based districting is justified wherever there is "a strong basis in evidence" for concluding that the VRA requires a minority-opportunity district, *id.* at 292 (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)), and it is tautological that such evidence is present where a court of

appeals confirms a district court's findings that the evidence indicates that Section 2 plaintiffs are likely to succeed on the merits of their claims.

Nor is there any question that Louisiana's political leaders believed that a congressional map lacking a second Black-opportunity district would be enjoined for violating Section 2. When Governor Landry issued the "court[-]required call for a redistricting special session" on the day he took office, he explained that he was doing so because of the Section 2 litigation. Madduri Decl., Ex. 6. Having tested plaintiffs' evidence in every way he could as Attorney General—and having failed to identify any significant gaps in that evidence or flaws in the courts' legal reasoning— Governor Landry announced that he had "exhausted ALL legal remedies" and it was time to "heed the instructions of the Court" and "make the Adjustments necessary" to the congressional map. Ex. 7. S.B. 8's sponsors and supporters shared this understanding. Senator Womack and Representative Beaullieu explained that the new map "respond[s] appropriately to the ongoing federal Voting Rights Act case in the Middle District of Louisiana," highlighting the district court's Section 2 findings and the subsequent unsuccessful appeals. Senate Comm., 32:05–32:49; *see also* Senate Comm., 33:56–34:24 (S.B. 8 "adheres to the command of the federal court in the Middle District of Louisiana"); Senate Comm., 32:49–33:03 ("[W]e are here now because of the federal court's order that we have a first opportunity to act [and the] court's order that we must have two majority black voting age population districts."); House Comm., 27:33–38:06 (Senator Womack explaining "[T]his map achieves the court's order"); House Floor, 2:54:00–2:54:15 (Senator Womack  stating that "[w]e're under a federal judge's mandate and this bill is our best attempt to comply with her decision."); Senate Floor, 22:05–24:35 (Senator Stine agreeing that the legislature must act to pass the map to prevent a court-imposed map).

Because Louisiana had good reason to believe that Section 2 requires a second Black-opportunity congressional district, the Constitution does not proscribe the Legislature's intentional creation of that district. *See Allen*, 599 U.S. at 41 (holding "race-based redistricting as a remedy for [state districting maps that constitute] § 2 violations" is not forbidden by the Fifteenth Amendment). That alone forecloses Plaintiffs' claim. *See Cooper*, 581 U.S. at 301.

**B.    Politics, not race, was S.B. 8's predominant motive.**

Legislatures "must have discretion to exercise the political judgment necessary to balance competing interests," and courts must "exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race." *Easley*, 532 U.S. at 242 (cleaned up). Caution is "especially appropriate . . . where the State has articulated a legitimate political explanation for its districting decision." *Id.* (reversing district court's finding that race rather than politics was predominant factor in state's congressional redistricting plan). As the Fifth Circuit has explained, map-drawers do not violate the Constitution where a district is drawn to be majority-Black to avoid Section 2 liability, and the district's shape is chosen primarily to protect incumbents and maintain other political advantages. *Theriot*, 185 F.3d at 485. Here, Plaintiffs cannot satisfy their burden to "disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 581 U.S. at 308.

**1.    Direct evidence of the Legislature's motives confirms that political considerations predominated.**

The legislative record is clear that politics—not race—ultimately determined S.B. 8's district lines and resulted in its enactment. *See Bush*, 517 U.S. at 960 (plurality op.) (affirming district court's predominance analysis based on "substantial direct evidence of the legislature's . . . motivations"). Senator Womack's recitation of his core political objectives, echoed by other bill supporters, was consistent across committee testimony and floor debates. His top priorities were

to protect the seats of Congresswoman Letlow, Speaker Johnson, and Majority Leader Scalise. Senate Comm., 30:38–31:17; House Comm., 1:43–3:55; Senate Floor, 4:45–5:13; House Floor, 2:46:02–2:47:13 ("The boundaries in this bill I'm proposing ensures that Congresswoman Letlow remains both unpaired with any other incumbents and in a congressional district that should continue to elect a Republican to Congress for the remainder of this decade. I have great pride in the work that Congresswoman Letlow has accomplished and this map will ensure that Louisianans will continue to benefit from her presence in the halls of Congress for as long as she decides and continue to serve our great state."); Senate Comm., 31:43–32:05 (noting that the second goal of S.B. 8 was ensuring that both Speaker Johnson and Majority Leader Scalise "will have solidly Republican districts at home so that they can focus on the national leadership that we need in the Washington, D.C." and that Louisiana's "conservative principles. . . will continue to extend past our boundaries to our nation's capital."). Even though other bills responding to the Middle District litigation were introduced and amendments seeking to improve compactness and parish splits were proposed, Senator Womack and the Legislature stuck with S.B. 8 because it was the "only map . . . that accomplished the political goals I believe are important for my district, for Louisiana, for my country." Senate Comm., 33:40–33:56. *See also* Senate Comm., 34:51–35:38 ("It was strictly politics [that] drove this map."); Senate Floor, 11:33–11:44 ("This map was strictly drawn from the political aspect.").

On occasion, Senator Womack referenced the desire to protect the entire Republican delegation *except* Congressman Graves, who had antagonized Governor Landry and Congressman Scalise by refusing to endorse their respective bids for Governor and Speaker in 2023. *See* House Comm., 25:53–25:56 (identifying interest in protecting Congressmembers Johnson, Scalise, Letlow, and Higgins), 26:22–26:36 (agreeing that "this is more of a political map" and that the

"primary driver" was protection of the Republican delegation); Senate Comm., 30:16–32:55 (explaining that S.B. 8's first goal was ensuring that Congresswoman Letlow remains "unpaired with any other incumbents" and in a "district that should continue to elect a Republican" and that the second goal was ensuring four "safe Republican seats."); Senate Comm., 32:55–34:24 (reiterating that the top goals were "protecting Congresswoman Letlow's seat, maintaining strong districts for Speaker Johnson and Majority Leader Scalise, ensuring four Republican districts"); Senate Comm., 36:22–37:15 (acknowledging that Congresswoman Letlow sits on the House Committees of Agriculture and Appropriations, that the top two ranking members of the U.S. House of Representatives were from Louisiana "had a lot to weigh in" to his decision, and that the three Congress members he sought to protect were "a lot of muscle" for the state of Louisiana).

When asked specifically whether race was the predominant factor in his configuration of CD-6, Senator Womack replied, "No, it's not the predominant factor." Senate Comm., 35:58–36:22; *see also* Senate Comm., 47:22–48:48 (Senator Cloud, who backed an amendment to S.B. 8, agreeing that race was not the predominant reason for the amendment; rather, it was her desire to protect specific incumbent members of Congress); Senate Comm., 1:10:26–1:10:48 (Chairman Cleo Fields reminding members of the Senate & Governmental Affairs Committee of their obligation to pass a map where "race is not the predominant reason"). In fact, Senator Womack considered the minority population of CD-2 and CD-6 only to evaluate whether the "performance of it appears to be positive for the minority district." Senate Comm., 37:15–38:06. But, as he noted, his performance analysis of the districts focused on whether a Democratic candidate would likely

win, irrespective of the voters' or candidate's race: "Our analysis," he made explicit, "is on party, not race." Senate Comm., 42:52–42:59.[7]

S.B. 8 thus does not even trigger equal protection scrutiny because political considerations like "incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of [] district lines." *Bush*, 517 U.S. at 967 (plurality op.). S.B. 8's sponsors considered communities of interest, Senate Floor, 7:10–8:15, House Comm., 3:50–4:23, and other traditional redistricting principles such as population deviation and parish splits, but ultimately, they explained, S.B. 8 was "politically drawn to protect our members of Congress" as much as possible while satisfying the district court's order. House Comm., 10:07–10:45. Race, though "inherently a consideration where, as here, a governing body must respond to violations of Section 2 of the Voting Rights Act," was "plainly subordinate to the [Legislature's] preoccupation with protecting incumbency and maintaining other political advantages," and therefore did not run afoul of the Constitution. *Theriot*, 185 F.3d at 485, 488. In other words, S.B. 8 "does not deviate substantially from a hypothetical court-drawn § 2 district *for predominantly racial reasons*." *Bush*, 517 U.S. at 994 (O'Connor, J., concurring) (emphasis added). Instead, it deviates from the remedial plan proposed by plaintiffs in the Section 2 litigation for predominantly political reasons. Because there is no constitutional

_____

[7] It is clear S.B. 8 was not enacted to maximize Black electoral power because many Black leaders expressed disappointment with the configuration. Representative Newell noted that "[i]t is disheartening that we do have so much politics that are guiding our maps instead of the policy and the people. . . . [S.B. 8] does not reflect what the African-Americans that we've heard from across the state during the road shows in 2021 asked for. It does not reflect all of what the Black Caucus and the Democratic Caucus has asked for these past three years, but it's the closest that we've gotten thus far, and it seems like it's the closest one that we are going to get that we could possibly get support from my other Republican colleagues on. But I just wanted to make that clear that it is not all that we asked for and there have been better ones that were submitted." House Comm., 12:42–16:08.

prohibition against drawing district lines to achieve political goals, *see Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019), Plaintiffs cannot succeed on the merits of their claims.

### 2. Plaintiffs' circumstantial evidence of the Legislature's motives does not show that racial considerations predominated.

Plaintiffs' circumstantial evidence fails on its own terms. Plaintiffs rely on an expert report prepared by Michael Hefner, a witness who the State defendants in the Middle District Litigation chose not to put on the stand, *see supra* at p. 4 n.1, and whose testimony the Western District of Louisiana has previously regarded as "less helpful," "argumentative and conclusory, and "not always directly responsive to the issues under consideration by the Court." *Thomas v. Sch. Bd. St. Martin Par.*, 544 F. Supp. 3d 651, 685–86 (W.D. La. 2021), *rev'd in part on other grounds sub nom.*, *Borel ex rel.  AL v. Sch. Bd. St. Martin Par.*, 44 F.4th 307 (5th Cir. 2022); *see also Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 422 (M.D. La. 2017) ("disagree[ing]" with Mr. Hefner's "visual observations" regarding district configuration because he "failed to provide any objective benchmarks for [his] visual assessments"), *rev'd on other grounds sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020).

In his expert report here, Mr. Hefner opines that because S.B. 8's districts are less compact and split more parishes and municipalities than H.B. 1 or an illustrative plan submitted by Plaintiffs—each of which lacks a second Black-opportunity district—it follows that "communities of interest were unnecessarily divided [in S.B. 8] because of race." *See* Expert Report of Michael C. Hefner at 27, ECF No. 17-3. That conclusory say-so is wrong. Mr. Hefner simplistic observations say nothing about what motivated those compactness scores or parish splits. To the contrary, Mr. Hefner refuses to consider any alternative explanations for the configuration of districts, including the record statements of S.B. 8's supporters explaining that departures from these redistricting criteria were necessary to accomplish political objectives, *see, e.g.*, Senate

Comm., 34:51–35:38; House Comm., 13:35–14:42. Mr. Hefner also fails to provide any context for the maps he produces with Black population clusters, such as municipal boundaries. Similarly, Mr. Hefner's calculation of Polsby-Popper scores ignores the fact that several illustrative plans with two majority-Black districts submitted by *Galmon* Amici in the Middle District litigation had better compactness scores than H.B.1, *Robinson*, 605 F. Supp. 3d at 782, refuting any suggestion that S.B. 8's compactness score was necessitated by the creation of an additional majority-Black district. Mr. Hefner concludes that S.B. 8's design "begs the question of whether the distribution of African Americans are [*sic*] compact enough to create a second majority-minority district," ECF No. 17-3 at 27, but he never undertakes any of the analysis that would be necessary to answer that threshold question or consider any alternative plans.

The Middle District of Louisiana, however, devoted extensive attention to evidence on that very subject, and concluded that the plaintiffs there were "substantially likely to prove that Black voters are sufficiently 'geographically compact' to constitute a majority in a second congressional district." *Robinson*, 605 F. Supp. 3d at 822 (footnote omitted). The Fifth Circuit did not find any error with this conclusion. *See Robinson*, 86 F.4th at 592. Accordingly, S.B. 8's deviation from ideal compactness and other districting criteria could not have been predominantly driven by racial reasons. The more natural conclusion follows from what the bill sponsors said: S.B. 8 pursued political goals over aesthetics. That is constitutionally permissible. *See Theriot*, 185 F.3d at 487–88 (rejecting racial gerrymandering challenge where "any irregularity associated with the shape of [the challenged district] is derivative of politics" and other acceptable considerations).

## II. The balance of equities and public interest disfavor injunctive relief.

Plaintiffs also fail to satisfy the equitable prerequisites for an injunction. *See VRC LLC*, 460 F.3d at 611. First, eight of the twelve Plaintiffs do not reside in CD-6, the district they allege

to have been drawn because of unconstitutional racial motives, *see* Compl. at 5–6, and thus they do not have standing and cannot suffer irreparable harm from a denial of the injunction. *See United States v. Hays*, 515 U.S. 737, 746 (1995).

Further, any injunction that deprives *Galmon* Amici and other Louisiana voters of the second Black-opportunity district required by federal law, as Plaintiffs request, would be extremely inequitable—especially given that the 2022 congressional elections were administered under a map that every federal court to weigh in on the issue has concluded likely violated Section 2 of the VRA. *See Robinson*, 605 F. Supp. 3d at 852 (concluding that "protecting voting rights is quite clearly in the public interest, while allowing elections to proceed under a map that violates federal law most certainly is not"). Plaintiffs' requested injunction of S.B. 8—a map that remedies that legal violation pursuant to the policy choices of the state's legislative and executive branches—would squarely undermine the public interest.

## CONCLUSION

The Court should deny Plaintiffs' motion and enter judgment for Defendants.

Respectfully submitted this February 27, 2024.

_s/ J.E. Cullens, Jr._                                    _s/ Abha Khanna_

J. E. Cullens, Jr. (LA # 23011)                          Abha Khanna* (# 917978)
Andrée Matherne Cullens (LA # 23212)                     ELIAS LAW GROUP LLP
Stephen Layne Lee (LA # 17689)                           1700 Seventh Ave., Suite 2100
WALTERS, THOMAS, CULLENS, LLC                            Seattle, WA 98101
12345 Perkins Road, Bldg. One                            (206) 656-0177
Baton Rouge, LA 70810                                    akhanna@elias.law
(225) 236-3636
cullens@lawbr.net                                        Lalitha D. Madduri* (# 917979)
acullens@lawbr.net                                       Jacob D. Shelly* (# 917980)
laynelee@lawbr.net                                       Daniel Cohen* (# 917976)
                                                         Qizhou Ge* (# 917977)
                                                         ELIAS LAW GROUP LLP
                                                         250 Massachusetts Ave. NW, Suite 400
                                                         Washington, DC 20001
                                                         (202) 968-4490
                                                         lmadduri@elias.law
                                                         jshelly@elias.law
                                                         dcohen@elias.law
                                                         age@elias.law

                                                         * Admitted _pro hac vice_

                                                         Counsel for Proposed Amici

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2024, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and that service will be provided through the CM/ECF system.

*/s/Abha Khanna*
Abha Khanna

Counsel for *Proposed Amici*