## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

PHILIP CALLAIS, LLOYD PRICE,           )
BRUCE ODELL, ELIZABETH ERSOFF,         )
ALBERT CAISSIE, DANIEL WEIR,           )
JOYCE LACOUR, CANDY CARROLL            )
PEAVY, TANYA WHITNEY, MIKE             )
JOHNSON, GROVER JOSEPH REES,           )
ROLFE MCCOLLISTER,                     )
                                       )     Case No. 3:24-cv-00122-DCJ-CES-RRS
       Plaintiffs,                     )
                                       )
v.                                     )     District Judge  David C. Joseph
                                       )     Circuit Judge Carl E. Stewart
NANCY LANDRY, IN HER OFFICIAL          )     District Judge  Robert R. Summerhays
CAPACITY AS LOUISIANA                  )
SECRETARY OF STATE, AND STATE          )
OF LOUISIANA,                          )     Magistrate Judge Kayla D. McClusky
                                       )
       Defendants.                     )


## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................... 1

    I.       Plaintiffs will succeed on the merits of Count I. ................................... 1

       A.  Plaintiffs have shown race predominated. ...................................... 2

       B.  Defendants fail to show SB8 is narrowly tailored. ........................ 8

           i.      The Legislature did not "reasonably believe" two majority-minority districts are necessary in Louisiana. ..................... 9

           ii.     The Legislature did not perform the requisite pre-enactment analysis. ........................................................ 12

           iii.    SB8 is not narrowly tailored to comply with the VRA. ............ 12

    II.      Plaintiffs will succeed on the merits of Count II. ................................ 13

    III.    The remaining preliminary injunction factors weigh in favor of Plaintiffs. ......... 18

    IV.    *Purcell* does not preclude this Court from awarding relief. ................. 19

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ............................................................................8, 12

*Ala. Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ..............................................................................3, 8

*Allen v. Milligan,*
    599 U.S. 1 (2023) ..................................................................................8, 13

*Ardoin v. Robinson,*
    142 S. Ct. 2892 (2022) ...............................................................................20

*Ardoin v. Robinson,*
    143 S. Ct. 2654 (2023) ...............................................................................20

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ...............................................................................20

*Bethune-Hill v. Va. State Bd. of Elecs.,*
    580 U.S. 178 (2017) ............................................................................passim

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021) ...............................................................................14

*BST Holdings v. OSHA,*
    17 F.4th 644 (5th Cir. 2021) ........................................................................18

*Bush v. Vera,*
    517 U.S. 952 (1996) .........................................................................4, 7, 13

*Chen v. City of Houston,*
    206 F.3d 502 (5th Cir. 2000) .....................................................................6, 7

*Clark v. Calhoun Cnty., Miss.,*
    88 F.3d 1393 (5th Cir. 1996) ......................................................................11

*Cooper v. Harris,*
    581 U.S. 285 (2017) ......................................................3, 7, 8, 13, 16

*Edmonson v. Leesville Concrete Co.,*
    500 U.S. 614 (1991) ...................................................................................15

iii

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) .................................................................. 18

*Gaffney v. Cummings*,
    412 U.S. 735 (1973) ............................................................................. 15

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960) ................................................................ 13, 14, 16

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ............................................................................. 15

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
    23 F.3d 1071 (6th Cir. 1994) ............................................................... 19

*Harris v. McCrory*,
    159 F.Supp.3d 600 (M.D. N.C. 2016) .................................................. 8

*Hays v. Louisiana*,
    936 F. Supp. 360 (W.D. La. 1996) .................................................. 7, 19

*Hays v. Louisiana*,
    862 F. Supp. 119 (W.D. La. 1994) ..................................................... 19

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ............................................................................... 6

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ............................................................................. 13

*LULAC v. Abbott*,
    601 F. Supp. 3d 147 (W.D. Tex. 2022) ........................... 14, 15, 16, 18

*LULAC v. Perry*,
    548 U.S. 399 (2006) ......................................................................... 9, 13

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) .......................................................................... 20

*Miller v. Johnson*,
    515 U.S. 900 (1995) ........................................................................... 2, 3

*Moore v. Harper*,
    142 S. Ct. 1089 (2022) ........................................................................ 20

*Personnel Adm'r of Mass v. Feeney*,
    442 U.S. 256 (1979) ....................................................................... 15, 16

iv

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ........................................................................................ 19, 20

*Regents of Univ. of Cal. v. Bakke,*
    438 U.S. 265 (1978) ..................................................................................... 14, 15

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    140 S. Ct. 1205 (2020) ....................................................................................... 20

*Reno v. Bossier Parish Sch. Bd.,*
    520 U.S. 471 (1997) ............................................................................... 15, 16, 18

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ........................................................................................... 19

*Rice v. Cayetano,*
    528 U.S. 495 (2000) ........................................................................................... 14

*Robinson v. Ardoin,*
    605 F. Supp. 3d 759 (M.D. La. 2022) ............................................................... 12

*Robinson v. Landry (Robinson II),*
    37 F.4th 208, 217 (5th Cir. 2022) .......................................................... 11, 17, 20

*Rogers v. Lodge,*
    458 U.S. 613 (1982) ..................................................................................... 16, 17

*Shaw v. Reno (Shaw I),*
    509 U.S. 630 (1993) .................................................................................. *passim*

*Shaw v. Hunt (Shaw II),*
    517 U.S. 899 (1996) .......................................................................... 5, 6, 7, 9, 13

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,*
    600 U.S. 181 (2023) ..................................................................................... 14, 15

*Tex. All. for Retired Ams. v. Hughes,*
    976 F.3d 564 (5th Cir. 2020) ............................................................................. 20

*Theriot v. Par. of Jefferson,*
    No. 95-2453, 1996 WL 637762 (E.D. La. 1996) ............................................... 11

*Thornburg v. Gingles*
    478 U.S. 30 (1986) ............................................................................... 2, 8, 12, 19

*United Jewish Org. of Williamsburg, Inc. v. Carey*,
    430 U.S. 144 (1977) .......................................................................... 14

*United States v. Brown*,
    561 F.3d 420 (5th Cir. 2009) ...................................................... 15, 17

*Velasquez v. City of Abilene, Tex.*,
    725 F.2d 1017 (5th Cir. 1984) ......................................................... 15

*Vill. of Arlington Heights v. Metro Housing Corp.*,
    429 U.S. 252 (1977) ...................................................... 15, 16, 17, 18

*Wis. Legislature v. Wis. Elecs. Comm'n*,
    595 U.S. 398 (2022) .......................................................................... 10

*Wright v. Rockefeller*,
    376 U.S. 52 (1964) ............................................................................ 14

**Other Authorities**

*House Chamber Day 5 – SINE DIE* (Jan. 19, 2024) ................................ 9, 16

*House & Governmental Affairs Committee* (Jan. 15, 2024) ......................... 3

*Senate Chamber 1ES Day 3 – SINE DIE* (Jan. 17, 2024) ..................... 4, 9, 16

*Senate Chamber 1ES Day 5 – SINE DIE* (Jan. 19, 2024) .......................... 5, 13

*Senate & Governmental Affairs Committee* (Jan. 16, 2024) ........................ 1

Plaintiffs submit this Reply in Support of their Motion for Preliminary Injunction, **Doc. 17**. As shown below and in Plaintiffs' first Memorandum, **Doc. 17-1**, the Motion should be granted.

<u>**ARGUMENT**</u>

**I.      Plaintiffs will succeed on the merits of Count I.**

Plaintiffs should prevail because the facts are not in dispute: in SB8, the State purposely set out to draw two majority-minority districts. Every legislator and official admits this was the overriding goal. Any other considerations—political or otherwise—were applied **after** the initial, core decision to create two majority-minority districts. Plaintiffs must therefore win the first prong of their *Shaw* claim: race predominated in the drawing of districts. *See* Section I.A. The Court need not resort to indirect evidence such as the serpentine shape of District 6, explainable only by its surgical envelopment of majority-minority precincts. **Doc. 17-3** (Hefner Report). That shape, though unaddressed by the State or Amici, is familiar to this Court: in the 1996 *Hays* litigation, it invalidated a nearly identical racial gerrymander intended to create two minority seats out of seven.

Indeed, the State concedes racial predominance. It shifts its defense to *Shaw*'s second prong by arguing that SB8 was narrowly tailored to comply with the State's interest in appeasing the Amici, ending their VRA litigation, and keeping the drafting pen—and thus the precise design of the two-district map—in the Legislature's hands. **Doc. 86, at 12-15**. But as shown in Section I.B, mere litigation strategy does not make out a VRA defense. The State is thus trapped in the web of its desire to appease all sides. By adopting as its own the Amici's racially-motivated plan to control two districts, the Legislature owns Amici's intent. With that intent comes racial predominance under *Shaw* prong I, as "[r]acial gerrymandering, even for remedial purposes" is still racial gerrymandering subject to strict scrutiny. *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 657 (1993). But

1

by then failing to actually rely on the VRA or show that the VRA requires SB8's absurd districts, the State loses prong II.

Amici's position is even less coherent. Rather than disputing the facts on prong I, they would shift *Shaw*'s goalposts by insisting that race must have predominated when the Legislature chose SB8 over other proposed maps. But a focus only on the downstream choice *between maps that all have two majority-minority districts* conveniently skips the Legislature's most important decision: its ill-considered choice to enact two majority-minority districts in the first place. As shown below, such goalpost-moving directly contravenes *Shaw* and its progeny. But it gets worse. Having just argued that SB8 survives prong I because non-racial factors caused the Legislature to favor SB8 over other two-district plans, Amici claim under prong II that the VRA required a two-district plan. But were that so, the State would lose prong I. And as the Plaintiffs show, neither the State nor Amici can begin to prove that the VRA could have required SB8's absurdly elongated District 6. It will become clear at trial that not only District 6, but every possible "second" majority-minority district fails under *Thornburg v. Gingles*, 478 U.S. 30 (1986). Plaintiffs' proposed remedial map should be promulgated.

### A. Plaintiffs have shown race predominated.

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elecs*., 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). It "prohibits unjustified racial classifications." *Id*. at 189. Plaintiffs must show "race was the predominant factor motivating the legislature's decision to place a significant number of voters *within or without a particular district*." *Id*. at 187 (emphasis added). This analysis is district-by-district. *Id*. at 187, 191-92. "[A]ctual considerations that provided the essential basis for the lines"

rather than "*post hoc* justifications the legislature in theory could have used but in reality did not" matter. *Id*. at 189-90. Many types of evidence can show racial predominance.

Plaintiffs have shown racial predominance by direct evidence. *Miller*, 515 U.S. at 916. The Governor called the Special Session in response to the Voting Rights Act litigation, solely to replace the State's then-current map—with only one majority-minority district—for a map with two majority-minority districts. **Doc 17-13**.[1] Everyone agrees on that point. The Legislature answered the Governor's call by repealing the prior map and enacting a new one *for the sole purpose of* adding a second majority-minority district. *Bethune-Hill*, 580 U.S. at 190.[2] The legislative history, statements made by legislators, the map itself, and the dramatic 30% increase of African American voters in District 6 all show racial predominance. **Doc. 17-1, at 21-31**; *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 267 (2015) (racial predominance where state "expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria"); *Cooper v. Harris*, 581 U.S. 285, 300 (2017) (finding a "textbook example of race-based districting" from an "announced racial target that subordinated other districting criteria and produced boundaries amplifying divisions between blacks and whites" (quotation omitted));

---

[1] Legislators' discussion with Attorney General Liz Murrill on the first day of the special redistricting session about the reason the special session was called—*i.e.* to create a map with two majority-minority districts in light of the *Robinson* litigation—further supports this point. **Doc. 94-3, at 15-30**. In response to Attorney General Murrill's advice in the hearing that "race cannot be the predominate factor," Representative Farnum rhetorically said, "Isn't that the only reason we're here right now? . . . isn't that the predominant reason?" Louisiana House of Representatives, *House & Governmental Affs Committee*, at 1:05:20-1:05:40 (Jan. 15, 2024), https://house.louisiana.gov/h_video/VideoArchivePlayer?v=house/2024/jan/0115_24_HG. Statements of SB8 Author Sen. Womack and Sponsor Rep. Beaullieu show that this was the mission from the outset. *See infra* n.7.

[2] Amici argue that the Court must compare SB8 and other proposed bills during the special session to determine if race predominated, and that by comparison, race did not predominate in SB8. **Doc. 94, at 27**. But that is not true. The relevant comparison is between SB8 and HB1 (the old law), which was repealed prematurely because it only had one majority-minority district. That comparison shows race clearly predominated in SB8. *Bethune-Hill*, 580 U.S. at 190. And even if the other proposed bills were relevant, racial predominance in those other maps does not lessen racial predominance in SB8's map. The express primary purpose of the redistricting special session was to create a map with two majority-African American districts. Therefore, for all maps introduced in the special session, "'[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Id*. at 189 (quoting *Shaw II*, 517 U.S. at 907).

*Bethune-Hill*, 580 U.S. at 192 (racial predominance where evidence shows "use of an express racial target"); *Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality) (racial predominance where State had "commit[ment] from the outset to creating majority-minority districts").

The point is further underscored by Amici's exhibits. *See, e.g.*, **Doc. 94-3**. For example, in the House Committee Hearing, Vice Chairman Representative Lyons stated in support of SB8:

> I'm looking at the mission that we have here, and **the mission that we have is that we have to create two majority of black districts** . . . . But we have to look at the center of this piece, and that is to create those districts that perform and some of that's going to be for debate, and some that's going to be for the clearing pieces to happen as we go forward. But I just want to put on the record that I know the senators worked hard on this piece, **and that goal is what was in mind, to create these two majority-black districts** and to do it with as much of the criteria as possible to be done to make sure that it is conforming. And with that being said, I wanted to get that clear of what that message is and what we're doing here . . . .

**Doc. 94-6, at 33-34** (emphasis added). Representative Carlson, too, conceded that the Legislature thought SB8 *had* to create two majority-minority districts and this map met that goal. ***Id*. at 42**.

Senator Womack, SB8's author, also repeatedly urged his colleagues in the hearing: "we *must* have [a second] majority black voting-age population district." ***Id*. at 3** (emphasis added). He stated: "[W]e all know why we're here. We were ordered to draw a new black district, and that's what I've done." ***Id*. at 51**. He repeated in the Senate Committee Hearing: "we *must* have two majority black voting age population districts." **Doc. 94-4, at 13** (emphasis added). He repeated again on the Senate Floor: "we *had* to draw two minority districts." Louisiana Senate, *Senate Chamber 1ES Day 3 – SINE DIE*, at 18:08-18:30 (Jan. 17, 2024) (emphasis added) [hereinafter Jan. 17 Senate Floor].[3] He referred to Districts 2 and 6 as the "minority" or "Black" districts and stated repeatedly that both intentionally had over 50% BVAP. *Id*. at 9:00-10:40, 16:35-16:43, 18:15. He said the precise "reason" for the configurations of the districts was race:

---

[3] Full video is at: https://senate.la.gov/s_video/VideoArchivePlayer.aspx?v=senate/2024/01/011724SCHAMB.

> Given the State's current demographics, there is not enough high Black population in the Southeast portion of Louisiana to create two majority Black districts and to also comply with the U.S. Constitution's one-person one-vote requirement. **That is the reason why** District 2 is drawn around Orleans parish while District 6 includes the Black population of East Baton Rouge Parish and travels up the I-49 corridor to include Black population in Shreveport.

*Id*. at 9:35-10:00 (emphasis added). SB8 Sponsor Rep. Beaullieu echoed this in the House.

In the second Senate floor debate, it was even clearer that race predominated. Senator Morris affirmed, "it looks like to me we primarily considered race." Louisiana Senate, *Senate Chamber 1ES Day 5 – SINE DIE*, at 8:25-8:58 (Jan. 19, 2024) [hereinafter Jan. 19 Senate Floor].[4] Likewise, Senator Luneau, who disagreed with most of SB8, acknowledged that race was predominant in his analysis: "It's important that we do these maps and we do them correctly where we establish another majority-minority district. For that reason, I'm going to support and I'm going to vote for this map." *Id*. at 16:35-16:52. Senator Carter also acknowledged that the singular goal was to create two African American districts. *Id*. at 17:30-18:30. Simply put, race was the criterion that "could not be compromised" and predominated over all other considerations. *Bethune-Hill*, 580 U.S. at 189 (quoting *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 907 (1996)).[5]

No one contests why the Special Session was called and what it accomplished. Instead, Amici argue that even though the Session was called specifically to draw racially based districts *at the request of Amici* and the map was racially drawn to the *satisfaction of Amici*, political concerns were the real reason SB8 was enacted and District 6 was drawn in a bizarre slash mark. **Doc. 93, at 12**; **Doc. 94, at 26**. But Amici's references to a few remarks about Legislators' attempts to maintain the status quo after they drew two majority-minority districts do not prove political concerns predominated. If the Legislature was fundamentally driven by maintaining incumbent

---

[4] Full video is at: https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011924SCHAMB2.
[5] That's not to mention all the other quotes from legislators cited in Plaintiffs' opening brief, **Doc. 17-1**.

seats, the old law would still be in effect. Rather, the record and map reveal that the goal was to create two majority-minority districts with express racial targets. **Doc. 17-1**. Only **after** that race-based decision did the State apply other factors, such as which incumbent seat would become the second minority seat. *Bethune-Hill*, 580 U.S. at 189 (racial predominance exists even "when a reapportionment plan respects traditional principles . . . if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only *after* the race-based decision had been made'" (quoting *Shaw II*, 517 U.S. at 907) (emph. added).

Amici argue, nonetheless, that unbeknownst to everyone else, including the State, SB8's real goal was to oust Congressman Garret Graves in District 6. **Doc. 93, at 13**. Yet no evidence in the legislative record or circumstantial evidence from the map shows this was even a *subordinate* goal of SB8.[6] In fact, Representative Newell shot down the notion that politics were at play in defense of SB8 in the House Committee Hearing. **Doc. 94-6, at 39-40**.[7] The map clearly shows the Legislature drew Districts 2 and 6 around pockets of African American voters, **Doc. 17-3, at 23-24**, and it reveals no hidden scheme to oust Graves. If that was the main goal, the Legislature had a far easier path than dragging District 6 out of its native Southeastern Louisiana to stretch hundreds of uncharted miles into the heart of District 4 to reach Shreveport. *See Chen v. City of Houston*, 206 F.3d 502, 507 (5th Cir. 2000) (noting "some highly bizarre districts give rise to inference that race predominated more strongly than the inference that factors such as politics created the distortion" (citing *Hunt v. Cromartie*, 526 U.S. 541, 547 n.3 (1999)). The only plausible

---

[6] Amici's reliance on speculation from a few newspapers is not direct evidence, nor can it withstand all the evidence demonstrating the exact opposite.

[7] Representative Newell stated: "[T]his is not a process by which one party is losing power and caving into another party. This is a process by which the other 30% of the people in this state are trying to get the representation that their population and numbers deserve in Congress. This isn't a caving in or power grab or giving away of power or losing the power of the Republican party. It's an opportunity for this body to represent all of the people that they are supposed to represent in a District listening to them and giving them the opportunity to vote for someone of their choice whether that person of their choice is a black Republican or white Democrat." **Doc. 94-6, at 39**.

explanation is that the State's predominant goal was to rig a second minority district by reaching African American voters in Caddo Parish—a racial gerrymander today, just as this Court found thirty years ago in invalidating a strikingly similar district that contained 82% of the African American population of today's District 6 under a seven-district map. *Hays v. Louisiana*, 936 F. Supp. 360, 367 (W.D. La. 1996). At any rate, *some* incumbent would have to be disadvantaged after the initial race-based decision was made to create a new majority-minority seat, but this does not excuse that initial race-based decision. In sum, this rumor is a meritless *post hoc* attempt to obscure a blatant racial gerrymander. *Bethune-Hill*, 580 U.S. at 190.

Equally unavailing is Amici's claim that "[m]aintaining control over the process" prevailed over race. **Doc 94, at 23-24**. Even if the desire for control influenced *procedural* timing and tactics, it does not compete with the *substantive* racial criteria applied by the Legislature, which predominated over traditional criteria like compactness. What matters is the predominant use of race to sort citizens, not the Legislature's desire that it, and not someone else, draw the lines. Amici's claim that legislative references to the Voting Rights Act and prior litigation show that race did not predominate is also meritless. **Doc. 94, at 22**. The Supreme Court has repeatedly held that race predominated precisely in those situations: where a State cited the VRA to make race-based decisions. *See, e.g*, *Cooper*, 581 U.S. at 311; *Shaw II*, 517 U.S. at 908. Again, "[r]acial gerrymandering, even for remedial purposes" is still subject to strict scrutiny. *Shaw I*, 509 U.S. at 657. Race was the first criterion considered by the Legislature, and it was the criterion that all agreed could not be compromised. *Bethune-Hill*, 580 U.S. at 189.[8]

---

[8] Although neither the State nor Amici seriously contest it, and it should be unnecessary given the direct evidence, Plaintiffs also showed strong circumstantial evidence of racial gerrymandering. Mike Hefner's expert report, **Doc. 17-3**., showed that District 6 has among the lowest compactness scores possible, and that its serpentine shape, mirroring the 1990s-era racial gerrymander invalidated by this Court, is designed to surgically carve out and stitch together disparate African American communities. This odd shape demonstrates a "racial quota." *Bush*, 517 U.S. at 976 (quotation omitted); *Chen v. City of Houston*, 206 F.3d 502, 507 (5th Cir. 2000) ("The shape alone of some districts may be so bizarre and irregular that their creation may only be interpreted as 'an effort to segregate the races for

**B.  Defendants fail to show SB8 is narrowly tailored.**

Because race predominated over other considerations when the Legislature drew SB8, it must withstand strict scrutiny. *Cooper*, 581 U.S. at 292. "The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end.'" *Id*. The State's response cannot clear this bar, nor do Amici's briefs provide a boost.

Both the State and Amici argue that the Legislature had "good reason" to believe race must predominate to comply with the VRA. **Doc. 86, at 13; Doc. 93, at 20; Doc. 94, at 21**. This argument fails on the facts and the law. On the facts, when a State uses race to draw district lines, it "must show (to meet the 'narrow tailoring' requirement) that it had a 'strong basis in evidence' for concluding that the [VRA] required its actions." *Cooper*, 581 U.S. at 292.

> To have a strong basis in evidence to conclude that § 2 demands such race-based steps, the State *must* carefully evaluate whether a plaintiff could establish the *Gingles* preconditions-including effective white bloc voting—in a new district created without those measures.

*Id*. at 304. Evidence for a "strong basis" may include: risk of racial retrogression, *Ala. Legislative Black Caucus*, 575 U.S. at 279; turnout rates and the results of recent contested elections, *Abbott v. Perez*, 585 U.S. 579, 621 (2018); and statistical evidence of racial block voting, *Harris v. McCrory*, 159 F.Supp.3d 600, 619 (M.D. N.C. 2016). Indeed, "where [the Supreme Court has] accepted a State's 'good reasons' for using race in drawing district lines, the State made a strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott*, 585 U.S. at 621.

The Supreme Court has cautioned that this "strong basis in evidence" is wholly distinct from a "pure error of law" in applying the VRA. *Cooper*, 581 U.S. at 306. Though a State is afforded some leeway under a proper application of the VRA, legal mistake sits squarely outside

---

purposes of voting, without regard for traditional districting principles.'" (quoting *Shaw I*, 509 U.S. at 642)). And the neglect of traditional criteria to unite dispersed minority populations shows racial predominance. *Bethune-Hill*, 580 U.S. at 190-91; *Allen v. Milligan*, 599 U.S. 1, 28 (2023).

of that leeway. *Id*. (concluding that the Court will not "approve a racial gerrymander whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake"). The State and Amici fall short of their factual burden and, if anything, show SB8 arises from pure legal error.

Finally, the State must show not only a strong evidentiary basis, but also that SB8's district lines are narrowly tailored to remedy an alleged VRA violation. *See Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 915 (1996); *see also LULAC v. Perry*, 548 U.S. 399, 429 (2006) (similar). In other words, the fear of a VRA violation *somewhere* does not allow the State to gerrymander *just anywhere*.

> ### i.  The Legislature did not "reasonably believe" two majority-minority districts are necessary in Louisiana.

As a preliminary matter, though the State argues in the abstract that the Legislature had a strong basis in evidence for concluding that the VRA necessitated its action, the State stops short of arguing that its Legislature actually held that belief. In fact, the State disclaims this line of thought, clarifying that the State "vehemently disagreed" with the notion that the VRA requires two majority-minority districts in Louisiana. **Doc. 86, at 11**. This disagreement persists: "Much as the State might disagree with [the outcome of the *Robinson* district court and Fifth Circuit] . . . ." ***Id.* at 14**. Legislators, including Senator Womack, also did not rely on the VRA in the legislative debates. Instead, they cited the *Robinson* litigation and concerns that Judge Dick would create her own new map.[9] And at the outset of the special redistricting session, Attorney General Murrill

---

[9] Among the many comments, introductory ones of SB8 author Senator Womack and sponsor Rep. Beaullieu are sufficient. Senator Womack stated: "As you know, Louisiana congressional districts must be drawn given the federal Voting Rights Act litigation . . . . [T]he maps in the proposed Bill responds appropriate to the ongoing federal Voting Rights Act in the Middle District of Louisiana. For those who are unaware, the congressional maps that we enacted in 2022 of March have been the subject of litigation roughly since the day the 2022 congressional redistricting bill went into effect. Even before we enacted it, after a substantial amount of prolonged litigation, the federal district court has *adhered to its view* that the federal law requires that the state have two congressional districts with a majority of black voters. Our secretary of state, attorney general and our prior legislative leadership appealed that but have yet to succeed and *we are now here because the federal court order that we have to have first opportunity to act*." Senate January 17, *supra*, 8:08-9:06 (emphasis added). Sponsor Rep. Beaullieu reiterated Sen. Womack's statement and added: "If we don't act, it's very clear that the federal court will impose the plaintiffs' proposed map on our State, and we don't want that." La. House of Representatives, *House Chamber Day 5 – SINE DIE*, at 2:48:25-2:48:56 (Jan. 19, 2024),

repeatedly advised them that in her view the VRA *did not* require two majority minority districts, **Doc. 94-3, at 16**, and that an attempt to intentionally create two may very well be unconstitutional.[10] In short, the Legislature drafted SB8 not to comply with the VRA, but to appease the *Robinson* litigants by meeting their racial target of controlling two districts, while keeping the pen in the hands of the Legislature to decide where the gerrymandering would occur.

The distinction between the VRA itself, and a strategic decision to appease litigants doggedly pursuing an errant reading of the VRA, is crucial. The State misses this distinction by conceding that no "actual" *evidentiary* basis exists to conclude that the VRA requires two majority-minority districts in Louisiana. **Doc. 86, at 14**. But in fact, the State must provide actual "evidence or analysis supporting the claim that the VRA *require[s]*" what is otherwise odious—sorting citizens by race. *Wis. Legislature v. Wis. Elecs. Comm'n*, 595 U.S. 398, 403 (2022) (emph. added).

Amici claim to invoke the VRA itself, but they don't deliver: upon closer review, they simply gesture towards non-final judicial decisions as if their mere existence establishes the VRA position the State now has the burden of proving. **Doc. 93, at 21** ("The Middle District litigation provided those good reasons here."); **Doc. 94, at 21** ("Here, the decisions by the district court and two unanimous Fifth Circuit panels in *Robinson* provided the State with much more than required to give it a strong basis."). No court ever finally held based on the evidence that the VRA requires

---

https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/jan/0119_24_1ES_Day5 [Jan. 19 House Floor].

[10] Representative Marcelle asked in the hearing: "So it is a fact that we do have six congressional districts in Louisiana. That is a fact, right? It is also a fact that a third of [] the population is African American?" The Attorney General responded: "Approximately. . . . I mean, it is expressly stated in section two of the Voting Rights Act that this is not an act of proportionate dividing. That is not permitted under Section 2. And so we can't just take that number and say, that's how we do this because it's not that simple and that's actually not permitted under the law." **Doc. 94-3, at 19**. Attorney General Murrill also warned: "The last time redistricting in the 1990s when the second majority minority map was drawn we ended up in litigation for a decade. So there is no guarantee that when you do this again, we won't still be in litigation, but we are in litigation now." **Doc. 94-3, at 15**. Attorney General Liz Murrill also repeatedly stated that she did not believe the current plan was unconstitutional.

two majority-minority districts, as the Attorney General emphasized to legislators.[11] As Senator Morris stated in the debate of SB8 on the Senate Floor:

> We came here to redistrict because there's a chance, it's not absolute, but there's a chance that a judge will rule that our districts that we completed in the last couple of years will not be declared unconstitutional. That case never went to a final judgment. It hasn't even gone to a full trial on the merits. But yet here we are.

Jan. 19 Senate Floor, *supra*, at 8:25-8:58. The State summarily deals with this inconvenient truth by asserting it could not "wait for the ministerial entry of a final judgment on the merits when the judicial writing was already on the wall." **Doc. 86, at 14**. But that conclusion was not reasonably certain. The Fifth Circuit cautioned that plaintiffs had yet to prove their case: "The Plaintiffs have prevailed at this preliminary stage given the record as the parties have developed it and the arguments presented (and not presented). But they have *much* to prove when the merits are ultimately decided." *Robinson II*, 37 F.4th at 215 (emphasis added). The Fifth Circuit reiterated its wariness after concluding the district court had erred in its compactness analysis. *Id*. at 222.[12]

Because neither the *Robinson* district court nor the Fifth Circuit finally concluded that Louisiana requires two majority-minority districts, their decisions cannot serve as a "strong basis" to support the State's action; relying on this false conclusion is nothing more than an error of law.

In sum, the Legislature did not and does not *actually* believe the VRA requires it to draw two majority-minority districts, but even if it did, that belief would be unreasonable because it is rooted not in statistical fact, but in a desire to end litigation for other purposes. That litigation, as the Fifth Circuit noted, was not final and the *Robinson* plaintiffs still had much to prove.

---

[11] "There's no definitive ruling on that case. It is still in litigation." **Doc. 94-3, at 16**. "We have not had any other fact finding because we haven't had a trial on the merits." **Doc. 94-3, at 18; Doc. 94-3, at 30**.

[12] Robinson Amici's citations to two cases in which parties supposedly relied on previous judicial findings to support a "strong basis" are misplaced and underscore the lack thereof in this case. In *Theriot*, the district court looked to *final judgments* of previous redistricting cases regarding one parish in Louisiana and emphasized "[a]ll of [the previous] findings were affirmed on appeal." *Theriot v. Par. of Jefferson*, No. 95-2453, 1996 WL 637762, at *1 (E.D. La. 1996) (unpublished). *Clark* likewise relied on findings from the *final judgment* of a prior iteration of the *same case*. *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1407 (5th Cir. 1996). Here, there has been no final judgment resolving the facts.

### ii. The Legislature did not perform the requisite pre-enactment analysis.

Relatedly, because the State and Amici rely entirely on non-existent holdings from the *Robinson* case, they proffer no evidence to support the contention that the VRA invariably requires two majority-minority districts in Louisiana. Though necessary to survive strict scrutiny, the Legislature did not engage in "a . . . pre-enactment analysis with justifiable conclusions" before it segregated voters into raced-based districts. *Abbott*, 585 U.S. at 621. In fact, the Legislature expressly stated that it had not conducted any sort of performance analysis to determine whether the districts consistently perform as majority-minority districts.[13] Instead of providing this Court with facts underlying its supposed "strong basis," the State simply suggests that a distant rumble from the "battle of the experts" in the early stages of *Robinson* carries their burden. **Doc. 86, at 14**. But any analysis of the *Gingles* factors in the prior litigation has no bearing here; it turned on the old law and on those plaintiffs' proposed illustrative maps, none of which resemble SB8. *See generally Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *vacated*, 86 F.4th 574 (5th Cir. 2023). The Robinson Amici would even reverse the burden, stating that "Plaintiffs make no effort to show that the *Gingles* preconditions are not satisfied." **Doc. 94, at 21**. But it is not Plaintiffs' burden to prove or disprove the *Gingles* preconditions. The burden belongs to the party attempting to mount a VRA claim or defense. Neither the State nor Amici undertake this burden. This Court should not assume the factual basis for *Gingles* in their stead.

### iii. SB8 is not narrowly tailored to comply with the VRA.

Even if the State reasonably believed the VRA will always require two majority-minority districts in Louisiana based on the *Robinson* litigation, SB8 is nonetheless not narrowly tailored because it does not remedy any alleged violation. *Shaw II*, 517 U.S. at 916. The State does not try

---

[13] Senate January 17, *supra*, at 25:00-25:20; Louisiana State Senate, *Senate & Governmental Affairs Committee*, at 41:45-43:12 (Jan. 16, 2024), https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/01/011624SG2.

to defend these districts. Instead, it repeatedly argues that it had to draw two majority-minority districts, writ large. But the VRA does not compel remedial action on a statewide basis or set a floor for a certain number of majority-minority districts. *Bush*, 517 U.S. at 979. The fear of violating the VRA somewhere does not allow the State to gerrymander a district anywhere. *LULAC v. Perry*, 548 U.S. 399, 431 (2006); *Bush*, 517 U.S. at 979; *Shaw II*, 517 U.S. at 916. The State had no basis to believe, much less a *stated* basis to believe, that the VRA required it to draw a district reaching hundreds of miles into the far recesses of the northwest corner of the State.

In fact, traditional redistricting criteria prove the exact opposite. A state legislature must always satisfy traditional redistricting principles to comply with the VRA. *Milligan*, 599 U.S. at 30; *LULAC*, 548 U.S. at 431; *Bush*, 517 U.S. at 979. Thus, some earlier law's purported VRA non-compliance cannot justify a new, non-compact district. *Bush*, 517 U.S. at 979. The "leeway" afforded States always requires adherence to this rule and only allows for "*reasonable* compliance measures." *Cooper*, 581 U.S. at 293 (emphasis added). Here, as attested by legislators themselves, traditional redistricting principles were subordinated to create two majority-minority districts. **Doc. 17-1, at 15, 23-24**; Jan. 19 Senate Floor, *supra*, at 8:30-12:30. These districts were not compact and were barely contiguous. **Doc. 17-3**. Thus, the map does not pass strict scrutiny.

## II.     Plaintiffs will succeed on the merits of Count II.

The Constitution protects all racial groups from representational schemes which have as their sole purpose the intentional overrepresentation of voters of a particular race over all other voters. *See Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *cf. Johnson v. De Grandy*, 512 U.S. 997, 1024 (1994). A claim that an election scheme is based predominantly on such discriminatory racial intent and results in the intended harm is actionable.

This claim is distinct from a *Shaw* claim because it implicates both the Fourteenth and Fifteenth Amendments, *Gomillion*, 364 U.S. 339; a *Shaw* claim only implicates the Fourteenth, *Shaw II*, 517 U.S. at 901. The Fourteenth Amendment claim here is also distinct from *Shaw* because it asserts that "legislative districting plans, including the configuration of legislative districts . . . diluted the ability of *particular* voters to affect the outcome of elections." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2331 (2021) (emphasis added). A *Shaw* racial gerrymandering claim ascribes universal harm to all voters; this Fourteenth and Fifteenth Amendment claim only alleges that specific segments of the population experience harm. The harm is not only that voters are classified and stereotyped by race, *see Shaw I*, 509 U.S. at 643-44, but that a class of voters experiences discrimination based on race, *see Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 306-07 (1978) (Powell, J.). Thus, Plaintiffs' claim is distinct from and can coexist alongside their *Shaw* claim. *See, e.g*., *LULAC v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex. 2022), *appeal dismissed Brooks v. Abbott*, 141 S. Ct. 441 (2022).

The Fifteenth Amendment "prohibits *all* provisions denying or abridging the voting franchise of any citizen or class of citizens on the basis of race," *Rice v. Cayetano*, 528 U.S. 495, 512 (2000) (emphasis added), including through the use of gerrymandering schemes, *Gomillion*, 364 U.S. 339; *Wright v. Rockefeller*, 376 U.S. 52, 56 (1964). It "grants protection to all persons, not just members of a particular race," or minority population. *Rice*, 528 U.S. at 512; *see also United Jewish Org. of Williamsburg, Inc. v. Carey*, 430 U.S. 144 (1977). The same principles are true of the Fourteenth Amendment. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206 (2023); *Wright*, 376 U.S. at 56; *Gomillion*, 364 U.S. 339. Plaintiffs are no less protected under these Amendments because they belong to a current racial majority.

14

Importantly, "[r]acial discrimination is invidious in all contexts." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991). This requires a showing of "discriminatory purpose." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997). This can be done through multiple means. A redistricting scheme may be "invidiously discriminatory because [it] is employed 'to minimize or cancel out the voting strength of racial or political elements of the voting population.'" *Gaffney v. Cummings*, 412 U.S. 735, 751 (1973) (quoting *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965)). "[T]he decisionmaker need not explicitly spell out its invidious goals—a court may sometimes infer discriminatory intent where an act has predictable discriminatory consequences." *LULAC*, 601 F. Supp. 3d at 160. "[T]he inevitability or foreseeability of consequences of a neutral rule" can reveal "discriminatory intent." *Personnel Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 n.25 (1979). "Certainly, when the adverse consequences of a law upon an identifiable group are [] inevitable . . . , a strong inference that the adverse effects were desired can reasonably be drawn." *Id.*; *see also United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).

A discriminatory purpose also exists where the State shows a race-based preference for a racial group; racial quotas are *per se* discrimination. *Students for Fair Admissions*, 600 U.S. at 210 (citing *Bakke*, 438 U.S. at 315 (Powell, J.)); *id.* at 230-31 (holding that the State cannot grant benefits based on race). A discriminatory purpose is even more evident where a State uses a racial quota to "discriminate *against* those racial groups that were not the beneficiaries of the race-based preference" or that inevitably harms those outside the target racial group. *Id.* at 212 (citing *Grutter v. Bollinger*, 539 U.S. 306, 341 (2003)). Moreover, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and the Fifteenth Amendments to occur." *Velasquez v. City of Abilene, Tex.*, 725 F.2d 1017, 1022 (5th Cir. 1984) (citing *Vill. of Arlington Heights v. Metro Housing Corp.*, 429 U.S. 252 (1977)).

Here, direct evidence of the precise racial quotas for each district and the "inevitable" discriminatory consequences of those quotas demonstrate the Legislature's discriminatory intent. *Feeney*, 442 U.S. at 256 n.25; *LULAC*, 601 F. Supp. 3d at 160. SB8 author Senator Womack and sponsor Representative Beaullieu repeatedly admitted their goal was to create "two congressional districts with a majority of Black voters," with "over 50% Black voting age population." Jan. 17 Senate Floor, *supra*, at 9:20-9:35; Jan. 19 House Floor, *supra*, at 2:48:25-2:49:13.

Countless other legislators and state officials expressed the need to hit the magic "majority" percentage of "51%" of African American voters in two districts and voted for SB8 precisely because it reached that threshold.[14] The State's quota forced it to supercharge BVAP in District 6 by 30% and to move some African American voters from District 2 to 6, giving them a bare, but necessary, majority in District 2 to reach the 51% threshold. The State also intentionally reduced non-African American voters in District 6 by 30%, pushing them out into super-majority districts where their votes had little to no power, *cf. Gomillion*, 364 U.S. 339, and intentionally packed them into the remaining four districts so that their majorities became super-majorities. **Doc. 17-1, at 29-30**. In doing so, the State intentionally minimized their influence and diluted their votes. Here, the "inevitability or foreseeability of consequences of a neutral rule," *Feeney*, 442 U.S. at 279 n.25, are joined by a facially discriminatory gerrymander and intentional racial quotas.

While not strictly necessary here, the *Arlington Heights* framework independently proves invidious discrimination. *Reno*, 520 U.S. at 481; *Rogers v. Lodge*, 458 U.S. 613, 617 (1982).[15]

---

[14] *See, e.g.*, Vice Chairman of the House & Governmental Affairs Committee Representative Lyons, *see* **Doc. 94-6, at 33-34**; Senator Carter, *see, e.g.*, Jan. 17 Senate Floor, *supra*, at 24:30-25:10; Senator Duplessis, Jan. 17 Senate Floor, *supra*, at 34:40-34:52; Senator Luneau, *see* Jan. 19 Senate Floor, *supra*, at 16:35-16:52; Representative Newell, *see* **Doc. 94-6, at 7**; Representative Willard, *see* **Doc. 17-32, 17-33**; Representative Lavardain, *see* **Doc. 94-6, at 11-12**; Representative Carlson, *see* **Doc. 94-6, at 42**; Representative Farnum, *see* **Doc. 94-6, at 18, 27**; Congressman Troy Carter, *see* Jan. 17 Senate Floor, *supra*, at 26:00-27:00; **Doc. 17-34**.
[15] The State's assertion that the *Arlington Heights* framework does not apply in the redistricting context is incorrect. Courts continue to apply this framework in redistricting cases where a claim of intentional discrimination is made. *See, e.g.*, *Reno*, 520 U.S. at 488; *LULAC*, 601 F. Supp. 3d at 164; *see also Cooper*, 581 U.S. at 319 (noting that "in no

"Necessarily, an invidious discriminatory purpose may often *be inferred* from the totality of the relevant facts, including the fact, if it is true, that the *law bears more heavily on one race than another.*" *Rogers*, 458 at 617 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)) (emphases added). All *Arlington Heights* factors demonstrate that the State acted with discriminatory intent.

First, plaintiffs can show discriminatory impact with evidence that the effects of SB8 "bear[] more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242). SB8 packs non-African American voters into Districts 1, 3, 4, and 5, and diminishes their voting strength in District 6, so their votes have less weight by virtue of their race. Meanwhile African American voters have greater voting strength by virtue of their concentration in Districts 2 and 6. The voting strength of non-African American and African American voters is disproportionate to their shares of the population. Thus, the resulting map discriminates against non-African American voters and favors African American voters.

Second, the historical background and the sequence of events leading up to SB8 each show that the decision was discriminatory. *Arlington Heights*, 429 U.S. at 267. The historical background of the challenged decision and the sequence of events leading up to SB8 show that SB8's maps were drawn specifically to form two majority-African American districts and four majority-non-African American districts. As the Fifth Circuit noted, the goal of plaintiffs in the *Robinson* litigation was to "seek another BVAP-majority district at the expense of a white-majority district." *Robinson v. Landry*, 37 F.4th 208, 217 (5th Cir. 2022). This goal was later realized.

Third, the irregular procedure that led to SB8 indicates discriminatory intent. *Arlington Heights*, 429 U.S. at 267. On the Governor's first day in office, he called for the special session. SB8 was introduced, passed, and signed in eight days. While the Legislature spent months after

---

area of our equal protection law have we forced plaintiffs to submit one particular form of proof to prevail" and citing the myriad of evidence available to show discriminatory intent under *Arlington Heights* as an example).

the 2020 Census traversing the state for public input, legislators who rose to speak at SB8's passage admitted they had not even had time to inform their constituents about the special session—much less ask their opinions and provide proper representation. The entire session was a whirlwind.

Fourth, the viewpoints expressed by legislators and other decision makers show they intended to dilute the votes of non-African American voters and they were motivated by race when they configured the districts for the reasons previously stated. *Brown*, 561 F.3d at 433-34. The Legislature's intent was discriminatory,[16] and as shown in Section I.B, SB8 fails strict scrutiny.

### III.   The remaining preliminary injunction factors weigh in favor of Plaintiffs.

The State and Amici rightly concede that irreparable harm exists if Plaintiffs can demonstrate they have suffered a constitutional injury. **Doc. 86, at 20; Doc. 93, at 28-29; Doc. 94, at 38**. Plaintiffs have done so here. *See supra* Part I-II; **Doc. 17-1**. Accordingly, they have suffered irreparable harm. *BST Holdings v. OSHA*, 17 F.4th 644, 618 (5th Cir. 2021).

The State and Amici do contest the balance of equities and public interest prongs, but their arguments are unavailing. The State argues its desire to have a finalized map counsels against invalidating SB8 and enacting a new map, and that this will create "chaos" and invite more litigation. **Doc. 86, at 20-21**. Amici claim an interest in preserving SB8 because they fought for the Legislature to enact this map. **Doc. 93, at 29; Doc. 94, at 38-39**. But the State has no interest in enforcing an unconstitutional law and Amici have no valid interest in voting under an unconstitutional reapportionment scheme. *BST*, 17 F.4th at 618 ("Any interest . . . in enforcing an

---

[16] Contrary to Amici's contention, Plaintiffs need not prove additional elements to show discrimination. The Supreme Court has instructed lower courts that in conducting an inquiry of the direct and circumstantial evidence of "a jurisdiction's motivation in enacting voting changes," "courts should look to our decision in *Arlington Heights* for guidance." *Reno*, 520 U.S. at 488. No more is required. *See, e.g.*, *LULAC*, 601 F. Supp. 3d 147. Plaintiffs also do not need to present evidence that they belong to a particular racial subset of non-African American voters to bring a constitutional challenge when the law has the effect of discriminating against all non-African Americans. **Doc. 94, at 35**. The Constitution requires no greater specificity. Plaintiffs have sufficiently identified themselves in this class to show they belong to an "identifiable group." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020).

unlawful (and likely unconstitutional) [law] is illegitimate."). Likewise, the State's unfounded fears of the costs of creating a constitutional map are not legitimate reasons to leave this irreparable harm uncorrected. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Plaintiffs' clear right to be free of this unconstitutional voting scheme is in the public interest and plainly outweighs these illegitimate interests. *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994).

The State also argues that the public interest favors maps drawn by the legislature and not the judiciary. **Doc. 86, at 22**. This is normally true, but here, the State's *second* attempted redistricting is unconstitutional; the State does not recognize the unconstitutionality of its action; and the State is at high risk of repeating its error. With so little time remaining, the State is not entitled to a third try. *See, e.g.*, *Hays*, 936 F. Supp. at 372; *Hays v. Louisiana*, 862 F. Supp. 119, 124-25 (W.D. La. 1994). Instead, the Court must ensure no elections are conducted under the unconstitutional plan. *Id.*

Finally, in an effort to stave off injunctive relief, Amici warn—but do not show—that Plaintiffs' own illustrative map fails under *Gingles*. In fact, Plaintiffs will show at trial that the VRA is fully satisfied with one majority-minority district because it is not possible to draw a second under *Gingles*. Every attempt to racially gerrymander that second district either results in a non-compact absurdity like SB8, or holds such thin minority margins that it cannot perform to actually elect African American candidates of choice. African American voters are not sufficiently numerous and compact, and do not sufficiently turn out in a cohesive bloc, to control two districts. Such a district will always violate Count I or II. The State saw this in 2022. It is still correct today.

### IV. *Purcell* does not preclude this Court from awarding relief.

The State argues that the doctrine elucidated in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), bars the requested remedy here. **Doc. 86, at 17**. But as the Fifth Circuit said in the context of Louisiana elections five months before the November 2022 election:

The classic *Purcell* case is different. It concerns an injunction entered *days or weeks before an election—when the election is already underway*. In *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014), we stayed an injunction entered nine days before the start of early voting. In *Texas Alliance*, we stayed an injunction entered eighteen days before the start of early voting. 976 F.3d at 567. In *Texas Democratic Party*, we stayed an injunction entered "weeks" before the start of in-person voting. 961 F.3d at 411. *Purcell* itself stayed an order changing election laws twenty-nine days before an election. *Tex. All.*, 976 F.3d at 567. And the Supreme Court has blocked injunctions entered five, thirty-three, and sixty days before Election Day.

*Robinson II*, 37 F.4th at 228-29 (emphasis added).[17] Here the election is not until November 2024. The State's concern about "an injunction . . . less than 150 days before the congressional candidate qualifying period" does not even approach a *Purcell* problem. **Doc. 86, at 21**. The State and voters will have months to prepare and understand new districts. The State's parade of horribles—voter confusion and legislative impossibility—is entirely speculative. As for the supposed "logistical nightmare," **Doc. 86, at 18**, such "administrative burdens" in complying with an injunction "would inflict no more than ordinary bureaucratic strain on state election officials." *Robinson II*, 37 F.4th at 230. *Purcell* does not apply this far from an election and the State has not sufficiently shown that the risks of chaos, distrust, or voter confusion at the heart of *Purcell* are present in this case.[18]

## CONCLUSION

For these reasons, Plaintiffs respectfully request the Court grant their preliminary injunction.

---

[17] Of note, even though the Supreme Court ultimately stayed the preliminary injunction in *Robinson* pending its decision in *Alabama v. Milligan*, *Purcell* was not a cited reason for doing so, and the stay was ultimately vacated. *See Ardon v. Robinson*, 142 S. Ct. 2892 (2022); *Ardoin v. Robinson*, 143 S. Ct. 2654 (2023).

[18] The Fifth Circuit and the Supreme Court have only applied *Purcell* to stay injunctions that threatened to confuse voters, unreasonably burden election administrators, or otherwise create unworkable conditions or distrust in the electoral process. *See, e.g.*, *Robinson II*, 37 F.4th at 228-29; *Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam); *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (per curiam); *Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring); *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring).

Dated this 8th day of March, 2024

Respectfully submitted,

**PAUL LOY HURD, APLC**
*/s/ Paul Loy Hurd*
Paul Loy Hurd
Louisiana Bar No. 13909
Paul Loy Hurd, APLC
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com
*Attorney for Plaintiffs*

**GRAVES GARRETT GREIM LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
Jackson Tyler
Missouri Bar No. 73115
*Admitted Pro Hac Vice*
Matthew Mueller
Missouri Bar No. 70263
*Admitted Pro Hac Vice*
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that, on this 8th day of March 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

*/s/ Edward D. Greim*
Edward D. Greim
