# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF LOUISIANA


PRESS ROBINSON, *et al.*
PLAINTIFFS


C.A. No. 3:22-cv-00211-SDD-RLB

v.


KYLE ARDOIN, in his
official capacity as Secretary
of State for Louisiana
DEFENDANT


--------------------------------------------------------------


EDWARD GALMON, SR., *et al.*
PLAINTIFFS


C.A. No. 3:22-cv-00214-SDD-RLB

v.


KYLE ARDOIN, in his
official capacity as Secretary
of State for Louisiana
DEFENDANT

EXPERT REPORT OF

Michael C. Hefner


ON BEHALF OF INVERVENOR

STATE OF LOUISIANA


May 29, 2022

**TABLE OF CONTENTS**

Introduction …………………………………………… 4

Factual Background …………………………………… 5

Methodology …………………………………………… 5

What Defines a Community of Interest ………………………… 6

Preservation of Communities of Interest in Redistricting ……… 7

Identifiable Regions in Louisiana ………………………… 8

Comparison of HB 1 Congressional Map ……………………… 10

Plaintiffs Illustrative Plans ……………………………… 13

Robinson Illustrative Plan ……………………………… 15

Galmon Illustrative Plan 1 ……………………………… 17

Galmon Illustrative Plan 2 ……………………………… 20

Galmon Illustrative Plan 3 ……………………………… 21

Conclusion …………………………………………… 22

Certification …………………………………………… 23

Appendix …………………………………………… 24

**EXPERT WITNESS REPORT OF MICHAEL C HEFNER**

# I.  Introduction

This report has been prepared at the request of the Louisiana State Attorney General's office representing the State of Louisiana, the intervenor in the case of *Press Robinson, et. al v. Kyle Ardoin*, CA No. 3:22-cv-00211-SDD-RLB, and *Edward Galmon, Sr., et. al v Kyle Ardoin*, CA No. 3:22-cv-00214-SDD-RLB. Geographic Planning & Demographic Services, LLC was retained by the Attorney General's office as an expert to determine the effects the Illustrative Plans filed by the Plaintiffs to this case have on the communities of interest within the State.

My rate for the State of Louisiana is $285 per hour. I have testified previously in the cases of *Terrebonne Parish Branch NAACP, et. al v. Piyush Jindal*, CA No. 3:14-cv-69-JJB-SCR and *Keith Kishbaugh vs The City of Lafayette Government, Lafayette Parish Government, and Lafayette City-Parish Government*. I have not published any publications within the past ten years.

I am an expert in demography and have been practicing in that field in a professional capacity since 1990. As a life-long resident of Louisiana, I am very familiar with the State of Louisiana and many of the parishes and communities within.  Since my early years, I have traveled to many of the various parts of the State leading bicycling tours as well as my own private cycling destinations. In my official capacity as a demographer and a specialist in redistricting, my work has taken me to most of the parishes and communities in the State.

Projects ranged from parish and regional housing studies, school attendance zone configurations, student assignment work for school desegregation cases, student population projection studies, site location analysis, private marketing studies, economic development studies, technical assistance with demographics and grant submissions, and numerous election district redistricting projects.  All those projects involved an intensive study of the areas being served.  The studies encompassed researching news articles, historical publications, demographics, community characteristics, and interviews with local citizens.  This level of research better prepared me for the work being done on behalf of the client and produced a quality product that was more responsive to their needs. That experience has well prepared me to serve as an expert witness in this case regarding communities of interest and how they are affected by the Congressional reapportionment plans since I am very familiar with the majority of them.

A full description of my qualifications is found in Appendix Exhibit 2 in accordance with 28 U.S.C. §1746, 26(a)(2)(B), the Fed. R. Civ. Proc. and Rules 702 and 703, the Fed R. of Ev.

## A. Factual Background

On August 12, 2021, the U.S. Census Bureau released the PL 94-171 redistricting file based on the 2020 census.  The Louisiana Legislature then embarked upon a State-wide tour of each of the regions of the State to gather citizen input prior to convening the legislative session to take up State-wide and Congressional redistricting.

On or about February 18, 2022, the Legislature voted to approve the Congressional district plan under HB 1/SB 5.  The Governor vetoed the plan stating that a second majority African American Congressional district needed to be created to match the African American State-wide proportionality.

The Legislature subsequently overrode the veto thus putting the Congressional plan in to effect. The Plaintiffs then filed their respective complaints against the plan.

## B. Methodology

Plan Review and Analysis

The election plans were reviewed using the latest 2020 Census Data in the PL:94-171 file as released to Louisiana on August 12, 2021 for redistricting purposes.  Both the U.S. Department of Justice and the State of Louisiana specify this file to be used in the absence of any approved special census counts.

The precinct geography used for the plan reviews was based on the 2021 state-wide precincts in effect as of the 2020 Census. The registered voter data attached to those precinct files were from the August 2021 voter database and were obtained from the Louisiana Legislative website.[1]

Evaluations of Enrolled plan and the Illustrative Plans submitted by the Plaintiffs were reviewed in the context of customary traditional redistricting criteria as described in Section 2 of the Voting Rights Act but more specifically to the charge, the preservation of communities of interest.[2]

**Technical Specifications**

| GIS Software: | Maptitude for Redistricting ver. 2022, Caliper Corporation. |
| | ArcPro 2.9, ESRI, Inc. |
| Election Data: | Louisiana Secretary of State Election databases. |

---

[1] This was the first set of registered voter data disaggregated to the census block level prepared for the reapportionment of the Congressional districts.  Subsequent versions updated the voter data to the December 2021 database. The differences are insignificant to these reviews.

[2] The Louisiana Legislature adopted Joint Rule 21 and HCR 90 of the 2021 Regular Legislative Session that established the redistricting criteria to be used for State-level redistricting purposes. https://legiscan.com/LA/text/HCR90/2021.

5

Base Maps:          U.S. Census Bureau TIGER 2020 Line File, Enhanced Caliper Street file, precinct geography updated as found on the Louisiana Legislative Website

## II.  What Defines a Community of Interest?

Communities of interest are formed by people, often within a geographic or a defined area, that self-identify themselves with others who share similar traits based on political issues, culture, economic, occupation, religion, or local traditions.[3] That commonality results in interests and concerns that affect the group as a whole.

Because of that self-identification, there is no set standard for a community of interest. Criteria that bind people together into a cohesive unit vary from one group to another as are set by the group. The specificity of the issues share by a community of interest also can vary by level of geography.

As an example, parents of students attending a particular high school can constitute a community of interest centered around school issues and may be very specific.  Larger geographic areas, such as precincts, may have communities that are connected by issues in their neighborhood and surrounding areas.  In fact, precincts often encompass neighboring neighborhoods within the specific geographic boundary of a precinct, and they gather to vote at a specific location.

Likewise, parish-level geography may take a more generalized approach to issues that affect the parish itself. A collection of parishes constitutes a region that may have in common issues at a state-wide or national interest. In essence, the larger the geography, the more generalized the cohesive characteristics that bind people into a community of interest.

A good example of a regional community of interest is where parishes that share similar political concerns are grouped together into a Congressional district.  That allows a more homogenous representation of that area in Congress when it comes to national issues and gives voice to those residents.[4]  Many states formally recognize the importance of maintaining communities of interest when it comes to redrawing the election districts after each census.[5]  While Louisiana does not have an adopted guideline when it comes to

---

[3] Duda, Jeremy "The Redistricting Conundrum: Just What is a Community of Interest?", AZ Mirror, December 2, 2021. https://www.azmirror.com/2021/12/03/the-redistricting-conundrum-just-what-is-a-community-of-interest/
[4] Buchler, Justin. "Competition, representation, and Redistricting: The Case against Competitive Congressional Districts." Journal of Theoretical Politics 17, no. 4: 431-463.
[5] "Communities of Interest", Brennan Center for Justice, November 2010. https://www.brennancenter.org/sites/default/files/analysis/6%20Communities%20of%20Interest.pdf

communities of interest, many other states do.[6]  A review of those guidelines helps illuminate the definition and importance of communities of interest.[7]

## III.   Preservation of Communities of Interest in Redistricting

Preservation of communities of interest is one of the seven traditional redistricting criteria used when designing election districts. From a representation perspective, keeping communities of interest together allows those persons to have a voice in affairs that affect them. When an election plan splits apart those communities, those voices are submerged, resulting in a disenfranchisement in the electoral process and in representation on issues that affect them.

Because modern day redistricting software is so powerful and robust with features that can quickly calculate demographic and plan boundary changes, a demographer drawing an election plan can easily become focused on the mathematical perfection of a plan. Use of specifically defined characteristics such as precinct and parish boundaries, total population counts, racial makeup, and voting age populations often dominate the attention of the mapmaker because they are easy to quantify.  Inclusion and exclusion of areas in a district map can be readily ascertained on the effectiveness of the desired outcome of the mapmaker.

Because communities of interest are not always clearly defined, they are very easy to overlook, particularly when inclusion of an area that some see having nebulous characteristics complicates the mathematics of a plan.  Without local knowledge, it can be difficult to readily identify areas that share common issues, culture, economics, and even religion.

However difficult it may be to factor in communities of interest in pursuing a mathematically based plan, failure to do so can exert a tremendous obstacle to the effectiveness of an election plan. This can be especially true with a state's Legislative or Congressional plan.

Since *Miller v Johnson*, the Supreme Court has recognized the importance of communities of interest as a race-neutral criteria in redistricting.[8] This approach legitimizes representation by having a diversity of interests among the population  is reflected in the elected body.[9]

---

[6] The Louisiana Legislature adopted Joint Rule 21 and HCR 90 of the 2021 Regular Legislative Session has a provision elevating the preservation of the communities of interest within the same district above that of respecting established boundaries of parishes, municipalities, other political subdivisions, and natural boundaries of the State.

[7] Id.

[8] Miller v. Johnson, 515 U.S. 900 (1995).

[9] M Malone, Stephen J. "Recognizing Communities of Interest in a Legislative Apportionment Plan." Virginia Law Review, vol. 83, no. 2, 1997, pp. 461–92, https://doi.org/10.2307/1073783.

7

# IV.        Identifiable Regions in Louisiana

For this analysis, two regional communities of interest maps will be used.  The effects of the Legislature adopted HB1 Congressional maps and the Plaintiffs Illustrative Plan on those regional areas will be compared.

The first analysis will use the five distinct regions that have been identified by the Louisiana Regional Folklore Program (LRFP) and will be used as the basis to show the effects on those establish regional communities of interest.[10]  A map of the LFRP regions is shown below.

**MAP 1**



These regions roughly correspond to the regional communities of interest identified by the State of Louisiana and commonly used with cultural and tourism activities.[11]  A map of those regions is shown below.

---

[10] Five Regions of Louisiana, Louisiana Regional Folklife Program. The program is a cooperative endeavor between Louisiana universities and the Louisiana Folklife Program within the Division of the Arts. One of the purposes is to identify and document folk cultural traditions and artists. The program is based at Louisiana Tech University. URL: https://www.nsula.edu/regionalfolklife/regions/default.htm

[11] About Louisiana, Map of Regions. http://microsite.smithsonianmag.com/ads/louisiana/about-louisiana/music.html

**MAP 2**



**Characteristics of the Five Regions**

The Louisiana Regional Folklife Program briefly describes each region as follows:[12]

Region 1:     Northeast and north central Louisiana is predominantly British and African American, and includes both Lowland and Upland South culture.

Region 2:     The Red River Valley cuts across the state from Shreveport to the Mississippi River and includes Shreveport, Alexandria, and Natchitoches. The old Neutral Strip that separated Spanish Texas and French Louisiana stretches down the Sabine River from the Zwolle area through Beauregard Parish. The Red River Valley and Neutral Strip region is home to many folk groups and traditions, including several groups of Native Americans.

Region 3:     The Acadiana parishes are located from west of the Atchafalaya Swamp to the Texas border. Most of the region is rural, but includes Lafayette, Lake Charles, and New Iberia. The region includes the Louisiana Prairie, Bayou Teche, coastal marshes, and parts of the Atchafalaya swamp. The predominant culture is a complex blend of French, Spanish, and African. Other cultural groups include Anglos, Laotians, Chitimacha and Koasati Indians.

Region 4:     Including three distinct cultural regions, Louisiana's Florida Parishes comprise the "toe of the boot" and are predominantly British and African American. There are also significant numbers of Hungarians and Italians. The predominant culture

---

[12] Five Regions of Louisiana, Louisiana Regional Folklife Program.

of the Mississippi River Road parishes from St. Francisville to north of New Orleans is a blend of French and Lowland South plantation culture. Eastern Acadiana includes Bayou Lafourche and the Terrebonne marshes, and parts of the Atchafalaya swamp where the dominant culture is a blend of French, Spanish, African and Houma Indian.

Region 5:       The city of New Orleans and the surrounding suburban and rural parishes make up Region 3. New Orleans urban culture is a complex blend of French, African, Spanish, German, Irish, and Italian influences. Other groups include Latinos, Vietnamese, Croatians, and Isleños. This region includes the parishes of Jefferson, Orleans, Plaquemines, St. Bernard, and St. Tammany.

## V. Comparison of HB1 Congressional Map

The boundaries of the HB1/SB5 Congressional Map are overlaid on the LRFP regions with the parish outlines are shown in Map 3.

**MAP 3**



Map 4 shows a simplified version of the map with the regions shaded and the HB1 district outlines.

**MAP 4**



The Congressional District 1 (CD 1) encompasses most of Region 5 and the southern part of Region 4. CD 2 follows the Mississippi River to include the river parishes in Region 4 and part of Orleans Parish in Region 5. Together CD 1 and CD 2 share the traits of the communities in those two regions.  That part of Region 5 in CD 1 is a blend of French, African, Spanish, and European influences.

The river parishes assigned to CD2 from Region 4 share many of the same traits, especially French, African, and some European.  Those communities share common ancestry and culture. Many of the activities center around the Mississippi River, which plays a predominate natural feature in their respective parish. Economically this area is linked by the petrochemical industry that lines both sides of the Mississippi River from New Orleans north to Baton Rouge.[13]

The communities of interest for both CD 1 and CD 2 are related. The commonality of culture, ancestry, and economic activity maintains the integrity of those communities of interest assigned to those two Congressional districts.

---

[13] "The Mississippi River Industrial Corridor (MRIC) includes the parishes: Ascension, East Baton Rouge, Jefferson, Iberville, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, and West Baton Rouge." Louisiana Hazardous Substances Emergency Events Surveillance Mississippi River Industrial Corridor Factsheet, Louisiana Department of Health and Hospitals. URL: https://ldh.la.gov/assets/oph/Center-EH/envepi/LaTSIP/Documents/Other/HSEES-Miss_Ind_FS.pdf

CD 3 encompasses the majority of Region 3. This is known as the Acadiana area.  The boundary of CD 3 on the east side uses the middle levee of the Atchafalaya Basin and continues south using the Atchafalaya River.  This is a long-time natural boundary which historically separated the Acadiana area from the eastern part of the State.[14] The western boundary goes to the Texas boundary, which forms a natural political boundary.  According to the LRFP, the predominate culture in CD 3 is French, Spanish, and African. Other cultural groups include Anglos, Laotians, and American Indian.  The communities of interest that form the core of the Acadiana region within CD 3 remain intact.  Many of these communities are highlighted as cultural destinations in the State of Louisiana travel promotions.[15]

CD 4 combines the three northern parishes of Region 3 with parishes from Regions 1 and 2. This combination is relatively consistent with composition of the communities along the western side of the State having common ancestral and cultural links to French Creoles, Acadians, Spanish, European, and American Indians found in Regions 1, 2, and 3. Cultural links along the Red River Valley in particular has commonality with the northern part of the Acadiana Region as the Red River connected to the Atchafalaya River at its juncture with the Mississippi River and formed an important water transportation route. The regional communities of interest within CD 4 are largely related and form a consistent aggregation of the population.

CD 5 pairs the eastern parishes in Region 1 and 3 together which collectively form the agricultural center of the north Delta area of the State.[16] The cultural traits are largely British and African American and includes Lowland and upper South culture but also includes some French.

This area is then combined with the northern part of Region 4 which also consists of British and African American cultures along with Lowland and South plantation culture. This area is commonly referred to as the Florida Parishes due to its unique history.[17] The communities of interest within CD 5, while somewhat

---

[14] Writing in the Journal of Geography, Vol. XXXIII, March 1934, Minnie Kelley said "Acadian South Louisiana, commonly known as the Attakapas District, lies south of the thirteenth parallel of Latitude. The Atchafalaya and the Mermentau Rivers mark the eastern and western boundaries respectively. The southern limit of the region is the Gulf of Mexico while the northern limit is the Avoyelles District." Devilliers, Gladys, "The Attakapas Territory", Acadiana Ancestral Home, 1998. http://www.gladysdevilliers.acadian-home.org/Atacapas-Territory.html

[15] About Louisiana, Map of Regions.

[16] "The existing land use of the North Delta District is predominantly for agricultural and forest purposes. These two categories of land use classification account for 98.5 percent of the total area of the North Delta District." Comprehensive Economic Development Strategy 2015-2020, North Delta Regional Planning & Development Districts, Inc. URL: https://northdelta.org/wp-content/uploads/2021/09/2015-2020-CEDS.pdf

[17] The Florida Parishes include St. Helena, St. Tammany, E. Feliciana, Washington, Livingston, and W. Feliciana. They were part of Louisiana under French, Spanish, and British rule. For a short time in 1810 they were the

diverse, are not incompatible.  Commonality in ancestry and cultural traits can be found as well as a common agrarian based economy.

CD 6 takes in what CD 2 and CD 4 left out of the Region 4 area. The population center in East Baton Rouge is combined with those parts of the more rural parishes to the south but offset from the Mississippi River corridor. This combines the French, African American, and European influences of the southwestern part of Region 4 in the Terrebonne, Assumption, and Iberville parishes together. Added to this are the Spanish, French, British and African American influences in the Florida Parishes.

The communities of interest are a more complex combination than in some of the other Congressional districts.  The Florida Parishes themselves capture the diversity of the State as a whole.[18] However many of the parishes share the same ancestry despite being more economically diverse with logging in the north part of CD 6 and the oil industry, construction, farming and fishing in the southern portion.[19] [20]

**Summary of Enrolled HB 1 Congressional Plan**

Overall, the boundaries of the enrolled HB1 Congressional plan maintain traditional communities of interest.  Where it was necessary to divide parishes to balance the population counts, the boundaries were appropriate as dictated by the geographical features of the areas being divided.

## VI.        Plaintiffs Illustrative Plans

The Plaintiffs in this case have filed four illustrative plans, all created for the purpose of creating a second majority-minority Congressional district.  The four plans are Robinson Illustrative Plan, Galmon Illustrative Plan 1, Galmon Illustrative Plan 2, and Galmon Illustrative Plan 3.  Each plan will be analyzed for its effect on the communities of interest established *supra* with the Enrolled Plan discussion.

My observation and opinions on the Plaintiffs plans are based on over 32 years of experience in providing professional redistricting and various demographic services in a majority of the parishes in Louisiana. The work entailed detailed demographic studies at both parish and municipal levels.  My personal and professional familiarity with many of these areas provides a good background to base my opinions upon.

---

independent Republic of West Florida. Kingsley, Karen, Florida Parishes of Louisiana. URL: https://64parishes.org/entry/florida-parishes-of-louisiana
[18] Gardner, Joel, Folklife in the Florida Parishes, Folklife in Louisiana. URL: https://www.louisianafolklife.org/lt/Virtual_Books/Fla_Parishes/book_florida_overview.html
[19] Id.
[20] Occupational Breakout of the Civilian Labor Force by Sex and Ethnic Group, Houma MSA 2019, Louisiana Workforce Commission. URL: https://www.laworks.net/LaborMarketInfo/LMI_LaborForceDiversity_MSA.asp

**Overview of Plaintiffs' Plans**

The Plaintiffs' mapmaker utilized the same approach to reach their desired objective of creating a second majority African American Congressional district in all four plans.[21]   The two targeted districts are Congressional District 2 (CD 2) and Congressional District 5 (CD 5).  The population anchor with CD 2 is New Orleans area and CD 5 has its population anchor in the Baton Rouge area.

All four plans are based on the presumption that African American Louisiana residents all share the same interests and issues because of their race, regardless of where they geographically reside. This has the effect of the Plaintiffs creating and defining their own community of interest based solely on racial characteristics and then parsing those members among those two Congressional districts.

All four plans use some geographical variation of identifying the majority African American concentrations to include in either CD 2 or CD 5.  Since the New Orleans area is heavily populated and has a high number of African Americans, creating a majority African American Congressional district was not as much a problem as with CD 5.

For CD 5, the mapmaker uses various pathways among the four plans to excise African Americans out of their traditional communities and place them with others in that Congressional district. In addition to the selective inclusion of African Americans into CD 5, it was quite evident that the mapmaker took significant efforts to avoid areas of White population concentrations so as to not be included.

The discussions of the individual plans will address the highlights of the approaches the mapmaker had to use to achieve the stated goal of a second majority African American districts that also had a minimum mathematical threshold for the African American population.

---

[21] The Louisiana media is replete with numerous articles regarding the desire of certain legislators, community leaders, and the Governor on need to create a second majority African American Congressional District.

### A. Robinson Illustrative Plan

**MAP 5-Robinson Illustrative Plan 1 Overlaid on LRFP Regions**





Immediately upon viewing the Robinson Illustrative Plan, it was evident that the mapmaker had identified areas where a majority African American population could be singled out to place into a prospective minority district. The most stunning carve out was taking the mostly African American population in the north part of Lafayette Parish (and the City of Lafayette); adding it to the entirety of St. Landry Parish to capture that African American population and assign those citizens to Congressional District 5.

Furthermore, the plan then carves out the predominantly African American population from Evangeline Parish to also add to CD 5.  Ville Platte is the population and cultural center of Evangeline Parish which isolates the City from the rest of Evangeline Parish when it comes to Federal representation.[22] It is also heavily African American populated as compared to the rest of the Parish.

These areas identify with the Acadiana area.  Evangeline Parish was created out of the old St. Landry Parish many years ago.[23] They share the same values, sense of community, cuisine, culture and traditions

---

[22] https://www.louisianatravel.com/cities/ville-platte
[23] "Evangeline Parish was once part of St. Landry Parish.",  LSU Ag Center.
https://www.lsuagcenter.com/portals/our_offices/parishes/evangeline/features/about

of the Acadiana area.[24] Being on the west side of the Atchafalaya Basin, those attributes are unique as compared to the rest of CD 5.

Separating those African American residents from their fellow neighbors and placing them into an entirely different Congressional district effectively disenfranchises them.  While they add the marginal gains in the African American population needed for the Plaintiffs' purpose, they add nothing to the representation of issues that affect them in the Acadiana area.  Effectively they are submerged into the vastly more numerous populations of CD 5 which lies in the Baton Rouge area.

Looking northward, the Robinson Illustrative Plan then carves out much of the White population in the Region 1 area and assigns them to the Region 2 area as part of CD 4.  The majority African American population on the east side are then assigned to CD 5. This move weakens the collective voice of the north Delta region of the State; a weakness they can ill afford given the poverty and economic issues facing that area.[25]

In the Ouachita Parish area, the Robinson plan splits the City of W. Monroe into CD 5 and CD 4. With a 2020 census population of 12,459 the Robinson plan surgically carves out 3,338 African American residents out of the 5,632 assigned to CD 5 to join up with E. Baton Rouge Parish to the south.[26]  The rest of the City is assigned to CD 4 thus splitting up this community of interest among two Congressional districts. With the way the City was divided to specifically move the majority of African Americans into CD 5, it is my opinion that race was the deciding factor on who to put in or out of CD 5.

East Baton Rouge Parish is divided up to carve out the heavily African American residents in the parish. This constitutes a line generally north of Florida Blvd. and excludes the mixed-race population between Florida Blvd. and Government St. as well as the majority White residents south of Government and east of Nicholson Blvd. The boundary carefully goes around the southwest and west side of the Parish to avoid the White populations in that area.

In the Florida Parishes area (Region 4), St. Tammany Parish is carved out between CD 5 and CD 6. That portion of the parish assigned to CD 5 is predominantly African American.[27] This move separates the small communities of Kentwood, Tangipahoa, Roseland, Amite City, and Independence into CD 5 along with the

---

[24] Id.

[25] The north Delta region has been specifically identified as an area of extreme need by the inclusion of that area into the Delta Regional Authority, a Federal program.  The Louisiana delta parishes are among the 252 counties and parishes served by the Delta Regional Authority that make up the most distressed area of the country. URL: https://dra.gov/about-dra/about-delta-regional-authority/

[26] The City of W. Monroe has a total 2020 Census White population of 7,538 and a Black population of 4,452.

[27] The 2020 Census counts for this area of St. Tammany Parish is a total population of 21,698 of which 9,419 are White and 11,351 are Black.

population center carve-out of E. Baton Rouge.[28] What issues affect these small communities will carry little weight given their small population in relation to a district that stretches through Baton Rouge, Lafayette, Alexandria, and Monroe.

Taken in totality, just these areas alone are being singled out based on their race and for no other reason. They are either not connected to the rest of CD 5 as a like-minded community or their voices are being diminished by isolating them from their fellow citizens.

**Opinion**: The enrolled HB 1 Congressional plan has demonstrated that a race-neutral approach that preserves communities of interest while using the other traditional redistricting criteria can be accomplished.  With that as a benchmark, the only justifiable reason to tear these African American communities away from their traditional areas of common interests is to create another majority-minority Congressional District in the Robinson Illustrative Plan using a race-central approach.

## B. Galmon Illustrative Plan 1

### MAP 6- Galmon Illustrative Plan 1 Overlaid on LRFP Regions




Similar to the Robinson plan, the Galmon Illustrative Plan seeks out majority African American communities with little respect to their home base parishes and communities. St. Landry Parish and the

---

[28] In the Robinson Plan, the E. Baton Rouge carve-out for CD 5 has 184,556 persons of which 139,181 are Black (2020 Census).

northern part of Lafayette Parish and the City of Lafayette are carved out of the Acadiana area (Region 3) and assigned to Congressional District 5.

Even more egregious, the Galmon Illustrative Plan 1 takes St. Martin Parish and half of Iberia Parish out of the Acadiana region and places it in Congressional District 1. This district encompasses the Metairie area and the Northshore area of the Greater New Orleans area.

St. Martin Parish is the genesis of the Acadiana culture.[29] It shares a common history with the eastern half of Iberia Parish by virtue of the Bayou Teche which served as a historic economic and cultural lifeline.[30] Everything from music, culture, cuisine, ancestry, and traditions are unique to St. Martin Parish as compared to the Greater New Orleans area.  Taking St. Martin Parish out of its historical place in Congressional District 3 literally rips the historical heart of Acadiana out and overshadows it with New Orleans.

Given the rural nature of St. Martin and Iberia Parishes and the uncommon association with the Greater New Orleans population, the effectiveness of any voice on Congressional matters is virtually none.  St. Martin and part of Iberia Parish are isolated from its own heritage and history for no other reason than racial considerations arising from the drafting of other Congressional districts.  They are merely cogs in the machine to help reach the desired population deviations after CD 2 and CD 5 were created.

On the northeastern end of the State, the Galmon Illustrative Plan 1 does much of what the Robinson plan does by isolating the majority African American parishes of the north Delta area from the rest of Region 1. Accordingly, the City of W. Monroe is split into a smaller unit with even more race-based specificity and assigning it to CD 5.

That part of the City has almost as many African Americans being carved out as with the Robinson plan but with much fewer Whites, thus helping their African American percentages in the plan.[31] These African Americans would then share the same Congress person as that part of E. Baton Rouge Parish carved out for

---

[29] "It can be said that Acadiana was born when 200 members of the Acadian resistance settled around present-day St. Martinville in 1765.… Today, the founding cultures, Acadian, African, French, Italian, and Spanish, have maintained their cultural identities while blending together to form a savory "cultural gumbo"." St. Martin Parish History, St. Martin Parish Government. URL: https://www.stmartinparish.net/about/st-martin-parish-history/

[30] "Early economic development of the Atchafalaya Basin hinged on the Bayou Teche. Before roads, the little Teche, not the Atchafalaya, was the highway from the Gulf of Mexico into the heart of Louisiana. The Teche was navigable over 100 miles, yet just wide enough, deep enough and swift enough to maneuver. Several Bayou Teche settlements materialized because of the timber and waterborne economy.", The Teche Project, URL: https://www.techeproject.org/bayou-teche-paddle-trail/history-culture/#:~:text=History%20%26%20Culture%20The%20Bayou%20Teche%20takes%20you,a%20booming%20cypress%20industry%20in%20the%20early%201900s.

[31] The CD 5 split has 3,176 Blacks and 1,330 Whites (2020 Census).

CD 5, which is far more numerous.[32]  Due to that severe imbalance in the geographical population, the African American residents in Ouachita Parish will be effectively disenfranchised.  They will not constitute enough of a population to warrant much attention on Federal matters from a Congress person more beholden to a much larger political base in the Baton Rouge area.

East Baton Rouge Parish is divided up in a similar manner as in the Robinson Illustrative Plan. The plan purposely places almost all of the African American population into CD 5. This keeps the White neighborhoods out of CD 5 to improve the African American percentages in the plan.

The boundary that divides Rapides Parish and goes through the heart of the City of Alexandria is even more bizarre.[33]  Of a total of 35,866 persons being placed in CD 5, 26,287 are African American. At one point the boundary passes through a residential area, putting one part in CD 4 and the other part in CD 5. A minor drainage ditch divides this neighborhood among CD 4 and CD 5.

**Opinion**: Other than racial considerations, it is difficult to rationalize the splitting of a large community of interest as represented by Alexandria into two separate Congressional Districts and with one of those districts encompassing the northern half of E. Baton Rouge Parish.

There is even less justification that St. Martin Parish and half of Iberia Parish would be grouped into a New Orleans-centric Congressional district. There is little in common and such a move disenfranchises those residents who cannot compete against the sheer numbers in the Greater New Orleans area.

The HB 1 plan has demonstrated that a race-neutral approach preserves the communities of interest in North and Central Louisiana area and the east end of the Acadiana region in Louisiana.

---

[32] Galmon Illustrated Plan 1 has 222,196 persons in CD 5, of which 158,199 are Black (2020 Census).
[33] The 2020 Census for the City of Alexandria was 47,212.

19

### C.      Galmon Illustrative Plan 2

**MAP 7- Galmon Illustrative Plan 2 Overlaid on LRFP Regions**





Roux-base gumbo vs tomato-based gumbo. Cajun two-step vs Second Line. Cajun band vs jazz band. Cous-Cous vs. grits. Old world French vs Parisian French.

In one State, but worlds apart and yet combined together under Galmon Illustrative Plan 2 are the City of Lafayette and St. Martin Parish with the City of New Orleans.  Completely different cultures, different history, and completely different communities of interest, yet this plan adds the core of the Acadiana area to some of the River Parishes and New Orleans.

While there is a thread of ancient French and Spanish ancestry, they are as different today as the dialects spoken.[34] And the issues that concern the Lafayette/St. Martin Parish areas are just as different as urban New Orleans.

Much like Galmon Illustrative Plan 1, St. Landry Parish and the easternmost parishes of the north Delta region are paired with the heavily populated African American northern half of E. Baton Rouge Parish. While sharing the same racial characteristics, they share little in common as communities of interest.

The boundary dividing the City of Alexandria and Rapides Parish is softened by including the predominantly African American community of Lecompt.  It nonetheless accomplishes the splitting of

---

[34] "Cajun or Creole: What's the Difference", URL: https://www.neworleans.com/restaurants/where-to-eat/cajun-or-creole/.

Alexandria and Rapides Parish into two Congressional districts with little rational, with the exception of the overt racial considerations needed to make the plan meet the stated objectives.

East Baton Rouge Parish continues under this plan configuration to carve out the heavily African American residents in the parish. There are but minor precinct swaps between this plan and the other Plaintiff plans.

**Opinion:** This plan pairs up two major areas of the State that have little in common when it comes to daily community life, history, culture, music, cuisine, and national issues. There is no ration basis for a configuration that promotes this or the division of other towns and cities other than if race was the primary consideration to meet specific goals and objectives. Likewise, the division of Rapides Parish, and the cities of Alexandria and W. Monroe can only be justified using racial considerations.

The effort to create a second majority African American Congressional district comes at the expense of the preservation of readily identifiable and long-standing communities of interest.  It has been demonstrated in the HB 1 plan that these parishes can be kept together in a race-neutral manner using traditional redistricting criteria.

### D. Galmon Illustrative Plan 3

### MAP 7- Galmon Illustrative Plan 3 Overlaid on LRFP Regions





Harking back to the Robinson Illustrative Plan and Galmon Illustrative Plan 1, the northern part of Lafayette Parish and the City of Lafayette are put into Congressional District 5. St. Landry Parish again

joins CD 5 as does the southeastern quarter of Rapides Parish, including the dividing of the City of Alexandria. The largely predominantly African American parishes of the eastern north Delta parish are included into CD 5 thus sharing that representation with the more populous north E. Baton Rouge Parish.[35]

As with the two earlier plans referenced, the City of W. Monroe is divided between two Congressional districts. Under Galmon 3, the selective carve-out for CD 5 represents 4,521 persons of which 2,933 are African American.  The rest of the City is in CD 4.

As in the Robinson plan, Galmon Illustrative Plan 3 carves up St. Tammany Parish. The Tangipahoa River westerly to the Parish boundary is put in CD 5.  This area is primarily African American.  The predominantly White eastern part of the Parish is included in CD 6, thus avoiding the putting Whites in CD 5.

E. Baton Rouge Parish retains the majority of the placement of African Americans in the central to north part of the parish in CD 5.  There are but a few precincts different than the other plans.

**Opinion:** Despite the minor plan configuration changes, the Congressional district boundaries in Galmon Illustrative Plan are still established by the racial composition of areas either being included or excluded based only on the race of the population.  This is an identical dynamic to the other Plaintiff plans. Like the other Illustrative plans, it is a race-based plan.

## VII.      Conclusion

Whereas the Engrossed HB1 plan largely follows the regions identified by the Louisiana Rural Folklife Program and keeps many more communities of interest intact, the Plaintiffs' plans do not.

Modern redistricting software possesses considerable power to quickly evaluate the effects of moving populations in and out of prospective districts. It is very easy to get focused on a pre-determined outcome and employ the power of the software to try and achieve it. Efforts by the Plaintiffs to use this tool to establish a second majority African American Congressional District in proportion to the overall State ratio results in plan configurations that break up both major and minor communities of interest.

The fact that so many communities of interest were either divided among the Congressional districts or paired with unlikely and dissimilar larger cities begs the question of whether the distribution of African Americans are truly compact enough to create a second majority-minority Congressional district.  In the Statewide aggregate, the ratio may suggest that it is.  But the actual distribution of the African American

---

[35] Under the Galmon Plan 3, 210,172 persons are carved out for CD 5, of which 155,806 are Black (2020 Census).

population tells a different story when it takes extreme and race-centric measures to arrive at even bare minimum majority configuration.

Considering the extent to which disparate communities of interest are paired together under all of the Plaintiffs' plans and the splitting of other small towns and cities, the only reasonable conclusion to reach is that the Plaintiffs' plans were designed specifically to reach a pre-determined minimal mathematical threshold that could result in the creation of a second majority African American Congressional district. This is the stated result the Plaintiffs were seeking.

The process used by the mapmaker to meet those goals subrogated other traditional redistricting principals, such as respecting communities of interest. The effort elevated the racial component in designing a plan above the other traditional redistricting criteria.

The Engrossed HB1 Congressional plan shows that a reasonable plan can be drawn in a race-neutral manner and respects the use of traditional redistricting principals.  It may not lead to the outcome some were looking for but based on the analysis of the various plans, that areas of traditional areas representation and preservation of communities of interest are far better.

## VIII.    Certification

The opinions expressed above are sworn, under penalty of perjury, to be true and based on the facts and criteria available to the expert witness as of the time of this report. This expert reserves the right to supplement this report as new information becomes available or as requested by the Defendant.  Any documents and information relied upon not footnoted are listed in the Appendix.

Michael C. Hefner, Esq.

Signed this 29th day of April, 2022.

s/s _____

Michael C. Hefner, Esq.
Expert Witness for the
Louisiana Secretary of State

# APPENDIX

Exhibit 1

## Table of Authorities

**List of Resources and References:**

Louisiana Legislature  Joint Rule 21 and HCR 90 of the 2021 Regular Legislative Session that establishing the redistricting criteria to be used for State-level redistricting purposes. https://legiscan.com/LA/text/HCR90/2021.

Five Regions of Louisiana, Louisiana Regional Folklife Program. URL: https://www.nsula.edu/regionalfolklife/regions/default.htm

URL: https://www.laworks.net/LaborMarketInfo/LMI_LaborForceDiversity_MSA.asp

Malone, Stephen J. "Recognizing Communities of Interest in a Legislative Apportionment Plan", *Virginia Law Review* Vol. 83, No. 2 (Mar., 1997) p. 465.

About Louisiana, Map of Regions. https://www.laworks.net/LaborMarketInfo/LMI_LaborForceDiversity_MSA.asp

Evangeline Parish was once a part of St. Landry Parish https://www.lsuagcenter.com/portals/our_offices/parishes/evangeline/features/about

Ville Platte as cultural center of Evangeline Parish: https://www.louisianatravel.com/cities/ville-platte.

"Cajun or Creole: What's the Difference", URL: https://www.neworleans.com/restaurants/where-to-eat/cajun-or-creole/.

Devilliers, Gladys, "The Attakapas Territory", Acadiana Ancestral Home, 1998. https://www.laworks.net/LaborMarketInfo/LMI_LaborForceDiversity_MSA.asp

Comprehensive Economic Development Strategy 2015-2020, North Delta Regional Planning & Development Districts, Inc. URL: https://www.laworks.net/LaborMarketInfo/LMI_LaborForceDiversity_MSA.asp
Kingsley, Karen, Florida Parishes of Louisiana. URL: https://64parishes.org/entry/florida-parishes-of-louisiana

Gardner, Joel, Folklife in the Florida Parishes, Folklife in Louisiana. URL: https://www.louisianafolklife.org/lt/Virtual_Books/Fla_Parishes/book_florida_overview.html

Occupational Breakout of the Civilian Labor Force by Sex and Ethnic Group, Houma MSA 2019, Louisiana Workforce Commission. URL: https://www.laworks.net/LaborMarketInfo/LMI_LaborForceDiversity_MSA.asp

Delta Regional Authority https://dra.gov/about-dra/about-delta-regional-authority/

The Teche Project: URL: https://www.techeproject.org/bayou-teche-paddle-trail/history-culture/#:~:text=History%20%26%20Culture%20The%20Bayou%20Teche%20takes%20you,a%20booming%20cypress%20industry%20in%20the%20early%201900s.

**Exhibit 2**

# Michael C. Hefner

*Vitae of Reapportionment, Economic, & Demographic Work Experience*

## 1.0    Qualifications

### 1.1    *Demographic, Reapportionment and Economic Development Experience*

Mike Hefner is the Chief Demographer and owner of Geographic Planning and Demographic Services, LLC. He has extensive experience working with specialized demographics, census counts from the Census Bureau and use of the Bureau's TIGER Line Files, dating back to 1990.  These computer-generated map files are used to enumerate the Census as well as serving as the base map for reapportionments and other demographic uses.

Hefner served as the Economic Development Manager and later became the Assistant Director of the Evangeline Economic and Planning District from 1990-1995.  Among other things, EEPD was the Census Data Center Affiliate for District 4.  During that time, he served as the Census Bureau's liaison for the 8 Parish Acadiana area.  He and staff from the Imperial Calcasieu Planning District were the first in the State to use the Census Bureau's TIGER Line Files and related census data on PC-based computers.  He was also among the first in the State to fully computerize the functions of reapportioning based on PCs.  During this time he also provided extensive assistance to other Planning and Development Districts statewide in use of the TIGER Line Files, the 1990 Census data, and reapportionment through the use of PC computers.

Hefner also provides demographic services under contract to the newly renamed Acadiana Regional Development District.  His experience, combined with his familiarity of the service area of the District, provides the district with a comprehensive source of demographic and economic data.

From 1995 to 1999, Hefner served as the Executive Director of the Enterprise Center of Louisiana.  In that capacity, he provided hundreds of hours of assistance to entrepreneurs starting or expanding a business. In addition, he provided economic development assistance to municipalities and parish entities throughout the eight parish Acadiana Area.  He also served as President of the Louisiana Business Incubator Association.

Hefner also served on the Lafayette Parish School Board, having first been appointed to the Board in 1986 to fill the unexpired term of his father-in-law, E. Lloyd Faulk.  He was elected to the Board in 1990 and re-elected in the elections of 1994, 1998, 2002 and 2006.  He has served in the capacity of President and Vice President of the Board.  Hefner chose not to run for re-election in 2010 due to anticipated schedule conflicts arising from 2010 redistricting projects.

### *1.2    Legal Qualifications*

In connection with the 1990 Census, Hefner was certified as an expert witness in the United States District Court Western District of Louisiana and testified when the Evangeline Parish School Board defended a Section 2 suit brought against their reapportionment plan by a citizen of the parish.  The citizen filed suit against a Parish School Board on the plan after they had adopted and received Justice Department Section 5 approval. The plan was successfully defended.

For the 2000 Census, Hefner was retained by the Attorney General of the State of Louisiana and the Department of Elections to develop alternative plans and provide expert testimony in the case of City of Baker School Board vs. State of Louisiana.  The case was heard in the 19th Judicial Circuit Court and

26

Hefner was the sole witness presented by the State. That case was ruled in favor of the State at both the district court and the Appellate Court.

After the 2000 census redistricting the redistricting plan for St. Landry Parish School Board was challenged under Section 2 of the Voting Rights Act.  Hefner served as the expert witness for the defendants.  The case was resolved among the parties based on some suggested modifications by Hefner.

Hefner currently serves as an expert witness in demography and reapportionment for the Louisiana Department of Justice.  Recent cases involve the method of election for the five judicial seats in the 32nd JDC in Terrebonne Parish and in the 40th JDC.  Hefner's earlier work in the Terrebonne 32nd JDC case on behalf of the Louisiana Secretary of State played a large part in successfully dismissing the Secretary as a defendant in the case. Hefner is also providing expert witness services in a case concerning the minority representation in the current Louisiana Congressional Districts.

Hefner is currently certified as an Expert Witness in reapportionment and demography for the U.S. District Court Western District of Louisiana, the Middle District of Louisiana, and the 15th and 19th District Courts in Louisiana.  Most recently, Hefner was reaffirmed as an expert in reapportionment and demography in the 15th Judicial District Court in the case of Keith Kishbaugh vs The City of Lafayette Government, Lafayette Parish Government, and Lafayette City-Parish Government.

Hefner completed his legal education and received his Juris Doctorate in law in January 2008.  He successfully passed the California Bar exam and is a member in good standing with the California Bar.

## 2.0    Past Reapportionment, Economic Development, Demographic & Mediation/Facilitation Work

### 2.1    Reapportionment, Demography & Economic Development

After the 1990 Census, Hefner provided Technical Assistance Services to some 22 governmental entities for reapportionment.  In addition, some half dozen were performed directly whereby the full scope of the reapportionment process was conducted.  Much of the Technical Assistance comprised of drawing up a number of possible plans with the associated data for consultants and governmental staff working on reapportionment or providing detailed demographic data at the precinct and/or census block level.

With the release of the 2000 Census, Hefner had been primarily involved in performing analyzing population trends in connection with the reapportionment services to over 41 jurisdictions throughout Louisiana.

For the 2010 Census, Hefner successfully completed redistricting plans for over 73 jurisdictions.  Hefner has also performed a number of market analyses for private companies and site location analysts.

Hefner is currently serving on a legislative committee charged with reviewing redistricting statutes. He was appointed by the Louisiana Secretary of State to represent demographers.

Additionally, population census counts, updates, and projections have been conducted for several municipal governments, water, fire, and wastewater districts.  The projections have withstood state reviews and court scrutiny as well as U.S. Department of Justice review where applicable.

During his tenure at the Evangeline Economic and Planning District, Hefner provided numerous economic and site location analyses for major corporations looking to locate or expand in south central Louisiana.  Nearly every municipality, water district, wastewater district, and Parish government in the 8 parish Acadiana area was the recipient of one or more demographic studies performed at their request.

In addition, Hefner performed Economic Needs Assessments for each of the 8 Parishes in the District annually and developed reports of the findings to the U.S. Department of Commerce.  Many of these assessments were used to help secure millions of dollars in infrastructure grants.

### 2.2    School Demographic Work

In the highly specialized area of school demographics, Hefner has provided demographic services to the Lafayette Parish School Board, the St. Landry Parish School Board, the Pointe Coupee Parish School Board, the St. John the Baptist School Board, the Vermilion Parish School Board, the Bossier Parish School Board, the E. Feliciana Parish School Board, the Evangeline Parish School Board, the Union Parish School Board, the Ouachita Parish School Board, Monroe City School Board, the W. Baton Rouge Parish School Board, the DeSoto Parish School Board, the Jackson Parish School Board, the Lincoln Parish School Board, and the U.S. Department of Justice.  For the Lafayette, Bossier, E. Feliciana, Vermilion, Evangeline, Union, Ouachita, Monroe City, DeSoto, W. Baton Rouge Parish School Boards as well as for the U.S. Department of Justice, much of the demographic work has concentrated on general population trends, student demographics, analyzing, and/or constructing school attendance zones in connection with their respective desegregation cases.

Recent efforts in St. Landry, Evangeline, Monroe City, Union, DeSoto, Ouachita and Bossier have centered on modification of their school attendance zones as they relate to their school facilities in order to meet the mandates of their respective desegregation litigation.  Pointe Coupee was a combined project of consolidating schools, redrawing attendance zones, and a complete redesign of their bus transportation system and a complete audit of their contract bus routes. The U.S. Department of Justice project involved the student assignment plan for the Avoyelles Parish School Board and Morehouse Parish School Board.

To date the school districts in Ouachita, Evangeline, St. Landry, Avoyelles, and Morehouse Parishes have received Unitary Status based on the student assignment work conducted by Hefner.  Union has recently received Unitary Status.

The use of computer GIS software has been extensively used to help with these efforts and provides the maximum opportunity to rapidly assess a number of different school district configurations or to analyze existing zones.  Hefner is one of the few, if not the only one in the State currently using specialized GIS software for these educational-related activities.

### 2.3    Mediation/Facilitation

Hefner has extensive mediation and facilitation experience.  For the Federal courts, he was one of the representatives from the School Board chosen to facilitate an agreement regarding the District's dress code and the exercise of religious customs of students attending Lafayette Parish Public Schools.  A successful agreement was reached thereby avoiding a costly court hearing and trial.

Hefner also facilitated the Consent Decree response in the <u>Alfreda Trahan v. Lafayette Parish School Board</u> desegregation case.  After the court ruling of May 19, 2002, Judge Richard Haik ordered the Board to develop a new desegregation plan within 6 weeks.  Hefner was chosen by the Board President to facilitate the development of that plan.  Street wisdom at that time said it would take over a year for the Board to develop a plan and one could never be developed that all parties would agree to.  By bringing

28

all parties together from the beginning, a plan was developed within 5 weeks that all parties to the desegregation suit signed off on and the plan was later accepted by Judge Haik.

Hefner also exercised mediation and facilitation skills during many of the reapportionment projects undertaken during the past two censuses.  Competing interests often came to the surface during many of the reapportionment discussions, which had to be successfully mediated in order to come reach agreement on a plan that would meet community and legal criteria.  Many reapportionment projects conducted after the 2000 and 2010 censuses required mediation among elected officials as well as among some community leadership.  All reapportionment projects conducted by Hefner received Section 5 approval from the U.S. Department of Justice on the first submission prior to the *Shelby* ruling.

### *2.4 Government Demographic, GIS, Reapportionment Projects, Expert Witness Testimony:*

Acadia Parish Police Jury (reapportionment 2000, 2010, 2020 precinct mergers, 2021 prospective precincts).
Acadia Parish School Board (reapportionment 2000, 2010, 2020).
Acadia Parish Police Jury (parish wide GIS project).
Allen Parish Police Jury (reapportionment 2020).
Allen Parish School Board (reapportionment 2020).
Ascension Parish School Board (student attendance boundaries, school site selection, reapportionment 2020)
Ascension Parish Council (reapportionment 2020)
Avoyelles Parish Police Jury (reapportionment 2020).
Bossier Parish School Board (new school zones, student pop projections, school site planning).
Bossier Parish School Board (grade realignments/school zone modification project).
Bossier Parish School Board (school desegregation expert witness services).
Bossier Parish School Board (reapportionment 2010, 2020).
Bossier Parish Police Jury (reapportionment 2020).
Cameron Parish School Board (Reapportionment 2010).
Central Community School System (5/10 Year student projection report, reapportionment 2020)
DeSoto Parish Police Jury (Precinct mergers and consolidations, 2021 prospective precincts, 2020 redistricting).
DeSoto Parish School Board (desegregation plan review, student projections, plan modification,  USDoJ plan review, expert witness services, 2020 redistricting).
East Baton Rouge Parish School Board (Five-year student projection reports 2017, 2018, redistricting 2020).
East Baton Rouge Metro Council (redistricting 2020).
Evangeline Parish Police Jury (reapportionment 2000, 2010, 2020, Census update, precinct mergers).
Evangeline Parish School Board (reapportionment 1990, 2000, 2010, 2020).
Evangeline Parish School Board (School Consolidations, student projections, student assignment plans, and expert witness services).
E. Feliciana Parish Police Jury (Precinct realignments, 2021 Prospective Precincts, 2020 redistricting).
E. Feliciana Parish School Board (change in board composition, 12-year student population projections, 2020 redistricting).
Lafayette Parish School Board/Consolidated Council (TA) (reapportionment 2000, 2010, 2020).
Lafayette Parish School Board (30-year study of Parish demographic shifts by race, comprehensive student assignment plan, five-year student projection report).
Lafayette Consolidate Government (City of Lafayette & Lafayette Parish council reapportionments for charter revision, expert witness testimony).

Livingston Parish Police Jury (precinct realignments).

Iberia Parish HRC Council (reapportionment 1990, 2000, 2010, 2020, precinct mergers, 2021 prospective precincts).

Iberia Parish School Board (reapportionment 2000, 2010, 2020).

Iberia Parish School Board (student assignment plan 2018, 2019).

Iberia Parish HRC Council (Membership reduction plans).

Iberville Parish Police Jury (precinct realignments).

Jackson Parish School Board (student assignment plans, basic student projection report, expert witness services).

Madison Parish (Precinct realignments).

Monroe City School Board (Student projections and Zone Alignments 2010-2012, 2020, 2022).

Ouachita Parish School Board (Unitary Status *Green* factor review and expert witness services).

Plaquemine Parish Police Jury (precinct realignments).

Pointe Coupee Parish Police Jury (election districts for new Home Rule Charter implementation, precinct mergers, 2021 prospective precincts, 2020 redistricting).

Pointe Coupee Parish School Board (reapportionment 2000, 2010, 2020).

Pointe Coupee Parish School Board (transportation routing/school consolidation/zone boundary changes, bus audits).

Richland Parish School Board (student assignment plans).

St. Bernard Parish Government (residential housing study)

St. John the Baptist School Board (5/10 year student census projections).

St. Landry Parish Police Jury (reapportionment 2000, 2010 for new Home Rule Charter, 2020 redistricting).

St. Landry Parish Council (precinct realignments, Census LUCA updates, precinct mergers, 2021 prospective precincts).

St. Landry Parish School Board (reapportionment 2000, 2010, 2020).

St. Landry Parish School Board (student assignment plans, bus transportation plan, student population projection report, expert witness services).

St. James Parish School Board (student assignment, school attendance boundaries, 5-Year projection report, reapportionment 2010, 2020).

St. James Parish Council (Housing study).

St. John the Baptist Parish School Board (10-year student projection report)

St. Martin Parish HRC Council (reapportionment 2000, 2010, 2020).

St. Martin Parish School Board (reapportionment 2000, 2010, 2020).

St. Martin Parish School Board (2016 student assignment plans, expert witness services).

St. Martin Parish HRC Government (parish wide GIS project, Census LUCA updates).

St. Martin Parish Government (precinct realignments and mergers, 2021 prospective precincts).

St. Mary Parish HRC Council (reapportionment 2000 and 2010).

St. Mary Parish HRC Council (precinct realignments).

St. Mary Parish School Board (2010, 2020 reapportionment, student assignment plans, expert witness services).

State of Louisiana-Secretary of State (alternative reapportionment plans, demographic and reapportionment expert witness services).

State of Louisiana-Louisiana Department of Justice (32nd JDC, 40JDC demographic and reapportionment expert witness services.)

Tangipahoa Parish School Board (5/10 Year Student Projection Report).

City of Scott (reapportionment 1990, 2000, 2010, 2020 Census LUCA update).

City of Eunice (reapportionment 1990, 2000, 2010, 2020).

City of Broussard (reapportionment 2000, 2010, 2020).
City of Broussard (50-year population study).
City of Breaux Bridge (reapportionment 2010, 2020).
City of Crowley (reapportionment 1990, 2000, 2010, 2020).
City of Donaldsonville (reapportionment 2020).
City of Marksville (reapportionment 2010, 2020).
City of Rayne (reapportionment 2000, 2010, 2020).
City of Church Point (reapportionment 2000, 2010, 2020).
City of Opelousas (reapportionment 2010, 2020).
City of Central (reapportionment 2020).
City of Ville Platte (reapportionment 2010, 2020).
City of Zachary (2010, 2020 reapportionment).
Town of Sunset (reapportionment 2000, 2010, 2020).
Town of Mamou (reapportionment 2000, 2010, 2020).
Town of Washington (reapportionment 2000, 2010, 2020).
Town of Bunkie (reapportionment 2000, 2010, 2020).
Town of Cottonport (reapportionment 2000, 2010, 2020).
Town of Kinder (reapportionment 2000, 2010, 2020).
Town of Tallulah (reapportionment 2000).
Town of Springhill (reapportionment 2010, 2020).
Town of St. Francisville (reapportionment 2020).
Tucson Independent School District No. 1, Tucson AZ (Desegregation Initiatives and Review).
City of Youngsville (census update 2004, 2014, reclassification as a City in 2004, 30-Year Demographic Projection).
Union Parish School Board (student assignment plan for Union Parish Deseg case, expert witness services).
U.S. Department of Justice (student assignment plan for Avoyelles Parish Schools, expert witness services).
U.S. Department of Justice (student assignment plan review for Morehouse Parish, expert witness services).
Vermilion Parish School Board (school rezoning, parish-wide street and address updates, student population projection report, 2020).
Vermilion Parish School Board (reapportionment 2000, 2010, 2020).
Webster Parish School Board (school attendance plan, expert witness services).
W. Feliciana Parish HRC Council (Precinct mergers, 2021 prospective precincts, redistricting 2020).
W. Feliciana Parish Police Jury (redistricting plan for Home Rule Charter compliance).
W. Feliciana Parish School Board (Twelve-year student projection report 2018, Report Update 2019).
W. Baton Rouge Parish School Board (5-year student projection, redistricting 2010, 2020)
Winona-Montgomery Consolidated School District (School desegregation-Transportation bus route analysis).

**1990 Census Reapportionments:**

City of Crowley
City of Scott
City of Eunice
Evangeline Parish School Board
Iberia Parish Council (TA)

Several Private Consultants *(primarily city engineers doing redistricting plans)*
Vermilion Parish Police Jury (TA)
Lafayette Parish School Board (TA)
Town of Ville Platte (TA)
City of Breaux Bridge (TA)
Town of St. Martinville (TA)

### 3.0    Educational Background

- Graduated from Concord Law School earning a Juris Doctorate in law.  Successfully passed the February 2008 administration of the California Bar exam.  Member of the California Bar, Bar #257492.
- Commissioned as a Louisiana Notary Public, May 2015.
- Completed Public Service course sessions at the Leadership Institute, Greensboro, NC March 1993
- Graduated from the Basic Economic Development Course, University of Kansas, 1992
- Completed Leadership Lafayette, Class II, 1987
- Graduated from University of Southwestern Louisiana 1978, Degree in Business Administration, Marketing
- Graduated from Our Lady of Fatima High School, 1974

### 4.0    Community Leadership

- Member of the Lafayette Parish School Board, District 5, 1986, 1990 to 2010.  Did not seek reelection due to meeting conflicts anticipated with redistricting.
- Past Chairman and director on the Board of Directors for Goodwill Industries.
- Director CADENCE non-profit board.
- Past Chairman of the Lafayette Parish Industrial Development Board
- Past Chairman of the Louisiana Business Incubation Association
- Past Chairman Citizens for Public Education
- One of the charter founders of the Lafayette Public Education Foundation, past member.

### 5.0    Contact Information:


*Mike Hefner*
*Chief Demographer*
*Geographic Planning and Demographic Services, LLC*
*905 Golden Grain Rd.*
*Duson, LA  70529*
*(337) 873-4244 (Home Office)*
*(337) 739-4499 (cell/text)*
mhefner@cox.net

Cal. Bar #257492