# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

| | |
|---|---|
| PHILIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, <br><br> Plaintiffs, <br><br> v. <br><br> NANCY LANDRY, IN HER OFFICIAL CAPACITY AS LOUISIANA SECRETARY OF STATE, <br><br> Defendant. | Case No. 3:24-cv-00122-DCJ-CES-RRS <br><br> District Judge David C. Joseph <br> Circuit Judge Carl E. Stewart <br> District Judge Robert R. Summerhays <br><br> Magistrate Judge Kayla D. McClusky |

**PLAINTIFFS' RESPONSE TO INTERVENORS' OMNIBUS MOTION IN LIMINE**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

SUMMARY ....................................................................................................................... 1

LEGAL STANDARD ....................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

    I.    Analysis of the *Gingles* factors and traditional redistricting criteria is critical ... 2

    II.    A prior case does not obviate the necessity of this analysis .......................... 5

        a.  *Robinson* has no preclusive effect ........................................................ 5

        b.  This Court is one of first view .............................................................. 6

        c.  The *Robinson* district court did not decide whether there was a wrong to compel this remedy ......................................................................... 6

        d.  Even if there was a wrong, evidence of a VRA violation somewhere does not compel creation of majority-minority district anywhere ......... 8

        e.  Robinson Intervenors' position proves too much ................................. 10

    III.    Plaintiffs' experts' testimony is relevant and should not be excluded ............ 11

        a.  Michael Hefner's testimony is reliable and relevant in this case .......... 11

        b.  Dr. Voss's testimony and simulations are relevant and should not be excluded ............................................................................................. 13

CONCLUSION .................................................................................................................. 15

CERTIFICATE OF SERVICE .......................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Milligan*,
    599 U.S. 1, 30 (2023) ................................................................................................. 5, 14

*Bethune-Hill v. Va. State Bd. of Elecs.*,
    580 U.S. 178 (2017) ......................................................................................................... 13

*Bush v. Vera*,
    517 U.S. 952 (1996) ................................................................................................. 2-5, 9, 10

*Clark v. Calhoun County, Miss.*,
    88 F.3d 1393 (5th Cir. 1996) ........................................................................................... 2, 6

*Cooper v. Harris*,
    581 U.S. 285 (2017) ................................................................................................... 2, 3, 5-9

*Hays v. State of La.*,
    936 F. Supp. 360 (W.D. La. 1996) ............................................................................. 3, 7, 12, 13

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ............................................................................................... 2, 8, 9, 10

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................................................... 2, 3, 5, 7

*Robinson v. Ardoin*,
    605 F. Supp. 3d 759 (M.D. La. 2022) ............................................................................. *passim*

*Robinson v. Landry*,
    37 F.4th 208 (5th Cir. 2022) ............................................................................................... 7

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ..................................................................................................... *passim*

*Thomas v. Sch. Bd. St. Martin Par.*,
    Civil Action No. 65-11314, 2023 WL 4926681 (W.D. La. July 31, 2023) ............... 12

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ....................................................................................................... *passim*

*Vallecillo v. McDermott, Inc.*,
    576 F. Supp. 3d 420 (W.D. La. 2021) ............................................................................ 11

**Other Authorities**

Fed. R. Evid. 401 .................................................................................................................. 1, 2

Fed. R. Evid. 402 ..................................................................................................................... 1

Fed. R. Evid. 702 ..................................................................................................................... 1

U.S. Const. art. III ................................................................................................................... 5

**Other Authorities**

Fed. R. Evid. 401 .................................................................................................................. 1, 2

Fed. R. Evid. 402 ..................................................................................................................... 1

Fed. R. Evid. 702 ..................................................................................................................... 1

U.S. Const. art. III ................................................................................................................... 5

**SUMMARY**

The Robinson Intervenors bring a motion for summary judgment wearing the cloak of a motion in limine. Their relevance objection hinges entirely on their own unique version of the law that, if correct, would not only decide this case, but would fundamentally transform redistricting. But the Intervenors' decision to use a "motion in limine" to reveal their true legal position has a benefit. It puts the issue in sharp relief and should demonstrate to the Court that if Intervenors are wrong, they (and the State) cannot prevail. They are indeed wrong.

Intervenors' position boils down to the following: "The question in this case is whether the decisions of the Middle District of Louisiana and the Fifth Circuit in *Robinson* themselves provided the required strong basis in evidence, not whether the courts that issued those decisions correctly evaluated the evidence before them or whether this Court would weigh that evidence differently." **Doc. 144-1, at 6**. That is not the law. It is wrong for several reasons: (1) analysis of the *Gingles* factors and traditional redistricting criteria is critical for Plaintiffs' *Shaw* claim; (2) *Robinson* does not provide a strong basis in evidence that obviates this crucial analysis; (3) the facts and law at issue here were not litigated in *Robinson*; (4) this injury was never adjudicated in *Robinson*; and (5) the "remedy" of SB8 is not tailored to any wrong adjudicated in *Robinson*.

**LEGAL STANDARD**

Relevant evidence is admissible. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Expert testimony must be relevant and based on reliable methods and application of those methods. Fed. R. Evid. 702.

1

**ARGUMENT**

**I.    Analysis of the *Gingles* factors and traditional redistricting criteria is critical.**

To begin, Plaintiffs' *Shaw* claim turns on whether Plaintiffs can first show that race predominated in the drawing of the lines in SB8; and then, (a) whether the State had a compelling interest to draw race-based lines and (b) whether the map was narrowly tailored to satisfy that interest. While the State's belief (if actually held) that it must draw the district lines as it did to comply with the Voting Rights Act may be a compelling interest, the State cannot satisfy strict scrutiny by mere invocation of the VRA. Strict scrutiny is, after all, a "demanding one." *Miller v. Johnson*, 515 U.S. 900, 928 (1995) (O'Connor, J., concurring). Rather, the "the State must have a 'strong basis in evidence' for finding that the three *Gingles* preconditions exist." *Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1404 (5th Cir. 1996). This is the key inquiry—a point to which the Robinson Intervenors at least provide lip service. **Doc. 144-1, at 6**. Accordingly, Plaintiffs' evidence of the State's failure to consider, and the State's divergence from, those *Gingles* factors is absolutely relevant to the case because it makes a fact of consequence in determining the action—*i.e.* whether such a strong basis exists—more or less probable. Fed. R. Evid. 401.

This principle is well established. At least as far back as *Shaw* itself, courts have looked to whether a racially gerrymandered map comports with the *Thornburg v. Gingles*, 478 U.S. 30 (1986), factors to determine whether the State has met this demanding strict scrutiny threshold, and whether the requisite strong basis in evidence therefore exists. *Shaw v. Hunt*, 517 U.S. 899, 918 (1996) ("*Shaw II*"); *see also Cooper v. Harris*, 581 U.S. 285, 301-06 (2017); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006) ("*LULAC*"); *Bush v. Vera*, 517 U.S. 952, 978-79 (1996) (plurality).

2

Take *Cooper v. Harris*, 581 U.S. 285 (2017), for example. In that case, the Supreme Court ***only*** heard a Fourteenth Amendment challenge to the North Carolina congressional districts—not a VRA challenge. But there, the Court looked primarily to the *Gingles* factors to determine whether the State had a strong basis in evidence for believing that it needed to draw the majority-minority district where it did to avoid liability under the VRA. *Id*. at 301-06. The Court summarized the legal standard as such: "To have a strong basis in evidence to conclude that § 2 demands such race-based steps, the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions . . . in a new district created without those measures." *Id*. at 304; *see also id.* at 302 ("If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. *See Bush v. Vera*, 517 U.S. 952, 978 (1996) (plurality opinion). But if not, then not."). Applying that standard, the Supreme Court held that the State's failure to properly analyze the *Gingles* factors for the map doomed the racial gerrymander at the strict scrutiny stage. *Id*. at 306.

*Shaw II* reinforced and expanded this principle to make clear that the State cannot outsource its analysis or showing, relying on some other authority's analysis. In adjudicating a racial gerrymandering claim, *Shaw II* used the *Gingles* factors to analyze whether the State had a strong basis in evidence to satisfy strict scrutiny. *Shaw II*, 517 U.S. at 916-18. That was true even though the State relied expressly on findings from no less an authority than the Department of Justice, Civil Rights Division, that the State needed two majority-minority districts to satisfy its obligations under the VRA. *Id*. at 911-12.[1] There, unlike here, the State was able to at least show that it was genuinely relying on DOJ as an expert (rather than wielding it for strategic reasons),

---

[1] The same was also true in *Miller v. Johnson*, 515 U.S. 900, 923-24 (1995) and *Hays v. State of La.*, 936 F. Supp. 360, 372 (W.D. La. 1996).

but *even this* did not provide the requisite strong basis in evidence. *Id*. at 918. The Court concluded that the State had not satisfied *Gingles* prong I and therefore had violated the Constitution. *Id*.

Likewise, in *Bush v. Vera*, the State's failure to satisfy the first *Gingles* prong, evidence of noncompact, bizarrely shaped districts, and deviations from traditional districting criteria, were enough to defeat the State's attempt to satisfy strict scrutiny. 517 U.S. at 979-81.

This case is no different, and the standard remains the same:

> Strict scrutiny remains, nonetheless, strict. The State must have a "strong basis in evidence" for finding that the threshold conditions for § 2 liability are present:
>
> "first, 'that [the minority group] is sufficiently large and *geographically compact* to constitute a majority in a single member district'; second, 'that it is politically cohesive'; and third, 'that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.' " *Growe v. Emison*, 507 U.S. 25, 40 (1993), (emphasis added) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)).
>
> And, as we have noted above, the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is "reasonably necessary" to avoid § 2 liability.

*Bush*, 517 U.S. at 978-79.

Courts specifically examine *the challenged districts* under these *Gingles* factors to ensure compliance with the strong basis in evidence standard. *Id*. at 979. If the Court finds that a district is "bizarrely shaped and far from compact, and that those characteristics are predominantly attributable to gerrymandering that was racially motivated and/or achieved by the use of race as a proxy," such "characteristics defeat *any* claim that the districts are narrowly tailored to serve the State's interest in avoiding liability under § 2, because § 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Id*. (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994)) (emphasis added). Thus, "[d]istrict shape is not irrelevant to the narrow tailoring inquiry." *Id*. at 980; *see also id*. at 979-80 (rejecting the argument "that bizarre shaping and noncompactness do not raise narrow tailoring concerns"). Nor are "deviations from

4

traditional districting principles." *Id.* at 980; *see also Cooper*, 581 U.S. at 305 ("When a minority group is not sufficiently large to make up a majority in a reasonably shaped district, § 2 simply does not apply."); *Allen v. Milligan*, 599 U.S. 1, 30 (2023) (noting that Section 2 "never require[s] adoption of districts that violate traditional redistricting principles").

In *Robinson*, SB8 did not exist, no one found that its population was sufficiently compact to be drafted into a district, and SB8's characteristics were never considered. Mr. Hefner and Dr. Voss are the first to address these questions. Their testimony on SB8's "deviations from traditional redistricting principles" is not just relevant—it is *critical* to Plaintiffs' case both at the racial predominance and at the strict scrutiny stages of their *Shaw* claim. *Bush*, 517 U.S. at 980; *see also Miller v. Johnson*, 515 U.S. 900, 916 (1995). Both analyses supplement the direct evidence to prove that the Legislature lacked a strong basis in evidence to create such districts under the VRA.

## II. A prior case does not obviate the necessity of this analysis.

Against the weight of these cases, the Intervenors argue that the *Robinson* preliminary injunction hearing, subject only to clear error appellate review, decides all issues of this case. This Court can then skip strict scrutiny, deciding the case and controversy before it by adopting the preliminary decision of the *Robinson* district court. That analysis is wrong for multiple reasons.

### a. *Robinson* has no preclusive effect.

First, *Robinson*'s non-final preliminary findings have no preclusive effect here. The *Robinson* district court only adjudicated part of the case or controversy before it. *See* U.S. Const. art. III. That controversy was different on the facts and the law from the present one. That case dealt with a VRA challenge to HB1, a law that has since been repealed. This case deals with Fourteenth and Fifteenth Amendment challenges to SB8, a map that in no way resembles HB1. That case never went to a full trial on the merits or had a full briefing. That case never had a final

5

judgment. That case never examined or litigated a map that even resembled SB8 or included a majority-minority district that touched the Northwestern parishes of Louisiana. Plaintiffs were not parties to that case. Simply put, that case has no final, preclusive effect on this one. Therefore, the Intervenors cannot attempt to bind Plaintiffs or this Court to *Robinson*'s preliminary findings.

### b. This Court is one of first view.

Second, contrary to Intervenors' implication, this Court does not sit as a court of appeals to review preliminary injunction findings of the *Robinson* district court for clear error review. This Court is one of first view. It hears its own evidence. It is not bound by fact-finding or the undeveloped evidentiary record of the *Robinson* district court. And in fact, this Court is better disposed to deal with this case since it is conducting a full trial on the merits, as opposed to a preliminary injunction hearing.

### c. The *Robinson* district court did not decide whether there was a wrong to compel this remedy.

Third, even if the State properly invoked the VRA remedy, the *Robinson* district court did not decide whether there was a wrong that compelled this remedy. To be narrowly tailored, there must be both a wrong and a remedy that is no greater than necessary to remedy that wrong:

> To be narrowly tailored, the remedial district must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the found wrong. Stated another way, the remedial district must "substantially address" the violation and "not deviate substantially from a hypothetical court-drawn § 2 district for predominantly racial reasons.

*Clark*, 88 F.3d at 1407-08. And the Supreme Court "has made clear that unless each of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" *Cooper*, 581 U.S. at 306 (quoting *Growe*, 507 U.S. at 41).

Robinson Intervenors fail at the first step—the wrong. Reliance on the *Robinson* opinions writ large will not save them. An honest reading shows that they do not provide a strong basis in

6

evidence. No court ever finally held based on the evidence and a full trial on the merits that the previous map violated the VRA. The Fifth Circuit cautioned that plaintiffs had yet to prove their case: "The Plaintiffs have prevailed at this preliminary stage given the record as the parties have developed it and the arguments presented (and not presented). But they have *much* to prove when the merits are ultimately decided." *Robinson v. Landry*, 37 F.4th 208, 217 (5th Cir. 2022) (emphasis added). The Fifth Circuit reiterated its wariness after concluding the district court had erred in its compactness analysis. *Id.* at 222. Because neither the *Robinson* district court nor the Fifth Circuit finally concluded that Louisiana violated the VRA, their decisions cannot serve as a "strong basis" to support that there was a wrong. *Cf. Shaw II*, 517 U.S. at 911-12; *Miller*, 515 U.S. at 923-24; *Hays*, 936 F. Supp. at 372.

And even if the holding in *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *vacated*, 86 F.4th 574 (5th Cir. 2023), were final, it still would not demonstrate the necessary wrong. That's because that case analyzed HB1, a map that has since been repealed and that does not resemble SB8, and then-Robinson-Plaintiffs' Illustrative Maps, none of which resemble the map here or create a majority-minority district that even touches into the traditional District 4 in the Northwest corner of the State. *See generally Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *vacated*, 86 F.4th 574 (5th Cir. 2023). In fact, the *Robinson* district court's entire analysis of the *Gingles* factors and the VRA turned on the then-Plaintiffs' Illustrative Maps. For example, the analysis of whether there was a sufficiently compact and numerous minority population was based on whether that population existed near the Mississippi Delta—not the opposite corner of the State. Accordingly, the *Robinson* district court never found (or even heard sufficient evidence) that there was a VRA violation in the Northwest corner of the State. Absent evidence of a wrong, there can be no remedy. *Cooper*, 581 U.S. at 306.

7

As a legal matter, the Court's limited analysis makes sense. After all, the *Gingles* factors assess inherently "local question[s]" based on particular maps, not "generalized conclusion[s]" about the state. *Cooper*, 581 U.S. at 304 n.5. These factors are not meant to make state-wide conclusions. That's in part why "a legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements" in light of the *Gingles* factors. *Id*. at 303-04. Analysis of the particular map enacted in SB8, not the repealed map in HB1 or the illustrative maps raised in the *Robinson* preliminary injunction hearing almost two years ago, matters. *Id*. at 304 n.5. Thus, a new analysis of SB8, a map that was not litigated or enacted at the time, is warranted. **Even now, neither the State—nor Robinson Intervenors—have ever done any such analysis.** Accordingly, they have no evidence of a wrong. And without evidence of a wrong, there can be no remedy for this region. *Id.* at 306.

> d. **Even if there was a wrong, evidence of a VRA violation somewhere does not compel creation of majority-minority district anywhere.**

Robinson Intervenors nonetheless assume that there is a wrong by merely gesturing to the *Robinson* litigation. And then Robinson Intervenors assume that any remedy will do to fix that alleged wrong. In doing so, they rely on a single sentence from *LULAC*, which states: "Section 2 does not forbid the creation of a noncompact majority-minority district." *LULAC*, 548 U.S. at 430. But several errors doom their analysis.

First, their selective citation omits the sentences that immediately follow, **which hold the exact opposite**:

> The noncompact district cannot, however, remedy a violation elsewhere in the State. *See Shaw II*, 517 U.S. at 916 (unless "the district contains a 'geographically compact' population" of the racial group, "where that district sits, 'there neither has been a wrong nor can be a remedy'" (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)). Simply put, the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right. And since there is no § 2 right to a district that is not reasonably

> compact, *see Abrams*, 521 U.S., at 91–92, the creation of a noncompact district does not compensate for the dismantling of a compact opportunity district. . . .
>
> ***Shaw II*, moreover, refused to consider a noncompact district as a possible remedy for a § 2 violation**. 517 U.S. at 916. It is true *Shaw II* applied this analysis in the context of a State's using compliance with § 2 as a defense to an equal protection challenge, but the holding was clear: **A State cannot remedy a § 2 violation through the creation of a noncompact district**. *Ibid*.

*Id.* at 430-31 (emphasis added). In the context of a racial gerrymandering claim, *Shaw II* made the same points as *LULAC*, holding that a showing of a strong basis in the evidence turns on the *Gingles* factors and that the majority-minority district's compactness and compliance with traditional redistricting criteria remain relevant to satisfy strict scrutiny. *Shaw II*, 517 U.S. at 916-19. Thus, some earlier law's purported VRA noncompliance cannot justify a new, non-compact district. *Bush*, 517 U.S. at 979. The "leeway" afforded States always requires adherence to this rule and only allows for "*reasonable* compliance measures." *Cooper*, 581 U.S. at 293 (emphasis added).

Second, Robinson Intervenors' selective citation does not support that an alleged VRA violation somewhere can support the creation of a majority-minority district anywhere. Such a "remedy" is not narrowly tailored to satisfy strict scrutiny. After all, evidence of a geographically compact minority somewhere in the State does not establish a "strong basis in evidence" of a "geographically compact" minority population "somewhere else in the State" to justify racial gerrymandering. *Shaw II*, 517 U.S. at 916-17. In fact, the Supreme Court has rejected an argument *almost identical* to Robinson Intervenors' that "once a legislature has a strong basis in evidence for concluding that a § 2 violation exists in the State, [the State] may draw a majority-minority district anywhere, even if the district is in no way coincident with the compact *Gingles* district, as long as racially polarized voting exists where the district is ultimately drawn." *Id.* at 916.

9

Even if there was a wrong, it was tied to then-Robinson Plaintiffs' illustrative maps. *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *vacated*, 86 F.4th 574 (5th Cir. 2023). Thus, it could not provide a strong basis in evidence for this alleged remedial map across the State. *LULAC*, 548 U.S. at 431; *Bush*, 517 U.S. at 979; *Shaw II*, 517 U.S. at 916. The Legislature had no strong basis to believe that the VRA forced it to draw a district reaching hundreds of miles into the far recesses of the Northwest corner of the State. Accordingly, *Robinson* does not decide this case.

Moreover, even if there were evidence of that part of this population in the two majority-minority districts had been wronged, that would not be sufficient. As the Supreme Court held in *Shaw II*, even a "degree of incorporation" of a "concentration of minority voters that would have given rise to a § 2 claim" into the enacted majority-minority district does not necessarily "substantially address[] the § 2 violation" to show narrow tailoring in compliance with the VRA. *Id.* at 918. In other words, even creation of a majority-minority district to accommodate part of a concentrated minority group who has *actually proven* a violation of the VRA under the *Gingles* factors is not per se sufficient to show narrow tailoring.

e. **Robinson Intervenors' position proves too much.**

Ultimately, Robinson Intervenors' theory proves too much. It would require this Court to: (a) accept all the findings of an expedited case that has minimal bearing on case before it; and (b) eliminate Plaintiffs' right to introduce evidence of a constitutional injury that has transpired in the critical two years since the *Robinson* district court held its preliminary injunction hearing. It would render the Plaintiffs, who were not parties in the prior case, nonetheless bound as non-parties.

Beyond the scope of this case, if the Intervenors' argument were correct, a State could racially gerrymander **anywhere** based on a non-final preliminary injunction supposing a VRA violation **somewhere**. The VRA does not provide States with an excuse to racially gerrymander.

10

It requires a narrowly tailored remedy to fix a real violation for those specific people who face such harm. Such a standard was not met here.

### III. Plaintiffs' experts' testimony is relevant and should not be excluded.

The Intervenors try to build on their underlying legal argument to assert that the testimony of two of Plaintiffs' experts, Michael Hefner and Dr. Stephen Voss, should be excluded because they are not "relevant" to this case. This argument lacks merit.

> Expert testimony is relevant if it is shown that the expert's reasoning or methodology can be properly applied to the facts in issue. . . . Whether an expert's opinion would be helpful to the trier of fact is a low bar to meet and turns largely on whether the testimony is relevant; questions related to the bases and sources of expert's opinion go to the weight to be assigned to it, rather than its admissibility. The Court's role is not to displace the adversary system[.]

*Vallecillo v. McDermott, Inc.*, 576 F. Supp. 3d 420, 423-24 (W.D. La. 2021). Here, the Intervenors fail to show that Plaintiffs' experts do not even meet this "low bar." To the extent Intervenors feel this Court should not give weight to these experts' testimony, they are free to argue that during cross examination and through rebuttal testimony. *See id.* ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate ways" to attack admissible evidence).

### a. Michael Hefner's testimony is reliable and relevant in this case.

Intervenors assert in a footnote that this Court should exclude all of Mr. Hefner's testimony. **Doc. 144-1, at 5, n.2**. First, Intervenors again attempt to claim an inconsistency between Mr. Hefner's expert report in the *Robinson* case and his reports in this case, claiming that Mr. Hefner opined that there is a community of interest "running 'from Shreveport to the Mississippi River.'" *Id*. Crucially, the referenced portion of Mr. Hefner's *Robinson* expert report compares two different maps of Louisiana broken down into regions based on various categories—not "communities of interest." *See* **Doc. 103-3, at 9-10** ("The Louisiana Regional Folklife Program briefly describes

11

each region as follows . . .").[2] At no point did Mr. Hefner opine that there is a community of interest running "from Shreveport to the Mississippi River." **Doc. 144-1, at 5, n.2**.

Moreover, even if this region were a community of interest, the plans in *Robinson* and SB8 both split it, just in different ways. SB8 narrowly carves out its center—the middle of the Red River Valley is assigned to CD6 while the rest is in CD4—while the *Robinson* plan cuts out the middle of the region. If, of course, Intervenors still feel Mr. Hefner has made inconsistent statements, they are free to probe the issue on cross-examination.

Similarly, Intervenors' reference to courts' comments regarding Mr. Hefner are misleading. For instance, the court in *Thomas v. Sch. Bd. St. Martin Par*. did not opine that Mr. Hefner "used 'guesswork.'" Civil Action No. 65-11314, 2023 WL 4926681 (W.D. La. July 31, 2023); **Doc. 144-1, at 5, n.2**. Instead, the court disfavored a certain metric referenced by Mr. Hefner because of its large margin of error. *Thomas*, 2023 WL 4926681, at *28. No court in Intervenors' cited cases excluded Mr. Hefner's testimony.

Next, Intervenors ask this Court to exclude Mr. Hefner's testimony discussing *Hays v. State of Louisiana*, 862 F. Supp. 119 (W.D. La. 1994), asserting that such testimony is irrelevant and presents legal conclusions. **Doc. 144-1, at 9-10**. In doing so, Intervenors identify no supposed legal conclusions but argue that "[t]he political realities governing Louisiana politics in the 1990s are very different from those of today." **Doc. 144-1, at 9**. While Intervenors are free to present evidence to this point, this Court should not simply take their word for it, particularly where—as Mr. Hefner will testify—the racially gerrymandered 1994 map shares 82% of the Black population of SB8. Intervenors also neglect to acknowledge the second question looming over SB8: whether

---

[2] As noted by Mr. Hefner in his *Robinson* Report, "[o]ne of the purposes [of the Program's Regional Map] is to identify and document folk cultural traditions and artists." **Doc. 103-3, at 9, n.10**. The map does not purport to document "communities of interest."

12

it passes strict scrutiny. A discussion of *Hays* and its evidentiary basis is relevant to whether the legislature possessed a "strong basis in evidence" to draw district lines predominantly based on race. On the one hand, Intervenors ask this Court to entertain the idea that a mere preliminary injunction in *Robinson* constitutes such a "strong basis in evidence," but on the other hand ignore the final judgment in *Hays* which held that a substantially similar map to SB8 is unconstitutional. Such a false dichotomy is certainly convenient for Intervenors but has no place in this case.

Intervenors also cite various redistricting cases to argue that "[f]ocusing on the Hays case also neglects the decades of precedent since the 1990s that govern racial gerrymandering cases." **Doc. 144-1, at 9**. But Intervenors never identify the "precedent" that casts doubt on *Hays* and therefore casts doubt on Mr. Hefner's present conclusions.

### b. Dr. Voss's testimony and simulations are relevant and should not be excluded.

Intervenors likewise assert that Dr. Voss's testimony should be excluded. First, Intervenors claim Dr. Voss's conclusion that it is not possible to draw a sufficiently compact second majority-minority district in Louisiana is irrelevant given that the Supreme Court has instructed that it is necessary only for a legislature to have "good reasons to believe" it must use race to draw district lines. **Doc. 144-1, at 7**; *see also Bethune-Hill v. Va. State Bd. of Elecs.*, 580 U.S. 178, 194 (2017).

But Intervenors fail to apprehend that they must still prove that such "good reasons" or "strong basis in evidence" actually existed for race to predominate. Because, as Dr. Voss shows, it is not possible to draw a second sufficiently compact majority-minority district, the Intervenor-Defendants and Defendant must proffer some other evidentiary basis to justify the Legislature's predominating use of race. Again, Intervenors would like this Court to simply take their word for it and ignore Plaintiffs' statistical data to the contrary, but as shown above, this question is at the core of the present case.

Intervenors also mischaracterize the state of play regarding Dr. Voss's simulations. Specifically, Intervenors argue that Dr. Voss's simulations are irrelevant because they employ a race-neutral benchmark. **Doc. 144-1, at 8**. This is a half-truth. In Dr. Voss's March 22, 2024 report, (attached as Exhibit A), he concludes, among other things, that Louisiana's African-American population is too spread out to support a second majority-minority district and, consequently, "[a] race-neutral approach to mapmaking generally will not produce two districts dominated by African-American voters." Ex. A, at 2. Dr. Voss accordingly provided evidence via simulation showing that the legislature had to consider race in the drawing of SB8. But Dr. Voss did not stop there. He went on to run simulations allowing for various levels of race-consciousness (*see* Section 4.2.2, "Race-Conscious Simulations," Ex. A, at 9-12). Contrary to Intervenors' argument, Dr. Voss acknowledges in the first sentence of this section that, "Subsequent to the *Robinson* decision, drawing race-neutral maps ceased to be the goal, so I did not end with this comparison between the enacted 2024 plan and race-neutral simulation methods." Ex. A, at 9.

Of course, Dr. Voss's conclusion involving even the race-conscious maps is highly relevant: even considering race, the simulations could not create two majority-minority districts. Exhibit A, at 10. This conclusion and the included analysis are directly relevant to the question of whether race had to be the predominant factor in drawing the map enacted by SB8. If, as Dr. Voss explains, drawing a second majority-minority district would be exceedingly improbable (even allowing for a certain level of race-consideration), there is strong reason to corroborate the existing direct evidence that race dominated the legislature's map-making decisions.

Intervenors' citation to *Allen v. Milligan*, 599 U.S. 1, 34-37 (2023) for the proposition that "Section 2 cannot require courts to judge a contest of computers" is likewise misleading. In *Allen*, the State presented the Court with race-neutral simulations to assess whether the State's plan

14

abridged the right to vote on account of race by unconstitutionally affecting minority voters. *Id*. at 44 (Kavanaugh, J., concurring). While no member of the Court thought race-neutral simulations helped in this narrow way, Justice Kavanaugh specifically addressed the actual situation in this case, noting:

> It is true that computer simulations might help detect the presence or absence of *intentional* discrimination. For example, if all the computer simulations generated only one majority-minority district, it might be difficult to say that a State had intentionally discriminated on the basis of race by failing to draw a second majority-minority district.

*Id*. (emphasis original). Such is the case here. Dr. Voss's simulations show the legislature acted intentionally in predominantly considering race because neither SB8 nor anything like it emerges from tens of thousands of both race-neutral and race-conscious simulations. *See* Ex. A.

Finally, Intervenors claim without explanation that Dr. Voss's simulation analysis does not accurately represent the districting process in Louisiana. **Doc. 144-1, at 8** (internal citations omitted). They reference generally mention their own expert's report but provide no citation for their allegation. *Id*. This Court need not simply take their word for it, and as the Court may well see when Intervenors' expert testifies at trial, their objection lacks merit.

## CONCLUSION

For the foregoing reasons, Intervenors' Motion in Limine, **Doc. 144**, should be denied.

Dated this 3rd day of April, 2024                                    Respectfully submitted,

**PAUL LOY HURD, APLC**                                **GRAVES GARRETT GREIM LLC**
*/s/ Paul Loy Hurd*                                              */s/ Edward D. Greim*
Paul Loy Hurd                                                         Missouri Bar No. 54034
Louisiana Bar No. 13909                                       *Admitted Pro Hac Vice*
Paul Loy Hurd, APLC                                             Jackson Tyler

15

<div style="display: flex;">

<div>
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com
*Attorney for Plaintiffs*
</div>

<div>
Missouri Bar No. 73115
*Admitted Pro Hac Vice*
Matthew Mueller
Missouri Bar No. 70263
*Admitted Pro Hac Vice*
Katherine Graves
Missouri Bar No. 74671
*Admitted Pro Hac Vice*
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
jtyler@gravesgarrett.com
mmueller@gravesgarrett.com
kgraves@gravesgarrett.com
*Attorneys for Plaintiffs*
</div>

</div>

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 3rd day of April, 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

*/s/ Edward D. Greim*
Edward D. Greim
*Attorney for Plaintiffs*