IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

| | | |
|---|---|---|
| PHILIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| v. | ) ) ) | District Judge David C. Joseph Circuit Judge Carl E. Stewart |
| NANCY LANDRY, IN HER OFFICIAL CAPACITY AS LOUISIANA SECRETARY OF STATE, | ) ) ) ) ) | District Judge Robert R. Summerhays Magistrate Judge Kayla D. McClusky |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO INTERVENORS' MOTION TO RECONSIDER EXCLUSION OF SUR-REBUTTAL EXPERT LISA HANDLEY**

On Friday night, April 5, 2024, the Robinson Intervenors unexpectedly moved this Court (Doc. 155) to reconsider its Thursday morning decision not to permit a last-minute sur-rebuttal witness (now revealed as Dr. Lisa Handley), to rebut the opinion of Dr. Benjamin Overholt, Plaintiffs' rebuttal witness to Robinson expert Anthony Fairfax. The motion should be denied.

1. Dr. Handley's attached report (Doc. 155-3) turns out to **agree with, not rebut,** the core of Dr. Overholt's opinion. Dr. Overholt's central point was this: based on a racial performance analysis, SB8 District 6's lower compactness and higher parish splits when compared to Mr. Fairfax's other proposed 2-minority-district maps "can be explained as an effort to maximize racial performance," rather than to serve some other political goal, as Mr. Fairfax claimed. Doc. 145-7, p.2. Dr. Overholt therefore rebuts Mr. Fairfax's attack on Plaintiffs' "racial predominance" showing, the first part of the *Shaw* claim. Dr. Handley, in contrast, never mentions or attacks any

1

of this. She instead argues that SB8 and a few other maps—not even the same set analyzed by Mr. Fairfax or in Dr. Overholt's rebuttal—*do* racially perform. Yet the key to Dr. Overholt's analysis, the only reason it was a rebuttal to Mr. Fairfax, was that SB8 was *a better racial performer* than Mr. Fairfax's chosen alternatives. Dr. Handley does not even bother addressing this point. Indeed, confirming Dr. Overholt's point, her analysis also shows SB8 performing better than the alternative maps she chose (for unknown reasons) to analyze. See Doc. 155-3, pages 9-10, Table 3.

2. Why would Dr. Handley be asked to submit a "rebuttal" report whose tables confirm (albeit silently, without comment) the thesis of Dr. Overholt's report on *Shaw* part 1? And why would Dr. Handley focus solely on the majority-minority districts' absolute racial performance, rather than (as Dr. Overholt did) the differences in racial performance between plans? Perhaps with an eye to a possible remedial stage, Intervenors are likely alarmed to see evidence that SB8 (and all of the alternative plans) do not perform.

But we are now at the liability stage. At this stage, the issue of absolute performance of a district goes to a question on which Intervenors and the State—not the Plaintiffs—had the burden under *Shaw* part 2: whether there was a "strong basis in evidence" for believing that the VRA, as measured by the *Gingles* case, "required" such racial sorting. *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 426 (2006). The Robinson Intervenors' Motion in Limine has vociferously advanced a severe position on this point: that no evidence *at all* should come in on *Shaw* part 2, the question of strict scrutiny. *See* Doc. 144-1 (moving to exclude "1) evidence or argument offered to prove that SB 8 does not satisfy the *Gingles* standard, [and] 2) evidence or argument on the question of whether Section 2 of the Voting Rights Act requires a congressional redistricting plan that includes two districts in which Black voters have an opportunity to elect candidates of their choice."). The Robinson Intervenors apparently insist that the vacated

2

preliminary injunction from their own litigation carries the field and is irrebuttable. *Id*. at 4. The Robinson Intervenors argued that Dr. Overholt could not testify at all for the same reason (Doc. 145-1), and until Dr. Handley's Friday night unmasking as a witness purely on racial performance under *Gingles*, appeared to have no witnesses who would even address this question. Thus, to the extent that the Robinson Intervenors have shifted yet again and now wish to submit testimony purely on a point they claim is irrelevant and inadmissible, their Motion should be denied.

3. There are other reasons that Dr. Handley's testimony would not be particularly helpful. Drs. Handley and Overholt agree on much, but one point on which they disagree is on which past elections provide appropriate data for making conclusions about district racial performance. Dr. Handley recently served as an expert for the Michigan Independent Citizens Redistricting Commission on the question of complying with the VRA in drawing state legislative districts. *See Agee v. Benson*, 2023 WL 8826692 (W.D. Mich., Case No. 1:22-cv-272, December 21, 2023). Knowing that the Commission was composed of citizens "with no experience in redistricting and no knowledge of election law," *id*. at 1, Dr. Handley advised the Commission that the VRA required it to "unpack" Black voters by drawing so-called "majority-minority" districts with BVAP targets "as low as 35 and 40%." *Id*. at *4-5. Not surprisingly, the resulting districts—which stretched from cores of Black voters and reached out into the suburbs to purportedly create more VRA-required districts—were deeply flawed, and a three-judge panel sustained a *Shaw* racial gerrymandering claim much like the one at hand. *Id*.

The Court made "short[] work" of the Commission's *Shaw* part-2 strict scrutiny defense that Dr. Handley's analysis showed that the VRA required these districts. *Id*. at 52. Dr. Handley knew that for these districts, Black control of primaries made primaries the key race for analysis,

3

but instead used data for various general elections that was not probative—even while telling Commissioners that it was. *Id*. at 53. The Court severely criticized Dr. Handley and her associates:

> Nor did the Commission have anywhere near an adequate basis for the factual premise of its theory: namely, that black voters could in fact elect their preferred candidates at the BVAP levels prescribed for the districts here. Everyone agrees that the elections in these districts are decided in the Democratic primaries, not the general election. Yet Handley's analysis lacked any primary-election data that was relevant to whether black voters could elect their preferred candidates at these BVAP levels. Even Adelson admitted as much. And Handley herself admitted to Szetela, at the eleventh hour, that "we simply do not know" how black-preferred candidates would fare in Democratic primaries. Yet these experts told the commissioners again and again—based on general-election data alone—that black-preferred candidates would "perform well" in these districts. **That was a grave disservice to everyone involved with this case, above all the voters themselves.**

*Id*.

There is no question that Dr. Handley has had a long career in this field and that her general method of analysis—also employed by Dr. Overholt—is useful in estimating the racial performance of purported VRA-required districts. However, her most recent work in interpreting the VRA and, as relevant here, in deciding which elections provide appropriate data for making conclusions about racial performance, has been criticized in a *Shaw* case just like this one in the severest terms possible. Dr. Handley cannot be accepted as a last-second sur-rebuttal witness.

4. Finally, the Intervenors again attempt to attack the opinion of Dr. Overholt as improper rebuttal. Perhaps because of the press of time or the late hour of their filings, they make some serious, and some less serious, misrepresentations regarding the record.

First, Intervenors try to couch Dr. Overholt as having started his report months ago, sandbagging them and springing at the last moment. But the only testimony they cite for this point is wrong: Dr. Overholt never "testified that he started working on his report in late January or early February." Intervenors' Memorandum (Doc. 155-1), at 3. Instead, he was retained to answer Mr.

4

Fairfax's opinion on "March 28th." See Transcript, Doc. 155-4, 26:15-19. He began talking with counsel about the case in general, it is true, around late January or early February, and received some early data "in February" to "see if there was anything I could do." But the "bulk of the datasets that I used here would have been late March kind of as I was building up for being a testifying witness." The complete testimony, from Doc. 155-4, pages 26 to 28, is as follows:

```
15 Q When were you retained to be an
16 expert witness in this case?
17 A Yeah. I was retained to put this
18 memo together comparing these guys on
19 March 28th. I think March 28th.
20 Q Okay. And was that the first
21 time you were contacted about this case?
22 A No. No. We -- I signed a
23 contract to work here on March 28th. I've
24 had prior conversations about my potential
25 work on the case before that.
2 Q Okay. And when did you have your
3 first conversation about work in this case?
4 THE WITNESS: Do you remember
5 when we had our first conversation?
6 Q You can't -- I'm sorry.
7 MS. THOMAS-LUNDBORG: It has to
8 be the witness's recollection.
9 MR. GREIM: Oh, I'm sorry. I
10 can't help you. Sorry.
11 THE WITNESS: Okay.
12 A Before Valentine's Day. Yeah.
13 Before Valentine's Day. I -- so early
14 February. And, say, early February, maybe
15 late January, somewhere in there. I
16 don't -- I don't know exactly the day.

17 Q Okay. And when did you start
18 putting together the data that you used to
19 analyze in this case?
20 A So the datasets I first got, they
21 were kind of spread out. But over the
22 course of -- I think the very first data I
23 looked at, I did, in fact, get in -- I
24 would have gotten in February, because
25 that's when I first starting looking to see

2 if there was anything I could do. The
3 final datasets that -- like, the bulk of
4 the datasets that I used here would have
```

```
5 been late March kind of as I was building
6 up for being a testifying witness, is when
7 I got the most -- the bulk of the data that
8 I used here.
```

There is zero basis for claiming that Dr. Overholt was working on his expert report in January-February and that it was somehow withheld until the time for a rebuttal.

Next, that Dr. Overholt did not analyze or critique Mr. Fairfax's review of compactness, subdivision splits, or similar factors (Intervenors' Memorandum at 4, 5) is true but, as Plaintiffs show in their opposition to the Motion to Strike Dr. Overholt's testimony (Doc. 153 at pp. 3-4), is beside the point. Mr. Fairfax attempted to opine that SB8's inferiority on these points compared to other 2-majority-minority district plans must have been based on politics rather than race, assuming that all 2-minority districts were created alike. It is that point that Dr. Overholt rebuts.[1] *Id*. Plaintiffs' argument is that before ruling out race and selecting politics as the reason for the gap he observed between SB8 and the other alternatives he offered, Mr. Fairfax could and should have considered whether SB8 was a better racial performer than his other cited 2-minority-district plans. Or perhaps Dr. Handley, whose expertise is more appropriate to this sort of claim and whose expert reports from their earlier case Intervenors have included on their exhibit list in this case, could have been offered instead of smuggling the conclusion in through Mr. Fairfax, leaving Dr. Handley as a last-minute sur-rebuttal.

Finally, the Robinson Intervenors complain that Plaintiffs violated Rule 26(a)(2)(B)(ii) by failing to produce "data and code" to them simultaneously with his report. *Id*. at 6. Most important here is the claim of undisclosed data. Yet there is no basis for claiming that Dr. Overholt's data—including the file to which he testified—was not turned over on Monday, April 1, 2024, with his

---

[1] What redistricting or mapmaking software Mr. Fairfax used (Intervenors' Memorandum at 5) was utterly irrelevant to Dr. Overholt's conclusion.

report. There was no suggestion at deposition that the Intervenors lacked any of the data, and the parties specifically conferred on this point in an email exchange the Intervenors fail to mention. *See* Exhibit 1 hereto. After counsel learned Dr. Overholt had used a particular code, it was disclosed on the morning of Friday, April 5, 2024, and Intervenors point out no reason to believe that the code—which was not mentioned by Dr. Handley's Friday night report even though it had been with Intervenors since that morning—will be relevant in any examination of Dr. Overholt at trial.

5. Excessive motion practice, including the most recent motion to reconsider, has begun to impact Plaintiffs' trial preparation and has become disproportionate to the issues actually raised. The Robinson Intervenors are now beginning to "lap" the Plaintiffs in filing motions and responsive papers, often raising the same issue in successive motions before a response has even been filed to the last motion. This presents great difficulty when the Intervenors begin to change their earlier positions in new motions even while earlier ones are still being briefed.[2] The instant dispute stems from exactly one opinion of Dr. Fairfax—that SB8's inferiority to other two-majority-minority district maps must be attributable to politics and not race—that he rendered without proper analysis of racial performance. Were Intervenors to simply withdraw this proposed testimony (just one part of Mr. Fairfax's series of opinions) the resulting chain of testimony, starting with Dr. Overholt and leading (albeit indirectly and improperly) through Dr. Handley, would be severed and might not come in. Two rounds of motion practice could have been avoided.

This case will largely be tried on direct evidence from legislators. On strict scrutiny, the State and Intervenors will not be able show that any real VRA analysis was conducted on SB8's

---

[2] For example, Intervenors argued in multiple midweek briefs that no *Gingles* evidence is admissible (Docs. 144, 145), but abruptly shifted to claim that the opinion of Mr. Fairfax was offered not to rebut Drs. Voss and Hefner on the question of racial predominance, but instead to meet the Intervenors' burden on *Gingles* 1. Doc. 155-1, p. 4.

7

districts, let alone that the VRA analysis on this map is somehow controlled by an earlier decision. Much of Intervenors' motion practice—like their requests to lengthen or delay the proceedings—seem to concern issues that hover at the periphery of the main factual and legal battles in this case. Plaintiffs respectfully submit that it is time to move forward with trial.

## Conclusion

For the foregoing reasons, Intervenors' Motion to Reconsider, Doc. 155, should be denied.

Dated this 6th day of April, 2024                                       Respectfully submitted,

**PAUL LOY HURD, APLC**                                   **GRAVES GARRETT GREIM LLC**
*/s/ Paul Loy Hurd*                                                         */s/ Edward D. Greim*
Paul Loy Hurd                                                                Missouri Bar No. 54034
Louisiana Bar No. 13909                                               *Admitted Pro Hac Vice*
Paul Loy Hurd, APLC                                                     Jackson Tyler
1896 Hudson Circle, Suite 5                                         Missouri Bar No. 73115
Monroe, Louisiana 71201                                             *Admitted Pro Hac Vice*
Tel.: (318) 323-3838                                                      Matthew Mueller
paul@paulhurdlawoffice.com                                      Missouri Bar No. 70263
*Attorney for Plaintiffs*                                                 *Admitted Pro Hac Vice*
                                                                                     Katherine Graves
                                                                                     Missouri Bar No. 74671
                                                                                     *Admitted Pro Hac Vice*
                                                                                     GRAVES GARRETT GREIM LLC
                                                                                     1100 Main Street, Suite 2700
                                                                                     Kansas City, Missouri 64105
                                                                                     Tel.: (816) 256-3181
                                                                                     Fax: (816) 256-5958
                                                                                     edgreim@gravesgarrett.com
                                                                                     jtyler@gravesgarrett.com
                                                                                     mmueller@gravesgarrett.com
                                                                                     kgraves@gravesgarrett.com
                                                                                     *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I do hereby certify that, on this 6th day of April, 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

*/s/ Edward D. Greim*
Edward D. Greim
*Attorney for Plaintiffs*
