## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

| | | |
|---|---|---|
| PHILIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, | ) ) ) ) ) ) ) ) | |
| | ) | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | District Judge  David C. Joseph |
| | ) | Circuit Judge  Carl E. Stewart |
| NANCY LANDRY, IN HER OFFICIAL CAPACITY AS LOUISIANA SECRETARY OF STATE, | ) ) ) | District Judge  Robert R. Summerhays |
| | ) | Magistrate Judge  Kayla D. McClusky |
| Defendant. | ) | |

### THE PARTIES' DESIGNATIONS OF THE 2024 FIRST LEGISLATIVE SESSION

COME NOW Plaintiffs Philip Callais, Lloyd Price, Bruce Odell, Elizabeth Ersoff, Albert Caissie, Daniel Weir, Joyce LaCour, Candy Carroll Peavy, Tanya Whitney, Mike Johnson, Grover Joseph Rees, and Rolfe McCollister (collectively, "Plaintiffs") by and through counsel and designate the following:

| January 15, 2024 House Governmental Affairs Committee Hearing | |
|---|---|
| **Start** | **End** |
| Attorney General Murrill: 36:1 | 37:1 |
| Attorney General Murrill, Rep. Marcelle: 43:22 | 45:14 |
| Attorney General Murrill: 48:13 | 49:7 |
| Rep. Farnum, Attorney General Murrill: 52:14 | 53:15 |
| Rep. Carter: 57:11 | 57:14 |
| Attorney General Murrill: | |

| 61:20 | 62:12 |
|---|---|
| Attorney General Murrill: 62:24 | 63:5 |
| Attorney General Murrill: 67:17 | 67:24 |
| Attorney General Murrill: 76:12 | 76:22 |

| January 17, 2024 Senate Floor Session | |
|---|---|
| **Start** | **End** |
| Sen. Womack, Sen. Morris: 3:19 | 8:6 |
| Sen. Morris, Sen. Womack: 8:21 | 9:8 |
| Sen. Womack: 12:4 | 12:9 |
| Sen. Carter: 15:14 | 17:5 |
| Sen. Duplessis: 21:8 | 21:25 |
| Sen. Pressly: 22:7 | 23:25 |

| January 18, 2024 House Governmental Affairs Committee Hearing | |
|---|---|
| **Start** | **End** |
| Sen. Womack: 5:8 | 5:12 |
| Sen. Womack: 6:25 | 8:5 |
| Rep. Marcelle, Sen. Womack: 9:9 | 9:18 |
| Rep. Boyd, Sen. Womack: 13:6 | 13:18 |
| Rep. Beaullieu, Sen. Womack: 26:12 | 27:3 |
| Rep. Beaullieu, Sen. Womack: 27:21 | 28:4 |

| | |
|---|---|
| Rep. Lyons:<br>75:24 | 76:21 |
| Rep. Newell:<br>89:8 | 89:21 |
| Rep. Marcelle:<br>101:08 | 101:16 |
| Sen. Womack:<br>121:19 | 122:1 |

| January 19, 2024 House Floor Session | |
|---|---|
| **Start** | **End** |
| Rep. Beaullieu:<br>4:15 | 8:10 |
| Rep. Amedee, Rep. Beaullieu:<br>9:3 | 9:8 |

| January 19, 2024 Senate Floor Session | |
|---|---|
| **Start** | **End** |
| Sen. Morris, Sen. Womack:<br>5:14 | 7:4 |
| Sen. Cathey:<br>8:7 | 8:18 |
| Sen. Luneau:<br>10:5 | 10:9 |
| Sen. Carter:<br>10:13 | 10:17 |

Dated this 7th day of April, 2024

Respectfully submitted,

**PAUL LOY HURD, APLC**
*/s/ Paul Loy Hurd*
Paul Loy Hurd
Louisiana Bar No. 13909
Paul Loy Hurd, APLC
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com
*Attorney for Plaintiffs*

**GRAVES GARRETT GREIM LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
Jackson Tyler
Missouri Bar No. 73115
*Admitted Pro Hac Vice*
Matthew Mueller
Missouri Bar No. 70263
*Admitted Pro Hac Vice*
Katherine Graves
Missouri Bar No. 74671
*Admitted Pro Hac Vice*
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
jtyler@gravesgarrett.com
mmueller@gravesgarrett.com
kgraves@gravesgarrett.com
*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I do hereby certify that, on this 7th day of April, 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.


<u>/s/ *Edward D. Greim*</u>
Edward D. Greim



# PohlmanUSA®
## Court Reporting and Litigation Services

House Governmental Affairs Committee Hearing
-Audio Transcription

January 15, 2024

Phillip Callais, et al.

vs.

Nancy Landry

Page 34

1    REPRESENTATIVE GADBERRY:  That's the one that
2    she looked at though, that she rejected?
3        MS. LOWREY-DUFOUR:  Well, I mean -- and -- and
4    also there have been other plans --
5        REPRESENTATIVE GADBERRY:  Okay.
6        MS. LOWREY-DUFOUR:  -- that have been
7    submitted by plaintiffs to the court.
8        REPRESENTATIVE GADBERRY:  And -- and would you
9    say that Act 5 did not meet the redistricting criteria?
10       MS. LOWREY-DUFOUR:  Representative Gadberry --
11       REPRESENTATIVE GADBERRY:  I know.  You're not
12   (inaudible 0:43:45) --
13       MS. LOWREY-DUFOUR:  That is a -- that is a
14   legal matter that is currently the subject of litigation
15   in the Middle District, and again, much more
16   appropriately addressed by our chief legal officer.
17       REPRESENTATIVE BEAULLIEU:  Yeah.  We can let
18   our attorney general handle that one.
19       REPRESENTATIVE GADBERRY:  Okay.  Thank you.
20       MS. LOWREY-DUFOUR:  Thank you.
21       REPRESENTATIVE BEAULLIEU:  Thank you, Ms.
22   Lowrey.  Members, as -- as you all were just -- got a --
23   got a teaser from Representative Gadberry, we have our
24   attorney general here with us, Ms. -- Ms. Liz Murrill.
25   She's going to join us and give us an update on the

Page 35

1    litigation.  And I see Ms. Murrill has a familiar face
2    with her, so I'd like to welcome back to the House of
3    Representatives former colleague Representative Larry
4    Frieman.  Welcome, welcome, Mr. Frieman.
5        MR. FRIEMAN:  Thank you, Chair.  Thank you,
6    members.  It's -- I'm glad to be back.  And sitting on
7    this side of the table is a familiar place --
8        REPRESENTATIVE BEAULLIEU:  Yeah.
9        MR. FRIEMAN:  -- for myself as well.  So thank
10   you for having me.
11       REPRESENTATIVE BEAULLIEU:  If you wouldn't
12   mind, everyone, and introduce yourself for the
13   committee, and then it's all yours.
14       MS. MURRILL:  Thank you, Mr. Chairman, and
15   members of the committee.  It's great to be with you
16   today as your new attorney general.  I'm Liz Murrill.  I
17   also have with me Tom Jones who is the new director of
18   the civil division and has been involved in the
19   litigation.  And now, chief deputy -- almost chief
20   deputy, assuming you confirm him, is Larry Frieman.  So
21   that'll be before you soon, too.
22       I -- I -- I want to tell you that
23   redistricting is hard.  I'm not going to tell you this
24   is easy.  I -- I think that you did a -- you did the
25   best job you could before.  We've been in litigation.

Page 36

1    The last time redistricting, in the 1990s, it -- it was
2    -- when the second majority/minority map was drawn, we
3    ended up in litigation for a decade.  So there is no
4    guarantee that when you do this again, we won't still be
5    in litigation.  But we are in litigation now.
6        The District Court judge has conducted a
7    fact-finding mission - that's what will -- what always
8    happens - and made fact findings regarding the map.  She
9    issued an injunction.  That injunction is not currently
10   in effect for reasons that I can explain to you, but I
11   think the bottom line is it is not currently in effect
12   because the deadlines for the election that it enjoined
13   are -- are over.
14       The courts, nevertheless, have told us to draw
15   a new map, and they have indicated that we have a
16   deadline to do that or Judge Dick will draw the map for
17   us.  So you have an opportunity now to go back and draw
18   the map again.  And -- and I think that it is not an
19   easy task because the United States Supreme Court has
20   not made it an easy task.  They've given you some
21   directives that seem to be -- to not give you a lot of
22   clear lines for doing your job.  I -- I apologize on
23   their behalf for -- but, you know, we tried.
24       I mean, I am defending that map, and so you
25   won't hear me say that I believe that that map violated

Page 37

1    the redistricting criteria.  I'm defending that map, but
2    I will defend your new map if you draw a new map.  So,
3    you know, it's an act of the legislature.  My job is to
4    defend the work of the legislature, and I will do that
5    to the very best of my ability.
6        I think that the difficulty is that in the
7    Merrill v. Milligan case, which was the Alabama
8    litigation that preceded ours, the Supreme Court issued
9    an opinion.  And it says that in a Section 2 disparate
10   impact claim, which is different really from the work
11   that you did -- you did your work.  You did it in good
12   faith.  But they can -- they -- the plaintiffs will go
13   to court, and they will make a disparate impact claim,
14   and that's what gets litigated.
15       That has nothing to do with whether your
16   intent was nefarious or not.  Everyone can have had the
17   right intent and followed the rules as they believed
18   they were given to them, and go to court.  And the court
19   can still say, "Under Section 2, there's a disparate
20   impact.  And because there's a disparate impact, you
21   have to go back and do it again, or I will do it for
22   you."
23       And that is -- that is the short version of
24   what Judge Dick has held and what has not been
25   overturned by any court that we have brought it before,

10  (Pages 34 to 37)

Page 42

1  that core retention is the part that the court has given
2  the least amount of attention in this process now,
3  that once you are trying to redraw the map, I think that
4  core retention takes -- is -- becomes a less important
5  factor under Merrill v. Milligan.
6         REPRESENTATIVE THOMAS:  Thank you,
7         REPRESENTATIVE BEAULLIEU:  Thank you,
8  Representative Thomas.  Representative Marcelle.
9         REPRESENTATIVE MARCELLE:  Thank you.  Let me
10  start by congratulating you.  I don't know if I should
11  say congratulations or condolences.  I'm not really
12  sure.  Congratulations.
13         MS. MURRILL:  Well, I asked for the job, so
14  thank you.
15         REPRESENTATIVE MARCELLE:  Okay.  Let -- let me
16  just go over a couple of things that you said, and --
17  and so I can be clear in what you're -- what you're
18  telling us today.  Number one, you said you're going to
19  defend the map, Act 5, that they presented because that
20  is your job to do so, correct?
21         MS. MURRILL:  Yes.
22         REPRESENTATIVE MARCELLE:  And so --
23         MS. MURRILL:  I am defending it now.
24         REPRESENTATIVE MARCELLE:  Correct.  Because
25  that's -- that's what we hired you to do, to defend us,

Page 43

1  right?  And if we pass another map, you'll defend that
2  map as well?
3         MS. MURRILL:  That's correct.
4         REPRESENTATIVE MARCELLE:  The other thing that
5  I -- I -- I -- I -- I heard you say was this is a
6  -- the judge has fact-finding matters.  Can you kind of
7  elaborate on what that means?  Is that -- that's based
8  upon the testimony that was presented by the plaintiffs;
9  is that accurate?  And -- and the -- and the defense,
10  obviously, she took both -- both matters into
11  consideration when she was doing her fact finding.
12         MS. MURRILL:  She did.  That doesn't mean I
13  agree with them.
14         REPRESENTATIVE MARCELLE:  Okay.  So --
15         MS. MURRILL:  And I -- and I think that it's
16  also a product of -- this is part of what's frustrating,
17  I think, for the legislature when it goes into
18  litigation because people can -- like, experts, for
19  example, that are hired by the plaintiffs, no matter who
20  they are -- this could happen on the new map.  Right?
21  Those experts can come and testify in court, and the
22  judge can control that testimony.  In our case, it
23  happened in a very, very short, short turnaround in a
24  preliminary injunction hearing which is different from a
25  trial on the merits.  We've never had a trial on the

Page 44

1  merits.
2         So, you know, the -- the -- the court -- the
3  judge, whoever that judge may be, has an enormous amount
4  of control over how much testimony is allowed and by
5  whom, and -- and how much time we will have to do that.
6  That was all very, very compressed when we litigated
7  this right after the map was passed.  We have not had
8  any other fact finding because we haven't had a trial on
9  the merits.  I have raised an objection to that because
10  I think that you are entitled to have a trial on the
11  merits, but the courts have not accepted those arguments
12  at this point.
13         They have told us to go back and draw the map,
14  and they have given us a deadline.  So, you know, I am
15  making the same arguments that I would make on the new
16  map.  But at the -- at the same time, you know, the --
17  the courts haven't given us a lot of safe harbor to go
18  litigate --
19         REPRESENTATIVE MARCELLE:  Okay.
20         MS. MURRILL:  -- the rest of this case.
21  They've said, "Go do this."
22         REPRESENTATIVE MARCELLE:  So it's -- it -- it
23  is a fact that we do have six congressional districts in
24  Louisiana?  That is --
25         MS. MURRILL:  It is.

Page 45

1         REPRESENTATIVE MARCELLE:  -- a fact, right?
2  Is -- is it also a fact that a third of that -- the
3  population is African American?
4         MS. MURRILL:  Approximately, based on the
5  data.  I would also point out that 50 percent are women.
6  I mean, there are other -- there are other population,
7  you know, and gender and differences -- like, that's why
8  Section 2 has never been -- I mean, it is expressly
9  stated in Section 2 of the Voting Rights Act that this
10  is not an act of proportionate dividing.  That is not
11  permitted under Section 2.  And so we can't just take
12  that number and say that's -- that's how we do this,
13  because it's not that simple and that's actually not
14  permitted under the law.
15         REPRESENTATIVE MARCELLE:  So -- so it's not
16  permitted to say that we have six congressional
17  districts, and of those six congressional districts, we
18  -- we talk about community interests, I think was one of
19  them.  So do you believe that all five of the other
20  districts has all the community interests impacted in
21  those, and African American districts only should have
22  one?
23         MS. MURRILL:  Representative Marcelle, the --
24  the -- the -- the job of drawing the districts is yours.
25         REPRESENTATIVE MARCELLE:  I get it.

Page 46

1    MS. MURRILL: It's not mine.
2        REPRESENTATIVE MARCELLE: Right.
3        MS. MURRILL: And I -- I am defending what I
4    believe to have been a -- defensible map. And if you
5    draw a new map, I will defend that map. Judge Dick has
6    put us in a -- in a position -- and the Fifth Circuit,
7    the panel that reviewed that decision, and the whole
8    court, when I asked them to go en banc, by declining to
9    go en banc, have put us in a position of where we are
10   today, where we -- we need to draw a map. So I'm here
11   to tell -- I'm not here to tell you don't draw a map. I
12   mean, I think we do have to draw a map --
13       REPRESENTATIVE MARCELLE: And -- and --
14       MS. MURRILL: -- and I will defend that map.
15       REPRESENTATIVE WYBLE: And -- and my final
16   question. I heard Representative Beaullieu talk about
17   two-thirds of the legislature approving this map and --
18   and -- and voting for it. Beaullieu. I'm sorry.
19       (Simultaneous speaking.)
20       REPRESENTATIVE MARCELLE: Beaullieu?
21       (Simultaneous speaking.)
22       REPRESENTATIVE MARCELLE: I just call you
23   Beau, so I'm -- I'm trying to get your real name because
24   --
25       REPRESENTATIVE BEAULLIEU: We'll -- we'll --

Page 47

1        REPRESENTATIVE MARCELLE: -- I been calling
2    you Beau.
3        REPRESENTATIVE BEAULLIEU: -- we'll work on
4    you --
5        REPRESENTATIVE MARCELLE: Yes.
6        REPRESENTATIVE BEAULLIEU: -- Representative
7    Marcelle.
8        (Laughter.)
9        REPRESENTATIVE MARCELLE: So Beaullieu -- I
10   always call him Beau. But Beaullieu, I -- I -- I --
11   heard him say that two-thirds of the legislature voted
12   for this map. And he's absolutely accurate because the
13   majority of the legislature would support this map
14   because it benefits them. We talked about, you know,
15   our districts and our interests. What I did not hear
16   him say is -- because I sat at that table on the other
17   side and presented a map, and none of the maps that he
18   presented got out of this committee.
19       So it's, you know, it's unfair to say, "Okay,
20   we passed it with the majority of the people," because a
21   majority of the people would support us not having an --
22   an additional African American representation in another
23   district. I get that. But it's not fair to say that
24   those arguments weren't made to -- to support that. I
25   was one of those that made the argument to support an

Page 48

1    additional congressional map. And I think what we're
2    hearing from Judge Kelly Dick is --
3        MS. MURRILL: Shelly Dick.
4        REPRESENTATIVE MARCELLE: -- Shelly Dick is
5    that the map is not fair for the state of Louisiana.
6    And -- and what I -- what I agree with her on is that if
7    we cannot -- and we had an opportunity to draw this map
8    ourselves and we did not do it as it supports Section 2,
9    in my opinion. I know you gave yours, but this is my
10   opinion. So then we will allow her to draw that map if
11   we can't do that. We can't draw a map right now, right?
12   Is that accurate?
13       MS. MURRILL: So what will happen if you do
14   not draw a map is that she has set a trial date. It's
15   very, very quick, and we will still be operating under
16   the old map. So we will move forward then with a trial
17   on the -- under the old map. There'll be a trial on the
18   merits, the same record I think that was presented, and
19   Tom can affirm or -- or correct me if I'm wrong, but the
20   -- the record from the preliminary injunction hearing
21   will all go into the -- into the -- into the court
22   record, and we will look at whether we want to have
23   additional testimony. And that trial will move forward.
24       I -- I don't expect Judge Dick to change her
25   position. I think she will draw a map, and -- and so

Page 49

1    you are getting the first opportunity to do that. I
2    mean, we could have -- in theory, we could have had a
3    trial on the merits, and she could have said, "I don't
4    --" you know, again, "I don't like the old map," and --
5    or, "I don't like the map that you drew and I'm going to
6    redraw your map." But as a matter of law, you get the
7    first shot at doing that, so.
8        REPRESENTATIVE MARCELLE: No. We get the
9    second shot at doing it. Thank you very much, though.
10       REPRESENTATIVE BEAULLIEU: Thank you.
11   Representative Marcelle. Representative Farnum.
12       REPRESENTATIVE FARNUM: Thank you, Mr.
13   Chairman. So a couple of things. So the -- the
14   parallel that the argument has been based on is the --
15   the case in Alabama; was that the one?
16       MS. MURRILL: Yeah. The Alabama case was
17   litigated just, you know, a few months ahead of ours,
18   and so it went up to the Supreme Court before ours did.
19   And so we've basically been held -- our case was held in
20   abeyance pending the outcome of that case.
21       REPRESENTATIVE FARNUM: So -- and that was a
22   seven-member district, right?
23       MS. MURRILL: I believe so.
24       REPRESENTATIVE FARNUM: So -- so they were
25   trying to reach a second district in a seven-member

13 (Pages 46 to 49)

Page 50

1    state.  So would you say, just in your opinion, is it
2    harder to -- to draw two of six than it is two of seven,
3    just based on the compactness of the population of that
4    state?  Because wouldn't you say that every state has a
5    different compactness, there's no two states that are
6    identical, and maybe it's easier in one state, that
7    maybe the compactness is -- is much more centrally
8    located to reach that conclusion.  Wouldn't -- would you
9    agree with that?
10        MS. MURRILL:  I -- I would agree with you that
11   every state is different and that -- that our population
12   -- how our population is spread out is -- is different
13   from every other state.
14        REPRESENTATIVE FARNUM:  Would -- would you --
15        MS. MURRILL:  So our population is -- our
16   population, I think, is relatively close to theirs.  I
17   -- they'd probably have a little more population because
18   they still have seven districts.  You know, we -- this
19   isn't going to be easy.  I -- I didn't -- that's why I
20   started out by saying, "I'm not here to tell you this is
21   an easy job."  You have a hard job.  Our state is
22   different.  Every state is different from each other,
23   and -- and you have to do this based on the facts in our
24   state.
25        We have argued in our case that our state is

Page 51

1    different from Alabama with regard to -- so that they --
2    the fact findings aren't -- can't be the same.  We're
3    not the same.  Our history isn't the same.  Our history
4    of redistricting and redistricting litigation is not the
5    same.  And we -- we brought those issues up, and here we
6    are still, so.
7        REPRESENTATIVE FARNUM:  I -- I -- I know.  I
8    spent the better part of three years going over this.  I
9    was on the committee last time and sat through numerous,
10   numerous meetings on -- on this across a period of the
11   three years.  Help -- help me understand how the -- the
12   voting-age population factors in when the voting -- the
13   Black voting-age population is lower than the total
14   population in the state.  How does that factor in?
15        MS. MURRILL:  You want to take that one?
16        MR. JONES:  Yeah.  The -- the judge --
17        MS. MURRILL:  Introduce yourself just quickly
18   again.
19        REPRESENTATIVE BEAULLIEU:  You're on.  You're
20   on.
21        MR. JONES:  The judge here in the Middle
22   District has based her rulings on the Black --
23        REPRESENTATIVE BEAULLIEU:  If you don't mind,
24   could you kind of speak into the mic a little bit?  Or
25   you can pull the mic to you, I believe, as well.

Page 52

1        MR. JONES:  I'm sorry.  My name is Tom Jones.
2    I'm the director of the civil division in the attorney
3    general's office.
4        The judge has principally based her ruling on
5    Black voting-age population.  That's what she's used as
6    the primary criteria.  Then the experts take that Black
7    voting-age population, and they're very clever people,
8    and they do very clever things with those numbers.  They
9    can persuade you on one side that the Black voting-age
10   population should be analyzed this way, and the other
11   experts can convince you of just the opposite the next
12   day.  But Black voting-age population has been the
13   primary criteria for this judge's rulings.
14        REPRESENTATIVE FARNUM:  Because you did say
15   something earlier, that -- that race cannot be a
16   determining factor of -- of why you draw maps.
17        MS. MURRILL:  It can't be the predominant
18   factor.
19        REPRESENTATIVE FARNUM:  Isn't that the only
20   reason we're here right now?
21        MS. MURRILL:  You know, we're here because of
22   --
23        REPRESENTATIVE FARNUM:  But isn't that the
24   predominant reason?
25        MS. MURRILL:  -- the court's telling us we

Page 53

1    have to be here.  I mean, I -- I think that's part of
2    it.  You know, the -- I mean, I'm defending the map.
3    I'm going to defend the new map.  I -- I want you to
4    know, I mean, if you draw a new map, I'm defending that
5    map, so.
6        REPRESENTATIVE FARNUM:  I -- I agree.
7        MS. MURRILL:  I'm not going to say that, you
8    know, I mean, I think -- I don't -- I have complaints
9    about how this case was managed, I mean, not by our
10   litigators, not -- you know, I just think that we need
11   -- we should have a trial on the merits.  I've always
12   I have argued that in court.  I have signed off on those
13   pleadings.  I still believe that that's true.  The
14   courts have told us to do this by a certain date or it's
15   going to be done for us.
16        REPRESENTATIVE FARNUM:  I -- I think the
17   circular fashion of -- of the 14th, the 15th Amendment,
18   and this Section 2 of the Voting Rights Act is a circle.
19   So it -- it -- it sends you in this race to chase your
20   tail to try and accomplish what you're trying to
21   accomplish.  And -- and each one contradicts the other
22   one in the circle.  So you end up in this never ending
23   loop of -- of how do you accomplish what we're tasked to
24   do here.
25        We did look at a lot of maps and -- and, you

14  (Pages 50 to 53)

Page 54

1   know, I -- I personally think that the one we passed was
2   -- was a very legal, legitimate map. And -- and -- and
3   we'll do the best we can with what we have. So,
4   appreciate your time today. Thank you, Mr. Chairman.
5       REPRESENTATIVE BEAULLIEU: Thank you,
6   Representative Farnum. Representative Carter.
7       REPRESENTATIVE CARTER: Thank you, Mr.
8   Chairman. I -- because this committee meeting is being
9   viewed by people throughout the state, I think it's
10  important that we be honest and -- and -- and -- and put
11  the whole picture, why we here, how we got here. It
12  seemed to be an impression that the old Judge Dick's
13  begging us, trying to make us do something even though
14  we've done the right thing.
15      Is it not true that the judge's job, her task,
16  is to look at the law, first the law, the -- the
17  jurisprudence of reapportionment, and look at the -- the
18  -- the -- the statute that's been passed,
19  reapportionment and other criteria that Congress and --
20  has given us, to see if we went about this the right
21  way. She just didn't come up the side to say, "I'm
22  going to make them have another Black district." That
23  is not her job. And -- and -- and she did anything
24  contrary to that, she certainly would have been reversed
25  quite quickly.

Page 55

1       But -- but -- but what she did, she looked at
2   the law, and there was -- there was -- there was a
3   request made by motion to -- to -- as to whether or not
4   the plaintiff would succeed on this problem with
5   disparity and what have you if they went to trial. And
6   she pretty much said, after studying the law and
7   studying the facts and what actually took place in this
8   legislature, she decided it would probably succeed. So
9   she asked the legislature to go back and try to do this
10  over again the right way. And the legislature has that
11  opportunity. We could get nothing done, okay?
12      So now the judge -- it will stay -- the
13  attorney general office -- she -- she expressed that she
14  wanted another map and she -- a better map, she thought,
15  that's more legal. And so she -- she asked the
16  legislature to -- there was a state made by the attorney
17  general's office, and that was granted by the Fifth
18  Circuit.
19      And because of the Alabama case -- and Alabama
20  is different from -- first of all, Alabama has 26
21  percent population of African Americans. Louisiana, 33
22  percent. Alabama has a larger overall population than
23  Louisiana as well. That's why they have seven
24  congressman. But -- but you can't compare Alabama to
25  Louisiana.

Page 56

1       But the law is pretty much the -- it's the
2   same. So based on that law, that judge says, "Well,
3   y'all either going to do a map, or I'm going to do a
4   map." So -- so he gave us another -- a third time to do
5   the map. Now, if you look at the analysis of the -- of
6   what we done the last time, there was about eight maps
7   that were presented to this House and Government Affairs
8   Committee, but there's only one map, the speaker map,
9   House Bill 1, that was even considered, seriously
10  considered.
11      I mean, there was some people came to the --
12  to the table and -- and talked about these other maps,
13  but -- but -- but it was asked by the speaker then --
14  the then speaker who was carrying the House Bill 1, "Did
15  you look at Section 2 of the Voters Right Act? And did
16  you try to comply this map with Section 2?" And the
17  speaker said no.
18      "Well, did you look at the disparity that this
19  map represents? It's just common sense. If you got a
20  third of the population that is African American and --
21  and -- and 33 -- over 33 percent, did you look at those
22  -- those figures? You don't have to be the primary
23  criteria, but you got to first look at whether or not
24  it's a -- it's appears to be a fair map and complying
25  with the 14th Amendment, Section 2 and other -- other of

Page 57

1   Supreme Court jurisprudence?" He said no.
2       He said that he -- he -- he -- he -- this is
3   his map that he's presenting, and he didn't -- let the
4   lawyers worry about all this other stuff. This is his
5   map. So the -- the -- the record -- the record of the
6   -- and I tried to tell him this because I was asking
7   questions to this -- to -- on House Bill 1, like
8   everybody else, "Why this map have a problem?" And so
9   -- so -- so the legislature knew the map had a problem,
10  but they wouldn't listen to anybody else.
11      So while I agree that the -- your
12  representation that race is not the -- the sole factor,
13  the -- the fact is you got to have six divided equally,
14  okay? And -- and if it -- but -- but -- but Section 2
15  says if you've got a group that is compact, that is
16  compact and that vote certain voting patterns, that you
17  should try to create a map that allow that group to
18  represent a person of their choice. That's all it says.
19  So I asked the speaker, "Did you look at Section 2 and
20  try to come up with a map that does that?" He said,
21  "No, I didn't."
22      So it's the speaker's and -- and -- and the
23  legislators' testimony in the record that caused them
24  the problem they had when it went to the judge. Had
25  they said, "We looked at Section 2, we tried to comply

15  (Pages 54 to 57)

Page 58

1    with Section 2 but we couldn't because the Black
2    population is so dispersed in the state.  We could not
3    get another district that was compact," they didn't say
4    that, didn't even try.  So that's why the state is in
5    the position it's in, not because somebody is out there
6    -- some federal judge is out there trying to make
7    Louisiana have another -- another minority district now.
8         However, I do agree that we need to have this
9    opportunity, and it's wonderful to have this opportunity
10   to try to create a map that will comply.  Now -- now --
11   and I think that I applaud the governor because I think
12   the governor wants to do the right thing.  The new
13   governor wants to do the right thing.  He wants to have
14   a map to -- so we can do our own map and not a federal
15   judge.  And I support that.  And so -- but I don't want
16   to give the impression that federal judge is just a bad,
17   bad monster, is trying to make us do something we
18   shouldn't do.  She has to comply with the law.
19        Now, the Supreme Court has reviewed what the
20   -- the -- the the attorney general's office presented
21   there on confection of the state, and it's really --
22   they -- they denied that.  It's the United States
23   Supreme Court saying you got to go back and do this map,
24   not just Judge Dick, okay?  So -- so we need to accept
25   the fact that the map we had, based on the record, based

Page 59

1    on the testimony presented here in the legislature,
2    based on the debate in the legislature, based on the
3    law, that it was not in compliance.
4         Now, you can differ.  People can differ
5    because they -- they don't like what the law says,
6    maybe, or they want to twist the law.  But the fact of
7    the matter is it's not a sustainable map.  This map is
8    not sustainable that we have now.  And so we have a
9    chance to do that and not offend too many political
10   notions at the same time.
11        And so I just -- I just want to make that --
12   put that in the record that -- that this is a effort on
13   the part of people of different political interests to
14   try to resolve the issue that had been defined by -- by
15   Supreme Court decision and by federal statute, and --
16   and try to come up with a district that is acceptable.
17        That's what we're trying to do, you know.  And
18   it doesn't mean that you're a bad person or you -- or
19   you got a problem because you supported that last map.
20   It's just that the record did not support -- we didn't
21   get enough input from other people that had concerns
22   about it.  We didn't allow people to have -- have -- put
23   their input in.  Had we putting three or four maps on
24   the floor and explain why we putting on the floor, that
25   might have been different.  Have we tried to do what the

Page 60

1    -- what the Supreme Courts over the years have told us
2    to do?
3         I happened to be on the legislature in '84 to
4    '92 when we wrote a lot of the reapportion maps.  Okay.
5    So this problem been around a long time.  So we -- and
6    -- and so we had -- oftentimes, federal judges had to
7    put us on the right track, say, "Okay.  Y'all doing
8    good.  Y'all working in the right direction, but y'all
9    got to go back and do this over again."  And that's what
10   she did.
11        REPRESENTATIVE BEAULLIEU:  Thank you, Judge
12   Carter.  Vice-chairman Lyons.
13        VICE-CHAIRMAN LYONS:  Thank you, Mr. Chairman.
14   Is it Ms. Murrill?
15        MS. MURRILL:  Murrill.
16        VICE-CHAIRMAN LYONS:  I'm sorry,
17   sorry.  I -- I -- I have a question for you, but before
18   I get into my question, I just wanted to note that as we
19   talk about the Voting Rights Act and -- and the premise
20   of a lot of things that we've done, today is actually
21   the holiday of Martin Luther King Day, today, which his
22   actual birthday is tomorrow.  This is -- the observance
23   of it is today.  So a lot of us question, you know, as
24   the federal holiday (inaudible 1:14:43) was -- was
25   empty, what have you, is why we're here today.

Page 61

1         So I just want to just remind everyone that
2    one of the things that Martin Luther King did say was
3    there's never a wrong time to do the right thing.  So
4    we're here today and we would not have any other, I
5    guess, issue -- he wouldn't.  Now we're doing something
6    that we'll be doing to correct where we at and -- and so
7    forth.  But my question to you, ma'am, is you alluded to
8    earlier that you want to have a -- preference to have a
9    trial on the merits, that you were requesting -- asking
10   for.
11        So as a body here, as we're going to be going
12   through this process, can you outline to us in any form
13   necessary that -- to get it across, what were some of
14   those merits?  Because I'm assuming when you say the
15   trial on the merits, you mean that the merits of -- of
16   the decision that you may have had difference with, you
17   had other merits that you wanted to talk about or maybe
18   defend in the -- in the fact-finding portion that was
19   not revealed.
20        MS. MURRILL:  So, Representative Lyons, when
21   we went into this litigation right after the legislature
22   completed the map drawing process, we went into a very,
23   very compressed hearing on a motion for a preliminary
24   injunction.  That is a different standard.  It was very
25   compressed.  We did not have the -- length of time

16  (Pages 58 to 61)

Page 62

1  that we would ordinarily have for a full trial.
2       I believe that -- I mean, this is -- you can
3  blame it on the litigator in me, which is fine, but I
4  believe that it -- that -- that the state and -- and I
5  believe this under the new map that you pass, that we
6  should be entitled to have a trial on the merits --
7  merits before we are forced to go in and change an act
8  of the legislature.  That is just a fundamental premise
9  that I have about acts of the legislature and us being
10  required by the courts to redo them.  That -- that -- as
11  a practical matter, we did not have a lot of time, but I
12  have lost -- we lost on that issue.
13       I mean, we -- we did.  Not just me, but the
14  entire litigation team, including the lawyers who
15  represented the legislature or the -- the -- the speaker
16  and the -- the president of the Senate at the time and
17  the secretary of state.  We asked to have a trial on the
18  merits set before you were required to go into session,
19  and we offered to do it quickly.  So just to be clear,
20  we were not trying to delay.  We offered to do it in
21  November.  There was another trial set.  I mean, we
22  tried to do this quickly so that we could have a
23  complete record upon which whatever the decision was.
24       And we did not believe that Judge Dick would
25  change her decision, but we still believe that the case

Page 63

1  should be before the courts on a complete record.  It is
2  not, because we weren't -- we never had a trial on the
3  merits.  The courts have told you to go back and draw a
4  map.  And they said, "We can have a trial on the merits,
5  but we can do that after you draw a map."
6       So as a -- I mean, just fundamentally as a
7  lawyer who represents the -- you and defends the laws
8  that you pass, your laws -- if you have a law that you
9  pass, that you feel very strongly about, and the entire
10  legislature has voted for it even though some people may
11  disagree with it, then I will defend your law.  And I --
12  I think that -- that you are entitled and the
13  legislature is entitled to that defense.  So that's the
14  point that I was making.  I -- I don't think any of
15  these cases should be tried and decided at the
16  preliminary injunction stage.  I think we are entitled
17  to a trial on the merits.
18       And -- but at this point, the courts have told
19  you -- the federal courts have told me and they have
20  told you that we don't get that right now.  You -- you
21  get to have this session right now, or Judge Dick is
22  going to draw the map for you.  So, you know, I'm not
23  here to say, "Don't draw the map."  I'm here to tell
24  you, "Draw the map."
25       VICE-CHAIRMAN LYONS:  Okay.  Thank -- thank

Page 64

1  you very much.  Thank you, Mr. Chairman.
2       REPRESENTATIVE BEAULLIEU:  Thank you,
3  Representative Lyons.  Representative Gadberry.
4       REPRESENTATIVE GADBERRY:  Thank you, Mr.
5  Chair.  Ms. Murrill, if we draw a new map and Judge Dick
6  decides she don't like that one, do we start all over
7  again, or will she immediately draw a map?  I don't
8  think she's capable of drawing a map, number one.  I
9  just don't think she could do it.  But --
10       MS. MURRILL:  She -- I mean, no federal judge
11  does this without a demographer helping.  I mean,
12  they're -- she'll appoint -- she will ask for experts.
13  She will ask for the maps to be submitted to her with
14  expert testimony, and she will -- typically, she's
15  probably going to decide which map to take, but she can
16  tweak those lines.  She can decide how to draw the map,
17  how she wants to draw this map based on the input of the
18  experts from both sides.  She could appoint her own
19  expert and have that expert assist her in the
20  map-drawing exercise.
21       And remember, you've been through this before.
22  A large part of this exercise is done through computer
23  generated maps.  So, you know, you put the numbers in,
24  you start changing -- you change the inputs, it spits
25  out a new map.  She's going to have to go through that

Page 65

1  same process that you did, and then -- and then we
2  continue.  So I -- I mean, I can't tell you that the
3  plaintiffs will accept the map that you draw.  She has
4  established a timeline for the plaintiffs to amend their
5  petition and challenge that map, and then we will -- we
6  will go through the process again to determine whether
7  or not that map is acceptable.
8       REPRESENTATIVE GADBERRY:  And for four years
9  on this committee previously, I spent hours upon hours
10  looking at this map, all the maps.  And I looked at the
11  plaintiff's map, so to speak, that they presented before
12  this group, and I didn't feel like any of those met the
13  criteria.  The -- the -- the overriding factor, I guess,
14  was they had gerrymander lines, which is against the
15  Voting Rights Act.  So I'm hearing that you said that
16  the map -- that the current map that's been rejected, I
17  guess, by the judge, has it been to the US Supreme
18  Court?  Because that's the next step.
19       MS. MURRILL:  It has not.  It -- the -- the --
20  the US Supreme Court can decide whether to take a case
21  or not take a case.
22       REPRESENTATIVE GADBERRY:  Right.
23       MS. MURRILL:  They have not taken our case.
24  They took our -- they -- they stayed our case last
25  summer while the Alabama case went forward and was

Page 66

1    litigated. They said, "You just wait." They thought we
2    had made a good case for a stay and so they paused our
3    case while they decided that one. But they did
4    something and these -- this is kind of a term of art,
5    but I mean, they granted cert in advance of judgment.
6    That means they actually took our case, and then after
7    they decided the Merrill case, the Alabama case, they
8    just vacated their own grant and sent it back to us.
9         So in a way, they took our case, and then they
10   vacated their own decision to take our case and they
11   sent it back down to the Fifth Circuit and to judge
12   Dick. And so it's -- it's back in the hands of the
13   District Court judge who is supervised by the Fifth
14   Circuit Court of Appeals. And so there has been some
15   litigation between August and, really, through the
16   summer since the Merrill case came out all the way
17   through the time that the opinion was issued in
18   November, I think, from the Fifth Circuit where a panel
19   of the Fifth Circuit said, "You need to go draw a map by
20   February 15th."
21        So they actually suggested we should have done
22   this before -- before we legally, really -- or -- or --
23   or I think it was practically possible to even get it
24   done. But, you know, here you are. I think the
25   governor heeded that call that -- that -- that demand.

Page 67

1    I mean, we've had it reviewed by a number of judges.
2    They have had nothing to say about our arguments. It's
3    been radio silence. And so the only decision that
4    remains in front of us right now is Judge Dick's.
5         And -- and so Judge Dick has set a timeline
6    for us to have a trial. They did say we get to have a
7    trial, but we don't get to have that trial until after
8    you go through this exercise. And, you know, she will
9    do it for you.
10        REPRESENTATIVE GADBERRY: And once we have
11   that trial, we have the opportunity, if she still
12   rejects the map, to appeal that?
13        MS. MURRILL: If she -- if she rejects the new
14   map?
15        REPRESENTATIVE GADBERRY: Or the existing one
16   again.
17        MS. MURRILL: Well, I mean, if she -- if you
18   don't draw a map, then we will be back in front of her
19   for the trial on the merits in very short order and that
20   -- that case will continue. If you do draw a map, then
21   the plaintiffs will have to decide whether they wish to
22   challenge that map, whether they accept that map. And
23   if they accept that map, then -- then the whole case
24   should be over.
25        REPRESENTATIVE BEAULLIEU: Yeah.

Page 68

1         MS. MURRILL: If they do not accept that map
2    for whatever reason, then if they don't like it, I mean,
3    they may -- it may be a perfectly acceptable map for
4    some people. It may be a second majority/minority map
5    that -- that some people like or that some people don't.
6    So there's no guarantee that someone won't, that they
7    -- that the plaintiffs will like the map. But if they
8    -- they can -- so they could continue to challenge it,
9    and now they will have to go and amend their pleadings
10   and we, basically, will start over because it is a new
11   act of the legislature.
12        REPRESENTATIVE BEAULLIEU: It's going to
13   replace the existing map --
14        MS. MURRILL: It will replace the existing
15   map.
16        REPRESENTATIVE BEAULLIEU: -- Representative
17   Gadberry.
18        REPRESENTATIVE GADBERRY: Well, I mean, along
19   what Representative Farnum -- Farnum was saying earlier,
20   you chase your tail on this thing.
21        MS. MURRILL: Well, that's why I said it's not
22   easy.
23        REPRESENTATIVE GADBERRY: You comply with one
24   part, and you check another part and it doesn't meet the
25   criteria. So you go back and rework your population or

Page 69

1    your districts, and that doesn't meet. So you're --
2    you're constantly going in a circle.
3         MS. MURRILL: Look, I believe that the United
4    States Supreme Court should give you better
5    instructions. I -- I do. I think that -- that -- that
6    is the argument that we made last summer. And, you
7    know, if -- if you pass a map and somebody else
8    challenges that map, it -- I will make that argument
9    again. I mean, I think that they -- the courts have
10   made this a difficult task for you and -- and so you are
11   doing the best that you can now within the constraints
12   of the rulings of the federal court.
13        So, you know, it's -- it's not an easy task
14   that you have and I believe that the jurisprudence has
15   made it confusing and that the Supreme Court would be
16   well -- I mean, you know, in my opinion, that the
17   Supreme Court ought to make its own jurisprudence
18   clearer to those of you who have the job of drawing the
19   maps. I think that's fair.
20        The constitution makes it clear that it is
21   your job to draw the maps. I believe that it is not
22   correct in terms of the balance of power between the
23   state and federal government, between the constitution,
24   you know, purview of how this should be happening, for
25   the courts to create precedent that makes it impossible

Page 74

1  also said that we had maps, and he pointed out the fact
2  that the -- we as -- and I want -- I think it was Rep.
3  Marcelle that said it. We did not have an opportunity
4  to vote on all maps because all maps were not allowed to
5  come out of this committee.
6       There were options upon options to draw a
7  second minority/majority congressional district, and
8  they went all across the state to give minorities an
9  opportunity to vote for their candidate of choice. They
10 were not allowed to come out of this committee. We sat
11 for a month, six hours, at least, a day, listening to
12 the arguments of -- and the -- the makeup of each map
13 and discussing voting -- voting-age population vs.
14 population. So I understand why we still having those
15 questions because we talked about it ad nauseam.
16      But when you choose not to do right, that is
17 when the process becomes difficult and it -- it seems as
18 though we can't make a headway. But I want to put it on
19 the record that I didn't vote for none of them maps that
20 came out. I didn't vote for any of the maps that Judge
21 Dick had in front of her because they were not maps that
22 were fair and they were not maps that were taking
23 consideration of all of the citizens of this great state
24 that I call home no matter how unfair or how unjust it
25 is to me.

Page 75

1       We still need to look and make sure that
2  Louisiana is a state that it used to be, considering all
3  of her citizens. And thank you for your time, Mr.
4  Chair. I don't have a question for anybody.
5       REPRESENTATIVE BEAULLIEU: Yeah. Let's try
6  and -- and look -- let's try and keep this to questions
7  for the attorney general. We -- we going to have a time
8  to -- to talk about maps and -- and all that, but if --
9  like to try and stick to any kind of questions out of
10 respect for the attorney general's time. Representative
11 Schamerhorn.
12      REPRESENTATIVE SCHAMERHORN: Thank you, Mr.
13 Chairman. Good morning.
14      MS. MURRILL: Good morning.
15      REPRESENTATIVE SCHAMERHORN: Welcome aboard.
16      MS. MURRILL: Thank you.
17      REPRESENTATIVE SCHAMERHORN: My question is if
18 we do not present a different map, Judge Dick has
19 threatened to draw her map. Is it not our --
20      MS. MURRILL: Promised, not threatened.
21      REPRESENTATIVE SCHAMERHORN: Well, okay. Is
22 it not our responsibility as legislators by the -- and
23 protected by the constitution, that our map should be
24 the one that is approved? Now if she draws her own map,
25 when she does, do we still have to approve -- would we

Page 76

1  have to approve her map --
2       MS. MURRILL: No.
3       REPRESENTATIVE SCHAMERHORN: -- or would it
4  automatically go in force above what the constitution
5  says is our duties as representatives?
6       MS. MURRILL: So let me kind of -- let me
7  untangle that a little bit. If you draw a map now, that
8  map will become an act of the legislature and it will
9  supersede the prior act of the legislature. The old map
10 goes away.
11      REPRESENTATIVE SCHAMERHORN: Okay.
12      MS. MURRILL: If -- if you do not draw a map,
13 then the -- the map that you drew before will remain --
14 will be the map, and the plaintiffs will continue to
15 litigate that. We will have a trial on the merits. The
16 -- the record from the preliminary injunction will be,
17 probably, supplemented with some additional testimony.
18 She will issue a new ruling and she will issue a
19 permanent injunction against the map. And then that
20 will be litigated, which is my duty. And so I will
21 continue to carry forth my duty to defend against the
22 injunction. That's the process.
23      If she draws the map herself, then someone
24 could intervene and challenge that map. You know, there
25 are a number of different potential outcomes if she

Page 77

1  draws the map. If she draws the map, you know, we could
2  accept that map. You don't get it back. You don't get
3  a second -- you don't get another opportunity to approve
4  her work. The only question is can her work survive the
5  scrutiny of the Fifth Circuit who grades her papers, and
6  potentially, the United States Supreme Court who grades
7  their papers.
8       And, you know, I think what makes your job a
9  little more complicated is that the prior -- not the --
10 the exact prior map, but the map before that had been
11 pre-cleared, there had been litigation in the past over
12 a majority/minority map that was declared
13 unconstitutional. So, you know, that's why I have never
14 taken the position that our history is -- or at least
15 our recent history is the same in redistricting as
16 Alabama.
17      And I believe that the courts need to make it
18 more clear what your job is so that you can do it
19 properly the first time and we can all avoid the
20 litigation side of this and -- and continue to move
21 forward with -- with an act that -- that, as I believe
22 all your acts are, presumed to be constitutional. That
23 is, you know, that's how I'll approach the next -- the
24 next act that you issue. So I'm not picking and
25 choosing. I mean, I think unless it's very clearly

20  (Pages 74 to 77)

Page 86

1    minority district. Thank you.
2         REPRESENTATIVE BEAULLIEU: Thank you, Ms.
3    Labry. The -- the board is clear. Members, this is
4    going to conclude our educational meeting this morning.
5    I appreciate you all being here this morning and -- and
6    your attentiveness and your questions. We're going to
7    have a busy week. I ask you all to stay close to your
8    computers. As bills are uploaded, read them, become
9    familiar with them. If you have amendments, please get
10   them to staff as soon as possible.
11        Remember, you also -- if anybody in any --
12   from the outside is submitting information or submitting
13   maps, to include shapefiles as well so we can have the
14   -- the equivalency -- block equivalency files so that we
15   can -- we can have that data and -- and get it to staff
16   as -- as soon as possible. But, members, look forward
17   to it. It'll be a fun week. Thank you.
18        MS. BAKER: Move to adjourn?
19        REPRESENTATIVE BEAULLIEU: Yeah.
20   Representative Thomas has moved to adjourn.
21        (Meeting adjourned.)
22
23
24
25

Page 87

1         CERTIFICATE OF TRANSCRIPTION
2         I, Nathan Pikover, COO of TranscribeMe, Inc.,
3    do hereby certify that 291001-Audio-1-15-24_HC on HG
4    Affairs Meeting.mp4 was transcribed utilizing computer
5    aided means and the TranscribeMe transcription team.
6         The transcript of the audio mentioned above,
7    having been transcribed and reviewed by TranscribeMe,
8    Inc. to the best of the company's ability, is a full,
9    true, and correct transcription.
10        I further certify that neither I, nor the
11   TranscribeMe, Inc. transcription team, have any personal
12   association with the parties involved or are in any way
13   interested in the outcome thereof.
14        Dated this 12th of March, 2024.
15   _____
16   Nathan Pikover, COO TranscribeMe, Inc.
17
18
19
20
21
22
23
24
25

23  (Pages 86 to 87)



# PohlmanUSA®

## Court Reporting and Litigation Services

Louisiana State Senate 1st Special Session-Audio Transcription

January 17, 2024

In Re: Louisiana House Floor/Committee Video

Page 2

1    MS. MIZELL:  Official Journal of the Senate of
2  the state of Louisiana, Second day's proceedings,
3  Tuesday, January 16th, 2024.
4        MALE SPEAKER:  Senator Hodges moves to
5  dispense the reading of the journal without objection.
6        MS. MIZELL:  Petitions, memorials, and
7  communications, I am in receipt of a letter from the
8  president appointing the parliamentarians, Senator
9  Gregory Miller.  Messages from the house, the house is
10  finally passed and asked for concurrence in the
11  following house bills and joint resolutions.  House Bill
12  16, House Bill 8, respectfully submit headed.  Michelle
13  Fontenot, Clerk of the House.  Introduction of House
14  bills.  Senator Talbot now moves for suspension of the
15  rules for the purpose of reading the house bills the
16  first and second time and referring them to Committee.
17        House Bill 8 by Representative Mike Johnson is
18  an act to Entitled 13 relative to the Supreme Court to
19  provide relative to redistricting Supreme Court Justice
20  districts.  It is referred to senate and governmental
21  affairs.  House Bill 16 by Representative McFarland is
22  an act to appropriate funds and to make certain
23  reductions from certain sources to be allocated to the
24  designated agencies and purposes in specific amounts for
25  making of supplemental appropriations.  Refer to

Page 3

1  finance.
2        MALE SPEAKER:  Oh, Senator O'Connor for an
3  introduction.
4        MALE SPEAKER 2:  (inaudible 0:04:15).
5        MALE SPEAKER:  Oh, okay.
6        MALE SPEAKER 2:  It's okay.
7        MALE SPEAKER:  Never mind.  It's -- that zip
8  sound?  Senate bills on third reading and final passage.
9        MS. MIZELL:  First bill?  Senator Womack now
10  moves for a suspension of the rules for the purpose of
11  calling out of order, Senate Bill 8 by Senator Womack.
12  It's an act to amend Title 18 relative to congressional
13  districts to provide for the redistricting of
14  Louisiana's congressional
15        FEMALE SPEAKER:  To provide with respect to
16  positions and offices other than congressional, which
17  are based on congressional districts.
18        MALE SPEAKER:  Senator Womack, on your bill.
19        SENATOR WOMACK:  Thank you, Mr. President.
20  Colleagues, I bring Senate Bill Number 8 before you this
21  evening.  As you know, Louisiana congressional districts
22  must be drawn, given the Federal Voting Rights Act
23  litigation that is still ongoing in the US District
24  Court for the Middle District of Louisiana.  This map in
25  the bill that I'm introducing, which is the product of a

Page 4

1  long, detailed process, achieves several goals.
2        First, as you know and you're aware of,
3  Congresswoman Julia Letlow is my representative in
4  Washington, DC.  The boundaries in the bill I'm
5  proposing ensure that Congresswoman Letlow remains both
6  unpaired with any other incumbents, and in a
7  congressional district that should continue to elect a
8  Republican to Congress for the remainder of this decade.
9  I have great pride in the work of Congresswoman Letlow
10  and -- that she's accomplished, and this map will ensure
11  that Louisianans will continue to benefit from her
12  presence in the halls of the Congress for as long as she
13  decides to continue to serve this great state.
14        Second.  Louisiana has six congressional
15  districts.  The map that's proposed bill ensures that
16  four are safe Republican seats.  Louisiana Republican
17  presence in the United States' countours has contributed
18  tremendously to the national discourse, and I'm very
19  proud that both Speaker of the US House of
20  Representatives, Mike Johnson, and US House Majority
21  Leader Steve Scalise are both from our great state.
22  This map ensures that two of them will have solidly
23  Republican districts at home, so they can focus on the
24  national leadership that we need in Washington, DC.  The
25  map that's proposed in this bill ensures conservative

Page 5

1  principle is retained by the majority of those in
2  Louisiana and will continue to extend past our
3  boundaries to the nation's capital.
4        Third.  The corridor that you see on the map
5  that -- that you have on your -- your table, if you'll
6  notice the map runs up Red River, which is barge
7  traffic, commerce.  It also has I-49, which is a --
8  which is -- goes from Lafayette to Shreveport, which is
9  also a corridor for our state that is very important to
10  our commerce.  We have a college.  We have education
11  along that corridor.  We have a presence with ag with
12  our row crop, as well as our cattle industry all up
13  along Red River in those parishes.
14        A lot of people from that area, the
15  Natchitoches Parish, as well as Alexandria, use
16  Alexandria for -- for -- for their healthcare, their
17  hospitals, and so forth in that area.  So finally, the
18  amounts in the proposed bill responds appropriate to the
19  ongoing Federal Voting Rights Act in the Middle District
20  of Louisiana.  For those who are unaware, the
21  congressional amounts that we enacted in 2022 of March
22  have been the subject of litigation, roughly since the
23  day -- the 2022 Congressional Redistricting Bill went
24  into effect.  Even before we enacted it.
25        After a substantial amount of prolonged

                                          2  (Pages 2 to 5)

Page 6

1  litigation, the Federal District Court has adhered to
2  its view that the federal law requires that the state
3  have two congressional districts with a majority of
4  Black voters.  Our secretary of state, attorney general,
5  and our prior legislative leadership appealed that, but
6  have yet to succeed.  And we are now here because of the
7  federal court order, that we have to have first
8  opportunity to act.  The district court order that we
9  must have two majority voting-age population districts,
10  combined with the political impurities I just described,
11  have largely -- largely driven the boundaries of
12  District Two and District Six on your map, both of which
13  are over 50 percent voting -- Black voting age
14  population.
15      Given the state's current demographics, there
16  is not enough high Black population in the southeast
17  portion of Louisiana to create two majority Black
18  districts, and to also comply with the US Constitution
19  one person, one vote requirement.  That is the reason
20  why District Two is drawn around Orleans Parish, while
21  District Six includes the Black population of East Baton
22  Rouge Parish and travels up the I-49 quarter to include
23  Black population in Shreveport.  While this is a
24  different map than the Plaintiffs' litigation have
25  proposed, this is the only map I reviewed that

Page 7

1  accomplishes the political goals I believe that are
2  important for my district, for Louisiana, and for the
3  country.
4      While I did not draw these boundaries myself,
5  I carefully considered the number of different map
6  options.  I firmly submit that the congressional voting
7  boundaries represented in this bill best achieve the
8  goals of protecting Congresswoman Letlow's seat,
9  maintaining a strong district for Speaker Johnson, as
10  well as Majority Leader Steve Scalise, ensuring four
11  Republican districts, and adhering to the command of the
12  Federal Court in the Middle District of Louisiana.  And
13  I ask for favorable passage.
14      MALE SPEAKER:  We have -- we have one question
15  by Senator Morris for --
16      SENATOR MORRIS:  Senator Womack, among the
17  factors that you considered was the community of
18  interest of the district.  Something that was considered
19  in coming up with this version of the map that we have
20  before us.
21      SENATOR WOMACK:  Senator Morris, this map was
22  strictly drawn from the political aspect of our
23  congressman in -- in office is how it was drawn.
24      SENATOR MORRIS:  Did -- you didn't consider
25  the community of interest of people having something in

Page 8

1  common with one another within the district?
2      SENATOR WOMACK:  No, I didn't because it was
3  -- it was -- we had to draw two districts, and that's
4  the only way we could get two districts.  One of the
5  ways we could get two districts, and still protect our
6  political interest.
7      SENATOR MORRIS:  Well, one of the things you
8  said earlier was that -- that we had in common the
9  agriculture.  You mentioned that.  That's a community of
10  interest.  So you did consider agriculture as being
11  something that everybody had in common with this
12  district, or?
13      SENATOR WOMACK:  My comment was -- was the
14  fact that it was along that corridor.  Ag was along that
15  corridor some -- some -- not so much in that community
16  interest.  Just maintaining -- bringing out the fact
17  that I-49 does go through there, and it does encompass
18  your -- your timberland, your ag, your hospitals.  Just
19  trying to bring to light some of the positives going up
20  that corridor.
21      SENATOR MORRIS:  So would you -- would you say
22  that the heart of this district is Northeast Louisiana
23  and North Central Louisiana?
24      SENATOR WOMACK:  I wouldn't say the heart of
25  the district is that way, but the way the district -- to

Page 9

1  pick up the -- the -- and honor the courts, it had to be
2  drawn like it had to be drawn to pick that up.
3      SENATOR MORRIS:  So the -- is there a heart of
4  the district?
5      SENATOR WOMACK:  If it is, it'll be a small
6  majority of the heart.  I don't think it's a -- it's a
7  -- it -- it has a heart of the district, but it had to
8  start somewhere.
9      SENATOR MORRIS:  Do you know what the most
10  populated parish is of Congressional District Five at
11  the current moment?
12      SENATOR WOMACK:  I do not.  I hadn't looked at
13  that to -- to prove that myself.  I (inaudible 0:08:54)
14  -- could be Ouachita Parish.
15      SENATOR MORRIS:  Right.  So Ouachita Parish,
16  which is the most populated parish in Congressional
17  District Five, which you seek to protect for
18  Congresswoman Letlow.  Your map cuts Ouachita Parish
19  into various pieces, does it not?  And puts a lot of
20  that in Congressman Johnson's District Four, correct?
21      SENATOR WOMACK:  That's true.  The way the map
22  is drawn.  That's in my bill.  That is the way it's
23  drawn.
24      SENATOR MORRIS:  And like you, your -- I -- I
25  think you indicated that Congresswoman Letlow is your

PohlmanUSA Court Reporting
(877)  421-0099      PohlmanUSA.com

Page 10

1   congressperson, and -- and it's important to you for her
2   to remain to be your Congresswoman; is that correct?
3        SENATOR WOMACK:  Very important.
4        SENATOR MORRIS:  Well, under your map, I would
5   be Congressman Johnson's -- in his district, and so
6   would Senator Cathey, and so would Representative
7   Echols; is that correct?
8        SENATOR MORRIS:  That would be correct.  I
9   don't -- I know -- I've been to your house, but I hadn't
10  been in any of the others, but I think you're correct.
11       SENATOR MORRIS:  So that would be important to
12  me; did you know?  But -- but this district as it's
13  drawn now, would move Lincoln Parish and Louisiana Tech
14  into Congressman Johnson's district; would it not?
15       SENATOR WOMACK:  That's a possibility.
16       SENATOR MORRIS:  Well, your map does -- map
17  does put Lincoln Parish -- all of Lincoln Parish into
18  Congressman Johnson's district; does it not?
19       SENATOR WOMACK:  It does do that, yes.
20       SENATOR MORRIS:  So -- but the district does
21  reach down into Baton Rouge; does it not?
22       SENATOR WOMACK:  It does.
23       SENATOR MORRIS:  And the district includes
24  Tiger Stadium in the district and also Joe Aillet
25  Stadium at -- in Louisiana Tech in Ruston.

Page 11

1        SENATOR WOMACK:  In the minority district, in
2   district -- in District Two -- or District Six.
3        SENATOR MORRIS:  Isn't it true that Tiger
4   Stadium in your -- on your map is located in
5   Congresswoman Letlow's district?
6        SENATOR WOMACK:  Yes.
7        SENATOR MORRIS:  And so is Joe Aillet Stadium
8   at Louisiana Tech.
9        SENATOR WOMACK:  Not -- not in -- not in that
10  district.  She don't go into -- under my map, she
11  doesn't go into Ruston.
12       SENATOR MORRIS:  Under your map, all of
13  Lincoln Parish is in Congresswoman -- that's Lincoln on
14  the map right there.  That's where Ruston is.
15       SENATOR WOMACK:  Right.
16       SENATOR MORRIS:  And so that is Congresswoman
17  -- that would be -- it's currently Congresswoman
18  Letlow's, but now it's going to be Congressman
19  Johnson's.
20       SENATOR WOMACK:  Right.
21       SENATOR MORRIS:  Okay.  Right.
22       SENATOR WOMACK:  Yeah.
23       SENATOR MORRIS:  So they will be in different
24  districts.  Tiger Stadium will be in Congresswoman -- I
25  mean, yeah, Congresswoman Letlow's district, but

Page 12

1   Louisiana Tech will be in Congressman Johnson, even
2   though Louisiana Tech is only 30 mile -- 30, 40 miles
3   away from Congresswoman Letlow's home.
4        SENATOR WOMACK:  I -- I agree with that --
5   with that totally, where we had to draw two minority
6   districts.  That's -- that's the way the numbers worked
7   out.  You've worked with -- with -- with redistricting
8   before, and that's -- that's -- you have to -- you have
9   to work everybody around the best you can.  This is --
10       SENATOR MORRIS:  Well, as of yesterday before
11  Committee, the map -- my home and Senator Cathey's home,
12  but you amended it to put even more in Congressman
13  Johnson's district; did you not?
14       SENATOR WOMACK:  Senator Morris, my
15  understanding that -- that -- that my amendment put you
16  all in Congresswoman Letlow's district.
17       SENATOR MORRIS:  In Congressman Johnson's
18  district under the -- under your amendment because it
19  added more Ouachita Parish into District Four; did it
20  not?
21       SENATOR WOMACK:  My understanding that when we
22  moved that, that it added y'all.  I could be wrong on
23  that, but it added y'all.
24       SENATOR MORRIS:  The -- the amendment as I
25  understand it and looked at it in Committee before

Page 13

1   yesterday, the bill was filed -- but now, under the
2   current version of the bill, I am in Congressman
3   Johnson's district.
4        SENATOR WOMACK:  Okay.
5        SENATOR MORRIS:  Don't you think we should
6   have moved -- included Louisiana Tech and Ouachita
7   Parish in the Northeast Louisiana Congressional
8   District?
9        SENATOR MORRIS:  Senator Morris, it's -- it's
10  a lot of could have, and -- and I regret that
11  it's not, but we also have to look at the other members
12  of Congress, and what we can live with concerning that.
13       SENATOR MORRIS:  If your bill gets out of --
14  off the floor today and goes over to the House, would
15  you be amenable to amendments that would allow this
16  district, as long as all the other requisites are -- are
17  there for -- to comply with the judge's order, and to
18  comply with, you know, the -- the community of interest
19  and all the other redistricting principles that we have
20  to abide by?
21       SENATOR WOMACK:  Senator Morris, I have no
22  problem in that, as long as it -- it -- it -- it
23  meets the requirements of the bill.
24       SENATOR MORRIS:  Thank you, Senator.  I
25  appreciate your efforts, and I'm hopeful that we can --

4  (Pages 10 to 13)

Page 14

1  as if -- assuming the bill does move, that we can
2  perhaps find a resolution that can make everybody, if
3  not absolutely happy, a little happier.  Thank you.
4      SENATOR WOMACK:  Thank you, Senator Morris.
5      MALE SPEAKER:  Senator Stine for the floor.
6      (Pause.)
7      SENATOR STINE:  Thank you, Mr. President.
8  Members of this esteemed chamber, today we stand at a
9  crossroads, burdened with a decision that weighs heavily
10  on each of us.  The congressional map before us, a
11  construct far from our ideal, now demands our reluctant
12  endorsement.  It pains me, as it does many of you, to
13  navigate these troubled waters not of our own making,
14  but of a heavy-handed, Obama-appointed federal judge,
15  who has regrettably left us little room to maneuver.
16  This map, imperfect as it is, stands as a bulwark
17  protecting not just lines on a map, but the very pillars
18  of our representation in Congress.
19      It safeguards the positions of pivotal
20  figures, the United States Speaker of the House, the
21  majority leader, and notably, the sole female member of
22  our congressional delegation.  Her role is not merely
23  symbolic.  She is a lynchpin in the appropriations,
24  education, and workforce committees which are vital to
25  the prosperity and well-being of our state.  We are the

Page 15

1  guardians of Louisiana's voice on the national stage.
2  Our decision today, while constrained, is crucial.
3      It's about more than lines on a map.  It's
4  about ensuring our state's continued influence in the
5  halls of power where decisions are made that affect
6  every citizen we represent.  So with a heavy heart, but
7  a clear understanding of the stakes, unfortunately, we
8  must pass this map before us instead of giving the pen
9  to a heavy-handed, Obama-appointed federal judge who
10  seeks to enforce her will on the legislature.  Into an
11  untenable situation, rather than acting as a co-equal
12  branch of government as laid out in our constitution.
13      MALE SPEAKER:  Senator Carter for the floor.
14      SENATOR CARTER:  Thank you, Mr. President,
15  members.  This proposed map by Senator Womack -- well,
16  let me start with the current district, District Two.
17  The current African American voting age population in
18  District Two is currently 58 percent.  This map proposed
19  by Senator Womack reduces it to barely 51 percent, and,
20  Committee, the bill's author testified that no sort of
21  performance analysis had been conducted to determine
22  whether or not District Two continues to consistently
23  perform as an African American district.  There are
24  serious concerns about this map.  There are serious
25  concerns about this proposal.

Page 16

1      Despite those concerns, I stand in support of
2  this legislation.  It still needs work, it must be
3  amended, but I stand in support of it today, and I speak
4  only for today.  I would like to read to you all a
5  statement from Congressman Carter, who currently
6  represents the Second Congressional District.  Many of
7  us served with him either when we were in the House, or
8  those of us who served with him in the Senate.  Here's a
9  statement.
10      "My dear friends and colleagues, as I said on
11  the steps of the capital, I will work with anyone who
12  wants to create two majority-minority districts.  I am
13  not married to any one map.  I have worked tirelessly to
14  help create two majority-minority districts that
15  perform.  That's how I know that there may be better
16  ways to create -- to craft both of these districts.
17  There are multiple maps that haven't been reviewed at
18  all.  However, the Womack map creates two
19  majority-minority districts, and therefore I am
20  supportive of it.  And I urge my former colleagues and
21  friends to vote for it while trying to make both
22  districts stronger with appropriate amendment."
23      "We do not want to jeopardize this rare
24  opportunity to give African American voters the equal
25  representation they rightly deserve."  And that's the

Page 17

1  statement from Congressman Troy Carter.  I expressed my
2  concerns.  They're serious concerns.  It is my
3  expectation and my hope that this bill continue to be
4  worked on, that amendments continue to happen, but today
5  I stand in support.  Thank you.
6      MALE SPEAKER:  Senator Jackson for the floor.
7      (Pause.)
8      SENATOR JACKSON:  He tried to cut off my mic.
9      (Pause.)
10      MALE SPEAKER:  Members, you have to talk
11  directly into the mic, unlike in previous times, where
12  you could kind of talk around the mic.  You have to
13  literally talk directly into the mic for it to work.
14  We're going to adjust that for the next --
15      SENATOR JACKSON:  Hello.  Okay.  Good.
16  (inaudible 0:23:11) was going to have a fit if I wasn't
17  able to speak.  I stand in support of this map.  I first
18  want to thank Senator Womack, who had the fortitude,
19  regardless of how we got here, but to stand up and do
20  what the last body couldn't do, and that's to come
21  together.  But I do stand to say this because I said it
22  in Committee.  I reluctantly came to the floor to
23  support this map because my constituents and a lot of
24  our constituents in North Louisiana right now are still
25  experiencing an ice state.  That's what I call it

Page 18

1   because we didn't get snow.
2          And so a lot of them don't even know that
3   we're down here right now passing maps.  And so this is
4   the first time in a long time I'm probably going to vote
5   for something that I haven't vetted through my
6   constituency because tonight, myself, Representative
7   Fisher and Representative Morrell will have a Zoom
8   community meeting to catch them up on what they have
9   lost while they were at home, because my legislative
10  assistant was finally able to get to the office and at
11  least send something out to our constituency.
12         However, at some point, what they did tell me
13  over and over again for the last year, year and a half
14  that we've been going through this process, that they
15  were supportive of fair and equitable maps, and that
16  they knew a fair and equitable -- equitable map would be
17  something that created fair representation for all
18  people in the State of Louisiana.  I will end with this.
19   I don't think we're in a -- in the hands of a
20  heavy-handed judge, but we're in the hands of
21  consequences that the last legislature created in our
22  failure to act.  And I say that with a heart of hope
23  that we act today on what is right, on what is just, and
24  what is fair.
25         I don't believe, and I said this before, any

Page 19

1   of my colleagues in this chamber would have it to be
2   that a certain group of people in the State of Louisiana
3   would not be properly represented.  I am an American who
4   stands every time the flag is presented.  I proudly say
5   one nation under God.  And I hope today that in this
6   senate we will stand as one Louisiana under God, because
7   God is for what's just and what's equitable and what
8   helps all people.
9          There is nothing that says that a second
10  African American serving in Congress in Louisiana will
11  not help the masses.  Well, if we think that, then we
12  think that we're less or better than a person based on
13  race.  If anyone in this chamber could articulate a
14  reason why they believe that any African American that
15  sits before you today wouldn't go to Congress with the
16  same zeal and vigor and heart for the people, then maybe
17  we can say that there's not an African American in this
18  state that's going to stand in Congress and represent
19  us.
20         But I literally do not believe that there's a
21  colleague in here that looks across this chamber at any
22  member of the Black caucus and does not believe that we
23  wouldn't go to Congress and represent Louisiana.  And so
24  I stand in support, with reluctancy of having to talk to
25  my constituents after this vote, but with carrying the

Page 20

1   spirit of fairness that they asked me to carry in the
2   last redistricting session.  And I want to thank Senator
3   Womack because the mark of a true leader is a leader
4   that not only does what he wants to do, but what's
5   necessary to bring resolve and wholeness to a body that
6   has to work together on a number of issues.  Thank you.
7          MALE SPEAKER:  Thank you, Senator Jackson.
8   Senator Duplessis for the floor.
9          SENATOR DUPLESSIS:  Thank you, Mr. President.
10  Thank you, Chairman Womack.  I just want to make a few
11  brief comments based on some comments that have been
12  made earlier today.  I was not necessarily planning to
13  speak, but I think it's important that I just share a
14  thought or two.  It was said that this is much more than
15  just lines on a map, and I agree.  It is much more than
16  just lines on a map.  We've heard a lot from Chairman
17  Womack and my colleague, Senator Stine about the
18  importance of protecting certain elected officials, but
19  it's about more than lines on a map.  It's about the
20  people of this state.  It's about one-third of this
21  state going underrepresented for too long.
22         It's about a federal law called the Voting
23  Rights Act that has not been interpreted just by one
24  judge in the Middle District of Louisiana who was
25  appointed by former president Barack Obama, but also a

Page 21

1   US Fifth Circuit Court of Appeals that's made up of
2   judges that were appointed by predominantly Republican
3   presidents, and a United States Supreme Court that has
4   already made rulings.  That has been made up of justices
5   that were appointed by a majority of Republican
6   presidents, primarily former president Trump.  This is
7   not about one judge that was appointed by former
8   president Barack Obama.  This is about the people of
9   this state, and one-third of that state, 33 percent, to
10  be exact, being underrepresented.
11         So I think it's important that we keep the
12  focus on why we're here today.  None of us want to be
13  here today.  We've been at this for well over two years,
14  and all of us have a level of reluctancy with the maps
15  that are before us.  Just like Senator Carter, I'm not
16  thrilled about what's happening to send it to
17  Congressional District Two, and the way that it's
18  lowering the numbers.
19         Senator Price and I, we coauthored a bill that
20  we felt performed better, but we too are going to
21  support this map because not only have we been ordered
22  to do it by, yes, a judge who was appointed by President
23  Obama, but if we felt like the -- the -- the -- the
24  appellate judges would overrule her, then we'd be right
25  back in court.  We're at the end of the road, and I too

Page 22

1  will support this -- this map.  Not because I think it's
2  perfect, not because I think it's the best thing that we
3  could do, but because it's time to give people of this
4  state fair representation.  Thank you.
5      MALE SPEAKER:  Thank you, Senator Duplessis.
6  Senator Pressly for the floor.
7      SENATOR PRESSLY:  Thank you, Mr. President,
8  and members.  Senators, I rise today in opposition of
9  this bill, and I rise in opposition because I represent
10  a community that's unique and wonderful in many ways,
11  very diverse, and clearly a passionate part of my life
12  in Northwest Louisiana.  I believe that Shreveport and
13  Bossier City and the surrounding parishes of De Soto and
14  Red River and Webster are unique from the rest of our
15  state, and I believe that commonalities of -- of
16  interest are important.
17      I agree with -- with Senator Jackson.  I would
18  have no issue whatsoever of having any member of this
19  body, and many others from throughout our state of any
20  background, of any creed, of any race represent our
21  great, wonderful, diverse state in Washington, DC.  But
22  I cannot support a map that puts Caddo Parish and
23  portions of my district, which is over 220 miles from
24  here, in a district that will be represented by someone
25  in East Baton Rouge that may or may not have ever even

Page 23

1  been to Northwest Louisiana, and certainly doesn't
2  understand the rich culture, rich, important uniqueness
3  of our area of the state.
4      When we look at -- at Louisiana, we often talk
5  about north and south, and that division is true.  It's
6  real.  I think all of us acknowledge that.  The I-10
7  corridor has unique needs.  When you look at -- at the
8  challenges that you face with storms, often you think of
9  hurricanes.  In North Louisiana, we think of tornados
10  and ice storms.  When you look at the -- the important
11  region of our states and the -- the diverse industries
12  that we have in Northwest Louisiana, Barksdale is
13  vitally important.  Certainly, having Barksdale and Fort
14  Johnson now, previously Fort Polk, together in one
15  district is the one positive thing that I see in this
16  map, and I think that is something that we must keep in
17  mind as we continue through this process.
18      But I am concerned with the important part of
19  -- of this state, Northwest Louisiana, not having the
20  same member of Congress.  With having a -- two members
21  of Congress, that has the potential to split our
22  community even further along a -- a -- a -- a --
23  line that's based purely on race, and I'm concerned
24  about that.  Therefore, I'm voting no, and I urge you to
25  do the same.

Page 24

1      MALE SPEAKER:  Thank you, Senator Pressly.
2  The board is clear.  Senator Womack, to close on your
3  bill.
4      SENATOR WOMACK:  Colleagues, appreciate the
5  questions and the comments, and I just ask that we move
6  this bill favorable.
7      MALE SPEAKER:  Senator Womack has moved
8  favorable passage of Senate Bill 8.  When the machines
9  are open, all those in favor, aye.  Those opposed, vote
10  nay.  Open the machines.  Madam Secretary, open the
11  machines.  Go to a machine, members.  Senator -- Senator
12  Miguez.  There we go.  Secretary, close the machines.
13  27 ayes, 11 nays.  The -- the -- the bill is passed.
14  Senator Womack moves of reconsideration.  The -- the
15  vote by which the bill was passed.  I lay the motion on
16  the table without objection.  So ordered.
17
18
19
20
21
22
23
24
25

Page 25

1      CERTIFICATE OF TRANSCRIPTION
2      I, Nathan Pikover, COO of TranscribeMe, Inc.,
3  do hereby certify that
4  290872-Audio-011724SCHAMB-Edited-Appended.json was
5  transcribed utilizing computer aided means and the
6  TranscribeMe transcription team.
7      The transcript of the audio mentioned above,
8  having been transcribed and reviewed by TranscribeMe,
9  Inc. to the best of the company's ability, is a full,
10  true, and correct transcription.
11      I further certify that neither I, nor the
12  TranscribeMe, Inc. transcription team, have any personal
13  association with the parties involved or are in any way
14  interested in the outcome thereof.
15      Dated this 8th of March, 2024.
16
17  Nathan Pikover, COO TranscribeMe, Inc.
18
19
20
21
22
23
24
25

7 (Pages 22 to 25)



**PohlmanUSA®**

## Court Reporting and Litigation Services

---

House Governmental Affairs **-** Audio Transcription

January 18, 2024

---

Phillip Callais, et al.

vs.

Nancy Landry

Page 2

1   Representative Larvadain.  Vice Chair Lyons.
2       VICE CHAIRMAN LYONS:  Present.
3       MS. BAKER:  Present.  Representative Marcelle.
4       REPRESENTATIVE MARCELLE:  Here.
5       MS. BAKER:  Present.  Representative Newell.
6       REPRESENTATIVE NEWELL:  Here.
7       MS. BAKER:  Present.  Representative
8   Schamerhorn.
9       REPRESENTATIVE SCHAMERHORN:  Here.
10      MS. BAKER:  Present.  Representative Thomas.
11      REPRESENTATIVE THOMAS:  Here.
12      MS. BAKER:  Present.  Representative Wright.
13  Representative Wyble.
14      REPRESENTATIVE WYBLE:  Here.
15      MS. BAKER:  Present.  We have 12 members in a
16  quorum.
17      CHAIRMAN BEAULLIEU:  Thank you, Ms. Baker.
18  Members, we have one item on the agenda today.  It's
19  Senate Bill 8 by Senator Womack.  Senator Womack is --
20  is delayed this morning, so what we're going to do --
21  until I hear back from Senator Womack, we're going to
22  stand at ease until then.  So we just ask you all to
23  kind of stay nearby.
24      We'll give you all some time to -- to be able
25  to get back, but until we hear back from Senator Womack,

Page 3

1   we're going to go ahead and stand at ease.  And so just
2   viewer -- members that are listening online or watching
3   online, just kind of be aware.  We are hoping to come
4   back in at some time later this morning.  Thank you all.
5       (Pause.)
6       CHAIRMAN BEAULLIEU:  Good afternoon, members,
7   viewing audience.  Thank you for your patience.  We are
8   ready to resume our House and Governmental Affairs
9   Committee.  Today is Thursday, January 18th, 2024.  Ms.
10  Baker, can you give me an updated roll call, please?
11      MS. BAKER:  Chairman Beaullieu.
12      CHAIRMAN BEAULLIEU:  Here.
13      MS. BAKER:  Present.  Representative Billings.
14      REPRESENTATIVE BILLINGS:  Here.
15      MS. BAKER:  Present.  Representative Boyd.
16      REPRESENTATIVE BOYD:  Present.
17      MS. BAKER:  Present.  Representative Carlson.
18      REPRESENTATIVE CARLSON:  Present.
19      MS. BAKER:  Present.  Representative Carter.
20  Representative Carver.
21      REPRESENTATIVE CARVER:  Here.
22      MS. BAKER:  Present.  Representative Farnum.
23      REPRESENTATIVE FARNUM:  Here.
24      MS. BAKER:  Present.  Representative Gadberry.
25      REPRESENTATIVE GADBERRY:  Here.

Page 4

1       MS. BAKER:  Present.  Representative Johnson.
2   Representative Larvadain.
3       REPRESENTATIVE LARVADAIN:  Here.
4       MS. BAKER:  Present.  Vice Chair Lyons.
5       VICE CHAIRMAN LYONS:  Present.
6       MS. BAKER:  Present.  Representative Marcelle.
7   Representative Newell.
8       REPRESENTATIVE NEWELL:  Here.
9       MS. BAKER:  Present.  Representative
10  Schamerhorn.
11      REPRESENTATIVE SCHAMERHORN:  Here.
12      MS. BAKER:  Present.  Representative Thomas.
13      REPRESENTATIVE THOMAS:  Here.
14      MS. BAKER:  Present.  Representative Wright.
15  Representative Wyble.
16      REPRESENTATIVE WYBLE:  Here.
17      MS. BAKER:  Present.  We have 13 in a quorum.
18      CHAIRMAN BEAULLIEU:  Thank you, Ms. Baker.
19  Members, we have one item on our agenda today.  That's
20  Senate Bill 8 by Senator Womack.  Ms. Lowery, would you
21  please read-in the bill?
22      MS. LOWERY:  Thank you so much, Mr. Chairman.
23  Members, Senator Womack brings Senate Bill Number 8 to
24  provide relative to the redistricting of Louisiana's
25  Congressional District, to provide with respect to

Page 5

1   positions and offices other than congressional based
2   upon congressional districts, and to provide related
3   matters.
4       CHAIRMAN BEAULLIEU:  Senior Womack, on your
5   bill.
6       SENATOR WOMACK:  Thank you, Mr. Chairman.
7   Committee members, good evening.  Thank you for letting
8   me come in today and present this bill.  As you know,
9   Louisiana Congressional Districts must be redrawn, given
10  the Federal Voting Rights Act litigation that is still
11  ongoing in the US District Court for the Middle District
12  of Louisiana.  The map and the bill that I'm
13  introducing, which is the product of a long, detailed
14  process, achieves several goals.
15      First, as you all are aware, Congresswoman
16  Julia Letlow is my representative in Washington, DC.
17  The boundaries in this bill I'm proposing, ensure that
18  Congresswoman Letlow remains both unpaired with any
19  other incumbents, and in the congressional district that
20  should continue to elect a Republican to Congress for
21  the remainder of this decade.
22      I have great pride in the work that
23  Congresswoman Letlow has accomplished, and this map will
24  ensure that Louisianans will continue to benefit from
25  her presence in the halls of Congress for as long as she

2  (Pages 2 to 5)

## Page 6

1    decides and continues to serve our great state.  As you
2    know, Congresswoman Letlow sits on appropriations.  She
3    sits on ag, which is a big part of my district.
4            Second, the Louisiana 6th Congressional
5    District.  The map and the proposed bill ensures that
6    four are safe Republican seats.  Louisiana's Republican
7    present in the United States Congress has contributed
8    tremendously to the national discourse, and I'm very
9    proud that both Speaker of the US House of
10   Representatives, Mike Johnson, and US House Majority
11   Leader Steve Scalise are both from our great state.
12           This map ensures that the two of them will
13   have solidly Republican districts at home, so they can
14   focus on the national leadership that we need in
15   Washington, DC.  The map proposed in this bill ensures
16   that the Conservative principles retained by the
17   majority of those in Louisiana will continue to extend
18   past our boundaries to our nation's capital.
19           Third, the map that I've presented is -- goes
20   along the Red River.  It's the I-49 corridor.  We have
21   commerce through there.  We have a college through
22   there.  We have a lot of ag cattlemen as well as farm
23   row crop, and a lot of people up through that corridor
24   comes back to Alexandria using that corridor for their
25   healthcare.  Finally, these maps in the proposed bill

## Page 7

1    respond appropriate to the ongoing Federal Voting Rights
2    Act case in the Middle District of Louisiana.
3            For those who are unaware, the congressional
4    maps that we enacted in March 2022 have been the subject
5    of litigation, roughly since the day the 2022
6    Congressional Redistricting Bill went into effect and
7    even before we enacted it.  After a substantial amount
8    of prolonged litigation, the Federal District Court has
9    adhered to its view that the federal law requires that
10   the state have two congressional districts with a
11   majority of Black voters.
12           Our secretary of state, attorney general, and
13   our prior legislative leadership appealed, but have yet
14   to succeed, and we are now here because of the Federal
15   Court's order that we have a first opportunity to act.
16   The District Court's order that we must have two
17   majority Black voting age population districts, combined
18   with the political imperative I just described, have
19   largely driven the boundaries for District 2 and
20   District 6, both of which are over 50 percent Black
21   voting age population.
22           Given the state's current demographics, there
23   is not enough high -- high enough Black population in
24   the southeast portion of this -- Louisiana to create two
25   majority Black districts, and to also comply with the US

## Page 8

1    Constitution one person, one vote requirement.  That is
2    the reason why District 2 is drawn around the Orleans
3    Parish and why District 6 includes the Black population
4    of East Baton Rouge Parish and travels up I-49 corridor
5    to include Black population in Shreveport.
6            While this is a different map than the
7    plaintiffs' litigation have proposed, this is the only
8    map I reviewed that accomplishes the political goals I
9    believe are important for my district, for Louisiana,
10   and for the country.
11           While I did not draw these boundaries myself,
12   I carefully considered a number of different map
13   options, and I firmly submit the congressional voting
14   boundaries represented in this bill best achieve the
15   goals for protecting Congressman Letlow's seat,
16   maintaining strong districts for Speaker Johnson and
17   Majority Leader Scalise, ensuring four Republican
18   districts, and adhering to the command of the Federal
19   Court in the Middle District of Louisiana.  I'd be happy
20   to answer any questions.
21           CHAIRMAN BEAULLIEU:  Thank you, Senator
22   Womack.  Representative Marcelle for a question.
23           REPRESENTATIVE MARCELLE:  Thank you, Senator
24   Womack, for presenting this bill.  Were -- did you have
25   the opportunity to view the map that I filed?

## Page 9

1            SENATOR WOMACK:  I -- I reviewed several maps,
2    Representative Marcelle.
3            REPRESENTATIVE MARCELLE:  HB5.
4            SENATOR WOMACK:  HB5.  I didn't -- I didn't
5    look at the HB5 --
6            REPRESENTATIVE MARCELLE:  Did not.
7            SENATOR WOMACK:  -- per se.  I looked at
8    several maps.  One of them could have been that.
9            REPRESENTATIVE MARCELLE:  Okay.  Because I
10   heard you say that you thought that your map was the
11   best possible route.  A pathway to get to what we needed
12   to, first of all, make sure that we get out of the
13   litigation, apply with Section 2, and go about the
14   deviations and the compactness and all of those
15   different things that we needed to do in order to create
16   a second Black seat -- congressional seat.  Is that what
17   I heard you say?
18           SENATOR WOMACK:  Yes, ma'am.
19           REPRESENTATIVE MARCELLE:  Okay.  Well, I -- I
20   certainly want to thank you, and I know -- I spoke to
21   you yesterday about putting an amendment on your bill to
22   make sure that we could reduce the parish splits and
23   that we had some conversations, and it's a short period
24   of time.  Certainly, I don't know when the amendments
25   are going to be offered up, but I certainly want to go

Page 10

1  down those same lines of -- since I could not get my map
2  through, which I thought was the best path, that I -- I
3  would support this map, with some cleanup done to it.
4       So I -- I just want to make sure that I go on
5  the record of saying that I spoke to you.  The things
6  that my amendment would do would certainly be to add Red
7  River Parish to Congressional District 6, and preserving
8  the things in Red River community as well.  So I want to
9  go on the record of saying that -- I believe that we
10  have had several maps that would have gotten us there,
11  but I think because of political reasons, we are here
12  where we are today.
13       CHAIRMAN BEAULLIEU:  Representative Marcelle,
14  just if I can chime in for a second, so I can let the
15  viewing members know that online there are two different
16  amendments that -- that will likely be proposed today,
17  and both of those are available online for the -- for
18  the viewing public.  If we could hold off on those
19  amendments for -- we have a -- a handful of questions on
20  the board, Representative Marcelle, and then we'll come
21  back.  Is that okay with you?
22       REPRESENTATIVE MARCELLE:  Yes.  I just --
23       CHAIRMAN BEAULLIEU:  Okay.  Good.
24       REPRESENTATIVE MARCELLE:  I just wanted to --
25  to make mention to that why -- why I was asking him some

Page 11

1  of the questions.  So when you did this map, you -- you
2  considered the population deviation.
3       SENATOR WOMACK:  Well, we had -- had to -- to
4  create the two districts, we had to think about the
5  population.
6       REPRESENTATIVE MARCELLE:  And the parish
7  splits as well?
8       SENATOR WOMACK:  The parish splits as well.
9       REPRESENTATIVE MARCELLE:  So you felt like
10  this was the best pathway after you viewed those areas
11  that we certainly had to do to enact this map.
12       SENATOR WOMACK:  Representative Marcelle, I --
13  I -- I want to be -- and -- and I -- I was hoping that
14  it -- that covered that in my opening statement, but it
15  -- it -- my map is politically drawn to protect our
16  members of Congress as it stands, as well as create the
17  two districts, minority district, Black districts.
18       REPRESENTATIVE MARCELLE:  So in your opinion,
19  your map does two things.  It satisfies the Court, and
20  it also protects the politics, or our congressional
21  members.  Is that -- is that --
22       SENATOR WOMACK:  Yes, ma'am.
23       REPRESENTATIVE MARCELLE:  -- accurate to say?
24       SENATOR WOMACK:  Yes, ma'am.
25       REPRESENTATIVE MARCELLE:  Okay.  Thank you

Page 12

1  very much and thank you for your work.
2       SENATOR WOMACK:  Thank you.
3       CHAIRMAN BEAULLIEU:  Thank you, Representative
4  Marcelle.  Representative Boyd.
5       REPRESENTATIVE BOYD:  Good afternoon, Senator.
6  How are you?
7       SENATOR WOMACK:  Fine, thank you.
8       REPRESENTATIVE BOYD:  So I agree with Rep
9  Marcelle.  This is not, in my opinion, the best map that
10  I've seen, but I do understand what it took to get here,
11  and my congressman seems to also be in support of the
12  map.  Therefore, I do plan on supporting the map,
13  hopefully with some amendments.  Are you open to an
14  amendment on this?
15       SENATOR WOMACK:  Yes, ma'am, once -- once I
16  see some amendments.
17       REPRESENTATIVE BOYD:  Okay.
18       SENATOR WOMACK:  You know, we'll look at
19  amendments.
20       REPRESENTATIVE BOYD:  And then she mentioned
21  the parish splits.  How many parish splits are they; do
22  you know?
23       SENATOR WOMACK:  I think we're 16 at the -- at
24  the present time.
25       REPRESENTATIVE BOYD:  And do you know the

Page 13

1  BVAPs for 2 and 6?
2       SENATOR WOMACK:  I'm sorry?
3       REPRESENTATIVE BOYD:  The BVAPs for 2 and 6,
4  do you know what they are right now?
5       SENATOR WOMACK:  No, I don't.
6       REPRESENTATIVE BOYD:  Okay.  Did you have any
7  communication with anybody from -- with community
8  influences on this?  Have you met with other groups?
9  Who did you meet with to come up with this map?
10       SENATOR WOMACK:  I've had several meetings
11  over the period of time with several groups.
12       REPRESENTATIVE BOYD:  With community of
13  interest as well?
14       SENATOR WOMACK:  It -- it was hard to -- to
15  create communities of interest with this map and -- and
16  -- and still achieve some of the goals that we were
17  trying to achieve from the congressional, political
18  standpoint.
19       REPRESENTATIVE BOYD:  Okay.  Again, based on
20  the map and my conversation with our congressman, if we
21  can get some things cleared up and straightened up on
22  it, I would be in support of the bill as well.
23       SENATOR WOMACK:  Okay.  Thank you.
24       CHAIRMAN BEAULLIEU:  Thank you, Representative
25  Boyd.  Representative Newell.

4 (Pages 10 to 13)

Page 26

1   there was another map. There's a lot cleaner map
2   because the map that I see goes from Shreveport to Baton
3   Rouge, which you're just zigzagging. And you picked up
4   Alexandria, you picked up Natchitoches, you picked up
5   DeSoto, but it's more of a political map. The map that
6   the Democrats pursued, it was a map that we agreed on
7   two majority-minority districts, and this is more of a
8   political map.
9       SENATOR WOMACK: Yeah, I know.
10      REPRESENTATIVE LARVADAIN: Okay. Thank you.
11      SENATOR WOMACK: Thank you.
12      CHAIRMAN BEAULLIEU: Senator Womack, why are
13  we here today? What -- what brought us all to this
14  special session as it -- as it relates to you, know,
15  what we're discussing here today?
16      SENATOR WOMACK: The middle courts of the
17  district courts brought us here from the Middle
18  District, and said, "Draw a map, or I'll draw a map."
19      CHAIRMAN BEAULLIEU: Okay.
20      SENATOR WOMACK: So that's what we've done.
21      CHAIRMAN BEAULLIEU: And -- and were you --
22  does -- does this map achieve that middle court's
23  orders?
24      SENATOR WOMACK: It does.
25      CHAIRMAN BEAULLIEU: Okay. When you were

Page 27

1   drawing the maps, you also took into consideration
2   incumbency, correct?
3       SENATOR WOMACK: Right.
4       CHAIRMAN BEAULLIEU: Okay. To protect not
5   just our state, but our national interest as well.
6       SENATOR WOMACK: Our national.
7       CHAIRMAN BEAULLIEU: Is that correct?
8       SENATOR WOMACK: Right.
9       CHAIRMAN BEAULLIEU: This is -- this is bigger
10  than just us.
11      SENATOR WOMACK: It's bigger than just us, and
12  Louisiana has never been sitting in the poor position
13  that they are today.
14      CHAIRMAN BEAULLIEU: What -- what position
15  does Congressman Mike Johnson have in the United States
16  House of Representatives?
17      SENATOR WOMACK: He's a speaker of the house.
18      CHAIRMAN BEAULLIEU: Okay. And what about
19  Congressman Steve Scalise?
20      SENATOR WOMACK: Majority leader of the house.
21      CHAIRMAN BEAULLIEU: Okay. So if we've been
22  able to accomplish what the judge has ordered through
23  your map, and also been able to protect the political
24  interest, that is kosher, correct?
25      SENATOR WOMACK: That's exactly.

Page 28

1       CHAIRMAN BEAULLIEU: Okay. That's what --
2   that's what I was thinking. That's what I've learned
3   through the process, and I just wanted to make sure that
4   your map achieved that. Yeah.
5       SENATOR WOMACK: Yes, sir, Mr. Chairman.
6       CHAIRMAN BEAULLIEU: All right. Senator, the
7   board's cleared. We're going to go ahead, if you don't
8   mind, and -- and take up the amendments right now. Bear
9   with me for two seconds. Senator Marcelle, and -- and
10  -- excuse me. Sorry about that promotion,
11  Representative Marcelle.
12      REPRESENTATIVE MARCELLE: That's okay.
13      CHAIRMAN BEAULLIEU: And -- and Representative
14  Farnum both have amendments.
15      FEMALE SPEAKER 2: Here. This card's in
16  Marcelle's name.
17      CHAIRMAN BEAULLIEU: Okay. Hold that -- hold
18  that for me. Bear with me. So the first amendment is
19  how -- is Amendment 68. That is Amendment 60. Give me
20  a second while it's loading. What amendment is 68?
21      MS. LOWERY: That is the one offered by
22  Representative Farnum.
23      CHAIRMAN BEAULLIEU: Representative Farnum,
24  we're going to take up your amendment first.
25  Representative Farnum, on your amendment.

Page 29

1       REPRESENTATIVE FARNUM: Thank you, Mr.
2   Speaker. So I offer -- does -- do we need to read it
3   in?
4       MS. LOWERY: Certainly.
5       CHAIRMAN BEAULLIEU: Ms. Lowery, please
6   read-in the amendment.
7       MS. LOWERY: Thank you so much, Mr. Chairman.
8   Representative Farnum is offering up HCASBA-36268. And
9   on page 1, it's going to delete lines 13 through 17, and
10  delete pages 2 through 6, and we'll be inserting a new
11  district configuration for the congressional districts
12  for the State of Louisiana. This amendment is available
13  online and is available in your packets, members, and
14  contains maps and statistics relevant to the plan.
15      CHAIRMAN BEAULLIEU: Thank you, Ms. Lowery.
16  Representative Farnum, on your amendment.
17      REPRESENTATIVE FARNUM: Thank you, Mr.
18  Chairman. So in the -- in the beginning of this
19  process, me and my colleagues from Southwest Louisiana
20  set out to accomplish making Calcasieu whole. In the
21  history of -- of our -- our great parish, we've always
22  had one congressman that represented us. And -- and --
23  and with the current map as presented from Senator
24  Womack, it -- it split Calcasieu Parish basically in
25  half in population. And -- and with the community of

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 74

1   or COI landmark.  So thinking of school districts or
2   hospitals, airports, everything else when you're looking
3   at that metric, all I can speak to -- I can't speak to
4   this amendment.  I just saw it.  But in terms of
5   landmark place splits, the map that we had proposed had
6   the exact same amount as the enacted map.
7        So that was another metric that, in our
8   process, we were able to hold ourselves accountable to,
9   to making sure our map was as good as or, in most of the
10  instances, better than the enacted map.
11       CHAIRMAN BEAULLIEU:  So, Representative Wyble,
12  what we can do -- I know you're a big school board guy.
13  Why don't we get you with them afterwards, and y'all can
14  talk in some details on that?
15       MS. WENGER:  We've got slide decks on this.
16       CHAIRMAN BEAULLIEU:  Right.  No.  They have --
17  they have -- they have tons of information.
18       MS. WENGER:  I'd be happy to provide it for us
19  anytime.
20       REPRESENTATIVE WYBLE:  Thank -- thank you so
21  much.
22       MS. WENGER:  Thank you.
23       CHAIRMAN BEAULLIEU:  Thank you, Representative
24  Wyble.  Members, that clears the board.  Representative
25  Farnum has a motion on the table to adopt Amendment Set

Page 75

1   68.  And objection -- what's that?
2        VICE CHAIRMAN LYONS:  (inaudible 1:22:44).
3        CHAIRMAN BEAULLIEU:  Oh, oh.  One second,
4   Members, Vice Chairman Lyons.
5        VICE CHAIRMAN LYONS:  Thank you, Mr. Chairman.
6   And I was going to address this -- this to
7   Representative Farnum on -- on your amendment.  And
8   after the table was just -- was clear with that
9   information, now, I -- I just want to say that the past
10  two years, I've been through every roadshow throughout
11  this state.
12       I was in Calcasieu, and I heard the testimony
13  there.  And I -- I sympathize in it with the individual
14  residents there as they talked about being whole as
15  other communities of interest throughout the state.
16  That was the most impacting testimony that we received
17  throughout this process.  And it went on for not only
18  from our community to your community, everywhere else.
19       And the question remains always - and we don't
20  have an answer for - is: can we draw the perfect map?  I
21  don't think we ever can draw the perfect map.  I don't
22  think that there's ever going to be a situation where
23  everybody's going to be happy or even whole.
24       But I'm looking at the mission that we have
25  here.  And the mission that we have here is that we have

Page 76

1   to create two majority-Black districts.  And performance
2   of those maps that we saw earlier, some that didn't make
3   it through, some that were here, including yours,
4   Senator Womack, some of them perform.  Some perform
5   better than others.
6        But we have to look at the -- the -- the
7   center of this piece, and that is to create those
8   districts that perform.  And some of that's going to be
9   for debate and some that's going to be for the -- the
10  clearing pieces to happen as we go forward.
11       But I just want to put on the record, you
12  know, that I know the senators worked hard on this
13  piece.  And that goal is what was in mind, to create
14  these two majority-Black districts and to do it with as
15  much of the criteria as possible to be done to -- to
16  make sure that it -- it -- it is conforming.
17       And -- and with that being said, I wanted to
18  get that clear of what that message is and what we're
19  doing here, which you remember before we -- we go with
20  this piece.  And I wanted to say that, Mr. Chairman, as
21  we go forward in this opportunity.  Thank you.
22       CHAIRMAN BEAULLIEU:  Thank you, Vice Chairman
23  Lyons.  Members, back on the motion, we have a -- a
24  motion by Representative Foreman to adopt -- Farnum to
25  adopt Amendment Set 68.  Is there any objections to the

Page 77

1   adoption of that amendment set?  Hearing no -- no
2   objection, Amendment Set 68 is -- is hereby adopted.
3        On to the next amendment.  We have Amendment
4   Set 70, I believe, Representative Marcelle.
5   Representative Marcelle, on -- on your amendment.
6        REPRESENTATIVE MARCELLE:  That's amendment
7   (inaudible 1:25:52).
8        CHAIRMAN BEAULLIEU:  Or Ms. Lowery, would you
9   mind reading that in?
10       REPRESENTATIVE MARCELLE:  I just missed my
11  objection -- amendment.
12       MS. LOWERY:  Thank you, Mr. Chairman.
13  Representative Marcelle brings Amendment Set HCASB-8362,
14  number 70.  This is available, Members, in front of you,
15  and also for members of the public, it's available
16  online.
17       CHAIRMAN BEAULLIEU:  Representative Marcelle,
18  on your amendment.
19       REPRESENTATIVE MARCELLE:  Thank you.
20  Amendment Number 3 adds River -- the Red River Parish to
21  Congressional District 6, better preserving the Red
22  River community of interest and the community of
23  interest formed by Red River, Natchitoches, and DeSoto
24  Parishes.  It also makes Ouachita Parish whole in
25  Congressional District 5.

20  (Pages 74 to 77)

Page 86

1  decision.
2       Well, her actual order says that the
3  plaintiffs, when they went into Court for a preliminary
4  injunction, never tried on the merits, just a summary
5  proceeding, said that they had carried their burden of
6  showing that the current map violates Section 2 of the
7  Voting Rights Act and that the plaintiffs had a
8  substantial likelihood of making their claim successful,
9  which is that we'll have a second minority district in
10  Louisiana.
11       But there was no trial on the merits.  But the
12  judge essentially said, if we have a trial on the
13  merits, I'm going to rule in favor of the plaintiffs,
14  and I'm going to create a second majority-minority
15  district in Louisiana.  That's exactly what this bill is
16  doing right now.
17       And if our current map goes -- if you do
18  nothing and our current map goes back before Judge Dick,
19  she's going to probably end up doing the same thing.
20  But at least we have a chance to fight for the current
21  map in our state.  And no matter how she rules, we have
22  the Fifth Circuit Court of Appeal, and we have the US
23  Supreme Court,
24       And, again, everything is at stake, and it
25  seems like we're simply giving it all away right now.

Page 87

1  We believe that this is worth fighting for.  We believe
2  that that balance of power is worth fighting for,
3       And I would remind the members of this panel
4  that I know, some of whom we helped get elected, along
5  with Governor Landry whom we worked very hard for and
6  who we respect and think he's going to be a great
7  governor, that the citizens of Louisiana worked very
8  tirelessly to get you elected to come here, not to cave
9  in to political pressure, which is it appears to
10  hundreds and hundreds of citizens across the state that
11  that's what you're doing.  You're caving in to political
12  pressure, and you're giving in without a fight.
13       Speaker Mike Johnson has weighed in on this.
14  We heard some testimony earlier that Congressman Johnson
15  apparently was okay with this proposed legislation.
16  That's not our legislation.  That's not our
17  understanding at all.  In fact, Congressman Johnson
18  specifically said that our current map from 2022 needs a
19  full trial on the merits, with appellate review all the
20  way to the Supreme Court, if necessary, because the
21  issue is so profoundly important to the future of this
22  republic.  I will -- I want to reiterate before I close,
23  as I said, people all over the state are watching this
24  right now, many of whom voted for you to come here, some
25  of you who were just elected very recently.

Page 88

1       And if six months or a year from now, the
2  United States Congress is controlled by Democrats, it
3  started in this house, it started and ended in this
4  capital, and that's what will have made it possible.
5  And the citizens of Louisiana, I can tell you, will have
6  a very, very good memory if that occurs.  I would
7  respectfully submit that your responsibility is to
8  represent the interests of the substantial majority of
9  Louisiana citizens and not to cave to political
10  pressure.  And we're asking you to defeat this
11  legislation.  Thank you.
12       CHAIRMAN BEAULLIEU:  Thank you, Mr. Alexander,
13  And look just to -- to -- and -- and you got a couple
14  of questions.  But just from -- from my standpoint, I
15  sat on the committee when we drew the other maps that we
16  all believe were fair, and we believe is representative
17  of the state of Louisiana.  The Fifth Circuit sent it
18  back to the federal judge and basically held us hostage
19  that if -- if we don't do it, she's going to do it.  And
20  so none of us like the position we're in.
21       But -- you know, and -- and a little bit to
22  your point, we were elected to serve, and we feel that
23  -- that we would prefer to have the lines drawn in this
24  committee than have some Obama-appointed judge drawing
25  the lines for us.  And so we don't like it.  It's

Page 89

1  painful to do.  And so I feel your sentiment, and -- and
2  I don't -- I'm not disagreeing with most of what you
3  said.  I mean, it's -- it's -- it's -- it's what goes on
4  in a lot of our minds.  So I -- I appreciate your
5  comments.  Thank you.  And you do have -- you do have a
6  question.  Representative Newell.
7       REPRESENTATIVE NEWELL:  Thank you very much,
8  Mr. Chairman.  I'm troubled by your statements because
9  this is not a process by which one party is losing
10  power, caving into another party.  This is a process by
11  which the other 30 percent of the people in this state
12  are trying to get the representation that their
13  population and numbers deserve in Congress.  This isn't
14  a caving in or power grab or giving away of power or
15  losing of power of the Republican Party.
16       It's an opportunity for this body to represent
17  all of the people that they supposed to represent in
18  their district, listening to them and giving them the
19  opportunity to vote for someone of their choice, whether
20  that person of their choice is a Black Republican or
21  White Democrat.  It's an opportunity for Black people,
22  as some of my colleagues would prefer to be said, but a
23  minority-majority district to have the opportunity to
24  vote for their candidate of choice.  And I'm troubled by
25  the way you said your statement.  You're very

23  (Pages 86 to 89)

Page 98

1 was 40, 50 years ago.
2 And so the reason why this is so difficult is
3 because we are moving in the right direction. We don't
4 have concentrated populations of -- of certain
5 minorities or populations of White folks in certain
6 areas. It is spread out throughout the state. Compared
7 to Alabama, Alabama has 17 counties that are
8 minority-majority, and they're all contiguous.
9 Louisiana has seven parishes that are minority-majority
10 and only three are contiguous. That's why this process
11 is so difficult, but here we are without any other
12 options to move forward.
13 And so I -- I hear what you're saying. I
14 respectfully disagree with the characterization that
15 it's bending to political pressure.
16 MR. ALEXANDER: Yeah.
17 REPRESENTATIVE CARLSON: I -- I -- you know
18 me, and you know that I wouldn't do that. But I don't
19 see any other path forward. This is the best of two bad
20 options, and I'm going to always do my job --
21 MR. ALEXANDER: Yeah.
22 REPRESENTATIVE CARLSON: -- that's before me.
23 MR. ALEXANDER: And I understand that.
24 CHAIRMAN BEAULLIEU: Thank you.
25 MR. ALEXANDER: Is there -- is -- is there --

Page 99

1 do you think there's anything that would be -- an option
2 would be to allow our attorney general to argue the
3 constitutionality of our current map in Federal Court,
4 Fifth Circuit Court of Appeal, and Supreme Court?
5 REPRESENTATIVE MARCELLE: Already been done
6 twice in the Fifth Circuit and asked of the Supreme
7 Court, and they've refused to do that. And here we lie
8 today.
9 MR. ALEXANDER: Yeah.
10 CHAIRMAN BEAULLIEU: There's never even been a
11 trial on the merits, Representative Carlson, on this map
12 --
13 REPRESENTATIVE CARLSON: That's not our
14 decision.
15 CHAIRMAN BEAULLIEU: -- even in district
16 court.
17 REPRESENTATIVE CARLSON: That -- that is the
18 judge's decision, unfortunately.
19 CHAIRMAN BEAULLIEU: And if you don't do
20 anything, they'll have one.
21 REPRESENTATIVE CARLSON: And if we don't do
22 anything, we'll have a worse map. Thank you, Mr. Chair.
23 CHAIRMAN BEAULLIEU: Thank you.
24 MR. ALEXANDER: Thank you, sir. I appreciate
25 the interchange.

Page 100

1 CHAIRMAN BEAULLIEU: Representative Marcelle.
2 REPRESENTATIVE MARCELLE: Thank you. Mr.
3 Alexander, I guess it's disheartening for me to sit here
4 in 2024 and hear that we certainly need to keep the
5 power. And if you all do what's right in Louisiana,
6 we're going to lose our thin majority. If we would have
7 done what was right long time ago, you probably wouldn't
8 be in a majority. If Alabama passes what they need to
9 pass and we pass what we need to pass, then, perhaps, we
10 will have a fair and balanced Congress.
11 MR. ALEXANDER: And you'll be in the majority.
12 REPRESENTATIVE MARCELLE: Well -- and -- and
13 what's the problem with that, sir?
14 MR. ALEXANDER: Well, there's millions of
15 Americans who have a problem with that.
16 REPRESENTATIVE MARCELLE: And guess what, it's
17 millions of people who have not had an opportunity to
18 have a seat at the table. We have a problem with voter
19 suppression. We have a problem with people thinking
20 that we can't make decisions. And let me say this: on
21 the other side of the aisle -- on the other side of the
22 chamber in the Senate, I have colleagues that have some
23 of the same beliefs that some of you have, right? And
24 they believe in pro-life. They are African Americans.
25 I believe in pro-choice. So to say that everybody's

Page 101

1 ideology because they are Black is one way, is certainly
2 crazy, number one.
3 And number two, I really agree with you with
4 something, and that is, send it back to the courts and
5 let Judge Shelly Dick draw the maps. We could then
6 remove --
7 MR. ALEXANDER: But you -- you agree with me.
8 REPRESENTATIVE MARCELLE: I -- I do agree with
9 that because then we could remove all of these different
10 people and these moving parts that everybody -- these
11 political interests because we do deserve two Black
12 congressional seats because where I went to school - it
13 was a Black school, though, Capitol High School - when
14 you divide six into a third, a third into sixth, you get
15 two. And so we deserve two seats, and that's what we
16 deserve. We didn't -- we're not begging for something
17 that we don't deserve. That's what we deserve.
18 And -- and God forbid, maybe somebody will get
19 elected that feels like you, have the same ideologies as
20 you, but perhaps they won't. People need an opportunity
21 to have their voices heard.
22 MR. ALEXANDER: I respect that.
23 REPRESENTATIVE MARCELLE: And when I send
24 somebody to Congress that feels like you that represents
25 my district, then you do not represent what I believe.

26 (Pages 98 to 101)

Page 118

1    REPRESENTATIVE CARLSON:  Absolutely.  And
2  thank you, Mr. Chair.  I'm done.
3    MR. HURD:  It's absolutely the same.  What
4  they held was in the '90s, the federal agency that was
5  telling you, "You had to do it," was the DOJ under
6  Section 5, which itself was later held unconstitutional.
7   The answer is they were wrong.  They were
8  unconstitutionally demanding racial districting beyond
9  what the federal courts now recognize as the permissible
10  range of remedy.  We may be -- we don't -- I -- I --
11  look, I'll give Judge Dick an opportunity.  It's not
12  that she's hailed Section 2 applies.
13    The question is whether or not Section 2 has a
14  constitutional remedy, i.e., I believe that my
15  districting plan that I've handed in and I did it for an
16  -- an example is as close as you can get to a
17  non-racially gerrymandered district and get to two
18  majority-minority districts, and it does.  The
19  plaintiff's remedy, Senate Bill 4 and 5, they're both
20  racial gerrymanders and will not stand up to the Fifth
21  Circuit.  There are abilities to draw a compact
22  contiguous majority-minority district, second one, in
23  Louisiana.  What you're going to do, you're going to
24  enact this.
25    If I was Judge Dick, I'd look at it and go,

Page 119

1  "I'm sorry.  I've got -- already got the judge that
2  wrote the opinion on the Fifth Circuit that says what
3  y'all are about to do is a constitutional gerrymander.
4  Therefore, I can disregard it."  Disregard it.  It is
5  null and void.  And she's going to draw the plan if you
6  want to remedy an actual remedy.  That's why it's
7  exactly the same.  You read the opinion, and you'll see
8  they said, "The federal power does not override or force
9  you to violate the Constitution."  Stand up for the
10  Constitution.
11    Stand up if you want a compact district.  Draw
12  the one that makes sense with our traditional
13  districting principles because you can do it.  The --
14  the -- the -- the -- the answer is, this is an
15  unconstitutional alternative.
16    CHAIRMAN BEAULLIEU:  Okay.  Thank you, Mr.
17  Hurd.  You -- you -- I think you've been very, very
18  clear on it.  The board is clear.  We have no more
19  witnesses.  Senator Womack, we're going to go ahead and
20  -- and call you back up to -- to close.
21    MR. HURD:  Your Honor, if -- I mean, Your
22  Honor.  I apologize.  I'd like to -- I've got a copy of
23  that opinion that outlines all the reasons that what
24  you've got is a racial gerrymander.  I had an outline of
25  what it -- of -- of the -- each criteria that the judge

Page 120

1  applies on why this is a -- a -- a ineffective remedy,
2  and I hope -- I hope your good judgment finds another
3  solution.
4    CHAIRMAN BEAULLIEU:  Thank you.
5  Representative Phelps, you failed to call, but you
6  didn't say you wanted to speak.  Are you trying to speak
7  now?
8    REPRESENTATIVE PHELPS:  Yes, (inaudible
9  2:19:39).
10    CHAIRMAN BEAULLIEU:  I know you're not on the
11  committee, but you want -- all right.  Come on.  Let's
12  -- all right.  All right.  So let's fill this out that
13  says she does want to speak.  She's providing
14  information only, not a green card or a red card.  So
15  Representative Phelps?
16    REPRESENTATIVE PHELPS:  Thank you for the
17  opportunity to speak.  I -- I just wanted to mention to
18  maybe some of our new colleagues here when we talk about
19  why we're here.  This started from an increase of the
20  population from our census.  So I -- and I think that's
21  not -- we haven't heard a lot of that with the audience
22  on the outside.  It just was not a mandate to draw a
23  map.  So this does go with the 2020, the Census results
24  that resulted in a population increase of African
25  Americans across the state.

Page 121

1    Secondly, I hope that there is some passion
2  here about if there were a different population, a White
3  population, and there was so much pushback about
4  creating a district so that everyone would be
5  represented, how that may feel.  Just a thought.
6  Thirdly, when I heard Judge Dick's name reference to
7  Obama's judge, I don't know if I've ever heard someone
8  say Trump's judge or Carter's judge or Reagan's judge or
9  whomever.  I don't know if we're going to start
10  referencing judges that way, but I hope that we do not
11  do that in this body.
12    I think we should give all of our elected
13  officials a little bit more respect in that, regardless
14  of what president they were appointed to or from.  Thank
15  you for your time.
16    CHAIRMAN BEAULLIEU:  Thank you, Representative
17  Phelps.  The board is clear.  Senator Womack, would you
18  come up and close on your bill?
19    SENATOR WOMACK:  Thank you, Mr. Chairman.
20  Members of the committee, we all know why we're here.
21  We were ordered to -- to draw a new Black district, and
22  that's what I've done.  At the same time, I tried to
23  protect Speaker Johnson, Minority Leader Scalise, and my
24  representative, Congresswoman Letlow.  I'm agreeable to
25  the amendment, and we complied with everything the judge

31 (Pages 118 to 121)

Page 122

1   has asked.  And I just ask for favorable passage.
2       CHAIRMAN BEAULLIEU:  Thank you, Senator --
3   Senator Womack.  Representative Farnum has made a motion
4   that we adopt Senate Bill 8 as amended.  Is there any
5   objection?  Representative Marcell objects.  Ms. Baker
6   -- listen, do we have anybody in an anteroom needs to
7   come in real quick?  We have everyone here?  Looks like
8   everyone's here.  Okay.  Ms. Baker, would you please
9   call the role?  So let me clarify the vote.  A vote of
10  yes moves Senator Womack's bill as amended by
11  Representative Farnum forward.  A vote of no leaves in
12  here in the committee.  Ms. Baker?
13      MS. BAKER:  Thank you.  Mr. Chairman.
14  Chairman Beaullieu?
15      CHAIRMAN BEAULLIEU:  Yes.
16      MS. BAKER:  Yes.  Representative Billings?
17      REPRESENTATIVE BILLINGS:  Yes.
18      MS. BAKER:  Yes.  Representative Boyd?
19      REPRESENTATIVE BOYD:  Yes.
20      MS. BAKER:  Yes.  Representative Carlson?
21      REPRESENTATIVE CARLSON:  Yes.
22      MS. BAKER:  Yes.  Representative Carter?
23  Representative Carver?
24      REPRESENTATIVE CARVER:  Yes.
25      MS. BAKER:  Yes.  Representative Farnum?

Page 123

1       REPRESENTATIVE FARNUM:  Yes.
2       MS. BAKER:  Yes.  Representative Gadberry?
3   Yes.  Representative Johnson?  Representative Larvadain?
4   Yes.  Representative Lyons?
5       VICE CHAIRMAN LYONS:  Yes.
6       MS. BAKER:  Yes.  Representative Marcelle?
7   Representative Newell?
8       REPRESENTATIVE MARCELLE:  Not as amended.  No,
9   as amended.
10      MS. BAKER:  No for Representative Marcelle.
11      REPRESENTATIVE MARCELLE:  No.
12      MS. BAKER:  Representative Newell?
13      REPRESENTATIVE NEWELL:  Yes.
14      MS. BAKER:  Yes.  Representative Schamerhorn?
15      REPRESENTATIVE SCHAMERHORN:  Yes.
16      MS. BAKER:  Yes.  Representative Thomas?
17      REPRESENTATIVE THOMAS:  Yes.
18      MS. BAKER:  Yes.  Representative Wright?
19      REPRESENTATIVE WRIGHT:  Yes.
20      MS. BAKER:  Yes.  Representative Wybel?
21      REPRESENTATIVE WYBEL:  Yes.
22      MS. BAKER:  Yes.  There are 14 yeas and 1 nay.
23      CHAIRMAN BEAULLIEU:  Members -- members have a
24  vote of 14 yeas, 1 nay.  Senate Bill 8 is hereby adopted
25  as amended.  Reported as amended.  There are no other

Page 124

1   matters before this committee.  Representative Thomas
2   had made a motion that we adjourn.  Look, and -- as we
3   adjourn, thank you everyone for your patience.  Thank
4   you everyone for your time.  It's been a -- a great
5   debate and -- and we appreciate you.  Meeting adjourned.
6   Thank you all.
7       (Meeting adjourned.)

Page 125

1       CERTIFICATE OF TRANSCRIPTION
2       I, Nathan Pikover, COO of TranscribeMe, Inc.,
3   do hereby certify that
4   291001-Audio-COMBINE-1-18-24_HG_p1-p2.MP3
5   was transcribed utilizing computer aided means and the
6   TranscribeMe transcription team.
7       The transcript of the audio mentioned above,
8   having been transcribed and reviewed by TranscribeMe,
9   Inc. to the best of the company's ability, is a full,
10  true, and correct transcription.
11      I further certify that neither I, nor the
12  TranscribeMe, Inc. transcription team, have any personal
13  association with the parties involved or are in any way
14  interested in the outcome thereof.
15      Dated this 12th of March, 2024.
16      _____
17      Nathan Pikover, COO TranscribeMe, Inc.



**Pohlman**USA®
## Court Reporting and Litigation Services

---

Floor - Audio Transcription

January 19, 2024

---

Phillip Callais, et al.

vs.

Nancy Landry

## Page 2

1    Members, I'm bringing you this congressional

2    redistricting map that Senator Womack presented.  You've

3    -- you've heard it debated a couple of times.  You heard

4    it in -- in committee as well.  Yesterday, we added an

5    amendment in committee to Senator Womack's bill.  And so

6    my first order of business, even before I make my

7    opening remarks, is going to be get this bill in a proper

8    posture.  I'd like to offer up an amendment to delete

9    the amendments that we added in committee yesterday.  So

10   if you'll check your monitors, it's going to -- or Madam

11   Clerk, would you mind reading in the amendment?

12        THE CLERK:  Mr. Speaker and members,

13   Representative Beaullieu, as he's just discussed, is

14   offering up a one-page set of amendments.  That set is

15   online.  It's set number 83.

16        REPRESENTATIVE BEAULLIEU:  So, members, after

17   hearing from a lot of you, it's my thought that this

18   instrument was in its best posture when it came over

19   here from the Senate.  And so I am offering an amendment

20   to put it back in that posture, and I'd ask for your

21   support.

22        MR. SPEAKER:  I see no questions on the

23   amendment.  Representative Marcelle for the floor on the

24   amendment.

25        REPRESENTATIVE MARCELLE:  Thank you, Mr.

## Page 3

1    Speaker and Chairman.  And thank you, members.  On

2    yesterday, we had a pretty, I would say, heated debate

3    in H&G about these amendments, and so I rise in support

4    of removing those amendments.  And I had a lot of

5    questions after I got home about why didn't I object to

6    the amendments, but I'd stepped out of the room and so

7    that's the reason for me not objecting to the

8    amendments.  I did object to the bill because the

9    amendments had been added.

10   I know this is the process.  I think that the

11   bill was in its best posture when it came over with

12   Representative -- I mean, with Senator Womack, Senate

13   Bill 8.  However, I tried to put that bill in a better

14   posture.  That matter failed.  I know the process.  I

15   appreciate the process.  And I appreciate the chairman

16   taking that amendment off that I think does us no good

17   to get to a better place where we can get the second

18   congressional district.  And I'd ask that you all would

19   support the chairman in removing the amendment that was

20   placed on there on yesterday.  Thank you.

21        MR. SPEAKER:  Is there any objections to the

22   adoption of the amendment?  Representative Farnum,

23   objection.  Would you like to speak on your objection?

24   Representative Beaullieu, would you like to close on

25   your amendment?

## Page 4

1    REPRESENTATIVE BEAULLIEU:  Members, I just ask

2    you to support the removal of the amendment that we

3    added in -- in House and Governmental.  Thank you.

4        MR. SPEAKER:  Representative Beaullieu has

5    offered up an amendment which Representative Farnum

6    objects.  All those in favor, vote yea.  All those

7    opposed, vote nay.  The clerk will open the machine.

8        THE CLERK:  (inaudible 0:04:34).

9        MR. SPEAKER:  Wright, yea.

10       THE CLERK:  Emerson, yea.

11       MR. SPEAKER:  Emerson, yea.  Are you through

12   voting, members?  The clerk will close the machine.  We

13   have 84 yeas and 16 nays, and amendment passes.

14   Representative Beaullieu on the bill.

15       REPRESENTATIVE BEAULLIEU:  Okay, Mr. Speaker.

16   Thank you, members, for supporting me on that amendment.

17   You'll bear with me for a second.  So, members, I -- I

18   appreciate you giving me the opportunity to be with you

19   here today.  Two years ago, I sat on the committee that

20   -- that passed the original congressional map after

21   redistricting, and we spent a lot of time going around

22   the state listening to folks from all over our state.

23   And this House, by two -- over two-thirds vote,

24   supported a map that we thought was fair, that we

25   thought was representative of the state of Louisiana.

## Page 5

1        As Senator Stine said earlier in this week,

2    "It's with a heavy heart that I present to you this

3    other map," but we have to.  It's that clear.  A federal

4    judge has ordered us to draw an additional minority seat

5    in the state of Louisiana.  We have the -- the federal

6    Voting Rights Act litigation is still going on in the US

7    District Court in the Middle District of Louisiana.  The

8    map in this bill that I'm presenting is one of a product

9    of long, detailed process with several goals.

10       First, and as a lot of you are aware,

11   Congresswoman Julia Letlow represents north Louisiana in

12   our nation's capital and serves on both the

13   appropriations and agricultural committees.  The

14   boundaries in the bill that I'm presenting ensure that

15   Congresswoman Letlow remains both unimpaired with any

16   other incumbents, and in a congressional district that

17   should continue to elect a Republican Congress for the

18   remainder of this decade.

19       I have great pride in the work Congresswoman

20   Letlow has accomplished, and this map will ensure that

21   Louisianians will continue to benefit from her presence

22   in the halls of Congress for as long as she decides to

23   continue serving our great state of Louisiana.

24       Second, of Louisiana's six congressional

25   districts, the map and the proposed bill ensures that

Page 6

1  four are safe from -- safe Republican seats.
2  Louisiana's Republican presence in the United States
3  Congress has contributed tremendously to the national
4  discourse, and I'm very proud, and it's remarkable, that
5  both the speaker of the United States House of
6  Representatives, Mike Johnson, and the US House majority
7  leader, Steve Scalise, are both from our great state.
8        This map ensures that the two men -- the two
9  of them will have solidly Republican districts at home
10  so they can focus on the national leadership that we
11  need in Washington, DC.  The map proposed in this bill
12  ensures that the conservative principles retained by the
13  majority of those in Louisiana will continue to extend
14  past our boundaries to our nation's capital.
15        Finally, the maps in the proposed bill respond
16  appropriately to the ongoing federal litigation, the
17  ongoing federal Voting Rights Act case in the Middle
18  District of Louisiana.  For those who are unaware of the
19  background, the congressional maps that we enacted, that
20  I mentioned a second ago, in March of -- in March of
21  2022, have been the subject of litigation roughly since
22  the day the 2022 congressional redistricting bill went
23  into effect, and even before we enacted it.  So the suit
24  was filed before we actually enacted the bill.
25        After a substantial amount of prolonged

Page 7

1  litigation, two trips to the Fifth Circuit asking it to
2  reverse it, and a trip to the US Supreme Court, the
3  federal District Court has adhered to its view that the
4  federal law requires that the state have two
5  congressional districts with a majority of Black voters.
6  It's that simple.  Our secretary of state, our attorney
7  general, and our prior legislative leadership appealed
8  but have yet to succeed.  We are now here because the
9  federal courts order that we have a first opportunity to
10  act.
11        If we don't act, it is very clear that the
12  federal court will impose the plaintiff's proposed map
13  on our state, and we don't want that.  The District
14  Court's order that we must have two majority-Black
15  voting-age population districts, combined with the
16  political imperatives I just described, have largely
17  driven the boundaries for District 2 and District 6,
18  both of which are over 50 percent Black voting-age
19  population, or BVAP as you've heard discussed a lot in
20  committees and may hear with folks discussing today.
21        Given the state's current demographics,
22  there's not a high enough Black -- Black population in
23  the southeast portion of Louisiana to create two
24  majority-Black districts and to also comply with the US
25  Constitution's one vote, one person requirement.  That a

Page 8

1  -- the reason why District 2 is growing around Orleans
2  Parish, while District 6 includes the Black population
3  of east Baton Rouge Parish and travels up the I-49
4  corridor and the Red River to include Black population
5  in Shreveport.
6        While this is a different map than the
7  plaintiffs in the litigation have proposed, this is the
8  only map I reviewed that accomplishes the political
9  goals I believe are important for my district, for
10  Louisiana, and for our country.
11        While I did not draw these boundaries myself,
12  and I'm bringing the bill to the floor for the --
13  Senator Womack carried through the Senate and through
14  committee yesterday in this House, I firmly submit that
15  the congressional voting boundaries represented in this
16  bill best achieve the goals of protecting Congresswoman
17  Letlow's seat, maintaining strong districts for Speaker
18  Johnson and Majority Leader Scalise, ensuring four
19  Republican districts, and adhering to the command of the
20  federal court in the Middle District of Louisiana.
21        I submit to you this map, and I'll be happy to
22  take any questions.
23        MR. SPEAKER:  Representative Taylor on a
24  question.
25        THE CLERK:  She waives.

Page 9

1        MR. SPEAKER:  She waives.  Representative
2  Amedee on a question.
3        REPRESENTATIVE AMEDEE:  Thank you, Mr.
4  Speaker.  Rep.  Beaullieu, thanks for carrying the bill
5  over here.  Is this bill intended to create another
6  Black district?
7        REPRESENTATIVE BEAULLIEU:  Yes, ma'am, and to
8  comply with the judge's order.
9        REPRESENTATIVE AMEDEE:  Thank you.
10        MR. SPEAKER:  Seeing no further questions,
11  Representative Bayham for the floor.
12        (Pause.)
13        REPRESENTATIVE BAYHAM:  When I ran for the
14  legislature, I had one goal, and that is to give my
15  community a voice.  I've studied some of the plans that
16  were submitted by my colleagues here.  Representative
17  Wilford Carter had a plan, I believe, that kept St.
18  Bernard Parish intact, and I appreciate that,
19  Representative Carter.  I am here to stand up for my
20  community.  St. Bernard has never been split into two
21  congressional districts.  We've already been split into
22  two Senate districts.  And to be brutally honest,
23  looking at the way these precincts are -- and I know
24  every precinct.  I've campaigned in every precinct in
25  St. Bernard.

PohlmanUSA Court Reporting
(877)  421-0099          PohlmanUSA.com

Page 10

1    We have two precincts, for example, that are
2  in the 2nd Congressional District.  One, Precinct 24,
3  gave President Trump 75 percent of the vote.  Precinct
4  25 gave President Trump 69 percent of the vote.  Those
5  are in the 2nd District.  In the 1st District is
6  Precinct 44, which gave President Biden 83 percent of
7  the vote.  Precinct 45 gave President Biden 85 percent
8  of the vote.  It seems like these precincts were just
9  thrown together like a mechanical claw machine, just
10  grabbing people and dropping them off.
11    Now, I participated in the hearings on the
12  congressional reapportionment where they toured the
13  state, and I appreciated the leadership of the House and
14  the Senate, the committees in doing this.  I took
15  advantage of it.  I testified.  We are being told that
16  we have to redraw all of this in a period of less than
17  eight days.  That is not how you make sausage.  That's
18  how you make a mess.  I cannot in good conscience vote
19  for this bill that divides my community, and I will
20  stand by that for my community.  Thank you.
21    MR. SPEAKER:  There's no questions.
22    REPRESENTATIVE BAYHAM:  Thank you.
23    MR. SPEAKER:  Representative Beaullieu to
24  close on the bill.
25    REPRESENTATIVE BEAULLIEU:  As a colleague

Page 11

1  mentioned earlier - sorry, Representative Cox, if I have
2  to poach you - "Everybody likes to eat sausage, but
3  nobody likes to see how it's made."  And it's -- it has
4  been painful, and it has been painful for all of us.
5  But it's simple.  We're under a federal judge's mandate,
6  and this bill is our best attempt to comply with her
7  decision.  So, members, I ask you to support me in
8  voting for this map.  Thank you.
9    MR. SPEAKER:  Representative Beaullieu moves
10  for final passage of the bill.  Those in favor, vote
11  yea.  Those opposed, vote nay.  The clerk will open the
12  machine.  Vote your machine, members.  Members, are you
13  through voting?  The clerk will close the machine.  We
14  have 86 yeas, 16 nays, and the bill is finally passed.
15  Representative Beaullieu moves to adopt the title, and
16  moves to reconsider the vote for which the bill finally
17  passed and lay that motion on the table without
18  objection.
19    MR. SPEAKER:  Open the machine for co-authors.
20    (Pause.)
21    MR. SPEAKER:  The clerk will close the
22  machine.  We have ten co-authors.
23    MALE SPEAKER:  Representative Bagley for a
24  motion to move to correct his vote.
25    REPRESENTATIVE BAGLEY:  I want to correct on

Page 12

1  -- on Senate Bill Number 8.  I want to correct from
2  absent to nay.
3    MALE SPEAKER:  Without objection.
4    REPRESENTATIVE BAGLEY:  Thank you, Mr. --
5    MALE SPEAKER:  Representative Taylor moves for
6  a motion to correct her vote.
7    REPRESENTATIVE TAYLOR:  Good afternoon.  I
8  would also like to vote from absent to yea on the
9  amendment.
10    MALE SPEAKER:  Without objection,
11  Representative Jackson moves to correct his vote.
12    REPRESENTATIVE JACKSON:  Yes.  I want to
13  change my vote from nay to yea.
14    MALE SPEAKER:  Without objection.
15    REPRESENTATIVE JACKSON:  Thank you.
16
17
18
19
20
21
22
23
24
25

Page 13

1    CERTIFICATE OF TRANSCRIPTION
2    I, Nathan Pikover, COO of TranscribeMe, Inc.,
3  do hereby certify that 291001-Audio-1-19-24_1es_day5 -
4  Cut-Appended was transcribed utilizing computer aided
5  means and the TranscribeMe transcription team.
6    The transcript of the audio mentioned above,
7  having been transcribed and reviewed by TranscribeMe,
8  Inc. to the best of the company's ability, is a full,
9  true, and correct transcription.
10    I further certify that neither I, nor the
11  TranscribeMe, Inc. transcription team, have any personal
12  association with the parties involved or are in any way
13  interested in the outcome thereof.
14    Dated this 11th of March, 2024.
15    _____
16    Nathan Pikover, COO TranscribeMe, Inc.
17
18
19
20
21
22
23
24
25



# **Pohlman**USA®
## Court Reporting and Litigation Services

Lousiana State Senate 1st Special Session-Audio Transcription

January 19, 2024

In Re: Louisiana House Floor/Committee Video

Page 2

1  in the exact posture that it left the Senate.  The House
2  is removed.  HGA Committee amendment I move to concur
3  with on Senate Bill Number 8.
4      (Pause.)
5      MALE SPEAKER:  Gotcha.  Members, the summaries
6  are being passed out right now, so we're just going to
7  slow down a little bit.  I want to give everybody the
8  chance to see what we're voting on.
9      (Pause.)
10      MALE SPEAKER:  Senator Womack, would you mind
11  going over the -- I know we've all seen the amendment
12  once.  We -- we know what the bill looks like, but if
13  you could just go over some high points on it while
14  they're passing this out.  Members, if you have a --
15  members, if you want to speak, hit your Floor button if
16  anybody would like to come to the Floor to discuss the
17  bill.  I know some members -- make sure that you do
18  that.
19      (Pause.)
20      SENATOR WOMACK:  Okay.  They're passing out
21  the amendments.  The -- the way they did lay up the
22  House -- I mean, lay up the Senate, it was one district
23  change on that amendment.  That took in part of
24  Avoyelles Parish.  That was the only change, to my
25  knowledge, that was in the -- that was in the new map.

Page 3

1      MALE SPEAKER:  Okay.  Senate Morris for -- for
2  -- Senator Morris for a question on the bill, and you
3  also have your Floor button, so which -- you want to
4  question.  Let's do question first, please, and then we
5  can do the Floor.  Thank you.
6      SENATOR MORRIS:  Senator Womack, you said the
7  only change was -- was taking some of Avoyelles Parish
8  and putting it in Miss Letlow's district, correct?
9      SENATOR WOMACK:  Correct.
10      SENATOR MORRIS:  However, it actually took my
11  personal home out of Miss Letlow's district, as well as
12  Senator Cathey's home precinct, as well as State Rep
13  Echols' home precinct, and put that in Representative
14  Johnson's district; did it not?
15      SENATOR MORRIS:  It did.
16      SENATOR MORRIS:  So the only thing done
17  was not just Avoyelles Parish, correct?
18      SENATOR WOMACK:  I stand to be corrected.
19  You're correct.
20      SENATOR MORRIS:  Why did we do that for
21  Avoyelles Parish?
22      SENATOR WOMACK:  That was -- that was brought
23  before the -- the -- I'll have to look back.  I -- I was
24  -- I was thinking that was a -- a -- a Senate Committee
25  amendment on that, and that's the way it came out of

Page 4

1  Committee.
2      SENATOR MORRIS:  Yes, sir.  I think you
3  altered the amendment.
4      SENATOR WOMACK:  Senator Morris, I'll have to
5  -- I'll have to look back and -- and put that together
6  for you.  Any other questions?
7      SENATOR MORRIS:  So you don't know why we put
8  Avoyelles in Miss Letlow's district?
9      SENATOR WOMACK:  As I stated earlier, we were
10  -- we were trying to put what we could to -- to give
11  senator -- Representative Letlow as much North Louisiana
12  as we could.  So that was what we -- that was what we
13  done on -- on that amendment.
14      SENATOR MORRIS:  By -- by trading Avoyelles
15  for Monroe, we gave her more North Louisiana.
16      SENATOR WOMACK:  As I understand it, in that
17  bill, I didn't think that -- that your home or Senator
18  Cathey or Echols was in the original bill to start with.
19  My recollection.
20      SENATOR MORRIS:  It wasn't in Miss Letlow's
21  district.
22      SENATOR WOMACK:  Right.
23      SENATOR MORRIS:  Would you be shocked if that
24  was not the case, and that we were all in Miss Letlow's
25  district?

Page 5

1      SENATOR WOMACK:  Probably so.  But that -- at
2  the -- at the time I put that amendment on, I don't
3  remember the original map having that -- y'all's address
4  in her district.
5      SENATOR MORRIS:  But you did know that the
6  amendment took some more of Ouachita Parish out of
7  Letlow's, and put it into Johnson's district; you did
8  know that, right?
9      SENATOR WOMACK:  I knew it had to come from
10  somewhere.
11      SENATOR MORRIS:  Yes, sir.  Thank you.
12      MALE SPEAKER:  Senator Morris, you have the
13  Floor now for the -- for Senate (inaudible 0:08:19).
14      SENATOR MORRIS:  Thank you, Mr. President.  We
15  came here to redistrict because there's a chance.  It's
16  not absolute, but there's a chance that the judge will
17  rule that our districts that we -- that we completed in
18  the last couple of years will not be declared
19  unconstitutional.  That case never went to a final
20  judgment.  It hasn't gone to a full trial on the
21  merits, but yet here we are.  So what do we do?  We're
22  supposed to redistrict with a lot of principles in mind.
23  Among those include compactness and contiguity.
24      This bill does neither.  It's neither
25  contiguous nor compact.  We're all supposed to do it and

2  (Pages 2 to 5)

Page 6

```
 1   consider political subdivisions and communities of
 2   interest.  So now, by everyone's account, I live in
 3   Northeast Louisiana, and now I'm in the same district as
 4   Lake Charles.  Louisiana Tech, Grambling, and University
 5   of Louisiana, Monroe are now in different congressional
 6   districts.  They're all only 30 miles apart.
 7         Senator Womack said in Committee that what he
 8   wanted to do was protect Julia Letlow.  She's the only
 9   woman in our congressional delegation in this state,
10   she's the only member of appropriations, and she's on
11   the Agriculture Committee.  So protecting her district
12   because she has seniority, and because she's a bright,
13   articulate, and effective Congresswoman, that's a very
14   noble and worthwhile goal.  And I applaud him for having
15   stated that that is one of the objectives of this bill,
16   but this bill doesn't do that.
17         This bill puts more votes south of the
18   Mississippi line in the Florida parishes than it does in
19   the northeast corner of the state.  Now, I'm not
20   horribly disappointed to be in Congressman Johnson's
21   district because I admire him immensely.  It's nothing
22   against him.  He -- I served with him in the House, and
23   we are friends, and I'm a supporter, and he knows that.
24   It has nothing to do with him.  But we didn't do the
25   things that I believe that we should have done.  Well,
```

Page 7

```
 1   what did we do?
 2         It looks like to me we primarily considered
 3   race, and we considered the personal interest of a
 4   handful of members.  There was no reason.  The bill, as
 5   originally filed, we did not like.  It cut my home
 6   parish in half.  I understand it's got to go through
 7   somebody's district, right?  A lot of you have your
 8   districts, your home parishes cut through, but you
 9   didn't have to zigzag it around just so somebody can get
10   a personal stake, who might want to run for Congress, or
11   just wants their parish there because of their personal
12   interest.
13         I'm not going to be around to run for Congress
14   or anything of the sort in two years, eight years, or
15   ten years.  This is about districts and regions that
16   will represent the people of our area, and the lack of
17   compactness is going to effectively disenfranchise, I
18   believe, to a certain degree, the people that I
19   represent.  And for these reasons, I urge you to vote
20   against this bill.  Thank you, Mr. President.
21         MALE SPEAKER:  Thank you, Senator Morris.
22   Senator Cathey to the Floor on the bill.
23         (Pause.)
24         SENATOR CATHEY:  Thank you, Mr. President.
25   Members, I -- I don't know that I can say any better
```

Page 8

```
 1   than what Senator Morris just said, and I wholeheartedly
 2   agree with everything that he said.  You know, I love
 3   the Senate, and I love being a member of this body, and
 4   I'm excited about the things that we're going to do in
 5   this term.  I think we're going to do some great things.
 6   Unfortunately, today is not one of those days.
 7         What we're doing to Northeast Louisiana with
 8   this map is a travesty and a disservice to the only
 9   woman that we have serving in our congressional
10   delegation.  The only member that we have that sits on
11   the House Appropriations Committee, which controls
12   federal dollars to this state.  When we say that this
13   map protects Northeast Louisiana and Congresswoman
14   Letlow, I'll have you know, 50 percent of the votes in
15   Congresswoman Letlow's district now reside within 30
16   miles of this building.  Let that sink in.  30 miles of
17   this building.  Look, I can see the writing on the wall,
18   and I know where this is going to go.
19         And so, look, I'm -- I'm -- I've been around
20   long enough to -- to count, and -- and I know that --
21   that we can't get to 20, but -- but I just couldn't let
22   this go without standing up for my people and my
23   district and my congresswoman.  And so I guess there is
24   one other thing that -- that I do want to say just to
25   put it into perspective.  Again, kind of like Senator
```

Page 9

```
 1   Morris said, my home, my personal home, which is 35
 2   miles from the Arkansas line, and 65 miles from the
 3   Mississippi line will now be in the same congressional
 4   district as Fort Polk and McNeese State University and
 5   Lake Charles.  That's a disservice and a travesty.  So
 6   with that, I close.
 7         MALE SPEAKER:  Thank you, Senator Cathey.
 8   Senator Luneau for the Floor.
 9         (Pause.)
10         SENATOR LUNEAU:  Thank you, Mr. President.
11   Members, we -- we did redistricting last year, I'm sure
12   most of you remember that, and it was an utter failure.
13   And there were a lot of us that talked about some of the
14   things that we could have done different to make it
15   different, but it didn't work out that way, so here we
16   are again.  And I remember when we redistricted our own
17   district, our Senate districts, Rapides Parish, my home
18   parish, now has six different senators.  Six.  And I
19   fought that, but I lost on that -- on that -- on that
20   quest.  I -- I just couldn't -- couldn't get everybody
21   together.
22         And they said, "You know, it's going to be
23   great if you have six centers.  Then you've got six
24   people coming together."  That -- that didn't happen.
25   That's not true.  We didn't come together, and it hurt
```

Page 10

1   Rapides Parish. And now this map, yet again, has
2   Rapides Parish divided in half. I guess that's better
3   than six, but I guess we would have to have every
4   congressperson from the -- from the state to have six.
5   It's important that we do these maps, and we do them
6   correctly, where we establish another minority majority
7   district. And for that reason, I'm going to support and
8   I'm going to vote for this map, but like my colleagues
9   before me, I have to admit we should do better.
10       MALE SPEAKER: Thank you, Senator Luneau.
11   Senator Carter for the floor.
12       SENATOR CARTER: Thank you, Mr. President.
13   Members, we have an historic opportunity before us
14   today, and it's an exciting day for the great State of
15   Louisiana. If we concur and accept Senate Bill 8, we
16   get to create two performing African American districts
17   right here in the State of Louisiana. That is historic.
18   That is to be celebrated. I really want to say thank
19   you to everyone in this room. I can't thank you all
20   enough. I appreciate the sincere effort. I appreciate
21   the -- the -- the working late into the evenings that --
22   I want to thank the staff of the SGA committee and the
23   tireless hours that they have. This is -- this is
24   historic.
25       I know that it's hard to do anything that's

Page 11

1   perfect, and I know redistricting is the hardest thing
2   that we do of all. This is my second redistricting
3   session, and they're very tough, but we came together in
4   a effort to comply with a federal judge's order that
5   Louisiana provide equal representation to the African
6   Americans in the State of Louisiana, and we have an
7   opportunity to do that. Let's celebrate. Let's be
8   happy. Let's be glad this state has an opportunity to
9   provide equal representation in our congressional
10   leadership right here in the State of Louisiana. Thank
11   you all so much.
12       And I also want to thank -- I'll be remiss if
13   I didn't thank the -- the president, all the members of
14   SGA committee, the -- the governor who called this
15   session. We began with the governor addressing us on
16   Dr. King's Day, and here we are celebrating at the end
17   of that week. And it just didn't start at the beginning
18   of this week with Dr. King's Day. It started way back
19   when Dr. King was alive, in a push for a voters' rights
20   act. There's so many hurdles along the way and so many
21   battles. There's so many -- so many -- so much effort.
22   So much energy.
23       And when we were in Committee, we heard from
24   many people. From the LDF people to the plaintiffs to
25   all the -- community people that came to testify

Page 12

1   because they did it last year. And some of them said,
2   "We are tired. We're tired of keep doing this." But
3   let me tell my friends and my colleagues, to everyone,
4   we shall not tire. We shall continue to fight for
5   what's right. It is -- this is how we make progress.
6   It is not easy, it is challenging, but this is how we
7   make progress, and we make progress. We celebrate it.
8   We acknowledge it. So thank you to my colleagues.
9   Thank you to all of us who engaged in this process.
10   Thank you, Mr. President.
11       MALE SPEAKER: Thank you, Senator Carter.
12   Senator Womack to close.
13       SENATOR WOMACK: Members, we all -- we all
14   know what we went through and worked through and
15   tirelessly. Late nights. Many hours. Many hours spent
16   in the drafting room, of trying to help Senator Morris
17   and Senator Cathey in trying to alleviate some of the
18   problems they had. We worked on that. However,
19   congressional, it wasn't working for everybody. So
20   we're here where we're at, and here your bill's before
21   you. I ask that you concur with Senate Bill 8. Thank
22   you.
23       MALE SPEAKER: Thank you, Senator Womack.
24   Senator Womack moves to concur in Senate amendments
25   proposed to House -- to Senate Bill 8. When the

Page 13

1   machines are open, all those in favor to concur in the
2   Senate amendments will vote aye. All opposed will vote
3   nay. Madam Secretary may open the machines.
4       SENATOR HENRY: Go to machine, members, Go to
5   machines. Go to machines, members. Close machine,
6   please.
7       27 yeas, 11 nays, and the motion carries.
8       Senator Talbot for a motion.
9       SENATOR TALBOT: Thank you, Mr. President. I
10   make a motion that we adjourn sine die.
11       SENATOR HENRY: Without objection. Members,
12   if you could have your seat just for a second. Sit down
13   just.
14
15
16
17
18
19
20
21
22
23
24
25

4  (Pages 10 to 13)

Page 14

```
 1          CERTIFICATE OF TRANSCRIPTION
 2          I, Nathan Pikover, COO of TranscribeMe, Inc.,
 3  do hereby certify that
 4  290872-Audio-011924SCHAMB2-Edited-Appended was
 5  transcribed utilizing computer aided means and the
 6  TranscribeMe transcription team.
 7          The transcript of the audio mentioned above,
 8  having been transcribed and reviewed by TranscribeMe,
 9  Inc. to the best of the company's ability, is a full,
10  true, and correct transcription.
11          I further certify that neither I, nor the
12  TranscribeMe, Inc. transcription team, have any personal
13  association with the parties involved or are in any way
14  interested in the outcome thereof.
15          Dated this 8th of March, 2024.
16          _____
17          Nathan Pikover, COO TranscribeMe, Inc.
18
19
20
21
22
23
24
25
```