## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

PHILIP CALLAIS, LLOYD PRICE,           )
BRUCE ODELL, ELIZABETH ERSOFF,         )
ALBERT CAISSIE, DANIEL WEIR,           )
JOYCE LACOUR, CANDY CARROLL            )
PEAVY, TANYA WHITNEY, MIKE             )
JOHNSON, GROVER JOSEPH REES,           )
ROLFE MCCOLLISTER,                     )
                                       )       Case No. 3:24-cv-00122-DCJ-CES-RRS
            Plaintiffs,                )
                                       )
v.                                     )       District Judge  David C. Joseph
                                       )       Circuit Judge Carl E. Stewart
NANCY LANDRY, IN HER OFFICIAL          )       District Judge  Robert R. Summerhays
CAPACITY AS LOUISIANA                  )
SECRETARY OF STATE,                    )       Magistrate Judge Kayla D. McClusky
                                       )
            Defendant.                 )

## THE *ROBINSON* INTERVENORS' DESIGNATIONS OF THE 2024 FIRST
## LEGISLATIVE SESSION

*Robinson* Intervenors Press Robinson, Edgar Cage, Dorothy Nairne, Edwin Rene Soule,

Alice Washington, Clee Earnest Lowe, Davante Lewis, Martha Davis, Ambrose Sims, the National

Association for the Advancement of Colored People Louisiana State Conference, and the Power

Coalition for Equity and Justice (collectively, "Robinson Intervenors"), by and through counsel

designate the following:

| January 15, 2024 House Governmental Affairs Committee Hearing ||
|---|---|
| **Start** | **End** |
| 1:1 | 28:3 |
| 30:2 | 86:21 |

| January 15, 2024 Joint Session ||
|---|---|
| **Start** | **End** |
| 2:11 | 3:17 |
| 5:13 | 5:15 |

| 5:22 | 5:25 |
|---|---|
| 8:17 | 9:7 |
| 10:11 | 13:21 |

| January 16, 2024 Senate Governmental Affairs Committee Hearing [Part I] ||
|---|---|
| **Start** | **End** |
| 1:1 | 36:23 |

| January 16, 2024 Senate Governmental Affairs Committee Hearing [Part II] ||
|---|---|
| **Start** | **End** |
| 1:1 | 32:22 |

| January 17, 2024 Senate Floor Session ||
|---|---|
| **Start** | **End** |
| 1:1 | 24:16 |

| January 17, 2024 House Governmental Affairs Committee Hearing ||
|---|---|
| **Start** | **End** |
| 3:1 | 9:9 |
| 10:14 | 10:18 |

| January 18, 2024 House Governmental Affairs Committee Hearing ||
|---|---|
| **Start** | **End** |
| 4:18 | 105:11 |
| 120:4 | 124:7 |

| January 19, 2024 House Floor Session ||
|---|---|
| **Start** | **End** |
| 1:1 | 12:15 |

| January 19, 2024 Senate Floor Session | |
|---|---|
| **Start** | **End** |
| 1:1 | 13:13 |

Dated this 9th day of April, 2024            Respectfully submitted,

By: /s/ *Tracie L. Washington*                    By: /s/ *John Adcock*
Tracie L. Washington                          John Adcock
LA. Bar No. 25925                             Adcock Law LLC
Louisiana Justice Institute                   3110 Canal Street
8004 Belfast Street                           New Orleans, LA 70119
New Orleans, LA 70125                         Tel: (504) 233-3125
Tel: (504) 872-9134                           jnadcock@gmail.com
tracie.washington.esq@gmail.com


*Counsel for* Robinson *Intervenors Dorothy*       *Counsel for* Robinson *Intervenors*
*Nairne, Martha Davis, Clee Earnest Lowe,*
*and Rene Soule*

Stuart Naifeh*
Kathryn Sadasivan*
Victoria Wenger*
Colin Burke*
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
vwenger@naacpldf.org
cburke@naacpldf.org

R. Jared Evans
LA. Bar No. 34537
I. Sara Rohani*
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Sarah Brannon*
Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org
mkeenan@aclu.org

Nora Ahmed
NY Bar No. 5092374 (pro hac vice
forthcoming)
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

Robert A. Atkins*
Yahonnes Cleary*
Jonathan H. Hurwitz*
Amitav Chakraborty*
Adam P. Savitt*
Arielle B. McTootle*
Robert Klein*
Neil Chitrao*
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com
amctootle@paulweiss.com
rklein@paulweiss.com
nchitrao@paulweiss.com

Sophia Lin Lakin*
Garrett Muscatel*
Dayton Campbell-Harris (pro hac vice
forthcoming)**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org
gmuscatel@aclu.org
dcampbell-harris@aclu.org

T. Alora Thomas-Lundborg*
Daniel Hessel*
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

*Additional counsel for* Robinson *Intervenors*

\* Admitted pro hac vice.
\*\*Practice is limited to federal court.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record, on this 9th day of April, 2024.

By: /s/ *John Adcock*
John Adcock
Adcock Law LLC
L.A. Bar No. 30372
3110 Canal Street
New Orleans, LA 70119
Tel: (504) 233-3125
Fax: (504) 308-1266
jnadcock@gmail.com



# PohlmanUSA®
## Court Reporting and Litigation Services

House Governmental Affairs Committee Hearing -Audio Transcription

January 15, 2024

Phillip Callais, et al.

vs.

Nancy Landry

REPRESENTATIVE BEAULLIEU:  Members, if you could please find your seats.  Good morning, everyone. Today is January 15th, 2024.  Welcome to the committee on House and Governmental Affairs.  Welcome, members. Welcome, public.  This is the -- from what I can understand, the first gavel of the new legislative leaders here at -- at the capital.  So welcome, everyone.

A couple of things.  If you have a cell phone, please silence it.  If -- if you forgot to turn off your gumbo or you need to remind somebody to stir your gumbo back home, we ask you to step out and take all calls outside.  We have some cards up here for witnesses although we won't be hearing bills today.  And just reminding everybody, this is -- this is a preparatory committee meeting.  The special session doesn't start until this -- this afternoon.

So what we're going to be doing here is educating members, educating the public, refreshing everyone on redistricting and redistricting principles, and then also hearing from our attorney general.  So we won't be debating bills.  If -- if everyone could, you know, keep questions and comments strictly to the -- the subject matter that -- we're going to be here from an education standpoint.  And if you have questions as it

Page 2

1  relates to certain bills, we ask you to hold those until
2  we -- until we have -- have those bills.  But, Ms.
3  Baker, if you wouldn't mind, please call role.
4        MS. BAKER:  Thank you, Mr. Chair.  Chairman
5  Beaullieu?
6        REPRESENTATIVE BEAULLIEU:  Here.
7        MS. BAKER:  Present.  Vice-chair Lyons?
8  VICE-CHAIRMAN LYONS:  Present.
9        MS. BAKER:  Present.  Representative Billings?
10       REPRESENTATIVE BILLINGS:  Present.
11       MS. BAKER:  Present.  Representative Boyd?
12 Representative Carlson?
13       REPRESENTATIVE CARLSON:  Present.
14       MS. BAKER:  Present.  Representative Carter?
15 REPRESENTATIVE CARTER:  Present.
16       MS. BAKER:  Present.  Representative Carver?
17 REPRESENTATIVE CARVER:  Here.  Present.
18       MS. BAKER:  Present.  Representative Farnum?
19 REPRESENTATIVE FARNUM:  Here.
20       MS. BAKER:  Present.  Representative Gadberry?
21 REPRESENTATIVE GADBERRY:  Here.
22       MS. BAKER:  Present.  Representative Johnson?
23 REPRESENTATIVE JOHNSON:  Here.
24       MS. BAKER:  Present.  Representative
25 Larvadain?

Page 3

1        REPRESENTATIVE LARVADAIN:  Here.
2        MS. BAKER:  Present.  Representative Marcelle?
3  Representative Newell?  Representative Schamerhorn?
4        REPRESENTATIVE SCHAMERHORN:  Here.
5        MS. BAKER:  Present.  Representative Thomas?
6        REPRESENTATIVE THOMAS:  Here.
7        MS. BAKER:  Present.  Representative Wright?
8  Representative Wyble?
9        REPRESENTATIVE WYBLE:  Here.
10       MS. BAKER:  Present.  We have 13, and a
11 quorum.
12       REPRESENTATIVE BEAULLIEU:  Thank you.
13 Members, a couple of things.  One, in your folders
14 you're going to have a copy of the -- rules for the
15 House and Governmental Affairs Committee.  These are the
16 rules that have been adopted by this committee.  If you
17 would review them at -- at your leisure, we're not going
18 to be discussing them today.  But if you have questions
19 regarding these rules or you would like to amend these
20 rules or -- or make some changes, we're going to address
21 that in the -- in the regular session.  But I just
22 wanted to point that out that we have those in -- in the
23 folder for all of you.
24       Also, members, and -- and the viewing public,
25 we don't want to forget all of the work that this

Page 4

1  committee has done over the last several years as it
2  relates to redistricting.  On our website, if you go to
3  the legislator's main page and you click on House page,
4  and then there's a -- a button that says, "Additional
5  Sites."  Under that "Additional Sites" button is a
6  Louisiana redistricting site where we have all the work
7  that this committee has done over the last couple of
8  years.  We don't want to have to -- to -- we want -- we
9  don't want to forget that hard work.  And if anybody
10 needs a resource, there's a lot of resources there.
11       But with that said -- so we're going to start
12 off this morning with Ms. -- Ms. Lowery from here in the
13 House and Governmental staff.  She's going to update us
14 on some principles with redistricting and -- and kind of
15 get everybody up to speed.  So, Ms. Lowrey.
16       MS. LOWREY-DUFOUR:  Thank you so much, Mr.
17 Chairman.  Hi, members.  My name is Patricia
18 Lowrey-Dufour.  I am the senior legislative analyst for
19 House and Governmental Affairs.  I have staffed this
20 committee in some capacity since 1988.  And the chairman
21 has asked me to give y'all a brief redistricting 101
22 this morning, and it's going to be abbreviated.
23       And again, as the chairman said, there are a
24 plethora of resources available on the redistricting
25 website of the legislature, including links to the

Page 5

1  videos of the hearings, the roadshow hearings, all
2  public comments and documents that were received there.
3  So again, you are encouraged to go look there.
4        REPRESENTATIVE BEAULLIEU:  Anyone watching
5  online, we're working on the technology.
6        MS. LOWREY-DUFOUR:  Thank you, Anthony.  Thank
7  you.  Okay.  Briefly, we'll be giving an overview of
8  redistricting terms concepts and law, redistricting
9  criteria, the 2020 census population and population
10 trends, malapportionment statistics and illustrative
11 maps on Congress and the Supreme Court since those are
12 items included in the call for this special session, and
13 the act for Congress that was adopted in the 2022 First
14 Extraordinary Session as well as the timeline related to
15 the adoption of that act.
16       Okay.  Briefly, Louisiana's resident
17 population is 4,657,757.  This is the number that we use
18 to determine the ideal district.  Now, why is this
19 important to you?  One of the main criteria for
20 redistricting is to achieve population equality, so --
21 among the district.  So the ideal district population is
22 very important.
23       Just so you know, for congressional
24 apportionment there is a different number that is used.
25 It's called the apportionment population.  And Louisiana

2  (Pages 2 to 5)

## Page 6

1  had an additional 3,711 overseas and uniform citizens
2  allocated to Louisiana for the apportionment population
3  which is how Congress uses the method of equal
4  proportions to allocate the number of congressmen to the
5  state.
6       Okay.  Briefly, in Louisiana our 2020 census
7  data showed that we grew by 2.74 percent while the
8  growth rate of the nation was 7.35 and the southern
9  region growth rate was 10.22.  This is key because even
10 though we are showing a population growth, we are
11 lagging behind both the nation and the state.  And just
12 keep in mind that the nation grew at its lowest rate
13 since 1940.
14      This is a map that shows the historical
15 population trends in the state of Louisiana.  And while
16 you can see that there were some decade differences --
17 so, you know, clearly we had significant population
18 growth from 1990 to 2000, you know, there were trends
19 such as what you see in the 2000s to 2010 which were the
20 effects of hurricanes Katrina and Rita on our coastal
21 and Orleans metro areas.
22      But what I also want to tell you is this is
23 important because, again, even though the state grew in
24 each of these decades, when I first started working for
25 this committee in the late eighties, we had eight

## Page 7

1  congressmen allocated to the state.  So in the 1980 to
2  '90, we had eight.  Following the 1990 census, we were
3  dropped to seven.  And then we maintained seven from
4  2000 to 2010 and again from -- then we dropped another
5  congressman.
6       So what you see is a pattern is emerging that
7  every other decade, even though the state is growing,
8  because we're lagging behind the nation we are losing
9  our -- our number allocated to us for Congress.
10      So specifically with the 2020 census, you will
11 see there is growth in this state along, really, the
12 I-10/12 corridor.  There is loss in north Louisiana
13 generally, although there are a few spots of growth and,
14 you know, there are areas of our coast that are clearly
15 suffering population losses.  So why is this important?
16 Obviously, when the districts were drawn in 2010, the
17 population, you know, was substantially equal -- or
18 equal to the extent practicable in all of the districts.
19 Over the decade, you can see, because of the shifts in
20 population it necessitated a change in the district
21 boundaries.
22      Now, our census population demographic change.
23 In 2010, you can see there we had 62.56 percent of
24 people who identified as single race White, 32.8 percent
25 of people who identified as Black, and we had 1.8

## Page 8

1  percent of people who identified as Asian, 1.3 percent
2  that identified as American Indian, and 1.83 as Other.
3  And one thing I want to point out about this chart is
4  Hispanic is an ethnicity.  So when you look at these
5  numbers across the chart, they will not total to 100
6  because you can be any of these races and also Hispanic.
7  Okay?
8       So Hispanic is separately reported as a
9  number, and we have 4 -- we had 4.25 percent Hispanic in
10 2010.  That number has increased to 6.92 in 2020.  The
11 White population is 57.06; the Black population, 33.13;
12 Asian, 2.30; American Indian, 1.87.  And again, the
13 Other -- you'll see the most significant growth in the
14 Other category.  The sum of the race is interesting
15 because it's not -- these are people who chose to
16 respond to the census as being not White, not Black, not
17 Asian, not American Indian.  Okay.  So it's just an
18 interesting jump to see this increase.
19      REPRESENTATIVE BEAULLIEU:  Yeah.  Ms. Lowrey,
20 also just to kind of point out, if -- if members look at
21 the -- the decrease in the White population and look at
22 the increase in the Other population, they're pretty
23 close to the same from a number standpoint.  Just if --
24 I don't know if it's more people.  I -- we had talked
25 about this in committee over the last couple of years,

## Page 9

1  if it's more people identifying as Other with mixed
2  races.  But just to kind of point that out for you all.
3       MS. LOWREY-DUFOUR:  Right.  And -- and I do
4  want to point out that we -- so this will tell you how
5  the census reports the -- the population to the state.
6  So every person in the state can respond in a single
7  race or any combination of six races.  And so there are
8  -- you know, you can respond that you are White, Black,
9  and African -- you could be all six, okay?  And you can
10 respond to the census that way.
11      But in order for y'all to be able to analyze
12 reports -- and I have included -- we've included some
13 reports from Act 6 which was the congressional act that
14 y'all adopted.  And if you flip to this page called,
15 "Total Population", it's numbered page 9 in your packet.
16 And I just want to talk about it just a little bit so
17 that y'all will become familiar because tomorrow, as we
18 are hearing bills, you'll need to be familiar with these
19 reports.
20      So each report will have a total population
21 figure, will have White -- so in order -- so we -- the
22 -- your six -- your predecessors on this committee and
23 the Joint Senate Committee adopted a population
24 allocation document that is available on the
25 redistricting website.  And so the White population

3  (Pages 6 to 9)

Page 10

1  number that you see on this report indicates White
2  alone.  So this is not going to be any person that
3  reported that they were White and any other race.
4      The Black category reflects all people who
5  reported Black alone, plus any other race and Black,
6  okay?  Asian is Asian alone and any other race other
7  than Black, okay?  And total American Indian, the same,
8  American Indian alone and any other race other than
9  Asian or Black.  And the Other is that category that we
10 talked about, the people who reported that they were any
11 other, and it also includes the Pacific Islanders that
12 the population in Louisiana was not significant.  So
13 that is included in the Other category.
14      And the category that's labeled VAP total,
15 that means voting-age population.  And that's going to
16 be key, as you will hear, I'm sure, from our attorney
17 general.  Okay.  Moving on.  Any questions about that?
18 All right.  Yes, sir.
19      REPRESENTATIVE CARTER:  So (inaudible 0:13:18)
20 --
21      REPRESENTATIVE BEAULLIEU:  Hold on, let me --
22 let -- is it Carter?
23      REPRESENTATIVE CARTER:  If -- if you reported
24 --
25      REPRESENTATIVE BEAULLIEU:  Representative

Page 11

1  Carter, you're on.
2      REPRESENTATIVE CARTER:  Thank you.  Thank you,
3  Mr. Chairman.  If you reported White and -- and you --
4  you -- is any other -- only White -- is counted all the
5  (inaudible 0:13:36) --
6      MS. LOWREY-DUFOUR:  The White population
7  category on your report is people who responded to the
8  census as being White alone.
9      REPRESENTATIVE CARTER:  White alone?
10     MS. LOWREY-DUFOUR:  Not combination with any
11 other race.
12     REPRESENTATIVE CARTER:  Okay.
13     MS. LOWREY-DUFOUR:  Okay?
14     REPRESENTATIVE CARTER:  So, basically, the
15 same way with the -- the Black population as --
16     MS. LOWREY-DUFOUR:  No, sir.
17     REPRESENTATIVE CARTER:  So go back
18 through that because --
19     MS. LOWREY-DUFOUR:  On the report -- and
20 again, this population allocation document is on the
21 website and it was adopted by the committee when we
22 started the process.  So the Black population category
23 is people who reported to the census that they were
24 Black and any other race.
25     REPRESENTATIVE CARTER:  Okay.

Page 12

1      MS. LOWREY-DUFOUR:  Okay.  So they could be a
2  combination of up to the six.
3      REPRESENTATIVE BEAULLIEU:  Oh, gotcha.
4      MS. LOWREY-DUFOUR:  Okay?
5      REPRESENTATIVE BEAULLIEU:  Thank you,
6  Representative Carter.  And members, also just to -- to
7  let you all know, I know some of this -- this room --
8  this technology is new to some of y'all.  The buttons on
9  your -- your desk, the one to the left is -- is -- is
10 dead.  There's nothing on it.  So if you want to be
11 recognized, please hit the button towards your right,
12 and you'll see your microphone light up when -- when
13 it's your turn.  Representative Gadberry for a question.
14     REPRESENTATIVE GADBERRY:  A pleasure, Mr.
15 Chair.
16     REPRESENTATIVE BEAULLIEU:  Give me a second.
17 It's giving me a little trouble here.  All right.
18 You're on.
19     REPRESENTATIVE GADBERRY:  Pleasure, Mr. Chair.
20 So when we proportion a district, we go by voting-age
21 population and not total population?
22     MS. LOWREY-DUFOUR:  No, sir.  So the
23 population of the district that is keyed into the ideal
24 district population is the total population of the
25 district.

Page 13

1      REPRESENTATIVE GADBERRY:  Okay.  So what's the
2  significance of voting-age population then if we --
3      MS. LOWREY-DUFOUR:  That is the population
4  that is 18 or over, and it is significant when you're
5  analyzing voting rights issues because, obviously, the
6  people who are 18 and over are of voting age.
7      REPRESENTATIVE GADBERRY:  Right.  So the -- I
8  guess the question is -- is -- that I've always come up
9  with is -- and I'm just taking the -- say, District 1
10 here, it shows 69 percent is White on total population
11 and 100 -- I'm sorry, 71 percent on voting-age
12 population.  So -- so when we proportion or when we come
13 up with a district, do we go by the percentage based on
14 total population or voting-age population?
15     MS. LOWREY-DUFOUR:  To achieve the population
16 equality required on the districts, you go by
17 population.  To achieve other goals, you look at the
18 totality of the circumstances including voting-age
19 population, okay?
20     REPRESENTATIVE GADBERRY:  Thank you.
21     MS. LOWREY-DUFOUR:  You're welcome.  Okay.
22     REPRESENTATIVE BEAULLIEU:  You did that well,
23 Ms. Lowrey.
24     MS. LOWREY-DUFOUR:  Thank you, Mr. Chairman.
25 What is redistricting?  I will tell you the terms

4 (Pages 10 to 13)

Page 14

1  apportionment and districting are sometimes used
2  interchangeably, and in fact, in our state constitution,
3  the term reapportionment is used.  However, they are
4  different concepts.  Apportionment is the process of
5  allocating seats in a legislature while districting is
6  the process of drawing lines to create geographical
7  territories from which officials are elected.
8      So, again, we talked about the apportionment
9  of numbers of members of Congress to each state.  That
10  is allocating seats to the state in Congress, whereas
11  what -- the charge before you under the call for this
12  special session is to draw lines for the geographic
13  territories from which those officials will be elected.
14      Why do you redistrict?  Well, there are many,
15  many, many legal requirements involving redistricting,
16  as we briefly touched on with Representative Gadberry
17  just a moment ago.  One includes Article III, Section 6
18  of our constitution that includes deadlines and duties
19  regarding legislative redistricting.  There are also
20  various statutes for your local governing bodies and
21  school boards to conduct redistrictings and as well as
22  deadlines.  And then there are some general legal
23  requirements, including the Equal Protection Clause and
24  the Voting Rights Act of 1965.
25      So given that, who do you -- who are you

Page 15

1  responsible for redistricting?  Congress, the courts,
2  the House and the Senate, the Public Service Commission
3  and the State Board Of Elementary and Secondary
4  Education.  All those have been enacted by the state
5  legislature as laws, so it takes a bill.
6      The issue's dealing with federal law, right,
7  so equal population.  You know, you hear often the term,
8  "One man, one vote," you know.  So how do you measure
9  it?  Again, you measure it by looking at the ideal
10  population.  And again, how do we come up with that
11  ideal population?  We take the total resident population
12  of the state or the geographic area where the districts
13  are to be confected, and you divide that total
14  population by the number of districts, and you come up
15  with an ideal district population.
16      So I'm going to refer you now to the planned
17  statistic document that's in your folder.  It's numbered
18  8.  And again, this is all relevant to Act 5 of the 2022
19  First Extraordinary Session.
20      So this report -- and again, I encourage you
21  to become familiar with the structure of it and what it
22  is telling you.  So this will tell you there are six
23  districts in a congressional plan, they are single
24  member districts, the actual population within the
25  district, the ideal population that you are basing the

Page 16

1  calculation to determine your deviation off of.  And so
2  you can see there that the absolute deviation ranges
3  from negative 24 to positive 41 for an overall deviation
4  of 65 people between all six districts and a relative
5  mean deviation of 0.00 and overall range of 0.01.
6      REPRESENTATIVE BEAULLIEU:  Ms. Lowrey, if you
7  don't mind, just -- if -- for a question, if we -- if we
8  drew -- since we're -- one of the maps we're going to be
9  talking about is -- is Congress.  And we were out of --
10  the deviation was 1 and a half percent which on -- on
11  the legislative maps, that's well within -- within
12  deviation range.  What would 1 and a half percent or 2
13  percent do for Congress?  Is that allowable?  Is there
14  -- what's -- what's -- what's the wiggle room there?
15      MS. LOWREY-DUFOUR:  So the courts have clearly
16  established that strict population equality among
17  congressional districts has to be the overriding
18  objective.  Now that said, however, there have also been
19  some deviations that have been okay in certain states
20  provided the state has an overriding reason for it that
21  is rational and nondiscriminatory.
22      REPRESENTATIVE BEAULLIEU:  So we want to be as
23  close to zero as we can?
24      MS. LOWREY-DUFOUR:  Yes.  Sir.
25      REPRESENTATIVE BEAULLIEU:  Thank you.

Page 17

1      MS. LOWREY-DUFOUR:  Okay.  Everybody clear on
2  population equality and deviations?  Okay.  And as the
3  chairman alluded to, the standards are different between
4  Congress and other representative districts that we
5  draw.  They are based on different legal provisions.
6      Congress, the nearly as equal in population as
7  practicable is based on jurisprudence.  Wesberry v.
8  Sanders is the seminal case there, based on Article 1,
9  Section 2 in the 14th Amendment, "Representatives shall
10  be apportioned," among the states, "according to their
11  respective numbers."  And you must make a good faith
12  effort to avoid deviation and to be able to provide a
13  legally acceptable, nondiscriminatory justification for
14  any deviation.
15      Whereas for other representative districts
16  that you will draw, you are allowed to have a slightly
17  larger deviation field.  It is substantial equality of
18  population among various districts.  That derives from
19  the case of Reynolds v. Sims.  Again, the 1960s created
20  a lot of cases dealing with population equality as well
21  as requirements for single member districts.
22      Again, based on the Equal Protection Clause of
23  the 14th Amendment, there's a generally accepted 10
24  percent standard that a legislative plan with an overall
25  range of less than 10 percent would not be enough to

5 (Pages 14 to 17)

Page 18

1  make a prima facie case of invidious discrimination
2  under the 14th Amendment. However, so asterisk, it is
3  not necessarily a state harbor -- a safe harbor. I'm
4  sorry.
5      In Larios v. Cox, you -- any substantial
6  deviation must have a legitimate state interest behind
7  it. Okay. In Louisiana, in order to accomplish this
8  overall 10 percent range, we have adopted a criteria of
9  plus or minus five from the ideal to stay as close to
10  that ideal population among the districts as you can
11  get.
12      Okay. Again, and I know this seems like it's
13  very repetitive. It's important. Equality of
14  population must be the overriding objective of
15  districting, and deviations from the -- the principle
16  are permissible only if incident to the effectuation of
17  a rational state policy which would include allowing
18  representation to political subdivisions, compactness,
19  preserving cores of prior districts, and avoiding
20  contest between incumbents. And again, that is based on
21  Reynolds v. Sims.
22      Okay. Judicial districts, which, again, will
23  be the subject of this special session. In a Louisiana
24  case, Wells v. Edwards which was decided in the Middle
25  District of Louisiana, the court decided that the one

Page 19

1  person, one vote standard does not apply to judicial
2  districts as judges serve the people. They do not
3  represent the people.
4      Now, we're going to talk about other issues of
5  federal law: discrimination against minorities, the
6  Voting Rights Act of 1965. And again, principles of
7  this are contained within the 14th and 15th Amendment,
8  but basically, Section 2 of the Voting Rights Act
9  prohibits the state or any political subdivision from
10  imposing a voting qualification, standard, practice, or
11  procedure that results in the denial or abridgment of
12  any citizen's right to vote on account of race, color,
13  status as a member of a language minority group.
14      So there have been a lot of litigation on this
15  issue. Section 2 of the Voting Rights Act was amended
16  in 1982 to clarify that a violation of Section 2 is
17  established if, based on the totality of circumstances,
18  it is shown that election processes are not equally open
19  to participation by members of a protected class in that
20  its members have less opportunity than other members of
21  the electorate to participate in the political process
22  and elect representative of their choice.
23      So there was a case, Thornburg v. Gingles,
24  1986, that established certain preconditions that courts
25  will look to to make determinations on violations of the

Page 20

1  Voting Rights Act. They are size and geographical
2  compactness of the group. It requires that the
3  population be sufficiently large and geographically
4  compact; a constitutional majority in a single member
5  district; that the minority population is politically
6  cohesive; and that in the absence of special
7  circumstances, block voting by the majority defeats the
8  minority's preferred candidates.
9      Once courts have established those
10  preconditions, there are other objective factors that it
11  looks to to determine the totality of the circumstances.
12  And I'm not going to go into those at this moment, but
13  if you would like to talk later, we'll be happy to do
14  that.
15      Now, the other side of that is racial
16  gerrymandering. So again, the Equal Protection Clause
17  of the 14th Amendment found that -- you know, there have
18  been a series of cases, Reno v. Shaw in Louisiana, Hays
19  -- the Hays lines of cases where the courts have found
20  that if race was found to be the predominant overriding
21  factor, that strict scrutiny on the state's plan would
22  apply. And in order to survive that strict scrutiny,
23  the plan must have been narrowly tailored to serve a
24  compelling state interest.
25      So what would be a compelling state interest?

Page 21

1  Remedying past discrimination, avoiding retrogression,
2  avoiding violations of Section 2 of the Voting Rights
3  Act. And key here is those interests must be strongly
4  supported in the evidence when the policymakers are
5  making their decisions on the plan. And this would
6  apply not only to plans that distinguish citizens
7  because of race, but also to plans that may be race
8  neutral but on their face are inexplicable except on
9  grounds other than race.
10      REPRESENTATIVE BEAULLIEU: Ms. Lowrey, we have
11  a question. Representative Marcelle.
12      REPRESENTATIVE MARCELLE: Thank you. Can you
13  go back over what you just said about the -- the strict
14  scrutiny and how -- how that's overridden? Why would
15  that be overridden? So I -- I know you -- you -- you
16  talked about the --
17      MS. LOWREY-DUFOUR: No, I --
18      REPRESENTATIVE MARCELLE: -- idea of
19  population, and I'm just --
20      MS. LOWREY-DUFOUR: -- think it's satisfied.
21      REPRESENTATIVE MARCELLE: So it has to be
22  satisfied?
23      MS. LOWREY-DUFOUR: That if you can prove that
24  it -- that the plan was narrowly tailored to further
25  your compelling governmental interest.

6 (Pages 18 to 21)

Page 22

1    REPRESENTATIVE MARCELLE:  And what would be an
2   example of that?
3       MS. LOWREY-DUFOUR:  Remedying past
4   discrimination, avoiding retrogression, avoiding
5   violations of Section 2 of the Voting Rights Act.  And
6   again, all those things must be firmly established on
7   the record as you are making your decisions on a plan.
8       REPRESENTATIVE MARCELLE:  So in essence -- I'm
9   new on the committee, so, you know, you got to bring me
10  up to speed.  So -- so in essence, if -- if a bill is
11  proposed and these criterias aren't met, what you're
12  saying is during the argument of the bill they have to
13  be laid out -- or they should be laid out.  Is that what
14  the law says?
15      MS. LOWREY-DUFOUR:  Okay.  This is based on
16  jurisprudence, not, you know, necessarily the letter of
17  the law.  But to -- I think, you know, because y'all
18  were elected to represent your districts and the state
19  of Louisiana.  And y'all are the policymakers of the
20  state of Louisiana.  And so as you're making the policy,
21  I think it's important that as you're presenting --
22  because, you know, individually, you -- you alone have
23  the right to present your bill, right?
24      REPRESENTATIVE MARCELLE:  Right.
25      MS. LOWREY-DUFOUR:  And I think it's important

Page 23

1   for your -- for your colleagues to understand the
2   reasons why because you're asking them to vote -- or to
3   -- to vote for your bill.  And I think that would be on
4   any bill that you present.  You know, what is the policy
5   behind your legislation?  Why is it important?  So --
6       REPRESENTATIVE MARCELLE:  Well -- well, I
7   understand, you know, that each of us have to, when we
8   present a bill, talk about how it's important to us at
9   our districts, but we also have to take into account of
10  the laws that are set and the criteria that we need to
11  meet.  So when we don't do that, then we find ourselves
12  in court like -- like we are now.
13      MS. LOWREY-DUFOUR:  Yes, ma'am.
14      REPRESENTATIVE MARCELLE:  Thank you.
15      MS. LOWREY-DUFOUR:  Thank you.
16      REPRESENTATIVE BEAULLIEU:  Thank you,
17  Representative Marcelle.
18      MS. LOWREY-DUFOUR:  And -- and one other thing
19  I want to say is the courts are very aware that
20  redistricting plans are not drawn in a vacuum.  They
21  understand that this is a, you know, environment, a
22  political environment, that y'all have awareness of many
23  factors.  So I just want to put that on.
24      All right.  Redistricting criteria, the
25  legislature adopted, in the '21 Regular Session, Joint

Page 24

1   Rule -- Joint Rule 21.  So this is the criteria, and
2   copies of this rule, members, are in your packets.  And
3   this is important because this is the standards that the
4   legislature has adopted for consideration of
5   redistricting plans.
6       So what are we talking about?  Compliance with
7   the Equal Protection Clause of the 14th Amendment, the
8   15th Amendment, Section 2 of the Voting Rights Act, all
9   other applicable federal and state law; that all
10  redistricting plans must be composed of contiguous
11  geography - does anybody have a question about that? -
12  okay; contain whole VTDs - so that is the term -- the
13  census term for election precincts - to the extent
14  practicable, and a limitation on the number of divisions
15  that can be used in a precinct if they have to be split.
16      All redistricting plans have to respect
17  establish boundaries of parish municipalities - but that
18  is subordinate and not used to undermine maintenance of
19  communities of interest within the same district - to
20  the extent practicable.  We must use the most recent
21  census data, that is the redistricting data file, the PL
22  94-171 data released by the census, as it is validated
23  through our data verification program.
24      If a member of the public wishes to submit a
25  plan, they must submit it electronically in a comma

Page 25

1   delimited block equivalency file.  The purpose for this,
2   members, is so we can import it into our system and be
3   able to produce the reports that you're going to be used
4   to seeing.  Each redistricting plan for the House and
5   the Senate, PSC, BESE, Congress, and the Supreme Court
6   must be a whole plan which assigns all the geography of
7   the state.  Now, why is this?
8       Well, I can tell you what.  After many decades
9   of drawing districts, I can tell you: I can draw a
10  single perfect district every day all day, but drawing
11  105 or 39 or even 6 is much more difficult, so.  And you
12  have to, again, consider the totality of the
13  circumstances there.  So we require -- you can't just
14  submit the perfect district, you must submit a whole
15  plan.
16      Each redistricting plan for the House, Senate,
17  PSC, and BESE must contain single member districts;
18  contain districts substantially equal in population, and
19  that, again, is that plus or minus 5 percent from the
20  ideal; must give due consideration to traditional
21  district alignments to the extent practicable.  For
22  Congress, again, single member districts, and contain
23  districts with as nearly equal to the ideal district
24  population as practicable.
25      Okay.  Let's talk about what we've got.  So

7 (Pages 22 to 25)

Page 26

1  when the 2020 census came in and was reported to the
2  state -- and again, this was a unique year for the
3  census.  They were seriously behind in reporting the
4  data to the states, and they also employed a new privacy
5  metric, the differential privacy, which has been a
6  challenge.  But anyway, the census data is considered
7  the gold standard for data to use for redistricting.
8          So in 2010, the ideal population for
9  congressional districts was 755,562.  That increased by
10  over 20,000 to 776,292 following the 2020 census.  Why
11  is this important?  Well, here is the map of the prior
12  congressional districts before the redistricting cycle
13  following the 2020 census.  This is the
14  malapportionment.  So what does that mean?  That is the
15  number by which the districts, both each individual
16  district and the overall plan, deviate from the ideal.
17  And as you can see, there is substantial deviation.
18          There is a difference of 88,120 between
19  Congressional District number 4 and Congressional
20  District number 6.  And as a reminder, congressional
21  districts have to be as close to equal in population as
22  possible.  Therefore, the legislature had to act to
23  redraw the districts.  I call this the heat map.  This
24  shows the -- and so the dark orange reddish color are
25  deviations with -- that are furthest below the ideal.

Page 27

1  The lighter orange is still below the ideal.  The light
2  yellow colors are population that is above.  But
3  obviously, District 6 was the most above the ideal
4  district.
5          So to remedy the population inequality among
6  the districts, the legislature passed a bill.  That bill
7  was introduced on February 1st.  It was reported
8  favorably by your predecessor committee on February 4th,
9  2022.  It passed the House, 70 votes to 33 nays, on the
10  10th.  It was received in the Senate on the 14th.  The
11  Senate and Governmental Affairs Committee reported it on
12  the 15th.  Senate passed it 27 to 10 on the 18th.  The
13  House concurred in amendments, 62 yeas to 27 nays, on
14  the 18th.
15          Then it was sent to the governor on March the
16  10th.  The governor vetoed the bill on May the 30th.
17  The House override the veto, 72 yeas to 31 nays.  On
18  March 30th, the Senate also overrode the veto, 27 yeas
19  to 11 nays.  And on March 31st, the bill became Act
20  number 5 of the 2022 First Extraordinary Session.  This
21  bill, Act 5, is -- this map represents the districts
22  that were drawn pursuant to Act 5.  And this is the map
23  that, again, is in litigation currently.
24          This is the population, again, statistics, the
25  deviations.  You've looked at the report.  I don't need

Page 28

1  to repeat that to you, but you can see that they are as
2  nearly equal in population, and certainly much more
3  equal in population than where we started.
4          Malapportionment of the Supreme Court, and
5  we're talking about this again because it is in the
6  special session call.  These are the current districts
7  for the seven Supreme Court districts.  These districts,
8  while not subject to equal population requirements due
9  to that case that we mentioned earlier -- when these
10  districts were last drawn in 1997 using the 1990 census
11  -- okay.  So they were drawn in 1997 using 1990 census
12  figures.
13          The legislature did draw them with
14  substantially equal populations, and in fact, the mean
15  deviation was less than 2 percent among the districts.
16  The ideal district population at that time was 602,853.
17          This, members, shows you this current state of
18  the deviations among each of the Supreme Court
19  districts.  District 1, well, the -- I'm just going to
20  say the -- population of the districts vary
21  considerably from a low of 476,554 in District number 7
22  which is a Orleans and Jefferson-based district, to a
23  high of 838,610 in District 5 which is the Baton Rouge
24  metropolitan-based district, a difference among the
25  districts of more than 362,000 people.

Page 29

1          REPRESENTATIVE BEAULLIEU:  Ms. Lowrey, just --
2  the original districts, they were -- they were built in
3  the '20s; is that -- is that correct?  And only changed
4  once if -- if my memory --
5          MS. LOWREY-DUFOUR:  Changed once.  I believe,
6  '21, they were -- Supreme Court districts were
7  established.
8          REPRESENTATIVE BEAULLIEU:  Let me -- since
9  we're in the twenties again, like, we're talking the
10  1920s?
11          MS. LOWREY-DUFOUR:  Yes.  I'm sorry.  Yes.
12  Yes.  Back before, I believe, anyone in this room had
13  yet made an appearance.
14          REPRESENTATIVE BEAULLIEU:  Yeah.
15  Representative Thompson may have been in the
16  legislature, but that's -- that's it.
17          (Laughter.)
18          MS. LOWREY-DUFOUR:  He certainly has more
19  seniority than anyone in the legislature.  Whether or
20  not he was actually here in the '20s, we'd have to ask.
21  But, yes.  So again, and here's that heat map showing
22  the population deviations.  Dark red, dark orange,
23  furthest below the ideal, and then dark green
24  representing population the furthest above the ideal.
25          REPRESENTATIVE BEAULLIEU:  Ms. Lowrey, we have

8  (Pages 26 to 29)

Page 30

1  a question. Representative Wyble.
2      REPRESENTATIVE WYBLE: Thank you, Mr. Chair.
3  Ms. Lowrey, thank you for all of this information. It's
4  very helpful. I'm still trying to wrap my head around
5  how the census is counting population, what we talked
6  about earlier. So if a respondent checked White and
7  Asian, that respondent would be counted as --
8      MS. LOWREY-DUFOUR: Okay. The census reported
9  all of those population figures to the state, okay?
10     REPRESENTATIVE WYBLE: Right.
11     MS. LOWREY-DUFOUR: So if you really want to
12 know who reported -- not who, but numbers who reported
13 themselves as White and Asian, we can certainly provide
14 that to you. However, and I -- I just want to say
15 there's a limited number -- there's a limited space on
16 -- on reports. And in order for you to be able to
17 analyze voting-rights issues -- and we have a document
18 on our website, and it was a kind of guidance from the
19 justice department -- the United States Justice
20 Department about analyzing Section 2 guidance for that
21 where you really look at one -- the population of
22 "alone," so who reported single race.
23     And then you would allocate to the protected
24 class minority groups the White plus the minority group
25 as well as any other reporting. So you would look at it

Page 31

1  like that. So for simplicity and -- and to basically
2  allow y'all to look at, you know, categories of
3  population, this is how the reports are confected. But
4  the census reports hundreds of categories of racial
5  populations, you know, and they'll tell you. I mean,
6  it's, like, White alone, White plus Black, White plus
7  Asian, White plus Black plus Asian plus other. I mean,
8  all those things will be reported by the census.
9      But for simplicity, I mean, there's no way for
10 y'all to look at --
11     REPRESENTATIVE WYBLE: Sure.
12     MS. LOWREY-DUFOUR: -- the report --
13     REPRESENTATIVE WYBLE: Sure.
14     MS. LOWREY-DUFOUR: -- because it would be
15 hundreds of columns of data.
16     REPRESENTATIVE WYBLE: But -- but that
17 criteria is regarded equally regardless of what they
18 check off, I guess is what I'm trying to find out. If
19 -- if they were White -- White only, they're counted as
20 White. But if they're White and another, then they're
21 counted as Other. But if they check off Black and
22 others, then we count them as part of our Black
23 population; is that correct?
24     MS. LOWREY-DUFOUR: Right. And that's based
25 on that guidance.

Page 32

1      REPRESENTATIVE WYBLE: From the federal
2  government?
3      MS. LOWREY-DUFOUR: Yes, sir.
4      REPRESENTATIVE WYBLE: Has that guidance been
5  -- I -- I don't know if this is a fair question or not.
6  Was that similar guidance in 2020 --
7      MS. LOWREY-DUFOUR: Yeah.
8      REPRESENTATIVE WYBLE: -- compared to 2010?
9      MS. LOWREY-DUFOUR: Yes.
10     REPRESENTATIVE WYBLE: Has it always been that
11 way?
12     MS. LOWREY-DUFOUR: It's similar guidance.
13     REPRESENTATIVE WYBLE: All right. Thank you.
14     MS. LOWREY-DUFOUR: No. You're very welcome.
15 Okay. Well, that --
16     REPRESENTATIVE BEAULLIEU: I think
17 Representative --
18     MS. LOWREY-DUFOUR: -- concludes my
19 presentation, unless there's any other questions.
20     REPRESENTATIVE BEAULLIEU: Thank you, Ms.
21 Lowrey. Representative Gadberry does have a question.
22 Representative Gadberry.
23     REPRESENTATIVE GADBERRY: Thank you, Mr.
24 Chair. Just to make this clear, what was the ruling
25 from the judge against the maps that were submitted? I

Page 33

1  -- I assume we submitted a --
2      MS. LOWREY-DUFOUR: Representative Gadberry,
3  we do have the attorney general here today --
4      REPRESENTATIVE GADBERRY: Okay.
5      MS. LOWREY-DUFOUR: -- to address those issues
6  regarding the litigation, and I think it would be much
7  more appropriate coming from the chief legal officer of
8  the state.
9      REPRESENTATIVE GADBERRY: I figured that would
10 be your answer. We submitted Act 5 though, right? This
11 one?
12     MS. LOWREY-DUFOUR: Act 5 --
13     REPRESENTATIVE GADBERRY: Is what we submitted
14 --
15     MS. LOWREY-DUFOUR: -- was adopted by the
16 legislature.
17     REPRESENTATIVE GADBERRY: That's what we
18 submitted to the judge?
19     MS. LOWREY-DUFOUR: Well, the judge was
20 looking at it --
21     REPRESENTATIVE GADBERRY: Yeah.
22     MS. LOWREY-DUFOUR: -- as part of the
23 litigation.
24     REPRESENTATIVE GADBERRY: Right.
25     MS. LOWREY-DUFOUR: Okay?

9 (Pages 30 to 33)

Page 34

1   REPRESENTATIVE GADBERRY:  That's the one that
2   she looked at though, that she rejected?
3       MS. LOWREY-DUFOUR:  Well, I mean -- and -- and
4   also there have been other plans --
5       REPRESENTATIVE GADBERRY:  Okay.
6       MS. LOWREY-DUFOUR:  -- that have been
7   submitted by plaintiffs to the court.
8       REPRESENTATIVE GADBERRY:  And -- and would you
9   say that Act 5 did not meet the redistricting criteria?
10      MS. LOWREY-DUFOUR:  Representative Gadberry --
11      REPRESENTATIVE GADBERRY:  I know.  You're not
12  (inaudible 0:43:45) --
13      MS. LOWREY-DUFOUR:  That is a -- that is a
14  legal matter that is currently the subject of litigation
15  in the Middle District, and again, much more
16  appropriately addressed by our chief legal officer.
17      REPRESENTATIVE BEAULLIEU:  Yeah.  We can let
18  our attorney general handle that one.
19      REPRESENTATIVE GADBERRY:  Okay.  Thank you.
20      MS. LOWREY-DUFOUR:  Thank you.
21      REPRESENTATIVE BEAULLIEU:  Thank you, Ms.
22  Lowrey.  Members, as -- as you all were just -- got a --
23  got a teaser from Representative Gadberry, we have our
24  attorney general here with us, Ms. -- Ms. Liz Murrill.
25  She's going to join us and give us an update on the

Page 35

1   litigation.  And I see Ms. Murrill has a familiar face
2   with her, so I'd like to welcome back to the House of
3   Representatives former colleague Representative Larry
4   Frieman.  Welcome, welcome, Mr. Frieman.
5       MR. FRIEMAN:  Thank you, Chair.  Thank you,
6   members.  It's -- I'm glad to be back.  And sitting on
7   this side of the table is a familiar place --
8       REPRESENTATIVE BEAULLIEU:  Yeah.
9       MR. FRIEMAN:  -- for myself as well.  So thank
10  you for having me.
11      REPRESENTATIVE BEAULLIEU:  If you wouldn't
12  mind, everyone, and introduce yourself for the
13  committee, and then it's all yours.
14      MS. MURRILL:  Thank you, Mr. Chairman, and
15  members of the committee.  It's great to be with you
16  today as your new attorney general.  I'm Liz Murrill.  I
17  also have with me Tom Jones who is the new director of
18  the civil division and has been involved in the
19  litigation.  And now, chief deputy -- almost chief
20  deputy, assuming you confirm him, is Larry Frieman.  So
21  that'll be before you soon, too.
22      I -- I -- I want to tell you that
23  redistricting is hard.  I'm not going to tell you this
24  is easy.  I -- I think that you did a -- you did the
25  best job you could before.  We've been in litigation.

Page 36

1   The last time redistricting, in the 1990s, it -- it was
2   -- when the second majority/minority map was drawn, we
3   ended up in litigation for a decade.  So there is no
4   guarantee that when you do this again, we won't still be
5   in litigation.  But we are in litigation now.
6       The District Court judge has conducted a
7   fact-finding mission - that's what will -- what always
8   happens - and made fact findings regarding the map.  She
9   issued an injunction.  That injunction is not currently
10  in effect for reasons that I can explain to you, but I
11  think the bottom line is it is not currently in effect
12  because the deadlines for the election that it enjoined
13  are -- are over.
14      The courts, nevertheless, have told us to draw
15  a new map, and they have indicated that we have a
16  deadline to do that or Judge Dick will draw the map for
17  us.  So you have an opportunity now to go back and draw
18  the map again.  And -- and I think that it is not an
19  easy task because the United States Supreme Court has
20  not made it an easy task.  They've given you some
21  directives that seem to be -- to not give you a lot of
22  clear lines for doing your job.  I -- I apologize on
23  their behalf for -- but, you know, we tried.
24      I mean, I am defending that map, and so you
25  won't hear me say that I believe that that map violated

Page 37

1   the redistricting criteria.  I'm defending that map, but
2   I will defend your new map if you draw a new map.  So,
3   you know, it's an act of the legislature.  My job is to
4   defend the work of the legislature, and I will do that
5   to the very best of my ability.
6       I think that the difficulty is that in the
7   Merrill v. Milligan case, which was the Alabama
8   litigation that preceded ours, the Supreme Court issued
9   an opinion.  And it says that in a Section 2 disparate
10  impact claim, which is different really from the work
11  that you did -- you did your work.  You did it in good
12  faith.  But they can -- they -- the plaintiffs will go
13  to court, and they will make a disparate impact claim,
14  and that's what gets litigated.
15      That has nothing to do with whether your
16  intent was nefarious or not.  Everyone can have had the
17  right intent and followed the rules as they believed
18  they were given to them, and go to court.  And the court
19  can still say, "Under Section 2, there's a disparate
20  impact.  And because there's a disparate impact, you
21  have to go back and do it again, or I will do it for
22  you."
23      And that is -- that is the short version of
24  what Judge Dick has held and what has not been
25  overturned by any court that we have brought it before,

10  (Pages 34 to 37)

Page 38

1   since then.  There's no definitive ruling on that case.
2   It is still in litigation.  If you pass a new act of the
3   legislature, that will become the new law.  So I'm happy
4   to take some more questions.  I think that what -- what
5   Merrill v. Milligan did, which is, I think, one
6   question, is that it said, "You can't do this job once
7   there's been some litigation over disparate impact.  You
8   can't really do the job without taking race into
9   account."
10      And so that's not illegal or improper to -- to
11  think about race when you're doing this.  You can't
12  really do it otherwise.  I mean, that's the whole -- the
13  litigation is because someone has made a claim about the
14  disparate impact.  And so there's no way to not give
15  some thought to what you're doing in that context,
16  especially when it's preceded by some litigation and
17  some fact finding.  But what the United States Supreme
18  Court has said is that race can't predominate in the way
19  that you draw your lines.
20      So there have to be other reasons that would
21  justify the map.  And those are some -- I thought Ms.
22  Lowery did an excellent job of -- of giving you what the
23  broad parameters are.  They aren't -- you know, they're
24  not going to be real -- it's not going to be easy
25  because the Supreme Court hasn't made it real clear in

Page 39

1   terms of how you can meet strict scrutiny,
2   Representative Marcelle.  I mean, it's -- it is -- it is
3   a difficult task.
4       And I think that some of the other directives
5   that the court has given, like trying to keep
6   geographical compactness, doing the best you can in
7   terms of meeting all the other requirements, I mean,
8   those are things -- those are justifications that still
9   apply.  Maintaining communities of interest still apply.
10  Balancing geographical -- I mean, population still
11  applies.  So all of those things are, you know -- and
12  then the totality of the circumstances is ultimately
13  what the test is going to be that the courts apply.
14      And so, you know, I -- I think that if that
15  makes things even more confusing to you, I blame the
16  courts.  I mean, we -- we have tried to get them to
17  explain and give you more clear directions.  It is
18  ultimately your job.  The constitution makes this the
19  job of the legislature to draw the maps, and then when
20  we end up in litigation, it perverts that process.
21      Because the -- the -- the way that the -- the
22  precedent is built, there's fact finding that occurs
23  from a judge that can override the very fact finding
24  that you've made and your legislative record.  And --
25  and that's just a product of precedent and how these

Page 40

1   cases have been litigated.  It's not something I can
2   change.
3       REPRESENTATIVE BEAULLIEU:  So let me just --
4   to kind of -- you know, I sat on this committee last --
5   the last four years, and we spent a long time working on
6   the map that we ultimately ended up drawing.  And with
7   over two-thirds vote of the legislature, we upheld it
8   over a veto override and whatnot.  Went through --
9   thought it was the most -- two-thirds of us thought it
10  was the most representative of the state of Louisiana.
11      And even all the work we did, everything we've
12  put into it, all the testimony we've heard, the -- the
13  deviation being what it is, close to zero, none of that
14  matters with the federal judge and control.  She has the
15  ability to draw it without our input and can do what she
16  -- if we don't draw a map this week.  Is that correct?
17      MR. FRIEMAN:  Well, she -- yeah.  She made
18  fact findings of her own based on the evidence that was
19  presented to her in court, and those fact findings are
20  very difficult to overturn in the federal judicial
21  system.  There's -- you know, I can talk to you about
22  precedent, I can talk to you about terms of our -- in
23  terms of appellate review.  But at the end of the day,
24  her fact finding becomes very difficult to overturn.
25      REPRESENTATIVE BEAULLIEU:  Okay.  We have --

Page 41

1   we have a couple of questions.  Representative Thomas.
2       REPRESENTATIVE THOMAS:  Thank you, Mr. Chair.
3   Good morning.  I think I heard you say that race is the
4   predominant --
5       MS. MURRILL:  No.  No.  Race cannot be the
6   predominant factor in what you would draw.  That would
7   violate the Equal Protection Clause.  So what you have
8   to do is think about how to best draw the maps, given
9   the criteria that the Supreme Court has established,
10  without allowing race to be the predominant factor that
11  drives the drawing of your lines.  That's where the
12  actual Equal Protection Clause violation will come in.
13  So, you know, you need to stay south of that.
14      And then I -- I think that, you know, you're
15  going to have a lot of other things that you have to
16  think about when you draw these maps.  Communities of
17  interest is one of the -- the -- the most important
18  ones.  I think that's always been a driving feature of
19  the maps -- or of the map drawing exercise.
20      Core retention is what was discussed very
21  heavily in Merrill v. Milligan, and I think core
22  retention has now become -- and -- and I'm just going to
23  tell you my personal opinion in trying to decipher
24  Merrill v. Milligan.  It was not easy.  There are a lot
25  of -- it's a very fractured opinion.  But I -- I think

Page 42

1   that core retention is the part that the court has given
2   the least amount of attention to in this process now,
3   that once you are trying to redraw the map, I think that
4   core retention takes -- is -- becomes a less important
5   factor under Merrill v. Milligan.
6          REPRESENTATIVE THOMAS:  Thank you.
7          REPRESENTATIVE BEAULLIEU:  Thank you,
8   Representative Thomas.  Representative Marcelle.
9          REPRESENTATIVE MARCELLE:  Thank you.  Let me
10  start by congratulating you.  I don't know if I should
11  say congratulations or condolences.  I'm not really
12  sure.  Congratulations.
13         MS. MURRILL:  Well, I asked for the job, so
14  thank you.
15         REPRESENTATIVE MARCELLE:  Okay.  Let -- let me
16  just go over a couple of things that you said, and --
17  and so I can be clear in what you're -- what you're
18  telling us today.  Number one, you said you're going to
19  defend the map, Act 5, that they presented because that
20  is your job to do so, correct?
21         MS. MURRILL:  Yes.
22         REPRESENTATIVE MARCELLE:  And so --
23         MS. MURRILL:  I am defending it now.
24         REPRESENTATIVE MARCELLE:  Correct.  Because
25  that's -- that's what we hired you to do, to defend us,

Page 43

1   right?  And if we pass another map, you'll defend that
2   map as well?
3          MS. MURRILL:  That's correct.
4          REPRESENTATIVE MARCELLE:  The other thing that
5   I -- I -- I -- I -- I heard you say was this is a
6   -- the judge has fact-finding matters.  Can you kind of
7   elaborate on what that means?  Is that -- that's based
8   upon the testimony that was presented by the plaintiffs;
9   is that accurate?  And -- and the -- and the defense,
10  obviously, she took both -- both matters into
11  consideration when she was doing her fact finding.
12         MS. MURRILL:  She did.  That doesn't mean I
13  agree with them.
14         REPRESENTATIVE MARCELLE:  Okay.  So --
15         MS. MURRILL:  And I -- and I think that it's
16  also a product of -- this is part of what's frustrating,
17  I think, for the legislature when it goes into
18  litigation because people can -- like, experts, for
19  example, that are hired by the plaintiffs, no matter who
20  they are -- this could happen on the new map.  Right?
21  Those experts can come and testify in court, and the
22  judge can control that testimony.  In our case, it
23  happened in a very, very short, short turnaround in a
24  preliminary injunction hearing which is different from a
25  trial on the merits.  We've never had a trial on the

Page 44

1   merits.
2          So, you know, the -- the -- the court -- the
3   judge, whoever that judge may be, has an enormous amount
4   of control over how much testimony is allowed and by
5   whom, and -- and how much time we have to do that.
6   That was all very, very compressed when we litigated
7   this right after the map was passed.  We have not had
8   any other fact finding, we haven't had a trial on
9   the merits.  I have raised an objection to that because
10  I think that you are entitled to have a trial on the
11  merits, but the courts have not accepted those arguments
12  at this point.
13         They have told us to go back and draw the map,
14  and they have given us a deadline.  So, you know, I am
15  making the same arguments that I would make on the new
16  map.  But at the -- at the same time, you know, the --
17  the courts haven't given us a lot of safe harbor to go
18  litigate --
19         REPRESENTATIVE MARCELLE:  Okay.
20         MS. MURRILL:  -- the rest of this case.
21  They've said, "Go do this."
22         REPRESENTATIVE MARCELLE:  So it's -- it -- it
23  is a fact that we do have six congressional districts in
24  Louisiana?  That is --
25         MS. MURRILL:  It is.

Page 45

1          REPRESENTATIVE MARCELLE:  -- a fact, right?
2   Is -- is it also a fact that a third of that -- the
3   population is African American?
4          MS. MURRILL:  Approximately, based on the
5   data.  I would also point out that 50 percent are women.
6   I mean, there are other -- there are other population,
7   you know, and gender and differences -- like, that's why
8   Section 2 has never been -- I mean, it is expressly
9   stated in Section 2 of the Voting Rights Act that this
10  is not an act of proportionate dividing.  That is not
11  permitted under Section 2.  And so we can't just take
12  that number and say that's -- that's how we do this,
13  because it's not that simple and that's actually not
14  permitted under the law.
15         REPRESENTATIVE MARCELLE:  So -- so it's not
16  permitted to say that we have six congressional
17  districts, and of those six congressional districts, we
18  -- we talk about community interests, I think was one of
19  them.  So do you believe that all five of the other
20  districts has all the community interests impacted in
21  those, and African American districts only should have
22  one?
23         MS. MURRILL:  Representative Marcelle, the --
24  the -- the -- the job of drawing the districts is yours.
25         REPRESENTATIVE MARCELLE:  I get it.

12  (Pages 42 to 45)

Page 46

1    MS. MURRILL:  It's not mine.
2        REPRESENTATIVE MARCELLE:  Right.
3        MS. MURRILL:  And I -- I am defending what I
4    believe to have been a -- a defensible map.  And if you
5    draw a new map, I will defend that map.  Judge Dick has
6    put us in a -- in a position -- and the Fifth Circuit,
7    the panel that reviewed that decision, and the whole
8    court, when I asked them to go en banc, by declining to
9    go en banc, have put us in a position of where we are
10   today, where we -- we need to draw a map.  So I'm here
11   to tell -- I'm not here to tell you don't draw a map.  I
12   mean, I think we do have to draw a map --
13       REPRESENTATIVE MARCELLE:  And -- and --
14       MS. MURRILL:  -- and I will defend that map.
15       REPRESENTATIVE WYBLE:  And -- and my final
16   question.  I heard Representative Beaullieu talk about
17   two-thirds of the legislature approving this map and --
18   and -- and voting for it.  Beaullieu.  I'm sorry.
19       (Simultaneous speaking.)
20       REPRESENTATIVE MARCELLE:  Beaullieu?
21       (Simultaneous speaking.)
22       REPRESENTATIVE MARCELLE:  I just call you
23   Beau, so I'm -- I'm trying to get your real name because
24   --
25       REPRESENTATIVE BEAULLIEU:  We'll -- we'll --

Page 47

1        REPRESENTATIVE MARCELLE:  -- I been calling
2    you Beau.
3        REPRESENTATIVE BEAULLIEU:  -- we'll work on
4    you --
5        REPRESENTATIVE MARCELLE:  Yes.
6        REPRESENTATIVE BEAULLIEU:  -- Representative
7    Marcelle.
8        (Laughter.)
9        REPRESENTATIVE MARCELLE:  So Beaullieu -- I
10   always call him Beau.  But Beaullieu, I -- I -- I
11   heard him say that two-thirds of the legislature voted
12   for this map.  And he's absolutely accurate because the
13   majority of the legislature would support this map
14   because it benefits them.  We talked about, you know,
15   our districts and our interests.  What I did not hear
16   him say is -- because I sat at that table on the other
17   side and presented a map, and none of the maps that we
18   presented got out of this committee.
19       So it's, you know, it's unfair to say, "Okay,
20   we passed it with the majority of the people," because a
21   majority of the people would support us not having an --
22   an additional African American representation in another
23   district.  I get that.  But it's not fair to say that
24   those arguments weren't made to -- to support that.  I
25   was one of those that made the argument to support an

Page 48

1    additional congressional map.  And I think what we're
2    hearing from Judge Kelly Dick is --
3        MS. MURRILL:  Shelly Dick.
4        REPRESENTATIVE MARCELLE:  -- Shelly Dick is
5    that the map is not fair for the state of Louisiana.
6    And -- and what I -- what I agree with her on is that if
7    we cannot -- and we had an opportunity to draw this map
8    ourselves and we did not do it as it supports Section 2,
9    in my opinion.  I know you gave yours, but this is my
10   opinion.  So then we will allow her to draw that map if
11   we can't do that.  We can't draw a map right now, right?
12   Is that accurate?
13       MS. MURRILL:  So what will happen if you do
14   not draw a map is that she has set a trial date.  It's
15   very, very quick, and we will still be operating under
16   the old map.  So we will move forward then with a trial
17   on the -- under the old map.  There'll be a trial on the
18   merits, the same record I think that was presented, and
19   Tom can affirm or -- or correct me if I'm wrong, but the
20   -- the record from the preliminary injunction hearing
21   will all go into the -- into the -- into the court
22   record, and we will look at whether we want to have
23   additional testimony.  And that trial will move forward.
24       I -- I don't expect Judge Dick to change her
25   position.  I think she will draw a map, and -- and so

Page 49

1    you are getting the first opportunity to do that.  I
2    mean, we could have -- in theory, we could have had a
3    trial on the merits, and she could have said, "I don't
4    --" you know, again, "I don't like the old map," and --
5    or, "I don't like the map that you drew and I'm going to
6    redraw your map."  But as a matter of law, you get the
7    first shot at doing that, so.
8        REPRESENTATIVE MARCELLE:  No.  We get the
9    second shot at doing it.  Thank you very much, though.
10       REPRESENTATIVE BEAULLIEU:  Thank you.
11   Representative Marcelle.  Representative Farnum.
12       REPRESENTATIVE FARNUM:  Thank you, Mr.
13   Chairman.  So a couple of things.  So the -- the
14   parallel that the argument has been based on is the --
15   the case in Alabama; was that the one?
16       MS. MURRILL:  Yeah.  The Alabama case was
17   litigated just, you know, a few months ahead of ours,
18   and so it went up to the Supreme Court before ours did.
19   And so we've basically been held -- our case was held in
20   abeyance pending the outcome of that case.
21       REPRESENTATIVE FARNUM:  So -- and that was a
22   seven-member district, right?
23       MS. MURRILL:  I believe so.
24       REPRESENTATIVE FARNUM:  So -- so they were
25   trying to reach a second district in a seven-member

13 (Pages 46 to 49)

Page 50

1  state.  So would you say, just in your opinion, is it
2  harder to -- to draw two of six than it is two of seven,
3  just based on the compactness of the population of that
4  state?  Because wouldn't you say that every state has a
5  different compactness, there's two states that are
6  identical, and maybe it's easier in one state, that
7  maybe the compactness is -- is much more centrally
8  located to reach that conclusion.  Wouldn't -- would you
9  agree with that?
10       MS. MURRILL:  I -- I would agree with you that
11  every state is different and that -- that our population
12  -- how our population is spread out is -- is different
13  from every other state.
14       REPRESENTATIVE FARNUM:  Would -- would you --
15       MS. MURRILL:  So our population is -- our
16  population, I think, is relatively close to theirs.  I
17  -- they'd probably have a little more population because
18  they still have seven districts.  You know, we -- this
19  isn't going to be easy.  I -- I didn't -- that's why I
20  started out by saying, "I'm not here to tell you this is
21  an easy job."  You have a hard job.  Our state is
22  different.  Every state is different from each other,
23  and -- and you have to do this based on the facts in our
24  state.
25       We have argued in our case that our state is

Page 51

1  different from Alabama with regard to -- so that they --
2  the fact findings aren't -- can't be the same.  We're
3  not the same.  Our history isn't the same.  Our history
4  of redistricting and redistricting litigation is not the
5  same.  And we -- we brought those issues up, and here we
6  are still, so.
7       REPRESENTATIVE FARNUM:  I -- I -- I know.  I
8  spent the better part of three years going over this.  I
9  was on the committee last time and sat through numerous,
10  numerous meetings on -- on this across a period of the
11  three years.  Help -- help me understand how the -- the
12  voting-age population factors in when the voting -- the
13  Black voting-age population is lower than the total
14  population in the state.  How does that factor in?
15       MS. MURRILL:  You want to take that one?
16       MR. JONES:  Yeah.  The -- the judge --
17       MS. MURRILL:  Introduce yourself just quickly
18  again.
19       REPRESENTATIVE BEAULLIEU:  You're on.  You're
20  on.
21       MR. JONES:  The judge here in the Middle
22  District has based her rulings on the Black --
23       REPRESENTATIVE BEAULLIEU:  If you don't mind,
24  could you kind of speak into the mic a little bit?  Or
25  you can pull the mic to you, I believe, as well.

Page 52

1       MR. JONES:  I'm sorry.  My name is Tom Jones.
2  I'm the director of the civil division in the attorney
3  general's office.
4       The judge has principally based her ruling on
5  Black voting-age population.  That's what she's used as
6  the primary criteria.  Then the experts take that Black
7  voting-age population, and they're very clever people,
8  and they do very clever things with those numbers.  They
9  can persuade you on one side that the Black voting-age
10  population should be analyzed this way, and the other
11  experts can convince you of just the opposite the next
12  day.  But Black voting-age population has been the
13  primary criteria for this judge's rulings.
14       REPRESENTATIVE FARNUM:  Because you did say
15  something earlier, that -- that race cannot be a
16  determining factor of -- of why you draw maps.
17       MS. MURRILL:  It can't be the predominant
18  factor.
19       REPRESENTATIVE FARNUM:  Isn't that the only
20  reason we're here right now?
21       MS. MURRILL:  You know, we're here because of
22  --
23       REPRESENTATIVE FARNUM:  But isn't that the
24  predominant reason?
25       MS. MURRILL:  -- the court's telling us we

Page 53

1  have to be here.  I mean, I -- I think that's part of
2  it.  You know, the -- I mean, I'm defending the map.
3  I'm going to defend the new map.  I -- I want you to
4  know, I mean, if you draw a new map, I'm defending that
5  map, so.
6       REPRESENTATIVE FARNUM:  I -- I agree.
7       MS. MURRILL:  I'm not going to say that, you
8  know, I mean, I think -- I don't -- I have complaints
9  about how this case was managed, I mean, not by our
10  litigators, not -- you know, I just think that we need
11  -- we should have a trial on the merits.  I've always --
12  I have argued that in court.  I have signed off on those
13  pleadings.  I still believe that that's true.  The
14  courts have told us to do this by a certain date or it's
15  going to be done for us.
16       REPRESENTATIVE FARNUM:  I -- I think the
17  circular fashion of -- of the 14th, the 15th Amendment,
18  and this Section 2 of the Voting Rights Act is a circle.
19  So it -- it -- it sends you in this race to chase your
20  tail to try and accomplish what you're trying to
21  accomplish.  And -- and each one contradicts the other
22  one in the circle.  So you end up in this never ending
23  loop of -- of how do you accomplish what we're tasked to
24  do here.
25       We did look at a lot of maps and -- and, you

14  (Pages 50 to 53)

Page 54

1  know, I -- I personally think that the one we passed was
2  -- was a very legal, legitimate map.  And -- and -- and
3  we'll do the best we can with what we have.  So,
4  appreciate your time today.  Thank you, Mr. Chairman.
5       REPRESENTATIVE BEAULLIEU:  Thank you,
6  Representative Farnum.  Representative Carter.
7       REPRESENTATIVE CARTER:  Thank you, Mr.
8  Chairman.  I -- because this committee meeting is being
9  viewed by people throughout the state, I think it's
10 important that we be honest and -- and -- and -- and put
11 the whole picture, why we here, how we got here.  It
12 seemed to be an impression that the old Judge Dick's
13 begging us, trying to make us do something even though
14 we've done the right thing.
15      Is it not true that the judge's job, her task,
16 is to look at the law, first the law, the -- the
17 jurisprudence of reapportionment, and look at the -- the
18 -- the -- the statute that's been passed,
19 reapportionment and other criteria that Congress and --
20 has given us, to see if we went about this the right
21 way.  She just didn't come up the side to say, "I'm
22 going to make them have another Black district."  That
23 is not her job.  And -- and -- and she did anything
24 contrary to that, she certainly would have been reversed
25 quite quickly.

Page 55

1       But -- but -- but what she did, she looked at
2  the law, and there was -- there was -- there was a
3  request made by motion to -- to -- as to whether or not
4  the plaintiff would succeed on this problem with
5  disparity and what have you if they went to trial.  And
6  she pretty much said, after studying the law and
7  studying the facts and what actually took place in this
8  legislature, she decided it would probably succeed.  So
9  she asked the legislature to go back and try to do this
10 over again the right way.  And the legislature has that
11 opportunity.  We could get nothing done, okay?
12      So now the judge -- it will stay -- the
13 attorney general office -- she -- she expressed that she
14 wanted another map and she -- a better map, she thought,
15 that's more legal.  And so she -- she asked the
16 legislature to -- there was a state made by the attorney
17 general's office, and that was granted by the Fifth
18 Circuit.
19      And because of the Alabama case -- and Alabama
20 is different from -- first of all, Alabama has 26
21 percent population of African Americans.  Louisiana, 33
22 percent.  Alabama has a larger overall population than
23 Louisiana as well.  That's why they have seven
24 congressman.  But -- but you can't compare Alabama to
25 Louisiana.

Page 56

1       But the law is pretty much the -- it's the
2  same.  So based on that law, that judge says, "Well,
3  y'all either going to do a map, or I'm going to do a
4  map."  So -- so he gave us another -- a third time to do
5  the map.  Now, if you look at the analysis of the -- of
6  what we done the last time, there was about eight maps
7  that were presented to this House and Government Affairs
8  Committee, but there's only one map, the speaker map,
9  House Bill 1, that was even considered, seriously
10 considered.
11      I mean, there was some people came to the --
12 to the table and -- and talked about these other maps,
13 but -- but -- but it was asked by the speaker then --
14 the then speaker who was carrying the House Bill 1, "Did
15 you look at Section 2 of the Voters Right Act?  And did
16 you try to comply this map with Section 2?"  And the
17 speaker said no.
18      "Well, did you look at the disparity that this
19 map represents?  It's just common sense.  If you got a
20 third of the population that is African American and --
21 and -- and 33 -- over 33 percent, did you look at those
22 -- those figures?  You don't have to be the primary
23 criteria, but you got to first look at whether or not
24 it's a -- it's appears to be a fair map and complying
25 with the 14th Amendment, Section 2 and other -- other of

Page 57

1  Supreme Court jurisprudence?"  He said no.
2       He said that he -- he -- he -- he -- this is
3  his map that he's presenting, and he didn't -- let the
4  lawyers worry about all this other stuff.  This is his
5  map.  So the -- the -- the record -- the record of the
6  -- and I tried to tell him this because I was asking
7  questions to this -- to -- on House Bill 1, like
8  everybody else, "Why this map have a problem?"  And so
9  -- so -- so the legislature knew the map had a problem,
10 but they wouldn't listen to anybody else.
11      So while I agree that the -- your
12 representation that race is not the -- the sole factor,
13 the -- the fact is you got to have six divided equally,
14 okay?  And -- and if it -- but -- but -- but Section 2
15 says if you've got a group that is compact, that is
16 compact and that vote certain voting patterns, that you
17 should try to create a map that allow that group to
18 represent a person of their choice.  That's all it says.
19      So I asked the speaker, "Did you look at Section 2 and
20 try to come up with a map that does that?"  He said,
21 "No, I didn't."
22      So it's the speaker's and -- and -- and the
23 legislators' testimony in the record that caused them
24 the problem they had when it went to the judge.  Had
25 they said, "We looked at Section 2, we tried to comply

                                    15  (Pages 54 to 57)

Page 58

1   with Section 2 but we couldn't because the Black
2   population is so dispersed in the state.  We could not
3   get another district that was compact," they didn't say
4   that, didn't even try.  So that's why the state is in
5   the position it's in, not because somebody is out there
6   -- some federal judge is out there trying to make
7   Louisiana have another -- another minority district now.
8       However, I do agree that we need to have this
9   opportunity, and it's wonderful to have this opportunity
10  to try to create a map that will comply.  Now -- now --
11  and I think that I applaud the governor because I think
12  the governor wants to do the right thing.  The new
13  governor wants to do the right thing.  He wants to have
14  a map to -- so we can do our own map and not a federal
15  judge.  And I support that.  And so -- but I don't want
16  to give the impression that federal judge is just a bad,
17  bad monster, is trying to make us do something we
18  shouldn't do.  She has to comply with the law.
19      Now, the Supreme Court has reviewed what the
20  -- the -- the the attorney general's office presented
21  there on confection of the state, and it's really --
22  they -- they denied that.  It's the United States
23  Supreme Court saying you got to go back and do this map,
24  not just Judge Dick, okay?  So -- so we need to accept
25  the fact that the map we had, based on the record, based

Page 59

1   on the testimony presented here in the legislature,
2   based on the debate in the legislature, based on the
3   law, that it was not in compliance.
4       Now, you can differ.  People can differ
5   because they -- they don't like what the law says,
6   maybe, or they want to twist the law.  But the fact of
7   the matter is it's not a sustainable map.  This map is
8   not sustainable that we have now.  And so we have a
9   chance to do that and not offend too many political
10  notions at the same time.
11      And so I just -- I just want to make that --
12  put that in the record that -- that this is a effort on
13  the part of people of different political interests to
14  try to resolve the issue that had been defined by -- by
15  Supreme Court decision and by federal statute, and --
16  and try to come up with a district that is acceptable.
17      That's what we're trying to do, you know.  And
18  it doesn't mean that you're a bad person or you -- or
19  you got a problem because you supported that last map.
20  It's just that the record did not support -- we didn't
21  get enough input from other people that had concerns
22  about it.  We didn't allow people to have -- have -- put
23  their input in.  Had we putting three or four maps on
24  the floor and explain why we putting on the floor, that
25  might have been different.  Have we tried to do what the

Page 60

1   -- what the Supreme Courts over the years have told us
2   to do?
3       I happened to be on the legislature in '84 to
4   '92 when we wrote a lot of the reapportion maps.  Okay.
5   So this problem been around a long time.  So we -- and
6   -- and so we had -- oftentimes, federal judges had to
7   put us on the right track, say, "Okay.  Y'all doing
8   good.  Y'all working in the right direction, but y'all
9   got to go back and do this over again."  And that's what
10  she did.
11      REPRESENTATIVE BEAULLIEU:  Thank you, Judge
12  Carter.  Vice-chairman Lyons.
13      VICE-CHAIRMAN LYONS:  Thank you, Mr. Chairman.
14  Is it Ms. Murrill?
15      MS. MURRILL:  Murrill.
16      VICE-CHAIRMAN LYONS:  Murrill.  I'm sorry,
17  sorry.  I -- I -- I have a question for you, but before
18  I get into my question, I just wanted to note that as we
19  talk about the Voting Rights Act and -- and the premise
20  of a lot of things that we've done, today is actually
21  the holiday of Martin Luther King Day, today, which his
22  actual birthday is tomorrow.  This is -- the observance
23  of it is today.  So a lot of us question, you know, as
24  the federal holiday (inaudible 1:14:43) was -- was
25  empty, what have you, is why we're here today.

Page 61

1       So I just want to just remind everyone that
2   one of the things that Martin Luther King did say was
3   there's never a wrong time to do the right thing.  So
4   we're here today and we would not have any other, I
5   guess, issue -- he wouldn't.  Now we're doing something
6   that we'll be doing to correct where we at and -- and so
7   forth.  But my question to you, ma'am, is you alluded to
8   earlier that you want to have a -- preference to have a
9   trial on the merits, that you were requesting -- asking
10  for.
11      So as a body here, as we're going to be going
12  through this process, can you outline to us in any form
13  necessary that -- to get it across, what were some of
14  those merits?  Because I'm assuming when you say the
15  trial on the merits, you mean that the merits of -- of
16  the decision that you may have had difference with, you
17  had other merits that you wanted to talk about or maybe
18  defend in the -- in the fact-finding portion that was
19  not revealed.
20      MS. MURRILL:  So, Representative Lyons, when
21  we went into this litigation right after the legislature
22  completed the map drawing process, we went into a very,
23  very compressed hearing on a motion for a preliminary
24  injunction.  That is a different standard.  It was very
25  compressed.  We did not have the -- the length of time

16  (Pages 58 to 61)

Page 62

1 that we would ordinarily have for a full trial.
2 I believe that -- I mean, this is -- you can
3 blame it on the litigator in me, which is fine, but I
4 believe that it -- that -- that the state and -- and I
5 believe this under the new map that you pass, that we
6 should be entitled to have a trial on the merits --
7 merits before we are forced to go in and change an act
8 of the legislature. That is just a fundamental premise
9 that I have about acts of the legislature and us being
10 required by the courts to redo them. That -- that -- as
11 a practical matter, we did not have a lot of time, but I
12 have lost -- we lost on that issue.
13 I mean, we -- we did. Not just me, but the
14 entire litigation team, including the lawyers who
15 represented the legislature or the -- the speaker
16 and the -- the president of the Senate at the time and
17 the secretary of state. We asked to have a trial on the
18 merits set before you were required to go into session,
19 and we offered to do it quickly. So just to be clear,
20 we were not trying to delay. We offered to do it in
21 November. There was another trial set. I mean, we
22 tried to do this quickly so that we could have a
23 complete record upon which whatever the decision was.
24 And we did not believe that Judge Dick would
25 change her decision, but we still believe that the case

Page 63

1 should be before the courts on a complete record. It is
2 not, because we weren't -- we never had a trial on the
3 merits. The courts have told you to go back and draw a
4 map. And they said, "We can have a trial on the merits,
5 but we can do that after you draw a map."
6 So as a -- I mean, just fundamentally as a
7 lawyer who represents the -- you and defends the laws
8 that you pass, your laws -- if you have a law that you
9 pass, that you feel very strongly about, and the entire
10 legislature has voted for it even though some people may
11 disagree with it, then I will defend your law. And I --
12 I think that -- that you are entitled and the
13 legislature is entitled to that defense. So that's the
14 point that I was making. I -- I don't think any of
15 these cases should be tried and decided at the
16 preliminary injunction stage. I think we are entitled
17 to a trial on the merits.
18 And -- but at this point, the courts have told
19 you -- the federal courts have told me and they have
20 told you that we don't get that right now. You -- you
21 get to have this session right now, or Judge Dick is
22 going to draw the map for you. So, you know, I'm not
23 here to say, "Don't draw the map." I'm here to tell
24 you, "Draw the map."
25 VICE-CHAIRMAN LYONS: Okay. Thank -- thank

Page 64

1 you very much. Thank you, Mr. Chairman.
2 REPRESENTATIVE BEAULLIEU: Thank you,
3 Representative Lyons. Representative Gadberry.
4 REPRESENTATIVE GADBERRY: Thank you, Mr.
5 Chair. Ms. Murrill, if we draw a new map and Judge Dick
6 decides she don't like that one, do we start all over
7 again, or will she immediately draw a map? I don't
8 think she's capable of drawing a map, number one. I
9 just don't think she could do it. But --
10 MS. MURRILL: She -- I mean, no federal judge
11 does this without a demographer helping. I mean,
12 they're -- she'll appoint -- she will ask for experts.
13 She will ask for the maps to be submitted to her with
14 expert testimony, and then she will -- typically, she's
15 probably going to decide which map to take, but she can
16 tweak those lines. She can decide how to draw the map,
17 how she wants to draw this map based on the input of the
18 experts from both sides. She could appoint her own
19 expert and have that expert assist her in the
20 map-drawing exercise.
21 And remember, you've been through this before.
22 A large part of this exercise is done through computer
23 generated maps. So, you know, you put the numbers in,
24 you start changing -- you change the inputs, it spits
25 out a new map. She's going to have to go through that

Page 65

1 same process that you did, and then -- and then we
2 continue. So I -- I mean, I can't tell you that the
3 plaintiffs will accept the map that you draw. She has
4 established a timeline for the plaintiffs to amend their
5 petition and challenge that map, and then we will -- we
6 will go through the process again to determine whether
7 or not that map is acceptable.
8 REPRESENTATIVE GADBERRY: And for four years
9 on this committee previously, I spent hours upon hours
10 looking at this map, all the maps. And I looked at the
11 plaintiff's map, so to speak, that they presented before
12 this group, and I didn't feel like any of those met the
13 criteria. The -- the overriding factor, I guess,
14 was they had gerrymander lines, which is against the
15 Voting Rights Act. So I'm hearing that you said that
16 the map -- that the current map that's been rejected, I
17 guess, by the judge, has it been to the US Supreme
18 Court? Because that's the next step.
19 MS. MURRILL: It has not. It -- the -- the --
20 the US Supreme Court can decide whether to take a case
21 or not take a case.
22 REPRESENTATIVE GADBERRY: Right.
23 MS. MURRILL: They have not taken our case.
24 They took our -- they -- they stayed our case last
25 summer while the Alabama case went forward and was

17 (Pages 62 to 65)

Page 66

1  litigated.  They said, "You just wait."  They thought we
2  had made a good case for a stay and so they paused our
3  case while they decided that one.  But they did
4  something and these -- this is kind of a term of art,
5  but I mean, they granted cert in advance of judgment.
6  That means they actually took our case, and then after
7  they decided the Merrill case, the Alabama case, they
8  just vacated their own grant and sent it back to us.
9      So in a way, they took our case, and then they
10  vacated their own decision to take our case and they
11  sent it back down to the Fifth Circuit and to judge
12  Dick.  And so it's -- it's back in the hands of the
13  District Court judge who is supervised by the Fifth
14  Circuit Court of Appeals.  And so there has been some
15  litigation between August and, really, through the
16  summer since the Merrill case came out all the way
17  through the time that the opinion was issued in
18  November, I think, from the Fifth Circuit where a panel
19  of the Fifth Circuit said, "You need to go draw a map by
20  February 15th."
21      So they actually suggested we should have done
22  this before -- before we legally, really -- or -- or --
23  or I think it was practically possible to even get it
24  done.  But, you know, here you are.  I think the
25  governor heeded that call that -- that -- that demand.

Page 67

1  I mean, we've had it reviewed by a number of judges.
2  They have had nothing to say about our arguments.  It's
3  been radio silence.  And so the only decision that
4  remains in front of us right now is Judge Dick's.
5      And -- and so Judge Dick has set a timeline
6  for us to have a trial.  They did say we get to have a
7  trial, but we don't get to have that trial until after
8  you go through this exercise.  And, you know, she will
9  do it for you.
10      REPRESENTATIVE GADBERRY:  And once we have
11  that trial, we have the opportunity, if she still
12  rejects the map, to appeal that?
13      MS. MURRILL:  If she -- if she rejects the new
14  map?
15      REPRESENTATIVE GADBERRY:  Or the existing one
16  again.
17      MS. MURRILL:  Well, I mean, if she -- if you
18  don't draw a map, then we will be back in front of her
19  for the trial on the merits in very short order and that
20  -- that case will continue.  If you do draw a map, then
21  the plaintiffs will have to decide whether they wish to
22  challenge that map, whether they accept that map.  And
23  if they accept that map, then -- then the whole case
24  should be over.
25      REPRESENTATIVE BEAULLIEU:  Yeah.

Page 68

1      MS. MURRILL:  If they do not accept that map
2  for whatever reason, then if they don't like it, I mean,
3  they may -- it may be a perfectly acceptable map for
4  some people.  It may be a second majority/minority map
5  that -- that some people like or that some people don't.
6  So there's no guarantee that someone won't, that they
7  -- that the plaintiffs will like the map.  But if they
8  -- they can -- so they could continue to challenge it,
9  and now they will have to go and amend their pleadings
10  and we, basically, will start over because it is a new
11  act of the legislature.
12      REPRESENTATIVE BEAULLIEU:  It's going to
13  replace the existing map --
14      MS. MURRILL:  It will replace the existing
15  map.
16      REPRESENTATIVE BEAULLIEU:  -- Representative
17  Gadberry.
18      REPRESENTATIVE GADBERRY:  Well, I mean, along
19  what Representative Farnum -- Farnum was saying earlier,
20  you chase your tail on this thing.
21      MS. MURRILL:  Well, that's why I said it's not
22  easy.
23      REPRESENTATIVE GADBERRY:  You comply with one
24  part, and you check another part and it doesn't meet the
25  criteria.  So you go back and rework your population or

Page 69

1  your districts, and that doesn't meet.  So you're --
2  you're constantly going in a circle.
3      MS. MURRILL:  Look, I believe that the United
4  States Supreme Court should give you better
5  instructions.  I -- I do.  I think that -- that -- that
6  is the argument that we made last summer.  And, you
7  know, if -- if you pass a map and somebody else
8  challenges that map, it -- I will make that argument
9  again.  I mean, I think that they -- the courts have
10  made this a difficult task for you and -- and so you are
11  doing the best that you can now within the constraints
12  of the rulings of the federal court.
13      So, you know, it's -- it's not an easy task
14  that you have and I believe that the jurisprudence has
15  made it confusing and that the Supreme Court would be
16  well -- I mean, you know, in my opinion, that the
17  Supreme Court ought to make its own jurisprudence
18  clearer to those of you who have the job of drawing the
19  maps.  I think that's fair.
20      The constitution makes it clear that it is
21  your job to draw the maps.  I believe that it is not
22  correct in terms of the balance of power between the
23  state and federal government, between the constitution,
24  you know, purview of how this should be happening, for
25  the courts to create precedent that makes it impossible

18  (Pages 66 to 69)

Page 70

1  for you to follow.  So I think they should give you
2  better guidance.  And you are -- you know, you are here
3  to do the best job that you can to try and draw the map.
4  And I will defend the map, and then we will see what
5  happens.
6          REPRESENTATIVE BEAULLIEU:  Yeah.  Members,
7  look.  We're not going to be able to litigate the
8  litigation here in committee.
9          REPRESENTATIVE GADBERRY:  Well, you know, my
10  -- my problem is we had a year to draw this map, at
11  least a year.  Now we've got eight days.
12          MS. MURRILL:  That's right.
13          REPRESENTATIVE BEAULLIEU:  That's nothing.
14          MS. MURRILL:  That's because the judge gave
15  you deadlines.
16          REPRESENTATIVE GADBERRY:  That's probably not
17  going to work then.  Thank you, Mr. Chair.
18          REPRESENTATIVE BEAULLIEU:  Thank you,
19  Representative Gadberry.  Representative Newell.
20          REPRESENTATIVE NEWELL:  Thank you very much,
21  Mr. Chairman.  I don't have very many questions because
22  I just don't have very many questions.  To add what
23  Judge Carter said, as far as ensuring that people are
24  educated about this process, most of us who are
25  attorneys or have some information or some kind of

Page 71

1  experience with a court system in process, we know that
2  sometimes you do need a preliminary injunction when
3  things need to happen quickly, particularly when there
4  is going to be irreparable harm, irreparable harm to the
5  applicants.
6          And in this case, the applicants were the
7  minorities of this state who would have not been given
8  the opportunity to vote for a candidate of choice in the
9  elections that were quickly coming upon us at the end of
10  the session, the first redistricting session.  So those
11  citizens, once again, did not have the opportunity to
12  have a candidate of choice because this legislature
13  could not come to an agreement.  The process is not
14  difficult.  The rules, the guidelines, are not difficult
15  if you want to understand the rules and guidelines that
16  have been put before you.
17          What comes to -- what -- what makes it
18  difficult is when we are choosing not to do what is
19  right, not to do what is fair for all of the citizens
20  that we represent.  I have a lot of folks in my district
21  that did not vote for me, but you know what I do?  I
22  still represent them in this body.  Some of us do not
23  take -- take upon that task.
24          This is the first redistricting session that
25  we have had -- well, '21 was the first redistricting

Page 72

1  session that the United States had after the expiration
2  of Section 5 of the Voting Rights Act which required all
3  of our maps and every law that we made -- and I'm saying
4  we, states that have had a history of discrimination.
5  Laws that we put in place before had to be reviewed by
6  the United States attorney general's office or by United
7  States District Courts if they were challenged in court.
8          This is why this has been such a foreign task,
9  I guess, this second part.  Because we are taking on all
10  of the onus, creating the maps and then going back and
11  reviewing and redrawing and rewriting the maps, because
12  this is the first time we've had to.  Before, we would
13  just throw something together and the United States
14  would take -- take over it.  We don't have that luxury
15  anymore.  We don't have that opportunity of having
16  someone else to say, "All right.  You messed this up.
17  We've got to do it."  Thank God for Judge Dick.
18          Just as it was stated that she doesn't have
19  the knowledge or the know-how to write a map -- Judge, I
20  didn't say it.  It -- clearly, we don't have it either.
21  And we've given -- been given every opportunity to
22  learn, every opportunity to educate ourselves, but some
23  of us take that information and -- sir, what's your name
24  again?  I -- I apologize.
25          MR. JONES:  Tom Jones.

Page 73

1          REPRESENTATIVE NEWELL:  (inaudible 1:30:56).
2  Just as Mr. Jones said in his opening statement, you
3  have -- or you determine -- okay.  Thank you.  Just as
4  Mr. Jones said in his opening statement, you got one
5  side that it's their job to confuse you and make you
6  think this.  The other job is -- the other side, it's
7  their job to confuse you and make you think that.  We
8  are not here to confuse anybody.  We should not try to
9  confuse ourselves with trying not to do right.
10          If we as a body task ourselves with
11  representing the interests of all the citizens that we
12  represent, whether they voted for us or not, whether we
13  want them in our district or not, if we set ourselves to
14  representing all, this is not going to be a difficult
15  task.  And the more we argue amongst ourselves and the
16  more we try to go and adopt a national agenda that
17  does not care for the state of Louisiana, the longer
18  we're going to continue to have these fights and the
19  more divided the state will be.  I've never seen this
20  state as divided as it is now.
21          We used to have the divisions on just basic
22  moral value things, but we always, as Louisiana, looked
23  at family, looked at community, and tried to do what was
24  right by our neighbors.  I don't see that anymore, and
25  that is what's making this process difficult.  Judge

19 (Pages 70 to 73)

Page 74

1  also said that we had maps, and he pointed out the fact
2  that the -- we as -- and I want -- I think it was Rep.
3  Marcelle that said it.  We did not have an opportunity
4  to vote on all maps because all maps were not allowed to
5  come out of this committee.
6          There were options upon options to draw a
7  second minority/majority congressional district, and
8  they went all across the state to give minorities an
9  opportunity to vote for their candidate of choice.  They
10 were not allowed to come out of this committee.  We sat
11 for a month, six hours, at least, a day, listening to
12 the arguments of -- and the -- the makeup of each map
13 and discussing voting -- voting-age population vs.
14 population.  So I understand why we still having those
15 questions because we talked about it ad nauseam.
16          But when you choose not to do right, that is
17 when the process becomes difficult and it -- it seems as
18 though we can't make a headway.  But I want to put it on
19 the record that I didn't vote for none of them maps that
20 came out.  I didn't vote for any of the maps that Judge
21 Dick had in front of her because they were not maps that
22 were fair and they were not maps that were taking
23 consideration of all of the citizens of this great state
24 that I call home no matter how unfair or how unjust it
25 is to me.

Page 75

1          We still need to look and make sure that
2  Louisiana is a state that it used to be, considering all
3  of her citizens.  And thank you for your time, Mr.
4  Chair.  I don't have a question for anybody.
5          REPRESENTATIVE BEAULLIEU:  Yeah.  Let's try
6  and -- and look -- let's try and keep this to questions
7  for the attorney general.  We -- we going to have a time
8  to -- to talk about maps and -- and all that, but if --
9  like to try and stick to any kind of questions out of
10 respect for the attorney general's time.  Representative
11 Schamerhorn.
12         REPRESENTATIVE SCHAMERHORN:  Thank you, Mr.
13 Chairman.  Good morning.
14         MS. MURRILL:  Good morning.
15         REPRESENTATIVE SCHAMERHORN:  Welcome aboard.
16         MS. MURRILL:  Thank you.
17         REPRESENTATIVE SCHAMERHORN:  My question is if
18 we do not present a different map, Judge Dick has
19 threatened to draw her map.  Is it not our --
20         MS. MURRILL:  Promised, not threatened.
21         REPRESENTATIVE SCHAMERHORN:  Well, okay.  Is
22 it not our responsibility as legislators by the -- and
23 protected by the constitution, that our map should be
24 the one that is approved?  Now if she draws her own map,
25 when she does, do we still have to approve -- would we

Page 76

1  have to approve her map --
2          MS. MURRILL:  No.
3          REPRESENTATIVE SCHAMERHORN:  -- or would it
4  automatically go in force above what the constitution
5  says is our duties as representatives?
6          MS. MURRILL:  So let me kind of -- let me
7  untangle that a little bit.  If you draw a map now, that
8  map will become an act of the legislature and it will
9  supersede the prior act of the legislature.  The old map
10 goes away.
11         REPRESENTATIVE SCHAMERHORN:  Okay.
12         MS. MURRILL:  If -- if you do not draw a map,
13 then the -- the map that you drew before will remain --
14 will be the map, and the plaintiffs will continue to
15 litigate that.  We will have a trial on the merits.  The
16 -- the record from the preliminary injunction will be,
17 probably, supplemented with some additional testimony.
18 She will issue a new ruling and she will issue a
19 permanent injunction against the map.  And then that
20 will be litigated, which is my duty.  And so I will
21 continue to carry forth my duty to defend against the
22 injunction.  That's the process.
23         If she draws the map herself, then someone
24 could intervene and challenge that map.  You know, there
25 are a number of different potential outcomes if she

Page 77

1  draws the map.  If she draws the map, you know, we could
2  accept that map.  You don't get it back.  You don't get
3  a second -- you don't get another opportunity to approve
4  her work.  The only question is can her work survive the
5  scrutiny of the Fifth Circuit who grades her papers, and
6  potentially, the United States Supreme Court who grades
7  their papers.
8          And, you know, I think what makes your job a
9  little more complicated is that the prior -- not the --
10 the exact prior map, but the map before that had been
11 pre-cleared, there had been litigation in the past over
12 a majority/minority map that was declared
13 unconstitutional.  So, you know, that's why I have never
14 taken the position that our history is -- or at least
15 our recent history is the same in redistricting as
16 Alabama.
17         And I believe that the courts need to make it
18 more clear what your job is so that you can do it
19 properly the first time and we can all avoid the
20 litigation side of this and -- and continue to move
21 forward with -- with an act that -- that, as I believe
22 all your acts are, presumed to be constitutional.  That
23 is, you know, that's how I'll approach the next -- the
24 next act that you issue.  So I'm not picking and
25 choosing.  I mean, I think unless it's very clearly

Page 78

1  unconstitutional based on existing precedent, then my
2  job is to defend the map.  I mean, not just that map,
3  any act of the legislature.
4       REPRESENTATIVE SCHAMERHORN:  Thank you, ma'am.
5       REPRESENTATIVE BEAULLIEU:  Thank you.
6  Representative Schamerhorn.  Attorney General, that
7  clears the board.  Thank you for your time this morning.
8  Mr. Frieman, Mr. Jones, thank y'all for being here with
9  us today, look forward to working with y'all in the
10 future.  And again, congratulations on -- on your
11 election.
12      MS. MURRILL:  Thank you very much.  Thank you
13 for having me, and good luck.
14      REPRESENTATIVE BEAULLIEU:  Thank you.
15      MR. FRIEMAN:  Thank you, Mr. Chairman.  Thank
16 you, members.
17      REPRESENTATIVE BEAULLIEU:  Members, we have a
18 -- a couple of witness card that -- that would like to
19 speak.  Again, I want to remind the witnesses as well.
20 We don't -- we're not debating any bills today.  We want
21 to hear your voices.  So we have an information -- call
22 for information only card, but would like to speak.  Mr.
23 Scott -- Edward Scott Galmon, if you want to please come
24 on up.  Do you mind introducing yourself?
25      MR. GALMON:  Yes.  I'm Edward Scott Galmon

Page 79

1  from St. Helena Parish, Greensburg, Louisiana.  And just
2  (inaudible 1:39:31), I'm -- I'm a plaintiff on the map.
3  My name is Galmon.  If you look at the -- at the
4  original lawsuit, it bears my name.  And you guys have a
5  -- a tremendous job ahead of you.  And I just want to
6  thank y'all in advance, number one, because I -- I think
7  that this time that you -- you guys are going to produce
8  a map that both the plaintiff and the courts can agree
9  with.
10      I think the last map that we produced, it went
11 away from some of the -- of the -- the challenges that
12 set before.  Because, number one, this would be a lot
13 easier if we pulled all the -- the congressmen off the
14 map and just looked at geography and the people.  It'd
15 be very easy to do a map.  The challenge comes in is
16 that the geography and the people that are already
17 elected, if you leave them on the map, you have another
18 caveat that you have to overcome.
19      So once again, you guys have a challenge.  I
20 just thought I'd come this morning just to look at y'all
21 face and thank y'all.  I thank y'all in advance because
22 I think we -- this time we going to achieve where we
23 trying to go.  And for me, 33 percent is one-third.  Six
24 divided by three is two.  Pretty simple for me, not so
25 simple for you guys.  But once again, I want to thank

Page 80

1  y'all in advance, and I know that at the end of this
2  process, we going to have something that we all can live
3  with.  Thank y'all.
4       REPRESENTATIVE BEAULLIEU:  Thank you, sir.  We
5  have two witness cards.  They're red cards.  I'm -- I'm
6  not sure what we are -- this is just an educational
7  meeting this morning.  But if you -- you're welcome to
8  come to the table, Ms. -- Ms. Labry, or if you wanted to
9  save it for the bills that are presented -- or I mean,
10 you're welcome to come to the table.  Come on up.
11 You're welcome.
12      MS. LOWERY-DUFOUR:  This is just -- can -- can
13 we come up together?
14      REPRESENTATIVE BEAULLIEU:  Sure.  Is -- is
15 this Mr. Harmon?
16      MR. HARMON:  Yes, sir.
17      MS. LABRY:  I wanted him to speak.
18      REPRESENTATIVE BEAULLIEU:  Okay.  Go ahead and
19 y'all have a seat and introduce yourselves.
20      MS. LABRY:  Okay.  You want to do you?  And
21 then I'll do me.
22      MR. HARMON:  You want me to go first?
23      MS. LABRY:  Yes.  You need to.
24      MR. HARMON:  All right.  JC Harmon from -- I'm
25 speaking for myself, but I'm on the benefit of working

Page 81

1  with a bunch of groups that are interested in the
2  process.  What I did is I actually submitted to the --
3  to the committee a -- a --
4       REPRESENTATIVE BEAULLIEU:  Yeah.  We --
5       MR. HARMON:  -- a -- a PowerPoint --
6       REPRESENTATIVE BEAULLIEU:  Yeah.  We --
7       MR. HARMON:  -- if you got to look at that.
8       REPRESENTATIVE BEAULLIEU:  -- we -- we
9  received -- the -- the committee -- we're going to hear
10 it when -- we're not in the special session yet, so the
11 committee is going to receive it and it's going to be
12 part of tomorrow's testimony.
13      MR. HARMON:  Okay.  So you want me to hold it
14 till then, or?
15      REPRESENTATIVE BEAULLIEU:  Yeah, that might be
16 -- that might be best.  If it's having to do with maps,
17 I -- I would suggest that.
18      MR. HARMON:  I can do a brief overview right
19 now if -- if --
20      REPRESENTATIVE BEAULLIEU:  We -- we're not
21 debating maps at all today.
22      MR. HARMON:  Okay.
23      REPRESENTATIVE BEAULLIEU:  So if -- if there
24 was, like, an educational thing that you had for the
25 committee real quick, we'll be happy to take it.  But if

21  (Pages 78 to 81)

Page 82

1  it's on a map, we would like to hold that.
2      MR. HARMON:  Well, it's kind of a -- just a --
3  just let me give a brief overview.  I won't go over the
4  report.  Basically, what I did is I took a map of the --
5  of Louisiana, and I color-coded it based on the
6  breakdown of Black, White, Republican, Democrat, and
7  looked at the state from an overview standpoint.  And I
8  had some people asking me to do that.  And what I did is
9  when I did that, you could see that the northern part of
10 the state only had what -- I based it on senatorial
11 districts.  So if you look at the northern part of the
12 state, you have three senatorial districts that would
13 fit the criteria that you were looking for.
14      The issue there is if you take the 39
15 senatorial district divided by 6, which is the number of
16 representatives you get, you have -- you get 6 and a
17 half.  So you need 6 and a half district -- senatorial
18 districts to make a US representative.  So if you -- if
19 -- so from a breakdown standpoint, it gives you a good
20 breakdown to start -- or a preference to start -- what
21 you're looking to do.  So that -- but when you do that,
22 you immediately see that you take the northern part of
23 the state off because it doesn't work.  So then you can
24 -- so now you're down at the southern part of the state.
25      So what I was trying to do is make it -- I

Page 83

1  know you have a big job and it's not easy to do what
2  you're trying to do, but if you can break down the state
3  into geographical sections and take certain sections
4  off, that makes you focus on the other part of the state
5  to where you need to do what you're looking to do.  So
6  -- and I'll hold the rest of it till later.  But
7  hopefully, if you take a look at what I did, I think
8  you'll see.
9      And -- and I did it to try and help the
10 process because I agree that what you want to do is you
11 want to look at what you can do to unite the state.
12 Because I would agree with -- I think it was
13 Representative Newell that said, you know, we're divided
14 now.  And I think, if anything, because we're not
15 working to unite the state, that we -- I -- I did a
16 breakdown and if you look at the parishes and you break
17 it down, I actually came up where the parishes actually
18 split out into perfect six representatives.
19      And I didn't know what the number was as far
20 as the plus/minus number.  I was just looking at
21 population.  So it gives you a good starting point.  So
22 Representative Beaullieu, I'll -- I'll leave it there.
23      REPRESENTATIVE BEAULLIEU:  Thank you, Mr.
24 Harmon.  Ms. Labry, you have something you'd like to
25 add?

Page 84

1      MS. LABRY:  Yes.  I'm Susie Labry, and I'm
2  representing myself.  I'm -- I'm an appropriate
3  individualist, not as a part of a collective class of
4  color, of skin, height, genealogy, gender, physical
5  descriptions.  As for districting, I tried to find a way
6  to create an additional minority district.  After
7  studying up myself and with JC Harmon here, I still
8  cannot come up with an additional majority district
9  without gerrymandering, which I consider as illegal if I
10 wanted to or not.  But I did try.  Gerrymandering, you
11 know, is illegal.  I also see it, myself, as reverse
12 discrimination.
13      Those I see, in my opinion, as other
14 ethnicities such as the Vietnamese, Spanish, et cetera,
15 farmers, rural communities and interests, small business
16 -- so proprietors, main street USA where I have seen
17 that liberals poorly represent by unfair overtaxation in
18 the working people and agriculture, farmers, and
19 businesses.
20      Three, it would pose more central power,
21 lessening individual power.  Individual constituents
22 would fall between the cracks and get less attention by
23 congressmen or be hurt or heeded-to less in a
24 one-size-fit-all class approach which is -- I've seen
25 happen to me.  When you represent a collective class as

Page 85

1  a one-size-fit-all, too many of us individuals fall
2  between the cracks as -- especially special needs, self
3  identity, talents, ethnicities, nativities, et cetera.
4      Four, it would cause us one vote short for
5  conservatives in the United States House of
6  Representatives and remove and keep Louisiana in a
7  less-empowered position in the United States.  Five, the
8  only way I could see myself to add a minority district
9  is to draw it as a Z, S, coil, or snake which all have
10 been rejected over the decades -- which all have been
11 rejected over -- if we have to do so, I'm suggesting we
12 pop up a minority district as a set of archipelago
13 island -- looking like different-size polka dots as the
14 archipelago islands were scattered between a water.
15      A majority districts are districts -- majority
16 district's a district.  Or we can make a district as a
17 coil, like a slinky toy and -- and draw that around the
18 minorities.  And after studying up with myself and JC, I
19 find it mathematically impossible.  So I would say,
20 please -- and he'd adapt to -- his maps, we presenting
21 later.  He is -- JC here is a genius in research,
22 numbers, statistics, and science.  Being an actor myself
23 and also a great devil's advocate, and also trying as a
24 fair approach, I have tried justifying both sides.  And
25 I'm just going to ask you, please do not add another

22  (Pages 82 to 85)



Page 86

1    minority district.  Thank you.
2          REPRESENTATIVE BEAULLIEU:  Thank you, Ms.
3    Labry.  The -- board is clear.  Members, this is
4    going to conclude our educational meeting this morning.
5    I appreciate you all being here this morning and -- and
6    your attentiveness and your questions.  We're going to
7    have a busy week.  I ask you all to stay close to your
8    computers.  As bills are uploaded, read them, become
9    familiar with them.  If you have amendments, please get
10   them to staff as soon as possible.
11         Remember, you also -- if anybody in any --
12   from the outside is submitting information or submitting
13   maps, to include shapefiles as well so we can have the
14   -- the equivalency -- block equivalency files so that we
15   can -- we can have that data and -- and get it to staff
16   as -- as soon as possible.  But, members, look forward
17   to it.  It'll be a fun week.  Thank you.
18         MS. BAKER:  Move to adjourn?
19         REPRESENTATIVE BEAULLIEU:  Yeah.
20   Representative Thomas has moved to adjourn.
21         (Meeting adjourned.)
22
23
24
25

Page 87

1          CERTIFICATE OF TRANSCRIPTION
2          I, Nathan Pikover, COO of TranscribeMe, Inc.,
3    do hereby certify that 291001-Audio-1-15-24_HC on HG
4    Affairs Meeting.mp4 was transcribed utilizing computer
5    aided means and the TranscribeMe transcription team.
6          The transcript of the audio mentioned above,
7    having been transcribed and reviewed by TranscribeMe,
8    Inc. to the best of the company's ability, is a full,
9    true, and correct transcription.
10         I further certify that neither I, nor the
11   TranscribeMe, Inc. transcription team, have any personal
12   association with the parties involved or are in any way
13   interested in the outcome thereof.
14         Dated this 12th of March, 2024.
15         _____
16         Nathan Pikover, COO TranscribeMe, Inc.
17
18
19
20
21
22
23
24
25

23  (Pages 86 to 87)

0115_24_241es
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**[BACKGROUND NOISE]**

**SPEAKER DEVILLIER:**  The house will come to order. The clerk will open the machines for rollcall. Members vote your machines. Are you through voting, Jordan? Fisher? Jordan? Fisher? Members are you through voting? Emerson?

**[BACKGROUND NOISE]**

The clerk will close the machine. We have 104 members present in quorum.

**[00:05:01]**

The house will be opened in prayer by Representative Amedee. Please rise.

**REPRESENTATIVE AMEDEE:**  Thank you, Mr. Speaker. Heavenly Father, we come before you today. We thank you, first of all, for your precious Son. We thank you, Lord, that you could have placed us anywhere in time, and anywhere on this globe. And you saw fit to place each one of us here and now. And you also saw fit to place each legislator in their seat for such a time as this. Lord, I ask that you would help us to never take that lightly. I ask that you would guide us with the serious matters that come before us. And in this opening of this class of the legislature for the next four years, also ask that each day when we come here, we would never lose the awe of this building and all that it stands for. And we would never forget the people who sent us here to represent them. May we always legislate with Louisiana in mind. May we always make decisions that align with your vision for our state. May we take steps to bring Louisiana to the place where she leads as you planned, in Jesus name.

**SPEAKER DEVILLIER:**  Thank you, Representative Amedee. Representative Knox will lead us in Pledge of Allegiance.

**REPRESENTATIVE KNOX:**  I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all."

**SPEAKER DEVILLIER:**  Morning hour number five.

**FEMALE 1:**  Mr. Speaker, and members, the house is in receipt of a proclamation by virtue of the authority vested in me by the Louisiana Constitution, I, Jeff Landry, Governor in the State of Louisiana do hereby call and convene the legislature of Louisiana into extraordinary session to convene State Capital, City of Baton Rouge during eight calendar days, beginning 4:00 PM on the 15th day of January and ending no later than 6:00 PM on the 23rd day of January. The call includes 14 items and is signed by Jeff Landry, governor of the State of Louisiana.

**[BACKGROUND NOISE]**

1



**Hearing Exhibit**
**R005**
Case No: 3:24-cv-00122-DCJ-CES-RRS

0115_24_241es
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

Members, the speaker appoints the following committee to notify the governor that the house is convened and is ready to conduct business. Those members are Representatives Bayham, Emerson, LaFleur, Moore and Owen. Again, Representative Bayham, Emerson LaFleur, Moore, Owen, please meet Stephen Lewis near the rear of the chamber. Please raise your hand. And Emerson, I think I may have forgotten you. Committee to notify the senate, Representative Billings, Representative Echols, Representative Larvadain, Representative Ventrella, Representative Willard, please meet Mr. Francoise near the middle rear of the chamber to notify the senate, Representatives Billings, Echols, Larvadain, Ventrella and Willard.

[BACKGROUND NOISE]

[00:10:00]

**SPEAKER DEVILLIER:** Representative Newell for a personal privilege.

**REPRESENTATIVE NEWELL:** Thank you, Mr. Speaker. Thank you, Mr. Speaker and members. First, I want to just say thank you to my colleagues who called, who sent cards, who attended. Most of you all know that my mom passed on the last day of the last special session that we had. And these past few months have been filled with a lot of firsts for me. My first birthday without the woman that gave birth to me. My first Thanksgiving without the woman that taught me how to cook. My first Christmas without the woman who made sure that Santa had all the gifts on my list. Today would have been my mama's 71st birthday. And this past Monday when we got sworn in, my biggest cheerleader was not here with me. I had intended -- fix your face. I could see you, Schlegel. Don't make me cry. I thought I would be spending today with my dad and with my mom's sisters, but that is not the case. Members, we are here in these rails for one term representing the people of our districts, and I am curious and hopeful about what we will uncover on Louisiana over the next four years. Today, please not let it be lost on us that we start this term and most of you are starting your very first term as legislators. Some are second, some are third with the most important redistricting session on a most fitting and significant day. Starting this redistricting session on Martin Luther King Day has been a controversial and a sensitive issue to some and it seems to be disrespectful to the legacy of Dr. King and his fight for civil rights and voting rights. Some of our constituents, neighbors and supportive, had touted that the beginning of a redistricting session on King Holiday is a fitting tribute to Dr. King's legacy as it is an opportunity to ensure that the electoral districts reflect the diversity and needs of the communities that we all serve. Starting this session on King Holiday is not intended to be disrespectful or divisive, but rather an effort to fulfill a constitutional and legal duty and to meet a tight deadline imposed on us by the courts and the federal government. We have drastically different opinions on how this redistricting session is being started on Martin Luther King's holiday and those opinions have been heavily contested and it's a controversial task of redistricting. But we must remember that this is a matter that will have a significant impact on the representation and power of different groups of voters, which, if not done with consideration of context and circumstances of each district, can undermine the principle of one person, one vote and the democratic rights of the people that we serve. Dr. King's cause went beyond white and black. He also dealt with concerns of poverty, privilege and access, particularly at the voting polls. Ultimately, holding a redistricting session today on King's

**2**

0115_24_241es
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

holiday is a matter of debate and perspective. Therefore, any redistricting session should be guided by the values of justice, dignity and democracy that Dr. King embodied and advocated for. Thus, in the spirit of democracy, I want to remind all of our citizens and constituents that all of our sessions is open and accessible to the public. Anyone can attend and we, your legislative body, should be committed to following the principles of fairness and equality in the redistricting process. I do not believe any of us in this chamber is committed to forgetting an unerasable history and repeating or perpetuating the suppressive practices and ideologies of those such as Thurman and Wallace. We have come a long way considering the history of the south and with this governor's commitment to keeping Louisianans in Louisiana.

**[00:15:02]**

This is our opportunity to show all citizens that we are not only working to create opportunities of education and employment for Louisiana citizens, but also giving them fair elections and the opportunity to elect a candidate of choice. I am hopeful about the outcome of this session. And again, considering the dedication of Governor Landry and our Speaker DeVillier of ensuring this body will create that second minority majority district. On Martin Luther King's holiday, let us remember his contribution and sacrifice to voting rights and remember his words, "The time is always right to do what is right." Thank you, Mr. Speaker and members.

**SPEAKER DEVILLIER:** Thank you, Representative Newell.

**FEMALE 1:** Mr. Speaker and members, Representative Brown requests five days leave for his seatmate, Representative LaCombe.

**SPEAKER DEVILLIER:** Without objection.

**[BACKGROUND NOISE]**

**FEMALE 1:** Mr. Speaker and members, the Senate committee has appeared and is prepared to provide a report.

**SPEAKER DEVILLIER:** Senator Seabaugh.

**SENATOR SEABAUGH:** Members, we are here to advise that the Senate has convened and we are ready to do business. And I look forward to working with you all from over there.

**SPEAKER DEVILLIER:** Thank you, Senator.

**[BACKGROUND NOISE]**

**FEMALE 1:** Mr. Speaker and members, the committee sent to notify the governor has returned and is prepared to give a report.

**SPEAKER DEVILLIER:** Representative Emerson.

**3**

0115_24_241es
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**SPEAKER DEVILLIER:**  Representative Cruz for a personal privilege.

**REPRESENTATIVE CRUZ:**  Thank you, Mr. Speaker. Members, if you've been looking at your chamber laptop, there was a reminder sent out. If you want your per diem payments non taxed, you need to sign that form today and get it to house accounting so per diem payment can be tax free if you sign that form and submit it today. Thank you, Mr. Speaker.

**SPEAKER DEVILLIER:**  Thank you, Representative Cruz. Morning hour number seven.

**FEMALE 1:**  House Bill by Representative Wilford Carter constitutional amendment proposing to amend Article 5 of the Constitution of Louisiana and provides relative to conversation to Supreme Court.

**SPEAKER DEVILLIER:**  Representative Mike Johnson moves for a suspension of the rules for the purpose of referring all pre filed House Bills to the committee at this time without objection so order, House and Governmental.

**FEMALE 1:**  House Bill by Representative Wilford Carter to enact Title 18 governmental districts redistricting positions offices based on congressional districts.

**SPEAKER DEVILLIER:**  House and Governmental.

**FEMALE 1:**  House Bill by Representative Wilford Carter Title 13 Supreme Court redistricting Supreme Court districts billing of vacancies additional judgeships becomes House Bill 3.

**SPEAKER DEVILLIER:**  House and Governmental.

**FEMALE 1:**  House Bill by Representative Marcelle Title 18 campaign finance provide for assessment of penalties becomes House Bill 4.

**SPEAKER DEVILLIER:**  House and Governmental.

**FEMALE 1:**  House Bill by Representative Marcelle Title 18 congressional districts redistricting of congressional districts positions offices based on congressional districts becomes House Bill 5.

**SPEAKER DEVILLIER:**  House and Governmental.

**FEMALE 1:**  House Bill by Representative Mandie Landry Title 18 elections nature of judicial elections exempt certain candidates from additional fees becomes House Bill 6.

**SPEAKER DEVILLIER:**  House and Governmental.

5

0115_24_241es
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

[BACKGROUND NOISE]

**SPEAKER DEVILLIER:** The Joint Session will come to order. President Barrow moves to dispense of the calling of role of the Senate without objection so ordered. President pro tempore Mike Johnson moves to dispense with the calling of the role of the House without objection so ordered.

[00:40:00]

**SPEAKER DEVILLIER:** The President appoints, on part of the Senate, the following members to escort the Governor: Senators Harris, Pressly, Jenkins, Talbot and Owens. Harris, Pressly, Jenkins, Talbot and Owens. The speaker appoints on the part of the House the following members to escort the Governor: Bayham, Moore, Emerson, Owen and LaFleur. Go to the back door. That committee will assemble and discharge their duties. Those members need to go get the Governor. The ones I just read out, like get up and walk back there and then he walks in. Go ahead. Harris, Pressly, Jenkins. I know you all are here. They're all back there. Well, come on down, gentlemen. Come on. The members come out first. The members come out first, then the Governor. There we go.

[APPLAUSE]

**SPEAKER DEVILLIER:** Members, Governor Jeff Landry.

[APPLAUSE]

**SPEAKER DEVILLIER:** Right there. I think if you could sit in. There we go. Thank you, buddy. All right. Members, we'd like to recognize Lieutenant Governor Billy Nungesser.

[APPLAUSE]

**SPEAKER DEVILLIER:** Secretary of State Nancy Landry.

[APPLAUSE]

**SPEAKER DEVILLIER:** Attorney General Liz Murrill.

[APPLAUSE]

**SPEAKER DEVILLIER:** Treasurer John Fleming.

[APPLAUSE]

**SPEAKER DEVILLIER:** Agriculture Commissioner Mike Strain.

8

0115_24_241es
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**[APPLAUSE]**

**SPEAKER DEVILLIER:** And Commissioner of Insurance Tim Temple.

**[APPLAUSE]**

**SPEAKER DEVILLIER:** We also have members of the Supreme Court here. Justice Weimer.

**[APPLAUSE]**

**SPEAKER DEVILLIER:** Justice Crain, Justice Genovese, Justice McCallum, Justice Hughes and Justice Griffin. Thank you all for being here.

**[APPLAUSE]**

**SPEAKER DEVILLIER:** Representative Jason Hughes will lead us in the prayer and please remain standing afterwards for the pledge.

**REPRESENTATIVE JASON HUGHES:** All things work together for good, to those who are called before the Lord and are called according to His purpose. Members, let's go before the Lord in prayer. Father God, we thank You for this day that You have made. And with all going on in the world, Father, we are going to rejoice and be glad in it. Father, the Bible tells us to humble ourselves before You, and good will come from it. So, Father, we come before You as humbly as we know how first and foremost to say thank You, Father. Thank You for this extraordinary opportunity, Father. Father, I thank You on behalf of every person in this body, for our Governor Jeff Landry and his wife Sharon. Father, please guide his stewardship of this great State of Louisiana as he oversees 4.6 million people, Father God. Father, we thank You for all of the statewide elected officials assembled before us, may You guide them as well. Father, we thank You for our Senate President, our Speaker of the House, our respective pro tems, clerk, secretary, sergeant-at-arms, and all of the staff that keeps these noble bodies running each and every day, Father.

**[00:45:11]**

Father, we can't do this work without them and we are so thankful. Father, we thank You for the members of our Judiciary, our Supreme Court that are gathered here today. Father, may You continue to stand in their bodies, think with their minds and speak with their voices as they do the work of the Judiciary, Father. Father, out of 4.6 million people, You have selected, ordained, appointed, anointed only 144 people to lead the legislative branch of government. What an awesome responsibility and task that is. Father, may You remind us every day that we are all created by You. May we not see political party. May we not see race. May we not see gender. May we just see people and do the work that You have called us to do. Now, Father, let Your sweet, sweet spirit fill this place. Father, bless everyone under the sound of my voice, from this podium to the door, from the balcony to the floor, from the crowns of our heads to the soles of our feet, oh, Lord, our strength and our redeemer. And Lord, in everything, let us be so very

9

0115_24_241es
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

careful to give You all the praise, all the glory and all the honor. Now, let us go forth conquer and do the work that You have called us to do. In Jesus' name, we pray. Let all of the people of God join me in saying. Amen!

**SPEAKER DEVILLIER:**  Amen!

**[APPLAUSE]**

**SPEAKER DEVILLIER:**  Please remain standing for the pledge.  I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all. Ladies and gentlemen, the Governor of Louisiana, the Honorable Jeff Landry.

**[APPLAUSE]**

**GOVERNOR JEFF LANDRY:**  Mr. President, I would tell you and the representatives and senators that escorted me that we'll do this at least one more time before the regular session and so, we'll have it perfected for the rest of the term. Please sit. Mr. Speaker, Mr. President, Members of the House and Senate, thank you for your cordial welcome. May I begin by recognizing on this day Dr. Martin Luther King, whose moral fortitude and spiritual inspiration allowed millions to live the American dream. And I would like to begin with one of my favorite quotes of his many, that the ultimate measure of a man is not where he stands in the moments of comfort and convenience, but where he stands at times of challenge and controversy. Our stage DNA is directly connected to the diverse and varied relationships that we all share with one another. Diverse relationships between our friends, our acquaintance, our neighbors, our old classmates, our co-workers, our caregivers, our colleagues, our family and each other right here in this room. For our culture is built upon relationships.  And we are here today because we have inherited the issues that others have laid at our feet. So let us accept that task. Let us do the work that is incumbent upon us so that we can move towards solving much larger problems for the people of this great State.

**[APPLAUSE]**

**GOVERNOR JEFF LANDRY:**  Now I am well aware that Huey Long was shot over redistricting matters. And I am hopeful and I am confident that we can dispose of this matter without you all disposing of me. Is that fair? Because for various reasons, both known and unknown, spoken and unspoken, closure of this redistricting problem has evaded us. It is time to stop averting the issue and confront it head-on. We are here today because the federal courts have ordered us to perform our job. Our job which is not finished, our job that our own laws direct us to complete, and our job that our individual oaths promise we would perform.

**[00:50:01]**

**GOVERNOR JEFF LANDRY:**  To that end, I ask you to join me in adopting the redistricting maps that are proposed. These maps will satisfy the court and ensure that the congressional

**10**

0115_24_241es
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

districts of our State are made right here in this Legislature and not by some heavy handed federal judge.

[APPLAUSE]

**GOVERNOR JEFF LANDRY:**  We do not need a federal judge to do for us what the people of Louisiana have elected you to do for them. You are the voice of the people, and it is time that you use that voice. The people have sent us here to solve problems, not to exacerbate them, to heal divisions, not to widen them. To be fair and to be reasonable, the people of this State expect us to operate government efficiently and to act within the compliance of the laws of our nation and of our courts, even when we disagree with both of them and let me say this. I know that many of you in this Legislature have worked hard and endured and tried your very best to get this right. As Attorney General, I did everything I could to dispose off this litigation. I defended the redistricting plan adopted by this body as the will of the people. We sought a stay in the Fifth Circuit. We successfully stayed the case at the United States Supreme Court for more than a year, allowing the 2022 elections to proceed. Last October, we filed for writ mandamus, which was granted in the Fifth Circuit, which would again allow us one more chance to take care of our business. However, when the Fifth Circuit panel ruled against us later in the fall, we filed for an en banc hearing, which they denied. We have exhausted all legal remedies and we have labored with this issue for far too long. I recognize the difficulty of getting 144 people to agree on anything. My wife and I don't agree on everything. She's kept me for 21 years. But I sincerely commend you for the work you have done so far. But now, once and for all, I think it's time that we put this to bed. Let us make the necessary adjustments to heed the instructions of the court. Take the pen out of the hand of a non-elected judge and place it in your hands. In the hands of the people. It's really that simple.

[APPLAUSE]

**GOVERNOR JEFF LANDRY:**  I would beg you, help me make this a reality in this special session, for this special purpose, on this special day. The redistricting challenge goes further than just our congressional maps. While one federal judge has the pen in her hand, another is eager to pick it up from his desk and redraw our Supreme Court. In 2021, in a regular session, the Senate passed a resolution, Resolution 248, asking the State Supreme Court to provide this Legislature with the recommendations for redistricting their court. A wide majority of the court, over two-thirds, has responded. Justice McCallum, Justice Genovese, Justice Crane, Justice Hughes, and Justice Griffin, have conscientiously and unselfishly and courageously stepped forward and presented us with a map that redraws the Supreme Court districts in a manner that will comply with the Voting Rights Act and alleviate the costly litigation to the State. You can fulfill your responsibility and honorably meet your obligation to redistrict our high court so that the people of Louisiana will have a fair, democratic, and equally represented judiciary. The litigation involving our Supreme Court districts has been pending for quite some time. In fact, there are cases in all three federal districts in the State.

[00:55:04]

11

0115_24_241es
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**GOVERNOR JEFF LANDRY:** Again, as Attorney General, we worked to defend the State and to have those cases dismissed. I know, firsthand, how indefensible these cases are. Our Supreme Court districts have been redistrict by this Legislature only one time in 103 years. The result is that districts are grossly unbalanced with two districts twice as large as another one. Last year, I negotiated a scheduling order with the plaintiffs in one of those cases, allowing the Legislature, allowing you all a chance to willingly handle our own affairs rather than unwillingly have it done by another nonelected federal judge. I want to publicly commend the justices for their willingness to set aside any regard for their own careers or the power that they hold. They epitomize statesmanship, honor, integrity, and the very embodiment of fairness. They are a reflection of our people's goodness, decency and justness. Every single person in this great State can look up to them with pride and reverence and a reborn confidence that the judicial system in this State is great and filled with men and women who will absolutely do the right thing.

**[APPLAUSE]**

**GOVERNOR JEFF LANDRY:** Just as we would respect and honor and comply with any decision reached by such a majority of this court. I ask you to respect that and adopt the court's redistricting map and allow the first seat to be filled this fall. Now, every voting age citizen in Louisiana may or may not join a political party of his or her choosing. It is a choice. It is their freedom. But if you choose to join a political party, it certainly is only fair and right that you have the ability to select your party's candidate for office without the interference of another party or without the distraction and the interference of a convoluted, complicated and extended ballot to wade through and to decipher.

**[APPLAUSE]**

**GOVERNOR JEFF LANDRY:** As I travel the State, I have listened carefully to those who seek a more focused, electoral process where they may participate in the nomination of their party's chosen candidate. And I believe it is an issue that our Legislature should consider and we have included a proposal for a closed party primary system for your consideration for that very reason. Because it's about fairness, it's about simplicity, it's about clarity and we have tested this system before in this State, and it works. The United States House Majority Leader Steve Scalise is in his seat as a result of being elected to Congress under a party primary system. Our State Treasurer was elected to Congress under a tried and tested system. I was elected to Congress under a party primary system. President Joe Biden was elected in Louisiana's presidential primary, as was President Trump, and other presidential nominees that were put forward by this State were chosen in a party primary system which allows the major parties to pick their candidates. It is fair and it is common sense. And as for our independent or no party voters, who by their own choice, decide not to join a party, their voice is heard and their votes are counted. Counted on a simpler, shorter, clearer November election ballot containing generally one Democrat, one Republican, and ballot qualifying independent candidates. Some things make Louisiana unique. Our food, our music, and our culture. These are sources of our pride. However, our jungle primary system is the only one of its kind in this country. It is a relic of the past, which I believe has left us dead last.

12

**0115_24_241es**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**[APPLAUSE]**

**[01:00:07]**

**GOVERNOR JEFF LANDRY:**  All of our fellow southern states are succeeding, they have a closed primary system, a process which results in stronger, more unified elected leaders. It is time to rewrite our story and to move to a similar system. We have already tried, we have already tested and still use in presidential primaries and will use in February of this year. As we work on other electoral reforms with these redistricting maps. Now is the time to also deal, I believe, with this commonsense change. Today, we honor Dr. Martin Luther King. And I do not believe that it is mere irony that finds us here today on this great day, on this consecrated day, where we seek to amplify the voice of few, where we seek to broaden the opportunity for participation in the government and governance of our people. The courage and the wisdom and the relentless pursuit of fairness in our electoral process was exactly what Dr. King spoke for. And so, it should be profoundly moving that we do this on this day. In fact, his words in 1968, I believe, are wholly appropriate 56 years later at this very hour where he said, "The arc of the moral universe is long, but it bends towards justice." You see, for Dr. King's, his was an uphill journey into the headwinds of hate. His was a march into a battle, while ours is a mere walk in the park. His was a persecution for speaking his truth, while ours is just a comfortable dialogue. His was a mighty shove, while yours is simply a mere push of the button. Ladies and gentlemen, let us take these affairs and the things that have divided us in this state off the table so we can begin the work that the people have sent us here. God bless you. God bless each and every one of you. God bless the people of Louisiana, and God bless the people we represent. Thank you so very much.

**SPEAKER DEVILLIER:**  Thank you, governor. Senator McMath moves that the senate retire to its chambers without objection.

**[01:05:00]**

**[BACKGROUND NOISE]**

Members, we're waiting on additional bills to be filed, so please don't leave. Members, we're waiting on additional bills to be filed, so please do not leave.

**[01:10:00]**

**[BACKGROUND NOISE]**

**[01:15:00]**

**[BACKGROUND NOISE]**

**SPEAKER DEVILLIER:**  Morning hour number seven.

**13**

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**FEMALE 1:** And Senator Womack.

**SENATOR WOMACK:** Present.

**FEMALE 1:** We have nine members.

**CHAIRMAN FIELDS:** Nine members present on a quorum. First, let me thank the members of the public who are here. We had to delay it because of the weather. We wanted to give people more of an opportunity to get here. And I know today is probably one of the coldest days in Baton Rouge, and if you don't like today, tomorrow is going to be even colder, I understand. But thank you all so much for coming. We're here pursuing to Proposition No. 1. Special session called by the governor as a result of a map that was passed by this legislature and challenged in court. And both the district and the appeals court have said we need to do something before the next congressional elections. And there are other things in the call, but we're going to first take congressional redistricting. Let me advise the public. We're only going to take before we break two congressional maps. In fact, Senator Carter. And then we're going to do Senator Price bill. The Womack bill will be delayed until after we recess. So Senator Carter would like to be recognized on a matter of personal privilege first, Senator Carter. But before I do, I want to welcome all of the members to this committee, and I think it'd be appropriate, Senator Carter, if you would just yield just for a second to let each member kind of introduce themselves to the public. And we'll start with Senator Miller.

**SENATOR GREG MILLER:** Thank you, Mr. Chairman. Greg Miller, Senate District 19. That's all of St. Charles Parish parts of the east bank of St. John the Baptist Parish, parts of Jefferson, Kenner, and then North Lafourche. And I'm coming over here after serving three terms in the House, where I also served, I think, eight years on House and Governmental Affairs and one year as chairman. Thank you.

**CHAIRMAN FIELDS:** Thank you, Senator Miller. You're going to be a great addition to this committee. Let's now go to Senator Womack.

**SENATOR WOMACK:** Good morning, Senator Womack from District 32. Senate District 32 go from Avoyelles, West Feliciana, Concordia, LaSalle, Catahoula, Rapides, Caldwell, Franklin, Richland, and Ouachita, ten parishes. This is my second term. I served on Senate and Governmental Affairs last term and glad to be back on the team. Thank you.

**CHAIRMAN FIELDS:** Thank you, Senator Womack, and welcome back. Let's now go to Senator Kleinpeter.

**SENATOR KLEINPETER:** Thank you, Mr. Chairman. Senator Kleinpeter, District 17. I as well represent ten parishes, St. Helena, East Feliciana, West Fel., part of East Baton Rouge, and I jump across Pointe Coupee, West Baton Rouge, Iberville, and jump across the other river and go into upper St. Martin, part of Lafayette and St. Landry. I was on SGA last year, ran in a special election, and look forward to working with everybody on this panel.

1



011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**CHAIRMAN FIELDS:** Welcome back, Senator Kleinpeter. And now we're going to go to another freshman member who by way of the House of Representative, Senator Miguez.

**SENATOR BLAKE MIGUEZ:** How are you doing? Happy to be here this morning. My name is Blake Miguez. I'll be representing Senate District 22, which is Iberia, St. Martin and a portion of Lafayette Parish. I had the honor to serve nine years in the House of Representatives. I look forward to serving here on the Senate Governmental Affairs Committee. I appreciate the president giving me this opportunity and I look forward to serving with you, Mr. Chairman. And I hope to provide a great balance and help you work towards solving the problems for our state.

**CHAIRMAN FIELDS:** Thank you, Senator Miguez. And Senator Miguez is also the vice chair of the committee. Now we go to Senator Fesi.

**SENATOR FESI:** Thank you, Mr. Chairman. I represent Senate District 20, which is Terrebonne, main portions of Terrebonne and Lafourche.

**CHAIRMAN FIELDS:** Thank you, Senator Fesi, and welcome back to the committee. And now we go into another house member who moved from the house and now in the senate, Senator Sam Jenkins.

**SENATOR SAM JENKINS:** Thank you, Mr. Chairman. Good morning, everyone. It's good to see everybody out today. Glad to have you here. I'm glad to be here. Eight years in the House of Representatives on House and Governmental affairs. Now I'm here on Senate and Governmental Affairs. So the learning curve has been somewhat steep coming from the House to the Senate.

**[00:05:00]**

But a few days in, I see a whole lot of familiar faces here that used to be in House and Governmental Affairs, often to testify. I represent Senate District 39, and that's parts of Shreveport and Blanchard.

**CHAIRMAN FIELDS:** I welcome Senator Jenkins. And now we're going to go to a returning member of the committee, Senator Reese.

**SENATOR MICHAEL REESE:** Thank you, Mr. Chairman. Michael Reese, Senate District 30, which is Western Calcasieu Parish, all of Beauregard Parish, all of Vernon Parish, and most of Western Rapides Parish. Had the privilege of serving on the committee during our last term in redistricting and through that process. So I want to say I'm thankful to be back, I guess. Thank you, Mr. Chairman.

**CHAIRMAN FIELDS:** Thank you, Senator Reese. And last but certainly not least, we go to a returning member of the Senate, Senator Carter, who's going to be recognized to introduce himself and also on a matter of personal privilege. Senator Carter.

2

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**SENATOR GARY CARTER:** Thank you, Mr. Chairman and members, I'm State Senator Gary Carter. I represent District 7, which is the west bank of Arlene's and Jefferson Parishes, and also the east bank of Plaquemines Parish. It's really good to be on this committee given the important work that we have in front of us, and I'm ready to get started. I do have a matter of personal privilege that I want to take. Congressman Carter was hoping to be here today, but with the weather and traveling to DC for votes, he was unable to make it. But he asked that I enter into a record a letter that all of us have from his office that I'd like to take time just to read very briefly, and it's addressed to us directly to the chairman. And this is from Congressman Troy Carter, representing the Second Congressional District in Louisiana. Dear Senator Fields, I regret that I cannot be here today due to the weather conditions on the roads. I pray that all throughout the state are remaining safe and warm as they wait for this winter storm to pass. As a member of Congress, I stand ready to help anyone affected in any way that I can. Watching a storm roll in brings back the memories of other storms that have rolled through the state, Katrina, Rita, Gustav, Ike, great flood of 2016, Ida, and so many more have altered life for everyone. During the immediate aftermath of natural disasters, this state shows the compassion and resilience that others envy. However, as we learn from natural disasters, recovery is different in every community. The disparate needs of communities give concrete examples of why representation matters. As a former member of this beloved body, I know your hearts because I have the opportunity to see them up close and personal. While we have not always agreed on policy, we have always agreed on the love of our country, community, and the great people of Louisiana. Dr. Martin Luther King said, "The time is always ripe to do what is right." Today, Louisiana stands ready to enact constitutional congressional maps that reflect that map is map. One third of six is two. I am willing to work with anyone to produce a constitutional map creating two majority minority districts that give black candidates a meaningful opportunity to win. Louisiana stands ready to show that all of its citizens deserve equal opportunity to elect their candidates of choice. Louisiana stands ready to do the right thing. I trust that my former colleagues and distinguished members of this committee will not wait. I pray you will do the right thing. And it's signed by Congressman Troy Carter. And I asked that a copy of it be entered into the record. Thank you, Mr. Chairman.

**CHAIRMAN FIELDS:** Without objections, so ordered a copy of the congressman letter will be entered into the record. Members would take up our first bill for today. We'll take Senate Bill 4 by Senator Price, which provides for the redistricting of Louisiana Congressional Districts. Senator Price, if you can come forward and you can bring whomever you so desire to the table. Welcome Senator Price. Why don't we have everyone at the table to introduce themselves, and then we get started. All right. This is a new little gizmo for me. I got you. I think I can do this. Let's see. I'm going to put all three on at the same time.

**SENATOR ED PRICE:** Thank you. Thank you, Mr. Chairman ad member of the committee, Senate and Governmental Affairs.

**[00:10:00]**

I'm State Senator Ed Price, and I represent the River Parishes, St. James, St. John, Ascension, Iberville, West Baton Rouge, Assumption and Lafourche.

3

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**SENATOR ROYCE DUPLESSIS:** Good morning Chairman and senate colleagues, my name is Royce Duplessis, and I represent senate District 5, Orleans Parish, and a portion of both east and west Bank of Jefferson Parish.

**JARED EVANS:** Good morning, Mr. Chairman and members, I'm Jared Evans. I am a Senior Policy Counsel with the NAACP Legal Defense Fund, and I'm also counsel for the plaintiffs in Robinson v. Landry.

**CHAIRMAN FIELDS:** Let me say you before you get started Senator Price. Mr. Evans, you've been before this committee quite some time. I want to thank you for all your hard work, and you're the reason why we're here today. Senator Price, you're recognized.

**SENATOR ED PRICE:** Thank you, Mr. Chairman. Members, I come before you today to present Senate Bill 4. We all know that we've been ordered by the court that we draw congressional district with two minority districts. This map will comply with the order of both the Fifth Circuit Court of Appeal and the district court. They have said that the legislature must pass a map that has two majority black districts. In this map, those districts are District 2 and District 5. I will walk through the cohesion of the black population in both of the districts. Okay. And so, what we're going to talk about today is getting there, but I do want to say, before I turn it over to our attorney with the LDL on the roadshow, and I was on Senate and Government Affairs at the time, and I attended every roadshow that we had. And one of the things that was talked about at all this roadshow was that we should have fair maps. Fair maps in a second congressional district. We all know that one third of six is two, and that was pushed very hard during these roadshows by a lot of speakers that came forward. So, when designing this map, we made sure that it was very compact, we didn't split a lot of Parishes, and we think that this is a fair map that can meet the muster of the courts. At this time, I want Senator Duplessis to give his statement, and then we'll turn it over to Jared.

**SENATOR ROYCE DUPLESSIS:** Thank you, Senator Price. I want to begin -- there we are. I'd like to just begin by thanking Senator Price for his leadership and filing this map. While he was on Senate and Governmental Affairs, I served on House and Governmental Affairs as Vice Chair, so had the opportunity to be intimately involved in this process. And as we sit here today, it brings me back to more than two years ago, as Senator Price just mentioned, where we began this process going to every corner of this state on the roadshow, northeast, northwest, southeast, southwest, Central Louisiana, all throughout this state that we began. I want to say in the fall of 2021, and here we are now in 2024 trying to resolve this matter at the direction of the court. So, I would just like to read just a few comments for purposes of Senate Bill 4, which we believe is the best path forward given the order of the court, and provides some motivating factors in the creation of this map. In drawing this map that complies with Section 2 of the Voting Rights Act, we considered equal population, contiguity, compactness, parish splits, and communities of interest. Consideration of the legislature's Joint Rule 21 was paramount in this process, but the overall strategy was to balance all of the relevant districting principles without allowing any single factor to predominate. Unlike many of the maps for the legislature and other bodies, the ideal population deviation of each district is zero, as close to zero deviation as possible. So, our

4

goal is to have 776,292 people in each district. We balance this with keeping as many parishes whole as possible. The few parishes that are split in this map are done so to keep each district with as close to the same number of people as possible.

**[00:15:02]**

I want to briefly walk through this map, district by district, to talk about the communities of interest that we consider. We certainly know, starting out that Louisiana has a great agriculture heritage that can be respected in this map by maintaining primarily the rural compositions in Districts 4 and 5. Starting with District 4, the northwest corner of the state is kept intact, with Shreveport being the major anchor of the district and the surrounding parishes that have common rural and agricultural interests. Moving to District 5, which is a newly minority district in this map is similar and that it contains large agricultural communities that are united with four of the state's larger population centers being Monroe, Alexandria, Opelousas and Baton Rouge. Moving to District 3, this map preserves the connectivity of Louisiana's Acadiana region, an important theme from the roadshow. Major cities and the surrounding communities are preserved and connected to the maximum extent possible in this map by keeping Lake Charles and nearly all of Lafayette in District 3. We keep District 1 as a coastal district. District 1 also includes the southern half of St. Tammany, the northern half of Orleans, and the majority of Jefferson. These communities are greatly important to the New Orleans region. Thousands of parents work and send their children to school in New Orleans, and it was important for us to keep these communities connected to the greater New Orleans region. District 1 also includes the largest maritime community in the country. These parishes are the first line of defense when hurricanes hit the southeast corner of the state, such as Katrina did in 2005, and with respect to the representative of that district, it allows them to work closely with our federal agencies on issues like flood insurance, flood protection, coastal restoration, et cetera. Terrebonne and Lafourche and are also fully united in the map, which we also heard a lot about during the roadshow. Moving to District 6, this map unites the northwest Florida Parishes with South Baton Rouge, north Ascension, all of Livingston, and the vast majority of Tangipahoa Parish, which is the fastest growing region in the state, and this map unites those communities in the 6th District. We know thousands of residence work in and send their children to school in and worship in Baton Rouge, and it's important that we keep these communities of interest connected. Finally, instead of packing black voters in New Orleans and Baton Rouge into one district, District 2 goes west and includes communities in the River Parishes and the Bayou region. It was very important for us that New Orleans remained the heart and population center of the second congressional district. So, this map unites New Orleans with St. Martin, St. James, St. John, St. Charles, South Ascension, and Assumption. These parishes again, have many industries in common, such as fishing and energy, and also share some of the same concerns and challenges as flood protection and insurance. And I may have failed to mention the connection of sugar cane along these parishes. These communities in District 2 are also united by a large petrochemical industry. Members, as you can see, we really wanted to keep as many of these communities of interest intact as possible while maintaining close to equal population among the districts as possible. And for those reasons that I've given, and you will hear additional reasons, we believe this is the best map for us to adopt. Thank you.

5

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**CHAIRMAN FIELDS:** Thank you, senator.

**JARED EVANS:** Thank you, senator. Good morning, Mr. Chairman and members. As I said, I'm Jared Evans, and I'm an attorney with the NAACP Legal Defense Fund. I'm joined by my colleague, Victoria Wenger. For almost two years now, Victoria and I have had the privilege of serving as counsel for the NAACP Louisiana State Conference and the Power Coalition for Equity and Justice, and nine individual voters and their challenge to the current congressional map. Several of them are sitting behind me in the room today, and it has truly been an honor to represent them throughout this process. This special session was convened as a direct result of that litigation, Robinson v. Landry. The map we present here mirrors the map submitted by plaintiffs in multiple phases of our case. It has been vetted by the federal courts and now provides you with the clearest path to remedy the state's violation of Section 2 of the Voting Rights Act. This map builds off of previous versions that were presented in this committee two years ago during the roadshow. The first redistricting session. The second special redistricting session and amendments that were filed again throughout this process.

**[00:20:05]**

The common links between those maps and disks are multifold, including the fact that it unpacks the populations packed into a single majority black district running from New Orleans to Baton Rouge, and instead provides for a new configuration of District 5 connecting Baton Rouge with the Delta parishes. Creating new opportunities for fair representation and a second majority black congressional district. Also, like previous versions, this map is notable in that it outperforms the others that have been offered throughout this process. As the federal courts have acknowledged the map offered by the Robinson plaintiffs, the map before you today, performs equal to or better than the states enacted maps from both 2022 and 2011 in adhering to traditional and state redistricting criteria, including those embodied in the Legislature's Joint Rule 21. This map has been updated from the plaintiff's map to utilize the most up-to-date precinct lines. Unlike its prior versions, this map once again surpasses its competitors. It has fewer pair splits than the enacted map, with only 11 compared to 15. As courts have held, there is no more fundamental unit of societal organization in the history of Louisiana than the parish. This map does not split any precincts. This map splits fewer municipalities than the enacted map. It achieves better scores on three quantitative measures of compactness, most accepted by the courts, Reock, Convex Hull, Polsby-Popper. And it has less instances of fracking where two or more noncontiguous pieces of a parish are within the same district than the enacted map and alternatives here. In other words, members, this map is a better map when graded on the rubric that this legislature wrote for itself in Joint Rule 21 and the redistricting criteria accepted for decades by the federal courts. As Governor Landry acknowledged yesterday, we are not here to debate the merits of our case or whether black voters should have a map of two majority black districts. The court has already decided that and ruled in our favor. We are here to talk about what that map will actually look like. I want to thank Senators Price and Duplessis for their leadership in carrying this map and their commitment to a fair process and true representation for black residents in this state. They have stood with us and with our clients from the beginning of this process. I will now turn over to Senator Price to explain the map further.

6

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**SENATOR ED PRICE:** Thank you. As you can see, at this time, we're going to want to bring the map up. Okay.

**CHAIRMAN FIELDS:** Duplessis, Senator, why don't you just grab that chair and let sergeant [INDISCERNIBLE 00:23:15]? We have a sergeant so sue can sit right next to you. Thank you. You may proceed, senator.

**SENATOR ED PRICE:** Thank you, Mr. Chairman. As you can see on this map, Senate District 2, which is the present minority district runs from Orleans Parish through St. Charles, St. John, St. James, Ascension Assumption, Iberville, and portions which is new of St. Martin. The other district, District 5, actually runs from the bottom of the boot here from St. Helena, take a little bit of Tangipahoa, East Feliciana, East Baton Rouge, West Baton Rouge, Pointe Coupee, St. Landry, West Feliciana, Avoyelles, Concordia, Catahoula, Tensas, Franklin, Madison, Richland, East Carroll, West Carroll, Morehouse and that's basically how the present district runs down from North Louisiana all the way into the Florida Parishes presently. But a big difference there, is it picks up portion of East Baton Rouge and West Baton Rouge. District 4, of course, remains basically the same. It represents Northwest Louisiana and District 3, the southern portion from Rapides to the Cameron of Amelia and Iberia area.

**[00:25:00]**

One is the Orleans, the coast area and goes into St. Bernard and Orleans also. The maps at this time, population we've talked about making sure that we stay within the deviation. District 1 has 507,988 whites with 144,750 blacks. District 2; 776,287 with 275,643 white and 415,880, which is 53.73% black. District 3; 776,249 with 555,655 white, 154,675 at 71% white, 19.9% black. District 4 is 776,310 with 455,308 white, 58% 262,042 with 33.75% black. District 5; 776,309 with 310,229 white or 39.9%, 424,358, 54.664% black, and District 6; 776,286 with 552,819 71% white, 141,414 and that's 18.2% black. So those are basically the numbers for the district.

**[BACKGROUND CONVERSATION]**

**SENATOR ED PRICE:** Okay, the next is voter registration. In District 1, we have a percentage, 75% white and 15% black. District 2 is 39% white and 52.9% black. District 3, 75% total registered voters with 79% black and 16.3% black. District 4 is 65% white and 30% black. District 5 is 43% white and 53.479 black. And District 6 is 80% white, 14% black. And the others to make up the 100%, is other voters. At this time, I think we can start to take some question, because we can go over all these numbers if you want, but we'll start to take the question.

**CHAIRMAN FIELDS:** Why don't you have your guest to your right to introduce herself and we'll start taking questions. Unless she would like to make some opening comments.

**SENATOR ED PRICE:** No, hit it back. You turn it off.

7

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**VICTORIA WENGER:** All right, I think its officially afternoon, so, good afternoon, Chairman Fields and members of the committee. My name is Victoria Wenger and I'm an attorney with the Legal Defense Fund and a very proud representative of the Robinson plaintiffs, many of whom are here today.

**CHAIRMAN FIELDS:** Thank you very much. I have just a few questions, Senator Price, I'm familiar with this map because it's similar to the one that we had in the last redistricting session. In terms of splits, this map splits 11 parishes, is that correct?

**VICTORIA WENGER:** That's correct.

**CHAIRMAN FIELDS:** And the present congressional plan that we have that members are running under today splits 15 parishes.

**VICTORIA WENGER:** That's correct.

**CHAIRMAN FIELDS:** So, this map splits less parishes than the present map?

**VICTORIA WENGER:** Correct.

**CHAIRMAN FIELDS:** The deviation, which is another important factor. Your deviations are in line, I think your highest deviation. Your highest deviation in this plan is minus 43, is that correct?

**[00:30:05]**

**ATTY. VICTORIA WENGER:** I believe the statistic I have for the deviation is 67. So essentially 67 people between the lowest populated district and the highest populated district. Just for a point of context, the bill that originated, or the version of the map that was put in comparison in our record in the case compared to the enacted map at the time had 61 for the deviation. The difference here, the slight adjustments that have been made between the map that's been in the record before the courts and that had several versions that have been before this legislature before the prior your predecessors, that map has just been updated to reflect precinct changes in the past year or two or three, wherever we're at now. So this has a deviation of 67. The enacted plan has one of 65. In its original form, we had a deviation of 61, but all essentially trying to get as close to that one person, one vote principal.

**CHAIRMAN CLEO FIELDS:** All right, so your overall range is 67. And how does that compare to the map that's enacted today?

**ATTY. VICTORIA WENGER:** That is just within two people?

**CHAIRMAN CLEO FIELDS:** Lastly, in terms of Senate Bill 4, it creates two majority minority districts. One in district two, which is the present minority district, and that voter registration is 52.9. Voter registration.

8

011624sg
**Paul, Peiss, Rifkind, Wharton & Garrison LLP**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**ATTY. VICTORIA WENGER:** The map provides us with multiple different statistics. There are voter registration numbers. There's also the black voting age population, essentially the population of Louisianans from one race or another who are above the age of 18, so qualified to vote whether they're registered or not.

**SENATOR FIELDS:** So I think it's 52.9 in voter registration.

**SENATOR ED PRICE:** Yeah. Registered black.

**CHAIRMAN CLEO FIELDS:** Registered black. And then population is 53.5.

**ATTY. VICTORIA WENGER:** The total population, is that what you're referring to?

**CHAIRMAN CLEO FIELDS:** Yes, ma'am.

**SENATOR ED PRICE:** 53.5. That's correct.

**CHAIRMAN CLEO FIELDS:** All right. And now let me go to District 5. You have a voter registration of 53.4?

**SENATOR ED PRICE:** Yeah, 53.479.

**CHAIRMAN CLEO FIELDS:** And then you have a population of 54.6. Is that correct?

**SENATOR ED PRICE:** Yes. That is correct.

**CHAIRMAN CLEO FIELDS:** So my only question is, do you think that this complies with any court order that this legislature is under today?

**SENATOR ED PRICE:** I certainly do think that it complies with the court order, Senator Fields. We've looked at this map and we studied it, and we based on what the court ordered, and that's why we filed it the way it is. We think it meets the court order.

**SENATOR FIELDS:** All right. Thank you, senator. I have no other questions. I'm now Senator Carter for a question.

**SENATOR CARTER:** Thank you, Mr. Chairman. Thank you, Senator Duplessis. Thank you, Senator Price. And thank you to the legal defense fund for not just your work on this legislation and especially to the legal defense fund for helping get us to this point of having the court order and having us into session to do this important work. I believe Senator Fields, the chairman, asked most of my questions, but I just want to ask a couple of questions to make sure. The map that you're proposed, it creates two African-American majority districts in the state of Louisiana?

**SENATOR ED PRICE:** It creates two minority majority districts. Yes, sir.

9

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**SENATOR CARTER:**  And they both perform as two. And you're nodding, but yes.

**SENATOR ED PRICE:**  Yes, that's correct.

**SENATOR CARTER:**  And when I say perform, what does that mean for those who actually run, I'm looking at you, the legal defense fund? When we hear that, does it perform as an African-American district? What does that mean? Is that calculated any sort of way? Is it analyzed any sort of way? You can help us explain how that's done.

**ATTY. VICTORIA WENGER:**  Absolutely. So we have a very thorough record on this. In the court, we had a PhD, Dr. Lisa Hanley, who has essentially gone, and she's recompiled the results of prior elections and superimposed those on the districts that we have here. So she was able to analyze 15 elections at that primary stage and then nine elections where you're looking at the outcomes when you're putting the candidates of choice here in the elections that she analyzed, black candidates. But truly, we're looking at who is the candidate of choice of the voters, black voters here, who we represent in contest with the candidate of choice of white voters here, white candidates as well.

**[00:35:05]**

So in 15 primary elections and 9 runoffs, she was able to analyze what the results would be on our district lines. In District 2, the current black majority district represented by Congressman Carter. In these elections, in all of the 24 that she analyzed, the candidate of choice of black voters was elected 100% of the time. So 24 out of 24 elections. If you were using these district lines and looking at the outcome of those elections that have happened. So, many of these are statewide elections looking at secretary of state or governor or other offices where we have votes for each and every precinct within the configuration of the districts as they've been drawn here 100% of the time.

**SENATOR CARTER:**  And let me pause you. That's 100% of the time for District 2, which is current congressional.

**ATTY. VICTORIA WENGER:**  Correct. As we reconfigured here, which, yes, it will bring down the black population. It'll look different than the district that it's drawn as right now. But maintaining that majority, black population, not only as a total population or a registered voter population, which were the metrics presented before, but the black voting age population, which the court is often looking to. That's the primary metric we're using here. Here, we have a black voting age population above 50%, lower than its current percentage, but still 100% of the time on those elections, black voters were able to see the candidate that they want win.

**SENATOR CARTER:**  And let me ask you, so 100% of the time performance for District 2. The other district that's created will be District 5, the third African-American majority seat. Did you run the performance numbers on that one as well?

**10**

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**ATTY. VICTORIA WENGER:** We certainly did. We did for all six districts. But let me talk about District 5, the real one in question here. In the 15 primary elections here, 86.7% of the time, black voters saw their candidate of choice succeed. Looking to the later elections, between, in two candidate contests, 77.8% of the time, black voters were seeing their candidate of choice succeed. I'll note that once you get to that runoff scenario, those nine elections in the remaining of the districts, you're very rarely, if ever, seeing black voters have their candidates of choice elected. But in District 5, an opportunity is created here that just has not been recorded in recent history and certainly is not provided under the currently enacted map.

**SENATOR CARTER:** Thank you. Thank you for your questions. Thank you, Mr. Chairman.

**SENATOR FIELDS:** Thank you, senator. Senator Jenkins.

**SENATOR JENKINS:** All right. Thank you, Mr. Chairman. And let me start off also by just expressing my appreciation for all the hard work that has gone into this effort. I said in my opening comments, well, my introduction, that I served in-house and governmental affairs. So I was very much a part of the redistricting process over there, served with Senator Duplessis, who was vice chair of our House and governmental affairs committee, and certainly want to salute you, sir, on your leadership once again. We touched upon it somewhat, but I just want, just for the record, if we could, can you expand a little bit on the motivating factors behind this particular map?

**ATTY. VICTORIA WENGER:** Certainly. So I can speak from the perspective of the litigation, and again, where the map was a teeny, tiny bit different because this one has been adjusted for precinct lines and updates since our phases of litigation, when this map was introduced jointly by parties involved. But we had our incredible map drawer Tony Fairfax, who's been credited by courts for decades now testified before the district court about his process of drawing a map. And he spoke to balancing principles, to really looking at joint Rule 21, the rules of the game that the legislature here enacted, but also what courts have sustained for decades now. We really look at the rubric provided by Thornburg v. Gingles, which was upheld in Allen v. Milligan just last year. The Alabama case, very analogous to this one before the Supreme Court and argued by my colleagues at LDF. So he was able to provide in his analysis, and this is all in the public record. I can provide it, or you can find it there. A comparison of eight of the quantitative measures for redistricting that really put in joint Rule 21 into numeric measures so that you can see a side by side of this map compared to the enacted map or any of the other maps that were presented or argued either as bills or amendments during prior redistricting sessions or in the session that we were reconvened for today. So we can first talk about population deviation. At the time that Mr. Fairfax was working on this map, we spoke to this earlier, he was able achieve a deviation of only 61 people HB1 have a deviation of 65.

**[00:40:07]**

Both maps were able to comply with the principle of geographic contiguity. That's the idea that you don't have one pocket of a district over here and the other pocket over here. Everything is connected by land or waterway. You can get from one point in a district to the other without

11

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

needing to go through another district. Both were successful on that, but he was ensuring that he was complying with that principle. Parish splits is a huge one here and my colleague, Jared, spoke to it earlier. Mr. Fairfax was able to get parish splits down to 11. We've seen very few bills here, or in other phases of the process that we're able to keep so many parishes whole. And in Louisiana, that's a huge deal. If you do anything on elections, voter registration, and I know each one of you all do, because you have to run for office. That's the level at which elections are administered. Ballots are often built at that level. But you also see school boards, administration, all these other elements of civic and public life really codified around that parish level. So keeping parishes whole was a huge guiding principle here, but again, balanced with all of these other dynamics. In comparison, again, HB-1 split 15 parishes. VTD splits, that's a fancy census way of saying precinct splits. This legislature is very committed to making sure that number is zero, both maps achieved that. Census place split. So that's another fancy term for municipal splits, but also accounting for unincorporated areas. It's really what's your hometown and is it encompassed in one district or cut up into multiple. Mr. Fairfax was able to get it down to 27 splits in comparison to HB-1, the enacted maps 32. Landmark splits. So this is where we're talking about airports, cemeteries, parks, schools, churches. How many times are they sliced and diced into multiple different districts? Mr. Fairfax had it at 58. Same number for HB-1. Now let's get into compactness. The layman's way of analyzing compactness is something very scientific called the Eyeball Test. How does it look? Do the district lines look silly? Do they look like they have a bunch of tendrils going in one direction or another? Just illogical if you're taking any kind of rivers or other things that may also wind and bent out of the equation. What's that eyeball test? You can run the eyeball test for yourself. If I was offering my opinion here, I would say that our map looks much more compact than the enacted map that voters are participating on to this day and represented under right now. But we also have some math to back that up. And specifically, Mr. Fairfax was looking at three tests, which again, my colleague mentioned earlier, the Reock Test which calculates the ratio of district area to the smallest circle containing the district. So draw the district and try to have a circle encompass it, you can run some numbers to see what that ratio is. You have the Convex-Hull Test, which determines the ratio of the area of the district to the convex-hull area of the district. And then finally, the Polsby-Popper Test, which calculates the ratio of the same area of the district to the area of a circle with the same perimeter. So here your goal is to get as close to one as possible. And I'll give you the numbers for Mr. Fairfax's map and then the enacted one. He was able to get to a compactness score of point 0.4, 0.2 and 0.7 compared to HB-1's 0.37, 0.14 and 0.62. In easiest terms, this map that we're presenting here today beats the enacted map and many of the others that it was up against throughout the multi fold processes we've been before the legislature during it outperforms on every measure. So compactness is another check in favor of this bill. And then finally, Fracking, which I know can mean different things in different contexts. But here fracking is whether or not discontiguous parts of a district are or of a parish are populating the district. So essentially, how are things being sliced and diced. Here, Mr. Fairfax was able to get the number down to 12. Again, lower the better versus the inactive plan at 17. So that is 8 quantitative measures where at worst this map is exactly the same as the enacted map and at best it is well outperforming it. But on one measure which is listed towards the top, if not at the top of Joint Rule 21, and a guiding principle for how redistricting comes into play is compliance with Federal and State Law. And one of those Federal Laws is the Voting Rights Act of 1965, including Section 2, including the promise that black voters where there's an opportunity to create a second black majority district

12

or any additional majority districts that give black voters an opportunity to elect their candidate of choice where it is possible, we're number one, and this is the Jingles Test.

**[00:45:03]**

It's possible to draw a map because that population lives geographically compactly enough to be able to draw the district. So again, this is not about just some ratio, it's not because black voters are 1/3 of the state that they inherently get another black majority district, it's because of where they live, it's because we've seen multiple maps presented here in these chambers and in front of the courts that showed it's possible, it's easy, and in fact, you can do a better and comply with all of these other measures, better wills doing that, then passing the map that you all have enacted here and that voters are operating under today. So number one, is it possible. Number two, is it necessary. The Voting Rights Act looks to voting behaviors. It's asking in the second part of that Jingles test, if the black voters are voting cohesively, if they really have a voting block and shared interests and community and needs based off of legacies of discrimination, but also contemporary realities. And then two, are white voters, the majority population voting in the opposite direction. So unless you create a geographic majority, black voters or whatever the minority population is are just not going to see their candidates of choice elected. Those conditions exist here. This record is replete with examples, including ones filed finally from across the aisle here that show it's possible to create another black majority district. And we know from Dr. Lisa Hanley's analysis and other record evidence before the courts that it is necessary because of patterns of racially polarized voting in this state. If those elements weren't here, we wouldn't be in this place. There's a future where maybe those elements subside where the state is more integrated, where the politics are less divided by race. We are not there yet. So we're in this situation. And so what we have here is a map that complies with the Voting Rights Act of 1965, that has withstood that test of jingles, which has now been in play wills, we had to see that test sustained through Allen V. Milligan and the Supreme Court of the United States. All of these factors bring us to today and bring us to this map which is well vetted by the courts and which a lot of folks in this room have been really excited about for many years now. So I'll leave it at that. But the point is, this map complies with the Voting Rights Act, and we hope that you can get on board with it.

**SENATOR JENKINS:** Great answer. And much needed. Thank you so much for that information.

**ATTY. VICTORIA WENGER:** Thank you.

**SENATOR JENKINS:** Senator Price, you mentioned about the roadshows that took place. You went to a larger roadshow.

**SENATOR PRICE:** Yes, went to all of them.

**SENATOR JENKINS:** All right. and I went to a majority of them myself. And would you agree with me that there was a broad cross section of the community at most of those roadshows talking about redistricting?

13

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**SENATOR PRICE:**  Yes.

**SENATOR JENKINS:**  All right. Do you feel like this particular map represents the voices of the people that we heard, regardless of race, color, creed at those roadshows?

**SENATOR PRICE:**  It absolutely does.

**SENATOR JENKINS:**  And Senator Duplessis, you know when we are drawing these maps, we're not just drawing them, just drawing two minority districts, am I right?

**SENATOR DUPLESSIS:**  Correct.

**SENATOR JENKINS:**  What we have to do is present a map that contains all of the geography of Louisiana.

**SENATOR DUPLESSIS:**  That's correct.

**SENATOR JENKINS:**  And do you feel like this map adequately represents all the geography of Louisiana, and the community of interest, the very community interests that take place in different parts of the state?

**SENATOR DUPLESSIS:**  I do. Yes, sir.

**SENATOR JENKINS:**  All right. Thank you for your answers and for the information. I think it was something we needed to discuss and make sure that it's in a record. Thank you, Mr. Chairman.

**CHAIRMAN CLEO FIELDS:**  Thank you, Senator Jenkins. Now we'll go to Senator Reese. Before we do, let me say that there is an overflow room, Room E, that the sergeant at arms have opened up, so those individuals who are in Room E now, when we get to the testimony, we'll call you and if you hear your name, you can come. Senator Reese.

**SENATOR REESE:**  Thank you, Mr. Chairman. Senator Price, thank you for the work that you put into this. Certainly respect your time and effort in it. I would like to take a moment though to point out my reservation about this map and it's not one that I've pointed out in similar drawn maps before. For me, it's difficult to abandon one set of standards for the Voting Rights Act to accept others. And district three, we split in Vernon Parish, the state's largest single federally owned asset in the state of Louisiana, which is a military installation. So that that is now fully consumed in District Four. So not only do we abandon our continuity representation, and a well-defined community of interest, from a federal standard.

**[00:50:00]**

14

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

We personally believe in congress' primary responsibility as the national defense of our country. That is a strong, very strong community of interest. They're occupying about half of the land mass of Vernon Parish and currently encapsulated within one congressional district in one area of responsibility. In addition to that, when the map is drawn in the fashion in which it is, the housing for the military installations captured in District 3 while training lands are captured in District 4. And so, you have a population there of nearly 8,000 to 10,000 people that would be counted in the population but who do not typically register to vote in the State of Louisiana. And so, it's for those two reasons and I've articulated this before. I had really good discussion with the chairman as a matter of fact during our last round of redistricting about this topic. I'll continue to listen to the debate and again appreciate the work put into but I just want to voice serious reservation about the split of that strong federal community of interest in the way that we manage Vernon Parish in this version of the redistricting map. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you. And thank you for your concern. I think when we look at it, we had to have some split for population reason and that's why that area right there does constitutes a split. But we have less split than we have right now in enacted map and I know probably an enacted map stayed whole. But because of the population and the deviation and trying to make sure we have the minimum amount of deviation, that's the way we had to do it.

**SENATOR REESE:** There's no perfect way to define the areas that you have to make those divides. I just have to express what I believe is serious consideration for that community of interest, continue the representation in that large federal asset in that area. Thank you, Mr. Chair.

**CHAIRMAN CLEO FIELDS:** Thank you, Senator Reese. The Board is clear. I want to thank each of you for your testimony. We're going to announce or taken some testimony from the public. I do have a state representative here. We'd take her. Do you wish to be heard? Yes, we're going to hear the state rep. You want to be heard now? First, let's hear from Senator Jackson and then Senator Marcelle, if you would come to the table as well. And then, we'll start taking public testimony. First, Senator Jackson wish to be heard. So, Senator Jackson, you recognize and then we'll hear from Representative Denise Marcelle. Senator Jackson.

**SENATOR JACKSON:** Thank you, Senator Fields and members of the committee. Mr. Chairman, I want to first thank you for your work not just today but throughout this entire process even from last term and what you've done to try to create a fair and equitable districts and this committee. We're under a duty, I understand, of the court but I must come express my concern that while North Louisiana is ice stun, our legislative assistance cannot even get to our offices to our constituent databases. Some of our constituents do not know that we're here today and in the process of redistricting, I want to express my strong opposition that this body continues to meet while North Louisiana, specifically for me, Northeast Louisiana constituents cannot come and give their testimony nor can we communicate with them as we normally would through our office process to give them the maps that we received on yesterday. I know that this legislature has attempted not to act in a clandestine way and we're up against a clock of a court order, as well as this ice storm that Northeast Louisiana and I think Northwest is experiencing. However, in redistricting, the constituents input is paramount to understand the communities of interest for me and how our constituents feel. My constituents, Northeast Louisiana constituents,

15

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

cannot be here now. And worse than that is that our mechanisms and our databases for communicating with them are in offices that our staff cannot reach. And for that reason, Mr. Chairman, in a very respectful way for all of the work that you and other committee members have done. It is my hope that at some point the resolve would be for this legislature to at least ask for an extension of time based on this ice storm that we cannot effectuate the goals of the order because I agree with the court order. Let me say that. I firmly agree with it. That fairness must prevail. However, in fairness, how fair is it for my constituents not to be able to look at maps that I have to vote on.

**[00:55:01]**

Because if I can't hear from them, how do I take a vote that's in their best interest. And so, I know this is not idea, right? And I know that no one could have planned what is happening in the North Louisiana, in Northwest Louisiana, Northeast Louisiana but our constituents have not seen these maps. And usually, I have a database of 4,000 or 5,000 constituents and you noticed about me, Mr. Chairman, you worked with me long enough that I would've sent out and said, "These are the maps that's introduced." You at home, "The data is great. Please look at them. Communicate with us. Let's get on Zoom and talk about them." But as I come today, a couple of my more learned constituents about the process have called and expressed concern that if they wanted to there was no way for them to get in their car and drive here and express concerns they have with some of the maps that's been introduced. And for that reason, I believe and I may stand alone in this belief that those attorneys who represent us and the state and others who support the legal defense on point should have at least asked for an extension so our constituents could take part in this process. I do not believe maps should be passed in a way where our constituents can't get here. What I don't want to happen is, and I think every senator and representative from my area should feel the same way or any area this iced in, is that maps are passed and we go home and our constituents gain knowledge of it are their path and the time to speak to the senators who are elected to represent them is over because the maps are sitting in the house and that's the place I found myself in today and I have to speak up for those constituents who can't be here and don't know what's going on. And that's with all due respect to all of your hard work because I greatly appreciate it Mr. Chairman and I agree with the court's ruling. I just think that we're up against a clock that may be ticking to a point where our constituents cannot participate in the process. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you, Senator. Comment will be noted for the record. I mean, as all of us know when the governor made this call, no one knew, at least I didn't know and I don't think any member of this committee knew, that we would be in the conditions that we're in now but we are against a mandate from the courts and you can take that up with the president.

**SENATOR JACKSON:** I've expressed my concern to the president. That's why great deference to the committee chairman and its members, that at some point both parties in this lawsuit should consider that and I wanted that to go on the record. That no one could have known this ice storm was coming but our goal is to effectuate the goals of the people and the wishes of the people and represent them. And if our people can't be here, then I think it's only

16

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

incumbent upon those in leadership to ask for that extension until such time as half of the state can come because right now half of the state is iced in and can't be here. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you, madam. I mean, Senator Jackson. Now, we hear from Representative Denise Marcelle who wants to be a senator. I'm just teasing.

**REPRESENTATIVE DENISE MARCELLE:** Is that right?

**CHAIRMAN CLEO FIELDS:** I'm just teasing. Please, proceed Representative.

**REPRESENTATIVE DENISE MARCELLE:** Thank you for the promotion. I appreciate it, Chairman, and thank you Senator Price and Senator Royce Duplessis for putting on this SB4. I certainly appreciate it. I thought it was important that I come over because I have the same identical map on the house side. I don't believe in duplicating things, so I'm going to park my map on my bill until I see if this bill moves forward. I do want to go on the record with my testimony though that I believe that this map represents communities of interest. I believe that District 5, the new district that's being created unites the Baton Rouge with the Delta, Monroe, Alexandra, and St. Landry and I think that's important. You know, when we attempted to address redistricting a few sessions ago, we found that Baton Rouge had growth. To me, it made perfect sense that Baton Rouge would have its own congressional district. We added population. Others lost population. So, I thought it was a great thing to create the district where Baton Rouge would have representation and that's important because there are some goals that we had to achieve with a fair map given African-Americans an additional seat. There is a need to unpack Black voters. And in my opinion, the current configuration is a map where we have compact voters. Black voters particularly.

**[01:00:03]**

And so that leaves us with the one district. One of the things that I thought about as I came up here that there is a history of voter suppression in Louisiana. I started thinking back about why did we actually have to do this and I started thinking about before, we used to have a pre-clearance method that we had to take up, but that was removed by the decision of Shelby. That was the protection because it appears that this is not the first time that we could not do what was right in Louisiana. I listened very intently in H&G today as we talked about the courts and I know we're on the congressional map, but it's the same thing. We have not fixed the map of the Supreme Court in over 100 years. Think about that just for a moment. 100 years we have not done it. Hence is the reason we used to have the protection when we were doing redistricting, but that has been again removed. As we go through this process for the third time, for the third time, I just want you all to remember that a third of six is two. If the shoe were on the other foot, would you want a second congressional district? Know, the district are not going to be idea of what everybody wants. Somebody is going to lose something. This is not about a person. It is about the entire Louisiana. And until we can see it that way, everybody has to have a seat at the table and have proper representation, and until we do what's right in Louisiana, we always going to be in the back. I don't want to see us do that. My ideas may be different from your ideologies, but I should have a seat at the table or I should be able to go to Congress and fight for the people

17

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

in my district. I shouldn't be outnumbered unfairly. I should be able to do what Section II provides. And so that's why I came to give my testimony in support of this map. We have failed to do what's right. That's why the courts have ordered us to do it. And some of us are still saying we don't want to do it. We want to defy what the court's opinion is. We don't want to look at facts. We want to look at what we believe should happen so we can have the control. It's not about one party having the control over the other. It's about what the constitution says and it provides, and the Voting Rights Act was clear. Of course, we had to fight for that as well so that we could have a seat at the table and represent our people. I think we need to do what's right. I think we need to pass this map. It is the best representation that I've seen of fair maps for the congressional district. Let's do what's right. Let's not let Judge Dick have to do what our job is, which is to create a second minority-majority district. I beg of you to do the right thing. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you very much. Members of the public, please keep your opinions to yourself. But thank you very much, Ms. Marcelle, for your testimony. Now we're going to now go to public testimony. I know I saw Press Robinson, are there any other plaintiffs? I take you off first and then we'll take -- will all the plaintiffs just come? I know Press Robinson, you first up on my list, and just identify yourself for the record and you all may proceed. I'm sorry, Devante. Commissioner Davante Lewis I forgot. Identify yourselves for the record and you may proceed however you so desire.

**ASHLEY SHELTON:** Good afternoon. My name is Ashley Shelton and I'm the Founder, President and CEO of the Power Coalition for Equity and Justice.

**CHAIRMAN CLEO FIELDS:** Identify yourself and you may proceed.

**ASHLEY SHELTON:** I'm sorry, thought we were going to all go. I'll introduce myself. You know, I kind of changed my talking points up today because as I sit before you, I'm a little tired.

**[01:05:00]**

We have been moving this process, working with community, educating community for over two years. And actually, for us, we've been doing this since the census. We've been working with communities across the State of Louisiana and I think it is unfortunate that fairness is a concept that evades us here in the legislature. And so as we sit here today with one more chance to do what's right, I hope that we find a pathway there. Because what is true is that for many of the plaintiffs, what I'm clear is that if we can't get our map through this session, then Judge Dick is going to give us a second minority-majority district. And what I do know too, is I've traveled the state. We have worked on this process starting with the roadshows. Hundreds of folks participated in the roadshow stops across the state. We trained, talked to, worked with communities. We also had unprecedented citizen participation within the redistricting process. We know that at least on one day there were over 300 green cards, which you know are affidavits. So these are Louisiana citizens and other folks from our legal team, from outside the state as well who said that they support this map. And they think that today we have some community with us. Certainly the weather put us in a position to not have as many people be able

18

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

to join us, but what we know is that the theme that has been clear is that across those roadshows and throughout all of the redistricting sessions, the veto session and the sessions that would follow and court that at the end of the day, people want a fair map. And the people have said it time and time again and here's what I think is important around what is important to understand around African-American voters. When we were in that first session around redistricting, African-American voters from all over this state, folks that would not even benefit and would not even live in the two or three potential districts that could be created, understood that they wanted to have one more voice in Congress that reflected their experiences, their values, and fighting for the things that matter to them. For example, the infrastructure bill that was basically our entire delegation with the exception of Congressman Charles Carter was voted down, was not voted for by our delegation. And so in the second poorest state in the country, I am always confused around why we are voting around political lines that are voting for the needs and the interests of our people. I also want to talk about the cohesion of this map. I support this map because it does something that I think is very true for all of the parishes that are included in the new district. All of the areas that are included in the new district, it is composed of all of the communities that are overlooked in the current districts where they exist, whether it's North Baton Rouge, the Flora parishes, or the delta. We find that all of those communities are not centered in the districts that they are in. And so this would be an opportunity for these communities to actually have a voice. And we also know that these communities have rich culture and history, but also have some of our lowest life indicators, whether it's life expectancy, maternal mortality and other issues. And so these are things that we can fix not only at this legislative level, but certainly at the federal level and they need that attention. So for me, this is really just an opportunity to, again, affirm what I have said now for the last two years, which is you know, fairness isn't complicated, and I think Representative Marcelle said it best. We're not going to all get what we want, but two districts should -- I think we've shown both through the original session that there were eight different maps that showed that it could be done eight different ways. And here we are again, looking at a number of maps, including ours, and proving yet again that it can be done. And so with that, I will conclude my testimony and certainly allow my other plaintiffs to speak.

**CHAIRMAN CLEO FIELDS:**  Thank you very much, Ms. Shelton and for brazen this cold weather and coming here. Mr. Robinson, please identify yourself for the record, please.

**PRESS ROBINSON:**  My name is Press Robinson. I'm one of the plaintiffs in the Robinson v. Landry litigation related to the redistricting of its congressional boundaries. Pursuant to of course the 2020 census, by law, the Louisiana Legislature is responsible for redistricting a number of districts for the state, but none more important than those for the US House of Representatives.

**[01:10:04]**

I hope that the legislature will not repeat the mistake of the past by denying Black citizens of the state their rightful opportunities to elect representatives of their choice. Now, according to the 2020 census, Blacks represent approximately a third of the state's population, and they live close enough together to easily create two majority Black districts. Easily to create two majority Black districts. You know, it's really unfortunate that here we are today, amidst the celebration of Martin Luther King's birthday, fighting for rights that we thought had been earned in 1965 with

**19**

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

a passing of the Voting Rights Act by the US Congress. That's almost as old as I am, and yet here we are still fighting today for those same rights. But because you are the elected officials with the responsibility of joining the congressional districts, I strongly, very strongly urge you to live up to your charge by adopting a lawful map and thus avoid a court imposed remedial one. The map represented by SB 4 is plaintiff's offering, and it balances traditional redistricting principles, including those articulated by the legislature here in the State of Louisiana as the top priorities for this redistricting session, as well as uniting communities with common interests. But perhaps just as important, the passes of SB 4 is the clearest route, the clearest route to ending the Robinson litigation. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you, Mr. Robinson. Commissioner, thank you. Please identify yourself for the record.

**DAVANTE LEWIS:** Yes, sir. Good afternoon Committee, and thank you, Mr. Chairman. My name is Davante Lewis. I proudly serve on the Louisiana Public Service Commission, representing the third district which includes 10 parishes here in the State of Louisiana, primarily East Baton Rouge Parish and Orleans Parish. And as you can imagine, I was up late last night ensuring that most of my constituents did not lose power. Their power was restored. But when my grandmother called me this morning to check on me and we had a talk, she reminded me of an old hymn that she would sing in church about how I feel this morning. And she told me to wake up this morning with my mind state on freedom. And so that is why I'm here. That is why I am a plaintiff in this case, because we have been asking to be free for too long. Senate Bill 4 presents a plan that complies with the Voting Rights Act, keeps community of interest in the State of Louisiana together, and allows us, as Louisiana finally an opportunity to join as one and do something right for our people. I'm often reminded by what St. Augustine said, which is, we love the truth when it enlightens us, but we hate it when it convicts us. And the truth is, the map that we passed into law showcased that we did not put the best interest of Louisiana first. This map in Senate Bill 4 gives us the opportunity to do what is right, to do what is just, and to give every Louisiana the opportunity to be heard and their voices be recognized in these elections. I appreciate what Senator Jackson said, as we would have had more people here had the bad weather not been, but I would be remiss not to remind the Committee that the judge gave us until January 30th to pass a new map, not until January 23rd. There are still seven more days that we can do it. But we all know, I'll admit we wanted to go to Washington Mardi Gras, but I think if we can't get this done in the next few days, instead of leaving our responsibility, we should not travel to DC, we should not go to balls, we should not go to the events, we should stay here and do the work of the Louisiana people.

**CHAIRMAN CLEO FIELDS:** Members of the public, please do not show any expressions.

**[01:15:03]**

If we do it again, I may have to have the sergeant at arms, so please work with me. You may proceed.

20

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**DAVANTE LEWIS:** Thank you, Mr. Chairman. I will say in conclusion, my fellow plaintiffs and I have worked tirelessly and we appreciate the work that we know you have done. Looking at models and districts, looking at how we can do this, and we strongly believe this is the best path, the clearest path, the legal path to getting it done, and I'll end with the reason why I put my name on this lawsuit was not for anything of personal self-gratification, but because I'm reminded of what my grandmother always taught me which is, when you get to judgment day, you will not be judged by what you personally accomplished in your life, but you will be judged by where you stood in relationship with those in despair. And there are people in our state who felt they are in despair because their voices haven't been heard and I would not do my job on this Earth if I did not stand with them. Thank you, Mr. Chairman.

**CHAIRMAN CLEO FIELDS:** Thank you, Commissioner. Appreciate your testimony. And the last plaintiff, please identify yourself, ma'am.

**DR. DOROTHY NAIRNE:** Hey. My name is Dr. Dorothy Nairne, and I'm a plaintiff in the case and I am here on the shoulders of my ancestors who are from this region, from Assumption Parish, so I saw Senator Price. That's my elected official. And for me, on a cold day, when we couldn't go outside and somebody was misbehaving, it was like we had to wait until everybody was behaving well and then we could go outside. So I look at that here in Louisiana, where if we, as African-Americans are a third of the population, then when we rise, everyone rises. So when I see this map as a plaintiff, I sign up, because this map represents everyone, and together we rise. So elected officials watch us all rise as we celebrate the saints, as we stand on the sidelines for Mardi Gras and catch beads. Let's all rise together, just like it's Mardi Gras every day, so that our least thought of members of our community in places like Napoleonville have some opportunities. The despair that I see around me every day in Assumption Parish, it's weathering and I just moved back here. So just to give a little background, I lived in South Africa for 20 years and moved back here to Louisiana in 2016, and it's been really difficult where I don't see the opportunities for my people. I don't see how we can elect ourselves. I don't see the answers for my people where I live. But one step in having answers and solutions which we have ourselves would be in the passing of this map. So instead of putting more energy into maps, we can put our energy, once we pass the map, that makes good sense to the majority of people. We can put our energy into our economic development. So that's what we're here for and we represent a whole lot of people who tonight are talking about glimmers of hope, whether they're being snuffed out or whether they're being lifted up. So lift us up, because together we can go outside. Together we can win something. And this map is a step towards our together, Louisiana together. Together, we thrive together.

**CHAIRMAN CLEO FIELDS:** Thank you very much, ma'am, for your testimony. Let me thank all the plaintiffs. We appreciate you all coming here in this tough weather. We only have now nine other individuals who wish to be heard on the bill and we have one person who wished to be heard in opposition, and I'm going to put everybody cards in the record. Let me first take -- is this Jacqueline [PH 01:19:12] Germany? If you're here and you still wish to testify, you may come forward. And Carlos Pollard, Jr. with Power Coalition. If you're still here and you wish to testify, please come forward. And Morgan Walker, if you are still here, you may come forward and you may testify. Please identify yourself for the record and you may proceed.

21

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**JACQUELINE GERMANY:** Okay, first, good afternoon, Chairman Fields and other members of the Senate Committee. My name is Jacqueline Germany, and I'm a member of East Veterans Parish and Senate District 14. Your district Senator Fields.

[01:20:00]

**CHAIRMAN CLEO FIELDS:** Welcome to the committee. And this is the most important witness I want every member to pay attention to. Please proceed.

**JACQUELINE GERMANY:** I have lived and worked in Baton Rouge, East Baton Rouge Parish for 74 years and I'm very proud of that and I'm a very active member. Today, I come before you do with members of the community and other groups and coalitions at Lord. I also come to speak for those who are afraid to speak. I come to speak for the voiceless, the ones who feel like their voices cannot be heard. Today, I urge you to keep my community together, to give us fair representation. Since the beginning of the redistrict process beginning with the roadshows which I attended, and I testified, and I've come before senate committees and testified and given you my opinion as to how I feel. We need fair representation. I need to feel like my voice is heard, that I have a part of the process, that I have a right to have. For far too long, justice had been denied and I have something that I use to say and sometime I back up from saying it but I'm sick and tired of feeling like I'm not a part and we are not a part of the process. My community deserves fair representation. We deserve to be heard, to be a part of everything. Not to sit back and look over and feel like I'm not a part of that. I work in the community trying to encourage people to vote and it's hard because they feel like they don't have a voice, that their voices are not being heard, that they're not a part of the process. You all have an opportunity to give us a chance, to give us what we deserve and that's fair representation. The time is right to do what is best by giving me, my community and others the right to have a choice. A choice in who we want to serve us and feel like that person understands how I feel, what I need, what my community need and wants. We have values and we have expectations, and we need those things heard and we need those things expressed. Thank you very much for listening to me and please give us fair and equitable maps. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you very much. Ms. Germany. Please identify yourself.

**CARLOS POLLARD, JR.:** Yes, sir. Good afternoon. I am Carlos Pollard, Jr. with Power Coalition for Equity and Justice and a 2L at Southern University Law Center. I am happy to be here, but also tired as Ms. Jacqueline Germany expressed and the plaintiffs because I started off this redistricting process as a redistricting fellow almost three years ago and today, we're still here fighting the same fight and I just came here to express that back in 2022, we mobilized over 300 people to come to the capitol to express their need and their want for fair representation across this state. And yet, in 2024, we still have not received that. And we, again today had planned to mobilize over 200 people. And just in response to Senator Jackson's sentiments earlier, we had planned two busloads of people from North Louisiana to come here today to testify what they want in their state that they live, pay taxes in. So again today, we're in support of Senate Bill 4, and we deserve two majority minority districts in this state.

22

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**[01:25:07]**

**CHAIRMAN CLEO FIELDS:**  Thank you very much, Mr. Pollard.

**MORGAN WALKER:**  Good afternoon. I'm Morgan Walker, the founder and executive director of Bike N Vote, here with Power Coalition as well. And I just want to reiterate and express some of the things that the community said. Bike N Vote is a Louisiana non-profit organization dedicated to mobilizing millennials in Louisiana to register to vote and get out to vote in an innovative way. I traveled here to express my sentiments to the people Louisiana elected to represent us and vote for us on our behalf. Two years ago, close to this exact date, the first special session was held for the redistricting cycle where over 250 people traveled to our state capitol to urge you all to pass fair maps. To date in 2024, we are urging you to do the same thing we urged in 2022. The numbers have shown as Black people make up one-third of Louisiana population and this session presents an opportunity to create two out of the six congressional districts where Black voters can have their voices heard. Today, I urge you, as a Louisiana constituent, to vote in the favor of the Senate Bill 4. This map illuminates fair representation. Fair representation can lead to real change for Black Louisianans and help improve disparities in education, health care access, environmental safety, infrastructure, and more. Please, on the behalf of your constituents, pass a fair map. Thank you.

**CHAIRMAN CLEO FIELDS:**  Thank you all so very much for coming to the Committee to testify in this inclement weather. Thank you all. Next, we have John Milton, Devon Trey Newman, and Wilfred Johnson. If you're still here, you can come forward. Please identify yourself for the record and you may proceed.

**JOHN W. MILTON:**  Thank you, sir. I'm John W. Milton. I am a resident of Carencro, Lafayette area, and I am here today in support of the Senate Bill 4. I've been out of law school for over 35 years. I've never come to this body, the legislative body, to ever testify. I remember some years ago when I was in law school, 1987, I think it was, and there were some issues of how do we get African-American on the judiciary, and so, I did some research as part of the Louisiana, Martin society and realized the dynamics that required and the state did take some action to set up an opportunity where there would be subdistricts and African-Americans could enter the judiciary and be a part of the process of governing our people in the State of Louisiana. I remember that time, Senator Fields, if you remember, we had a very gerrymandered second district while we had seven congressional seats available in the State of Louisiana before Katrina. And I remember how awkward that was and how crazy it was. Thank God these maps don't look like that. But I say to you that I think one thing that was most important if I had a couple of minutes to say to you is that where I lived, my neighbor on my right was a very staunch Democrat, I'm sorry, my neighbor on my left. My neighbor on my right was a very staunch Republican, and we were all three friends. But when you ran for governor, there was a Mary Landrieu sign, a Cleo Fields sign and a Mike Foster sign. And I'll be darned, when you entered the election, I'm not sure if all the members are aware what I'm talking about, but most of you, I think would that when Senator Fields entered into the runoff against Governor Mike Foster, my

23

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

neighbor on the left took down his Mary Landrieu sign when we all walked out to get our newspaper, The Daily Advertiser.

**[01:30:00]**

And I saw a Mike Foster sign. I'm thinking all of the issues that were on the table, [INDISCERNIBLE 01:30:09], were like this. And Foster was over here, and he looked at me and said, "John, I know how it looks. It looks bad". And he gave me some reason why he would not, as a Democrat, not vote for Cleo Fields for governor, and why he put up a sign, and all of a sudden, that was a republican sign. I'm saying to you that race is a factor. It is undeniable. And while the day after the King holiday, we talk about the move toward integration and one America, one Louisiana, and how miserably a failure that has been, the reality of it. So, if we're not going to go there as a people, then allow the African-American community to have some type of representation so that we can be a part and continue to participate in self-governance and make sure that we are protected in all of the rights that all American should continue to have. So, I simply rise for that purpose to say that the creation of districts that are majority-minority, while is not desired by me or most people in this room, we shouldn't have to do that. It is only a band aid on a bigger problem of white supremacy and racism in America in this state and until we can get to the root of it, let's go ahead on and take care of this and at least show some empathy to all of the people of this state. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you, sir, for your testimony. Please identify yourself and you may proceed.

**DEVON TREY NEWMAN:** My name is Devon Trey Newman. I am an activist and community person from Lafayette, Louisiana. I travel here on behalf of the Village 337 as the president and director of the organization in partnership with the Power Coalition and many other organizations that are here today. We traveled here with a bus of about 30 people from places from Lafayette to New Iberia, Carencro, Opelousas. And we were scheduled to leave at 6:00 a.m. but we waited it out and waited until we had clearance to leave. And so, we are here today. I'm here to support House Senate Bill 4, and thank you all for your time and allowing us to be here. And I want to say that it is disheartening that we are still here today. I believe it was in the year 2020 when there was an attack on the 1965 -- '64, '65 Voting Rights Act. And unfortunately, this is, I believe, part of the problem. We see that this is only -- as the bishop said, putting a band aid on the problem. But as we continue to address these issues, we wanted it to be known that people from across the state of Louisiana are aware of what's happening. Part of the problem that we see too often is that things go on in this great building without us ever knowing about it, without people -- and when I say us, I mean people who live in the community for real. I'm not talking about those that wear suits like we all have on most of the time. I'm talking about the ones who struggle to make ends meet. I'm talking about the ones who are going to be affected mostly by how the resolve of this is. We hope today that this can be resolved and that it doesn't have to go back to the courts, because we know that that means that somebody's going to be making a choice for black people once again in Louisiana. And we are sick and tired of other people making choices for us and being pushed in corners like we're being pushed in today, that we have to choose when most of the state or most of the people who want to be here cannot be

24

here. We actually were supposed to bring two busloads, but unfortunately, due to those conditions, we cannot. And so, again, even in this situation, our people are underrepresented, under supported, and rushed again to make the decisions that will affect not only their lives, but the lives of their families in their future. I pray that this resolve does give us more representation and that we can continue to work towards a more equal Louisiana. But we cannot go without acknowledging the fact that this is deeply rooted in racism and white supremacy. And if we look at the representation here today, I think that especially when you talk about involving and engaging younger voters, and everybody's complaining as to why young, particularly young black voters, don't vote. Well, when you look at what our options are, it's kind of hard for me to make that argument. Especially I'm not talking about individuals, but I'm talking about on what we actually can vote for. Having the idea that we have to engage young people in 2024 about coming to the state capitol to make sure that we can have fair and equitable maps and lines drawn out to represent them is what makes them not want to participate in the process.

**[01:35:15]**

So, I hope and pray that going forward, we can continue to engage and we just wanted it to be known that people from across the State of Louisiana are aware, and we do. Thank you, Mr. Chairman, for your support in all what you're doing to make this happen. Thank you.

**CHAIRMAN CLEO FIELDS:**  Thank you, Mr. Trey Newman. And you may identify yourself and proceed.

**REV. WILFRED JOHNSON:**  Good afternoon, Mr. Chairman and to this committee. I am Reverend Wilfred Johnson. I'm from a little small town called Jeanerette, Louisiana. My senator just walked out. I wish he wouldn't have, but I wanted to look him in the eye when I say what I have to say. I'm also founder of A New Chapter Push, which is a community organization that was founded in 2007 that focus upon assisting those that were formally incarcerated. I myself, as a formerly incarcerated individual, after serving 20 years in Angola, the majority of my life now is focused upon the community affairs. I'm here also representing Power Coalition. We've been here too long. Three years is too long. As I look, as some of the testimonies been going on, some people are not even paying attention. They're looking away. They're doing other things. They're not even hearing what we're saying. It's like it doesn't even matter. I mean, when is this going to stop? When are we going to live out the life that we say we are? I promise you, if I ask every one of you to raise your hand, if you're God fearing, you will. But how can you be God fearing when you can't do the right thing, when you can't see that the numbers, that is, before you make all the sense there is, we shouldn't be going through this. There shouldn't have been a federal judge that has to make a decision when those that we've elected can't make the decision for us. It saddened my heart. I mean, I just got my voting rights back five years ago, and I'm always excited to vote, but the point I'm making is, guys, come on. Look at it for what it is. We got to do the right thing because it's the right thing to do. Anybody know who said that? The Honorable Dr. Martin Luther King. So, we got to understand what it is that we're here for, man, we drove -- we didn't know what we was going to run into icy roads. We came down here, like Devon and Pastor Milton said. I mean, we had to busload of people to come, but unfortunately, that didn't happen. But we're here, and we speak for those that didn't come, that wanted to come. We speak for

25

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

those that are not in Louisiana. That is ice out that couldn't get here. We speak for those in New Orleans and all over the State of Louisiana to let you all know, man, we're sick and tired of going through the same thing over and over again. When you have been elected to do a job that you are not doing. Cut it out. Give us what we deserve. We deserve fair mapping. That's all I have to say.

**CHAIRMAN CLEO FIELDS:**  Thank you very much, reverend. Both reverends, thank you all for your testimony. Appreciate you being here today. We now have three left, and then we get to the opposition. No, we have two because we've [PH 01:38:36] Bristetta Carter. Did I mispronounce that? And Marja Broussard are the last two witnesses who I have cards for and we put the others in the record. Please identify yourself and you may proceed.

**RADISHA CARTER:**  Good afternoon, Chairman. My name is [PH 01:39:00] Radisha Carter and I am a first-year law student at Southern University Law Center. I am a resident of Shreveport, Louisiana, in Caddo Parish. I have been a resident of this community for 34 years, my entire life. I am here with my community members and larger coalitions. I urge you to vote in favor of Senate Bill 4. My goal for this redistricting process is for our elected officials to pass Senate Bill 4, a fair and equitable map that does not deflate my power in the election process. Our voices cannot go unheard on this matter. Shreveport and Caddo Parish are unique from the rest of the state and so are our traditions and issues that we are facing. According to The Daily Advertiser, in 2022, Caddo Parish had an average weekly average of $1,109, ranking next to last among the large Louisiana parishes.

**[01:40:06]**

This redistricting cycle has been going on for close to three years now and the numbers have been the same. Fair representation can lead to real change for Black Louisianans. Please, as a person you represent, pass Senate Bill 4 for a fair and equitable map. Thank you.

**CHAIRMAN CLEO FIELDS:**  Thank you very much for your testimony.

**MARJA BROUSSARD:**  Good afternoon. My name is Marja. M-A-R-J-A.

**CHAIRMAN CLEO FIELDS:**  I'm sorry, Ms. Marja.

**MARJA BROUSSARD:**  Marja Broussard. I am the NAACP Louisiana State Conference District D, Vice President, also a member of The Village 337. Vote Imani Temple and many other community organizations. I'm from Lafayette. Have been a longtime community activist in hopes to move our people, people who look like me, forward. It's important for Louisiana to secure a second majority congressional seat for many reasons. Representation, equal opportunity, protecting minority voting rights. As far as representation is concerned, a second majority black congressional seat would ensure better representation for the significant black population in Louisiana. As of now, Louisiana has one majority black seat despite having a substantial African-American population. Having another district with a majority black representation will give a greater voice to the concerns and the interests of this community. As far as equal

26

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

opportunity, a second majority black congressional seat would provide an opportunity for fair representation and better political participation. It allows for diverse range of perspectives and experiences to be brought to decision making processes, leading to more equitable policies that addresses the unique needs and challenges faced by the black community, which is different than what faces the white community, or the Hispanic community, or the Asian community, or any other community protecting majority-minority voting rights. The creation of a second congressional black seat can help safeguard minority voting rights. Louisiana, like many other states, has an ugly history, and that history is of gerrymandering and racially discriminatory redistricting practices. By establishing another district with a majority black population, it becomes more difficult to dilute the voting power of the African-American community through redistricting plans that minimize their influences. Overall, securing a second majority black congressional seat in Louisiana is crucial to advancing representation, equal opportunity, protecting voters' rights, and addressing specific community concerns and promoting diverse perspective in policy making. Now, what's most concerning to me is that each person who is sitting on this seat here, each of you know that it is right -- you know that a second congressional seat is needed to represent the African-American community. And every elected official, every elected lawmaker know that this is the right thing. It is disheartening for me to sit before you this afternoon and watch this process, to watch my people beg the lawmakers to do what is right. You are elected to do what is right. We shouldn't need a judge to tell us what to do. We shouldn't need a judge to tell you what to do. You guys represent us, knowing what is the right thing to do. You know it, yet you still fight not to do it. That's scary and as Reverend Johnson said, "Martin Luther King said, the time is always right to do what is right." And we're asking you because I don't want to be -- I'm a proud woman. I don't want to be perceived as a beggar, okay?

**[01:45:00]**

So, I refuse to beg you to do the right thing. I'm a proud black woman, unapologetically black and beautiful, and have five beautiful black daughters and beautiful black grandkids. And I refuse to beg you guys to do what is right. But I will make a request that you do what is right. Thank you.

**CHAIRMAN CLEO FIELDS:** Thank you very much for your testimony. Members, I've had -- I know people have driven here doing inclement weather, but I picked up three more cards when I closed. But Christopher Toombs, if you must be heard, please come. Jordan, is that Braithwaite? If you must be heard, please come and then lastly, Maya -- I didn't bring my glasses. And those would be the last cards and then we close off. Those would be all of the people who wish to be heard. Please proceed, sir.

**CHRISTOPHER TOOMBS:** Good morning, committee members, Senator Fields and all people in attendance. I just feel like this is a Bill that we have to make sure that we pay close adherence to. When you look at the makeup of the ivory hue and the ebony hue people in this state, then you kind of see where we're trending towards a point where there has to be equitable representation. I think that when you think about things from a progressive climate standpoint with the rest of the country, we've got to keep up with the norms that are existing and the algorithm that's creating a society that we want to be a part of. And I think that in other major

27

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

metropolis and other areas, they're able to get through the minutiae a lot easier because their policies and procedures are much more progressive. This is an opportunity to show that Louisiana, with all of our, I guess, deficiencies that we have to deal with on a day to day basis, that we take these larger, looming issues like this and we give it the proper attention it deserves. Now, here's the deal. If you look at Louisiana from unhistorical perspective, the ebony hue population has been largely underserved. This is an opportunity to show that we're making progress because we want to be progressive. Like right now, a lot of big companies look at our state and they see where we are. And it's almost like if we don't show the progress on a national level, which this can do, then we're saying that we're regressing and not progressing, right? And I just think that this is a great opportunity with a Bill like this that you can make an impact on our national image. Because here's the deal. We're in an international marketplace now. We have to show as a collective that we have the capability that we have the intentionality to get some equity in these spaces. And I'm saying this as a doctoral candidate at LSU in cultural preservation. This is all I deal with all day. I read about the history of this state. I understand the history of this state and this is an opportunity as a collective for ebony hue and ivory hue together, to come together and show that we're the progressive state that we can be, and this is your opportunity to do it.  Thank you.

**CHAIRMAN CLEO FIELDS:**  Thank you, Mr. Toombs.

**JORDAN BRAITHWAITE:**  Good afternoon, Mr. Chairman. All the members of the committee. Thank you for taking the opportunity to hear my testimony. My name is Jordan Braithwaite, and I'm currently a proud graduating senior attending Grambling State University. And I come here on behalf of not only Power Coalition, but Louisiana NAACP, as I currently serve as the state president for the Youth and College Conference. And the main reason that I'm here, and I'm advocating and strongly urging for the adoption of the Senate Bill 4, is because it's an opportunity to allow the youth to be heard and know that our voices truly matter. When I have the pleasure in serving in this role and being able to travel across Louisiana and go to underrepresented communities and register youth to vote, black youth to vote specifically and talk and have conversations about voting with them and educating them on that knowledge, it always peaks with the conversation of the picture that's displayed that my vote doesn't matter. It goes unheard. I already know that with gerrymandering and things of that nature, that I don't have a say in our democracy. And so that's why I strongly urge the passing of this Bill, because it allows the opportunity for the youth to see that we do matter, we do have a say so, and that our future isn't in vain.

**[01:50:03]**

And so, that's why I came on here today, and that's mainly why I travel all the way from North Louisiana despite the weather conditions because I just wanted to ensure that the youth's voice is being heard today and that they could see this as an opportunity and understanding that we do matter and that this is happening so that we can know that our future and our democracy. This is the clearest path to that. And so, thank you again, and I appreciate your time today.

**CHAIRMAN CLEO FIELDS:**  Thank you for coming. Thank you for your testimony.

28

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**MAYA SANE:**  Good afternoon, Chairman, and members of the committee. My name is Maya Sane and I'm also a student at Grambling State University. I won't say much and I won't be long, but I do want my presence today to serve as a form of support not only for the underrepresented but African-American youth voters as well. Through my advocacy and hands-on efforts through voter registration through Northern and Southern Louisiana, the SB 4 Bill has shown its effective measures for the inclusion of not only black voters, but voters across the State of Louisiana. So, today, all I am asking is that you hear the concerns of the citizens and the youth and take heed to the major concerns regarding the current one at hand. Thank you.

**CHAIRMAN CLEO FIELDS:**  Thanks to each of you, and let me thank all of the individuals who actually showed up today in this very bad weather to testify. There are also 47 cards which I won't read, but they -- I'm going to -- we are going to put them, make them a part of the record. Thank you all so much for coming to testify. And at this time, we start taking – we take the -- those in opposition of the Bill and then we move on it right after that. Senator, thank you all. In opposition -- let me first -- I just have a card in who wish to speak. Former State Representative Woody Jenkins, it doesn't say opposition, it simply say that you wish to speak. So, I guess this would be an appropriate time to call up on you, Representative Woody Jenkins.

**REPRESENTATIVE WOODY JENKINS:**  Thank you, Senator Cleo Fields, my friend. I appreciate you and this chance to speak. My name is Woody Jenkins and I did serve in the House of Representatives for 28 years. I want to especially congratulate Senator Jenkins. It is long overdue that we have a Senator Jenkins in Louisiana. I can tell you that. I want to read a statement from Speaker of the House, Mike Johnson, who wants to weigh into this, a very important message, I think. But before I say that, I want to just say that we've now set for 2 hours and 15 minutes and heard some wonderful testimony from people who are very passionate. They are coming from a Democratic perspective, that the main thing about a person is that person's race, and that when we draw maps, we ought to be looking what the race of people is and drawing maps about that. Over two-thirds of this legislature were elected on a very different philosophy, and that is the people or individuals, and they need to be treated as individuals, and we are not to be looking at their race when we do things like draw maps. In fact, the Supreme Court has said we're not supposed to draw maps based on race, and we're not supposed to gerrymander around as most of these plans do, trying to pick up precincts here and there to make an artificial racial balance. In fact, what the testimony has said not just based on race but to guarantee, if you listen to the testimony, they wanted a guarantee of the outcome and elections based on how the maps are drawn. That's all based on this philosophy that the most important characteristic about a person is their race or their sex or whatever it is. And that's not the philosophy of the people who elected you, and it's not the philosophy of most of the people sitting here. Now, this debate needs to be in the context of what's happening in this country today. We have a Speaker of the House elected from the State of Louisiana who has a two-vote majority. What's he doing up there? He's trying to stop the flow of millions and millions of illegal aliens into this country. He's trying to lead an investigation of the wrongdoing of this administration in power right now. He's trying to protect the security of this country, and he has a two-vote majority, which these Bills would deprive him of if enacted because it's going to take one vote away and take it the other way. It's a two-vote swing. So, this matter is extremely

29

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

serious. It's not about our local politics. It's not about deals that have been made. It's not about who might run based on this district or that. It affects the security of this country. Now, here's the message from -- that I would like to read from the Speaker of the House who has made this especially for the members of this committee so that you would know how he feels about it. He said we've just seen, and this was at 10:30 this morning, he said, "We've just seen and are very concerned with the proposed congressional map presented to Louisiana legislature.

**[01:55:00]**

It remains my position that the existing map is constitutional and that the legal challenge to it should be tried on the merits so that the state has adequate opportunity to defend its merits, to defend its merits, which we haven't had in court. Should the state not prevail at trial, there are multiple other map options that are legally compliant and do not require the unnecessary surrender of a Republican seat in Congress." Now, that's the position of the Speaker of the House, which leads me to the next thing. We have had over and over again, we've been told in this committee something that's completely false, and what we've been told is that the Fifth Circuit Court of Appeals has ordered this legislature to redo the maps and create a second majority black district. The Fifth Circuit Court of Appeals has done nothing of the sort. It hasn't ordered this legislature to do anything, and it certainly hasn't ordered this legislature to create an additional majority black district. Here's what the Fifth Circuit Court of Appeals and, unfortunately, most people have not read it. It's not that long an opinion. You should read it. But here's the final statement in the Fifth Circuit's comments on this case. It says this, "If the legislature adopts a new redistricting plan and it becomes effective, then that map will be subject to potential new challenges." Now think about that. You top something new. That's not the end of the story. It's going to be challenged. In fact, in the 1990s, our colleague, Senator Fields, is not in Congress today because maps were thrown out by the courts where there was gerrymandering to create a second black district. Those maps were thrown out. Those maps are very similar to the maps you are looking at today. They were thrown out because they require you to look at people's race to draw congressional district maps. Now, go back to what the Fifth Circuit said. They said, "If the legislature adopts new districting plan and it becomes effective, then that map will be subject to any potential new challenge." And then it says, "If no plan is adopted," in other words, you don't pass any of these Bills, "then the District Court is to conduct a trial." The order is that if you take no action, the District Court, Judge Dick, has to have a trial. The Fifth Circuit has ordered her to have a trial.

**CHAIRMAN CLEO FIELDS:** Excuse me.

**REPRESENTATIVE WOODY JENKINS:** Yes.

**CHAIRMAN CLEO FIELDS:** Representative Jenkins, the gentleman has a point of order. State your point. Oh, let me turn you on first, I'm sorry.

**MALE 1:** Thank you, Mr. Chairman, and thank you for your testimony. It's my understanding you put in a white card as opposed to a red card, and I just question the point of order of that. It seems as if he's taking a certain position on the legislation as opposed to a neutral position.

30

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**CHAIRMAN CLEO FIELDS:** Yeah. Is it safe to say you in opposition, too?

**REPRESENTATIVE WOODY JENKINS:** No. I'm here giving you information about what the court said, which you have not heard here for.

**CHAIRMAN CLEO FIELDS:** Gentleman may proceed, but I understand your point.

**REPRESENTATIVE WOODY JENKINS:** It says, "If you take no action on a new plan, then the District Court is to conduct a trial and any other necessary proceedings to decide the validity of the HB1 map." And it says, "At the completion of the trial, there shall be time for appellate review." Now, that's what the court actually said. They didn't say you have to draw any new map, and they didn't say you have to have two majority black districts. It says if you take no action, the district judge has to have a trial on the merits which has never been. Attorney general said she's ready to defend our law. Now, when you look at the Roadshow, the 24 stops that the Roadshow made, and people are talking about the Great Roadshow, they did, but they didn't result in this plan. They resulted in the passage of HB1, which is the current reapportionment plan. That's what the Roadshow did. Now, we got notice anybody in this state yesterday afternoon about 5:45 of these different plans. There has not been adequate notice for the people of this state to come here and weigh in on this plan, which totally changes our existing plan. You've had bad information. No transparency. You have a good plan to defend. One of the things I want to point out as a Baton Rouge and who represented this Parish for 28 years, these bills eliminate a congressional seat for Baton Rouge, for the capital area, which normally we've had a capital-based congressional seat, which that does away with it. So, I want to just conclude by pointing out that congressman, our Speaker of the House, Mike Johnson, is opposed to all of these plans, thinks we need to go ahead and go to trial, hear the evidence and what we have an Obama judge, a Judge Dick, and we have a conservative Fifth Circuit and a Supreme Court that's conservative.

**[02:00:07]**

They don't think alike. So let's have a trial and see what happens and see what the judges do.

**CHAIRMAN CLEO FIELDS:** All right. Thank you very much, Representative Jenkins, for coming to explain to us what the Fifth Circuit has said.  The last person in opposition, well, the only card I have in opposition is [PH 02:00:32] Mary Labrie. Ms. Labrie, if you come forward.

**SUSIE LABRIE:** I pull it up here.

**CHAIRMAN CLEO FIELDS:** Thank you for coming here and thank you for coming through this tough weather. Please proceed. Identify yourself, please.

**SUSIE LABRIE:** Well, I'm very glad to be here. All right, thank you. When I'm here, the reason I'm here is I want to represent JC Harmon and also myself. JC could not be here because of the weather. He's stuck at home in Jefferson Parish. But he did send everybody a packet in the

31

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

map that he proposed. And I hope every one of you got to see the map and the presentation, which I thought was superior. And this is my take, a combination of JC in my testimony. I like to support JC's proposal, and the reason I want to suggest JC Harmon's proposal is because, first of all, it's illegal to gerrymander. And he feels like statistically and scientifically, it is not really possible. I am Susie Labrie. I'm representing myself. I see myself as an appropriate situationalist individualist, not as a part of a collective class of color, skin, age, height, genealogy, gender, physical description, et cetera. JC was going to appear, like I told you, he was crowned. So I'm sort of representing him, too, as an individual. As redistricting, I tried to find a way to create and convert into an additional minority district. After studying up myself and with JC, I still cannot come up with any additional minority district without gerrymandering, which is illegal to add. But did try. I see it, as well as JC. That is mathematically and statistically impossible. And he has a solution that he has sent to all of us. In law, I understand that gerrymandering is illegal, like I said, number two, I see its reverse discriminations, those I see, in my opinion, such as Vietnamese, Spanish, disabilities, gender, age, so forth. And also, especially as in my district, I see it as against rural and farmers interests, small business, sole proprietors, main streets, those I had seen the electing liberals represented by unfair overtaxation and other issues on the working people, on the farms and small menaces. Number three, it would pose more central power, lessening individual power. Individual constituents would fall between the cracks and less attention would be heard or heeded to less. When you represent a collective, huge class as a one size fits all, too many fall between the cracks, especially myself. Special needs, self-identity, talents, nativities, et cetera. I've been through that. I want to integrate, not segregate, a district with a one-size fits all, collective class approach. I don't want to do that. I would not feel represented in a homogeneous, segregated community or district which hides individual needs and representation. Number four, it would cause us one vote to two votes shorts for us in the US House of Representative, which would remove Louisiana from its high position, for example, the speaker of the house and the majority leader, Mike Johnson and Steve Scalise, et cetera. Louisiana is enjoying a good position in the house if we stay put. The only way I can see for myself to add a minority district is to draw it as a Z, S, a zero or coil snake, a tornado, which all have been rejected over the decades. If we had to do this, I'm still suggesting a pop-up. A minority district is a set of archipelago islands looking like different size polka dots. Small one is as small as a voter, a minority voter's house up to the largest size you could get around a district.

**[02:05:03]**

And scatter these polka dots all within, all across the state, within a water of majority district or districts, or make the district as a coil, like a slinky toy or tornado, like that. And after studying that myself with JC Harmon, I find it mathematically and scientifically impossible. Number six, it would divide the state and cause disunity. So we need to integrate, not segregate. So please heed and adapt to this proposal and maps that were submitted to you. JC is a genius in research, numbers, geostatistics, engineering and science. And me being an actor myself, I'm also a great devil's advocate and trying to hit a fair approach. I have tried justifying both sides, could not find a solution until JC came around. And I suggest that you receive this. Once again, integrate, don't desegregate -- I mean, integrate don't segregate. Thank you, gentlemen.

32

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**CHAIRMAN CLEO FIELDS:** Thank you very much for your testimony. And again, we appreciate you going, coming through all this bad weather to be here to testify.

**SUSIE LABRIE:** It was mighty. It was a great pleasure and I thank you for having us.

**CHAIRMAN CLEO FIELDS:** Thank you. Members, you've heard all the testimony. There are seven other cards that do not wish to speak, but in an opposition, that would be a part of the record as well. Senator Price, to close on your bill.

**SENATOR ED PRICE:** Thank you, Mr. Chairman and members of the committee, I know we've had a lot of testimony today and we've been here a long time, but this bill is very and extremely important. I know we heard some comments a little while ago about race. Well, the Voting Rights Act never said that it could not be about race. It said it could not be a predominant factor. So sometimes you get information and it's just not what it should be. We've come a long way and we need to move a map forward. This map does what the court has ordered us to do. Regardless of what you heard, we are on a court order and we need to move forward. We would not be here if we were not under a court order to get this done. So I say to you that, look at the map. We have seen it. It works. It performs. It does what it needs to do to make things right. This is a fair map, a map that has been vetted, a map that has shown that it will work. And I implore upon you that we need to move a map forward. And I feel that this map will do what we intend it to do. Don't listen to some things that are just said to be said. We know what we have to do. We know that we have 33% in this state and one-third of six is two. And that's where we need to go. We have a fair map. I went all over the state of Louisiana doing the redistricting hearing. I heard what the people said. I heard from North Louisiana in Monroe, Shreveport. I heard in Alexandria. I heard in Thibodaux, Louisiana, Baton Rouge, Lake Charles. I was at every hearing and everybody wants a fair map with two minority districts. They were there. So we know what they want from around the state. I heard it all. And I ask that we move this bill favorable, we'll move it to the floor so that we can start to do what we need to do to have a fair map. My colleagues, you want to --

**CHAIRMAN CLEO FIELDS:** Senator Duplessis, you want to close?

**SENATOR ROYCE DUPLESSIS:** Just really briefly, without reiterating or repeating what Senator Price said, all the points have been made. We've been at this well over two years now. And if you compare it to a sporting event, we are past the fourth quarter. We are what I compare to double OT with no time left on the clock. This is it.

**[02:10:00]**

And the question I think we have to ask ourselves is how much more time, how many more resources will we expend on a process where we're at the end of the road? We have so much other business that we need to be handling on behalf of this state, and our constituents deserve us to do the right thing and move on. Governor Landry was very clear yesterday in his speech to both chambers that this is our time to get this right, to adopt the maps that have been put before us. And he was very clear in his message, and I think this is our opportunity to do that. So I'm

33

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

asking this committee to basically do what's been consistent throughout all of this presentation today and adopt the map before us. Thank you.

**CHAIRMAN CLEO FIELDS:** All right. Thank you, Senator Price. You've been at this for a long time, and thank you for your former service on this committee. And thank you, Mr. Duplessis, as well. We've heard the testimony of Senate Bill 4. Members, what's your pleasure? All right, Senator Jenkins moved that we report Senate Bill 4 favorable. Are there any objections, Senator Miguez? Object. Secretary will call the role if you want to. Senator Miguez.

**SENATOR BLAKE MIGUEZ:** Thank you, Mr. Chairman. I want to first start off by amending my introduction that I'm also, as you know, I represent Senate District 22, which is Iberia St. Martin in Lafayette Parish. But I'm also the only member on this committee that serves in the capacity and represents the Acadiana region, the Lafayette regional area. And I think it's incumbent upon me to state the reasons for my objection here today. Also want to preface my comments to everyone that supported this particular instrument, that this is not the only instrument in the process. The instrument that's going to be heard today that's active, that creates a second majority minority district. We have SB4, which is currently up, and we also have SB8. But I'm going to talk about this bill in particular, and what's most important is to point out who is going to pay the real price for this legislation if it were to pass. And that's the Acadiana region. Senator Duplessis mentioned connectivity into the Acadiana region, which in the Acadiana region, we're looking at the Lafayette surrounding area and those parishes like Acadia, St. Morton, Vermilion, Iberian, St. Mary, that are known to have a lot of cohesiveness there. And I would disagree that they have connectivity. They're in fact split into many different areas. Senator Duplessis has also mentioned that be his area would be connected with my district, which is St. Martin Parish. And I can tell you that the folks in my district would give me a tough time at the coffee shop next week, and then they would have trouble finding a lot in common with St. Martin in Orleans Parish besides the fact that we're both Louisiana citizens. Senator Price, you mentioned that you had attended every single roadshow, so you likely attended the UL roadshow?

**SENATOR ED PRICE:** Yes.

**SENATOR BLAKE MIGUEZ:** And you got an opportunity to see a different dynamic at the UL roadshow. Not only did you hear a lot of testimony about a second majority minority district, but you got to see people come out from Iberia and St. Martin Parish and talk about the history over 60 years of how, and it was particularly about the Senate district that I currently represent, but how much we had in common. And the folks that testified were local elected officials from my business community. They were folks from my minority community, and they talked about some great testimony. I encourage you to go back and look at it. I also spoke there as well. But the testimony there also applies to this congressional proposal here today, because in this proposal, you are splitting Iberian St. Martin area. And I know you guys are some really great guys. I want to mention that. But I do have one issue with you both. You all both overachievers. I didn't get enough time to spend serving with you in the House because you all moved over to the senate so quickly. And I think it's partly my fault. And I don't think you guys are trying to adversely affect my map. And I want to have an invitation to both Senator Price, Senator

34

011624sg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

Duplessis. I'm Cajun. We're known for our foods. You guys can come on down to my home district and I'm going to bring you some of the best local food possible. We're going to get in the car, we're going to drive around 30 or 45 minutes, and we're going to pick up some of the best shrimp in [INDISCERNIBLE 02:14:31] in congressional district three. Then we're going to go get some of the best crawfish in Breaux Bridge, just about 30 minutes away in congressional district number two. Then we're going to get some of the best Buddha in north Lafayette in congressional district number five. And then we're going to go to congressional district number one right there in Morgan City and get all the petroleum products to cook. And we're going to have a great cookout. And I want you guys, my point is that our chairman mentioned splits. This map only splits 11 ways, whereas the other map, which I believe is Senator Womack's map, splits 15 ways.

[02:15:00]

It's a difference of four, but which I'll fail to point out, is that Acadiana area gets split into four different ways. That's something that's very unique to your map. You got four congressional districts that meet between St. Landry, Lafayette, St. Morton and St. Mary Parish. I have a real issue with that, and I encourage any maps that are going through this process to weigh that in and go back. And you made some great testimony about all the people that spoke. You mentioned, I believe, 200 people. I think we had about 150 to 200 people that showed up from St. Morton, Iberia Parish to talk about keeping cohesion is there. Guys, we're just on the west side of the basin there. We got a lot in common, and we talked about our differences with folks way down the bayou in Houma. But just imagine the kind of differences that we have in Orleans Parish. So if this bill were to make it favorably here today, which I hope it doesn't, I've reserved the opportunity to maybe make it a floor amendment, and I'm going to rename it the Divide Acadian in Congress Act, because I want the public to know that's exactly what this bill does. And I want you to know that's the reason for my objection here today. But I appreciate you guys bringing the bill. And, Mr. Chairman, with that, I formally object to the bill.

**CHAIRMAN CLEO FIELDS:** All right, thank you. And you're going to have to operate this because I've lost all control with this computer here. Senator Jenkins moved that we report Senate Bill 4 favorable. Senator Miguez, object. Therefore, when the secretary called a roll, please vote yes if you in favor and no if you're not. All the roll.

**FEMALE 1:** Senator Miguez?

**SENATOR BLAKE MIGUEZ:** No.

**FEMALE 1:** Votes no. Senator Carter?

**SENATOR GARY CARTER:** Yes.

**FEMALE 1:** Yay. Senator Fesi.

**SENATOR FESI:** No.

35

011624sg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**FEMALE 1:** Nay. Senator Jenkins?

**SENATOR SAM JENKINS:** Yes.

**FEMALE 1:** Yay. Senator Kleinpeter?

**SENATOR KLEINPETER:** No.

**FEMALE 1:** Nay. Senator Miller?

**SENATOR MILLER:** No.

**FEMALE 1:** Nay. Senator Reese?

**SENATOR MICHAEL REESE:** No.

**FEMALE 1:** Nay. Senator Womack?

**SENATOR WOMACK:** No.

**FEMALE 1:** Votes nay.

**CHAIRMAN CLEO FIELDS:** And the Chair of votes yes.

**FEMALE 1:** Yes, sir. Excuse me. Senator Fields?

**CHAIRMAN CLEO FIELDS:** Yes.

**FEMALE 1:** Yay. I have three yays and six nays.

**CHAIRMAN CLEO FIELDS:** Three yays and six nays. The bill is deferred. All right. Thank you, senators. Members, we've been at it for a minute, and some of us without a restroom break, but why don't we break until 3:00 and --

**[OVERLAY]**

**CHAIRMAN CLEO FIELDS:** That's probably not going to happen. Let's break into 3:00 and if we're a little late later, members of the public, these members have not eaten, so we're going to just say 3:00 and hopefully we'll be back by three. Senator Carter moves that we recess until break until 3:00 p.m. Thanks.

**[BACKGROUND NOISE]**

**[02:20:00]**

36



# **Pohlman**USA®

## Court Reporting and Litigation Services

---

Louisiana State Senate 1st Special Session-Audio Transcription

January 16, 2024

---

In Re: Louisiana Senate Committee Video

CHAIRMAN FIELDS:  Bill by Senator Womack, Senate Bill 8.  Senate Bill 8 by Senator Womack provides for redistricting of the Louisiana congressional districts.

(Pause.)

SENATOR WOMACK:  Thank you, Mr. Chairman. Members of the committee, I have an amendment, if I could pass out, please.  If I could, I'll -- I'll begin with my opening.

CHAIRMAN FIELDS:  All right.  Senator Womack, you are recognized, and you may proceed, sir.

SENATOR WOMACK:  Thank you.  As you know, Louisiana congressional districts must be drawn given the Federal Voting Rights Act litigation that is still ongoing in the US District Court for the Middle District of Louisiana.  The map is the bill that I'm introducing, which, as the product of a long, detailed process, achieves several goals.  First, as you know -- all are aware, Congresswoman Letlow, Julia Letlow, is my representative in Washington, DC.

The boundaries in this bill I'm proposing ensure that Congresswoman Letlow remains both unimpaired with any other incumbents and in a congressional district that should continue to elect a Republican to Congress for the remainder of this decade.  I have great

## Page 2

1  pride in the work Congresswoman Letlow has accomplished,
2  and this map will ensure that Louisianans will continue
3  to benefit from her presence in the halls of Congress
4  for a long -- for as long as she decides to continue to
5  serve our great state.
6      Second, of Louisiana's six congressional
7  districts, the map and the proposed bill ensures that
8  four of our safe Republican seats, Louisiana Republican
9  presence in the United States Congress has contributed
10  tremendously to the national discourse.  And I'm very
11  proud of both Speaker of the US House of Representatives
12  Mike Johnson and US House Majority Leader Steve Scalise
13  are both from our great state.  This map ensures that
14  the two of them will have solidly Republican districts
15  at home so that they can focus on the national
16  leadership that we need in Washington, DC.
17      The map proposed in this bill ensures that the
18  conservative principles retained by the majority of
19  those in Louisiana will continue to extend past our
20  boundaries to our nation's capital.  Finally, the maps
21  in the proposed bill respond appropriately to the
22  ongoing Federal Voting Rights Act case in the Middle
23  District of Louisiana.  For those of you who are
24  unaware, the congressional maps that we enacted in March
25  2022 have been the subject of litigation since the day

## Page 3

1  the 2022 congressional redistricting bill went into
2  effect and even before we enacted it.
3      After a substantial amount of prolonged
4  litigation, the federal district court has (inaudible
5  0:03:35) to its view that the federal law requires that
6  the state have two congressional districts with a
7  majority of Black voters.  Our secretary of state,
8  attorney general, and our prior legislative leadership
9  appealed but have yet to succeed.  And we are here now
10  because of the federal court's order that we must --
11  that we have a first opportunity to act.
12      The district court's order that we must have
13  two majority Black voting age population districts,
14  combined with the political imperatives I just
15  described, having largely driven the boundaries of
16  District 2 and District 6, both of which are over 50
17  percent Black voting age population -- given the state's
18  current demographics, there is not a high enough Black
19  population in the southeast portion of Louisiana to
20  create two majority Black districts and to also comply
21  with the US Constitution one person, one vote
22  requirement.
23      That is the reason why District 2 is drawn
24  around New Orleans Parish, while District 6 includes the
25  Black population of East Baton Rouge Parish and travels

## Page 4

1  up I-49 to include back -- Black population in
2  Shreveport.  While this is a different map than the
3  plaintiffs in the litigation have proposed, this is the
4  only map I reviewed that accomplished the political
5  goals I believe are important for my district, for
6  Louisiana, and for my country.  While I did not draw
7  these boundaries myself, I carefully considered a number
8  of different map options.
9      I firmly submit the congressional voting
10  boundaries represented in this bill best achieve the
11  goals of protecting Congressman Letlow's seat,
12  maintaining strong districts for Speaker Johnson and
13  Majority Leader Scalise, ensuring four Republican
14  districts, and adhering to the command of the federal
15  court in the Middle District of Louisiana.  I'd be happy
16  to take any questions.
17      CHAIRMAN FIELDS:  All right.  Thank you,
18  Senator.  Just a couple questions.  Do -- do -- do you
19  know how many parishes -- I did -- I tried to do a
20  count.  How many -- this district here -- can you put it
21  back up?  It appears to split about 15 parishes.  Senate
22  Bill 8.
23      SENATOR WOMACK:  Right.  It does split --
24      CHAIRMAN FIELDS:  All right.  And you were
25  here and you heard the testimony of Senator Price with

## Page 5

1  Senate Bill 4.  Senate Bill 4 split only 11 parishes, as
2  I appreciate it, and it created two majority-minority
3  districts.  What was the predominant reason for you to
4  create the 6th District the way it looks now vs. just
5  going with Senator Price's bill, which created a more
6  compact district?
7      SENATOR WOMACK:  It -- it was strictly --
8  politics drove this map because of the -- the -- Speaker
9  Johnson, Majority Leader Scalise, and my congresswoman,
10  Julia Letlow, predominantly drove this map that I was a
11  part of.
12      CHAIRMAN FIELDS:  All right.  So is it safe to
13  say that your convection of District 6, race is not the
14  predominant factor?
15      SENATOR WOMACK:  No.  It's not the predominant
16  factor.  It -- it -- it has a secondary consideration in
17  that because that was the district that we were trying
18  to -- trying to encompass, but it wasn't the primary.
19      CHAIRMAN FIELDS:  So I guess it's kind of
20  difficult when you got a speaker of the house.  We're
21  very fortunate in Louisiana.  But when you got two
22  members of your Congress that are the two top-ranking
23  members of the US House of Representatives, being a
24  speaker and a majority leader, you know, how much did
25  that weigh in on your decision in drawing this map?

2  (Pages 2 to 5)

Page 6

1    SENATOR WOMACK:  Well, it -- it -- it had a
2  lot to weigh in on.  Not only that, but you have
3  Congresswoman Letlow that sits on Ag and Appropriation,
4  which is a big part of my district.  So when you put
5  them all together, that's -- that's a lot of -- a lot of
6  I call it muscle that we -- we were able to look at and
7  put in for the State of Louisiana, for all of Louisiana.
8    CHAIRMAN FIELDS:  Okay.  So your -- your
9  minority population in District 2 is -- is -- voter
10  registration is 52.6, and your population is 53.1.  And
11  in the 6th District it's 54.3 in registration and 56.1
12  in population.  And this was the -- the -- you know,
13  looking at all of the issues you were dealing with, this
14  was the best you could come up with?
15    SENATOR WOMACK:  Yes, sir.  They perform well.
16  When you look at the performance base, when you look at
17  the District 6, the performance of it appears to be
18  positive for the minority district.
19    CHAIRMAN FIELDS:  All right.  Are there any
20  things that bring these communities together in District
21  6?  I guess that would be considered the Red River
22  District.
23    SENATOR WOMACK:  Well, you -- you got the Red
24  River, but you also got I-49 that -- that -- that goes
25  through this district from Shreveport down to Lafayette,

Page 7

1  follows the (inaudible 0:09:30) of the Red River through
2  there.
3    CHAIRMAN FIELDS:  Okay.  All right.  Questions
4  from members of the committee?  No questions.  You have
5  some amendments you had, Senator?
6    SENATOR WOMACK:  I do.  Did -- did you --
7  y'all have the amendments?
8    CHAIRMAN FIELDS:  I'm sorry.  Senator Carter
9  for --
10    SENATOR CARTER:  I don't have a --
11    CHAIRMAN FIELDS:  -- a question.
12    SENATOR CARTER:  -- copy to (inaudible
13  0:09:50).  Thank you, Mr. Chairman.  I'm sorry, Senator.
14  I did have a -- a -- a question before we move to the
15  amendment.  You said that both districts -- you said
16  that the district performed.  You were asked a question
17  from the Chairman a minute ago about District 6 and
18  whether or not it performs as an African American
19  district.  Do you remember that question a second ago?
20    SENATOR WOMACK:  I do.
21    SENATOR CARTER:  Same question for District 2.
22  From looking at the District 2 in your map, we have a
23  total African American population of 53.121 percent, and
24  we have the registered African American -- registered
25  African American vote for District 2 at 52.659 percent;

Page 8

1  did I read that correctly?
2    MALE SPEAKER 1:  (inaudible 0:10:56)?
3    SENATOR WOMACK:  Yes.
4    SENATOR CARTER:  Did -- was any performance
5  test conducted -- I'm sorry.  I'm (inaudible 0:11:02).
6  Did -- were any performance tests or analyses conducted
7  to see how District 2 performs as an African American
8  majority district or not?
9    SENATOR WOMACK:  The Democratic incumbent wins
10  over 60 percent of the time in that race.
11    SENATOR CARTER:  (inaudible 0:11:43) 60
12  percent of the time?
13    SENATOR WOMACK:  Okay.  I'm sorry.  60 percent
14  of the vote.
15    SENATOR CARTER:  Yeah, I think my microphone
16  -- can you repeat it?  I'm sorry.
17    SENATOR WOMACK:  The Democratic --
18    SENATOR CARTER:  So my question -- well, let
19  me ask this.  So my question was: how does District 2
20  perform?  And you just gave me a figure.  What was it?
21    SENATOR WOMACK:  60 percent of the vote on the
22  Democratic nominee.
23    SENATOR CARTER:  We heard earlier when we were
24  considering Senator Price's bill that the -- the legal
25  defense fund had conducted an analysis of the

Page 9

1  performance of that district.  They conducted multiple
2  different elections based upon that district, and it had
3  a 100 percent performance race that's coming in as an
4  African American seat.  And I guess I'm curious to know
5  what would be the comparable number in terms of the
6  performance of the District 2 of this particular map,
7  the District 2 on your map that's being proposed here.
8  You -- am I asking the question in a way you get what
9  I'm asking?
10    CHAIRMAN FIELDS:  I think -- yeah.  I think
11  what the Senator is -- is requesting -- have you done
12  any kind of performance tests for either District 6 or
13  District 2?  Any performance analysis?
14    SENATOR WOMACK:  I have not.
15    SENATOR CARTER:  Okay.
16    SENATOR WOMACK:  I -- I -- I have a report
17  here printed off on a congressional map, and in District
18  2, a Democratic candidate could win 100 percent of the
19  time.
20    SENATOR CARTER:  A democratic candidate, but
21  not necessarily an African American Democratic -- an
22  African American candidate regardless of party.  So you
23  said "a Democratic candidate."  So I'm asking about an
24  African American candidate.  You said that a Democrat
25  candidate performs in that district, but my question is

3  (Pages 6 to 9)

Page 10

1  whether or not it performs as a -- for an -- as an
2  African American district?
3       SENATOR WOMACK:  Okay.  Our analysis is on --
4  is -- on party, not race.  So -- so I can't answer
5  that.
6       SENATOR CARTER:  There was -- there was no
7  analysis done to determine whether or not District 2 for
8  this map -- of your map performs as an African American
9  district?
10      SENATOR WOMACK:  No.
11      SENATOR CARTER:  Okay.  Thank you, Mr.
12 Chairman.
13      CHAIRMAN FIELDS:  Thank you, Senator Carter.
14 The board is clear.  Do you have an amendment, Senator?
15      SENATOR WOMACK:  I do.  It's Amendment 34.
16      CHAIRMAN FIELDS:  All right.  Senate Womack
17 brings up Amendment Number 34.  Senator Womack on his
18 amendment.
19      SENATOR WOMACK:  You want -- you want -- you
20 want to pull that up and --
21      MALE SPEAKER 2:  Yes, Senator.
22      SENATOR WOMACK:  It's okay for him to pull
23 that up?
24      CHAIRMAN FIELDS:  Yes, sir.
25      SENATOR WOMACK:  Sorry.

Page 11

1       (Pause.)
2       CHAIRMAN FIELDS:  Okay.  You may proceed,
3  Senator.  This is the amended -- the amended --
4       SENATOR WOMACK:  This is the amendment.  What
5  we did on that in Avoyelles Parish, we -- we took out --
6  split Avoyelles Parish, put those into Rapides, around
7  Alexandria, Rapides Parish.  And then we moved into --
8  that's Rapides there where we moved it to.  And then we
9  moved into Ouachita Parish and took Ouachita, West
10 Monroe, Monroe, and Calhoun into that.
11      CHAIRMAN FIELDS:  Okay.
12      SENATOR WOMACK:  Any other -- that's it.
13      CHAIRMAN FIELDS:  All right.  So how many
14 parishes, with the -- with that amendment would the bill
15 overall split?
16      SENATOR WOMACK:  Could you -- it'd -- it goes
17 from 15 to 16.
18      CHAIRMAN FIELDS:  Okay.  So it splits one
19 additional one there.
20      SENATOR WOMACK:  One -- one extra parish.
21      CHAIRMAN FIELDS:  And that would be Avoyelles
22 Parish?
23      SENATOR WOMACK:  That would be Avoyelles
24 Parish.  Okay.
25      CHAIRMAN FIELDS:  All right.  Questions from

Page 12

1  members of the -- and the percentages pretty much stay
2  the same in the 2nd District?
3       SENATOR WOMACK:  Yes.
4       CHAIRMAN FIELDS:  And the 6th District?
5       SENATOR WOMACK:  And 6th, yeah.  The -- the
6  numbers are the same.
7       CHAIRMAN FIELDS:  Are there questions from
8  members of the committee?  All right.  I do have a card
9  - you don't need to fill out no card - from Senator
10 Heather Cloud.  If you wish to be recognized, you --
11 please come and take --
12      SENATOR CLOUD:  Thank you, Mr. Chair.  I just
13 want to make a simple statement.  As a Republican woman,
14 I want to stand here -- or sit here, rather, and offer
15 my support for the amendment to the map, which I believe
16 further protects Congresswoman Julia Letlow.  She is the
17 only woman in the Louisiana's congressional district.
18 She is a member of the Appropriations Committee in the
19 US House, as Senator Womack stated, and also a member of
20 the Agricultural Committee in the US House.  It's --
21 it's important to me and all of the other residents of
22 our area that -- to have these two representatives from
23 our crucial region in our state.
24      I think that politically, this map does a
25 great job protecting Speaker Johnson and Congresswoman

Page 13

1  Julia Letlow as well as Majority Leader Scalise.  It
2  keeps CD5 in the northern Louisiana area and allows
3  Congresswoman Letlow to keep doing the great job that
4  she's been doing.  So I just sit here and offer my
5  support of the amendment.  Thank you, members.
6       CHAIRMAN FIELDS:  Thank you.  And -- and so we
7  can be clear, Senator, just to be, like they say, on -
8  what is it? - A Few Good Men, crystal clear, so this
9  map, with this amendment, there are other ways we could
10 perfect a second minority-majority district --
11 majority-minority district that's more compact, 11
12 parishes split.  This one splits 16 parishes, and the
13 reason you're offering this amendment is for protecting
14 -- I hate to say for -- but to protect incumbents,
15 members of Congress.  But race is not your predominant
16 reason for drawing and perfecting this map?
17      SENATOR CLOUD:  Mr. Chair, I have both
18 Congresswoman Julia Letlow and Congressman Mike Johnson
19 in my Senate -- in my district.  I work well with both
20 of them, and I want them to continue to be able to do
21 the great job that they do on behalf of all of the
22 constituency in my district.
23      CHAIRMAN FIELDS:  Okay.  So basically, you are
24 trying to -- attempting to comply with the federal
25 court, but yet protect members of the US Congress, be it

4  (Pages 10 to 13)

Page 14

1  a female and be it two of the most powerful members of
2  the US Congress?
3         SENATOR CLOUD:  Yes, sir.
4         CHAIRMAN FIELDS:  All right.  Senator Reese
5  for a question.
6         SENATOR REESE:  Thank you, Mr. Chairman.  For
7  Senator Womack.  First of all, you know, as we -- as we
8  continue to contemplate these alternative maps, I've got
9  to say that I -- I continue to move forward cautiously
10  as I have been concerned that -- that we may indeed be
11  taking some action that the courts may not have
12  necessarily directed us to take yet.  You know, we do
13  know that there was an alternative to -- to ultimately
14  end up with a hearing on the merits.
15         But I'm also conflicted in that because I know
16  that the person charged with the responsibility of
17  representing the decisions we make in this legislature
18  is our attorney general, and our attorney general has --
19  has certainly declared that she thought it was the best
20  action for us to -- to take at this time to -- to
21  contemplate a different map structure.  The reason we've
22  not done that in the past is because of the difficulty,
23  I believe, in managing what the Voting Rights Act would
24  ask us to do and avoiding other pitfalls in the Voting
25  Rights Act like gerrymandering to ultimately come up

Page 15

1  with the districts.  And so I -- I appreciate what
2  you're charged with trying to present here.
3         Would you say that -- that predominantly, in
4  the remaining districts that are not majority-minority
5  districts, that you've tried to really adhere to the
6  continuity of representation in those districts?  And it
7  appears perhaps that you're really trying to -- to not
8  bust up the -- kind of the communities of interest,
9  crack or split or divide those communities of interest.
10         SENATOR WOMACK:  Yes.
11         SENATOR REESE:  So in -- in -- in the 4th
12  District, for instance, I noticed that you've kept
13  together, like, our major military installations in that
14  4th District that has -- that kind of speaks to
15  communities of interest that it looks like you're --
16  you're attempting to preserve with this map while you
17  still attempt to -- to comply with -- with the objective
18  of the courts in terms of creating another
19  majority-minority district there.
20         SENATOR WOMACK:  That's exactly right.
21         SENATOR REESE:  The numbers -- and -- and
22  we're talking -- we're on your amendment now, right, Mr.
23  Chairman?
24         CHAIRMAN FIELDS:  Yes.
25         SENATOR REESE:  We've not adopted the

Page 16

1  amendment yet?
2         CHAIRMAN FIELDS:  No, we have not.
3         (Pause.)
4         CHAIRMAN FIELDS:  What -- just -- yes.  And
5  because if you need to be -- want to --
6         MALE SPEAKER 3:  It's okay.  Yeah.  Just in
7  opposition.
8         CHAIRMAN FIELDS:  Okay.  Yeah.  Your -- your
9  opposition will be noted for the record.  There are no
10  other cards that I see.  Senator Reese has moved that
11  the amendments be adopted.  Are there any objections to
12  the adoption of the amendments?  Hearing no objections,
13  those amendments are adopted.
14         SENATOR WOMACK:  Thank you, committee members
15  and Mr. Chairman.  Close on my bill.
16         CHAIRMAN FIELDS:  Yes.  Before you do, I have
17  -- I wanted to just show you an amendment that I'm not
18  -- I wanted -- Bill, can you pull up -- initially, when
19  I -- when I saw the -- you know, I tried to -- you know,
20  I'm a stickler to keeping parishes together, try to make
21  districts as compact as possible.  And I had tried to
22  put something together, and I just want to get some
23  comments from you about it.  As soon as Bill pulls it
24  up, I want to know if this amendment would impact any of
25  the considerations you have -- you have made in

Page 17

1  perfecting the one we just passed.  Is it working?
2         All right.  I tried to keep as many parishes
3  whole as possible in both the -- you know, in the whole
4  state, but I particularly want to concentrate on the 2nd
5  District and the 6th District.  Would -- would -- would
6  -- would that satisfy your -- if I -- if -- if -- if we
7  were to adopt that amendment, would that interfere with
8  your concerns about helping some of the members of
9  Congress?
10         (Pause.)
11         CHAIRMAN FIELDS:  Do we have the amendment
12  prepared?  Okay.  Let me offer up the amendment.  I want
13  to offer up an amendment.  I'm -- I'm going to offer it
14  up.
15         (Pause.)
16         CHAIRMAN FIELDS:  Give you a quick second to
17  look at this amendment.  This amendments -- amendment
18  splits only 15 parishes.  Would you have a problem with
19  adopting this amendment?
20         SENATOR WOMACK:  Well, I -- Mr. Chairman, all
21  due respect, if we could get a few minutes to look at
22  it.  If you could get a --
23         CHAIRMAN FIELDS:  Yes, sir.
24         SENATOR WOMACK:  Go -- maybe a 10- or
25  15-minute recess to look at it and -- and kind of see.

5  (Pages 14 to 17)

Page 18

1 I -- I -- I can see where I could have some issues with
2 it on the north end, but.
3     CHAIRMAN FIELDS:  For example, it keeps --
4 keeps Avoyelles whole.  And under your -- the amendment
5 we just adopted, it splits Avoyelles.  Sorry.  Senator
6 Miguez.
7     SENATOR MIGUEZ:  Thank you, Mr. Chairman.  And
8 to save a little bit of time, if you don't mind if you
9 have this information readily available, if you can give
10 us the split comparisons to the -- the author's current
11 version until now, and then give us some -- maybe the
12 African American voting population numbers as it relates
13 to Congressional District 2 and 6 in both and any other,
14 you know, notable differences in his map that's really
15 available that doesn't have me digging through the
16 entire bill trying to cross up multiple papers, if you
17 have any of that.
18     CHAIRMAN FIELDS:  Yeah.  The amendment
19 actually shows the split with -- with the senator's
20 amendment, and it also shows the -- the splits with the
21 amendment we're discussing.  I'm -- I'm trying to show
22 that we could do -- we can create this district more
23 compact, even trying to protect members of Congress.
24 And I just want to know, could you be for that
25 amendment?  And if the answer is no, that's fine.

Page 19

1     SENATOR WOMACK:  At -- at this point, I would
2 have to say no.
3     CHAIRMAN FIELDS:  Okay.  All right.  I'm going
4 to withdraw the amendment.  And are there -- are there
5 any further discussions on the bill?  Oh, Senator
6 Carter.
7     SENATOR CARTER:  No, no, no, no.  Are we doing
8 any other amendments right now or just the bill?
9     CHAIRMAN FIELDS:  If there is an amendment,
10 now is the time because we're going to vote one way or
11 the other in a few.
12     SENATOR CARTER:  Give me one second.
13     CHAIRMAN FIELDS:  Are there any further
14 amendments on the bill?
15     SENATOR CARTER:  Yeah, I (inaudible 0:29:27).
16     (Pause.)
17     CHAIRMAN FIELDS:  Senator Carter.
18     (Pause.)
19     CHAIRMAN FIELDS:  All right.  Senator Carter,
20 you're recognized.
21     SENATOR CARTER:  Give me a second.  I'm
22 coming.  I'm looking at the numbers.
23     (Pause.)
24     SENATOR CARTER:  Thank you, Mr. Chair.
25 Members, this amendment swaps one, two, three, four

Page 20

1 precincts between what is listed as District 2, the
2 Congressional District 2, and District 6.  It moves
3 approximately - I believe it's 3,000 - approximately
4 3,000 or so voters.  But what it does, though, is it
5 increases the -- very slightly, the registered
6 Democratic African American vote in District 2 by
7 increasing that number to 52.823 percent, which is a
8 very slight increase.  It's an increase of right around
9 an additional thousand or so votes for District 2.
10     And it barely has any implications with the
11 new District 6.  It doesn't involve and I -- and I --
12 it's my understanding from staff that it doesn't affect
13 any other districts other than District 2 and District
14 6.  It doesn't affect any of the other congressional
15 districts proposed in the map.
16     CHAIRMAN FIELDS:  Okay.  Senator, how many
17 additional parishes would this amendment split?
18     SENATOR CARTER:  Well, it does.  It would
19 split West Baton Rouge Parish, but I believe West Baton
20 Rouge Parish is currently in District 2, and also very
21 slightly in Iberville Parish.  There would be one, two,
22 three parishes in those for a very minor adjustment, but
23 it increases the African American population in District
24 2 by an additional couple of thousand votes or so.
25     CHAIRMAN FIELDS:  So it split -- it splits two

Page 21

1 additional parishes?
2     SENATOR CARTER:  Very slightly, yes.
3     CHAIRMAN FIELDS:  Senator Jenkins.
4     SENATOR JENKINS:  I'm just trying to see.  So
5 where -- where -- if you picked up some votes in 2,
6 which I don't inherently -- I don't inherently have a
7 problem with it, but where do -- where do they -- where
8 do those votes come from?
9     SENATOR CARTER:  They came from District 6.
10 So if you look at the -- the map that's proposed
11 (inaudible 0:33:36).  If you look at the map that's
12 proposed by Senator Womack, it moves precincts 1C, 1B,
13 8, and 6 from West Baton Rouge, and in Iberville Parish,
14 it will move those precincts from District 2 into
15 District 6, precincts 20, 22, and 26.  So it's very,
16 very small and minor in terms of an adjustment.  Small,
17 but very important.  Very significant.  It increases the
18 -- the African American vote in District 2 with a swap
19 between 2 and 6.
20     SENATOR JENKINS:  So how much of a decrease in
21 6?
22     SENATOR CARTER:  So the -- in -- with 6, 6
23 will maintain a registered African American percentage
24 of 54.189.  And then for District 2, it will be 52.823.
25     (Pause.)

6  (Pages 18 to 21)

Page 22

1    CHAIRMAN FIELDS:  Okay.  6 is not contiguous
2  with this amendment.  I don't -- I don't know if the
3  author knew it or not.
4    SENATOR CARTER:  I just -- I just heard from
5  staff -- I just heard from staff that there was a
6  problem with one of the areas being not contiguous that
7  they just pointed out to me that we didn't discuss
8  during the recess.  Perhaps that's something we could
9  quickly adjust in the next few minutes or so.
10   CHAIRMAN FIELDS:  Or -- or we could do it on
11 the floor.
12   SENATOR CARTER:  I would prefer to handle it
13 in committee, of course, Mr. Chair.
14   CHAIRMAN FIELDS:  All right.  So you're
15 splitting two additional parishes, Senator.
16   SENATOR CARTER:  And it's also my
17 understanding that the -- in addition to that, it also
18 is supposed to take into consideration the previous
19 amendment that was inserted on from -- the previous
20 amendment from Senator Womack.
21   CHAIRMAN FIELDS:  All right.
22   SENATOR CARTER:  So those are some technical
23 revisions that -- to consider the -- the amendment that
24 was just passed by Senator Womack and also deal with the
25 one issue that they just mentioned regarding the

Page 23

1  contiguous nature of it.  You were supposed to take the
2  -- supposed to take both of those things into
3  consideration, the amendment.
4    CHAIRMAN FIELDS:  Okay.  Senator Miguez.
5    SENATOR MIGUEZ:  Thank you.  Thank you, Mr.
6  Chairman.  Just -- just for clarification, and you may
7  have just addressed this, the Womack -- I'll call it the
8  -- the amendment that Senator Cloud just testified upon
9  and then just got onto the bill, your new amendment
10 doesn't contemplate those changes in Avoyelles Parish.
11 You're going to have to rework that, because I'm looking
12 -- I may have the wrong amendment.  I'm looking at
13 Avoyelles Parish being completely within the new --
14 within Congressional District 6.  Oh, yeah; is that
15 right?
16   SENATOR CARTER:  It's my understanding that
17 that is being (inaudible 0:36:41).
18   SENATOR MIGUEZ:  So --
19   SENATOR CARTER:  (inaudible 0:36:43).
20   SENATOR MIGUEZ:  So you had the --
21   SENATOR CARTER:  My amendment would assume --
22 it should assume that that amendment was (inaudible
23 0:36:49).  So it should not affect the previous
24 amendment that was just passed.
25   SENATOR MIGUEZ:  You have to rework your

Page 24

1  amendments --
2    CHAIRMAN FIELDS:  Let's -- let's --
3    SENATOR MIGUEZ:  -- that contemplate the
4  change, basically.
5    SENATOR CARTER:  Yes.  That's correct, and
6  that's what they're working on.
7    SENATOR MIGUEZ:  Okay.  Then we're not ready
8  to really review it at this point until we can see that
9  because that -- the version I have is based on the
10 original version of the bill.
11   CHAIRMAN FIELDS:  Senator, you -- have you
12 concluded, Senator?
13   SENATOR MIGUEZ:  Yes.
14   CHAIRMAN FIELDS:  Senator Kleinpeter.
15   SENATOR KLEINPETER:  Thank you, Mr. Chairman.
16 Senator Carter, with all due respect, this -- I'm not in
17 favor of this.  This is from my -- two of my hometown
18 parishes, growing up in Iberville and West Baton Rouge
19 and -- and part of this is my old council district that
20 -- we're already chopped up as it is between Senator
21 Price and I as far as on the state level, and we're
22 definitely going to be cutting West Baton Rouge and
23 Iberville up.  I just wanted to go on the record and
24 voice my opinion based on this new map that has been
25 presented to us.

Page 25

1    CHAIRMAN FIELDS:  Senator Miller.
2    SENATOR MILLER:  Thank you.  Just two -- two
3  quick questions again.  What was the voting age
4  population splits for 2 and 6 with these amendments,
5  your math?
6    SENATOR CARTER:  The voting age --
7    SENATOR MILLER:  Voting age population, Black.
8    SENATOR CARTER:  African American voting age
9  population in District 2 -- oh, here it is.  The -- the
10 VAP, the African American voting age population for
11 District 2 would be 51.132 percent, and the African
12 American voting age population for District 6 would be
13 53.612 percent.
14   SENATOR MILLER:  Okay.  And last question: did
15 any -- did you have any information of how these would
16 -- would perform?
17   SENATOR CARTER:  It's my understanding it
18 would help it better perform because it is an additional
19 increase of African American voters, even though it's a
20 small amount of individuals.  It's a small but
21 significant change.
22   SENATOR MILLER:  But y'all -- y'all didn't run
23 any -- any performance tests on it?
24   SENATOR CARTER:  No.
25   SENATOR MILLER:  Okay.  Thank you.

7  (Pages 22 to 25)

Page 26

1  CHAIRMAN FIELDS:  Thank you, Senator.  Senator
2  Jenkins.
3  SENATOR JENKINS:  Well, I'm just trying to be
4  sure here.  I mean, I fundamentally don't have an issue.
5  I'm just trying to see what's happened here in -- in
6  north Louisiana.
7  SENATOR CARTER:  It shouldn't affect northern
8  Louisiana at all.  It's just a swap between 6 -- sorry,
9  I'm -- I'm not on.  It -- it should not affect northern
10  Louisiana.  This is just a swap between District 2 and
11  District 6.  At the very bottom, if you're looking at
12  Iberville and West Baton Rouge parishes right there
13  towards the bottom, it has no bearing or no effect on
14  northern Louisiana.
15  SENATOR JENKINS:  Well, I'm looking at the
16  configuration.  I mean --
17  SENATOR CARTER:  Well, I think the difference
18  is we're looking at the configuration from the previous
19  amendment from Senator Womack.  That should be
20  incorporated into the amendment that I'm offering.
21  SENATOR JENKINS:  Okay.  So --
22  SENATOR CARTER:  So that's a technical thing
23  that they're fixing.  It -- it doesn't have anything to
24  do with the swap that I am.  So there was the previous
25  amendment that was offered by Senator Womack with

Page 27

1  Senator Cloud testifying at the table that got adopted.
2  SENATOR JENKINS:  Okay.
3  SENATOR CARTER:  This amendment doesn't --
4  SENATOR JENKINS:  It doesn't -- doesn't
5  (inaudible 0:40:09).
6  SENATOR CARTER:  -- doesn't undo that, doesn't
7  touch it whatsoever.  This is just a very slight swap
8  between District 2 and District 6.
9  SENATOR JENKINS:  I see that.  Okay.  Got it.
10  Thank you, Mr. Chairman.
11  CHAIRMAN FIELDS:  Okay.  Senator Jenkins.  All
12  right.  Are there any other members who wish to be heard
13  on the amendment?
14  SENATOR CARTER:  At this time I would like to
15  move -- provide -- we don't have the amendment.  Can we
16  do it in concept or no?
17  CHAIRMAN FIELDS:  Senator Carter, why don't we
18  -- why don't we move the bill out the way it is now.
19  The -- your amendment is not ready.  And you're talking
20  about 3,000 people.  You know, I -- I -- I -- (inaudible
21  0:41:02) --
22  SENATOR CARTER:  I know we had the
23  conversation earlier about doing the hard work in the
24  committee and making certain we have amendments that we
25  need here.  I -- I did not realize that it didn't

Page 28

1  contemplate the previous amendment that got on.  It was
2  my --
3  CHAIRMAN FIELDS:  Yeah.  Yeah.
4  SENATOR CARTER:  -- understanding it was
5  supposed to, and I just heard about the issue --
6  CHAIRMAN FIELDS:  Right.
7  SENATOR CARTER:  -- about the contiguousness
8  of it.
9  CHAIRMAN FIELDS:  I -- I hate to oppose one of
10  my distinguished colleagues in committee.
11  SENATOR CARTER:  Well, I hope you don't.
12  CHAIRMAN FIELDS:  But I do think we have an
13  obligation to -- to make sure that anything we do and
14  pass is not for -- race is not the predominant reason.
15  Can you give us the reason for splitting two parishes
16  other than race?
17  SENATOR CARTER:  Well, I think -- one, I think
18  hearing the testimony of my previous colleague, Senator
19  Womack and Senator Cloud, this makes -- this increases
20  the odds of District 2 performing as an African American
21  district.  And given the importance that our
22  congressperson has performed in District 2, I think it's
23  very important that that district remains strengthened
24  where it can perform as an African American district.
25  That is a factor.  It is not the predominant factor.

Page 29

1  It's also consistent with the principles outlined with
2  the federal judge, and it's also consistent with
3  communities of interest and all the other factors that
4  we previously considered.
5  CHAIRMAN FIELDS:  So lastly, what's the
6  predominant factor you're using to split the two
7  parishes, that -- the 3,000 people?
8  SENATOR CARTER:  It's very important, and we
9  talked about very -- earlier when this hearing started,
10  we talked about many of the storms and hurricanes that
11  we've had.  It's very important.  You look at what
12  happened in New Orleans after Hurricane Katrina, making
13  certain we had congressional representation to deliver
14  for the City of New Orleans, for not just the City of
15  New Orleans, but for that whole area, the whole 2nd
16  Congressional District.  Similarly, during hurricane --
17  not hurricane, with the pandemic with COVID, making
18  certain we have congressional representation that can
19  continue to deliver for our district.
20  CHAIRMAN FIELDS:  Okay.  Members, you've heard
21  the discussion by Senator Carter.  The amendment can't
22  be adopted because it's not ready.  We do have other
23  bills we have to hear.  I would plead to the gentleman
24  to let us pass the bill, and if we can perfect your
25  amendment on the floor, we can do just that.

8 (Pages 26 to 29)

Page 30

1    SENATOR CARTER:  Well, my only concern with
2    doing it on the floor is it opens it up to -- you know,
3    it's -- it's -- it's important that we do the hard work
4    in committee, I thought.
5        CHAIRMAN FIELDS:  All right.
6        SENATOR CARTER:  So if we can perhaps give
7    staff --
8        CHAIRMAN FIELDS:  How much more time --
9        SENATOR CARTER:  -- an opportunity to -- to
10   finalize the amendment so we can get that hopefully
11   considered by the committee.
12       CHAIRMAN FIELDS:  Well, we're going to pass
13   over -- Senator, if you -- if we could pass over your
14   bill for now and get to the rest of these bills because
15   --
16       SENATOR CARTER:  It shouldn't take long.  It's
17   -- it's a very small -- it's -- I believe it's less than
18   3,000 voters, so it should be easy and quick to fix.
19       CHAIRMAN FIELDS:  All right.  Let's pass over
20   Senator -- Senator Womack, do you -- do you wish for us
21   to pass over your bill for now?
22       SENATOR WOMACK:  That's good.
23       CHAIRMAN FIELDS:  Bill, you have it?
24       SENATOR CARTER:  I think we have it, but.
25       MALE SPEAKER 4:  (inaudible 0:44:47) not quite

Page 31

1    the same.  You can't have that one.
2        SENATOR CARTER:  I believe we have the revised
3    amendment, so don't -- don't go too far, Senator.
4        MALE SPEAKER 4:  (inaudible 0:45:02).
5        SENATOR CARTER:  Yes.
6        (Pause.)
7        SENATOR CARTER:  Does this contemplate the
8    previous amendment from that -- that got on from Senator
9    Womack and Senator Cloud?
10       MALE SPEAKER 4:  (inaudible 0:45:30)?
11       SENATOR CARTER:  The one that's already
12   passed, yes, yes.
13       MALE SPEAKER 4:  (inaudible 0:45:34).
14       SENATOR CARTER:  Without -- it doesn't undo
15   any of the previous amendments.  It maintains the
16   revisions that was --
17       MALE SPEAKER 4:  It maintains all of that
18   (inaudible 0:45:41).
19       SENATOR CARTER:  Okay.  Good.  Yes.  I
20   believe, Mr. Chairman, that the amendment is now -- it's
21   being finalized, that solves both of those issues where
22   it doesn't undo the previous -- where it doesn't undo
23   the previous amendment that was offered by Senator
24   Womack and Senator Cloud.  It wasn't intended to do
25   that.  And it fixed the one part of the amendment that

Page 32

1    wasn't contiguous.
2        CHAIRMAN FIELDS:  Okay.  The -- the staff is
3    -- is the staff ready?  Staff?
4        MALE SPEAKER 5:  (inaudible 0:46:13).
5        CHAIRMAN FIELDS:  I'm going to lean on the
6    gentleman one last time.  Will -- will the gentleman
7    defer to the chair and allow us to pass it now?  And we
8    will have discussions between now and the floor.  You
9    can have discussions with the author between now and the
10   floor.
11       SENATOR CARTER:  Sounds good, Mr. Chairman.
12       CHAIRMAN FIELDS:  Thank the gentleman.  All
13   right.  Thank you, Senator Carter.  Are there any
14   further discussions on the bill?  Senator Reese has
15   moved that Senate Bill 8 be reported favorable -- be
16   reported as amended.  Are there any objections to
17   reporting Senate Bill 8 as amended?  Hearing no
18   objections, that bill is reported favorable.
19       SENATOR WOMACK:  Thank you, Mr. Chairman,
20   members.
21       CHAIRMAN FIELDS:  Thank you.  All right.
22   Let's get into some.
23
24
25

Page 33

1        CERTIFICATE OF TRANSCRIPTION
2        I, Nathan Pikover, COO of TranscribeMe, Inc.,
3    do hereby certify that 290872-Audio-Senate and
4    Governmental Affairs-Edited.wav was transcribed
5    utilizing computer aided means and the TranscribeMe
6    transcription team.
7        The transcript of the audio mentioned above,
8    having been transcribed and reviewed by TranscribeMe,
9    Inc. to the best of the company's ability, is a full,
10   true, and correct transcription.
11       I further certify that neither I, nor the
12   TranscribeMe, Inc. transcription team, have any personal
13   association with the parties involved or are in any way
14   interested in the outcome thereof.
15       Dated this 8th of March, 2024.
16       _____
17       Nathan Pikover, COO TranscribeMe, Inc.
18
19
20
21
22
23
24
25

9  (Pages 30 to 33)



# PohlmanUSA®
## Court Reporting and Litigation Services

---

Louisiana State Senate 1st Special Session-Audio Transcription

January 17, 2024

---

In Re: Louisiana House Floor/Committee Video

Page 1

MALE SPEAKER:  Senate will come to order.
Sector, open machines.  Members, vote your machines.
OCHA, machines.  Senator McMath is here.  Senator
Pressly.  Senator Morris.  Senator Talbot.  Senator
Talbot is here.  Senator Connick is here.  36 members
are present for a quorum.  Senate will rise.  Senator
Mizell will -- will open the senate in prayer and also
lead us in the -- for the Pledge of Allegiance.

MS. MIZELL:  Thank you, Mr. President.
Members, before we pray, I just want to say, we are all
here for a time such as this.  I -- I haven't heard one
member say this is easy, and I -- I just -- I think it
would be appropriate if we join together in the Lord's
Prayer of unifying our body and reaching out to God.  If
you'd join me.  Our Father, who art in Heaven, hallowed
be Thy name.  Thy kingdom come.  Thy will be done on
earth, as it is in Heaven.  Give us this day our daily
bread.  And forgive us our trespasses, as we forgive
those who trespass against us.

And lead us not to temptation, deliver us from
evil.  For thine is the kingdom and the power and the
glory forever.  Amen.  Thank you.  Join me in the
pledge, please.

(Pledge of Allegiance.)

MALE SPEAKER:  Reading of the journal.

## Page 2

1  MS. MIZELL:  Official Journal of the Senate
2  the state of Louisiana, Second day's proceedings,
3  Tuesday, January 16th, 2024.
4  MALE SPEAKER:  Senator Hodges moves to
5  dispense the reading of the journal without objection.
6  MS. MIZELL:  Petitions, memorials, and
7  communications, I am in receipt of a letter from the
8  president appointing the parliamentarians, Senator
9  Gregory Miller.  Messages from the house, the house is
10  finally passed and asked for concurrence in the
11  following house bills and joint resolutions.  House Bill
12  16.  House Bill 8, respectfully submit headed.  Michelle
13  Fontenot, Clerk of the House.  Introduction of House
14  bills.  Senator Talbot now moves for suspension of the
15  rules for the purpose of reading the house bills the
16  first and second time and referring them to Committee.
17  House Bill 8 by Representative Mike Johnson is
18  an act to Entitled 13 relative to the Supreme Court to
19  provide relative to redistricting Supreme Court Justice
20  districts.  It is referred to senate and governmental
21  affairs.  House Bill 16 by Representative McFarland is
22  an act to appropriate funds and to make certain
23  reductions from certain sources to be allocated to the
24  designated agencies and purposes in specific amounts for
25  making of supplemental appropriations.  Refer to

## Page 3

1  finance.
2  MALE SPEAKER:  Oh, Senator O'Connor for an
3  introduction.
4  MALE SPEAKER 2:  (inaudible 0:04:15).
5  MALE SPEAKER:  Oh, okay.
6  MALE SPEAKER 2:  It's okay.
7  MALE SPEAKER:  Never mind.  It's -- that zip
8  sound?  Senate bills on third reading and final passage.
9  MS. MIZELL:  First bill?  Senator Womack now
10  moves for a suspension of the rules for the purpose of
11  calling out of order, Senate Bill 8 by Senator Womack.
12  It's an act to amend Title 18 relative to congressional
13  districts to provide for the redistricting of
14  Louisiana's congressional
15  FEMALE SPEAKER:  To provide with respect to
16  positions and offices other than congressional, which
17  are based on congressional districts.
18  MALE SPEAKER:  Senator Womack, on your bill.
19  SENATOR WOMACK:  Thank you, Mr. President.
20  Colleagues, I bring Senate Bill Number 8 before you this
21  evening.  As you know, Louisiana congressional districts
22  must be drawn, given the Federal Voting Rights Act
23  litigation that is still ongoing in the US District
24  Court for the Middle District of Louisiana.  This map in
25  the bill that I'm introducing, which is the product of a

## Page 4

1  long, detailed process, achieves several goals.
2  First, as you know and you're aware of,
3  Congresswoman Julia Letlow is my representative in
4  Washington, DC.  The boundaries in the bill I'm
5  proposing ensure that Congresswoman Letlow remains both
6  unpaired with any other incumbents, and in a
7  congressional district that should continue to elect a
8  Republican to Congress for the remainder of this decade.
9  I have great pride in the work of Congresswoman Letlow
10  and -- that she's accomplished, and this map will ensure
11  that Louisianans will continue to benefit from her
12  presence in the halls of the Congress for as long as she
13  decides to continue to serve this great state.
14  Second.  Louisiana has six congressional
15  districts.  The map that's proposed bill ensures that
16  four are safe Republican seats.  Louisiana Republican
17  presence in the United States' countours has contributed
18  tremendously to the national discourse, and I'm very
19  proud that both Speaker of the US House of
20  Representatives, Mike Johnson, and US House Majority
21  Leader Steve Scalise are both from our great state.
22  This map ensures that two of them will have solidly
23  Republican districts at home, so they can focus on the
24  national leadership that we need in Washington, DC.  The
25  map that's proposed in this bill ensures conservative

## Page 5

1  principle is retained by the majority of those in
2  Louisiana and will continue to extend past our
3  boundaries to the nation's capital.
4  Third.  The corridor that you see on the map
5  that -- that you have on your -- your table, if you'll
6  notice the map runs up Red River, which is barge
7  traffic, commerce.  It also has I-49, which is a --
8  which is -- goes from Lafayette to Shreveport, which is
9  also a corridor for our state that is very important to
10  our commerce.  We have a college.  We have education
11  along that corridor.  We have a presence with ag with
12  our row crop, as well as our cattle industry all up
13  along Red River in those parishes.
14  A lot of people from that area, the
15  Natchitoches Parish, as well as Alexandria, use
16  Alexandria for -- for -- for their healthcare, their
17  hospitals, and so forth in that area.  So finally, the
18  amounts in the proposed bill responds appropriate to the
19  ongoing Federal Voting Rights Act in the Middle District
20  of Louisiana.  For those who are unaware, the
21  congressional amounts that we enacted in 2022 of March
22  have been the subject of litigation, roughly since the
23  day -- the 2022 Congressional Redistricting Bill went
24  into effect.  Even before we enacted it.
25  After a substantial amount of prolonged

2  (Pages 2 to 5)

Page 6

1  litigation, the Federal District Court has adhered to
2  its view that the federal law requires that the state
3  have two congressional districts with a majority of
4  Black voters.  Our secretary of state, attorney general,
5  and our prior legislative leadership appealed that, but
6  have yet to succeed.  And we are now here because of the
7  federal court order, that we have to have first
8  opportunity to act.  The district court order that we
9  must have two majority voting-age population districts,
10 combined with the political impurities I just described,
11 have largely -- largely driven the boundaries of
12 District Two and District Six on your map, both of which
13 are over 50 percent voting -- Black voting age
14 population.
15       Given the state's current demographics, there
16 is not enough high Black population in the southeast
17 portion of Louisiana to create two majority Black
18 districts, and to also comply with the US Constitution
19 one person, one vote requirement.  That is the reason
20 why District Two is drawn around Orleans Parish, while
21 District Six includes the Black population of East Baton
22 Rouge Parish and travels up the I-49 quarter to include
23 Black population in Shreveport.  While this is a
24 different map than the Plaintiffs' litigation have
25 proposed, this is the only map I reviewed that

Page 7

1  accomplishes the political goals I believe that are
2  important for my district, for Louisiana, and for the
3  country.
4        While I did not draw these boundaries myself,
5  I carefully considered the number of different map
6  options.  I firmly submit that the congressional voting
7  boundaries represented in this bill best achieve the
8  goals of protecting Congresswoman Letlow's seat,
9  maintaining a strong district for Speaker Johnson, as
10 well as Majority Leader Steve Scalise, ensuring four
11 Republican districts, and adhering to the command of the
12 Federal Court in the Middle District of Louisiana.  And
13 I ask for favorable passage.
14       MALE SPEAKER:  We have -- we have one question
15 by Senator Morris for --
16       SENATOR MORRIS:  Senator Womack, among the
17 factors that you considered was the community of
18 interest of the district.  Something that was considered
19 in coming up with this version of the map that we have
20 before us.
21       SENATOR WOMACK:  Senator Morris, this map was
22 strictly drawn from the political aspect of our
23 congressman in -- in office is how it was drawn.
24       SENATOR MORRIS:  Did -- you didn't consider
25 the community of interest of people having something in

Page 8

1  common with one another within the district?
2        SENATOR WOMACK:  No, I didn't because it was
3  -- it was -- we had to draw two districts, and that's
4  the only way we could get two districts.  One of the
5  ways we could get two districts, and still protect our
6  political interest.
7        SENATOR MORRIS:  Well, one of the things you
8  said earlier was that -- that we had in common the
9  agriculture.  You mentioned that.  That's a community of
10 interest.  So you did consider agriculture as being
11 something that everybody had in common with this
12 district, or?
13       SENATOR WOMACK:  My comment was -- was the
14 fact that it was along that corridor.  Ag was along that
15 corridor some -- some -- not so much in that community
16 interest.  Just maintaining -- bringing out the fact
17 that I-49 does go through there, and it does encompass
18 your -- your timberland, your ag, your hospitals.  Just
19 trying to bring to light some of the positives going up
20 that corridor.
21       SENATOR MORRIS:  So would you -- would you say
22 that the heart of this district is Northeast Louisiana
23 and North Central Louisiana?
24       SENATOR WOMACK:  I wouldn't say the heart of
25 the district is that way, but the way the district -- to

Page 9

1  pick up the -- the -- and honor the courts, it had to be
2  drawn like it had to be drawn to pick that up.
3        SENATOR MORRIS:  So the -- is there a heart of
4  the district?
5        SENATOR WOMACK:  If it is, it'll be a small
6  majority of the heart.  I don't think it's a -- it's a
7  -- it -- it has a heart of the district, but it had to
8  start somewhere.
9        SENATOR MORRIS:  Do you know what the most
10 populated parish is of Congressional District Five at
11 the current moment?
12       SENATOR WOMACK:  I do not.  I hadn't looked at
13 that to -- to prove that myself.  I (inaudible 0:08:54)
14 -- could be Ouachita Parish.
15       SENATOR MORRIS:  Right.  So Ouachita Parish,
16 which is the most populated parish in Congressional
17 District Five, which you seek to protect for
18 Congresswoman Letlow.  Your map cuts Ouachita Parish
19 into various pieces, does it not?  And puts a lot of
20 that in Congressman Johnson's District Four, correct?
21       SENATOR WOMACK:  That's true.  The way the map
22 is drawn.  That's in my bill.  That is the way it's
23 drawn.
24       SENATOR MORRIS:  And like you, your -- I -- I
25 think you indicated that Congresswoman Letlow is your

Page 10

1    congressperson, and -- and it's important to you for her
2 to remain to be your Congresswoman; is that correct?
3      SENATOR WOMACK:  Very important.
4      SENATOR MORRIS:  Well, under your map, I would
5 be Congressman Johnson's -- in his district, and so
6 would Senator Cathey, and so would Representative
7 Echols; is that correct?
8      SENATOR WOMACK:  That would be correct.  I
9 don't -- I know -- I've been to your house, but I hadn't
10 been in any of the others, but I think you're correct.
11      SENATOR MORRIS:  So that would be important to
12 me; did you know?  But -- but this district as it's
13 drawn now, would move Lincoln Parish and Louisiana Tech
14 into Congressman Johnson's district; would it not?
15      SENATOR WOMACK:  That's a possibility.
16      SENATOR MORRIS:  Well, your map does -- map
17 does put Lincoln Parish -- all of Lincoln Parish into
18 Congressman Johnson's district; does it not?
19      SENATOR WOMACK:  It does do that, yes.
20      SENATOR MORRIS:  So -- but the district does
21 reach down into Baton Rouge; does it not?
22      SENATOR WOMACK:  It does.
23      SENATOR MORRIS:  And the district includes
24 Tiger Stadium in the district and also Joe Aillet
25 Stadium at -- in Louisiana Tech in Ruston.

Page 11

1      SENATOR WOMACK:  In the minority district, in
2 district -- in District Two -- or District Six.
3      SENATOR MORRIS:  Isn't it true that Tiger
4 Stadium in your -- on your map is located in
5 Congresswoman Letlow's district?
6      SENATOR WOMACK:  Yes.
7      SENATOR MORRIS:  And so is Joe Aillet Stadium
8 at Louisiana Tech.
9      SENATOR WOMACK:  Not -- not in -- not in that
10 district.  She don't go into -- under my map, she
11 doesn't go into Ruston.
12      SENATOR MORRIS:  Under your map, all of
13 Lincoln Parish is in Congresswoman -- that's Lincoln on
14 the map right there.  That's where Ruston is.
15      SENATOR WOMACK:  Right.
16      SENATOR MORRIS:  And so that is Congresswoman
17 -- that would be -- it's currently Congresswoman
18 Letlow's, but now it's going to be Congressman
19 Johnson's.
20      SENATOR WOMACK:  Right.
21      SENATOR MORRIS:  Okay.  Right.
22      SENATOR WOMACK:  Yeah.
23      SENATOR MORRIS:  So they will be in different
24 districts.  Tiger Stadium will be in Congresswoman -- I
25 mean, yeah, Congresswoman Letlow's district, but

Page 12

1 Louisiana Tech will be in Congressman Johnson, even
2 though Louisiana Tech is only 30 mile -- 30, 40 miles
3 away from Congresswoman Letlow's home.
4      SENATOR WOMACK:  I -- I agree with that --
5 with that totally, where we had to draw two minority
6 districts.  That's -- that's the way the numbers worked
7 out.  You've worked with -- with -- with redistricting
8 before, and that's -- that's -- you have to -- you have
9 to work everybody around the best you can.  This is --
10      SENATOR MORRIS:  Well, as of yesterday before
11 Committee, the map -- my home and Senator Cathey's home,
12 but you amended it to put even more in Congressman
13 Johnson's district; did you not?
14      SENATOR WOMACK:  Senator Morris, my
15 understanding that -- that -- that my amendment put you
16 all in Congresswoman Letlow's district.
17      SENATOR MORRIS:  In Congressman Johnson's
18 district under the -- under your amendment because it
19 added more Ouachita Parish into District Four; did it
20 not?
21      SENATOR WOMACK:  My understanding that when we
22 moved that, that it added y'all.  I could be wrong on
23 that, but it added y'all.
24      SENATOR MORRIS:  The -- the amendment as I
25 understand it and looked at it in Committee before

Page 13

1 yesterday, the bill as filed -- but now, under the
2 current version of the bill, I am in Congressman
3 Johnson's district.
4      SENATOR WOMACK:  Okay.
5      SENATOR MORRIS:  Don't you think we should
6 have moved -- included Louisiana Tech and Ouachita
7 Parish in the Northeast Louisiana Congressional
8 District?
9      SENATOR WOMACK:  Senator Morris, it's -- it's
10 a lot of could have, and -- and -- and I regret that --
11 it's not, but we also have to look at the other members
12 of Congress, and what we can live with concerning that.
13      SENATOR MORRIS:  If your bill gets out of --
14 off the floor today and goes over to the House, would
15 you be amenable to amendments that would allow this
16 district, as long as all the other requisites are --
17 there for -- to comply with the judge's order, and to
18 comply with, you know, the -- the community of interest
19 and all the other redistricting principles that we have
20 to abide by?
21      SENATOR WOMACK:  Senator Morris, I have no
22 problem in that, as long as it -- it -- it -- it -- it
23 meets the requirements of the bill.
24      SENATOR MORRIS:  Thank you, Senator.  I
25 appreciate your efforts, and I'm hopeful that we can --

4 (Pages 10 to 13)

Page 14

1 as if -- assuming the bill does move, that we can
2 perhaps find a resolution that can make everybody, if
3 not absolutely happy, a little happier.  Thank you.
4      SENATOR WOMACK:  Thank you, Senator Morris.
5      MALE SPEAKER:  Senator Stine for the floor.
6      (Pause.)
7      SENATOR STINE:  Thank you, Mr. President.
8 Members of this esteemed chamber, today we stand at a
9 crossroads, burdened with a decision that weighs heavily
10 on each of us.  The congressional map before us, a
11 construct far from our ideal, now demands our reluctant
12 endorsement.  It pains me, as it does many of you, to
13 navigate these troubled waters not of our own making,
14 but of a heavy-handed, Obama-appointed federal judge,
15 who has regrettably left us little room to maneuver.
16 This map, imperfect as it is, stands as a bulwark
17 protecting not just lines on a map, but the very pillars
18 of our representation in Congress.
19      It safeguards the positions of pivotal
20 figures, the United States Speaker of the House, the
21 majority leader, and notably, the sole female member of
22 our congressional delegation.  Her role is not merely
23 symbolic.  She is a lynchpin in the appropriations,
24 education, and workforce committees which are vital to
25 the prosperity and well-being of our state.  We are the

Page 15

1 guardians of Louisiana's voice on the national stage.
2 Our decision today, while constrained, is crucial.
3      It's about more than lines on a map.  It's
4 about ensuring our state's continued influence in the
5 halls of power where decisions are made that affect
6 every citizen we represent.  So with a heavy heart, but
7 a clear understanding of the stakes, unfortunately, we
8 must pass this map before us instead of giving the pen
9 to a heavy-handed, Obama-appointed federal judge who
10 seeks to enforce her will on the legislature.  Into an
11 untenable situation, rather than acting as a co-equal
12 branch of government as laid out in our constitution.
13      MALE SPEAKER:  Senator Carter for the floor.
14      SENATOR CARTER:  Thank you, Mr. President,
15 members.  This proposed map by Senator Womack -- well,
16 let me start with the current district, District Two.
17 The current African American voting age population in
18 District Two is currently 58 percent.  This map proposed
19 by Senator Womack reduces it to barely 51 percent, and,
20 Committee, the bill's author testified that no sort of
21 performance analysis had been conducted to determine
22 whether or not District Two continues to consistently
23 perform as an African American district.  There are
24 serious concerns about this map.  There are serious
25 concerns about this proposal.

Page 16

1      Despite those concerns, I stand in support of
2 this legislation.  It still needs work, it must be
3 amended, but I stand in support of it today, and I speak
4 only for today.  I would like to read to you all a
5 statement from Congressman Carter, who currently
6 represents the Second Congressional District.  Many of
7 us served with him either when we were in the House, or
8 those of us who served with him in the Senate.  Here's a
9 statement.
10      "My dear friends and colleagues, as I said on
11 the steps of the capital, I will work with anyone who
12 wants to create two majority-minority districts.  I am
13 not married to any one map.  I have worked tirelessly to
14 help create two majority-minority districts that
15 perform.  That's how I know that there may be better
16 ways to create -- to craft both of these districts.
17 There are multiple maps that haven't been reviewed at
18 all.  However, the Womack map creates two
19 majority-minority districts, and therefore I am
20 supportive of it.  And I urge my former colleagues and
21 friends to vote for it while trying to make both
22 districts stronger with appropriate amendment."
23      "We do not want to jeopardize this rare
24 opportunity to give African American voters the equal
25 representation they rightly deserve."  And that's the

Page 17

1 statement from Congressman Troy Carter.  I expressed my
2 concerns.  They're serious concerns.  It is my
3 expectation and my hope that this bill continue to be
4 worked on, that amendments continue to happen, but today
5 I stand in support.  Thank you.
6      MALE SPEAKER:  Senator Jackson for the floor.
7      (Pause.)
8      SENATOR JACKSON:  He tried to cut off my mic.
9      (Pause.)
10      MALE SPEAKER:  Members, you have to talk
11 directly into the mic, unlike in previous times, where
12 you could kind of talk around the mic.  You have to
13 literally talk directly into the mic for it to work.
14 We're going to adjust that for the next --
15      SENATOR JACKSON:  Hello.  Okay.  Good.
16 (inaudible 0:23:11) was going to have a fit if I wasn't
17 able to speak.  I stand in support of this map.  I first
18 want to thank Senator Womack, who had the fortitude,
19 regardless of how we got here, but to stand up and do
20 what the last body couldn't do, and that's to come
21 together.  But I do stand to say this because I said it
22 in Committee.  I reluctantly came to the floor to
23 support this map because my constituents and a lot of
24 our constituents in North Louisiana right now are still
25 experiencing an ice state.  That's what I call it

5  (Pages 14 to 17)

Page 18

1  because we didn't get snow.
2         And so a lot of them don't even know that
3  we're down here right now passing maps. And so this is
4  the first time in a long time I'm probably going to vote
5  for something that I haven't vetted through my
6  constituency because tonight, myself, Representative
7  Fisher and Representative Morrell will have a Zoom
8  community meeting to catch them up on what they have
9  lost while they were at home, because my legislative
10 assistant was finally able to get to the office and at
11 least send something out to our constituency.
12        However, at some point, what they did tell me
13 over and over again for the last year, year and a half
14 that we've been going through this process, that they
15 were supportive of fair and equitable maps, and that
16 they knew a fair and equitable -- equitable map would be
17 something that created fair representation for all
18 people in the State of Louisiana. I will end with this.
19 I don't think we're in a -- in the hands of a
20 heavy-handed judge, but we're in the hands of
21 consequences that the last legislature created in our
22 failure to act. And I say that with a heart of hope
23 that we act today on what is right, on what is just, and
24 what is fair.
25        I don't believe, and I said this before, any

Page 19

1  of my colleagues in this chamber would have it to be
2  that a certain group of people in the State of Louisiana
3  would not be properly represented. I am an American who
4  stands every time the flag is presented. I proudly say
5  one nation under God. And I hope today that in this
6  senate we will stand as one Louisiana under God, because
7  God is for what's just and what's equitable and what
8  helps all people.
9         There is nothing that says that a second
10 African American serving in Congress in Louisiana will
11 not help the masses. Well, if we think that, then we
12 think that we're less or better than a person based on
13 race. If anyone in this chamber could articulate a
14 reason why they believe that any African American that
15 sits before you today wouldn't go to Congress with the
16 same zeal and vigor and heart for the people, then maybe
17 we can say that there's not an African American in this
18 state that's going to stand in Congress and represent
19 us.
20        But I literally do not believe that there's a
21 colleague in here that looks across this chamber at any
22 member of the Black caucus and does not believe that we
23 wouldn't go to Congress and represent Louisiana. And so
24 I stand in support, with reluctancy of having to talk to
25 my constituents after this vote, but with carrying the

Page 20

1  spirit of fairness that they asked me to carry in the
2  last redistricting session. And I want to thank Senator
3  Womack because the mark of a true leader is a leader
4  that not only does what he wants to do, but what's
5  necessary to bring resolve and wholeness to a body that
6  has to work together on a number of issues. Thank you.
7         MALE SPEAKER: Thank you, Senator Jackson.
8  Senator Duplessis for the floor.
9         SENATOR DUPLESSIS: Thank you, Mr. President.
10 Thank you, Chairman Womack. I just want to make a few
11 brief comments based on some comments that have been
12 made earlier today. I was not necessarily planning to
13 speak, but I think it's important that I just share a
14 thought or two. It was said that this is much more than
15 just lines on a map, and I agree. It is much more than
16 just lines on a map. We've heard a lot from Chairman
17 Womack and my colleague, Senator Stine about the
18 importance of protecting certain elected officials, but
19 it's about more than lines on a map. It's about the
20 people of this state. It's about one-third of this
21 state going underrepresented for too long.
22        It's about a federal law called the Voting
23 Rights Act that has not been interpreted just by one
24 judge in the Middle District of Louisiana who was
25 appointed by former president Barack Obama, but also a

Page 21

1  US Fifth Circuit Court of Appeals that's made up of
2  judges that were appointed by predominantly Republican
3  presidents, and a United States Supreme Court that has
4  already made rulings. That has been made up of justices
5  that were appointed by a majority of Republican
6  presidents, primarily former president Trump. This is
7  not about one judge that was appointed by former
8  president Barack Obama. This is about the people of
9  this state, and one-third of that state, 33 percent, to
10 be exact, being underrepresented.
11        So I think it's important that we keep the
12 focus on why we're here today. None of us want to be
13 here today. We've been at this for well over two years,
14 and all of us have a level of reluctancy with the maps
15 that are before us. Just like Senator Carter, I'm not
16 thrilled about what's happening to send it to
17 Congressional District Two, and the way that it's
18 lowering the numbers.
19        Senator Price and I, we coauthored a bill that
20 we felt performed better, but we too are going to
21 support this map because not only have we been ordered
22 to do it by, yes, a judge who was appointed by President
23 Obama, but if we felt like the -- the -- the --
24 appellate judges would overrule her, then we'd be right
25 back in court. We're at the end of the road, and I too

6 (Pages 18 to 21)

Page 22

1  will support this -- this map. Not because I think it's
2  perfect, not because I think it's the best thing that we
3  could do, but because it's time to give people of this
4  state fair representation. Thank you.
5       MALE SPEAKER: Thank you, Senator Duplessis.
6  Senator Pressly for the floor.
7       SENATOR PRESSLY: Thank you, Mr. President,
8  and members. Senators, I rise today in opposition of
9  this bill, and I rise in opposition because I represent
10 a community that's unique and wonderful in many ways,
11 very diverse, and clearly a passionate part of my life
12 in Northwest Louisiana. I believe that Shreveport and
13 Bossier City and the surrounding parishes of De Soto and
14 Red River and Webster are unique from the rest of our
15 state, and I believe that commonalities of -- of
16 interest are important.
17      I agree with -- with Senator Jackson. I would
18 have no issue whatsoever of having any member of this
19 body, and many others from throughout our state of any
20 background, of any creed, of any race represent our
21 great, wonderful, diverse state in Washington, DC. But
22 I cannot support a map that puts Caddo Parish and
23 portions of my district, which is over 220 miles from
24 here, in a district that will be represented by someone
25 in East Baton Rouge that may or may not have ever even

Page 23

1  been to Northwest Louisiana, and certainly doesn't
2  understand the rich culture, rich, important uniqueness
3  of our area of the state.
4       When we look at -- at Louisiana, we often talk
5  about north and south, and that division is true. It's
6  real. I think all of us acknowledge that. The I-10
7  corridor has unique needs. When you look at -- at the
8  challenges that you face with storms, often you think of
9  hurricanes. In North Louisiana, we think of tornados
10 and ice storms. When you look at the -- the important
11 region of our states and the -- the diverse industries
12 that we have in Northwest Louisiana, Barksdale is
13 vitally important. Certainly, having Barksdale and Fort
14 Johnson now, previously Fort Polk, together in one
15 district is the one positive thing that I see in this
16 map, and I think that is something that we must keep in
17 mind as we continue through this process.
18      But I am concerned with the important part of
19 -- of this state, Northwest Louisiana, not having the
20 same member of Congress. With having a -- two members
21 of Congress, that has the potential to split our
22 community even further along a -- a -- a -- a -- a
23 line that's based purely on race, and I'm concerned
24 about that. Therefore, I'm voting no, and I urge you to
25 do the same.

Page 24

1       MALE SPEAKER: Thank you, Senator Pressly.
2  The board is clear. Senator Womack, to close on your
3  bill.
4       SENATOR WOMACK: Colleagues, appreciate the
5  questions and the comments, and I just ask that we move
6  this bill favorable.
7       MALE SPEAKER: Senator Womack has moved
8  favorable passage of Senate Bill 8. When the machines
9  are open, all those in favor, aye. Those opposed, vote
10 nay. Open the machines. Madam Secretary, open the
11 machines. Go to a machine, members. Senator -- Senator
12 Miguez. There we go. Secretary, close the machines.
13 27 ayes, 11 nays. The -- the -- the bill is passed.
14 Senator Womack moves of reconsideration. The -- the
15 vote by which the bill was passed. I lay the motion on
16 the table without objection. So ordered.

Page 25

1       CERTIFICATE OF TRANSCRIPTION
2       I, Nathan Pikover, COO of TranscribeMe, Inc.,
3  do hereby certify that
4  290872-Audio-011724SCHAMB-Edited-Appended.json was
5  transcribed utilizing computer aided means and the
6  TranscribeMe transcription team.
7       The transcript of the audio mentioned above,
8  having been transcribed and reviewed by TranscribeMe,
9  Inc. to the best of the company's ability, is a full,
10 true, and correct transcription.
11      I further certify that neither I, nor the
12 TranscribeMe, Inc. transcription team, have any personal
13 association with the parties involved or are in any way
14 interested in the outcome thereof.
15      Dated this 8th of March, 2024.
16
17      _____
18      Nathan Pikover, COO TranscribeMe, Inc.

7 (Pages 22 to 25)

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**CHAIRMAN BEAULLIEU:**  Good morning, members. Good morning viewer in public. Today is Wednesday, January 17, 2024, and you're in the committee on House and Governmental Affairs. We ask everyone to please silence your cell phones. If you need to take a call, we ask you to be courteous and step out to take that call. If any witnesses. We have some cards on the table. White cards of information. Green cards in favor, red cards are in opposition. These are held as evidence in these hearings. We're going to go ahead this morning. Ms. Baker, would you mind calling roll?

**MS. BAKER:**  Thank you, Mr. Chairman. Chairman Beaullieu?

**CHAIRMAN BEAULLIEU:**  Here.

**MS. BAKER:**  Here. Sorry. Representative Billings?

**REPRESENTATIVE BILLINGS:**  Here.

**MS. BAKER:**  Representative Boyd? Representative Carlson?

**REPRESENTATIVE CARLSON:**  Present.

**MS. BAKER:**  Present. Representative Carter?

**REPRESENTATIVE CARTER:**  Present.

**MS. BAKER:**  Present. Representative Carver?

**REPRESENTATIVE CARVER:**  Here.

**MS. BAKER:**  Present. Representative Farnham?

**REPRESENTATIVE FARNHAM:**  Here.

**MS. BAKER:**  Present. Representative Gadberry?

**REPRESENTATIVE GADBERRY:**  Here.

**MS. BAKER:**  Present. Representative Johnson? Representative Larvadain?

**REPRESENTATIVE LARVADAIN:**  Here.

**MS. BAKER:**  Present. Vice Chair Lyons?

**VICE CHAIR LYONS:**  Present.

**MS. BAKER:**  Present. Representative Marcel? Representative Noel?

**1**



Hearing Exhibit
**R013**
Case No: 3:24-cv-00122-DCJ-CES-RRS

**MS. LOWRIE:**  Thank you, Mr. Chairman. House Bill 5 by Representative Marcelle provides for the election districts for members of congress and provides with respect to positions and offices other than congressional based upon those districts.

**CHAIRMAN BEAULLIEU:**  Representative, Ms. Marcelle.

**REPRESENTATIVE MARCELLE:**  Thank you, Mr. Chairman and members. Again, I've filed a similar bill to this one in previous sessions, and we're here to this session, a special session, to address this issue. So I'd like to give you some information on this bill, if that's okay.

**CHAIRMAN BEAULLIEU:**  Proceed.

**REPRESENTATIVE MARCELLE:**  Good. So, good morning members, this has been vetted by the Federal Courts, House Bill 5 and the map that I'm presenting to you today, and it now provides you with the clearest path to remedy the state's violation of Section II of the Voting Rights Act. This map builds off of my bill that was presented in this committee two years ago. During the roadshow and first redistricting session, as well as bills and amendments that were filed again throughout the multiple sessions when the legislature has been convened with a directive to pass a map that complies with state and federal law. The common links between those maps and this are multifold, including the fact that it performs better than an active map on multiple redistricting criteria like parish splits and compactness, among other metrics, in Joint Rule 21.

**[00:05:13]**

And because it unpacks the populations running from New Orleans to Baton Rouge and instead provides a new configuration of District 5 connecting Baton Rouge and the Delta parishes, creating new opportunities for fair representation and a second majority black congressional district. In other words, HB 5 is a better map when graded on the Rubik that this legislature wrote for itself in Joint Rule 21 and the redistricting criteria accepted for decades by the federal courts, including compliance with the Voting Rights Act. In drawing this map that complies with Section II of the Voting Rights Act, we considered equal population, contiguity, compactness, parish splits, communities of interest and fracking. Consideration of the legislature's Joint Rule 21 was paramount in this process. But the overall strategy was to balance all of the relevant districting principles without allowing any single factor to predominate. We balanced population in line with the principles of one person, one vote, with efforts to keep as many parishes whole as possible. The few parishes that are split in this map are done so to keep each district with as close to the same number of people as possible. Finally, I want to talk about the two majority black districts in our map. To comply with the order of both the 5th Circuit Court of Appeals and the District Court, the legislature must pass a map. I'm going to say that again. The legislature must pass a map that has two majority black districts. In this map, those districts are District 2 and 5. I will walk through the cohesion of the black population in both of the districts. Congressional District 5 is centered around Baton Rouge and the Delta parishes. Congressional District 2 is based in New Orleans and the river parishes. While not the predominant factor to comply with the court's order to create a plan with two majority minority districts, race was a factor in the

3

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

creation of this map. The population is compact enough to draw a district that meets all traditional redistricting criteria and unlike some of the cases where distant pockets of minority populations have been found to have desperate interests, the court has accepted that the concentrations of black population grouped together in Council District 5 share cultural, economic and social and educational ties. The cohesion of black population in Congressional District 5 in this map is evidenced by faith-based congregations, Greek lettered organizations, cultural events, activities, and shared entertainment. The black churches, I will start with one of the oldest and most important institutions in the black community, the church. Since African-Americans first arrived in what was then the Louisiana Purchase in 1719, the black church has been the bedrock and foundation of this community, and that continues to be the case in the proposed 5th Congressional District in this map. Black communities regularly fellowship in various denominations of their faith. I will walk through several of those communities and each denomination in turn. The Church of God in Christ, COGIC as is commonly known or referred to, is a Holiness Pentecostal Christian Denomination. That is the oldest Black Pentecostal Denomination in the country. There are many COGIC churches located in Madison, Richland, Tensas, and other parishes that worship together. There are regional conferences, meetings and convocations of the COGIC church in District 5 that are held throughout the year. These events provide for connection with other COGIC members within different parishes in congressional District 5. There are many other protestant denominations represented in Congressional District 5, including Pentecostal, Full Gospel and Southern Baptist churches. There are also two large Black Methodist denominations in congressional District Five.

**[00:10:00]**

First, the Christian Methodist Episcopal Church, which was founded in 1870 in the south as the Colored Methodist Episcopal Church in America. It is the largest Black Methodist Church in the U.S. and there is a Colored Methodist Episcopal Church in nearly every parish in Congressional District 5. Second, the African-American Methodist Episcopal Church is the first independent protestant denomination to be founded by Black people. The AME faith is very prominent in the southern half of Congressional District 5, including right here in Baton Rouge. What unites all of these denominations is a shared faith in the gospel of Jesus Christ. All of these churches hold events such as conferences and conventions, bible studies, vacation bible schools and general assemblies. If you were to attend a church anniversary, choir anniversary or appraised team anniversary, family and friends day or any other celebration in one of these churches, the guest pastor and choir would likely be from another church within Congressional District 5. For example, the guest pastor and choir at a Praise Team Anniversary is one of the Delta parishes in one of the Delta parishes is often drawn from Alexandria and Monroe. Pastoral and church anniversary in Saint Landry often also feature guest preachers and choirs from other churches within Congressional District 5. In the catholic faith Holy Ghost Catholic Church in Opelousas is the oldest and largest black catholic parish in the state. For many years, it was the only Black Catholic Church in the region. It draws attendees and worshipers from neighboring parishes within Congressional District 5. The same dynamics among the black churches exists in Congressional District 2. The Divine Nine of which I'm a part of, as Delta Sigma Theta Sorority Incorporated member. This is another important institution in the black community, in our Greek lettered organizations, I referred to as the Divine Nine. The Divine Nine refers to the nine black

4

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

Greek lettered organizations and five fraternities and four sororities that formed the National Pan-Hellenic Council founded in Howard University in 1930. Their inceptions were a result of African-American students being excluded from Greek organizations at predominantly white institutions. I will list these organizations in order in which they were founded. Alpha Phi Alpha 1906, Alpha Phi Alpha founded in 1906. Louisiana is located in the south western region, and A Pi A has two alumni chapters partially located in Congressional District 5 and two chapters wholly contained in Congressional District 5. AKA 1908, known as AKA that was Alpha Kappa Alpha known as AKA, the oldest black sorority founded in 1908. Louisiana is located in South Central Region. The AKAs have one chapter that is partially contained and three that are wholly contained in Congressional District 5. Kappa Alpha Psi 1911, it was founded on the campus of Indiana University in 1911. Louisiana is located this fraternity southwestern province. Kappa Alpha Psi had six alumni chapters located partially in Congressional District 5 and three chapters wholly contained in Congressional District 5. Omega Psi Phi is the fraternity that has Louisiana chapters located in Congressional District 5 which form United Omegas of Louisiana. There are two alumni chapters in Congressional District 5, one in Alexandria, Louisiana, one in Opelousas, Louisiana, St. Landry Parish. Delta Sigma Theta founded in 1913. It's the largest Black Greek Letter Sorority in the world. The Deltas have eight chapters partially located in Congressional District 5 and six chapters wholly located in Congressional District 5. Phi Beta Sigma 1914, this chapter is partially in Congressional District 5 and one chapter wholly in Congressional District 5. Zeta Phi Beta has several undergraduate and graduate chapters in Louisiana. There is one undergraduate chapter partially located in Congressional District 5 and one undergraduate chapter wholly located in Congressional District 5. Sigma Gamma Rho 1922, has one graduate chapter wholly located in Congressional District 5.

**[00:15:10]**

Lota Phi Theta also has several chapters throughout the proposed 5th Congressional District. These Greek organizations not only have alumni chapters throughout Congressional District 5, but are also united through the undergraduate chapters on the campuses of ULM and southern university. These organizations fellowship together throughout the year and serve as a shared binding experience within black culture, these community-oriented organizations have scholarship programs, community service outreach, founder's day programs of which we're about to celebrate on Sunday with the Deltas, regional conventions and other meetings that bring the communities together. For example, Alumni Founders Day Gatherings and Christmas parties are often jointly hosted by chapters in St. Landry and Baton Rouge. The alumni chapters in Alexander Monroe draw memberships from surrounding rural areas and parishes.  The Divine Nine organizations unite the black community in Congressional District 5 in this map through a shared sense of brotherhood and sisterhood and commitment to black excellence and achievement. Next, another unifying feature among the black community in Congressional District 5 is Southern University. Looking at our map, it is fair to say that Southern is the anchor of black community southeastern portion of Congressional District 5. Southern is known as a flagship public institution and is the largest HBC in Louisiana of where I graduated from, and the largest HBC system in the country. In the early days after it's founded, the Southern University was the only higher education that would admit and educate black students. Southern University serves as the pivotal training ground for community of black students and attracts the black

5

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

community in Congressional District 5. The largest event in the black community within Congressional District 5 is Southern University's Homecoming, which is held every fall. Homecoming is attended by alumni, families and friends and supporters from across Congressional District 5. I also want to mention McKinley High School in Baton Rouge. For many years McKinley was the only high school option for black students in a wide swath of Louisiana. It attracted students from all across to propose Congressional District 5, followed by the Capital High School of where I graduated from that did the same thing in Congressional District 5. In conclusion, Congressional District 5 is rich in black history, cultural, events and experiences. As you can see, senators, the black community in Congressional District 5 in this map is comprised of a cohesive community that includes churches, organizations and universities. It is time that community has an equal voice in our political process. I think it is important that my motivation for filing this map was made clear on the record and that I speak here on behalf of the many folks who have voiced support for a fair map from across the state but who cannot be here today. That said, I attended the committee on senate and governmental affairs meeting yesterday and saw a parallel version of this map completely shutdown. Just like every single over bill, members of the black churches I have presented in this now three sessions since the redistricting process. In fact, I, myself, sat here with a Bill that was very similar to this, and it never made it to the floor. So, my concern is that this bill will probably not make it to the floor as well. It is evident to me that whatever map that this legislator want to pass and who has the majority of votes that is exactly what is going to pass and nothing else is going to get out of these committees, although I don't agree with it. At this time, knowing what the politics are at play, I move to voluntarily defer this bill. Thank you.

**CHAIRMAN BEAULLIEU:** Thank you, Representative Marcelle. Representative Larvadain, do you still want to come to the table or?

**REPRESENTATIVE LARVADAIN:** Thank you, Mr. Chair and members. It is time for us to create a second majority minority district. This is the time. We have spent a lot of time and money on this issue, we must put this to bed.

**[00:20:03]**

Our citizens demand fair and equitable maps. When you look at the State of Louisiana, there are 4.6 million citizens in Louisiana. 33% are African Americans that live in our state. When you talk about the Alabama case, let me tell you quickly about that. The Alabama case there are seven congressional seats. In Louisiana we have six. So, Alabama has a larger population. However, Alabama has 28% African-Americans. They have one seat, but they trying to get another African-American seat. We have to correct the wrong in Alabama and we have to correct the wrong here in Louisiana. Section II of the Voting Rights Act of 1965 prohibits voting practices and procedures that discriminate on the basis of race, color, and membership of one of the language minority groups. In other words, we cannot intentionally dilute black vote. In the landmark case of Thornburg versus Gingles, it states, it demands that where there's another majority black district can be drawn, it must be drawn. The map that you have in front of you, this map won't proceed forward, but whatever map we have, it has to have compactness, continuity, preservation of counties and parishes, preservation of communities of interest,

6

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

preservation of prior districts, and avoiding prior incumbents against each other. We must try to correct this wrong and this is the time to do it. When you look at District 5, you look at a lot of community of interests. You look at East Carroll, Madison, Tensas, Concordia is nothing but poverty in those areas. Good working hard family people. When they get sick all of those folks have rural hospitals. You saw what happened with COVID rural hospitals. These are rural hospitals with 30, 40 beds. You can't do a whole lot with 30, 40 beds and no equipment and no staffing. Those folks in the Delta have to come to Alexandria to Rapides or Cabrini. They have to go to Washita to St. Francis to get medical help or West Monroe. Those folks even sometimes have to go to Jackson out of state to get healthcare or Natchez. When you look at the community of interest, health care is vital. Medicaid is the heartbeat of our community. When folks cannot afford Blue Cross or Blue Shield, they have to have access to hospitals. We can't be here if we're sick and we're unhealthy. The hospitals are the pulling force. All these communities are struggling with poverty. You look at the Delta Farmland, wide open farmland, cotton, soybeans. That's the bedrock of those communities. You look at District 5, that's what you have. They have a connectivity. Highway 65 leaves Concordia goes all the way to 20. Those folks know each other. They attend churches, they're families, they're friends. My high school in Alexandria plays Washita, plays Neville. There's a strong connection in that area. Peabody, which is one of the top schools has to go play Neville and then when ASH has to play Washita and West Monroe, it's tough because those are strong powerhouses. So, all of us family and friends. Look at Avos Parish. Avos Parish has connected its community because Avos has a small hospital, 30, 40 beds. When you look at health care and all these folks, these folks have a common interest. They worship together. They visit their family, their friends. The East, West Feliciana, your small hospitals, your rural folks, the churches, the communities, all of them are family, all of them are related. So, when you look at District 5, all is family. In Alexandria, I've got a lot of students that attend school in UL Monroe. They attend school in Baton Rouge. So, when you look at the community of interest in this area, it's there. We want to make sure that we have two districts that are majority-minority. And when you look at the community of interest, these are folks who worship together, their family, their friends, they travel, they visit, they do a lot together. We also want to make sure that we look at District 2. We want to make sure that's our first majority-minority district. We want to make sure we protect that district also, because that's important. If we're going to apply the law according to the constitution because some of you all are constitutional scholars, I'm not, we have to be fair to everybody. We have to be fair to District 2, Congressmen, and we have to be fair to 5 because the courts have asked us to do two majority-minority districts. This map will not proceed but whatever map we have we have to do what's right and what's fair.

[00:25:03]

If Shelly Dick has asked us to come back and get a district, it's important that we comply with it. You might agree, you might disagree, but at the end of the day, she's the judge. We have to respect her wishes. I go to court all the time. I don't always agree with what the judges say, but I have to comply with it. I'm asking for you all, whatever we do in a good compact district, we have to be fair. The District 5, the District 2, and to all of the folks in those districts. Thank you, Mr. Chair.

7

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**REPRESENTATIVE MARCELLE:**  Thank you, Mr. Chairman, for giving me an opportunity to present.

**CHAIRMAN BEAULLIEU:**  So, look, Judge Carter, I see you have your button pushed. She's voluntarily deferred the bill.

**REPRESENTATIVE CARTER:**  Yeah.

**CHAIRMAN BEAULLIEU:**  Hold on one second. There you go.

**REPRESENTATIVE CARTER:**  I understand your decision to defer the bill, but I don't necessarily agree that we need to because we don't have the votes in the committee and we know we don't have the votes in the committee, and we're going to do the same thing we've done every session, come up with a bill that's really not the best bill we can come up with. The better bills, this bill and some other maps that have been presented, and none of those maps are going to get into consideration. But sometimes you still got to make a record and take a vote, but your decision is to defer it. But I don't necessarily agree that we need not pursue and develop a bill and develop the benefits of the bill for the record. And you said a lot of things, but it's a lot more can be said why this bill, this particular map is a good map. Why seven other maps they have are very good maps, but because the leadership is going to let one bill out, we know that, and one or two bills out and neither one of them are really good bill, not the best we can do. And it seemed that we feel like we got to do this because they offer two minority districts as shallow as they maybe because they're doing us a favor. They're not doing us no favor. The governor, the administration, nobody, no favors. They're doing themselves a favor. The favor to us will pass one of these decent maps that's compacted, that creates a real second minority district and create a map that is going to be challenged either on constitutional ground by the 14th Amendment or by Section II. Just to say you got two black districts, it's really not the right thing to do. And while it will happen, we know we can still make a record, and the record is important for future court action. Personally, I don't care what the legislature do with these maps, because on February 5 there's going to be a trial. Okay. And what this whole session is about, in my opinion, is to not have the trial on February 5 because they don't want to do the right thing. They won't pass a map with two black districts in it, even though it may not be a good performing district, in order to say they gave us something. The people are not getting nothing from the leadership in this legislature. The court is going to make a decision on this. So, I like to see the court make the decision because I don't trust the legislature.

**REPRESENTATIVE MARCELLE:**  Well, thank you, Representative Judge.

**REPRESENTATIVE CARTER:**  Not my bill.

**REPRESENTATIVE MARCELLE:**  Thank you, Judge. I appreciate and understand your concern. However, I know that we vetted this same bill on the other side. I know the outcome of it. And so that's why I made the decision to do that. I did want to go on the record to talk about the communities of interest and the things that we share in common throughout the areas that we proposed. And that's why I wanted to go ahead and tell you all about the map. I do believe I have

8

the best map. I think I had the best map the last time. However, I've been here long enough, this is my 9th year to know what's going to get out and what's not going to get out. And so, I didn't want to just have people vetted again on this side and when I knew what the outcome was going to be and there was an opportunity for everyone to hear this pretty much the same map on the other side. So, I appreciate what you said. I did want to go on the record to talk about the communities of interest, the churches, the schools, the things that we do, the Divine 9, the things that we have in common and I do agree that we must do what the judge has ordered us to do, and further, that we should not be passing a map that's going to be ruled unconstitutional and have us back in court. I get what you're saying. Thank you so much.

**CHAIRMAN BEAULLIEU:**  So, Rep. Thomas, for a bite.

**REPRESENTATIVE THOMAS:**  Thank you, Mr. Chair. My question actually is to you Mr. Chair.

**[00:30:00]**

I firmly believe that words mean something and that we are using -- I am hearing the phrase majority minority being used as a synonym for majority black, and I would like a clarification on what did Judge Dick order us to do in drawing these maps. Was it majority minority or majority black?

**CHAIRMAN BEAULLIEU:**  It was majority black.

**REPRESENTATIVE THOMAS:**  Thank you very much.

**CHAIRMAN BEAULLIEU:**  And look Representative Marcelle, just in light of the comments, especially with what Judge Carter said, and he didn't care about what the legislature does. I care about everything that goes on in this committee, and we all need to be caring about what we do in this legislature. And so, if anyone doesn't care about this process, it's a shame because this process is very important. I voted against you, and I'm only saying this because of all the evidence, you laid out your cases really well. You decimate the communities of interest in my area. I voted against it before and was very respective about it. But I understand you had communities of interest and you laid it all out with the fraternities and sororities but in the Bayou Teche area and the KDN area where we're at, they're decimated and so I'll stand firm. I want to have that on record the same way you have everything else on record. And I think if you look around your map, I think what was brought up, and again, we're not re-litigating what we had last year when we heard this maps before but there was a lot of evidence brought up on why that was the case. So just want to in light of the evidence being brought up and understanding, especially with Judge Carter saying about preparing for trial and a lot of this is to get information on record simply for trial, I want to make sure that was clear. Representative Wright for comment.

**REPRESENTATIVE WRIGHT:**  Thank you, Mr. Chair. Representative Marcelle, I appreciate you. Although I just don't know what's the problem with St. Tammany. You split us up. That's

9

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

our community of interest. Not going to be able to vote for it, just so you know but I know
you're going park it.

**REPRESENTATIVE MARCELLE:**  Thank you very much sir. I respect your position and
everyone's position. And as I said yesterday in the Senate, when they had the hearing on the
similar map, when you decide or when you were told to make two districts, it's going to impact
somebody. And if we could remove the people from it and just divide it like it should be divided,
then we could come out with something that's best for the State of Louisiana. So if it affects your
congressional district, you're a congressman, of course, you're not going to be for it. That's why
I really believe that Judge Dick should draw the map and we can stay out of it, and then she can
do what's best for the state because of the interest that everybody up here represents somebody
and I get it. But I also believe that we deserve two black congressional districts, and that's my
belief. So that's why I keep bringing the bill. But thank you so much, Representative Wright. I
understand. And I love the people in your parish.

**CHAIRMAN BEAULLIEU:**  All right, thank you. Representative Marcelle. She's moved that
we voluntary defer House Bill 5. Any objection? Hearing no objection, House Bill 5 is voluntary
deferred. Mr. Melerine are you close by? Representative Melerine? Representative Melerine, do
you want to start with the -- well, we'll start with House Bill 7 since that's kind of the meat of
the maps for your bill. Ms. Smith, would you please read in House Bill 7.

**MS. SMITH:**  Okay. Members, this is House Bill No. 7 by Representative Melerine. It provides
for the redistricting of the Supreme Court districts.

**CHAIRMAN BEAULLIEU:**  Representative Melerine, on your bill.

**REPRESENTATIVE MELERINE:**  Good morning, members of the committee and thank you
for hearing the bill today. So, House Bill 7 provides for a map with nine Supreme Court justices.
I have a constitutional amendment, which was HB 13, I can discuss later, but essentially what
this does is the map that ties to my constitutional amendment. In looking across the state and
seeing some of the pushback that we've had at the seven person maps, it seems like a lot of the
issues arise from geography and separating communities of interest and separating geographical
regions.

**[00:35:00]**

And some of the feedback I've had is that certain areas of the state don't feel as if their interest
would be represented in a seven-person map. Digging into it a little bit easier, I feel a nine-
person Supreme Court would geographically represent the members of the state and the citizens
of the state. I can tell you now, geography was the thing I looked at most. If you look at the map,
it splits only five parishes. It's compact. It has six majority white districts based on voting age
population, two majority black districts, and then the third is more of a purple district. And I
have the breakdown right here, if you hold on one second. It's actually my home district that we
made as the purple district. It's district nine. So if you look the voting age population across the
state, the voting age population -- let me start with the district first. So District 9's white voting

**10**



# PohlmanUSA®
## Court Reporting and Litigation Services

---

House Governmental Affairs - Audio Transcription

January 18, 2024

---

Phillip Callais, et al.

vs.

Nancy Landry

Page 2

1    Representative Larvadain.  Vice Chair Lyons.
2        VICE CHAIRMAN LYONS:  Present.
3        MS. BAKER:  Present.  Representative Marcelle.
4        REPRESENTATIVE MARCELLE:  Here.
5        MS. BAKER:  Present.  Representative Newell.
6        REPRESENTATIVE NEWELL:  Here.
7        MS. BAKER:  Present.  Representative
8    Schamerhorn.
9        REPRESENTATIVE SCHAMERHORN:  Here.
10       MS. BAKER:  Present.  Representative Thomas.
11       REPRESENTATIVE THOMAS:  Here.
12       MS. BAKER:  Present.  Representative Wright.
13   Representative Wyble.
14       REPRESENTATIVE WYBLE:  Here.
15       MS. BAKER:  Present.  We have 12 members in a
16   quorum.
17       CHAIRMAN BEAULLIEU:  Thank you, Ms. Baker.
18   Members, we have one item on the agenda today.  It's
19   Senate Bill 8 by Senator Womack.  Senator Womack is --
20   is delayed this morning, so what we're going to do --
21   until I hear back from Senator Womack, we're going to
22   stand at ease until then.  So we just ask you all to
23   kind of stay nearby.
24       We'll give you all some time to -- to be able
25   to get back, but until we hear back from Senator Womack,

Page 3

1    we're going to go ahead and stand at ease.  And so just
2    viewer -- members that are listening online or watching
3    online, just kind of be aware.  We are hoping to come
4    back in at some time later this morning.  Thank you all.
5        (Pause.)
6        CHAIRMAN BEAULLIEU:  Good afternoon, members,
7    viewing audience.  Thank you for your patience.  We are
8    ready to resume our House and Governmental Affairs
9    Committee.  Today is Thursday, January 18th, 2024.  Ms.
10   Baker, can you give me an updated roll call, please?
11       MS. BAKER:  Chairman Beaullieu.
12       CHAIRMAN BEAULLIEU:  Here.
13       MS. BAKER:  Present.  Representative Billings.
14       REPRESENTATIVE BILLINGS:  Here.
15       MS. BAKER:  Present.  Representative Boyd.
16       REPRESENTATIVE BOYD:  Present.
17       MS. BAKER:  Present.  Representative Carlson.
18       REPRESENTATIVE CARLSON:  Present.
19       MS. BAKER:  Present.  Representative Carter.
20   Representative Carver.
21       REPRESENTATIVE CARVER:  Here.
22       MS. BAKER:  Present.  Representative Farnum.
23       REPRESENTATIVE FARNUM:  Here.
24       MS. BAKER:  Present.  Representative Gadberry.
25       REPRESENTATIVE GADBERRY:  Here.

Page 4

1        MS. BAKER:  Present.  Representative Johnson.
2    Representative Larvadain.
3        REPRESENTATIVE LARVADAIN:  Here.
4        MS. BAKER:  Present.  Vice Chair Lyons.
5        VICE CHAIRMAN LYONS:  Present.
6        MS. BAKER:  Present.  Representative Marcelle.
7    Representative Newell.
8        REPRESENTATIVE NEWELL:  Here.
9        MS. BAKER:  Present.  Representative
10   Schamerhorn.
11       REPRESENTATIVE SCHAMERHORN:  Here.
12       MS. BAKER:  Present.  Representative Thomas.
13       REPRESENTATIVE THOMAS:  Here.
14       MS. BAKER:  Present.  Representative Wright.
15   Representative Wyble.
16       REPRESENTATIVE WYBLE:  Here.
17       MS. BAKER:  Present.  We have 13 in a quorum.
18       CHAIRMAN BEAULLIEU:  Thank you, Ms. Baker.
19   Members, we have one item on our agenda today.  That's
20   Senate Bill 8 by Senator Womack.  Ms. Lowery, would you
21   please read-in the bill?
22       MS. LOWERY:  Thank you so much, Mr. Chairman.
23   Members, Senator Womack brings Senate Bill Number 8 to
24   provide relative to the redistricting of Louisiana's
25   Congressional District, to provide with respect to

Page 5

1    positions and offices other than congressional based
2    upon congressional districts, and to provide related
3    matters.
4        CHAIRMAN BEAULLIEU:  Senior Womack, on your
5    bill.
6        SENATOR WOMACK:  Thank you, Mr. Chairman.
7    Committee members, good evening.  Thank you for letting
8    me come in today and present this bill.  As you know,
9    Louisiana Congressional Districts must be redrawn, given
10   the Federal Voting Rights Act litigation that is still
11   ongoing in the US District Court for the Middle District
12   of Louisiana.  The map and the bill that I'm
13   introducing, which is the product of a long, detailed
14   process, achieves several goals.
15       First, as you all are aware, Congresswoman
16   Julia Letlow is my representative in Washington, DC.
17   The boundaries in this bill I'm proposing, ensure that
18   Congresswoman Letlow remains both unpaired with any
19   other incumbents, and in the congressional district that
20   should continue to elect a Republican to Congress for
21   the remainder of this decade.
22       I have great pride in the work that
23   Congresswoman Letlow has accomplished, and this map will
24   ensure that Louisianans will continue to benefit from
25   her presence in the halls of Congress for as long as she

2  (Pages 2 to 5)

## Page 6

1  decides and continues to serve our great state.  As you
2  know, Congresswoman Letlow sits on appropriations.  She
3  sits on ag, which is a big part of my district.
4       Second, the Louisiana 6th Congressional
5  District.  The map and the proposed bill ensures that
6  four are safe Republican seats.  Louisiana's Republican
7  present in the United States Congress has contributed
8  tremendously to the national discourse, and I'm very
9  proud that both Speaker of the US House of
10  Representatives, Mike Johnson, and US House Majority
11  Leader Steve Scalise are both from our great state.
12       This map ensures that the two of them will
13  have solidly Republican districts at home, so they can
14  focus on the national leadership that we need in
15  Washington, DC.  The map proposed in this bill ensures
16  that the Conservative principles retained by the
17  majority of those in Louisiana will continue to extend
18  past our boundaries to our nation's capital.
19       Third, the map that I've presented is -- goes
20  along the Red River.  It's the I-49 corridor.  We have
21  commerce through there.  We have a college through
22  there.  We have a lot of ag cattlemen as well as farm
23  row crop, and a lot of people up through that corridor
24  comes back to Alexandria using that corridor for their
25  healthcare.  Finally, these maps in the proposed bill

## Page 7

1  respond appropriate to the ongoing Federal Voting Rights
2  Act case in the Middle District of Louisiana.
3       For those who are unaware, the congressional
4  maps that we enacted in March 2022 have been the subject
5  of litigation, roughly since the day the 2022
6  Congressional Redistricting Bill went into effect and
7  even before we enacted it.  After a substantial amount
8  of prolonged litigation, the Federal District Court has
9  adhered to its view that the federal law requires that
10  the state have two congressional districts with a
11  majority of Black voters.
12       Our secretary of state, attorney general, and
13  our prior legislative leadership appealed, but have yet
14  to succeed, and we are now here because of the Federal
15  Court's order that we have a first opportunity to act.
16  The District Court's order that we must have two
17  majority Black voting age population districts, combined
18  with the political imperative I just described, have
19  largely driven the boundaries for District 2 and
20  District 6, both of which are over 50 percent Black
21  voting age population.
22       Given the state's current demographics, there
23  is not enough high -- high enough Black population in
24  the southeast portion of this -- Louisiana to create two
25  majority Black districts, and to also comply with the US

## Page 8

1  Constitution one person, one vote requirement.  That is
2  the reason why District 2 is drawn around the Orleans
3  Parish and why District 6 includes the Black population
4  of East Baton Rouge Parish and travels up I-49 corridor
5  to include Black population in Shreveport.
6       While this is a different map than the
7  plaintiffs' litigation have proposed, this is the only
8  map I reviewed that accomplishes the political goals I
9  believe are important for my district, for Louisiana,
10  and for the country.
11       While I did not draw these boundaries myself,
12  I carefully considered a number of different map
13  options, and I firmly submit the congressional voting
14  boundaries represented in this bill best achieve the
15  goals for protecting Congressman Letlow's seat,
16  maintaining strong districts for Speaker Johnson and
17  Majority Leader Scalise, ensuring four Republican
18  districts, and adhering to the command of the Federal
19  Court in the Middle District of Louisiana.  I'd be happy
20  to answer any questions.
21       CHAIRMAN BEAULLIEU:  Thank you, Senator
22  Womack.  Representative Marcelle for a question.
23       REPRESENTATIVE MARCELLE:  Thank you, Senator
24  Womack, for presenting this bill.  Were -- did you have
25  the opportunity to view the map that I filed?

## Page 9

1       SENATOR WOMACK:  I -- I reviewed several maps,
2  Representative Marcelle.
3       REPRESENTATIVE MARCELLE:  HB5.
4       SENATOR WOMACK:  HB5.  I didn't -- I didn't
5  look at the HB5 --
6       REPRESENTATIVE MARCELLE:  Did not.
7       SENATOR WOMACK:  -- per se.  I looked at
8  several maps.  One of them could have been that.
9       REPRESENTATIVE MARCELLE:  Okay.  Because I
10  heard you say that you thought that your map was the
11  best possible route.  A pathway to get to what we needed
12  to, first of all, make sure that we get out of the
13  litigation, apply with Section 2, and go about the
14  deviations and the compactness and all of those
15  different things that we needed to do in order to create
16  a second Black seat -- congressional seat.  Is that what
17  I heard you say?
18       SENATOR WOMACK:  Yes, ma'am.
19       REPRESENTATIVE MARCELLE:  Okay.  Well, I -- I
20  certainly want to thank you, and I know -- I spoke to
21  you yesterday about putting an amendment on your bill to
22  make sure that we could reduce the parish splits and
23  that we had some conversations, and it's a short period
24  of time.  Certainly, I don't know when the amendments
25  are going to be offered up, but I certainly want to go

Page 10

1    down those same lines of -- since I could not get my map
2    through, which I thought was the best path, that I -- I
3    would support this map, with some cleanup done to it.
4        So I -- I just want to make sure that I go on
5    the record of saying that I spoke to you. The things
6    that my amendment would do would certainly be to add Red
7    River Parish to Congressional District 6, and preserving
8    the things in Red River community as well. So I want to
9    go on the record of saying that I -- I believe that we
10   have had several maps that would have gotten us there,
11   but I think because of political reasons, we are here
12   where we are today.
13       CHAIRMAN BEAULLIEU: Representative Marcelle,
14   just if I can chime in for a second, so I can let the
15   viewing members know that online there are two different
16   amendments that -- that will likely be proposed today,
17   and both of those are available online for the -- for
18   the viewing public. If we could hold off on those
19   amendments for -- we have a -- a handful of questions on
20   the board, Representative Marcelle, and then we'll come
21   back. Is that okay with you?
22       REPRESENTATIVE MARCELLE: Yes. I just --
23       CHAIRMAN BEAULLIEU: Okay. Good.
24       REPRESENTATIVE MARCELLE: I just wanted to --
25   to make mention to that why -- why I was asking him some

Page 11

1    of the questions. So when you did this map, you -- you
2    considered the population deviation.
3        SENATOR WOMACK: Well, we had -- had to -- to
4    create the two districts, we had to think about the
5    population.
6        REPRESENTATIVE MARCELLE: And the parish
7    splits as well?
8        SENATOR WOMACK: The parish splits as well.
9        REPRESENTATIVE MARCELLE: So you felt like
10   this was the best pathway after you viewed those areas
11   that we certainly had to do to enact this map.
12       SENATOR WOMACK: Representative Marcelle, I --
13   I -- I want to be -- and -- and I -- I was hoping that
14   it -- that covered that in my opening statement, but it
15   -- it -- my map is politically drawn to protect our
16   members of Congress as it stands, as well as create the
17   two districts, minority district, Black districts.
18       REPRESENTATIVE MARCELLE: So in your opinion,
19   your map does two things. It satisfies the Court, and
20   it also protects the politics, or our congressional
21   members. Is that -- is that --
22       SENATOR WOMACK: Yes, ma'am.
23       REPRESENTATIVE MARCELLE: -- accurate to say?
24       SENATOR WOMACK: Yes, ma'am.
25       REPRESENTATIVE MARCELLE: Okay. Thank you

Page 12

1    very much and thank you for your work.
2        SENATOR WOMACK: Thank you.
3        CHAIRMAN BEAULLIEU: Thank you, Representative
4    Marcelle. Representative Boyd.
5        REPRESENTATIVE BOYD: Good afternoon, Senator.
6    How are you?
7        SENATOR WOMACK: Fine, thank you.
8        REPRESENTATIVE BOYD: So I agree with Rep
9    Marcelle. This is not, in my opinion, the best map that
10   I've seen, but I do understand what it took to get here,
11   and my congressman seems to also be in support of the
12   map. Therefore, I do plan on supporting the map,
13   hopefully with some amendments. Are you open to a
14   amendment on this?
15       SENATOR WOMACK: Yes, ma'am, once -- once I
16   see some amendments.
17       REPRESENTATIVE BOYD: Okay.
18       SENATOR WOMACK: You know, we'll look at
19   amendments.
20       REPRESENTATIVE BOYD: And then she mentioned
21   the parish splits. How many parish splits are they; do
22   you know?
23       SENATOR WOMACK: I think we're 16 at the -- at
24   the present time.
25       REPRESENTATIVE BOYD: And do you know the

Page 13

1    BVAPs for 2 and 6?
2        SENATOR WOMACK: I'm sorry?
3        REPRESENTATIVE BOYD: The BVAPs for 2 and 6,
4    do you know what they are right now?
5        SENATOR WOMACK: No, I don't.
6        REPRESENTATIVE BOYD: Okay. Did you have any
7    communication with anybody from -- with community
8    influences on this? Have you met with other groups?
9    Who did you meet with to come up with this map?
10       SENATOR WOMACK: I've had several meetings
11   over the period of time with several groups.
12       REPRESENTATIVE BOYD: With community of
13   interest as well?
14       SENATOR WOMACK: It -- it was hard to -- to
15   create communities of interest with this map and -- and
16   -- and still achieve some of the goals that we were
17   trying to achieve from the congressional, political
18   standpoint.
19       REPRESENTATIVE BOYD: Okay. Again, based on
20   the map and my conversation with our congressman, if we
21   can get some things cleared up and straightened up on
22   it, I would be in support of the bill as well.
23       SENATOR WOMACK: Okay. Thank you.
24       CHAIRMAN BEAULLIEU: Thank you, Representative
25   Boyd. Representative Newell.

4  (Pages 10 to 13)

Page 14

1    REPRESENTATIVE NEWELL:  Thank you very much,
2  Mr. Chairman.  Senator Womack, thank you for the time
3  that you've spent because I know myself, we've been in
4  this redistricting process for almost three years now,
5  so I -- I knew the time it took for me just to try to
6  redraw my house district because of the growth in
7  Orleans Parish.  So I do understand when you're looking
8  at congressional districts.  So again, I want to thank
9  you for the time that you dedicated to -- to doing -- to
10  -- to redrawing this map and submitting this bill, but I
11  must say that I am along the lines of my two colleagues
12  that just spoke.
13    That although this is a good map, this isn't
14  the best map that has come before us.  It does meet the
15  -- it does meet the Court requirements.  It does meet --
16  meet the statute and the -- the -- the jurisprudence
17  that is before us that guides us as to what needs to be
18  to satisfy congressional districts.  I did look at your
19  numbers, the BVAP in 2 and 6, as well as the total
20  population for the -- these two minority-majority
21  districts.
22    However, there were two that were -- two other
23  maps that were presented that were stronger for those
24  two minority-majority districts and didn't do as many
25  splits.  That's House Bill 5 and Senate Bill 4.

Page 15

1  However, the politics of those two individuals that
2  submitted those two maps, I guess, have led us to having
3  to work with yours.  And -- and -- and it's -- it's
4  disheartening that we do have so much politics that are
5  guiding our maps instead of the policy, and the people
6  helping us to guide our maps and our decisions.
7    Because your map gives us what we're -- what
8  we're wanting, I am going to support your map.  And
9  again, I'm going to say it's not because it's the best
10  map, but it is because it -- it -- it looks that -- it
11  looks as though it's giving what we -- what we need.  It
12  does not reflect what the African Americans that we've
13  heard from across the state during the road shows in
14  2021 asked for.  It does not reflect all of what the
15  Black Caucus and the Democratic Caucus has asked for
16  these past three years.
17    But it's the closest that we've gotten thus
18  far, and it seems like it's the closest one that we're
19  going to get that we could possibly get support from my
20  other Republican colleagues on.  But I just wanted to
21  make that clear, that it is not all that we asked for,
22  and there have been better ones that were submitted by
23  Democrats.  But this is the best one that we've seen
24  that's been submitted by you, sir.  And again, I thank
25  you.  That's all I have for now, Mr. Chair.  I'll

Page 16

1  probably press my button again.
2    SENATOR WOMACK:  Thank you.
3    CHAIRMAN BEAULLIEU:  Thank you, Representative
4  Newell.  Representative Marcelle would like to just make
5  a clarification for the Committee.
6    REPRESENTATIVE MARCELLE:  Thank you.  Senator
7  Womack, we keep using the term BVAP, and we know that
8  there are many people in the audience who may not
9  understand that terminology.  So do you want to tell
10  them what BVAP means, or you want me to do it?
11    SENATOR WOMACK:  Go ahead.  You got the mic.
12    REPRESENTATIVE MARCELLE:  I got -- okay, sir.
13  I didn't want to take over your bill.  It's the Black
14  voting age population for those that are -- that are
15  looking online, and maybe across the state.  We --
16  because we keep using those terms, and I want to make
17  sure that everybody understands what BVAP means.  Thank
18  you, Senator Womack.
19    SENATOR WOMACK:  Thank you.  When she -- when
20  she asked that question, I started running through my
21  mind.  It's got to be voting age population.  And -- and
22  I hadn't heard the term BVAP.  It's voting age
23  population, which does meet the -- I don't know exactly,
24  but it's in a high percentage, 50 percentile on that --
25  on voting age population.

Page 17

1    CHAIRMAN BEAULLIEU:  Thank you, Senator
2  Womack.  And look, for the -- again, the viewing
3  audience, those numbers are all on the bill.  They're
4  part of the bill that's been filed.  So if you -- if
5  you're listening online and you want to scroll through
6  and -- and look at different statistics on the maps and
7  on the amendments, they're all there for you.  Vice
8  Chairman Lyons.
9    VICE CHAIRMAN LYONS:  Thank -- thank you, Mr.
10  Chairman.  Thank you, Senator Womack, for -- for -- for
11  bringing this like that, even though we're looking at
12  this piece, and I'm studying it as -- as it is there.
13  And you mentioned in your opening statement about the --
14  the plaintiffs and -- and the cause of -- of why you're
15  doing this, but my question is: did you do any -- any
16  comparisons to the -- the plaintiffs' map or the first
17  map that was -- that was issued, drawn on this piece
18  with your map?
19    SENATOR WOMACK:  Representative Lyons, I've
20  looked at so many maps in the last three days till --
21  till -- to say I did or didn't would be -- be -- I
22  couldn't answer that.  I'm sorry, but -- but I've looked
23  at so many maps from what -- even through our roadshow.
24  But in the last two or three days to -- to say that --
25  that my map and how it compares to another map, I'm kind

5 (Pages 14 to 17)

Page 18

1    of where I'm at right now, and I -- I can -- I know what
2    my map looks like now.
3        VICE CHAIRMAN LYONS:  Well, the reason why I
4    asked that question was I wanted to know if you did any
5    type of analysis to see how it would perform.  I mean,
6    it looks, in particular, according to certain criteria,
7    that it is a -- a -- a workable map of some sort, but
8    how does it perform in comparison to the plaintiffs' map
9    that was out there, that existing map?  I -- I would
10   think that you would compare it to that one because that
11   was the map of -- not of choice, but that was the map in
12   litigation.  How would your map perform along with that
13   one?
14       SENATOR WOMACK:  I -- I didn't look at a map.
15   I looked at a performance chart --
16       VICE CHAIRMAN LYONS:  Performance.  Yes.
17       SENATOR WOMACK:  -- and it -- it -- right.
18   That was printed.  It's online.  That -- that we --
19       VICE CHAIRMAN LYONS:  Okay.
20       SENATOR WOMACK:  -- pull, and it does -- it
21   does perform very well.  It does in the election.  It --
22   it performs.
23       VICE CHAIRMAN LYONS:  Okay.  And --
24       SENATOR WOMACK:  I -- I don't have that map in
25   front of me, I'm sorry.  I thought -- I'm looking for

Page 19

1    it.  But I thought it was here, but it's not.  But I did
2    have -- I did have that with me.
3        VICE CHAIRMAN LYONS:  Okay.
4        SENATOR WOMACK:  But it's not with me, but I
5    -- I do remember us looking at that.
6        VICE CHAIRMAN LYONS:  Okay.  Okay.  I want --
7    I just wanted to know if you did analysis and it was
8    done and how it compared.  I know it could perform.
9    Basically, as I'm looking at it now, I would think it
10   does.  And I don't think it would perform better --
11   better than the original map of -- of the plaintiff, but
12   it does perform.  I kind of want to see if something at
13   least close to that performance measures there, but this
14   is a performing map.  Thank you for answering my
15   questions.
16       CHAIRMAN BEAULLIEU:  Thank you, Vice Chairman
17   Lyons.  Representative Farnum for a question.
18       REPRESENTATIVE FARNUM:  Yeah.  Thank you, Mr.
19   Speaker.  If it's the proper time, I'd like to offer an
20   amendment.
21       CHAIRMAN BEAULLIEU:  Do we have any other
22   questions before we go into the amendments?  Because we
23   do have -- we have two amendments.  No other button's
24   pushed.  So give me two seconds, and we'll -- we'll come
25   right back to you.  Give me -- we've got one more

Page 20

1    question.  Representative Larvadain.
2        REPRESENTATIVE LARVADAIN:  Thank you, Senator
3    Womack.  I want to thank you for -- for trying to make
4    an effort to comply with the federal judge.  But when I
5    look at your map - and you have a copy in front of you -
6    it goes from East Baton Rouge to West Baton Rouge to
7    Pointe Coupee to Saint Landry, some of Avoyelles, some
8    of Rapides, all of Natchitoches, DeSoto, and then some
9    of Caddo; is that correct?  Am I right?  We're looking
10   at the right map?
11       SENATOR WOMACK:  Which district are you going
12   through, 2 --
13       REPRESENTATIVE LARVADAIN:  Yeah.  District 2.
14       SENATOR WOMACK:  -- or 5 -- 6?  2?
15       REPRESENTATIVE LARVADAIN:  6.
16       SENATOR WOMACK:  Right.
17       REPRESENTATIVE LARVADAIN:  6.
18       SENATOR WOMACK:  You're right.
19       REPRESENTATIVE LARVADAIN:  Okay.  Now, when
20   you look at the community of interest -- I'm in Rapides.
21   I've got -- my district is cut up two -- two spots.
22   I'm in District 4 and District 6.  I know in the
23   community of interest, you've got Rapides and
24   Natchitoches, and I think that you've got the Creole
25   Nation.  You've got Northwestern State University.  A

Page 21

1    lot of my students in my district attend those, so
2    that's the community of interest; would you agree?
3        SENATOR WOMACK:  I agree.
4        REPRESENTATIVE LARVADAIN:  When you look at
5    Natchitoches, there's a community of interest with
6    Natchitoches and Caddo.  You've got a lot of -- you've
7    got lumber companies in the Natchitoches area.  A lot of
8    people work.  RoyOMartin has a big -- big plant in
9    Natchitoches --
10       SENATOR WOMACK:  Right.
11       REPRESENTATIVE LARVADAIN:  -- and a lot of
12   folks in my area work there.  RoyOMartin from
13   Alexandria.  And a lot of folks work in DeSoto where you
14   have a lot of timber.  And would you agree with that?
15       SENATOR WOMACK:  I agree.
16       REPRESENTATIVE LARVADAIN:  You look at Saint
17   Landry.  Saint Landry has -- Opelousas has a nice-sized,
18   medium-sized hospital.  So those folks in Pointe Coupee,
19   they will go to Saint Landry to get their medical care
20   and so forth in the Opelousas area.  Would you agree
21   with that?
22       SENATOR WOMACK:  I agree.
23       REPRESENTATIVE LARVADAIN:  And you look at
24   West Baton Rouge-East Baton Rouge Parish.  Is East Baton
25   Rouge Parish cut in one district or two districts in

6  (Pages 18 to 21)

Page 22

1   your map?  Because I'm having problems seeing it.  Is it
2   two?
3        SENATOR WOMACK:  I would have to look at the
4   --
5        REPRESENTATIVE LARVADAIN:  Two.  Okay.  I've
6   seen maps to infinitum.  So I think East Baton Rouge is
7   divided into two.
8        SENATOR WOMACK:  It's --
9        REPRESENTATIVE LARVADAIN:  Is that two?  It's
10  yellow, and I guess a white piece.
11       SENATOR WOMACK:  Yeah.  Right.  Two.
12       REPRESENTATIVE LARVADAIN:  Okay.  And it goes
13  all the way to the great city of Shreveport.
14       SENATOR WOMACK:  Right.  Where our LSU
15  hospital is.
16       REPRESENTATIVE LARVADAIN:  And the hospital is
17  vital because in Alexandria, we had a HOEPA loan.
18  You're familiar with that.  And Jindal shut my HOEPA
19  loan.  So my folks --
20       SENATOR WOMACK:  Right.
21       REPRESENTATIVE LARVADAIN:  -- in Rapides have
22  to go to LSU.  So that's a community of interest.  Now,
23  with your hospital, with your district, it goes from
24  East Baton Rouge all the way to Caddo, which is probably
25  about a two-hour ride, give or take, because I take that

Page 23

1   ride a lot going up to Meyer in Alexandria.  There was a
2   -- a different map that was heard in the Senate, but it
3   was a much cleaner map.  That map didn't get out of the
4   Senate, and it didn't get out of this area.  The map I'm
5   talking about is Ed Price's.  I think Ed Price had a
6   map.
7        FEMALE SPEAKER 1:  It was Price and Marcelle.
8        REPRESENTATIVE LARVADAIN:  Price-Marcelle map.
9   I'm sorry.  Did you get a chance to look at that map?
10  That map was heard on the Senate side.
11       SENATOR WOMACK:  Yes.
12       REPRESENTATIVE LARVADAIN:  Those districts
13  were a lot closer, a lot compact, but you're presenting
14  this district.  When you look at District 4, that's --
15  that is the district for the Speaker, Mr. Johnson; is
16  that correct?
17       SENATOR WOMACK:  Right.
18       REPRESENTATIVE LARVADAIN:  Does he have a
19  problem with his district being cut in -- in half like
20  that?  If you look at Winnfield, if he's in Winnfield
21  and he goes to Sabine, he has to go through
22  Natchitoches, which is not (inaudible 0:26:54) district.
23  Yet you think he has a problem with that?
24       SENATOR WOMACK:  No.  It looks like the
25  shortest route would be through Natchitoches.

Page 24

1        REPRESENTATIVE LARVADAIN:  But his prior map
2   was just one continuous area.  Now he has to leave one
3   district and go to another area, which is -- which he'll
4   be representing; is that correct?
5        SENATOR WOMACK:  Yeah, that.
6        REPRESENTATIVE LARVADAIN:  Okay.  Have you had
7   a chance to talk to -- to Congressman Johnson about this
8   map?
9        SENATOR WOMACK:  Not directly to him.
10       REPRESENTATIVE LARVADAIN:  Okay.  Is he
11  content with this map?
12       SENATOR WOMACK:  He's content.
13       REPRESENTATIVE LARVADAIN:  Even though it
14  slashes right through the middle of his district.
15       SENATOR WOMACK:  Yeah.  It -- it -- it --
16       REPRESENTATIVE LARVADAIN:  Now, Ed Price and
17  Denise Marcelle.  Let's go to District 5.  Let's go the
18  District 5 area.  Their map, they were looking at
19  District 5, which is the eastern part of Louisiana.  And
20  their map, they had that as the minority --
21  majority-minority district, I think, but they kept that
22  map so you can help your friend, Congressman Letlow; is
23  that correct?
24       SENATOR WOMACK:  Yes.  Yes, sir.
25       REPRESENTATIVE LARVADAIN:  So this is more of

Page 25

1   a political map.
2        SENATOR WOMACK:  Exactly.
3        REPRESENTATIVE LARVADAIN:  So our objective is
4   to get two majority-minority districts, but you have
5   presented us a political map; isn't that correct?
6        SENATOR WOMACK:  The influence is political.
7   I created -- we created two minority Black districts.
8        REPRESENTATIVE LARVADAIN:  But you also said
9   earlier that you were trying to do your best to protect
10  Congressman Scalise.
11       SENATOR WOMACK:  That was -- that -- that --
12  Scalise, as well as Johnson, Letlow, which is my
13  representative, and Higgins.
14       REPRESENTATIVE LARVADAIN:  You were trying to
15  protect your Republican team.
16       SENATOR WOMACK:  That was a primary driver.
17       REPRESENTATIVE LARVADAIN:  So this is a
18  political matter.  But the judge wanted you to make sure
19  that you presented two --
20       SENATOR WOMACK:  Two Black.
21       REPRESENTATIVE LARVADAIN:  --
22  majority-minority districts.
23       SENATOR WOMACK:  And I've done that.
24       REPRESENTATIVE LARVADAIN:  I don't know if
25  you've done -- you've -- you've made a effort at it, but

7 (Pages 22 to 25)

Page 26

1  there was another map.  There's a lot cleaner map
2  because the map that I see goes from Shreveport to Baton
3  Rouge, which you're just zigzagging.  And you picked up
4  Alexandria, you picked up Natchitoches, you picked up
5  DeSoto, but it's more of a political map.  The map that
6  the Democrats pursued, it was a map that we agreed on
7  two majority-minority districts, and this is more of a
8  political map.
9      SENATOR WOMACK:  Yeah, I know.
10      REPRESENTATIVE LARVADAIN:  Okay.  Thank you.
11      SENATOR WOMACK:  Thank you.
12      CHAIRMAN BEAULLIEU:  Senator Womack, why are
13  we here today?  What -- what brought us all to this
14  special session as it -- as it relates to, you know,
15  what we're discussing here today?
16      SENATOR WOMACK:  The middle courts of the
17  district courts brought us here from the Middle
18  District, and said, "Draw a map, or I'll draw a map."
19      CHAIRMAN BEAULLIEU:  Okay.
20      SENATOR WOMACK:  So that's what we've done.
21      CHAIRMAN BEAULLIEU:  And -- and were you --
22  does -- does this map achieve that middle court's
23  orders?
24      SENATOR WOMACK:  It does.
25      CHAIRMAN BEAULLIEU:  Okay.  When you were

Page 27

1  drawing the maps, you also took into consideration
2  incumbency, correct?
3      SENATOR WOMACK:  Right.
4      CHAIRMAN BEAULLIEU:  Okay.  To protect not
5  just our state, but our national interest as well.
6      SENATOR WOMACK:  Our national.
7      CHAIRMAN BEAULLIEU:  Is that correct?
8      SENATOR WOMACK:  Right.
9      CHAIRMAN BEAULLIEU:  This is -- this is bigger
10  than just us.
11      SENATOR WOMACK:  It's bigger than just us, and
12  Louisiana has never been sitting in the poor position
13  that they are today.
14      CHAIRMAN BEAULLIEU:  What -- what position
15  does Congressman Mike Johnson have in the United States
16  House of Representatives?
17      SENATOR WOMACK:  He's a speaker of the house.
18      CHAIRMAN BEAULLIEU:  Okay.  And what about
19  Congressman Steve Scalise?
20      SENATOR WOMACK:  Majority leader of the house.
21      CHAIRMAN BEAULLIEU:  Okay.  So if we've been
22  able to accomplish what the judge has ordered through
23  your map, and also been able to protect the political
24  interest, that is kosher, correct?
25      SENATOR WOMACK:  That's exactly.

Page 28

1      CHAIRMAN BEAULLIEU:  Okay.  That's what --
2  that's what I was thinking.  That's what I've learned
3  through the process, and I just wanted to make sure that
4  your map achieved that.  Yeah.
5      SENATOR WOMACK:  Yes, sir, Mr. Chairman.
6      CHAIRMAN BEAULLIEU:  All right.  Senator, the
7  board's cleared.  We're going to go ahead, if you don't
8  mind, and -- and take up the amendments right now.  Bear
9  with me for two seconds.  Senator Marcelle, and -- and
10  -- excuse me.  Sorry about that promotion,
11  Representative Marcelle.
12      REPRESENTATIVE MARCELLE:  That's okay.
13      CHAIRMAN BEAULLIEU:  And -- and Representative
14  Farnum both have amendments.
15      FEMALE SPEAKER 2:  Here.  This card's in
16  Marcelle's name.
17      CHAIRMAN BEAULLIEU:  Okay.  Hold that -- hold
18  that for me.  Bear with me.  So the first amendment is
19  how -- is Amendment 68.  That is Amendment 60.  Give me
20  a second while it's loading.  What amendment is 68?
21      MS. LOWERY:  That is the one offered by
22  Representative Farnum.
23      CHAIRMAN BEAULLIEU:  Representative Farnum,
24  we're going to take up your amendment first.
25  Representative Farnum, on your amendment.

Page 29

1      REPRESENTATIVE FARNUM:  Thank you, Mr.
2  Speaker.  So I offer -- does -- do we need to read it
3  in?
4      MS. LOWERY:  Certainly.
5      CHAIRMAN BEAULLIEU:  Ms. Lowery, please
6  read-in the amendment.
7      MS. LOWERY:  Thank you so much, Mr. Chairman.
8  Representative Farnum is offering up HCASBA-36268.  And
9  on page 1, it's going to delete lines 13 through 17, and
10  delete pages 2 through 6, and we'll be inserting a new
11  district configuration for the congressional districts
12  for the State of Louisiana.  This amendment is available
13  online and is available in your packets, members, and
14  contains maps and statistics relevant to the plan.
15      CHAIRMAN BEAULLIEU:  Thank you, Ms. Lowery.
16  Representative Farnum, on your amendment.
17      REPRESENTATIVE FARNUM:  Thank you, Mr.
18  Chairman.  So in the -- in the beginning of this
19  process, me and my colleagues from Southwest Louisiana
20  set out to accomplish making Calcasieu whole.  In the
21  history of -- of our -- our great parish, we've always
22  had one congressman that represented us.  And -- and --
23  and with the current map as presented from Senator
24  Womack, it -- it split Calcasieu Parish basically in
25  half in population.  And -- and with the community of

8 (Pages 26 to 29)

Page 30

1  interest in our industrial sector down there, we thought
2  that was not just for our area.
3        We -- we have -- we're -- we're probably one
4  of the top two or three economic engines for the State
5  of Louisiana with our oil and gas industries and our LNG
6  industry that's going on in -- in our region.  So we
7  thought it would be -- be great to make an effort to get
8  back to one congressman.
9        We have issues with -- with all sorts of
10 natural disasters in our area, and we have a hard enough
11 time getting -- getting the -- the adequate supplies and
12 -- and resources to our region in those situations with
13 one congressman, and I -- I can imagine it might be a
14 little more difficult with two.  So in that effort, we
15 set out to make -- make ourselves whole.  And in the
16 process, a lot of folks in -- in other areas wanted to
17 come along and -- and get -- be a part of this to -- to
18 correct little -- little tweaks in their area.
19        So last night a group of senators and
20 representatives got together.  I wasn't able to attend
21 that meeting.  So this is the product of that meeting.
22 At the end of the day, we -- we accomplished a few
23 things.  We -- we kept the, the basic intent of what
24 Senator Womack's bill is in place, and with a -- a --
25 kind of a counterclockwise shift that would -- but the

Page 31

1  process has to happen that way to increase some areas in
2  -- in Northeast Louisiana to help that district to make
3  Congressman Johnson come down some.
4        That inherently makes Congressman Higgins have
5  to shift to the east, and so on and so forth.  In the
6  process, we increase the -- the -- both the Black
7  population and the voting population of both of the
8  minority districts by almost a percent each in most
9  cases.
10       So it helps -- it helps the -- the workability
11 of the two new districts and -- and what they're trying
12 to accomplish, and it accomplished the -- the -- making
13 more -- more parishes whole.  I think we -- we only --
14 we're down to 15 split parishes with this map, and so I
15 think we've accomplished several things in the process.
16 And -- and with that, we can answer questions or ask for
17 your passage.
18       CHAIRMAN BEAULLIEU:  Representative Farnum,
19 does your -- does your amendment meet the judge's order?
20       REPRESENTATIVE FARNUM:  Absolutely.
21       CHAIRMAN BEAULLIEU:  Okay.  And so we have two
22 majority-minority districts, or two Black districts that
23 have a voting -- a majority voting age population over
24 50 percent?
25       REPRESENTATIVE FARNUM:  I -- I think it

Page 32

1  accomplished that, but it -- it actually increases the
2  -- the viability of the two minority districts.
3        CHAIRMAN BEAULLIEU:  Okay.  And what about
4  incumbency, are the -- the current members protected?
5        REPRESENTATIVE FARNUM:  Protects all the
6  current incumbencies.  I think it -- it -- it meets all
7  the -- all the checkboxes.
8        CHAIRMAN BEAULLIEU:  Okay.  Thank you.
9  Representative Marcelle.  Again, give me a second,
10 Representative Marcelle, because I'm going to get
11 Representative Farnum added back on.  Bear with me.
12       (Pause.)
13       REPRESENTATIVE MARCELLE:  You ready?  Thank
14 you.  Representative Farnum.
15       REPRESENTATIVE FARNUM:  Yes, ma'am.
16       REPRESENTATIVE MARCELLE:  You said that some
17 senators and some representatives met last night, but
18 you weren't able to be there.  Is that -- is that what
19 you said?
20       REPRESENTATIVE FARNUM:  That's correct.
21       REPRESENTATIVE MARCELLE:  So whose map is
22 this?
23       REPRESENTATIVE FARNUM:  This is Senator
24 Womack's map.
25       REPRESENTATIVE MARCELLE:  No, no, no, no.  The

Page 33

1  amendment.
2        REPRESENTATIVE FARNUM:  The amendment.  I'm
3  the author because --
4        REPRESENTATIVE MARCELLE:  Because if senator
5  -- I don't mean --
6        REPRESENTATIVE FARNUM:  -- it has -- it has to
7  have an author from this committee, and -- and I'm --
8        REPRESENTATIVE MARCELLE:  Okay.  It has to
9  have an author from this committee, so that's why.  Who
10 asked you to carry it is my question.
11       REPRESENTATIVE FARNUM:  I started it myself
12 without anybody asking me.  Now, I -- I allowed input
13 from other members of this body to -- to better my
14 amendment because it -- mine was -- mine was from my
15 region's perspective.
16       REPRESENTATIVE MARCELLE:  It's Calcasieu.
17       REPRESENTATIVE FARNUM:  Calcasieu's
18 perspective.
19       REPRESENTATIVE MARCELLE:  And so let me -- let
20 me see -- let -- let me walk down this really quick.  In
21 Calcasieu, you said that you wanted to make your parish
22 whole.  Did I understand that correctly?
23       REPRESENTATIVE FARNUM:  Correct.
24       REPRESENTATIVE MARCELLE:  So instead of having
25 two congressional representatives, you wanted to make

9  (Pages 30 to 33)

Page 34

1   sure you were whole, and you just wanted one; is that
2   accurate?
3          REPRESENTATIVE FARNUM:  Correct.  That's
4   correct.
5          REPRESENTATIVE MARCELLE:  Okay.  But over in
6   East Baton Rouge, if I'm reading it correctly, we now
7   have three congressional districts; is that accurate?
8          REPRESENTATIVE FARNUM:  That's accurate.
9          REPRESENTATIVE MARCELLE:  That's accurate.
10  Okay.  Good.  So on the one hand, you want to make
11  yourself whole, and you want to split us three ways in
12  East Baton Rouge Parish.
13         REPRESENTATIVE FARNUM:  That's the net result.
14         REPRESENTATIVE MARCELLE:  That's the net
15  result.  Okay.  Got it.  So are you aware of the
16  population shift in Louisiana?  You know, we had these
17  hearings a year and a half ago, two, whatever.  It was
18  two years ago.  Whenever it was.  Are you aware --
19  because I think you were on this committee.
20         REPRESENTATIVE FARNUM:  Yes, ma'am.
21         REPRESENTATIVE MARCELLE:  Okay.  So are you
22  aware of the growth, the largest growth in the state?
23         REPRESENTATIVE FARNUM:  Yes.
24         REPRESENTATIVE MARCELLE:  Where was that?
25         REPRESENTATIVE FARNUM:  Northshore.

Page 35

1          REPRESENTATIVE MARCELLE:  Where?  Northshore.
2          REPRESENTATIVE FARNUM:  Northshore.
3          REPRESENTATIVE MARCELLE:  And where was Baton
4   Rouge in that?
5          REPRESENTATIVE FARNUM:  It's probably middle
6   of the road.
7          REPRESENTATIVE MARCELLE:  Middle of the road.
8          REPRESENTATIVE FARNUM:  Yeah.
9          REPRESENTATIVE MARCELLE:  Would you say that
10  Baton Rouge had more growth than Calcasieu?
11         REPRESENTATIVE FARNUM:  I don't know if that's
12  accurate.  I -- I couldn't speak to that.
13         REPRESENTATIVE MARCELLE:  They did.  My -- my
14  point to you is that there was growth in -- in Baton
15  Rouge.  They lost population in North Louisiana.  Is
16  that accurate?
17         REPRESENTATIVE FARNUM:  That's correct.
18         REPRESENTATIVE MARCELLE:  They did lose
19  population, and I'm just trying to --
20         REPRESENTATIVE FARNUM:  That's correct.
21         REPRESENTATIVE MARCELLE:  -- refresh my
22  memory.  In North Louisiana, so, but you wanted to make
23  sure that North Louisiana -- because it looks like --
24  I'm looking at his map and your map, and it looks like
25  you shift Letlow back over --

Page 36

1          REPRESENTATIVE FARNUM:  That's correct.
2          REPRESENTATIVE MARCELLE:  -- and she picked up
3   some more, right?
4          REPRESENTATIVE FARNUM:  That's correct.
5          REPRESENTATIVE MARCELLE:  His map -- Womack's
6   map didn't do that.  So you added back Lincoln, Jackson,
7   and you made her whole in Ouachita.
8          REPRESENTATIVE FARNUM:  Ouachita.
9          REPRESENTATIVE MARCELLE:  Ouachita.  Ouachita.
10         REPRESENTATIVE FARNUM:  Ouachita whole.
11         REPRESENTATIVE MARCELLE:  Ouachita, right?
12         REPRESENTATIVE FARNUM:  Correct.
13         REPRESENTATIVE MARCELLE:  Is that right?
14  Okay.
15         REPRESENTATIVE FARNUM:  That's correct.
16         REPRESENTATIVE MARCELLE:  I -- I want to make
17  sure I -- I got that straight.  So it -- are you aware
18  that this map that you're proposing has less compact
19  overall than Womack's map or the enacting map?  Are you
20  aware of that?  It has less compactness.
21         REPRESENTATIVE FARNUM:  No.
22         REPRESENTATIVE MARCELLE:  I know you didn't
23  have a whole lot of time to study it because it was last
24  minute.
25         REPRESENTATIVE FARNUM:  Yeah.  I don't know if

Page 37

1   I agree with that.
2          REPRESENTATIVE MARCELLE:  You don't know if
3   you agree with it.
4          REPRESENTATIVE FARNUM:  No.
5          REPRESENTATIVE MARCELLE:  Okay.  Well, it
6   does.  In fact, it's the lowest compactness of all of
7   the maps.  That's A.  The district level in Congressional
8   District 6 is less compact than Womack's map, and the
9   Congressional District 2 is half as compact as Womack's
10  map.  Are you aware of that?
11         REPRESENTATIVE FARNUM:  So what I do know is
12  that the -- BVAP increased.
13         REPRESENTATIVE MARCELLE:  I'm not asking about
14  the BVAP.
15         REPRESENTATIVE FARNUM:  The population
16  increased, and it helps those -- the electability of
17  those minority candidates in those areas.
18         REPRESENTATIVE MARCELLE:  I -- I guess that's
19  your opinion, but what I'm asking you for right now is
20  facts in -- in -- in -- in terms of the compactness of
21  the districts.  So let me go to another one.  Are you
22  aware that it splits more municipalities than Womack's
23  and almost twice as many as the -- the bill that I
24  brought?
25         REPRESENTATIVE FARNUM:  I'm not familiar --

10  (Pages  34  to  37)

Page 38

1      REPRESENTATIVE MARCELLE:  Are you aware of
2  that?
3      REPRESENTATIVE FARNUM:  I'm not familiar with
4  your bill.
5      REPRESENTATIVE MARCELLE:  Okay.  Was HB5 up?
6      REPRESENTATIVE FARNUM:  We didn't -- we didn't
7  have a chance to hear that.
8      REPRESENTATIVE MARCELLE:  I presented it in
9  here.  You were -- you were here.
10      REPRESENTATIVE FARNUM:  You -- you voluntarily
11  withdrew it.
12      REPRESENTATIVE MARCELLE:  Pardon me?
13      REPRESENTATIVE FARNUM:  You voluntarily
14  withdrew it.
15      REPRESENTATIVE MARCELLE:  But I presented it.
16  But you had an opportunity to get it on your laptop and
17  see it like we get all bills, right, because you're on
18  this committee.
19      REPRESENTATIVE FARNUM:  Yes.
20      REPRESENTATIVE MARCELLE:  Okay.  So this map,
21  the -- well, not map, the amendments.  If these
22  amendments get on this bill, it will split more
23  municipalities than Womack's.  The deviation on these
24  amendments that go to this map is a 129, which is both
25  higher than Womack's bill, which is almost twice as much

Page 39

1  as the enacted map at 65.  I -- I think what I'm saying
2  is there were more than one goal to meet when we were
3  told to draw these maps.
4      It was more than one thing that we had to
5  consider: compactness, communities of interest, not
6  splitting municipalities.  And it appears that this map
7  -- or these amendments, if we were to vote on this, does
8  far more harm than good.
9      REPRESENTATIVE FARNUM:  So -- so it's my
10  opinion that -- that we -- we addressed all of the
11  issues that we were set out to do.  We've accomplished
12  all the goals that we were mandated by the Court to do.
13  We have the -- the two minority districts were very,
14  very lightly touched, and -- and mostly White population
15  was pulled out of those districts.
16      REPRESENTATIVE MARCELLE:  Well, let -- let me
17  just say this, Representative Farnum, with all due
18  respect.  If you were just trying to make Calcasieu
19  whole and that was your parish and you were trying to do
20  that, I might have a little bit more respect for this
21  amendment.  But since you are trying to make yourself
22  whole, and East Baton Rouge Parish split between three
23  congressional districts, that would mean that for the
24  public that's watching -- because you can't see the map,
25  or you may not be able to understand it.

Page 40

1      That would mean that Clay Higgins would
2  represent the people on Lakeshore Drive in Baton Rouge.
3  That's what that would mean.
4      REPRESENTATIVE FARNUM:  So -- so in -- in my
5  area, Clay Higgins represents my house, and if I drive
6  10 houses down the road, Congressman Johnson represents
7  those people --
8      REPRESENTATIVE MARCELLE:  I guess --
9      REPRESENTATIVE FARNUM:  -- 10 houses away from
10  my house.
11      REPRESENTATIVE MARCELLE:  I imagine because
12  you're on the line.  But what I'm saying is that's a far
13  distance from where his district starts, to bring him
14  down to Baton Rouge, and I'm just trying to -- it's
15  unclear to me what the motivation of offering this
16  amendment is, other than political reasons.  It -- it --
17  it certainly doesn't help us in Baton Rouge.
18      REPRESENTATIVE FARNUM:  Well, all -- all I can
19  say is my constituents at home expressed a strong desire
20  to remain whole.  Now, whether we were in District 3 --
21      REPRESENTATIVE MARCELLE:  So do mine.
22      REPRESENTATIVE FARNUM:  -- or District 4 -- I
23  -- I can appreciate that.  I really can appreciate that,
24  and that's why we all get a vote here.  And so it's --
25  this is -- this is my attempt to -- to help my citizens

Page 41

1  in my area.
2      REPRESENTATIVE MARCELLE:  I get that.
3      REPRESENTATIVE FARNUM:  And in the process, I
4  included -- a lot of other people from a lot of other
5  regions were included in the conversation.  I can't
6  speak to who all was included that night because I
7  wasn't able to attend that.  So it -- it was people from
8  New Orleans.  I think Senator Womack was in the room
9  when -- when it was discussed, and -- and feel free to
10  jump in any time.
11      SENATOR WOMACK:  Okay.  I -- I was in that
12  meeting, and -- and the -- back to the BVAP.  And in the
13  districts, District 2 and District 6 went up -- up as
14  far as Black voter age population.  Senator Gary Carter
15  was in the room with us looking at this and -- and
16  working on this to -- to try to come up with the best
17  outcome.  We did --
18      REPRESENTATIVE MARCELLE:  That would be --
19      SENATOR WOMACK:  -- include --
20      REPRESENTATIVE MARCELLE:  I'm sorry.  That --
21  you said Senator Carter.
22      SENATOR WOMACK:  Carter.  Gary Carter.
23      REPRESENTATIVE MARCELLE:  And that we be
24  Congressional District 2, right?
25      SENATOR WOMACK:  He was in the room.

11  (Pages 38 to 41)

Page 42

1    REPRESENTATIVE MARCELLE:  Okay.
2    SENATOR WOMACK:  He was in the room, and --
3  and -- and looking at these districts with us.  This
4  wasn't -- this wasn't -- this was several senators
5  trying to work to -- to try to accomplish, I guess, a
6  lot of maybe concerns from different ones, but I know
7  Red River Parish was put in.
8    REPRESENTATIVE MARCELLE:  Well, the -- the
9  only one that could have been concerned about
10  Congressional District 2 would be Congressman Troy
11  Carter; is that accurate?  Who -- did he have a concern
12  about your map?
13    SENATOR WOMACK:  I -- I would think that
14  Congressman -- Senator Carter would -- would be speaking
15  in -- in that capacity, as to watching the -- the -- the
16  VAP, the -- the -- the -- the voting age population.  He
17  was watching that.  He was working with us to try to
18  best fit everything that we -- that -- that people was
19  wanting and -- and -- and concerns from each side that
20  we're asking for and -- and to still maintain the -- the
21  fact that -- that we -- we got a map to draw.  And we
22  had to draw this map to get --
23    REPRESENTATIVE MARCELLE:  So let me -- let me
24  ask you, Senator.  Was somebody from Baton Rouge asking
25  to be split three ways in that room?  Because I want to

Page 43

1  know who that was.
2    SENATOR WOMACK:  I -- I -- I don't know where
3  these people -- all the people live.
4    REPRESENTATIVE MARCELLE:  Don't know where the
5  --
6    SENATOR WOMACK:  I -- I think Carter lives
7  back toward New Orleans.
8    REPRESENTATIVE MARCELLE:  Yeah.  That's what I
9  said.
10    SENATOR WOMACK:  Okay.  All right.
11    REPRESENTATIVE MARCELLE:  Right.  That's what
12  I said.  And this is --
13    SENATOR WOMACK:  And -- and -- and that's --
14  and I can't say he's been on the phone, but he was in
15  the room and worked with us on this.
16    REPRESENTATIVE MARCELLE:  Let -- let -- let me
17  say this, and I'll -- I'll leave it alone at this.  I --
18  I respect you, Senator Womack.  That's why when I
19  proposed a cleanup amendment to your bill, I came over
20  to talk to you about exactly what I was going to propose
21  on your bill.  I think it's disingenuous that we sit
22  here, and we drop maps that changes Baton Rouge because
23  some senators got in a room and decided to change my
24  district.  This is what I represent.  I -- I -- I don't
25  mean -- I'm -- and you --

Page 44

1    SENATOR WOMACK:  I'm sorry.
2    REPRESENTATIVE MARCELLE:  It's not your
3  amendment.
4    SENATOR WOMACK:  Yeah.  I'm sorry.
5    REPRESENTATIVE MARCELLE:  I'm just making a
6  statement.
7    SENATOR WOMACK:  Yes, ma'am.
8    REPRESENTATIVE MARCELLE:  And I'm not voting
9  for any map that has Baton Rouge split three ways
10  because that's insane.  It's insane.  And so for
11  whatever motive that they had, I believe that they threw
12  a monkey wrench in a bill that I think would have gotten
13  out of here without any opposition, which is your bill.
14  So I don't -- I don't know if you realize it --
15    SENATOR WOMACK:  Yeah.  Yeah.
16    REPRESENTATIVE MARCELLE:  -- but, I mean, I
17  don't think what they have done has helped your bill.
18  And if Farnum wanted to protect Calcasieu, that's
19  Calcasieu.  It ain't got nothing to do with Baton Rouge.
20  So he should have put amendment on this bill that
21  protects Calcasieu, not Baton Rouge.  Not change
22  anything in Baton Rouge.  And that's just my honest
23  opinion.  So I -- I -- I could not -- so I would object.
24    REPRESENTATIVE MARCELLE:  I -- I -- I could
25  not -- so I would object to this amendment being added.

Page 45

1  And I want everybody in Baton Rouge who's listening to
2  please call your senators and the people that represent
3  you and tell them we do not want to be split in three
4  ways in Baton Rouge.  Thank you.
5    SENATOR WOMACK:  Thank you.  Just for
6  correction, Senator Fields was in the room with us.  So
7  that -- that -- I appreciate Senator Kathy reminding me
8  of that.  He was in the room as well.
9    CHAIRMAN BEAULLIEU:  Thank you.  Ms. --
10  Representative Marcelle.  Representative Johnson.
11    REPRESENTATIVE JOHNSON:  Thank you, Mr.
12  Chairman.  Senator Womack, you represent Senate District
13  -- what's the number?
14    SENATOR WOMACK:  32.
15    REPRESENTATIVE JOHNSON:  32.  You're my
16  senator, and we share a lot of people, a lot of
17  population.  You have spent a lot of time on this map;
18  haven't you?
19    SENATOR WOMACK:  Yes, sir.
20    REPRESENTATIVE JOHNSON:  And you've tried to
21  do it as best you can and to make it legal and to make
22  it -- to adjust the population shift that has occurred
23  in our state; is that right?
24    SENATOR WOMACK:  That's right.
25    REPRESENTATIVE JOHNSON:  And it -- you're not

12  (Pages 42 to 45)

Page 46

1    doing it in a vacuum.  It's affecting people that are in
2    your district.
3         SENATOR WOMACK:  Yes, sir.  That's exactly
4    right.
5         REPRESENTATIVE JOHNSON:  And you are catching
6    a lot of heat because of that; aren't you?
7         SENATOR WOMACK:  That's right.
8         REPRESENTATIVE JOHNSON:  You take your
9    responsibility seriously; don't you?
10        SENATOR WOMACK:  I do.
11        REPRESENTATIVE JOHNSON:  Even when it hurts
12   you politically?
13        SENATOR WOMACK:  I do.
14        REPRESENTATIVE JOHNSON:  It hurts me
15   politically.
16        SENATOR WOMACK:  It does.  And I've
17   apologized.
18        REPRESENTATIVE JOHNSON:  I know you to be a
19   good and honest man who tries to do the right thing.
20   Does this map, as amended by -- by Representative
21   Farnum, my good friend from Southwest Louisiana -- well,
22   let me back up.  You believe that you have presented a
23   map that achieves all the necessary requirements and
24   provides us with the best instrument that you could come
25   up with?

Page 47

1         SENATOR WOMACK:  I do.
2         REPRESENTATIVE JOHNSON:  Do you believe that
3    Representative Farnum's amendment makes your bill
4    better?
5         SENATOR WOMACK:  Yes.
6         REPRESENTATIVE JOHNSON:  And would you support
7    your bill and your map and all of your time and all your
8    political pain that you and I are feeling if he presents
9    that amendment?
10        SENATOR WOMACK:  I do.  I would.
11        REPRESENTATIVE JOHNSON:  Okay.  Thank you,
12   Senator.
13        CHAIRMAN BEAULLIEU:  Thank you, Representative
14   Johnson.  Representative Newell.
15        REPRESENTATIVE NEWELL:  Thank you very much,
16   Mr. Chairman.  And Representative Farnum, I appreciate
17   your attempt at drawing this map.  But what I don't
18   appreciate -- and I do understand that this is a
19   compressed session.  And let me pause right quick and
20   say thank you to our staff because our staff is truly
21   overworked and underpaid.  So I -- I -- I -- I
22   understand how swiftly they work to try to get bills
23   prepared, amendments prepared so that we can have them
24   in order to get to committee.
25        But I -- with all of that, we also need to

Page 48

1    consider this -- this -- how critical it is for everyone
2    to have these -- this information and these documents in
3    time that those of us who are sitting right here and
4    about to vote on this -- and Senator, I'm sorry.  I'm
5    looking directly at you, but you -- you right there.
6    But this is -- no -- no slight against you.
7         This was not enough time to digest everything
8    that is in this amendment.  We went at ease at about
9    10:15, 10:20, whatever time it was in the 10 o'clock
10   hour.  We just got these maps before we sat down.  When
11   y'all saw us sit down and pick up these papers, that's
12   why we were shuffling because we just got these
13   amendments.  And I just needed to say this is too
14   sensitive of a issue, too sensitive of a topic to rush
15   through it and to be thrown a set of amendments.
16        There's probably more splits that we -- than
17   -- than what we're noticing.  Rep Marcelle saw Baton
18   Rouge because that's where she lives.  So that's what's
19   kind of jumped out at her first.  But I'm sure there's
20   some other members that might feel slighted.  There
21   might be some other populations or communities of
22   interest that feel that they are not being listened to
23   or heard.
24        We -- we -- I would have appreciated more time
25   to understand this since I was not given the benefit of

Page 49

1    being in the room.  Rep Farnum's name is on this map,
2    and he wasn't in the room.  You mentioned a lot of
3    senators in the room talking about something that
4    representatives are now sitting here trying to pour
5    over, talk about, discuss, and understand in a shorter
6    period of time.
7         Most of us can't really pay attention to the
8    discussions because we're looking and trying to
9    understand these 15 pages that we've just been given.
10   And I just needed to put that out there, Mr. Pro Tem,
11   that we should need to give each other more
12   consideration in our futures, that we give each other
13   more time to digest things that are this sensitive of a
14   issue and of a topic.  And I'm still not satisfied with
15   this map.  Thank you.
16        CHAIRMAN BEAULLIEU:  Thank you, Representative
17   Newell.  Representative Mark Wright.
18        REPRESENTATIVE WRIGHT:  Thank you, Mr. Pro
19   Tem.  I didn't expect to get called on so soon I thought
20   there'd be a line.  I -- I don't know.  I'm going to
21   upset somebody with this statement, but I'm just going
22   to say it.  I don't understand the idea of wanting just
23   one rep for a parish.
24        I think if you got two, you got two people to
25   go to.  I don't think congressmen sit there and say,

13  (Pages 46 to 49)

Page 50

1   "Oh, you know, St. Tammany, 50 percent is there.  I'm
2   only going to give it 25 percent of my time."  I think
3   if you got three, I think it's possible you get three
4   congressmen working for your parish.
5        So I don't know what that does, but I just --
6   I've been hearing this all week, heard it the last time
7   we did this, and to me, it's just not something I think
8   matters.  So I'll leave it there.
9        CHAIRMAN BEAULLIEU:  Thank you.
10  Representative Wright.  Representative Boyd.
11       REPRESENTATIVE BOYD:  Thank you, Mr. Speaker
12  Pro Tem.  I think what the problem is is that, again,
13  following up on Candace -- on Rep Newell, we just were
14  presented with these amendments and your map as a matter
15  of fact.
16       I do understand, Rep Marcelle, that Senator
17  Fields was in the room with this.  But that's Senator
18  Fields and Senator Carter in the room.  We were not
19  privy to that conversation, so we had no idea what we
20  were expecting to see the -- today.  And now we're
21  shuffling through pages and pages of a bill as well as
22  an amendment.
23       So I don't think anything was done
24  intentionally, but the frustration comes from us not
25  having this ourselves to actually digest it and meet

Page 51

1   with our people, our community of interest, and speak
2   about what's being presented.  So I think --
3        MALE SPEAKER 1:  (inaudible 0:57:16).
4        REPRESENTATIVE BOYD:  Exactly.  So I think
5   that that's the -- main issue here.  We know who was
6   in the -- well, we know now who were in the room when
7   this was being discussed, but we weren't, if that makes
8   any sense.  Thank you.
9        CHAIRMAN BEAULLIEU:  Thank you, Representative
10  Boyd.  Representative Larvadain.
11       REPRESENTATIVE LARVADAIN:  Thank you, Mr.
12  Chair.  Rep Farnum, thank you for making an effort to
13  try to comply with the judge's wishes, but I'm still
14  confused with your map.  In the great parish of Rapides,
15  we've divided three ways; is that correct?
16       REPRESENTATIVE FARNUM:  Two or three.
17       REPRESENTATIVE LARVADAIN:  I -- three -- I see
18  pink, green, and yellow in the great -- is that correct?
19   Am I seeing something right?  Yes.  Look at Rapides,
20  the real parish, where I'm from and Mike Johnson.
21  Rapides is -- on the east side, it's in the yellow,
22  which is Clay Higgins.  In the middle, it'll be in
23  District 6, and then it has a portion of District 5.  So
24  it's three in the -- is that correct?
25       REPRESENTATIVE FARNUM:  That's correct.

Page 52

1        REPRESENTATIVE LARVADAIN:  Okay.  But your
2   parish is only single; is that correct?
3        REPRESENTATIVE FARNUM:  That's correct.
4        REPRESENTATIVE LARVADAIN:  I think Avoyelles
5   Parish is -- is divided into two areas; is that correct?
6        REPRESENTATIVE FARNUM:  Excuse me?
7        REPRESENTATIVE LARVADAIN:  Avoyelles Parish is
8   divided in District 5 and 4.
9        MALE SPEAKER 1:  5 and 10.
10       REPRESENTATIVE LARVADAIN:  5 and --
11       REPRESENTATIVE FARNUM:  Yes, and they're --
12  they're --
13       REPRESENTATIVE LARVADAIN:  5 and 6?
14       REPRESENTATIVE FARNUM:  -- split in the
15  current map.
16       REPRESENTATIVE LARVADAIN:  Okay.  Now, we had
17  a better map that we think we proposed.  But once again,
18  with your map, you're dipping and diving, and you're
19  going through -- you've got a -- how many split
20  districts do you have in that area; do you know?
21       REPRESENTATIVE FARNUM:  How many what?
22       REPRESENTATIVE LARVADAIN:  Split parishes you
23  have in -- just in District 6.
24       REPRESENTATIVE FARNUM:  So in -- in this map,
25  there are 15 split parishes.  And -- and in the original

Page 53

1   map, if I counted it right, there's 32 split parishes.
2        REPRESENTATIVE LARVADAIN:  If I told you it
3   was 16 original, would that be correct?  Where would you
4   get 36?
5        REPRESENTATIVE FARNUM:  That's not the count
6   that I came up -- but I -- I don't know.  I might be
7   wrong, but I -- I think the asterisk --
8        CHAIRMAN BEAULLIEU:  16.
9        REPRESENTATIVE FARNUM:  -- the asterisk beside
10  the parishes mean that they're split.
11       REPRESENTATIVE LARVADAIN:  Okay.  Let -- let
12  me correct then --
13       REPRESENTATIVE FARNUM:  There's 32 of them.
14       REPRESENTATIVE LARVADAIN:  Yeah.  And -- and
15  Senator Womack's map, it was 16 split; is that correct?
16       REPRESENTATIVE FARNUM:  I don't believe that's
17  correct.  I think there's 32 in the original map.  Help
18  -- help me with that Ms. Lowery.
19       REPRESENTATIVE LARVADAIN:  I think it's 16.
20       MS. LOWERY:  Members, I think what
21  Representative Farnum is counting the number of
22  asterisks, but the asterisk in front of a parish on the
23  report -- on the split parish report means it's split,
24  but there are 16 split parishes --
25       REPRESENTATIVE FARNUM:  Okay.

14  (Pages 50 to 53)

Page 54

1    MS. LOWERY:  -- in the plan, so.
2        REPRESENTATIVE FARNUM:  Okay.  So we reduced
3    that by one.
4        REPRESENTATIVE LARVADAIN:  Those 15?
5        REPRESENTATIVE FARNUM:  I think.  If I -- if
6    I'm adding right.
7        MS. LOWERY:  15 in his original --
8        REPRESENTATIVE FARNUM:  15 in the original?
9        MS. LOWERY:  -- and 16 in your amendment,
10   Representative.
11       REPRESENTATIVE FARNUM:  Okay.  So we increase
12   it by one.
13       REPRESENTATIVE LARVADAIN:  Yeah.  You added
14   one to it, okay.  What about -- where does Congressman
15   Graves live?  Is he in District 6 or he's in District 5?
16       REPRESENTATIVE FARNUM:  I have no idea where
17   Congressman Graves lives.
18       FEMALE SPEAKER 3:  I think Baton Rouge.
19       REPRESENTATIVE LARVADAIN:  I think he's in --
20   I think he's in East Baton Rouge Parish.
21       REPRESENTATIVE FARNUM:  I -- I have no --
22       REPRESENTATIVE LARVADAIN:  If I told you --
23       REPRESENTATIVE FARNUM:  -- no idea where he
24   lives.
25       REPRESENTATIVE LARVADAIN:  Would he -- would

Page 55

1    he be a part of District 5, that district, or you don't
2    know?
3        REPRESENTATIVE FARNUM:  I don't know.  I don't
4    know where any of the congressmen live other than the
5    regions that they come from.
6        REPRESENTATIVE LARVADAIN:  Okay.  Okay.  Did
7    you get a chance to talk to Congressman Mike Johnson
8    about his district?
9        REPRESENTATIVE FARNUM:  Huh?  I have not.  I
10   talked to Congressman Higgins about his.
11       REPRESENTATIVE LARVADAIN:  Okay.  And what did
12   Congressman Higgins say about his district?
13       REPRESENTATIVE FARNUM:  He -- he -- he thought
14   it was a good idea that we were okay to be split.  I
15   disagreed with him.  Very -- very civil conversation.
16   He was disappointed that we would rather push -- push to
17   the -- a single member.  But, you know, I'm -- I'm
18   listening to my constituents, and that's -- that's who I
19   have to answer to.
20       REPRESENTATIVE LARVADAIN:  Does Congressman
21   Higgins have -- have a problem with going all the way
22   from Cameron to Baton Rouge Parish?  Is that ideal for
23   him?
24       REPRESENTATIVE FARNUM:  That wasn't an issue
25   that he -- that he expressed to me.

Page 56

1        REPRESENTATIVE LARVADAIN:  Okay.
2        REPRESENTATIVE FARNUM:  He -- he -- he would
3    like to retain part of Calcasieu if possible.  And --
4        REPRESENTATIVE LARVADAIN:  Blame him.  That's
5    a big city.
6        REPRESENTATIVE FARNUM:  -- and we -- we
7    disagreed with that.
8        REPRESENTATIVE LARVADAIN:  Yeah, I don't -- I
9    don't blame him.  I know he wants to control --
10   represent Lake Charles.
11       REPRESENTATIVE FARNUM:  And I'm -- I'm
12   perfectly fine having Congressman Higgins or Congressman
13   Johnson.  I like both of them.  We just want to have
14   one.
15       REPRESENTATIVE LARVADAIN:  And it's not
16   Representative -- Congressman Higgins.  It's -- you'd
17   rather have --
18       REPRESENTATIVE FARNUM:  No.  It's -- it's --
19       REPRESENTATIVE LARVADAIN:  Yeah.
20       REPRESENTATIVE FARNUM:  That's -- that's the
21   rotation that's possible.
22       REPRESENTATIVE LARVADAIN:  Okay.
23       REPRESENTATIVE FARNUM:  Is -- is a
24   counterclockwise rotation is the only one that's
25   possible.

Page 57

1        REPRESENTATIVE LARVADAIN:  And I know with
2    Congressman Mike Johnson, the Caddo Parish, they wanted
3    to make sure Bossier -- they wanted to make sure
4    Barksdale and Fort Johnson were in the same district; is
5    that correct?
6        REPRESENTATIVE FARNUM:  I believe so.
7        REPRESENTATIVE LARVADAIN:  And this map does
8    that?
9        REPRESENTATIVE FARNUM:  I believe so.
10       REPRESENTATIVE LARVADAIN:  Now, what about
11   Congressman Scalise?  Did he have a problem with his
12   district?
13       REPRESENTATIVE FARNUM:  I don't think -- I
14   haven't spoke with him.  I haven't spoke with any of his
15   staff.  I couldn't answer that question.
16       REPRESENTATIVE LARVADAIN:  What about
17   Congressman Letlow?  Does she have a problem with her
18   district?
19       REPRESENTATIVE FARNUM:  I think she very happy
20   with the fact that she made Ouachita whole, which was
21   one of her desires, and gained more northern population
22   to -- for -- for her district.  People that she's
23   represented in the past, she wanted to retain those
24   people.
25       REPRESENTATIVE LARVADAIN:  And you had a good

15  (Pages 54 to 57)

Page 58

1  idea of what Congressman Carter wanted in District --
2  District 2?
3        REPRESENTATIVE FARNUM:  I have no idea.
4        REPRESENTATIVE LARVADAIN:  Okay.  And let me
5  make sure in -- in District 6, the new district, the VAP
6  -- the VAP map is 54.342; is that correct?  I'm looking
7  at it.
8        REPRESENTATIVE FARNUM:  I'll take your word
9  for it.  It -- they went up.
10       REPRESENTATIVE LARVADAIN:  Yeah.  BVAP.  Okay.
11  And we know that that district will perform at that
12  capacity?
13       REPRESENTATIVE FARNUM:  We feel like it'll
14  perform better because the population -- the -- the BVAP
15  has increased.
16       REPRESENTATIVE LARVADAIN:  And what about the
17  BVAP for District 2 at 51.7??  Will that increase?
18       REPRESENTATIVE FARNUM:  It -- it increased as
19  well.
20       REPRESENTATIVE LARVADAIN:  So your -- your map
21  will produce two majority-minority districts; is that
22  correct?
23       REPRESENTATIVE FARNUM:  That's correct.
24       REPRESENTATIVE LARVADAIN:  But you've got
25  several districts in District 6 where you have my

Page 59

1  district, Rapides, is split three ways, and also East
2  Baton Rouge Parish is split three ways.
3        REPRESENTATIVE FARNUM:  I -- I think in order
4  to accomplish the shift in population, I think some of
5  the white population was extracted from -- from that
6  minority district in order to increase their -- their
7  BVAP.
8        REPRESENTATIVE LARVADAIN:  Okay.  That's it.
9  Thank you.
10       REPRESENTATIVE FARNUM:  Thank you.
11       CHAIRMAN BEAULLIEU:  Thank you, Representative
12  Larvadain.  Representative Marcelle.
13       REPRESENTATIVE MARCELLE:  Thank you.  Let --
14  let -- let me start out by saying I'm not personally
15  attacking any senator, particularly Gary Carter, who I
16  like and have served with.  I believe that you said that
17  Senator Carter was in the room.  And I believe that you
18  said that he probably was protecting the interest or
19  speaking on behalf of Senator -- I mean, Congressman
20  Carter.
21       So I -- I asked a question was anybody in
22  there from Baton Rouge?  What I'm being told by my
23  senator or one of my senators, which is Cleo Fields,
24  that he was handed the finished product - he did not
25  work on the product - after the product was finished.

Page 60

1  That's what I was being told.
2        That's A. And B, we do have another senator in
3  Baton Rouge.  Her name is Senator Regina Barrow.  She is
4  the Pro Tem.  So I'm wondering why she wasn't in the
5  room.  We're a metropolitan area.  So I want to clear
6  that up.  I guess she wasn't invited to the party.  I --
7  I don't know.
8        But I -- I do want to ask our chairman if the
9  Legal Defense Fund can come up and help to clear up some
10  of the questions that we may have about these map and
11  the performance because we have the public who's
12  listening, and they should know what's going on.  I
13  believe that these are the people who could perhaps
14  answer some of the questions that we have.
15       And I certainly have some questions for them
16  myself, since I can't get a clear answer on performance
17  or compactness.  All of these issues that we're talking
18  about: the deviation, how many splits it is.  I have an
19  attorney right here by me, Mr. Larvadain.  And he's --
20  because we were given this information a few minutes
21  ago, as legislators, many of us can't decipher through
22  it.
23       So I would ask that LDF, the Legal Defense
24  Fund, would be able to come up to the table to answer
25  some questions as it relates to these amendments, if you

Page 61

1  don't mind.  Mr. Beaullieu -- Chairman Beaullieu.  Thank
2  you.
3        REPRESENTATIVE JOHNSON:  Someone here present
4  from the Legal Defense Fund like to come to the table?
5        CHAIRMAN BEAULLIEU:  Ms. Lowery on a
6  clarification.
7        MS. LOWERY:  I just wanted to correct.  Hey,
8  Members - I'm sorry - in the audience, I want to correct
9  something I said earlier.  Senator Womack's Bill
10  presently has 16 split parishes as well as
11  Representative Farnum's amendment at 16 split parishes.
12       CHAIRMAN BEAULLIEU:  Thank you.  Ms. Lowery,
13  Rep Marcelle.  And we have -- if y'all wouldn't mind,
14  please introduce yourselves.  And y'all filled out
15  cards?
16       MS. WENGER:  We did not, but we can.
17       CHAIRMAN BEAULLIEU:  Please do.  Thank you.
18       MS. WENGER:  My name is Victoria Wenger.  I'm
19  an attorney with the Legal Defense Fund.
20       MR. EVANS:  Jared Evans, attorney with the
21  Legal Defense Fund.
22       REPRESENTATIVE MARCELLE:  Thank you all for
23  coming to the table, and thank you for your work on this
24  matter.  Can you please -- first of all, let me -- let
25  me ask you a question because perhaps you all got this

16  (Pages 58 to 61)

Page 62

1    map a lot sooner than us.  You all have been working for
2    how many years on getting this done?
3        MS. WENGER:  We filed our litigation,
4    Robinson, now, v. Landry - at the time it was Robinson
5    v. Ardoin - the day that the legislature overrode the
6    governor's veto.  I believe it was March 30th, 2022.
7        MR. EVANS:  But the work started around the
8    first roadshow in October 2021 -- September 2021.
9        REPRESENTATIVE MARCELLE:  Okay.  So can you
10   all please tell me, in your opinion, what adding -- if
11   this amendment get on, what does it do to Womack's bill?
12   Does it make it better?  Does it make it worse?  Is it
13   more compactness?  Is it more split parishes?  Does it
14   make sense?
15       Help me and help walk us through it because
16   the public really needs to know what's going on.  And I
17   know they can't know because we just got hit with it
18   today.
19       MS. WENGER:  Representative Marcelle, we're in
20   a similar posture to you.  The map that we advocated for
21   was presented here in the legislature as SB4 which died
22   in committee, and HB5, sponsored by you.  That exact map
23   has been in public discourse since the roadshow, as my
24   colleague mentioned, at least a similar version.  Our
25   attempt was to create a new Black-majority district in

Page 63

1    District 5, uniting north Baton Rouge with the Delta
2    parishes.
3        We have also seen in the public domain other
4    versions of maps, like HB12 in 2022, that run along the
5    Red River and the I-49 corridor.  But we, for a variety
6    of different reasons, had really coalesced around
7    another -- another option here, and that's because it
8    has been held up to court scrutiny for years now.
9        It has made its way before the District Court,
10   but also before the Fifth Circuit Court of Appeals.
11   We've had to show that it's possible to reduce parish
12   splits in line with Joint Rule 21, which was passed by
13   this legislature in 2021.
14       So I guess our journey started earlier than we
15   represented.  We've been following redistricting since,
16   perhaps, the census and since you all made the rules.
17   So --
18       REPRESENTATIVE MARCELLE:  So -- so I guess my
19   question is: does this amendment make more splits than
20   -- because I think it has 16 in it.
21       MS. WENGER:  So you'll put us on the spot.  So
22   let me pull out my notebook and -- and talk a little bit
23   about the other maps we've seen in this process.
24       REPRESENTATIVE MARCELLE:  Okay.  Well, I'm
25   just trying to get a little clarity for myself and other

Page 64

1    members and -- and just trying to figure out exactly
2    what putting this amendment -- and I know you hadn't had
3    a long time to digest it.  What is -- what is your
4    opinion about adding this amendment to Senator Womack's
5    bill?
6        MS. WENGER:  Sure.  So I think I heard
7    recently - and, again, we're processing this information
8    as quickly as you all are - that there was 16 parish
9    splits.  Am I accurate in that?
10       REPRESENTATIVE MARCELLE:  Yeah.
11       MS. WENGER:  Okay.
12       REPRESENTATIVE MARCELLE:  That's what I
13   counted.
14       MS. WENGER:  So the enacted map that is
15   currently in place has 15 parish splits.  The remedial
16   map that we proposed in litigation and that been vetted
17   by the courts --
18       REPRESENTATIVE MARCELLE:  11.
19       MS. WENGER:  -- has 11 parish splits.
20       REPRESENTATIVE MARCELLE:  Yeah.  That's what I
21   thought.
22       MS. WENGER:  Representative Marcelle, I think
23   you also have an amendment that -- I don't know if it
24   has it beat, but it's certainly closer to that.  And,
25   again, I know that there's been different opinions

Page 65

1    shared here about parish splits.  But that's coming not
2    only directly from doctrine around redistricting, but
3    also Joint Rule 21.  We have been abiding by the rules
4    that this legislature put in place for yourselves.
5        So that is the rubric that we are guided by,
6    that the courts are referring to, that our map drawer is
7    accountable to.  So that's why parish splits are
8    emphasized.
9        There's also a logic to it.  There's a lot of
10   governing that's done at the parish level here.  There's
11   election administration, school boards, other elements
12   of civic life that have been recognized in your
13   politics, in your policy, in Joint Rule 21, and by the
14   federal courts.  So that's why that principle is so
15   important.  I think there's many other things.
16       And, again, I don't even have a copy of
17   the amendment in front of me here, but we have had to
18   comply with principles like deviation, trying to get
19   that as close to zero as possible, certainly trying to
20   keep important places.
21       We've heard really compelling testimony about
22   the importance of keeping military bases whole or the
23   communities that serve those areas, whether it's, you
24   know, housing or other communities of interest.  We have
25   tried to comply with that over the course of the -- the

17  (Pages 62 to 65)

Page 66

1  process.  Even SB4 and HB5, we have alternative options
2  that we could pursue to keep some of the military
3  districts that have been -- or military bases that have
4  been mentioned whole.
5          We'd be happy to work on that with you all.
6  We would be happy to end this litigation with a map that
7  complies with Section 2 and also can achieve other
8  political ends.  We understand for any type of politics
9  that our bill was not successful here.
10         We do, however, know based off of the
11  amendment that Representative Marcelle has presented
12  here, based off of record from prior bills filed in this
13  process or presented by the civil rights community that
14  follow the Red River and I-49, that there could be ways
15  to clean up this amendment to otherwise perfect it that,
16  maybe, maybe, could get us further towards resolution in
17  this litigation but none that could do that as
18  efficiently and cost-effectively for years and years of
19  expensive litigation with folks far above my -- my
20  bracket to get it over with and to finally just be
21  resolved.
22         There is a path forward there.  It is in
23  grasp.  We would love -- and on behalf of our clients,
24  we would love to see that resolution.
25         REPRESENTATIVE MARCELLE:  Well, thank you.  I

Page 67

1  -- I just was wondering, Rapides and East Baton Rouge
2  are heavily populated by minorities, right?
3          MS. WENGER:  That's correct.
4          MR. EVANS:  That's correct.
5          REPRESENTATIVE MARCELLE:  Would you agree with
6  that?
7          MR. EVANS:  That's correct.
8          REPRESENTATIVE MARCELLE:  And I'm just
9  wondering how would the Court view that, that we split
10 it three ways, both of them?
11         MS. WENGER:  I think the Court would have a
12 lot of questions about what are the politics guiding
13 this.  And I think my question is: why, for three years
14 or more, are we not listening to Black people who came
15 here?  We had young people who drove here overnight in
16 the snow and back roads from my colleague's alma mater
17 up north at Grambling University just to have their
18 voices heard in the process.
19         We had people who were here when the whole
20 state was closed down, were here on Martin Luther King
21 Day when the nation is closed down.  And they came to
22 advocate for SB4.  And they still, after years, have
23 never gotten a floor debate.
24         They've never been able to see this
25 conversation happen or to have their grievances met with

Page 68

1  any genuine effort to resolve this Section 2 violation
2  or just honor a principle of fairness.
3          So there might be a path forward here.  We
4  tried to give a much easier one to get this litigation
5  over with.  I cannot speak to whether this is that path
6  forward.  I can speak to ways to do this better by
7  redistricting criteria and, hopefully, give people some
8  fairness and give you all some reprieve from federal
9  court litigation.
10         REPRESENTATIVE MARCELLE:  Okay.  Thank you.
11 I'm -- I'm just wondering if there's a risk that the
12 judge would say that this is -- she would go ahead and
13 draw it herself because instead of reducing it, we
14 increased it, and so -- the splits.  And I -- and I --
15 I'm just curious.
16         And -- and we keep talking about the political
17 motivations.  And I heard and I respect Senator Womack
18 who talked about he wanted to -- to make Scalise -- he
19 checked with Scalise.  He checked with Letlow.  I heard
20 every person's name except Gary Graves, and that's one
21 of my congressmen.  I was wondering if y'all had a
22 conversation with him as well.  But --
23         MR. EVANS:  Hope you're not asking us that.
24         REPRESENTATIVE MARCELLE:  Pardon me?
25         MR. EVANS:  I was talking -- yeah.  You

Page 69

1  weren't asking that to me, right?
2          REPRESENTATIVE MARCELLE:  No, no, no, no, no
3  --
4          MR. EVANS:  Yeah.
5          REPRESENTATIVE MARCELLE:  -- no, no, no.  I
6  was just making a statement because I'm -- I'm -- I'm
7  about to be quiet.
8          But I -- I just want to make sure that
9  everybody understand when you start talking about -- and
10 I said this the other day when I was at the table.  If
11 we could remove all of the people who represent the
12 districts away from it and give it to somebody and allow
13 them to draw it fairly, then we would get the best
14 product because it's not impossible to draw two Black
15 congressional districts.
16         But if everybody -- nobody wants to give up
17 any portion of anything, you're going to have the same
18 problem over and over again.  And -- and I do respect
19 that Senator Womack says he's -- you know, his district
20 is -- is getting hit as well.  But everybody has to give
21 up something to do what is right.  And nobody wants to
22 do that.
23         Some people want to make sure that they have,
24 you know, a certain number of a certain population to
25 win.  And it's just not right.  It is not right.  It is

18  (Pages 66 to 69)

## Page 70

1   far too long that Louisiana has done things wrong.  And
2   it's about time that we do something that's right and
3   get us out of the courts.
4        And I want to thank you guys for your work.  I
5   don't know if anybody else has any questions for you,
6   but I -- I see this as strictly politics, last minute,
7   let's throw in something and confuse the whole issue.
8   But I will not vote for this bill with that amendment on
9   it.  Thank you.
10       CHAIRMAN BEAULLIEU:  Also -- have -- have --
11  have y'all filled out cards.  If not, would you please
12  do it?
13       MR. EVANS:  We going to fill them out.
14       MS. WENGER:  We will.  Thank you.
15       CHAIRMAN BEAULLIEU:  Thank you.
16  Representative Wyble.
17       REPRESENTATIVE WYBLE:  Yes.  Thank you.  If
18  you could remain just for a minute, please.  Sorry.  I'm
19  sorry.  I didn't catch your name.
20       MS. WENGER:  Sorry.  I'm Victoria Wenger.
21       REPRESENTATIVE WYBLE:  Oh, thank you both for
22  being here.  I appreciate it.  You mentioned in -- in
23  your remarks, you connected splitting parishes with
24  local politics and, like, school board elections.  So
25  just connect for me, where's the voter confusion if a

## Page 71

1   parish is split with a school board election?  Make that
2   connection for me, because you mentioned school board
3   particularly --
4        MS. WENGER:  So --
5        REPRESENTATIVE WYBLE:  -- specifically.
6        MS. WENGER:  Yeah, this could vary based off
7   -- parish to parish, based off where -- what types of
8   elections are happening, whether they're a district, at
9   large, whether -- you know, how many folks are on a
10  school board, if there's someone elected at large and
11  another position.  It can happen a lot of different
12  ways.
13       Again, what -- what I was speaking to, again,
14  is Joint Rule 21, which signified the fact that this
15  legislature and the prior legislature that enacted it,
16  wanted to keep in consideration how current lines,
17  political lines, like parishes -- that's probably the
18  most significant one you could think of here.
19       But another thing that our map drawer
20  considered and that Joint Rule 21 is considering is
21  municipalities or unincorporated areas.  And so you're
22  thinking about how are ballots drawn around that.  How
23  are people conceptualizing?
24       And, you know, we -- we don't just work on
25  redistricting or litigating.  We do civic education all

## Page 72

1   the time, and we represent groups that are trying to get
2   folks engaged in this process, excited, and knowing that
3   their vote's going to matter.  So it's perhaps a way to
4   reduce some confusion or to have, again, the lines line
5   up.
6        But, again, I think the legislature and the
7   folks behind Joint Rule 21, many of y'all, colleagues,
8   or folks that, you know, have moved along to the Senate
9   but were part of that process, can speak best to why
10  that matters specifically to them.
11       But it is something that's been dignified in
12  the courts, that's been recognized both at a very
13  Louisiana-specific level.  Most other places, we're
14  calling them counties instead of parishes.  So it means
15  something here.  It really matters.
16       So I think that's why, perhaps, it was
17  involved in Joint Rule 21.  Perhaps it's mattered to the
18  courts.  But parish splits is -- is something you can
19  quantify.  You can look at how many times the parishes
20  are split overall.  There's this other quantitative
21  metric we talk about called fracking, which is, like,
22  where multiple districts or different non-contiguous
23  parts of a district are coming into a parish.
24       We're just really looking at what are those
25  metrics where it's fair to put one map side by side and

## Page 73

1   make some observations about how they compare, where you
2   can take politics or you can take other subjective
3   measures out of the equation for a moment just to do
4   that side by side.  So I was mentioning that as one of
5   those quantitative measures that's codified for this
6   legislature in Joint Rule 21.
7        REPRESENTATIVE WYBLE:  I -- I was just curious
8   where the correlation was because, I'm not sure if
9   you're aware, but we actually have parishes in Louisiana
10  that have multiple public school districts.
11       MS. WENGER:  Absolutely.
12       REPRESENTATIVE WYBLE:  So in some of those
13  parishes, they're already voting for different school
14  board members and -- and there are splits, if you want
15  to call it that.  And I just -- you -- you -- you caught
16  my attention when you mentioned school boards.  And I
17  was trying to figure out the correlation to that and
18  splitting a parish in a congressional district.
19       MS. WENGER:  Yeah.  And it really depends
20  parish by parish, and those are -- those are the types
21  of lines.  Or, like, you could halve the districts,
22  those school districts.  That's one of the things that
23  map drawers can actually have on the screen and can use
24  as a measure of how to look at that.
25       So you can also look at what's called landmark

19 (Pages 70 to 73)

Page 74

1  or COI landmark.  So thinking of school districts or
2  hospitals, airports, everything else when you're looking
3  at that metric, all I can speak to -- I can't speak to
4  this amendment.  I just saw it.  But in terms of
5  landmark place splits, the map that we had proposed had
6  the exact same amount as the enacted map.
7       So that was another metric that, in our
8  process, we were able to hold ourselves accountable to,
9  to making sure our map was as good as or, in most of the
10  instances, better than the enacted map.
11       CHAIRMAN BEAULLIEU:  So, Representative Wyble,
12  what we can do -- I know you're a big school board guy.
13  Why don't we get you with them afterwards, and y'all can
14  talk in some details on that?
15       MS. WENGER:  We've got slide decks on this.
16       CHAIRMAN BEAULLIEU:  Right.  No.  They have --
17  they have -- they have tons of information.
18       MS. WENGER:  I'd be happy to provide it for us
19  anytime.
20       REPRESENTATIVE WYBLE:  Thank -- thank you so
21  much.
22       MS. WENGER:  Thank you.
23       CHAIRMAN BEAULLIEU:  Thank you, Representative
24  Wyble.  Members, that clears the board.  Representative
25  Farnum has a motion on the table to adopt Amendment Set

Page 75

1  68.  And objection -- what's that?
2       VICE CHAIRMAN LYONS:  (inaudible 1:22:44).
3       CHAIRMAN BEAULLIEU:  Oh, oh.  One second,
4  Members.  Vice Chairman Lyons.
5       VICE CHAIRMAN LYONS:  Thank you, Mr. Chairman.
6  And I was going to address this -- this to
7  Representative Farnum on -- on your amendment.  And
8  after the table was just -- was clear with that
9  information, now, I -- I just want to say that the past
10  two years, I've been through every roadshow throughout
11  this state.
12       I was in Calcasieu, and I heard the testimony
13  there.  And I -- I sympathize in it with the individual
14  residents there as they talked about being whole as
15  other communities of interest throughout the state.
16  That was the most impacting testimony that we received
17  throughout this process.  And it went on for not only
18  from our community to your community, everywhere else.
19       And the question remains always - and we don't
20  have an answer for - is: can we draw the perfect map?  I
21  don't think we ever can draw the perfect map.  I don't
22  think that there's ever going to be a situation where
23  everybody's going to be happy or even whole.
24       But I'm looking at the mission that we have
25  here.  And the mission that we have here is that we have

Page 76

1  to create two majority-Black districts.  And performance
2  of those maps that we saw earlier, some that didn't make
3  it through, some that were here, including yours,
4  Senator Womack, some of them perform.  Some perform
5  better than others.
6       But we have to look at the -- the -- the
7  center of this piece, and that is to create those
8  districts that perform.  And some of that's going to be
9  for debate and some that's going to be for the -- the
10  clearing pieces to happen as we go forward.
11       But I just want to put on the record, you
12  know, that I know the senators worked hard on this
13  piece.  And that goal is what was in mind, to create
14  these two majority-Black districts and to do it with as
15  much of the criteria as possible to be done to -- to
16  make sure that it -- it -- it is conforming.
17       And -- and with that being said, I wanted to
18  get that clear of what that message is and what we're
19  doing here, which you remember before we -- we go with
20  this piece.  And I wanted to say that, Mr. Chairman, as
21  we go forward in this opportunity.  Thank you.
22       CHAIRMAN BEAULLIEU:  Thank you, Vice Chairman
23  Lyons.  Members, back on the motion, we have a -- a
24  motion by Representative Foreman to adopt -- Farnum to
25  adopt Amendment Set 68.  Is there any objections to the

Page 77

1  adoption of that amendment set?  Hearing no -- no
2  objection, Amendment Set 68 is -- is hereby adopted.
3       On to the next amendment.  We have Amendment
4  Set 70, I believe, Representative Marcelle.
5  Representative Marcelle, on -- on your amendment.
6       REPRESENTATIVE MARCELLE:  That's amendment
7  (inaudible 1:25:52).
8       CHAIRMAN BEAULLIEU:  Or Ms. Lowery, would you
9  mind reading that in?
10       REPRESENTATIVE MARCELLE:  I just missed my
11  objection -- amendment.
12       MS. LOWERY:  Thank you, Mr. Chairman.
13  Representative Marcelle brings Amendment Set HCASB-8362,
14  number 70.  This is available, Members, in front of you,
15  and also for members of the public, it's available
16  online.
17       CHAIRMAN BEAULLIEU:  Representative Marcelle,
18  on your amendment.
19       REPRESENTATIVE MARCELLE:  Thank you.
20  Amendment Number 3 adds River -- the Red River Parish to
21  Congressional District 6, better preserving the Red
22  River community of interest and the community of
23  interest formed by Red River, Natchitoches, and DeSoto
24  Parishes.  It also makes Ouachita Parish whole in
25  Congressional District 5.

                                    20  (Pages 74 to 77)

Page 78

1    It keeps all the Delta parishes whole and
2    together.  It reduces the parish splits to 11.  It
3    reduces the deviation to 22.  It keeps more of
4    Shreveport together in Congressional District 6 - I did
5    that for Representative Phelps - substantially improves
6    compactness of Congressional District 6, performs as
7    well for Black voters as Senate Bill 8 with a lower
8    Black voting-age population.
9        And that's what it does.  And I ask for your
10   favorable passes.  This is actually a cleanup bill.  It
11   doesn't change Senator Womack's bill a whole lot.  It's
12   just a cleanup bill, and it gives us fewer splits.  And
13   I'd ask for your favorable passage.
14       CHAIRMAN BEAULLIEU:  Thank you, Representative
15   Marcelle.  Members, just as a clarification, the way
16   these amendments are drafted, they are drafted in a --
17   in a -- in a fashion that -- it's the whole plan.  It's
18   not -- we're not taking a precinct here or there and --
19   and adding them.  And so it's a -- it's a whole plan.
20       So the amendment set that we just adopted,
21   Representative Farnum, is currently the whole plan.
22   What Representative Marcelle is proposing is that we
23   abandon Representative Farnum's plan and we adopt
24   Amendment Set 70, which would be another -- which would
25   be a separate whole plan.  And should this amendment

Page 79

1    pass, it would replace the Representative Farnum
2    amendment that -- that just passed.
3        I just want to make sure we have a
4    clarification on there.  Do we have any questions on the
5    amendment?  Okay.  There are no questions at this time.
6    If you give me a second, I believe we have some -- I got
7    a bunch of cards up here, and we might have some cards
8    on the amendment set.  Bear with me for a second while I
9    start through some of these.
10       (Pause.)
11       SENATOR WOMACK:  Mr. Chairman, if I might --
12       CHAIRMAN BEAULLIEU:  Yeah.  Go ahead, Senator.
13       SENATOR WOMACK:  -- have the mic.  I just want
14   to clarify that Senator Fields did come in with the plan
15   -- on the plan, but he was not for splitting up Baton
16   Rouge.  I want to clarify that.
17       REPRESENTATIVE MARCELLE:  I -- I certainly
18   thank you for that, because I was going to vote against
19   Senator Fields the next time he ran if you told me he
20   was splitting up Baton Rouge three ways.  And I -- and I
21   like him, but he -- he was going to have to go if he did
22   that.
23       SENATOR WOMACK:  Well, I just wanted to --
24   wanted to put that on the record.
25       REPRESENTATIVE MARCELLE:  Yes, sir.  Thank

Page 80

1    you.
2        SENATOR WOMACK:  Thank you.
3        REPRESENTATIVE MARCELLE:  Thank you.
4        CHAIRMAN BEAULLIEU:  Representative Marcelle,
5    we do have some -- some green cards.  All of them
6    present and do not wish to speak, but all in favor of
7    this amendment set: Ms. Martha Davis (phonetic), Mr.
8    Jared Evans, Ms. Ashley Shelton (phonetic), and Ms.
9    Victoria Wenger.  So all those green cards in favor.
10       There are no questions for you, Representative
11   Marcelle.  Members, Representative Marcelle has offered
12   up Amendment Set 70 --
13       REPRESENTATIVE FARNUM:  Objection.
14       CHAIRMAN BEAULLIEU:  -- for your
15   consideration.  Representative Farnum has objected.  Ms.
16   Baker, would you please call -- so look -- an -- a --
17   vote yes replaces Representative Farnum's amendment with
18   Representative Marcelle's amendment.  A vote of no keeps
19   Representative Farnum's amendment as your -- your
20   primary maps.  Ms. Baker.
21       MS. BAKER:  Thank you.  Mr. Chairman.
22   Chairman Beaullieu?
23       CHAIRMAN BEAULLIEU:  No.
24       MS. BAKER:  No.  Representative Billings?
25       REPRESENTATIVE BILLINGS:  No.

Page 81

1        MS. BAKER:  No.  Representative Boyd?
2        REPRESENTATIVE BOYD:  Yes.
3        MS. BAKER:  Yes.  Representative Carlson?
4        REPRESENTATIVE CARLSON:  No.
5        MS. BAKER:  No.  Representative Carter --
6    Representative Carver?
7        REPRESENTATIVE CARTER:  No.
8        MS. BAKER:  No.  Representative Farnum?
9        REPRESENTATIVE FARNUM:  No.
10       MS. BAKER:  No.  Representative Gadberry?
11       REPRESENTATIVE GADBERRY:  No.
12       MS. BAKER:  No.  Representative Johnson?
13       REPRESENTATIVE JOHNSON:  No.
14       MS. BAKER:  No.  Representative Larvadain?
15       REPRESENTATIVE LARVADAIN:  Yes.
16       MS. BAKER:  Yes.  Representative -- Vice Chair
17   Lyons?
18       VICE CHAIRMAN LYONS:  Yes.
19       MS. BAKER:  Yes.  Representative Marcelle?
20       REPRESENTATIVE MARCELLE:  Yes.
21       MS. BAKER:  Yes.  Representative Newell?
22       REPRESENTATIVE NEWELL:  Yes.
23       MS. BAKER:  Yes.  Representative Schamerhorn?
24       REPRESENTATIVE SCHAMERHORN:  No.
25       MS. BAKER:  No.  Representative Thomas?

21  (Pages 78 to 81)

Page 82

1   REPRESENTATIVE THOMAS:  No.
2   MS. BAKER:  No.  Representative Wright?
3   REPRESENTATIVE WRIGHT:  No.
4   MS. BAKER:  No.  Representative Wyble?
5   REPRESENTATIVE WYBLE:  No.
6   MS. BAKER:  No.  There are 5 yeas and 11 nays.
7   CHAIRMAN BEAULLIEU:  Members, Amendment Set 70
8   has failed to pass.  So we're back on the bill, which is
9   the Amendment Set of 68, which we have just adopted.
10  We're going to go ahead and -- and -- and read in some
11  cards present in support and not wishing to speak.
12      We have Ms. Brianna Robillard (phonetic),
13  present in support and not wishing to speak; Deborah
14  Hebert (phonetic); Gary Hebert as well; Elise Blade
15  (phonetic), present, in support, not wishing to speak.
16      All of these are present in support, not
17  wishing to speak.  Ashley Duly (phonetic), Heather Trice
18  (phonetic), Catherine Mays (phonetic), Gail Baralt
19  (phonetic), Julia Harris, Joyce LaCour, Lucille Harris
20  (phonetic), Kristy Robinson (phonetic), Kathleen --
21  maybe, Matharms.
22      MS. FARMS:  Farms.
23      CHAIRMAN BEAULLIEU:  Form?
24      MS. FARMS:  F-A-R-M-S.
25      CHAIRMAN BEAULLIEU:  Oh, Farms.  Okay, yeah.

Page 83

1   Thank you.  Farms, Tisha -- and Tisha Lathan.
2       We have a couple of red cards present and not
3   wishing to speak, in opposition.  Christine Robinson,
4   Gail Paralt.  And then we have some red cards present
5   and would like to speak.  We'll start with Chris
6   Alexander.  So if you'll give the floor, please,
7   Senator.
8       MR. ALEXANDER:  Thank you.
9       CHAIRMAN BEAULLIEU:  Mr. Alexander, if you
10  would please introduce yourself for the committee?
11      MR. ALEXANDER:  Sure.  My name is Chris.
12      CHAIRMAN BEAULLIEU:  Give me -- give me one
13  second, Mr. Alexander.
14      MR. ALEXANDER:  Sure.
15      CHAIRMAN BEAULLIEU:  Representative Newell, do
16  you have a question?
17      REPRESENTATIVE NEWELL:  Newell.
18      CHAIRMAN BEAULLIEU:  Newell.
19      REPRESENTATIVE NEWELL:  We're back --
20      CHAIRMAN BEAULLIEU:  I get it right most of
21  the time.
22      REPRESENTATIVE NEWELL:  Sometimes you do
23  (inaudible 1:33:36).  These red cards are on the
24  amendment that we just voted on or back on the bill?
25      CHAIRMAN BEAULLIEU:  So they can -- so that's

Page 84

1   -- so the bill now is the amendment.  So as -- as the --
2   the red cards come up, if they have a clarification to
3   where they -- this is -- they're not in opposition
4   anymore, they can waive and -- or -- or -- or correct
5   it.  And we can -- we can waive these red cards if -- if
6   they are in favor of this amendment.  So they could --
7   we give the liberty of those who turned in the red card
8   to be able to clarify that.  I don't want to speak for
9   them.
10      REPRESENTATIVE NEWELL:  Okay.  So we listening
11  to these red cards before we do the final vote on
12  passing --
13      CHAIRMAN BEAULLIEU:  Yes, ma'am.
14      REPRESENTATIVE NEWELL:  -- the bill as
15  amended.
16      CHAIRMAN BEAULLIEU:  Yes, ma'am.
17      REPRESENTATIVE NEWELL:  Okay.  Thank you for
18  that clarification, Mr. Chair.
19      CHAIRMAN BEAULLIEU:  No.  I'm -- thank you for
20  asking, Mr. Alexander.
21      MR. ALEXANDER:  Thank you, Representative
22  Beaullieu.  Thank you, members of the committee.  My
23  name is Chris Alexander.  I'm here simply on behalf of
24  the Louisiana Citizen Advocacy Group.
25      As each of you know, conservatives in the US

Page 85

1   House of Representatives now have a two-vote majority,
2   razor-thin Republican majority.  This is a
3   super-majority Republican legislature.  And it's that
4   for a reason because 70 percent of the citizens of
5   Louisiana are conservative.  And, actually, in the US
6   House of Representatives, at this second, there's --
7   there's a one-vote majority -- Republican majority
8   because Representative Scalise is on medical leave now.
9       So we're one vote away in our country right
10  now, in the US Congress, from having the Biden-Schumer
11  agenda essentially unleashed on the country.  Some
12  people may say it's already been.  But there is some
13  protection in the US Congress right now because of that
14  razor-thin majority.
15      By voting for this bill, creating an
16  additional minority district in Louisiana, it's our view
17  that you are giving that majority away.  And you're
18  putting the very delicate balance of power in the US
19  Congress in very grave jeopardy on matters of profound
20  consequence to citizens of Louisiana and citizens across
21  the country.  Everything is at risk here.
22      Now, the argument that we've heard from a lot
23  of Republican members here is that if you don't pass a
24  new plan creating an additional minority district in
25  Louisiana, then the Federal Court judge will make that

22  (Pages 82 to 85)

Page 86

1  decision.
2      Well, her actual order says that the
3  plaintiffs, when they went into Court for a preliminary
4  injunction, never tried on the merits, just a summary
5  proceeding, said that they had carried their burden of
6  showing that the current map violates Section 2 of the
7  Voting Rights Act and that the plaintiffs had a
8  substantial likelihood of making their claim successful,
9  which is that we'll have a second minority district in
10  Louisiana.
11      But there was no trial on the merits.  But the
12  judge essentially said, if we have a trial on the
13  merits, I'm going to rule in favor of the plaintiffs,
14  and I'm going to create a second majority-minority
15  district in Louisiana.  That's exactly what this bill is
16  doing right now.
17      And if our current map goes -- if you do
18  nothing and our current map goes back before Judge Dick,
19  she's going to probably end up doing the same thing.
20  But at least we have a chance to fight for the current
21  map in our state.  And no matter how she rules, we have
22  the Fifth Circuit Court of Appeal, and we have the US
23  Supreme Court.
24      And, again, everything is at stake, and it
25  seems like we're simply giving it all away right now.

Page 87

1  We believe that this is worth fighting for.  We believe
2  that that balance of power is worth fighting for.
3      And I would remind the members of this panel
4  that I know, some of whom we helped get elected, along
5  with Governor Landry whom we worked very hard for and
6  who we respect and think he's going to be a great
7  governor, that the citizens of Louisiana worked very
8  tirelessly to get you elected to come here, not to cave
9  in to political pressure, which is it appears to
10  hundreds and hundreds of citizens across the state that
11  that's what you're doing.  You're caving in to political
12  pressure, and you're giving in without a fight.
13      Speaker Mike Johnson has weighed in on this.
14  We heard some testimony earlier that Congressman Johnson
15  apparently was okay with this proposed legislation.
16  That's not our legislation.  That's not our
17  understanding at all.  In fact, Congressman Johnson
18  specifically said that our current map from 2022 needs a
19  full trial on the merits, with appellate review all the
20  way to the Supreme Court, if necessary, because the
21  issue is so profoundly important to the future of this
22  republic.  I will -- I want to reiterate before I close,
23  as I said, people all over the state are watching this
24  right now, many of whom voted for you to come here, some
25  of you who were just elected very recently.

Page 88

1      And if six months or a year from now, the
2  United States Congress is controlled by Democrats, it
3  started in this house, it started and ended in this
4  capital, and that's what will have made it possible.
5  And the citizens of Louisiana, I can tell you, will have
6  a very, very good memory if that occurs.  I would
7  respectfully submit that your responsibility is to
8  represent the interests of the substantial majority of
9  Louisiana citizens and not to cave to political
10  pressure.  And we're asking you to defeat this
11  legislation.  Thank you.
12      CHAIRMAN BEAULLIEU:  Thank you, Mr. Alexander.
13  And look just to -- to -- and -- and you got a couple
14  of questions.  But just from -- from my standpoint, I
15  sat on the committee when we drew the other maps that we
16  all believe were fair, and we believe is representative
17  of the state of Louisiana.  The Fifth Circuit sent it
18  back to the federal judge and basically held us hostage
19  that if -- if we don't do it, she's going to do it.  And
20  so none of us like the position we're in.
21      But -- you know, and -- and a little bit to
22  your point, we were elected to serve, and we feel that
23  -- that we would prefer to have the lines drawn in this
24  committee than have some Obama-appointed judge drawing
25  the lines for us.  And so we don't like it.  It's

Page 89

1  painful to do.  And so I feel your sentiment, and -- and
2  I don't -- I'm not disagreeing with most of what you
3  said.  I mean, it's -- it's -- it's -- it's what goes on
4  in a lot of our minds.  So I -- I appreciate your
5  comments.  Thank you.  And you do have -- you do have a
6  question.  Representative Newell.
7      REPRESENTATIVE NEWELL:  Thank you very much,
8  Mr. Chairman.  I'm troubled by your statements because
9  this is not a process by which one party is losing
10  power, caving into another party.  This is a process by
11  which the other 30 percent of the people in this state
12  are trying to get the representation that their
13  population and numbers deserve in Congress.  This isn't
14  a caving in or power grab or giving away of power or
15  losing of power of the Republican Party.
16      It's an opportunity for this body to represent
17  all of the people that they supposed to represent in
18  their district, listening to them and giving them the
19  opportunity to vote for someone of their choice, whether
20  that person of their choice is a Black Republican or
21  White Democrat.  It's an opportunity for Black people,
22  as some of my colleagues would prefer to be said, but a
23  minority-majority district to have the opportunity to
24  vote for their candidate of choice.  And I'm troubled by
25  the way you said your statement.  You're very

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 90

1  respectful, but I listen to the words.
2       This is not supposed to be a process that is
3  this contentious and this divisive, but it is a very
4  difficult process.  And we have been fighting this for
5  three years now, and I've been on this committee since
6  the very start.  Went to Utah with the rest of the
7  people from across this country that had the same job
8  that we all have here to learn what we're doing.
9  Traveled this state from north to south, east to west,
10 to listen to what all of the people in this state
11 wanted.  The White citizens in this state, their issue
12 was keeping their -- their communities together.
13      You know what Black people wanted?  Just an
14 opportunity to have a voice in a room.  And that is what
15 we're trying to do.  It is not to -- it's not a power
16 grab.  It's not to say that Republicans rule or that if
17 that -- if there's another chance where Democrats are
18 ruling, that that's a problem.  We should not see one
19 party as a problem.  We should not see another person
20 that has a different letter behind the name as the
21 enemy.  I like him.  He's not the enemy because he's a
22 Republican.  We just have a different way of looking at
23 things, and that's how we should see it.  We both
24 observing the same problem.
25      We just have different ways as -- different

Page 91

1  ways as how we gets to the solution.  And we cannot
2  continue to have this rhetoric on -- out in the -- in
3  the world like it's a problem to be of another party, or
4  it's a problem for another party to be in -- in
5  leadership.  We're not giving away power.  The
6  Republicans are not caving in because they're helping
7  African Americans have an opportunity to vote for a
8  candidate of their choice.
9       That is what we're doing here because -- and
10 we're going through this fight because, as I've said
11 many times before, this is the first time that this
12 country has gone through redistricting where -- after
13 the expiration of Section 5 of the Voting Rights Act.
14 Section 5 required all states that had a history of
15 racism that any bills -- any laws that were passed that
16 would affect people's access and rights to voting had to
17 be overseen and approved by the Department of Justice.
18 This is our first time doing this where we no longer
19 have that supervision.
20      And God knows, I wish we still had that
21 supervision because, clearly, we can't do this on our
22 own, because, clearly, somewhere along the lines, the
23 message is getting construed that this is a giving up of
24 power.  Instead, this is an opportunity to let other
25 people enjoy the benefits that another group has had for

Page 92

1  forever.  And we're just -- I just want to see African
2  Americans across the state have the same privileges
3  you've had all your life, and that is voting in someone
4  that they know or believe will have their best interest
5  at heart, whether it's in this building or whether it's
6  in our United States Capitol.
7       It's not a caving-in.  Because if it was a
8  caving-in, this process would have been over a long time
9  ago.  And I just needed to say, I don't have any
10 questions for you, but your statement kind of disturbed
11 me a little bit --
12      MR. ALEXANDER:  Sure.
13      REPRESENTATIVE NEWELL:  -- because I don't
14 want you to think that it's a caving-in of any party.
15      MR. ALEXANDER:  Well, I respect you,
16 Representative Newell, and I respect your right to
17 speak.
18      REPRESENTATIVE NEWELL:  Newell.
19      MR. ALEXANDER:  And I would always -- Newell.
20 And I would always protect your right to speak, but we
21 do live in a democracy here.  And when a majority with a
22 particular ideology is in power and control, policy
23 should reflect that ideology.  Our position here is very
24 simple, that Congressman Mike Johnson, the Speaker of
25 the House, represents a conservative ideology.  Many

Page 93

1  citizens across Louisiana are very proud and happy that
2  he's there, and this legislation threatens the authority
3  that conservatives have in the United States Congress.
4       He has said very clearly that our current map
5  is constitutional and that we should fight for it in
6  federal court in order to reflect the interests of a
7  majority of Louisiana citizens.  And democracy and a
8  republic means something.  But I would always fight, by
9  the way, for your right to speak, and I -- I value it
10 greatly, as much as I value mine.
11      REPRESENTATIVE NEWELL:  Thank you for giving
12 me my right for letting me know I have a right to speak.
13 I also have a right to vote.  And I also have had a
14 right all my life, coming from Orleans Parish as having
15 an opportunity to vote for a representative of my
16 choosing that I believe represented my interests.  And
17 this democracy, we need to make sure that it enables
18 other people across this state to also have a voice and
19 a right to vote for a candidate of choice that could
20 also be their voices in rooms that they're not able to
21 be in.  That is what this process is, sir.
22      So I appreciate you reminding me of my right
23 to speak because I'm going to do it anyway.
24      MR. ALEXANDER:  Yes, ma'am.
25      REPRESENTATIVE NEWELL:  But it also is my

24  (Pages 90 to 93)

Page 94

1　right to ensure that others have their right to speak
2　and their right to vote and keep their access to voting
3　intact.  And while they have that right in that access,
4　that they also have the ability to vote for a person of
5　their choice.  Thank you very much, Mr. Chairman.
6　　　　CHAIRMAN BEAULLIEU:  Thank you, Representative
7　Newell.  We have a handful of representatives that want
8　to exercise their right to speak.  Representative
9　Carlson.
10　　　　REPRESENTATIVE CARLSON:  Thank you, Mr. Chair.
11　 Mr. Alexander, I appreciate your comments.
12　　　　MR. ALEXANDER:  Sure.
13　　　　REPRESENTATIVE CARLSON:  I really do.  I'm --
14　　　　MR. ALEXANDER:  And congratulations on your
15　election.
16　　　　REPRESENTATIVE CARLSON:  Thank you very much.
17　I appreciate that.  Look, I'm -- certainly wish that
18　we're in a different position in the House of
19　Representatives with more than just a one-vote majority
20　--
21　　　　MR. ALEXANDER:  Sure.
22　　　　REPRESENTATIVE CARLSON:  -- and that this
23　wasn't looked at as a "we're going to lose the majority
24　or not" kind of decision.  But unfortunately, that's the
25　position that we find ourselves in.  I can assure you

Page 95

1　this: that we are not -- that we're not here today
2　because we're caving to any kind of political pressure.
3　The fact of the matter is, like it or not, Judge Dick
4　has said, "Either you do your job and draw the map, or
5　I'll draw the map for you," period.  We've argued this
6　case before the Fifth Circuit twice.
7　　　　We've asked the Supreme Court to hear it.
8　They've said, "You need to go and do your job first,"
9　which our job is to draw these maps.
10　　　　MR. ALEXANDER:  Sure.
11　　　　REPRESENTATIVE CARLSON:  I don't like this
12　position.  I wish we were not in this position.  I like
13　the maps that the legislature a few years ago voted on
14　and approved, but here we are.  And so we -- if I -- as
15　I look at it today, I can -- I'm a -- I'm a realist,
16　right?  I don't -- I -- I could say I wish things were
17　different.  But today, what is presented in front of me
18　is either Judge Dick draw the map or we draw the maps.
19　I feel like this legislative body is going to draw a
20　better map than Judge Dick will, period.
21　　　　MR. ALEXANDER:  Yeah.
22　　　　REPRESENTATIVE CARLSON:  And that's why we're
23　here.  That's why we're going to vote on the map that we
24　think is the best.
25　　　　MR. ALEXANDER:  Yeah.

Page 96

1　　　　REPRESENTATIVE CARLSON:  And, you know, I
2　would rather put this decision in the hands of elected
3　representatives than in -- in the hands of an unelected
4　judge.
5　　　　CHAIRMAN BEAULLIEU:  Thank you for that
6　(inaudible 1:48:43).
7　　　　MR. ALEXANDER:  And I very much appreciate
8　that, Representative Carlson.  And I would simply argue,
9　I'm consistent with Speaker Johnson's position that our
10　current map is constitutional, and it's worth fighting
11　for when you consider what is so profoundly at stake.
12　　　　REPRESENTATIVE CARLSON:  I understand, but
13　there is no position to fight at this time.  It is
14　either Judge Dick draw a map or we create a map.  There
15　is no continue --
16　　　　MR. ALEXANDER:  Right.  That's true.
17　　　　REPRESENTATIVE CARLSON:  The -- the fight
18　cannot continue on beyond that until we draw a map or we
19　don't draw a map.
20　　　　MR. ALEXANDER:  But if you don't draw a map,
21　you're -- or do draw a map, either way, you end up with
22　a one --
23　　　　REPRESENTATIVE CARLSON:  If we don't draw --
24　　　　MR. ALEXANDER:  -- majority-minority increase.
25　　　　REPRESENTATIVE CARLSON:  If we don't draw a

Page 97

1　map, we end up with the map that Judge Dick draws, which
2　will be a map with two majority Black districts.  But if
3　you say worse than that is --
4　　　　MR. ALEXANDER:  Exactly what we're going to
5　have as a result of this legislation.
6　　　　REPRESENTATIVE CARLSON:  But it will not be as
7　good as the senator's map.
8　　　　MR. ALEXANDER:  Well, in the net effect, I
9　would respectfully submit, would be the same.
10　　　　REPRESENTATIVE CARLSON:  It -- it certainly
11　is.  And, look, I -- I -- I think there is a legal basis
12　for it.  Look, I'm glad that we are having this
13　conversation.  In -- in all fairness and all honesty, I
14　think all of these maps look crazy because --
15　　　　MR. ALEXANDER:  Yeah.
16　　　　REPRESENTATIVE CARLSON:  -- the truth is that
17　every -- the overarching argument that I've heard from
18　nearly everyone over the last four days has been race
19　first.  I wish it weren't that.  This is the first
20　argument today that said, "I'm basing a -- a map on
21　political reasons, not on race."  And I -- I think it's
22　a shame that we are having a conversation where race
23　seems to be, at least based on the conversations, the
24　driving force, when we do not live in a -- a -- a -- a
25　segregated society or nearly as segregated as it once

25  (Pages 94 to 97)

Page 98

1    was 40, 50 years ago.
2        And so the reason why this is so difficult is
3    because we are moving in the right direction.  We don't
4    have concentrated populations of -- of certain
5    minorities or populations of White folks in certain
6    areas.  It is spread out throughout the state.  Compared
7    to Alabama, Alabama has 17 counties that are
8    minority-majority, and they're all contiguous.
9    Louisiana has seven parishes that are minority-majority
10   and only three are contiguous.  That's why this process
11   is so difficult, but here we are without any other
12   options to move forward.
13       And so I -- I hear what you're saying.  I
14   respectfully disagree with the characterization that
15   it's bending to political pressure.
16       MR. ALEXANDER:  Yeah.
17       REPRESENTATIVE CARLSON:  I -- I -- you know
18   me, and you know that I wouldn't do that.  But I don't
19   see any other path forward.  This is the best of two bad
20   options, and I'm going to always do my job --
21       MR. ALEXANDER:  Yeah.
22       REPRESENTATIVE CARLSON:  -- that's before me.
23       MR. ALEXANDER:  And I understand that.
24       CHAIRMAN BEAULLIEU:  Thank you.
25       MR. ALEXANDER:  Is there -- is -- is there --

Page 99

1    do you think there's anything that would be -- an option
2    would be to allow our attorney general to argue the
3    constitutionality of our current map in Federal Court,
4    Fifth Circuit Court of Appeal, and Supreme Court?
5        REPRESENTATIVE BEAULLIEU:  Already been done
6    twice in the Fifth Circuit and asked of the Supreme
7    Court, and they've refused to do that.  And here we lie
8    today.
9        MR. ALEXANDER:  Yeah.
10       CHAIRMAN BEAULLIEU:  There's never even been a
11   trial on the merits, Representative Carlson, on this map
12   --
13       REPRESENTATIVE CARLSON:  That's not our
14   decision.
15       CHAIRMAN BEAULLIEU:  -- even in district
16   court.
17       REPRESENTATIVE CARLSON:  That -- that is the
18   judge's decision, unfortunately.
19       CHAIRMAN BEAULLIEU:  And if you don't do
20   anything, they'll have one.
21       REPRESENTATIVE CARLSON:  And if we don't do
22   anything, we'll have a worse map.  Thank you, Mr. Chair.
23       CHAIRMAN BEAULLIEU:  Thank you.
24       MR. ALEXANDER:  Thank you, sir.  I appreciate
25   the interchange.

Page 100

1        CHAIRMAN BEAULLIEU:  Representative Marcelle.
2        REPRESENTATIVE MARCELLE:  Thank you.  Mr.
3    Alexander, I guess it's disheartening for me to sit here
4    in 2024 and hear that we certainly need to keep the
5    power.  And if you all do what's right in Louisiana,
6    we're going to lose our thin majority.  If we would have
7    done what was right long time ago, you probably wouldn't
8    be in a majority.  If Alabama passes what they need to
9    pass and we pass what we need to pass, then, perhaps, we
10   will have a fair and balanced Congress.
11       MR. ALEXANDER:  And you'll be in the majority.
12       REPRESENTATIVE MARCELLE:  Well -- and -- and
13   what's the problem with that, sir?
14       MR. ALEXANDER:  Well, there's millions of
15   Americans who have a problem with that.
16       REPRESENTATIVE MARCELLE:  And guess what, it's
17   millions of people who have not had an opportunity to
18   have a seat at the table.  We have a problem with voter
19   suppression.  We have a problem with people thinking
20   that we can't make decisions.  And let me say this: on
21   the other side of the aisle -- on the other side of the
22   chamber in the Senate, I have colleagues that have some
23   of the same beliefs that some of you have, right?  And
24   they believe in pro-life.  They are African Americans.
25   I believe in pro-choice.  So to say that everybody's

Page 101

1    ideology because they are Black is one way, is certainly
2    crazy, number one.
3        And number two, I really agree with you with
4    something, and that is, send it back to the courts and
5    let Judge Shelly Dick draw the maps.  We could then
6    remove --
7        MR. ALEXANDER:  But you -- you agree with me.
8        REPRESENTATIVE MARCELLE:  I -- I do agree with
9    that because then we could remove all of these different
10   people and these moving parts that everybody -- these
11   political interests because we do deserve two Black
12   congressional seats because where I went to school - it
13   was a Black school, though, Capitol High School - when
14   you divide six into a third, a third into sixth, you get
15   two.  And so we deserve two seats, and that's what we
16   deserve.  We didn't -- we're not begging for something
17   that we don't deserve.  That's what we deserve.
18       And -- and God forbid, maybe somebody will get
19   elected that feels like you, have the same ideologies as
20   you, but perhaps they won't.  People need an opportunity
21   to have their voices heard.
22       MR. ALEXANDER:  I respect that.
23       REPRESENTATIVE MARCELLE:  And when I send
24   somebody to Congress that feels like you that represents
25   my district, then you do not represent what I believe.

26 (Pages 98 to 101)

Page 102

1    And that's called community --
2         MR. ALEXANDER:  But what about representing
3    majority of the people in your district?
4         REPRESENTATIVE MARCELLE:  What -- what?
5         CHAIRMAN BEAULLIEU:  Look, let's let --
6         REPRESENTATIVE MARCELLE:  I'm -- I'm just --
7         CHAIRMAN BEAULLIEU:  The questions come from
8    this way to you.
9         MR. ALEXANDER:  I'm sorry.  I'm sorry.
10        CHAIRMAN BEAULLIEU:  So we don't go the other
11   way.
12        MR. ALEXANDER:  Thank -- thank you.  I
13   appreciate that.
14        REPRESENTATIVE MARCELLE:  All I'm saying to
15   you is -- is --
16        CHAIRMAN BEAULLIEU:  And we keep this
17   timeline.
18        MR. ALEXANDER:  Yeah.  Absolutely.
19        REPRESENTATIVE MARCELLE:  I think it's -- it's
20   -- it's disingenuous to sit here and say -- and look at
21   us in 2024 and say, "Black people in Louisiana, you
22   might be a third.  You could be 40 percent, but we do
23   not want you at the table making decisions as it relates
24   to what you want or your constituents want."  And that's
25   what I'm hearing.  And it's really, really sad.

Page 103

1         MR. ALEXANDER:  Representative Marcelle, I
2    hear you.
3         REPRESENTATIVE MARCELLE:  It's really -- it's
4    about -- it's about choice.  It's about power.  And it
5    is really fundamentally wrong.  And I -- I said this
6    last year, and I -- I was hoping not to get upset, but
7    we -- we meet afterwards.  We barbeque.  We go across
8    the street.  We hang out.  We cool.  I love you.  You
9    love me.  We go up to the bible study and we pray
10   together, but we do not feel like we are equal, and that
11   is wrong.
12        CHAIRMAN BEAULLIEU:  Thank you, Representative
13   Marcelle.  Representative Boyd.
14        MR. ALEXANDER:  Thank you, Representative
15   Marcelle.  I appreciate that.
16        REPRESENTATIVE BOYD:  Thank you, Mr. Chair.
17   Sitting here today, thinking about the fact that we are
18   literally fighting for an opportunity.  It's not given
19   because people still have to vote.  An opportunity to
20   have two Black representation of African Americans in
21   DC.  The opportunity, nothing is guaranteed.  We're here
22   fighting for the last three years just for the
23   opportunity.  And with voter apathy, we really don't
24   know where that's going to end up.  The closed
25   primaries, we really don't know where that's going to

Page 104

1    end up.  But if we continue along this path, I feel this
2    -- the state as a whole will suffer.  The reality of it
3    is, is that Mike Johnson is the Speaker of the House.
4         They still have four Republicans representing
5    Louisiana.  We're here trying to stop just one
6    additional African American seat.  What does that say
7    for us?  We have my chairman referring to the judge as
8    an Obama-judge.  We cannot continue to divide the city
9    -- the state and expect to survive.  It won't happen.
10   We have to learn to coexist, appreciate our differences,
11   appreciate the culture and differences.  There are
12   things that you cannot possibly understand in African
13   American life because you're not one.  We cannot
14   continue to throw out and spew divisive words and think
15   that we can survive as a state.  It won't happen.
16        MR. ALEXANDER:  Yeah.
17        REPRESENTATIVE BOYD:  Thank you.
18        MR. ALEXANDER:  Representative Boyd, in what
19   you're saying, it just -- it makes me think of what
20   Thomas Jefferson said as one of the founders of our
21   country.  He said, "In matters of taste and culture,
22   swim like a fish.  In matters of principle, stand like a
23   rock."  And that's what I'm asking this committee to do,
24   is stand like a rock and allow our country to not argue
25   the constitutionality.

Page 105

1         REPRESENTATIVE BOYD:  I repeat, that makes no
2    sense.  So you're looking to further divide the state.
3         MR. ALEXANDER:  I'm not here to divide anyone.
4         REPRESENTATIVE BOYD:  That's exactly what
5    you're doing.  Thank you.
6         MR. ALEXANDER:  Thank you.
7         CHAIRMAN BEAULLIEU:  Thank you.  Mr.
8    Alexander, that clears the board.
9         MR. ALEXANDER:  Thank you.  Appreciate your
10   time.
11        CHAIRMAN BEAULLIEU:  Thank you.
12        FEMALE SPEAKER 4:  Mr. Chairman, it's possible
13   to have a --
14        CHAIRMAN BEAULLIEU:  We -- we have three
15   witnesses left.  Let's -- let's hold tight on that.
16   Let's try and get through these three -- three
17   witnesses.  If y'all could just be respectful of --
18   everyone be respectful of time.  Ms. -- Ms. Suzie
19   Labrie.  What's that?
20        MS. LABRIE:  Labrie.
21        CHAIRMAN BEAULLIEU:  Ms. Suzie Labrie, would
22   you --
23        MS. LABRIE:  Yes, (inaudible 1:58:09).
24        CHAIRMAN BEAULLIEU:  -- would like to speak in
25   opposition.

27  (Pages 102 to 105)

## Page 118

1    REPRESENTATIVE CARLSON:  Absolutely.  And
2 thank you, Mr. Chair.  I'm done.
3    MR. HURD:  It's absolutely the same.  What
4 they held was in the '90s, the federal agency that was
5 telling you, "You had to do it," was the DOJ under
6 Section 5, which itself was later held unconstitutional.
7  The answer is they were wrong.  They were
8 unconstitutionally demanding racial districting beyond
9 what the federal courts now recognize as the permissible
10 range of remedy.  We may be -- we don't -- I -- I --
11 look, I'll give Judge Dick an opportunity.  It's not
12 that she's hailed Section 2 applies.
13    The question is whether or not Section 2 has a
14 constitutional remedy, i.e., I believe that my
15 districting plan that I've handed in and I did it for an
16 -- an example is as close as you can get to a
17 non-racially gerrymandered district and get to two
18 majority-minority districts, and it does.  The
19 plaintiff's remedy, Senate Bill 4 and 5, they're both
20 racial gerrymanders and will not stand up to the Fifth
21 Circuit.  There are abilities to draw a compact
22 contiguous majority-minority district, second one, in
23 Louisiana.  What you're going to do, you're going to
24 enact this.
25    If I was Judge Dick, I'd look at it and go,

## Page 119

1 "I'm sorry.  I've got -- already got the judge that
2 wrote the opinion on the Fifth Circuit that says what
3 y'all are about to do is a constitutional gerrymander.
4 Therefore, I can disregard it."  Disregard it.  It is
5 null and void.  And she's going to draw the plan if you
6 want to remedy an actual remedy.  That's why it's
7 exactly the same.  You read the opinion, and you'll see
8 they said, "The federal power does not override or force
9 you to violate the Constitution."  Stand up for the
10 Constitution.
11    Stand up if you want a compact district.  Draw
12 the one that makes sense with our traditional
13 districting principles because you can do it.  The --
14 the -- the -- the -- the answer is, this is an
15 unconstitutional alternative.
16    CHAIRMAN BEAULLIEU:  Okay.  Thank you, Mr.
17 Hurd.  You -- you -- I think you've been very, very
18 clear on it.  The board is clear.  We have no more
19 witnesses.  Senator Womack, we're going to go ahead and
20 -- and call you back up to -- to close.
21    MR. HURD:  Your Honor, if -- I mean, Your
22 Honor.  I apologize.  I'd like to -- I've got a copy of
23 that opinion that outlines all the reasons that what
24 you've got is a racial gerrymander.  I had an outline of
25 what it -- of -- of the -- each criteria that the judge

## Page 120

1 applies on why this is a -- a -- a ineffective remedy,
2 and I hope -- I hope your good judgment finds another
3 solution.
4    CHAIRMAN BEAULLIEU:  Thank you.
5 Representative Phelps, you failed to call, but you
6 didn't say you wanted to speak.  Are you trying to speak
7 now?
8    REPRESENTATIVE PHELPS:  Yes, (inaudible
9 2:19:39).
10    CHAIRMAN BEAULLIEU:  I know you're not on the
11 committee, but you want -- all right.  Come on.  Let's
12 -- all right.  All right.  So let's fill this out that
13 says she does want to speak.  She's providing
14 information only, not a green card or a red card.  So
15 Representative Phelps?
16    REPRESENTATIVE PHELPS:  Thank you for the
17 opportunity to speak.  I -- I just wanted to mention to
18 maybe some of our new colleagues here when we talk about
19 why we're here.  This started from an increase of the
20 population from our census.  So I -- and I think that's
21 not -- we haven't heard a lot of that with the audience
22 on the outside.  It just was not a mandate to draw a
23 map.  So this does go with the 2020, the Census results
24 that resulted in a population increase of African
25 Americans across the state.

## Page 121

1    Secondly, I hope that there is some passion
2 here about if there were a different population, a White
3 population, and there was so much pushback about
4 creating a district so that everyone would be
5 represented, how that may feel.  Just a thought.
6 Thirdly, when I heard Judge Dick's name reference to
7 Obama's judge, I don't know if I've ever heard someone
8 say Trump's judge or Carter's judge or Reagan's judge or
9 whomever.  I don't know if we're going to start
10 referencing judges that way, but I hope that we do not
11 do that in this body.
12    I think we should give all of our elected
13 officials a little bit more respect in that, regardless
14 of what president they were appointed to or from.  Thank
15 you for your time.
16    CHAIRMAN BEAULLIEU:  Thank you, Representative
17 Phelps.  The board is clear.  Senator Womack, would you
18 come up and close on your bill?
19    SENATOR WOMACK:  Thank you, Mr. Chairman.
20 Members of the committee, we all know why we're here.
21 We were ordered to -- draw a new Black district, and
22 that's what I've done.  At the same time, I tried to
23 protect Speaker Johnson, Minority Leader Scalise, and my
24 representative, Congresswoman Letlow.  I'm agreeable to
25 the amendment, and we complied with everything the judge

31  (Pages 118 to 121)

Page 122

1    has asked.  And I just ask for favorable passage.
2         CHAIRMAN BEAULLIEU:  Thank you, Senator --
3    Senator Womack.  Representative Farnum has made a motion
4    that we adopt Senate Bill 8 as amended.  Is there any
5    objection?  Representative Marcell objects.  Ms. Baker
6    -- listen, do we have anybody in an anteroom needs to
7    come in real quick?  We have everyone here?  Looks like
8    everyone's here.  Okay.  Ms. Baker, would you please
9    call the role?  So let me clarify the vote.  A vote of
10   yes moves Senator Womack's bill as amended by
11   Representative Farnum forward.  A vote of no leaves it
12   here in the committee.  Ms. Baker?
13        MS. BAKER:  Thank you.  Mr. Chairman.
14   Chairman Beaullieu?
15        CHAIRMAN BEAULLIEU:  Yes.
16        MS. BAKER:  Yes.  Representative Billings?
17        REPRESENTATIVE BILLINGS:  Yes.
18        MS. BAKER:  Yes.  Representative Boyd?
19        REPRESENTATIVE BOYD:  Yes.
20        MS. BAKER:  Yes.  Representative Carlson?
21        REPRESENTATIVE CARLSON:  Yes.
22        MS. BAKER:  Yes.  Representative Carter?
23   Representative Carver?
24        REPRESENTATIVE CARVER:  Yes.
25        MS. BAKER:  Yes.  Representative Farnum?

Page 123

1         REPRESENTATIVE FARNUM:  Yes.
2         MS. BAKER:  Yes.  Representative Gadberry?
3    Yes.  Representative Johnson?  Representative Larvadain?
4    Yes.  Representative Lyons?
5         VICE CHAIRMAN LYONS:  Yes.
6         MS. BAKER:  Yes.  Representative Marcelle?
7    Representative Newell?
8         REPRESENTATIVE MARCELLE:  Not as amended.  No,
9    as amended.
10        MS. BAKER:  No for Representative Marcelle.
11        REPRESENTATIVE MARCELLE:  No.
12        MS. BAKER:  Representative Newell?
13        REPRESENTATIVE NEWELL:  Yes.
14        MS. BAKER:  Yes.  Representative Schamerhorn?
15        REPRESENTATIVE SCHAMERHORN:  Yes.
16        MS. BAKER:  Yes.  Representative Thomas?
17        REPRESENTATIVE THOMAS:  Yes.
18        MS. BAKER:  Yes.  Representative Wright?
19        REPRESENTATIVE WRIGHT:  Yes.
20        MS. BAKER:  Yes.  Representative Wybel?
21        REPRESENTATIVE WYBEL:  Yes.
22        MS. BAKER:  Yes.  There are 14 yeas and 1 nay.
23        CHAIRMAN BEAULLIEU:  Members -- members have a
24   vote of 14 yeas, 1 nay.  Senate Bill 8 is hereby adopted
25   as amended.  Reported as amended.  There are no other

Page 124

1    matters before this committee.  Representative Thomas
2    had made a motion that we adjourn.  Look, and -- as we
3    adjourn, thank you everyone for your patience.  Thank
4    you everyone for your time.  It's been a -- great
5    debate and -- and we appreciate you.  Meeting adjourned.
6    Thank you all.
7         (Meeting adjourned.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 125

1         CERTIFICATE OF TRANSCRIPTION
2         I, Nathan Pikover, COO of TranscribeMe, Inc.,
3    do hereby certify that
4    291001-Audio-COMBINE-1-18-24_HG_p1-p2.MP3
5    was transcribed utilizing computer aided means and the
6    TranscribeMe transcription team.
7         The transcript of the audio mentioned above,
8    having been transcribed and reviewed by TranscribeMe,
9    Inc. to the best of the company's ability, is a full,
10   true, and correct transcription.
11        I further certify that neither I, nor the
12   TranscribeMe, Inc. transcription team, have any personal
13   association with the parties involved or are in any way
14   interested in the outcome thereof.
15        Dated this 12th of March, 2024.
16   _____
17   Nathan Pikover, COO TranscribeMe, Inc.
18
19
20
21
22
23
24
25



# PohlmanUSA®
## Court Reporting and Litigation Services

---

Floor - Audio Transcription

January 19, 2024

---

Phillip Callais, et al.

vs.

Nancy Landry

THE CLERK:  Mr. Speaker and members, Representative Beaullieu moves to advance to Regular Order No.  6, Senate Bills on Third Reading and Final Passage.

MR. SPEAKER:  Without objection.

THE CLERK:  Mr. Speaker and members, first instrument in this order -- only instrument in this order is Senate Bill 8 by Senator Womack: to enact Title 18 relative to congressional districts; provide relative to redistricting Louisiana's congressional district; provide with respect to offices, positions, other than congressional, which are based on congressional districts.

MR. SPEAKER:  Representative Beaullieu on the bill.

REPRESENTATIVE BEAULLIEU:  Thank you, Mr. Speaker.  Thank you, Madam Clerk.  Members, also, thank you.  Thank you for your patience this week.  I know we have been charged with a tall task, and your patience, your fortitude, your strong desires to represent your district, it's impressive.  It's -- it's nice to see, especially -- especially with some of the new members.  You've been awesome this week, and you've -- you've stood strong.  And to say it's impressive is -- is -- is a -- is just the bit of it.

## Page 2

1  Members, I'm bringing you this congressional
2  redistricting map that Senator Womack presented.  You've
3  -- you've heard it debated a couple of times.  You heard
4  it in -- in committee as well.  Yesterday, we added an
5  amendment in committee to Senator Womack's bill.  And so
6  my first order of business, even before I make my
7  opening remarks, is going to get this bill in a proper
8  posture.  I'd like to offer up an amendment to delete
9  the amendments that we added in committee yesterday.  So
10  if you'll check your monitors, it's going to -- or Madam
11  Clerk, would you mind reading in the amendment?
12      THE CLERK:  Mr. Speaker and members,
13  Representative Beaullieu, as he's just discussed, is
14  offering up a one-page set of amendments.  That set is
15  online.  It's set number 83.
16      REPRESENTATIVE BEAULLIEU:  So, members, after
17  hearing from a lot of you, it's my thought that this
18  instrument was in its best posture when it came over
19  here from the Senate.  And so I am offering an amendment
20  to put it back in that posture, and I'd ask for your
21  support.
22      MR. SPEAKER:  I see no questions on the
23  amendment.  Representative Marcelle for the floor on the
24  amendment.
25      REPRESENTATIVE MARCELLE:  Thank you, Mr.

## Page 3

1  Speaker and Chairman.  And thank you, members.  On
2  yesterday, we had a pretty, I would say, heated debate
3  in H&G about these amendments, and so I rise in support
4  of removing those amendments.  And I had a lot of
5  questions after I got home about why didn't I object to
6  the amendments, but I'd stepped out of the room and so
7  that's the reason for me not objecting to the
8  amendments.  I did object to the bill because the
9  amendments had been added.
10  I know this is the process.  I think that the
11  bill was in its best posture when it came over with
12  Representative -- I mean, with Senator Womack, Senate
13  Bill 8.  However, I tried to put that bill in a better
14  posture.  That matter failed.  I know the process.  I
15  appreciate the process.  And I appreciate the chairman
16  taking that amendment off that I think does us no good
17  to get to a better place where we can get the second
18  congressional district.  And I'd ask that you all would
19  support the chairman in removing the amendment that was
20  placed on there on yesterday.  Thank you.
21      MR. SPEAKER:  Is there any objections to the
22  adoption of the amendment?  Representative Farnum,
23  objection.  Would you like to speak on your objection?
24  Representative Beaullieu, would you like to close on
25  your amendment?

## Page 4

1      REPRESENTATIVE BEAULLIEU:  Members, I just ask
2  you to support the removal of the amendment that we
3  added in -- in House and Governmental.  Thank you.
4      MR. SPEAKER:  Representative Beaullieu has
5  offered up an amendment which Representative Farnum
6  objects.  All those in favor, vote yea.  All those
7  opposed, vote nay.  The clerk will open the machine.
8      THE CLERK:  (inaudible 0:04:34).
9      MR. SPEAKER:  Wright, yea.
10      THE CLERK:  Emerson, yea.
11      MR. SPEAKER:  Emerson, yea.  Are you through
12  voting, members?  The clerk will close the machine.  We
13  have 84 yeas and 16 nays, and amendment passes.
14  Representative Beaullieu on the bill.
15      REPRESENTATIVE BEAULLIEU:  Okay, Mr. Speaker.
16  Thank you, members, for supporting me on that amendment.
17  You'll bear with me for a second.  So, members, I -- I
18  appreciate you giving me the opportunity to be with you
19  here today.  Two years ago, I sat on the committee that
20  -- that passed the original congressional map after
21  redistricting, and we spent a lot of time going around
22  the state listening to folks from all over our state.
23  And this House, by two -- over two-thirds vote,
24  supported a map that we thought was fair, that we
25  thought was representative of the state of Louisiana.

## Page 5

1      As Senator Stine said earlier in this week,
2  "It's with a heavy heart that I present to you this
3  other map," but we have to.  It's that clear.  A federal
4  judge has ordered us to draw an additional minority seat
5  in the state of Louisiana.  We have the -- the federal
6  Voting Rights Act litigation is still going on in the US
7  District Court in the Middle District of Louisiana.  The
8  map in this bill that I'm presenting is one of a product
9  of long, detailed process with several goals.
10  First, and as a lot of you are aware,
11  Congresswoman Julia Letlow represents north Louisiana in
12  our nation's capital and serves on both the
13  appropriations and agricultural committees.  The
14  boundaries in the bill that I'm presenting ensure that
15  Congresswoman Letlow remains both unimpaired with any
16  other incumbents, and in a congressional district that
17  should continue to elect a Republican Congress for the
18  remainder of this decade.
19  I have great pride in the work Congresswoman
20  Letlow has accomplished, and this map will ensure that
21  Louisianians will continue to benefit from her presence
22  in the halls of Congress for as long as she decides to
23  continue serving our great state of Louisiana.
24  Second, of Louisiana's six congressional
25  districts, the map and the proposed bill ensures that

2  (Pages 2 to 5)

Page 6

1   four are safe from -- or safe Republican seats.
2   Louisiana's Republican presence in the United States
3   Congress has contributed tremendously to the national
4   discourse, and I'm very proud, and it's remarkable, that
5   both the speaker of the United States House of
6   Representatives, Mike Johnson, and the US House majority
7   leader, Steve Scalise, are both from our great state.
8       This map ensures that the two men -- the two
9   of them will have solidly Republican districts at home
10  so they can focus on the national leadership that we
11  need in Washington, DC.  The map proposed in this bill
12  ensures that the conservative principles retained by the
13  majority of those in Louisiana will continue to extend
14  past our boundaries to our nation's capital.
15      Finally, the maps in the proposed bill respond
16  appropriately to the ongoing federal litigation, the
17  ongoing federal Voting Rights Act case in the Middle
18  District of Louisiana.  For those who are unaware of the
19  background, the congressional maps that we enacted, that
20  I mentioned a second ago, in March of -- in March of
21  2022, have been the subject of litigation roughly since
22  the day the 2022 congressional redistricting bill went
23  into effect, and even before we enacted it.  So the suit
24  was filed before we actually enacted the bill.
25      After a substantial amount of prolonged

Page 7

1   litigation, two trips to the Fifth Circuit asking it to
2   reverse it, and a trip to the US Supreme Court, the
3   federal District Court has adhered to its view that the
4   federal law requires that the state have two
5   congressional districts with a majority of Black voters.
6   It's that simple.  Our secretary of state, our attorney
7   general, and our prior legislative leadership appealed
8   but have yet to succeed.  We are now here because the
9   federal courts order that we have a first opportunity to
10  act.
11      If we don't act, it is very clear that the
12  federal court will impose the plaintiff's proposed map
13  on our state, and we don't want that.  The District
14  Court's order that we must have two majority-Black
15  voting-age population districts, combined with the
16  political imperatives I just described, have largely
17  driven the boundaries for District 2 and District 6,
18  both of which are over 50 percent Black voting-age
19  population, or BVAP as you've heard discussed a lot in
20  committees and may hear with folks discussing today.
21      Given the state's current demographics,
22  there's not a high enough Black -- Black population in
23  the southeast portion of Louisiana to create two
24  majority-Black districts and to also comply with the US
25  Constitution's one vote, one person requirement.  That a

Page 8

1   -- the reason why District 2 is growing around Orleans
2   Parish, while District 6 includes the Black population
3   of east Baton Rouge Parish and travels up the I-49
4   corridor and the Red River to include Black population
5   in Shreveport.
6       While this is a different map than the
7   plaintiffs in the litigation have proposed, this is the
8   only map I reviewed that accomplishes the political
9   goals I believe are important for my district, for
10  Louisiana, and for our country.
11      While I did not draw these boundaries myself,
12  and I'm bringing the bill to the floor for the --
13  Senator Womack carried through the Senate and through
14  committee yesterday in this House, I firmly submit that
15  the congressional voting boundaries represented in this
16  bill best achieve the goals of protecting Congresswoman
17  Letlow's seat, maintaining strong districts for Speaker
18  Johnson and Majority Leader Scalise, ensuring four
19  Republican districts, and adhering to the command of the
20  federal court in the Middle District of Louisiana.
21      I submit to you this map, and I'll be happy to
22  take any questions.
23      MR. SPEAKER:  Representative Taylor on a
24  question.
25      THE CLERK:  She waives.

Page 9

1       MR. SPEAKER:  She waives.  Representative
2   Amedee on a question.
3       REPRESENTATIVE AMEDEE:  Thank you, Mr.
4   Speaker.  Rep. Beaullieu, thanks for carrying the bill
5   over here.  Is this bill intended to create another
6   Black district?
7       REPRESENTATIVE BEAULLIEU:  Yes, ma'am, and to
8   comply with the judge's order.
9       REPRESENTATIVE AMEDEE:  Thank you.
10      MR. SPEAKER:  Seeing no further questions,
11  Representative Bayham for the floor.
12      (Pause.)
13      REPRESENTATIVE BAYHAM:  When I ran for the
14  legislature, I had one goal, and that is to give my
15  community a voice.  I've studied some of the plans that
16  were submitted by my colleagues here.  Representative
17  Wilford Carter had a plan, I believe, that kept St.
18  Bernard Parish intact, and I appreciate that,
19  Representative Carter.  I am here to stand up for my
20  community.  St. Bernard has never been split into two
21  congressional districts.  We've already been split into
22  two Senate districts.  And to be brutally honest,
23  looking at the way these precincts are -- and I know
24  every precinct.  I've campaigned in every precinct in
25  St. Bernard.

3  (Pages 6 to 9)

Page 10

1  We have two precincts, for example, that are
2  in the 2nd Congressional District. One, Precinct 24,
3  gave President Trump 75 percent of the vote. Precinct
4  25 gave President Trump 69 percent of the vote. Those
5  are in the 2nd District. In the 1st District is
6  Precinct 44, which gave President Biden 83 percent of
7  the vote. Precinct 45 gave President Biden 85 percent
8  of the vote. It seems like these precincts were just
9  thrown together like a mechanical claw machine, just
10  grabbing people and dropping them off.
11  Now, I participated in the hearings on the
12  congressional reapportionment where they toured the
13  state, and I appreciated the leadership of the House and
14  the Senate, the committees in doing this. I took
15  advantage of it. I testified. We are being told that
16  we have to redraw all of this in a period of less than
17  eight days. That is not how you make sausage. That's
18  how you make a mess. I cannot in good conscience vote
19  for this bill that divides my community, and I will
20  stand by that for my community. Thank you.
21  MR. SPEAKER: There's no questions.
22  REPRESENTATIVE BAYHAM: Thank you.
23  MR. SPEAKER: Representative Beaullieu to
24  close on the bill.
25  REPRESENTATIVE BEAULLIEU: As a colleague

Page 11

1  mentioned earlier - sorry, Representative Cox, if I have
2  to poach you - "Everybody likes to eat sausage, but
3  nobody likes to see how it's made." And it's -- it has
4  been painful, and it has been painful for all of us.
5  But it's simple. We're under a federal judge's mandate,
6  and this bill is our best attempt to comply with her
7  decision. So, members, I ask you to support me in
8  voting for this map. Thank you.
9  MR. SPEAKER: Representative Beaullieu moves
10  for final passage of the bill. Those in favor, vote
11  yea. Those opposed, vote nay. The clerk will open the
12  machine. Vote your machine, members. Members, are you
13  through voting? The clerk will close the machine. We
14  have 86 yeas, 16 nays, and the bill is finally passed.
15  Representative Beaullieu moves to adopt the title, and
16  moves to reconsider the vote for which the bill finally
17  passed and lay that motion on the table without
18  objection.
19  MR. SPEAKER: Open the machine for co-authors.
20  (Pause.)
21  MR. SPEAKER: The clerk will close the
22  machine. We have ten co-authors.
23  MALE SPEAKER: Representative Bagley for a
24  motion to move to correct his vote.
25  REPRESENTATIVE BAGLEY: I want to correct on

Page 12

1  -- on Senate Bill Number 8. I want to correct from
2  absent to nay.
3  MALE SPEAKER: Without objection.
4  REPRESENTATIVE BAGLEY: Thank you, Mr. --
5  MALE SPEAKER: Representative Taylor moves for
6  a motion to correct her vote.
7  REPRESENTATIVE TAYLOR: Good afternoon. I
8  would also like to vote from absent to yea on the
9  amendment.
10  MALE SPEAKER: Without objection.
11  Representative Jackson moves to correct his vote.
12  REPRESENTATIVE JACKSON: Yes. I want to
13  change my vote from nay to yea.
14  MALE SPEAKER: Without objection.
15  REPRESENTATIVE JACKSON: Thank you.

Page 13

1  CERTIFICATE OF TRANSCRIPTION
2  I, Nathan Pikover, COO of TranscribeMe, Inc.,
3  do hereby certify that 291001-Audio-1-19-24_1es_day5 -
4  Cut-Appended was transcribed utilizing computer aided
5  means and the TranscribeMe transcription team.
6  The transcript of the audio mentioned above,
7  having been transcribed and reviewed by TranscribeMe,
8  Inc. to the best of the company's ability, is a full,
9  true, and correct transcription.
10  I further certify that neither I, nor the
11  TranscribeMe, Inc. transcription team, have any personal
12  association with the parties involved or are in any way
13  interested in the outcome thereof.
14  Dated this 11th of March, 2024.
15  _____
16  Nathan Pikover, COO TranscribeMe, Inc.

4 (Pages 10 to 13)



# **Pohlman**USA®
# Court Reporting and Litigation Services

Lousiana State Senate 1st Special Session-Audio Transcription

January 19, 2024

In Re: Louisiana House Floor/Committee Video

MALE SPEAKER:  Secretary will open the machines.  Vote at the machines, members.  Vote at the machines.  Are we finished voting?  36 members in a quorum.  Next order of business.

THE CLERK:  Messages.  Messages from the House.  The -- I'm directed to inform you that the House of Representatives has finally passed the following Senate bills and joint resolutions.  Senate Bill 8 reported with amendments respectfully submitted.  Michelle Fontana, clerk of the house.  Senate bills returned from the House with amendments.  Senate Bill 8 by Senator Womack is an act to amend Title 18, relative to congressional districts, to provide for the redistricting of Louisiana's congressional districts to provide with respect to positions and offices other than congressional, which are based upon congressional districts.  The bill comes from the House with a set of House Committee amendments and House Floor amendments.

Senator Womack now moves for suspension of the rules to take up the bill at this time.

MALE SPEAKER:  Without objection.  Without objection.  Senator Womack, on your bill.

SENATOR WOMACK:  Thank you, Mr. President.  Members, Senate Bill 8, which provides for redistricting of congressional districts, appears to be before you now

Page 2

1  in the exact posture that it left the Senate.  The House
2  is removed.  HGA Committee amendment I move to concur
3  with on Senate Bill Number 8.
4       (Pause.)
5       MALE SPEAKER:  Gotcha.  Members, the summaries
6  are being passed out right now, so we're just going to
7  slow down a little bit.  I want to give everybody the
8  chance to see what we're voting on.
9       (Pause.)
10      MALE SPEAKER:  Senator Womack, would you mind
11  going over the -- I know we've all seen the amendment
12  once.  We -- we know what the bill looks like, but if
13  you could just go over some high points on it while
14  they're passing this out.  Members, if you have a --
15  members, if you want to speak, hit your Floor button if
16  anybody would like to come to the Floor to discuss the
17  bill.  I know some members -- make sure that you do
18  that.
19      (Pause.)
20      SENATOR WOMACK:  Okay.  They're passing out
21  the amendments.  The -- the way they did lay up the
22  House -- I mean, lay up the Senate, it was one district
23  change on that amendment.  That took in part of
24  Avoyelles Parish.  That was the only change, to my
25  knowledge, that was in the -- that was in the new map.

Page 3

1       MALE SPEAKER:  Okay.  Senate Morris for -- for
2  -- Senator Morris for a question on the bill, and you
3  also have your Floor button, so which -- you want to
4  question.  Let's do question first, please, and then we
5  can do the Floor.  Thank you.
6       SENATOR MORRIS:  Senator Womack, you said the
7  only change was -- was taking some of Avoyelles Parish
8  and putting it in Miss Letlow's district, correct?
9       SENATOR WOMACK:  Correct.
10      SENATOR MORRIS:  However, it actually took my
11  personal home out of Miss Letlow's district, as well as
12  Senator Cathey's home precinct, as well as State Rep
13  Echols' home precinct, and put that in Representative
14  Johnson's district; did it not?
15      SENATOR WOMACK:  It did.
16      SENATOR MORRIS:  So the only thing done
17  was not just Avoyelles Parish, correct?
18      SENATOR WOMACK:  I stand to be corrected.
19  You're correct.
20      SENATOR MORRIS:  Why did we do that for
21  Avoyelles Parish?
22      SENATOR WOMACK:  That was -- that was brought
23  before the -- the -- I'll have to look back.  I -- I was
24  -- I was thinking that was a -- a -- a Senate Committee
25  amendment on that, and that's the way it came out of

Page 4

1  Committee.
2       SENATOR MORRIS:  Yes, sir.  I think you
3  altered the amendment.
4       SENATOR WOMACK:  Senator Morris, I'll have to
5  -- I'll have to look back and -- and put that together
6  for you.  Any other questions?
7       SENATOR MORRIS:  So you don't know why we put
8  Avoyelles in Miss Letlow's district?
9       SENATOR WOMACK:  As I stated earlier, we were
10  -- we were trying to put what we could to -- to give
11  senator -- Representative Letlow as much North Louisiana
12  as we could.  So that was what we -- that was what we
13  done on -- on that amendment.
14      SENATOR MORRIS:  By -- by trading Avoyelles
15  for Monroe, we gave her more North Louisiana.
16      SENATOR WOMACK:  As I understand it, in that
17  bill, I didn't think that -- that your home or Senator
18  Cathey or Echols was in the original bill to start with.
19  My recollection.
20      SENATOR MORRIS:  It wasn't in Miss Letlow's
21  district.
22      SENATOR WOMACK:  Right.
23      SENATOR MORRIS:  Would you be shocked if that
24  was not the case, and that we were all in Miss Letlow's
25  district?

Page 5

1       SENATOR WOMACK:  Probably so.  But that -- at
2  the -- at the time I put that amendment on, I don't
3  remember the original map having that -- y'all's address
4  in her district.
5       SENATOR MORRIS:  But you did know that the
6  amendment took some more of Ouachita Parish out of
7  Letlow's, and put it into Johnson's district; you did
8  know that, right?
9       SENATOR WOMACK:  I knew it had to come from
10  somewhere.
11      SENATOR MORRIS:  Yes, sir.  Thank you.
12      MALE SPEAKER:  Senator Morris, you have the
13  Floor now for the -- for Senate (inaudible 0:08:19).
14      SENATOR MORRIS:  Thank you, Mr. President.  We
15  came here to redistrict because there's a chance.  It's
16  not absolute, but there's a chance that the judge will
17  rule that our districts that we -- that we completed in
18  the last couple of years will not be declared
19  unconstitutional.  That case never went to a final
20  judgment.  It hasn't even gone to a full trial on the
21  merits, but yet here we are.  So what do we do?  We're
22  supposed to redistrict with a lot of principles in mind.
23  Among those include compactness and contiguity.
24      This bill does neither.  It's neither
25  contiguous nor compact.  We're all supposed to do it and

2  (Pages 2 to 5)

Page 6

1 consider political subdivisions and communities of
2 interest.  So now, by everyone's account, I live in
3 Northeast Louisiana, and now I'm in the same district as
4 Lake Charles.  Louisiana Tech, Grambling, and University
5 of Louisiana, Monroe are now in different congressional
6 districts.  They're all only 30 miles apart.
7     Senator Womack said in Committee that what he
8 wanted to do was protect Julia Letlow.  She's the only
9 woman in our congressional delegation in this state,
10 she's the only member of appropriations, and she's on
11 the Agriculture Committee.  So protecting her district
12 because she has seniority, and because she's a bright,
13 articulate, and effective Congresswoman, that's a very
14 noble and worthwhile goal.  And I applaud him for having
15 stated that that is one of the objectives of this bill,
16 but this bill doesn't do that.
17     This bill puts more votes south of the
18 Mississippi line in the Florida parishes than it does in
19 the northeast corner of the state.  Now, I'm not
20 horribly disappointed to be in Congressman Johnson's
21 district because I admire him immensely.  It's nothing
22 against him.  He -- I served with him in the House, and
23 we are friends, and I'm a supporter, and he knows that.
24 It has nothing to do with him.  But we didn't do the
25 things that I believe that we should have done.  Well,

Page 7

1 what did we do?
2     It looks like to me we primarily considered
3 race, and we considered the personal interest of a
4 handful of members.  There was no reason.  The bill, as
5 originally filed, we did not like.  It cut my home
6 parish in half.  I understand it's got to go through
7 somebody's district, right?  A lot of you have your
8 districts, your home parishes cut through, but you
9 didn't have to zigzag it around just so somebody can get
10 a personal stake, who might want to run for Congress, or
11 just wants their parish there because of their personal
12 interest.
13     I'm not going to be around to run for Congress
14 or anything of the sort in two years, eight years, or
15 ten years.  This is about districts and regions that
16 will represent the people of our area, and the lack of
17 compactness is going to effectively disenfranchise, I
18 believe, to a certain degree, the people that I
19 represent.  And for these reasons, I urge you to vote
20 against this bill.  Thank you, Mr. President.
21     MALE SPEAKER:  Thank you, Senator Morris.
22 Senator Cathey to the Floor on the bill.
23     (Pause.)
24     SENATOR CATHEY:  Thank you, Mr. President.
25 Members, I -- I don't know that I can say any better

Page 8

1 than what Senator Morris just said, and I wholeheartedly
2 agree with everything that he said.  You know, I love
3 the Senate, and I love being a member of this body, and
4 I'm excited about the things that we're going to do in
5 this term.  I think we're going to do some great things.
6 Unfortunately, today is not one of those days.
7     What we're doing to Northeast Louisiana with
8 this map is a travesty and a disservice to the only
9 woman that we have serving in our congressional
10 delegation.  The only member that we have that sits on
11 the House Appropriations Committee, which controls
12 federal dollars to this state.  When we say that this
13 map protects Northeast Louisiana and Congresswoman
14 Letlow, I'll have you know, 50 percent of the votes in
15 Congresswoman Letlow's district now reside within 30
16 miles of this building.  Let that sink in.  30 miles of
17 this building.  Look, I can see the writing on the wall,
18 and I know where this is going to go.
19     And so, look, I'm -- I'm -- I've been around
20 long enough to -- to count, and -- and I know that --
21 that we can't get to 20, but -- but I just couldn't let
22 this go without standing up for my people and my
23 district and my congresswoman.  And so I guess there is
24 one other thing that -- that I do want to say just to
25 put it into perspective.  Again, kind of like Senator

Page 9

1 Morris said, my home, my personal home, which is 35
2 miles from the Arkansas line, and 65 miles from the
3 Mississippi line will now be in the same congressional
4 district as Fort Polk and McNeese State University and
5 Lake Charles.  That's a disservice and a travesty.  So
6 with that, I close.
7     MALE SPEAKER:  Thank you, Senator Cathey.
8 Senator Luneau for the Floor.
9     (Pause.)
10     SENATOR LUNEAU:  Thank you, Mr. President.
11 Members, we -- we did redistricting last year, I'm sure
12 most of you remember that, and it was an utter failure.
13 And there were a lot of us that talked about some of the
14 things that we could have done different to make it
15 different, but it didn't work out that way, so here we
16 are again.  And I remember when we redistricted our own
17 district, our Senate districts, Rapides Parish, my home
18 parish, now has six different senators.  Six.  And I
19 fought that, but I lost on that -- on that -- on that
20 quest.  I -- I just couldn't -- couldn't get everybody
21 together.
22     And they said, "You know, it's going to be
23 great if you have six centers.  Then you've got six
24 people coming together."  That -- that didn't happen.
25 That's not true.  We didn't come together, and it hurt

3  (Pages 6 to 9)

Page 10

1    Rapides Parish.  And now this map, yet again, has
2    Rapides Parish divided in half.  I guess that's better
3    than six, but I guess we would have to have every
4    congressperson from the -- from the state to have six.
5    It's important that we do these maps, and we do them
6    correctly, where we establish another minority majority
7    district.  And for that reason, I'm going to support and
8    I'm going to vote for this map, but like my colleagues
9    before me, I have to admit we should do better.
10           MALE SPEAKER:  Thank you, Senator Luneau.
11   Senator Carter for the floor.
12           SENATOR CARTER:  Thank you, Mr. President.
13   Members, we have an historic opportunity before us
14   today, and it's an exciting day for the great State of
15   Louisiana.  If we concur and accept Senate Bill 8, we
16   get to create two performing African American districts
17   right here in the State of Louisiana.  That is historic.
18   That is to be celebrated.  I really want to say thank
19   you to everyone in this room.  I can't thank you all
20   enough.  I appreciate the sincere effort.  I appreciate
21   the -- the -- the working late into the evenings that --
22   I want to thank the staff of the SGA committee and the
23   tireless hours that they have.  This is -- this is
24   historic.
25           I know that it's hard to do anything that's

Page 11

1    perfect, and I know redistricting is the hardest thing
2    that we do of all.  This is my second redistricting
3    session, and they're very tough, but we came together in
4    a effort to comply with a federal judge's order that
5    Louisiana provide equal representation to the African
6    Americans in the State of Louisiana, and we have an
7    opportunity to do that.  Let's celebrate.  Let's be
8    happy.  Let's be glad this state has an opportunity to
9    provide equal representation in our congressional
10   leadership right here in the State of Louisiana.  Thank
11   you all so much.
12           And I also want to thank -- I'll be remiss if
13   I didn't thank the -- the president, all the members of
14   SGA committee, the -- the governor who called this
15   session.  We began with the governor addressing us on
16   Dr. King's Day, and here we are celebrating at the end
17   of that week.  And it just didn't start at the beginning
18   of this week with Dr. King's Day.  It started way back
19   when Dr. King was alive, in a push for a voters' rights
20   act.  There's so many hurdles along the way and so many
21   battles.  There's so many -- so many -- so much effort.
22   So much energy.
23           And when we were in Committee, we heard from
24   many people.  From the LDF people to the plaintiffs to
25   all the -- community people that came to testify

Page 12

1    because they did it last year.  And some of them said,
2    "We are tired.  We're tired of keep doing this."  But
3    let me tell my friends and my colleagues, to everyone,
4    we shall not tire.  We shall continue to fight for
5    what's right.  It is -- this is how we make progress.
6    It is not easy, it is challenging, but this is how we
7    make progress, and we make progress.  We celebrate it.
8    We acknowledge it.  So thank you to my colleagues.
9    Thank you to all of us who engaged in this process.
10   Thank you, Mr. President.
11           MALE SPEAKER:  Thank you, Senator Carter.
12   Senator Womack to close.
13           SENATOR WOMACK:  Members, we all -- we all
14   know what we went through and worked through and
15   tirelessly.  Late nights.  Many hours.  Many hours spent
16   in the drafting room, of trying to help Senator Morris
17   and Senator Cathey in trying to alleviate some of the
18   problems they had.  We worked on that.  However,
19   congressional, it wasn't working for everybody.  So
20   we're here where we're at, and here your bill's before
21   you.  I ask that you concur with Senate Bill 8.  Thank
22   you.
23           MALE SPEAKER:  Thank you, Senator Womack.
24   Senator Womack moves to concur in Senate amendments
25   proposed to House -- to Senate Bill 8.  When the

Page 13

1    machines are open, all those in favor to concur in the
2    Senate amendments will vote aye.  All opposed will vote
3    nay.  Madam Secretary may open the machines.
4            SENATOR HENRY:  Go to machine, members.  Go to
5    machines.  Go to machines, members.  Close machine,
6    please.
7            27 yeas, 11 nays, and the motion carries.
8    Senator Talbot for a motion.
9            SENATOR TALBOT:  Thank you, Mr. President.  I
10   make a motion that we adjourn sine die.
11           SENATOR HENRY:  Without objection.  Members,
12   if you could have your seat just for a second.  Sit down
13   just.
14
15
16
17
18
19
20
21
22
23
24
25

4 (Pages 10 to 13)