0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**CHAIRMAN BEAULLIEU:**  Good morning, members. Good morning viewer in public. Today is Wednesday, January 17, 2024, and you're in the committee on House and Governmental Affairs. We ask everyone to please silence your cell phones. If you need to take a call, we ask you to be courteous and step out to take that call. If any witnesses. We have some cards on the table. White cards of information. Green cards in favor, red cards are in opposition. These are held as evidence in these hearings. We're going to go ahead this morning. Ms. Baker, would you mind calling roll?

**MS. BAKER:**  Thank you, Mr. Chairman. Chairman Beaullieu?

**CHAIRMAN BEAULLIEU:**  Here.

**MS. BAKER:**  Here. Sorry. Representative Billings?

**REPRESENTATIVE BILLINGS:**  Here.

**MS. BAKER:**  Representative Boyd? Representative Carlson?

**REPRESENTATIVE CARLSON:**  Present.

**MS. BAKER:**  Present. Representative Carter?

**REPRESENTATIVE CARTER:**  Present.

**MS. BAKER:**  Present. Representative Carver?

**REPRESENTATIVE CARVER:**  Here.

**MS. BAKER:**  Present. Representative Farnham?

**REPRESENTATIVE FARNHAM:**  Here.

**MS. BAKER:**  Present. Representative Gadberry?

**REPRESENTATIVE GADBERRY:**  Here.

**MS. BAKER:**  Present. Representative Johnson? Representative Larvadain?

**REPRESENTATIVE LARVADAIN:**  Here.

**MS. BAKER:**  Present. Vice Chair Lyons?

**VICE CHAIR LYONS:**  Present.

**MS. BAKER:**  Present. Representative Marcel? Representative Noel?

EXHIBIT

JE37

**0117_24_hg**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**REPRESENTATIVE NOEL:**  Here.

**MS. BAKER:**  Present. Representative Shammerhorn?

**REPRESENTATIVE SCHAMERHORN:**  Here.

**MS. BAKER:**  Present. Representative Thomas?

**REPRESENTATIVE THOMAS:**  Here.

**MS. BAKER:**  Present, Representative Wright?

**REPRESENTATIVE WRIGHT:**  Present.

**MS. BAKER:**  Present. Representative Wyble?

**REPRESENTATIVE WYBLE:**  Present. We have 14 in a quorum.

**CHAIRMAN BEAULLIEU:**  Thank you, Ms. Baker. We're going to go ahead and start this morning with Representative Marcelle's bills, and she has stepped out for a second, but if we'll sit tight for a second, she'll be right with us.

**[BACKGROUND NOISE]**

Representative Marcelle. Good morning. We have two bills. We'll start with House Bill 4. Okay, Ms. Smith, you want to read in the bill?

**MS. SMITH:**  All right. Thank you, Mr. Chairman, committee members, this is House Bill No. 4 by Representative Marcel. It provides for the assessment of penalties for failure to timely file required reports.

**CHAIRMAN BEAULLIEU:**  Representative Marcelle.

**REPRESENTATIVE MARCELLE:**  Thank you, Chairman and members. House Bill 4 is a bill that I've previously filed in another session. I intend to run this bill again. However, due to the time restraints that we're under, I know that the most important thing that we're here to do is to make sure that we have fair maps. So, in the interest of time, I will move to voluntarily defer this bill, and you will see it again in regular session.

**CHAIRMAN BEAULLIEU:**  Representative Marcelle has moved voluntarily to defer the bill. Is there any objection? Hear no objection. We're going to hold that billing committee. Thank you, Representative Marcelle. We're going in the House Bill 5, Ms. Lowrie.

2

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**MS. LOWRIE:**  Thank you, Mr. Chairman. House Bill 5 by Representative Marcelle provides for the election districts for members of congress and provides with respect to positions and offices other than congressional based upon those districts.

**CHAIRMAN BEAULLIEU:**  Representative, Ms. Marcelle.

**REPRESENTATIVE MARCELLE:**  Thank you, Mr. Chairman and members. Again, I've filed a similar bill to this one in previous sessions, and we're here to this session, a special session, to address this issue. So I'd like to give you some information on this bill, if that's okay.

**CHAIRMAN BEAULLIEU:**  Proceed.

**REPRESENTATIVE MARCELLE:**  Good. So, good morning members, this has been vetted by the Federal Courts, House Bill 5 and the map that I'm presenting to you today, and it now provides you with the clearest path to remedy the state's violation of Section II of the Voting Rights Act. This map builds off of my bill that was presented in this committee two years ago. During the roadshow and first redistricting session, as well as bills and amendments that were filed again throughout the multiple sessions when the legislature has been convened with a directive to pass a map that complies with state and federal law. The common links between those maps and this are multifold, including the fact that it performs better than an active map on multiple redistricting criteria like parish splits and compactness, among other metrics, in Joint Rule 21.

[00:05:13]

And because it unpacks the populations running from New Orleans to Baton Rouge and instead provides a new configuration of District 5 connecting Baton Rouge and the Delta parishes, creating new opportunities for fair representation and a second majority black congressional district. In other words, HB 5 is a better map when graded on the Rubik that this legislature wrote for itself in Joint Rule 21 and the redistricting criteria accepted for decades by the federal courts, including compliance with the Voting Rights Act. In drawing this map that complies with Section II of the Voting Rights Act, we considered equal population, contiguity, compactness, parish splits, communities of interest and fracking. Consideration of the legislature's Joint Rule 21 was paramount in this process. But the overall strategy was to balance all of the relevant districting principles without allowing any single factor to predominate. We balanced population in line with the principles of one person, one vote, with efforts to keep as many parishes whole as possible. The few parishes that are split in this map are done so to keep each district with as close to the same number of people as possible. Finally, I want to talk about the two majority black districts in our map. To comply with the order of both the 5th Circuit Court of Appeals and the District Court, the legislature must pass a map. I'm going to say that again. The legislature must pass a map that has two majority black districts. In this map, those districts are District 2 and 5. I will walk through the cohesion of the black population in both of the districts. Congressional District 5 is centered around Baton Rouge and the Delta parishes. Congressional District 2 is based in New Orleans and the river parishes. While not the predominant factor to comply with the court's order to create a plan with two majority minority districts, race was a factor in the

3

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

creation of this map. The population is compact enough to draw a district that meets all traditional redistricting criteria and unlike some of the cases where distant pockets of minority populations have been found to have desperate interests, the court has accepted that the concentrations of black population grouped together in Council District 5 share cultural, economic and social and educational ties. The cohesion of black population in Congressional District 5 in this map is evidenced by faith-based congregations, Greek lettered organizations, cultural events, activities, and shared entertainment. The black churches, I will start with one of the oldest and most important institutions in the black community, the church. Since African-Americans first arrived in what was then the Louisiana Purchase in 1719, the black church has been the bedrock and foundation of this community, and that continues to be the case in the proposed 5th Congressional District in this map. Black communities regularly fellowship in various denominations of their faith. I will walk through several of those communities and each denomination in turn. The Church of God in Christ, COGIC as is commonly known or referred to, is a Holiness Pentecostal Christian Denomination. That is the oldest Black Pentecostal Denomination in the country. There are many COGIC churches located in Madison, Richland, Tensas, and other parishes that worship together. There are regional conferences, meetings and convocations of the COGIC church in District 5 that are held throughout the year. These events provide for connection with other COGIC members within different parishes in congressional District 5. There are many other protestant denominations represented in Congressional District 5, including Pentecostal, Full Gospel and Southern Baptist churches. There are also two large Black Methodist denominations in congressional District Five.

**[00:10:00]**

First, the Christian Methodist Episcopal Church, which was founded in 1870 in the south as the Colored Methodist Episcopal Church in America. It is the largest Black Methodist Church in the U.S. and there is a Colored Methodist Episcopal Church in nearly every parish in Congressional District 5. Second, the African-American Methodist Episcopal Church is the first independent protestant denomination to be founded by Black people. The AME faith is very prominent in the southern half of Congressional District 5, including right here in Baton Rouge. What unites all of these denominations is a shared faith in the gospel of Jesus Christ. All of these churches hold events such as conferences and conventions, bible studies, vacation bible schools and general assemblies. If you were to attend a church anniversary, choir anniversary or appraised team anniversary, family and friends day or any other celebration in one of these churches, the guest pastor and choir would likely be from another church within Congressional District 5. For example, the guest pastor and choir at a Praise Team Anniversary is one of the Delta parishes in one of the Delta parishes is often from Alexandria and Monroe. Pastoral and church anniversary in Saint Landry often also feature guest preachers and choirs from other churches within Congressional District 5. In the catholic faith Holy Ghost Catholic Church in Opelousas is the oldest and largest black catholic parish in the state. For many years, it was the only Black Catholic Church in the region. It draws attendees and worshipers from neighboring parishes within Congressional District 5. The same dynamics among the black churches exists in Congressional District 2. The Divine Nine of which I'm a part of, as Delta Sigma Theta Sorority Incorporated member. This is another important institution in the black community, in our Greek lettered organizations, I referred to as the Divine Nine. The Divine Nine refers to the nine black

4

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

Greek lettered organizations and five fraternities and four sororities that formed the National Pan-Hellenic Council founded in Howard University in 1930. Their inceptions were a result of African-American students being excluded from Greek organizations at predominantly white institutions. I will list these organizations in order in which they were founded. Alpha Phi Alpha 1906, Alpha Phi Alpha founded in 1906. Louisiana is located in the south western region, and A Pi A has two alumni chapters partially located in Congressional District 5 and two chapters wholly contained in Congressional District 5. AKA 1908, known as AKA that was Alpha Kappa Alpha known as AKA, the oldest black sorority founded in 1908. Louisiana is located in South Central Region. The AKAs have one chapter that is partially contained and three that are wholly contained in Congressional District 5. Kappa Alpha Psi 1911, it was founded on the campus of Indiana University in 1911. Louisiana is located this fraternity southwestern province. Kappa Alpha Psi had six alumni chapters located partially in Congressional District 5 and three chapters wholly contained in Congressional District 5. Omega Psi Phi is the fraternity that has Louisiana chapters located in Congressional District 5 which form United Omegas of Louisiana. There are two alumni chapters in Congressional District 5, one in Alexandria, Louisiana, one in Opelousas, Louisiana, St. Landry Parish. Delta Sigma Theta founded in 1913. It's the largest Black Greek Letter Sorority in the world. The Deltas have eight chapters partially located in Congressional District 5 and six chapters wholly located in Congressional District 5. Phi Beta Sigma 1914, this chapter is partially in Congressional District 5 and one chapter wholly in Congressional District 5. Zeta Phi Beta has several undergraduate and graduate chapters in Louisiana. There is one undergraduate chapter partially located in Congressional District 5 and one undergraduate chapter wholly located in Congressional District 5. Sigma Gamma Rho 1922, has one graduate chapter wholly located in Congressional District 5.

**[00:15:10]**

Lota Phi Theta also has several chapters throughout the proposed 5th Congressional District. These Greek organizations not only have alumni chapters throughout Congressional District 5, but are also united through the undergraduate chapters on the campuses of ULM and southern university. These organizations fellowship together throughout the year and serve as a shared binding experience within black culture, these community-oriented organizations have scholarship programs, community service outreach, founder's day programs of which we're about to celebrate on Sunday with the Deltas, regional conventions and other meetings that bring the communities together. For example, Alumni Founders Day Gatherings and Christmas parties are often jointly hosted by chapters in St. Landry and Baton Rouge. The alumni chapters in Alexander Monroe draw memberships from surrounding rural areas and parishes.  The Divine Nine organizations unite the black community in Congressional District 5 in this map through a shared sense of brotherhood and sisterhood and commitment to black excellence and achievement. Next, another unifying feature among the black community in Congressional District 5 is Southern University. Looking at our map, it is fair to say that Southern is the anchor of black community southeastern portion of Congressional District 5. Southern is known as a flagship public institution and is the largest HBC in Louisiana of where I graduated from, and the largest HBC system in the country. In the early days after it's founded, the Southern University was the only higher education that would admit and educate black students. Southern University serves as the pivotal training ground for community of black students and attracts the black

5

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

community in Congressional District 5. The largest event in the black community within Congressional District 5 is Southern University's Homecoming, which is held every fall. Homecoming is attended by alumni, families and friends and supporters from across Congressional District 5. I also want to mention McKinley High School in Baton Rouge. For many years McKinley was the only high school option for black students in a wide swath of Louisiana. It attracted students from all across to propose Congressional District 5, followed by the Capital High School of where I graduated from that did the same thing in Congressional District 5. In conclusion, Congressional District 5 is rich in black history, cultural, events and experiences. As you can see, senators, the black community in Congressional District 5 in this map is comprised of a cohesive community that includes churches, organizations and universities. It is time that community has an equal voice in our political process. I think it is important that my motivation for filing this map was made clear on the record and that I speak here on behalf of the many folks who have voiced support for a fair map from across the state but who cannot be here today. That said, I attended the committee on senate and governmental affairs meeting yesterday and saw a parallel version of this map completely shutdown. Just like every single other bill, members of the black churches I have presented in this now three sessions since the redistricting process. In fact, I, myself, sat here with a Bill that was very similar to this, and it never made it to the floor. So, my concern is that this bill will probably not make it to the floor as well. It is evident to me that whatever map that this legislator want to pass and who has the majority of votes that is exactly what is going to pass and nothing else is going to get out of these committees, although I don't agree with it. At this time, knowing what the politics are at play, I move to voluntarily defer this bill. Thank you.

**CHAIRMAN BEAULLIEU:**  Thank you, Representative Marcelle. Representative Larvadain, do you still want to come to the table or?

**REPRESENTATIVE LARVADAIN:**  Thank you, Mr. Chair and members. It is time for us to create a second majority minority district. This is the time. We have spent a lot of time and money on this issue, we must put this to bed.

**[00:20:03]**

Our citizens demand fair and equitable maps. When you look at the State of Louisiana, there are 4.6 million citizens in Louisiana. 33% are African Americans that live in our state. When you talk about the Alabama case, let me tell you quickly about that. The Alabama case there are seven congressional seats. In Louisiana we have six. So, Alabama has a larger population. However, Alabama has 28% African-Americans. They have one seat, but they trying to get another African-American seat. We have to correct the wrong in Alabama and we have to correct the wrong here in Louisiana. Section II of the Voting Rights Act of 1965 prohibits voting practices and procedures that discriminate on the basis of race, color, and membership of one of the language minority groups. In other words, we cannot intentionally dilute black vote. In the landmark case of Thornburg versus Gingles, it states, it demands that where there's another majority black district can be drawn, it must be drawn. The map that you have in front of you, this map won't proceed forward, but whatever map we have, it has to have compactness, continuity, preservation of counties and parishes, preservation of communities of interest,

**6**

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

preservation of prior districts, and avoiding prior incumbents against each other. We must try to correct this wrong and this is the time to do it. When you look at District 5, you look at a lot of community of interests. You look at East Carroll, Madison, Tensas, Concordia is nothing but poverty in those areas. Good working hard family people. When they get sick all of those folks have rural hospitals. You saw what happened with COVID rural hospitals. These are rural hospitals with 30, 40 beds. You can't do a whole lot with 30, 40 beds and no equipment and no staffing. Those folks in the Delta have to come to Alexandria to Rapides or Cabrini. They have to go to Washita to St. Francis to get medical help or West Monroe. Those folks even sometimes have to go to Jackson out of state to get healthcare or Natchez. When you look at the community of interest, health care is vital. Medicaid is the heartbeat of our community. When folks cannot afford Blue Cross or Blue Shield, they have to have access to hospitals. We can't be here if we're sick and we're unhealthy. The hospitals are the pulling force. All these communities are struggling with poverty. You look at the Delta Farmland, wide open farmland, cotton, soybeans. That's the bedrock of those communities. You look at District 5, that's what you have. They have a connectivity. Highway 65 leaves Concordia goes all the way to 20. Those folks know each other. They attend churches, they're families, they're friends. My high school in Alexandria plays Washita, plays Neville. There's a strong connection in that area. Peabody, which is one of the top schools has to go play Neville and then when ASH has to play Washita and West Monroe, it's tough because those are strong powerhouses. So, all of us family and friends. Look at Avos Parish. Avos Parish has connected its community because Avos has a small hospital, 30, 40 beds. When you look at health care and all these folks, these folks have a common interest. They worship together. They visit their family, their friends. The East, West Feliciana, your small hospitals, your rural folks, the churches, the communities, all of them are family, all of them are related. So, when you look at District 5, all is family. In Alexandria, I've got a lot of students that attend school in UL Monroe. They attend school in Baton Rouge. So, when you look at the community of interest in this area, it's there. We want to make sure that we have two districts that are majority-minority. And when you look at the community of interest, these are folks who worship together, their family, their friends, they travel, they visit, they do a lot together. We also want to make sure that we look at District 2. We want to make sure that's our first majority-minority district. We want to make sure we protect that district also, because that's important. If we're going to apply the law according to the constitution because some of you all are constitutional scholars, I'm not, we have to be fair to everybody. We have to be fair to District 2, Congressmen, and we have to be fair to 5 because the courts have asked us to do two majority-minority districts. This map will not proceed but whatever map we have we have to do what's right and what's fair.

**[00:25:03]**

If Shelly Dick has asked us to come back and get a district, it's important that we comply with it. You might agree, you might disagree, but at the end of the day, she's the judge. We have to respect her wishes. I go to court all the time. I don't always agree with what the judges say, but I have to comply with it. I'm asking for you all, whatever we do in a good compact district, we have to be fair. The District 5, the District 2, and to all of the folks in those districts. Thank you, Mr. Chair.

JE37-007

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**REPRESENTATIVE MARCELLE:**  Thank you, Mr. Chairman, for giving me an opportunity to present.

**CHAIRMAN BEAULLIEU:**  So, look, Judge Carter, I see you have your button pushed. She's voluntarily deferred the bill.

**REPRESENTATIVE CARTER:**  Yeah.

**CHAIRMAN BEAULLIEU:**  Hold on one second. There you go.

**REPRESENTATIVE CARTER:**  I understand your decision to defer the bill, but I don't necessarily agree that we need to because we don't have the votes in the committee and we know we don't have the votes in the committee, and we're going to do the same thing we've done every session, come up with a bill that's really not the best bill we can come up with. The better bills, this bill and some other maps that have been presented, and none of those maps are going to get into consideration. But sometimes you still got to make a record and take a vote, but your decision is to defer it. But I don't necessarily agree that we need not pursue and develop a bill and develop the benefits of the bill for the record. And you said a lot of things, but it's a lot more can be said why this bill, this particular map is a good map. Why seven other maps they have are very good maps, but because the leadership is going to let one bill out, we know that, and one or two bills out and neither one of them are really good bill, not the best we can do. And it seemed that we feel like we got to do this because they offer two minority districts as shallow as they maybe because they're doing us a favor. They're not doing us no favor. The governor, the administration, nobody, no favors. They're doing themselves a favor. The favor to us will pass one of these decent maps that's compacted, that creates a real second minority district and create a map that is going to be challenged either on constitutional ground by the 14th Amendment or by Section II. Just to say you got two black districts, it's really not the right thing to do. And while it will happen, we know we can still make a record, and the record is important for future court action. Personally, I don't care what the legislature do with these maps, because on February 5 there's going to be a trial. Okay. And what this whole session is about, in my opinion, is to not have the trial on February 5 because they don't want to do the right thing. They won't pass a map with two black districts in it, even though it may not be a good performing district, in order to say they gave us something. The people are not getting nothing from the leadership in this legislature. The court is going to make a decision on this. So, I like to see the court make the decision because I don't trust the legislature.

**REPRESENTATIVE MARCELLE:**  Well, thank you, Representative Judge.

**REPRESENTATIVE CARTER:**  Not my bill.

**REPRESENTATIVE MARCELLE:**  Thank you, Judge. I appreciate and understand your concern. However, I know that we vetted this same bill on the other side. I know the outcome of it. And so that's why I made the decision to do that. I did want to go on the record to talk about the communities of interest and the things that we share in common throughout the areas that we proposed. And that's why I wanted to go ahead and tell you all about the map. I do believe I have

8

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

the best map. I think I had the best map the last time. However, I've been here long enough, this is my 9th year to know what's going to get out and what's not going to get out. And so, I didn't want to just have people vetted again on this side and when I knew what the outcome was going to be and there was an opportunity for everyone to hear this pretty much the same map on the other side. So, I appreciate what you said. I did want to go on the record to talk about the communities of interest, the churches, the schools, the things that we do, the Divine 9, the things that we have in common and I do agree that we must do what the judge has ordered us to do, and further, that we should not be passing a map that's going to be ruled unconstitutional and have us back in court. I get what you're saying. Thank you so much.

**CHAIRMAN BEAULLIEU:**  So, Rep. Thomas, for a bite.

**REPRESENTATIVE THOMAS:**  Thank you, Mr. Chair. My question actually is to you Mr. Chair.

**[00:30:00]**

I firmly believe that words mean something and that we are using -- I am hearing the phrase majority minority being used as a synonym for majority black, and I would like a clarification on what did Judge Dick order us to do in drawing these maps. Was it majority minority or majority black?

**CHAIRMAN BEAULLIEU:**  It was majority black.

**REPRESENTATIVE THOMAS:**  Thank you very much.

**CHAIRMAN BEAULLIEU:**  And look Representative Marcelle, just in light of the comments, especially with what Judge Carter said, and he didn't care about what the legislature does. I care about everything that goes on in this committee, and we all need to be caring about what we do in this legislature. And so, if anyone doesn't care about this process, it's a shame because this process is very important. I voted against you, and I'm only saying this because of all the evidence, you laid out your cases really well. You decimate the communities of interest in my area. I voted against it before and was very respective about it. But I understand you had communities of interest and you laid it all out with the fraternities and sororities but in the Bayou Teche area and the KDN area where we're at, they're decimated and so I'll stand firm. I want to have that on record the same way you have everything else on record. And I think if you look around your map, I think what was brought up, and again, we're not re-litigating what we had last year when we heard this maps before but there was a lot of evidence brought up on why that was the case. So just want to in light of the evidence being brought up and understanding, especially with Judge Carter saying about preparing for trial and a lot of this is to get information on record simply for trial, I want to make sure that was clear. Representative Wright for comment.

**REPRESENTATIVE WRIGHT:**  Thank you, Mr. Chair. Representative Marcelle, I appreciate you. Although I just don't know what's the problem with St. Tammany. You split us up. That's

9

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

our community of interest. Not going to be able to vote for it, just so you know but I know you're going park it.

**REPRESENTATIVE MARCELLE:**  Thank you very much sir. I respect your position and everyone's position. And as I said yesterday in the Senate, when they had the hearing on the similar map, when you decide or when you were told to make two districts, it's going to impact somebody. And if we could remove the people from it and just divide it like it should be divided, then we could come out with something that's best for the State of Louisiana. So if it affects your congressional district, you're a congressman, of course, you're not going to be for it. That's why I really believe that Judge Dick should draw the map and we can stay out of it, and then she can do what's best for the state because of the interest that everybody up here represents somebody and I get it. But I also believe that we deserve two black congressional districts, and that's my belief. So that's why I keep bringing the bill. But thank you so much, Representative Wright. I understand. And I love the people in your parish.

**CHAIRMAN BEAULLIEU:**  All right, thank you. Representative Marcelle. She's moved that we voluntary defer House Bill 5. Any objection? Hearing no objection, House Bill 5 is voluntary deferred. Mr. Melerine are you close by? Representative Melerine? Representative Melerine, do you want to start with the -- well, we'll start with House Bill 7 since that's kind of the meat of the maps for your bill. Ms. Smith, would you please read in House Bill 7.

**MS. SMITH:**  Okay. Members, this is House Bill No. 7 by Representative Melerine. It provides for the redistricting of the Supreme Court districts.

**CHAIRMAN BEAULLIEU:**  Representative Melerine, on your bill.

**REPRESENTATIVE MELERINE:**  Good morning, members of the committee and thank you for hearing the bill today. So, House Bill 7 provides for a map with nine Supreme Court justices. I have a constitutional amendment, which was HB 13, I can discuss later, but essentially what this does is the map that ties to my constitutional amendment. In looking across the state and seeing some of the pushback that we've had at the seven person maps, it seems like a lot of the issues arise from geography and separating communities of interest and separating geographical regions.

**[00:35:00]**

And some of the feedback I've had is that certain areas of the state don't feel as if their interest would be represented in a seven-person map. Digging into it a little bit easier, I feel a nine-person Supreme Court would geographically represent the members of the state and the citizens of the state. I can tell you now, geography was the thing I looked at most. If you look at the map, it splits only five parishes. It's compact. It has six majority white districts based on voting age population, two majority black districts, and then the third is more of a purple district. And I have the breakdown right here, if you hold on one second. It's actually my home district that we made as the purple district. It's district nine. So if you look the voting age population across the state, the voting age population -- let me start with the district first. So District 9's white voting

**10**

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

age population is right under 57%. It's 35% black and then the rest of the Asian, American-Indian and other totals about 5 or 6%. When you get into the voting age population across the state it's about 59% white, 31% black, and then the remainder is either Asian, American-Indian, or other. So as you can see, the proportion in that purple district of voting age population white is lower than the state average or the state percentage. The voting age population for blacks is higher than the state. And again, the key was to keep it as compact as we could. I know there have been questions about what do other states around us look like, how many Supreme Court justices do those states have. I've done that research. Mississippi has nine Supreme Court justices. Alabama has nine Supreme Court justices. Georgia has the same. Now, when you move to our west, Texas has 18. Now, that split nine in a criminal supreme court and nine in a civil supreme court. Oklahoma also has 14, with nine being on the civil bench and five being on a criminal bench. So it would not be out of line. We would not be an outlier if we went to nine. And also, another question I've received is, well, what are those populations look like compared to Louisiana. Alabama has more population than us. Georgia has more population than us, but Oklahoma and Mississippi both have smaller populations. So we, again, would not be out of line by having a nine-member Supreme Court. I'm happy to answer any questions.

**CHAIRMAN BEAULLIEU:**  Thank you, Representative Melerine. Representative Wright for a question.

**REPRESENTATIVE WRIGHT:**  Thank you, Mr. Chair. Representative Melerine actually answered my question. I've been sympathetic to this idea for a couple of years and just wanted to get a little layout of the other states because I know nine is not an outlier. It's incongruent. It's congruent with a lot of other states. But you answered that before. You answered it after I pressed my button, so thank you.

**CHAIRMAN BEAULLIEU:**  Representative Carter.

**REPRESENTATIVE CARTER:**  Yes. Thank you, Mr. Chair. Representative, I'm trying to figure out, are you aware that we are in litigation of a 72 map, trying to resolve a 72 map?

**REPRESENTATIVE MELERINE:** Yes rep.

**REPRESENTATIVE CARTER:**  And the Supreme Court has suggested a map that we voted out of here. So that might resolve the litigation, that map that we voted out of here?

**REPRESENTATIVE MELERINE:**  Yes. And that brings up another one. So the second part or my second bill is a constitutional amendment. So obviously, hypothetically, if my bill passed, both of them, and then we passed a seven-member map, there would have to be some enabling language in mind and also some trigger languages.

**REPRESENTATIVE CARTER:**  We would have to have a constitutional amendment vote of people, and we would --

**REPRESENTATIVE MELERINE:**  Correct.

**11**

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**REPRESENTATIVE CARTER:**  But it's not going to resolve the litigation because your map create two minority district, the black districts, and the one is. I guess, you would call it an opportunity, I don't know if there was opportunity of district. District 9 has 33% black race of voters.

**[00:40:00]**

And it looks like -- but you're still going to have the same issue that you have a third of the population. A third of nine is three, not two. So, you're going to have the same issue we're litigating right now. Your map doesn't resolve a dispute that exists.

**REPRESENTATIVE MELERINE:**  If you look at the percentage, it's actually slightly less than a third and it falls in that number where I understand that it's about 31% black is the state population?

**REPRESENTATIVE CARTER:**  Actually, it's 33%.

**REPRESENTATIVE MELERINE:**  I'm looking at the numbers I was given. My understanding is you look at the voting age population, and if you look at the voting age population, it's 31. So, it's not quite a third. And if you look at it again, it comes as close as you can while keeping geography as the main component. It did factor in race breakdown, the map. Again, it was not the only factor. I believe if you look at the Milligan case, there is no bright line rule as to a percentage. It talks about -- as the supreme court obviously normally does, and you know this, they don't set forth bright line rules. But again, the voting age population of the state is not quite a third, so then you get into the position where you're in here, where with a nine-member map, it doesn't easily -- it goes from either two to three and it falls somewhere in between.

**REPRESENTATIVE CARTER:**  Except Representative Jingles and other cases doesn't talk about voting age population so much as population. You got -- performance would be -- you take considered voting age population for performance factors, but the population of Louisiana is over 33% black. That's the third, okay? If you base the population, you have still two out of nine. I would rather two out of seven than two out of nine. You see what I'm saying? I agree with you. Race should not be the primary factor. That's what the cases say, but it can be a factor in order to achieve compliance with section two. So, I don't think this map is going to comply with section two at all. We're going to have the same argument we got right now.

**REPRESENTATIVE MELERINE:**  And again –

**REPRESENTATIVE CARTER:**  [INDISCERNIBLE 00:42:23] the same fight.

**REPRESENTATIVE MELERINE:**  As I've told the people that have asked, representatives that have discussed this with me, this is a starting point. By no means is this what I'm saying has to be passed? Obviously, we would have to go through a constitutional amendment process. If

**12**

**0117_24_hg**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

you look at the HB 13 that I'm bringing, the election wouldn't be until November of this year, which would give us time to come back at a later point if we're unable to reach a Bill -- reach a map. Again, there's a lot of hurdles that it would have to clear even if we do pass the nine amendment.

**REPRESENTATIVE CARTER:**  Okay.

**CHAIRMAN BEAULLIEU:**  Thank you, Judge Carter. Representative Melerine, just on your question, I think you're accurate. Just on the congressional side, Judge Dick has told us to focus on the voting age population. I think that was similar to what Representative Thomas had mentioned as well. I know there is a difference on the court maps versus congressional maps, but you don't have the same one person, one vote rule, but voting age population has been the key focus question for you on the other states. Do you know how many of them elect their supreme court justices statewide by any chance, or is it broken up by district?

**REPRESENTATIVE MELERINE:**  Some of them are broken. Some of them are appointed by a commission. For example, Oklahoma's are appointed by a commission. Mississippi, I believe, is elected statewide. And I'm not sure about Georgia and Alabama. I looked and it's slipping my mind right now.

**CHAIRMAN BEAULLIEU:**  Okay. Thank you for that clarification. Representative Marcelle, for a question.

**REPRESENTATIVE MARCELLE:**  Thank you. I'm going to try to get your name correct. Is it Melen?

**REPRESENTATIVE MELERINE:**  Melerine.

**REPRESENTATIVE MARCELLE:**  Melerine?

**CHAIRMAN BEAULLIEU:**  Representative Melerine, please be patient with Representative Marcelle on the name pronunciations.

**REPRESENTATIVE MARCELLE:**  Name pronunciations.

**CHAIRMAN BEAULLIEU:**  She and I have been working on this.

**REPRESENTATIVE MELERINE:**  I'm used to it.

**REPRESENTATIVE MARCELLE:**  All right, Balu. Thank you. Sir, serious. All seriousness. Your Bill would increase the number of supreme court justices to nine?

**REPRESENTATIVE MELERINE:**  Correct. We're currently at seven.

**13**

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**REPRESENTATIVE MARCELLE:**  And we're currently at seven. So, you're adding two seats?

**REPRESENTATIVE MELERINE:**  Correct.

**REPRESENTATIVE MARCELLE:**  How does this fix the litigation that we're currently in? Do you see this as --

**REPRESENTATIVE MELERINE:**  The litigation we're currently in is over the seven-person map. Obviously, if you change it and expand it to nine, you would need a new map, depending on what that map is.

**REPRESENTATIVE MARCELLE:**  You don't see this as being the same issue that we'll be fighting over since we're already saying that –

**[00:45:01]**

I know you all saying a voting age population, but the argument is going to be that if you're going to increase it, then you need to increase the number of seats.

**REPRESENTATIVE MELERINE:**  I understand the argument and what I'm saying is until we see a final map, that issue could be addressed in a final map. I'm not sure what –

**REPRESENTATIVE MARCELLE:**  So, your map is not a final map that you want to do.

**REPRESENTATIVE MELERINE:**  No, this was a map that I thought was a good starting point, and if there are amendments to it, we could look at –

**REPRESENTATIVE MARCELLE:**  So, it's starting point. Let me ask you something.

**REPRESENTATIVE MELERINE:**  Again, geography was the main factor that I looked at was keeping compact districts.

**REPRESENTATIVE MARCELLE:**  How would these justices run, subdistricts?

**REPRESENTATIVE MELERINE:**  Yes. So, if you look, there are none --

**REPRESENTATIVE MARCELLE:**  Not statewide because I know we got a Bill out here to say everybody runs statewide.

**REPRESENTATIVE MELERINE:**  This one does not do that. This one says you elect everybody that lives in District 9 elects the judge from District 9 and so on.

**REPRESENTATIVE MARCELLE:**  Okay. And how do you -- I was looking at your fiscal note. They cast -- I know, this is your first term, but they come up here every year and they ask

14

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

for additional money and they say they don't have enough money. So, adding two more seats would be more money. Is that –

**REPRESENTATIVE MELERINE:**  Yeah. There's a fiscal note that we received last night. I'm sorry?

**REPRESENTATIVE MARCELLE:**  I was looking at it. What is your fiscal note saying?

**REPRESENTATIVE MELERINE:**  It looks like in fiscal year 25, it'd be right over a million dollars. by fiscal year 28, 29 --

**REPRESENTATIVE MARCELLE:**  Is that taken into consideration, the judges and all of their staff and their offices and everything?

**REPRESENTATIVE MELERINE:**  Correct? Yes, ma'am.

**REPRESENTATIVE MARCELLE:**  And that's for the two additional seats.

**REPRESENTATIVE MELERINE:**  That is because in fiscal year 25, it's only a half year. If you look into fiscal year 26, that's the first full year and it jumps up to, I think, right under 2 million because there is some cost associated, some one-time cost associated with expanding offices, buying furniture, things like that.

**REPRESENTATIVE MARCELLE:**  Right. I think this is probably my first time meeting you, so I would think that you might be a fiscal conservative. So, I'm trying to figure out why we're trying to find additional money to spend on judicial seats when we're trying to fix what we currently have and they don't have enough money. Currently, I sit on appropriation every year. Every single year they come and say they don't have enough money. So, this would be on top of the already not having enough money. I'm just trying to figure out why would we be going this route? What does this do?

**CHAIRMAN BEAULLIEU:**  Representative Marcelle, can I jump in real quick?

**REPRESENTATIVE MARCELLE:**  Sure.

**CHAIRMAN BEAULLIEU:**  Just because I want to make sure everybody's clear on this. We are here in House Bill 7, and on the constitutional amendment side, there's a fiscal note on having the constitutional amendment, the election, and then from the number of judges. Sorry. And then there's another one from the secretary of state that's also in your packet as well.

**REPRESENTATIVE MARCELLE:**  Okay, yeah. I was trying to figure –

**CHAIRMAN BEAULLIEU:**  And that's on the Bill we're on.

**REPRESENTATIVE MARCELLE:**  I'm looking -- yeah, it is two different notes.

15

**0117_24_hg**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**REPRESENTATIVE MELERINE:** Yeah, it goes with actually, the fiscal note I was just referring to goes with HB 13 and this one that we're talking about now, 7. I'm happy to answer it. We'll talk about 13 in a minute. I'm happy to answer it now or then.

**REPRESENTATIVE MARCELLE:** And my final question, I'm going to let somebody else, if somebody else has a question. Talk. Did you speak with the judges concerning this, or is this something? Because when they came in here, they all agreed on the way to fix the matter that we're currently under in court. So, they've met. Have they met with you?

**REPRESENTATIVE MELERINE:** I've talked to several judges.

**REPRESENTATIVE MARCELLE:** Are they in agreement with this?

**REPRESENTATIVE MELERINE:** I can't speak for all the judges, and I don't want to speak for all the judges. I can tell you not all supreme court justices signed off on that map that was presented yesterday by Representative Johnson. I know my supreme court justice from my area did not sign off on it. Again, I don't want to speak for every supreme court justice here and say yes or no. They're in favor of this.

**REPRESENTATIVE MARCELLE:** So, when they came to this committee and said that they had come to an agreement, all of them, that wasn't accurate?

**REPRESENTATIVE MELERINE:** I'm not sure exactly what they meant by had come to an agreement. They may have come to an agreement to something else, but if you look at the letter that went out with the map, there were only five of seven justices that signed on to that map.

**REPRESENTATIVE MARCELLE:** Okay. Thank you very much. I would just like -- I mean, for someone else's position and area, we typically try to lean towards what they would like overall. When we're doing this major -- this is a major change. I would consider this a major change. I would think that you would get the support of most of the justices before we will move in this direction.

**[00:50:05]**

But thank you for your work. I see you coming in working.

**REPRESENTATIVE MELERINE:** Appreciate it.

**REPRESENTATIVE MARCELLE:** Thank you.

**CHAIRMAN BEAULLIEU:** Rolling up your sleeves. Representative Carver?

**REPRESENTATIVE CARVER:** Thank you, Mr. Chairman. Representative Melerine, thank you for your work on this, and I appreciate the intent and the conversations you've had with the

16

**0117_24_hg**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

folks in Northwest Louisiana, and Representative Marcelle actually asked the question that I was planning to ask. I just -- yesterday, we had testimony from Justice Crane, also an Appellate Court Judge Guidry was here. And the governor's comments in the opening of special session just alluded to the fact that there had been some consensus on the court, not all of them, and I wondered if you had had the same feedback, but you answered the question to my satisfaction. So, thank you.

**CHAIRMAN BEAULLIEU:**  Representative Melerine, that clears the Board. We do have one witness card in opposition not wishing to speak, Ms. A'Niya Robinson with the ACLU of Louisiana. You have an opportunity to close on your Bill, Representative Melerine.

**REPRESENTATIVE MELERINE:**  Yeah.

**CHAIRMAN BEAULLIEU:**  Oh, excuse me. We have a technical amendment for you Bill that we'd like to adopt first.

**REPRESENTATIVE MELERINE:**  Yeah.

**CHAIRMAN BEAULLIEU:**  Ms. Smith?

**MS. SMITH:**  Thank you, Mr. Chairman. Committee Members, this is Amendment Set 52. It is online. This is a technical amendment, just to literally fill in the blank, tying this instrument House Bill 7 to House Bill 13.

**CHAIRMAN BEAULLIEU:**  Members, we have Amendment Set 52 that I will offer up. Is there any opposition to this technical amendment? Hearing none, Amendment Set 52 is hereby adopted. Back on your closing, Representative Melerine.

**REPRESENTATIVE MELERINE:**  Thank you. I just appreciate the opportunity to present the Bill. Thank you for your questions. Look, the reason why I started going down this road is I saw the issues that we were facing with a seven-member map, seven justice map. This is another opportunity or another option in order to alleviate some of those concerns. I know there is a companion essentially Bill running through the Senate that's a little bit ahead of mine. It was discharged from committee yesterday and has been taken off on the floor. So, at this time, I would like to just hold my Bill here, and if we need to come back to it.

**CHAIRMAN BEAULLIEU:**  Okay. Representative Melerine, I'm going to go ahead and offer that we voluntarily defer Representative Melerine's House Bills 13. Is there any opposition to that? Hearing none. The House Bill 13 will stay in here as amended. I'm sorry, House Bill 7. Sorry about that. I have both of them in front of me, Representative Melerine. House Bill 7, as amended, will stay here in committee. So, House Bill 13, Representative Melerine. Let's go ahead and just read it in, Ms. Smith.

**MS. SMITH:**  This is House Bill 13 by Representative Melerine. It is a constitutional amendment increasing the number of associate supreme court justices from six to eight.

17

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**CHAIRMAN BEAULLIEU:**  Representative Melerine?

**REPRESENTATIVE MELERINE:**  Yeah. So, this is -- if you look at the language, it's very plain and straight forward. All it does is say we should have a chief justice and eight associate justices, and it changes the number that concur -- must concur to render an opinion from four to five. That's really the change. The changes in the numbers, it goes exactly with HB 7. Happy to answer any questions.

**CHAIRMAN BEAULLIEU:**  Yes. So, I think we'll go ahead and hold that one here as well in committee. I'm going to make a motion that we defer this Bill as well. Oh, Representative Wright, you have something real quick? Do you want to add to this?

**REPRESENTATIVE WRIGHT:**  Yes, Sir, Mr. Chair. Thank you. Thank you. I wanted to jump in on the last Bill when this came up in the subject matter. I don't know if Representative Melerine knows this, but my senator actually a couple of years ago had worked with some supreme court justices to increase it to nine. I want to say it was going to be two -- definitely two, maybe three, majority-minority districts as well. So, this is not a foreign concept, and there was an interest in the supreme court and might not have been everybody, but there was justices currently elected that considered this. So, this is not out of left field. Thank you.

**REPRESENTATIVE MELERINE:**  Yeah. And again, this is not something I came up with on my own. I looked around. I'm not trying to reinvent the wheel. And so, again, if it is something that goes through, we can address those other issues. I know. Look, that's how we get this done. So, thank you all.

**CHAIRMAN BEAULLIEU:**  Thank you. We also had just red card, Ms. A'Niya Robinson with ACLU of Louisiana in opposition as well. Thank you, Representative Melerine. Last Bill for the day, Representative Echols, House Bill 14. Ms. Lowrie?

**[00:55:00]**

**MS. LOWRIE:**  Thank you, Mr. Chairman. Members, Representative Echols is bringing House Bill 14 to provide relative to the election districts for members of congress, also provides with respect to positions in office other than congressional that are based upon congressional districts.

**CHAIRMAN BEAULLIEU:**  Representative Echols, on your Bill?

**REPRESENTATIVE ECHOLS:**  I got to go in the middle? Okay. I was trying to get close to Rep. Boyd. Thank you. It's tough to start out here. Oh, first, committee members, I want to say it's an honor to be here with you today. I know that we've all suffered quite a bit of duress over the last few days with hard freezes throughout Louisiana, and that, coupled with a super abbreviated session to try to solve a problem that we worked on last year and presented and to have to come back under this stressful situation, I'm obviously thankful that we have members that are committed to be here and do this. So, I'll read my first statement and then be happy to

18

answer any questions around the proposal that I have before you today. So, members, I come before you today to a matter -- address a matter of utmost importance, the congressional redistricting in Louisiana. Our commitment to democracy and fair representation compels us to carefully consider the principles that underpin this process. Today, I'm here to present a proposal that not only adheres to the mandates of the voting rights act and all the other components of making a fair and free maps and the principles of compactness, communities of interest and all that, but all those things combined have been taken into consideration as I developed a proposal for your consideration. As we continue on this redistricting journey, we recognize the imperative to safeguard the democratic rights of all citizens. This process is equally complicated as it is the role of the legislature to adopt districts that represent communities of political geographic and other interest to ensure fair representation. Today, we're here due to a liberal judge forcing the legislature to reconsider the super majority decision to adopt maps that I deemed, as well as many of you and dozens of other of our colleagues, fair and reasonable. For that, I've worked to further design a new concept that provides opportunities for minorities to have two majority districts. While this process has produced some unique outcomes, and I think we're seeing it both on the senate side as well as these concepts we're debating in the house, today, we see a map coming from the senate that is obviously obtuse. In some ways, it even looks racially gerrymandered to a point of dividing communities of interest and making it impossible for fair representation for our elections, which, again, is why I have a proposal before you today. One of the main components and challenges of redistricting is ensuring that the districts are fair and equitable. This requires we meet certain criteria such as population compactness, communities of interest and all the other things that we've considered and you have for the years that you've served on this committee and brought this process to Louisiana citizens. However, these criteria can be difficult to define and can be influenced by many political considerations. Another challenging of redistricting is ensuring that districts are contiguous. That means all parts of the district are connected. Of course, with the geographic makeup of Louisiana, the dispersions of population, communities of interest, black, white, and other populations, this, again, creates dynamics that's set up for gerrymandered or other odd-shaped districts. Finally, the highest, and probably the most difficult reason putting this process forward, is the political process, which plays into many of these situations. We see that with judges being activist judges and creating a process that the judiciary is creating maps versus the legislative as law states. So, in conclusion today, I've committed and have the principles committed towards the voting rights act, compactness and keeping a liberal activist judge at bay by willing to adopt a new concept that creates two majority-minority districts that candidates can come from and have access to elect the representative of their choice.

[01:00:02]

My goal is to pass fair maps for all of our citizens. I present a concept today that would likely meet the criteria and the spirit of the law and suffice to meet our activist judge's demands. I'd be happy to answer any questions.

**MS. LOWRIE:**  Representative Marcelle. She left. Representative Carter.

19

**REPRESENTATIVE CARTER:**  Thank you. Representative Echols, are you aware that you talk about this liberal judge? Are you aware that the Fifth Circuit is not considered to be a liberal circuit in the federal court system? The Fifth Circuit?

**REPRESENTATIVE ECHOLS:**  I'm aware of the Fifth Circuit.

**REPRESENTATIVE CARTER:**  They're a conservative circuit, and the United States Supreme Court is pretty conservative, would you say?

**REPRESENTATIVE ECHOLS:**  If you say so.

**REPRESENTATIVE CARTER:**  Well, they have all agreed that the map need to be redone, not just this liberal judge you keep talking about. You understand the history of the litigation and how we got to where we are now basically. It's not just --

**REPRESENTATIVE ECHOLS:**  I've definitely heard a recap of all those legislative judicial processes.

**REPRESENTATIVE CARTER:**  Okay. I just want to point out that it's not just this judge that you think is liberal, it's the supreme court. It's the Fifth Circuit that suggests we do something. I noticed that no district, the two minority districts, I guess. Neither one of them are 50% registration, but they around 48-49% registration, but they 50%, just slightly 50% population. Okay.

**REPRESENTATIVE ECHOLS:**  Voting age population is what you're referring to, to those percentages. Just to reiterate, I think where your point is going, District 6, in this example, the voting age population in this model is 47.828. And then District 2, the other majority-minority or black district, is 48.205.

**REPRESENTATIVE CARTER:**  Okay. So, neither one of them are majority voting age population.

**REPRESENTATIVE ECHOLS:**  Each district is majority-minority as a whole. When you roll those stats up, they're well over 55% each and majority-minority. Now, as far as majority black, yes. The majority over the white population. If you're just looking at black versus white, they are majority black population as well.

**REPRESENTATIVE CARTER:**  Okay.

**REPRESENTATIVE ECHOLS:**  Just looking at the data and reiterating what's on the page.

**REPRESENTATIVE CARTER:**  How can you tell they're majority-minority but not majority black?

**REPRESENTATIVE ECHOLS:**  I would consider Asian population part of a minority population, American-Indian part of a minority population.

**REPRESENTATIVE CARTER:**  Your map identifies the Indian population and the --

**REPRESENTATIVE ECHOLS:**  My statistical attachment does the population center. To get to where I think you're going with this, the spirit of the law is asking us to find a majority-minority district, another minority, or at least this activist judge that you referenced. If you continue to up the VAP black percentage, you end up with what the senate currently has, which is a gerrymandered district, which I don't think would hold up long term. We fought this battle 20 years ago, and I think this is a good reference for the record to go back that 20 years. We had a Zorro district, as I'll understand it, I wasn't in the legislature, nor was I probably engaged in the political process as actively as I am now. My goal is to avoid going back to a gerrymandered district. Compactness, communities of interest, that is the intent of this map. Now, there is potential with this map, with some additional tweaks to further enhance that VAP black number, probably by another half a percent to a percent, and still keep the compactness factor. But if you, again, you keep running that number up, you gerrymander. So, I'm trying to avoid that. Splitting parishes and those communities of interest. While this map is not perfect, none of them are. This is, again, with the spirit of the law. That's the intent of what I've done.

**REPRESENTATIVE CARTER:**  So, how many parish your map split?

**REPRESENTATIVE ECHOLS:**  I think 17. I'll have to go back.

**REPRESENTATIVE CARTER:**  Right. I think around 16, 17.

**REPRESENTATIVE ECHOLS:**  16, 17, yeah, it's 17.

**REPRESENTATIVE CARTER:**  Does it split into precincts?

**REPRESENTATIVE ECHOLS:**  We tried to narrow and eliminate precinct splitting because, again, our intent was -- when I set up to do this process, my intent was not to look at where all of our congressmen and congresswomen live, their houses, nor you as representatives. I know I have numerous representatives that don't want to see certain parishes split. They don't want two reps. So, they've made that vibrantly clear.

**[01:05:00]**

I've committed with those members to continue to work as long as it doesn't throw the whole equation out of balance, mess with communities of interest, the compactness, to continue to tweak that as we move this Bill forward. I'm just trying to get to reasonable and fair.

**REPRESENTATIVE CARTER:**  I think you prefer your map over the map in House Bill 4 myself map. Why do you prefer this map over the map we just deferred?

21

0117_24_hg
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
**February 9, 2024**
**Transcript by TransPerfect**

**REPRESENTATIVE ECHOLS:**  I haven't looked at that. The only map I've looked at is what they passed in the senate. Anything that's active, I've kind of followed. But my focus has strictly been on my map. I'm not being selfish. I'm just trying to find fair. I love my congressmen, congresswomen, everybody in our delegation. They're great people. I think with these maps, the way they're designed now, that each one of them have equal opportunity to win in these respective districts. I also think it creates a phenomenal opportunity for a minority, a black or other to win in the other drawn district, which is six, for example. So, I think the spirit of the law has been met with this design versus some of the other things we've seen moving.

**REPRESENTATIVE CARTER:**  Well, that's what I'm getting to, because it's my understanding, and I might be wrong, that our acts was to create a map with two minority black districts, not two minority districts. I mean, that's a slight distinction. So, this map creates two minority districts.

**REPRESENTATIVE ECHOLS:**  Majority-minority, but the majority population within that district is black.

**REPRESENTATIVE CARTER:**  Right. I agree with that. But the majority of the district is minority district, not a black district. It's really not what we were being asked to do. I understand you --

**REPRESENTATIVE ECHOLS:**  And again, I can get to an additional percent to move these up to where you have exactly 50 plus one as a VAP. The problem is, as I suggested before, you end up with a district that starts to look like the Senate Bill. I believe it's eight. Is it Senator Womack's Bill?

**REPRESENTATIVE CARTER:**  And I agree with you. I got problems with that Bill, too. Don't assume that Bill is favored by the minority.

**REPRESENTATIVE ECHOLS:**  I've taken the perspective that I'm not coming in with any favored status. I haven't come in and had national groups and other people ask me to do this. I did this just as a reasonable approach to solving this problem. There are no easy answers to solving this problem. This is one more concept that I hope we could have vibrant debate around that gets us to fair, whatever fair is.

**REPRESENTATIVE CARTER:**  Have you looked at what is the breakdown in the present map we operate under? How this map different from the map we actually operate under?

**REPRESENTATIVE ECHOLS:**  I don't have the data comparisons, but I do know that -- and I'm going off of memory here from about a week ago when I looked at the current maps, five of the six districts were majority white in those six maps. This map changes that equation and makes two majority-minority, more black districts than those maps. I would think from the way this is designed that if the intent of the legislature is to elect more black people, this provides that opportunity far and above than any other map that's out there.

22

0117_24_hg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
February 9, 2024
Transcript by TransPerfect

**REPRESENTATIVE CARTER:**  All right, thank you.

**MS. LOWRIE:**  Representative Wyble.

**REPRESENTATIVE WYBLE:**  Thank you, Ms. acting chair. Rep. Echols, thank you for bringing this map and this scenario to us. When you ran scenarios to come up with this, did you consider any that retain that portion of the Florida parishes that's currently in District 5, namely Washington Parish, my area. Did you look at that any?

**REPRESENTATIVE ECHOLS:**  I did not. I've put blinders on, and we use population and data, and I work with Ms. Lowrie on coming up with potential designs that kept the compactness. So again, I didn't favor any rep. I didn't favor any congressman or woman to that degree that I said, "okay, I know this congressman or woman wants a certain parish". I did not put that into consideration. I'm sure after this committee hearing, if this Bill moves, I'll get phone calls from elected officials, both Democrats and Republicans. But no, I tried to do this blindly.

**REPRESENTATIVE WYBLE:**  Sure. When you consider communities of interest, I'm not expecting you to be an expert on Washington parish.

**REPRESENTATIVE ECHOLS:**  And I'm not.

**REPRESENTATIVE WYBLE:**  Right. But you can imagine there's probably a lot more community of interest in what you've drawn as District 5 right now in terms of rural challenges, just being a rural community, economy, communities.

**REPRESENTATIVE ECHOLS:**  Poverty, river communities.

**REPRESENTATIVE WYBLE:**  Right.

**REPRESENTATIVE ECHOLS:**  I see, of course, the coastal communities separating a Lafourche and Jefferson and Plaquemines into two different districts.

**[01:10:00]**

There could be communities of interest there that don't align, or maybe they do perfectly. It just depends on those community of interest perspective.

**REPRESENTATIVE WYBLE:**  Sure. So, if this one would move forward, would you be willing to work with me to see if we could create some scenario that may --

**REPRESENTATIVE ECHOLS:**  I am 100% committed, so I've had several representatives that contacted me about Calcasieu Parish. One that had to leave for another committee a moment ago. I've committed to them and everyone that I'm committed to tweaking things around the edges. As long as we don't end up with a gerrymandered district that I think will be challenged

23

longer term. I'm more than happy to work with you to come up with a solution to separating, particularly Washington Parish, because now if you look at the map that's coming out of the senate, it breaks Washington Parish into the former fifth congressional district or the current fifth congressional district, which is where it's been. In this case, it would go to District 1 and kind of breaks up from what you've been used to.

**REPRESENTATIVE WYBLE:**  Right.

**REPRESENTATIVE ECHOLS:**  But I'm committed.

**REPRESENTATIVE WYBLE:**  Yeah. Let's work together on that. Thank you.

**CHAIRMAN BEAULLIEU:**  Bear with me, Representative Echols, we just kind of -- give me a second.

**REPRESENTATIVE ECHOLS:**  I'm here at the pleasure of the committee.

**CHAIRMAN BEAULLIEU:**  Representative Echols, I have a couple of questions for you. Just as it relates to the maps and the communities of interest. How much focus did you give? I asked the last question specifically in our area on the Bayou Teche region and Acadiana, did you specifically go into some of those areas, and did you focus on that?

**REPRESENTATIVE ECHOLS:**  So, one of the challenges with accumulating the numbers we needed for the appropriate black population, especially in District 6, we did had to dip into Lafayette or St. Martin Parish to grab those communities to make our numbers work. So, we did split some parishes there. Now, as it relates to Cameron and Calcasieu again, we had to get the numbers right for the fourth congressional district, and so we have split some parishes for that. But I think every map that's out there has had to do that to try to reach the numbers we need for a fair, minority-based district.

**CHAIRMAN BEAULLIEU:**  Okay, thank you. Representative Echols, we're going to have to recess for a second. We've lost quorum, so as soon as we get quorum back, we're going to recess. So, just for the viewing members, give us a couple of minutes.

**[01:12:59]**

24