1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF LOUISIANA

3                          MONROE DIVISION

4
     PHILLIP CALLAIS, LLOYD PRICE,      )
5    BRUCE ODELL, ELIZABETH ERSOFF,     )
     ALBERT CAISSIE, DANIEL WEIR,       )
6    JOYCE LACOUR, CANDY CARROLL        )
     PEAVY, TANYA WHITNEY, MIKE         )
7    JOHNSON, GROVER JOSEPH REES,       )
     ROLFE MCCOLLISTER,                 )
8                                       )
                    Plaintiffs,         )
9                                       )
     VS.                                )        Civil Action
10                                      )        No. 3:24-cv-00122
     NANCY LANDRY, in her official      )
11   capacity as Secretary of State,    )
                                        )
12                  Defendant.          )

13

14             PRELIMINARY INJUNCTION HEARING
                CONSOLIDATED WITH BENCH TRIAL
15       OFFICIAL TRANSCRIPT OF PROCEEDINGS, VOLUME I
      BEFORE THE HONORABLE CIRCUIT JUDGE CARL E. STEWART
16       THE HONORABLE DISTRICT JUDGE DAVID C. JOSEPH
     AND THE HONORABLE DISTRICT JUDGE ROBERT R. SUMMERHAYS
17                      APRIL 8, 2024
                    SHREVEPORT, LOUISIANA
18

19

20

21

22                    DIANA CAVENAH, RPR
                FEDERAL OFFICIAL COURT REPORTER
23             300 FANNIN STREET, SUITE 4203
                SHREVEPORT, LOUISIANA 71101
24                    (318) 934-4754

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFFS:

 3   Edward D. Greim
     A. Bradley Bodamer
 4   Katie Graves
     Jackson Tyler
 5   Attorneys at Law
     1100 Main Street, Suite 2700
 6   Kansas City, MO 64105
          and
 7   Paul Loy Hurd
     Attorney at Law
 8   1896 Hudson Circle, Suite 5
     Monroe, LA 71201

 9

10   FOR THE STATE OF LOUISIANA:

11   Jason B. Torchinsky
     Phillip M. Gordon
12   Brennan A.R. Bowen
     Zachary D. Henson
13   Drew Ensign
     Attorneys at Law
14   15405 John Marshall Highway
     Haymarket, VA 20169
15        and
     Morgan Brungard
16   Carey Tom Jones
     Office of the Attorney General
17   Louisiana Department of Justice
     1885 N. Third St.
18   Baton Rouge, LA 70804

19   FOR NANCY LANDRY, IN HER OFFICIAL CAPACITY AS
     SECRETARY OF STATE:
20
     Phillip J. Strach
21   Attorney at Law
     301 Hillsborough Street, Suite 1400
22   Raleigh, NC 27603
          and
23   John C. Walsh
     Attorney at Law
24   628 St. Louis Street
     P.O. Box 4225
25   Baton Rouge, LA 70821
```

1    FOR ROBINSON INTERVENORS:

2    Stuart Naifeh
     Kathryn Sadasivan
3    Victoria Wenger
     Attorneys at Law
4    NAACP Legal Defense and Educational Fund, Inc.
     40 Rector Street, 5th Floor
5    New York, NY 10006
             and
6    I. Sara Rohani
     NAACP Legal Defense and Educational Fund, Inc.
7    700 14th Street N.W. Ste. 600
     Washington, DC 20005
8            and
     Sarah Brannon
9    Megan C. Kennan
     American Civil Liberties Union Foundation
10   15th Street, NW
     Washington, DC 20005
11           and
     Jonathan H. Hurwitz
12   Amitav Chakraborty
     Arielle B. McTootle
13   Attorneys at Law
     1285 Avenue of the Americas
14   New York, NY 10019
             and
15   T. Alora Thomas-Lundborg
     Daniel Hessel
16   Robert Klein
     Election Law Clinic
17   Harvard Law School
     6 Everett Street, Ste. 4105
18   Cambridge, MA 02138

19

20

21                  C O N T E N T S

22   WITNESSES ON BEHALF OF THE PLAINTIFFS:          PAGE

23   TESTIMONY OF SENATOR ALAN THOMAS SEABAUGH:
     Direct Examination by Mr. Greim                   42
24   Cross-Examination by Ms. Sadasivan                54
     Cross-Examination by Mr. Gordon                   59

25

1                      C O N T E N T S

2    WITNESSES ON BEHALF OF THE PLAINTIFFS:            PAGE

3    TESTIMONY OF SENATOR THOMAS PRESSLY:
     Direct Examination by Mr. Greim               65
4    Cross-Examination Mr. Klein                   74
     Cross-Examination by Mr. Gordon               77
5    Redirect Examination by Mr. Greim             82

6    TESTIMONY OF DENNIS GEORGE STEPHEN VOSS, JR.:
     Direct Examination by Mr. Greim               85
7    Cross-Examination by Mr. Chakraborty         143
     Cross-Examination by Mr. Torchinsky          173

8

9    TESTIMONY OF SENATOR CORY McCARTAN:
     Direct Examination by Ms. Rohani             184
10   Cross-Examination by Mr. Torchinsky          214
     Cross-Examination by Mr. Greim               223
11   Redirect Examination by Ms. Rohani           242

12                   *   *   *   *   *

13        (Court called to order with all parties present at

14   9:10 a.m.)

15             JUDGE JOSEPH:  Good morning.  Before we get

16   started today, we had a couple of motions that were filed

17   over the weekend which we need to address.

18        We're on the record now in 24-cv-122, Callais, et al.

19   versus Nancy Landry, et al.

20        Counsel, please make your appearances at this time.

21             MR. GREIM:  For the plaintiffs, Eddie Greim,

22   with Graves Garrett Greim.

23             MS. GRAVES:  Katie Graves, Graves Garrett Greim.

24             MR. TYLER:  Jackson Tyler, Graves Garrett Greim.

25             MR. HURD:  Paul Hurd.

```
 1              MR. BODAMER:  Brad Bodamer, Graves Garrett
 2    Greim.
 3              JUDGE JOSEPH:  Good morning to each of you.
 4              MR. STRACH:  Good morning, Your Honor.  Phil
 5    Strach, with Nelson Mullins; here for the Secretary.
 6              JUDGE JOSEPH:  Good morning.
 7              MR. WALSH:  Good morning, Your Honor.  John
 8    Walsh on behalf of Secretary Landry.
 9              MR. NAIFEH:  Good morning, Your Honor.  Stuart
10    Naifeh, from the Legal Defense Fund on behalf of the
11    Robinson intervenors.
12              JUDGE JOSEPH:  Good morning.
13              MS. SADASIVAN:  Good morning, Your Honors.
14    Kathryn Sadasivan on behalf of the Robinson intervenors.
15              MR. CHAKRABORTY:  Good morning, Your Honor.
16    Amitav Chakraborty from Paul, Weiss, Rifkind, Wharton &
17    Garrison on behalf of the Robinson intervenors.
18              JUDGE JOSEPH:  Good morning.
19              MR. HURWITZ:  Good morning, Your Honors.
20    Jonathan Hurwitz, also from Paul, Weiss, on behalf of the
21    Robinson intervenors.
22              MS. THOMAS:  Good morning, Your Honors.  Alora
23    Thomas of Harvard Election Law Clinic, also on behalf of
24    the intervenors.
25              MR. NAIFEH:  And, Your Honors, we have a number
```

 1    of other lawyers who are currently sitting in the gallery.

 2    Some of them will be participating in the --

 3              JUDGE JOSEPH:  Okay.

 4              MR. NAIFEH:  -- trial case.

 5              JUDGE JOSEPH:  They can make their appearances

 6    as they come to the podium.

 7              MR. NAIFEH:  Thank you.

 8              MS. BRUNGARD:  Good morning, Your Honors.

 9    Morgan Brungard, Deputy Solicitor General for the State of

10    Louisiana.

11              MR. TORCHINSKY:  Your Honor, Jason Torchinsky of

12    Holtzman Vogel on behalf of the State of Louisiana.

13              MR. GORDON:  Your Honor, Phillip Gordon from

14    Holtzman Vogel on behalf of the State of Louisiana.

15              MR. JONES:  Carey Jones from the Attorney

16    General's Office on behalf of the State.

17              MR. BOWEN:  Good morning, Your Honors.  Brennan

18    Bowen from Holtzman Vogel on behalf of the State of

19    Louisiana.

20              JUDGE JOSEPH:  From what firm -- what did you

21    say?

22              MR. BOWEN:  Holtzman Vogel, Your Honor.

23              MR. ENSIGN:  Good morning, Your Honors.  Drew

24    Ensign from Holtzman Vogel on behalf of the State of

25    Louisiana.

1          JUDGE JOSEPH:  Good morning.

2      Okay.  Let's go through these motions.  We did

3  receive a motion to continue.

4      And what's the document number on that, the docket

5  number, Lisa?

6          MS. LACOMBE:  It's 161, Judge.

7          JUDGE JOSEPH:  Okay.  We received a filing over

8  the weekend to continue the trial we have set for today.

9  And, in the alternative, to separate the preliminary

10  injunction hearing from the trial.

11      That motion is opposed -- is it opposed by the State

12  as well?

13          MR. GORDON:  No, Your Honor.  The State's

14  position was that we oppose it to the extent it would

15  interfere with the election calendar; otherwise, we take

16  no position.

17          JUDGE JOSEPH:  Okay.  All right.  In ruling on

18  that motion, that motion to continue is denied for the

19  following reasons.

20      First, the weekend before a trial is not the

21  appropriate time to ask for a trial continuance absent

22  some emergency.  We very well may have granted a

23  continuance had the motion to continue been timely filed.

24      Second, the intervenors' role in this case is limited

25  to the subject matters permitted by the Court in order to

1    supplement the State's defense.  But the map of the

2    plaintiffs' challenge is not the Robinson intervenors'

3    map.  It's the State's map, duly enacted into law by the

4    Legislature and signed by the Governor through the

5    democratic process.  It's primarily the State's duty to

6    defend the map.  And both the plaintiffs and the State

7    defendants initially requested an abbreviated time frame

8    in order to ensure that there was certainty in the

9    election map in sufficient time to have the election this

10   fall.  There is also substantial public interest of the

11   citizens of Louisiana in ensuring certainty in the

12   election map in sufficient time so that the candidates can

13   decide to run and the voters can do due diligence on their

14   preferred candidates.

15       Third, although the Robinson intervenors came into

16   this case later than the other parties, they've been

17   involved in redistricting litigation in the Middle

18   District for years.  They are very familiar with the

19   subject matter of this case.

20       Now, I would like to go to the motion to reconsider

21   striking the plaintiffs' expert, their rebuttal expert.

22   I have read the -- we have read the briefing on that.  I

23   think I have a proposal that may be acceptable to both

24   parties, to all three parties.

25       It seems that the plaintiffs' position about the

1    performance of these districts is not rebuttal to the

2    Robinson intervenors' expert.  Okay.  The performance of

3    this district, the challenged district, and the

4    performance as majority-minority district of the proposed

5    districts in the Robinson litigation, I can't see a way

6    that's rebuttal.

7        I think what is rebuttal is the fact that this map is

8    more racial than the other proposed maps.  So we will

9    allow your rebuttal expert to testify on that point, that

10   it's more racial, but not on the performance, the validity

11   of these districts as racial districts.  And I think

12   Robinson intervenors' main point was that we haven't had a

13   chance to run the stats on that; or if you have, that you

14   don't have an expert designated for that.  Right?

15           MR. NAIFEH:  Yes, Your Honor.  That is

16   acceptable.

17           JUDGE JOSEPH:  Is that acceptable to you?

18           MR. NAIFEH:  Your Honor, yes.  That I think

19   resolves our primary concern that the expert is being

20   offered in rebuttal to testify about something that goes

21   beyond the --

22           JUDGE JOSEPH:  Yeah.  I think that's beyond; I

23   think the performance is beyond.

24       All right.  With that being said, the plaintiffs have

25   the burden of proving its case.  Please proceed.

1          JUDGE STEWART:  Just one housekeeping note.

2    Even though we're well wired, it will help if you keep

3    your voice up, you know, when you are speaking so we can

4    hear it.  For one thing, the mics should transmit well,

5    but with some of you, you know, speak soft, it may be

6    difficult.  Not shout, but just so that, you know, it's

7    audible for us to make sure we have it.

8          MR. GREIM:  Your Honor, Judge Joseph, I do have

9    just a question, a clarification.  I probably don't need

10   to handle it right this second.  But on the expert issue,

11   his analysis to get to the racial performance, or that the

12   racial comparison runs through performance, I wonder if

13   the Court would just simply not take that as part of his

14   opinion.  He doesn't really have an opinion about the

15   racial, I guess we could say superiority is in terms of

16   performance.  So maybe the -- maybe the point could be,

17   when he testifies, if he is able to say this, that SB8

18   performs better and we leave out the sort of concrete --

19   the testimony about whether they actually perform at all,

20   in other words, whether they get a 50 percent.

21          JUDGE JOSEPH:  Well, that was my point.

22          MR. GREIM:  Okay.  I just wanted to make sure I

23   understood correctly.

24          MR. NAIFEH:  That was my understanding of your

25   point, Your Honor.

1          MR. GREIM:  Okay.

2          JUDGE JOSEPH:  All right.  You'll have to touch

3    on performance to some degree to rebut the fact that it's

4    political, not racial, if he says that it's, you know,

5    actually more of a racially motivated map, okay?  That's a

6    proper rebuttal opinion.  But anything else about the

7    performance of these districts as majority-minority

8    districts is beyond the scope of the intervenors' case.

9          MR. GREIM:  I understand.

10          JUDGE JOSEPH:  All right.

11          MR. GREIM:  I understand that we are to make our

12    openings from this middle podium.

13          JUDGE JOSEPH:  As long as there is a microphone,

14    I don't think -- I'll have to ask my fellow judges, but I

15    don't have a preference, really.  Wherever you are

16    comfortable.  Just make sure you stand up and you're near

17    a microphone.

18          MR. GREIM:  This is a case that may turn more on

19    the law than on the facts.  On plaintiffs' *Shaw* claim,

20    Count 1, this is not a factually complicated case on

21    either the two prongs that we will be addressing.

22          On the first prong, the direct evidence that you'll

23    hear from the legislative record proves that race

24    predominated.  We're going to be playing the transcripts.

25    The Court will hear the House and Senate sponsors each

1    reading from what sounds like an almost identical script.

2    The script makes clear that the crucial decision was that

3    two majority-minority districts were required with Senate

4    Bill 8.

5         Here's Senator Womack:  We had to draw two

6    majority-minority districts.  You will hear them say,

7    again, from Senator Womack:  Given the State's current

8    demographics, there is not a high enough black population

9    in the southeast portion of Louisiana to create two

10   majority-black districts and to also comply with the

11   U.S. Constitution's one-vote, one-person requirement.

12   That is the reason why District 2 is drawn around Orleans

13   Parish, why District 6 includes the black population of

14   East Baton Rouge Parish and travels up the I-49 corridor

15   and the Red River to include the black population of

16   Shreveport.  He is saying that's why.  You'll hear more

17   like that.

18        Two majority-minority districts was a fixed mandate

19   for the Legislature.  It could not be compromised.  Any

20   political trade-offs, you'll hear, were only because the

21   initial racial mandate caused a loss of one Republican

22   seat.  The sponsors' questions and answers, you'll hear,

23   with the other legislatures will remove any doubt.

24        Finally, two area senators from -- who represent

25   parts of this parish who voted against SB8 will be here

1    shortly to testify.  The legislative record and their

2    direct testimony will remove any doubt and it will carry

3    the day on the question of racial predominance.

4        Now, on the second prong, strict scrutiny, the burden

5    shifts to the State and the intervenors.  Just for a

6    moment, we should focus on what is that burden.

7        First, they must show that the senate had a

8    compelling -- I'm sorry -- that the State had a compelling

9    government interest in sorting voters based on race.  If

10   the State relies on the VRA itself and not just the

11   judicial strategy as a compelling interest, the State must

12   then show that the remedy it actually drew was narrowly

13   tailored to remedy a violation of the VRA.  The fear of

14   violating the VRA somewhere does not allow the State to

15   draw a racially gerrymandered district anywhere.  The

16   State must have a strong basis in evidence for concluding

17   that the three *Gingles*' preconditions in the totality of

18   circumstances are satisfied under the VRA.  Not just for

19   two majority districts anywhere -- two minority districts

20   anywhere, but for the actual second minority district that

21   it drew that covers this area.  This requires a

22   pre-enactment analysis of the particular districts drawn.

23       The State must also show it did not subordinate

24   traditional districting principles more than necessary to

25   avoid Section 2 liability.  This is important when we hear

1    the witnesses.  The State must believe that the statute

2    required, that the VRA required and "demanded," demanded

3    such steps in a particular area of the State, here in

4    Northwest Louisiana.  The remedy must be narrowly tailored

5    to redress the wrong found under the VRA.

6         Now, both the State and intervenors at this point

7    have an identical argument when it comes to strict

8    scrutiny.  If it wasn't clear at first, it is now clear

9    from the briefing.  It's really a legal argument.  We saw

10   this in the intervenors' motion in limine.  The State had

11   a strong basis, they say, to believe that the VRA requires

12   a second majority district because of the vacated

13   preliminary injunction, reviewed only for clear error by

14   the Fifth Circuit in the *Robinson* litigation.  But that

15   litigation, we'll see, considered an allegedly compact

16   minority population elsewhere in the state, and the State

17   was never able to put on its full case in that litigation.

18   There will be no evidence of any independent analysis by

19   the State before SB8 was enacted.  Indeed, the intervenors

20   argue the lack of any state analysis -- this is in their

21   motion in limine -- is one reason to keep out any

22   testimony about whether the VRA requires a second

23   district.  They don't actually want that evidence to be in

24   the courtroom here unless it's from the Judge Dick case.

25        Given that position, it is no surprise that none of

1   the intervenors' witnesses are here to testify as to

2   strict scrutiny.  This, frankly, could be a one-day trial;

3   however, the plaintiffs have other circumstantial evidence

4   on both prongs of *Shaw*.  Intervenors have brought

5   witnesses then to argue on *Shaw*, Prong 1.  I am just going

6   to walk through a short summary of that evidence.

7        Mike Hefner, plaintiffs' expert demographer and

8   long-time Louisiana political expert, who has worked with

9   redistricting maps since the early '90s, will provide

10  useful background, starting with the *Hays* case, litigated

11  actually by Mr. Paul Hurd, who is sitting here at counsel

12  table, 30 years ago.

13       The *Hays* case shows we've been here before.  In the

14  '90s, the Legislature tried to create a second

15  majority-minority district out of its seven congressional

16  districts.  Here's what crucial.  It relied on a DOJ

17  letter stating that the VRA required the Legislature to

18  draw a second majority-minority district.  This was

19  powerful.  The Legislature had to comply with the DOJ

20  letter or else litigate, unlike anything that existed from

21  Judge Dick at the time of the legislation here.

22  Following its obligation under the DOJ letter, the

23  Legislature created a Z-shaped district which was

24  challenged as an unconstitutional gerrymander.  The

25  Legislature then repealed that map and created a slash

1   district stretching from Shreveport in Northwest

2   Louisiana, 250 miles to Baton Rouge, while picking up

3   African American population in Lafayette and Alexandria.

4   Before this very court, the Legislature argued that its

5   attempt to comply with the DOJ's requirements rendered the

6   district lawful under the Fourteenth Amendment.  Sounds

7   familiar.  The Court recognized the DOJ letter, mandatory

8   though it was, was not enough on strict scrutiny.  The

9   State had to actually prove its case that the VRA demanded

10  its district and found that this map as well was an

11  unconstitutional racial gerrymander.  It bears a striking

12  resemblance to SB8.  Indeed, as Mr. Hefner will testify,

13  today's District 6 has 82 percent of the minority

14  population that was in the 1994 map.  Hefner will also

15  show that the Legislature drew for CD-2 and CD-6

16  specifically to encircle pockets of black voters

17  throughout the state while pushing white voters into the

18  four remaining congressional districts.

19      And you can see here on this map, which we will show

20  through Mr. Hefner, the red dots are black voters, the

21  white dots are white voters.  So you can see how the lines

22  are very careful to bring in pockets of red where they

23  will not take in too much white.  That is the racial

24  gerrymander that ultimately happened here.

25      Later today -- Hefner will go tomorrow -- you'll hear

1    a different kind of testimony from Dr. Stephen Voss, a

2    Louisiana native and political scientist, who's at

3    Kentucky right now.  Voss does employ Mr. Hefner's

4    methods, but he also runs a cutting-edge simulation

5    technique that shows that even after trying to focus his

6    algorithm on race, no majority-minority districts emerged.

7    Drawing one, let alone two districts, requires an

8    overwhelming focus on race.  That even includes

9    District 2.

10        The Robinson intervenors' experts will tell you they

11   have no proof of their own; they're simply here to contest

12   the methods and conclusions of the plaintiffs' experts.

13   The one exception possibly is Anthony Fairfax, who will

14   testify that SB8 is less compact and splits more parishes

15   than the other two-minority district plans because he says

16   it must be considering politics.  But he won't be able to

17   show he considered racial differences between these

18   competing maps.  As we discussed earlier this morning,

19   plaintiffs' expert, Ben Overholt, will come in and show

20   that, in fact, SB8's ugly shape helps it to include more

21   black voters and perform better than the competing

22   two-minority maps.

23        Now, the Secretary intervenors have a few fact

24   witnesses, which I think you'll hear Tuesday and

25   Wednesday.  Listen to what you won't hear from them.

1    Not a single person will testify that the Legislature came

2    into special session specifically because it wanted to

3    rejigger the congressional districts based on political

4    concerns or to oust Congressman Garret Graves.  Not a

5    single person will testify that the Republican-dominated

6    legislature wanted to lose a Republican seat in Congress

7    for political reasons.  And not a single person will

8    testify that the Legislatures created Districts 2 and 6 to

9    protect incumbents or political districts in Districts 2

10   and -- political interests in Districts 2 and 6.  Not a

11   single person will testify that the Legislature conducted

12   any pre-enactment analysis of the *Gingles* factors in the

13   totality of circumstances for the map and SB8, or any map

14   resembling SB8.  The intervenors' witnesses are going to

15   lack relevant personal knowledge.  Not a single person

16   will testify that the Court in the Robinson litigation,

17   number one, even offered an opinion on a possible VRA

18   violation in Northwest Louisiana.  Nothing material has

19   changed since the *Hays* case.  At the end of this trial,

20   all evidence will show that SB8 plainly violated the

21   Constitution.

22            JUDGE JOSEPH:  Thank you.

23            MR. GORDON:  Your Honor, I just want to

24   interject for a brief moment of clarification.  I think

25   the parties have gotten slightly lax about the naming

1    conventions used in this case and I note that both the

2    State and the Robinson intervenors are technically

3    intervenors.  We certainly didn't have a motion in limine

4    here.  I believe that refers to the Robinson intervenors.

5    So to the extent I think we can all agree the parties can

6    just refer, when they want to refer to the State

7    specifically, just refer to "the State."  And

8    "intervenors," we can just take to mean, the Robinson

9    intervenors.  Is that --

10            JUDGE JOSEPH:  Is there any daylight between the

11    State and the Secretary?

12            MR. STRACH:  Other than this space right here,

13    not really.

14            JUDGE JOSEPH:  Okay.  Well, just we'll have

15    "the State" and we'll have "the Robinson intervenors."

16            MR. GORDON:  Thank you, Your Honor.

17            MS. BRUNGARD:  Good morning, Your Honors.

18    Morgan Brungard on behalf of the State.  It's my

19    understanding that the Secretary is not going to give an

20    opening and has given me a couple of minutes of their

21    time.

22        We appreciate the opportunity to address the Court

23    this morning.  For the past 30 years, the State has been

24    torn between the Voting Rights Act and the Fourteenth

25    Amendment.  In the 1990's the State drew a map with two

1    majority-black districts because the U.S. Attorney General

2    required it under Section 5 of the Voting Rights Act.

3    That map was challenged under the Fourteenth Amendment in

4    the *Hays* litigation from the '90s that my friend on the

5    other side mentioned, and that map was struck down as a

6    racial gerrymander.

7         While the Supreme Court ultimately concluded that the

8    *Hays* plaintiffs lacked standing, the State has followed

9    this Court's merits holding in *Hays* that the Fourteenth

10   Amendment prohibits two majority-black districts.  That

11   holding is why the State passed the map with one

12   majority-black district in the 1990's and continued that

13   practice through 2022.

14        In 2022, two sets of plaintiffs sued to enjoin that

15   map under the Voting Rights Act.  Those suits,

16   consolidated in *Robinson* in the Middle District of

17   Louisiana, alleged that Section 2 of the VRA required the

18   creation of a second majority-black district.  The State

19   vigorously defended that case and lost.  The Middle

20   District preliminarily enjoined the 2022 map and held that

21   Section 2 requires a second majority-black district.  In

22   the Fifth Circuit, the State strenuously again argued that

23   the VRA did not require two majority-black districts in

24   Louisiana and again lost.  The Fifth Circuit expressly

25   agreed with the Middle District that plaintiffs were

1    likely to succeed in proving that the VRA requires two

2    majority-black districts.  But the Fifth Circuit vacated

3    the preliminary injunction primarily for timing-related

4    issues and remanded to the Middle District.  On remand,

5    the Middle District gave the State two options:  Either

6    enact a new map or go to trial in February 2024 on the

7    single majority-black district map, a map that the

8    Middle District had enjoined once already.

9        The State took the first option.  Seeing the VRA

10    liability writing on the wall, the Governor called a

11    special session of the Legislature in January 2024.

12    The Legislature convened and took the Middle District and

13    Fifth Circuit at their word when they said the VRA

14    requires a second majority-black district.

15        Senator Womack introduced SB8 that proposed a map

16    with the second majority-black district, and he gave

17    detailed political reasons for the shape of the districts.

18    The Legislature passed the SB8 map, which plaintiffs here

19    now challenge.  The State's effort to comply with the

20    decisions from the Middle District and the Fifth Circuit

21    and draw a second majority-black district is the impetus

22    of this Fourteenth Amendment challenge.

23        To prevail here, plaintiffs must show not just that

24    the State was aware of racial demographics, but that race

25    predominated in the drawing of the SB8 map.  If they

1    succeed, the burden switches to the State to satisfy

2    strict scrutiny.  Plaintiffs cannot show predominance; and

3    even if they could, the State can satisfy strict scrutiny.

4         Taking predominance first, plaintiffs cannot meet

5    their burden.  The evidence will show that the

6    Legislature's predominant reason for passing the SB8 map

7    was a desire to do two things:  First, to comply with the

8    decisions from the Middle District and the Fifth Circuit

9    holding that the VRA requires a second majority-black

10   district.  And second, to protect Representative Julia

11   Letlow.  The difference between the SB8 map and the

12   remedial map that the Robinson intervenors here presented

13   to the Middle District there, illustrates that political

14   considerations drove the configuration of the SB8 map.

15   The Robinson remedial map and the SB8 map are largely the

16   same in South and Middle Louisiana.  Both maps encompass

17   portions of Baton Rouge, Alexandria, and Lafayette in the

18   second black-majority district.  But where they diverge is

19   in North Louisiana.  The Robinson remedial map included

20   minority areas in Monroe, the delta parishes, and portions

21   of the Florida parishes in its second black-majority

22   district.  Drawing the district that way put incumbent

23   Republican Representative Julia Letlow into a

24   majority-black district that favors Democrats, making it

25   nearly impossible for her to win.  Essentially, the

1    Robinson remedial map redistricted Representative Letlow,

2    the only woman in the Louisiana congressional delegation,

3    out of Congress.  She is one of only two incumbents

4    representing North Louisiana who serve in the majority

5    party of the U.S. House.  She also serves on the

6    Appropriations Committee and the Agriculture Subcommittee

7    of Appropriations.  These positions are crucial to

8    Louisiana and especially to North Louisiana.

9        Senator Womack, who introduced SB8, is also from

10   North Louisiana.  And he stated very clearly that his

11   political objective with SB8 was to protect Representative

12   Letlow.  To accomplish that political objective, the SB8

13   map, second majority-black district, includes nearly all

14   of Shreveport and excludes Monroe.  Replacing Monroe with

15   Shreveport keeps Representative Letlow in a district she

16   can win, ensures that North Louisiana retains two

17   incumbent congressional members, and guarantees

18   Louisiana's presence on very powerful congressional

19   committees.

20       This political reality, as Senator Womack explained

21   in committee and on the Senate floor, coupled with the

22   need to comply with the orders of the Middle District and

23   the Fifth Circuit, drove the configuration of the SB8 map.

24   To the extent that race played a role in the fact that the

25   SB8 map has a second majority-black district, that

1    decision was made by the federal courts.  The Court's

2    decision to require two such districts cannot be impugned

3    to the State.  The only decision the State itself made was

4    where to draw the lines of those districts, and that was a

5    political decision.

6         Even if this Court finds that Plaintiffs have met

7    their burden, the State can easily satisfy strict

8    scrutiny.  Under the first prong of strict scrutiny, the

9    Supreme Court has long assumed without deciding that VRA

10   compliance is a compelling government interest.  Here the

11   facts more strongly show a compelling interest because the

12   State was complying with federal court decisions telling

13   the State what the VRA required.  And no one seriously

14   disputes that the State enacted the SB8 map to comply with

15   those court decisions.  The Governor said as much when he

16   convened the special session.

17        The inquiry then moves to the second prong:  whether

18   the State's race-conscious redistricting was bolstered by

19   a strong basis in evidence or good reasons to believe that

20   the VRA required race-based redistricting here.  And the

21   answer is a resounding yes.  The State's decision to

22   redistrict was expressly driven by the Middle District's

23   and the Fifth Circuit's decisions indicating that the VRA

24   requires a second majority-black district.  And having not

25   one but two court decisions saying the VRA requires a

1    second majority-black district is the strongest evidence

2    of all that the VRA indeed requires that.  To the best of

3    our knowledge, the State's evidence of what the VRA

4    required in this case is stronger than the evidence in all

5    of the Supreme Court cases considering whether a map drawn

6    by the State to comply with the VRA violates the

7    Fourteenth Amendment.

8         Plaintiffs argue that the Legislature did not conduct

9    racial performance analyses or consult experts when

10   debating SB8.  That's only half the story and also misses

11   the point.  The State was redistricting in response to two

12   court decisions that took into account competing expert

13   analyses.  And so the Legislature was not drawing lines in

14   a vacuum; it was working off multiple court decisions

15   informed by the analyses of multiple experts.  That is

16   enough here.  Indeed, the very reason that legislatures

17   and redistricting bodies across the country hire VRA

18   experts and Ph.D.s to evaluate their proposed map is to

19   predict how federal courts might review the maps under the

20   VRA.  Of course, the Louisiana Legislature didn't need to

21   hire experts to predict how the Courts might view the

22   creation of a second majority-black district because the

23   Courts had already spoken for themselves.

24        So although the Legislature did not specifically hire

25   an expert during the special session, its drafting of the

1    SB8 map was informed by the most definitive experts whose

2    opinions matter more than any others, the federal courts

3    that would be adjudicating the maps' VRA compliance based

4    on expert reports filed in that case.  There can be no

5    stronger basis in evidence or better reasons to believe

6    that the VRA required a second majority-black district

7    here than a precedential opinion of the Fifth Circuit

8    affirming that a map with a single majority-black district

9    likely violated Section 2.  Accordingly, the State's

10   redistricting satisfies strict scrutiny.

11       Before concluding, I want to turn back to the law.

12   Section 2's statutory language, as interpreted by the

13   Supreme Court, demands that states consider race when

14   redistricting.  That is difficult to square with the

15   Fourteenth Amendment's command that states act in a

16   race-blind manner.  The State's actions here are a good

17   faith effort to comply with those statutory and

18   constitutional commands as well as the decisions of the

19   Middle District and the Fifth Circuit.  The State's

20   position in this matter is that the Middle District

21   required the State to have a second majority-black

22   district; and the Fifth Circuit affirmed that decision,

23   which gave the Legislature the best reason of all to

24   believe that such a district was required.  It is

25   irrelevant in this case whether the VRA actually requires

1   a second majority-black district or whether the State

2   agrees with the Middle District or the Fifth Circuit.

3        In sum, the SB8 map is an attempt to comply with the

4   command of the Middle District, backed by the Fifth

5   Circuit, and the Republican majority's desire to preserve

6   Julia Letlow's district.  This attempt satisfies the

7   Fourteenth Amendment, plaintiffs' case fails on the

8   merits, and their requested injunction should be denied.

9   We look forward to presenting our case to this Court.

10       Thank you.

11            MR. CHAKRABORTY:  Good morning, Your Honors.

12       Your Honors, Amitav Chakraborty, on behalf of the

13   Robinson intervenors.  And similar to the State, I

14   understand that I have a few more minutes, given that the

15   Secretary has ceded, but I'll be brief.

16       Your Honors, this case presents the question of

17   whether race was the predominant factor in the enactment

18   of Senate Bill 8, a congressional plan with two

19   majority-black districts.  It is a question of monumental

20   importance to the present and the future of this state and

21   implicates the fundamental rights of its citizens and

22   particularly its black citizens.  The answer to that

23   question is a resounding no.  The Legislature properly

24   took race into account in light of the multiple federal

25   court decisions holding that any plan with one

1    majority-black district likely violates Section 2 of the

2    Voting Rights Act.  The Legislature balanced that

3    consideration of race with other redistricting criteria,

4    including respecting communities of interest and, most

5    importantly, its own political and policy goals and

6    ultimately deciding on and enacting SB8.

7        The issue with plaintiffs' entire theory is that it

8    hinges on pretending that we are operating off of a blank

9    slate.  It requires everyone in this courtroom to forget

10   recent history, to forget the events of the last two and a

11   half years.  But, Your Honors, history matters, whether

12   it's the long history in this state of voting-related

13   discrimination, or the events leading up to the enactment

14   of SB8.

15       Now, throughout the redistricting process in fall

16   2021 and spring 2022, voters and voting rights

17   organizations alike provided compelling testimony to the

18   Legislature about the reasons -- moral, political, and

19   personal -- that the Legislature should adopt a plan with

20   two black-majority districts.  The Legislature instead

21   adopted HB1, a plan that like its predecessor had only one

22   such district.  Now, immediately the Robinson intervenors

23   filed suit challenging HB1 on the ground that it diluted

24   the strength of the State's black voters in contravention

25   of Section 2 of the Voting Rights Act.  Then, as now, our

1    clients or voting rights organizations and individual

2    black voters, some of whom are here today, whose rights

3    were violated by that map.

4        The district court in *Robinson v. Ardoin* held a

5    five-day evidentiary hearing during which seven fact

6    witnesses and 14 expert witnesses testified on these

7    questions, at the conclusion of which the judge issued a

8    152-page ruling and an order granting the preliminary

9    injunction.  The district court's assessment of the merits

10   of intervenors' claim was upheld not once but twice by

11   unanimous panels of the Fifth Circuit Court of Appeals.

12       Now, all of those decisions addressed issues that

13   plaintiffs re-raise here, including rejecting the

14   proposition that a map with two majority-black districts

15   is necessarily a racial gerrymander.  It is against this

16   backdrop, it is against this history, that SB8 was

17   enacted.  Both the Governor and the Legislature made clear

18   through their words and their actions that they were fully

19   aware of the events leading up to the special session.

20   The evidence will show that they intended to pass the

21   VRA-compliant map of their own accord that took into

22   account their own political goals, their own redistricting

23   goals as well, rather than insisting on a trial that the

24   Fifth Circuit had said they were likely to lose and have

25   the Court-drawn map imposed upon them.

1          Now, as you hear the testimony over the next few

2     days, I would like you to keep in mind, just how high

3     plaintiffs' burden of proof is in this case.  Plaintiffs

4     have to prove that race was a predominant factor

5     motivating the Legislature to pass SB8.  And the Supreme

6     Court has explained that that standard is a "demanding

7     one."

8          So what does the standard require?  Well, it requires

9     that plaintiffs prove that the Legislature subordinated

10    all other criteria including compactness, communities of

11    interest, political considerations, incumbent criteria,

12    and other criteria set out in Joint Rule 21.  Discarded

13    all of that on a single-minded focus on race.  Your

14    Honors, that did not happen.

15         Instead you will hear evidence of the actual

16    considerations that the Legislature took into account when

17    passing SB8.  Through transcripts and videos of

18    legislative session, you will first hear about those

19    considerations directly from the bill's sponsor.  When

20    introducing SB8, Senator Womack made clear that his

21    foremost consideration was ensuring that Congresswoman

22    Julia Letlow remain in pairing with any other incumbents

23    in a safe Republican seat.  This single political factor

24    distinguishes SB8 from numerous other introduced maps

25    during that same session, which also achieved a

1  majority-black district and balanced redistricting

2  criteria.

3      As he stated under questioning in a senate

4  governmental affairs committee hearing, Senator Womack

5  said, quote, "Politics drove this map."  You will hear

6  Senator Womack and other legislators further describe the

7  importance of guarding Louisiana's political influence in

8  Washington through protecting the districts of House

9  Speaker Mike Johnson and House Majority Leader Steve

10  Scalise, among the four safe Republican seats.

11      You will also hear that Senator Womack and others

12  spoke candidly about the shared interests protected under

13  SB8 in CD-6.

14      They viewed CD-6 as a commerce district with shared

15  industry across agricultural and timber.  They recognized

16  educational and health care connections within CD-6, given

17  that residents of the new district went to the same

18  schools and attended the same hospitals.

19      And yes, you will hear that the Legislature properly

20  considered race, because Joint Rule 21 and federal law

21  requires that districting plans comply with the VRA.

22  Now, I understand that plaintiffs wish that the

23  Legislature would have made different choices.  They take

24  issue with the fact that the Legislature considered maps

25  at all that had two majority-black districts.  They say

 1   that the Legislature could have taken into account

 2   different choices with respect to communities of interest.

 3   And it's no big secret that SB8 was not the preferred

 4   choice of Robinson intervenors either.  We preferred other

 5   maps that were introduced during the special session.

 6         But let me be as clear as I can about this:  That is

 7   not the test for overcoming the standard for racial

 8   gerrymandering.  Racial gerrymandering isn't just

 9   established whenever a person or persons disagrees with

10   the policy choices that are input and reflected in an

11   enacted map or whenever a state intentionally creates a

12   majority-minority district.  And even if plaintiffs were

13   somehow able to establish that race predominated, you will

14   hear that the Legislature clearly had a strong basis in

15   evidence here for believing that the VRA required two

16   majority-black districts.  The Legislature was briefed by

17   legislative staff and the Attorney General, who made clear

18   that passing a compliant map was the advisable path

19   forward.  They saw both the factual evidence introduced in

20   *Robinson* and the legal results and decisions from those

21   courts and understood that they needed to consider race

22   among other criteria in crafting new districts.  That

23   compelling interest is all that the Constitution requires.

24   In fact, it's hard to think of a case in which there could

25   be a stronger basis in evidence than for a legislator to

1   conclude that race should be considered than the one

2   that's before you today.

3       Now, in addition to the legislative session record

4   laying this out, you will hear live testimony from several

5   sets of witnesses.  First you will hear from public

6   officials such as State Representative Mandie Landry and

7   State Senator Royce Duplessis.  They will explain in

8   detail that politics drove the creation of this map and

9   talk through the specific political goals of the

10  Legislature.

11      Second, you will hear from three expert witnesses:

12  Mr. Tony Fairfax, Dr. Cory McCartan, and Dr. Michael

13  Martin.  Now, unlike plaintiffs' experts, Mr. Fairfax is

14  an accomplished mapping expert who has developed almost

15  1,000 plans for every level of government, including in

16  Louisiana.  Mr. Fairfax will explain that plaintiffs'

17  experts cannot establish that race was a predominant

18  motive behind the creation of CD-6, and that other

19  redistricting factors better explain the district

20  configurations in the enacted map.

21      Dr. Michael Martin will walk the Court through the

22  complex political dynamics that informed the choices

23  resulting in SB8.  He'll discuss the relationship between

24  Governor Landry and Representative Garret Graves and how

25  that, combined with outside political factors, resulted in

1    Representative Graves being drawn into a majority-black

2    district.

3        Dr. Cory McCartan will explain all of the reasons

4    that Dr. Voss's use of map simulations to the

5    circumstances at issue here were inappropriate.  He is

6    uniquely qualified to do that because he created the

7    simulation and the simulation packages that Dr. Voss

8    relied on and tried to use here.

9        Dr. McCartan will explain Dr. Voss's failure to

10   incorporate the relevant redistricting criteria used by

11   actual mapmakers and placing undue weight on other

12   criteria in a manner that ultimately skews Dr. Voss's

13   analysis.

14       You will hear from Pastor Steven Harris and former

15   State Representative and Shreveport Mayor Cedric Glover,

16   both lifelong residents of Louisiana, who will testify to

17   the commonalities between the communities that are now

18   connected in the new Sixth Congressional District.  They

19   will speak to their own experiences living, working, and

20   serving in the boundaries of the district and discuss the

21   cultural, geographical, and economic communities of

22   interest that unite Shreveport, DeSoto, Natchitoches,

23   Alexandria, Opelousas, and Baton Rouge.

24       And finally, you will hear from some of the Robinson

25   intervenors themselves, black voters and civic leaders,

1  who have been litigating for a representative map for over

2  two years.

3      Now, in the papers leading up to trial and just now,

4  you saw that the plaintiffs missed no opportunity to

5  invoke the ghost of a 30-year-old map, the *Hays* map, a

6  vestige of a time when Louisiana had seven districts and

7  hundreds of thousands of fewer black voters.  But *Hays* was

8  considered and disregarded by the *Robinson* district court

9  for the simple reason that it doesn't represent or

10 resemble the factual circumstances here.  There were

11 decisions by multiple federal courts, as there are here,

12 explaining that Section 2 requires a majority-black

13 district.

14     Your Honors, I would like to end on a note about the

15 4.6 million voters in Louisiana, including the more than

16 1.5 million black voters.  They deserve a map that their

17 elected representatives crafted.  They deserve a map that

18 takes into account their preferences, regardless of

19 whether everyone agrees with them.  They deserve a map

20 that is compliant with Section 2 of the Voting Rights Act

21 that does not subvert federal law and that does not dilute

22 minority voting power.  SB8 is that map.  It is not a

23 racial gerrymander.  SB8 rightly contains two

24 majority-black districts and incorporates traditional

25 redistricting criteria as well as the Legislature's

1   political considerations.

2        Plaintiffs' Hail Mary attempt to subvert the will of

3   the people and the government of this state should be

4   rejected.  Thank you.

5            JUDGE JOSEPH:  I'm going to ask my colleagues'

6   brief indulgence to ask a question that was kind of danced

7   around by all the parties in their openings.  I think each

8   of the parties understands and has acknowledged that the

9   Middle District litigation does come into play somewhat

10  here.

11       My questions are as follows, and I'll give each party

12  a chance to respond to them:  Did the Middle District

13  litigation evaluate whether two majority-minority

14  districts are possible without violating the Equal

15  Protection Clause?

16       Did the Court in the Middle District litigation have

17  the statutory authority to determine whether two

18  majority-minority districts in Louisiana are possible

19  without violating the Equal Protection Clause?

20       And accordingly, did the Fifth Circuit panel that

21  reviewed that decision have the statutory authority to

22  determine whether the two majority-minority districts

23  would violate the Equal Protection Clause?

24       You don't have to respond.

25            MR. GREIM:  I'm sorry.  Your Honor, do you want

 1   us to step up and --

 2           JUDGE JOSEPH:  Hold on one second.

 3           (Judges confer off the record.)

 4           JUDGE JOSEPH:  We're just going to leave it at

 5   that, and that will be something for each party to

 6   consider during the course of this trial.

 7       Please proceed with your first witness, Mr. Greim.

 8           MR. GREIM:  Your Honor, we're bringing him in.

 9   While he comes up, I have a few logistical things while

10   he's making his way up, if it's okay.  The parties have

11   conferred beforehand, and I just want to make a record on

12   joint exhibits and stipulations.  So I thought I would do

13   it while he is walking up.

14       What we had marked as Plaintiffs' Exhibits 1 through

15   17 have also been submitted to the Court, I understand, as

16   Joint Exhibits 1 through 17.  So I wanted to just move the

17   entry into the record of those 17 joint exhibits.  I can

18   represent the parties --

19           JUDGE STEWART:  For my benefit at least, we had

20   a list and then we got an amended list and then we got a

21   later list.  So just tie in which of the more recent

22   submissions -- you are saying this is the joint

23   stipulation?  Is that --

24           MR. GREIM:  Well, there is a list of joint

25   exhibits that was filed, I understand.

 1              JUDGE STEWART:  Right.

 2              MR. GREIM:  That is exactly the same as the

 3    original list --

 4              JUDGE JOSEPH:  It's Document 165, right?

 5    Let's refer to it by docket number.  That way the record

 6    is clear and we can look it up.  The joint stipulations

 7    document, Docket 165, according to Ms. LaCombe, our

 8    courtroom deputy.

 9              MR. GREIM:  Yes.

10              JUDGE STEWART:  My point was just clarity

11    because we've had so many filings and so forth.  And if

12    you refer to them by numbers, we've got to track them

13    down, and we don't err in not knowing which one you had.

14              MR. GREIM:  Okay.  So we move the admission of

15    those exhibits, and I think that's without objection.

16              MR. GORDON:  No objection.

17              MR. NAIFEH:  No objection.

18              MR. GREIM:  Next we have --

19              JUDGE JOSEPH:  Without objection, let them be

20    entered.

21              MR. GREIM:  Next we have Plaintiffs' Exhibits 23

22    through 29.  And those have existed in every exhibit list.

23    Those are excerpts from the legislative record.

24         And so what's happened here is:  Each party has their

25    own designations from that record.  Each party has their

1    own set of exhibits.  They have been broken up by day for

2    most parties.  We've all agreed no one is going to object

3    to anyone else's transcripts sections, but each person

4    will move for that in their case-in-chief.

5         So I am now moving for the admission of Exhibits 23

6    through 29.

7              JUDGE JOSEPH:  Any objection?

8              MR. GORDON:  No objection, Your Honor.

9              MR. NAIFEH:  No objection.

10             JUDGE JOSEPH:  Without objection, let them be

11   entered.

12             MR. GREIM:  You will hear a shorter version of

13   those played in this courtroom after our next two live

14   witnesses.

15        And then finally, Plaintiffs' Exhibit P39 are the

16   parties' joint stipulations.  We included them as a

17   Plaintiffs' exhibit but we now want to move those into

18   evidence, and I don't think I've got any objection there.

19             MR. NAIFEH:  No objection.

20             MR. GORDON:  No objection.

21             JUDGE JOSEPH:  Without objection, let them be

22   entered.

23             MR. GREIM:  The last piece of housekeeping -- I

24   haven't done this yet, but there's an exhibit called P40

25   which is just simply a list of the admitted facts from the

1    complaint and the answers.  We just combined them together

2    into an exhibit for the record.  The other parties want to

3    study those more closely.  Before I am done tomorrow, I

4    will move those.  I just wanted to flag that for the

5    Court.

6            JUDGE JOSEPH:  Okay.  So P40, what document

7    number is that?

8            MR. GREIM:  It isn't a document number.

9            JUDGE JOSEPH:  Okay.  What document?

10           MR. GREIM:  It's from Docket Number 139.

11           JUDGE JOSEPH:  Docket Number 139.  We'll circle

12   back to that.

13           MR. GREIM:  Yes.

14           JUDGE JOSEPH:  And it may be essentially

15   effectively stipulations based on the complaint and the

16   answer.

17           MR. GREIM:  That's right.  And I think it's

18   unlikely, Your Honor, that we'll -- well, we'll see.  I

19   don't think we're going to be admitting any other exhibits

20   very likely; however, we will have demonstratives.

21   Everybody will.  They have changed because we were taking

22   depositions, even after the bench books.  So the parties

23   are exchanging those the day before the hearing, each day

24   at trial; and we are then going to just I think mark them

25   afterwards.  We'll make a record, so it's very clear what

1   they are.  Then afterwards, we'll stamp them and just --

2   we can lodge them with you so that you can see them.  They

3   are not going to be evidence; they are just

4   demonstratives.  But I thought you would like to have them

5   later to go with the transcript.  So we'll make sure you

6   get those in some organized way.

7          JUDGE JOSEPH:  Okay.  And thank you, Mr. Greim.

8   And again, please make sure that Counsel is working

9   together to make sure there is no interruptions in the

10  trial, to the extent that there is any objections; those

11  could be queued up appropriately at the right time.  And

12  there is nothing to be gained at this point from

13  gamesmanship in providing documents to the parties.

14         MR. GREIM:  Also to be clear, our final exhibit

15  list is Document 141.  I just want to make that clear.

16         JUDGE JOSEPH:  141.

17         MR. GREIM:  141.

18         JUDGE JOSEPH:  All right.  Call your first

19  witness.

20         MR. GREIM:  We call Senator Alan Seabaugh.

21         (Oath administered to the witness.)

22         MR. GREIM:  Your Honor, is it okay if I conduct

23  the examination from this podium instead of over there?

24         JUDGE JOSEPH:  Yes.  As long as you're by a

25  microphone and so the court reporter can hear you, then

1    I'll leave it to your discretion.

2            MR. GREIM:  I'll watch my speed.

3            <u>SENATOR ALAN THOMAS SEABAUGH</u>,

4    having been first duly sworn to testify the truth, the

5    whole truth, and nothing but the truth, testified as

6    follows:

7                    <u>DIRECT EXAMINATION</u>

8    BY MR. GREIM:

9    Q.   Senator Seabaugh, welcome this morning.  Could you

10   please state your full name for the record.

11   A.   Alan Thomas Seabaugh.

12   Q.   What's your profession?

13   A.   I am an attorney in my day job, but I'm also a

14   Louisiana state senator.

15   Q.   What office specifically do you hold?

16   A.   Well, I was a Louisiana state representative for 13

17   years.  I've been in the Louisiana state senate for two or

18   three months now.

19   Q.   And what is your current district?

20   A.   The number is 31.  It's basically all of two parishes

21   and parts of eight parishes in Northwest Louisiana.

22   Q.   If we can pull up -- I think we have a demonstrative

23   of the -- of all of the senate districts.  While we're

24   doing that, let me ask you:  Was your house district in

25   the same general area as your senate district?  Is it in a

1    corner of it?

2    A.    General area, yes; but there wasn't very much overlap

3    at all.

4    Q.    Okay.  We have shown you what we are going to -- we

5    will just call this Plaintiffs' Demonstrative 1.  This is

6    a map we exchanged with the parties last night.

7         Do you recognize this as a map of the current senate

8    districts?

9    A.    I do.

10   Q.    And which one is your district?  Can you describe it

11   for us?

12   A.    It's the large gray one on the left-hand side toward

13   the top, but not going all the way up to the top.

14   Q.    And you've been representing that area for about

15   three months?

16   A.    Well, yes.  I started running about two years ago.

17   So I campaigned for almost -- about a year and a half and

18   then was elected in October; so yes, I got sworn in, in

19   January.

20   Q.    Now, we're going to talk about redistricting this

21   cycle in just a second.  But before the most recent

22   congressional redistricting, had you been involved in past

23   cycles of redistricting in Louisiana?

24   A.    Yes.  I was there in 2011, when we redistricted after

25   the 2010 Census.  And then I was there in 2022, when the

1    districts were drawn following the 2020 census.  I was in

2    the House both times.

3    Q.   And did you participate in deliberation and debate

4    about each of those districting plans?

5    A.   I did.

6    Q.   Is there a particular rule or law that controls the

7    legislative review that includes substantive factors for

8    legislative districting?

9    A.   Yes.  I mean the -- is "yes" good enough or do you

10   want me to keep going?

11   Q.   That's fine.  That's fine.  Does it have a name?

12   What's it called?

13   A.   Well, the Constitution and the Voting Rights Act.

14   Q.   Does "Joint Rule 21" have any meaning to you?

15   A.   I don't know what that is.  I'm sure I have at some

16   point or another but...

17   Q.   Okay.  Generally, what factors is the Legislature

18   looking to when it draws congressional districts?

19   A.   Well, first of all, the biggest problem is they have

20   to be very close to equal in size.  And then you're

21   looking at communities of interest, traditional voting

22   patterns, traditional -- what they looked like in the past

23   and do the people in the area have anything in common

24   and -- to some extent, they are going to be large, and

25   especially in North Louisiana with the diverse -- not

1  diverse but spread-out population.  They are going to be

2  large.  But you have to find communities of interest and

3  keep people that have kind of something that have

4  something to do with each other in the same district.

5  Q.   You said "equal in size."  Do you mean land area or

6  population?

7  A.   Population.  There's this -- the deviation we use for

8  legislative districts is you take the state, you divide by

9  105 for House, 39 for Senate.  And I believe the deviation

10 was five percent.  And for Congress, I think it was less

11 than that.  Or plus or minus five percent over the median.

12 And I think for Congress, it was less than that.

13 Q.   Do you consider parish and municipal splits?

14 A.   Do we consider them?

15 Q.   Sure.

16 A.   You had to.  You tried to avoid them, but we had to.

17 Q.   Do you try to preserve cores in districts?

18 A.   Yes.

19 Q.   Now, let's talk about the 2011 plan when you were in

20 the House.  Do you recall whether the Department of

21 Justice approved that plan?

22 A.   Yes.  Back then we were still under the preclearance

23 requirement of Section 5 of the Voting Rights Act, and

24 that was precleared.  I believe it's the only time

25 Louisiana ever had a plan precleared on the first attempt.

1   Q.   And how many majority-minority districts did the

2   congressional map have?

3   A.   One.

4   Q.   Let's talk now -- let's move to SB8.  You understand

5   that that's the current redistricting law --

6   A.   Yes.

7   Q.   -- that we're challenging here?  And when was that

8   passed?

9   A.   January of this year, 2024.

10  Q.   So I guess you were a freshman in the Senate when

11  that was coming through?

12  A.   I think it was my second week.

13  Q.   Who was the sponsor in the Senate of SB8?

14  A.   Senator Glen Womack.

15  Q.   Now, when did you first learn of Senator Womack's

16  map?

17  A.   We knew there was a map that was floating around.  I

18  didn't know that Senator Womack was going to be the

19  sponsor and actually bring the bill until maybe session

20  started or a week or so before.  It was not known well in

21  advance by me.

22  Q.   And SB8, of course, has a second majority-minority

23  district?

24  A.   Correct.

25  Q.   Once you saw Senate Bill 8, who did you discuss it

1    with?

2    A.    A lot of people.  Mostly colleagues in the Senate.  I

3    believe I discussed it with the Governor and the Attorney

4    General.

5    Q.    And there were several -- I take it there were

6    committee hearings but also floor debates on SB8?

7    A.    Yes.  And also other meetings, which were like

8    delegation meetings and things like that.

9    Q.    What do you mean by "delegation meetings"?

10   A.    I'm a Republican, so it was discussed in the

11   Republican delegation meetings.

12   Q.    Some might call it like a caucus meeting --

13   A.    Yes.

14   Q.    -- a caucus?  Based on your personal observation, was

15   there any consideration that, in your view, was overriding

16   in the approval of SB8?

17   A.    Any particular -- ask me that again.

18   Q.    Was there any consideration that, in your view, was

19   overriding with respect --

20   A.    Yes.

21   Q.    -- to SB8?  What was that?

22   A.    Well, the -- really, the only reason we were there

23   was because of the other litigation; and Judge Dick saying

24   that she -- if we didn't draw the second minority

25   district, she was going to.  I think that's the only

1    reason we were there.

2    Q.   Was there any decision that was made at the outset of

3    this -- well, I should back up.  You were in special

4    session; is that right?

5    A.   Correct.

6    Q.   And was there any decision that was made at the

7    outset of that special session that was common to all of

8    the proposed maps?

9    A.   I'm not sure.  I'm not sure what you're asking.  I

10   mean --

11   Q.   Sure.  Let me back up.  You mentioned the litigation

12   and Judge Dick a second ago.

13   A.   Yes.

14   Q.   So did you have any understanding that there was any

15   particular number of majority-minority districts that had

16   to be drawn in whatever map was drawn?

17   A.   Yes.  I mean, that was -- we were there because -- I

18   mean, essentially, we were told we had to draw a second

19   majority-minority district or the judge was going to.  So

20   there was really no point in introducing a map that did

21   not include a second majority-minority district.

22   Q.   Now, what was going to be the partisan impact of

23   adding a second majority-minority seat?

24   A.   I mean, theoretically, a second minority seat would

25   switch from five Republicans and one Democrat to four

1  Republicans and two Democrats, theoretically.

2  Q.   So was there some discussion about which Republican

3  seat would be lost?

4  A.   Yes, there was.

5  Q.   And did anyone, to your knowledge, advocate for

6  losing a Republican seat without drawing a

7  majority-minority district?

8  A.   No.

9  Q.   Now, do you recall any discussion about protecting

10 incumbent -- I'm sorry?

11 A.   Let me qualify that real quick.  There's a

12 difference in majority-minority and majority black or

13 majority African American.  You can draw -- there was a

14 couple of people who floated maps counting --

15 minority-minority, counting Native Americans, Hispanics,

16 that sort of thing, trying to float that.  And everybody

17 was told no, it's -- if we say "majority-minority," it

18 really has to be majority African American.

19      So I don't know if any of those actually got filed.

20 I know they were floated around and people discussed

21 it and -- again, I don't know if they were separate maps

22 or amendments to SB8, but it was discussed, but I don't

23 think -- it didn't ever go anywhere.

24 Q.   Is it fair to say that having a second majority-black

25 district was the one thing that couldn't be compromised in

1    the considered plans?

2    A.    Yes.  I mean, that's why we were there.

3    Q.    Now, you've mentioned the Voting Rights Act a couple

4    of times.  Do you recall having to apply that in 2011 and

5    in this redistricting cycle?

6    A.    Yes.

7    Q.    What sort of analysis before this redistricting cycle

8    does the Legislature typically consider in trying to draw

9    maps consistent with the Voting Rights Act?

10   A.    Well, again, sticking -- well, obviously personal

11   representation, the number has to be the same, which is

12   surprisingly difficult to get there to get the number, the

13   population the same.

14        But the other thing you would look at is, what has it

15   always looked like -- communities of interest, traditional

16   voting blocks and traditional voting patterns,

17   relationships of the people, and that sort of thing.

18   Q.    Is one of the factors whether a given district has

19   over 50 percent black voting age population?

20   A.    Yes.

21   Q.    Now, when -- let me ask you this.  Is the analysis of

22   black voting age population, in your experience in the

23   Legislature, has that been sufficient to decide whether

24   the Voting Rights Act likely applies to a particular

25   district?

1          MS. SADASIVAN:  Object, Your Honor.  This is

2    beyond the scope of the Senator's personal knowledge.

3    It's also calling for a legal conclusion.

4          JUDGE JOSEPH:  You want to rephrase that

5    question?

6          MR. GREIM:  Sure.  I'm trying to ask about his

7    own experience, not about what the law requires in having

8    these debates.

9    Q.   (BY MR. GREIM) So let me make this clear, Senator.

10   In your own experience in the Legislature, has the

11   Legislature treated the 50 percent BVAP measure as

12   sufficient by itself to decide whether the VRA likely

13   applies to a particular district?

14   A.   Actually, not really.  The numbers used in the '20

15   and 2022, I specifically remember it was more like 55.

16   The number was above 50.  And again, I don't know what the

17   law says, but that we were told that it needed to be

18   55-plus.  And that's for legislative districts and

19   everything else.  For it to be considered a true

20   majority-minority district, it needed to be 55.

21   Q.   And do you recall discussion about why that was true?

22   A.   Well, using voting age population, the question came

23   up:  Would the district perform?  Which was interesting.

24   I never heard that term before 2011 -- and that was

25   because you have voting age population, then you have

1    voter registration numbers, and then you have turnout

2    numbers.  And those are three completely different -- you

3    have total population, voting age population, registered

4    voters, and then potential turnout.  So if it's 50 or 51,

5    it's less likely to perform.  And "perform" means elect an

6    African American, so it needed to be closer to 55.

7    Q.   Now, let's talk about SB8 in particular.  Do you

8    recall any analysis or discussion in the Legislature about

9    whether the second majority-minority district would

10   actually perform?

11   A.   Yes.  And there were amendments that were floated and

12   there was discussion -- couldn't go below a certain

13   number.  Again, I think that's where the minority versus

14   African American analysis came up in certain -- like

15   around New Orleans, there's a sizable number of Hispanics

16   that could have created a -- it would have made it much

17   easier to draw a second majority-minority district but it

18   would not have been majority black.

19   Q.   Now, you voted no ultimately on SB8, correct?

20   A.   I did.

21   Q.   Why was that?

22   A.   I still think the 2022 map was good.  I stand by the

23   2022 map.  I don't think it violated anything, and I would

24   have preferred to go to court in the other case and try

25   the case rather than give up before going to trial.

1    Q.    Now, you talked about communities of interest a

2    couple of times just now in your testimony.  And I think

3    you have also told us earlier that you campaigned for a

4    couple of years for your senate seat throughout your

5    district; is that right?

6    A.    About a year and a half, yes.

7    Q.    Do you believe that your district is in a community

8    of interest?

9    A.    On some things, yes; but by and large, no, not

10   really.

11   Q.    How would you describe the community -- well, would

12   you say your district is in multiple communities of

13   interest?

14   A.    Yes.

15   Q.    Could you just describe them for us.

16   A.    Well, you have -- I have parts of Shreveport and

17   Bossier City, which are very urban, densely populated

18   cities.  And the rest of my district is extremely rural.

19   Other than the little bit of Shreveport and Bossier that I

20   have, the two largest municipalities in my district are

21   Many and Mansfield.  And then I have a lot of very, very,

22   very small towns.  And that's -- there's just not a lot in

23   common in some of the -- in some things there are.  I

24   mean, we're all from, roughly, North Central or

25   Northwest Louisiana and, you know, there -- it's not

1    completely different.  I don't go quite to Lafayette

2    and -- you know.  There are certainly a lot of things that

3    people in that area have in common, but there's a lot of

4    things that they don't.

5    Q.    Do you believe your district shares a community of

6    interest with Lafayette?

7    A.    Not at all.

8    Q.    Or with Baton Rouge?

9    A.    Not really, no.

10              MR. GREIM:  I don't have any further questions.

11                        CROSS-EXAMINATION

12    BY MS. SADASIVAN:

13    Q.    Good morning, Your Honors, Senator Seabaugh.

14    Kathryn Sadasivan for the Robinson intervenors.

15          Senator Seabaugh, you voted against SB8; is that

16    right?

17    A.    I did.

18    Q.    And do you agree that your district, Senate

19    District 31, isn't one community of interest, right?

20    A.    It's closer than the district that was in question in

21    this trial, but yes, it's more --

22    Q.    It's not one community of interest, right?

23    A.    Not particularly, no.

24    Q.    And during the 2024 extraordinary session, you didn't

25    serve on the Senate and Governmental Affairs Committee,

1  right?

2  A.   Not on the committee.  I was in for most of the

3  hearings, but I did not -- I'm not on the committee.

4  Q.   And the bill that became SB8 originated in the

5  Senate and Governmental Affairs Committee, right?

6  A.   It originated with Senator Womack; it was assigned to

7  the Senate and Governmental Affairs Committee.

8  Q.   You didn't draft any congressional redistricting

9  bills during the First Extraordinary Session of 2024,

10  right?

11  A.   I did.  I don't know that I ever actually filed them.

12  I worked -- I spent hours trying to draw a second

13  majority-minority district.  And I was never convinced

14  that it was possible without violating the Fourteenth

15  Amendment.

16  Q.   And you didn't introduce any --

17  A.   I don't think I did.  I honestly don't remember, but

18  I don't think I did.  But I know I drafted several.  At

19  least I tried.

20  Q.   And you didn't work with Senator Womack on SB8,

21  right?

22  A.   I was involved in a couple of conversations, so I

23  don't know what you mean by "work with."

24  Q.   You didn't help draw SB8, did you?

25  A.   No, I did not.  I was involved in some discussions of

1    some amendments to SB8.

2    Q.    And you didn't offer any amendments to SB8 yourself,

3    right?

4    A.    I did not.

5    Q.    And as a senator, you can attend any meeting of any

6    Senate Committee that you want, right?

7    A.    Correct.

8    Q.    And you didn't participate in any hearings in the

9    Senate and Governmental Affairs Committee, right?

10    A.    By "participate" if you mean testify, then no.

11    Q.    And you didn't speak on the record in the Senate

12    about your opposition to SB8?

13    A.    I don't believe I did.

14    Q.    And you didn't have any other role in drafting SB8,

15    right?

16    A.    Not on the record, no.

17    Q.    So you weren't personally aware of the factors that

18    were considered when SB8 was being drawn?

19    A.    Yes, I was.  I mean, again, we had a lot of

20    off-the-record conversations and delegation meetings, and

21    I talked to Senator Womack several times as we were going

22    through the process.  So I was aware of the factors that

23    were considered.

24    Q.    But you weren't involved in the drawing of the map

25    that became SB8 at all?

1  A.    Not really, no.

2  Q.    Okay.  And you were a member of the Louisiana House

3  during the '22 First Extraordinary Session on

4  redistricting, right?

5  A.    I was.

6  Q.    You didn't serve on the committee responsible for

7  redistricting, right?

8  A.    That is correct.

9  Q.    And you didn't vote in favor of any congressional

10  districting plan that created two majority-black

11  congressional districts in the 2022 Extraordinary Session?

12  A.    Correct.

13  Q.    You opposed SB8 because you believed Louisiana

14  doesn't need a second -- or isn't required to draw a

15  second majority-black congressional district, right?

16  A.    If you could draw one without, in my opinion,

17  violating equal protection of the Fourteenth Amendment, I

18  would consider it.  You just can't.  I mean, it's

19  literally impossible to get two out of six congressional

20  districts in Louisiana without literally looking at the

21  state, finding the pockets of black population, and

22  playing connect the dots and, in my opinion, that's not

23  allowed.

24  Q.    Are you familiar with Senate Bill 4 introduced in the

25  First Extraordinary Session of 20 --

1    A.    I don't like bill numbers is that.  Is that Ed

2    Price's bill?

3    Q.    Yes.  It's the Price --

4    A.    Yes.

5    Q.    -- Duplessis bill.  So you're familiar with it?

6    A.    I can't quote you anything, but yes, I am aware that

7    it was filed and I remember looking at it.

8    Q.    And you are aware that it included two majority-black

9    districts in Congressional Districts 2 and 5, right?

10   A.    Correct.

11   Q.    And in that map, Congressional District 4 keeps

12   Northwest Louisiana in one congressional district, right?

13   A.    Yes.  As far as I recall.

14   Q.    And you didn't support SB4?

15   A.    I would have chosen it over this one.

16   Q.    But you didn't publicly comment on it --

17   A.    I don't think I got a chance to vote on it.

18   Q.    You didn't publicly comment on SB4?

19   A.    I am not telling you I didn't talk to a reporter or

20   anybody about it.  I didn't like this map when I saw it.

21   I might have said that to a reporter or somebody.  I

22   don't -- I didn't comment on the record, if that's what

23   you're asking.

24   Q.    And speaking of reporters, you said you couldn't see

25   why the Legislature would concede such a huge point,

1    referring to creating a second majority-black district,

2    one with national implications, without going to trial,

3    right?

4    A.    Correct.  That's what I said earlier.  I would like

5    to have gone to trial on the 2022 districts because I

6    don't think they were bad.

7    Q.    So you would have voted against any bill that

8    created two majority-black districts without going to

9    trial, right?

10   A.    In 2024, yes, I would have.  Because, again, I will

11   stand by the 2022 district.  I still think it was good.

12   Q.    So in two decades of redistricting, you have never

13   voted in favor of a map that would create two

14   majority-black districts, right?

15   A.    If somebody could show me one that didn't violate the

16   Fourteenth Amendment, I would.

17            MS. SADASIVAN:  Nothing further.

18                      CROSS-EXAMINATION

19   BY MR. GORDON:

20   Q.    Good morning, Senator.

21   A.    Good morning.

22   Q.    My name is Phillip Gordon.  I represent the State of

23   Louisiana.  How are you doing today?

24   A.    I'm good.

25   Q.    Sort of dovetailing on the question of national

1    implications that Counsel just mentioned.  Do you know

2    what parish the United States Speaker of the House Mike

3    Johnson lives in?

4    A.    He lives in Bossier now.

5    Q.    Do you know what parish the Majority Leader Scalise

6    lives in?

7    A.    Jefferson, I believe.

8    Q.    Would you consider it important to Louisiana that the

9    Speaker and the Majority Leader of the U.S. House of

10   Representatives are from Louisiana?

11   A.    Yes.

12   Q.    Yeah.  In fact, it's beneficial to Louisiana that

13   certain high-ranking members of the majority of the

14   U.S. House of Representatives are from Louisiana.

15   A.    Sure.

16   Q.    And, you know, to lose either of those members would

17   then, therefore, be bad for Louisiana.

18   A.    Well, yes.  Whether they're the Speaker or -- I mean

19   Speaker and Majority Leader are kind of a big deal, so

20   yes.

21   Q.    Agreed.  Do you know what parish Representative

22   Letlow lives in?

23   A.    I believe she's in Ouachita.

24   Q.    Are you aware that Representative Letlow is on the

25   Appropriations Committee?

1    A.    I am.

2    Q.    Are you aware that the Appropriations Committee is a

3    very important committee of the U.S. House of

4    Representatives?

5    A.    I am.

6    Q.    And, you know, it would be also important to the

7    State of Louisiana that Representative Letlow maintain her

8    seat so she can continue her work on the Appropriations

9    Committee; is that right?

10   A.    Less important than the other two, but yes.

11   Q.    And would you say that protecting the three members

12   I just discussed -- Speaker Johnson, Majority Leader

13   Scalise, and Representative Letlow -- is an important

14   consideration when drawing a congressional map?

15   A.    Yes.

16   Q.    And, in fact, that would be a political

17   consideration; is that true?

18   A.    Yes.

19   Q.    And political considerations are the day-to-day work

20   of a senator such as yourself?

21   A.    We don't do this very often.  It's not a big part of

22   being a senator, but when you're discussing redistricting,

23   yes.

24   Q.    Sure.  But I mean --

25   A.    In general, political considerations, yes.

1    Q.    Right.  I mean, you mentioned a minute ago that you

2    had had a caucus meeting about this regarding the

3    congressional map.

4    A.    Yes.

5    Q.    And I'm sure you have meetings with the caucus about

6    a great many other issues; is that right?

7    A.    Yes.

8    Q.    And I'm sure politics is discussed at those meetings?

9    A.    Yes.

10   Q.    Are you aware of the still-pending litigation in the

11   Middle District of Louisiana over HB1, the map that

12   preceded SB8?

13   A.    Are you talking about the 2022 map?

14   Q.    Yes, sir.

15   A.    Yes, I am aware of it.

16   Q.    What is your understanding of that case?

17   A.    That it has not gone to trial yet, but that Judge

18   Dick has signaled through some preliminary proceedings

19   that they had, that she has kind of told everybody how she

20   was going to rule, and ordered us to draw a second

21   majority-minority district or she was going to do it.

22   Q.    And just on a related point, we saw the map of the

23   current senate districts on there.  You're aware that

24   that map has also been enjoined?

25   A.    Yes.  I don't agree with her about that either.

1    Q.   And so going back to the Representative Letlow.  It
2    was important that Representative Letlow be -- her
3    district be protected in the SB8 map; is that right?
4    A.   It was a consideration that -- it was certainly
5    important to Senator Womack.  I don't know how important
6    it was to everybody else, but yes.
7    Q.   But as we covered, it is important that she maintain
8    her work on the Appropriations Committee?
9    A.   Sure.
10   Q.   And you can't very well do that if you're not a
11   member of the U.S. House of Representatives.
12   A.   Well, that's true.  But somebody else could be
13   appointed.  I mean, it's not -- you know, it's -- the
14   Speaker and Majority Leader are not on the same level as a
15   member of Appropriations.
16   Q.   Was it also important in the creation of SB8, the map
17   we're here about today, that Louisiana maintain two
18   members from Northern Louisiana?
19   A.   That was something that I preferred, yes.
20   Q.   And surfing back really quick to the political point
21   we made earlier.  You would say it's part of your job to
22   make certain political decisions when you're deciding to
23   vote for or against certain laws.
24   A.   Of course.
25   Q.   And that's perfectly fine for a sitting senator to

1   do.

2   A.   It's part of the job, yes.

3   Q.   Do you know if federal judges are supposed to

4   consider politics in making their considerations?

5   A.   I don't believe they are.

6   Q.   Then something like protecting Majority Leader

7   Scalise, Speaker Mike Johnson, or Representative Letlow

8   wouldn't necessarily be a consideration for, say, the

9   Middle District of Louisiana, would it?

10  A.   That's probably true.

11          MR. GORDON:  Thank you.  No further questions.

12          JUDGE JOSEPH:  All right.  Any redirect?

13          MR. GREIM:  No, Your Honor.

14          MR. STRACH:  No questions.

15          MR. GREIM:  We are ready to call our next -- we

16  have no further questions.

17          JUDGE JOSEPH:  You have no redirect?

18          MR. GREIM:  No.

19          JUDGE JOSEPH:  All right, Senator.  You may step

20  down.  Thank you for your testimony.

21          MR. GREIM:  Your Honor, our next witness is

22  going to be Tom Pressly.

23          JUDGE JOSEPH:  And I'll just ask, generally

24  speaking, please, please go at a cadence so our court

25  reporter can follow the questions and the answers.

1    She'll tell us when she can't, but I'm telling you now,

2    okay?

3                    (Oath administered to the witness.)

4                    <u>SENATOR THOMAS PRESSLY</u>,

5    having been first duly sworn to testify the truth, the

6    whole truth, and nothing but the truth, testified as

7    follows:

8                    <u>DIRECT EXAMINATION</u>

9    BY MR. GREIM:

10   Q.   Senator Pressly, good morning.

11   A.   Good morning.

12   Q.   My name is Eddie Greim, and I represent the

13   plaintiffs in this case.  It's nice to meet you.

14   A.   Nice to meet you.

15   Q.   Senator, what's your profession?

16   A.   I'm an attorney and state senator.

17   Q.   What district do you represent?

18   A.   I represent District 38.

19   Q.   We're going to put up a map here as a demonstrative

20   exhibit, Plaintiffs' Demonstrative 1.  That's a statewide

21   map.  And I wonder, from where you are sitting, can you

22   see the district that you represent?

23   A.   I can.  It's in the green in the northwest corner.

24   Q.   Sort of a triangle with its base to the west?

25   A.   Sure.  Yes.

 1    Q.    And how long have you represented District 38?

 2    A.    I was elected in October, took office in January, and

 3    previously held a portion of this district in a state

 4    representative capacity.

 5    Q.    How long were you in the state house?

 6    A.    Four years.

 7    Q.    So I take it, then, that before -- well, let me ask

 8    you:  Were you involved in the passage of House Bill 1,

 9    which was the 2022 congressional map?

10    A.    I was.

11    Q.    And in your prior involvement in redistricting, in

12    congressional redistricting, what sort of factors did you

13    consider?

14    A.    Communities of interest.  Compactness.  The

15    appearance of reasonableness.  Keeping the core of prior

16    districts the same.

17    Q.    What about -- would parish or municipality splits be

18    a factor?

19    A.    Absolutely.

20    Q.    What about equal population?

21    A.    Yes.

22    Q.    And the Voting Rights Act?

23    A.    Sure.

24    Q.    Now, are those all factors that you considered back

25    when HB1 was passed?

1    A.    Yes.

2    Q.    Now, let's fast-forward to January of this year.

3    Was a congressional redistricting passed in January of

4    2024?

5    A.    Did we pass legislation redistricting congressional

6    seats?  Yes, we did.

7    Q.    And that was Senate Bill 8?

8    A.    That's correct.  Of the First Special Session.

9    Q.    Who called that special session?

10   A.    That was called by the Governor.

11   Q.    And do you recall who the sponsor of Senate Bill 8

12   was?

13   A.    Senator Womack.

14   Q.    When did you, Senator Pressly, first learn of

15   Senator Womack's proposed map?

16   A.    I don't recall the specific time period.  I'm sure it

17   was just before or during the First Extraordinary Session.

18   Q.    And does SB8 have a second majority-minority

19   district?

20   A.    It does.

21   Q.    Let me ask you:  Did you discuss Senate Bill 8 with

22   other legislators?

23   A.    I did.

24   Q.    And just generally, who did you discuss it with?

25   A.    Other senators, for the most part.  I certainly had

1    some conversations with House members as well, just

2    voicing my concerns about Northwest Louisiana.

3    Q.    Did a particular caucus basically draw SB8?

4    A.    I don't have specific knowledge of that.

5    Q.    You know, in other words, was it put together by the

6    Republican or the Democratic caucus?

7    A.    I don't know specifically that the caucus put it

8    together but certainly we were instructed that we needed

9    to have two majority-minority districts, and any other

10   redistricting guidelines were secondary to that.

11   Q.    Which hearings and debates did you attend?

12   A.    So I watched portions of the Senate and Governmental

13   Affairs Committee, as well as the House and Governmental

14   Affairs Committee.  I don't believe I was in person for

15   either of those.  I was on the floor for the Senate bill

16   when it first came to the Senate side, and I was also on

17   the floor and participated in the debate during the

18   concurrence discussion as well.

19   Q.    You made some remarks on the floor, correct?

20   A.    I did.

21   Q.    Now, we're going to hear transcripts later, so just

22   to save time, I'm not going to ask you to try to

23   regurgitate your remarks here.

24   A.    Sure.

25   Q.    But I will ask you if you discussed Senate Bill 8

1    with Senator Womack.

2    A.    I know I came to the floor and spoke against the

3    bill.  I'm not sure that I came to the floor and asked him

4    questions during that discussion.  I believe I just spoke

5    personally about my objections to the legislation.

6    Q.    Did you ever speak with him off the record about the

7    bill?  Do you recall?

8    A.    I did.  I spoke with him about the legislation.

9    Q.    And was there discussion about it within any kind of

10   Republican caucus meeting?

11   A.    Yes.

12   Q.    And based on your own personal observation -- I

13   think you might have just told us this -- was there any

14   consideration that was, in your view, overriding in the

15   Special Session?

16   A.    Certainly the racial component in making sure that we

17   had two performing African American districts was the

18   fundamental tenet that we were looking at.  Everything

19   else was secondary to that discussion.

20   Q.    Now, did the Legislature perform any analysis in the

21   Special Session that considered whether any of the

22   districts in SB8, or SB8 as a whole, was required under

23   the Voting Rights Act?

24   A.    We were told that we had to have two performing

25   African American districts.  And that we were -- that

1    that was the main tenet that we needed to look at and

2    ensure that we were able to draw the court -- draw the

3    maps; otherwise, the court was going to draw the maps for

4    us.

5    Q.    And who told the Legislature that?  Do you recall?

6    A.    Judge Dick is the one that ultimately told the

7    Legislature.  Governor Landry stated that when he opened

8    the committee -- I'm sorry -- the Special Session and we

9    heard it from Attorney General Murrill as well.

10   Q.    Now, different versions of two majority-minority seat

11   maps were considered, right?

12   A.    I believe that's correct.  But this was the main bill

13   that was being considered.

14   Q.    What was the partisan impact of all of the different

15   two majority-minority maps, if any?  In other words, what

16   was the -- let me rephrase that.

17        What was the impact on the partisan split of the

18   congressional delegation of all of the two

19   majority-minority maps?

20   A.    So like what would the ultimate impact of partisan

21   Republican/Democrat split be?

22   Q.    Yes.

23   A.    So, ultimately, we'd go from 5-1 Republican/Democrat

24   to 4-2, more than likely with the way that it was drawn.

25   Q.    And so, in other words, a Republican would lose a

1    seat?

2    A.    That's correct.

3    Q.    Was there --

4    A.    Most likely.

5    Q.    Most likely.  Was there a discussion within the

6    caucus about if that was going to happen which

7    Republicans ought to be protected?

8    A.    And when say "caucus," you're talking the

9    Republican delegation, right?

10   Q.    That's right.

11   A.    There were certainly discussions on ensuring -- you

12   know, we've got leadership in Washington.  You have the

13   Speaker of the House that's from the Fourth Congressional

14   District and we certainly wanted to protect Speaker

15   Johnson.  The House Majority Leader, we wanted to make

16   sure that we protected, Steve Scalise.  Julia Letlow is on

17   Appropriations.  That was also very important that we

18   tried to keep her seat as well.

19   Q.    I just want to be very clear:  Did anybody discuss

20   creating a second majority-minority seat in order to

21   protect any incumbent?

22   A.    I'm sorry.  Can you reask the question?

23   Q.    Sure.  Did any Republican legislator at any time

24   suggest creating a second majority-minority seat in order

25   to protect any congressional incumbent?

1    A.    No.  The conversation was that we would -- that we

2    were being told we had to draw a second majority-minority

3    seat.  And the question then was, okay, who -- how do we

4    do this in a way to ensure that we're not getting rid of

5    the Speaker of the House, the Majority Leader, and

6    Senator Womack spoke on the floor about wanting to protect

7    Julia Letlow as well.

8    Q.    Earlier you discussed that one issue that's

9    considered by the Legislature is communities of interest.

10   If we could put the map up again as a demonstrative.

11   I'm going to show you your parish again.  I mean, I don't

12   think you need to see it.  That's really all for our

13   benefit.

14   A.    Sure.

15   Q.    Let me ask you, which parish do you generally cover?

16   A.    So about 85 percent of my district is in Caddo

17   Parish, the southern portion of Caddo Parish and western

18   portions of Caddo Parish.  And then I represent the

19   western side of DeSoto Parish, and the northern portion

20   kind of splits in a 45-degree angle between Senator

21   Seabaugh and my district in DeSoto Parish.

22   Q.    And do you believe your own senate district is in a

23   community of interest?

24   A.    I do.

25   Q.    How would you describe it?

1   A.   So certainly -- you know, it's the northwest corner

2   of the State.  So when you're dividing by about 120,000

3   people, you know, I represent a large portion of the city

4   of Shreveport.  I represent folks in DeSoto Parish, the

5   northern portion of DeSoto Parish.  A lot of those kids go

6   to school in South Shreveport as well.  I represent folks

7   that are -- you know, it's generally the urban area of

8   Shreveport as well as some rural outskirts of the third

9   largest city in our state.

10  Q.   Do you consider any part of your district to share a

11  community of interest, for example, with Lafayette?

12  A.   I don't.  I think there is a large divide between

13  North and South Louisiana.  You know, when you're looking

14  at natural diasters, for example, we're concerned about

15  tornadoes and ice storms; they are concerned about

16  hurricanes.

17       When you're looking at educational needs, you know,

18  our community has two satellite public universities

19  being -- actually three -- being LSU-Shreveport,

20  Northwestern State University's Nursing School is up here,

21  as well as having, you know, Southern University at

22  Shreveport; whereas Lafayette has a Tier 1 research

23  institution in University of Louisiana Lafayette.

24  Q.   Same question, but what about Baton Rouge?  Do you

25  believe any part of your district shares communities of

1    interest with Baton Rouge?

2    A.    I can say without any hesitation that Baton Rouge and

3    Shreveport are very different locations.  I fight the

4    North Louisiana fight on a regular basis at the State

5    Capitol, and our need for funding, our needs for economic

6    development, and our needs that are unique and different

7    from almost 250 miles from this location.

8    Q.    Senator, I have no further questions.  Thank you.

9    A.    Thank you.

10            MR. KLEIN:  Good morning, Your Honors.  I'm

11    Robert Klein of Paul Weiss for the Robinson intervenors.

12                    CROSS-EXAMINATION

13    BY MR. KLEIN:

14    Q.    Senator, did you talk to any colleagues about whether

15    it was possible to draw a map with two majority-black

16    districts that also kept Northwest Louisiana together in

17    one district?

18    A.    I did have some conversations on that and the need

19    for our region to have -- to remain intact.

20    Q.    Right.  And were you aware that legislators

21    introduced several alternative redistricting bills?

22    A.    I'm aware that during the course of not only the

23    special but during prior legislation sessions we had those

24    discussions.

25    Q.    And several of those bills contained two

1    majority-black districts, right?

2    A.    It's my recall, yes.

3    Q.    And some of those also kept all of Northwest

4    Louisiana together in the same congressional district

5    while maintaining two majority-black congressional

6    districts, right?

7    A.    I'm sorry.  Can you repeat your question?

8    Q.    So some of the proposed bills kept all of

9    Northwest Louisiana together in one district while also

10   containing two majority-black districts?

11   A.    I don't recall that specifically.  I do -- you know,

12   essentially the maps that I recall seeing either split

13   Northeast or Northwest Louisiana and added it with the

14   Baton Rouge area.  And I think I could make the same

15   arguments for Northeast Louisiana as I can for Northwest

16   on the uniqueness and individuality of that region

17   compared to our State Capitol.

18   Q.    Understood.  So if one of the maps that split

19   Northwest Louisiana, Northeast Louisiana were adopted,

20   Representative Letlow would have been in a majority-black

21   congressional district, right?

22   A.    I don't recall specifically seeing that map.  I know

23   that there were discussions on that issue and, you know,

24   there is no question that we were trying to look at the

25   map that -- there's no question that we were trying to

1    create a map that addressed the underlying basis, which

2    was two majority-minority districts, as we were being told

3    by our leaders -- by the Governor and by the Attorney

4    General -- that we had to do.

5    Q.    Okay.  So you're not aware of any alternative maps

6    where Representative Letlow would have been in the second

7    majority-black district?  You didn't see those maps?

8    A.    I don't recall seeing them, as I sit here today.

9    But if you tell me that we had some out there, I have

10   looked at lot of maps on this issue, on the Supreme Court

11   redistricting as well.

12   Q.    And if Representative Letlow were in the second

13   black-majority district, would she be likely to lose that

14   district in your view?

15   A.    I don't know the answer to that.  I certainly think

16   that she would be at a disadvantage compared to her

17   current seat that she ran in two years ago.  But I will

18   also say that I think Congresswoman Letlow is in a

19   district that now has the majority of population in the

20   Baton Rouge and the southern portion of her district,

21   which I think puts her at risk as well.

22   Q.    But you did testify earlier that a Republican would

23   be likely to lose in a second majority-black district,

24   right?

25   A.    Yeah.  I think that that is the view of most.  I will

1    say that, you know, the public has the opportunity to

2    vote.  That's part of our democracy is allowing people the

3    opportunity to make a decision for themselves.

4    Q.    And you didn't publicly express support for any of

5    the alternative bills to SB8, right?

6    A.    I did not publicly support any of the alternatives.

7    I believe that we should keep the map that was put forth

8    in 2022.

9    Q.    Okay.  Thank you.

10   A.    Thank you.

11          MR. KLEIN:  Those are all the questions I have.

12                    CROSS-EXAMINATION

13   BY MR. GORDON:

14   Q.    Good morning, Senator Pressly.

15   A.    Good morning.

16   Q.    My name is Phillip Gordon.  I am counsel for the

17   State of Louisiana.  How are you doing?

18   A.    Doing well.

19   Q.    Great.  I heard you're a lawyer before; is that

20   accurate?

21   A.    I am.

22   Q.    As a fellow lawyer, I am sorry.  So I don't want to

23   re-cover too much ground that you've already covered

24   before, so I'll sort of get right at it.

25          I think you mentioned something about this earlier.

1    You consider it important to Louisiana that the current

2    United States Speaker of the House of Representatives and

3    the Majority Leader are from Louisiana?

4    A.    Are what?

5    Q.    Are from Louisiana?

6    A.    Yes.  I think that's a huge benefit to our state and

7    our region.

8    Q.    Right.  And then losing either of those members would

9    therefore be bad for Louisiana?

10   A.    Absolutely.

11   Q.    And I think you mentioned this earlier as well:

12   Representative Letlow is on the Appropriations Committee.

13   A.    That's correct.

14   Q.    And are you aware that's a very important and

15   influential committee of the U.S. House of

16   Representatives?

17   A.    So I've heard.

18   Q.    And so you would say that keeping Representative

19   Letlow on the Appropriations Committee would be important

20   to the state of Louisiana as well?

21   A.    Absolutely.

22   Q.    And sort of following from that, then, you would say

23   protecting Speaker Johnson, Representatives Scalise and

24   Letlow would be an important consideration when drawing a

25   congressional map?

1  A.    Certainly it would be important to keep our

2  leadership in Washington and our power base for the state

3  in Washington, yes, I would agree with that fundamentally.

4  Yes.

5  Q.    And that's fundamentally a political consideration,

6  isn't it?

7  A.    Yeah.   It's a political consideration to ensure that

8  we keep those that are in power up there.   But I think

9  that you -- also, again, going back to the fundamental

10  what we were told we had to do was create two minority

11  districts, right?   That's issue one that we were asked to

12  do.

13       Issue two was:  Okay, now what?  Right?  And that's

14  where that secondary decision of okay, how do we draw this

15  in a way that we are keeping Speaker Johnson, Leader

16  Scalise, and Julia -- and Representative Letlow in power.

17  Q.    And to the point you were just making that it was the

18  primary consideration, are you aware of the ongoing

19  litigation right now in the Middle District of Louisiana

20  over House Bill 1, the previous congressional map?

21  A.    I am familiar with that.

22  Q.    What do you understand that litigation to be about?

23  A.    That there were challenges made to the way that we

24  redrew the maps in 2022, and that the plaintiffs asked for

25  a trial on the merits of whether or not the maps were

1    racially gerrymandered in a way that limited the African

2    American ability to draw a map.

3    Q.    All right.

4    A.    Influence in electing their member of Congress

5    rather.

6    Q.    Understood.  And are you aware that the Middle

7    District Court preliminarily enjoined HB1?

8    A.    Yes.  And that's why we were called to the First

9    Special Session.  Again, we were told that essentially we

10   were being forced to draw a second majority-minority

11   district prior to any other consideration.

12   Q.    And, similarly, you are aware that the same Middle

13   District Court enjoined the current senate map that you

14   sit in; is that right?

15   A.    I am familiar with that, yes.

16   Q.    And just touching again on the issue of politics,

17   sort of as a sitting state senator, politics is part of

18   your job; is that right?

19   A.    It is.

20   Q.    It's sort of the day-to-day root and branch thing you

21   do?

22   A.    Day to day, when I'm not in session, I try to

23   practice a little bit of law.  I'm having a harder and

24   harder time with all of these special sessions, though.

25   Q.    Understood.  And do know if federal -- I mean, you're

1    an attorney.  Do you know if federal judges are supposed

2    to consider politics when rendering their decisions?

3    A.    They're not.

4    Q.    And then so therefore protecting Representative

5    Scalise, Speaker Johnson, Representative Letlow wouldn't

6    be something the Middle District Court would consider,

7    would it?

8    A.    They're not supposed to get into politics, that is

9    correct.  I can't tell you how that would -- as far as the

10   individuality of a case, I can't speak on behalf of a

11   federal judge.  Even -- even during my time clerking for a

12   federal judge, I wasn't able to speak on their behalf.

13   Q.    Nor am I trying to do any of that either.  I am just

14   really trying to make the point that based on your

15   previous answer, the Middle District Court isn't supposed

16   to?

17   A.    That's correct.  I mean, certainly, you know -- and I

18   think that was my understanding of what we were

19   essentially being told to do.  I think Senator Stine said

20   the federal judge basically had a gun to our head and we

21   were being forced to draw two majority-minority districts.

22   I wouldn't put it in that -- in that terminology, but I

23   certainly think that this was the one last chance prior to

24   having trial where all indications seemed to be that,

25   again, we would have two majority-minority districts and

1    it would be drawn as the judge wished to do so.

2    Q.   Thank you, Senator.  A couple of additional

3    questions.  About how many people are in a state senate

4    district in Louisiana?

5    A.   I believe it's about 120,000.

6    Q.   And about how many people are in a congressional

7    district in the state of Louisiana?

8    A.   You're putting me on the spot, but I want to say it's

9    somewhere in the 770,000 range.

10    Q.   Something like 776 --

11           THE REPORTER:  Can you slow down?

12           MR. GORDON:  Oh, I'm so sorry.

13    Q.   (BY MR. GORDON) I have something like 776?

14    A.   Sure.

15    Q.   So that sounds close enough to me.  So by necessity,

16    a congressional district is going to have to cover more

17    geographical area than a state senate seat; is that right?

18    A.   That's correct.

19    Q.   Thank you.  No more questions.

20           JUDGE JOSEPH:  All right.  Secretary?

21           MR. STRACH:  None from us, Your Honor.

22           JUDGE JOSEPH:  All right.  Any redirect?

23           MR. GREIM:  A little bit.

24           JUDGE JOSEPH:  Okay.

25                    REDIRECT EXAMINATION

1    BY MR. GREIM:

2    Q.    Senator Pressly, you were asked several questions

3    about Judge Dick's proceeding in the Middle District.

4    You never understood that the Legislature was actually

5    under an order from Judge Dick at the time that you were

6    in session, did you?

7    A.    No.  We were -- I was told that we were given one

8    last chance to try to cure the defect that was being

9    alleged against us.

10   Q.    And the Attorney General, when she addressed the

11   Legislature, did you ever hear her once state that the

12   State actually believed that the Voting Rights Act

13   required two majority-minority districts?

14   A.    I don't recall her ever saying that.

15            MR. KLEIN:  Objection.  It's a leading question.

16            JUDGE JOSEPH:  He's asking his personal

17   knowledge, so he can answer the question.  Overruled.

18            MR. GREIM:  No further questions.

19            JUDGE JOSEPH:  All right.  May Senator Pressly

20   be released?

21            MR. GREIM:  Yes, he may.

22            JUDGE JOSEPH:  All right.

23       Senator, you may step down.  Thank you for your

24   testimony.

25            THE WITNESS:  Thank you, Judge.

1          JUDGE JOSEPH:  I think it's time for our morning

2    break.  We will take a 15-minute break and come back at

3    10 after 11.  I think we'll probably go a little later and

4    maybe take lunch around one or so today, okay?

5          (Recess.)

6          JUDGE JOSEPH:  Please be seated.  Plaintiffs may

7    call their next witness.

8          MR. GREIM:  We call Dr. Stephen Voss.

9          (Oath administered to the witness.)

10          MR. CHAKRABORTY:  Your Honor, before we get

11    started, when we had the pretrial conference you mentioned

12    that if we have objections in terms of renewing our

13    objections with respect to our motion in limine, to do

14    them now.  So we are lodging that objection to Dr. Voss's

15    testimony on the record for the same reasons that are

16    outlined in our --

17          JUDGE JOSEPH:  To all of his testimony?

18          MR. CHAKRABORTY:  Say it one more time.

19          JUDGE JOSEPH:  You're objecting to all of his

20    testimony?

21          MR. CHAKRABORTY:  I'm sorry.  We are objecting

22    to the portions of his testimony that are -- that we are

23    objecting to in our motion in limine.

24          JUDGE JOSEPH:  Okay.  That motion is overruled.

25    Please proceed, Counsel.

1              <u>DENNIS GEORGE STEPHEN VOSS, JR.,</u>

2    having been first duly sworn to testify the truth, the

3    whole truth, and nothing but the truth, testified as

4    follows:

5                      <u>DIRECT EXAMINATION</u>

6    BY MR. GREIM:

7    Q.   Dr. Voss, good morning.  Could you state for us your

8    full name for the record?

9    A.   Sure.  Dennis George Stephen Voss, Jr.

10   Q.   Can you tell us just a little bit about your personal

11   background?

12   A.   Yes.  I was born in Louisiana in Orleans Parish.  I

13   lived most of my life in Jefferson Parish.  I have a

14   family who remain here in several of the parishes nearby,

15   St. Tammany, Livingston, Tangipahoa.  I went to high

16   school in Natchitoches Parish, went to college in East

17   Baton Rouge Parish, and I served newspapers based in

18   Caddo, Bossier, and Ouachita Parish, the Shreveport Times

19   and the Monroe News Star.

20   Q.   And before we go much further, Dr. Voss, I am going

21   to make sure we're -- for some reason I am having a little

22   bit of a hard time.

23              MR. GREIM:  I wonder if the court reporter is

24   okay?  You're good?

25              THE REPORTER:  Speak up, please.

1          MR. GREIM:  Okay.

2          THE WITNESS:  Sure thing.

3   Q.   (BY MR. GREIM) During your time here, either

4   personally or through past employment, have you had any

5   exposure to Louisiana politics?

6   A.   Sure.  I spent -- other than being a college reporter

7   for a while -- we covered political affairs -- I spent two

8   years as an intern with Gannett News Service, covering the

9   State House.  That's the service for the Times of

10  Shreveport and the Monroe News Star.

11         JUDGE STEWART:  We're getting some feedback

12  somewhere.

13         JUDGE JOSEPH:  Yeah, I wonder maybe try pushing

14  your microphone a little further away and lowering your

15  seat a little bit.

16         THE WITNESS:  Okay.

17         JUDGE JOSEPH:  Brent, if you have suggestions,

18  please let him know.

19  Q.   (BY MR. GREIM) You don't sound like yourself.

20      Okay.  So let's go back.  I think you had indicated

21  you did some reporting.  Let's go back to that.  Tell us

22  about your reporting experience.

23  A.   Well, the other main connection is after two years

24  with the press corps, I crossed the aisle and I served as

25  an aide to a state senator from Northwest Louisiana, State

1    Senator Syd Nelson, and I spent the legislative session as

2    a senate aide.

3    Q.   Okay.  So let's talk -- anything else from your

4    Louisiana political or personal experience?

5    A.   No, I don't think so.

6    Q.   Let me ask you now about your education, just

7    starting with college.

8    A.   Okay.  I went to Louisiana State University.  I

9    earned two bachelor's degrees, one in history and one in

10   journalism.  I then went to Harvard University where I

11   earned a master's and then a Ph.D.

12   Q.   And where did you earn your master's and Ph.D. in at

13   Harvard?

14   A.   Government, which is what they call political

15   science.

16   Q.   And do you have any kind of education in statistics

17   or quantitative -- the quantitative side of political

18   science?

19   A.   Yes.  My focus field in the graduate program was

20   political methodology, which is quantitative analysis, as

21   I have studied it at least.  And then my dissertation, my

22   main two advisers were political methodologists: Gary King

23   and James Alt.

24   Q.   What is Gary King known for in the field of political

25   methodology?

1    A.    Well, related to -- I mean, it's so many things.

2    He's the most cited political scientist of his generation.

3    He is known for ecological inference, which is used to

4    study voting behavior by race.  He was responsible for the

5    JudgeIt software that was a groundbreaker in terms of

6    simulating districts or estimating the effect of districts

7    using simulation.  I co-authored one version of the manual

8    along the way, but it moved well past where it was when I

9    worked on it.

10        His solution to the ecological inference problem,

11   which also used simulations as part of the methodology, I

12   was involved with that enough that his very first example

13   in that book was a Louisiana precinct analysis using data

14   that I simultaneously had been working on.  Anyway, we

15   could spend on Gary King's resume and take the whole

16   session, so...

17   Q.    Let me try to hit few more highlights before we get

18   on with some of your substantive testimony.  Have you had

19   any peer-reviewed publications regarding southern

20   elections and voting behavior?

21   A.    Yes.  In fact, my most cited piece to this day is an

22   analysis of David Duke's voting support in the early '90s

23   in the Journal of Politics.

24   Q.    And I guess -- was that Louisiana?

25   A.    That was Louisiana.  Now, you know, the discipline

1    does not encourage state-specific studies.  If you do

2    that, it has to be sort of a hobby.  So not everything I

3    have done on Louisiana or Kentucky makes it into a

4    peer-reviewed publication.

5         My most famous piece now, notorious piece now

6    analyzing Louisiana voting, is a conference paper that was

7    never published but that Harvard University President

8    Claudine Gay used almost verbatim.  So I got caught in

9    that plagiarism -- Harvard plagiarism scandal.  So more

10   people have looked at that unpublished paper now than have

11   looked at most anything I have written.

12   Q.   This was the -- understood.  What about elections and

13   redistricting?

14   A.   Yes.  I have peer-reviewed publications related to

15   both voting behavior and redistricting.  Maybe the highest

16   ranked one is a piece on southern state legislative

17   districts in the American Journal of Political Science.

18   Q.   What about methods of quantitative analysis?

19   A.   Yes.  I have published on ecological inference in

20   particular, but most of my work uses quantitative analysis

21   along the way.  I have very few publications that are

22   purely what we call qualitative.

23   Q.   In the past, have you designed simulations or

24   conducted research that applied them?

25   A.   Yes.  Most -- as I mentioned, most of those methods

1    Gary King developed used simulations.  I didn't mention

2    one that's used for interpreting -- I didn't mention one

3    of his software packages which is used for figuring out

4    the results of a quantitative analysis called Clarify.

5    But that one also uses simulation, Clarify.  That one also

6    uses simulation.  In these cases, for my work applying his

7    software packages, I have gone into the simulation method

8    and, you know, altered it in order to adapt it to a new

9    research situation.

10        So I also, at the early end of the design stage, was

11    involved in a simulation of inland waterway vessels,

12    barges moving through rivers, locks and dams, although

13    that was at the design end.  I wasn't there by the time of

14    the final execution of that particular simulation.

15    Q.    Now, we're here on a redistricting case, so I've got

16    to ask you:  Have you acted as an expert in any

17    redistricting cases before, Dr. Voss?

18    A.    Just a few.  I was involved in the '90s, I guess, or

19    maybe early 2000s in a pair of Indiana redistricting cases

20    or voting rights cases that included district shapes.

21    More recently, two years ago, I was involved in Kentucky's

22    redistricting case, which involved a partisan

23    gerrymandering claim.  I very briefly was involved

24    recently with Wisconsin's, but I basically talked them out

25    of using me.  I didn't want to do that one because I don't

1    know Wisconsin the way I know Kentucky and Louisiana.

2    That's pretty much it.

3    Q.    Let's turn to the subject of your testimony here

4    today.  Are there questions that you are prepared to

5    address here today as an expert witness?

6    A.    Yes.

7    Q.    What are those?

8    A.    Okay.  So the first is whether Senate Bill 8

9    represents an egregious partisan gerrymander -- racial

10   gerrymander, excuse me, egregious racial gerrymander,

11   which is to say that race is a, if not the predominant,

12   influence on numerous features of the districts that

13   resulted.

14   Q.    Okay.  What else?

15   A.    The second is that in drawing the districts in

16   Senate Bill 8, various traditional redistricting criteria

17   were compromised to a fairly severe degree, including

18   compactness, how tidy the district is.  We'll talk about

19   that more I think later.  The parish lines that were

20   preserved versus split.

21          And then, finally, whether it's even possible to draw

22   two majority black districts in a way that is compact, or

23   if instead there really is not a sufficiently large and

24   compact African American population to allow districts

25   that would conform to traditional redistricting criteria.

1    Q.    So let's just march through, then, Dr. Voss.  I want

2    to first ask you, you used the phrase "racial

3    gerrymandering."  What do you mean by that?  What

4    understanding are you applying today?

5    A.    That term is problematic because there's no one

6    agreed cutoff for what is versus isn't a racial

7    gerrymander, even among social scientists, let alone any

8    differences between how we might argue about it compared

9    to legal definitions, which could be distinct.  But,

10   you know, as I said, there are numerous features of

11   Senate Bill 8 that are explicable primarily based on race.

12   Add them up; it's fairly conspicuous.

13            JUDGE JOSEPH:  Mr. Greim, do you want to tender

14   him as an expert?  I wasn't sure, when you finished his

15   qualifications, if you were going to do that or not.

16            MR. GREIM:  I will.  I will use that method.

17   I'll tender him -- I'll ask him for his first opinion,

18   then I'll tender him as an expert on that opinion.

19            JUDGE JOSEPH:  All right.

20   Q.    (BY MR. GREIM) So back on the very first topic that

21   you mentioned, what opinion are you prepared to give here

22   today?

23   A.    That Senate Bill 8 represents an egregious racial

24   gerrymander.

25            MR. GREIM:  Then I would tender the witness on

1    that topic.

2            JUDGE JOSEPH:  Do you want to voir dire on the

3    qualifications?

4            MR. CHAKRABORTY:  Objection, Your Honor.  I

5    don't -- he's being tendered as to what's an egregious

6    racial gerrymander?

7            JUDGE JOSEPH:  Sir, I asked if you have any

8    voir dire of this witness before we decide qualification.

9            MR. CHAKRABORTY:  No, Your Honor.

10           JUDGE JOSEPH:  State?

11           MR. TORCHINSKY:  No, Your Honor.

12           JUDGE JOSEPH:  Secretary?

13           MR. STRACH:  No.

14           (Reporter clarification.)

15           MR. TORCHINSKY:  Jason Torchinsky for the

16   State, Your Honor.

17           (Judges confer off the record.)

18           JUDGE JOSEPH:  All right.  Dr. Voss is qualified

19   to render expert opinion on the first factor.  Go ahead,

20   Mr. Greim.

21   Q.   (BY MR. GREIM) Dr. Voss, when you look at SB8 as an

22   election scholar, what evidence did you examine to

23   determine whether race was the predominant factor?

24   A.   Okay.  Just looking at the districts, what you have

25   is a district that stretches, or I guess the term is

1    "slashes" across the state of Louisiana to target four

2    metropolitan areas, which is the majority of the larger

3    cities in the state.  It then scoops out from each of

4    those predominant -- the majority black and predominantly

5    black precincts from each of those cities.

6         It also has -- both District 6 and District 2 have

7    various tendrils or scoops or bulges that specifically

8    pull in African American dominated precincts.  I'll stop

9    there.

10              MR. GREIM:  Maybe what I can do is, if you don't

11   mind, please put up Plaintiffs' Demonstrative 2.

12   Q.   (BY MR. GREIM) Are you able to see this either on

13   your screen or on --

14   A.   On my screen just fine.  Thank you.

15   Q.   So I wonder if you could show us, using this map,

16   the areas that you're talking about.  You mentioned four

17   far-flung areas.  Which areas are you talking about?

18   A.    Okay.  So we have Caddo Parish, Shreveport there.

19   We've got Rapides Parish here.  We've got Lafayette here.

20   We've got East Baton Rouge here.  In each of the cases, if

21   you look at where the district lines track, it's tracking

22   along the darker gray; those are the precincts with the

23   larger African American population percentage.  And you

24   see how it hugs the border in Alexandria, which is the

25   middle one in Rapides Parish, sticking to the darker

 1   colored precincts.  You can see how it pushes down into

 2   Lafayette just to grab the more African American part of

 3   Lafayette.

 4        You also get this bulge here to grab up another town

 5   that's heavily black.  Meanwhile, if you look at

 6   District 2, there is not only lines that are grabbing up

 7   places like Thibodaux and parts of Houma that qualify, you

 8   also see the district lines -- you know, flip this around,

 9   the district lines are often avoiding pockets,

10   heavily-white pockets, large pockets of white voters.

11             MR. GREIM:  I wonder if we could pull up

12   Rapides.  This will be Plaintiffs' Demonstrative 3.  It

13   should be the very next -- this is Report Figure 13.

14   Q.   (BY MR. GREIM) Now, looks to me like this is

15   actually, may have been rotated.  And I wonder if this is

16   a way to remove those markings.  Looks like they stick to

17   the screen.

18   A.   I won't do that again.

19             MR. GREIM:  Your Honor?

20             JUDGE JOSEPH:  I think you tap in the corner of

21   it, right?

22             MS. LACOMBE:  It's done.

23             MR. GREIM:  Oh, it's done.  Wonderful.  Thank

24   you.

25   Q.   (BY MR. GREIM) So do you recognize this as Rapides

1    Parish?  Maybe just tilted at 90 degrees.

2    A.    Yes, I do.

3    Q.    Okay.  And can you show us where -- what does this

4    demonstrative represent?

5    A.    Right.  So this time we switch to the colors, which I

6    used, but people felt wasn't, you know, that wasn't as

7    clear.  The blue areas represent the majority black

8    precincts, the darker blue ones.  As you move through

9    yellow, those are the ones that have a lower black

10   population.  Red is predominantly white.

11        So to illustrate the point I just made, what you can

12   see is how the line -- I'm assuming this can be deleted

13   again -- the line tracks along specifically in a way

14   that's unmistakable to pull into one district the central

15   city and to leave in the other district the much

16   heavily -- much whiter areas.

17   Q.    All right.  I'll take you -- We won't run through all

18   the examples in your report, but maybe let's look at

19   Caddo, Shreveport.

20             MR. GREIM:  And I'll just have my team flip

21   over -- keep going.  Let's go ahead and put this one up.

22   This is also from Plaintiffs' -- from Voss's Report Figure

23   13.  We will call this Plaintiffs' Demonstrative 4.

24   Q.    (BY MR. GREIM) Do you recognize this geography,

25   Dr. Voss?

1    A.    Yes.  That one is a little clearer in zoom.  And once

2    again, what you can see is the district line just hugging

3    the precincts based on race in a fairly jagged way.

4          I actually walked to my hotel and then here from the

5    Greyhound bus station, and I like to know where the places

6    I am walking through and visiting appear on the map.  So I

7    tracked my route, and it turns out that just that two-part

8    walk, I crossed congressional district borders four times.

9    I walked from one district to another, then into another,

10   then --

11   Q.    Four districts?

12   A.    The four times I crossed just from the walk from the

13   station to the hotel to here.

14          MR. GREIM:  Thank you.  We can remove that map.

15   Q.    (BY MR. GREIM) Now, let me ask you -- so we looked at

16   the shape and some of the individual splitting.  You

17   talked about twists and tendrils.  Let me ask you, did you

18   consider parish splits?

19   A.    Yes.  If you -- if you compare how many parishes were

20   split and how many parishes were split more than once by

21   Senate Bill 8, compared to either past plans or compared

22   to the other proposals that were considered in the

23   Special Session where Senate Bill 8 was adopted, it split

24   more parishes than most.  It also multi-split, split into

25   three at two parishes.  Put those together.  It's

1    crossing parish lines and breaking up parishes more than

2    anything else that I was able to look at it or consider.

3    Q.    I'm going to show you what we have previously marked

4    as Report Table 4.  We'll call this Plaintiffs'

5    Demonstrative 5.  And is this a table you prepared,

6    Dr. Voss?

7    A.    Yes, it is.

8    Q.    What have you analyzed here?

9    A.    Okay.  So partly, it illustrated what you just asked

10   me.  The "2024 enacted," that's Senate Bill 8.  As you can

11   see, it splits 16 parishes.  Only one of the other maps at

12   which I looked split 16 parishes.  And while it's true

13   there was one that split 17, that particular plan, the

14   Echols Plan, didn't split any parishes into three.

15   Senate Bill 8 fractures, two parishes -- that's yet

16   another time -- for a total of 18 splits.  That's the most

17   of any.

18        Now, the next column, "population affected," is just

19   a way for the Court, for you to see whether these tended

20   to be smaller parishes and which might be towns that don't

21   have a lot to do with each other, other than they're under

22   the same parish government.  Or is it hitting the more

23   populous areas and taking communities of interest, large

24   cities, and dividing them up, divvying them up across

25   congressional districts.  So percent population affected,

1   it's how many people live in those parishes that got

2   split.  And Senate Bill 8 especially was cracking fairly

3   populous places, especially was breaking apart fairly

4   populous parishes.  So it has the largest number on that

5   metric.

6        And then the others just -- the other metrics only

7   added to it, but they're telling you how many counties are

8   split by districts, how many districts are split by

9   counties.  It's another metric that showed Senate Bill 8

10  doesn't perform very well, but not metrics on which I

11  relied as much.

12  Q.  So far we have covered then the actual lines, the

13  tendrils and twists in the district.  We've talked about

14  parish splits.  I think you've also mentioned compactness.

15  Did you consider the compactness of SB8 compared to other

16  real life maps?

17  A.  Yes.  So are we going to have the demonstrative up

18  there?

19  Q.  Yes.  I mean, if -- I think there is a demonstrative

20  that might help you here.  Let's put up Report Table 1,

21  which will be Plaintiffs' Demonstrative 5.

22  A.  Anyway, I'll start answering the question, though,

23  while that comes up.

24       Compactness, like racial gerrymandering, is a

25  highly conflicted concept.  The quantitative analysis on

1    compactness have dozens of measures that can be used to

2    judge this thing.  Each one capturing something slightly

3    different, some refinement or the other in terms of what

4    is compactness.

5         Furthermore, as I understand it, there's no nice,

6    scientifically precise definition of "compactness" from

7    the legal community that I can look for.  What we can use

8    compactness measures to determine is how one set of maps

9    differ from another.  If you're comparing it relatively --

10   the same way there is no border between hot and cold, but

11   we can talk about something getting hotter or colder.

12   Compactness is like that.

13   Q.   So let me ask you, then, I see you have chosen three

14   criteria.  Can you just briefly tell us what each

15   criterion is and why you chose it?

16   A.   All right.  So one consensus within the quantitative

17   community, I think I can say -- there are very few -- but

18   one is that you should not only look at a single

19   compactness measure, because they are capturing different

20   things, and you can gain one while performing poorly on

21   the others.

22        Now, two of the most frequently used are the one

23   that's in the middle there -- I'll start with that because

24   it's the oldest, the Reock score.  And what it's asking

25   is:  How close to a circle is the district?  So a really

1    oblong one, to draw a circle around it, you're going to

2    have a whole lot of the area of that circle outside the

3    district.  That would look not very good.  Something

4    that's closer to a circle, if you put the circle that can

5    encompass that, most of the district is in the circle.

6    Okay.  So that's what that one gets.

7    Q.   And before we move on, then, what's the scale on the

8    Reock score?

9    A.   Well, as I said, it's a relative measure.

10   Q.   Well, in terms of the actual figures that you've

11   calculated, though, for example, 2022 enacted is .35.

12   What's the scale?

13   A.   I see.  So let's take the perfect case, although it

14   wouldn't be perfect in real life, of a district that's

15   exactly a circle.  If you drew a circle around that, the

16   entire circle would be the district and vice versa.  That

17   would be a one.

18        And as you go down from there, you're getting worse.

19   That means more and more of the circle needed to capture

20   the whole district is outside the district.  So you could

21   have a very smooth in an otherwise compact district, but

22   that circle would be very large and, therefore, that

23   number would be low.

24   Q.   Tell us about the Polsby-Popper Score.

25   A.   Okay.  Polsby-Popper is intended to capture a

1    different type of non-compactness.  When you get all

2    these jagged edges and stabs in and out of places in order

3    to try to fine-tune and control who's in and who's out of

4    the district, it's similar to the circle measure in that

5    you then draw a circle around that district that's meant

6    to have a perimeter equal to the perimeter of the district

7    you drew.  So the more of these little segments and the

8    more of the jagged edges you have, the wider that circle

9    would have to be to have the same perimeter; otherwise,

10   though, it's giving you the same basic thing.  Once you

11   have drawn that circle, the one that has the same size as

12   the district lines, in terms of perimeter, how much of the

13   circle is the district, how much of the circle is not the

14   district?  Big scores are very good.  You know, if you

15   have a circle that is entirely the district, it would be a

16   one because 100 percent of the circle is the district.

17   But the more you have those jagged lines that the circle

18   expands, expands, expands and leaves the little farming

19   district behind, the smaller that number gets.

20   Q.   Now, you've also got a third one up there.  It's an

21   abbreviation.  It's -- I believe it stands for "know it

22   when you see it."  Am I right?

23   A.   That's right.  That phrase was taken from obscenity

24   law:  I don't know what obscenity is, but I know it when I

25   see it.  And the developers of that method said that lack

1    of compactness was similar, that people have fairly

2    complex ways they judge this, that just the Reock, just

3    the Polsby-Popper, even both of them cannot capture.

4        So that method was derived through showing different

5    sets of people.  I was a little hazy on this during the

6    deposition, so I went back and looked.  I wasn't sure

7    whether it was a representative sample of people, to see

8    what they thought a compact versus a non-compact district

9    was, or a group of people with more specialized knowledge.

10   The reason I was confused is because they can be both.

11   They took people, from your judges and attorneys, who

12   study redistricting or focus on redistricting, but they

13   also used Mechanical Turk in an attempt at a

14   representative sample of people.

15       What they then did is they showed them a series of

16   shapes.  They said:  Do you consider this a compact

17   district or not?  And as people gave them those answers

18   and they looked at the patterns, they trained the

19   statistical model to capture numerically the features that

20   real people exhibited in judging these shapes as being

21   good or ugly.  And so it used to be subjective.  It was

22   built from people's "I know it when I see it" impressions.

23   But it is now objective.  You feed a district into the

24   software, it gives you a number, where somebody would look

25   at that and say, yeah, that's gerrymander, you know,

1    that's a non-compact district -- I know it when I see

2    it -- versus not.

3    Q.    Now, I see that you've -- rather than measuring

4    individual districts, you've measured entire plans here.

5    Why did you do it that way?

6    A.    So you get a bit of a debate over whether you should

7    look at these scores that summarize over a plan versus

8    look at them individually per district.  I did both.  I

9    didn't think that there were enough differences to need to

10    report both, so I went with what would keep the report

11    shorter and keep the exhibits smaller.  But, you know, I

12    can talk about the district scores if you would like,

13    especially the ones in question in Senate Bill 8.

14        So -- and a second reason is that if you draw one

15    district that's compact, that might actually force another

16    district to be less compact.  But not necessarily.  If you

17    draw one district with very jagged edges and tendrils,

18    that might create jagged edges and tendrils in another

19    district.  So if you only look at one district and ignore

20    what impact the rest of the plan might have had or what

21    impact it had on the rest of the plan, I don't think you

22    get the full picture.

23    Q.    So what did you conclude from your plan level

24    analysis?

25    A.    What this particular table illustrates is that

1    Senate Bill 8 performed worse than either the map that was

2    active in 2022, or the map that it replaced from the

3    previous decade across all three of these distinct

4    measures of compactness.  It is worse on the Polsby-Popper

5    that gets the jagged edges and the tendrils.  It was worse

6    on the Reock that gets how roughly circular is it.  It was

7    worse on the "know it when you see it," which is to say

8    the sort of people who developed that measure, who we used

9    to develop that measure, would look at these districts and

10   say "huh" or say something to that; they would scoff at

11   it.

12            MR. GREIM:  Let's, if we could, put up

13   Plaintiffs' Demonstrative 6, which is Voss Report Table 7.

14   Q.   (BY MR. GREIM) Now, Dr. Voss, do you recognize this

15   as a table you prepared?

16   A.   Yes, I do.

17   Q.   What analysis were you performing here?

18   A.   Okay.  So, once again, it's using those measures

19   relatively to compare them to other options.  This time,

20   though, I am comparing the enacted plan to the other ones

21   that had been considered at some point.  Most of them

22   represent proposals that were considered during the

23   legislative session, the Special Session, that generated

24   the 2024 map.  The exception is the one called "Robinson."

25   That's the map that was offered as a possible substitute

1    in the Robinson case.

2    Q.    So as we look at this table, it looks like your first

3    three columns are the overall plan scores, which we have

4    already talked about, right?

5    A.    Correct.

6    Q.    And the second three columns are entitled "Second

7    Black."  What were you trying to designate there?

8    A.    So all of these plans created two majority black

9    districts; therefore, this table is not helping you

10   judge in any sense the cost or the effect on traditional

11   redistricting criteria of a decision to do that.  It's

12   evaluating the way Senate Bill 8 met that goal and the

13   cost in terms of compactness compared to what the other

14   proposals would have cost in terms of compactness.

15   Q.    So, Dr. Voss, what did you determine from this

16   analysis?

17   A.    So the slash district, as it's come to be called --

18   I'm looking at the rightmost three columns -- is worse on

19   the Polsby-Popper Score than the second majority black

20   district in the other plans.  It is worse on the Reock

21   score than the other plans that created a second majority

22   black district.  And it is -- it's a very low score.  It

23   is worse on the "know it when you see it" than the other

24   plans and the majority black districts they proposed.

25   Q.    In fact, Dr. Voss, in your analysis, did you find any

1  district in any plan that scored worse on Polsby-Popper

2  than District 6 in the 2024 plan in SB8?  I know you don't

3  have all your numbers up here, but can you find --

4  A.   Would you ask it again?  I'm sorry.

5  Q.   Sure.  Did you find any individual congressional

6  district that scored worse on Polsby-Popper than did the

7  second black district, District 6, in Senate Bill 8?

8  A.   I see.  No, no.  It -- Senate Bill 6 is the worst in

9  its plan and it has a worse score than any of the

10 districts in the plan it replaced or the one that that one

11 replaced.

12 Q.   Okay.  So before we move on to your next opinion,

13 then what conclusion did you draw from looking at all of

14 these different factors with respect to Senate Bill 8 in

15 District 6?

16 A.   That Senate Bill 8 did not produce compact maps when

17 judged in comparison to everything else that I had

18 available in the record.  That, in particular, the way it

19 chose to draw its majority black districts were especially

20 non-compact compared to even other plans that would have

21 accomplished that same goal.

22 Q.   Let's move on to your second opinion, and I am just

23 going to ask you:  Under that opinion, you considered

24 whether political motives could be the primary explanation

25 for Senate Bill 8's lack of compactness.

1          And so let me just ask you:  Why do you dismiss
2     political motives as the primary explanation of SB8's lack
3     of compactness?
4     A.   As we'll probably discuss again later, disprove --
5     proving that something is impossible is not something that
6     you really can do with quantitative analysis.  You can
7     prove that something is possible.  You can make it -- you
8     can provide lots of evidence that something is probably
9     not possible, but you can't pin that down.
10         What I can speak about, using both the analysis we
11    have talked about so far -- and we can get to it again if
12    you would like later when we introduce my other
13    analysis -- is whether the political goals I knew about
14    that people had been discussing, whether those could
15    explain Senate Bill 8.
16         So, for example, one thing we heard earlier today was
17    protecting Representative Julia Letlow, okay?  If you're
18    not trying to draw a second black majority district, it is
19    very easy to protect Representative Julia Letlow.  Even if
20    you are, it's not super difficult to protect
21    Representative Julia Letlow.  Do you want to show the --
22    Q.   Sure.
23              MR. GREIM:  If we could put up Rebuttal Report
24    Figure 3, and we'll call this Plaintiffs' Demonstrative
25    8 -- I'm sorry, 7.

1          COURTROOM DEPUTY:  It's 8.

2          MR. GREIM:  Oh, it is 8.

3          THE WITNESS:  Now, understand, I do not know

4    where these people live and, therefore, I was given from

5    counsel information as to which precincts contain the

6    residences of each of Louisiana's members of Congress.  I

7    take that on faith.  My analysis contingent on those data

8    being true.

9          MR. CHAKRABORTY:  Your Honor, we would object

10   because these figures, you know, this line of questioning

11   has not come up in Dr. Voss's initial report, his rebuttal

12   report, his deposition.  There has not -- there has been

13   no foundation laid as to his ability to talk about this,

14   and also no sort of record of why this is coming in at

15   this stage.

16         JUDGE JOSEPH:  Okay.  If you'll lay a foundation

17   and then allow time for voir dire if he wants to challenge

18   Dr. Voss's qualifications and his opinion.

19   Q.   (BY MR. GREIM) Let me back up.  So in preparing your

20   rebuttal report, did we ask you to determine whether a map

21   could be drawn that protected Julia Letlow?

22   A.   Yes, you did.  You also asked me -- well, I don't

23   want to talk about the simulations yet.

24        Yes, you did.

25   Q.   And did you actually prepare such a map?

1       Or I'm sorry.  Did you perform an analysis to answer

2    that question?

3    A.   I need you to ask that again.  I'm sorry.

4    Q.   Sure.  Let me back up.  So did we ask you, for

5    purposes of your rebuttal report, to determine whether it

6    was possible to protect Representative Letlow without

7    Senate Bill 8?

8    A.   Yes, you did.

9    Q.   And did you proffer an opinion on that in your

10   rebuttal report?

11   A.   Yes, I did.

12   Q.   And did you prepare the demonstrative on the left as

13   evidence of your opinion?

14   A.   That was part of that written material, yes.

15   Q.   And what did you consider in preparing this map?

16   What analysis did you perform?

17   A.   It was merely to illustrate for the reader why I

18   could assert that the political goal of protecting

19   Representative Letlow, or if you wanted to target

20   Representative Graves, why neither of those was a special

21   challenge that should have had much effect on the

22   compactness of the districts.

23        MR. GREIM:  Your Honor, this was disclosed in

24   the rebuttal report.  These are straight from the rebuttal

25   report.

1          JUDGE JOSEPH:  Okay.  Well, then I am going to

2     ask the Robinson intervenors:  Do you have any voir dire

3     about this expert's qualifications to testify as to the

4     subject matter?

5          MR. CHAKRABORTY:  Not at this time.

6          JUDGE JOSEPH:  Please proceed, Mr. Greim.

7     Dr. Voss is qualified to testify.

8     Q.   (BY MR. GREIM) Dr. Voss, what did you determine with

9     respect to Representative Letlow?

10    A.   Yeah.  These amounts were supposed to illustrate

11    very simple points.  One, Letlow's precinct, as it was

12    expressed to me, was Richland 12.  That's the yellow one

13    on the right-hand side.  And what it's supposed to show is

14    that she is on the other side of Richland Parish, from the

15    Delta parishes.  She is in what historically is called the

16    Macon Ridge, which is those -- that strip of parishes that

17    include Richland.  And given where she is located, it is

18    not hard to get her into a heavily Republican, heavily

19    white district.

20    Q.   And was it your opinion that could be done, even with

21    drawing two majority-minority districts?

22    A.   Yes, it could be done and draw two majority-minority

23    districts.

24    Q.   And let me ask you about Garret Graves.  What is the

25    map on the left with the red circle on the bottom?  What

1   does that indicate?

2   A.   So like the state as a whole, Baton Rouge has

3   something of a north-south divide in terms of the race of

4   its population.  All of the majority black districts, the

5   second ones, the one outside of the Greater New Orleans

6   area, all of them had Baton Rouge as its main starting

7   point or seed or heavy black population.  The precinct

8   that I was told represents Garret Graves' home is right on

9   the border of that heavily-black East Baton Rouge

10   community, pulling him into that and therefore pulling him

11   into the second majority black district.  If you drew one,

12   it was not hard.

13   Q.   And I take it, it did not require Senate Bill 8?  The

14   purpose was to target Graves.  Is that your analysis?

15   A.   That is correct.  You do not need Senate Bill 8 to

16   put Representative Graves in a majority black district.

17   Q.   Let's turn to your third opinion.

18        Dr. Voss, how did you determine whether the black

19   population was sufficiently large and sufficiently compact

20   to form two black majority districts consistent with

21   traditional redistricting principles?

22   A.   I simulated a handful of possible sets of districts,

23   using various rules for how districts might have been

24   constructed.

25   Q.   And what did you try to test with the simulation?

1    A.    Okay.  So one of the best practices when

2    simulating --

3              MR. CHAKRABORTY:  Objection, Your Honor.

4    Counsel hasn't laid the foundation for Dr. Voss to be an

5    expert in talking about simulations.

6              JUDGE JOSEPH:  Why don't you lay a foundation.

7    Sustained.

8    Q.    (BY MR. GREIM) So, Dr. Voss, have you used the

9    simulation method that you are about to talk about here

10   before as an expert in a case?

11   A.    I just used it two years ago in the Kentucky case.

12   Q.    And how did you use the simulation method in that

13   case?

14   A.    There I was a rebuttal witness.  Professor Kosuke

15   Imai of Harvard had come in using the redist package to

16   analyze the districts drawn both for Congress and also for

17   the state house in Kentucky.  The bulk of his testimony

18   was related to analysis he had done using redist.  I was

19   asked to evaluate his work as someone from outside that

20   particular community, applying his software first as he

21   did, and then later to incorporate important features of

22   Kentucky's political geography.  And also to implement it

23   using rival interpretation of the law to see what the

24   effect the interpretation of the law had on the resulting

25   districts.

1          (Reporter clarification.)

2    Q.   (BY MR. GREIM) That's right where I going to go,

3    actually, Dr. Voss.  What is this "redist" simulation

4    package?

5    A.   It's a method that uses sequential Monte Carlo

6    simulation in order to put together what hopes to be, what

7    you hope will be, a representative sample of districts

8    that could have been drawn or that could emerge from a

9    smaller number of considerations than take place in the

10   real world.  Not because you pretend that legislators

11   operate from a completely blank slate, but because being

12   able to compare their handiwork to what you would get from

13   people drawing districts or from, in this case a machine

14   drawing districts, from a completely blank slate what it

15   would produce.  And you can look at the real thing,

16   compare it to these lab-grown, sort of theoretically pure

17   versions, and try to get a sense of the effect of

18   decisions that were made during the redistricting process.

19   It's a way not to know what was in the heads of the people

20   who drew the district or, you know, what they might have

21   been told by another court, but to infer what motivated

22   them based on their work, based on the actual maps they

23   produced.  It's a method of -- it sets up an inference.

24   Q.   Well, I am just going to explore that for a second.

25   You say it sets up an inference.  But why are you

1    comparing the results of the simulation with the real

2    live enacted map?  What are you trying to determine?

3    A.    Right.  So as you move across the different

4    simulations I created, you can judge two things:  One is

5    are there naturally occurring, sort of organic majority

6    black districts --

7    Q.    But, now, my question -- we are qualifying you, okay?

8    So I want you to limit your testimony, if you could,

9    Dr. Voss, to how the process works in general.

10   A.    Oh, okay.  Okay.  I understand.  So how this works

11   broadly.  If you look at the map of all precincts in

12   Louisiana and look at their borders, imagine putting a dot

13   in the middle of each of these precincts, okay?  And then

14   within each parish you can connect a precinct to all the

15   precincts around it, connecting their dots.

16         Now, when you stop there, there are all these

17   different routes you can take to move from precinct to

18   precinct.  But then the method comes behind and starts

19   knocking out, ignoring those non -- those redundant

20   connectors until what's left is like a maze that you get

21   in a newspaper.  Indeed, the algorithm used to produce the

22   simulations is like the algorithm used to create mazes for

23   people to do in maze books.

24         When you get to the point that now there is only one

25   route to get to each precinct, like a maze -- call this a

1    spanning tree -- the simulation then can go crack some of

2    those -- now they're not redundant, some of those

3    necessary connectors that hold the whole thing together to

4    look at the branches that break off.

5    Q.   Let me stop you right there.  Just so the record is

6    clear, you are describing for us now the way the algorithm

7    actually works in the sequential Monte Carlo simulation,

8    right?

9    A.   I am describing the sorts of simulations I ran,

10   correct.

11   Q.   Okay.  So let's just -- we won't go too much further;

12   we're just laying the foundation.  But let me ask you:

13   What is the purpose of the algorithm cracking?  What is it

14   doing when that happens?

15   A.   So when it starts cracking off those first branches,

16   the goal is to generate a sample of possible first

17   districts into which the state could have been cut up,

18   okay?  So we are -- depending on how many simulations you

19   requested, that's going to determine how many versions of

20   a first district eventually you will get.  In my first

21   report, I did 10,000.  But in reacting to the criticism, I

22   upped the number of simulated map plans of each type to

23   20,000.

24   Q.   Let me ask you just a couple of other foundational

25   questions.  So you used this same redist software, which

1    uses the same algorithm in the Kentucky case, right?

2    A.    Yes and no.  The first analysis I did in my initial

3    report was the same version of the software, the same

4    redist package version that Professor Imai had used in his

5    testimony, because the point was to see how his analysis

6    changed.  Now, when I started out here, I also used the

7    same version of the software because I had used it before.

8    It was less demanding on the computers, given the time

9    frame, than the other option.  I produced with my initial

10    report the simulations using the exact same software I had

11    previously used.

12    Q.    And was your testimony in the Kentucky case accepted

13    by the Court?

14    A.    Yes, it was.

15    Q.    Now, one difference -- I want to make sure the record

16    is clear -- the Kentucky case was partisan gerrymandering;

17    in this case it's racial gerrymandering, right?

18    A.    That is correct.

19    Q.    Now, in your opinion, is the simulation software, or

20    the SMC, sequential Monte Carlo algorithm, any less useful

21    in a racial gerrymandering case than a partisan

22    gerrymandering case?

23    A.    Exactly how you would use a method like this will

24    depend on the question you're asking; it should depend on

25    the question you're asking.  But insofar as the goal is to

1    have a purer set of maps generated under simpler rules

2    against which to compare the real thing, you can compare

3    the simulated maps to what has been called, alleged to be

4    a partisan gerrymander.  You can compare the simulated set

5    of maps against what has been called or alleged to be a

6    racial gerrymander, and people have done both.

7    Q.   Okay.  I want to now skip ahead -- this is my last

8    question on laying the foundation, but I am going to skip

9    ahead to the point where simulations have been run.  You

10   have a body of simulations, you've got diagnostics and

11   data on those, and you are now comparing it to the enacted

12   map.  Okay.  What sort of opinion are you able to render

13   when you compare those two things?

14   A.   You need to ask that again.

15   Q.   Sure.  I'm asking you:  At the end of the day, after

16   you have run the simulations and you've got the output

17   from the redist software, what sorts of opinions are you

18   able to render about the enacted map based on those

19   simulations?

20   A.   You can judge whether the parameters or constraints

21   under which you created the simulations explain the

22   deviations that you see in a real map compared to what you

23   saw in the simulations.  I can give examples, but I --

24   Q.   Well, let's keep it general.  How then does that help

25   inform an opinion about whether racial gerrymandering may

1    have occurred with the enacted map?

2    A.   You can compare the racial makeup of the districts

3    that are formed under rules we know, under constraints,

4    limitations that we know because there were posited in

5    advance, and compare what you got under those known

6    instructions to what you got from the hazier political

7    process where you may not know all the considerations that

8    went into the drawing of those maps.

9              MR. GREIM:  All right.  I think with that, I

10   would ask that the witness be qualified to testify in the

11   simulation matter.

12             JUDGE JOSEPH:  Any voir dire of this witness --

13             MR. CHAKRABORTY:  No voir dire, Your Honor.

14             JUDGE JOSEPH:  -- as to qualifications?

15      Dr. Voss, I do have one question.  Is this redist

16   software widely used by demographers?

17             THE WITNESS:  By the --

18             JUDGE JOSEPH:  -- demographers.  By

19   demographers.

20             THE WITNESS:  Oh.

21             JUDGE JOSEPH:  Where did the software come from?

22   Who made it, et cetera?  How often is it used?

23             THE WITNESS:  It comes from people in -- I mean,

24   you're asking me other people's qualifications, but

25   mathematics --

 1                    JUDGE JOSEPH:  No, I'm not.  I'm asking you --

 2                    THE WITNESS:  -- statistics --

 3                    JUDGE JOSEPH:  You are using the software.  I'm

 4      asking you what the basis of the validity of the software

 5      is.  So answer the question.

 6                    THE WITNESS:  Right.  Sorry, Your Honor.

 7           The people I know -- okay, it's a large team -- come

 8      from statistics and political science.  That's the main

 9      two fields that I believe are represented by that team.

10      It draws on insights from mathematics though.  So if you

11      expand how you define the people whose work led to it, you

12      would include mathematicians.  I don't know of any

13      demographers involved, but there may be.  There may be.

14                    JUDGE JOSEPH:  How widely is it used other than

15      the Kentucky case that you mentioned?

16                    THE WITNESS:  It's fairly new software,

17      especially in its -- in its sophisticated form.  It won a

18      software award in just 2022, and the version that

19      intervenors said I should have been using is -- emerged

20      right around that year.  So it's only a few years old.

21      It has been used in multiple legal cases related to

22      redistricting, including racial redistricting in those

23      years, in those recent years.

24                    JUDGE STEWART:  I've got two questions.  One, is

25      the redist software, is that a commercial product?  And

1   the question is who's the maker, if you will, of the

2   soft -- you know, whoever makes it.  That's the first

3   question.

4        Then, secondly, am I understanding you to say in the

5   Kentucky case -- I know you said you were a rebuttal

6   witness, so my question is -- I don't know if I have his

7   name right, Professor Imai --

8             THE WITNESS:  Imai, I-M-A-I.

9             JUDGE STEWART:  My only question is:  Was his

10  testimony in direct, did he use the software in direct and

11  then you used the software in your rebuttal?  Or in his

12  direct, did he have some other kind of methodology and

13  then you used or introduced the redist in the rebuttal?

14  Do you follow what I'm saying?

15       I'm not asking the answers to whatever was said,

16  but I'm just trying to understand if the software was used

17  first in the rebuttal, as opposed to he used it in his

18  direct and then you used it to counter what he said.  You

19  following?

20            THE WITNESS:  Yes, Your Honor.  One of the

21  virtues -- I'm answering your first question.  One of the

22  virtues of this redist package is the algorithm itself.

23  What I used is freely available to the public.  It is also

24  what's called "open source."  So that's what allowed me to

25  learn what I learned about exactly what it did.  You

1    know, usually you cannot tell such things just from a

2    description of software.  But if you can actually see the

3    steps they went through, then you really understand what

4    they're doing.

5                JUDGE JOSEPH:  And you did that, Dr. Voss?

6    You're saying you did that?

7                THE WITNESS:  I did do that, yes.  I walked

8    through it.  Now, I should be clear.  Certain portions of

9    it rely on other people's algorithms; it becomes sort of a

10   tree in and of itself, and I did not follow every trail.

11               JUDGE JOSEPH:  But using your expertise in this

12   area, you looked at it to check and make sure you thought

13   it was good software?

14               THE WITNESS:  Yes, that is correct.  Now, it

15   runs as part of what I'll call a "statistical software

16   package," although that's not a great way to describe it,

17   called "R," just the capital letter "R."  The reason R has

18   become increasingly common in what we do, but also in

19   statistics, economics and demography, lots of fields, is

20   because it also is free and easily available to students,

21   to graduate students, and analysts.  So this is a use

22   of R, which is free, building on R, which is free.

23       As to the other question, the bulk of Professor

24   Imai's direct involved the simulations he ran.  And what I

25   was asked to do was to evaluate whether he was either

1   using it in a way that did not fit the Kentucky context,

2   or was describing what he had done in a way likely to

3   mislead laypeople or to mislead the Court.  You know, what

4   did he miss that might not have been obvious if all the

5   Court had heard was his testimony and not a rebuttal.

6             JUDGE STEWART:  Thank you.

7             JUDGE JOSEPH:  All right.  Dr. Voss is qualified

8   to testify as to the redist software and its application

9   in this case.

10  Q.   (BY MR. GREIM) Dr. Voss, let's move in to the actual

11  test simulations that you ran in this case.  What are your

12  inputs into the redist software?

13  A.   Okay.  So before you start telling redist the rules

14  under which you want it to make the sims, you need to feed

15  it certain data.  If those data are no good, nothing else

16  that follows will be any good; garbage in, garbage out.

17       One thing it needs are the shapefiles that the

18  mapping data -- that would have been available or that

19  comes as close as possible to being what was available to

20  the district drawers.  These shapefiles, if you open them

21  up, they would make no sense to people, that they're in

22  machine language, I guess it is.  They're able to be read

23  by Geographic Information System software and R has some

24  GIS-related compatibility that allows those shapefiles to

25  be worked on in R as well.  You can make maps with R.

1          And in terms of those maps, I trusted that what was

2     available to me -- for the most part from the State, from

3     the State's redistricting web page -- were the right

4     shapefiles, both for districts that had previously been

5     drawn and also for the precincts.  The only exception is

6     the Robinson map, which was not available to me that I

7     could see, or it was not available from the State.  And

8     that was provided to me by counsel.

9     Q.   So we talked about data.  What about -- I mean, I

10    guess we should ask about the simulations themselves.

11    A.   Oh, I'm sorry.  I didn't talk about the rest of the

12    data.

13    Q.   Go ahead.  I'm sorry.

14    A.   That was just the map shapes.  We also have available

15    the voting behavior and the demographics of those

16    low-level units of those precincts.  They are embedded

17    within -- some of that data is embedded within the

18    shapefiles; it comes with it.  But others came to me in

19    the form of spreadsheets reporting how people had voted or

20    information about each of those precincts that, again,

21    were provided to me by counsel.

22          However, that's -- those data are so critical, that I

23    didn't basically trust that the data I had received were a

24    sufficient basis or foundation for analysis.  So I then

25    separately downloaded from the State Secretary of State

1    page the similar election data, broken down by parish,

2    that I was supposed to have been given and compared parish

3    returns, according to the Secretary of State, to what was

4    in the data and made sure that these numbers were

5    adequate.

6    Q.   Okay.  I didn't mean to interrupt your data

7    discussion.  But let me ask you now, Dr. Voss:  How did

8    you design the simulations themselves?  What principles

9    did you use?

10   A.   Okay.  So the first choice I made is not just to try

11   to pick what I thought was the perfect dream simulation

12   and offer, you know, would be a one-trick pony, offer one

13   and only one sort of package of simulations to the Court

14   and to the contending sides.  One of the best practices

15   for conducting simulations is to move around some of the

16   constraints, the parameters you're putting on it, to make

17   sure that the main conclusion you are drawing is fairly

18   stable.  Stability is considered a virtue in simulation.

19       So one decision I made was to give a host of

20   different types of simulations with different rules just

21   to make sure that the main conclusions weren't going away

22   or weren't, you know, a quirky result of one set of

23   choices.

24       In choosing what that span or spectrum of

25   simulations would do, though, I chose them with a purpose

1   in mind.  Each one is supposed to allow you to test a

2   particular hypothesis, either about why majority black

3   districts were failing to form on their own, because if

4   there is a naturally occurring, organic majority black

5   district out there, you ought to be able to find it

6   through simulation.

7         And the second one was to see whether some of the

8   other redistricting criteria that Louisiana had set aside

9   as important to it could explain the loss of compactness.

10  So did protecting parishes cause very non-compact

11  districts?  Did protecting metropolitan statistical areas

12  as community of interest and economic community of

13  interest cause a problem with the compactness that

14  explains the numbers I'm seeing?  So do I get majority

15  black districts?  Do I get non-compact districts?

16  Q.   Now, did you -- when you considered your constraints,

17  did you also take a look at the constraints or at least --

18  I shouldn't use this phrase -- at the criteria that

19  Louisiana uses in drawing congressional districts?

20  A.   I did.  I had Joint Rule 21 available to me.

21  Q.   And we'll see in a moment -- I know some of your

22  criteria involved compactness.  Is compactness actually in

23  Joint Rule 21?

24  A.   No, it is not.

25  Q.   But is there a reason that you used compactness

1    anyway as one of your constraints?

2    A.    Leaving aside the district compactness has long been

3    a federal priority for the drawing of congressional

4    districts, I knew that one of the questions that the Court

5    needed to settle was whether the black population is large

6    and sufficiently compact.

7         Now, there may be other ways to judge the compactness

8    of a population, separate from the compactness of the

9    districts drawn to encompass that population, but that

10   latter question, you know, how much does it mess with

11   compactness in order to draw a majority black district, is

12   the one that this sort of analysis could inform.

13   Q.    Now, are you aware of any reason that the simulations

14   of the kinds that you ran would be appropriate for judging

15   partisan but not racial gerrymandering?

16   A.    No.  There is -- as I said earlier, there is no

17   reason why this method is solely useful for judging

18   partisan gerrymandering.  People have written at length

19   about specifically why it's good for judging racial

20   gerrymandering.  And as I said, I know -- although I don't

21   know the details of those cases, I know it has been used

22   in prior litigation successfully.

23   Q.    Before concluding your opinion and presenting your

24   results, did you review the work of anyone else who has

25   used this same software on Louisiana congressional

1  districting?

2  A.   I, in particular, along the way of producing the

3  rebuttal report especially, consulted the work of Dr. Cory

4  McCartan and his team, the ALARM team -- all capitals,

5  A-L-A-R-M, the ALARM team.  They ran a Louisiana

6  simulation as part of their hopping across the country

7  simulating districts in multiple states.

8  Q.   And so they used the same software that you did in

9  your rebuttal report?

10 A.   They used the same version, I guess, or -- well, it

11 was not the same version.  Correction.  They used a

12 version closer to the one I used in the rebuttal report,

13 as I understand it, than the one I used in my initial

14 report.

15 Q.   And did you look at the constraints that

16 Mr. McCartan's team, the team that he led, ran in

17 Louisiana?

18 A.   So to be clear, we haven't talked about constraints

19 yet; but in shorthand, that's the rules, either hard or

20 soft, given to the simulation to shape the hypothetical

21 maps that it's going to draw.  One of them that came up as

22 a matter of contention is how much to encourage

23 compactness?  How much to encourage performing well on

24 those scores we previously discussed?  I used -- and this

25 is just going to be a number floating out there -- I used

1    a compactness constraint of one.  Dr. McCartan and his

2    team used a compactness constraint of one.  I did not

3    actively try to protect municipalities because, in my

4    judgment, that would not have helped with the purpose at

5    hand.  They did not actively restrict it not to break

6    apart Louisiana's municipalities.

7          Now, that analysis used something that they called a

8    VRA constraint.  I mostly did not use that, but I did try

9    the VRA constraint, so I had a version and I used it.

10   It made very little difference so I did not report it.

11         There was really only one major difference between,

12   to my mind, what I had done and what the ALARM team had

13   done, a difference that I addressed in the rebuttal

14   report.

15   Q.   All right.  We'll come to that later.

16              MR. GREIM:  But I think without further ado, if

17   we could put up Rebuttal Table 1.  This will be

18   Plaintiffs' Demonstrative 9.

19         I wonder if we can blow that up just a little bit.

20   Thank you.

21   Q.   (BY MR. GREIM) Now, is this a report that you

22   prepared, Dr. Voss, of the results of your simulations?

23   A.   That is the table at the end of the rebuttal report.

24   It reports -- it does not report the simulations done in

25   the original report because by this point I had done them

1   all better.

2   Q.   Ask me about -- I'm sorry.  Don't ask me.  Let me

3   ask you about the two major groups here.  You've got one

4   category called race-neutral, another one called

5   race-conscious.  Just generally speaking, what were you

6   trying to accomplish with each set?

7   A.   Okay.  So the race-neutral simulations are to give

8   you an idea of what would emerge from this process, as a

9   random sample of possible congressional district plans

10  if, in a direct way, the information of each precinct's

11  racial mix is used.  So in that sense, it's race-neutral.

12  The simulation package hasn't even told the racial

13  breakdown and the places to take it into account in any

14  way, shape, or form.  Now, that doesn't mean, to be clear,

15  that it's 100 percent race neutral because some of the

16  things that on the surface are race neutral aren't

17  necessarily in practice.  They may be correlated with

18  race.  But, if so, the software is working indirectly.  It

19  does not have direct information about race.

20  Q.   And then what about the race-conscious?  What were

21  you trying to accomplish there?

22  A.   Okay.  So in some way, shape, or form information

23  that clearly was directly or indirectly racial was used in

24  the simulation.  Either the simulation package was

25  encouraged to try not to break apart certain black

1    populations, or it was instructed to try to avoid breaking

2    apart the districts that were drawn and that I knew were

3    drawn with the intention of being majority black.

4    Q.    Just on that last point, which of those

5    race-conscious simulations is the simulation that tried to

6    avoid breaking up Senate Bill 8, the Senate Bill 8

7    districts?

8    A.    Okay.  So that is the very last of the simulations.

9    So the final row -- and it's called 7-1 -- protect enacted

10    cores.  What we did with that simulation, in addition to

11    other things we haven't discussed yet, is we used the

12    method the ALARM team had used, that Professor McCartan's

13    team had used to try to protect Louisiana's old districts,

14    the 2022 ones, I guess that would be.

15    Q.    I see.  It's not Senate Bill 8.  2022.  I'm sorry,

16    Dr. Voss.  I think I misunderstand you.  You used the

17    method that Dr. McCartan's team used to protect the 2022

18    map on the 2024 map?

19    A.    We used it on the 2024 map, on Senate Bill 8.  And so

20    the idea is, if those districts, if the center, the

21    biggest portions of those districts are the foundation of

22    the majority black nature of the districts or the majority

23    white nature of the districts -- we're talking about the

24    other four -- and we're telling the simulation:  Do

25    everything not to break into the core of those districts,

1   but you can simulate around the edges, you can move around

2   the edges, change the edges, and see what you get.  Okay?

3        If we've told it, try to protect the core of

4   Congressional District 2, the majority black district in

5   the New Orleans area; and try to protect the core of

6   District 6, which is the one that grows out of East Baton

7   Rouge; and also try to protect Julia Letlow's, you know,

8   faded district in the northeast; and the Speaker's faded

9   district in the northwest; and Scalise's district and, you

10  know, your Cajun Triangle, what happens to the racial

11  makeup of the districts?

12       Now, one of two things could be true.  If they are

13  really kind of centered around a majority black

14  population, then the one around the edges should make very

15  little difference and we should keep simulating majority

16  black districts.  If, instead, the perimeters of those

17  districts were heavily shaped by race and that tendril was

18  shaped by race and that bulge was shaped by race, if the

19  edges -- race is what's defining where the edges are --

20  then allowing the software as it simulates and tries to

21  draw compact districts to nibble around the edges could

22  change the racial makeup of the districts fundamentally.

23  Q.   Let me ask you now -- now you've kind of outlined

24  your test, and I won't take you through each simulation

25  here on direct -- but let me ask you:  Did your

1    diagnostics, after you run these, show that each of these

2    simulations had run properly?

3    A.    How high or low a diagnostic score ought to get is

4    another thing that tends to shift around.  But I compared

5    my diagnostic scores -- and there are four of them.

6    It's the middle -- the big column in the middle.  I

7    compared them both to what had been recommended by the

8    software developers as targets, and I also compared them

9    to the scores that were returned when we replicated

10   Dr. McCartan's Louisiana analysis.  And across the board,

11   my simulations met the standards that they indicated in

12   this neutral setting proper simulations ought to meet.

13   Q.    And then the next two columns to the right, what do

14   those indicate?

15   A.    Okay.  So that's the average splits column.  So it's

16   looking at, for each of these sets of districts simulated

17   under the different sets of rules, how many parishes were

18   split in the formation of the districting plans.

19        Now, you may notice that with only two exceptions,

20   either those numbers are low, they're bouncing around the

21   number five, or they're very high, they're splitting

22   around 30 parishes.

23   Q.    Why is that, Dr. Voss?

24   A.    With a baseline use of the software, if you -- you

25   have a choice.  You either break five parishes, more or

1    less, or you tell it:  Don't worry about where the

2    parishes are.  Those are the choices.  And it's a setting

3    you toggle on or off.  So all the ones that have the very

4    low number, it was toggled on.  All the ones that have the

5    very high number, it was toggled off.

6         Now, the reason why it's not exactly five is a quirk

7    of Louisiana geography.  Louisiana has a parish,

8    St. Martin, that's not contiguous.  And the nature of the

9    method is that if you split St. Martin only by breaking

10   off the not-contiguous part, the simulation doesn't count

11   that against its budget of five.  So it's either a very

12   strict or a very loose; you know, like loose to

13   nonexistent frame.

14   Q.   Are there other methods you can use with the software

15   that even though you've got the five-parish split toggled

16   on, you can still basically encourage additional parish

17   splits?

18   A.   Yes.  You can allow the simulation package to fall in

19   between, but that always involves some degree of choice.

20   In other words, specifying ahead of time:  Break these

21   parishes, or don't break those parishes.  So you can

22   freeze things, you can specifically set out areas that

23   cross parish lines to protect.

24        Dr. McCartan and his ALARM team did that in Louisiana

25   when they said "try to protect the core of the 2022

1    districts," right?  So since those 2022 districts crossed

2    parish lines, that opened up more possibilities to break

3    some parishes apart.

4         The two of mine that fell between the extremes --

5    the protect MSA cores and the protect enacted cores --

6    once again, I'm choosing which parishes are on the

7    chopping block versus which ones aren't.  In the first

8    case, I am saying you can nibble around the edges of a

9    metropolitan statistical area, but try to hold the main

10   city together.  In the protect enacted core one, I am

11   saying you can nibble around the edges of the Senate Bill

12   8 districts but try to keep the core areas of the Senate

13   Bill 8 districts together.  So I've chosen some -- I have

14   put on the chopping blocks some parishes.

15   Q.   Dr. Voss, as you add additional constraints to your

16   model, what does that do to the universe of possible

17   plans, generally speaking?

18   A.   The more constraints you add, the harder it becomes

19   for the simulation to generate legitimate maps that are

20   contiguous and that have equal population, and also that

21   meet whatever compactness parameter you have given it.  As

22   you additional constraints, it just gets harder and harder

23   for it to find its way to legitimate maps.  It squeezes it

24   more and more into repetition of the same sorts of

25   patterns, like you see with the real plans.  I mean,

1    there's only a couple of ways to get those two majority

2    black precincts, and most of the plans that I analyzed

3    looked fairly similar to one or the other of the solutions

4    here.

5    Q.   Dr. Voss, at the end of this, what did you conclude

6    regarding number of average districts that the simulations

7    yielded that were majority black?

8    A.   Yes.  If you do any of these race-neutral sorts of

9    simulations that I ran, you're not getting two majority

10   black districts.  Not even once, okay, for most of these

11   methods did I get two majority black districts through

12   these more clean-slate simulation methods.  And it was

13   actually quite rare to get even one.  Even the one based

14   around Orleans Parish gets pretty hard these days because

15   of the changes in the population, the growth in Hispanic

16   population, the growth in the Asian population.  Often I

17   would get zero majority black districts.

18   Q.   And I see the same thing happened even with

19   race-conscious simulations; is that right?

20   A.   Yes.  Now, there -- one of the rebuttals to my sims

21   was that I was not pushing race --

22             (Reporter clarification.)

23             THE WITNESS:  Simulations, S-I-M-S.  I'll try

24   not to do that again.  One of the complaints with my

25   simulations was that I was not pushing race hard enough.

1    You know, given that just today, we've heard some very

2    different definitions of racial gerrymandering, trying to

3    decide the right amount of race consciousness in a way the

4    Court would want was not possible to me as a nonlawyer.

5         So what I was instead trying to do is offer forms of

6    race consciousness that might have been mild, might have

7    been modest, but that I could describe in a way that would

8    make sense to laypeople.  So they at least knew what I had

9    told it and what I had not told it, in terms of trying to

10   draw majority black districts.

11   Q.   Let me ask you about the final column.  You flipped

12   over, it looks like, to a partisan criterion.  Why did you

13   do that and what did you find?

14   A.   My understanding, that I was trying to produce

15   results that would help the Court deciding, is that while

16   we talk about forming majority black congressional

17   districts, often what people want to know is:  Are you

18   forming districts in which black voters would get their

19   representative of choice.  And, therefore, since in

20   Louisiana that tends overwhelmingly to be a democratic

21   candidate, showing you how democratic the district was

22   might have been a metric of interest to people trying to

23   understand the lay of the land, the political geography of

24   the state.

25        Secondly, insofar as one of the goals, as I

1    understood it, was to protect Representative Julia Letlow,

2    who is a Republican -- whether she was put in a

3    Republican district or a Democratic district seemed

4    directly relevant to that political explanation for what's

5    going on in this map.

6    Q.    Did you have any understanding, Dr. Voss, as to

7    whether a second black voting age population majority

8    district would have to be a Democrat-electing district?

9    A.    In no way did I run these race-conscious simulations

10   with party or such political factors as a direct influence

11   on what resulted.

12   Q.    Did you find any plans that randomly yielded two

13   Democratic seats?

14   A.    No, I don't believe I did.

15   Q.    Yet that's what Senate Bill 8 does; is that right?

16   A.    That is correct.

17   Q.    In conclusion, Dr. Voss, if you could point to maybe

18   just one of these simulations that best encapsulates your

19   conclusions, what would that be?

20   A.    I think it's that last one that we already talked

21   about.  I think it's that simulation 7-1 where I used

22   basically the same trick as Dr. McCartan and his ALARM

23   team to try to protect the cores of the Senate Bill 8

24   districts.  Because, you know, the question that you folks

25   seem want answered is, you know:  Are the tendrils

1    predominantly influenced by race?  Are the bulges

2    predominantly influenced by race?  Is the stretched,

3    non-compact nature of the district reflective of the fact

4    that race was the overriding priority in the shaping of

5    the districts?

6        So what it allows you to assess is if we simply ask:

7    within the population of districts that could have been

8    formed around each of these cores, okay, do you

9    continually get, in these simulations, two majority black

10   districts?  If so, then the tendrils are about something

11   else, the bulges are about something else.  Or do you no

12   longer get majority black districts if it's able to take

13   away the tendrils and the bulges.  And what the results

14   clearly showed is that when you simulate districts that

15   are going to mess around the edges of these majority black

16   districts, they stop being majority black districts.

17   Q.   So at the end of the day, as a result of this

18   simulation analysis, Dr. Voss, what did you conclude about

19   your question regarding the compactness of the black

20   population in Louisiana?

21   A.   That the non-compact features of Senate Bill 8 are

22   predominantly explicable by the racial considerations that

23   shape the district.

24       Now, there is one thing you did not ask me about that

25   relates to that conclusion, though, that I would like to

1    make sure I add.  You know, protecting incumbents has been

2    offered multiple times as an explanation as well.  And so

3    for me to say that race is predominant, I only need to

4    show that, when you stop thinking about race, those two

5    districts go away.  There is also the question of:  Do the

6    incumbents go away?  Do you lose the incumbency protection

7    feature of Senate Bill 8 when you do that as well?  And

8    the answer is no.  My simulations, pretty much across the

9    board, were leaving Julia Letlow in a safely Republican

10   district.  Now, not all of them kept her away from the

11   Speaker of the House, but a substantial number did.  And

12   if you have 20,000 choices, you can pick.  They kept her

13   away from the Speaker of the House.  Garret Graves was

14   never as safe, never in such a nice position as Julia

15   Letlow was across these simulations.  Maybe the hardest

16   part is keeping Steve Scalise away from Congressional

17   District 2, but there were simulations that kept him safe

18   as well.  So while I wouldn't say the average not

19   necessarily protected Steve Scalise, options were there.

20        In sum, pursuing the political goals ascribed to

21   Senate Bill 8, my simulations could meet.  Pursuing the

22   racial goal that apparently the Court handed down and that

23   the maps were supposed to accommodate, my simulations

24   could not meet.

25             MR. GREIM:  No further questions.

1          MR. CHAKRABORTY:  Your Honor, I would like to

2    move to strike that last bit of testimony there because

3    nothing in his original reports or his rebuttal reports

4    touch on whether the simulations could be used for these

5    political considerations such, you know, as Dr. Voss was

6    saying, about how they treated, you know, Steve Scalise's

7    district or Julia Letlow's district or anything else.

8    That's not in his report.

9          JUDGE JOSEPH:  Response, Mr. Greim?

10          MR. GREIM:  Well, it is in the rebuttal report.

11    It was not a key feature, but it is -- I guess I could do

12    this with the witness to show you, but pages 17 and

13    through 19 -- actually, pages 18 through 19 consider the

14    question of, in the simulations how often, you know, what

15    Letlow's district often encompasses and what Graves'

16    district often encompasses.  We are using up a lot of time

17    so I am wanting to move --

18          JUDGE JOSEPH:  Right.  Okay.  Are you satisfied

19    with that answer or not?

20          MR. CHAKRABORTY:  I'm not, Your Honor.

21          JUDGE JOSEPH:  You're not satisfied with the

22    answer.

23      Dr. Voss, can you please explain whether your

24    testimony was reflected in your report?

25          THE WITNESS:  Insofar as I did not give them

1     breakdowns of how often the Speaker and Letlow were

2     together in the same district and the like, that is true.

3     I did have a map that showed the most -- if you look at

4     the second-to-last column, there is a single district,

5     single majority black district that resulted, and I did

6     provide that actual map so that anybody who knew where

7     they lived would know where they fell in that particular

8     simulation.  But no, I did not give a breakdown percentage

9     of districts that has Letlow in a Republican location or

10     the like.

11            JUDGE JOSEPH:  Okay.  Thank you, Dr. Voss.

12       You can address those issues in your

13     cross-examination.

14            MR. CHAKRABORTY:  Thanks, Your Honor.

15            JUDGE JOSEPH:  I think I told you 1:00, but I

16     think we're going to go ahead and take our lunch break.

17     It is 12:45 approximately now.  How about we come back at

18     2:00 and start back then with cross-examination of

19     Dr. Voss.

20       Dr. Voss, we're taking a lunch break.  You are still

21     under oath, so I would ask that you not consult with

22     Counsel during the break.  Come back prepared for your

23     cross-examination.

24           (Lunch recess.)

25            JUDGE JOSEPH:  All right.  We're back on the

 1   record now.  Anything we need to discuss before we start

 2   back into evidence?

 3        Mr. Greim, please proceed.

 4             MR. GREIM:  Nothing, Your Honor.

 5             MR. NAIFEH:  Nothing from us, Your Honor.

 6             MR. JONES:  Nothing, Your Honor.  Thank you.

 7             JUDGE JOSEPH:  All right.  Mr. Greim, you're up.

 8   Go ahead.  Oh, wait.  I'm sorry.  Dr. Voss needs to come

 9   back to the witness stand.

10             MR. GREIM:  We ended our questioning of Dr. Voss

11   so we --

12             JUDGE JOSEPH:  You tender him into --

13             MR. GREIM:  Tender him, yes.

14             JUDGE JOSEPH:  Dr. Voss, as I mentioned before

15   the lunch break, you are still under oath, so we don't

16   have to swear you in, and you may answer counsel's

17   questions.

18             MR. CHAKRABORTY:  Thank you, Your Honor.

19                     CROSS-EXAMINATION

20   BY MR. CHAKRABORTY:

21   Q.   Good afternoon, Dr. Voss.

22   A.   Good afternoon.

23   Q.   Good to see you again.  Can you hear me all right?

24   A.   Yes, I can.

25   Q.   Great.  So let me dive right into it.  Dr. Voss,

1    you're not trained as a mapmaker, are you?

2    A.   No.  I'm not a cartographer.

3    Q.   You haven't published articles discussing mapmaking

4    software?

5    A.   No, I have not.

6    Q.   You haven't been hired by a legislature before to

7    draw maps?

8    A.   No, I have not.

9    Q.   You haven't been hired as an expert before to draw

10   maps?

11   A.   No, I have not.

12   Q.   In fact, you haven't been hired as a mapmaker in any

13   professional capacity, correct?

14   A.   I have never worked as a cartographer.

15   Q.   So actual mapmakers need to balance a number of

16   redistricting criteria in creating their maps, right?

17   A.   That is correct.

18   Q.   And the act of balancing those criteria might require

19   trade-offs between one criteria on another, right?

20   A.   Absolutely.

21   Q.   For example, ensuring that communities of interest

22   are protected may require making a map less compact,

23   right?

24   A.   Yes, that is correct.

25   Q.   You didn't speak to any actual mapmakers as part of

1    preparing for this report, did you?

2    A.   No.  I did not consult with people who did this job,

3    no.

4    Q.   You didn't speak to, for example, the person who drew

5    SB8?

6    A.   No, I did not.

7           JUDGE JOSEPH:  And, Dr. Voss, make sure you're

8    speaking up.  The Court can't hear you that well.

9           JUDGE STEWART:  You took the words out of my --

10   even though counsel is close to you and you are looking at

11   him, but do just like you did before that --

12          JUDGE JOSEPH:  Because there's a larger

13   audience.

14          JUDGE STEWART:  Your back is kind of turned.

15          THE WITNESS:  Okay.  Sorry.

16   Q.   (BY MR. CHAKRABORTY) So we were just saying -- you

17   know, you didn't speak to the person who drew SB8, right?

18   A.   I did not.

19   Q.   And so you aren't -- you didn't speak to the person

20   or persons who drew the other maps submitted in the

21   special redistricting session, right?

22          THE REPORTER:  Wait.  Slow down.

23   Q.   (BY MR. CHAKRABORTY) -- in the legislative session,

24   right?

25   A.   I did not.

1    Q.    So you aren't aware, for example, of which
2    redistricting criteria he or she or they used in creating
3    these maps, are you?
4    A.    Only judging that by inference.
5    Q.    Is that a "yes" to my question?
6    A.    So, yes, I did not speak to them.  No, I did not
7    speak to them.
8    Q.    Thank you, Dr. Voss.  You didn't speak to any of the
9    legislators who sponsor SB8?
10   A.    No, I did not.
11   Q.    You didn't speak to any of the legislators who were
12   just here today, did you?
13   A.    No, I did not.
14   Q.    And so you -- when they were considering -- when they
15   got the maps and they were considering what to pass and
16   what not to pass, you aren't aware of which redistricting
17   criteria they chose or did not choose to prioritize, are
18   you?
19   A.    Aside from having Joint Rule 21 available, no, I did
20   not.
21   Q.    So we'll get to Joint Rule 21 in a second.  But I
22   just want to wrap up here.  So you didn't review
23   any videos -- I just want to get a sense of everything you
24   looked at.  You didn't review any videos of the most
25   recent legislative session in preparing your report, did

1    you?

2    A.   No, I did not.

3    Q.   And you wouldn't know, let's say, in a committee

4    hearing on that video if they discussed specific

5    redistricting criteria or priorities in crafting the maps,

6    would you?

7    A.   I did not review that legislative record.

8    Q.   Thank you.  If there were -- one last question on

9    this.  If there were amendments that were submitted,

10   let's say to SB8, you wouldn't have seen those, would you?

11   A.   I did not view that legislative record either.

12   Q.   So it's possible, based on the record you didn't

13   review, that an amendment, for example, could make a map

14   more compact?

15   A.   Yes.  Amendments could have been submitted that would

16   have made more compact maps.

17   Q.   And less compact, right?

18   A.   That is correct.

19   Q.   And so you haven't looked at any of that?

20   A.   I have not.

21   Q.   All right.  Turning to your simulations, we were just

22   discussing before lunch the redist package, right?

23   A.   Correct.

24   Q.   So you were saying the redist package uses an

25   algorithm to simulate maps, right?

1    A.    Yes.

2    Q.    You didn't create that package, right?

3    A.    No, I did not.

4    Q.    You're aware that Dr. McCartan, who you mentioned

5    during your direct, helped create that package, right?

6    A.    I am aware of that.

7    Q.    And you used his package for your analysis, right?

8    A.    That is correct.

9    Q.    You've never worked before with Dr. Imai or

10   Dr. McCartan, have you?

11   A.    No, I have not.

12   Q.    They didn't run through their redist package with

13   you?

14   A.    No, I did not run through it with them.

15   Q.    The simulations that you have proposed here or that

16   are in your report, they haven't -- they didn't help you

17   put those together or put that design together, did they?

18   A.    Only in the sense that the very first sim I ran was

19   directly from Dr. Imai's code, and in that sense he helped

20   me.  I was standing on his shoulders when I did it.  I did

21   not vet what I did by either of them.

22   Q.    Yeah.  So the latter is my question.  Thank you for

23   answering that.

24         And you haven't published articles about the use of

25   simulations -- of map simulations, have you?

1    A.    No, I did not do anything that specific.

2    Q.    You were saying on direct you first used the

3    simulation algorithm yourself, I believe it was in the

4    Kentucky case?

5    A.    That's right.

6    Q.    And in that case, you were called in to Dr. Imai on

7    the simulations?

8    A.    Correct.

9    Q.    And you were called in to look at the simulations he

10    ran and check his code, or something along those lines,

11    right?

12    A.    Well, no.  I ended up running a lot more variants of

13    the simulations than he did.  I ultimately was asked to

14    run simulations.

15    Q.    So this will be the second case in which you've run

16    map simulations; is that right?

17    A.    That is correct.

18    Q.    And that first case, as you were saying, is a case of

19    partisan gerrymandering, right?

20    A.    That is correct.

21    Q.    You've never applied these redist simulations that

22    you were talking about in a racial gerrymandering context,

23    have you?

24    A.    No, I have not.

25    Q.    You're not familiar with any peer-reviewed research

1    about whether it's appropriate to apply map simulation

2    techniques to a racial gerrymandering context, are you?

3    A.    I am certainly aware of articles on the use of

4    simulation with regard to racial redistricting.  The

5    question of which ones were peer-reviewed, I cannot do off

6    top of my head.

7    Q.    So sitting here today, though, you are not currently

8    aware of any peer-reviewed articles or literature about

9    whether it's appropriate to use map simulation techniques

10   in the racial gerrymandering context, are you?

11   A.    Oh, I'm sorry.  In the general sense, I know.  Not

12   this redistricting package.  There are general articles

13   that deal with simulation and racial redistricting, yes.

14   Q.    With respect to the redist package?

15   A.    No, I am not.

16   Q.    Thank you.

17   A.    Thank you.

18   Q.    And you're not familiar with any other expert

19   applying these map simulation techniques in the racial

20   gerrymandering context, are you?

21   A.    Well, I know that Dr. Imai has done --

22   Q.    Sorry.  You're not familiar with their work in a --

23   I think you just said Dr. Imai did it in a partisan

24   gerrymandering context, right?

25   A.    No.  My understanding is he has used it in racial

1    gerrymandering cases.

2    Q.    And you're saying you've looked at that work?

3    A.    No.  I know it exists.  I've read about it.  I did

4    not go probe specifically what he did in those cases.

5    Q.    Got it.  Thank you.

6         So turning to the algorithm itself, or the package

7    itself, the number of possible simulations that the

8    algorithm can generate for a map like Louisiana are close

9    to infinite, right?

10   A.    With no constraints, yes.

11   Q.    With no constraints.  And your analysis consisted of

12   generating several thousand of them for your report,

13   right?

14   A.    Yes.  The rebuttal report, it was 20,000 per set of

15   conditions.

16   Q.    And as you were saying on direct, in designing your

17   simulations, you've put into place a number of simulation

18   constraints, right?

19   A.    That is correct.

20   Q.    And these simulation constraints, they're effectively

21   inputs affecting the kinds of maps that the simulation

22   will produce, right?

23   A.    That is right.  They set the boundaries under which

24   the simulations take place.

25   Q.    And so naturally if you change the simulation

1   constraints that you apply, the maps that will be

2   generated by the simulation will necessarily be different,

3   right?

4   A.   That is correct.  They are a reflection of the

5   parameters under which the simulated maps were drawn.

6   Q.   Similarly, if you change the degree to which you

7   apply your constraints -- so turning up or down a

8   compactness measure, the maps generated by the simulation

9   can be different, right?

10  A.   That is right.  You're not only decide what the

11  constraints are, you decide their strength.

12  Q.   But you recognize that one of the limitations of

13  simulated maps is they may not take into account all of

14  the many unique features of a time and a place that a

15  mapmaker would want to incorporate, right?

16  A.   That is correct.  Things will be left out for sure.

17  Q.   So, for example, what seems possible -- well, not

18  "for example," but what seems possible in a computer

19  simulation might not have been feasible or even desirable

20  in real life, right?

21  A.   I am choking a little bit on the word "feasible."

22  If you mean politically feasible, then, yes, I agree.

23  Q.   Well, I'm actually just quoting from your report,

24  Dr. Voss.  Would you agree that what seems possible in a

25  computer simulation might not have been feasible or even

1    desirable in real life?

2    A.    Okay.  I know what I was referencing there.  The

3    population tolerances required from real maps without

4    splitting precincts may not be achievable with a

5    simulation method.  So if you stopped with these

6    simulations, you may not meet the population goals.  You

7    may have to split -- you probably do in many cases, have

8    to split some precincts to get the right population

9    tolerances.  In that sense, these may not be feasible

10   maps, yeah.

11   Q.    Got it.  So I'm just building off that, but going

12   broader than population, to the extent that simulations

13   are helpful, it would be when the simulation constraints

14   mirror as closely as possible, or the choices that actual

15   mapmakers would use in creating maps in a state, right?

16   A.    I don't think I fully agree with that.  Comparing the

17   real map to a sample that you know to be artificial, to

18   represent a sort of purer version that is not realistic

19   and does not incorporate politics, is informative

20   nonetheless because it gives you a baseline against which

21   to compare the real thing, to know how far the real thing

22   is from that pure circumstance.

23   Q.    But it's a baseline untethered to real choices made

24   by actual mapmakers, right?

25   A.    That is correct.  And for sure, if you have created

1    those simulations under a fairly simple sort of lab-grown

2    situation, the laypeople who are asked to, you know,

3    interpret that comparison should understand those

4    limitations, yes.

5    Q.    Got it.  So you were just mentioning a second ago

6    Joint Rule 21.  That's the statute outlining the criteria

7    that the Legislature must use when creating maps, right?

8    A.    I believe that is an actual legal characterization of

9    it, yes.

10   Q.    To your understanding, that's what that is?

11   A.    To my understanding, yes.

12   Q.    And so you reviewed Joint Rule 21 before you created

13   the initial report and the rebuttal report, right?

14   A.    Yes, I did.

15   Q.    Your simulations don't include all of the

16   considerations referenced in Joint Rule 21, do they?

17   A.    No.  Not every one.

18   Q.    So, for example, Joint Rule 21 mentions respect for

19   the natural geography of the state, right?

20   A.    That is correct.

21   Q.    And you didn't actively impose any geographical

22   features of the state in your simulations, did you?

23   A.    I didn't actively impose them, no.

24   Q.    Joint Rule 21 mentions respect for the established

25   boundaries of municipalities, right?

1    A.    That is correct.

2    Q.    You didn't take into account municipality boundary

3    protection in your simulations, did you?

4    A.    I did not actively impose that, no.

5    Q.    Joint Rule 21 mentions that plans must comply with

6    the Constitution and Section 2 of the Voting Rights Act.

7    So to the extent that compliance with Section 2 requires

8    consideration of race, your simulations don't include

9    that, do they?

10   A.    Some of them clearly do not.  We talked earlier about

11   the VRA constraint that I ran on one of them.  You would

12   be better able to tell me whether that answers your

13   question.

14        And then, of course, one of the maps protected

15   Senate Bill 8's cores.  Again, whether you would say that

16   that's a yes or a no to your question, I am not sure

17   myself.

18   Q.    Put it another way, when you designed the simulation,

19   you didn't have in mind -- when you looked at Joint Rule 1

20   (sic) and you were designing your simulations, you weren't

21   thinking:  How do I incorporate this redistricting

22   criteria that's in Joint Rule 21 in my simulations, were

23   you?

24   A.    With the Joint Rule 21, the actual rules set out

25   there, yes.  But you're talking about the one where it is

1    drawing on constitutional federal laws and rules.  And no,

2    precisely because of my impression that what those mean

3    for this case is under contest, is in contest, is being

4    decided, I was trying to provide useful simulations so

5    that others could apply their interpretations of what the

6    Equal Protection Clause, for example, requires in this,

7    rather than imposing my nonlawyer's interpretation of the

8    Equal Protection Clause.

9    Q.   Okay.  Joint Rule 21 mentions maintaining communities

10   of interest, right?

11   A.   Yes, it does.

12   Q.   You don't know which communities of interest that the

13   Legislature intended to maintain when they drew SB8, do

14   you?

15   A.   No, I do not.  I do know that it mentioned it crossed

16   parish borders, so I understood that they were talking

17   about communities of interest bigger than just within a

18   single parish.

19   Q.   So, for example, if a legislature considered areas

20   served by the same health care centers to be a community

21   of interest worth protecting, your simulations would not

22   have taken that into account, right?

23   A.   That is right.  I did not look at other jurisdictions

24   or other maps.

25   Q.   If the Legislature considered shared industries like

1  agriculture or timber in a particular area to be a

2  community of interest, your simulations wouldn't have

3  captured that criteria within it, right?

4  A.   None of the ones I reported, aside from the

5  metropolitan statistical area.

6  Q.   Well, we'll get to the MSA's in a second.  But the

7  ones that are in your reports.

8  A.   That is correct.

9  Q.   Right.  So actually turning to the metropolitan

10 statistical areas, your initial report includes a count of

11 the -- across different maps how many times they are

12 split, right?

13 A.   That is correct.

14 Q.   And it also includes an account of how many times

15 parishes are split, right?

16 A.   That is correct.

17 Q.   With respect to -- I'm going to take them one by one,

18 but with respect to MSA's --

19      With respect to metropolitan statistical areas, which

20 I'll call MSA's for short, it's possible that they contain

21 within them multiple communities of interest, right?

22 A.   Depending on what type of community of interest you

23 mean, yes, it is certainly possible.

24 Q.   That's a "yes" to my question, Dr. Voss?

25 A.   Some would be contained within; some would span

1    MSA's.  Yes, some of them are within.

2    Q.    So let's take that one by one.  So there would be

3    also some communities of interest that span multiple

4    MSA's.  Let's say two neighboring MSA's, right?

5    A.    That is possible as well.

6    Q.    And so to the extent that there are similar

7    communities of interest across MSA's, uniting those

8    communities of interest may sometimes require splitting

9    those MSA's, right?

10   A.    If you're trying to unite across MSA's, you may have

11   to split MSA's.

12   Q.    And that's the same with parishes.  If there is a

13   community of interest in one parish and a similar one in

14   another, sometimes you have to split the parish to unite

15   them, right?

16   A.    That -- that is true, yes.

17   Q.    You don't know whether the Legislature actually made

18   decisions to split MSA's or certain parishes to unite

19   communities of interest, do you?

20   A.    I do not know what they specifically said they were

21   doing.

22   Q.    So to the extent that they did do those things, the

23   information as to why or how, all that stuff, that's not

24   reflected in your simulations, is it?

25   A.    None of that inside -- inside knowledge is reflected

1    in my simulations.

2    Q.   Joint Rule 21 only contains the minimally acceptable

3    criteria for consideration in a plan, right?

4    A.   I'm unwilling to agree to that because I am not sure

5    that ultimately the maps in place meet all the Joint

6    Rule 21 criteria.  That's why I won't say yes to what you

7    said.

8    Q.   So let me ask that a different way.  You don't

9    believe that Joint Rule 21 constitutes only the minimally

10   acceptable criteria that a legislature may consider?

11   A.   I don't know that all the Joint 21 rules actually

12   were met.  So it can't be a minimum if they --

13        (Reporter clarification.)

14   A.   It cannot -- I am balking at agreeing that it's a

15   minimum if they did not meet that minimum.

16   Q.   Right.  But you just testified a second ago that you

17   have no knowledge of what they consider or and what they

18   didn't consider?

19   A.   No.  But I do know how many times the map actually

20   split parish lines.  I do know that the actual map created

21   two multi-splits.

22   Q.   I understand that.  But you're not -- if you're not

23   familiar with what -- if you're not familiar with how they

24   balanced the criteria that are in Joint Rule 21, you are

25   not in a position right now -- you were just attempting to

1    say they incorporated all of them, they incorporated none

2    of them.  Right?

3    A.   Okay.  I cannot say with precision how much weight

4    they gave to each of those criteria in the Joint Rule 21.

5    I cannot say which criteria outside the joint rule they

6    also did use.

7    Q.   Okay.  Do you know whether -- setting aside your

8    reservations about whether they used it or not, used all

9    of the criteria that were in there or not, do you know

10   whether Joint Rule 21 allows for the Legislature to use

11   additional criteria?

12   A.   My recollection is that it did say something like

13   that, but I don't have it in front of me.

14   Q.   I'm going to pull it up.

15             MR. CHAKRABORTY:  Can we pull up Joint

16   Exhibit 2?  Can we go down to Joint Rule 21(F).  Not (F),

17   (E).

18   Q.   (BY MR. CHAKRABORTY) So do you see there where it

19   says in addition to the criteria specified -- I'll

20   paraphrase a little bit of this Joint Rule -- the

21   minimally acceptable criteria for consideration in a

22   redistricting plan shall be as follows?

23   A.   Yes.

24   Q.   So that contemplates that the Legislature can take

25   into account additional criteria as well, right?

1   A.   Yes.

2   Q.   So your simulations, if they did take into account

3   additional criteria when they were making their maps, that

4   wouldn't account for -- your simulations wouldn't account

5   for that criteria, would it?

6   A.   Not unless it's one that I did include.  I mean, I

7   have things that were not in Joint Rule 21.  But probably

8   not.

9   Q.   Great.  So things like educational differences,

10  socioeconomic differences wouldn't be included, right?

11  A.   Not in any direct way.

12  Q.   Right.  And legislatures -- well, actually I'll move

13  on.

14       Now, you mentioned on direct and just now actually,

15  that your simulations did take into account parish splits,

16  right?

17  A.   Yes, it did, or most of them did.

18  Q.   And almost all of your simulations resulted in parish

19  splits above 29 or below 5, right?

20  A.   That is correct.

21  Q.   Specifically, I think 11 out of the 13 fall into one

22  of those two categories, right?

23  A.   I am willing to accept that.

24  Q.   And your review of the actual plans -- and I think we

25  were, again, running through it a second ago -- both the

1    enacted ones, like SB8 and the ones that were introduced,

2    they indicated that they had -- these real-life maps had

3    parish splits between 13 and 17, right?

4    A.    That is correct.

5    Q.    So the number of parish splits resulting from your

6    simulations, or reflected in them, was not representative

7    of the number of parish splits that actual map-drawers

8    split, actual map-drawers split when creating real-life

9    maps, right?

10   A.    In all but two of the cases, yes.

11   Q.    For the 11 out of the 13, I'm talking about, yeah.

12         (Reporter clarification.)

13   Q.    For the 11 out of the 13, I just mentioned, yes.

14   A.    That is correct.

15   Q.    Great.  Your simulations also take into account a

16   compactness measure, right?

17   A.    That is correct.

18   Q.    And as we were just saying a second ago, if you

19   modulate that up or down, the sample of simulated maps

20   would be different, right?

21   A.    Yes, that is true.

22   Q.    And so you said -- I believe you said on direct, you

23   set the default value of one, right?

24   A.    Yes.  All the ones I reported but one used one.

25   Q.    And you didn't update that between your original map

1   and your rebuttal report, did you?

2   A.   I'm sorry.  Would you repeat that?

3   Q.   You didn't update that between your initial report

4   and rebuttal report, did you, the one compactness measure?

5   A.   One unites the simulations in both reports almost

6   entirely.

7   Q.   Great.  And so if you change that one to let's say

8   .5 or 1.5, I mean, these numbers may not mean anything to

9   us, but --

10          JUDGE JOSEPH:  Mr. Chakraborty, you have to slow

11   down.  You're about to get in trouble again.  Speak as

12   fast as you think you need to speak and then slow it down

13   by one and a half times.  Okay?

14          MR. CHAKRABORTY:  Okay.  Great.

15          JUDGE JOSEPH:  All right.

16          MR. CHAKRABORTY:  Thank you, Your Honor.

17   Q.   (BY MR. CHAKRABORTY) So if you adjusted the number

18   one to .5 or 1.5 for compactness, that would affect or

19   alter the level of compactness seen in the results in your

20   simulations, right?

21   A.   Yes, that's right.  One is the baseline.  Going up to

22   1.5 would be even stricter without smoothing and having

23   more compact all the districts.  And a .5, at least in

24   theory, would allow the districts to be less compact.

25   It doesn't always actually work that way, so it's not so

1    simple that you just adjust the number and the resulting

2    districts come out either more or less compact.

3          If you lower the number -- I didn't actually get to

4    develop the method very far during direct, but it does it

5    one district at a time, okay?  And after you have 10,000

6    or 20,000 of District 1, it goes on to 2, you can actually

7    result in a package that's less compact after having told

8    it to try, to worry less -- I'm sorry.  You can tell it to

9    worry less about compactness and nonetheless result in

10   maps that are more similar and ultimately more compact,

11   because once you've got the one district, how the other

12   ones form around it are impacted.

13   Q.   Thank you, Dr. Voss.

14         So you ran -- you put in the one measure.  It comes

15   back.  The map -- the simulations come back.  And the

16   numbers that came back, the compactness scores, let's say

17   the Polsby-Popper scores, were much higher than those of

18   the enacted maps, right?

19   A.   Yes.  The simulations almost always are drawing more

20   compact maps than the real-life ones.

21   Q.   And once you saw that disparity, you didn't try to --

22   or as reflected in your report, change the compactness

23   measure to more closely resemble historical measures of

24   compactness seen in real-life maps, right?

25   A.   Okay.  If you're talking about just the initial

1    report, all I did there was experiment with lowering the

2    compactness parameter.  It did not actually work, it

3    didn't actually change much; and, therefore, it's probably

4    never even put that one in the report.  Now, in the

5    rebuttal, there were other routes to allowing less compact

6    districts, which was the MSA protection and the core

7    protection.

8    Q.   Sure.  But you didn't change -- again, once you got

9    the initial results, you didn't change the one default

10   value to go:  Well, let me adjust this to see if I can

11   replicate what real-life maps -- how compact real-life

12   maps actually are.  Right?

13   A.   I think the answer is yes, that's right.  As I said,

14   I tried lowering the compactness parameter.  It didn't

15   perform.  The results were less efficient.  The maps were

16   not actually notably less compact.  I gave up that route.

17   And only later, which meant "later" being the rebuttal

18   report, did I have time to experiment with those other

19   less direct ways of adjusting the compactness.

20   Q.   So is that a "yes" to my question, Dr. Voss?

21   A.   I said that I think it was a "yes" to your question.

22   Q.   Right.  And when you looked at the actual enacted

23   plans, the ones that were up a second ago, I believe the

24   2020 and the 2022 maps have Polsby-Popper scores of .14,

25   right?

1    A.    Well, again, if you don't show it to me, I can't

2    agree to .14 but --

3    Q.    I'm going to show it to you.  So this is P-32 at 6.

4    A.    There's a .14 on the Polsby-Popper, yes.

5    Q.    Great.  And SB8 had a score of .11?

6    A.    SB8's the 2024 enacted and it had a score of .11,

7    yes.

8    Q.    So the difference between those -- to ask an obvious

9    question -- is .3, right?

10   A.    .03.

11   Q.    .03.  Excuse me.  Yes.

12   A.    Yes.

13   Q.    So you have no basis to evaluate, though, whether an

14   actual mapmaker would find a .03 difference in compactness

15   to be problematic, would you?

16   A.    No.  I have no way to judge whether a real mapmaker

17   would care about that difference.

18   Q.    You have no basis to evaluate whether a court would

19   find that level of difference to be problematic, would

20   you?

21   A.    No.  They have the choice because I presented it.

22   Q.    Is that a "yes" to my question, Dr. Voss?

23   A.    I did not try to choose for the core.

24   Q.    Right.  And as we just discussed actually, when we

25   were talking about trade-offs, you aren't aware of whether

1   the difference in compactness between SB8 and these prior

2   maps could be a result of different choices made by the

3   Legislature in balancing compactness against other

4   criteria, right?

5   A.   No, no.  I actually sharply disagree with that.

6   The whole point of having a series of simulations where

7   different rules were adjusted was, in part, so that you

8   and the Court could observe whether those parts of Joint

9   Rule 21, whether those rules are the reason the

10  compactness difference is so great.

11       So you go from a baseline that has no parish split

12  protection to a simulation that has a parish split

13  protection, and you then can look, how much did the

14  Polsby-Popper range change as a result of that additional

15  protection?  What you will see is that adding a parish

16  protection, even a strict one, with a multi-split

17  constraint so you can't split them more than once any

18  easier than you can split them once, as I fold in those

19  additional parameters that we know about, the compactness

20  is not getting dramatically worse.  So you can look and

21  say, okay, these poor compactness scores they're not

22  caused by the parish protection.  These poor compactness

23  scores, they're not caused by the multi-split protection,

24  and so on.

25  Q.   But you have just said in response to a number of

1   questions that your simulations didn't take into account a

2   number of criteria that actual mapmakers may have taken

3   into account when creating SB8, right?

4   A.   So the ones I did not use, I did not give you that

5   information on, but I should stress some of the ones that

6   you asked me whether I used that I did not use should have

7   made the map performance -- the simulations worse -- in

8   other words, I was trying to see if I could simulate

9   majority black districts -- would have made it harder,

10  not easier, to simulate majority black districts.  So once

11  the more rural free wasn't doing it, adding additional

12  barriers to creating majority black districts would not

13  have helped us at all.

14  Q.   Well, I understand that point.  But if you are -- put

15  another way, if you do not know what choices were made by

16  legislators that created these three maps for the criteria

17  that you did not analyze, because they weren't in your

18  simulations, you don't know whether the .3 difference

19  could be accounted by those, right?

20  A.   Well, that's right.  I was not given, you know,

21  testable hypotheses beyond Joint Rule 21 by Counsel and

22  said would you see what sims would look like if you froze

23  Julia Letlow's old district or things like that.  It can

24  do that.  The method can do that, but I was not asked to,

25  and my report did not do so.

1   Q.   Got it.  Just one less set of questioning, Dr. Voss.

2   You created four sets of simulations that you classified

3   as race-conscious, right?

4   A.   Yes.

5   Q.   These metrics are -- and correct me if I'm wrong --

6   your attempt to measure race in the creation of a map in

7   simulations, right?

8   A.   It was an attempt to introduce some degree of

9   race-consciousness in a way that laypeople could

10  understand.  I am not claiming that it's a heavy-handed

11  introduction of race, race super consciousness.  But

12  since I did not know the border between when race had to

13  be taken into account to satisfy one court versus when

14  race was being too much taken into account, such that it

15  might violate the Equal Protection Clause, I was sort of

16  inching my way along, trying to give different examples of

17  race-consciousness so that it would be available in

18  evidence.

19  Q.   But by "examples," you're talking about different

20  simulation constraints as a way -- as a proxy to measure

21  how race would be introduced into a map, right?

22  A.   Some level of race-consciousness.

23  Q.   And you used these particular metrics because they,

24  as you were saying on direct, are easy to explain to

25  laypeople, right?

1  A.    Yes.  And I would add, though, that at least one of

2  them represented a hypothesis that seemed worth testing.

3  I knew that there had been accusations that the 2022 map

4  resulted in part from splitting the black -- cracking is

5  the -- you know, the sort of jargon term -- cracking the

6  black vote.  So one of them specifically imposed an

7  additional constraint to protect the majority black

8  portions of each parish.  The idea being if the problem

9  with the old map, if the problem with the simulations, the

10  reason they are not generating majority black districts is

11  because the black communities are getting cracked.

12  Maybe not on purpose.  Again, I don't -- I'm not judging

13  motives; I'm inferring outcomes.  Maybe for accidental

14  reasons, even, if that black vote, that black community in

15  each parish is getting divided and, therefore, cracked, I

16  wanted a set of sims where the method was told:  Leave

17  those groups together.  They go in one district or they go

18  in the other.  You don't get to split them apart.

19      So it had a second purpose, which was to test the

20  hypothesis:  Is this cracking of the black communities

21  within parishes part of what's going on, part of what's

22  causing the lack of majority black districts to form.

23  Q.    But directing you back to my question, Dr. Voss, as

24  you explained on direct, the way in which you picked the

25  metrics were so that -- you used these because they were

1   easy to explain to laypeople, right?

2   A.   That was a virtue that I thought all of them had,

3   yes.

4   Q.   And so these particular metrics that you used, they

5   haven't been peer-reviewed by other academics, right?

6   A.   No, they have not been peer-reviewed.

7   Q.   You didn't run these techniques by Dr. Imai or

8   Dr. McCartan?

9   A.   No, I did not.

10  Q.   You haven't seen any other legislators -- excuse

11  me -- any other experts use these metrics, right?

12  A.   No, I have not.

13  Q.   And you haven't seen any Legislature use them before,

14  right?

15  A.   Other than these communities that I told it not to

16  crack often were near municipalities, no.

17  Q.   So you don't know whether actual mapmakers who

18  drafted SB8 or just generally rely on these kinds of

19  metrics to actually consider race when they're drafting a

20  map, right?

21  A.   I'm mostly willing to agree with that, although,

22  once again, if you look at maps, they tend to group those

23  communities.  The SB8 maps tend to group the communities

24  that I told the sims not to crack, for example.  There are

25  signs they're used, but I can't put a weight on how

1    important those things were compared to the Joint Rule 21.

2    I can't give you the weights of all of these different

3    criteria that they thought they were using, chose to use.

4    When something emerges out of a legislature, you know, a

5    legislature doesn't have one mind.  It doesn't have one

6    goal.  The legislative record usually is in conflict all

7    by itself.

8    Q.   Right.  So that's a "yes" to my question, you don't

9    know if the mapmakers who drafted SB8 relied on your

10   specific metrics to take into account race when drafting

11   maps?

12   A.   And my maybe too-lengthy answer is:  I know what I

13   can infer from what I see, but I have no inside knowledge.

14   Q.   Great.  Thank you.

15           MR. CHAKRABORTY:  No further questions.

16           JUDGE JOSEPH:  Dr. Voss, a quick point of

17   clarification.  You testified that you did not include

18   municipal lines in your simulations.  What would have been

19   the effect on the outcome of your simulations had you

20   included those lines?

21           THE WITNESS:  Okay.  First, insofar as I am

22   using the simulations to see if I can get majority black

23   districts to form in some kind of organic sense, it would

24   have only made it harder, okay, only made it harder.

25       Second, you know, I looked at that Louisiana ALARM

1    simulation that Dr. McCartan's team did to see how they

2    handled municipalities.  And they only dealt with those

3    when cities were very large, okay, very large metropolitan

4    areas.  And none of Louisiana's cities were big enough to

5    kick in that municipality constraint.

6    Q.   Is there any city in Louisiana large enough to be a

7    its own congressional district?

8    A.   Now, if you're talking about the central

9    county/parish, no.  If you're talking the greater

10   metropolitan area, yes.  In fact, just Orleans Parish and

11   Jefferson Parish by themselves are too big for a

12   congressional district.

13   Q.   But other than that, none?

14   A.   Baton Rouge -- I forget if I checked to see if you

15   could get a single congressional district for Baton Rouge.

16   I am doubting it, but I did not check that, Your Honor.

17                          CROSS-EXAMINATION

18   BY MR. TORCHINSKY:

19   Q.   Dr. Voss, Jason Torchinsky on behalf of the State.

20   I have just a couple of questions for you.

21        You mentioned Joint Legislative Rule 21 in your

22   report.  Do you know which session of the Louisiana

23   Legislature adopted that rule?

24   A.   I saw the date on it.  I believe it preceded

25   Senate Bill 8.

1    Q.    Did it precede House Bill 1?

2    A.    I can't recall right now.

3    Q.    Are you familiar with whether legislative rules are

4    binding on future legislatures?

5    A.    I would assume no.  And, in fact, one of my answers

6    previously was hedging for precisely that reason.

7    Q.    When you evaluated SB8, did you review the call for

8    the Special Session?

9    A.    I did look at that.  I don't have good recall of it,

10    though.

11    Q.    Did you review the Governor's statement upon the

12    opening of the Special Session?

13    A.    Again, I looked at that a while ago, but I would not

14    say it was directly incorporated in my analysis.

15    Q.    Did you have any understanding that the Governor

16    called the Special Session to respect the decision of the

17    *Robinson* court?

18    A.    I understood that the *Robinson* court was the catalyst

19    for the whole process, yes.

20    Q.    And what is your understanding of what the *Robinson*

21    court required?

22    A.    I'm not a lawyer; I can't judge.  I had been told

23    that the perception was the State was being forced to draw

24    two majority black districts.

25    Q.    Okay.

1   A.    And let me say, so all of my analysis was contingent

2   on that having been the target.

3   Q.    Okay.  The redist algorithm, does it allow you to

4   include other constraints beyond the compactness and the

5   splits that you imposed?  In other words, are there pieces

6   of that algorithm that you could have chosen to add in

7   that you didn't?

8   A.    Yes, indeed.  One of them is to protect double

9   bunking, as it's called, of incumbents, to prevent two

10  incumbents from appearing in the same district.

11  Q.    Okay.  And does it allow you to specify which

12  incumbents not to pair?

13  A.    Perhaps.  I did not explore it to that level.  And

14  the reason is, in thinking about whether to use that

15  parameter, I decided it would be inappropriate.

16  Louisiana has only one Democrat right now.  The rest are

17  Republicans.  So instructing the algorithm to protect

18  incumbents would for sure have made it harder, not easier,

19  to produce two majority-black districts.  And since that

20  was the primary question, once again, as with the

21  municipalities, I didn't add additional burdens to the

22  simulation method that would have made it even harder to

23  come up with the target, which was two majority-black

24  districts.

25  Q.    Got it.  So the simulation wasn't able to, for

1    example, incorporate political constraints that

2    legislators might see, which is, say, not pairing Speaker

3    Johnson and Julia Letlow, and protecting a district for

4    Julia Letlow, the simulation can't incorporate a command

5    like that?

6    A.    Well, at some level, I think it could.  I don't know

7    how much I would have needed to change, but I was -- you

8    know, the goal of this method is it try to come up with

9    representative districts.  When you start imposing

10   something like that, I want representative districts that

11   are unrepresentative because I want to chop out all of the

12   ones that combine -- it's not obvious that the better way

13   to get a representative sample is to stick that into the

14   algorithm, into the process, as opposed to just generate

15   the maps and then only focus on the ones that meet some

16   additional hard criterion like make sure Julia Letlow's

17   precinct is not in the second majority-black district.

18   Q.    So let me ask you this.  When you say "representative

19   districts," are you drawing representative districts that

20   are representative of what an actual legislature might

21   consider, or are you drawing basically representative

22   criteria that come up with the range of maps that meet

23   with the constraints that you have programmed into the

24   simulation?

25   A.    The latter.  It is maps representative of the rules

1  everybody has been told were shaping the process by the

2  algorithm.

3  Q.   So given your background as sort of a political

4  scientist and then your background in studying government

5  and, frankly, your background in legislature, is it your

6  understanding that the political bodies like legislatures

7  consider political concerns when making redistricting

8  decisions?

9  A.   No.  I know they do.  I mean, down to the point of --

10  I've heard cases, I think in Louisiana, where legislators

11  wanted a precinct in their district because their

12  grandmother lived there.

13  Q.   Would the Legislative consider something like the

14  parish in which the Speaker of the House lives when

15  drawing districts?

16  A.   Absolutely.

17  Q.   How about the home address of the House majority

18  leader?

19  A.   Absolutely.

20  Q.   How about the home address of the member serving on

21  the Appropriations Committee?

22  A.   Absolutely.

23  Q.   So would a legislature consider the regional

24  representation?  In other words, could the legislature

25  have said, or the legislator who introduced the bill said:

1   I want to make sure that I protect the two incumbents in

2   North Louisiana?

3   A.   Yes, you can do that.

4   Q.   And were any of those considerations programmed into

5   the simulations?

6   A.   No.  Once again, the simulations may have met those

7   criteria; you've got 20,000 of them.  But I did not

8   restrict the simulation method to only try to pick among

9   the ones that always had those criteria met.

10  Q.   Great.  Thank you.

11          MR. TORCHINSKY:  I don't have any further

12  questions, Your Honor.

13          JUDGE JOSEPH:  Does the Secretary have any

14  questions?

15          MR. STRACH:  No, Your Honor.

16          JUDGE JOSEPH:  Any redirect of Dr. Voss?

17          MR. GREIM:  I do have one question.

18                   REDIRECT EXAMINATION

19  BY MR. GREIM:

20  Q.   Dr. Voss, you were asked many, many questions about

21  whether you knew what was in the head of the legislators

22  when they were drafting SB8.  I think you said you didn't

23  know.

24      I guess my question to you is:  Does the

25  effectiveness of your simulation for answering the

1  questions that you've been asked depend on knowing what

2  was in the legislators' heads when they were drafting SB8?

3  A.   No.  The main use of simulation in a racial

4  redistricting case is so you don't have to fully rely on

5  insider knowledge.  I mean, especially when it comes to

6  race, often the problem is that you can't observe all the

7  motives that are at play.

8      The benefit of simulation in a racial redistricting

9  case is because you need to infer what was going on from

10  the data, from the map.  And having those lab-grown, if

11  you will, relatively pure simulations lets you compare the

12  real world, the outcome to the ones that clearly could not

13  have had those considerations because the algorithm wasn't

14  allowed to take them into account.

15  Q.   Okay.  Well, now I have a second question.  You were

16  asked by the State about some of these political factors,

17  the double bunking, I think as you said.  I have never

18  heard that before, but I kind of enjoy that statement.

19      Do you have any concern that failing to run

20  simulations on those political factors might have missed a

21  nudge that, something that would have nudged these plans

22  toward a two black majority-minority district plan?

23  A.   Yes.  Trying to run the simulations with that

24  additional criteria of split apart, you know, protect

25  five Republicans, would have made it only harder to come

1   up with two majority black districts, given that I wasn't

2   finding any anyway in much simpler, much purer

3   simulations, making it even harder by adding an incumbency

4   protection simulation made no sense.

5       But it's not as though the simulations were always

6   throwing Julia Letlow either in with the Speaker of the

7   House or into the majority black district.  There clearly

8   were many, many versions where that did not happen.  And a

9   legislature doesn't need to adopt 10,000 or 5,000 maps,

10  you know, it only needs one.  And the districts that met

11  those political criteria were there in every batch of

12  simulations.

13      There's a different way to put this.  You could meet

14  the political goals without needing to draw two majority

15  black districts.  Now, once you are trying to draw two

16  majority black districts, it then became very difficult to

17  meet the political goals.

18          MR. GREIM:  No further questions.

19          JUDGE JOSEPH:  All right, Dr. Voss.  Thank you

20  for your testimony.  You may step down.

21          MR. GREIM:  Your Honor, the next thing that we

22  are going to do here, I think, is play the transcript

23  sections.  We intended to do those earlier but I wanted to

24  try to use the lunch hour appropriately, so I think we

25  will do it now.

 1          Just so everyone knows, I think these total about 35

 2    minutes long.  When these end, this is this -- we're back

 3    to this issue with not having a witness to cover

 4    ourselves.  But Dr. McCartan, who has already been

 5    mentioned a lot, he'll go.  And so I think that will close

 6    out our day, and then we'll do Hefner tomorrow.  So that's

 7    just a roadmap.

 8          JUDGE JOSEPH:  Is Hefner the only witness you

 9    have left?

10          MR. GREIM:  Other than Overholt, whose testimony

11    depends on Fairfax.

12          JUDGE JOSEPH:  Right.  Overholt is the one that

13    we ruled on this morning?

14          MR. GREIM:  That's right.

15          JUDGE JOSEPH:  Very good.  We will listen to

16    this transcript and then we'll take our afternoon break,

17    and then we'll proceed with the Robinson intervenors'

18    witnesses.

19          (Audio of transcript sections played.)

20          MR. GREIM:  That concludes the transcript

21    sections.

22          JUDGE JOSEPH:  Thank you, Mr. Greim.  How about

23    we take a 15-minute break.  Then we will pause the

24    plaintiffs' case and call a defense witness.

25          (Recess.)

 1                  JUDGE JOSEPH:  Let's address the administrative

 2      matter we had real quick before the break.  We had talked

 3      about the audio transcript that was played by plaintiffs'

 4      counsel prior to the break, whether that was going to be

 5      entered into evidence or as a demonstrative exhibit.

 6          I think the larger point here is that we need to make

 7      sure -- for example, the things that the expert, the

 8      summary charge the expert prepared, if you want it to be

 9      in the record, it needs to be entered into evidence.  The

10      demonstrative is just for our benefit, for us to see.  So

11      I'll give you a chance to do that and clean that up later.

12      But I was -- I think we are all a little bit surprised

13      that that wasn't entered into evidence for the record.

14      And so the same for the audio clip.  You can attach --

15      maybe attach that as an appendage to the previously

16      entered transcript.  That's what Judge Stewart I think

17      recommended.

18                  MR. GREIM:  So we discussed -- first of all,

19      thank you, Your Honor.  That same thought occurred to me

20      about the file as I was sitting here.  And I appreciate

21      that.  I mean I think we would like to -- I think we would

22      like to make sure the record is clear on, not every

23      demonstrative, but a couple of the charts.

24          The other thing I would say is:  We conferred and

25      we're back to the plan we started with a couple of weeks

 1   ago, which is, you will be getting a joint exhibit that

 2   has the video and audio with basically everything.

 3           JUDGE JOSEPH:  Okay.

 4           MR. GREIM:  We wanted to try to piece it all

 5   together.  Now what I will do is I will offer what we

 6   played.  If for some reason you're curious what we just

 7   designated, we will just call that Plaintiffs'

 8   Demonstrative 10.  But we don't -- there doesn't have to

 9   be a record of that moving up.  You will have a record --

10   everyone will have a record of the video and audio.

11           JUDGE JOSEPH:  And that will be video/audio of

12   all the legislative history behind this bill?

13           MR. GREIM:  Well, it will -- yes, it will --

14   that's right.

15           JUDGE JOSEPH:  It will be what the parties wish

16   to enter from that?

17           MR. GREIM:  That's right.

18           JUDGE JOSEPH:  Okay.

19           MR. TORCHINSKY:  Your Honor, let me add, I think

20   what we agreed to do was submit individual designations of

21   where on the audio and video files that the intervenors

22   were going to submit, that each of us can then submit a

23   document that says these are the audio clips we played in

24   the courtroom.  You know, for example, Senator Womack's

25   statement on the floor of the house, we were going to play

1  that.  They've already played that.  We will designate

2  that on our end.  We have a clip from the Governor from

3  the legislative session from his opening speech that we

4  want to add.  So play it in the courtroom and then we'll

5  submit a designation that tells you kind of where in the

6  audio/video file that the intervenors are submitting it's

7  going to be.

8          JUDGE JOSEPH:  Sounds perfect.

9          MR. TORCHINKSKY:  That's my understanding of

10  what we agreed to.

11          JUDGE JOSEPH:  That will make things much more

12  clear for us.

13          MR. TORCHINSKY:  Thank you, Your Honor.

14          MR. NAIFEH:  And I have nothing to add.  We

15  already have the video on our exhibit list, so we'll just

16  move it in at some point when we start our case-in-chief.

17          JUDGE JOSEPH:  Secretary, anything to say?

18          MR. STRACH:  I'm going to exhaust you with "We

19  have nothing to add."

20          MS. ROHANI:  Good afternoon, Your Honors.

21  Sara Rohani, counsel for the Robinson intervenors.  And

22  the intervenors call Dr. Cory McCartan to the stand.

23          (Oath administered to the witness.)

24                  <u>CORY MCCARTAN</u>,

25  having been first duly sworn to testify the truth, the

1    whole truth, and nothing but the truth, testified as

2    follows:

3                        DIRECT EXAMINATION

4    BY MS. ROHANI:

5    Q.   Good afternoon, Dr. McCartan.  Can you please state

6    and spell your name for the record.

7    A.   Cory McCartan.  C-O-R-Y, M-c-C-A-R-T-A-N.

8              JUDGE STEWART:  Raise your mic up or use your

9    theatre voice, one.

10             THE WITNESS:  Yes, Your Honor.

11   Q.   (BY MS. ROHANI) Thank you for joining us,

12   Dr. McCartan.  Dr. McCartan, what is your educational

13   background?

14   A.   I have a bachelor's degree in math from Grinnell

15   College and a master's and Ph.D. in statistics from

16   Harvard University.

17   Q.   And can you very briefly walk us through your

18   academic positions?

19   A.   Sure.  I am currently a faculty fellow, data science

20   assistant professor at the Center for Data Science at

21   New York University.  In July, I will start on the tenure

22   track as an assistant professor of statistics at Penn

23   State.

24   Q.   Thank you.  And what do you consider your areas of

25   expertise and specialization?

1    A.    Sure.  Broadly I study statistics applied to the

2    social sciences, but most of my dissertation work and work

3    since graduating has focused on redistricting

4    specifically, a lot of work in redistricting simulation.

5    Q.    And have you relied on these areas of expertise and

6    specialization for the analyses that you conducted in this

7    case?

8    A.    I have.

9    Q.    And have you written any peer-reviewed articles?

10   A.    Yes.  A dozen or so.

11   Q.    And what topics have those peer-reviewed articles

12   generally covered?

13   A.    Many of them have covered redistricting simulations,

14   studies that use those simulations to answer questions in

15   political science or demography or privacy.

16   Q.    Have you ever actually previously provided expert

17   opinions in federal voting and redistricting cases?

18   A.    I have.

19   Q.    And in how many of those cases have you testified at

20   trial?

21   A.    Two.

22   Q.    And in what areas have you testified in before?

23   A.    One of them involving redistricting and simulations.

24   The other, just computing various numbers about

25   redistricting plans, including compactness.

1  Q.   And for this case, did you rely on the same methods

2  and procedures in those cases and consistent with experts

3  in the field?

4  A.   I did.

5          MS. ROHANI:  Your Honors, the Robinson

6  intervenors tender Dr. McCartan as an expert witness in

7  the field of redistricting and the use of simulations.

8          JUDGE JOSEPH:  Voir dire?

9          MR. GREIM:  No objection.

10          JUDGE JOSEPH:  Any objection to his

11  qualifications?

12          MR. GREIM:  None.

13          JUDGE JOSEPH:  Without objection, the expert is

14  so qualified.

15  Q.   (BY MS. ROHANI) Dr. McCartan, I'd like turn to your

16  role in this case.  Who were you retained by?

17  A.   I was retained by the NAACP Legal Defense Fund.

18  Q.   And what is the Legal Defense Fund's role in this

19  case?

20  A.   I understand that they are counsel for the

21  intervenors.

22  Q.   Can you describe to the Court what you were asked to

23  opine on?

24  A.   Sure.  I was provided with a copy of Dr. Voss's

25  reports and asked to study the evidence there including

1    the simulations that he did, to what extent those

2    simulations have supported his conclusions.

3    Q.    And what software did Dr. Voss use to conduct the

4    analysis in his report?

5    A.    He used the redist software.

6    Q.    And what is the redist software?

7    A.    This is software that I developed, along with some of

8    my collaborators to do redistricting simulations and

9    analyze redistricting plans.

10   Q.    And are there peer-reviewed articles about the work

11   you have done in creating this software?

12   A.    Yes.  So one of the main algorithms that is part of

13   this redist software is the Sequential Monte Carlo or SMC

14   algorithm that I developed in a paper with Kosuke Imai.

15   And that's peer reviewed and published at the "Annals of

16   Applied Statistics."

17   Q.    Thank you.  And are you aware of any map that has

18   been drawn using simulations?

19   A.    I am not.  I think when you're drawing a map, you're

20   really trying to take a number of criteria and draw the

21   best map possible according to those criteria.

22         Redistricting simulations are more of an analytical

23   tool to help understand maybe the range of certain

24   features of plans or things of that nature.  And so even

25   though I believe obviously a lot in the value of

1   redistricting simulations broadly, they haven't really

2   played a role in map drawing specifically.  And that's,

3   appropriate.

4   Q.   Thank you.  So, Dr. McCartan, I'd like to begin by

5   discussing simulation analyses generally.  Can you tell me

6   what do simulations attempt to do?

7   A.   Sure.  So what simulations do is -- well, it's right

8   there in the name really.  They're trying to simulate what

9   might have happened or what would have come out of a map

10  drawing process that followed certain criteria or

11  constraints provided by the analyst.  And so they generate

12  a large number of random redistricting plans that are

13  supposed to be representative of all the plans that meet

14  those criteria or constraints.

15  Q.   And when applied properly, what kinds of questions or

16  simulations best suited to answer?

17  A.   Yeah.  So the way that they've mostly been used and I

18  think that they were sort of designed primarily to answer

19  as questions from measuring maybe the impact or the

20  presence of a certain factor.  And the way that works is

21  by taking a plan in the real world that you want to study

22  and if you want to see whether or not a certain factor is

23  present, creating simulations that use all the same

24  considerations used to draw that real world map except for

25  the one factor you're trying to measure.  And by just

1   removing that one piece and creating a whole bunch of

2   examples of what plans would look like without that piece

3   and then comparing, you can determine whether or not that

4   factor and to what extent it's present.

5   Q.   And are there some questions that are more difficult

6   to answer using simulations than others?

7   A.   Sure.  So the simulation tools excel in making --

8   following certain criteria and prioritizing certain

9   considerations, for instance, compactness.  So if you're

10  trying to ask them to produce examples of plans that

11  involve more complicated constraints, that might be harder

12  to use using simulations.  The big thing, as I mentioned,

13  is that simulations really sort of provide a

14  representative sample like a poll.  It really is telling

15  you sort of what's -- sorry.  They provide a

16  representative sample, like a poll, trying to tell you

17  what's typical, what's average in the population.  And so

18  because of that, they're really less well suited to answer

19  questions about what's possible, what's the best we can

20  do, what's the most we could push something in one

21  direction.  They're not trying to explore the very edges,

22  if you will, on the very extremes of all the different

23  plan configurations but really sort of give you what's

24  typical.

25  Q.   Thank you.  And did you hear Dr. Voss say that

1  including a constraint like incumbent protection that

2  legislatures do consider would make the simulation

3  analyses less representative?

4  A.   I did hear that.

5  Q.   And do you agree with that statement?

6  A.   No.  I think in trying to measure, for instance, what

7  role, if any, race played or the size of the effect that

8  race played, as I said, it's very important to make an

9  apples to apples comparison where the only thing you're

10 changing is whether or not a certain factor enters the

11 picture.  So all the other factors -- in this case that

12 are not race -- should be included.  And so for example,

13 the legislature considered incumbent protection and you

14 did not, then your simulations are no longer

15 representative of what the Legislature might have drawn

16 with or without race because they did include incumbent

17 protection.

18 Q.   Thank you.  So just at the base level, what in your

19 opinion are the value of simulation analyses when used

20 properly?

21 A.   When used properly, they can provide evidence that a

22 factor has been used in the drawing of particular plans.

23 Q.   Thank you.  So can you describe an academic project

24 where you used these techniques to answer a redistricting

25 question like the ones that you just described,

1    redistricting questions that the simulations are well

2    suited for?

3    A.    Sure.  So one project that I helped lead is with a

4    research group involved looking at to what extent

5    partisanship played a role in the drawing of congressional

6    districts following the 2020 census, and if so, how big

7    were those effects.  So that involved us going to all 50

8    states or the 40-odd that have more than one district.

9    Collecting the actual enacted congressional maps and then

10   also collecting the criteria that they used to draw those

11   maps and performing simulations that used all those

12   criteria except partisan or political considerations.

13   And then by comparing those simulations to the enacted

14   maps, we can measure those partisan effects.

15   Q.    In that project, were you trying to examine whether

16   more than one majority black district could be created in

17   Louisiana consistent with traditional redistricting

18   principles?

19   A.    No.  So as I say, we were really focused on the

20   partisan question.  Obviously the Voting Rights Act is

21   something that impacts how you draw districts in

22   Louisiana.  Our goal was to actually follow the

23   legislature's at the time interpretation of what that

24   meant.  So if a legislature drew, for example, one

25   majority-minority district, then we were going to try to

1    create simulations that also created exactly sort of one

2    majority-minority district.  We didn't spend time or do

3    specific research on whether or not more or fewer would

4    have been possible or if those would have changed, for

5    example, the partisan mentioned.  That just wasn't our

6    focus.

7    Q.   Would the simulation you ran -- would the simulation

8    that you used look like the ones in ALARM if you were

9    trying to answering that previous question?

10   A.   It's hard for me to be sure.  One thing you learn

11   when you do these simulations is just how much can change

12   and how many possibilities are out there.  So I strongly

13   suspect that if I had done a project that specifically

14   looked at the range of possible black majority districts,

15   that the approach would look different and therefore the

16   simulations would have also looked different.

17   Q.   And you included a parameter for compliance with the

18   Voting Rights Act.  What was that intended to do in the

19   ALARM simulations?

20   A.   Yeah.  So specifically we told the algorithm as it's

21   drawing these districts to keep an eye on the black voting

22   age percentage -- or sorry -- the overall minority

23   percentage in the districts and to try to keep that

24   minority percentage higher in the top two minority

25   districts.  So there was no specific threshold; there was

1    nothing you have to cross, a certain percentage.  And that
2    was again I'd say just put in place and calibrated to
3    recreate one majority-minority district on average like we
4    saw in the enacted plan from the legislature.
5    Q.   And earlier today you heard Dr. Voss say that he
6    tried to use the VRA constraint and it didn't make a
7    difference.  Do you agree with that statement?
8    A.   Well, I can't fully agree or disagree.  When I got
9    the reports from Dr. Voss, they didn't really mention
10   this.  The data and code that he turned over didn't
11   include specific uses of this same approach that we did.
12   As we may talk about, there were a couple of other cases
13   where he turned over data and code where what he said in
14   the report didn't match the data and code.  So without
15   sort of going over it myself, I can't really know if
16   that's what he did or that's what he tried.  What I can
17   tell you is in our project, which did have a different
18   purpose, you know, putting in this VRA, you know, these
19   VRA constraints, did have an effect on the black shares in
20   the various districts.  So it would surprise me if there
21   were no such effect here.
22   Q.   Thank you.  So now moving on to some general
23   questions about the opinions Dr. Voss gave in his
24   testimony today.  Did you listen to Dr. Voss's testimony
25   earlier?

1    A.    I did.

2    Q.    Did you review Dr. Voss's reports as well?

3    A.    Yes.

4    Q.    And what parts of Dr. Voss's reports did you review

5    specifically?

6    A.    I focused on reviewing the parts about his simulation

7    analyses.

8    Q.    And again what makes you qualified to assess this

9    part of Dr. Voss's report?

10   A.    Well, as we talked about, Dr. Voss used the software

11   that I wrote, implementing the algorithm that I designed.

12   And not only did I study his reports but also the specific

13   computer code and the data that went into those.  And so I

14   could cross-check and fully examine his simulations and

15   their quality without having to do any additional sort of

16   analysis.

17   Q.    And prior to testifying today, you have reviewed the

18   data and the code that he relied on?

19   A.    Yes.

20   Q.    Did you hear Dr. Voss explain the questions he was

21   trying to answer and can you summarize what you understood

22   that he was trying to do?

23   A.    Sure.  So I saw two main conclusions in Dr. Voss's

24   report and his testimony today.  The first, primarily

25   based on a set of race-neutral simulations, was that

1    Louisiana's African American population is dispersed

2    enough so as not to dominate a compactly drawn

3    congressional district.

4         And then the second conclusion, based more on a set

5    of race-conscious, as he calls it, simulations was that in

6    order to create two black majority districts, that would

7    require extreme racial gerrymandering in Louisiana.

8    Q.   And based on that review, do you believe that his

9    simulations were set up to answer either of those

10   questions?

11   A.   I don't.

12   Q.   And why not?

13   A.   So as to the first question, Dr. Voss is asking a

14   question about could a certain population dominate a

15   compactly drawn congressional district.  That's

16   fundamentally a question about possibility.  As I think

17   Dr. Voss himself said, simulations can't prove that

18   something is impossible or isn't.  I mean, I agree with

19   that.  As we talked about, simulations tell you sort of

20   what's typical or what's average.  And so whether or not

21   it's possible to draw a compact district with a certain,

22   you know, demographic feature is not what simulations are

23   designed to do.

24        As for whether extreme racial gerrymandering is

25   required to produce two black district, as we may talk

1   about, the so-called race-conscious simulations didn't

2   incorporate racial information very much and/or at all in

3   some cases.  And so there's a very big difference between

4   saying that a simulation that uses a tiny bit of racial

5   information doesn't produce black districts, and then

6   extrapolating from there to say that if you produce two

7   black districts, it must be extreme racial gerrymandering.

8   There's a whole range in between and that he didn't

9   explore with simulations but maybe could have.  And so

10  neither of his race-conscious or his race-neutral

11  simulations really got at the questions that he was trying

12  to answer.

13  Q.   So now I would like to discuss some more specifics

14  about Dr. Voss' report.  You mentioned earlier that the

15  value of a simulation analysis is to provide a useful

16  comparison to what a map-drawer would create.  Is that a

17  fair characterization?

18  A.   That's right.

19  Q.   Is that also what Dr. Voss refers to as a benchmark?

20  A.   I believe so, yes.

21  Q.   And to clarify, did you do any independent

22  simulations for this case?

23  A.   I did not.  As we talked about, based on both the

24  report and all the code and the data, that was enough for

25  me to evaluate sort of the quality of his simulations.

1        Moreover, as we just talked about, I actually don't

2    think simulations are useful at all for some of these

3    questions, so it wouldn't have been appropriate for me to

4    run my own and for those cases.

5    Q.   Thank you.  And did you reach any ultimate conclusion

6    about whether Dr. Voss's simulations form a useful

7    benchmark in SB8?  I know we just touched on that.

8    Apologies.  For assessing the rule of race in SB8?

9    A.   Yeah.  So among all the simulations he ran -- well

10   let me put it this way.  As we discussed, the simulations

11   are useful for answering a question like the role of race

12   only to the extent that the difference between the enacted

13   map and the simulated plans only involves race.  If other

14   factors are also changing, then you can't be sure whether

15   the differences are because of the racial differences or

16   whether they're because of these other factors.  And it

17   turns out there are a number of differences between

18   Dr. Voss's simulations and the enacted plan in terms of

19   both what criteria are considered and also among the

20   criteria that were considered, what weight was placed on

21   them.  So it's, end of the day, not an apples-to-apples

22   comparison, and that muddies the waters in terms of

23   understanding the role that race played or could play or

24   things of that nature.

25   Q.   Thank you, Dr. McCartan.

1       So let's turn to the criteria that Dr. Voss did not

2   incorporate in his analyses.

3           MS. ROHANI:  Can you please pull up the first

4   slide, which we will mark as -- it's Robinson Intervenors'

5   Demonstrative Number 1 -- No. 2.  My apologies.  The next

6   slide.  Thank you.

7   Q.   (BY MS. ROHANI) So, Dr. McCartan, can you quickly

8   walk us through what this table represents.

9   A.   Sure.  So this is a table from my report.  In

10  Dr. Voss's first report, he did seven different simulation

11  analyses for what he called race-neutral, three

12  race-conscious.  So those are listed in that first column

13  simulation analysis.  And then I've marked in the

14  additional columns various facts about these simulation

15  analyses.  So as we just touched on, none of these

16  analyses uses exactly the same set of criteria, including

17  those specifically listed in Joint Rule 21.  And moreover,

18  among the criteria that were applied, they were not

19  applied in the same manner that the legislature does.  The

20  same weight was not placed on the various criteria.  So

21  that's the first two columns there.

22  Q.   Thank you.  And turning to the column with Joint

23  Rule 21.  For example, did Dr. Voss incorporate any

24  considerations of municipal splits in his analyses?

25  A.   He did not.

1   Q.   And did Dr. Voss incorporate any considerations of

2   natural geography in his simulation analyses?

3   A.   He did not.

4   Q.   And do criteria like municipal splits and following

5   natural geographic boundaries affect compactness?

6   A.   Generally, yes.

7   Q.   And was compactness one of the key objectives of

8   Dr. Voss's report?

9   A.   Yes.  A lot of his conclusions were based

10  specifically around the compactness of districts.

11  Q.   And how did that affect the usefulness of the

12  simulations that he ran?

13  A.   Well, if you're missing certain factors that we know

14  are likely to affect compactness and you're also basing a

15  judgment about the role of race on, for example,

16  differences in compactness or plans that are very compact,

17  so on, then once again you can't tease out how much of

18  that is race and how much of that is failing to include

19  these other considerations.  So it would tend to make the

20  simulations a much less useful benchmark or comparator

21  against SB8.

22  Q.   And did you hear Dr. Voss testify that including

23  various additional criteria from Joint Rule 21 would make

24  it harder to draw majority black districts?

25  A.   I did.

1  Q.    And do you agree with that statement?

2  A.    I don't.  Specifically I don't think he is in the

3  position to know that.  So one of the things you learn

4  when you're designing these algorithms is actually just

5  how many possible plans exist.  Very easy to sort of get

6  locked in to what, you know, a specific enacted plan looks

7  like.  But in a state like Louisiana with, even if you

8  say let's look at all the plans that are exactly equal

9  populations of certain compactness, the number of plans

10  that meet all those criteria is probably bigger than the

11  number of atoms in the entire universe.  So the space is

12  just so unimaginably huge, you really can't know if there

13  is one out there that does or doesn't do something.  And I

14  think Dr. Voss agrees in that he's admitted that you can't

15  prove impossibility, you know, with simulations.  And so I

16  don't think it's -- certainly I wouldn't want to make a

17  conclusion about what effect incorporating additional

18  criteria would or wouldn't have without running that and

19  seeing myself.  That's why we do simulations, is to answer

20  those questions rather than just speculate.  And a number

21  of those considerations may well have influenced things in

22  one direction or another.  So to say categorically that

23  the effect was to make it harder to draw black majority

24  districts I don't think is accurate.

25  Q.    Thank you.

1          MS. ROHANI:  Can you please turn to slide 3,

2    which will be Robinson Intervenors' Demonstrative 3.

3    Great.  Thank you.

4    Q.   (BY MS. ROHANI) Dr. McCartan, I would like to turn to

5    the few traditional redistricting principles Dr. Voss did

6    consider in his analyses.  So can you walk us through what

7    this figure demonstrates?

8    A.   Sure.  So, overall this figure is visualizing the

9    compactness of both various plans the legislature has

10   enacted as well as the compactness of all the plans that

11   Dr. Voss simulated.  So there are sort of seven rows, each

12   corresponding to one of the analyses that he ran.  And

13   these are sort of, they're called box and whisker plots.

14   The horizontal line reflects the range of compactness

15   scores that we see across all of his 10,000 simulations.

16   So this is the Polsby-Popper compactness that he testified

17   about earlier.  And that middle colored box overlaps sort

18   of the middle 50 percent of those scores.  Then the

19   vertical lines are labeled with the compactness scores of

20   the last three plans the legislature has enacted,

21   including SB8.  So looking at this you can see that the

22   range of compactness in all of the simulated plans is more

23   compact than any of these three plans that the legislature

24   has enacted in the past.

25   Q.   And what does that demonstrate to you?

1   A.   Well, certainly that the weight the legislature

2   placed on compactness in drawing those three plans was

3   less than the weight that Dr. Voss placed on compactness

4   in generating his simulations to the extent that the

5   simulations don't resemble those plans at all in terms of

6   compactness.

7   Q.   Thank you.  So let's move on to discussing parish

8   splits.

9        MS. ROHANI:  Can you go to next side, please,

10  which would be Robinson Intervenor's Demonstrative 4, I

11  believe.  Thank you.

12  Q.   (BY MS. ROHANI) Did you hear Dr. Voss discuss what he

13  calls a baseline?

14  A.   A baseline simulation, I think so, yes.

15  Q.   And do you know how he described that?

16  A.   Well, I think he ran two baseline simulations, one

17  the original, and then one in the rebuttal report.  In the

18  original report, the baseline simulation was described as

19  districts that met the bare bones criteria, so population

20  equality, contiguity, and a like compactness pressure.

21  Q.   And in Dr. Voss's second baseline -- actually first,

22  would you mind walking us through the table very quickly

23  or the chart figure?

24  A.   Sure.  So this is kind of analogous to the last one.

25  There is seven rows, one for each of the analyses.  And

1   here we are drawing boxes that correspond to what fraction

2   of Dr. Voss's simulated plans have a certain number of

3   parish splits.  So, for instance, looking at the biggest

4   box in the first row, 54.2 percent of the baseline

5   simulations split five parishes.

6   Q.   In Dr. Voss's second baseline, he didn't include any

7   split constraints?

8   A.   Well, so that's correct.  And actually so when we

9   were talking about what Dr. Voss included in the baseline

10  simulation, what I described there, as I said, was what

11  was reported in his first report.  What you can see here,

12  though, in this figure summarizing his simulations is

13  that, in fact, the baseline simulations are actually

14  constrained to have no more than six parish splits.  And

15  that isn't just random chance that this happened this way.

16  When I looked at Dr. Voss's code, he had actually turned

17  on a switch to limit the number of parish splits in the

18  baseline simulation even though that was not a criteria

19  that was disclosed or described in the report.

20  Q.   And with the second baseline when he turned off the

21  parish split constraint, what was the effect of that?

22  A.   He has a table, and if I remember, basically the

23  typical number of parish splits in his second baseline

24  actually didn't have the switch flipped, was around 30

25  parish splits.  So that would be off, that would be off

1  this chart.

2          MS. ROHANI:  We can go to the next slide, which

3  I believe is the table that you are talking about from

4  Dr. Voss's rebuttal report.  One more.  Perfect.  Thank

5  you very much.

6  Q.   (BY MS. ROHANI) Is this the table you were referring

7  to?

8  A.   Yes.

9  Q.   Great.  So does it surprise you that the effect of

10  turning off the parish split constraint resulted in the

11  median of 30 splits?

12  A.   No.  If you are not including any information about

13  parishes, then you're likely to split a lot of them.

14  Q.   So if you're not including a criteria, if you are

15  ignoring a constraint, what would happen -- well, actually

16  rather -- what would happen if Dr. Voss had put in

17  criteria that he did not include such as race?

18  A.   Like I say, I don't like to speculate about this

19  stuff because you really don't know.  But certainly it's

20  my experience that changing the criteria can change the

21  simulations, sometimes unpredictably.  So certainly here,

22  turning off this parish constraint went from, you know, no

23  more than 6 on the one hand to an average of 30.  And that

24  would maybe affect not just parish splits but also other

25  measures.  Maybe compactness, maybe BVAP shares.  And so

1   including or not including other consideration, political

2   considerations, geographic considerations, could likewise

3   have big effects on the simulated plans.

4   Q.   Thank you.  And so we will continue with this table

5   and move on to Dr. Voss's race -- what Dr. Voss calls

6   race-conscious simulations.  And I believe -- I'm not sure

7   if I stated, but I believe this is Robinson Intervenors'

8   Demonstrative 5.

9        So, Dr. McCartan, did Dr. Voss perform any

10  race-conscious simulations?

11  A.   He had some simulations that he describes as

12  race-conscious.

13  Q.   And do you agree with that?

14  A.   It's true that some of them include some racial

15  information directly, but I think it's a bit far to call

16  them, you know, really race conscious.  On some cases the

17  amount of racial information provided is basically zero.

18  Q.   And can you describe to the Court the four approaches

19  that Dr. Voss used in his, what he calls race-conscious

20  analyses?

21  A.   Sure.  So looking at Dr. Voss's table, under

22  race-conscious, the analyses are numbered 4, 5, 6, 7.

23  Some of them have multiple versions.  But the 4, 5, 6, 7

24  correspond to the four different approaches.  4, 5, and 6

25  all use the same overall strategy.  The strategy there is

1   to sort of at the beginning of the analysis define a set

2   of precincts in the state that are sort of special and

3   grouped together and then instruct the algorithm to avoid

4   splitting those more than once or twice.  So, for example,

5   in Simulations 5-1 and 5-2, Dr. Voss said take all of the

6   majority black precincts in the state and try to assign

7   them to the same district because a majority black

8   precinct in Shreveport and one in New Orleans should be in

9   the same district.  And if you can do that, great, and if

10  not we're going to discourage plans that don't do that.

11  The way that Dr. Voss actually put that instruction into

12  the algorithm meant that if you couldn't satisfy that

13  constraint, that is, if you were to take the black

14  precincts, the majority black precincts in Louisiana and

15  assign them to two or more -- I'm sorry -- three or more

16  districts, once you've done that, now the constraint gets

17  turned off.  There is no additional discouragement of

18  this.  Obviously it's impossible to put all majority black

19  precincts of Louisiana in the same district.  So, for

20  example, that set of statewide black "pop" simulations

21  functionally had very little, if any, racial information.

22  And a similar thing could be said to maybe a slightly less

23  extreme degree about 4 and 6.  These are all various ways

24  of lightly discouraging certain groups of parishes from

25  being split.  But the only way racial information possibly

1    enters is in how these groupings are defined.  And once

2    the groupings are violated more than twice, that

3    encouragement or preference is turned off.

4    Q.    And did this have any effect on the simulated

5    districts?

6    A.    Yeah.  So one thing you can actually do is look at

7    the simulations and say, okay, what -- maybe they didn't

8    produce black majority districts, but what was the black

9    fraction of the population in the district that got the

10   closest.  And you can look at that for, not just the

11   race-conscious simulations, but also the race-neutral.

12   And if these simulations were generally race-conscious,

13   you would hope or expect that the race-conscious

14   simulations would have a higher black share and these

15   districts would have actually been successful at

16   encouraging districts that lump more black voters

17   together.  In fact, the range of black voting age

18   population demographics of these districts was basically

19   the same in all the race-neutral and the race-conscious.

20        So there is really no evidence, at least from his own

21   simulations, that these encouragements in the so-called

22   race-conscious simulations had any actual effect on the

23   demographics of the district.

24   Q.    Thank you.  So let's turn to Dr. Voss's discussion of

25   core areas.  Can you tell us what Dr. Voss -- well,

1  Dr. Voss described the simulations as protecting core

2  areas.  Can you tell us what he did in these simulation

3  analyses?

4  A.   Sure.  So I understand you're referring to this last

5  line?

6  Q.   Correct.  7-1.

7  A.   7-1, protecting enacted cores.  Sure.  So as Dr. Voss

8  mentioned, he used a strategy or an approach that I've

9  used myself in situations where you are trying to

10 incorporate information about the cores of districts into

11 your analysis.  The reason I say approach and not like a

12 specific code or constraint is that there is some analyst

13 leeway in deciding how to set up these cores.  I think the

14 way Dr. Voss described it was:  You have the core and then

15 the simulations are allowed to nibble around the edges.

16 Well, the analyst has choices in how far that nibbling is

17 allowed to happen.  So, when setting up the cores, it's

18 important not to just set them up and press go, but to

19 actually look at a picture, see the cores that were

20 generated and understand if those make substantive sense.

21 Do you think that these cores actually reflect the real

22 live cores of the districts as the legislature, you know,

23 might consider.

24         MS. ROHANI:  Can we go to the slide immediately

25 before this.  And this will be Robinson Intervenors'

1    Demonstrative 6.

2    Q.    (BY MS. ROHANI) So can you explain to me what this

3    map is showing?

4    A.    Sure.  So this is a map I kind of printed off

5    electronically from Dr. Voss's data that he turned over.

6    Specifically this is showing the cores that were used in

7    that simulation that we just talked about, 7-1, the cores

8    that were defined by Dr. Voss and then used in the

9    simulation.

10        So the way this works is the yellow areas are the

11   cores that he defined.  All the precincts there have been

12   glued together.  So once you define them this way, all the

13   simulations he draws will never ever split these yellow

14   areas.  In the blue areas, anything can happen.

15        So what you see when you look at this is CD-2, around

16   New Orleans, and CD-6 stretching across the state there,

17   unlike some of the other districts, there is no big core.

18   There's a couple scattered yellow areas, but there is no

19   sort of central core that defines either of those

20   districts.  That means is, when it comes time to run the

21   simulations, there is no encouragement or cores being

22   protected in that part of the state where those districts

23   are being drawn.  In fact, the cores that are only being

24   protected are the ones there at the edges that I think

25   tend to be whiter than the rest of the state.  And so as

1   far as racial information or race-consciousness that's

2   being applied, there really isn't much being applied at

3   all as far as the cores of CD-2 and CD-6.

4   Q.   And just to confirm, did you hear earlier today

5   Dr. Voss testified that this method in 7-1 of his table

6   protected the cores of CD-2 and CD-6?

7   A.   I did.

8   Q.   And do you agree with that?

9   A.   I don't.  For that sentence to make sense, you'd have

10  to have a core that you defined.  And you can just see

11  here in the picture, there is no core.  There is a couple

12  scattered, you know, conglomerations of precincts that are

13  held together, but no single core for either of those

14  districts.

15  Q.   And did you hear Dr. Voss state earlier today that

16  this --

17          MS. ROHANI:  We can go to the next slide.

18  Apologies.

19  Q.   -- 7-1 at the bottom best encapsulates his

20  conclusions?

21  A.   I did.

22  Q.   And can you tell us what that means about how useful

23  his analyses are?

24  A.   Well, as I say, these protect enacted cores really

25  use hardly any, if at all, racial information especially

1    when it comes to the areas around the challenged CD-2 and

2    CD-6.  So that best encapsulates, you know, his

3    conclusions -- that reinforces for me that none of these

4    race-conscious simulations use that much racial

5    information at all and sort of then go from looking at

6    those to extrapolating all the way out and saying you have

7    to go to extreme racial gerrymandering to generate two

8    black districts.  That's just not supported.  There was no

9    attempt to use simulations in a way that use race in a

10   more conscious way if you would that could have explored

11   anywhere in between a small amount of racial information

12   and extreme racial gerrymandering.

13   Q.   And if Dr. Voss had successfully designed a

14   race-conscious simulation, would that have answered his

15   ultimate question of whether two majority black districts

16   are typical under any race-conscious simulation?

17   A.   It could have possibly.  Of course, that depends on

18   to what extent he incorporated the other criteria and

19   factors, to what extent the benchmark, as we talked about

20   it, is appropriate.  But since he didn't do either of

21   those things, his simulations don't get at that question.

22           MS. ROHANI:  Your Honors, could I have one

23   moment to confer with counsel?

24           JUDGE JOSEPH:  Sure.

25   Q.   (BY MS. ROHANI) Dr. McCartan, could you just

1    summarize the significance of your ultimate conclusions

2    regarding Dr. Voss's testimony?

3    A.    Sure.  So to kind of go back to what I said.

4    There's, to my understanding, two main conclusions he

5    draws.  The first about the compactness of the black

6    population and whether you can draw a compact

7    congressional district that's black majority.  Because the

8    race-neutral simulations don't follow the legislature in

9    applying the various criteria and because they're really

10   measuring what's typical in a race-neutral setting versus

11   what's possible, none of those simulations can answer that

12   first conclusion.

13        As far as the second conclusion, as I said, to make a

14   claim that extreme racial gerrymandering is required to

15   draw two black districts can't really be supported by two

16   sets of simulations that use race zero and a very small

17   amount.

18   Q.    Thank you, Dr. McCartan.  No further questions.

19             MR. GREIM:  Before I start, I have deposition

20   transcripts here.  They're not in the bench book because

21   we didn't designate them.  But I've got eight copies.  I

22   may use them for impeachment so I don't interrupt the flow

23   later.  Shall I distribute these now and I wondered if you

24   might want them?

25             JUDGE JOSEPH:  If you need a copy, grab a copy

1    and give the rest of them to Lisa.

2              MR. TORCHINSKY:  Your Honor, I think, because

3    we're taking this witness out of order, I'm fine if

4    Mr. Greim wants to go before me but I'd like a few minutes

5    to question the witness perhaps after Mr. Greim as long as

6    that's okay with the Court.  It's out of order

7    traditionally because we're on the same side of the V as

8    the intervenors, but I'd like to -- I'm happy to let

9    Mr. Greim go first.

10             JUDGE JOSEPH:  You can go first.  In the

11   meantime, do you have a copy of the deposition transcript

12   of Dr. McCartan?

13             MS. ROHANI:  No, I do not.

14             JUDGE JOSEPH:  You don't have one?

15             MS. ROHANI:  I do not have a printed one.

16   Sorry, Your Honor.

17             JUDGE JOSEPH:  I think he has enough for

18   everybody so we'll hand you one.  And we'll let the State

19   go ahead and --

20             MR. TORCHINSKY:  I just have a few questions.

21                       CROSS-EXAMINATION

22   BY MR. TORCHINSKY:

23   Q.  Dr. McCartan, I'm Jason Torchinsky.  I represent the

24   State.  Are you a demographer?

25   A.  No.

1    Q.    Have you ever been hired by a legislature?

2    A.    No.

3    Q.    Have you ever drawn a map that's been enacted by any

4    legislative body anywhere?

5    A.    No.

6    Q.    How much have you studied Louisiana's political

7    geography?

8    A.    Could you be more specific about "political

9    geography."

10   Q.    Have you examined where white and black population

11   live in the state of Louisiana?

12   A.    Some, yes.

13   Q.    Do you know if there is enough black population in

14   Southeast Louisiana to draw two black districts that are

15   concentrated there?

16   A.    I haven't drawn such a map.  I think -- so I couldn't

17   answer definitively one way or another.

18   Q.    Okay.  So other than the ALARM project -- I want to

19   be clear -- you didn't run your own simulations in

20   Louisiana for this case at all?

21   A.    That's right.

22   Q.    And the ALARM simulation had -- I want to understand:

23   When you ran the ALARM simulation and you said you

24   included a Voting Rights Act constraint, what exactly did

25   that require the simulations to do?

1    A.    Sure.  There was no hard requirement.  It was a

2    pressure or a preference, if you will, for a higher

3    minority share of the top two most minority districts.

4    You can choose how strong to impose that preference, and

5    we adjusted strength such that most of the plans -- almost

6    all the plans -- produced, created one minority-majority

7    district following what we saw as the legislature's

8    choices immediately post census.

9    Q.    So on the ALARM website, when your report presents

10   Louisiana and it shows -- am I correct that it shows an

11   average of one democratic district out of the six of the

12   simulations that you produced?

13   A.    I would have to go look at that again to be sure.

14   Q.    And is it true that on the ALARM website, where you

15   presented your exemplars, there was only democratic

16   district and they were always concentrated in southeastern

17   Louisiana?

18   A.    Once again, I would have to go check the underlying

19   simulations there.

20   Q.    In preparing for your testimony today, you didn't go

21   back and look at what your own simulation project produced

22   for Louisiana?

23   A.    Right.  Because as we talked about, that project was

24   looking at partisan effects, and that's just not a

25   question that I was sure was up for today at trial, so it

1    wouldn't have been relevant for me as far as what I was

2    retained to testify and study on.

3    Q.   But to be clear, you did -- when you testified or

4    when you prepared your report, you said that Joint

5    Legislative Rule 21 sort of underlined what you were doing

6    in the ALARM project; is that right?

7              MS. ROHANI:  Objection, Your Honor.  I would

8    just like to state the questions are leading, and we did

9    not understand this to be a cross-examination of the

10   witness.

11             JUDGE JOSEPH:  Overruled.

12             THE WITNESS:  I'm sorry.  Could you repeat the

13   question?

14   Q.   (BY MR. TORCHINSKY) Yeah.  You discussed Joint

15   Legislative Rule 21 in your report, and I believe in your

16   deposition you said that the ALARM project incorporated

17   the Joint Legislative Rule criteria into the ALARM

18   project; is that right?

19   A.   I don't recall my exact words.  As far as the

20   project, we did our best to incorporate those criteria

21   into the simulations.

22   Q.   Do you have any idea which session of the Louisiana

23   Legislature adopted Joint Legislative Rule 21?

24   A.   After today's earlier testimony, I believe it was the

25   session immediately following the census.

1   Q.   And are you familiar with whether Joint Legislative

2   Rule 21 would have been binding on future legislative

3   sessions in Louisiana?

4   A.   No.

5   Q.   When you were evaluating Dr. Voss's analysis of SB8,

6   did you review the call for the Special Session?

7   A.   Sorry.  What was that?

8   Q.   Did you review the call for the Special Session that

9   produced SB8, the Governor's call?

10  A.   No.

11  Q.   Did you understand that the Governor called the

12  Special Session to respect the decision of the Robinson

13  court?

14  A.   That is my understanding of why SB8 was drawn at a

15  high level, but I don't know anything about how that

16  relates to the Governor's call specifically.

17  Q.   What is your understanding of what the Robinson court

18  required?

19  A.   To be honest, I wasn't involved in that case and

20  don't know the procedural details, but I understand that

21  there was something about the Voting Rights Act was either

22  had been decided or was shortly to be decided.

23  Q.   Does the redistricting algorithm that you helped

24  procure or the redist software package, does it allow you

25  to consider home addresses of incumbents?

1    A.    Yes, you could.  You could do that.

2    Q.    Does it allow you to minimize incumbent pairings?

3    A.    Yes.

4    Q.    Does it allow you to specify avoiding certain

5    incumbent pairings?

6    A.    Sure.

7    Q.    Does it allow you to respect existing districts?

8    A.    There's various ways you could go about doing that

9    with the software.

10   Q.    Does it allow you to specify the number of

11   majority-minority districts it produces in its

12   simulations?

13   A.    No, not directly.

14   Q.    So you didn't incorporate any of that in your

15   evaluation of what Dr. Voss presented, did you?

16   A.    Sorry.  What do you mean by "incorporate in my

17   analysis"?

18   Q.    In other words, I just discussed some of the things

19   that you can do with the redist package.  You didn't apply

20   any of those or try to run any simulations, including any

21   of those factors, when you were evaluating what Dr. Voss

22   did; is that correct?

23   A.    Right.  So for some of Dr. Voss's questions, it would

24   not have been appropriate for me to do simulations.  The

25   others, I was able to evaluate them without running my

1    own.  And note that he also did not incorporate those

2    various political factors in his simulations.

3    Q.   Would you agree that political bodies like

4    legislatures consider political issues and concerns when

5    making decisions like where to actually draw lines?

6    A.   Yes.

7    Q.   And do you think it's appropriate for a legislature

8    to consider, say, the home address of the Speaker of the

9    House when drawing a congressional district?

10   A.   I have not given much thought to my personal views

11   about appropriateness there.

12   Q.   As a political scientist, is it is reasonable to

13   believe that legislatures would consider the address of

14   the Speaker of the House regardless of what your personal

15   views on the issue are?

16   A.   Yes.

17   Q.   And how about respecting the home address of, say,

18   the House Majority Leader when drawing a congressional

19   map?

20   A.   Yes.

21   Q.   And how about a member of Congress from a particular

22   region of the state?

23   A.   Yes.

24   Q.   Or how about a member of Congress who serves on the

25   Appropriations Committee?

1    A.    Yes.

2    Q.    And would a legislature also consider regional

3    representation in a state that, let's say, is a couple of

4    hundred miles from north to south.  Is that an appropriate

5    consideration for legislatures or at least something that

6    you would expect legislatures to consider?

7    A.    Sure.

8              MR. TORCHINSKY:  Thank you, Your Honor.  I have

9    no further questions.

10             THE REPORTER:  I'm confused.  Was that cross

11   that we just had?

12             JUDGE JOSEPH:  You can call it cross.

13        Go ahead, Mr. Greim.

14             JUDGE STEWART:  Well, let's be clear.  From the

15   State, was that cross?  I mean, you're leading, so I mean,

16   what's the --

17             MR. TORCHINSKY:  Yes, Your Honor, I think it

18   was --

19             JUDGE STEWART:  Because when you started, you

20   said:  We're on the same side of the V.

21             MR. TORCHINSKY:  That is correct.

22             JUDGE STEWART:  When Mr. Greim was up.  And then

23   when you got over, your line went that way.  So let's be

24   clear so we know it's the posture that you're going

25   forward.

 1                    MR. TORCHINSKY:  Yes, Your Honor.  I think our

 2     position, the State, is that the simulations and the

 3     discussion of simulations from both sides really doesn't

 4     reflect the real world reality of what the Legislature,

 5     i.e. the State, did --

 6                    JUDGE STEWART:  I'm not trying to get you to --

 7                    MR. TORCHINSKY:  Right.

 8                    JUDGE STEWART:  -- the hand.  It was just more

 9     procedural kind of --

10                    MR. TORCHINSKY:  Yes, Your Honor.

11                    JUDGE STEWART:  When you come up and you say:

12     Well, we're on the same side of the V, so then you do

13     cross.  So the case is not going to turn on this?

14                    MR. TORCHINSKY:  Okay.

15                    JUDGE STEWART:  We're trying to get the

16     nomenclature correct.

17                    MR. TORCHINSKY:  Yes, Your Honor.  I think --

18                    JUDGE STEWART:  So it was a hybrid; is that

19     right?

20                    MR. TORCHINSKY:  I think that's correct, Your

21     Honor.

22                    JUDGE JOSEPH:  It's not your witness.  You are

23     testing the witness by cross-examining?

24                    MR. TORCHINSKY:  That is correct.  Both of these

25     witnesses have criticisms of the State and the actions of

1    the Legislature and the Governor of the State.  So we were

2    kind of testing and pressing both.

3              JUDGE JOSEPH:  Very well.  Thank you.

4              JUDGE STEWART:  Gotcha.  We know what

5    Mr. Greim is.

6              MR. GREIM:  Before I began, I sort of forgot

7    where we were with the transcripts.  Should I just deposit

8    them --

9              JUDGE JOSEPH:  You handed them to who needed

10   them among counsel, correct?  And then if you hand a

11   couple of copies to Lisa that you don't need in case we

12   want to look at it.  I don't know that we'll really look

13   at it.  We'll rely on you to do that.

14             MR. GREIM:  I'll just hand them up to Your

15   Honor.  I will give one to the witness.

16                        CROSS-EXAMINATION

17   BY MR. GREIM:

18   Q.   Dr. McCartan, good afternoon.  You might remember me,

19   Eddie Greim.  I took your deposition last week.

20        Dr. McCartan, you've admitted you don't know what

21   racial gerrymandering is, correct?

22   A.   I don't have a -- I'm not a lawyer.  I don't have a

23   legal understanding of that term, correct.

24   Q.   And you have never devised a test to detect racial

25   gerrymandering on a given map, right?

1    A.    Not in a legal context.

2    Q.    You haven't done academic work on racial

3    gerrymandering?

4    A.    Nothing published.

5    Q.    And you haven't given any thought about the extent to

6    how simulations can test for the presence of racial

7    gerrymandering in any particular state, right?

8    A.    I have not focused on what simulations can do as far

9    as legal conclusions about racial gerrymandering.

10   Q.    And I just want to make sure I understand.  I'm not

11   sure I got an answer, but I'm not sure I actually heard

12   everything.  Just for the record, you haven't given any

13   thought about the extent to which simulations can test for

14   the presence of racial gerrymandering in any particular

15   state, right?

16   A.    So by "racial gerrymandering," if we're still talking

17   in a legal context, then that statement is right.  The

18   reason I pause is because we are currently working on a

19   project that's not published that thinks about race and

20   redistricting in an academic context.  But as I said, I'm

21   not a lawyer.  I don't have a test of racial

22   gerrymandering from a legal perspective, and so I haven't

23   given thought as to the role of simulations as far as that

24   legal question in any particular state.

25   Q.    What is the project you're working on right now?

```
 1    A.   Well --
 2              MS. ROHANI:  Objection.
 3              THE WITNESS:  Oh, I'm sorry.
 4              MS. ROHANI:  Apologies.  That's beyond the scope
 5    of Dr. McCartan's testimony.
 6              JUDGE JOSEPH:  He referenced it.  He can answer
 7    the question.
 8              THE WITNESS:  Well, it's early stages.  But
 9    we're looking at the topic of representation and how
10    legislators and congressmen with different attributes do
11    or don't represent minority populations and to what extent
12    that may vary across different configurations in
13    districts.  We anticipate maybe simulation techniques of
14    some sort will be used in that project.  But like I say,
15    it's in early stages.
16    Q.   (BY MR. GREIM) You haven't designed any simulations,
17    right?
18    A.   Sorry.  Design simulations for?
19    Q.   As part of your project you just mentioned.
20    A.   Oh.  Not yet, no.
21    Q.   And you have given no opinion here on the criteria
22    for determining racial gerrymandering, right?
23    A.   No.
24    Q.   Now, you talked about the ALARM team that you led
25    that created the 50-state survey.  We already heard
```

1   testimony on direct, right?

2   A.   That's right.

3   Q.   And you led the 50-state simulation project, right?

4   A.   Yes.

5   Q.   And in each state of that project, including

6   Louisiana, you primarily had in mind preparing a baseline

7   to detect the presence of partisan gerrymandering, right?

8   A.   To the extent to which partisanship played a role in

9   drawing the maps, and then, if so, what those effects

10  were.

11  Q.   And you wouldn't deny here today that your

12  simulations can also be useful for detecting maps that are

13  extreme racial outliers, would you?

14  A.   Sorry.  Could you be more specific about what you

15  mean by "racial outliers."  That's an outlier compared to

16  what specifically?

17  Q.   Let's just do this.

18         MR. GREIM:  If we could put up McCartan

19  Exhibit 3.  And if we could -- well, let's start here.

20  Q.   (BY MR. GREIM) Do you recall I showed you this

21  50-state simulations FAQ from your ALARM project website,

22  Dr. McCartan?

23  A.   I think we looked at this in my deposition, yes.

24  Q.   Yes, we did.

25         MR. GREIM:  And if we could, let's go to page 2,

1    top of page 2.

2    Q.    (BY MR. GREIM) And you see at the bottom of the first

3    paragraph your project website states:  The comparison of

4    an enacted plan with these sampled alternative plans can

5    reveal the extent to which the enacted plan is likely to

6    yield extreme partisan, racial, or other outcomes.  I read

7    that correctly, didn't I?

8    A.    Yes, you did.

9    Q.    And, in fact, you wrote a research paper, you were

10    the lead author on a research paper that reported the

11    results of the 50-state simulations project, didn't you?

12    A.    Yes.

13    Q.    And in that paper also, you state that the 50-state

14    simulations are well suited to assess what types of

15    partisan or racial outcomes could have happened under

16    alternative plans in a given state.  You said that, right?

17    A.    I'll take your word for it, yeah.

18    Q.    I mean, do you agree with that?

19    A.    With that statement?

20    Q.    Uh-huh.

21    A.    Yeah.  I think when those statements refer to

22    outliers or extreme, that's in reference to the

23    distribution or the representative set that we're trying

24    to recreate with simulations.  How you design that set,

25    what counts as representative for a particular study,

1    depends on, like I say, what the goals of that study are

2    and what questions you are trying to answer.

3        So I think in the context of the specific sort of

4    representative set in the criteria that we were going for

5    in generating the simulations for this project, then I

6    would absolutely stand by that statement.

7    Q.    There is neither an academic nor a legal consensus on

8    the best practices for simulating maps which are VRA

9    compliant, right?

10   A.    I suppose that's fair.

11   Q.    Let's go back to your ALARM simulation.  When you

12   prepared the baseline for comparison with the enacted

13   plan, that meant imposing certain constraints through the

14   redistricting software, right?

15   A.    That's right.

16   Q.    And you attempted to approximate the redistricting

17   rules in each state that you analyzed, right?

18   A.    Yes.

19   Q.    And we can actually get on your website and we can

20   find the criteria that your ALARM project used for

21   Louisiana, can't we?

22   A.    Yes.

23            MR. GREIM:  So let's pull that up, if we could.

24   If we could get McCartan Exhibit 4.  Now, we've got

25   unfortunately -- why don't we just scroll down so the

1   witness can see the whole thing.  Then it goes into a

2   second page.

3   Q.   (BY MR. GREIM) Dr. McCartan, do you recall this as

4   the criteria that we explored at your deposition last

5   week?

6   A.   Yeah.  We discussed this document.

7   Q.   And here in the first paragraph, you say Louisiana

8   follows Joint Rule Number 21 and you list five criteria,

9   right?

10  A.   Yes.

11  Q.   Now, Joint Rule 21 doesn't actually say that

12  districts must be geographically compact, does it?

13  A.   Does not.

14  Q.   But you list it on your website, right?

15  A.   It's listed on the website, yes.

16  Q.   And Joint Rule 21 did not say congressional districts

17  need to preserve the course of traditional district

18  alignments, right?

19  A.   I believe that's right.

20  Q.   But again, it's listed as part of Joint Rule 21 on

21  your ALARM website, right?

22  A.   Yeah.  So I think one thing we talked about in the

23  deposition was that this document is built from a --

24  Q.   Now I will say I haven't asked you a question about

25  what goes beyond that.  Your counsel may want to come in

1    and bring that up but I --

2    A.   Oh, I'm sorry.

3    Q.   We don't have time to have you to give an

4    explanation.  You'll have a chance.  You'll have a chance.

5         MS. ROHANI:  Your Honor, he asked a question.  I

6    think to permit the witness to answer would be

7    appropriate.

8         JUDGE JOSEPH:  You can answer, but try to be

9    brief.

10        THE WITNESS:  I will try to be brief.

11   A.   So when you're doing 50 states' worth of simulations,

12   we have a template that helps our team produce this.  We

13   have a whole team that ran the simulations, not just me.

14   So that team -- the template basically says:  Paste here

15   the link to, you know, the PDF that you can find that

16   explains the criteria.

17        And so, yes, it is a mismatch between the criteria

18   that we have inferred are relevant to designing our

19   simulations and what's listed there in English.  And I'll

20   take ownership over that, that misstatement.  But to be

21   clear, those five bullet points reflect our understanding

22   of what criteria we were going to follow in our

23   simulations for this academic project.

24   Q.   (BY MR. GREIM) And you did not impose any kind of

25   requirement for natural or geographic boundaries, correct?

1    A.   Correct.

2    Q.   That you just criticized Dr. Voss for that, right?

3    A.   I don't think that -- I think that Dr. Voss's failure

4    to include that is a limitation of his analysis, yes.

5    Q.   And you criticize Dr. Voss for imposing too high of a

6    compactness restraint, correct?

7    A.   That's not how I'd characterize my criticism.

8    Q.   You criticize him for using a 1.0 on his compactness

9    measure on the software, right?

10   A.   That's not how I'd characterize my criticism.

11   Q.   Not today?  Well, let me just ask you:  Is 1.0 the

12   compactness requirement that your team used in your ALARM

13   simulation?

14   A.   Louisiana, I believe so.  I believe so in Louisiana.

15   Q.   And that's what you used in most states, right?

16   A.   Yes.

17   Q.   And that constraint is a nudge towards compactness,

18   correct?

19   A.   It represents a fairly strong preference for compact

20   districts.

21        MR. GREIM:  Can we pull up McCartan Exhibit 3,

22   please.  And if we could go to page 3 under -- one moment.

23   I think I've got a mistake in my outline here.

24   Q.   (BY MR. GREIM) Dr. McCartan, do you recall that at

25   your deposition, I asked you about a description, your own

1    description of your method, which stated that:  Unless

2    otherwise noted, the algorithm nudges towards compactness

3    by an adjacency graph base measure of compactness, the

4    fraction of edges kept.

5         Do you remember I asked you about that?

6    A.   I don't remember that question specifically, but I

7    believe that, yeah, that question was asked to me.

8    Q.   Do you recall that I asked you if that was true and

9    your quibble with that statement was the second part of

10   the statement, about the fact that fraction of edges was

11   the method you were using.  Right?

12   A.   I don't remember that exchange, but I believe that

13   that's what I said.

14           MR. GREIM:  Well, I'm sorry.  I need to have a

15   better reference here to do this properly with the

16   witness.  I am going to move on and circle back before

17   we're done.

18   Q.   (BY MR. GREIM) Now, in Louisiana, the purpose of your

19   constraints was to try to mimic the Louisiana legal

20   constraints, right?

21   A.   Yeah.  We attempted to incorporate the criteria that

22   we saw the Legislature using and in Joint Rule 21 to the

23   extent possible to help us answer that question about

24   partisan effects.

25   Q.   Now, your team did not include a communities of

1    interest constraint either, did they?

2    A.    Lacking a definition from the legislature

3    specifically about which communities of interest are

4    important to protect, we did not incorporate that

5    information specifically.

6    Q.    Now, you did testify you included the Voting Rights

7    Act constraint.  And I think we heard today for the first

8    time what that constraint was.  You said that you tried to

9    maximize BVAP in two districts; is that correct?

10   A.    Not exactly.  "Maximize" suggests that we're taking

11   steps to make that higher, basically if the algorithm

12   happened to draw randomly a district that had a higher

13   BVAP score that fell in that sort of range, near 50

14   percent, then that plan was sort of given preferential

15   treatment, if you will, but there was no maximization, per

16   se.

17   Q.    And your analysis, like Dr. Voss's, also generated

18   plans that were more compact than the enacted plan, right?

19   A.    I believe so.

20   Q.    In fact, the enacted plan was far off on the end, the

21   noncompact end of the distribution of your Polsby-Popper

22   scores for your ALARM run, right?

23   A.    I have to double-check the exact position, but I

24   believe that's true.

25   Q.    And your analysis did not report your measure on the

1    number of black majority-minority districts you created,

2    but you did report some partisan metrics, didn't you?

3    A.   Sorry.  When you say our analysis, sorry, what are

4    you referring to there?

5    Q.   The 50-state simulation analysis.

6    A.   The reason I ask is, for example, the number of

7    typical seats a Democrat would win, or the typical

8    demographics of a district were all included in the data

9    we produced as far as that analysis, and that's available

10   publicly at the website that sort of summarize some of the

11   key parts of these.  Simulations may or may not have

12   included one of those particular, but there is an

13   extensive collection of numerical summaries that were

14   produced as part of the analysis and are available

15   publicly.

16        MR. GREIM:  Can we pull up McCartan Exhibit 9.

17   Q.   (BY MR. GREIM) And we'll kind of scroll through here.

18   Do you recognize this as your Projects Louisiana

19   Redistricting Analysis?

20   A.   This is an automated summary that gets sent to the

21   website from part of the analysis.

22        MR. GREIM:  Let's move back up, if we could,

23   just right there.  Let's try to keep the -- let's try to

24   go to the top of the third page.  Scroll on down.  That's

25   fine.  Let's stop right there.

1  Q.   (BY MR. GREIM) We discussed this at your deposition,

2  didn't we?

3  A.   This top paragraph, yes.

4  Q.   Now, you report your partisan results as:  We expect

5  the enacted plan to yield 1.0 Democratic seats on average,

6  which is more than 100 percent of all simulated plans.

7       That's what the website says, correct?

8  A.   You read that correctly.

9          MR. GREIM:  And then let's scroll down a little

10  bit further so we can see the map.

11  Q    (BY MR. GREIM) Now, each bar on this map represents

12  the -- for each simulated district, the partisan split of

13  that district for one of the simulated maps, right?

14  A.   Each dot -- yeah.

15  Q.   Right.  And there should be 5,000 dots in each little

16  bar?

17  A.   That's right.

18  Q.   And then the black square is the enacted plan.  The

19  enacted plan's partisan split, right?

20  A.   That's right.

21  Q.   And so it looks -- and a correct interpretation of

22  this chart is that the 6th District almost always comes

23  out to be heavily Democratic, right?

24  A.   For this set of simulations and that set of

25  constraints, yes.

1   Q.   And then the 5th District tends to be Republican, but

2   it starts to shift up towards even, right, a few dots?

3   A.   That's right.

4   Q.   And I think we counted -- I'm sure it's not clear on

5   the screen, but I think we counted that there were

6   actually 10 blue dots above the even line, right?

7   A.   I remember counting, yes.

8   Q.   Right.  We sat and we looked closely.  So those 10

9   blue dots represent that 10 out of these 5,000 randomly

10  generated plans, using your criteria, yielded a second

11  Democratic seat, right?

12  A.   That's right.

13  Q.   Now, I do have a question for you.  Do you see a red

14  dot on six that's below even?

15  A.   So, to be honest, I'm actually -- I'm actually

16  color-blind, so I see a dot there, but I couldn't tell you

17  the color.

18  Q.   Okay.  Well, if it's red, what does that represent?

19  A.   Well, that would represent a plan that even in the

20  most Democratic district had less than a 50 percent

21  predicted, you know, Democratic vote margin.

22  Q.   Now, these 10 randomly generated out of 5,000 second

23  Democratic seats that we just talked about, you don't know

24  if any of those were a second black majority-minority

25  district, do you?

1    A.    Of those 10, no, I haven't checked.

2    Q.    And, in fact, you don't know if any of your plans

3    generated a second black majority-minority district, do

4    you?

5    A.    I know that a number of them produced a second

6    minority-majority district.  We did not separately

7    calculate any part black number, so I don't know about

8    that.

9    Q.    Now, you testified I think -- I think you've told us

10   you did not review your team's Louisiana constraints or

11   simulation design before you critiqued Dr. Voss, right?

12   A.    Beyond what I recollected myself, that's right.

13   Q.    And you didn't review your team's Louisiana sim

14   diagnostics before criticizing Dr. Voss, correct?

15   A.    Are you referring to the software's diagnostic

16   measures?

17   Q.    (Nods head.)

18   A.    No, I did not.

19   Q.    I want to ask you a couple of other questions here.

20   I think very early in your cross, you testified that a

21   simulation that did not include the incumbent protection

22   was no longer representative and could therefore not be

23   relied upon to determine the presence of racial

24   gerrymandering.  Did I understand that correctly?

25   A.    Not quite.

1   Q.   What did I get wrong?

2   A.   I think we were talking about a hypothetical, which,

3   say, we knew that a legislature did consider a criterion

4   like incumbent protection.  And if you knew that and then

5   ran simulations, how it didn't include that, what would

6   the role of those simulations be as far as providing a

7   comparator.  I don't recall specifically if that was

8   referring to establishing, you know, racial gerrymandering

9   specifically.  I think that was more about the overall

10  usefulness of simulations as a comparator.

11  Q.   And so you're not here to tell us that adding

12  incumbent protection would tend to trigger a black

13  majority-minority district to be drawn, correct?

14  A.   Correct.

15  Q.   You haven't done that analysis?

16  A.   Correct.

17          MR. GREIM:  You know, I don't think we have it,

18  but I wonder if I could prevail upon my friends, the

19  Robinson intervenors, to put up the -- I think it was the

20  second or third demonstrative exhibit with the core

21  protection.  Are you able to do that?  I'm sorry to --

22          JUDGE JOSEPH:  Which one?

23          MR. GREIM:  It's the blue and yellow one.

24  There it is.  Okay.

25          JUDGE JOSEPH:  Just for the record, the witness

1   is being shown -- what did you call this map?

2           MS. ROHANI:  I believe this was Robinson

3   Intervenor's Demonstrative 6.  My apologies, Your Honor.

4           JUDGE JOSEPH:  No, you're fine.

5           MS. ROHANI:  I believe this was Robinson

6   Intervenor's Demonstrative 6.

7           JUDGE JOSEPH:  Okay.  Thank you.

8   Q.   (BY MS. ROHANI) And so in the middle of Robinson

9   Demonstrative 6, you see sort of a blue section.  And

10  those basically represent the border regions of all of the

11  SB8 districts.  Do you understand that to be true?

12  A.   I guess I don't have an opinion about whether

13  something or isn't in the border region.  The blue

14  precincts are those that were not sort of frozen and glued

15  together by Dr. Voss in conducting this set of

16  simulations.

17  Q.   Let me ask you -- I'm not trying to ask you to

18  qualify what counts as border or what doesn't.  But I

19  mean -- maybe I can ask this.  You agree with me that the

20  actual lines for all of the districts run through the

21  blue-shaded area on the map, correct?

22  A.   Yes.

23  Q.   And did you do any analysis -- you'll see in the

24  middle of the blue regions there are some yellow spots

25  that are coded true.  In other words, those were supposed

1   to be protected, right?

2   A.   They were protected in that it was impossible to draw

3   a district that split those regions.

4   Q.   And as you look, those yellow spots are -- there are

5   yellow spots that are within District 6 and 2.  I know it

6   may be hard on the big screen to see the black lines, but

7   I can actually see pretty well in front of me.  Can you

8   see it too?

9   A.   I can.  There's a number of distinct, quite separated

10  cores or BVAP regions in both CD-2 and CD-6.

11  Q.   And did you do any analysis to determine whether

12  those yellow areas within District 6 are high BVAP

13  regions?

14  A.   I didn't do any specific analysis.  This is just

15  visualizing the data that I received from Dr. Voss.

16  Q.   And so Dr. Voss's software had nothing that would

17  keep the district lines that you see here on the map from

18  being drawn, did it?

19  A.   Well, Dr. Voss continued to use the defaults high

20  compactness preference, which as we saw in other

21  simulations tend to produce districts that were where the

22  of compactness was completely not overlapping with the

23  enacted map.  So since that continued to be the case in

24  these simulations, while not technically impossible, as I

25  mention, there is trillions upon trillions of ways to draw

1    maps, I think it's safe to say that it was unlikely that

2    the way he set up these simulations would have ever

3    produced -- recreated SB8.

4    Q.   And, of course, you didn't run the simulation

5    yourself, did you?

6    A.   Sorry.  What do you mean by that?

7    Q.   You didn't actually run the simulation and observe

8    the universe of plans that were created by Dr. Voss?

9    A.   Dr. Voss turned over the plans that he created, the

10   universe of plans, if you will, and I did, you know, take

11   a look at that.

12   Q.   And you're not able to tell us whether it's

13   impossible to pull together the yellow spots if they are

14   in fact high BVAP spots in Senate District 6 under the

15   1.0 compactness constraint, are you?

16   A.   I can tell you, actually, it's definitely possible

17   the way this constraint or the strategy, this approach,

18   that we talked about with cores is designed, is to make it

19   possible to recreate the district -- the plan on which

20   those cores were based.  When we talk about that

21   compactness preference, that's kind of cumulative.  Every

22   additional sort of deviation of compactness gets

23   progressively discouraged.  So it's not uncommon, for

24   example, for the range of Polsby-Popper differences that

25   were seen for a plan at one end to be preferred over a

1    plan at the other end by a factor of something like a

2    billion or 10 billion.  So when we're talking about

3    quadrillions, quintillions, you know, numbers bigger than

4    that of redistricting plans, practically, there may be

5    very little difference between just one of those plans is

6    the enacted and you can sit around for the entire time

7    you've been in the universe and never see that plan come

8    up.  I think that latter situation more accurately

9    describes the way these set of simulations were set up by

10   Dr. Voss.

11   Q.   Dr. McCartan, you yourself don't know what sort of

12   race-consciousness it would take to come up with two

13   majority-minority districts, do you?

14   A.   Are you referring to simulations specifically or --

15   Q.   Let me just ask you this.

16   A.   Sure.

17   Q.   You have done no theoretical work to make that

18   determination, have you?

19   A.   No.

20           MR. GREIM:  No further questions.

21           MS. ROHANI:  Very brief, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MS. ROHANI:

24   Q.   Dr. McCartan, so was the context of the ALARM

25   project -- was the ALARM project done in the context of a

1    court case?

2    A.    No.

3    Q.    And in what context was it developed?

4    A.    We designed these simulations primarily for use in a

5    follow-up paper about these partisan effects, so we talked

6    about that.  And what that means is that when there were

7    tradeoffs, whether that was tradeoffs in our time,

8    computational resources or whatever, whether it was a

9    tradeoff between those resources and how faithfully we

10   could exactly match, you know, certain aspects of real

11   world plans, those tradeoffs were made thinking about the

12   bigger picture.  And so when you have 50 states and we're

13   trying to draw a conclusion to the national level, we

14   wouldn't have, for instance, had the resources to go in

15   and conduct surveys of Louisiana voters to determine which

16   communities of interest to protect and things of that

17   nature.

18        Because what we were looking at was partisanship, we

19   were also able to judge which of those other factors were

20   more or less likely to impact partisanship.  Whereas, for

21   example, with compactness, we know that if you're going to

22   follow a winding river versus a straight parish line,

23   that's going to have a big influence on compactness.

24   And so if you're designing a simulation that's answering

25   questions or asking questions about compactness and

1  whether you can draw compact districts, getting the

2  constraints right that we know are strongly tied to

3  compactness, like parish splits, like natural geography,

4  getting those right is especially important in that case

5  and perhaps less important in a partisan case.

6  Q.  And to clarify, was the ALARM project intended to

7  study the effect on race in Louisiana's congressional map?

8  A.  No.  So as I mentioned, we specifically just sort of

9  did what we could minimally to sort of recreate what we

10  saw as the Legislature's choices post-census as regard to

11  the number of majority-minority districts.  And we did not

12  try to look at race in any other way.  It was just as

13  little as possible to sort of calibrate the constraint to

14  match the enacted plan's choices.

15  Q.  Thank you.  And has the discussion you just had with

16  Mr. Greim regarding the ALARM project changed your

17  conclusions in this case in any way?

18  A.  No.  Definitely not.

19  Q.  Thank you.

20       MS. ROHANI:  Could we again pull up Robinson

21  Intervenor's Demonstrative 6, which I believe is -- yes.

22  Thank you.

23  Q.  (BY MS. ROHANI) So do you remember, Dr. McCartan,

24  Mr. Greim was walking you through this map, he asked if

25  there was nothing to prevent these -- nothing to prevent

1    from drawing the existing district lines; is that correct?

2    The simulations from drawing the existing district lines?

3    A.    I remember talking about that with him.

4    Q.    Yes.  But was there anything to encourage drawing

5    these lines based on those cores?

6    A.    No.  So the enacted lines are drawn on here, but each

7    of these yellow regions is held together independently, so

8    the fact that some of these yellow regions are inside the

9    boundaries of CD-6, the algorithm doesn't know that fact,

10   and it does not have any particular instructions to try to

11   keep those regions together in a new version of CD-6.

12   And so, like I say, put that all together, there's really

13   no sort of racial or other information about the shape of

14   CD-2 or CD-6 that was really provided to the set of

15   simulations.

16   Q.    So, again, I know Mr. Greim was discussing whether

17   there was nothing to prevent the drawing of the lines, but

18   is the purpose of the core protection simulation to

19   encourage the districts to be drawn the way they were as

20   if they were in SB8?

21   A.    Yeah.  That's generally why we do something like

22   this.  And as regards to CD-2 and CD-6 specifically,

23   because the cores that Dr. Voss defined don't really exist

24   as a single core, no such encouragement could be provided.

25   Q.    So just to sum up, what they were supposed to do was

1  to encourage drawing these lines similar to SB8; is that

2  correct?

3  A.   Yes.

4  Q.   And were they designed to do that?

5  A.   No.  Because the design involved defining these cores

6  and they don't -- there's no core to speak of with those

7  districts.

8           MS. ROHANI:  Thank you, Your Honor.

9           JUDGE JOSEPH:  Thank you for your testimony,

10  Dr. McCartan.  You may step down.

11           THE WITNESS:  Thank you, Your Honor.

12           JUDGE JOSEPH:  All right.  So it's getting close

13  to 5:30 which I think was our agreed endpoint for the day.

14  Anything we need to talk about before we recess for today?

15           MR. GREIM:  Your Honor, I'm sorry to do this at

16  the end of the day, but we do have the few Voss, what we

17  called demonstratives that we would like to offer.

18           JUDGE JOSEPH:  Okay.  Yeah, great.  Let's get

19  that over with.

20           MR. GREIM:  Okay.  And so we would like to offer

21  them -- okay.  So we would offer them as Plaintiffs' 2

22  through 9.  And I think the best way to do it quickly here

23  is maybe just to pop them up so people can remember what

24  they were.

25       So P2 is the gray scale map.  I think these

1    actually -- these match with -- this is P2.  It looks like

2    it's been labeled.  So we'd move the admission of P2.

3              JUDGE JOSEPH:  Is there any objection?

4              MR. NAIFEH:  Your Honor, I think we would need

5    to study these demonstratives again before we can take a

6    position.  So I think, you know, it would be best to do

7    this tomorrow, if we can, so that we can have a chance --

8              JUDGE JOSEPH:  We'll do it first thing tomorrow

9    morning.  We'll circle back, Mr. Greim.

10              MR. GREIM:  Very good.

11              JUDGE JOSEPH:  Court will be in recess until

12    9:00 tomorrow morning.

13              (Proceedings adjourned at 5:24 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, DIANA CAVENAH, RPR, Federal Official Court

4    Reporter, in and for the United States District Court for

5    the Western District of Louisiana, DO HEREBY CERTIFY that

6    pursuant to Section 753, Title 28, United States Code,

7    that the foregoing is a true and correct transcript of the

8    stenographically-reported proceedings held in the

9    above-entitled matter and that the transcript page format

10   is in conformance with the regulations of the Judicial

11   Conference of the United States.

12

13

14                         /s/ Diana Cavenah
                           DIANA CAVENAH, RPR
15                         Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25