1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF LOUISIANA

3                   MONROE DIVISION

4

   PHILLIP CALLAIS, LLOYD PRICE,      )
5  BRUCE ODELL, ELIZABETH ERSOFF,     )
   ALBERT CAISSIE, DANIEL WEIR,       )
6  JOYCE LACOUR, CANDY CARROLL        )
   PEAVY, TANYA WHITNEY, MIKE         )
7  JOHNSON, GROVER JOSEPH REES,       )
   ROLFE MCCOLLISTER,                 )
8                                     )
                Plaintiffs,           )
9                                     )
   VS.                                )     Civil Action
10                                    )     No. 3:24-cv-00122
   NANCY LANDRY, in her official      )
11 capacity as Secretary of State,    )
                                      )
12              Defendant.            )

13

14           PRELIMINARY INJUNCTION HEARING
              CONSOLIDATED WITH BENCH TRIAL
15    OFFICIAL TRANSCRIPT OF PROCEEDINGS, VOLUME II
     BEFORE THE HONORABLE CIRCUIT JUDGE CARL E. STEWART
16     THE HONORABLE DISTRICT JUDGE DAVID C. JOSEPH
   AND THE HONORABLE DISTRICT JUDGE ROBERT R. SUMMERHAYS
17                 APRIL 9, 2024
                SHREVEPORT, LOUISIANA
18

19

20

21

22              DIANA CAVENAH, RPR
           FEDERAL OFFICIAL COURT REPORTER
23          300 FANNIN STREET, SUITE 4203
            SHREVEPORT, LOUISIANA 71101
24               (318) 934-4754

25

1   APPEARANCES OF COUNSEL:

2   FOR THE PLAINTIFFS:

3   Edward D. Greim
    A. Bradley Bodamer
4   Katie Graves
    Jackson Tyler
5   Attorneys at Law
    1100 Main Street, Suite 2700
6   Kansas City, MO 64105
         and
7   Paul Loy Hurd
    Attorney at Law
8   1896 Hudson Circle, Suite 5
    Monroe, LA 71201

9

10  FOR THE STATE OF LOUISIANA:

11  Jason B. Torchinsky
    Phillip M. Gordon
12  Brennan A.R. Bowen
    Zachary D. Henson
13  Drew Ensign
    Attorneys at Law
14  15405 John Marshall Highway
    Haymarket, VA 20169
15       and
    Carey Tom Jones
16  Office of the Attorney General
    Louisiana Department of Justice
17  1885 N. Third St.
    Baton Rouge, LA 70804

18

19  FOR NANCY LANDRY, IN HER OFFICIAL CAPACITY AS
    SECRETARY OF STATE:
20
    Phillip J. Strach
21  Attorney at Law
    301 Hillsborough Street, Suite 1400
22  Raleigh, NC 27603
         and
23  John C. Walsh
    Attorney at Law
24  628 St. Louis Street
    P.O. Box 4225
25  Baton Rouge, LA 70821

1    <u>FOR ROBINSON INTERVENORS</u>:

2    Stuart Naifeh
     Colin Burke
3    Kathryn Sadasivan
     Victoria Wenger
4    Jared Evans
     Attorneys at Law
5    NAACP Legal Defense and Educational Fund, Inc.
     40 Rector Street, 5th Floor
6    New York, NY 10006
             and
7    I. Sara Rohani
     NAACP Legal Defense and Educational Fund, Inc.
8    700 14th Street N.W. Ste. 600
     Washington, DC 20005
9            and
     Sarah Brannon
10   Megan C. Kennan
     American Civil Liberties Union Foundation
11   15th Street, NW
     Washington, DC 20005
12           and
     Jonathan H. Hurwitz
13   Amitav Chakraborty
     Robert Klein
14   Arielle B. McTootle
     Attorneys at Law
15   1285 Avenue of the Americas
     New York, NY 10019
16           and
     T. Alora Thomas-Lundborg
17   Daniel Hessel
     Election Law Clinic
18   Harvard Law School
     6 Everett Street, Ste. 4105
19   Cambridge, MA 02138

20                    C O N T E N T S

21   WITNESSES ON BEHALF OF THE INTERVENORS:        PAGE

22   <u>TESTIMONY OF MICHAEL CHARLES HEFNER</u>:
          Direct Examination by Mr. Bodamer        257
23        Voir Dire Examination by Mr. Naifeh      262
          Voir Dire Examination by Mr. Bowen       269
24        Continued Direct Examination by Mr. Bodamer  271
          Cross-Examination by Mr. Naifeh          317
25        Cross-Examination by Mr. Bowen           339

1                    C O N T E N T S (Continued)

2    WITNESSES ON BEHALF OF THE INTERVENORS:          PAGE

3    TESTIMONY OF REPRESENTATIVE MANDIE LANDRY:
          Direct Examination by Mr. Hessel          365
4         Cross-Examination by Mr. Tyler            373
          Redirect Examination by Mr. Hessel        374
5
     TESTIMONY OF ANTHONY EDWARD FAIRFAX (VIA ZOOM):
6         Direct Examination by Ms. Sadasivan       377
          Cross-Examination by Mr. Bowen            402
7         Cross-Examination by Mr. Greim            406
          Redirect Examination by Ms. Sadasivan     423
8
     TESTIMONY OF MICHAEL STERLING MARTIN:
9         Direct Examination by Mr. Burke           432
          Voir Dire Examination by Mr. Greim        440
10
11   TESTIMONY OF MAYOR CEDRIC BRADFORD GLOVER
          Direct Examination by Ms. Rohani          453
12
     TESTIMONY OF PASTOR STEVEN HARRIS, SR.:
13        Direct Examination by Mr. Evans           462
14   TESTIMONY OF ASHLEY KENNEDY SHELTON:
          Direct Examination by Ms. Thomas          473
15        Cross-Examination by Mr. Bowen            490
          Redirect Examination by Ms. Thomas        493
16

17                    *   *   *   *   *

18        (Court called to order with all parties present at

19   9:08 a.m.)

20             JUDGE SUMMERHAYS:  Today is a continuation of

21   our proceeding in the case of Callais, et al. versus

22   Landry, et al., case number 24-CV-122.

23        A couple of housekeeping matters.  Where we left off

24   yesterday, there was discussion about the parties about

25   the demonstratives that were shown on the screen and

1    discussed during the expert testimony.  Have those

2    admissibility issues been resolved?

3            MR. GREIM:  Your Honor, I believe they have.

4    The one thing I would say is, to my dismay, I saw one

5    exhibit in our brand-new exhibit list that we changed was

6    wrong, and so I think they've been resolved.  But if we

7    could, maybe at the end of Hefner, so that they've got

8    time to look at that, we could return to that.  I'm sorry

9    to break up the day in that way, but --

10            JUDGE SUMMERHAYS:  Any objection to proceeding

11    in that way?

12            MR. NAIFEH:  No objection.

13            JUDGE SUMMERHAYS:  Very good.  As far as our

14    first witness, we have got Hefner up, and then you are

15    going to present Overholt in your case-in-chief?

16            MR. GREIM:  No.  He is a rebuttal witness,

17    Your Honor.  So he would follow Fairfax, depending on what

18    Fairfax says, candidly.

19            JUDGE SUMMERHAYS:  So you expect -- is Hefner

20    going to be your last witness before you rest your case?

21            MR. GREIM:  He would be.  There are a couple of

22    things we wanted to move in that we mentioned yesterday,

23    but otherwise that will be it for us.

24        The other thing I'd say, Your Honor, is we -- I'm

25    going to forget, but counsel has agreed to observe the

1    Rule keeping fact witnesses out of the courtroom.  We

2    observed it yesterday.  I think we never mentioned it on

3    the record.  But today we've got more potential fact

4    witnesses around, so I just wanted to make a record that

5    we've all asked that the Court, you know, invoke that

6    order here.

7            JUDGE SUMMERHAYS:  And the Court will invoke it

8    and you -- obviously they're not present in the courtroom

9    now.

10        You've informed them?  Are they present?

11           MR. GREIM:  We have no -- we have got two

12    experts here but no fact witness.

13           JUDGE SUMMERHAYS:  Yeah, the experts are fine.

14    But you've informed your fact witnesses of their

15    obligations under the Rule?

16           MR. GREIM:  We have.  Yeah, we did.

17           JUDGE SUMMERHAYS:  And I'm going to leave it to

18    counsel to police that, you know, make sure that they are

19    complying with the Rule.

20        As far as Mr. Hefner or Dr. Hefner, how long do you

21    anticipate with him?  Is he going to be most of the

22    morning?  I won't hold you to the estimate.  But do you

23    anticipate he'll be the morning?

24           MR. GREIM:  Mr. Bodamer is going to be putting

25    him on direct.  And what do we think?  Maybe --

```
 1          MR. BODAMER:  I don't think it will exceed an

 2   hour.

 3          JUDGE SUMMERHAYS:  Okay.  Very good.

 4       Just a couple of reminders.  Please talk slowly.

 5   Try to take the speed down one notch just to help with the

 6   record in the case.  And I know, you know, you're dealing

 7   with witnesses you can't all control the speed in which an

 8   expert will testify.  But if we could try to, you know, to

 9   keep it down, and to speak into the microphone and be sure

10   that, you know, that they're speaking up and we can hear

11   them.  Okay?

12       All right, Counsel, you may proceed, you may call

13   your next witness.

14          MR. GREIM:  Thank you.

15          MR. NAIFEH:  Your Honor, may I address one

16   matter before they start?

17          JUDGE SUMMERHAYS:  Yes, sir.

18          MR. NAIFEH:  We have one of our witnesses that

19   requires an accommodation, he has his own chair.  It's an

20   extra large chair.

21          JUDGE SUMMERHAYS:  This is Representative

22   Glover?

23          MR. NAIFEH:  Yes.  Yes, sir.

24          JUDGE SUMMERHAYS:  Okay.  And we will -- you

25   anticipate that'll be in your case-in-chief?  That'll
```

1    probably be after noon or when --

2         MR. NAIFEH:  I would suspect it will be after

3    noon, yes, sir.

4         JUDGE SUMMERHAYS:  We'll make sure that we make

5    the right accommodations for that.

6         MR. NAIFEH:  Thank you.

7         JUDGE JOSEPH:  What order is he in the lineup?

8         MR. NAIFEH:  I don't remember exactly what order

9    he is.

10        JUDGE JOSEPH:  Fourth maybe is what Ms. LaCombe

11   says.  Fourth or fifth?

12        MR. NAIFEH:  Yeah, something like that.

13        MR. HURWITZ:  He is the fifth witness.

14        JUDGE SUMMERHAYS:  Counsel, you may present.

15   You may call your next witness.

16        MR. BODAMER:  Good morning, Your Honors.  On

17   behalf of the plaintiffs, we call Mr. Michael Hefner.

18        JUDGE SUMMERHAYS:  Okay.  If Mr. Hefner will

19   approach and be sworn in.

20        (Oath administered to the witness.)

21        JUDGE SUMMERHAYS:  Counsel, you may proceed when

22   ready.

23        MR. BODAMER:  Thank you, Your Honor.  May it

24   please the Court.

25                    MICHAEL CHARLES HEFNER,

1    having been first duly sworn to testify the truth, the

2    whole truth, and nothing but the truth, testified as

3    follows:

4                          DIRECT EXAMINATION

5    BY MR. BODAMER:

6    Q.    Please state your full name for the record.

7    A.    Michael Charles Hefner, H-E-F-N-E-R.

8    Q.    Mr. Hefner, what do you do for a living?

9    A.    I am a demographer.  I do private and also

10   governmental work, along those lines.

11   Q.    Can you give the Court some examples of the projects

12   and governmental work that you do?

13   A.    For private work, many times it's marketing studies,

14   site location analysis, things along those lines.  Most of

15   my work, though, is now governmental dealing in the areas

16   of redistricting after each decennial census.  And in

17   between that, I do a lot of precinct management work for

18   various parish governments.

19   Q.    I was going to say, who do you do that work for?

20   A.    I do -- for redistricting, it's at the municipal,

21   school board and parish levels.  And then for precinct

22   management, that's done at the parish level.

23   Q.    How long have you been a demographer?

24   A.    I've been actually in this particular field since

25   1990, doing some work prior to that as part of my

1    marketing studies when I was a graduate at U.S.L. or

2    University of Louisiana Lafayette.

3    Q.    Where do you live?

4    A.    I live just outside of Lafayette, Louisiana.

5    Q.    How long have you lived in Louisiana?

6    A.    Born and raised.

7    Q.    Would you briefly tell the Court your educational

8    background.

9    A.    I received my Bachelor of Science in -- bachelor of

10   business administration actually in 1978 from, at that

11   time, it was U.S.L., the University of Southwestern

12   Louisiana, which is now University of Louisiana at

13   Lafayette.  And from there I later received my juris

14   doctorate in 2008.  I went through Concord, which is part

15   of Purdue Global Law University now.

16   Q.    So you're a licensed lawyer?

17   A.    Yes.

18   Q.    Do you practice law?

19   A.    Very rarely.  It's mostly to support my work that I

20   do in redistricting.

21   Q.    It sounds like you went to law school sometime after

22   you had gotten into the world of demography.  Is that

23   right?

24   A.    Yes.  After the 2000 census cycle and finishing up

25   redistricting, I realized that between school

1    desegregation cases, which I've been involved in a number

2    of them in Louisiana, and the redistricting cases that

3    probably 98 percent of my work was being reviewed by

4    attorneys and the Courts, so I figured I might as well

5    learn to think like them.  So at 48 years old, I went to

6    law school.

7    Q.    Do you intend to offer any legal opinions in this

8    matter today?

9    A.    No.

10              MR. BODAMER:  If I might, Your Honor, I would

11   like to offer into evidence Mr. Hefner's CV, which is

12   Plaintiffs' Exhibit 13.  It was an exhibit to his report,

13   his initial report.  And just for the record, we'd like

14   for that to be part of the information you have before

15   you, without wasting any more time here.

16              JUDGE SUMMERHAYS:  Any objection?

17              MR. NAIFEH:  No objection, Your Honor.

18              JUDGE SUMMERHAYS:  It's admitted.

19              MR. BODAMER:  Thank you.

20   Q.    (BY MR. BODAMER) So, Mr. Hefner, how can a

21   demographer help the Court and us in a matter such as

22   this?

23   A.    Demography is generally a -- it's the study of the

24   people and the characteristics that define them.  So when

25   you're looking at redistricting, I like to say that it's

1    the numbers and the geography that tell you the story.

2    It tells you what you need to do and it defines how those

3    various plans come out.  So demographers can assist by not

4    only looking at the total population, which is a very

5    important part of redistricting because it's a one-man,

6    one-vote issue, but also the characteristics that underlie

7    those total populations.  So that's where demography can

8    help out.

9    Q.    As a demographer, have you testified in other cases?

10   A.    Yes.

11   Q.    Can you give me some idea how many?

12   A.    Probably three dealing with redistricting.  And then

13   some involving -- several years ago -- with some

14   population projections for some municipalities.

15   Q.    The three redistricting cases you've testified in,

16   were you testifying as an expert witness?

17   A.    Yes.

18   Q.    Has any court ever told you that you weren't

19   qualified to testify as an expert in matters involving

20   demography?

21   A.    No.

22   Q.    In this particular case, what were you asked to do by

23   the plaintiffs or plaintiffs' counsel?

24   A.    I was asked to evaluate the recently enacted Senate

25   Bill 8 plan and also to evaluate a plan that was submitted

1    by the plaintiffs, which I refer to in my reports as

2    Illustrative Plan 1.  And also the previously enacted

3    plan, which was House Bill 1, which was used in the last

4    congressional election.

5    Q.    In doing that, did you prepare several reports?

6    A.    Yes.

7    Q.    How many reports did you prepare?

8    A.    I did an initial report February 7th and then a more

9    robust report on March 22nd and then a rebuttal report on

10   April 1st.

11   Q.    That's all done in a relatively short period of time,

12   correct?

13   A.    Yes.  It -- you know, we really had to shoehorn it

14   into my workflow because I had a very, very packed spring

15   schedule, so yes.

16   Q.    Are you working on any other matters other than this

17   one at this time?

18   A.    I have several precinct matters and projects going

19   on.  I have six active school desegregation cases going

20   on, plus two private client marketing studies and site

21   location analysis projects going on.

22   Q.    Busy man.  With respect to this case, can you please

23   summarize your methodology and the technical

24   specifications you used in considering the issues you were

25   asked to address.

1    A.   Well, the first thing was to examine the district

2    boundaries which were provided to me in what we call

3    shapefiles.  They're electronic map files that you load

4    into a geographic information system software that will

5    then display those boundaries.  And then my calculations

6    were based off these 2020 Census P.L. 94-171 census file,

7    which is a file that we're required to use for

8    redistricting.

9    Q.   Did you use any particular redistricting software to

10   assist you in creating maps?

11   A.   Yes.  I typically use Maptitude for redistricting.

12   I've been using that since the late '90s when they first

13   came out with it.  That's what I do my heavy lifting with.

14   And then I do some final map preparations publishing

15   through ArcMap, which is put out by ESRI.

16            MR. BODAMER:  Your Honor, at this time I would

17   ask that you allow Mr. Hefner to testify as an expert

18   witness in this case.

19            JUDGE SUMMERHAYS:  Counsel, any voir dire or

20   objections to this witness?

21            MR. NAIFEH:  Yes, sir, I have some voir dire.

22            JUDGE SUMMERHAYS:  You may proceed.

23                  VOIR DIRE EXAMINATION

24   BY MR. NAIFEH:

25   Q.   Good morning, Mr. Hefner.  I am Stuart Naifeh.  I am

1    with the Legal Defense Fund.  I'm counsel for the

2    Robinson intervenors.

3        So, Mr. Hefner, most of your map-drawing work in

4    Louisiana has been for local governments; is that right?

5    A.    That is correct.

6    Q.    So you've never drawn congressional districts for the

7    state of Louisiana in any professional capacity, correct?

8    A.    Not in an official capacity.

9    Q.    Okay.  I'd like to turn to some of your local work.

10   In around 2018 you drew maps for the Lafayette Parish

11   government; is that right?

12   A.    Correct.

13   Q.    And then when those maps were adopted by the parish

14   through a charter amendment there was a discrepancy

15   between the adopted maps and the written description of

16   the districts for the charter; is that right?

17   A.    That's correct.

18   Q.    And the parish government was sued as a result of

19   those discrepancies and the way the government attempted

20   to remedy them; is that right?

21   A.    That is correct.

22   Q.    And that case is listed in the biography that was

23   just admitted into evidence; is that right?

24   A.    Correct.

25            MR. NAIFEH:  Can we pull up the biography?

1    That's the Hefner report.  It's at page 41.  Well, let's

2    turn to page 40 first.

3    Q.   (BY MR. NAIFEH) This is the biography that we just

4    admitted into evidence?

5    A.   That is correct.

6            MR. NAIFEH:  And can we turn to the next page.

7    Q.   (BY MR. NAIFEH) So the case that we were just

8    discussing concerning the Lafayette Parish districting,

9    that's the *Kishbaugh* case that's listed on your biography;

10   is that right?

11   A.   That is correct.

12   Q.   And in your biography you describe that case as one

13   in which you were reaffirmed as an expert in

14   reapportionment and demography; is that right?

15   A.   That was my recollection, yes.

16   Q.   Now, when I asked you about the discrepancy that we

17   were just discussing in the maps and the written

18   descriptions, at your deposition you told me that the

19   wording of that -- the wording that was part of the

20   charter amendment was prepared by counsel for the

21   Lafayette consolidated government, not by you; is that

22   right?

23   A.   That is correct.

24   Q.   But the Court in that litigation stated, based on

25   your testimony, that the discrepancy was "solely due to

1  Mr. Hefner's admitted error in failing to use the correct

2  maps when drafting the textual descriptions."  Is that

3  right?

4  A.   The counsel for the consolidated government used the

5  file that I sent to them on the written descriptions, so

6  that is where that is related to.  That is correct.  I did

7  not do the final draft, though, on the charter.

8  Q.   But you sent them the wrong map or the wrong

9  descriptions?

10  A.   They had a change right before the plan was adopted,

11  and I was contacted while I was on my way to another

12  meeting and they needed the written descriptions.  I told

13  them I would get to them as soon as I got to my

14  destination and they said they needed it now.  So I had to

15  pull off Interstate 10 on the shoulder and send them the

16  file.  The file that I sent them was the one immediately

17  previous to that and it omitted that change.

18  Q.   And as a result of that error -- let me ask you this.

19  Do you agree with district court that the discrepancy was

20  solely due to your error in failing to use the correct

21  maps?

22  A.   In that particular part of the written descriptions,

23  but between the time that the written descriptions were

24  prepared by me in June of 2017, the precincts that were in

25  effect at the time of that written descriptions, as

1    reflected in the file that I sent.  However, between then

2    and when the charter was adopted in December of that year,

3    the parish went through some precinct consolidations and

4    mergers and several of the -- there were like 49 precinct

5    corrections that needed to be made to those written

6    descriptions at that time, so it was the omission that I

7    had plus we had to do 49 -- approximately 49 precinct

8    corrections or references to precincts in order for those

9    written descriptions to align with the adopted map.

10   Q.    And as a result of that, the parish government was

11   sued and had to defend itself in litigation?

12   A.    The way that we correct written descriptions are

13   through technical correction ordinances, and they were

14   taking issue that that was the way to do it.  They wanted

15   to have a new election on the charter amendments.

16   Q.    Because some voters in the parish had not been

17   assigned to a district; is that right?

18   A.    The omission that I had left an area that had some

19   population out, but the maps all reflected which district

20   they were in.

21   Q.    And, Mr. Hefner, I understand you're not here

22   testifying as a lawyer, correct?

23   A.    That is correct.

24   Q.    But as a map-drawer, you have an understanding of the

25   basic redistricting requirements like one-person,

1    one-vote, correct?

2    A.    Yes.

3    Q.    And you mentioned one-person, one-vote earlier today?

4    A.    Yes.

5    Q.    And although you don't provide legal advice to local

6    governments, you provide demographic services, and those

7    governments count on your expertise and experience

8    complying with one-person, one-vote, correct?

9    A.    Yes.

10   Q.    And you understand that the one-person, one-vote --

11   under the one-person, one-vote requirement, legislative

12   districts must be within a total deviation of no more than

13   10 percent from the most populated to the least populated?

14   A.    That is the preferred range.  That was set based on

15   statewide redistricting.  It's like congressional

16   districts, and whatnot.  That's where that original plus

17   or minus 5 percent standard came from.

18   Q.    And earlier in this redistricting cycle, maybe last

19   year, you drew maps for the DeSoto Parish Police Jury; is

20   that right?

21   A.    That's correct.

22   Q.    And the first of your redistricting plans that the

23   parish adopted had a deviation of 16 or 17 percent,

24   correct?

25   A.    That is approximately correct.

1    Q.    And that issue, among others, resulted in the parish

2    being threatened with litigation?

3    A.    That was one of the reasons that the litigation was

4    threatened, yes.

5    Q.    And the parish had to then enact a new map that

6    corrected the deviation to be within the allowable range,

7    correct?

8    A.    Yes.  That was my recommendation to them.

9          MR. NAIFEH:  Your Honors, we object to the

10   admission of Mr. Hefner.  He has a record of errors,

11   legal errors and technical errors, in his districting

12   work.  I believe that he is not qualified to provide the

13   opinions he is offered for.

14         JUDGE SUMMERHAYS:  You are addressing the

15   technical defects in the present report or are you arguing

16   that the experience in the prior cases that you addressed

17   with him disqualify him as an expert under 702?

18         MR. NAIFEH:  The latter.  We believe his history

19   of errors and his applications of legal requirements that

20   he is familiar with indicate that he is not qualified to

21   offer expert opinions on demography and redistricting.

22         MR. GORDON:  And, Your Honor, I'm sorry.  I

23   don't mean to interrupt.  We have a couple of questions on

24   voir dire as well in this case, and I think we will be

25   joining that.

1          JUDGE SUMMERHAYS:  So you are joining?  Are you

2   going to ask additional questions?

3          MR. GORDON:  Yes, Your Honor, briefly.

4          JUDGE SUMMERHAYS:  Why don't we do this

5   together.  Why don't you ask your questions and then you

6   can join if you wish.  And then I'll hear from the

7   plaintiffs.

8          MR. GORDON:  Thank, Your Honor.

9          JUDGE SUMMERHAYS:  Proceed.

10                    <u>VOIR DIRE EXAMINATION</u>

11  BY MR. BOWEN:                                                      )

12  Q.   Brennan Bowen from Holtzman Vogel on behalf of the

13  State.

14       Mr. Hefner, I'm just going to follow up on the DeSoto

15  case you were just discussing with Mr. Naifeh.

16       Do you recall in that case that the Court had said:

17  I would also note that there is evidence that the police

18  jury received what I believe is properly characterized as

19  constitutionally suspect legal advice from its

20  redistricting adviser, Mr. Hefner, in the process of

21  making its decision?

22  A.   I do recall that, yes.

23          MR. BOWEN:  That's it from the State, Your

24  Honors.

25          JUDGE SUMMERHAYS:  Now, are you joining in the

1    objection?

2            MR. GORDON:  We are, Your Honor.

3            JUDGE SUMMERHAYS:  Counsel, you are up.

4            MR. BODAMER:  Your Honor, I respectfully submit

5    that what you have just witnessed there may have some

6    impact on the weight to be given to his testimony, but

7    certainly does not impugn his qualifications in any

8    respect.  In fact, if anything, I think he buttressed his

9    qualifications in terms of the work that he's done and the

10   manner in which he conducts it.  So I would ask that you

11   accept him as an expert witness in this case.

12           JUDGE SUMMERHAYS:  What about the argument about

13   the other errors that were made, the mathematical errors

14   in the one-vote calculus?

15           MR. BODAMER:  I think he addressed what that was

16   about.  I don't think that disqualifies him as an expert

17   witness.

18           JUDGE SUMMERHAYS:  The argument is it goes to

19   the weight?

20           MR. BODAMER:  Correct.

21           JUDGE SUMMERHAYS:  Let me confer.

22               (Judges confer off the record.)

23           JUDGE SUMMERHAYS:  We are going to overrule the

24   objection to Mr. Hefner's testimony.  We find that based

25   on his testimony, he meets the qualifications and the

1  requirements to opine under Rule 702.  As far as the

2  matters in the other cases that were raised on voir dire,

3  those matters go to the weight of his testimony and not

4  the admissibility.  The panel will weigh that testimony

5  according.  You may proceed.

6                    CONTINUED DIRECT EXAMINATION

7  BY MR. BODAMER:

8  Q.   Mr. Hefner, you intend to offer several opinions in

9  this case, correct?

10  A.   Yes.

11  Q.   Do you intend to offer an opinion as to whether the

12  African-American population is compact enough to create a

13  second majority-minority district without sacrificing

14  traditional criteria?

15  A.   Yes.

16  Q.   And what is your opinion?

17  A.   Based on the analysis that I've looked at with the

18  geographic distribution and concentration of the

19  African-American population of the state of Louisiana,

20  it's -- you can't create a second majority-minority

21  district and still adhere to traditional redistricting

22  criteria.

23  Q.   Number two, in reviewing Senate Bill 8, that map, do

24  you have an opinion as to what impact, if any, race had in

25  taking that in consideration versus the other more

1    traditional criteria?

2    A.    Yes, I offered an opinion on that.

3    Q.    And what's your opinion?

4    A.    My opinion is that race predominated in the drafting

5    of Senate Bill 8 plan.  That's evidenced by the lack of

6    compactness, that the plan had the excessive dividing of

7    communities of interest, the deviation of -- radical

8    deviation from the traditional core districts within the

9    state.  I did not review incumbency but the fact that

10   those redistricting criteria were not followed led me to

11   the conclusion that the only reason that the districts

12   were drawn the way they were in Senate Bill 8 was because

13   race was a predominant factor or criteria in drawing the

14   plan.

15   Q.    And we're going to get into more detail.  Then the

16   third opinion I am going to ask you about:  Do you have an

17   opinion as to whether there is a -- whether a reasonable

18   plan can be drawn in a race-neutral manner that adheres to

19   use of traditional redistricting principles and preserves

20   more communities of interest, provide more compact

21   election districts, and preserves the core election

22   districts, and balance the population within each

23   district?

24   A.    Yes.

25   Q.    And what plan is that?

1    A.   The plan that the plaintiffs provided, which was

2    Illustrative Plan 1, met all of that criteria.

3              MR. BODAMER:  So can we pull up Joint Exhibit

4    14, please?

5    Q.   (BY MR. BODAMER) Mr. Hefner, are you familiar with

6    Joint Exhibit 14?

7    A.   Yes.

8    Q.   We lost it.

9         Map of Louisiana.  What is this?  What does this

10   show?

11   A.   The map that's before me is the 2024 congressional

12   districts that were -- looks like it's following Senate

13   Bill 8 plan.

14             MR. BODAMER:  Are the colors better on your

15   screen than they are shown up at the top?

16             JUDGE JOSEPH:  We see it very clearly on our

17   screen.

18             JUDGE SUMMERHAYS:  Yeah, the colors are clear.

19             MR. BODAMER:  They're better, okay.  I had

20   trouble yesterday, too.  I thought I was color-blind on

21   some of it.

22   Q.   (BY MR. BODAMER) So this is the enacted map, correct?

23   A.   Yes.

24             MR. BODAMER:  And then can we also pull up

25   Plaintiffs' Illustrative Plan 1, which is Plaintiffs'

1    Exhibit 14.

2    Q.    (BY MR. BODAMER) This is a map of the illustrative

3    plan that you were referring to just a minute ago?

4    A.    Yes.  This is a map that I created from the

5    shapefiles that were sent to me.

6    Q.    And, again, I notice there is no second

7    majority-minority district reflected on this map; is that

8    right?

9    A.    That is correct.

10   Q.    And again, why is that?

11            MR. NAIFEH:  Objection.  There is no foundation

12   that he knows why this plan doesn't contain the second

13   majority-minority district.

14            MR. BODAMER:  That's a good point.  That's a

15   good point.  Let me withdraw that.

16            JUDGE SUMMERHAYS:  I will sustain the objection

17   and, Counsel, you can lay your foundation.

18            MR. BODAMER:  Thank you.

19   Q.    (BY MR. BODAMER) Have you tried to draw a map in

20   which you could create a second majority-minority district

21   in the state of Louisiana?

22   A.    I've done --

23            MR. NAIFEH:  Objection.  He has no opinions in

24   his report on himself trying to draw a map that contains a

25   second majority black district.

```
1              JUDGE SUMMERHAYS:  Counsel?
2              MR. BODAMER:  I think it's inherent in that what
3     we've been doing here.  But that's okay.  I'll withdraw.
4              JUDGE SUMMERHAYS:  You offered testimony that he
5     was going to testify as to the ability to create a second
6     district, correct?
7              MR. BODAMER:  That's true.  And the Illustrative
8     Map Plan 1 has been admitted -- or, you know, it's been
9     present in, throughout the preparation for the trial and
10    through the trial itself.
11             JUDGE SUMMERHAYS:  You know, I'm inclined to
12    overrule the objection as long as we lay a foundation on
13    the preparation of the map that's on the screen there.
14             MR. BODAMER:  All right.
15             JUDGE SUMMERHAYS:  The objection is overruled.
16             JUDGE STEWART:  Why don't you back up and sort
17    of reformulate exactly the question you are asking.
18             MR. BODAMER:  Sure.
19             JUDGE STEWART:  It's not clear to me exactly
20    what you were asking.
21             MR. BODAMER:  Thank you.
22    Q.   (BY MR. BODAMER) Let me just ask it this way.  What
23    does Plaintiffs' Illustrative Plan Number 1, Exhibit
24    PE-14, what does that represent?
25    A.   That plan is a congressional plan that preserves
```

1    District 2 as a traditional majority-minority district.

2    It generally follows what has been in place for the past

3    couple of census cycles.  And the division of the rest of

4    the state into districts largely follows.  It's somewhat

5    similar to the traditional boundaries that have been used

6    in the past.  Some deviations, but generally overall it

7    follows that general configuration.

8    Q.    Based on your review of this map, does it adhere to

9    traditional redistricting principles?

10   A.    In my opinion it does.

11   Q.    And what about, does it preserve more communities of

12   interest than the Joint Exhibit 14, the 2022 map?

13   A.    Yes.  It splits fewer parishes and municipalities.

14   Q.    Does Plaintiffs' Illustrative Map Number 1,

15   Exhibit 14, what impact, if any, does it have on compact

16   election districts compared to SB8?

17   A.    The two most popular compact analysis are the

18   Polsby-Popper and Reock scores.  Polsby-Popper measures

19   the perimeters of the districts and comes out with a

20   score, a score of 1 being perfect.  Reock measures the

21   area of the districts.  And again ideal would be a 1 on

22   that.  So under -- running both of those compact score

23   analysis for Illustrative Plan 1, it comes in with a

24   higher score, the mean score getting closer to 1 than the

25   enacted Senate Bill 8 plan.

1    Q.    What is compactness?

2    A.    Compactness is basically a unity of representation.

3    The more compact a district is made, the more the people

4    within that area will share the same ideas, values, and

5    legislative needs.

6    Q.    So do you want -- with respect to those interests you

7    just described there, do you want a district that's more

8    compact rather than less?

9    A.    Yes.

10   Q.    And the higher the score means what?

11   A.    The higher the score means it's more compact.

12   Q.    So you want higher scores rather than lower scores?

13   A.    Correct.

14   Q.    And I'm going to get into that a little bit more in a

15   minute, but let me ask you, the basis for your conclusion

16   that race was the primary criterion or the predominant

17   reason for the creation of SB8.  Okay?

18           MR. BODAMER:  Can we pull map -- let's see it

19   will be Exhibits 15 and 16, but let's do 15 first.

20   Q.    (BY MR. BODAMER) What does map -- again, this would

21   be Exhibit 15.  I know it says Map 14.  That's from your

22   report, correct?

23   A.    That is correct.

24   Q.    Okay.  But it's Exhibit 15.

25           MR. NAIFEH:  May I just correct?  I think this

1   is a demonstrative.  I don't think this is an exhibit in

2   evidence yet, Your Honor.

3          JUDGE SUMMERHAYS:  This is one of the exhibits

4   that's going to -- that y'all are conferring and

5   introducing?

6          MR. NAIFEH:  I think it may be.  I just want the

7   record to be clear about what we're looking at.  I'm not

8   objecting to the use of the map.

9          JUDGE SUMMERHAYS:  It's not an exhibit; it's a

10  demonstrative until the parties can review it and come to

11  an agreement on admitting it as an exhibit.  But, you

12  know, I think I speak for all three of us:  We need a

13  complete record in this case for the reviewing court.  And

14  the preference is to admit these documents that are being

15  used and testified to by the expert as well as subject to

16  cross-examination.

17         JUDGE JOSEPH:  So if you can admit it through

18  this witness, do that.

19         MR. BODAMER:  Well, thank you.  That's what I

20  actually intended to do.  Whether to do it one at a time

21  or to do it at the end, and I'll handle it however you

22  want, but, yeah, it is our intent to offer this as an

23  exhibit.

24         JUDGE SUMMERHAYS:  Well, let's do it now.

25         MR. BODAMER:  Okay.

1          JUDGE STEWART:  Yeah.  It not only changes it --
2    even though it's going to come in, you still need for the
3    record that you lay the foundation.  I mean, you touch
4    first, second, and third, you know, so at least the record
5    is clear that he knows something about the piece, where it
6    came from and so on.  It doesn't take a whole lot of
7    questions to do that.  That just keeps it sequential.
8    You know what I'm saying?
9          MR. BODAMER:  Yes, sir, I do.
10          JUDGE SUMMERHAYS:  That helps.
11   Q.   (BY MR. BODAMER) Can you tell us what Map 14 from
12   your report, Exhibit 15, for purposes of this hearing --
13   A.   It's a form of a heat map.  Heat, H-E-A-T.  What it
14   does is it demonstrates concentrations --
15   Q.   Excuse me, to interrupt you, but before you do that.
16   Did you prepare this map?
17   A.   Yes.
18   Q.   And again, tell us what it does.
19   A.   It shows a concentration of the African-American
20   voting age population across the state and based on the
21   2020 census.
22          MR. BODAMER:  Your Honor, I would move for the
23   admission of Exhibit 14 -- excuse me -- Exhibit 15.
24          JUDGE SUMMERHAYS:  Any objection to 15?
25          MR. NAIFEH:  No objection, Your Honors.  I just

1  want to be clear what exhibit number we're talking about

2  because I think they've already admitted an exhibit with

3  the number 15, although I may be wrong.

4          MR. GREIM:  We have not admitted an Exhibit 15.

5  Our original 1 through 17 became joint exhibits, so that

6  opened up all those numbers and there will be a new list

7  that are going to replace those.

8          JUDGE SUMMERHAYS:  Very good.  So this is 15

9  that you are offering?

10          MR. BODAMER:  That's my understanding.

11          JUDGE SUMMERHAYS:  There is no objection to

12  that?

13          MR. NAIFEH:  No objection.

14          MR. GORDON:  No objection from the state, Your

15  Honor.

16          JUDGE JOSEPH:  Ms. LaCombe, are you tracking

17  the --

18          MS. LACOMBE:  Yes, sir.

19          JUDGE SUMMERHAYS:  Lisa was on top of it.  It's

20  admitted.

21          MR. BODAMER:  Thank you, Your Honor.

22  Q.   (BY MR. BODAMER) So again, you started to get into

23  this.  But I'm seeing hot spots or whatever on the map.

24  Can you explain to the Court again what this map reflects.

25  A.   Yes.  It ranges on a high end of red being a very

1    high concentration of African-American voting age

2    population to, into blue and the shades of purple.

3    Purple representing the lower end of the concentration.

4        What's useful about using this type of analysis is it

5    shows a concentration of a -- actually here it shows a

6    concentration of African-American voting age population

7    across the state.  You'll see that in Orleans Parish,

8    New Orleans area, it's -- it's very dense.  It goes into

9    red, to yellow, to blues.  And then the next largest area

10   of concentration is the East Baton Rouge area, which is

11   indicated by the light to medium blue colors.  After that,

12   it gets somewhat dispersed across the state until you get

13   to the next largest concentration, which is up in Caddo

14   Parish, or in the Shreveport area.  And that's indicated

15   by the light to darker blues.

16   Q.   Could you create a second majority-minority district

17   without conducting those areas of concentration of

18   Orleans up to Baton Rouge?

19           MR. NAIFEH:  Objection.  There is no foundation

20   for him to know if it's possible.

21           MR. BODAMER:  I'm sorry?

22           MR. NAIFEH:  There's no foundation for

23   Mr. Hefner to know if it's possible to draw a

24   majority-minority district without connecting those areas.

25           JUDGE SUMMERHAYS:  Counsel, do you want to

1    reformulate your question and lay a foundation?

2            MR. BODAMER:  Sure.

3            JUDGE SUMMERHAYS:  All right.  Sustained.

4    Q.   (BY MR. BODAMER) Have you attempted to form or create

5    a second -- a map that would include two majority-minority

6    districts?

7            MR. NAIFEH:  Objection.  He hasn't laid a

8    foundation that he has attempted to draw any such map.

9            JUDGE SUMMERHAYS:  I think he is trying to lay a

10   foundation.

11           MR. BODAMER:  That's what I asked him.

12           MR. NAIFEH:  He's trying to lay the foundation

13   but there was no opinion, so it's beyond the scope of the

14   opinions that were disclosed in the Rule 26(a)(2)

15   disclosures.  The report included no maps that Mr. Hefner

16   drew.

17           JUDGE SUMMERHAYS:  I think we've covered this.

18   I think we addressed the ability to form a second

19   majority-minority district.  Unless my colleagues dissent,

20   I am going to overrule the objection.

21           THE WITNESS:  As part of my review, I always

22   like to, for my own edification, I like to see what's

23   possible because I need to let my clients know there are

24   some issues that may be possible.  I did try to create a

25   second majority-minority district and follow traditional

1    redistricting criteria, and I was unable to do so.

2        There were different ways of trying to connect those

3    areas of concentration, but in doing so, it violated at

4    least one, or if not more of the traditional redistricting

5    criteria and therefore I was unable to come up with one

6    that had a second majority-minority district.

7            MR. BODAMER:  We've looked at Exhibit 15.  Can

8    we now pull up Exhibit 16.

9    Q.   (BY MR. BODAMER) Can you tell us what Exhibit 16 is?

10   A.   Yes.  I'm sorry.  Yes.  This is Map 15 from my

11   report.  This takes that heat map and it overlays the

12   Senate Bill 8 districts on the -- over that heat map to

13   show where those concentrations lie within the Senate

14   Bill 8 plan.

15       From a demographer standpoint, it was very clear to

16   me what the mapmaker did in creating Senate Bill 8, in

17   that once you took the minority population in District 2

18   from Orleans to East Baton Rouge, he then had to try and

19   build that second district.  And the way that they did

20   that was to come across the state toward Caddo, toward the

21   Shreveport area, where that next largest concentration is

22   outside of East Baton Rouge.  In doing so, particularly

23   like in Lafayette Parish -- that's a real good example --

24   you'll notice that they dip down and they carved out the

25   northeast part of Lafayette Parish.  They picked up those

1    precincts that are predominantly African American and then

2    it popped back up and took in St. Landry Parish where

3    Opelousas has a relatively large population of

4    African-American populations.  And then it narrowed itself

5    down until it got to the African-American population

6    concentration in Alexandria, which is there in the center

7    of the Rapides Parish area.  Carved right around that and

8    then worked its way up, picked up Natchitoches, which is

9    the population center for Natchitoches Parish or where

10   most of the people live.  It has a relatively large

11   African-American population.  And then it picked up

12   Mansfield, which has a large population in DeSoto Parish

13   and then went further north.  Went around Stonewall in the

14   north part of DeSoto.  That's where it turns in there just

15   as it comes into Caddo, and it picks up that bright blue

16   spot up in Caddo Parish, which is where that concentration

17   of African-American populations they were trying to pick

18   up.

19        So they tried to connect the two largest populations

20   between East Baton Rouge and Caddo with the

21   African-American voting age population.  And in doing so,

22   they tried to pick up as much African-American population

23   as possible without picking up too much total population,

24   because they needed room in the total population in order

25   to be able to get there so they didn't exceed a plus or

1  minus 5 percent deviation.

2          MR. BODAMER:  Can we look at or pull Exhibit 17?

3          JUDGE SUMMERHAYS:  Are you going to introduce --

4          MR. BODAMER:  I am.

5          JUDGE SUMMERHAYS:  But after 17?

6          MR. BODAMER:  Yeah, that was my plan.

7          JUDGE SUMMERHAYS:  You may proceed.

8          MR. BODAMER:  And again, this was Map 16 in his

9  report, but it's marked as Exhibit 17 for purpose of this

10  trial.

11  Q.   (BY MR. BODAMER) What are we looking at here with

12  Exhibit 17?

13  A.   This is the Map 16 from my report.  It's another way

14  of analyzing the distribution and concentration of the

15  population.  Each one of those dots represents 100 voting

16  age population people from the 2020 census.  The white

17  dots represent white voting age population.  The red dots

18  represent black or African-American voting age population.

19  And the green dots represent those of all the other races

20  combined.  So this shows the distribution of the voting

21  age population throughout the state and it overlays the

22  Senate Bill 8 plan on there, because, from a demographer

23  standpoint, it's very demonstrative to me to see how the

24  concentration of red dots fell within particularly CD-6,

25  which was the second majority-minority district and how

1    the sparse population in those populations -- in those

2    parishes between those concentrations allowed them to take

3    in the whole parish but not affect the total population

4    much on that district.

5         So you'll see a lot of those red clusters that

6    generally align with that heat map, but you'll also, with

7    this, you'll be able to see that it encompasses sparsely

8    populated parishes.  But when it got to more concentrated,

9    you'll see that district narrowing down to carve it out.

10   One area is it's only like 1.3 miles that connect -- the

11   width, that connects different parts of the district.  So

12   it indicates to me that they are very careful on how they

13   selected the populations.

14             MR. BODAMER:  Your Honor, at this time I would

15   offer into evidence Exhibits 15, 16, and 17.

16             JUDGE SUMMERHAYS:  I think we've already

17   admitted 15.

18             MR. BODAMER:  I'm sorry.  Thank you.

19             JUDGE SUMMERHAYS:  16 and 17.

20             MR. NAIFEH:  No objection from the Robinson

21   plaintiffs.

22             MR. BOWEN:  No objection from the State.

23             JUDGE SUMMERHAYS:  16 and 17 are admitted.

24             MR. NAIFEH:  I misspoke.  We're Robinson

25   intervenors, not the Robinson plaintiffs.

1          JUDGE SUMMERHAYS:  Very good.  16 and 17 are

2    admitted.

3    Q.   (BY MR. BODAMER) Look at Exhibit 18, please.  Can you

4    tell us, Mr. Hefner, what Exhibit 18 is.

5    A.   Exhibit 18 --

6    Q.   Map 21 of your earlier report?

7    A.   Yes, Map 21 from my original report.  This shows the

8    Shreveport area in Caddo Parish.  The colorations are the

9    voting age population, the black voting age population by

10   precinct.  The black outline is the CD-6 district under

11   Senate Bill 8, and this concentrates up in that Shreveport

12   area.  So we --

13   Q.   Was this the very northern portion of CD-6?

14   A.   Yes.

15   Q.   And so what's this tell us?

16   A.   If you take a look at the populations that have a

17   high black voting age population, which is represented in

18   red, that's 61 to 100 percent, and then the yellow, which

19   is 50 to 60 percent, you'll see that this CD-6 boundaries,

20   they follow -- it follows the exact perimeter that you

21   needed in order to pull those precincts into CD-6 in order

22   to get the high black voting age population.

23   Q.   So this is the northwestern tip and then it extends

24   all the way down to Baton Rouge?

25   A.   Yes.  This is the north -- this would be the

1    northwest end of that long district.  East Baton Rouge

2    would be on the southeast end.

3    Q.   So how far is it from East Baton Rouge to this

4    northwest point?

5    A.   About 251 miles.

6    Q.   Is that consistent with traditional redistricting

7    criteria?

8    A.   No, it's not -- it's not compact.  If it was compact,

9    it would be far less distance from one side of the

10   district to the other.

11          MR. BODAMER:  I apologize, sir, on the phone.

12          JUDGE SUMMERHAYS:  Make sure all electronics are

13   off.  It disrupts the hearing, but also it can interfere

14   with electronics.

15          MR. BODAMER:  I understand.  I warned everybody

16   yesterday and then didn't mind my own --

17          JUDGE JOSEPH:  We're used to it.

18          MR. BODAMER:  Can we pull up Exhibit 19, which I

19   believe is Table 5 from your report.  I'm sorry, I didn't

20   offer, I don't think, Exhibit 18 into evidence.

21          JUDGE SUMMERHAYS:  You are offering Exhibit 18?

22   Any objection?

23          MR. NAIFEH:  No objection from the Robinson

24   intervenors.

25          MR. BOWEN:  No objection from the State.

1      JUDGE SUMMERHAYS:  It's admitted.

2  Q.   (BY MR. BODAMER) Now, let's look at Exhibit 19.

3  What is Exhibit -- this is Table 5 from your report.  A

4  lot of information, a lot of detail here.  Can you explain

5  to the Court what this indicates?

6  A.   I take a look at the parish-level precincts and

7  identified those that had a 40 percent or higher voting

8  age population for blacks and I took a look at what they

9  had parishwide and also which of those were assigned to

10  CD-6.  The area in particular interest to me was the area

11  that's shaded in yellow.  For example, if we look at

12  Avoyelles Parish, in CD-6 they had, out of the total

13  parish with 40 percent any part black voting age

14  population, they had twelve precincts.  Out of those

15  twelve, eight were assigned to CD-6.  Or 67 percent of the

16  40 percent or higher black voting age population were

17  assigned to CD-6 in Avoyelles Parish.

18      Another example would be East Baton Rouge.  Following

19  that same methodology, there were 115 precincts that had a

20  40 percent or higher any part black voting age population.

21  Of that 115 in that parish, 112 were assigned to CD-6.  Or

22  97 percent of those that had a high black voting age

23  population were carved into CD-6.

24      The area in the purple on the right just showed an

25  indication of the total number of precincts that were in

1    each parish.  And then the total that were assigned to

2    CD-6 and then what that percentages were.  But what was

3    illustrative to me was that in the majority of these

4    parishes, as indicated in the gold area on the table, the

5    mapmaker was very deliberate in picking up as many of

6    those 40 percent or higher any part black voting age

7    populations into CD-6 in order to help get those numbers

8    up to a higher black VAP.

9            JUDGE SUMMERHAYS:  Let me stop you there.

10   Counsel.

11           MR. NAIFEH:  I would like to move to strike the

12   testimony about what the mapmaker deliberately did.  He

13   hasn't laid a foundation that he knows what the mapmaker

14   deliberately did or what the mapmaker's state of mind was.

15           JUDGE SUMMERHAYS:  Counsel?

16   Q.   (BY MR. BODAMER) Can I just the question:  What does

17   this chart state or show to a demographer?

18   A.   From a demographer standpoint, in my opinion, it

19   shows that it was very carefully crafted to bring in as

20   many black voting age population precincts into CD-6 as

21   you could.

22           JUDGE SUMMERHAYS:  I'm reading and you're

23   objecting to the testimony that the mapmaker was very

24   deliberate in picking up as many of those 40 percent or

25   higher?  Is that what your --

1           MR. NAIFEH:  That is exactly the question.

2           JUDGE SUMMERHAYS:  You know, as long as we

3    clarify that that is, from his point of vantage as a

4    demographer, it doesn't seem to be going into the state of

5    mind of the mapmaker.  It seems to be his opinion based on

6    reviewing the map.  With that limitation, I am going to

7    allow it.  I am going to overrule the motion to strike.

8           MR. BODAMER:  Which is why I asked that

9    follow-up question.  Yeah, no one is saying that he talked

10   to the mapmaker here.

11   Q.   (BY MR. BODAMER) You're basing your testimony on your

12   review of what another mapmaker did based on redistricting

13   criteria; is that right?

14   A.   Yes.  Based on my past work as a demographer doing

15   redistricting plans.

16          MR. BODAMER:  Oh, I'm sorry.  Let me move for

17   the admission of Exhibit 19, so I do that.

18          JUDGE SUMMERHAYS:  19, any objection?

19          MR. NAIFEH:  No objection from the Robinson

20   intervenors.

21          MR. BOWEN:  No objection from the state.

22          JUDGE SUMMERHAYS:  19 is admitted.

23   Q.   (BY MR. BODAMER) Mr. Fairfax I think is -- has also

24   issued a report.  You've reviewed that report and you've

25   issued a rebuttal report, correct?

1   A.    Correct.

2   Q.    Do you recall that Mr. Fairfax analyzed the

3   distribution of black voters at the parish level?  How did

4   you analyze the distribution of black voters?

5   A.    As far as my opinion of using Mr. Fairfax's

6   methodology?

7   Q.    Yeah.

8   A.    I did not find it very useful because it doesn't give

9   you a complete picture on the -- on where the black voting

10  age population is located within a parish.

11  Q.    Is that why you used the dot density maps and the

12  heat maps?

13  A.    Yes.  If you use Mr. Fairfax's approach, what you're

14  looking at is just on a parish level, you're looking at

15  the percentage of the black voting age population as a

16  percentage of the total voting age population.  You can

17  have a very -- you can have a parish with a very low

18  population and it would show up red if you had the

19  majority of those were black voting age population, but

20  numerically it would be very low.  Percentage-wise it

21  would like impressive.  But when you're drawing a plan,

22  you've got to go for numbers.  And so it's not a matter of

23  what that ratio is or that percentage is in a parish; it's

24  where it's located in the parish that you have to look at.

25  And that's one reason if you lay those heat maps on, you

1    can see where they actually divided some parishes in order

2    to carve where the black population was and didn't take

3    the parish as a whole.

4    Q.    Let me move on into traditional redistricting

5    criteria.  I think you mentioned earlier that you looked

6    at communities of interest, compactness, and preservation

7    of core districts; is that right?

8    A.    Yes.

9    Q.    Are there additional criteria that can be considered?

10   A.    Yes.  Incumbency can be considered as to not putting

11   incumbents against each other.  Preservation of political

12   entities.  It's similar to communities of interest but

13   some specified as political entries, which would be

14   parishes, precincts, municipalities, those that have

15   political boundaries.  Also, too, race plays a factor as

16   well, because that's part of what the Voting Rights Act

17   calls attention to for consideration.  So those are some

18   of the other criteria that we generally take a look at as

19   we're drafting redistricting plans.

20   Q.    Why did you focus on communities of interest,

21   compactness, and preservation of core districts?

22   A.    Well, contiguity is one of them.  The district needs

23   to be contiguous.  It needs to all be in one piece.  While

24   this plan is contiguous, it's rather tenuous.  As I

25   testified a moment ago, in some parts that district is

1    only 1.3 miles across.  Other areas it's 54 miles across.

2    So it's using very small connectors to piece together some

3    of the district.  It's contiguous, but it's barely

4    contiguous.  But I didn't evaluate that as one of the

5    criteria necessarily because it is contiguous.  It meets

6    that criteria.

7         I didn't look at the incumbency.  I don't even have

8    them located on my map.  What I was looking at were the

9    districts themselves and not the incumbency.

10        The political boundaries generally are rolled into

11   the communities of interest.  And then also you have your

12   traditional core districts.

13        So the ones that I saw the issues with were the ones

14   that I evaluated with, which was compactness, core

15   districts, and communities of interest.

16   Q.   Maybe you addressed this earlier, but why are

17   communities of interest an important criterion or

18   consideration?

19   A.   From a representation standpoint, communities of

20   interest are generally, at whatever level, are going to

21   share some shared issues, concerns, history, culture,

22   things that may drive with their legislative interests,

23   maybe, with their representatives.  From a representative

24   standpoint, having a district that's a bit more homogenous

25   in its needs, in its -- and its population makes it a

1    little easier to be able to represent them.  You don't

2    have as much opposition, opposing sides tugging at you as

3    a representative.  It's generally more homogeneous so you

4    can generally represent them better.

5    Q.    So how does SB8's redistricting map impact

6    communities of interest?  Can you give us some examples?

7    A.    Well, my concern was the number of parishes that the

8    plan split.

9    Q.    Why does that matter?

10   A.    Because when you start dividing up parishes, if

11   you're looking at them as communities of interest, which

12   they are, then when you start dividing them up between two

13   or more congressional districts, then you tend to weaken

14   that split part of the parish, their voice, the strength

15   of their voice, with those that may be in that district or

16   that may be whole parishes or more populated areas, so

17   they don't have quite the voice of representation that a

18   whole parish would, that can speak as one voice.

19   Q.    Did the SB8 also split municipalities?

20   A.    Yes, it split a number of municipalities.

21   Q.    What's the problem with that?

22   A.    The problem with that is a municipality is a

23   community of interest.  In fact, they have generally been

24   formed from a community of interest as part of their

25   history.  Citizens in that area get together, they have

1    shared ideas, and they form a municipality.

2        It's the same thing but at a little bit different is

3    that now a municipality, some of the residents having to

4    go to one congressional member for help issues and the

5    rest of them go to a different one, instead of speaking as

6    a unified voice.

7    Q.    You just talked about splitting of municipalities and

8    parishes, but SB8 also brought together some disparate

9    communities, did it not?

10   A.    Yes, it did.

11   Q.    What's that tell you?

12   A.    That, when you bring in different communities of

13   interest, you're bringing in perhaps maybe some

14   conflicting ideas, issues, cultural approaches, histories.

15   It makes it be more difficult for that district to speak

16   as one voice to its representative and for its

17   representative to be able to represent the interests of

18   those people.  East Baton Rouge, for example, may have

19   different issues and ideas than, say, Shreveport does.

20   They're both municipalities.  They're both large

21   municipalities, but also different parts of the State.

22   They have different issues and different cultures and

23   different backgrounds, and sometimes those can conflict.

24   And when you have that conflict within a single

25   congressional district, it's difficult for the people to

1    compete for the attention of their representative and also

2    for their representative to serve their communities.

3    Q.    Let's look at CD-6, the second majority-minority

4    district, from a community of interest perspective.

5    What about culturally?  You kind of hit on this I think.

6    But culturally, is there a community of interest in CD-6?

7    A.    You have a diversity of cultures in CD-6.

8    Q.    Did it make sense from a demographer's perspective to

9    remove Shreveport from traditional CD-4 and join it with

10   Baton Rouge?

11   A.    No.

12   Q.    What about economically?  Did you look at the

13   economic aspect as a community of interest in this matter?

14   A.    Yes.

15              MR. BODAMER:  Can we look at Exhibit 20 which

16   was your Map 10.

17   Q.    (BY MR. BODAMER) Why did you include Exhibit 20 in

18   your report?  What's this tell us?

19   A.    In looking at the SB8 plan, what I'm trying to find

20   is:  Was there any pattern or anything that might guide

21   the creation of the districts in SB8.  Since, particularly

22   CD-6, but also the others, 4 and 5, somewhat of 3, those

23   congressional districts, they are largely rural.

24   Agriculture is generally going to be one of the main

25   economic activities in those rural parishes.  So I took a

1    look at what the gross domestic product was in Louisiana

2    based on parish level.

3    Q.   Did you find any homogeneous economic activity as a

4    reason to combine Baton Rouge and Shreveport?

5    A.   No.

6    Q.   From an agricultural perspective, did the central

7    part of CD-6 have more dependence on agriculture than

8    either urban Shreveport or urban Baton Rouge?

9    A.   Yes.

10   Q.   What about education?  Is there a common educational

11   attainment justification for CD-6?

12   A.   In the maps that I -- the analysis that I ran, I did

13   not see any.

14   Q.   What about socioeconomically?  Did you look at that

15   and, if so, what factors did you look at?

16   A.   We took a look at, of course, the gross domestic

17   product on agriculture.  We took a look at education,

18   those that had attained a high school degree and didn't go

19   any further, and then those that had a high school and

20   some form of post-secondary education.  Those were the

21   main ones that I took a look at from socioeconomic.

22        I did provide some other analysis, though, on poverty

23   rates, renters, those that -- I'd have to probably go look

24   back through my maps.  But some of the -- there were about

25   two or three other factors that I looked that Mr. Fairfax

1  took a look at.  Said, well, let me see what they look

2  like statewide, because he kind of focused on the East

3  Baton Rouge area.

4       And so I took a look at each of those from a

5  statewide standpoint because I was more interested in

6  seeing what patterns developed that might have guided the

7  development of these SB8 districts.

8  Q.   Did you see any patterns that might have guided the

9  mapmaker from a community of interest perspective?

10 A.   From demographer standpoint --

11 Q.   Yes, sir.

12 A.   -- in my opinion, no.

13          MR. BODAMER:  Your Honor, I would move for the

14 admission of Exhibit 20.

15          JUDGE SUMMERHAYS:  Any objection?

16          MR. NAIFEH:  No objection from the Robinson

17 intervenors.

18          MR. BOWEN:  No objection from the State.

19          JUDGE SUMMERHAYS:  Exhibit 20 is admitted.

20 Q.   (BY MR. BODAMER) You mentioned just a second ago

21 there about Mr. Fairfax.  As you said, he specifically

22 looked at socioeconomic criteria, preservation of

23 municipalities, landmarks preserved.  Again, how did those

24 impact your opinion, if at all, in your analysis?

25 A.   In his report he specifically was citing the fact

1    that the SB8 plan, particularly CD-6, was following

2    municipal boundaries and wasn't splitting any there.  And

3    he named several of them and -- Shenandoah and Central and

4    as far as landmarks, the LSU campus area.

5         Yes, they were following the boundaries of Central,

6    which is the second largest city in East Baton Rouge.  But

7    they were following it to exclude it from East Baton

8    Rouge.  And if you look at the demographics of the

9    Central, it was probably in the 80 percentile regarding

10   majority white voting age population.  So you had a large

11   total population, being the second largest city in East

12   Baton Rouge, but you also had a very large population of

13   white and not black voting age population.  If you look at

14   Shenandoah and some of the other census-designated places,

15   they're not official municipalities but the Census Bureau

16   recognizes them as a community of interest.  Those also

17   too had a high white population.

18   Q.   What's that say to a demographer?

19   A.   From a demographer's standpoint, it's doing two

20   things.  Because when we're drawing a plan, we're trying

21   to accomplish two things.  Here, we're trying to balance

22   out the total population for the one-man, one-vote, so we

23   only have a certain number that we can work within.  So

24   we're not trying to overload that.  But when you're

25   looking at what the characteristics of the population

1    are -- and here with CD-6 they're trying to get the

2    African-American voting age population above 50 percent,

3    so you have to be careful which population you put in as

4    part of that total.  So if you add in a large total

5    population and you're not paying attention to the

6    characteristics of it, then you're going to run out of

7    total population before you get to that concentration in

8    Caddo Parish in this particular case.  So it was real

9    important to keep your total population as low as you can

10   on the East Baton Rouge end and try to keep it as

11   favorable toward building that second majority-minority

12   district so you had enough room with the total population

13   to be able to work your way across the State and reach

14   that total population of African-American voters in Caddo

15   Parish in the Shreveport area.  So they were trying to

16   balance two things.  So they were very careful on how they

17   did that in East Baton Rouge.

18   Q.   Let me move to compactness.  We talked a little bit

19   about this.  You mentioned Polsby-Popper a minute ago.

20   And yesterday there's been some testimony about this.

21   But looking at compactness from a score perspective, you

22   used Polsby-Popper; is that right?

23   A.   Yes.

24   Q.   And just briefly, because the Court's heard some of

25   this, but what is Polsby-Popper's purpose and why did you

1    use that?

2    A.    I used Polsby-Popper because I was looking at the

3    configuration of the districts with SB8 and the rather

4    awkward, strung out CD-6 district boundaries.

5    Polsby-Popper is a measurement of the perimeter of a

6    district.  And with that shape of 6 in particular, I

7    wanted to see how that scored based on shape.  So that's

8    why I initially went with Polsby-Popper.  I wanted to see

9    how did the SB8 score when you're measuring the perimeter

10    of the various districts.

11    Q.    Well, how did CD-6 score under a Polsby-Popper

12    analysis?

13    A.    Very, very low.

14    Q.    Was it the lowest of all six districts?

15    A.    Yes.

16    Q.    And that indicates what?

17    A.    That it's not compact at all.

18    Q.    Now, Mr. Fairfax criticized you for not using the

19    Reock compactness score.  How is Reock different than

20    Polsby-Popper?

21    A.    Reock measures the area of a district, not the

22    perimeter but the area.  Say a circle being ideal.

23    That would be a 1.  The area of a circle equals a 1 under

24    Reock.  If you look at the -- if you scored it on area

25    under Reock, SB8 didn't do any better.  It had very low

1    scores under Reock as it did under Polsby-Popper.  It

2    offered no advantage doing a Reock analysis.

3    Q.   And you looked at Reock as well as Polsby-Popper in

4    your rebuttal report; is that right?

5    A.   Yes.

6            MR. BODAMER:  Can we pull up table 9 which is

7    Exhibit 21?

8    Q.   (BY MR. BODAMER) Is this from your report?

9    A.   Yes.

10   Q.   And does this -- can you just point out here -- I

11   don't want to take much time on this.  Does this basically

12   substantiate the testimony that you just gave?

13   A.   Yes.  You can look at -- if you want to look at what

14   the plan scored on average, that would be the end at the

15   plan mean.  I prepared the one that -- the plan HB1 that

16   was used in the last congressional election, it came out

17   to a .14.  Remember that .1 -- 1.0 is ideal.  SB8 was a

18   .11, and the illustrative plan was a .23.  But in

19   particular, SB8 under CD-6 had a .05 score on that.

20   Very, very low.  Very strung out.

21   Q.   So whether you look or use Polsby-Popper or Reock

22   compactness scores, it looks to me that SB8 enacted plan

23   2024 is the lowest under either or both, correct?

24   A.   Whether you use Polsby-Popper or Reock, it was the

25   lowest scoring plan.

1           MR. BODAMER:  Can we pull up Joint Exhibit 14

2    again?

3       Your Honor, I would move for the admission -- thank

4    you -- of Exhibit 21.

5           JUDGE SUMMERHAYS:  And that's table 9.  Any

6    objection?

7           MR. NAIFEH:  No objection from the Robinson

8    intervenors.

9           MR. BOWEN:  No objection from the State.

10           JUDGE SUMMERHAYS:  Exhibit 21 is admitted.

11   Q.   (BY MR. BODAMER) The bottom line on this, Mr. Hefner,

12   is Senate Bill 8 Congressional District 6 reasonably

13   compact?

14   A.   No.

15   Q.   Again, what does that indicate to a demographer?

16   A.   The first question I would ask as a demographer is:

17   Why would you be drawing a district like this in the first

18   place that would be connecting two parts of the State 250

19   miles apart from each other?  For what purpose would that

20   be, that would drive such a configuration?

21           MR. BODAMER:  Can we pull up Joint Exhibit 14

22   again?

23   Q.   (BY MR. BODAMER) What's your reaction to the shape of

24   CD-6?

25   A.   Under this map here?

1   Q.   Yeah.

2   A.   It's very -- it's very elongated.  It's rather

3   contorted.  Actually, to be quite honest with you, it's

4   somewhat bizarre when you compare it to some of the other

5   districts.  It's a rather awkward and bizarre shape of a

6   district.  It's not compact whatsoever.  And it splits a

7   number of parishes as you can see with the parish boundary

8   overlays.

9   Q.   Is a picture worth a thousand words here?

10  A.   From a demographer's standpoint, this tells me a lot.

11  Q.   And what's it tell you?

12  A.   It tells me that there was something that was driving

13  the creation of this plan other than traditional

14  redistricting criteria.

15  Q.   The last item I want to ask you about is preservation

16  of core districts.  How does Senate Bill 8 impact core

17  district?

18  A.   It turns several of the districts on its head.  6

19  traditionally comes down around the St. Mary, Lafourche,

20  Terrebonne area, south of the East Baton Rouge area.  Now

21  you turn around and you're running it across the state.

22  And in doing so, you're coming up and almost bisecting

23  CD-4.  CD-5 doesn't have a whole lot of change, but it

24  does have some effect on it as it comes into that little

25  narrow gap where the north part of the state turns to come

1    in on the Felicianas at -- Feliciana Parishes at Pointe

2    Coupee.  A very little narrow gap right there.

3         Because of the way 6 was drawn, it affected how 3 had

4    to change from a traditional -- its traditional area that

5    it covered.  It changed how District 2 was because it gave

6    up some of its minority population to 6.  But 5, 4, 3 and

7    6 are the ones that were changed the most from be it

8    traditional configuration based on our previous

9    congressional plans.

10   Q.   Has the configuration of CD-6 ever reached this far

11   into the northwest part of the state of Louisiana?

12   A.   Not on any enacted congressional plan that I'm aware

13   of.

14   Q.   You said any enacted plan.  Was there a previous

15   proposed plan that was struck?

16   A.   After the 1990 census was released, there was a

17   congressional plan that was enacted by the Legislature

18   that created a second majority-minority district that

19   looked very, very close to what I see here in District 6

20   under the SB8 plan.

21        MR. BODAMER:  Let's pull up Exhibit 22.

22   Q.   (BY MR. BODAMER) Are you familiar with Exhibit 22?

23   A.   Yes.

24   Q.   What does this represent?

25   A.   This is the post-1990 congressional plan that was

1  adopted by the Legislature in -- around the 1992 time

2  frame which created a second majority-minority district

3  which was represented by the black district here on the

4  map that is labeled as 4, District 4.

5  Q.   What happened to this particular scheme?

6  A.   I'm sorry?

7  Q.   What happened to this particular scheme?  You said it

8  was passed by the Legislature.

9  A.   As I was looking through some history on this as part

10  of my review of the case, this was challenged in the *Hays*

11  litigation and the Court found this to be a racial

12  gerrymander and struck it down.

13          MR. BODAMER:  Let's look at Exhibit 30, please.

14  Q.   (BY MR. BODAMER) Can you tell us what Exhibit 30 is,

15  map 23?  Yeah, what is this?

16  A.   Map 23 is from my report.  What I wanted to look at

17  was the comparison between the plan that was struck down

18  in '94 in the *Hays* litigation and how did the Senate Bill

19  8 plan, particularly CD-6, how closely aligned was that

20  to -- between each other.  And it was, from a demographer

21  standpoint, it was rather illuminating.  It was a very,

22  very close parallel between those two districts.

23  Q.   So, again, illuminating in what way?

24  A.   In not only the geographical boundaries but also from

25  the population boundary -- from their population numbers.

1    The -- I calculated the *Hays* plan, the 1994 plan, I

2    calculated it with the 2020 census population so I could

3    compare it to the SB8, CD-6 2020 population so I have an

4    apples-to-apples comparison.

5        Between the *Hays* plan and the Senate Bill 8 Plan,

6    CD-6 under the SB8 plan share 70 percent of the total

7    population of the old *Hays* plan District 4 and 82 percent

8    of the black population between the senate bill CD-6 and

9    the District 4 under the *Hays* plan.

10   Q.   What does that say to the demographer?

11   A.   From a demographic standpoint, it's almost parallel,

12   too parallel not only geographically but population-wise.

13   Those two districts are very closely aligned with each

14   other.

15   Q.   So SB8 basically replicates, from a mapmaker's

16   perspective, the plan that was stricken in the *Hays* case

17   in '94; is that right?

18   A.   Yes.

19            MR. BODAMER:  Your Honor, I think that's all I

20   have.  But I would like to offer, if it isn't already in,

21   Plaintiffs' Exhibit 14, which was the Plaintiffs'

22   Illustrative Plan 1.

23            JUDGE SUMMERHAYS:  Any objection?

24            MR. NAIFEH:  No objection.

25            MR. BODAMER:  I would like to also offer

1    Exhibit --
2              JUDGE SUMMERHAYS:  State?
3              MR. BOWEN:  No objection from the State, Your
4    Honor.
5              JUDGE SUMMERHAYS:  14 is admitted.
6              MR. BODAMER:  I'd also like to offer Exhibit 22,
7    which is the 1994 scheme.
8              JUDGE SUMMERHAYS:  Any objection?
9              MR. NAIFEH:  No objection.
10             MR. BOWEN:  No objection.
11             MR. BODAMER:  And then I would like to offer
12   Exhibit 30, which is the SB8 comparison between CD-6 and
13   the 1994 plan.
14             MR. NAIFEH:  No objection.
15             MR. BOWEN:  No objection.
16             JUDGE SUMMERHAYS:  It's admitted.
17             MR. BODAMER:  That's all I have.  Thank you.
18             JUDGE JOSEPH:  Mr. Hefner, I have a couple of
19   questions, then I think it's time for our morning break,
20   follow-up questions to what you testified.
21        You mentioned the different cultures in CD-6 of SB8.
22   Now, of course, the judges on this panel all live in
23   Louisiana and we're all aware of the cultural differences
24   in our very unique culturally and otherwise State.  But
25   for the record -- I want to make a record -- what are

1    those different cultural differences in SB8?

2            THE WITNESS:  For that, I relied on my report on

3    the Louisiana folklife criteria because that was done in

4    collaboration with the State and the various universities

5    around the State.  And they established several areas,

6    five areas, and identified some cultural and historical

7    areas that those areas represented.  I use that because

8    that's probably about as quantitative a definition of

9    those areas that I think would be useful here.  And so I

10   took a look at how each of those districts bisected those

11   regional areas and offered some opinion as to whether I

12   felt, from a demographer standpoint, whether they were

13   appropriate or not.  So that was the criteria that I used.

14           JUDGE JOSEPH:  And just, your report is not into

15   evidence, so that's why I am asking my question.  Can you

16   explain what the different cultures are that are

17   encompassed in SB8, Congressional District 6?

18           THE WITNESS:  Yeah, for the detail I really

19   would like to be able to refer to my report.  But

20   generally District 1 is the --

21           JUDGE JOSEPH:  Any objection to him having a

22   copy of his report up there to refresh his recollection?

23           MR. NAIFEH:  No objection.

24           MR. BOWEN:  (Shakes head.)

25           THE WITNESS:  And just for accuracy purposes.

1          JUDGE JOSEPH:  We're going to give you one.

2    We're going to give you a copy.

3          Go ahead and give him a copy.

4          THE WITNESS:  This would be in my rebuttal

5    report for April 1st of 2024.  The Louisiana Regional

6    Folklife Program, five areas that they identify:

7    Region 1 is in like in the Quachita area, Monroe area,

8    northeast corner of the state.  And generally they define

9    that as mostly British and African American and what they

10   call upland and lowland south culture.  Basically North

11   Louisiana culture and South Louisiana culture.

12         Region 2 is this area here, in the Shreveport,

13   Natchitoches area, and coming down the Sabine River.

14   They kind of call it the "no-man strip" because that was

15   historically an area in dispute between the French and the

16   Spanish and the United States.  So that area takes in the

17   Red River from basically Shreveport all the way down to

18   where it meets up with the Mississippi River at the Old

19   River Lock's there by Pointe Coupee Parish and Avoyelles,

20   near that intersection.  But a large part of that comes

21   in, over and includes Shreveport, Natchitoches, and

22   Alexandria, all the way over to the Sabine River.  And

23   then that comes down to Region 3, which is the Calcasieu

24   Parish, Lake Charles area, and into the Acadiana area of

25   Louisiana.  That's the heart of the Cajun culture, a large

1    French heritage in that area.  A very unique culture.  It

2    historically has been, together and aligned, maybe some

3    with St. Mary Parish and down into Lafourche area.  That's

4    where that general pathway for those people were.

5         Then you have Region 4, which is the Feliciana area,

6    Baton Rouge, that area.  That one is really a rather

7    interesting area because it's a rather -- it's a --

8              JUDGE JOSEPH:  Florida parishes, right?

9              THE WITNESS:  Florida parishes, yes.  I mean, it

10   was its own republic for a short period of time.  So it

11   had a lot of different cultures there:  Italian,

12   Hungarian, British, American, and Indian, as well as

13   French and Spanish.  So it's kind of melting pot in that

14   area.

15        And then Region 5 is the New Orleans area.  And

16   that's a very complex one because that was the main port

17   of entry for centuries.  So they had a lot of French,

18   African, Spanish, Caribbean influences into those areas.

19   So each of those areas has its unique history and its

20   culture as identified with the Louisiana Folklife.

21             JUDGE JOSEPH:  CD-6 of SB8 pulls in how many of

22   those areas into one district?

23             THE WITNESS:  It splits three of them in CD-6.

24   It splits -- it splits part of 4, 3, and Region 2.

25             JUDGE JOSEPH:  You mentioned a thing that might

1    be important in figuring out communities of interest would

2    be agriculture, rural versus urban, and agriculture based.

3         Also, we are aware of this here on this panel, but

4    for the record, are there big differences between what

5    type of crops are grown in North Louisiana versus South

6    Louisiana?

7              THE WITNESS:  From an agricultural stand --

8              JUDGE JOSEPH:  Hold on one second.

9              (Off the record.)

10             JUDGE JOSEPH:  Okay.

11             THE WITNESS:  From an agricultural standpoint,

12   it's really just what crop you're growing, whether you're

13   growing pine trees or you're growing rice.  They aggregate

14   that all together as far as the activity goes.  That's

15   what the gross domestic product indicated that was

16   generated by the Bureau of Economic Analysis.

17        But, generally speaking, as you're moving north above

18   say where the 31st parallel is, which is basically the

19   border with the Florida parishes, a lot of that becomes

20   timber because that's higher ground.  Trees grow better

21   there.  South of that and then along the River Delta,

22   Mississippi River Delta, a lot of those are row crops

23   because they're generally lower line, they're great for

24   rice, sugar cane, those types of things.  Not as

25   productive for timber.  So you will normally see timber

1    more in the north part of the state, western part of the

2    state, grow crops more on the eastern and then on the

3    southern end.  As you get down toward the -- from Baton

4    Rouge, going down toward New Orleans along the river

5    there, there's a lot of sugar cane production in that

6    area, so -- and you're getting more of that in South

7    Louisiana now.  Sugar cane's become a really big crop in

8    that area.  But generally north of Evangeline Parish and

9    that area, moving north, it's more timber.

10            JUDGE JOSEPH:  Timber, soybeans, cotton, those

11   type crops, correct?

12            THE WITNESS:  Yes.

13            JUDGE JOSEPH:  South Louisiana is more sugar

14   cane crops?

15            THE WITNESS:  (Nods head.)

16            JUDGE JOSEPH:  Do each of these agricultural

17   industries have their own lobbies in congress?

18            THE WITNESS:  Yes, they do.

19            JUDGE JOSEPH:  All right.  You mentioned the

20   split parishes and municipalities in CD-6 of SB8.  Look at

21   the map.  It appears that the four biggest parishes of

22   CD-6 are split.  And that would be Caddo here, where we

23   are now, Rapides, Lafayette, and East Baton Rouge.

24   Correct?

25            THE WITNESS:  That is correct.

1          JUDGE JOSEPH:  Are any of those parishes so big

2    that they would have to be in two congressional districts

3    from a population standpoint?

4          THE WITNESS:  Not in my opinion.  That they

5    would have to be split?

6          JUDGE JOSEPH:  In other words, are they so big

7    that they would have to be in two districts --

8          THE WITNESS:  That they would have to be in two

9    districts?

10         JUDGE JOSEPH:  -- from a population standpoint?

11         THE WITNESS:  Probably not.  I don't see a

12   reason why you would split them the way you split them.

13         JUDGE JOSEPH:  Not for -- I'm asking from

14   population.  In other words, is Caddo so big that it has

15   to be in two congressional districts in order for it to

16   maintain the one-man, one-vote principle?

17         THE WITNESS:  I think Illustrative Plan 1

18   probably would answer that question in that you have that

19   whole corner of the parish, including Caddo, in its

20   entirety, is in that -- is in that District 4.  It's not

21   having to be split there.

22        So, to answer your question, I don't believe that you

23   would have to split Caddo for population purposes alone,

24   just like you wouldn't have to split Lafayette Parish for

25   population purposes alone or Rapides Parish for population

1    purposes.  East Baton Rouge, if you threw that in with

2    those others, you would probably have -- you would

3    probably hit your limit on your total population, ideal

4    population.  You would hit that long before you got to

5    Caddo Parish if you included East Baton Rouge in one

6    district because of its numerosity.

7             JUDGE JOSEPH:  All right.  We want to take a

8    break.  Do y'all have any other questions?

9             JUDGE SUMMERHAYS:  I don't have any questions.

10   We are going to go ahead and take our morning break.

11   We'll come back in 15 minutes.  Thank you.

12             (Recess.)

13             JUDGE SUMMERHAYS:  We are going to go back on

14   the record.  Let me ask you, as far as cross, what we were

15   planning on doing was just after 11:00 is going to about

16   12:30 and then breaking for lunch.  I'd like to time it so

17   we can get it in, as much or all of your cross.  Are you

18   going to need that much time, or do you think you can wrap

19   it up by 12:30?

20             MR. NAIFEH:  I am almost certain I can wrap it

21   up by 12:30.  I think we may even some extra time.  I

22   don't plan to go an hour and a half.  It may be long, but

23   it's not going to be an hour and a half.

24             JUDGE SUMMERHAYS:  Well then we'll play it be

25   ear and we may break early for lunch.  We'll go no later

1    than 12:30.

2              MR. NAIFEH:  Then I think my colleagues from the

3    State may have some questions too.

4              JUDGE SUMMERHAYS:  That's a goal.  All right.

5    You may proceed.

6              MR. NAIFEH:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. NAIFEH:

9    Q.   Good morning again, Mr. Hefner.

10   A.   Good morning.

11   Q.   So in formulating your opinions for this case, you

12   reviewed three congressional plans, correct?

13   A.   Yes.

14   Q.   And just for the record, those were the HB1 plan?

15   A.   Yes.

16   Q.   And that's the plan the Legislature enacted in 2022?

17   A.   Yes.

18   Q.   And then you reviewed the enacted SB8; is that right?

19   A.   Yes.

20   Q.   And then you reviewed Plaintiffs' Illustrative

21   Plan 1; is that right?

22   A.   That's correct.

23   Q.   So those are the three that you reviewed.  And you

24   didn't review any other plans in forming your opinions for

25   this?

1    A.    Other than the comparative with the *Hays* plan.

2    Q.    You didn't review any of the other plans with two

3    majority black districts that were considered by the

4    Legislature in the 2024 redistricting session, correct?

5    A.    Not in the 2024 redistricting session.

6    Q.    And you did not review any of the amendments that

7    were offered on SB8 in the 2024 redistricting session?

8    A.    I did not.

9    Q.    And other than HB1, you did not review any map with

10   two majority black districts that was considered by the

11   Legislature in 2022; is that right?

12   A.    I did an analysis of plaintiffs' plans for 2022, but

13   not --

14   Q.    For purposes of this case I'm asking.

15   A.    No.

16   Q.    So your opinion that you expressed earlier that it's

17   impossible to draw a congressional plan with two

18   majority black districts consistent with traditional

19   redistricting principles is based on SB8's failure to do

20   so?

21   A.    Not just SB8's failure to do so.

22   Q.    And HB1's lack of a second majority black district?

23   A.    Well HB1 didn't have a second majority-minority

24   district, so it was mostly through my own edification in

25   exploring that I came to that conclusion.

1    Q.   And because you haven't looked at all of the maps

2    that the Legislature has considered that have two

3    majority black districts, you can't rule out that some of

4    them may have created two majority black districts without

5    violating traditional redistricting principles, correct?

6    A.   Limited only to the 2024 legislative session.  Would

7    not agree with that with the 2022 session.

8    Q.   Let's say with respect to the 2024 session, you agree

9    that you -- I just want to restate the question just so

10   the record is clear.

11       So because you have not looked at other maps the

12   Legislature considered in the 2024 redistricting session

13   that have two majority black districts, you can't rule out

14   that it is possible to create a plan with two majority

15   black districts that satisfies traditional redistricting?

16   A.   I can't offer an opinion on any of those plans.

17           JUDGE SUMMERHAYS:  Rephrase the question,

18   please.

19   Q.   (BY MR. BODAMER) So because you haven't reviewed

20   other plans considered by the Legislature in 2024 that

21   have two majority black districts, you can't rule out that

22   it is possible to create a congressional plan with two

23   majority black districts that satisfies traditional

24   redistricting principles?

25   A.   I can't offer an opinion on those.

1    Q.    So just to clarify, you don't actually know that

2    it's impossible to create a congressional plan with two

3    majority black districts that perform well on traditional

4    redistricting principles?

5    A.    I can't offer an opinion on that.

6    Q.    So your opinions in this case concern SB8 as it was

7    finally enacted by the Legislature, correct?

8    A.    That is correct.

9    Q.    And at the time you formulated those opinions, you

10   were not aware that SB8, as originally introduced, was

11   configured differently than SB8 as it was ultimately

12   enacted, correct?

13   A.    That is correct.

14   Q.    And you were not aware that as introduced SB8 split

15   15 parishes?

16   A.    That is correct.

17   Q.    And you would agree that 15 parishes is the same

18   number of split parishes as in the HB1 plan; is that

19   correct?

20   A.    From my calculations, that would be correct.

21   Q.    And in particular, you were not aware that Avoyelles

22   Parish was not split in the original SB8?

23   A.    That is correct.

24   Q.    And do you recall that Avoyelles Parish is one of the

25   specific parishes that you mention in your report as one

1    that you think was split for racial reasons?

2    A.    Yes.

3    Q.    And you didn't review any of the legislative debates

4    or testimony concerning the amendment to SB8 that

5    introduced the split to Avoyelles Parish, correct?

6    A.    Correct.

7    Q.    And you don't know what the sponsor of that amendment

8    said was the reason for the amendment?

9    A.    I do not.

10   Q.    And you don't know that if the amendment that split

11   Avoyelles Parish had any significant effect on the black

12   voting age population of CD6, correct?

13   A.    I do not.

14   Q.    And just stepping back.  Beyond your high level

15   understanding that the map was intended to satisfy the

16   court order from the Middle District of Louisiana, you

17   don't have any knowledge of the reasons any legislature

18   had for drawing or supporting the placement of specific

19   district lines in SB8, correct?

20   A.    Not based on legislative debate.

21   Q.    And do you have any other basis for knowing what any

22   particular legislator thought about the district lines in

23   SB8 or why they supported them?

24   A.    I did see some interviews of some legislators after

25   SB8 was approved.

1    Q.    So interviews like on television?

2    A.    Yes.

3    Q.    And those are not basis for any of your opinions in

4    this case?

5    A.    No.

6    Q.    Earlier you discussed Plaintiffs' Illustrative

7    Plan 1, correct?

8    A.    Correct.

9    Q.    And you don't know who created Plaintiffs'

10   Illustrative Plan 1, correct?

11   A.    I do not.

12   Q.    And you don't know how it was drawn?

13   A.    I do not.

14   Q.    At your deposition you testified that Plaintiffs'

15   Illustrative Plan 1 appeared to have been created in

16   Maptitude, correct?

17   A.    It appeared to be, yes.

18   Q.    And Maptitude is the application that you use to

19   create redistricting plans?

20   A.    That is my primary software.

21   Q.    And Maptitude allows the map-drawer to view racial

22   demographic information along with other data when drawing

23   a plan, correct?

24   A.    That is correct.

25   Q.    And you don't know what information the unknown

1    person who drew Plaintiffs' Illustrative Plan 1 was

2    viewing as they drew the plan, correct?

3    A.    That is correct.

4    Q.    And just to be clear, you don't know whether they

5    considered race in drawing Illustrative Plan 1, that

6    map-drawer?

7    A.    Yeah, I do not know that.

8            MR. NAIFEH:  Can we pull up slide 3 from

9    the demonstratives.  And I believe this map was previously

10   introduced as Exhibit 20, Plaintiffs' Exhibit 20.

11   Q.    (BY MR. NAIFEH) Mr. Hefner, can you see the map on

12   your screen?

13   A.    Yes.

14   Q.    And you discussed this map a little earlier in your

15   testimony?

16   A.    Yes.

17   Q.    And you said that it shows 2021 GDP for forestry,

18   agriculture and fishing and hunting?

19   A.    Yes.  That's the general category, yes.

20   Q.    And that's at the parish level, correct?

21   A.    That is correct.

22   Q.    So we can't tell from this map whether it's only one

23   part of a parish or which parts of the parish that are

24   heavily dependent on agriculture; is that right?

25   A.    That is correct.

1    Q.   And because you present this information at the

2    parish level, we can't tell whether there are particular

3    communities within the parish that are more dependent on

4    agriculture than other communities; is that right?

5    A.   This data is collected by the Bureau of Economic

6    Analysis and they only provide that data at the parish

7    level or the county level and other areas or the

8    metropolitan statistical area.  Those are the only two

9    geographies they provide, so I cannot go any deeper than

10   that using their data.

11   Q.   And so just to be clear, you can't tell from this

12   map whether it's only -- whether there are particular

13   communities within the parish that are more dependent on

14   agriculture than other communities?

15   A.   That's correct, because that data wasn't available.

16   Q.   And in this figure, fishing, agriculture, forestry,

17   and hunting are combined into a single figure, right?

18   A.   That is correct.

19   Q.   And so you can't tell whether the parishes in this

20   map are dependent on forestry versus agriculture, for

21   example, correct?

22   A.   That's correct.

23   Q.   And you can't tell, for example, whether it would be

24   cattle versus row crops?

25   A.   That is correct.

1    Q.    And the map we have been discussing shows GDP --

2    total GDP for each parish, correct?

3    A.    That is correct.

4    Q.    For these particular industries?

5    A.    Yes.

6    Q.    It's not a percent of GDP for that parish, correct?

7    A.    No.  It's actual GDP.

8    Q.    And for a small parish that may have a small GDP

9    overall, this map wouldn't tell us if the low GDP from

10   fishing, agriculture and forestry is nevertheless a

11   significant percentage of that parish's GDP, correct?

12   A.    Yeah, it wouldn't show the percentages.  It shows

13   just the aggregate value.

14   Q.    So it wouldn't tell you how significant that GDP is

15   for a particular parish?

16   A.    Correct.

17   Q.    So it's very difficult to tell -- wouldn't you

18   agree -- from this map whether the particular parishes in

19   the particular agriculture, forestry, or fishing

20   industries that they depend on are drawn together in a

21   district or not, correct?

22   A.    Could you rephrase the question or reask it?

23   Q.    So just looking at this map that you've got in front

24   of you -- it's map 10; it's Exhibit 20 -- it's difficult

25   to tell, just looking at this map, whether the particular

1    parishes and the particular industries they depend on are

2    drawn together in a district or not; is that correct?

3    A.   I guess I am hesitating, because the purpose of the

4    map was to analyze what the GDP is at the parish level,

5    which is the smallest level that I could get statewide,

6    and how it pertains to that individual parish and seeing

7    if there was a pattern.  I can't break it down any lower

8    than that.  But in looking at it, it wasn't indicating

9    that a particular district was drawn for any particular

10   industry or for any particular activity.  So I don't know

11   if that's answering your question.

12   Q.   I think it sort of answers the question.  So just to

13   be clear, at the parish level, you can't tell if these

14   lines were drawn to accommodate a particular industry or

15   a --

16   A.   No.

17   Q.   -- particular community that depended on that

18   industry?

19   A.   No, because we couldn't get the breakouts.

20   Q.   Pull up Slide 4 in the illustrative.

21        Mr. Hefner, do you recognize this map that's in front

22   of you?

23   A.   Yes.

24   Q.   And is this a map from your report?

25   A.   Yes.

1   Q.   And this map shows the percent of the population

2   25 years and older by precinct -- or by census tract,

3   correct?

4   A.   By census tract.

5   Q.   Who have a high school -- who have graduated from

6   high school but it doesn't -- and that does not include

7   people who have gone on to higher education and it does

8   not include people who never graduated from high school,

9   correct?

10  A.   That is correct.  Only those who graduated from high

11  school only.

12  Q.   And so from looking at this map, it says that in the

13  southern part of -- and we're looking at, I believe, just

14  for the record, we're looking here at East Baton Rouge

15  primarily?

16  A.   Yes.

17  Q.   And so the southern part of East Baton Rouge has a

18  very low concentration of people who graduated from high

19  school 25 years and older?

20  A.   Yes.

21  Q.   And from looking at this map, from the shading on

22  this map, you don't know if that's because there are so

23  many people in those areas who have a higher education --

24  let me rephrase that question.

25       So from looking at this map, do you know if the

1    remainder of the population in those census tracts have a

2    higher education of beyond high school?

3    A.    Yes.  If you looked at the ones that had graduated

4    from high school and got additional, went post-secondary

5    additional education, that map will reflect that the area

6    that's shaded in red here, that this is a low percentage

7    of those that had a high school only because a majority of

8    those went on for some type of post-secondary education.

9    Q.    So that's a different map, though, correct?

10   A.    That is correct.  But that's why this is showing up

11   as red in here, because the majority of those went on

12   beyond high school.

13   Q.    What I'm asking you about here is:  From looking at

14   this map, you can't tell if the low rate of high school

15   graduation is because most of the people in that area have

16   a higher education or whether it's because most of the

17   people in that area never even graduated from high school,

18   correct?

19   A.    This is telling me there's a low percentage of people

20   who graduated from high school and who did not go yet, go

21   on for post secondary.  If you bring in the post-secondary

22   analysis, then you will see that those are high school

23   graduates that went on to post secondary, and this is low

24   because you have a low percentage of people that just have

25   a high school diploma in that area.

1    Q.    So I guess -- maybe let me try to rephrase the

2    question again.

3        Is the percentage of people with a high school

4    graduation shown in this map the result of there being a

5    larger number of people who never graduated from high

6    school at all?

7    A.    No.

8    Q.    How do you know that?

9    A.    Well, because I did -- I ran those numbers and that's

10   in a different map.

11   Q.    Well, we'll look at that map in a minute, but I'm

12   asking you:  From this map, can you tell that?

13   A.    You can tell it only because that's a category that I

14   used, 25 plus that have a high school diploma.  So that

15   doesn't include anybody that didn't graduate.  Those

16   numbers are excluded.

17   Q.    Correct.  So if it's a low number of people in the

18   category that's included, it could be -- tell me if you

19   disagree -- that there are a lot of people who never

20   graduated from high school?

21   A.    You could probably draw that analogy, but I don't

22   think it would be an accurate analysis because you have a

23   category that's available to you to find out which of

24   those fit that category which went through high school and

25   never graduated.  So you wouldn't rely just on this; you

1    would look at the two bookend categories:  Those that
2    didn't graduate; those that went on post secondary.
3    Q.    And in your initial report, you only provided this
4    map, correct?
5    A.    Yes, for the -- well, actually I think I had -- on
6    the initial one, I had the population.  I didn't have the
7    percentages.
8    Q.    But you only looked at people with a high school
9    degree, no more, no less, correct?
10   A.    That's correct.  Economic development, that's our
11   baseline for workforce education.
12   Q.    So from looking just -- looking at this map, you
13   don't know if the red areas are because there is a low
14   level of educational attainment or a high level of
15   educational attainment, correct?
16   A.    On its own, no.  That's why I would look at the two
17   bookend categories.
18          MR. NAIFEH:  Can we pull up slide 2?  Can we go
19   to the one before or slide 1?
20   Q.    (BY MR. NAIFEH) So I think these are the two maps
21   that you were just referencing.  I don't know, from that
22   screen, the big screen, it's very difficult to tell
23   because the colors are kind of all mushed into one.  But I
24   think on your screen it may be better.
25          These are the maps -- one of them, the one on the

1    left shows individuals who graduated from high school or

2    higher, statewide, correct?

3    A.    Right.

4    Q.    And we're limiting this to people 25 years and older,

5    correct?

6    A.    Yes.

7    Q.    And on the right, it's the people who have no high

8    school diploma.  So that's basically everybody else,

9    correct?

10   A.    That attended school through grades nine through

11   twelve but didn't complete high school.

12   Q.    Yeah.  So just looking at these two maps together,

13   they make -- they would count everybody who had -- who is

14   25 years and older in each of those census tracts,

15   correct?

16   A.    That would generally be the two bookends.

17   Q.    Yeah.  And so that's the total population of those

18   two -- of the census tracts depicted here?

19   A.    I don't know how it totals up.  But for those two

20   categories those would be the two bookends.

21   Q.    Are there any other categories?

22   A.    There could be those that didn't even go to high

23   school, that have only gone to less than.  But I don't --

24   I just included those that went to high school and got no

25   diploma.

1    Q.   So the map on the right you're saying -- it's your

2    testimony that the map on right doesn't include people who

3    never went to high school at all?

4    A.   Yeah.  That would be nine through twelve.  Those are

5    those that went -- the accurate depiction of that is those

6    that went through nine through twelve and did not get a

7    high school diploma.

8    Q.   That makes sense.  I understand.

9         Mr. Hefner, in this case you don't offer an opinion

10   that every majority black district is a racial gerrymander

11   by definition, correct?

12   A.   I would agree with that.  Not every one of them;

13   that's correct.

14   Q.   And you would also agree that every majority black

15   district has a majority of its population who are black,

16   correct?

17   A.   That's what makes it majority.

18   Q.   Yeah.  And that means that a majority of the

19   population that the map-drawer put in that district are

20   black, correct?

21   A.   Yeah.  Generally when you're looking at majority,

22   you're looking at the voting age population.

23   Q.   Let's agree we'll be talking about voting age

24   population.

25   A.   Okay.

1    Q.   Let me just rephrase the question just to make sure

2    we're clear.  In every district, every majority black

3    district required that the map-drawer -- that a majority

4    of the voting age population that the map-drawer placed

5    within the district is black, correct?

6    A.   Yes.

7    Q.   And that's true for every majority black district

8    that has ever been drawn, correct?

9    A.   To my knowledge.

10   Q.   I mean, if you couldn't -- would you have a

11   majority black district if you didn't put the majority of

12   the voters in the district?

13   A.   That, I think would be a safe conclusion, yes.

14   Q.   So you would agree then that the mere fact that the

15   map-drawer drew in black voters and drew out white voters

16   doesn't show that race predominated?

17   A.   In the context of other criteria, I wouldn't agree

18   with that.

19   Q.   Well, I'm just talking about that fact alone, not in

20   the context of other criteria.

21   A.   From a demographer standpoint, it depends on how that

22   district was configured and the reason for the

23   configuration.  That's a question you ask yourself as a

24   demographer:  Why was this drawn this way?  And --

25   Q.   That's looking at all the other criteria, right, not

1    just at the population alone?

2    A.    Other things could influence why the line was drawn

3    where it was.

4    Q.    But any district that's majority black is going to --

5    is going to have -- at some point require the map-drawer

6    to put a majority of the -- make the majority of the

7    population in that district black, correct?

8    A.    Yeah.  Has to reach that threshold.

9    Q.    Yeah.  And so that, just knowing that that's what

10   they did doesn't tell you anything about whether it's a

11   racial gerrymander or whether race dominated, correct, if

12   that's all you know?

13   A.    Not on that alone but within the context of the

14   totality of the circumstances.

15   Q.    So earlier you mentioned that the distance from one

16   end of CD-6 to the other in SB8 is about 250 miles, I

17   think you said?

18   A.    Yes.

19   Q.    And are you aware that in HB1, in CD-4, there are

20   parts of Caddo Parish that are about 220 miles from

21   parts of St. Landry Parish?

22   A.    I didn't run the comparisons on HB1 with regards

23   to --

24   Q.    So you can't say whether a district that spans 250

25   miles is unusual?

1    A.    No, because I didn't run those numbers for HB1.

2    Q.    So in your experience as a demographer, legislatures

3    commonly take account of political goals in redistricting,

4    correct?

5    A.    Yes.  That's what makes our job so interesting.

6    Q.    Pardon?

7    A.    That's what makes our job so interesting.

8    Q.    Yeah.  And one of the political goals that's quite

9    common that legislatures take into account is protecting

10   incumbents, correct?

11   A.    Yes.

12   Q.    And in your experience drawing districts for local

13   governments, have you ever been asked to protect

14   incumbents in the maps that you draw?

15   A.    We generally -- I generally as a rule try to avoid

16   putting incumbents against each other.

17   Q.    And is that often because that's what the people who

18   hired you want you to do?

19   A.    Well, generally it's -- there's a couple of reasons

20   for it.  One is if you deliberately draw in incumbents

21   against each other, you are going to have a very

22   contentious board or jury or council as they try to

23   outmaneuver each other leading up to the elections.  So it

24   doesn't always serve the needs of the people.

25   Q.    And sometimes there are circumstances where you can't

1    avoid pairing incumbents, correct?

2    A.    That is true.

3    Q.    Then you may have to favor -- you may have to draw a

4    plan that favors one or the other of those incumbents,

5    correct?

6    A.    Generally, I'll get guidance from my client body on

7    that, yes.  Or the numbers and the geography tell you

8    which way you got to go.

9    Q.    So sometimes the client will give you guidance about

10   which incumbent they want you to protect and which one

11   they don't in that circumstance?

12   A.    Oftentimes that decision comes as to whether either

13   one of those are looking to run for reelection.  Sometimes

14   it's like "I'm not planning on running for reelection," so

15   the problem resolves itself.  Other times, it may be the

16   numbers and the geography tell you which way it's got to

17   be because that's the only way the numbers fit.  And so

18   it's like the decision is already made.  Rarely has it

19   ever been, in my experience, where two incumbents are

20   having to get coalitions on their respective body to push

21   one plan that favors one over another.

22   Q.    But it's rare but it happens?

23   A.    It can, yes.

24   Q.    And sometimes when you're drawing a map to try to

25   protect incumbents, you might have to draw districts that

1    are less compact than you otherwise would, correct?

2    A.    Yes.

3    Q.    So earlier you testified a little bit about a

4    Louisiana Folklife map that had appeared in your report,

5    correct?

6    A.    Yes.

7    Q.    You would agree that the Louisiana Folklife map you

8    were discussing was not created for redistricting

9    purposes, correct?

10   A.    That is correct.

11   Q.    And in your report you offer no opinions concerning

12   how many of these folklife regions were split in HB1,

13   correct?

14   A.    That is correct.

15   Q.    So compared to SB8, you don't know if HB1 split more

16   of them or fewer of them?

17   A.    No.  I just looked at SB8.

18   Q.    So you wouldn't be aware then that in HB1, CD-4,

19   which is in northwest Louisiana where we are now, splits

20   three of those folklife regions?

21   A.    I did not take a look at that.  Not for the 2024

22   legislative session.

23   Q.    Well, I'm talking HB1 now.  So we're talking about

24   the map drawn in the 2022 legislative session, correct?

25   A.    Yes.  But I did have some analysis on that when I was

1    an expert for the State during the 2022 litigation.

2    Q.   So you don't have -- I mean, sitting here today, you

3    don't recall whether it splits three -- "it" meaning CD-4

4    in the HB 1 plan, you don't recall whether it splits three

5    of those?

6    A.   I would have to refer back to my report from back

7    then.

8    Q.   You have no reason to disagree with me that it does?

9    A.   No.

10   Q.   And do you have any reason to disagree with me that

11   in that HB1 Plan, CD-5, which is the north district that

12   covers Northeast Louisiana also splits three of those

13   folklife regions?

14   A.   I have no reason to, but I would prefer to confirm

15   it.

16   Q.   And earlier you testified that SB8 -- that CD-6 and

17   SB8 also splits three of those Louisiana Folklife regions,

18   correct?

19   A.   Yes.

20           MR. NAIFEH:  May I have just a moment to confer

21   with my colleagues?

22           JUDGE SUMMERHAYS:  You may.

23           MR. NAIFEH:  No further questions, Your Honor.

24           JUDGE SUMMERHAYS:  Okay.  Counsel, begin with

25   your cross when ready.

1          MR. BOWEN:  Thank you, Your Honor.

2                   CROSS-EXAMINATION

3     BY MR. BOWEN:

4     Q.   Mr. Hefner, I'm going to keep this short because I'm

5     the least popular man in this courtroom standing between

6     everybody and lunch.

7          In your earlier testimony, you said that SB8 is very,

8     very close to the *Hays* map that was struck down; is that

9     right?

10    A.   Yes.  From a demographer standpoint, yes.

11    Q.   And I think I recall correctly from your expert

12    report that part of the reason you say that is that the

13    census population for Louisiana has remained fairly

14    constant since the '90s; is that right?

15    A.   Yes.  The distribution changed a little bit, the

16    overall population relatively.

17    Q.   And by "distribution changed," do you mean that

18    certain population areas have spread out to other parts of

19    the State?

20    A.   Actually become more integrated over time.  You don't

21    have the larger concentrations of African-American

22    populations that you did several years back because

23    society has gotten more integrated with a wide variety of

24    programs:  Fair Housing Act, Community Reinvestment Act.

25    Those types of things encourage society's integration.

1  So -- and school desegregation cases, that drives a lot of

2  that as well.  So overall, the population hasn't changed a

3  whole lot, but the degree of concentration of some

4  African-American populations has.

5  Q.   And in addition to those wonderful advancements in

6  integration, there has also been some events such as

7  Hurricane Katrina, correct?

8  A.   Yes.

9  Q.   And has that contributed to the spreading of black

10  population say from the New Orleans area to Baton Rouge

11  and other areas?

12  A.   It's been an accelerant.  Some of those changes have

13  been taking place for -- I know since the '90s, 1990

14  census, because that's when I've been kind of tracking

15  some of that.  But Katrina definitely was an accelerant.

16  Q.   And it wasn't until after Hurricane Katrina that we

17  saw the first majority-minority district that spanned from

18  New Orleans to Baton Rouge; is that right?

19  A.   My recollection of CD-2 is mostly taking in that

20  black population along that river corridor between Baton

21  Rouge and New Orleans.  If you look at the old numbers for

22  the CD-2, the African-American percentages have been

23  dropping over each census.  Each decennial census has

24  been dropping in its concentration because of that

25  distribution.  I don't know if I'm answering your

1    question, but --

2    Q.    No.  That helps.  I appreciate it.

3    A.    Okay.

4              MR. BOWEN:  And Robinson intervenors' counsel

5    has graciously agreed to pull up Plaintiffs' Exhibit 14.

6    If I could impose upon you guys.  It should be

7    Plaintiffs' Exhibit 14, Illustrative Plan 1, or

8    Plaintiffs' Illustrative Plan 1.  Not number 4.  Thank you

9    so much.

10   Q.    (BY MR. BOWEN) Now do you see the -- I know it's a

11   little hard to see on this screen, but do you see the

12   orange district, District 5, in this illustrative plan?

13   A.    Yes.

14   Q.    Now, this district stretches all the way from

15   Washington Parish up to Monroe; is that right?

16   A.    Yes.

17   Q.    And do you know how far it is between those two

18   places?

19   A.    No, I did not run the mileage on it.

20   Q.    Does say 230 miles sound right?

21   A.    Eyeballing it, probably fairly close.

22   Q.    And in your reports you mentioned or cite to

23   Joint Legislative Rule 21.  Do you know which legislative

24   session that was adopted in?

25   A.    I believe they had one in 2011.  And I'm not sure if

1    it was amended in '20 or '21.  I don't have -- I'd have to

2    go back and look.

3    Q.    And are you familiar with whether legislative rules

4    are binding on future legislative sessions?

5    A.    Generally they're guidance and this is what they --

6    they generally specify as to what they consider to be the

7    minimum requirements for a plan to be adopted.

8    Q.    Certainly guidance, there's a number of things that

9    might be guidance, but are they binding on future

10   sessions?  Do you know?

11   A.    I do not know.

12   Q.    When evaluating SB8, did you review the call for the

13   special session from this 2020 special session?

14   A.    No.

15   Q.    Sorry.  2024 special session.

16   A.    No.  Not specifically no.

17   Q.    So it didn't serve as a basis for any part of your

18   report then?

19   A.    No.

20   Q.    Did you review the Governor's statements on the

21   opening of a special session in 2024?

22   A.    I didn't review them for this report, but I was aware

23   of them just through the news media.

24   Q.    But did they serve as a basis for anything in your

25   report?

1    A.    No.

2    Q.    Did you review the statements of SB8's sponsor

3    Senator Womack?

4    A.    No.

5    Q.    So they also did not serve as a basis for anything in

6    your report?

7    A.    They did not.

8    Q.    Do you understand that the Governor called a special

9    session to respect the decisions of the *Robinson* court

10   from the Middle District?

11   A.    That was my understanding through news accounts, yes.

12   Q.    And what is your understanding of what the Robinson

13   court required?

14   A.    A second majority-minority district be drawn.

15   Q.    And in looking at your reports, was that something

16   that you took into consideration in coming up with your

17   conclusions?

18   A.    What I was looking at was the plan that was adopted

19   and its compliance with traditional redistricting

20   criteria.  And also looking at Illustrative Plan 1.

21   Q.    You did not consider then the guidance of the

22   Middle District from the *Robinson* litigation that there

23   be majority-minority districts, correct?

24   A.    Not in my report.  It didn't guide an opinion in my

25   report.

1   Q.   When you were drawing your maps, I think you said

2   earlier that you weren't considering where any incumbent

3   member of congress lives; is that right?

4   A.   I didn't draw any maps.

5   Q.   Apologies.  When you were -- in your report, do you

6   consider where any incumbent member of congress lives?

7   A.   No.

8   Q.   Did you consider avoiding incumbent pairings then?

9   A.   Could you repeat the --

10  Q.   Strike that.  Did you the consider the political

11  objective of avoiding incumbent pairings?

12  A.   No.

13          MR. BOWEN:  May I confer with counsel, Your

14  Honor?

15      No further questions from the State, Your Honor.

16  Thank you.

17          MR. STRACH:  Nothing from the Secretary.

18          JUDGE SUMMERHAYS:  Redirect?

19          MR. BODAMER:  No.

20          JUDGE SUMMERHAYS:  You can step down.

21          THE WITNESS:  Thank you.

22          JUDGE SUMMERHAYS:  I think that the plaintiffs

23  had indicated that they wanted to move in some exhibits

24  when they were finished with this witness.

25          MR. GREIM:  We did, Your Honor.

1          JUDGE SUMMERHAYS:  You may proceed.

2          MR. GREIM:  Okay.  We would move the admission

3    of Plaintiffs' Exhibits 2 through 12, which were shared

4    with opposing counsel yesterday.

5          MR. NAIFEH:  And just for clarity, those are the

6    demonstratives from yesterday?

7          MR. GREIM:  Yes.  They are -- 2 through 9 were

8    used with Voss and 10 through 12 were used with McCartan.

9          MR. NAIFEH:  No objection from the Robinson

10   intervenors.

11         MR. GORDON:  No objection, Your Honor.

12         MR. GREIM:  And then plaintiffs also move --

13         JUDGE SUMMERHAYS:  Hold on a minute.

14         MR. GREIM:  I'm sorry.

15         (Off the record.)

16         MR. GREIM:  That's right.  It's Document 169.

17         COURTROOM DEPUTY:  Thank you.

18         JUDGE SUMMERHAYS:  Very good.  No objection.

19   Those exhibits are admitted.

20         MR. GREIM:  Plaintiffs next move the admission

21   of Exhibit 40 which was a statement of additional admitted

22   facts purely from the answer -- the complaint and the

23   answer in the case.

24         JUDGE SUMMERHAYS:  Any objection?

25         MR. NAIFEH:  Your Honors, I had wanted to take

1    an opportunity to review that document.  I have not had

2    the opportunity to do that yet.  I don't anticipate that

3    there will be an objection but if we could take that one

4    up perhaps after lunch.

5            JUDGE SUMMERHAYS:  We'll take that one up after

6    lunch.

7            MR. GREIM:  And then finally, the exhibits --

8    or the designations that we played yesterday, we

9    designated Plaintiffs' Exhibit 41 as the actual written

10   designations and 42 as the audio designations.

11           JUDGE SUMMERHAYS:  And that is a combination of

12   both sides?

13           MR. GREIM:  That's right -- oh, I'm sorry.

14   They're not both sides.  These are just --

15           JUDGE SUMMERHAYS:  Just the plaintiff?

16           MR. GREIM:  -- plaintiffs'.  So we would move

17   the admission of those.

18           JUDGE SUMMERHAYS:  Any objection?

19           MR. NAIFEH:  No objection.

20           MR. GORDON:  No objection, Your Honor.  Just a

21   point of clarity on the audio transcript issue.  I was

22   wondering if -- that we had any agreement on making the

23   audio or video transcript a joint exhibit in toto?

24           MR. GREIM:  We do have that agreement.

25           JUDGE SUMMERHAYS:  That's why I was asking

1   because there was some discussion of that whether we were

2   going to do it together.

3           MR. GREIM:  We are.  I just wanted to get this

4   in so that the Court can access it right away and see what

5   we played.  But I mean I would assume that we will have a

6   joint exhibit.  I think we just need to add to what we've

7   done.

8           JUDGE SUMMERHAYS:  Well, I'll defer to my

9   colleagues, but I would prefer instead of admitting this

10  piecemeal if we could admit one exhibit that is the joint

11  exhibit from all the parties.

12          JUDGE JOSEPH:  I guess you want to make sure

13  you admit it before rest your case.  I think that's part

14  of it.

15          MR. GREIM:  I do.  And just because we don't

16  have -- we've been trying to get feedback on what needs to

17  be added to it.  Just days are passing.  I just kind of

18  want to get in.

19          JUDGE SUMMERHAYS:  How about subject to keeping

20  the record open to admit the joint exhibit once that has

21  been agreed to, and we will admit what you have, what you

22  have designated as 41 and 42?

23          JUDGE JOSEPH:  To be possibly replaced with a

24  joint.

25          JUDGE SUMMERHAYS:  With the joint exhibit.

1    Exactly.

2              MR. GREIM:  That's right.  Yes.  Thank you,

3    Your Honor.  I would adopt that.

4              JUDGE SUMMERHAYS:  All right.

5              MR. NAIFEH:  No objection.

6              MR. GORDON:  No objection from us, Your Honor.

7              MR. STRACH:  No objection.

8              JUDGE SUMMERHAYS:  Very good.  We're at 10 till.

9    Why don't we go ahead and take our break now and we'll

10   come back at 1:00.

11             (Lunch recess.)

12             JUDGE SUMMERHAYS:  I just want to make a note to

13   start off.  The Court greatly appreciates the efforts by

14   counsel to slow down as far as speaking and answering

15   questions.  So that has been noted and it is appreciated.

16        Counsel, you had an exhibit that you needed to review

17   with the other side and to admit before you close.

18             MR. GREIM:  Yes.  That would be Plaintiffs' 40

19   and I think I'm just waiting on a response.

20             MR. NAIFEH:  No objection from the Robinson

21   intervenors.

22             MR. GORDON:  No objection.

23             JUDGE SUMMERHAYS:  No objection.  40 is

24   admitted.  And with that, you're going to close?

25             MR. GREIM:  Yes.  Yes, Your Honor.

1          JUDGE SUMMERHAYS:  And as far as the defendants'

2   and the intervenors' case, how are you going to proceed?

3          MR. NAIFEH:  Well, we've got some exhibits we'd

4   like to move in.

5          JUDGE SUMMERHAYS:  Okay.  Well, we can start

6   with the exhibits.

7          JUDGE JOSEPH:  I guess, who's going to go first?

8   The State or the intervenors?

9          JUDGE SUMMERHAYS:  I take it the intervenors are

10  going to go first?

11         MR. GORDON:  Yes, Your Honors.  The State has no

12  witnesses.  The Secretary may, but we do not.

13         MR. STRACH:  We may, but we were waiting to see

14  what the intervenors put on.

15         THE COURT:  Okay.  So the intervenors are going

16  to be first.  And so you're going to move some exhibits

17  in.  Who do you expect to call for first witness?

18         MR. NAIFEH:  Representative Mandie Landry from

19  the State's House of Representatives.

20         JUDGE SUMMERHAYS:  All right.  Let's proceed

21  with the witness.

22         MR. NAIFEH:  So first I would like to move in

23  Robinson Exhibits 24 to 46.  24 to 30 have an objection

24  from the Plaintiffs.

25              (Reporter clarification.)

 1          JUDGE SUMMERHAYS:  Yeah, you're going -- yeah,

 2   why don't you come on up to the front and that may be

 3   easier.  Can you repeat those again and slow down between

 4   each group?

 5          MR. NAIFEH:  Yes.  Robinson Exhibits 24 to 30,

 6   which are bills introduced in the 2024 legislative session

 7   for various redistricting plans for congress.  Those have

 8   been objected to by the plaintiffs on relevance grounds.

 9          JUDGE SUMMERHAYS:  Let's start with that group.

10     Counsel?

11          MR. GREIM:  We'll withdraw our relevance

12   objection.  This is only on Exhibits 24 to 30, the other

13   bills that were proposed.

14          JUDGE SUMMERHAYS:  So you don't have any

15   objections to 24 through 30?

16          MR. GREIM:  Correct.

17          JUDGE SUMMERHAYS:  All right.  Anybody else?

18          MR. GORDON:  No, Your Honor.

19          JUDGE SUMMERHAYS:  All right.  Those are

20   admitted.

21          MR. NAIFEH:  All right.  And then exhibits --

22   Robinson Exhibits 31 to 46, those are mostly vote tally --

23   amendments to some of those same bills.

24          JUDGE SUMMERHAYS:  Counsel?

25          MR. NAIFEH:  Those are not objected to at least

1    on the exhibit list.

2            JUDGE SUMMERHAYS:  Counsel?

3            MR. GREIM:  Yes, Your Honor, we don't have any

4    objection to those either, to the amendments.

5            JUDGE SUMMERHAYS:  They're admitted.  Those are

6    31 through 46.

7            MR. NAIFEH:  All right.  And then we have

8    Robinson Exhibits 114 to 124.  Those are expert reports

9    that were admitted into evidence in the Robinson

10   litigation.  And they have been -- they have objected to

11   them on hearsay, relevance and prejudice.  We are not

12   offering them for the truth of the matter, so I don't

13   think the hearsay objection applies.  We were offering

14   them as information that was part of the court record that

15   the Legislature had before them when they adopted SB8.

16           MR. GREIM:  Well, Your Honor, we do object.  I

17   mean I think there has to be a foundation laid that the

18   Legislature actually believed the VRA, you know, required

19   these districts and that they relied on these.  That

20   they're in the court record is one thing.  It might get us

21   past judicial notice on the fact of these, but I don't

22   think the contents all just come into this case.

23           JUDGE SUMMERHAYS:  So your argument is that

24   there is no foundation that they relied on these specific

25   expert reports that saying to introduce?

1          MR. GREIM:  That's right.  And I mean I take it

2     that the contents are not going to come in as substantive

3     evidence of what they're testifying to.  But I don't think

4     we even have the other ground either, so...

5          JUDGE SUMMERHAYS:  Counsel?

6          MR. NAIFEH:  There were -- legislative

7     leadership were intervenors in that case.  They were

8     aware -- leadership were aware of these documents.  I

9     think -- I don't have the transcript from yesterday in

10    front of me, but I believe that some of the legislators

11    who testified here yesterday were aware of those

12    documents -- testified that they were aware of those

13    documents in the court record --

14         JUDGE SUMMERHAYS:  That they reviewed the expert

15    reports?

16         JUDGE JOSEPH:  No one testified to that.

17         JUDGE SUMMERHAYS:  I don't recall that either.

18         MR. NAIFEH:  Okay.  Then we can potentially move

19    these in through one of our other witnesses.

20         JUDGE SUMMERHAYS:  I'll leave it open if you

21    wish to, if you wish to try to -- again, it would be

22    admissible if you were to do that.  Only first you would

23    have to establish foundation that it was relied upon by

24    those witnesses, that the Legislature relied upon it in

25    connection with the passage of Senate Bill 8.  But it

1    would only be admissible for the limited purpose that this

2    was something that they reviewed and relied on.

3        Any dissents from --

4            JUDGE JOSEPH:  No.  That's correct.

5            JUDGE SUMMERHAYS:  All right.  You may proceed.

6    At this point I am going to reserve --

7            JUDGE STEWART:  The only question I have with

8    respect to that, not putting cart before the horse because

9    of the order going, but just sort of one allowed given the

10   State's answer to the lawsuit and some other aspect that

11   it's adverted to about the Robinson case.  Just sort of a

12   little curious as to whether this piece was something the

13   State was going to be -- you follow my -- based on the

14   answers in the State's answer, i.e., Robinson lawsuit, et

15   cetera, et cetera, there are some other things coming out.

16   I guess I am circling back to where we were earlier about

17   pieces of this coming in for one person and pieces for

18   something else, and we're kind of doing it on the front

19   end before anybody's testified.

20       So it's a little awkward trying to get a real grasp

21   on where it fits in.  You know what I'm saying?  I mean,

22   we're just starting this case and then we have got

23   documents, they're not joint, we've got objections.

24   The other stuff they did, they were all agreed to.

25           So I am just wondering.  But anyway, this is your

1    offer; it's not a joint with the State, correct?

2              MR. GORDON:  Your Honor, I mean, we have

3    slightly different take on some of these documents and I

4    was going to raise that after Mr. Naifeh finished.

5              JUDGE STEWART:  Okay.  Got you.  But I don't

6    have any dissent with what the Court has said.  I merely

7    was trying to get clarity simply because looking at the

8    answers filed, there's a lot in there in the State's

9    answer about the Robinson case, et cetera, et cetera.

10   And so given that, and there being other testimony,

11   whether this -- was this prepared, something the State was

12   putting in?  So we need all that foundation.  That was

13   just a clarification, not a suggestion about what should

14   or shouldn't.  But basically just leaving it open subject

15   to foundation.

16             JUDGE SUMMERHAYS:  Did the State want to make a

17   statement or take a position at this point?

18             MR. GORDON:  So I think the State's position --

19   and we can refer to the State's exhibit list if you'd

20   like.  But we believe these -- the separate list of what

21   we have labeled as exhibits that are in reference to

22   certain expert reports and the Robinson preliminary

23   injunction decision, as well as the Fifth Circuit's

24   decision upholding that in part, are material to which the

25   Court can take judicial notice of and should take judicial

1    notice of because it's not offered for its truth or really

2    for any of the content or fact-finding therein, just for

3    its mere existence.

4              JUDGE SUMMERHAYS:  Counsel?

5              MR. GREIM:  Sure.  And they cited a case on

6    judicial notice but that only gets us past one hurdle.

7         I think the problem is this.  The State -- just going

8    to the evidence we've heard so far, the State -- we've

9    heard nobody from the State saying that we have a belief

10   that the VRA requires it.  Here is where it came from,

11   these materials in this other case, but we reviewed them

12   and we think that they made a pretty good case.  Instead,

13   testimony has been something different.

14        And so I don't think it can come in even for that

15   limited purpose unless there is somebody who can say that.

16   And we have -- not to go too far now, but in discovery we

17   asked the State for, you know, the purposes behind the

18   bill, et cetera, et cetera, and the State said, well,

19   that's something that the Legislature has.  We don't have

20   access to that.  I don't think the State can take that

21   position in discovery but then come in here and say, well,

22   we offer this.  It's something the Legislature considered.

23   I mean, there has to be a person who can say that.

24             JUDGE SUMMERHAYS:  Yeah.  And again, I think

25   this goes to foundation.  I'm going to reserve, subject to

1    dissent from my colleagues, reserve ruling on the

2    admissibility of those documents until a foundation has

3    been laid.  And that includes consideration of judicial

4    notice, which is the State's alternative approach.

5            MR. GORDON:  If I could be heard just one more

6    moment, Your Honor --

7            JUDGE SUMMERHAYS:  Yes.

8            MR. GORDON:  -- on this issue and then we can

9    certainly take it up later.  Is that the rules state that

10   the Court must take judicial notice if it's properly

11   offered.  And I will refer to a case from the Fifth

12   Circuit:  That a court may take judicial of a document

13   filed in another court, not for the truth of the matter as

14   asserted in the other litigation, but rather to establish

15   the fact that such litigation and related filings.

16       And that's merely what we wish to do here, Your

17   Honor.

18           JUDGE JOSEPH:  Is there an objection to just

19   to -- to admitting it for the purpose of saying it exists?

20           MR. GREIM:  Well, the problem is, you know,

21   saying it exists has to be relevant in this case.

22           JUDGE JOSEPH:  Okay.

23           JUDGE SUMMERHAYS:  It's not relevant without a

24   foundation.

25           MR. GREIM:  That's right.  I mean, judicial

1    notice, that's the Hornbook law.  No one's going to fight

2    that you can take judicial notice of the records of

3    another court or this court.  That's not at issue.  It's

4    what Judge Joseph said, that basically there's a relevance

5    objection and that's really foundational here.

6                JUDGE SUMMERHAYS:  And again, I'll rule on the

7    judicial notice as well as foundation once a foundation

8    has been laid.  You can reassert your request for judicial

9    notice.  You can reassert your request that the documents

10   be admitted.

11        Unless there is dissent, I am going to reserve ruling

12   on the objection until a foundation has been laid.

13                MR. GREIM:  Your Honor --

14                JUDGE SUMMERHAYS:  Yes, sir.

15                MR. GREIM:  -- if I could add one more thing, I

16   would just say that in the Rule 26 disclosures in the

17   discovery, no witness has been identified who can come in

18   and actually do that thing, who has been proffered as

19   someone who can do it.  But I don't want to get ahead of

20   myself.  I just -- I'll leave it there.

21                JUDGE SUMMERHAYS:  Very good.  So that's 31

22   through -- that's 114 through 124.  The Court will

23   reserve ruling on those documents that you may try to lay

24   a foundation.  What else do you have?

25                MR. NAIFEH:  All right.  We have Robinson 125

1    and 126, which are hearing transcripts from the Robinson

2    preliminary injunction hearing.  I gather the objection is

3    going to be the same, although there is no hearsy

4    objection to those for obvious reasons.  There is a

5    relevance objection.

6              JUDGE JOSEPH:  There is no hearsay objection for

7    what reason?

8              MR. NAIFEH:  Well, I think because it's a court

9    record.  It's a --

10             JUDGE JOSEPH:  The plaintiffs were in that case.

11             MR. NAIFEH:  They were not in that case.

12             JUDGE JOSEPH:  So that matters.

13             MR. NAIFEH:  They didn't raise a hearsay

14   objection.

15             JUDGE SUMMERHAYS:  Counsel?

16             MR. GREIM:  My notes show that we did raise a

17   hearsay objection and there would be hearsay within

18   hearsay as well.  But unless I -- my notes say that we've

19   raised hearsay, relevance, and prejudice.

20             JUDGE STEWART:  Yeah.  I mean, I think the

21   comfort level is reserving the ruling on it despite

22   you've worked well, but, you know, with all trials

23   obviously you're not agree on everything.  So we're not

24   pointing to that.  Although we have the threshold on this.

25   You fleshed out sort of where you're coming from and

1  you've alerted to that.  You know, my preference would be:

2  Whatever we can get started doing, turn to testimony and

3  so on and so forth, that would do that and not bog down

4  here on evidentiary stuff without anybody being prejudiced

5  to your position.  It may well be that you'll need to burn

6  some midnight oil in terms of providing a basis for

7  whatever your proposed offer is for us to do something

8  different.  Now that you've been alerted to it, weave it

9  in.  If you've got some case or cases that support what

10  you want to do, you or somebody may have to burn some oil

11  in terms of that so we're not just dealing with argument

12  of counsel.  We got the rule books up here, but this is a

13  nuanced case and everybody realizes that.  So just know

14  that that's an issue there.  We can proceed with some

15  testimony.  We get to the end of the day and that's an

16  issue.  Since we know we're going to be here tomorrow,

17  you'll know what you got to do or whenever, we can get

18  around to it.  Then, you know, we can rule on it.

19        JUDGE SUMMERHAYS:  We will reserve judgment on

20  125 to 126.

21        MR. NAIFEH:  Shall I proceed or is it Your

22  Honor's suggestion that we go ahead with witnesses and

23  take that --

24        JUDGE STEWART:  No.  I was only suggesting if

25  you continue down, you know, testimony, transcript, that

1   kind of thing.  I don't know what else...

2           MR. NAIFEH:  Well, we definitely got some

3   other --

4           JUDGE JOSEPH:  Let's go ahead and admit the ones

5   that are going to be agreed to and then save argument for

6   when a witness is on the testimony and the exhibits have

7   been offered into evidence for those that just not agreed

8   to.

9           JUDGE SUMMERHAYS:  Because I think our concerns

10  are going to be the same on all of the documents that are

11  related to the Robinson Middle District case.

12          MR. NAIFEH:  That's all I have for that category

13  of documents, so...

14          JUDGE SUMMERHAYS:  Okay.

15          MR. NAIFEH:  Next I have 127 through 150, and

16  194 and 195.  Those are bills and amendments containing

17  congressional maps with two majority black districts that

18  were introduced and considered in the 2022 First

19  Extraordinary Session, which is when HB1 was adopted.

20  That's the prior congressional map that SB8 replaced.

21  The plaintiffs have objected to those on relevance and

22  prejudice grounds.

23      Our position -- well, shall I --

24          JUDGE SUMMERHAYS:  You can finish.  You can

25  finish.

1          MR. NAIFEH:  Our position is one of the issues

2    in this case is that whether it's possible to create a

3    congressional map with two majority black districts that

4    complies with traditional redistricting principles.  There

5    are numerous examples from the legislative record that are

6    maps that contain two majority black districts, and so our

7    position is that those are relevant to that issue in the

8    case.

9          JUDGE SUMMERHAYS:  Counsel?

10          MR. GREIM:  A couple of things, Your Honor.

11    First of all, at this -- at the liability phase, we're

12    asking whether Senate Bill 8 is a racial gerrymander.

13    We're not asking whether some other district exists that's

14    not Senate Bill 8 that would not have been a racial

15    gerrymander.  And so that might be relevant if there is a

16    remedial phase, but that doesn't seem relevant today.

17          The other problem is that this is a different

18    legislature.  In the 2022, that's not the same legislature

19    that enacted these districts.  And we've already heard

20    insinuations about, you know, Joint Rule 21 may not bind

21    future legislatures.

22          So it's just that's 60 exhibits, like just 60

23    exhibits.  We don't know anything about how any of it's

24    going to be used.  And it just seems like *en masse* it is

25    not relevant, it's a lot of evidence that is not really

1    targeted to what we're here about today.  And so we don't

2    think it's -- we think it's cumulative and irrelevant.

3                JUDGE SUMMERHAYS:  Let me ask you, Counsel:  Is

4    this going to be the subject of the testimony of any of

5    the witnesses in your case?

6                MR. NAIFEH:  Yes, Your Honor.

7                JUDGE JOSEPH:  Then offer them at that time.

8                MR. NAIFEH:  Okay.

9                JUDGE SUMMERHAYS:  We'll reserve ruling on the

10   objection to 127 to -- the admissibility of 127 to 150,

11   and 194 and 195.

12               MR. NAIFEH:  And then the remaining -- well, not

13   all of the remaining, but we have several more categories

14   that are similar that are bills introduced in other

15   sessions.  And then the final category -- and I think I

16   have an issue with the numbers.  Maybe I could raise those

17   letter on.

18               JUDGE SUMMERHAYS:  So are these all exhibits

19   that are going to be the subject of testimony with

20   witnesses?

21               MR. NAIFEH:  I believe so, Your Honor.

22               JUDGE SUMMERHAYS:  Then let's raise it with

23   those witnesses so that we have some context so that we

24   know that you're going to be able to lay a foundation and

25   we can more readily judge relevancy at that point.

1          MR. NAIFEH:  Thank you, Your Honor.

2          JUDGE SUMMERHAYS:  Okay.  Are you prepared to

3     call your first witness?

4          MR. HESSEL:  Good afternoon, Your Honors.  My

5     name is Daniel Hessel.  I represent the Robinson

6     intervenors in the matter.  And intervenors call

7     Representative Mandie Landry.

8          JUDGE SUMMERHAYS:  If you'll approach and be

9     sworn in.

10         MR. GREIM:  I'm sorry to interrupt, Your Honor

11    It's Mr. Greim.  But I'm informed that the witness was in

12    the room during the discussion just now about what was

13    going to be brought in through witnesses and the relevance

14    of legislative drafts.

15         JUDGE SUMMERHAYS:  I left it up to Counsel to

16    instruct witnesses about the Rule.  Why was that not

17    followed?

18         MR. HESSEL:  Inadvertent error, Your Honors.

19    My apologies.

20         JUDGE JOSEPH:  Well, the problem is, we're

21    talking about -- directly about evidence which may or may

22    not be admissible based on what -- this being one of the

23    witness's testimony.  That's a problem.  That's why we

24    have the Rule of Sequestration.

25         MR. HESSEL:  I understand, Your Honor.  It was

1    my error, of course.  I thought it was about live

2    witnesses.  If I could confer with my co-counsel about

3    this briefly, I'd appreciate it.

4              JUDGE SUMMERHAYS:  Yes.

5              MR. HESSEL:  Your Honor, we don't intend to move

6    any of these exhibits in through Representative Landry, if

7    that makes things better.  And again, my apologies.

8              JUDGE SUMMERHAYS:  What about any -- even if

9    you're going to move -- not move them in with her, are you

10   going to ask questions that would lay a foundation for

11   those documents in her testimony?

12             MR. HESSEL:  We will eliminate those questions,

13   Your Honor.

14             JUDGE SUMMERHAYS:  Okay.  Counsel?

15             MR. GREIM:  Well, that may resolve the issue,

16   but I think if there is a question -- we'll just have to

17   listen to the questions and if we hear something we'll

18   object.

19             JUDGE SUMMERHAYS:  I mean, obviously if

20   something comes up that you believe would prejudice you as

21   a result of the violation of the Rule, then you can object

22   timely.

23             MR. GREIM:  Thank you, Your Honor.

24             JUDGE SUMMERHAYS:  With that, we'll have the

25   witness re-approach and we will swear you in.

 1              JUDGE JOSEPH:  And, Counsel, if you would just

 2    reconfirm that no other fact witnesses for plaintiff

 3    intervenors or the State are present in the courtroom

 4    during this testimony.

 5              JUDGE SUMMERHAYS:  Counsel, you may proceed when

 6    ready.

 7                    REPRESENTATIVE MANDIE LANDRY,

 8    having been first duly sworn to testify the truth, the

 9    whole truth, and nothing but the truth, testified as

10    follows:

11                       DIRECT EXAMINATION

12    BY MR. HESSEL:

13    Q.   Good afternoon, Representative Landry.  Thank you for

14    joining us.

15         Please state your name, and spell your name for the

16    benefit of the court reporter, please.

17    A.   Mandie Landry.  M-A-N-D-I-E, L-A-N-D-R-Y.

18    Q.   Where do you live, Representative Landry?

19    A.   New Orleans.

20    Q.   What do you do for a living?

21    A.   I am a lawyer and a state legislator.

22    Q.   What district do you represent?

23    A.   House District 91 in New Orleans.

24    Q.   Do you belong to a political party?

25    A.   Yes, I'm a Democrat.

1    Q.    When were you first elected to the State House?

2    A.    I was elected in November 2019 and sworn in January

3    of 2020.

4    Q.    Have you faced reelection since then?

5    A.    Yes.  I was reelected in October and sworn in this

6    January.

7    Q.    Are you familiar with the case that was filed in 2022

8    challenging HB1?

9    A.    Yes.

10   Q.    What is your understanding of the nature of that

11   case?

12              MR. TYLER:  Objection, Your Honor.  This is

13   exactly what we were referring to with the evidence.

14              JUDGE SUMMERHAYS:  Sustained.

15   Q.    (BY MR. HESSEL) Representative, when were you sworn

16   in for your second term?

17   A.    January 8th.

18   Q.    Of which year?

19   A.    This year.

20   Q.    What was the first legislative item of your second

21   term?

22   A.    We had a special session on redistricting about a

23   week later.

24   Q.    Are you familiar with Senate Bill 8?

25   A.    Yes.

1    Q.    When did you first see Senate Bill 8?

2    A.    Either the first day of session or the day before.

3    Q.    Was that the day that Governor Landry addressed

4    chambers?

5    A.    The first day of session, yes, was the day he

6    addressed chambers.

7    Q.    Did you attend that address?

8    A.    Yes.

9    Q.    What did you understand the Governor's goals to be

10   for the special session?

11   A.    To make sure we passed a new congressional bill that

12   would be accepted by the courts.

13   Q.    Did you ever have an impression of why the Governor

14   wanted to pass this bill?

15   A.    A few reasons --

16          MR. TYLER:  Objection.  Foundation.

17          JUDGE SUMMERHAYS:  Overruled.

18   Q.    (BY MR. HESSEL) Did you form an impression of why the

19   Governor had this call?

20   A.    Yes.  So after two years, it was time to put this to

21   rest after so much litigation.  There was fear among

22   Republicans that if they didn't do this the Court --

23          MR. TYLER:  Objection.  Foundation.

24          JUDGE SUMMERHAYS:  Overruled.

25          MR. TYLER:  And hearsay.  Sorry.

1          MR. HESSEL:  The witness is testifying her

2     impression that she had that led her to cast her vote on

3     Senate Bill 8 and not for the truth of the matter

4     asserted.

5          JUDGE SUMMERHAYS:  All right.  Overruled.

6     Q.   (BY MR. HESSEL) Did you have an impression of why the

7     Governor wanted to pass the map?

8     A.   Yeah.  So as I said, Republicans were afraid that if

9     they didn't, that the Court would draw one that wouldn't

10    be as politically advantageous for them.  They kind of

11    wanted to put this to rest and the Governor wanted

12    Congressman Graves out.

13    Q.   At some point during the special session, did you

14    have a sense of which bill the Governor preferred?

15    A.   We all knew from the beginning that the bill that was

16    going to be passed was Senate Bill 8.

17    Q.   And do you know how many majority black districts

18    there are in Senate Bill 8?

19    A.   Two.

20    Q.   And did you think that Senate Bill 8 would bring an

21    end to the litigation?

22    A.   Most likely.  It's impossible to predict, but all of

23    our understanding was that it was very likely to meet the

24    requirements of the Voting Rights Act.

25    Q.   Do you have an understanding if one of the

1    incumbents -- current congressional incumbents was drawn

2    out of his or her seat, so to speak, in Senate Bill 8?

3    A.   Yes.  Congressman Graves.

4              MR. TYLER:  Object to foundation.

5              JUDGE SUMMERHAYS:  Overruled.

6    Q.   (BY MR. HESSEL) Let me ask that again.  Do you have

7    an understanding if one of the current congressional

8    incumbents was drawn out of his or her seat, so to speak,

9    in Senate Bill 8?

10   A.   Congressman Graves was targeted in the map, correct.

11   Q.   And were you surprised that Congressman Graves was

12   targeted in the map?

13   A.   No.  Everyone -- everyone knew that.  All the

14   legislators, the media reported it.  They have had a

15   long-standing contentious relationship.

16   Q.   And when you say "they," who are you referring to?

17   A.   The Governor and Congressman Graves.

18   Q.   Did you support Senate Bill 8?

19   A.   Yes, I voted for it.

20   Q.   Why did you support Senate Bill 8?

21   A.   As I said, the understanding was that it was very

22   likely to be approved under the Voting Rights Act.

23   Q.   And did you think that Senate Bill 8 could pass the

24   Legislature?

25   A.   Yes.

1    Q.   Why did you conclude that Senate Bill 8 could pass

2    the Legislature?

3    A.   It was the Governor's bill.  All of leadership was

4    behind it.  It was the one bill that we all understood was

5    going to go through.  No other bill even made it out of

6    committee regarding the congressional districts.

7    Q.   You testified earlier that you formed an impression

8    that Governor Landry supported the bill because of his

9    relationship with Congressman Graves; is that right?

10   A.   Yes.

11   Q.   What formed that impression for you?

12   A.   I mean, there's a 144 of us constantly talking and

13   meeting --

14          MR. TYLER:  Objection.  Hearsay.

15          MR. HESSEL:  Your Honor, again, it's not for the

16   truth of the matter asserted, but the --

17          JUDGE SUMMERHAYS:  Overruled.

18          MR. HESSEL:  Thank you.

19   Q.   (BY MR. HESSEL) So let me just ask that again.

20   What formed your impression that SB8 was viable because of

21   the relationship between Governor Landry and Congressman

22   Graves?

23   A.   Yeah.  So this had been -- this discussion of the new

24   districts had been going on since the Governor was elected

25   among us and the media.  It increased as we got closer to

1    inauguration.  The chatter got bigger.  The media was

2    reporting constantly on it.  There were lots of meetings

3    on it.  Of course, I didn't hear from Republican

4    leadership but we eventually all knew what bill it was

5    going to be.  And there were actually a couple dozen bills

6    and other issues that we understood were the Governor's

7    bills.

8    Q.    Can you try to quantify for the Court how many of

9    these conversations were going on?

10   A.    Constantly.  The Legislature is a semicircle.

11   Because we wanted to know what was going on, when it was

12   going to end, which bills were being presented, what

13   amendments might be presented.  We were also discussing

14   the Supreme Court maps.  There was closed primaries.  I

15   mean, we were barely -- there was a lot going on.

16   Q.    Try to quantify how many of those conversations

17   revolved around this political dynamic that drove SB8.

18   A.    Since October, hundreds, if not more, that week.  I

19   mean the same, maybe it was constant.

20   Q.    And did you at some point form an impression that

21   your view on why SB8 was viable was shared by many in the

22   Legislature?

23   A.    I mean, the whole time, before we went in, there was

24   going to be a map that the Court was likely to accept

25   under the Voting Rights Act, and that this would be done

1    that week.

2    Q.    What impression have you gotten from constituents in

3    communities in the state about having a map with two

4    majority black districts?

5    A.    So over the last couple of years, it's been

6    heartening to see the public has come to understand better

7    gerrymandering, redistricting, what that means, what

8    that -- you know, the effects of that, packing.  And it's

9    been interesting to see, since I've been elected, the more

10   people who understand that and they might not know the

11   details but my constituents in New Orleans generally

12   understands that we are probably going to get the second

13   district.  And, you know, in a time of negative politics,

14   it's actually a good thing.

15   Q.    And as a public leader, what's your impression of the

16   impact on the communities you serve and people across the

17   state if SB8 were struck down?

18   A.    I mean, this is the South.  There is a long history

19   of oppression here.  To have a second district means a lot

20   of minority communities, not just racial minority, but

21   rural areas, poor areas, will have better representation

22   in congress.  More money will flow to infrastructure

23   projects.  They'll just have someone who better

24   understands and has to represent them in particular.

25   Q.    Thank you very much.  I have no further questions.

1    A.   Thank you.

2              JUDGE STEWART:  Before you go further, would you

3    clarify, because your name is Landry, if you are related

4    at all to either the Secretary of State or the Governor,

5    just so the record is clear if you are or you aren't.

6              THE WITNESS:  I am not related to anyone who was

7    elected with the last name Landry.  I have heard this

8    before.

9              JUDGE STEWART:  Thank you, ma'am.

10             JUDGE SUMMERHAYS:  Counsel?

11             MR. GORDON:  No questions from the State, Your

12   Honor.

13             JUDGE SUMMERHAYS:  Plaintiffs, cross?

14             MR. TYLER:  Cross, Your Honor.

15                  CROSS-EXAMINATION

16   BY MR. TYLER:

17   Q.   Ms. Landry, you testified that you did not talk to

18   Republican leadership; is that correct?

19   A.   Directly, no.

20   Q.   And so your information regarding that did not come

21   from them?

22   A.   No.

23   Q.   Were you a fan of SB8?

24   A.   I agreed and was satisfied that it would meet the

25   requirements of the Voting Rights Act.  It had two

1    majority-minority districts, which is what we've been

2    hoping for the whole time.  I was kind of indifferent to

3    other the political issues because they didn't really

4    involve my party.  But I thought the map was sufficient.

5    Q.    But you believe that it could have been drawn better?

6    A.    There were other maps in 2022 that as Democrats we

7    liked better, but this one was the one that was going to

8    pass.

9    Q.    And it's true, isn't it, that the Democrats did not

10   have much say in this map?

11   A.    We did not.

12   Q.    And that is your party, correct?

13   A.    Correct.

14          MR. TYLER:  Let me confer with counsel, if

15   that's okay.  We have no further questions.

16          JUDGE SUMMERHAYS:  Any redirect?

17          MR. HESSEL:  I have one question, Your Honor.

18          JUDGE SUMMERHAYS:  You may proceed.

19                   REDIRECT EXAMINATION

20   BY MR. HESSEL:

21   Q.    Representative Landry, during this process they were

22   describing, did you talk to any Republicans about what was

23   going on?

24   A.    You mean during the January session?  Yes, through my

25   colleagues.  I mean this a very --

1          MR. TYLER:  Objection, Your Honor.  This is not

2   redirect.  This was not covered on direct.

3          JUDGE SUMMERHAYS:  Overruled.

4   Q.    (BY MR. HESSEL) Did you talk to any Republicans

5   during the special session?

6   A.    Yes.  We were all in the chamber.  Where I sit, I'm

7   surrounded by Republicans.  We talk about all bills,

8   what's going on and what's going to fail and what's going

9   to pass.

10  Q.    Thank you very much.

11  A.    Thank you.

12          JUDGE SUMMERHAYS:  Can we release

13  Representative Landry?

14          MR. HESSEL:  Yes.

15          JUDGE SUMMERHAYS:  You are free to step down.

16  You can go.

17      Counsel, you may call your next witness.

18          MS. SANDASIVAN:  Your Honors, Kathryn Sadasivan

19  for the Robinson intervenors.  The Robinson intervenors

20  call Anthony Fairfax by remote testimony.

21          JUDGE SUMMERHAYS:  The witness will approach.

22          MS. SADASIVAN:  By remote testimony, Your Honor.

23  I apologize.

24          JUDGE JOSEPH:  This is a housekeeping matter.

25  What measures have you taken to make sure that the

1   situation -- obviously that witness is not in the

2   courtroom.  We don't know who is in the room with him,

3   what materials he has.  Have you told him he needs to be

4   by himself without any access to materials other than what

5   you show him?

6           MS. SANDASIVAN:  Yes, Your Honor.  And he was

7   given the exhibits from the plaintiffs they asked for him

8   to have.

9           JUDGE JOSEPH:  Sure.  And that's fine as long as

10  it's all disclosed what's being shown to him and what he

11  has.

12          MS. SANDASIVAN:  Yes, Your Honor.

13      Good afternoon, Mr. Fairfax.  Can you hear me?

14          THE WITNESS:  Yes, I can.  Good afternoon.

15          JUDGE SUMMERHAYS:  We'll go ahead and swear the

16  witness in.

17          (Oath administered to the witness.)

18          JUDGE SUMMERHAYS:  You may proceed.

19          MS. SANDASIVAN:  Thank you, Your Honor.

20              ANTHONY EDWARD FAIRFAX,

21  having been first duly sworn to testify the truth, the

22  whole truth, and nothing but the truth, testified as

23  follows via Zoom:

24              DIRECT EXAMINATION

25  BY MS. SADASIVAN:

1   Q.   Mr. Fairfax, can you please state and spell your full

2   name for the record?

3   A.   Yes.  Anthony, A-N-T-H-O-N-Y.  Edward, E-D-W-A-R-D.

4   Fairfax, F-A-I-R-F-A-X.

5   Q.   And what is your educational background, Mr. Fairfax?

6   A.   I have a master in geospatial information science and

7   technology from NC State, and I have a bachelor's of

8   science degree from Virginia Tech, in electrical

9   engineering from Virginia Tech.

10  Q.   And what do you do for a living?

11  A.   I am demographic and mapping consultant.

12  Q.   What professional experience have you had?

13  A.   I began my career as an electrical engineer.  I

14  worked for two companies, Teledyne, Inc., a Fortune 500

15  company at that time.  I then moved on to work for EVR

16  Systems, an engineering and economics research systems, as

17  an electrical engineer as well.  I then started a business

18  with another individual as a silent partner, a computer

19  training business.  The first one on what we call the

20  peninsula here.  We had to close that business because of

21  the 1990 recession and people cutting back on things like

22  training or the precursor to the recession.  I wanted to

23  stay out and continue to be an entrepreneur so I began

24  computer consulting.  I landed a contract with Norfolk

25  State University, first working as a manager of their

1    computer training facility in computers and IT managing

2    the computers.  But then someone talked to me about a

3    project in political science.  I went over and met with

4    the directors or the co-directors.  They hired me as a

5    GIS consultant.  The project was a redistricting project

6    funded by Ford and Rockefeller Foundation.  It changed the

7    course and direction of my life completely because over

8    the next 30-some years, I worked in redistricting,

9    provided services for a variety of organizations, some

10   small organizations, to nationally recognized

11   organizations.  I developed plans in approximately I'd

12   say 22, 23 different states.  And over the course of that

13   time, probably have developed several hundred to maybe

14   close to a thousand, maybe even more than a thousand at

15   this particular moment.  And I have reached -- fortunately

16   I'm blessed in let's say as a -- I have been able to

17   testify in federal and state court as a redistricting

18   expert, which leads me to today.

19   Q.   Thank you, Mr. Fairfax.  In how many court cases have

20   you served as a redistricting expert?

21   A.   Approximately nine or ten.

22   Q.   And you were qualified as an expert.  Do you know on

23   what basis you were qualified and what field you were

24   qualified?

25   A.   I believe mostly in demography, demographics, census

1    data, and those realms.

2    Q.    And did you submit a report in this case?

3    A.    Yes, I did.

4    Q.    How many reports did you submit?

5    A.    I submitted one report.

6             MS. SANDASIVAN:  Your Honors, pursuant to

7    Federal Rule 702, I'd like to qualify or proffer

8    Mr. Fairfax as an expert witness in redistricting and

9    demography.

10            JUDGE SUMMERHAYS:  Any voir dire?

11            MR. GREIM:  Your Honor, we have no objection to

12   his qualification in demography and demographics in the

13   area of redistricting.

14            MR. BOWEN:  Nothing from the State, Your Honor.

15            JUDGE SUMMERHAYS:  You may proceed.

16            MS. SANDASIVAN:  Thank you.

17   Q.    (BY MR. SADASIVAN) So let's turn to your role in this

18   case, Mr. Fairfax. What were you asked to do in Callais v.

19   Landry by the Robinson intervenor defendants?

20   A.    I was asked to review the expert reports of

21   Mr. Hefner, Dr. Voss, and Dr. Sadow in regard to

22   congressional district plan SB8, review their analysis,

23   come up with any opinions or conclusions, and develop a

24   report.

25   Q.    And were you asked to offer opinions on whether race

1    was the predominant motive of the Legislature in drawing

2    the SB8 plan?

3    A.   No, I was not.

4    Q.   Let's turn to your methodology.  How did you go about

5    reviewing and offering opinions on the reports of

6    Mr. Hefner and Dr. Voss?

7    A.   I first began to obtain the appropriate data.  I

8    downloaded the plans that were on the legislative

9    websites, including HB1, SB8, the Plan A3.  I also

10   included or accessed data that I had previously created,

11   for example, CVAP data, socioeconomic aspects or

12   indicators that I used previously in court.  And there was

13   one plan that I forgot.  That's why I hesitated.  The sell

14   points plan.  I couldn't think of that.  I downloaded that

15   as well.  I also was sent the plan from Mr. Hefner, the

16   Illustrative Plan 1.  I apologize for the brain fog.

17             MR. GORDON:  I'm sorry to interpret, Your

18   Honors.  I notice that on the monitor there is a

19   projection of the courtroom that has one of the -- I

20   believe of Your Honors' monitors on it.  I don't believe

21   it's readable at all, but I just wanted to bring that to

22   the Court's attention in case that was a concern for

23   anybody.

24             JUDGE SUMMERHAYS:  I think the -- which one is

25   it?

1            JUDGE JOSEPH:  I think it's got your monitor on

2     it.

3            MR. GORDON:  Perhaps it's the court reporter's.

4     I'm sorry.  Okay.  I'm sorry.

5            (Off the record.)

6            JUDGE SUMMERHAYS:  All right.  You may proceed.

7            MS. SADASIVAN:  Thank you, Your Honor.

8        Can you please pull up what I am going to ask -- what

9     I will call Robinson Exhibit 294?

10    Q.   (BY MS. SADASIVAN) Mr. Fairfax, are you familiar with

11    the two figures hopefully before you?

12    A.   Yes, I am.

13    Q.   And how are you familiar with them.

14    A.   One of them on the left is the Illustrative Plan 2023

15    that I developed and submitted in a report in December of

16    2023.  The other is a plan that I referred to before,

17    Plan A3.  That was developed in 2021.  It was submitted or

18    presented during that period of time where the state

19    legislature was requesting input from the community and

20    anyone else.  So the Power Coalition and LDF submitted

21    this as a proposed plan during that time.

22    Q.   And where did the Robinson Illustrative 2023 Plan 2

23    described in your report come from?

24    A.    It was a modification of the previous plan,

25    Illustrative Plan, 4 that was submitted during the

1   Robinson litigation.  Made some slight changes.

2   Q.   And are you aware of whether any of these -- either

3   of these plans was introduced in the Louisiana

4   legislature?

5   A.   There was a very similar plan, an HB12 plan that was

6   similar to the Robinson plan that was submitted.

7   Q.   Do you know when it would have been considered by the

8   Louisiana legislature?

9   A.   In 2024.  Excuse me, in 2021.  I apologize.

10  Q.   So just to clarify, which figure, Figure 3 or

11  Figure 4 from your report in Exhibit 294 would have been

12  considered by the Louisiana legislature in 2021?

13  A.   Plan A3.

14  Q.   Okay.  And that's Figure 4.

15  A.   I'm sorry.  I'm sorry.  The HB12 plan I believe

16  was -- check that.  Yes.  I'm sorry.  I apologize.

17  Continue, please.

18  Q.   Ask you again?  When was the -- do you know which of

19  these plans was introduced in the Louisiana legislature?

20  A.   Yes.  Plan HB12 similar to Plan A3.

21  Q.   Okay.  And when was HB12 introduced in the Louisiana

22  legislature?

23  A.   In 2021.

24  Q.   And is this -- did Robinson Illustrative 2023 Plan 2

25  and Figure 3 and the A3 plan and Figure 4 that you drew

1    create two majority black congressional districts?

2    A.    Yes, it did.

3    Q.    In the Marcelle-Price plan that you also considered

4    from the 2024 legislative session, did that create two

5    majority black congressional districts?

6    A.    Yes, it did.

7    Q.    Did these plans represent the only way in which you

8    could have drawn two majority black congressional

9    districts?

10   A.    No.  During the process, there are many different

11   configurations you can actually configure the two majority

12   black districts.

13   Q.    And what were the metrics by which you compared the

14   SB8 plan with other redistricting plans that you

15   considered in your report?

16   A.    I used traditional redistricting criteria.  A core

17   sequel population is always a consideration, but I looked

18   at contiguity.  I looked at compactness.  I looked at

19   preserving communities of interest and minimizing

20   political subdivision splits.

21   Q.    How did you prioritize the traditional redistricting

22   criteria that you considered?

23   A.    When there is no priority given any guidance, then

24   what you do is you attempt to balance the criteria.

25   Q.    What sources did you look at to identify communities

1    of interest in evaluating Dr. Voss and Mr. Hefner's

2    analysis of whether the SB8 plan respected traditional

3    districting principles?

4    A.    Mr. Hefner, in his first report, utilized communities

5    of interest or established communities of interest of

6    parishes and municipalities.  And so I looked at those in

7    regards -- in reality, they could be also be political

8    subdivision that you actually look for minimizing

9    political subdivision splits.

10   Q.    And what socioeconomic data did you look at?

11   A.    I looked at six different socioeconomic indicators:

12   Income, education, poverty, renter percentage, food

13   stamps.  And then there is one that the Census Bureau

14   actually creates called Community Resilience Estimates.

15   And it's a ranking of how resilient a population can come

16   back from a disaster.  And so I looked at that as well.

17   Q.    Are there other types of information that a

18   map-drawer might consider when drawing a congressional

19   districting plan, for example, on behalf of a legislature?

20   A.    Yes.  Yes.  Of course, there are political

21   considerations with any of the plans.  It could be, for

22   example, assets.  They call it assets.  These are areas

23   that would be included, that's desirable to be in a

24   particular district.  So, for example, like a college or a

25   university, the military bases.  And then, of course,

1    there is incumbent locations that you may consider as

2    well.

3    Q.   And I am going to show you what I'm going to call

4    Exhibit 295.  Next slide.  Are you familiar with these

5    tables, Mr. Fairfax?

6    A.   Yes, I am.

7    Q.   And how are you familiar with them?

8    A.   The one on the left is included in my report.  The

9    one on the right is included in Mr. Hefner's second

10   report.  Or it's the third, the last report, I believe.

11   Q.   And what do these tables from your response report on

12   page 12 show generally about parish splits across the HB1

13   and the SB8 plan?

14   A.   Insofar as parish splits, there are several.  SB8

15   split 16.  HB1 splits 15.  When you look at the

16   congressional district in each of the plan that has the

17   largest number of parish splits, it's 11 in HB1 and 6 in

18   SB8.  If you look and consider how the splits are spread

19   out, let's say, on each of the plans, you have the HB1

20   ranking or rating from 1 to 11 split.  Whereas, the SB8

21   goes from 3 to 6 splits, so it's a little more evenly

22   split across the plan.

23   Q.   And is that a tradeoff spreading the splits of

24   parishes more evenly between districts that you as a

25   mapmaker might have made?

1          MR. GREIM:  Objection.  Vague and leading.

2          JUDGE SUMMERHAYS:  Can you rephrase?

3   Q.   (BY MS. SADASIVAN) Have you as a mapmaker drawn

4   districts to spread out parish splits more evenly between

5   the districts?

6   A.   It's something that you can consider.  The primary

7   metric is the number of splits.  But I think you're always

8   cognizant of all of the different splits for each of the

9   districts.

10  Q.   Okay.  Did you analyze the split population as

11  Mr. Hefner did in the table on the right?

12  A.   No.  No, I did not.

13  Q.   Why not?

14  A.   That's usually not included in the splits.  You may

15  include the population in a report just for identification

16  of the population in each of the districts but not as a

17  metric for splitting.

18  Q.   Were you able to conclude, based on your analysis and

19  the opinions offered by Dr. Voss and Mr. Hefner that you

20  heard, that racial considerations predominated over the

21  preservation of parishes in the SB8 plan?

22          MR. GREIM:  Objection --

23  A.   No, I did not.

24          MR. GREIM:  Objection because this is not an

25  opinion.  It seems like it's calling for opinion that's

1    not actually offered in the report.

2            JUDGE SUMMERHAYS:  Counsel?

3            MS. SADASIVAN:  Mr. Fairfax does offer this

4    opinion in the report.

5            JUDGE SUMMERHAYS:  Where in the report?  If you

6    can clarify that, I'll allow the question.

7            MS. SADASIVAN:  Clarify where in his report?

8            JUDGE SUMMERHAYS:  Yes, that he is covering in

9    the report.  All I hear from you is:  Yes, it's in the

10   report.

11           MS. SADASIVAN:  Sorry, Your Honor.  I mean, it's

12   in the summary of his opinions.  That is what he was asked

13   to do in this particular case, whether -- and as I asked

14   at the beginning, he wasn't asked to determine whether

15   race was the predominant motive of SB8; he was simply

16   asked to opine on whether or not Mr. Hefner and Dr. Voss

17   were able to conclude that race predominated.  So the

18   entirety of his opinion, what he's offering is whether or

19   not the information that they have provided would allow

20   them to conclude that.

21           JUDGE SUMMERHAYS:  Counsel?

22           MR. GREIM:  Well, I didn't hear the question

23   that way.  I think so long as it's kept to whether Voss or

24   Hefner could draw that conclusion, I'm okay with it.  I

25   didn't hear it come out that way.

1            JUDGE SUMMERHAYS:  I will allow overrule the
2     objection.
3         Do you need to repeat the question?
4            MS. SADASIVAN:  Sure.
5            JUDGE SUMMERHAYS:  We've had a lot of argument
6     since you asked the question.
7     Q.   (BY MS. SADASIVAN) Were you able to conclude, based
8     on your analysis of the opinions of Dr. Voss and
9     Mr. Hefner, that racial considerations predominated over
10    the preservation of parishes in the SB8 plan?
11    A.   No, I did not.
12            MR. GREIM:  Well --
13            JUDGE SUMMERHAYS:  I'm going to overrule the
14    objection.  Please proceed.
15    Q.   (BY MS. SADASIVAN) You can answer, Mr. Fairfax.
16    Apologies.  Do you need me to ask the question again?
17    A.   No, I did not.  That's the answer.
18    Q.   No.  Okay.
19        So I am going to show you what I'll call Robinson
20    Exhibit 296.  Are you familiar with these tables,
21    Mr. Fairfax?
22    A.   Yes, I am.
23    Q.   How are you familiar with these tables?
24    A.   Once again, on the left you have a table from my
25    report, and on the right you have a table from

1    Mr. Hefner's report.

2    Q.   And what does the table on the left show you or

3    demonstrate about the number of split municipalities in

4    the SB8 and the HB1 plan?

5    A.   Once again, you see not a substantial difference.

6    You have SB8 as 42 municipality splits, and HB1 has 32.  I

7    also want to say, just go on the record, that the state

8    municipalities followed Mr. Hefner's nomenclature, these

9    are actually census places and not municipalities.

10        That said, 42 and 32 is not a significant difference

11   when you consider that you have 488 municipalities or

12   census splits, as I said.  Once again, you have a more

13   evenly spread of splits across the plan.  And the largest

14   congressional district in the HB1 plan splits 19 and the

15   SB8 plan splits only 15.

16   Q.   And what is the range of municipality splits in the

17   HB1 plan?

18   A.   They range from 3 to 19.

19   Q.   And what is the range of municipality splits in the

20   SB8 plan?

21   A.   They range from 12 to 15.

22   Q.   And were you able to conclude, based on your analysis

23   of the opinions Mr. Hefner offered, that racial

24   considerations predominated over the preservation of

25   municipalities in the SB8 plan?

1    A.    No, I could not.

2    Q.    Did Dr. Voss analyze municipality splits?

3    A.    I do not believe so.

4    Q.    Okay.  And in your opinion does that impact

5    Dr. Voss's ability to opine on political subdivision

6    splits as a traditional redistricting principle

7    subordinated to race?

8    A.    It is missing a component.

9    Q.    And does that affect Dr. Voss's ability to conclude

10   that race was a predominant factor motivating the splits

11   of municipalities in the SB8 plan?

12   A.    Yes, it's missing a component.

13   Q.    I am going to show you what I'll call Robinson

14   Exhibit 297.  Are you familiar with this table,

15   Mr. Fairfax?

16   A.    Yes, I am.

17   Q.    How are you familiar with it?

18   A.    It is a table included in Dr. Voss's report.

19   Q.    And what does this table show?

20   A.    It shows several plans and the MSA split in those

21   plans.  It shows the, what he calls the most effective,

22   which is the largest population.  I would say that's

23   effective.  And then he has the effective splits, a ratio

24   that is being calculated.  He then has the -- I would say

25   what the second most, and then the same thing with

1    effective splits.

2    Q.    And what's the approximate size of a metropolitan

3    statistical area?

4                MR. GREIM:  I have an objection.  This line of

5    testimony was not given by Dr. Voss.  It does exist in his

6    report.  It was not offered in evidence in our

7    case-in-chief.  And this witness was brought here only to

8    rebut the testimony of Dr. Voss.

9                MS. SADASIVAN:  That's fair.

10               JUDGE SUMMERHAYS:  Counsel?

11               MS. SADASIVAN:  That's fine.  We'll move on.

12               JUDGE SUMMERHAYS:  Sustained.

13               MS. SADASIVAN:  Can we pull up what I'll call

14   Robinson exhibit -- I'm going to call this 297?

15               JUDGE SUMMERHAYS:  297?

16               MS. SADASIVAN:  And take the other one out, if

17   that's okay.  So what I'll call Exhibit --

18               JUDGE SUMMERHAYS:  What's the plan?  Are you

19   going to introduce these exhibits?

20               MS. SADASIVAN:  If it's okay, I can introduce

21   them at the end.  I mean I think he's authenticated

22   through at least 296 thus far.  I can ask for them to be

23   moved into evidence now.

24               JUDGE SUMMERHAYS:  Any objection to that?

25               MR. GREIM:  No objection, Your Honor.

 1              MR. BOWEN:  No objection, Your Honor.

 2              JUDGE SUMMERHAYS:  And which ones, just so we

 3     state it on the record, which ones are you moving in?

 4              MS. SADASIVAN:  294 through 296.  And there will

 5     be more, but --

 6              JUDGE SUMMERHAYS:  All right.  We'll get those

 7     introduced.  There has been no objection.  They are

 8     admitted.

 9     Q.   (BY MR. SADASIVAN) So I'm showing you what I'm going

10     to call Robinson Exhibit 297.  Do you recognize the maps

11     in this exhibit, Mr. Fairfax?

12     A.   Yes, I do.

13     Q.   And what is the map, Map 14 on the left purport to

14     demonstrate?

15     A.   That is a heat map which provides the concentrated

16     locations of black voting age population using 2020 census

17     in the state of Louisiana.

18     Q.   How do you recognize that map?

19     A.   That map was included in Mr. Hefner's report.

20     Q.   And did you review that report?

21     A.   Yes.

22     Q.   And what does the map on the right illustrate?

23     A.   The map on the right I generated in response to the

24     map on the left.  The map on the right shows that the

25     parishes in Louisiana, the black population percentage is

1    not just concentrated in one or two or three or a few

2    areas, it is throughout the state.  And so the red that

3    shows you those parishes greater than 50 percent, and the

4    yellow shows between 25 and 50 percent, which is an ample

5    or a significant amount of black population.  Whereas, the

6    heat map gives you the impression that the population of

7    black persons only exist in a few areas throughout the

8    state.

9    Q.   And can you give us an example of how the heat map's

10   representation of the black population differs from the

11   map on the right, Figure 2, from your report, illustrates

12   the black population in Louisiana?

13   A.   Yes.  A visible difference is:  When you look at

14   East Carroll, Madison, and Tensas -- I believe is you how

15   pronounce it -- you see that on the heat map, it doesn't

16   appear that there is a significant amount of black

17   population in those parishes.  But they are all majority

18   black parishes if you look at the map on the right.  It

19   gives you a completely different perspective of the black

20   voting age population.

21   Q.   How did you go about assessing whether the black

22   population is distributed in such a way that you could

23   create a second majority black district while complying

24   with traditional redistricting principles?

25   A.   Well, I generated prior to this as well as in

1    December, an illustrative plan, as well as a remedial

2    plan, that contained two majority black districts and it

3    adhered to traditional redistricting criteria.

4    Q.   So in testing that hypothesis, how do you go about

5    determining whether it is, in fact, possible then?

6               MR. GREIM:  I'm sorry to object again.  But I

7    think now, rather than responding to Dr. Voss and

8    Mr. Hefner, this witness is just flat out testifying about

9    whether it's possible to draw other two majority-minority

10   maps following traditional redistricting criteria, which

11   is again not a response to Voss and Hefner.

12              JUDGE SUMMERHAYS:  Counsel?

13              MS. SADASIVAN:  This is actually what

14   Mr. Hefner testified about today, about whether or not it

15   was possible to draw a map with two majority black

16   districts that complies with traditional redistricting

17   principles. So not only is Mr. Fairfax responding to the

18   direct testimony we all heard today, but he is also

19   responding directly to what was contained in Mr. Hefner's

20   report.

21              JUDGE JOSEPH:  I think Dr. Voss and Mr. Hefner

22   both testified that they didn't think it was possible two

23   draw two majority black districts.

24              JUDGE SUMMERHAYS:  Yeah.  I am inclined to allow

25   it unless I have a dissent from --

1           JUDGE JOSEPH:  That's what they said.

2           JUDGE STEWART:  No, they testified -- it's free

3    rein on impossibility.  They were asked over and over

4    about it.  You've got experts on.  They're all reviewing

5    each other's reports.  You've got the reports unless

6    you're saying something is coming in that's not in the

7    report, we've given pretty wide range to all counsel with

8    these experts to be able to kind of testify within the

9    confines a bench trial.  We can exclude later if you want

10   to prop it up, but try to stay away from these, you know,

11   continued objections unless it's relevance, it's beyond

12   the report themselves.  If it's within the range of what

13   was brought out in direct or cross by experts, we've

14   allowed them to stay in the courtroom for a reason.  So

15   they've heard what each person has said.  This is not the

16   parameters when we're talking about fact witnesses.  And

17   all counsel are well aware that we've given a lot of room

18   on these reports.

19        So unless we're dealing with something relevant, it's

20   not in the report, something new or whatever, let's stay

21   within -- the same rules were given on these experts.

22   We're going to evaluate them in the end.  And counsel will

23   definitely be able to tell us, you know, what to consider

24   and how much weight to be given to them and so on and so

25   forth, without having waived any kind of, you know,

1  objection that you may have.  The fact that you don't

2  object to it doesn't mean you have waived any argument

3  about whether you should believe it, exclude it, whatever.

4  We're just trying to get the evidence in the record so

5  nobody's prejudiced by not having it in there.  And we'll

6  figure out, you know, what it all means.  We don't have a

7  jury in the box that we're worried about not being able to

8  "untell" it.

9         MR. GREIM:  And I would just say:  Obviously

10 we've had plenty of expert testimony, Your Honor.

11 Appreciate that.  I think this -- I am not certain if this

12 is in the report.  It's not something I focused on.

13 There's another part that does talk about maps.  But this

14 isn't it.

15        JUDGE SUMMERHAYS:  But it's been testified about

16 repeatedly in this proceeding.  I am going to overrule the

17 objection.  You may proceed.

18        MS. SADASIVAN:  Thank you, Your Honors.

19 Q.   (BY MS. SADASIVAN) Mr. Fairfax, would you like me to

20 ask the question again?

21 A.   Yes, please.

22 Q.   So in assessing of whether the black population is

23 distributed in such a way that you could create a second

24 majority black district, so to test that hypothesis, how

25 do you -- and comply with traditional redistricting

1    principles, how do you as a demographer go about

2    determining whether it's possible?

3    A.    Well, you attempt to develop a plan, a plan that

4    follows or adheres to either their redistricting criteria

5    that's established by the State or what's called

6    traditional redistricting criteria.  And, in essence,

7    that's what I did.  I developed a plan that created two

8    majority black districts and adhered to traditional

9    redistricting criteria.

10   Q.    Thank you.  And why does that make sense as a way of

11   determining whether or not it's possible?

12   A.    Well, if you are going to try to determine something,

13   I think it's good to attempt to try to do it to see if

14   it's possible.  But that's something that you would do in

15   many analysis that you perform.

16   Q.    And so in Mr. Hefner's heat map on the left -- and

17   just to go back -- what is the differences that you were

18   describing between the way the black population is

19   depicted in Mr. Hefner's heat map on the left and your map

20   specifically of the black population by parish on the

21   right?

22   A.    In his map, it gives the impression that the black

23   population only exists in those areas that you see are

24   colored in.  And that's not the true reality.  They exist

25   throughout.  And some of those areas that you can't see

1    that doesn't have them -- for instance, you don't see a

2    clear demarcation in East Carroll, Madison and Tensas, but

3    they're majority black.  And those would be, you know,

4    likely candidates to actually include in a majority black

5    district.

6    Q.    Okay.  Thank you.  And did Dr. Voss offer opinions on

7    socioeconomic factors as nonracial considerations that

8    could have motivated the lines in the SB8 plan?

9    A.    I believe Dr. Voss did not.

10   Q.    And in your opinion does that impact Dr. Voss's

11   ability to conclude that race was the predominant factor

12   motivating the district lines in the SB8 plan?

13   A.    Yes.  There's a component of that.  Yes.

14   Q.    And Mr. Hefner later looked at the socioeconomic

15   factors that you considered in your report; is that right?

16   A.    Yes, that's correct.

17   Q.    And did anything in Mr. Hefner's report change your

18   opinion that Mr. Hefner couldn't conclude that

19   socioeconomic factors couldn't explain the district lines

20   in the SB8 plan?

21   A.    No, nothing changed my mind or conclusions.

22   Q.    So I'll ask to pull up Robinson Exhibit 298.  Do you

23   recognize the figures in this exhibit?

24   A.    Yes.

25   Q.    And how do you recognize the figures in this exhibit?

1    A.    These were two maps that I included in my report.

2    Q.    And these maps depict East Baton Rouge -- sorry.

3    What does the map on Figure 5 from your report on the left

4    demonstrate?

5    A.    It shows the boundaries of CD-6 and SB8.  And then it

6    overlays the six socioeconomic aspects or indicators that

7    I mentioned before.  And the reason why I utilize them to

8    show if the socioeconomic aspects could generally define

9    the configuration of the districts, and they do so.

10   Q.    And what does Figure 6 from your response report on

11   the right illustrate?

12   A.    This shows I guess another aspect that could be

13   looked at.  And that's municipal boundaries in an asset of

14   LSU.  And so when you show these and overlay the census

15   places on top of the map and the boundaries, you show that

16   they generally attempt to follow the census places.  You

17   see central up at the top.  You know, you see the one

18   downs on the bottom?  They are generally attempting to

19   include them as whole census places.  The encroachment if

20   you will of CD-5, the district on the east, let's say,

21   goes all the way to what I consider LSU.  And it could be

22   an attempt to include the majority of LSU inside CD-5.

23   Q.    And as a demographer with -- drawn for numerous

24   states, drawn maps on behalf of numerous states and local

25   entities, are these maps that you use in drawing plans on

1    behalf of those entities?

2    A.    The types of maps is what you're referring to?

3    Q.    Yes.  Sorry.

4    A.    Yes.  Yes.  Routinely you would overlay municipal

5    boundaries just to check out to see if they follow.  And,

6    of course, the socioeconomic aspects are used to sometimes

7    even draw plans as I have done or to verify.

8    Q.    And did anything of Mr. Hefner's report lead you to

9    conclude that racial considerations had to predominate

10   over the preservation of communities of interest,

11   including the socioeconomic communities of interest in the

12   SB8 plan?

13   A.    No.  No.

14   Q.    And why not?

15   A.    Because one of the things that he did, I believe he

16   included the separate maps with socioeconomic aspects.

17   And that can be used but that doesn't present all of the

18   picture, so overlaying them on top shows a commonality of

19   all of these six different socioeconomic aspects or

20   indicators which allow you to reveal whether that district

21   actually truly followed those six versus looking at it one

22   at a time.

23   Q.    And do you agree with Mr. Hefner and Dr. Voss's

24   opinion that the black population is too dispersed to

25   create a second majority black congressional district

1   without sacrificing traditional districting principles?

2   A.   No, no.  I don't agree.

3   Q.   And do you agree with Mr. Hefner and Dr. Voss that

4   race had to be the predominant motive of the Louisiana

5   legislature in enacting SB8?

6          MR. GREIM:  I do object on this question

7   because we're now asking, while we're mentioning Dr. Voss

8   and Dr. Overholt and Dr. Hefner -- I'm sorry --

9   Mr. Hefner, the very first thing the witness said is he is

10  not offering opinion on whether race predominated.  Now he

11  is being asked that question basically in just different

12  words.

13         MS. SADASIVAN:  What I said was:  Do you agree

14  with Mr. Hefner and Dr. Voss that race had to be the

15  predominant motive of the Louisiana legislature, whether

16  or not -- in other words, their conclusions would lead him

17  analyzing it to conclude that it had to be the predominant

18  motive?

19         JUDGE SUMMERHAYS:  I am going to overrule the

20  objection.  Proceed, please.

21  Q.   (BY MS. SADASIVAN) Would you like me to ask the

22  question again, Mr. Fairfax?

23  A.   Yes, please.

24  Q.   Sorry about that.  Based on the testimony you've

25  heard from Mr. Hefner and Dr. Voss, do you agree with

1    Mr. Hefner and Dr. Voss that race had to be the

2    predominant motive of the Louisiana legislature in

3    enacting SB8?

4    A.    I do not agree with that.

5    Q.    And why not?

6    A.    Because in my analysis I saw other aspects that could

7    configure the district or allow the district to be

8    configured in a manner other than race.

9    Q.    And did you consider all of the things that the

10   Louisiana legislature could have considered in enacting

11   SB8?

12   A.    No, I didn't consider every one.

13   Q.    Did you conduct a racially polarized voting analysis

14   as part of your work in this case?

15   A.    No, I did not.

16            MS. SADASIVAN:  Nothing further right now.

17            JUDGE SUMMERHAYS:  Does the State have --

18            MR. BOWEN:  Yes, Your Honor, very brief.

19            JUDGE SUMMERHAYS:  You may approach.  Proceed

20   when ready.

21                    CROSS-EXAMINATION

22   BY MR. BOWEN:

23   Q.    Mr. Fairfax, are any of the maps included in your

24   reports ones that you drew?

25   A.    The illustrative --

 1              JUDGE STEWART:  Hold on, Counsel.  We got the

 2    chatter at the tables that --

 3              MR. BOWEN:  Apologies.

 4              MS. SADASIVAN:  Oh, I'm so sorry.

 5    Q.   (BY MR. BOWEN) Sorry about that.  I'll reask the

 6    question.  Are any of the maps included in your reports

 7    ones that you drew?

 8    A.   The Illustrative 2023 Plan 2.

 9    Q.   What about --

10    A.   I'm sorry.  And the Plan A3.  (Audio interference.)

11    Yes.

12    Q.   Sorry.  There seems to be a lag here.  Please answer.

13    A.   No, that's it.

14    Q.   When drawing your maps, did you consider the

15    political objective of not pairing incumbents?

16    A.   In drawing my plans, I did include the incumbents so

17    they would be separate.

18              MR. BOWEN:  And if I could impose on my friends,

19    the intervenors, over here to pull up pages -- page 31 of

20    Mr. Fairfax's report.

21              THE WITNESS:  And let me say a caveat in Plan A3

22    that wasn't a consideration.  That was in 2021.

23    Q.   (BY MR. BOWEN) And is this the A3 plan we were just

24    talking about?

25    A.   Yes.

1          MR. BOWEN:  And could we go to the next page,

2     page 32?

3     Q.   (BY MR. BOWEN) And on that page, in paragraph 72 you

4     said the A3 plan provides an example of how population

5     could be added to CD-4 using the SB8 plan as a baseline to

6     eliminate the wraparound configuration and create a more

7     compact district.  The configuration of the A3 plan would

8     have provided a more compact district and a plan

9     configuration while creating a second majority black

10    district in the Red River region of the State.  Plan would

11    have paired incumbents Mike Johnson and Julia Letlow in

12    CD-4 however.  Once again, the State legislature's choice

13    of a different less compact configuration than these

14    alternatives seems to be for political considerations and

15    not race predominating.

16         What did you mean by that?

17    A.   That means that this could have been one of the

18    political considerations of not accepting that particular

19    plan.  That it paired two incumbents.  And so they

20    weighed, let's say the pairing of the incumbents over the

21    compact aspect of the districts.

22    Q.   And when you were drawing your maps, did you consider

23    the conclusions of the Fifth Circuit and the Middle

24    District in the Robinson litigation?

25    A.   The Court direction of creating two majority black

1    districts?

2    Q.   Yes.

3    A.   Yes.  Yes, I did.

4             MR. BOWEN:  May I confer with counsel?

5             JUDGE SUMMERHAYS:  You may.

6             MR. BOWEN:  Nothing further from the State.

7    Thank you.

8             MS. SADASIVAN:  I apologize.  I forgot to move

9    for Exhibits 297 and 298 to be --

10            JUDGE SUMMERHAYS:  297 and 298?

11            MS. SADASIVAN:  -- into evidence.  I would like

12   to do so now.

13            JUDGE SUMMERHAYS:  Counsel?

14            MR. GREIM:  No objection.  I would love to know

15   what they are, though, for own my notes.

16            JUDGE SUMMERHAYS:  Why don't we put them up on

17   the --

18            MS. SADASIVAN:  So 297 was the heat map and 298

19   were the socioeconomic and census places.

20            JUDGE SUMMERHAYS:  Any objection?

21            MR. GREIM:  No objection.

22            MR. BOWEN:  No objection, Your Honor.

23            JUDGE SUMMERHAYS:  297 to 298 are admitted.

24            MS. SADASIVAN:  Thank you, Your Honor.

25            JUDGE SUMMERHAYS:  Counsel, cross?

1          Yeah.  Let me ask you:  Counsel, how much do you
2     anticipate for cross?
3               MR. GREIM:  Oh, probably 20 to 30 minutes.
4               JUDGE SUMMERHAYS:  Let's proceed with cross.
5               MR. GREIM:  It feels odd to come over here and
6     stand, but I've got a good video.
7               JUDGE SUMMERHAYS:  That's fine.
8               JUDGE JOSEPH:  Is that microphone on, Mr. Greim?
9          Yeah.  Make sure the button is pressed and the green
10    light on.
11              MR. GREIM:  Yeah, I think it's on.  I just
12    wasn't loud enough.  I wonder if we could please put up I
13    think what we just learned was 297.  The heat map, the
14    comparison.
15         Is the Court ready for me?
16              JUDGE SUMMERHAYS:  You may proceed.
17                        CROSS-EXAMINATION
18    BY MR. GREIM:
19    Q.  Doctor -- or Mr. Fairfax, good afternoon.  I'm
20    Eddie Greim and I represent the plaintiffs here.  I didn't
21    depose you so I'm new to you.  This may be the first and
22    only time.  We'll see.
23         I want to start with an exhibit that you explored
24    with counsel just a few moments ago.
25         Now, Mr. Hefner's heat map on the left accounts for

1    the actual size of population as well as its placement,

2    correct?

3    A.    That's correct.

4    Q.    And I want to turn to the three parishes you

5    mentioned -- well, first of all, your map does not account

6    for the actual size of the population, right?

7    A.    That's correct.

8    Q.    Nor does it account for where within those parishes

9    people live, right?

10   A.    That's correct.

11   Q.    And so by looking at your map, we can't tell, for

12   example, whether there is a huge population, a huge

13   metropolitan area in the bottom of Tensas County that has

14   500,000 black residents, right?

15            JUDGE STEWART:  Where you from, Mr. Greim?

16            JUDGE JOSEPH:  You said Tensas County.  It's

17   Tensas Parish.

18            MR. GREIM:  Tensas?  Okay.

19            JUDGE JOSEPH:  You got both of those words

20   wrong.

21            MR. GREIM:  That's like Arkansas.  Listen, I'm

22   Kansas City-ian.

23            JUDGE STEWART:  You just outed yourself.

24            MR. GREIM:  It's probably obvious already.

25   Q.    (BY MR. GREIM) So, Mr. Fairfax -- well, I think I got

1   an answer.  The answer was yes, right?

2   A.   Can you repeat the question just in case?

3   Q.   Well, I think, I'll move on.  I think the point is

4   made.

5        Did you know what the size of the black population

6   actually is in the three red counties up there in the

7   northeast of the State?

8   A.   No, not offhand, I don't.

9   Q.   Now, we heard you testify that you have used

10  traditional redistricting criteria to create maps with two

11  majority-minority districts, right?

12  A.   That is correct.  Can I address the previous

13  question?

14  Q.   About Tensas County?

15  A.   Yes, about the population in there.  And what I

16  wanted to follow up is to say that that's not the purpose

17  of this map.  The purpose of the map that I would add full

18  response is to show that black population in Louisiana

19  inside the parishes exists in many, many, many different

20  parishes, not in just the few locations as what's seen in

21  the heat map.  It gives a completely different prospective

22  of where the black population exists.  That's all.

23  Q.   Right.  But there simply may not be, in terms of raw

24  numbers, very many blacks living in those three counties,

25  correct?

1    A.    Correct.  But when you're drawing a plan, you're

2    looking -- if anything, you're not going to create areas

3    where there aren't any black population.  I mean they are

4    not going to create majority black districts in areas that

5    don't have a significant amount of black population.  And

6    so what I am showing is that you can create different many

7    places using many different parishes.  That's all.

8    Q.    Right.  You're going to be trying to draw towards the

9    red areas, right?

10   A.    That's one option.

11   Q.    And in fact, when you drew your Robinson maps, you

12   consciously drew those districts at right around 50

13   percent because that's what you thought you needed for

14   *Gingles*, right?

15          MS. SADASIVAN:  Objection, Your Honor.

16   Mr. Fairfax hasn't testified about the maps he drew for

17   the Robinson case or what he was intending to do or his

18   map-drawing process in that litigation.

19          JUDGE SUMMERHAYS:  Response?

20          MR. GREIM:  Well the response is that we learned

21   that one of these maps was a slight tweak on the Robinson

22   map.  And we heard the witness testify that you can come

23   up with his maps using traditional redistricting criteria.

24   I think we need to explore whether that's true.

25          JUDGE SUMMERHAYS:  I'm going to overrule the

1    objection.  You may proceed.

2    Q.   (BY MR. GREIM) So how -- I'll start again here,

3    Mr. Fairfax.  You consciously drew those districts at

4    right around 50 percent because that's what you needed for

5    *Gingles*, right?

6    A.   No.  No.  That would be using a target.  And so I

7    didn't consciously look at 50 percent.  I looked at it as

8    a minimum threshold because that's what *Gingles* says, but

9    that wasn't a target that I was looking at.

10   Q.   Mr. Fairfax, do you recall testifying about this very

11   topic when you presented your maps in court?

12   A.   I believe so.

13            MR. GREIM:  Could we pull up the Robinson

14   hearing transcript, please.

15   Q.   (BY MR. GREIM) And I'm presenting you, Mr. Fairfax,

16   with your testimony presenting one of your maps before

17   Judge Dick.  And I am going to take you to page 217.  If

18   we could scroll to that.  There we go.  And the questioner

19   here is Mr. Strach who was here.  He was sitting behind me

20   for much of the day in the courtroom.  You can't see that.

21   But Mr. Strach was questioning you.

22       And you'll see he asked you, line 9:  At least we

23   know that the CD-5 could have ended up at 50 percent -- 50

24   percent to 60 percent DOJ black.

25       Your answer:  I don't know if it would be that high.

1     Yeah, I don't know it would be that high.

2          Question:  All right.

3          Then he goes on -- and then you go on.  You see at

4     line 15:  But certainly there is a possibility it could be

5     higher than what it is here if that's what you are getting

6     to.

7          You follow me so far, Mr. Fairfax?

8     A.    Yes.

9     Q.    And you do recall giving testimony in that case,

10    right?

11    A.    Yes.

12    Q.    Line 18, question:  Okay.  So you consciously drew

13    the district right around 50 percent because that's what

14    you needed for the first *Gingles* precondition, right?

15         Answer:  That's right.  It satisfied -- it satisfied

16    that first precondition.

17         I read that correctly, didn't I?

18    A.    Yes, you did.

19    Q.    Let me also --

20         MR. GREIM:  Can we put up Plaintiffs' Exhibit --

21    I'm talking to the technician to work on putting up a new

22    exhibit.

23         (Off the record.)

24         THE WITNESS:  Let me respond to that.

25         MR. GREIM:  I'm sorry, Doctor.  I'm just

1    asking --

2                JUDGE SUMMERHAYS:  Don't respond until we have a

3    question.

4        Counsel, you're going to put something -- you're

5    going to put an exhibit up and then you can ask the

6    question and the witness can respond.

7                MR. GREIM:  I apologize to the Court.  I just

8    have a little technical difficulty.  An exhibit that was

9    supposed to go over here I think maybe didn't.  If I could

10   have one minute to talk to my bench just to have it sent

11   over.  We're having to do this because the --

12               JUDGE SUMMERHAYS:  Why don't we go ahead and

13   take the afternoon break.  I will advise, since we are in

14   the middle of cross-examination, that the witness will not

15   confer with counsel with respect to the subject matter of

16   his testimony.  Is that clear?

17               THE WITNESS:  Yes.

18               JUDGE SUMMERHAYS:  All right.  We'll come back

19   in 15 minutes.

20           (Recess.)

21               JUDGE SUMMERHAYS:  Counsel, you may resume.

22   Q.   (BY MR. GREIM) Mr. Fairfax, welcome back.  During the

23   break, did you talk to anybody?

24   A.   No.  No, I did not.

25   Q.   Did you review any documents you received from

1    anyone?

2    A.   No, I did not.

3    Q.   So before the break we were talking about your past

4    drawing of maps and I'm going to ask you to take a look at

5    what we've shown here on the screen.  This is Plaintiff's

6    Exhibit 22.  Do you recognize this as the map that was

7    invalidated in the *Hays* case?

8              MS. SADASIVAN:  Objection, Your Honors.

9    Mr. Fairfax hasn't testified at all about the *Hays* case or

10   the *Hays* map.  It's totally outside the scope of the

11   direct.

12             JUDGE SUMMERHAYS:  Counsel?

13             MR. GREIM:  This is directly relevant to the

14   point we were just covering, but I -- I hate to say it

15   like this, but I have to connect it up.

16             MS. SADASIVAN:  If it's outside the scope of the

17   direct, though, Your Honors, it -- just because it's

18   relevant --

19             JUDGE SUMMERHAYS:  I'm going to allow it.  The

20   Court can control the order and I will allow this

21   exploration.  You may proceed.

22   Q.   (BY MR. GREIM) And I'm sorry, Mr. Fairfax.  Do you

23   recognize this map?

24   A.   It does appear to be the *Hays* map.

25   Q.   And in drawing your own maps you would never draw a

1   map like this, correct?

2   A.   I would not draw a map like that, that is correct.

3   But can I address the last question?  Or I won't be able

4   to address when we left?

5   Q.   Mr. Fairfax, we have a system, a back and forth

6   system here and I can't let you just talk during my -- you

7   can answer my questions, but --

8            JUDGE SUMMERHAYS:  I'll just have the -- I have

9   the expert -- Mr. Fairfax, if you would just answer the

10   question that's asked.

11       Counsel, you may proceed with your question.

12   Q.   (BY MR. GREIM) Now, you testified about -- well, I

13   think we called it Robinson Illustrative Plan 2 and Map A3

14   which you had drawn in 21, right?

15   A.   Correct.

16   Q.   And I think you testified that the differences

17   between those two maps and Senate Bill 8 seemed to be for

18   political considerations.  Right?

19   A.   It could be.

20   Q.   Well, you have no way of knowing, right?

21   A.   That is correct.  It could be.  There is a

22   possibility that it could be for political reasons.

23   Q.   And you've done nothing to compare the racial

24   performance of SB8, A3, the Robinson Illustrative Plan 2,

25   and the other map that you considered in your report,

1   right?

2           MS. SADASIVAN:  Objection, Your Honor.  It's

3   totally unclear what Mr. Greim means by "racial

4   performance."

5           JUDGE SUMMERHAYS:  If you could clarify and

6   rephrase, please.

7           MR. GREIM:  I will.

8   Q.  (BY MR. GREIM) Okay.  Let's forget about racial

9   performance for a second.  You understand what the term

10  "BVAP" means?

11  A.   Yes.

12  Q.   And we talked a second ago about considerations of

13  BVAP in drawing districts.  So I assume you must have

14  looked at the BVAP, the comparative BVAP between SB8 and

15  the other three plans before hazarding an opinion about

16  whether race predominated in SB8, right?

17  A.   No, I did not.  What I did was analyze the reports

18  from the other experts -- Mr. Hefner, Dr. Voss, and

19  Dr. Sadow -- and respond to their analysis.

20  Q.   But you know, Mr. Fairfax, that BVAP is the highest

21  in SB8, isn't it?

22          MS. SADASIVAN:  Objection, Your Honor.  That

23  wasn't what Mr. Fairfax testified about.  He didn't say

24  that.

25          JUDGE SUMMERHAYS:  Counsel?

1            MR. GREIM:  I'm not asking -- he said he didn't

2   analyze.  I'm going to ask what this person knows as

3   someone who has drawn many of these maps.

4            JUDGE SUMMERHAYS:  I'm going to overrule the

5   objection.  You may proceed.

6   Q.   (BY MR. GREIM) So, Mr. Fairfax, you know that BVAP is

7   higher in SB8 than the other three maps, don't you?

8   A.   No.  No.  I didn't look at that.

9   Q.   You just completely blinded yourself to BVAP before

10  answering a question about racial predominance?

11  A.   No.  I analyzed the reports of the three experts and

12  responded to their analysis.

13  Q.   So even today, as you sit here as an expert after a

14  couple of years of testifying in different cases, your

15  testimony is you don't know if SB8 has a higher BVAP than

16  the other three districts.  Is that right?

17  A.   That is correct.  I can surmise from your question it

18  may.  But before that, no.

19            MR. GREIM:  I am sorry, but I didn't hear the

20  last words that the witness said.  I can surmise from --

21  and I actually didn't hear the end of it?

22            JUDGE STEWART:  He said I don't know.

23            MR. GREIM:  Okay.  I'm sorry.  I just -- I

24  couldn't hear it I wanted to make sure I wasn't...

25       Mr. Fairfax, I don't have any other questions for you

1    on cross.

2            JUDGE SUMMERHAYS:  Redirect?

3            MS. SADASIVAN:  Your Honor, I would like to

4    offer -- Your Honors, I would like to offer Exhibits 117,

5    118 and 122.  Those are the Fairfax reports in the

6    Robinson case, into evidence.  And then as well, I believe

7    it is Robinson 125, which is the transcript of the

8    preliminary injunction hearing in Robinson.

9            JUDGE SUMMERHAYS:  Is this the one that he

10   was -- the witness --

11           MS. SADASIVAN:  That Mr. Greim was just using

12   and referring to.

13           JUDGE SUMMERHAYS:  Counsel?

14           MR. GREIM:  I was using that to impeach the

15   witness's testimony in this case.  The purpose for which

16   these were going to be offered, foundation has not been

17   laid.  But the witness had inconsistent testimony in a

18   prior proceeding and that's the only thing he was

19   questioned on.  I can't believe that all of his reports

20   and an entire day of testimony now comes in for that

21   reason.

22           JUDGE SUMMERHAYS:  Yeah, I am disinclined

23   subject to any discussion with my colleagues, to allow

24   expert reports from a different proceeding into the case

25   unless a foundation can be laid.  And the foundation would

1    be if this was considered by the Legislature in

2    formulating a plan.  And that's what it was represented

3    as.  And I have not heard that testimony at this point.

4         As far as the transcript, to the extent this is

5    impeachment with prior inconsistent statements, the prior

6    inconsistent statement is read into the record, but it's

7    not independently admitted as an exhibit.  And unless the

8    parties agree to admit it, but I hear that there is an

9    objection.

10         MS. SADASIVAN:  Your Honor, respectfully, the

11    way that the transcript was offered, it wasn't an

12    inconsistent statement, because he hadn't any offered any

13    opinion yet and it was on traditional redistricting

14    principles.  Mr. Greim was exploring a new area of

15    testimony that he demonstrated the relevance of.

16         JUDGE SUMMERHAYS:  Yeah.  I thought I heard him

17    ask a question and a different answer that he highlighted

18    under the transcript.

19         Counsel, am I incorrect?

20         MR. GREIM:  Your Honor, I asked a question that

21    was worded almost exactly like the question that the

22    witness was asked, and I believe I impeached him by

23    showing a prior inconsistent statement with almost the

24    exact same words.

25         JUDGE SUMMERHAYS:  It appeared to be valid

1    impeachment to me.  And again, unless counsel agrees, I do

2    not admit the actual statement as independent -- as an

3    independent exhibit.  It can be read into the record, but

4    it's not -- and it is in the record -- independent basis.

5        Any disagreement?  The objection is --

6            JUDGE STEWART:  No, I don't disagree about the

7    transcript itself.  I'm trying to recollect, because

8    Mr. Greim had asked a question and felt, I guess, the

9    answer was nonresponsive in terms of what was in the

10   report then sought to put on the screen the paragraph and

11   the two questions and say is this what you said?  And my

12   recollection the witness said affirmative to what was

13   asked.  Is that -- wasn't that tracking?  You asked him

14   the question -- whatever it is, paragraph number 7, it's

15   just that portion is what you put on the screen?

16           MR. GREIM:  Well, Your Honor, I didn't put

17   anything on the screen.  What I had done, the witness had

18   testified that he drew other maps consistent with

19   traditional redistricting principles.  I then asked him if

20   he consciously drew the maps to get to 50 percent BVAP.

21   He said no.  I then asked him -- I guess, we did put it on

22   the screen.  We did.

23           JUDGE STEWART:  Well, I know.  I mean --

24           MR. GREIM:  Yeah.

25           JUDGE STEWART:  -- we saw it here.

1        MR. GREIM:  I'm sorry.  My short-term memory is

2  fading, but -- I'm sorry, Your Honor.

3        JUDGE JOSEPH:  I guess regardless of whether it

4  was successful impeachment or not, which we can debate

5  about I think, the purpose of the questioning was for

6  impeachment, not to admit it for the truth of the matter

7  asserted, therefore, it's not admitted into evidence.

8        MR. GREIM:  That's right.  We are not moving to

9  admit the other transcript.  I attempted to impeach his

10  statement that he did not consciously use race to draw

11  those districts.

12        JUDGE STEWART:  My only reticence -- I don't

13  disagree with that -- is that if counsel on redirect or

14  something is seeking -- in other words, he read paragraph

15  whatever it was, he needed to read the paragraph ahead of

16  it and afterwards to show it in its completeness, that is

17  proper redirect on an impeachment attempt.  That's why I

18  was saying we're talking about a segment.  So on redirect,

19  if she was seeking to do that, to show it in context as

20  opposed to one answer, that's proper redirect on it.

21  That's separate and apart from admitting the whole

22  document into evidence.  And I don't think Mr. Greim

23  disagrees with that.  Right?

24        MR. GREIM:  I don't.

25        MS. SADASIVAN:  Thank you, Your Honors.  I will

1    do that.  Would you --

2             JUDGE SUMMERHAYS:  So you're going to point the

3    witness to add the additional statements on redirect that

4    were not highlighted up on the screen?

5             MS. SADASIVAN:  Yes, Your Honor.

6             JUDGE SUMMERHAYS:  And we're not going to --

7    you're not going to introduce the entire exhibit?

8             MS. SADASIVAN:  No.

9             JUDGE STEWART:  To be clear, we're all in

10   agreement you don't get the whole exhibit, so don't take

11   anything I said as license for that.  We're all in

12   agreement that part doesn't come in.  Just clarification

13   of what Mr. Greim said he was doing in terms of that

14   impeachment if it were the case on the paragraph.  That

15   doesn't mean that's a green light and you have to do that.

16   We have the testimony in the record, you know, and that's

17   the best evidence what he is saying.

18            MS. SADASIVAN:  Thank you, Your Honors.  Do you

19   mind if just I consult with my --

20            JUDGE SUMMERHAYS:  Yes.  Absolutely.

21            MS. SADASIVAN:  I apologize, Your Honors.  But

22   with respect to the expert reports of Mr. Fairfax, he was

23   asked about his map drawing process in that case and

24   whether or not he was able to draw two majority black

25   districts that complied with traditional redistricting

1  principles, which Mr. Greim -- because he was asking about
2  it, clearly thinks is relevant.  So we're not offering it
3  or wouldn't ask for it to be admitted for the purposes of,
4  you know, its relevance to the Legislature.  But clearly
5  if the ability to create two majority black districts in
6  compliance with traditional redistricting principles is
7  relevant in Louisiana and his ability to do so, then those
8  reports explaining his map-drawing process -- and Mr.
9  Greim asked extensively about his map-drawing process --
10  then those two -- that's why we were seeking to offer them
11  into evidence.

12          JUDGE SUMMERHAYS:  I don't recall getting into
13  the contents of his reports.  These were questions that
14  were asked of the witness.  Again, to say that he
15  testified on those subject matters that may overlap with
16  the expert reports to say that that allows hearsay expert
17  reports from a different proceeding, I have a problem
18  with, unless --

19          JUDGE JOSEPH:  No.  Yeah.

20          JUDGE SUMMERHAYS:  -- my colleagues have a
21  different view, I --

22          JUDGE JOSEPH:  We don't even let expert reports
23  in for this case, and now you're asking us to put expert
24  report from a different case, so no.

25          JUDGE SUMMERHAYS:  I'm going to sustain the

 1   objection and I'm not going to reconsider it.

 2           MS. SADASIVAN:  Thank you for your indulging me.

 3   Apologies, Your Honors.

 4           JUDGE SUMMERHAYS:  Thank you.

 5           MS. SADASIVAN:  So if we can pull up the

 6   transcript from the preliminary injunction hearing which

 7   Mr. Greim just showed at 235.  And actually while you're

 8   pulling that up --

 9                    REDIRECT EXAMINATION

10   BY MS. SADASIVAN:

11   Q.   Mr. Fairfax, what did you want to say when you asked

12   if you could respond further about the question about your

13   map-drawing process?

14           MR. GREIM:  Objection.  I'm afraid there -- I

15   think that question sort of calls for a narrative.  I

16   think if there is a way to develop it, fine, but I don't

17   think he can just say -- answer what you wanted to say is

18   a question.

19           JUDGE SUMMERHAYS:  He is an expert.  You know,

20   again, I am going to allow it.  And if it gets out of

21   control, at that point the Court will step in.  But I'm

22   going to allow the question.  The objection is overruled.

23   Q.   (BY MS. SADASIVAN) Sorry, Mr. Fairfax.  Again, what

24   did you want to say when you were asking if you could

25   respond further to Mr. Greim's question about the BVAP in

1    the districts in Robinson?

2    A.   What I was going to say is that you take -- you have

3    to take that series of questions and answer in the context

4    of the questions and answers that were prior to that

5    statement about 50 percent.  And in the previous senators

6    above were clearly talking about a district that's 50 to

7    60 percent.  That's the question that was asked me about

8    50 to 60 percent.  My immediate response was:  No, it's

9    not that high.  Meaning that I clearly know that 50

10   percent came from that.  I'm talking about the 60 percent.

11   And so then the question moves -- so then what you did was

12   actually draw a district around 50 percent.  And what I am

13   responding to at that particular moment is:  Yes, it's not

14   60 percent, because I know a 60 percent district can't be

15   created.  So, yes, I am going to probably end up with a

16   district around 50, 54 percent.  I am just using the

17   experience that I have in drawing the plans.  I am not

18   using it as a target, which is the inference I think I got

19   from the original question here.  I am talking about, yes,

20   it's probably going to be around 50 to 60 percent -- 50 to

21   54 percent, even though I didn't use 54.  But I'm saying

22   around.  And the question was around.  And so it wasn't

23   that it was a target.  The inference here it was a target,

24   that I was shooting for 50 percent.  No, I was responding

25   that it's not going to be 60 percent because I know the

1  demographics.  I am familiar now with being able to draw a

2  plan.  The plan is going to be most likely in the 50's, in

3  the low 50's.

4  Q.    Thank you, Mr. Fairfax.  And on the screen I have

5  more of your testimony from the preliminary injunction

6  hearing.  Do you remember being asked when you were

7  talking about Congressional District 5 earlier and that

8  was the subjective of Mr. Greim's question, about the

9  number or the black voting age population fluctuating, you

10 weren't trying to achieve any particular racial target.

11 And what was your answer?

12 A.    The answer was no.  No, I am just trying to satisfy

13 that first precondition.  And that's, in essence, what I

14 was saying.  I knew I had to reach 50 percent in order to

15 satisfy it.  In the previous questions, as I was

16 mentioning, I know from being familiar with the state, I

17 am not going to get to 60 percent.  That's just the

18 reality.  And so, most likely, if I can satisfy it, it's

19 going to be around 50-ish, the low 50's.

20 Q.    Thank you, Mr. Fairfax.

21          MS. SADASIVAN:  That's all I have, Your Honors.

22          JUDGE SUMMERHAYS:  Counsel?

23          MR. GORDON:  Your Honor, I think I need to raise

24 one additional point here and this isn't to be overly

25 pedantic.  And I'm certainly not asking for a

1    reconsideration of the ruling on the admissibility of the

2    Fairfax reports.  I am circling back to our request that

3    judicial notice be taken of the Robinson proceeding as

4    well as -- and in this case the Fairfax reports.  I don't

5    think you can reasonably question, now that plaintiffs has

6    asked questions about Fairfax's reports and about the

7    proceedings in the Middle District, that the Court not

8    take judicial notice of those.

9            JUDGE SUMMERHAYS:  I am just not sure what

10   you're requesting judicial notice of.  The fact of the

11   reports?  Because even the standard that you articulated

12   would say the Court doesn't take judicial notice of

13   disputed facts.  And whatever is in those reports is

14   highly disputed.  I would imagine it's one side of a

15   proceeding.  And if the argument is that judicial

16   notice -- that those reports were filed, it has to be

17   relevant.  What's the relevance of that?

18           MR. GORDON:  That there existed certain --

19   certain facts, if you want to call them, or testimony,

20   that there existed something in the world that the State

21   had in its possession that said VRA districts may have

22   been required.  Not that that is in fact true, but that

23   the mere existence of the report is all we're seeking the

24   Court's acknowledgment of and the mere existence of the

25   proceeding in the Middle District.

1          JUDGE SUMMERHAYS:  I don't think you have laid a

2     foundation or a predicate for the relevancy of that.

3          Judicial notice, you correctly stated the standard,

4     and it's a -- it is required -- it's a "shall," the Court

5     shall take judicial notice.  But that doesn't overrule all

6     the rules of evidence as far as relevancy.  And I don't

7     see the relevance, and I am going to overrule the -- I'm

8     going to overrule your request to take judicial notice,

9     unless my colleagues have a different view on that with

10    respect to the expert reports.

11         MR. GORDON:  And with respect to the existence

12    of the proceeding in the Middle District, I believe you

13    heard significant testimony as to the fact that the

14    Legislature thought that the Middle District wasn't

15    somehow requiring them to draw a second majority-minority

16    district.

17         JUDGE SUMMERHAYS:  But why -- if we have that in

18    the record already, why do we need to -- why does the

19    Court need to take independent judicial notice of that

20    proceeding?

21         MR. GORDON:  And I guess that sort of begs the

22    question why.  Perhaps I'm being overly pedantic about

23    this, Your Honor, and I -- that's all I was seeking to

24    clarify.

25         JUDGE JOSEPH:  It's public record.  It's public

1   record --

2            MR. GORDON:  Yes.

3            JUDGE JOSEPH:  -- in the case.  The existence of

4   that case, that ongoing litigation is public record.

5            MR. GORDON:  That's correct, Your Honor, and

6   that's all.  We're just seeking acknowledgement of it.

7            JUDGE SUMMERHAYS:  And I'm sure counsel will be

8   able to cite it in their legal memoranda that they're

9   going to be submitting after the close of trial.  So I am

10  going to deny the motion or the request that the Court

11  take judicial notice.

12           JUDGE STEWART:  And I come back to the point I

13  raised earlier, because we went out of -- we went out of

14  convention.  The State is an intervenor of right.  These

15  intervenors came in permissibly.  So ordinarily I might

16  expect the State to have been after the plaintiffs.  And

17  that's why I heard this morning, earlier when this came

18  up, about the import or not of those other proceedings.

19       But the point is the State is yet to put its case on.

20  So, I mean, you know, we're not even there.  So I agree

21  with the ruling.  I am saying you're raising it kind of

22  hooked on to the intervenors who we're dealing with.  We

23  haven't even gotten to the point of whatever the State

24  chooses to do or not do.

25       So in addition, you're asking us to do something;

1   we're not even at your case yet.  Whatever the state --

2   the answer to us, was:  We'll observe what transpires and

3   determine our flow and so I guess we're about to get to

4   that point, maybe, or at some point.

5          MR. GORDON:  Understood, Your Honors.  Thank

6   you.

7          JUDGE SUMMERHAYS:  Thank you.

8          JUDGE JOSEPH:  If I can beg the indulgence of my

9   colleagues for a minute.

10     I am curious.  Mr. Fairfax, what -- and I understand

11  from the questions and your answers that you were involved

12  in this Robinson litigation.  Other than that, what

13  experience do you have in Louisiana specifically with

14  respect to being able to evaluate communities of interest?

15  Have you lived here?  Have you done a lot of work here?

16  What qualifies you to be able to determine communities of

17  interest in the state of Louisiana?

18          THE WITNESS:  I have assisted some

19  organizations, the Power Coalition during that

20  redistricting process that helped them work with different

21  organizations.  Of course, I looked at the socioeconomic

22  aspects of the state.  In that Robinson case I did look at

23  the regions that existed and their multiple regions that

24  exist and cultural regions and geographic regions that

25  exist in the state.  And so I tried to familiarize myself

1    adequately during the Robinson case.  Of course, I don't

2    live here, but many times map-drawers don't live in the

3    state of the jurisdiction that they draw in developing

4    plans for.

5                 JUDGE JOSEPH:  So outside the Robinson matter,

6    you haven't done any work here on districting?

7                 THE WITNESS:  Once again, I've helped and

8    assisted with the Power Coalition and some of their

9    jurisdictions that they were helping and assisting in

10   redistricting.  So I have worked looking at plans in

11   East Baton Rouge, I believe.  Probably a couple of others

12   that actually escape my mind right at this particular

13   time.  But there were -- there were other redistricting

14   plans, smaller jurisdictions that I've worked and helped

15   with.

16                JUDGE JOSEPH:  All right.  Thank you,

17   Mr. Fairfax.

18        Any follow-up questions based on that question from

19   counsel?

20                MR. GREIM:  Your Honor, I have nothing on that

21   question but I wanted to make a record on the very end of

22   the redirect about the text that was shown up there.  I

23   want to make sure we don't miss that.

24                JUDGE JOSEPH:  What?

25                MR. GREIM:  Well, we didn't get a page number.

1    It was just shown to the witness.  And I'd just like to

2    have a record on where that was in the transcript.

3                JUDGE SUMMERHAYS:  Counsel?

4                MS. SADASIVAN:  It was page 235, line 6 through

5    15.

6                MR. GREIM:  That's all I have.

7                JUDGE SUMMERHAYS:  Thank you.

8         All right.  Mr. Fairfax, thank you for your

9    testimony.

10        Counsel?

11               MR. NAIFEH:  Your Honor, I just want to say I'm

12   very proud that my new colleague, newly admitted colleague

13   will be calling our next witness.

14               JUDGE SUMMERHAYS:  Very good.  Welcome.

15   Congratulations.

16               MR. GREIM:  He is very involved in the case.

17               MR. BURKE:  Thank you, Your Honors.  I am Colin

18   Burke for the Robinson intervenors, and we would like call

19   to Dr. Michael Martin to the stand.

20               JUDGE SUMMERHAYS:  If Dr. Martin will approach,

21   you may swear him in.

22               (Oath administered to the witness.)

23               JUDGE SUMMERHAYS:  Counsel, you may proceed when

24   ready.

25                          MICHAEL STERLING MARTIN,

1    having been first duly sworn to testify the truth, the

2    whole truth, and nothing but the truth, testified as

3    follows:

4                          DIRECT EXAMINATION

5    BY MR. BURKE:

6    Q.   Good afternoon, Dr. Martin.  Can you please state and

7    spell your name for the record?

8    A.   My name is Michael Martin.  Michael Sterling Martin.

9    M-I-C-H-A-E-L, S-T-E-R-L-I-N-G, M-A-R-T-I-N.

10   Q.   Dr. Martin, where are you from?

11   A.   I was born in Lafayette.  Spent my childhood in

12   between there and the New Orleans area.  I did attend high

13   school in Magnolia, Arkansas not far from here.

14   Q.   And where did you attend college?

15   A.   For college, I returned to my hometown, Lafayette,

16   for the University of Southwestern Louisiana, where I

17   earned my bachelor's and master's in history.  I then

18   attended the University of Arkansas for my Ph.D. in

19   history.

20   Q.   And after you finished graduate school, what did you

21   do?

22   A.   I was blessed enough to be able to return home.  I

23   got a job at what was then UL Lafayette or is now UL

24   Lafayette in 2003 as assistant professor of history.

25   Q.   And what is your current title and occupation?

1    A.    I am professor of history and I am currently interim

2    department head for the department of history, philosophy,

3    and geography.

4    Q.    And how long have you been a faculty member of UL

5    Lafayette?

6    A.    In between 20 and 21 years.

7    Q.    So as a professor of history, what do you do?

8    A.    Basically three things:  First and foremost, I teach.

9    So I teach classes every semester.  Along with that, I do

10   research in fields of interest to me.  And then I'm also

11   engaged in community activities, service activities either

12   for the university or the larger Acadiana community.

13   Q.    And what does your research focus on?

14   A.    So my research mainly focuses on Louisiana, modern

15   Louisiana, and I have spent a lot of time writing about

16   Louisiana politics.

17   Q.    And can you briefly describe the types of classes

18   that you have taught?

19   A.    Sure.  So I teach a wide variety of classes.  My

20   specialization, as I said, is Louisiana history, so every

21   semester, pretty much every semester, I offer a survey

22   class in Louisiana history and an upper level class in

23   some specialized interest area, usually of Louisiana,

24   sometimes of Louisiana in a broader context.  I have

25   taught classes on Louisiana politics.  I've taught classes

1    on Louisiana and the South, Louisiana and the world.

2    Louisiana and the world, you know, Louisiana since 1898.

3    Things of that nature.

4    Q.    And what time periods do those classes tend to cover?

5    A.    The specialized courses tend to focus on the period

6    from, if it's Louisiana, 1898 or thereabouts, up until

7    today, or as close as I can get to today.  The survey

8    courses, I cover everywhere from 1699 through at least

9    Hurricane Katrina.

10   Q.    And has any of your scholarly work been published?

11   A.    Yes.  I have published several single-authored works.

12   I have published several edited volumes.  I have also

13   published journal articles, magazine articles, lots of

14   different things.

15   Q.    And can you tell me about the content or the subject

16   matter of those publications?

17   A.    Sure.  So I guess my most notable book was a

18   biography of U.S. Senator Russell Long, who served from

19   1948 to '86.  And, you know, the biography covered all the

20   way till his death in 2001 -- excuse me -- 2003.

21        I have also done quite a bit of peer-reviewed journal

22   articles on Louisiana politics focused especially on a

23   period covering from like the Long era from Huey Long

24   through the 1980's, 1990's.  And I sometimes get into

25   David Duke and the "race from hell," as it's called.

1    Q.    And were any of those publications you just described

2    peer reviewed?

3    A.    Not all of them but many of them, yes.

4    Q.    And about how many peer-reviewed publications would

5    you estimate you have?

6    A.    12, 13.

7    Q.    And you earlier testified that your research focuses

8    includes Louisiana political history.  Have you published

9    in peer-reviewed scholarly works on Louisiana political

10   history?

11   A.    Most of what I published has been on Louisiana

12   political history.

13   Q.    And do you supervise graduate students?

14   A.    I do.

15   Q.    What does that involve?

16   A.    Well, at UL we have a master's degree program that

17   involves two tracks.  One they can write a thesis, or the

18   other option is they can take comprehensive exams.  I have

19   overseen 10 or 12 comprehensive exam students, and as of

20   yesterday, 21 thesis students.

21   Q.    And can you tell me about what those theses covered?

22   A.    Yeah.  So the theses cover a wide variety of time

23   frames.  Of the 21, only one of them did not deal with a

24   Louisiana topic.

25   Q.    And do you some involve Louisiana politics?

1    A.    Yes.  Roughly a third.  So maybe seven, eight.

2    Q.    Have you presented any papers on academic

3    conferences?

4    A.    Yes.

5    Q.    And what have been the subject of those papers -- of

6    some of those papers?

7    A.    Well, again, it's a wide variety.  Most of my work

8    has, as I've said with other things, focused on Louisiana,

9    especially 20th century through today and political

10   history.

11   Q.    And have you presented papers on Louisiana's

12   congressional delegation?

13   A.    Yes.

14   Q.    And do you serve on any professional boards?

15   A.    I do.  I'm the managing editor for the Louisiana

16   Historical Association.  As a result of that, I'm on the

17   board of directors and also the executive counsel for the

18   Louisiana Historical Association.  And as managing editor,

19   I oversee the production of the state's quarterly

20   historical journal, "Louisiana History."

21   Q.    And are you sometimes called on to review the work of

22   your peers?

23   A.    Yes.

24   Q.    In what fields?

25   A.    Looking back on it, it's been a variety of different

1    fields.  But the main, I guess if there is a main theme,

2    it's Louisiana and 20th century politics.

3    Q.    And turning to this case, who retained you in this

4    case?

5    A.    The Robinson intervenors.

6    Q.    And what were you asked to do?

7    A.    I was asked to put together a history of the First

8    Extraordinary Session of 2024, the Louisiana session of

9    2024.

10   Q.    And as a trained historian, what sorts of materials

11   do you rely on to inform your work or your opinions?

12   A.    First and foremost, I'm looking for what we call

13   primary sources.  Primary sources are usually firsthand

14   accounts.  They can range from things like diaries,

15   manuscripts, memoirs, newspaper reports.  It's a broad

16   range of things.

17   Q.    And were those the type of materials you relied on to

18   prepare your expert report in this case?

19   A.    Yes.

20   Q.    And why did you rely on those materials in your

21   report?

22   A.    Well, it's part of the methodology of what historians

23   do.  We start with primary source materials.  We take

24   those materials, analyze them, attempt to create some sort

25   of narrative usually and at the same time think abstractly

1    about what those materials are telling us.

2    Q.    And are these materials that historians would usually

3    review in seeking to understand whatever they are seeking

4    to understand?

5    A.    Yes.  They're the standards of the profession.

6    Q.    Do you have any views on whether other historians

7    rely on these materials in conducting the same sort of

8    analysis?

9    A.    I would hope so, yes.  I would assume so, yes.

10   Q.    And turning to methods.  You kind of spoke about

11   this, but can you explain what sort of methods that you

12   use to analyze these materials?

13   A.    Sure.  So the first thing with in dealing with

14   primary source materials is looking for corroboration.

15   So ideally you want to find at least a couple of instances

16   where a particular event or happening is referenced and

17   you kind of cross-reference those.  You can't always find

18   corroboration.  And when you can't, it's important that

19   you kind of acknowledge that.  But the more corroboration

20   the better.

21        Secondly, we look for bias, bias by whoever created

22   the primary source, and that can come in various different

23   ways.  We're also -- you know, at some point we're going

24   to, as historians, look to see what other historians have

25   said just to try to see if we agree with what the way they

1    have interpreted things or not.  And quite often we

2    disagree.  In this instance very little actual history has

3    been written.  I think mine may be the very first for this

4    particular extraordinary session and so I wasn't able to

5    consult the historiography as we call that.

6    Q.   And is the methodology that you relied upon typical

7    for how a historian tries to understand historical events?

8    A.   Yes.  It's standard across the board for our

9    profession.

10   Q.   And do historians routinely apply these methods to

11   enable them to understand contemporary events?

12   A.   Yes.  I mean, there's a sense that studying history

13   has some relevance to the presence.  But there is no

14   reason why you can't apply those same methods to really

15   any field of time.  I mean, I would expect that everybody

16   would kind of think critically about the things that they

17   are presented with as factual and to test them for bias

18   and to try to make sense of them.

19           MR. BURKE:  So, Your Honors, at this time the

20   Robinson intervenors move to proffer Dr. Martin as an

21   expert in the political history of Louisiana, including

22   contemporary politics?

23           JUDGE SUMMERHAYS:  Any objection or voir dire?

24           MR. GREIM:  There is some voir dire?

25           JUDGE SUMMERHAYS:  You may approach.

1          VOIR DIRE EXAMINATION

2     BY MR. GREIM:

3     Q.   Dr. Martin, good afternoon.  I'm Eddie Greim.  I'm

4     counsel for the plaintiffs.  I think you told us where the

5     river was where we were walking around outside earlier.

6          I counted about 53 footnotes in your report.  Am I

7     right?  Does that sound right?

8     A.   Seems right.

9     Q.   Okay.  And in your description of methods, I noticed

10    in your report you say:  I relied much more on media

11    sources than I typically would.  Right?

12    A.   Correct.

13    Q.   And, in fact, almost every footnote cites a newspaper

14    article or a social media, right?

15    A.   Newspaper article, yes.  The statement about

16    typically doing it more than I would is simply because

17    there are no other primary sources available at this

18    moment.

19    Q.   Right.  As you said, very little history has been

20    written on things that happened last -- in January, right?

21    A.   As of now, yes.

22    Q.   Right.  And the only other -- the only primary source

23    you cited are the transcripts and videos from the

24    legislative session itself, right?

25    A.   No.  The press releases of the Governor.  But, yes,

1    the transcripts and the press releases.

2    Q.    Now, did you interview any Louisiana legislators?

3    A.    No.

4    Q.    Now you know that some have been witnesses in this

5    case, right?

6    A.    Yes, but I did not speak to them.

7    Q.    Okay.  And I noticed you said that you've got special

8    skills in rooting out bias.  That's one of the special

9    techniques that you are bringing to the Court?

10   A.    Yes.  That's one of the techniques of any historian.

11   Q.    So are you proposing to root out bias from statements

12   that are made in the official transcripts from the

13   Legislature?

14   A.    I am attempting to, yes.

15   Q.    And you also are an expert, I think you said, in

16   rooting out even your own bias; is that right?

17   A.    I assess my own biases, yes.  I don't think I used

18   the word "rooting out" though.  Maybe I did.

19   Q.    Well, I'll just tell you that is, in fact, what you

20   say in your report.

21   A.    All right.

22   Q.    So in drafting your report you realize that you had

23   some bias but you rooted it out before reaching your

24   conclusion?

25   A.    Yes, like anybody I have bias.

1    Q.    And what's your -- the basic topic you cover in your

2    report, if I could summarize, and tell me if I've missed

3    something -- is basically what the parties -- what you

4    think the legislators were trying to accomplish in the

5    legislative session.  That's one of them?

6    A.    Yes, that's one of them.

7    Q.    And then also what the Governor was trying to

8    accomplish?

9    A.    Yes.

10   Q.    And then also what the Governor was intending?

11   A.    That was one of my hopes, yes.

12   Q.    And the unexpressed motivations of some of the

13   legislators, correct?

14   A.    Yes.  That's where you get into the thinking about

15   primary sources as opposed to just using the facts alone.

16   Q.    So what you would be bringing us is special expertise

17   in understanding what the legislators and Governor were

18   thinking?

19   A.    Special expertise in the methods of trying to obtain

20   that information, yes.

21               MR. GREIM:  I'd have to object to this form of

22   expert testimony.  We've excluded newspaper articles as

23   hearsay.  And basically this is a compendium of newspaper

24   articles that is trying to create sort of a meta analysis

25   from what the newspaper articles say.  The Court itself

1    can read the transcripts.  The parties will be arguing

2    about what the transcripts say.  And this witness is about

3    to go in and try to characterize what he believes the

4    legislators wanted to do based on their statements and

5    based on other commentators.  It's just -- I mean, if

6    articles themselves can't come in, they can't come in

7    through an expert who mainly cites articles.  So I don't

8    think it's expert testimony.  I think it's going to be a

9    very large load of hearsay.

10              JUDGE SUMMERHAYS:  Let me ask Counsel, because

11   we're governed by Rule 702 that provides -- and this does

12   not appear to be a challenge to his expertise in his

13   subject field.  It's to the subject matter of his

14   testimony.

15       And 702 guides us that it's admissible if the

16   expert's scientific, technical, or other specialized

17   knowledge will help the trier of fact to understand the

18   evidence or to determine a fact in issue.

19       How would this expertise -- and counsel is correct.

20   We excluded newspaper articles.  How would this witness's

21   expertise assist the Court in determining racial

22   predominance or what the Legislature was intending or what

23   the Governor was intending as far as directing the

24   Legislature in this regard?  It seems like this is

25   evidence that their trier of fact can glean just as well

1    as an expert from the evidence that's available.

2              MR. BURKE:  Sure.  So, as Dr. Martin just

3    testified to, like he has a specialized methodology where

4    he attempts to corroborate sources, attempts to root out

5    their bias, and then creates a coherent like narrative

6    framework.  And so he is using this specialized

7    methodology to explain these sources and create this

8    framework --

9              JUDGE SUMMERHAYS:  Isn't that a part from just

10    citing newspaper articles, he's corroborated those

11    newspaper articles.  But what I heard was that he hadn't

12    interviewed the underlying sources for those articles.

13              MR. BURKE:  I mean, as he testified to, to the

14    best of his ability.  Like these events have just

15    happened, but he's also corroborated them like across

16    multiple sources of other types of sources.  Like, he

17    hasn't just used one type of source and has made sure that

18    those sources like line up with --

19              JUDGE SUMMERHAYS:  Well, I heard newspaper

20    articles, videos and transcripts and press releases.

21    Those are all available to this court for the Court to

22    make the determination why -- and I am not putting -- I am

23    not saying that he is not -- I know the skills of a

24    historian in assembling that data and coming to an opinion

25    on what the history shows, but in this proceeding, why do

1    we need that expertise to review the transcripts, the

2    videos that we have -- and audio recordings that we have

3    heard and come to our own conclusion?  Why would an expert

4    assist us in that process?

5            MR. BURKE:  Because part of his expertise is

6    creating a framework and narrative of thinking about these

7    sources.  And as we've recognized, there is lots of

8    sources, there is lots of transcripts, there is lots of

9    like news media articles that can all be assessed.  And

10   one of his qualifications that he has done for over 20

11   years and his 10 -- almost 10 years of education to

12   become a historian is creating narratives out of disparate

13   sources.  And he can put what happened in historical

14   context.

15       And also related to the hearsay point, that goes to

16   the weight of his -- the weight that Your Honors are

17   willing to give his testimony rather than its

18   admissibility.

19           JUDGE JOSEPH:  Response, Mr. Greim?

20           MR. GREIM:  I mean, we could do this in every

21   case.  The skills that this expert are said to bring are

22   what we think lawyers and judges do.  I mean, we are

23   supposed to assemble the facts.  This isn't any kind of

24   technical or specialized data.  I mean, these are the very

25   transcripts we heard.  And having someone opine that

1    so-and-so really wanted to do this, or, you know

2    summarizing several articles together, I mean, that

3    candidly, probably, compounds the problem rather -- of

4    letting in articles, rather than just letting individual

5    articles in, now we've got yet another person acting as

6    sort of a journalist of journalists.

7              JUDGE SUMMERHAYS:  What about the statements by

8    counsel that he is going to take his review of the current

9    history of the 2024 session and relate it to historical

10   precedent?  And that's something that we don't have in

11   front us.

12             MR. GREIM:  Right.  But the historical precedent

13   that it's being related to -- and I flipped through here

14   and there is very little -- I want to say there was a

15   reference to the nullification crisis of 1832 to 1833 sort

16   of appears in the middle of the report.  The Reagan

17   Revolution appears.  But it doesn't relate to

18   redistricting whatsoever.  I mean, it's sort of like an

19   attempt to introduce history into the middle of what's

20   otherwise a narrative of the transcripts and what

21   journalists have said about the redistricting process.

22             JUDGE SUMMERHAYS:  I will have to say I am more

23   open to accepting expert testimony in assigning the proper

24   weight as the Court deems, but we have a limited amount of

25   time.  And I have to say I am not convinced that this --

1   that this meets the 702 standard, but I could be persuaded

2   otherwise by my colleagues.

3           JUDGE JOSEPH:  I guess, Dr. Martin, let me ask

4   maybe -- something that kind of occurred to me.  Most of

5   your work takes place on things that happened years ago,

6   correct?

7           THE WITNESS:  Yes.

8           JUDGE JOSEPH:  And would you say, as a

9   historian, as a doctor in history, that historians can

10  have a better understanding as more time has passed of why

11  events happen than contemporaneous to those events?  Is

12  that true?

13          THE WITNESS:  Yes, I would agree with that.

14          JUDGE JOSEPH:  Okay.  So you think that affects

15  your ability to really opine on these issues?  They just

16  happened in January.

17          THE WITNESS:  Well, I think if I had 50 years, I

18  could probably opine on them better.  But for what I was

19  asked to do, I did what I was asked to do.

20          JUDGE JOSEPH:  Right.  I know that.  No one is

21  questioning your qualifications or anything.  We are

22  trying to figure out a very specific rule of evidence and

23  how your testimony would fit into that, okay?  So please

24  don't take anything as being dismissive of your work.

25       We're just -- if we were talking about the "Whiskey

1   Rebellion" after the Revolutionary War or something of

2   that nature, then the Court might very well benefit from

3   your expertise.  There has been a lot of articles,

4   peer-reviewed articles about that, a lot of textbooks, a

5   lot of nonfiction written about those types of things.

6   But this isn't that.  Right?

7           THE WITNESS:  No.  This would be like the very

8   first step towards those things, yes.

9           JUDGE JOSEPH:  Right.

10          JUDGE STEWART:  Have you been previously

11  qualified in a court to give this -- not a redistricting

12  case, but I mean have you been previously qualified as a

13  as an expert in a court to give the substance of the kind

14  of testimony you are purporting to offer here?

15          THE WITNESS:  This is my first time.  I was

16  asked to be an expert witness on a previous iteration of

17  this particular case, but that was --

18          JUDGE STEWART:  And the report that you did,

19  does it consist of -- other than the area we're talking

20  about?  I mean, we don't have the report in front of us.

21  But I mean does it consistent of more than -- more than

22  one thing?  I mean, sometimes with evidence, we sever

23  stuff out, you know, things that can't come in and get to

24  the sliver that can.  So without looking at your report,

25  is there some other area -- counsel, we haven t ruled on

1  it.

2          JUDGE SUMMERHAYS:  Can we narrow this down?

3          JUDGE STEWART:  -- that's in the report that's

4  not within the zone of this conversation?  Or said

5  differently, is there some other area of his report that

6  doesn't fit in this sliver of the conversation that you

7  would be offering, or is it kind of a totality of what you

8  want to put on, fit within what we're talking?

9          MR. BURKE:  Sorry.  I don't think I understand

10 your question.

11         JUDGE STEWART:  Well, I'm trying to figure

12 out -- because we don't have the report.  We ruling in a

13 blind.  We're just trying to figure out.  You hear the

14 colloquy here and so I am just asking:  Is there something

15 in addition?  In other words, does he have five paragraphs

16 worth of conclusions, the first three fit within what's

17 been objected to, but there is a bottom part that doesn't,

18 but that's part of your proffer?  Or is this an all or

19 nothing proposition?

20         MR. BURKE:  And it seems like Mr. Greim is

21 objecting to the totality of it, if I'm understanding him

22 correctly.

23         JUDGE JOSEPH:  Right, he is.  But Judge Stewart

24 is asking you is there -- I think probably the most -- the

25 part of what he is being proffered for that would most fit

1   within 702 would be trying to get historical context,

2   telling the Court what the historical background is.  And

3   not historical from January, but historical from many

4   years ago, what the relevance of that would be to the

5   case.

6           JUDGE SUMMERHAYS:  To motivation.

7           JUDGE JOSEPH:  Could you separate that and just

8   have him testify about that?  That's the question.

9           MR. BURKE:  It's difficult to separate.  There

10  are other areas in the report where he puts it in its

11  appropriate historical context, but it's interspersed.

12          JUDGE SUMMERHAYS:  My view is that, as far as

13  the issues we have to decide as to the intent and the

14  motivations of the Legislature in 2024, we already have

15  items in evidence and we have legislators that have come

16  and testified.  This evidence -- and it's not putting

17  anything past -- I agree with counsel that this expert is

18  well-qualified to opine and has a very outstanding body of

19  work on the issue in which he is opining, but I still have

20  not heard anything that convinces me that this comes

21  within 702(a) which it will assist the trier of fact in

22  our determination of the Legislature's intent and purpose

23  in a 2024 session.  You know, it's something that this

24  Court can do on its own, to be frank.  I am inclined to

25  sustain the objection to this testimony --

1          JUDGE JOSEPH:  I agree.

2          JUDGE SUMMERHAYS:  -- in toto.

3          JUDGE STEWART:  Only showing may, I agree,

4   unless -- on the showing, may I agree with the ruling.

5          JUDGE SUMMERHAYS:  The objection is sustained.

6       Dr. Martin, thank you for appearing here today.  I'm

7   sorry that this has transpired the way it has.  But again,

8   this has nothing to do with the quality of your work or

9   your background or your qualifications.  This is an

10  evidentiary rule that we have to comply with.

11         THE WITNESS:  Thank you.

12         JUDGE SUMMERHAYS:  Thank you.

13         MR. BURKE:  Thank you, Your Honor?

14         JUDGE SUMMERHAYS:  Thank you.  The intervenors

15  may call their next witness.

16         MR. NAIFEH:  Your Honors, may we reserve the

17  right to proffer Dr. Martin's report at a later stage of

18  the case?  We are not prepared to do that right this

19  moment, but --

20         JUDGE SUMMERHAYS:  You may -- you may proffer it

21  for the record in light of the Court's ruling sustaining

22  the objection.

23         MR. NAIFEH:  Thank you, Your Honor.

24         MR. GREIM:  I have a quick question.  We

25  actually have two experts who are here.  We never asked

 1   that they be released to get them out of here.

 2            JUDGE SUMMERHAYS:  You want to release them so

 3   you can stop the meter running?

 4            MR. GREIM:  It's already been running a little

 5   too long.  But I want them to be released, Dr. Voss and

 6   Mr. Hefner.

 7            JUDGE SUMMERHAYS:  Any objection to that?

 8            MR. NAIFEH:  No objection, Your Honor.

 9            MR. GORDON:  No objection, Your Honor.

10            JUDGE SUMMERHAYS:  Okay.  They are released.

11   Thank you all for appearing here and testifying.

12            MR. NAIFEH:  Your Honor, may we have a minute?

13   We have our witnesses here, but they are not in the room

14   and so we need to gather them because we didn't expect to

15   be there quite yet.  Can we have --

16            JUDGE JOSEPH:  Who is next, Mr. Naifeh?

17            MR. NAIFEH:  Well, we had talked about shuffling

18   the order because the day seems to be going more slowly

19   than we anticipated.  Now suddenly it's going more

20   quickly.

21            JUDGE JOSEPH:  It's weird how that happens

22   sometimes.

23            MR. NAIFEH:  So what we originally had intended

24   was to call Ashley Shelton next.  But we may be calling

25   Mayor Glover.  And I just would like a moment to confer

1    and try and sort that out.

2              JUDGE SUMMERHAYS:  Do you want to take a brief

3    recess?

4              JUDGE JOSEPH:  Do you we need a recess for Mayor

5    Glover?

6              MR. NAIFEH:  I think a five-minute recess might

7    be helpful.

8              JUDGE SUMMERHAYS:  We'll take a short recess.

9    We'll come back in five.

10             JUDGE STEWART:  He just walked in the door.

11             (Off the record.)

12             MS. ROHANI:  Good afternoon, Your Honors.

13             JUDGE SUMMERHAYS:  Good afternoon.  We are going

14   to swear in the witness as soon as we get everything

15   ready.

16             (Oath administered to the defendant.)

17             JUDGE SUMMERHAYS:  Counsel, you may proceed when

18   ready.

19                   MAYOR CEDRIC BRADFORD GLOVER

20   having been first duly sworn to testify the truth, the

21   whole truth, and nothing but the truth, testified as

22   follows:

23                       DIRECT EXAMINATION

24   BY MS. ROHANI:

25   Q.   Thank you.  Good afternoon, Mayor Glover.

1    A.    Good afternoon.

2    Q.    Thank you for joining us.  Will you please state and

3    spell your full name for the record?

4    A.    Full name is Cedric Bradford Glover.  That's

5    C-E-D-R-I-C, B-R-A-D-F-O-R-D, G-L-O-V-E-R.

6    Q.    So, Mayor Glover, where do you currently live?

7    A.    Here in Shreveport, Louisiana.

8    Q.    And how long have you live here in Shreveport?

9    A.    All of my life.

10   Q.    And can you briefly describe your professional

11   background in public service?

12   A.    I started as the president of the Martin Luther King

13   Neighborhood Association, became twice elected to

14   Shreveport City Council.  Served three terms in the

15   Louisiana House of Representatives.  Was elected mayor of

16   the city of Shreveport.  I served two terms there to be

17   term limited and returned back to Louisiana House of

18   Representatives for two additional terms.  Over the course

19   of that time, I professionally have worked in the staffing

20   industry.

21   Q.    Thank you.  And during your tenure as a state

22   representative, were you involved in the redistricting

23   process?

24   A.    I was.

25   Q.    And since your tenure as a state representative

1   ended, have you continued to follow redistricting efforts?

2   A.   Yes, I have.

3   Q.   Now, I would please like to pull up what's marked as

4   Joint Exhibit 11.

5        And, Mayor Glover, I am going to ask you if you are

6   familiar with the map that was passed -- you don't have to

7   look yet -- well, it's up now.  So are you familiar with

8   the map that was passed in January of this year?

9   A.   Yes, I am.

10  Q.   And I will refer to that as SB 8.  And is the map

11  that's presented on the screen the map that you are

12  familiar with?

13  A.   To the best of my recollection, it certainly

14  resembles it.

15  Q.   And were you surprised by the configuration of the

16  districts when you first saw SB8?

17  A.   Surprised that it passed, but not necessarily

18  ultimately that was offered.

19  Q.   Can you please elaborate a little bit about that?

20  A.   Well, it was just not ever sure that the Legislature

21  would ultimately do the right thing, that this represented

22  the first time, to my recollection, since the *Shelby* case

23  that you had seen an actual advancement around this

24  particular issue without the literal force of the federal

25  government stepping in to actually do it for us as opposed

1    to the Legislature taking initiative and actually doing it

2    itself.

3    Q.    And during the redistricting process, had you ever

4    seen a congressional map with a similar configuration of

5    districts?

6    A.    Yes, I did, on two occasions.  One, that I, myself,

7    drafted and considered offering and one that was actually

8    offered by Representative Marcus Bryant.

9    Q.    Thank you.  And are you familiar with Senator

10   Pressly?

11   A.    Yes, I am.

12   Q.    And if we could go to the next slide, please.

13        Mayor Glover, I would like to read you a quote from

14   Senator Pressly and I would like to get your reaction.

15   This is from the senate floor debate.  And do you see it

16   on the screen?

17   A.    I do.

18   Q.    What I am concerned with the important part of this

19   state, northwest Louisiana not having the same member of

20   congress.  With having two members of congress, that has

21   the potential to split our community even further along

22   the line that's purely based purely on race and I am

23   concerned about that; therefore, I am voting no and I urge

24   you to do the same.

25        Mayor Glover, what is your reaction to this

1    statement?

2    A.    I respect this, but I disagree.  I think it's a --

3    not necessarily a bad thing.  I think it was a great thing

4    to be able to have two different members of congress

5    representing this region, especially one of those members

6    being the Speaker of the House and the other member more

7    largely probably being a member of the democratic caucus.

8    That's where you have both of those -- both sides of the

9    congressional equation represented within one region, one

10   area I think would be a definite positive for us.

11   Q.    Thank you.  And if we could turn back to slide one,

12   please.  So in your experience as an elected official and

13   a community leader, does Congressional District 6 in SB 8

14   reflect common communities of interest?

15   A.    Yes, it does.

16   Q.    And how so?

17   A.    Well, I think the two that come most quickly to mind

18   would be the I-49 corridor and the Red River.  Obviously,

19   Shreveport itself was founded by the clearing of the

20   Red River.  One of the big things that helped make this

21   area grow was navigation thereof.  We had leadership over

22   the course of the last 50 years that's worked very hard

23   towards trying to bring that back.  You now have a series

24   of lock and dams, five of them, between here and where the

25   river flows into the Mississippi.  That essentially

1    mirrors the eastern side of that district.  When you add

2    to it, the connecting factor of I-49, that essentially

3    makes Shreveport, Mansfield, Natchitoches, all one general

4    commuting area, all of those are connecting factors.  You

5    layer on top of that the higher education connections

6    where you have campuses of Northwestern State University,

7    both in Shreveport and in Natchitoches.  You have

8    campuses in southern Shreveport and Southern University,

9    Baton Rouge, the main campus being Baton Rouge as

10   connecting factors.  And then when you put -- and wrap all

11   of that around the health-care component in that you have

12   a series of hospitals between Willis Knighton, the

13   CHRISTUS system, but most specifically the Ochsner/LSU

14   system which has a presence here in Shreveport,

15   Natchitoches, and even has a residency program that's in

16   Alexandria.  All of those are connections and commonalties

17   that represent communities of interests from my

18   perspective.

19   Q.    Thank you.  And are there other shared communities of

20   interest that you can think of that unite the area?

21   A.    From an economic development standpoint?

22   Q.    Correct.

23   A.    You have the North Louisiana Economic Partnership

24   which is based here in Shreveport that just last week

25   announced a huge job announcement down in DeSoto Parish.

1    So you have an actual Shreveport-based entity that is in

2    partnership with economic leaders from the south of us,

3    all the way down to Natchitoches working to retain and

4    grow jobs, all of those represent commonalities and

5    communities of interest.

6    Q.    Thank you.  And, Mayor Glover, did you and other

7    people from Shreveport articulate these ties earlier in

8    the redistricting process?

9    A.    Yes.

10   Q.    And can you tell me a little bit more about that?

11              MR. GREIM:  Objection.  I object.  It calls for

12   hearsay, talking about what he heard other people say.

13              JUDGE SUMMERHAYS:  Counsel, can you rephrase?

14   Q.    (BY MS. ROHANI) Mayor Glover, did you articulate

15   these ties earlier in the redistricting process?

16   A.    Yes.

17   Q.    And can you tell me a little more about your

18   experiences?

19   A.    Basically, that it was necessary to ensure that we

20   ended up with a fair and balanced representation

21   throughout the State, but especially, if possible,

22   through -- for Northwest Louisiana.  The idea of ending up

23   with a set of circumstances where you could have two

24   members of congress, based from this area, ending up

25   representing not just a fair distribution of congressional

1  districts throughout the State, but an opportunity to be

2  able to really elevate and advance this particular region.

3  Since we know obviously the southern part of the state has

4  benefited New Orleans, Baton Rouge being the capital.  So

5  more representation in this area ends up representing

6  greater opportunity and potential for us.

7  Q.    And without getting into the substance of the other

8  conversations, were there other individuals attesting to

9  these ties as well during the redistricting process?

10              MR. GREIM:  Your Honor, I object.  It, again,

11  calls for hearsay, just in an indirect way, asking if

12  other people said the same thing.

13              JUDGE SUMMERHAYS:  Counsel?

14              MR. ROHANI:  You can strike that question.

15  Q.    (BY MS. ROHANI) So, Mayor Glover, lastly, what would

16  the impact on your community would be if this map was

17  taken away?

18  A.    It would mean that you would have the ability to be

19  able to look to two members of congress to represent,

20  advance and elevate the interests of this region, whether

21  you're talking about higher education, whether you're

22  talking about research dollars, whether you're talking

23  about infrastructure funding, whether you're talking about

24  workforce development, to be able to have two individuals

25  representing both caucuses of the Congress representing

1    Northwest Louisiana would be something that would be

2    highly beneficial and highly empowering for Shreveport and

3    the rest of the region.

4              MS. ROHANI:  Thank you.  One moment to confer.

5    Q.   (BY MS. ROHANI) Mayor Glover, as the Legislature, did

6    you ever hear testimony of other community members

7    informing your impressions on communities of interest?

8              MR. GREIM:  Objection.  Calls for hearsay again

9    and also this witness was not a legislator in the last

10   session.  So we are probably going a couple of sessions

11   back.  We've got a relevance issue as well.

12             JUDGE SUMMERHAYS:  Counsel?

13             MS. ROHANI:  No further questions, Your Honor.

14   Thank you.

15             MR. GORDON:  Nothing from the State.

16             JUDGE SUMMERHAYS:  Counsel, cross?

17             MR. GREIM:  Nothing from plaintiffs.

18             JUDGE SUMMERHAYS:  We can release the mayor?

19             MR. GREIM:  Yes.

20             JUDGE SUMMERHAYS:  Thank you, Mayor, for

21   appearing here today.  Appreciate the time.

22        Counsel, you may call your next witness.

23             MR. NAIFEH:  My next witness is coming in now.

24             JUDGE SUMMERHAYS:  And this is Ms. Shelton?

25             MR. NAIFEH:  This is Pastor Steven Harris from

1    Natchitoches Parish.

2                    JUDGE SUMMERHAYS:  Okay.

3                    (Oath administered to the witness.)

4                    <u>PASTOR STEVEN HARRIS, SR.</u>

5    having been first duly sworn to testify the truth, the

6    whole truth, and nothing but the truth, testified as

7    follows:

8                         DIRECT EXAMINATION

9    BY MR. EVANS:

10   Q.    Good afternoon, Pastor Harris.

11   A.    Good afternoon.

12   Q.    Can you please state your name and spell it for the

13   record?

14   A.    Steven, S-T-E-V-E-N, Harris, H-A-R-R-I-S, Senior.

15   Q.    Pastor Harris, where do you currently live?

16   A.    Natchitoches, Louisiana.

17   Q.    Where and what schools did you attend?

18   A.    Elementary school, Goldonna, Louisiana.  Campti.

19   Grambling State University.  Went to seminary in

20   Slidell Bible College.  And in Metairie at Victory School

21   of Ministry.

22   Q.    What did you do after you finished school?

23   A.    Got involved in what I had been studying in, in

24   seminary.  Assistant pastor, youth pastor, different

25   pastoral callings.

1    Q.    And where did you do this work at?

2    A.    Jonesborough.  In Natchitoches.  And in Red River.

3    A little place called Lake End.

4    Q.    What do you currently do for a living?

5    A.    I'm full time pastor and I set on the Natchitoches

6    Parish School Board.

7    Q.    And how long have you been a pastor?

8    A.    Around 28 years.

9    Q.    And how long have you served on school board?

10   A.    This is my third term.  I think about nine years.

11   Q.    What do your duties as a pastor entail?

12   A.    Preparing messages for parishioners, doing marriages

13   and premarital counseling, funerals, visiting hospitals,

14   correctional centers, and things like that.

15   Q.    And when you are performing these services and these

16   sacraments, does it require you to travel at all?

17   A.    Yes.

18   Q.    Where does it require you to travel to?

19   A.    Anywhere from Alexandria, Shreveport, Lafayette,

20   Baton Rouge, places in between.

21   Q.    So let's break that down a little bit, Pastor Harris.

22   You said that your duties as a pastor require you to

23   travel to Shreveport; is that correct?

24   A.    Yes.

25   Q.    How often would you say that you travel to

1    Shreveport?

2    A.    Anywhere between four and five times during the week.

3    Q.    And what is the nature of your business to

4    Shreveport?

5    A.    Either to hospitals.  My dad is a veteran of the

6    Korean Conflict and so many times I have to take him

7    either to the VA Hospital in Shreveport or the VA in

8    Alexandria.  And also visiting parishioners that may be at

9    one of the hospitals.

10   Q.    You said that your duties as a pastor require you to

11   travel to Alexandria or Alec, as we call it; is that

12   correct?

13   A.    Yes.

14   Q.    How often would you say that you travel to Alec?

15   A.    Probably around the same amount of times, four or

16   five times during the week.

17   Q.    And what is the nature of your visits to Alec?

18   A.    Seeing parishioners in the hospital.  Things like

19   that.

20   Q.    You said that your duties as a pastor require you to

21   travel to Baton Rouge; is that correct?

22   A.    Yes.

23   Q.    How often would you say that you travel to Baton

24   Rouge?

25   A.    Maybe about four times out of a month or so.  And

1   kind of been traveling more since I got a new grandbaby.

2   My daughter lives in Baton Rouge as well.

3   Q.   So in addition to visiting your grandbaby in Baton

4   Rouge, what is the nature of your other visits to that

5   city?

6   A.   Sometime going to meet with some of my friends, as

7   far as pastor friends, part of the associations and things

8   like that.

9   Q.   You said that your duties as a pastor require you to

10  travel to Lafayette; is that correct?

11  A.   Absolutely.

12  Q.   Does that include the Opelousas area?

13  A.   Yes.

14  Q.   And how often would you say that you travel to the

15  Opelousas and Lafayette area?

16  A.   Anywhere between two to four times during the month.

17  Q.   And what is the nature of your visits to Opelousas

18  and Lafayette?

19  A.   Basically the same things.  Seeing about parishioners

20  or going to an association convention.

21  Q.   So, Pastor Harris, you shared with us that you live

22  in Natchitoches Parish?

23  A.   Yes.

24  Q.   But that your duties as a pastor require you to

25  travel to Shreveport?

A.   Yes.

Q.   To Alexandria, to Opelousas, and Lafayette and to
Baton Rouge, that's correct?

A.   Yes.

Q.   In your opinion, and based off of your own
experience, is there a sense of community and commonality
between these areas?

          MR. GREIM:  I just to have to object.  I don't
think the foundation has been laid for a general sense of
community among all of these different cities based on
this one witness's travel.

          MR. EVANS:  Your Honors, Pastor Harris is a
lifelong resident of this area.  He has pastored, lived,
worked and served in these areas.  He's an elected
official for three terms.  He's speaking to his own lived
experiences in these communities?

          JUDGE SUMMERHAYS:  I am inclined to overrule the
objection.  You may proceed.

          MR. EVANS:  Thank you.

Q.   (BY MR. EVANS) Pastor Harris, my last question was:
In your own opinion and based off of your own lived
experience, is there a sense of community and commonality
between these areas that we talked about?

A.   Yes, there is, because, you know, most of us
fellowship in our different churches, conventions, other

1    times seeing one another at these events and things.

2    Q.   You mentioned events.  Can you elaborate explain what

3    you mean by events?

4    A.   Our associations.

5    Q.   When you say "our," what do you mean there?

6    A.   Church.  Church associations.  Just recently we had

7    the Baptist Convention.  And we fellowship with both

8    Baptist, Church of God in Christ.  All of these different

9    conventions bring us together and we fellowship.

10   Q.   And so when you say that there is a sense of

11   community, is there any events or institutions that you

12   could cite?

13   A.   Yes.  Northwestern State University where my youngest

14   daughter attends and has a whole lot of friends and things

15   that come to our church, as well as where my daughter

16   attend both LSU as well as Southern University, the same.

17   Q.   Pastor Harris, earlier you said that you studied in

18   New Orleans, correct?

19   A.   Yes.

20   Q.   In your own opinion, does Baton Rouge reflect more

21   commonality with New Orleans or Alexandria?

22   A.   Alexandria.

23   Q.   Why do you say that?

24   A.   The culture is different.  Much different.  Foods are

25   different that we eat.  Even the music and thing is

1    different.  In New Orleans the food is mostly cayenne

2    pepper, and in Baton Rouge and Alexandria and

3    Natchitoches, we do more brown gravy.

4    Q.    And how about Shreveport?  Would you say that Baton

5    Rouge has more in common with Shreveport or New Orleans?

6    A.    Shreveport.

7    Q.    And why do you say that, Pastor?

8    A.    Some of the some thing.  Music even, it's different.

9    The culture is just so different.  And you have to be

10   there to actually see it, and I have in my engagement in

11   even the music.  In Baton Rouge and in Natchitoches and

12   things, we play more of a bottom baseline.  In the area of

13   New Orleans, it's more of a house party kind of

14   atmosphere.  Like that's why it's called The Big Easy.

15   Q.    Pastor Harris, are you familiar with the Red River?

16   A.    I am.  Very much so.

17   Q.    What, if anything, is the significance of the Red

18   River to your community?

19   A.    That's how we get our material to do our

20   infrastructure, our roads, and things like that.  It comes

21   in on the river at the port.  And we either go up the

22   river into the Shreveport area --

23   Q.    When you say port, do you mind elaborating what you

24   mean by that?

25   A.    The Natchitoches port, which is across the Red River

1    bridge, which is close to also where my residence is at.
2    And then we go down south and either drop off or pick up
3    things.  But it's very important to our area in order for
4    us to get products for roads and things like that.
5    Q.    Pastor Harris, are you familiar with Interstate 49?
6    A.    Very much so.
7    Q.    What, if anything, is the significance of I-49 to
8    your community?
9    A.    Very convenient in time in getting me from
10   Natchitoches to Shreveport about an hour 15 minutes from
11   Natchitoches to Alexandria from about 45 minutes.  And
12   when I'm having to run those areas, sometimes going to
13   Shreveport to go visit parishioners and going to
14   Alexandria or having to head all the way down into the
15   southern end, Baton Rouge or something, it's definitely
16   good on me and my vehicle.
17   Q.    Pastor, I would like to go back to something that you
18   mentioned earlier when you were talking about your work as
19   a pastor.  Do you ever have guest pastors or guest
20   churches come and visit your congregation?
21   A.    All the time.
22   Q.    And when these guest pastors and churches come to
23   visit your church, where are they visiting from?
24   A.    Anywhere from Shreveport, Alexandria, Opelousas,
25   Baton Rouge, anywhere in between there.

1    Q.    And do you yourself ever receive invitations to speak

2    at other churches?

3    A.    All the time.

4    Q.    And where do these invitations come from?  These

5    churches that you are invited to speak at, where are they

6    located mostly?

7    A.    Mansfield, Shreveport, Alexandria, Baton Rouge, all

8    over the state.  Even other states.

9    Q.    Pastor Harris, are you familiar with the map that

10   passed in January of this year, which I will refer to as

11   SB8?

12   A.    I am.

13          MR. EVANS:  I'd like to pull up Joint Exhibit

14   11.

15   Q.    (BY MR. EVANS) Pastor Harris, can you see this map on

16   your screen there?

17   A.    I can.

18   Q.    And is this the map that you're familiar with?

19   A.    Yes.

20   Q.    Which district do you live in under this map?

21   A.    District 6.

22   Q.    And where is your church located in this map?

23   A.    In the Natchitoches District 6.

24   Q.    And where is the majority of your church congregation

25   located at under this map?

1  A.    District 6.

2  Q.    And the majority of churches that you visit as a

3  pastor, where are those churches located at?

4  A.    In District 6.

5  Q.    Pastor Harris, in your experience living, working,

6  serving, pastoring and preaching in Natchitoches, does the

7  Sixth Congressional District in this map in SB8 reflect

8  common communities of interest?

9  A.    They do.

10  Q.    Can you cite some of those communities of interest or

11  explain what you mean there for the Court.

12  A.    Yes.  Again, we have different things, events that go

13  on, whether it's going to the state fair in Baton Rouge or

14  going to the state fair as a community church to Baton

15  Rouge or going to Alexandria to one of the events there,

16  we oft times commune together.  Matter of fact, we have a

17  couples retreat that we do, called "weekend getaways"

18  where about 250 couples from all over the state, as well

19  as other states, come to Baton Rouge.  And those are some

20  of the things that we have in common.

21  Q.    My last few questions for you, Pastor.  This map was

22  passed by the Legislature in January of this year.

23  A.    Uh-huh.

24  Q.    So there has not been an election held on this

25  particular map yet.  So, should this map still be in

1    place, you will be voting for the first time this fall in

2    a majority black district where your preferred candidate

3    would be able to be elected.  Is that correct?

4              MR. GREIM:  Objection.  Leading question.

5              JUDGE SUMMERHAYS:  Sustained.

6    Q.   (BY MR. EVANS) So you will be voting for the first

7    time under this map, Pastor Harris.  I'm rephrasing, Your

8    Honors.  You will have the opportunity to vote under this

9    current map.  Pastor Harris, what does that mean to you?

10   Can you tell the Court today, sitting there, not just as a

11   pastor, not as a black man in Louisiana, but just as an

12   American, as a human being, what does voting under this

13   map mean to you?

14   A.   I think it means that I have an opportunity to elect

15   someone who I have their ear as well as I have their

16   voice.  That's what I think.

17   Q.   Anything else you want to share with the Court what

18   about this map means to you, Pastor?

19   A.   Again, it gives us the opportunity to have someone

20   that has shared values, that are concerned about some of

21   the same things that we are concerned about in our

22   communities, whether it's in education or healthcare or

23   whatever the case may be.

24             MR. EVANS:  No further questions, Your Honor.

25   Thank you, Pastor.

1             JUDGE SUMMERHAYS:  Anything from the State?

2             MR. GORDON:  Nothing from the State, Your Honor.

3             JUDGE SUMMERHAYS:  Cross?

4             MR. GREIM:  No cross.

5             JUDGE SUMMERHAYS:  We can release this witness?

6    All right.  Pastor, you may step down.  Thank you for

7    testifying here today.

8        Counsel, you may call your next witness.

9             MR. NAIFEH:  Plaintiffs will call Ashley

10   Shelton.  And again, I misspoke again.  We're not the

11   plaintiffs.  We're the intervenor.

12            JUDGE SUMMERHAYS:  Ms. Shelton, if you will

13   approach and we'll swear you in.

14            (Oath administered to the witness.)

15             MS. THOMAS: My name is Alora Thomas on behalf

16   of the Robinson intervenors from Harvard Election Law

17   Clinic.

18            JUDGE STEWART:  Proceed when ready.

19                 ASHLEY KENNEDY SHELTON,

20   having been first duly sworn to testify the truth, the

21   whole truth, and nothing but the truth, testified as

22   follows:

23                 DIRECT EXAMINATION

24   BY MS. THOMAS:

25   Q.   Can you please state your name for the record?

1    A.    Yes.  Ashley Kennedy Shelton.

2    Q.    Where are you from?

3    A.    I am from Baton Rouge, Louisiana.

4    Q.    And how long have you lived in Louisiana?

5    A.    All my life.

6    Q.    Can you briefly describe your work history for the

7    Court?

8    A.    Sure.  I worked at the Baton Rouge Area Foundation

9    straight out of college, and then the Louisiana Disaster

10   Recovery Foundation, and then ultimately founded and run

11   the Power Coalition for Equity and Justice.

12   Q.    And type of work did you do with the Louisiana

13   Disaster Recovery Foundation?

14   A.    Help rebuild the communities affected and impacted by

15   Hurricanes Katrina, Rita, Gustav, Ike, and helping

16   communities rebuild with the focus on housing and economic

17   development.

18   Q.    And where do you currently work?

19   A.    At the Power Coalition for Equity and Justice.

20   Q.    And what is your title there?

21   A.    I am founder, president, and CEO.

22   Q.    And what is the Power Coalition for Equity and

23   Justice?

24   A.    We are a nonpartisan 501(c)(3) civic engagement

25   table.  We work to create pathways to power for

1    historically disenfranchised communities:  African

2    American, Latinx, Native American, and Asian Pacific

3    Islander.  And we do that work through both engaging in

4    voter education and information as well as deep listening

5    and organizing throughout communities in the state of

6    Louisiana.

7    Q.   And what is your involvement in this case?

8    A.   I am a "plain" -- I am the intervenor.

9    Q.   We've all been making that mistake today.  And are

10   you here as an individual voter or on behalf of the Power

11   Coalition?

12   A.   On behalf of the Power Coalition.

13   Q.   Where does Power Coalition have staff located?

14   A.   We have staff across the state.  We have offices in

15   both Baton Rouge, New Orleans, Shreveport, and then we

16   have additional staff in Alexandria and Lafayette as well.

17   Q.   Has Power Coalition been involved in the

18   redistricting process?

19   A.   Yes, we have.

20   Q.   And what has Power Coalition's involvement been?

21   A.   Power Coalition has been involved since census.  We

22   began this work educating community about census, trying

23   to allay people's fears about why they needed to take the

24   census and engage in the process.  And then went on to

25   educate communities about redistricting.  And so what it

1  was, what it meant to draw lines, trainings on Dave's

2  Redistricting app, multiple trainings on the principles of

3  redistricting.  And then certainly prepared and supported

4  the community in participating in the redistricting

5  session.

6  Q.   I would like to take a few of those in turn.  What

7  did the work that Power Coalition did around the census

8  look like?

9  A.   We -- even in the midst of COVID, we canvassed, phone

10 banked, and text messaged community -- you know, black and

11 brown communities throughout the state of Louisiana.  And

12 really again had to lay allay a lot of the fears.  I think

13 there was some fear created around where would their

14 information go, how would that information be used, and we

15 reassured people that we wanted to make that their voices

16 were counted and that Louisiana receive the funds that it

17 needed that was representative of the population.

18 Q.   And after the census, what did the work that Power

19 Coalition do look like?

20 A.   After the census, the State, both Senate Governmental

21 Affairs and House Governmental Affairs, went on a

22 roadshow.  I think it was 10 stops across the State.

23 Power Coalition worked with community along every one of

24 those stops, again, preparing them to be able to give

25 testimony at those roadshows.  Helping them again

1    understand the redistricting principles, organizing and

2    supporting folks in understanding like why redistricting

3    mattered, why their voices were really important in that

4    process.  And then again, you know, went on to mobilize

5    and engage communities to actually show up at the Capitol

6    and have their voices heard in the redistricting process.

7    And I'm really proud to say that we had historic

8    unprecedented participation in redistricting in 2022.

9    Q.    And what, if anything, did you learn through

10   engagement with communities throughout the redistricting

11   process?

12   A.    You know, I think one was that I was surprised that,

13   you know, as I was kind of focused on teaching people

14   about redistricting and its principles and what it meant,

15   but so many people in the community already knew.  And,

16   you know, one of the things that I appreciated as someone

17   that participated in several of the roadshows, myself

18   personally, in addition to training folks all across the

19   state, was that there was already a drumbeat around fair

20   and equitable maps.  People all across the state of

21   Louisiana asked again and said it again and again and

22   again, even one of the most compelling pieces of testimony

23   was a young woman from Dillard University --

24              MR. TYLER:  I'm going to object to hearsay.

25              JUDGE SUMMERHAYS:  Counsel?

1           MS. THOMAS:  I asked the witness what she

2    learned from engagement with communities, so we are not

3    offering this for the truth of the matter, just for its

4    impressions and how it affected the witness.

5           JUDGE SUMMERHAYS:  I'm not sure it would be

6    relevant for anything but for the truth of the matter as

7    it's phrased as I heard the question.  So I am going to

8    sustain the objection.  Let's steer away from hearsay.

9           MS. THOMAS:  Yes, Your Honor.

10   Q.   (BY MS. THOMAS) Did you have any impressions after

11   your engagement with community?

12   A.   Yes.  As I stated before, community was engaged.

13   They understood the importance of redistricting.  And,

14   again, unprecedented participation and engagement

15   throughout the process.  And I've participated in several

16   redistricting sessions and so there were not nearly as

17   many people last time as there was this time, so, again, I

18   can testify based on my own experiences.

19   Q.   And were you engaged in the process at the

20   legislature?

21   A.   I was.

22   Q.   And what was your involvement at the Legislature

23   like?

24   A.   We worked to support community and being able to show

25   up, speak to their legislators, educate them about the

1    legislative process, what's a green card, what's a red

2    card, helping people understand how to engage in the

3    legislative committee, decorum, et cetera, as well as

4    working with legislators to, you know, again educate and

5    provide information on the key principles of redistricting

6    and what it means to draw fair maps.

7    Q.    And did you testify at all at the legislature?

8    A.    I did.

9    Q.    And are you registered as a lobbyist?

10   A.    I am not because I do not lobby enough to have to

11   meet the time requirement just to register.

12   Q.    And focusing in on the work that Power Coalition has

13   done around redistricting, was the Power Coalition

14   involved in the process back in 2022?

15   A.    We were.

16   Q.    And what was the outcome of the 2022 redistricting

17   process?

18   A.    Again, I know at least on the second day of

19   redistricting there were 300 cards that were put into the

20   House and Governmental Affairs Committee from citizens

21   from across the state.  Green cards that meant that

22   citizens supported the map, and that is in the record.  It

23   is in the --

24            MR. TYLER:  I'm going to object to hearsay

25   again.

```
 1              JUDGE SUMMERHAYS:  Counsel?
 2              MS. THOMAS:  As of right now, she is not
 3    testifying to any statements that were made by anyone
 4    else.  She is testifying to things that -- actions that
 5    occurred that she witnessed herself.
 6              JUDGE SUMMERHAYS:  If you'd limit the question
 7    to those actions and not to statements, I'll allow the
 8    question.  If we limit it that way, I'll overrule the
 9    objection.  You may proceed.
10    Q.   (BY MS. THOMAS) To state my question again, what was
11    the outcome of the 2022 redistricting process?
12    A.   We -- there was -- the process ensued, people
13    testified, and our legislators ultimately approved a map
14    that only had one African American district even though
15    there was -- yeah, even though there was lots of, you
16    know, lots of requests and talk about fair and equitable
17    maps including two districts.
18    Q.   And were you involved in the litigation that ensued
19    after the 2022 redistricting process?
20    A.   Yes.
21    Q.   And why was the Power Coalition a part of that
22    litigation?
23    A.   Power Coalition is a nonprofit dedicated to building
24    pathways to power for historically-disenfranchised
25    populations, and so black and brown people need support to
```

1    be able to understand that their vote and their voice

2    actually matter and it actually does have the ability to

3    change outcomes for themselves and their communities.

4    Q.    And was Power Coalition involved in the 2024 special

5    legislative session that just happened this past January?

6    A.    We were.

7    Q.    And what was Power Coalition's involvement in the

8    special legislative session?

9    A.    It was the same as it has been throughout the

10   redistricting process over the last two and a half years:

11   Education, information, and to support the engagement of

12   anybody in the state who wanted to engage and have their

13   voices heard in the process.

14   Q.    And was there a bill or map that you supported as

15   part of the special legislative session in 2024?

16   A.    Yes, SB4.

17   Q.    And why did you support SB4?

18   A.    Because it was the most compact map.  And, you know,

19   the map made sense.  It also was drawn by Tony Fairfax,

20   who is one of -- in my opinion, one of the best

21   demographers in the country.  And so when I looked at it,

22   that was my opinion of SB4.

23   Q.    And do you know if SB4 contained two black majority

24   districts?

25   A.    Yes, it did.

1    Q.    What happened to SB4?

2    A.    It died in committee.

3    Q.    And are you familiar with Senate Bill 8?

4    A.    I am.

5    Q.    And what is Senate Bill 8?

6    A.    It was a bill introduced by Senator Womack.

7    Q.    And do you know if SB8 included two black majority

8    districts?

9    A.    It did.

10   Q.    And were you present at the legislature when SB8 was

11   debated and voted on?

12   A.    Yes.  I was in governmental affairs when it was

13   presented.

14   Q.    And you mentioned in your earlier testimony that

15   there are these things called red cards and green cards.

16   Can you just briefly describe those?

17   A.    Yes.  Green cards are for support.  Anybody that

18   gives testimony must complete one of the cards, whether

19   green for support, red for opposed, white for information.

20   Q.    And did you submit a red card in support of SB8?

21   A.    No, I did not.

22   Q.    I'm sorry.  I would just like to rephrase.  I think I

23   read two questions together.  So just for the record is

24   clear, did you support a red card in opposition to SB8?

25   A.    We did not.

1   Q.   Did you support a green card in support of SB8?

2   A.   No, we did not.

3   Q.   Did you end up supporting SB8 in other ways?

4   A.   Yes.  I mean, from the perspective of education and

5   looking at the map from the perspective of creating a new

6   district that actually centered communities that have

7   never been centered in any of the current congressional

8   districts that they are within.  And so when you look at

9   the district that's created in SB8, the communities across

10  that district are living in poverty, have poor health

11  outcomes, lack of access to economic opportunity, similar

12  hospitals, similar size airports.  Like there is this --

13  there is this opportunity to really center these

14  communities in a way that they have not had the attention

15  in the current districts that they exist within.

16  Q.   And what were the most important factors that you

17  considered in deciding to support SB8?

18  A.   Again, you know, the opportunity to, one, realize a

19  second majority-minority district, a district that makes

20  sense, a district that met the redistricting principles,

21  and also was fair and equitable.  And again, as we looked

22  at that map and went through that redistricting process,

23  ultimately that map, it got -- it made it -- it worked.

24  It worked.

25  Q.   Are you aware of amendments to SB8 that would have

1    increased BVAP in both CD-6 and CD-2?

2    A.    Yes.

3    Q.    Did you support those amendments?

4    A.    I did not.

5    Q.    Why?

6    A.    Because, one, it made the map less compact.  And then

7    also, the -- you know, like I think that the idea that we

8    were going to make the map less compact, to just pick up,

9    you know, pick up more BVAP didn't really make sense, and

10   so for us, we did not support the amendments.

11   Q.    Do you know what happened to those amendments.

12   A.    Yes.  They were voted down on the house floor if I'm

13   not mistaken.

14   Q.    We're going to pull up Joint Exhibit 11.  I think

15   we've been looking at this document quite a bit.  Do you

16   recognize this document?

17   A.    Yes.

18   Q.    And does this look like an accurate version of SB8?

19   A.    Yes.

20   Q.    What were your impressions about the geography of SB8

21   when you saw it?

22   A.    That, you know, these are -- these are communities

23   even though, you know, you have north Baton Rouge, which

24   is probably -- well, North Baton Rouge and Shreveport

25   which have, you know, strong population, that these are

1  all, again, poor communities that are not -- that have

2  never benefited from, you know, congressional leadership

3  that was going to vote on the things that they cared about

4  and things that matter to them.  And so for me, it was

5  really just an opportunity to see a district that just

6  made sense in comparison to HB1 that packs Baton Rouge and

7  New Orleans into the same district.

8  Q.   Does Power Coalition organize in communities

9  throughout CD-6?

10 A.   We do -- we have staff throughout -- throughout the

11 new district before it even was a district.  We have

12 always worked in communities throughout CD-6 and also do

13 work in other parts of the state.  But we have organized,

14 we have talked to, we have worked with, we have done

15 "Get Out to Vote."  We have done deep listening and we

16 have done policy work in support of the interests and

17 voices of those communities.

18 Q.   And are you familiar with the term "communities of

19 interest"?

20 A.   I am.

21 Q.   And what is your understanding of a community of

22 interest?

23 A.   The things that, you know, bring communities

24 together, the things that define the passions of a

25 community, the things that kind of define, you know,

1  define, to them, you know, for themselves what makes their
2  community unique.
3  Q.   How do you think SB8 compared to HB1 along
4  communities of interest, as you understand them?
5  A.   You know, again, as I said, you know, HB1 packed
6  Baton Rouge and New Orleans into the same district.  SB8,
7  one of the things that I'm really clear about is that,
8  you know, outside of New Orleans, certainly African
9  American communities and other communities of color kind
10  of have the same experience in this state as evidenced by
11  the fact that when you look at this particular district,
12  if you look at quality of life indicators, job
13  opportunities, again hospitals, airports, there's a lot
14  more similarities than there are with Baton Rouge and the
15  city of New Orleans.  I mean, again, I think that there
16  is, you know, there's kind of, unfortunately a very
17  similar experience being experienced by people in CD-6.
18  Q.   Do you think Baton Rouge has more in common with New
19  Orleans or with Alexandria?
20  A.   Alexandria.
21  Q.   Do you think Baton Rouge has more in common with New
22  Orleans or Monroe?
23  A.   Monroe.
24  Q.   Do you think Baton Rouge has more in common with New
25  Orleans or Lafayette?

1    A.    Lafayette.

2    Q.    Do you think Baton Rouge has more in common with New

3    Orleans or Shreveport?

4    A.    Shreveport.

5    Q.    And why do you give those answers about commonalities

6    between Baton Rouge and these other parts of the state?

7    A.    Because of the -- you know, like, again, for those of

8    us that work in the state and understand the state and its

9    demographics and the issues with folks throughout these

10   communities, again, the issues are the same and their

11   experience is the same.  High electricity bills.  Again,

12   lack access to healthcare, small airports, et cetera.  And

13   New Orleans is much more of a -- you know, it's a historic

14   city.  They have a pipeline of leaders.  They have the

15   first Supreme Court justice seat.  They have, you know,

16   much more of a history of, you know, of leadership and the

17   ability -- the ability like to hold, you know, to hold

18   what is now CD-2 wholly to themselves.

19   Q.    What was your impression of community sentiment

20   around SB8 when it was first passed?

21   A.    Communities were excited.  I mean, I think it was the

22   opportunity to see their voices realized in a map.

23              MR. TYLER:  I'm going to object to hearsay

24   there.

25              JUDGE SUMMERHAYS:  Counsel?

1          MS. THOMAS:  She didn't testify to any

2    statements.  I asked her about her impressions.  Her work

3    as an organizer organizing communities.  She is here on

4    behalf of an organizing NGO.

5          JUDGE SUMMERHAYS:  As long as we keep it away

6    from the statements of others --

7          MS. THOMAS:  Yes, Your Honor.

8          JUDGE SUMMERHAYS:  -- I'll allow it; I will give

9    some leeway on that.

10   Q.   (BY MS. THOMAS) And you mentioned that community was

11   excited about SB8.  Why was community excited about SB8?

12   A.   I think after -- again, after kind of moving and

13   watching this process over the last two and a half years,

14   community was really clear that this was an opportunity

15   again to have their voices centered in a congressional

16   district and as well as it establishing a second

17   majority-minority district.

18   Q.   What are the current impressions of the community?

19   What are your impressions about community sentiment around

20   SB8 currently?

21   A.   I think communities are waiting to see.  I think, me

22   personally, as well as our organization, we do voter

23   education and voter information.  And so as we prepare for

24   the 2024 elections, you know, there are so many questions

25   around like what district do people live in?  Is the

1    enacted map the map.  And so for us, we are trying to do

2    as much education and information as possible so that

3    community can be prepared for, you know, for the 2024

4    elections, which is why this is so important.

5    Q.    And what would it mean to Power Coalition's work if

6    the newly enacted CD-6 was taken away?

7    A.    It would mean that we spent 10 years as an

8    organization engaging, educating, and mobilizing voters of

9    color.  And what we know is that apathy is driven by

10   voters not feeling like they have a voice.  We know that

11   if they don't feel like they can actually elect a

12   candidate of choice, that again that drives voter apathy

13   and it makes my job harder.  It is not to say that

14   candidates don't matter, but it is certainly about, you

15   know, community, feeling like they have the opportunity to

16   elect a candidate of choice, someone that is actually

17   going to vote for and put them first and not politics.

18               MS. THOMAS:  I think I can turn over the

19   witness.  Just give me one second to confer.

20               JUDGE SUMMERHAYS:  Counsel?

21               MS. THOMAS:  We can pass the witness.

22               JUDGE SUMMERHAYS:  State?

23               MR. HENSON:  Nothing from the State, Your Honor.

24               JUDGE SUMMERHAYS:  Cross-examination?

25               MR. BOWEN:  Just a short one.

1          JUDGE SUMMERHAYS:  You may proceed when ready.

2                        CROSS-EXAMINATION

3    BY MR. BOWEN:

4    Q.   Ms. Shelton, we had a deposition the other day,

5    correct?

6    A.   We did.

7    Q.   I similarly told you that I did not have a whole lot

8    for you, and then we ended up going for quite a long time?

9    A.   Two hours.

10   Q.   So I will try to not do that again today, but no

11   promises.

12         First of all, you are not a demographer, correct?

13   A.   I am not.

14             MR. BOWEN:  Okay.  Can we go ahead and put up

15   Joint Exhibit 14.

16   Q.   (BY MR. BOWEN) So this exhibit is -- do you recognize

17   what this is?

18   A.   I am quickly putting it together.  This is -- is this

19   HB1 or -- I'm trying to see.  I mean, I would assume it's

20   the new map, if I'm not mistaken.  Could you make it a

21   little bigger?  I can't see.  I can't see the... yes.

22   This is actually -- yes, it is SB8.

23   Q.   So this is SB8, correct?

24   A.   I mean, as far as I can tell.  Again, I'm not a

25   demographer.  I've been looking at these maps for two and

1   a half years, various versions of it.  But it does look

2   like it runs the course of what I understand to be SB8.

3   Except for actually -- I know St. Landry actually isn't a

4   part of it, so actually maybe not.  But, yeah.  So can't

5   be sure.

6   Q.   The map that you looked at with intervenors' counsel

7   was not SB8, correct?

8   A.   Yes, it was.  With my lawyer?  Yes, it was.

9   Q.   Okay.  I will represent to you that this is SB8 post

10  amendment as it was passed, and what you were looking at

11  before was a pre-amendment version, not SB8.

12  A.   Okay.

13  Q.   So knowing that and we've heard your thoughts on the

14  map that you were looking at, this map, post-amendment, is

15  less compact and it has a higher BVAP value, which are two

16  things that you said were not worth the change, correct?

17  A.   The amendments, as they were proposed that I saw at

18  that time, whatever amendment this is -- could you be more

19  specific about who actually -- who actually presented the

20  amendment to the map?

21  Q.   This is SB8 as it is enacted.

22  A.   Okay.

23  Q.   And so knowing that it is less compact and it has a

24  higher BVAP value, do you still support it?

25  A.   I mean, I think at the end of the day, I'd have to

1   see -- do you -- I mean, do you have the -- I mean, again,

2   so if -- let's say, SB8 as enacted, you know, again,

3   six SB -- I mean, Senate Congressional District 6 is

4   what -- has a BVAP of about what, 54 percent, and then

5   District 2 is about 51 percent, if I am correct?

6   Q.   Are you asking me?

7                JUDGE SUMMERHAYS:  This is not a two-way

8   conversation.

9                THE WITNESS:  Okay.  I'm making a statement.

10               JUDGE SUMMERHAYS:  I'll ask the witness to

11   please just answer the question that's asked.

12       And, Counsel, let's try to lead the witness through

13   your questions.

14               THE WITNESS:  So, to answer your question, I

15   think that the map ultimately -- ultimately is a good map.

16   I mean, you know, we have presented in partnership with

17   our lawyers over six different maps that drew -- that drew

18   a two district -- a two-district two map.  And, again, we

19   presented SB4.  It was voted down in committee.  But as we

20   went through the process and the legislature did the work,

21   I mean, it is less compact and maybe has a lower or higher

22   BVAP.

23       But, again, I do think that those communities make

24   sense.  They are connected.  I drive them on a regular

25   basis and worked throughout all of those communities to

1  support them in engaging in their vote and their voice.

2  So again, it works.

3  Q.   (BY MR. BOWEN) So is your answer that you do support

4  it even though it has a higher BVAP value and is less

5  compact?

6  A.   Yes.

7        MR. BOWEN:  May I confer quickly?

8        JUDGE SUMMERHAYS:  You may.

9        MR. BOWEN:  We have no further questions.

10       JUDGE SUMMERHAYS:  Redirect?

11                   REDIRECT EXAMINATION

12  BY MS. THOMAS:

13  Q.   Do you recall the amendment that you did not support,

14  how many times Baton Rouge was split?

15  A.   Four times.

16  Q.   Does SB8 currently split Baton Rouge four ways?

17  A.   No, it does not.

18  Q.   Was the split of Baton Rouge one of the reasons that

19  you did not support the amendment that increased BVAP?

20  A.   Yes.

21  Q.   And do you recall whether the amendment that you did

22  not support increased BVAP to a higher level than is

23  currently present in SB8?

24  A.   Yes, it did.

25        MS. THOMAS:  No further questions.

1             JUDGE SUMMERHAYS:  Thank you.  We can release

2   this witness?  Thank you for testifying.  You are free to

3   go.

4             JUDGE JOSEPH:  How many more witnesses do you

5   have, Mr. Naifeh?

6             MR. NAIFEH:  We have two more witnesses in the

7   case.  We have one we could call today, but I think he

8   will probably go well beyond 5:30.

9             JUDGE SUMMERHAYS:  So what you're saying is that

10  now is a good time to break for the day?

11            MR. NAIFEH:  With Your Honor's leave, I think,

12  you know, it would be a good time to break for the day.

13            JUDGE JOSEPH:  And the other one is not here?

14            MR. NAIFEH:  He is not here.  He is coming.

15            JUDGE JOSEPH:  Who are those two witnesses?

16            MR. NAIFEH:  One is Davante Lewis.  He is one of

17  our clients, one of the intervenors.  And the other is

18  Senator Royce Duplessis.

19            JUDGE SUMMERHAYS:  And then we have Overholt as

20  rebuttal.  How much time do you think you have with him?

21            MR. GREIM:  Well, we're actually considering

22  whether to still call him based on Fairfax today.  That's

23  a decision that we'll make tonight.  But it's possible

24  that we actually, after all that, that we will not call

25  Overholt.

```
 1              JUDGE SUMMERHAYS:  So it looks like we could
 2   finish up and have closing arguments tomorrow morning.
 3              JUDGE JOSEPH:   So be prepared for closing
 4   arguments tomorrow morning before lunch.
 5              JUDGE STEWART:  Do we have any wrap-up left on
 6   all the document discussion?  Have all of those been
 7   neatly tied and packaged?
 8              MR. NAIFEH:  Not yet, Your Honor.  I think we
 9   will see where we are tomorrow.
10              JUDGE SUMMERHAYS:  Well, we'll put that to
11   counsel to complete that by tomorrow morning.
12              MR. NAIFEH:  Absolutely.  We will complete it
13   before we rest our case.
14              JUDGE SUMMERHAYS:  That's the cutoff is the
15   start of proceedings tomorrow morning.  That needs to be
16   resolved.
17              MR. NAIFEH:  Okay.  Your Honor, some of the
18   exhibits, if we do seek to move them in may come in
19   through one of our -- one or either one of our witnesses
20   tomorrow.  So we may need -- you know, to move them in
21   through the witness if there are foundation and relevance
22   issues that we can resolve through those witnesses.
23              JUDGE JOSEPH:  Okay.  And just a kind of
24   addendum.  We discussed amongst ourselves the fact that it
25   might be beneficial to have as an attachment to
```

1    post-hearing briefs proposed findings of fact.

2    Conclusions of law I don't think are necessary, but

3    proposed findings of fact.  So I think that's all I have.

4             JUDGE STEWART:  The only thing I have is just a

5    reprise of the earlier, earlier conversation where we were

6    going back and forth about the exhibits and foundations.

7    You both kind of made argument, but you've given us back

8    to sort them back.  I guess, more to the point, if you're

9    going to be firing along with that, you need to have

10   something to back it up besides just saying -- in other

11   words, if you're seeking to push through putting in things

12   we've otherwise said is hearsay, you heard sort of the --

13   call it what you want.  It's not going to be enough to

14   just like argue about it.  You know, as we say in my other

15   line of work, you know, give us your best case as to why

16   in this preface you can thread the needle with it, because

17   otherwise it's just argument.

18        So, you know, you heard the concerns.  You know,

19   we're trying to make a good record.  But we are at the

20   point now, you know, it's going to take more than argument

21   either way.  So I'm not talking about coming here with

22   briefs, just come with more than just the same argument we

23   heard today, particularly if it's foundational, if you're

24   talking about judicial notice in the generic sense.  You

25   know, be more precise as exactly what you're talking about

1    taking judicial notice in this context.  You know, that's

2    a doable item.  You follow me?  That precision should be

3    higher up in day three of the trial?

4              MR. NAIFEH:  Yes, Your Honor.

5              MR. GORDON:  I believe to one point about Your

6    Honor's concerns about a fulsome record and the transcript

7    and video issue, I believe we all have agreement that the

8    entire legislative transcript is in evidence, and also the

9    video record I think will be in evidence once we finalize

10   that this evening.  But we will, of course, be designating

11   portions of it for Your Honors' review that we think all

12   most favor our case.  For convenience, I believe the

13   entire transcript and video will be admitted.  Either it

14   will be called joint or it will just rely on the ones that

15   have been admitted already for each party I think.  Is

16   that an accurate statement to other counsel?  I'm sorry.

17             MR. NAIFEH:  That is accurate.  I think actually

18   most of it has already been moved in by the plaintiffs

19   without objection.  And we have a couple of more portions

20   of the transcript that we will be moving in.  And that we

21   can handle I think first thing tomorrow morning.

22             JUDGE SUMMERHAYS:  Just the portions that they

23   moved in their case, the idea that we are going to

24   supplement that with a joint exhibit.  And that's what

25   you're talking about?  You put --

1          MR. GORDON:  Well, if Your Honors would like us

2    to make it a joint exhibit, we certainly can.  Or we can

3    all each rely on the other parties' evidence, which we

4    have I think all listed as a reservation in our exhibit

5    lists so that we don't have to move them more than once.

6          JUDGE SUMMERHAYS:  I thought that we decided a

7    joint exhibit that's supposed to be substituted in.

8          MR. GORDON:  Okay.  Well, we can do it that way.

9    Absolutely.

10          JUDGE SUMMERHAYS:  Because if we do a dump of

11    the entire transcript, it doesn't really point us to what

12    you feel is the most relevant.  And the idea was we would

13    have it from both sides, what each side felt was the most

14    relevant portions of that transcript.  And unless my

15    colleagues disagree, I think that's the approach that the

16    panel is going to take.

17          JUDGE JOSEPH:  I thought that was the goal.  I

18    thought that was our goal.

19          MR. NAIFEH:  Absolutely.  So I think -- I think

20    that there may just be some confusion.

21          MR. GREIM:  Could be.

22          JUDGE SUMMERHAYS:  Well, you've got tonight to

23    iron it out.  Anything else?

24          MR. GREIM:  We'll figure it out.  I have a

25    question actually.  I know we talked about closing

1  statements last week.  I just wonder if there is any

2  further instruction from the panel because we're going to

3  be putting these -- finalizing these tonight.  I think we

4  said 20 minutes, but I might be wrong.

5        And my other question is:  In the openings, the

6  Secretary ceded her time equally to the other side, but it

7  kind of made me arguing 10 minutes against 30 minutes.  I

8  wonder what the understanding will be for closing so that

9  I don't find myself in that position again.

10             JUDGE JOSEPH:  30 and 30.  30 for plaintiffs,

11  30 for defendants and intervenors.  Is that okay?

12             MR. NAIFEH:  Yes, Your honor.

13             JUDGE SUMMERHAYS:  That seems like a fair

14  allocation.

15             MR. GORDON:  That's fine with us, Your Honor.

16             JUDGE JOSEPH:  Yeah, that sounds -- I think

17  that's enough time for everybody.

18             JUDGE SUMMERHAYS:  So I'll see you back at 9:00

19  and we'll start sharply.

20             (Proceedings adjourned at 5:08 p.m.)

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, DIANA CAVENAH, RPR, Federal Official Court

4    Reporter, in and for the United States District Court for

5    the Western District of Louisiana, DO HEREBY CERTIFY that

6    pursuant to Section 753, Title 28, United States Code,

7    that the foregoing is a true and correct transcript of the

8    stenographically-reported proceedings held in the

9    above-entitled matter and that the transcript page format

10   is in conformance with the regulations of the Judicial

11   Conference of the United States.

12

13                        /s/ Diana Cavenah

14                        DIANA CAVENAH, RPR
                          Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25