1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF LOUISIANA

3                   MONROE DIVISION

4

   PHILLIP CALLAIS, LLOYD PRICE,      )
5  BRUCE ODELL, ELIZABETH ERSOFF,     )
   ALBERT CAISSIE, DANIEL WEIR,       )
6  JOYCE LACOUR, CANDY CARROLL        )
   PEAVY, TANYA WHITNEY, MIKE         )
7  JOHNSON, GROVER JOSEPH REES,       )
   ROLFE MCCOLLISTER,                 )
8                                     )
                  Plaintiffs,         )
9                                     )
   VS.                                )      Civil Action
10                                    )   No. 3:24-cv-00122
   NANCY LANDRY, in her official      )
11 capacity as Secretary of State,    )
                                      )
12                Defendant.          )

13

14           PRELIMINARY INJUNCTION HEARING
              CONSOLIDATED WITH BENCH TRIAL
15    OFFICIAL TRANSCRIPT OF PROCEEDINGS, VOLUME III
     BEFORE THE HONORABLE CIRCUIT JUDGE CARL E. STEWART
16      THE HONORABLE DISTRICT JUDGE DAVID C. JOSEPH
   AND THE HONORABLE DISTRICT JUDGE ROBERT R. SUMMERHAYS
17                  APRIL 10, 2024
                 SHREVEPORT, LOUISIANA
18

19

20

21

22                DIANA CAVENAH, RPR
            FEDERAL OFFICIAL COURT REPORTER
23           300 FANNIN STREET, SUITE 4203
              SHREVEPORT, LOUISIANA 71101
24                 (318) 934-4754

25

```
 1  | APPEARANCES OF COUNSEL:
    |
 2  | FOR THE PLAINTIFFS:
    |
 3  | Edward D. Greim
    | A. Bradley Bodamer
 4  | Katie Graves
    | Jackson Tyler
 5  | Attorneys at Law
    | 1100 Main Street, Suite 2700
 6  | Kansas City, MO 64105
    |      and
 7  | Paul Loy Hurd
    | Attorney at Law
 8  | 1896 Hudson Circle, Suite 5
    | Monroe, LA 71201
 9  |
    |
10  | FOR THE STATE OF LOUISIANA:
    |
11  | Jason B. Torchinsky
    | Phillip M. Gordon
12  | Brennan A.R. Bowen
    | Zachary D. Henson
13  | Drew Ensign
    | Attorneys at Law
14  | 15405 John Marshall Highway
    | Haymarket, VA 20169
15  |      and
    | Carey Tom Jones
16  | Office of the Attorney General
    | Louisiana Department of Justice
17  | 1885 N. Third St.
    | Baton Rouge, LA 70804
18  |
    |
19  | FOR NANCY LANDRY, IN HER OFFICIAL CAPACITY AS
    | SECRETARY OF STATE:
20  |
    |
21  | Phillip J. Strach
    | Attorney at Law
    | 301 Hillsborough Street, Suite 1400
22  | Raleigh, NC 27603
    |      and
23  | John C. Walsh
    | Attorney at Law
24  | 628 St. Louis Street
    | P.O. Box 4225
25  | Baton Rouge, LA 70821
```

1    FOR ROBINSON INTERVENORS:

2    Stuart Naifeh
     Kathryn Sadasivan
3    Victoria Wenger
     Attorneys at Law
4    NAACP Legal Defense and Educational Fund, Inc.
     40 Rector Street, 5th Floor
5    New York, NY 10006
            and
6    I. Sara Rohani
     NAACP Legal Defense and Educational Fund, Inc.
7    700 14th Street N.W. Ste. 600
     Washington, DC 20005
8           and
     Sarah Brannon
9    Megan C. Kennan
     American Civil Liberties Union Foundation
10   15th Street, NW
     Washington, DC 20005
11          and
     Jonathan H. Hurwitz
12   Amitav Chakraborty
     Arielle B. McTootle
13   Attorneys at Law
     1285 Avenue of the Americas
14   New York, NY 10019
            and
15   T. Alora Thomas-Lundborg
     Daniel Hessel
16   Election Law Clinic
     Harvard Law School
17   6 Everett Street, Ste. 4105
     Cambridge, MA 02138

18

19                  C O N T E N T S

20   WITNESSES ON BEHALF OF THE INTERVENORS:          PAGE

21   TESTIMONY OF SENATOR ROYCE DUPLESSIS:
            Direct Examination by Ms. McTootle         512
22          Cross-Examination by Mr. Gordon            533
            Cross-Examination by Mr. Greim             538
23

24   TESTIMONY OF COMMISSIONER DAVANTE LEWIS:
            Direct Examination by Ms. Wenger           542
25          Cross-Examination by Mr. Tyler             585

 1          (Court called to order with all parties present at

 2    9:09 a.m.)

 3          JUDGE JOSEPH:  We are back on the record now in

 4    day three of Callais, et al. v. Nancy Landry, Docket

 5    No. 3:24-cv-122.

 6       When we left yesterday, I think we had a couple of

 7    administrative matters we were trying to handle.  The most

 8    consequential was the joint evidentiary offering by the

 9    parties.  Have the parties come to a resolution on that?

10          MR. TYLER:  Yes, we should have joint

11    designations of the audio and also of the text transcripts

12    themselves.

13          JUDGE JOSEPH:  Oh, great.  Wonderful.  So what

14    are we going to call those?

15          MR. TYLER:  They are Joint Exhibit -- somebody

16    might have the numbers.

17          MR. BOWEN:  Your Honor, Joint Exhibit 38 and 39.

18          JUDGE JOSEPH:  38 and 39.  Thank you very much.

19    That will be -- 38 will be the transcript and 39 the audio

20    or vice versa?

21          MR. BOWEN:  Vice versa.

22          JUDGE JOSEPH:  Okay.

23          MR. BOWEN:  Your Honor, we are also intending to

24    file them with their own separate ECF filing.  Would you

25    prefer that or is it sufficient to have them as exhibits?

1    Do we submit the list of designations or --

2            JUDGE JOSEPH:  Well, we can just admit them.  We

3    don't need to file them in ECF.

4            MR. BOWEN:  Okay.

5            JUDGE JOSEPH:  Yeah.

6            MR. NAIFEH:  And then I think we also need to

7    move in the actual transcripts themselves and the videos.

8    And I think -- I think my colleagues, the State or on the

9    Plaintiffs' side I think may have the numbers.  I don't

10   happen to have the numbers in front of me, but they are

11   joint exhibits that will replace, I believe, some of the

12   Plaintiffs' exhibits.

13           JUDGE JOSEPH:  I thought that's just what we

14   were talking about.

15           MR. NAIFEH:  Right.  So he was talking about the

16   documents 38 and 39 are just a list of the page numbers

17   and line numbers in the transcripts that we -- that each

18   party have designated to call to --

19           JUDGE JOSEPH:  Oh, but it doesn't have --

20           MR. NAIFEH:  -- Your Honors' attention.

21           JUDGE JOSEPH:  -- a lot of the --

22           MR. NAIFEH:  It's not the actual text --

23           JUDGE JOSEPH:  Okay.

24           MR. NAIFEH:  -- of those transcripts.  So the

25   text of the transcripts, I believe, is -- I don't know

1  what -- is it -- it's --

2          JUDGE JOSEPH:  Will that be provided -- that

3  will be provided to us maybe after trial --

4          MR. TYLER:  It will, Your Honor.

5          JUDGE JOSEPH:  -- it would be okay as long as --

6          MR. TYLER:  We can put that on a flash drive.

7          JUDGE JOSEPH:  -- we have an agreement about

8  what part that would be in this thing, which y'all have

9  already done you're telling me, then actually having the

10  thumb drive into Ms. LaCombe's hands can wait, I guess, a

11  couple of days.

12          MR. NAIFEH:  They need to be moved in just so

13  they -- you know, that there are exhibit numbers that

14  correspond to those.

15          JUDGE JOSEPH:  Yeah.  So we'll call those what?

16  Joint Exhibit 40 and 41?  40 being the joint transcript of

17  all of the legislative testimony and --

18          MR. CHAKRABORTY:  Your Honor, actually, the

19  parties met last night on this --

20          JUDGE JOSEPH:  Get by the microphone.

21          MR. CHAKRABORTY:  The parties met last night on

22  this and we have -- the last joint exhibit list ended at

23  Joint Exhibit 17 so the legislative videos and the

24  transcripts have been added and they go from Joint

25  Exhibit 18 to Joint Exhibit 37.  So 38 and 39 are the

1  designations at the end and everything in between are the

2  videos and the transcripts.

3            JUDGE JOSEPH:  So each designated portion has

4  its own number?

5            MR. CHAKRABORTY:  Each transcript and each video

6  has its own number, yes.

7            JUDGE JOSEPH:  All right.  That will be fine.

8  So when you have those prepared, just hand them to

9  Ms. LaCombe and however she wants that done, she'll let

10  you know.

11            MR. CHAKRABORTY:  Your Honor, we're finalizing

12  the thumb drives and we'll have those to the Court.

13            JUDGE JOSEPH:  Okay.  All right.  What else do

14  we need to talk about before we start back?

15            MR. NAIFEH:  Your Honors, the Robinson

16  intervenors have some exhibits that we would like to move

17  in, in addition to the joint exhibits.  So starting with

18  R294 to R306, those are the demonstratives that we showed.

19  I think 294 to 298 have actually already been admitted

20  during the witness examination yesterday.  299 to 306 were

21  used the day before with Dr. McCartan.  Those are the

22  demonstratives that we showed during the exam.

23            JUDGE JOSEPH:  Basically they were charts in the

24  report that --

25            MR. NAIFEH:  Charts from the reports and maps.

1           JUDGE JOSEPH:  Any objection to that?

2           MR. GREIM:  No objection, Your Honor.

3           JUDGE JOSEPH:  From the State?

4           MR. GORDON:  No objection, Your Honor.

5           JUDGE JOSEPH:  Okay.  Without objection, those

6    exhibits will be entered into evidence.

7           MR. NAIFEH:  And then two more exhibits and I

8    was just discussing before Your Honors came in with

9    Mr. Greim these exhibits, so we have not fully resolved

10   whether there are objections.  I think he will advise you

11   of that.

12          JUDGE JOSEPH:  All right.

13          MR. NAIFEH:  But they are R275 and R276.  Those

14   are letters that were submitted to the legislature during

15   the January special session.  One from the Legal Defense

16   Fund on behalf of the Robinson intervenors and one from a

17   coalition of organizations that include some of the

18   Robinson intervenors urging the legislature to adopt the

19   map with two majority black districts.  So those are part

20   of the legislative record.  They're available on the

21   Legislature's website and they were before the Legislature

22   as they were adopting SB8.

23          MR. GREIM:  And we had earlier objected to these

24   as having hearsay within hearsay.  My question has been

25   are we going to use -- is a legislator or someone going to

1    say, "Well, here is what I considered from this letter

2    from that letter," and at that point I think it comes in

3    to help prove what the Legislature was intending, but --

4              JUDGE JOSEPH:  It's a relevance objection?

5              MR. GREIM:  It's relevance and hearsay.

6    Because at least some of these --

7              JUDGE JOSEPH:  Well, if it's offered for the

8    truth of what's in those letters, it's hearsay.

9              MR. GREIM:  Right.

10              JUDGE JOSEPH:  I think if it's a motivating

11    factor behind some legislative action or could be

12    considered that, then it may be relevant for that purpose,

13    but you're saying that foundation has not been laid yet.

14              MR. GREIM:  Yes.  Better stated.  That's right,

15    Your Honor.  And we have the same general issue with a

16    bunch of other things where we haven't -- no one has told

17    us yet how exactly this is going to be used.  And so when

18    there are these blanket designations made, this is going

19    to be our objection.  Now, if it comes up with a witness,

20    you know, then it may come in for a more limited purpose.

21              JUDGE JOSEPH:  Response?

22              MR. NAIFEH:  Our position is that these were

23    before the Legislature.  The Legislature had a process for

24    taking in input from the public that became part of the

25    record, so they were before the Legislature.  Whether

1    one -- any individual legislator looked at them or relied

2    on them doesn't seem to be the dispositive issue.  The

3    question -- I mean, we don't know that any one legislator

4    listened to any particular part of the transcript, but

5    we've got the entire transcript in the record, even though

6    not every legislator was present at every hearing or every

7    meeting of the relevant committees.

8              JUDGE JOSEPH:  Were any other letters entered

9    into the legislative record?

10             MR. NAIFEH:  There were -- there were other --

11   there were definitely other submissions to the legislative

12   record.

13             JUDGE JOSEPH:  I guess -- I guess -- I

14   understand your point, Mr. Naifeh.  I guess, my question

15   would be, well, doesn't the witness need to draw attention

16   to these letters as being important?  I mean, if we had

17   the whole legislative record and you don't have a witness

18   that's saying these letters are important, now I don't

19   know if it meets the 401 standard.  I mean, I'd defer to

20   my colleagues on this, but that's my question.

21             JUDGE SUMMERHAYS:  I mean, it seems like the

22   letters in isolation without any testimony to establish

23   their connection to the decisions that were made, you

24   know, I am not sure how much probative value that has, so

25   I would tend to agree with you.

1        JUDGE JOSEPH:  Yeah.  If there is a witness that

2    can connect the dots on that, then, of course, we'll

3    consider it at that time, so right now those are not

4    admitted.

5        MR. NAIFEH:  Thank you, Your Honor.

6        JUDGE JOSEPH:  Anything else, Mr. Naifeh?  Any

7    other exhibits?

8        MR. NAIFEH:  No, nothing now, Your Honors.

9        JUDGE JOSEPH:  All right.  Well, then it's the

10   intervenor's case, so please proceed.

11       MR. NAIFEH:  The intervenors will call Davante

12   Lewis.

13       (Off the record.)

14       MR. NAIFEH:  Apparently, the order has changed.

15   We are calling Senator Royce Duplessis first.

16       JUDGE JOSEPH:  Okay.

17       (Oath administered to the witness.)

18       THE WITNESS:  Yes.

19       MS. MCTOOTLE:  Good afternoon, Your Honors.

20   My name is Arielle McTootle.  I represent the Robinson

21   intervenors in this matter and the intervenors call

22   Senator Royce Duplessis.

23                   SENATOR ROYCE DUPLESSIS,

24   having been first duly sworn to testify the truth, the

25   whole truth, and nothing but the truth, testified as

1    follows:

2                        DIRECT EXAMINATION

3    BY MS. McTOOTLE:

4    Q.   Good afternoon, Senator.

5    A.   Hi.

6    Q.   Can you please state your full name for the record

7    and spell it for the court reporter?

8    A.   Royce, R-O-Y-C-E.  Last name Duplessis,

9    D-U-P-L-E-S-S-I-S.

10   Q.   And where do you live, Senator Duplessis?

11   A.   I live in New Orleans, Louisiana.

12   Q.   And were you born and raised in New Orleans?

13   A.   Yes.

14   Q.   And what do you do for a living?

15   A.   I'm an attorney by trade, but I also serve in the

16   Louisiana State Senate.

17   Q.   And what district do you represent?

18   A.   District 5 which is most of uptown New Orleans and

19   parts of Jefferson Parish.

20   Q.   And how long have you served as a state senator?

21   A.   I've served as a -- I've served in the Senate since

22   December of 2022, but I served in the Legislature as a

23   whole since -- I think today makes six years.  I was sworn

24   in April 10th of '18, so six years, yes.

25   Q.   And can you tell us about your background in public

1    service before that time?

2    A.    Yes.  Before -- before going into the Legislature,

3    I -- right before then, for several years, I worked at the

4    Louisiana Supreme Court as special counsel to Chief

5    Justice and all the other Justices.  I worked -- I served

6    New Orleans City Planning Commission.  I volunteered on a

7    number of boards and commissions.  Yeah.  So that's a

8    little bit about what I did before running for office.

9    Q.    And so I want to ask you first about the 2020

10   redistricting cycle.  Were you a state representative

11   during the redistricting process that followed the 2020

12   census?

13   A.    Yes, I was.

14   Q.    And starting with that very first redistricting

15   legislative session around early 2022, did you play any

16   role in that redistricting process?

17   A.    Yes.

18   Q.    And what was that role?

19   A.    So I was assigned to serve on House and Governmental

20   Affairs as the vice chair of that committee and that was

21   the committee that vetted all the bills that were filed

22   during redistricting.  Prior to that process, we traveled

23   across the state extensively.  We traveled for months

24   across the state and conducted roadshows and listened to

25   the community, listened to the people of Louisiana, in

1    terms of what they wanted to see in the redistricting

2    process.  So I was very involved in that.  And once we

3    started the special session again, I was in every

4    committee meeting because I was vice chair of the

5    committee.  So every bill that was filed and heard on the

6    House side, I was very involved in that.  So a lot of time

7    was spent there.

8    Q.    And going back to the roadshows that you mentioned,

9    what was your reason for attending those roadshows?

10   A.    So the roadshows are something that are done in every

11   redistricting process.  It was my first time doing it and

12   it was our opportunity -- it was our -- the purpose of the

13   roadshows was to give the public an opportunity to share

14   their thoughts and what they wanted to see in

15   redistricting.  So my job -- I viewed my job as going in

16   and listen, to listen to the people of Louisiana, and what

17   they wanted to see from the redistricting process.

18   Q.    And you also mentioned that you were the vice

19   chair --

20   A.    Yes.

21   Q.    -- of the House and Governmental Affairs Committee.

22   And so, could you describe a little bit what role you

23   played as the vice chair?

24   A.    So I was -- I worked very closely with the chairman.

25   I'm a -- you know, because things are partisan, I guess

1    you could say, in the Legislature, you know, I'm a

2    registered Democrat, so, I guess, you could say I was a

3    ranking member for the Democrats on that committee.  Also

4    a member of the Black Caucus, so I had a leading role in

5    that -- in that effort.

6    Q.    And we're still talking about that early 2022

7    session.  What did you hope that the Legislature would do

8    in creating a congressional map?

9    A.    That we would draw a map that was fair, that we would

10   draw a map that would reflect the State, and that we would

11   draw a map that the people of Louisiana wanted to see.

12   And everything that I gathered from the roadshows was that

13   people wanted to see a map that was compliant -- well, not

14   that they wanted to see a map, but that we needed to draw

15   a map that was compliant with the Voting Rights Act.

16   That's what I wanted us to do.

17   Q.    Do you recall whether there were bills introduced

18   during that first session that included two majority black

19   districts?

20   A.    Yes.

21   Q.    And were any of those proposed plans with two

22   majority black districts passed by your committee?

23   A.    No, they were all voted down.

24   Q.    And was there a different bill from that session that

25   was adopted by the Legislature?

1    A.    Yes.

2    Q.    And are you okay with us calling that bill "HB1"?

3    A.    Sure.  I don't have a problem with it.  I just don't

4    remember the bill number.

5    Q.    And do you recall how many majority black districts

6    HB1 had?

7    A.    Just one.

8    Q.    Do you know whether that bill was adopted over a

9    Governor's veto?

10   A.    I believe -- yes.  Yes.  I believe that that original

11   one that was passed was vetoed by the Governor.

12   Q.    And so the bill was enacted?

13   A.    Yeah, then it was enacted.  Yeah.  Uh-huh.

14   Q.    And the Governor at the time was -- was that

15   Governor Edwards?

16   A.    Yes.  Uh-huh.

17   Q.    Are you familiar with the Robinson litigation?

18   A.    Somewhat, yes.

19   Q.    And so at a very high level, can you describe what

20   happened in that case?

21   A.    That lawsuit was brought after the map we just talked

22   about was enacted as not being in compliance with the

23   Voting Rights Act.  So the judge -- the Court in that

24   litigation ruled that the map was not compliant with the

25   Voting Rights Act and eventually, after a lot of

1    litigation, ordered us back to the Legislature to draw a

2    map that was compliant with the Voting Rights Act.

3    Q.    So going back in time, after the first district court

4    decision, do you recall whether there was a special

5    session that was called to address redistricting around

6    June 2022?

7    A.    Yes.

8    Q.    And did that session adopt a new map?

9    A.    No.

10   Q.    And do you have an understanding of why not?

11   A.    Well, I remember we were there for a limited number

12   of days.  We had a limited number of days in which to do

13   it.  Ultimately no map was adopted from what I recall and

14   I don't know the reason as to why we did not adopt a map,

15   but we didn't.

16   Q.    Were any of the maps proposed during that session

17   maps that contained two majority black districts?

18   A.    Yes.

19   Q.    But none of those maps were adopted?

20   A.    That's correct.  I actually filed one, but none of

21   those maps were adopted.

22   Q.    So the bill that you filed, did that have two

23   majority black districts?

24   A.    Yes, it did.

25   Q.    And did you believe at the time that your bill

1    complied with traditional redistricting principles?

2    A.    Yes.  Based on what I knew of redistricting

3    principles and its compliance with the Voting Rights Act,

4    yes, I do believe that.

5    Q.    And so could you describe a little bit about what you

6    knew about redistricting principles?

7    A.    Yes.  So one of the biggest takeaways that I learned

8    as it relates to the Voting Rights Act was that if we, as

9    a legislature could show or had the opportunity to draw a

10   map where black voters could elect the candidate of their

11   choice, then we had -- then we had an obligation to do

12   that under the Voting Rights Act.  And then there were

13   other principles that were also pretty critical around

14   compactness, contiguity, the number of split parishes,

15   et cetera.  So -- and the main driving force was

16   communities of interest, so those were the factors that we

17   all took into consideration.

18   Q.    So moving forward to 2024, were you a member of the

19   legislature during this most recent 2024 special session

20   on redistricting?

21   A.    Yes, I was.

22   Q.    And were you in the Senate at that point?

23   A.    Yes.

24   Q.    And what, if anything, did you hope that the

25   Legislature would do during that session?

1    A.    My hope was that we would finally do what we was

2    supposed to do from the beginning, which was to adopt a

3    map that was compliant with the Voting Rights Act, to

4    adopt a map that was fair, and to finally put an end to

5    this litigation.

6    Q.    Now, of your colleagues that were in the Senate

7    during the 2024 special session, do you have a general

8    sense of how many had been in the Legislature for the

9    first redistricting session in January 2022?

10   A.    I don't know the number, but I am pretty confident

11   that it was the majority of members.

12   Q.    What about that June 2022 session?

13   A.    I would say the majority of the members who were

14   there during the June session were also there during the

15   original session, but I don't know the number.

16   Q.    Did you attend Governor Landry's address to convene

17   the 2024 session?

18   A.    Yes, I did.

19   Q.    And based on what you heard from the Governor, what

20   did you understand to be his goal for that special

21   session?

22   A.    It was to put an end to the litigation and adopt a

23   map that was compliant with the Judge's order.

24   Q.    And Governor Landry represented -- strike that.

25   Governor Landry was the Attorney General before he was

1    Governor; is that your understanding?

2    A.    Yes.

3    Q.    And do you know if he had any involvement in the

4    Robinson litigation?

5    A.    As Attorney General, my understanding is that he

6    defended the State during that litigation, or represented

7    the State, defended the State.

8    Q.    So what role did you play in the 2024 redistricting

9    session?

10    A.    So my role was a little different in the 2024

11    redistricting session because I was not a member of the

12    redistricting committee, just one of 39 members.  I had an

13    opportunity to vote, like the rest of my colleagues, but I

14    wasn't a member of the committee.

15    Q.    Would you say that you were an active participant in

16    the session?

17    A.    Active to the extent that I did co-author a map and I

18    did present on that map in the Senate Governmental Affairs

19    Committee.  So, yeah, I would say I was probably more

20    active than any other colleagues who didn't file a map,

21    yeah.

22    Q.    So you mentioned that you introduced a bill during

23    the 2024 session.  Is it okay if I refer to that bill as

24    "SB4"?

25    A.    Yes.

1  Q.   Did SB4, your bill, have two majority black

2  districts?

3  A.   Yes, it did.

4  Q.   And why did you support SB4?

5  A.   Because I believed that it was compliant with the

6  Voting Rights Act.  I believed that it met the proper

7  redistricting principles that I discussed earlier and I

8  believed that it would put an end to the litigation that

9  we were ordered there to -- we were ordered by the Court

10 to comply with.

11 Q.   And did you have discussions with other legislators

12 about your map, SB4?

13 A.   Yes.

14 Q.   Do you recall, generally speaking, who you discussed

15 your map with?

16 A.   Senator Ed Price and I, we co-authored that

17 legislation, so we certainly had conversations about it.

18 I had conversations with a few members of the Senate

19 Governmental Affairs Committee and I'm sure I had other

20 conversations with members.  Specifically who, I don't

21 recall, but there were certainly conversations about the

22 map.

23 Q.   And did you have conversations with legislators who

24 supported your bill?

25 A.   Yes.

1    Q.   Did you get an impression, based on those

2    conversations, of why they supported your bill?

3    A.   Because they don't --

4             MR. GREIM:  Objection, Your Honor.  I don't

5    think we have -- I think we got hearsay here.  We haven't

6    laid a foundation that it's being used for anything other

7    than the truth of the matter.

8             JUDGE JOSEPH:  Can you rephrase the question?

9             MS. McTOOTLE:  Sure.

10   Q.   (BY MS. McTOOTLE) You mentioned that you spoke with

11   legislators who supported your bill; is that correct?

12   A.   Yes.

13   Q.   And do you have any belief about why they supported

14   your bill?

15            MR. GREIM:  Your Honor, I think, again, I am

16   going to object.  It's calling for hearsay.

17            JUDGE JOSEPH:  I do want to give some latitude

18   for this witness to discuss what -- his view of what

19   happened in the Senate was during this process, but is

20   there any -- other than the fact that what other

21   legislators told us as true, what's the relevance of that,

22   of those discussions?

23            MS. McTOOTLE:  It goes to just his general state

24   of mind throughout the legislative process.  It goes to

25   his -- it's relevant his background for the process of

1    leading up to.

2                JUDGE JOSEPH:  I'll allow it.  Go ahead,

3    Mr. Senator.

4                THE WITNESS:  What I can say is that there were

5    conversations, both informal and formal.  Because during

6    the presentation of the bill in committee, that was an

7    opportunity for those who supported the map to actually

8    take a vote on it.  So I took their vote yes -- those who

9    voted yes for the map as a sign of support.  Although it

10   didn't get enough votes to get out of committee, those

11   members who voted yes for the bill was an indication to me

12   that they supported the map.

13               MS. McTOOTLE:  Thank you.

14   Q.   (BY MS. McTOOTLE) And so what ultimately happened

15   with SB4?

16   A.   SB4 was voted down in committee.

17   Q.   Was there a bill that ultimately was enacted?

18   A.   Yes.

19   Q.   And what bill was that?

20   A.   That was a bill that was authored by Senator Glen

21   Womack.

22   Q.   And are you okay if I refer to that bill as "SB8"?

23   A.   Yes.

24   Q.   Great.  Were there any differences between your bill

25   and SB8?

A.    There were.

Q.    Can you talk a little bit about those differences?

A.    So with each bill that gets drafted and filed, there is a lot of -- a lot of information, a lot of data, that describes each District 1 through 6.  A lot of information on parishes, precincts, race, gender, party registration, you name it.  I mean, it's a lot of information.

     I recall the numbers being very similar.  The main difference between the two maps, that I recall, was just the geographic design of the map, if you will.  The map that I co-authored with Senator Price, the second majority black district went from Baton Rouge up to northeast Louisiana, the Monroe area.  The map that Senator Womack authored went from Baton Rouge to the northwest area of the State up to the Shreveport area.  And that was the only difference that I could point out or remember in the two maps.

Q.    Did you have any opinion about whether SB8 would pass, whether it would be enacted?

A.    I believed that it would.

Q.    And why was that?

A.    So as a member of the Legislature and sometimes just as a member of the general public, if you are listening to conversations, or if you are just paying attention, it was common knowledge in the Legislature that that was the map

1    that Governor Landry would support.  He clearly expressed

2    that he was going to support a map to resolve the

3    litigation.  And then Senator Womack filed a map and

4    that -- it became clear that that was the map that

5    Governor Landry would support and that the majority --

6    not all, but the majority of the Legislature would also

7    support.

8    Q.    How much influence did you understand the Governor to

9    have with respect to the passage of SB8?

10   A.    Newly-elected Governor, first session, literally his

11   first session after coming off of an election with no

12   runoff, pretty strong politically, in a legislature where

13   two-thirds of vote chambers share his party affiliation, I

14   would say that his support would have a lot of influence

15   on what does and doesn't get passed.

16   Q.    And so you mentioned the difference in configuration

17   between your Bill SB4 and SB8.  Did you have any

18   impression about any rationale behind those different

19   configurations?

20   A.    So during the whole time I spent in redistricting,

21   you don't have to be a redistricting expert to know that

22   any time a new map is drawn, it's kind of like playing

23   musical chairs.  There is going to be someone who is

24   negatively impacted from an incumbency standpoint.  And of

25   the six congressional districts, the question was always

1    if there was going to be a second majority black district

2    drawn, who would be negative -- who would be most

3    negatively impacted by this if we are -- again, we have --

4    a new map has to be drawn.  So I believe that ultimately

5    played into what map the Legislature chose to support.

6    Q.   Did you hear anything based on your experience during

7    the redistricting sessions about Representative Graves'

8    seat in relation to support or not for SB8?

9         MR. GREIM:  Your Honor, I object.  This is

10   calling for hearsay without the proper foundation for how

11   it impacted this witness's actions.

12        JUDGE JOSEPH:  Can you lay a foundation?

13        MS. McTOOTLE:  Yes.  I'll rephrase.

14   Q.   (BY MS. McTOOTLE) So I would like to read you

15   something that you said on -- during one of the

16   legislative debates.  Is that all right?

17   A.   Yes.

18        MR. GREIM:  Your Honor, I object to this.  I

19   think we have to first lay a foundation that the witness

20   can't remember something before we start reading the

21   witness's own words back to them on direct.

22        JUDGE JOSEPH:  Well, I think it's fine to read a

23   public statement that he made in the Legislature and then

24   ask him follow-up questions on that, on what he meant by

25   that.  That's fine.

1              MS. McTOOTLE:  Thank you.

2     Q.   (BY MS. McTOOTLE) You stated --

3              MS. McTOOTLE:  And, Your Honors, I'm referring

4     to RI 15, page 9, which has already been admitted into

5     evidence.

6     Q.   (BY MS. McTOOTLE) You stated, "We've heard a lot from

7     Chairman Womack and my colleague Senator Stine about the

8     importance of protecting certain elected officials."

9     Do you recall making that statement?

10    A.   Yes.

11    Q.   What were you referring to when you said "the

12    importance of protecting certain elected officials"?

13    A.   Right.  So going back to my earlier comment about the

14    redistricting process and as it relates to incumbency,

15    there will be someone who is negatively impacted, so the

16    choice had to be made -- the political decision was made

17    to protect certain members of congress and to not protect

18    one member of congress and it was clear that that member

19    was going to be Congressman Garret Graves.

20    Q.   Thank you.  Did you ultimately vote in favor of SB8?

21    A.   Yes.

22    Q.   And why did you vote in favor of SB8?

23    A.   Because as I mentioned earlier -- when I looked at

24    the numbers, I thought they were pretty similar, and I

25    believe that it actually complied with the Voting Rights

1    Act.  I believe that it met the criteria that we were

2    ordered to meet by the Court.  And I believe that it was a

3    fair map, that the people of Louisiana would be satisfied

4    with, based on all the time I spent on the road and people

5    saying repeatedly that they wanted to see a map that gave

6    voters the opportunity to elect their candidate of choice.

7    And I believe we had a map, although it wasn't the map

8    that I introduced, it still met the principles of what we

9    were there to do.

10   Q.    And so you mentioned earlier that after the

11   January 2022 session and after the June 2022 session, that

12   the Legislature did not adopt any maps with two majority

13   black districts; is that correct?

14   A.    June 2022?

15   Q.    Yeah.

16   A.    Correct.  We did not -- we did not adopt a map during

17   that special session.

18   Q.    So what was your understanding of the shift and --

19   strike that.  What was your understanding of why the

20   Legislature was likely to pass a map with two majority

21   black districts?

22   A.    To me it appeared as though the majority of the

23   Legislature and the newly-elected governor realized we had

24   come to the end of the road, that based on litigation that

25   was going on at the U.S. Supreme Court, litigation at the

1    U.S. Fifth Circuit Court of Appeals, that there was -- we

2    had to draw a map that was compliant with the Voting

3    Rights Act, and that is what basically forced members who

4    previously did not support that and may not still want to

5    see that, but they knew we had to comply with the Voting

6    Rights Act.

7    Q.    So we've talked a little bit about compliance with

8    the Voting Rights Act.  Would you say that was one of your

9    reasons for supporting SB8?

10   A.    Yes.

11   Q.    And did your belief about SB8 and the Voting Rights

12   Act, in part, rely on your prior experience as the vice

13   chair of the House and Governmental Affairs Committee

14   dealing with redistricting issues?

15   A.    Yes.

16   Q.    Was it based on anything else?

17   A.    It was based on -- you know, my understanding of what

18   I was able to learn about the Voting Rights Act and what's

19   required under Section 2, it was based upon just my life

20   experience, you know.  It was based on what I heard

21   traveling the state, where people showed up to those

22   roadshows and consistently said that they wanted to see

23   fair maps drawn.  They wanted to see maps that they felt

24   they could elect somebody that shared their values, that

25   shared their -- that shared their interests on a multitude

1    of issues, and I believe that that's -- that's what we

2    were doing.  So that's what largely influenced my thinking

3    and my decision-making as it pertains to the redistricting

4    process.

5    Q.   At the time that you voted for SB8, did you believe

6    that it would give black voters the opportunity to elect

7    their candidate of choice?

8    A.   Yes.

9    Q.   And as a public leader, what did it mean to you that

10   the Legislature enacted SB8?

11   A.   It was an incredibly proud moment.  Of course, I wish

12   it didn't take as much time as it did.  I wish we didn't

13   have to be forced to do it by the federal government or

14   the federal courts rather.  But it was also a sign, an

15   indication, that we can do the right thing.  And it was

16   always very clear that a map with two majority black

17   districts was the right thing.  It wasn't the only thing,

18   but it was a major component to why we were sent there to

19   redraw a map.  So that voters in Lake Charles or voters in

20   Alexandria or voters in Monroe, Shreveport, wherever they

21   live, feel like there is a map that's fair based upon the

22   diversity and the makeup of this state.  Again, not just

23   racial diversity, but the diversity of interests that we

24   share, and congressional representation is a big part of

25   that.  So I think it was a big deal for our state to make

1    that decision.  I was -- I was proud when Governor Landry

2    came and said that he was going to basically do the right

3    thing and comply with the order of the Court and put this

4    litigation past us.  So as a member of the Legislature, I

5    was very proud that we were able to, in a bipartisan way,

6    vote for the map that I believe is currently law.

7    Q.   Thank you.  I would like to show you an exhibit, what

8    we have marked as Exhibit 276.

9         Adrianna, do you mind pulling that up?

10        You should be able to see it on your screen.  Do you

11   recognize this exhibit?

12   A.   I can tell you what it is, but I don't

13   specifically -- I don't specifically recall reviewing this

14   letter or receiving this letter, but I can -- I can

15   acknowledge it for what it is.

16   Q.   Okay.

17   A.   I do recognize it.

18   Q.   Could we pull up 276?  Exhibit 276.

19        Thank you.  Apologies.  It was 275.

20   A.   Okay.

21   Q.   Do you recognize this letter?

22   A.   It's a letter to the chairman of the Senate

23   Governmental Affairs Committee from many different

24   organizations, a broad coalition of organizations,

25   supporting fair maps.

1    Q.    Do you recognize it?

2    A.    When you say "do I recognize it," I'm not sure I

3    understand the question.

4    Q.    Do you recall ever seeing this?

5    A.    I -- I don't recall seeing -- I wasn't on the

6    Senate Governmental Affairs Committee.  That's who it's

7    addressed to.  I may have seen it at some point, but we

8    get a lot of letters.  I mean, we get a lot of

9    correspondence.  So I may have seen this at some point,

10   but I don't specifically recall seeing this letter.

11   Q.    Thank you.

12   A.    Uh-huh.

13         MS. McTOOTLE:  Nothing further.

14         JUDGE JOSEPH:  Any questions from the State?

15         MR. GORDON:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17   BY MR. GORDON:

18   Q.    Good morning, Senator.

19   A.    Good morning.

20   Q.    My name's Phillip Gordon.  I'm here on behalf of the

21   State of Louisiana.  Just a few things from me.  I think

22   you mentioned this before, but SB8 ended up passing; is

23   that right?

24   A.    Yes.  That's the bill that was Senator Womack's bill,

25   yes.

1    Q.    Yeah, Senator Womack's bill.  Do you happen to

2    remember what the final vote total on that was in the

3    Senate?

4    A.    No, sir.

5    Q.    Do you know if that vote was bipartisan?

6    A.    Yes.

7    Q.    Do you know if Republicans voted for and against it?

8    A.    I believe there were some Republicans who voted

9    against it.  I recall -- I think some of the members of

10   the Shreveport delegation may have voted against it, but

11   it passed overwhelmingly.

12   Q.    Right.  And do you know if any Democrats voted both

13   for and against it?

14   A.    I don't -- I don't know of any Democrats that voted

15   against it, yeah.

16   Q.    So how would you characterize the process of sort of

17   debating bills?  How would you characterize that process?

18   A.    So bills were filed, referred to committee, they were

19   referred to -- if they were on the Senate side, the

20   Senate and Governmental Affairs Committee.  If it was on

21   the House side, it was the House and Governmental Affairs

22   Committee.  The bills were given hearings, voted up or

23   down.  If they advanced out of committee, they went to the

24   full floor for debate.

25   Q.    As part of that process, do you have many discussions

1    with both your Democratic and Republican colleagues?

2    A.    Yeah.  Yes.

3    Q.    Do you discuss any political considerations when you

4    are talking about a bill?

5    A.    Often.

6    Q.    Do you have those consideration -- did you have those

7    considerations with regard to SB8, the enacted plan?

8    A.    When you say "considerations," I want to make sure

9    I'm clear.  You know, consider -- it's a factor.  You

10   know, that it's a component.  But, you know, what it means

11   to me may mean something totally different to a colleague.

12   So, yes, there were absolutely political factors involved

13   in this discussion.

14   Q.    Right.  And was one of those political factors,

15   for example, protecting Representative Letlow?

16   A.    Yes.

17   Q.    Was one of those factors ensuring that two members of

18   the congressional delegation were formed from North

19   Louisiana?

20   A.    Yes, that was -- I believe I recall having those

21   conversations as well, yes.

22   Q.    As part of the process of reviewing legislation and

23   specifically in talking about SB8, the enacted plan, would

24   you receive public comments?

25   A.    Yes.

1   Q.   For instance, would you receive comments like that

2   you just saw on the screen from the Robinson intervenors

3   from various groups?

4   A.   Yes.

5   Q.   And what are the types of things those comments

6   would -- what would you understand those comments to be

7   for?

8   A.   Yeah.

9            MR. GREIM:  Objection, Your Honor.  This is a

10   rather vague question.  I mean, we may be calling for

11   hearsay.

12            JUDGE JOSEPH:  He can answer.  What

13   organizations in the Senator's letter is advocating her

14   position.

15            THE WITNESS:  Yeah, on any issue, whether it's

16   redistricting or just some other issue that's not related

17   to redistricting, but specifically, as it relates to

18   redistricting, lots of public comments, lots of public

19   input.  I didn't get to go through the specifics of the

20   letter, the exhibit that was shown, but I am quite certain

21   that that coalition of groups that wrote that letter were

22   advocating for a fair map.  They were advocating for the

23   community.  They were advocating for the State of

24   Louisiana to adopt a map that represented the State and we

25   heard that testimony in committee.  We heard -- I wasn't

1    on the -- I wasn't on the committee as a member in the

2    Senate, but I tried to watch the hearings as much as

3    possible.  I did -- I did bring a bill, so I spent some

4    time in the committee.  But most of the public input that

5    I can recall, most was all the support of this map.  If

6    there was any opposition, it was -- it just seemed to be

7    real disconnected.  I just recall it being overwhelming

8    support.

9    Q.   (BY MR. GORDON) And would public support for a bill

10   be part of your consideration to whether to vote for or

11   against a bill?

12   A.   Absolutely.

13   Q.   And would that also inform your political calculus as

14   to vote for or against a bill?

15   A.   Yes.

16   Q.   Because, I mean, these would be your constituents --

17   A.   Yes.

18   Q.   -- essentially?  You made several references to

19   litigation sort of driving the process.  Do I remember

20   that correctly?

21   A.   Well, litigation was a big piece of all this.  I

22   believe litigation is what led us back to all the special

23   sessions that we ended up having after the first session.

24   Q.   And are you referring to the Robinson litigation when

25   you make those comments?

1    A.    Yes.

2    Q.    And what was your understanding of the Robinson

3    litigation?

4    A.    Plaintiffs filed suit contesting the original map

5    that was adopted, that it was not compliant with the

6    Voting Rights Act.  And then we were ordered by the Court

7    to go back and draw a fair map that was compliant with the

8    Voting Rights Act, a map that had two majority black

9    districts and a map that gave black voters in the state of

10   Louisiana the opportunity to elect their candidate of

11   choice.

12   Q.    And are you aware of the process that courts use when

13   they're evaluating these maps?

14   A.    No, not -- not -- Court's process?  I can't -- I'm

15   not sure I can speak to that.

16   Q.    Fair enough.  And then sort of just the final --

17   your final button on this, you voted for SB8; is that

18   right?

19   A.    Yes.

20   Q.    And do you support SB8?

21   A.    Yes.

22   Q.    And you would like to see the current map remain the

23   current map?

24   A.    Yes.

25   Q.    Thank you.

```
 1              JUDGE JOSEPH:  Cross-examination.
 2                        CROSS-EXAMINATION
 3    BY MR. GREIM:
 4    Q.   Good morning --
 5    A.   Good morning.
 6    Q.   -- Senator.  My name is Eddie Greim and I represent
 7    the Plaintiffs in this case.  Nice to meet you.
 8    A.   Good morning.  Nice to meet you.
 9    Q.   You testified a few moments ago that Lake Charles and
10    Monroe would now be represented with the new map.  Do you
11    recall that testimony?
12    A.   Yes.  And I was speaking just generally --
13              MS. McTOOTLE:  Objection.
14    A.   -- but yes, I was just kind of speaking in
15    generalities about it.
16              JUDGE JOSEPH:  What's the objection?
17              MS. McTOOTLE:  Objection.  It mischaracterizes
18    his testimony.
19              JUDGE JOSEPH:  I think he said that.  He is
20    explaining what he said.  Overruled.
21              THE WITNESS:  Yeah.  Can I explain what I meant?
22    Q.   (BY MR. GREIM) Sure.
23    A.   I remember being in Lake Charles on the Roadshow and
24    I remember a gentleman -- they had been hit really, really
25    bad by a hurricane several years ago.  And I remember a
```

1    man who came and spoke in Lake Charles.  And he said that

2    as long as he's lived there, he has felt like the

3    congressperson never even knew he existed.  He has felt

4    like he didn't matter.  And he was advocating for the

5    opportunity just to have someone to share his interests,

6    who might vote yes on an infrastructure bill, you know.

7    So, like, that's what was in my mind as I was talking

8    about the passage of a map that gave people like him a

9    sense of hope, right, even if, you know, the congressman

10   in his district didn't change.  It was -- it was stories

11   like that, that I was trying to answer the earlier

12   question about how I felt once we passed SB8.

13   Q.   I see.

14   A.   Yes, sir.

15   Q.   So you know that Lake Charles, obviously, is not in

16   District 6?

17   A.   Clearly, yes, sir.

18   Q.   Nor is Monroe, correct?

19   A.   Yes, sir.

20   Q.   Right?

21   A.   Yes, sir.

22   Q.   I'm learning here.

23   A.   Yes.  Yes.  And that's what I meant when I talked

24   about -- all the people across the state of Louisiana,

25   yes.

1    Q.    Now, on the Senate floor, you gave a -- you made some

2    remarks on January the 17th.  Do you remember that?

3    A.    I've given a lot of remarks.  I don't recall the

4    dates.

5    Q.    Okay.  Well, you were speaking about redistricting in

6    the special session.

7    A.    Okay.

8    Q.    And do you recall saying:  This is about the people

9    of this state and one-third of that state, 33 percent, to

10   be exact, being underrepresented, so I think it's

11   important that we keep the focus on why we are here today.

12   You said that, didn't you?

13   A.    I would -- I probably said that.  I don't recall

14   everything I said, but I don't disagree.

15   Q.    And you were talking -- just a few more questions

16   here.  You were talking about the gap -- the differences

17   between your bill, which was Senate Bill 4, and Senate

18   Bill 8, and you supported Senate Bill 4 over 8, but you

19   went with 8.  I think that was your testimony.  Right?

20   A.    I supported both maps.  So I didn't support 4 over 8.

21   I filed 4 and I also voted for 8.  I thought both maps

22   would -- would work.

23   Q.    And did you prefer Senate Bill 4 to Senate Bill 8?

24   A.    It's just the map that I filed.  You know, it --

25   when I had conversations with people who I would consider

1    experts on this, I got a -- I gained a level of comfort

2    with SB8 that -- that it was more for me about complying

3    with the order of the Court and adopting a map that would

4    be compliant.

5    Q.   And Senate Bill 8 had a higher percentage of black

6    voting age population than Senate Bill 4 did, didn't it?

7    A.   I believe it did have a slight higher percentage,

8    yeah.  I don't disagree with that.

9    Q.   No more questions.

10   A.   Yes, sir.

11           JUDGE JOSEPH:  Any redirect?

12           MS. McTOOTLE:  Nothing, Your Honor.

13           JUDGE JOSEPH:  Thank you for your testimony,

14   Senator.  You may be released.

15           THE WITNESS:  Thank you.

16           JUDGE JOSEPH:  Secretary of State, no questions?

17           MR. STRACH:  None from us, Your Honor.

18           JUDGE JOSEPH:  Thank you.  I'll just rely on you

19   to tell me if you do, okay?

20           MR. STRACH:  I will, Your Honor.

21           MS. WENGER:  Good morning, Your Honors.

22           JUDGE JOSEPH:  Good morning.

23           MS. WENGER:  Victoria Wenger with the Legal

24   Defense Fund on behalf of the Robinson intervenors.  We

25   would like to call Davante Lewis.

1                    (Oath administered to the witness.)

2                    <u>COMMISSIONER DAVANTE LEWIS</u>,

3       having been first duly sworn to testify the truth, the

4       whole truth, and nothing but the truth, testified as

5       follows:

6                        <u>DIRECT EXAMINATION</u>

7       BY MS. WENGER:

8       Q.    Good morning, Commissioner Lewis.  Can you please

9       state and spell your name for the record?

10      A.    Yes.  It's Davante Lewis.  D-A-V-A-N-T-E, L-E-W-I-S.

11      Q.    How are you involved in this case?

12      A.    I am a plaintiff in *Robinson v. Landry* and an

13      intervenor in this case.

14      Q.    What race do you identify as?

15      A.    Black.

16      Q.    Where did you grow up?

17      A.    Lake Charles, Louisiana.

18      Q.    And where do you live now?

19      A.    Baton Rouge, Louisiana.

20      Q.    Are you registered to vote there?

21      A.    I am.

22      Q.    What do you do for a living?

23      A.    I'm elected to the Louisiana Public Service

24      Commission, representing the Third District of Louisiana,

25      and I also serve as the chief strategy officer to Invest

1    in Louisiana, formerly known as the Louisiana Budget

2    Project, a nonprofit think tank.

3    Q.    When were you elected to the Public Service

4    Commission?

5    A.    In December of 2022.

6    Q.    What areas does your district encompass?

7    A.    My district includes ten parishes in the state of

8    Louisiana.  Parts of West Baton Rouge Parish, Iberville

9    Parish, East Baton Rouge Parish, Ascension Parish, all of

10   Assumption -- excuse me -- parts of Assumption Parish, all

11   of St. James, all of St. John Parish, parts of Jefferson

12   Parish, and parts of Orleans Parish.

13   Q.    Within your profession or other roles, what is your

14   lens into Louisiana's political process?

15   A.    I got involved in Louisiana politics when I was

16   around 15.  I was one of the first members of the

17   Louisiana Legislative Youth Advisory Council that was

18   created under Governor Blanco to advise the Legislature

19   from a youth's perspective and I represented the Third

20   Congressional District on that council.  I have also

21   worked multiple political campaigns.  I have worked for

22   members of the Legislature.  I served on the University of

23   Louisiana Board of Supervisors which governs nine public

24   institutions in the state of Louisiana.  I chaired the

25   Louisiana Council of Student Body Presidents while I was

1  in college.  And my work at the Louisiana Budget Project

2  as a registered lobbyist.  So I've kind of been a

3  candidate, been a staffer, been an adviser, kind of been

4  all around the ecosystem.

5  Q.   About how many years did you serve as a registered

6  lobbyist?

7  A.   I want to say about six.

8  Q.   How much time do you spend at the State Capitol while

9  the Legislature is in session?

10  A.   Before this session, I started on March 11th, I would

11  be there just about every day.

12  Q.   Why has that changed since?

13  A.   My role at Invest in Louisiana has changed from being

14  the Director of Public Affairs and Outreach where my job

15  was to be not only our Governmental Affairs Director and

16  Lobbyist to the Chief Strategy Officer, and then my role

17  as the Commissioner has deviated me from being there

18  every single day and being in touch with the Legislature

19  like that.

20  Q.   Are you familiar with members of the current

21  Legislature?

22  A.   Yes.

23  Q.   What's the nature of your interactions with those

24  lawmakers?

25  A.   Most of them I have known professionally or

1    personally for -- for some time.  I mean, the House, some

2    of the newer members, I have known from their previous

3    political careers or political work.  I have been -- in

4    the Senate, the vast majority of the Senate, except for

5    two members, I have worked with as a lobbyist.

6    Q.   Except for two members why?  Were they current

7    Legislature?

8    A.   Yeah.  Those two members were not in the Legislature

9    during my tenure of lobbying or advocating.  So they were

10   newly elected in January -- or sworn in in January, I

11   should say, and I had not met either one of them prior,

12   but the remaining of the State Senate I was very familiar

13   of.

14   Q.   Were they in office during the full course of the

15   post 2020 redistricting process?

16   A.   No.

17   Q.   I'm talking about the rest of the Legislature part

18   and not those two --

19   A.   Oh, yes.

20   Q.   -- lobbyists.  Specifically other than those two

21   senators, was the rest of the Senate serving for the full

22   duration of the redistricting process following the 2020

23   census?

24   A.   Yes.

25   Q.   Are you familiar with members of the Executive Branch

1    here in Louisiana?

2    A.    I am.

3    Q.    And what's the nature of your interactions with them?

4    A.    I have known Governor Landry since he was a member of

5    Congress and we had some interactions while I was student

6    body president at McNeese State University.  We hosted a

7    congressional debate after the redistricting of 2012 and

8    that's how I personally got to know him, and so we speak

9    to each other when we see each other.  I have also worked

10   with Secretary of State Landry when she was a member of

11   the Education Committee when she served in the House of

12   Representatives.  I know a good chunk of the Governor's

13   policy staff and political staff that work now for him

14   from their services and other advocacy organizations and

15   other state agencies, and so just throughout the years of

16   various roles that we've all had interacting with each

17   other.

18   Q.    What's been the nature of your interactions with them

19   since the start of this year?

20   A.    I've had frequent conversations with most of them

21   when I see them or have requested meetings with them.

22   Q.    Did any conversations touch on the topic of

23   redistricting?

24   A.    It did.

25   Q.    How about members of the current congressional

1    delegation?  Any familiarity with them?

2    A.    I know just about all of them.

3    Q.    Can you walk me through each?  Let's start with

4    District 1.

5    A.    Yes.  I met Congressman Scalise when he was in the

6    State Senate and I was advocating in the early 2000s.  I

7    have known Senator -- excuse me -- Congressman Carter

8    since he was in the State Senate.  We have worked on

9    bills together.  We have had social gatherings together

10   many occasions.  Congressman Higgins represents most of my

11   family since I'm from Calcasieu Parish in Southwest

12   Louisiana and so we've had a few interactions in meetings

13   with his office and with him.  I met Congressman Johnson

14   or Speaker Johnson, I should say, when he was elected to

15   the State House of Representatives.  I have known

16   Congresswoman Letlow from her time working at the

17   University of Louisiana Monroe while I worked at the --

18   served on the board at the University of Louisiana system,

19   which governs and oversees the University of Louisiana

20   Monroe and I was friends with her late husband,

21   Congressman Luke Letlow.  And then Congressman Graves, I

22   have known since he was at CPRA and he is a neighbor, so I

23   see him every once in a while walking the dogs in the

24   morning.

25   Q.    Have you followed the redistricting process since the

1    2020 census at all?

2    A.    I have.

3    Q.    Have you been involved in any redistricting processes

4    prior?

5    A.    Yes.  I advocated in the 2010 redistricting process.

6    Q.    And can you expand upon the nature of your

7    involvement in that redistricting process?

8    A.    Yes.  I was an advocate at the time, just advocating

9    and researching.  I was still in undergrad, and so I wrote

10   some papers specifically on redistricting and that process

11   that was going on at the Louisiana Legislature.

12   Q.    For this more recent process, were you at the

13   Capitol for any of the sessions regarding redistricting

14   following the 2020 census?

15   A.    I was at all of them.

16   Q.    In the First Extraordinary Session of 2022, do you

17   recall any maps filed that created an additional

18   majority black district?

19   A.    I do.

20   Q.    Do you have a ballpark estimate of how many?

21   A.    There were many.  I would say at least six plus.

22   Q.    And do you recall any amendments to the bill that was

23   ultimately enacted that would have also created a second

24   majority black district?

25   A.    I do.

1    Q.    Did you form any impressions of those maps?

2    A.    Yes.

3    Q.    What rubric did you use to form your impressions?

4    A.    I looked at a variety of things.  I tried to ground

5    myself in, as a nerd, in the rules of the Legislature and

6    the Voting Rights Act, looking at what redistricting

7    should be, so I studied a lot using Dave's Redistricting

8    and following the process in other states and how they did

9    so.  But I particularly was interested in compactness,

10   communities of interest, ensuring that we weren't packing

11   and cracking certain districts to achieve certain goals.

12   And so it was kind of a variety of places and information

13   that I had gathered over the years that I kind of brought

14   into my evaluation.

15   Q.    Do you believe any of those maps introduced in that

16   2020 session complied with the Voting Rights Act?

17            MR. TYLER:  Judge, we're going to object to this

18   line of questioning.  This is expert testimony that we

19   have heard a lot of through this case and the witness has

20   not been established as an expert.

21            JUDGE STEWART:  He hadn't been asked an opinion

22   yet.

23            JUDGE JOSEPH:  I think he is being asked a legal

24   opinion, isn't he?

25            MR. TYLER:  Asking for his legal opinion, yes.

1          MS. WENGER:  We can move along.

2          JUDGE STEWART:  Rephrase your question.

3   Q.    (BY MS. WENGER) What informed your perceptions of the

4   viability of those maps to not only pass but be sustained?

5          MR. TYLER:  Objection.  This is a leading

6   question and same objection as the last.

7          JUDGE JOSEPH:  I think that's a proper question,

8   what was the basis of your opinion regarding the

9   congressional maps.

10         THE WITNESS:  Yeah.  The basis of my opinion was

11  using the research that I had conducted about compactness,

12  looking at redistricting criteria from the Supreme Court,

13  and so drowning myself in the criteria that I have learned

14  about, and then using analysis that I had seen to see if

15  it would apply and comply with those principles that I had

16  studied.

17         MR. TYLER:  Judge, objection.  This is just not

18  relevant unless it is expert testimony which the witness

19  is not qualified to give.

20         JUDGE JOSEPH:  What is the relevance of his

21  opinion about the maps?

22         MS. WENGER:  We are laying a foundation for his

23  impression of the process in 2024; his activities as a

24  plaintiff in the litigation that transpired leading to the

25  2024 special session; his basis of knowledge for what he

1  thought would make bills viable or not, what informed,

2  which bill he may or may not have supported along the

3  process, questions that my opposing counsel touched upon

4  in his deposition.  So, truly, we're telling the full

5  story of what Commissioner Lewis's understanding of

6  redistricting is as an individual, yeah, certainly as one

7  that that has a lot of experience, but we are not

8  tendering him as an expert.  We are bringing him here as a

9  party in this litigation.

10            JUDGE JOSEPH:  Okay.  I think the foundation has

11  been established about that he has looked at some of these

12  issues and he had some knowledge as an observer of the

13  legislative process about the benchmarks.  So you can move

14  on.

15  Q.   (BY MS. WENGER) What happened after that 2022

16  redistricting session?

17  A.   A map was signed -- a map was passed and sent to the

18  Governor, I should say, and the Governor vetoed the map

19  that then was overwritten by the Legislature.

20  Q.   How many majority black districts were in that map?

21  A.   One.

22  Q.   Where were you the day that *Merrill v. Milligan* came

23  down from the Supreme Court?

24  A.   I was at the State Capitol.

25  Q.   And why was that?

1    A.    It was the concluding day or better known as *sine*

2    *die*, so we still had some bills to be passed.  And as we

3    were waiting for some of the final bills -- I can't

4    remember if it was the budget or capital outlay bill -- we

5    had received notice of the Supreme Court's ruling.

6    Q.    And what was your impression of what that ruling

7    meant for the path forward here in Louisiana?

8              MR. TYLER:  Objection.  Calls for a legal

9    conclusion.

10              JUDGE JOSEPH:  Sustained.

11   Q.    (BY MS. WENGER) What were your sentiments that day?

12   A.    I was happy.  I mean, I had seen, as an observer and

13   I like to say a lay lawyer since I'm not a lawyer, but I

14   like to read case law and follow the Supreme Court, it was

15   a very joyous and happy moment to see that the Court had

16   did something that I thought it should have done and I

17   agreed with their ruling.

18   Q.    Were you the only one celebrating that day?

19   A.    Oh, no.

20   Q.    Who else was?

21   A.    I mean, multiple people.  I mean, legislators,

22   advocates.  As I said, we were all at the Capitol for the

23   conclusion of the day, and there is typically a

24   legislative *sine die* party where both parties and all

25   advocates and lobbyists come together.  It was a day of a

1    lot of social interaction and so a lot of happy faces

2    around the Capitol.

3    Q.    Any not-so-happy faces?

4    A.    I don't think so.  I think there was some confused

5    faces, but I wouldn't say some people were -- were

6    frowning.

7    Q.    All right.  Let's talk about the January 2024

8    First Extraordinary Session.  Did you engage in any

9    lobbying during that session?

10   A.    Yes.

11   Q.    And what was the purpose of that session?

12   A.    That was a redistricting session following the Court.

13   Q.    Was there any bill that you supported most during

14   that session?

15   A.    Yes.  Senate Bill 4.

16   Q.    Why was that?

17   A.    Senate Bill 4 was a map that had been in existence

18   since the start or a version of a map that had been in

19   existence since redistricting.  And looking at it with all

20   the criteria that I have studied and talking with fellow

21   Plaintiffs, it was the map that I thought was the most

22   viable path to accomplish the goal that we had set out.

23   Q.    And what about SB4, if anything else, made you feel

24   like it was the most viable map?

25              MR. TYLER:  Objection.  Calls for a legal

1    conclusion.

2              JUDGE JOSEPH:  Can you rephrase the question?

3              MS. WENGER:  I don't mean "viable" legally.  I

4    mean viable in the political process at the Legislature.

5              JUDGE JOSEPH:  Overruled.

6              THE WITNESS:  Well, one, it did the least

7    disruption to the existing congressional district.  So

8    when you looked at -- I mean, just the eyeball test, it

9    did not fundamentally alter the congressional map in such

10   a way.  It also provided, I thought, keeping communities

11   of interest, that had already been together, a part of it,

12   and it just followed all of the principles that we had

13   identified and outlined that we wanted to see in

14   redistricting.

15   Q.   (BY MS. WENGER) Did you sign on to any written

16   testimony in support of SB4?

17   A.   I did.

18   Q.   I would like to pull up Robinson Exhibit 275.

19   Commissioner Lewis, do you recognize this letter?

20   A.   I do.

21   Q.   What is it?

22   A.   It is a letter that was sent to the committee of

23   Senate Governmental Affairs right at the beginning of the

24   special session about our support for Senate Bill 4 or any

25   map that created two minority-majority districts.

1    Q.    And when you say "our," who do you mean?

2    A.    The Plaintiffs and advocacy organizations.

3    Q.    Including?

4    A.    Including myself and the place that I work, the

5    Louisiana Budget Project.

6    Q.    Is this a true and authentic rendering of the letter

7    that you recall submitting on behalf of the Budget Project

8    and your interests?

9    A.    Yes.

10   Q.    And is it your understanding that this letter became

11   a part of the public legislative record in support of

12   SB4?

13   A.    Yes.

14   Q.    And where are those documents made public?

15   A.    They are made public with the Legislature archiver,

16   I believe.  They stay in the Committee's -- the

17   Committee's record.

18   Q.    Are they posted anywhere else online where the public

19   can view them?

20   A.    I believe so, but I'm not a hundred percent sure if

21   they still post written testimony as they were doing

22   during the COVID years.

23   Q.    Do you recollect any acknowledgment of written

24   testimony from members of the Legislature during this

25   redistricting process?

1    A.    I do.

2    Q.    Did the letter here that you submitted play any role

3    in your perception of whether your views of the VRA

4    compliance were being heard?

5    A.    It did.

6    Q.    Do you recall if this letter -- or we'll get to

7    others -- recall if they were ever cited anywhere?

8    A.    I believe so.  I want to say when we -- or when I

9    testified in Senate Governmental Affairs, it was mentioned

10   when I was called to the table by the chairman.

11   Q.    Who is the chairman?

12   A.    Cleo Fields.

13   Q.    Were they -- was this letter cited anywhere else

14   publically?

15   A.    I can't fully recall.  I believe there may have been

16   some testimony during the debate on the Senate and House

17   floor, but I would have to go back and watch the

18   livestreams.

19   Q.    Any citation to this or other written testimony

20   beyond the walls of the Legislature?

21   A.    Yeah.  I know that it was covered in some of the news

22   articles that were published and it was picked up by a few

23   of the journalists or mentioned, but that's probably what

24   I can remember.

25           MS. WENGER:  At this time I would like to move

1    for the admission of Robinson Exhibit 275.

2            JUDGE JOSEPH:  State?

3            MR. BOWEN:  No objection.

4            MR. TYLER:  Plaintiffs object.  There is no

5    foundation for the relevance of this letter.  No testimony

6    that any Legislature relied on this letter, even Cleo

7    Fields.  We have no testimony that he actually relied on

8    this letter or anything like it.

9            JUDGE JOSEPH:  Let me confer with my colleagues.

10           Exhibit 275 we will admit and give it the weight we

11   think it deserves.

12           MS. WENGER:  Thank you, Your Honors.

13   Q.   (BY MS. WENGER) Next I would like to pull up

14   Robinson Exhibit 276.  Commissioner Lewis, do you

15   recognize this letter?

16   A.   Yes.

17   Q.   And what is it?

18   A.   It is a letter to the Senate Governmental Affairs

19   Committee and the chairman from the plaintiffs in

20   *Robinson v. Landry*.

21   Q.   And you are one of those plaintiffs?

22   A.   Yes.

23   Q.   And did you sign off on this letter being cited?

24   A.   I did.

25   Q.   Is this a true and authentic rendering of the letter?

1    A.   Yes.

2    Q.   When was it submitted to the Legislature?

3    A.   January 15th at the start of that legislative

4    session.

5    Q.   And is it your understanding that this letter became

6    part of the public legislative record in support of SB4 in

7    the redistricting process?

8    A.   It is.

9    Q.   Do you recollect any acknowledgment of this written

10   testimony from members of the Legislature?

11   A.   I do.

12   Q.   And did that acknowledgment play any role in your

13   perception of whether your views on maps were being heard?

14   A.   Yes.  It's the same as the advocacy letter.

15   Q.   And do you recall if this was ever cited in

16   conversations with legislatures or other venues?

17           MR. JACKSON:  Objection.  Calls for hearsay.

18           JUDGE JOSEPH:  I don't think it is hearsay.

19   It's did this letter come up in conversations with

20   legislatives.  Overruled.

21   Q.   (BY MS. WENGER) Did those conversations inform your

22   views of the lawmakers' state of mind regarding the views

23   in the letter?

24   A.   Yes.

25   Q.   I would like to turn to the last page of this letter,

1   page 4.  In the last paragraph, if we can zoom in, it

2   states, "The federal courts have been clear that the

3   Robinson Plaintiffs' Section 2 claims are well supported,

4   and resolution is necessary this year.  Passing SB4 or

5   another VRA-compliant map would ensure that nearly two

6   years of costly, taxpayer-financed litigation can finally

7   conclude."  Do you recall that representation,

8   Commissioner Lewis?

9   A.   I do.

10           MS. WENGER:  At this time I would like to move

11   for the admission of Robinson Exhibit 276.

12           MR. TYLER:  Same objection.

13           MR. BOWEN:  No objection.

14           JUDGE JOSEPH:  Let me confer with my colleagues

15   on that as well.  Hold on.

16       The one difference I think in this letter and the

17   other one is this one is actually signed by counsel for

18   the Robinson intervenors, and it is advocating their

19   position in the Robinson litigation.  However, we will

20   admit it into evidence and give it the weight it deserves.

21           MS. WENGER:  Thank you, Your Honors.

22   Q.   (BY MS. WENGER) Commissioner Lewis, what was your

23   recollection of the reactions you received from

24   legislatures to that letter from plaintiffs like yourself?

25   A.   That they were interested to hear where the

1    plaintiffs stood as most took the impression that we were

2    only in the special session because of litigation, and so

3    they were really interested to see what our thoughts would

4    be on potentially ending that litigation.

5    Q.   Did that inform your perceptions of how they felt

6    about Senate Bill 4 or, quote, "another VRA-compliant

7    map"?

8    A.   Yes.

9         MS. WENGER:  We can take that one down.

10   Q.   (BY MS. WENGER) Who sponsored Senate Bill 4?

11   A.   It was sponsored by Senator Ed Price and Senator

12   Royce Duplessis.

13   Q.   Did any House member sponsor a similar version of

14   that same map?

15   A.   Yes.  Representative Denise Marcelle had a map on the

16   House side.

17   Q.   How many majority black districts were in the map?

18   A.   Two.

19   Q.   Who currently represents those districts?

20   A.   It would be Congressman Carter and Congresswoman

21   Letlow.

22   Q.   Did you offer any oral testimony in support of SB4?

23   A.   I did.

24   Q.   What or who prompted you to testify when you did?

25   A.   After the bill was presented by the authors,

1    Senator Fields, as the chairman, recognized the plaintiffs

2    who were present.  There was about four of us.  And he

3    called us to the witness table to make statements and

4    there gave testimony in support of Senate Bill 4.

5    Q.   Do you remember who those other plaintiffs were?

6    A.   I believe it was Dr. Nairne and Mr. Robinson and I

7    believe Mr. Cage.

8    Q.   When did that meeting take place?  Do you recall?

9    A.   That took place on Tuesday.  So, I guess, that would

10   have been January 16th.  I vividly remember it, because it

11   was an ice storm and all the state government and state

12   buildings had closed for the day.  And I was, as a

13   utility commissioner, really worried about power outages,

14   and so I kind of very much remember that day.

15   Q.   Do you recall if Ashley Shelton was there with you?

16   A.   She was.

17   Q.   Do you recall if she testified?

18   A.   I believe she did, yes.

19   Q.   Can you describe the meeting?  For example, who else

20   was in the room?

21   A.   Yeah.  I would say for a day where all State

22   buildings were closed, it was a pretty packed committee

23   hearing.  About 50 to 60 people.  There were advocates

24   from across the State that had been present that I knew

25   of.  Quite a lot of journalists were in the room.  A few

1    of the lobbyists.  So for a cold and icy Tuesday morning,

2    it was a very packed room.

3    Q.    And any familiar faces on the committee?

4    A.    Yes, I knew the entire committee.

5    Q.    And why was that?

6    A.    I had worked with them, because they all either

7    served in the Legislature or previously served in the

8    Legislature.

9    Q.    Any former House members?

10   A.    Yes.  Senator Miguez, Senator Jenkins were two House

11   members who are now on Senate Governmental Affairs that I

12   had worked with for over eight years on the House side.

13   Q.    Do you recall if either of them had also served on

14   House and Governmental Affairs?

15   A.    Senator Jenkins did.

16   Q.    Had you testified in front of members of the Senate

17   and Governmental Affairs Committee meeting?  And I mean

18   those individual members in that room that day before?

19   A.    Yes.

20   Q.    During the prior redistricting processes?

21   A.    Yes.

22   Q.    And had you been present when they received any

23   briefing on redistricting principles in the past?

24   A.    Yes.

25   Q.    How about the Voting Rights Act?

1   A.    Yes.

2   Q.    Who did they receive that briefing from?

3   A.    Typically it was from Trish Lowrey, who is one of the

4   staff attorneys on House Governmental Affairs, and then

5   Dr. Bill Blair, who is the Senate demographer.

6   Q.    About how much experience do you understand

7   Ms. Lowrey to have?

8   A.    Years.  She had been there when I started as a young

9   child, so, I mean, I would say at least 15 years plus.

10  Q.    Did that include any prior redistricting processes?

11  A.    Yes.

12  Q.    Did SB4 make it out of committee that day?

13  A.    No.

14  Q.    How did the vote come down?

15  A.    It came down on party lines.  So all Democrats voted

16  for it.  All Republicans voted against it.

17  Q.    Did any congressional redistricting bills get out of

18  committee that day?

19  A.    Yes.  Senate Bill 8.

20  Q.    All right.  Let's shift and talk about Senate Bill 8.

21  When did you first see Senate Bill 8?

22  A.    Senate Bill 8 was released publicly after the

23  Governor's State of the State Address on January 15th.

24  Typically, we see bills prefiled before the gaveling in of

25  the session, but this was one of the rare occasions where

1   the bill dropped after the session had started.

2   Q.   Let's pull up that original version of the bill,

3   Joint Exhibit 11.  Can we go to page 16.

4        Is this your recollection of the map as filed?

5   A.   Yes.

6   Q.   From your understanding, how many majority black

7   districts were in SB8?

8   A.   Two.

9   Q.   And do you recall any amendments being adopted on the

10  map in Senate and Governmental Affairs that day?

11  A.   I do.

12  Q.   And what do you recall of those amendments?

13  A.   It was an amendment by Senator Heather Cloud.  She

14  represents a part of central Louisiana, and she had some

15  concerns, I want to say, about Avoyelles Parish that she

16  represents in the State Senate and their continuous

17  representation in Congresswoman Letlow's district, and so

18  she was offering an amendment to fix those concerns from

19  her constituents.

20            JUDGE JOSEPH:  You had --

21            MR. TYLER:  Objection.  Hearsay.

22            JUDGE JOSEPH:  -- a hearsay objection?  I don't

23  think it's being offered for the truth of those words as

24  much as that was why she was offering the amendment.

25  Correct?

```
 1                THE WITNESS:  Yes, sir.

 2                JUDGE JOSEPH:  All right.  Overruled.

 3   Q.   (BY MS. WENGER) And would her statements end up in

 4   the official video recorded of that meeting?

 5   A.   Yes.

 6   Q.   And any transcription of it?

 7   A.   Yes.

 8   Q.   Let's pull up Robinson Exhibit 42.  This I believe

 9   was admitted yesterday.  Do you understand this to be the

10   amendment that Senator Cloud supported in committee?

11   A.   Yes.

12   Q.   What was the impact of this amendment?

13   A.   As I stated, the impact was to shift some voters

14   outside, out of Avoyelles Parish, from District 6 into

15   District 5.

16   Q.   Did it increase any parish splits?

17   A.   I believe it did one.

18   Q.   What did you understand as the driving function of

19   that split?

20   A.   It was to have her constituents be represented by

21   Congresswoman Letlow.

22   Q.   Why did you understand Congressman Letlow to be

23   important to Senator Cloud?

24                MR. TYLER:  Objection.  Calls for speculation

25   and hearsay.
```

1              JUDGE JOSEPH:  Sustained.

2              MS. WENGER:  We can move along.

3    Q.   (BY MS. WENGER) Was this amendment adopted in

4    committee?

5    A.   It was.

6    Q.   And was it reflected in the engrossed version of the

7    map that crossed over to the House?

8    A.   It was.

9    Q.   Which congress members currently represent the

10   majority black districts contained in any of the versions

11   of SB8?

12   A.   It would have been Congressman Carter and Congressman

13   Graves.

14   Q.   Do you recollect any other bills that had previously

15   been introduced during the earlier redistricting processes

16   or this one that created a new majority black district in

17   District 6 where Congressman Graves serves?

18   A.   I think only one.

19   Q.   Did the configuration of Senate Bill 8 surprise you

20   at all?

21   A.   I had a mixed view of it.  I was interested to see

22   what the Governor was proposing once he said he had a map

23   and that Senator Womack would carry it, but once I started

24   to really drill into the bill and look at it, as us

25   legislative nerds do when bills drop, it did not surprise

1    me when I especially looked at East Baton Rouge Parish and

2    what had been done there.

3    Q.    What had been done there?

4    A.    Well, in East Baton Rouge Parish, you have seen that

5    there were some changes, especially around my neighborhood

6    in the Garden District or Mid City, as we call it.  As I

7    mentioned earlier, Congressman Graves and I live just a

8    few blocks away from each other.  He lives on the northern

9    side of the Garden District.  I lived on the southern side

10   of the Garden District.  And the northern side

11   traditionally and historically has always been one going

12   away from Terrace Avenue to Kleinert to Dalrymple and

13   LSU Lakes, including the main campus of LSU, while the

14   south side of the district traditionally fell with

15   Congressional District 2 going down towards Ascension,

16   Assumption Parish and Orleans Parish.  But there was now a

17   split in Mid City with parts of Kleinert and Terrace

18   neighborhood associations moving in to the blacker areas

19   of the district which started on the south side.

20   Q.    So those areas that were moved in, is it your

21   understanding that they were majority black or majority

22   white?

23   A.    Predominantly white.

24   Q.    And where do you understand Representative Graves to

25   live within that scenario?

1    A.    He would have lived in District 6 with me.

2    Q.    What about your experience working in Louisiana

3    politics informed your impressions of this configuration

4    of SB8?

5              MR. TYLER:  Objection.  It calls for expert

6    testimony.  The witness has, again, not been qualified as

7    an expert in this area.

8              MS. WENGER:  He is speaking to his personal

9    basis of knowledge that Your Honors can provide the proper

10    weight to that.

11              JUDGE JOSEPH:  I think we can qualify this as

12    lay opinion testimony based on his experience dealing with

13    these issues as an observer and sometime participant in

14    the redistricting session.

15              THE WITNESS:  Can you repeat the question for me

16    again?

17              MS. WENGER:  Certainly.

18    Q.    (BY MS. WENGER) What, if anything, about your

19    experience working in Louisiana politics informed your

20    impressions of this configuration of SB8?

21    A.    Well, Louisiana, I mean, as a studier of history and

22    a participant in multiple legislative events, political

23    retribution has been really used, I mean.  And so,

24    knowing that Congressman Graves had flirted with running

25    openly against Governor Landry, did not endorse Governor

1    Landry after he decided not to run for the race, and there

2    was known tension between supporters of Congressman Graves

3    and Governor Landry that this just seemed to be a

4    traditional Louisiana tactic that once you got some power

5    you went after your enemies.

6            MR. TYLER:  Objection, Judge.  This is

7    substantially similar to testimony that we excluded

8    yesterday on the history of a few months ago.

9            JUDGE JOSEPH:  Well, the big difference is the

10   witness yesterday was relying on newspaper articles.

11   This witness is relying on his experience at the

12   legislative -- during the legislative sessions and around

13   the Capitol, so he can form an opinion on that.

14   Q.   (BY MS. WENGER) Have there ever been, in your

15   lifetime, any other instances you're aware of when

16   co-partisans have put their partisan ties aside for the

17   purposes of political retribution?

18   A.   Yes.  I mean I think 2015 is one of the most recent

19   examples.  Senator Vitter had been running the

20   conservative majority pack that was directly targeting

21   Republicans in trying to build a stronger coalition and

22   had really created odds within the Republican party and

23   after the primary election in 2015 when State

24   Representative John Bel Edwards advanced along with

25   United States Senator Vitter, we saw active Republicans,

1   the current sitting Lieutenant Governor and Secretary of

2   State Jay Dardenne publicly endorsed Governor Edwards

3   along with former PSC Commissioner Scott Angelle, some

4   Republican sheriffs.  And so the tension showcased there

5   was particular in Baton Rouge.  In 2008 when Former

6   State Representative Woody Jenkins was running for

7   Congress after the retirement of Congressman Jim Baker you

8   saw a significant amount of Baton Rouge Republicans

9   support State Representative Don Cazayoux in that election

10  which flipped a seat in the United States House of

11  Representatives.  Mr. Jenkins also had some history when

12  he ran for United States Senator against Mary Landrieu in

13  2002.  And so there has been quite a -- quite often a bit

14  of if you had an odd with somebody in your party -- you've

15  also seen it the opposite way where Democrats have

16  endorsed Republicans over sitting democratic elected

17  officials.  So this is, in my experience, very common in

18  the state of Louisiana.

19  Q.   Did this insight inform your perception or thoughts

20  around the number of safe or unsafe Republican seats in

21  SB8?

22  A.   Yes.

23  Q.   What, if anything, about the overall geography of the

24  districts informed your impressions of SB8?

25  A.   Can you say that again?

1    Q.    I can move along.  To confirm, which district do you

2    live in under SB8?

3    A.    District 6.

4    Q.    Is that the same district you lived in before?

5    A.    No.

6    Q.    Were you at the House and Governmental Affairs

7    Committee meeting the day that the committee considered

8    SB8 on January 18, 2024?

9    A.    I was.

10   Q.    Do you recall any amendment offered by Representative

11   Farnum that day?

12   A.    I do.

13   Q.    Let's pull up House Committee Amendment No. 74.

14   This was introduced into evidence as Robinson Exhibit 45

15   yesterday.  I would like to turn to page 11 of that

16   exhibit.  Is this the amendment you recall being

17   introduced and debated on in House and Governmental

18   Affairs that day?

19   A.    I do.

20   Q.    Do you understand anyone else beyond Representative

21   Farnum to be involved in the crafting of this amendment?

22   A.    Yes.  Senator Gary Carter.

23   Q.    What did this amendment do?

24   A.    This amendment, as Representative Farnum presented

25   it, was to fix -- under Senate Bill 8 there was a parish

1    split in our hometown, in our home parish of Calcasieu

2    Parish, and he was attempting to make Calcasieu whole

3    since we had never been a split parish before and had also

4    joined up with an amendment that Senator Carter had

5    previously offered in Senate Governmental Affairs that

6    would move some black precincts around in District 2 and

7    in District 6.

8    Q.    And for folks in the room not familiar like yourself

9    with the geography of Louisiana, where is Calcasieu?

10   A.    Calcasieu would be in the southwest corner of the

11   State and so it's the last place you hit before you cross

12   over to Texas.

13   Q.    All right.  So I understand it to be the blue parish

14   right above Cameron Parish in the bottom green of the --

15   A.    That is correct.

16   Q.    -- southwest of the State.  All right.  And which

17   congressional district was that in?

18   A.    In the amendment or the map?

19   Q.    In the amendment.

20   A.    In the amendment it would have been District 4.

21   Q.    All right.  Can we turn to page 15 of the exhibit?

22   Do you understand this to be a rendering of the

23   amendment's treatment of East Baton Rouge Parish?

24   A.    I do.

25   Q.    And how did this compare to the original version of

1    SB8?

2    A.    It now brought East Baton Rouge Parish into three

3    different congressional districts instead of two.

4    Q.    How about the version of SB8 that crossed over from

5    the Senate?

6    A.    It was two.

7    Q.    How do you feel about the amendment?

8    A.    I did not like this amendment at all.  I mean, one of

9    my main objections was East Baton Rouge Parish and so I

10   live in the place where you see the three different

11   colors.  That's where we would call the Garden District or

12   Mid City.  And when I looked at it, I realized every

13   morning when I would walk my dog through the park, I would

14   walk through three different congressional districts.

15   Q.    Did you lobby around the amendment at all?

16   A.    I did.

17   Q.    Why were you so passionate about lobbying against

18   this amendment?

19   A.    I, one, did not like what it did to East Baton Rouge

20   Parish.  Secondly, I didn't see any strong justifications

21   for this amendment.  While I appreciated Representative

22   Farnum's desire for Calcasieu Parish where I am from, it

23   did a lot of harm in my eyes to the map and I was worried

24   that it would also potentially create litigation.

25   Q.    What did this amendment do in regards to racial

1  demographics in the districts?

2  A.   It increased the BVAP in both District 2 and

3  District 6 slightly.

4  Q.   And what was your perception on that effort?

5  A.   My perception was that was a direct push by some to

6  make both districts blacker.

7  Q.   When you lobbied around this amendment, who did you

8  reach out to?

9  A.   I reached out to members of the House since it was on

10  the House side so I talked to just about every member that

11  I personally knew or could.  So I made calls.  I sent

12  texts.  I spoke to them on the floor of the House about my

13  opposition to this amendment.

14  Q.   Any other government officials?

15  A.   I talked to the Governor's staff as well about my

16  opposition to this amendment.

17  Q.   Did you understand your grievances to be heard by the

18  folks that you spoke to?

19  A.   I did.

20  Q.   And did this amendment end up on the final version of

21  SB8 enacted?

22  A.   No.  There was an amendment offered on the House

23  floor and it was strucken down in a bipartisan vote.

24  Q.   Have you made your views on the amendment available

25  to anyone outside of the State Capitol?

1    A.    I'm a very vocal Tweeter and I Tweeted about this

2    amendment quite a bit.

3    Q.    Did you talk to the press at all?

4    A.    I did talk to the press about this amendment.

5    Q.    So was there any confusion in the political circles

6    that you operate in in your perception about whether or

7    not you supported this type of amendment?

8    A.    No.  I'm -- I'm a pretty vocal advocate and have been

9    for quite some time in this state, so when I speak, I tend

10   to make sure everybody hears that I have a view to share.

11   Q.    And how about your views on how this amendment

12   treated black voters on the basis of their race?

13   A.    I made that very clear that I felt this was just

14   moving black precincts around for no particular reason

15   other than to do so.

16   Q.    And so when this amendment was taken off of SB8 on

17   the House floor, how did that vote go down?

18   A.    That vote, I want to say, was a strong over

19   two-thirds vote in the House.  I want to say maybe 12 or

20   16 members voted against it out of the 105.

21   Q.    And did that version of SB8, now stripped of this

22   amendment, but still containing the one from Senator

23   Cloud, did that have an opportunity to cross over to the

24   Senate for final ultimate passage of Senate Bill 8 as we

25   know it enacted today?

1    A.    I don't think it did.  I think because there had been

2    no amendments now at that point on the House side and both

3    bodies had now passed a bill, it was considered now to be

4    enrolled and sent to the governor.

5    Q.    Did any final procedural steps occur to ensure that

6    this could move along to the Governor on the Senate side?

7    A.    No.

8    Q.    Were you happy about the ultimate passage of Senate

9    Bill 8?

10   A.    I was.

11   Q.    And why is that?

12   A.    At this point we had been dealing with redistricting

13   for quite some time and we now had passed a map.  While

14   this was not my preferred map, this was not the map.  Had

15   I been in charge of the Legislature, I would have tried to

16   usher through the body, but it accomplishes the goals that

17   I wanted to see which was complying with the rule of law

18   as well as creating a second black-majority district.

19   Q.    How did you feel it measured up to the rubric that

20   you had established for yourself based off of your prior

21   experiences with redistricting or this 2024 process?

22   A.    I felt it sufficed.  I'm a former elementary

23   schoolteacher, so I'm big at making rubrics and it got a

24   passing grade even though it wasn't the perfect score I

25   wanted.

1    Q.    What has been the impact of the passage of SB8 on the

2    political climate that you operate in?

3    A.    It has been a changing force.  I mean, I think when

4    we talk about the reaction to it, there has been multiple

5    actions that have demonstrated how we feel.  I was

6    recently at the Capital Press (sic) Association's Gridiron

7    dinner, which is an SNL skit fundraiser for journalist

8    scholarships where they produce skits about politicians.

9    I was really happy that I finally got a skit this year.

10        But they had one skit that I think summarizes this

11   entire session which was called the "Graves Graveyard."

12   And it had Congressman Graves lying there with a knife in

13   him and they had all of the other members of Congress

14   surrounding him, playing a game of Clue, and asking where

15   each congressman or congressperson was.  And at the end of

16   the skit, here comes somebody playing Governor Landry and

17   says, "It was me on the fourth floor with a pen signing

18   Senate Bill 8."  And that was kind of how people took what

19   Senate Bill 8 did to the political dynamics in Louisiana.

20   Q.    Were there any other political leaders at that

21   dinner?

22   A.    Yeah.  We had the Chief Justice of the Supreme Court,

23   Judge Weimer, was there.  The Agricultural Commissioner,

24   Mike Strain, was there.  Members of the Legislature and

25   the Republican leadership.  Appropriations Chair, Jack

1   McFarland.  Ways and Means Chair, Julie Emerson.

2   Representative Dixon McMakin and Congressman Graves was

3   there himself.

4   Q.   Did you observe any of his reactions to the skit?

5   A.   I did.

6   Q.   And what were they?

7   A.   He just laughed and nodded his head.

8   Q.   All right.  As a voter, now living in Congressional

9   District 6 in Baton Rouge, do you feel you share any

10  common interests with voters living in the rest of

11  District 6 under SB8?

12  A.   I do.

13  Q.   How so?

14  A.   I mean, when you look at, one, our economies.  I

15  mean, both have significant gaming and industrial shift

16  that exist there.  When you talk about your civic

17  organizations, like Junior League or Links or 100 Black

18  Men, those are typically in the same regions with each

19  other.  Parts of the southern part of this area is heavily

20  Protestant, even though the vast majority of South

21  Louisiana is considered heavily Catholicism and that

22  Protestant faith kind of runs up and down the Red River.

23  When you think about the educational system, the programs

24  that are offered at Northwestern and offered at Southern

25  A&M are very similar.  Agriculture is another place where

1    I particularly looked at because of my role as

2    commissioner in what we were doing with energy production

3    and plant and manufacturing.  And so there was a lot of

4    things from also the same style of music that made me feel

5    comfortable having commonality with people elsewhere in

6    the district.

7    Q.    How about your role as a public service commissioner?

8    Does that provide any perception on the shared needs of

9    people in District 6?

10   A.    Absolutely.  District 6 in Senate Bill 8 would be in

11   a congressional district that is almost entirely served

12   by, what we would call in the utility regulation space, an

13   IOU, an investor owned utility.  That means there is very

14   few municipality-run electric systems, very few electric

15   co-ops run by kind of more rural places.

16        And so when it comes to the engagement with our

17   federal delegation around transmission planning,

18   generation buildup, the energy transition, we would be --

19   this one would be well served because of the electric

20   providers that exist within this district.

21   Q.    Are any of those projects eligible for federal grants

22   or appropriations?

23   A.    Yes.

24   Q.    Do you have to coordinate with Representative Letlow

25   at all because of her role on Appropriations?

1    A.    Yes.  So part of the appropriation process that's

2    important to me is affordability when it comes to utility

3    services.  And so LIHEAP, as it is known, which is the

4    heating and cooling assistance that is given to those who

5    may not be able to afford their utility bills, has been a

6    very important conversation for me, as Louisiana

7    traditionally has gotten underfunded.  Right now about

8    60,000 Louisianans receive assistance, while 600,000

9    actually qualify for heating and cooling assistance, so I

10   have raised that issue significantly.

11        Recently after the passage of the IRA, there was the

12   Low Connectivity Program, which provided a rebate of $30

13   to individuals for access to broadband and that funding

14   was running out, and so we -- I sent a letter to her and

15   Congressman Scalise and I believe also Congressman Johnson

16   about the importance of renewing this program and the

17   recent spending package to ensure that Louisianans had

18   access to affordable broadband.  So there was a host of

19   issues that required ensuring funding for multiple

20   projects that have been part of the DoE or EPA or

21   Department of Transportation or HUD through the IIJA or

22   the IRA bills that passed Congress earlier in the term.

23   Q.    Has Representative Mike Johnson's ascension to

24   speaker of the house, now Speaker Johnson, had any impact

25   on your ability as Public Service Commissioner to serve

1   your constituents and other Louisianans statewide?

2   A.   Absolutely.  The Public Service Commission uses the

3   administrative law judge process before we make decisions

4   and we have been having cases regarding, for instance,

5   transmission siting, building a transmission line through

6   portions of North Louisiana.  And we had to deal with

7   procedural hurdles from some of the intervenors because

8   they were receiving or being invited to meetings with

9   Speaker Johnson and we had to evaluate whether or not we

10  would take that as a legitimate delay in our trial

11  process.  And so his ascension there has made that

12  extremely important as part of applying for a bunch of the

13  federal grant programs that have been offered under the

14  IRA.  So I think about the grid resiliency program.  We

15  have a project that is being funded at Beauregard Electric

16  for a transmission line that fell down during Hurricane

17  Laura.  So these conversations and his involvement has

18  significantly changed our interaction, especially when it

19  comes to permitting reform, transmission buildup, the

20  admission standards for power plants.  There is a lot of

21  issues that are now circling around, especially at the

22  commission level.

23  Q.   Are you in the same political party as Speaker

24  Johnson?

25  A.   I am not.

1    Q.    Do you have any stake in his proximity to power in

2    DC or even ascension to the presidency still?

3    A.    I do not.

4    Q.    Do you have any understanding of where Louisiana

5    ranks among states on quality of life and opportunity

6    indicators?

7    A.    Yes.  At Invest in Louisiana or formerly known as

8    Louisiana Budget Project, as I mentioned, we are a

9    nonprofit, nonpartisan policy think tank that advocates

10   and researches on issues that affect low and moderate

11   income families, and so every year we publish what we

12   call the census fact check which includes the American

13   Community Survey results, and so when we look at

14   Louisiana, we are the second poorest state in the nation.

15   We have the third highest child poverty rate in the

16   nation.  We have the sixth highest income and equality in

17   the nation.  And so when we look at statistics around

18   poverty or food access, we are at 49th.  And so all of my

19   years, I've -- it's been sad to see that Louisiana

20   typically falls at the top of every list that is bad and

21   falls at the bottom part of every list that is good.

22   Q.    And in your sense, what does power and representation

23   in Congress mean for making changes on these measures?

24   A.    Well, Louisiana's state budget is primarily federal

25   funds.  About 60 percent of our state budget is federal

1    funds that we receive.  So ensuring that our congressional

2    delegation is fighting for FITAP or CHIP or WIC or food

3    stamps assistance is extremely important.  I mean, when I

4    think about the Department of Health's budget, for every

5    dollar that is put into the State's budget by our

6    self-generated revenue, we get about five dollars from the

7    federal government.  And so having a congressional

8    delegation that reflects Louisiana and the needs of

9    Louisiana is extremely important since we are one of the

10   most dependent states on federal funds not only for our

11   state budget but in terms of all of the programs that are

12   offered through the various agencies.

13   Q.   What would it mean to you if this current map under

14   SB8 was taken away?

15   A.   Well, this was the start of a new legislative

16   session.  I think, if my memory serves me correctly, this

17   would have been my 33rd legislative session.  So I now

18   have a session just for about every year of my life.  And

19   it started off with a bipartisan endeavor, which I think

20   is extremely hard in this new political reality that we

21   live in of divisive politics, of parties being at odd, and

22   to see not only a governor that I didn't support and

23   advocated and worked against, along with the Legislature

24   combing forces and doing something together really

25   signified that when we put our differences aside and work

1    for the common good that we can achieve policy objectives

2    and it was really pleasing to see that we had done so.

3    And I'm afraid if Senate Bill 8 disappears, it only

4    enhances the divisiveness that too much has taken over our

5    politics and continues the division among class, among

6    race, among regions, among political affiliations, and

7    just continues to toxic our environment.

8            MS. WENGER:  If I may have a moment, Your

9    Honors.

10   Q.   (BY MS. WENGER) Commissioner Lewis, as one of the

11   Robinson intervenors, why was it important to you to be

12   heard in this court?

13   A.   It was extremely important to me to be heard because

14   this is something that I have been working on for a while.

15   Like I said, redistricting is not something that sparked

16   my interest after the census of 2020.  It has been

17   something since being in high school and learning about it

18   in my AP Civics course.  And so I felt it was extremely

19   important to share my experience in this process over the

20   last 20 years what has happened and what it really means

21   about how we were able to get Senate Bill 8 accomplished.

22           MS. WENGER:  I'll pass the witness.

23           MR. BOWEN:  Nothing from the State.

24           JUDGE JOSEPH:  Let's take our morning 15-minute

25   break and then we'll come back for cross-examination.

1          (Recess.)

2                    CROSS-EXAMINATION

3     BY MR. TYLER:

4     Q.   Mr. Lewis, this is a map of the Louisiana PCS

5     districts?

6     A.   Correct.

7     Q.   And District 6 in SB8 crosses through how many

8     different PSC districts?

9     A.   It would cross through -- it would cross through four

10    in this current map, yes.

11    Q.   So four different PSC districts out of how many

12    total?

13    A.   Five.

14              MR. TYLER:  No more questions.

15              JUDGE JOSEPH:  Any redirect?

16              MS. WENGER:  No redirect.

17              JUDGE JOSEPH:  State?  Nothing?

18              MR. BOWEN:  Nothing from the State, Your Honor.

19              JUDGE JOSEPH:  Secretary?

20              MR. STRACH:  None, Your Honor.

21              JUDGE JOSEPH:  All right.  Commissioner, you are

22    free to go.  Thank you for your testimony.

23              MR. NAIFEH:  Your Honors, the Robinson

24    intervenors have no further witnesses.

25              JUDGE JOSEPH:  And all the exhibits I think have

1    been taken care of, right?

2              MR. NAIFEH:  Yes, Your Honor.

3              JUDGE JOSEPH:  Okay.  Thank you, Mr. Naifeh.

4              MR. GORDON:  Your Honor, we don't have any

5    witnesses.  We do have about 10 minutes of our video

6    excerpts we would like to play for the Court now before

7    the defense closes its case.

8              JUDGE JOSEPH:  Okay.  And this has been admitted

9    previously?

10             MR. GORDON:  This has been admitted.  These are

11   from Joint Exhibits 19 and then 18.

12             JUDGE JOSEPH:  Okay.  Good.  Just for the record

13   we are playing Joint Exhibits 18 and 19 or at least

14   portions thereof right now.

15             MR. GORDON:  Yes, Your Honor.  Do we have our

16   computer turned on?

17             THE REPORTER:  Are we off the record?

18             JUDGE JOSEPH:  Is it all Joint 18 and 19 or not?

19             MR. GORDON:  It is not all Joint 18 and 19.

20   It's our excerpts that were not played by the plaintiffs

21   already, because some of our excerpts are also there.

22             JUDGE JOSEPH:  Okay.  Well, then we better have

23   it on the record.

24             (The following excerpts played:)

25             SPEAKER:  The U.S. Supreme Court can (audio

1    interference) or not taken our case.  They took our --

2    they stayed our case last summer, while the Alabama case

3    went forward and was litigated.  They said you just wait.

4    They thought we had made a good case for a stay and so

5    they paused our case while they decided that one.

6        But they did something -- and this is kind of a term

7    of art, but I mean they granted cert in advance of

8    judgment.  That means they actually took our case and then

9    after they decided the *Merrill* case, the Alabama case,

10   they just vacated their own grant and sent it back to us.

11       So in a way they took our case and then they vacated

12   their own decision to take our case and they sent it back

13   down to the Fifth Circuit and to Judge Dick.  And so it's

14   back in the hands of the district court judge who is

15   supervised by the Fifth Circuit Court of Appeals.

16       And so there has been some litigation between August

17   and really through the summer since the *Merrill* case came

18   out all the way through the time that the opinion was

19   issued in November, I think, from the Fifth Circuit where

20   a panel of the Fifth Circuit said you need to go draw a

21   map by February 15th.  So they actually suggested we

22   should have done this before -- before we legally really

23   or -- I think it was practically possible to even get it

24   done.

25       But, you know, here you are.  I think the Governor

1    heeded that call, that demand.  I mean, we've had it
2    reviewed by a number of judges.  They have had nothing to
3    say about our arguments.  It's been radio silence.
4         And so the only decision that remains in front of us
5    right now is Judge Dick's and so Judge Dick has set a
6    timeline for us to have a trial.  They did say we get to
7    have a trial.  But we don't get to have that trial until
8    after you go through this exercise and, you know, she will
9    do it for you.  The job of (audio interference) it's not
10   mine and I -- what I believed have been a defensible map
11   and if you draw a new map, I will defend that map.  Judge
12   Dick has put us in a position and the Fifth Circuit, the
13   panel that reviewed that decision, and the whole court,
14   when I asked them to go en banc, by declining to go on en
15   banc, have put us in a position pus of where we are today
16   where we need to draw a map.  So I'm here to tell -- I'm
17   not here to you to tell don't draw a map.  I mean, I think
18   we do have to draw a map and I will defend that map.  We
19   (audio interference) a fact-finding mission.  That's
20   what's always happens and made fact-findings regarding the
21   map.  She issued an injunction.  That injunction is not
22   currently in effect for reasons that I can explain to you,
23   but I think the bottom line is it is not currently in
24   effect because the deadlines for the election that it
25   enjoined are over.

1          The Courts, never the less, have told us to draw a

2    new map.  And they have indicated that we have a deadline

3    to do that or Judge Dick will draw the map for us.  So you

4    have an opportunity now to go back and draw the map again

5    and I think that it is not an easy task because the United

6    States Supreme Court is not made it an easy task.  They

7    have given you some directives that seem to be -- to not

8    give you a lot of clear lines for doing your job.  I

9    apologize on their behalf, but, you know, we tried.  I

10   mine I am defending that map, and so you won't hear me say

11   that I believe that that map violated the redistricting

12   criteria.  I am defend --

13          GOVERNOR LANDRY:  It is time to stop averting

14   the issue and confront it head-on.  We are here today

15   because the federal courts have ordered us to perform our

16   job.  Our job which is not finished.  Our job that are own

17   laws direct us to complete and our job that our

18   individuals promise we would perform.

19          To that end, I ask you to join me in adopting the

20   redistricting maps that are proposed.  These maps will

21   satisfy the Court and ensure that the congressional

22   districts of our state are made right here in this

23   legislature and not by some heavy-handed federal judge.

24   We do not need a federal judge to do for us what the

25   people of Louisiana have elected you to do for them.

1  You are the voice of the people and it is time that you
2  use that voice.  The people have sent us here to solve
3  problems, not exacerbate them.  To heal divisions, not to
4  widen them.  To be fair and to be reasonable.  The people
5  of this state expect us to operate government officially
6  and to act within the compliance of the laws of our nation
7  and of our courts even when we disagree with both of them.
8  And let me say this, I know that many of you in this
9  Legislature have worked hard and endured the -- and tried
10  your very best to get this right.  As Attorney General, I
11  did everything I could to dispose of this litigation.  I
12  defended the redistricting plan adopted by this body as
13  the will of the people.  We sought a stay in the Fifth
14  Circuit.  We successfully stayed the case at the United
15  States Supreme Court for more than a year allowing the
16  2022 elections to proceed.

17      Last October we filed for a writ of mandamus which
18  was granted in the Fifth Circuit which would again allow
19  us one more chance to take care of our business.  However,
20  when the Fifth Circuit panel ruled against us later in the
21  fall we filed for an en banc hearing which they denied.
22  We have exhausted all legal remedies and we have labored
23  with this issue for far too long.  I recognize the
24  difficulty of getting 144 people to agree on anything.
25  My wife and I don't agree on everything.  She has kept me

1    for 21 years.  But I sincerely commend you for the work

2    you have done so far.  But now, once and for all, I think

3    it's time that we put this to bed.  Let us make the

4    necessary adjustments to heed the instructions of the

5    Court, take the pen out of the hand of a nonelected judge

6    and place it in your hands.  In the hands of the people.

7    It's really that simple.  I would beg you, help me make

8    this a reality in this special session for this special

9    purpose on this special date.

10                MR. GORDON:  That concludes the presentation,

11    Your Honor.  The State rests.

12                JUDGE JOSEPH:  State rests.  Okay.  Thank you,

13    Counsel.

14                MR. STRACH:  No witnesses for the Secretary.

15    The secretary rests.

16                JUDGE JOSEPH:  No evidence heater?

17                MR. STRACH:  No.  No, Your Honor.

18                JUDGE JOSEPH:  All right.  Have the plaintiffs

19    made a decision about whether to call their rebuttal

20    expert?

21                MR. GREIM:  We have.  We are not going to call

22    him.

23                JUDGE JOSEPH:  Okay.  So the plaintiffs rest

24    their entire case then?

25                MR. GREIM:  We do.

1          JUDGE JOSEPH:  Okay.  You know, I guess I'll

2    kind of feel the pulse of Counsel.  Would it be preferable

3    to have a short lunch break before closing arguments?

4    Would that be helpful for would you rather just jump into

5    it?

6          MR. GREIM:  Your Honor, we would rather just

7    jump into it probably for travel reasons.

8          JUDGE JOSEPH:  Well, I am fine with that.

9       Mr. Naifeh?

10          MR. NAIFEH:  I think I prefer a lunch break

11    because I didn't have breakfast, but --

12          JUDGE JOSEPH:  You would?  I think Judge

13    Summerhays has a protein bar you can have.

14       What about the State?

15          MR. GORDON:  Let's jump ahead, Your Honors.

16          JUDGE JOSEPH:  Well, since the Plaintiffs

17    actually have to give their argument first, I think

18    they'd prefer to go.

19          JUDGE STEWART:  Mr. Greim, you don't want some

20    more Louisiana cuisine before you go back to the steaks

21    and Kansas City barbecue in Kansas City?

22          MR. GREIM:  Well, maybe I'll have some after I'm

23    all done.  Then I might even have a drink with it.

24          JUDGE STEWART:  No offense meant.  Just noted.

25          JUDGE JOSEPH:  And a point of clarification, in

1    case -- so I don't forget, Judge Stewart reminded me this

2    morning to clarify when post-trial briefs will be due.  I

3    think alluded to the fact that it would be a week later,

4    so we'll say close of business next Wednesday, April 17th,

5    and, again, we also ask that you attach to that proposed

6    findings of fact to this case.  All right.

7            MR. GREIM:  Your Honors, we said on Monday

8    morning that this could have been a one-day trial.

9    Didn't quite accomplish that, but no party used up its

10   allotted time.  Why is that?  The legislative record was

11   clear.  It took little time for us to play.  We then

12   brought in four legislators to testify.  After you

13   listened, no one contradicted the record.  The purpose of

14   the session, you clearly heard, was to draw a map with two

15   black districts.  End of story.  The Robinson intervenors

16   and State both tried to show that politics helps explain

17   which of the two black district maps were chosen, but not

18   that a two black district map was drawn.  In other words,

19   politics is not what caused the two black district.

20       So the principle that couldn't be compromised, to

21   quote directly from the case law we cited back in our

22   preliminary injunction briefing, and from which every

23   single political choice flowed, was that two black

24   districts had to be drawn.

25       The battle of the experts -- and, by the way, the

1    first prong of the case really could end there.  But the

2    battle of the experts here provided further circumstantial

3    evidence that race predominated in the SB8 lines.  So at

4    the end of the day, the sum of all that evidence is that

5    strict scrutiny is required and the burden was on the

6    State as supplemented by the intervenors under the

7    Court's order.

8         Now, that's a demanding standard.  That itself could

9    have taken days, and that's why these trials sometimes

10   take a long time.  Instead of strict scrutiny, this case

11   took almost no time.  Why was that?  As predicted, as we

12   mention in our preliminary injunction briefing and as we

13   said in our opening, the State and Robinson intervenors

14   adopted exactly the same VRA defense.  They adopted

15   exactly the same trial strategy.  They jointly argue that

16   the materials from the Robinson case, coupled with Judge

17   Dick's vacated decision of the Fifth Circuit's failure to

18   find clear error in Her factual findings, met their

19   evidentiary burden here.  But that strategy must fail

20   under the law.  It just can't work.

21        Under the law, as we cited this, the State cannot

22   rely on post hoc rationalizations and pretty up the record

23   after the fact.  Instead, it must show that it actually

24   performed a VRA analysis on the proposed legislation on

25   SB8 and on District 6.  It must show not that legislators

1    acted out of fear that, as we kept hearing, Judge Dick

2    would draw unfavorable districts, but because they were

3    actually convinced that the VRA itself demanded two

4    majority-minority districts.  Even if the State now claims

5    that the VRA itself and not merely a single judge requires

6    two districts.  And, to be clear, the State does not make

7    that claim.  It matters not one bit.  It's a post hoc

8    rationalization, based on a record that doesn't address

9    SB8 or these districts.  We never heard once after the

10   Court asked everyone for designations, tell us what you

11   want to use here, use them with witnesses.  They never

12   tried to do those things.  This is an open-and-shut case

13   for the plaintiffs and they must prevail.

14       Now, I am going to drill down a little bit on the law

15   and the facts.  First of all, the law, the *Bethune-Hill v.*

16   *Virginia Board of Elections* from 2017 says, "Racial

17   predominance exists even when a reapportionment plan

18   respects traditional principles if race was the criterion

19   that, in the State's view, could not be compromised and

20   race-neutral considerations came into play only after the

21   race-based decision had been made."  That's exactly what

22   happened.  That's describing our case.

23       There are several other cases that say the same

24   thing.  Racial predominance is established where the

25   State expressly adopted and applied a policy of

1    prioritizing mechanical racial targets above all other

2    redistricting criteria.  That's what the two

3    majority-minority seats was.

4         *Cooper v. Harris*.  Finding a textbook example of

5    race-based districting from an announced racial target

6    that subordinated other districting criteria and produced

7    boundaries, amplifying divisions between blacks and

8    whites.  Again, that's what we saw here.

9         *Bethune-Hill* involved the use of an expressed racial

10   target.  *Bush v. Vera* from 1996 plurality decision noted

11   that the State's, quote, "Commitment from the outset to

12   creating majority-minority districts" -- that's what we

13   had here -- "indicates racial predominance."  And here is

14   the important thing, because I know what the State is

15   going to say in response.  They are going to say, "Well,

16   Judge Dick was about to make us do this."  But racial

17   gerrymandering even for remedial purposes is still racial

18   gerrymandering subject to strict scrutiny.  That's from

19   all the way back at the beginning of this line of cases,

20   *Shaw* from 1993.  So that's why it's no answer to say,

21   "Well, the Court made us come here."  You don't get a

22   freebie and move on to other considerations.  If it's

23   race, it's race.

24        Now, we heard the facts from all the witnesses.  I

25   won't replay anything.  I do want to show, though, a few

1    clips from Senator Seabaugh and Senator Pressly's

2    testimony.

3         This is Senator Seabaugh.  I asked him if there was

4    any understanding about a particular number of

5    majority-minority districts.  And what did he say?  He

6    said, "We were there because, I mean, essentially we were

7    told we had to draw a second majority-minority district

8    where the Judge was going to.  So there was really no

9    point in introducing a map that did include a second" --

10   I think it should say "did not include" -- a second

11   majority-minority district."  Again, the principle that

12   couldn't be compromised.  Let's go to the next clip.

13        Senator Seabaugh, again, said the political

14   consequences flowed from that decision.  Theoretically,

15   he said, a second minority seat was switched from five

16   Republicans and one Democrat to four Republicans and two

17   Democrats theoretically.  And I asked him, just to be

18   clear, I said, "Did anyone, to your knowledge, advocate

19   for losing a Republican seat without drawing a

20   majority-minority district?"  "Answer:  No, of course

21   not."

22        Let's go to Senator Pressly.  His testimony, "I

23   don't know specifically that the caucus put it together,

24   but certainly we were instructed that we needed to have

25   two majority-minority districts and any other

1  redistricting guidelines were secondary to that."
2  Again, predominance.
3      Now, we also heard -- and we won't play these
4  clips -- but when you listen to the A.G. Murrill
5  testimony, a not insignificant number of legislators
6  openly expressed an intent to use a raw proportionality
7  measure, even after being warned by A.G. Murrill that that
8  would be unconstitutional.  You often heard six divided by
9  three is two.  Well, you can't do that.  That's further
10  direct evidence.
11      Now, much of the time we spent in this courtroom was
12  really not that evidence, it was circumstantial evidence,
13  and that's often how these cases go.  So I will briefly
14  walk through that testimony.
15      Mr. Hefner, showed that Senate Bill 8 is highly
16  similar to the district invalidated in the *Hays'* case as a
17  racial gerrymander.  Eighty-two percent of the black
18  population from the *Hays'* district is in SB8.  And even
19  Anthony Fairfax, the Robinson's expert, who is not
20  entirely credible in describing his own district drawing
21  methods as we heard on cross-examination, admitted he
22  would not have drawn the *Hays'* districts.  So Anthony
23  Fairfax would not have drawn the district that looks a
24  whole lot like Senate Bill 8.
25      Now, Mr. Hefner also showed how SB8 splits multiple

1    communities of interest, splits parishes and cannot be

2    explained by so-called socioeconomic factors.  He

3    explained how agricultural differs from the north and

4    south Louisiana.  I think Missouri is the flip side

5    around.  I think we have more row crops in the north and

6    we have more timber in the south.  That's the opposite in

7    Louisiana.  But perhaps the heat map best encapsulates

8    SB8.

9        So this is the heat map with the District 6 overlain

10   on top.  And we heard Mr. Fairfax criticize this and he

11   showed a different map that showed a lot of red up in the

12   upper northeast corner of the State.  But, again, as he

13   had to concede, there is no one living up there.  It's

14   very low population.  Where the actual population is, is

15   reflected on the heat map.  That's why we use that.  As

16   you can see, the gray shaded area almost perfectly weaves

17   in and out, catching those concentrations of minority

18   population and trying to bring them together.

19       We saw that this reached nearly 54 percent, as we

20   call it, BVAP, and that's the highest of any second black

21   majority district.  None of the other districts that you

22   saw, whether they were prepared for this litigation or

23   they were prepared in the prior litigation or wherever

24   they were used, got to this number.  So this is the way to

25   maximize BVAP.

1        Mr. Hefner testified that, as a demographer, he saw

2   no way to draw a second majority black district in north

3   Louisiana that's consistent with traditional redistricting

4   principles.  Certainly that this one was not.

5        Now, we wanted to do something different.  Dr. Voss

6   testified on many of these same principles for part of his

7   testimony, but we also had Dr. Voss simulate hundreds of

8   thousands of hypothetical maps in these different

9   simulations and he produced those in batches under a wide

10  variety of constraints.  This is a table that we used that

11  was entered into evidence with Dr. Voss and what he tried

12  to do here is, he obviously used contiguity, population,

13  equality and compactness.  Yet he found no evidence of a

14  naturally occurring, majority black district outside

15  New Orleans.  Even when he nudged the simulation process,

16  to avoid breaking apart various African American

17  populations, no second-majority black district appeared.

18  Even when Dr. Voss's simulations preserved much of SB8's

19  majority white districts, leaving little room around them

20  for other contiguous districts of equal population to

21  occupy, no black-majority district emerged organically in

22  central Louisiana.

23        Now, you might recall rebuttal witness, Dr. Cory

24  McCartan, put up the blue and yellow map that showed blue

25  bands in the middle of the State and little yellow specks

1   kind of scattered throughout and he actually was trying to

2   criticize Dr. Voss.  Said, "Well, this simulation didn't

3   do much, because, you know, there is not much here in the

4   middle."  Well, he told us that.  What he said was, the

5   slash district was, quote, "has no core." So he was

6   telling us little more than he realized at that point.

7        And actually that brought to mind the words of

8   Senator Womack in the audio we played for the Court who

9   basically admits the same.  He said it had no heart when

10  he was asked what's the heart of this district.  The

11  problem is if you take two precincts in around Senate

12  Bill -- around District 6, you end up with no district

13  almost, because in very few places is it even five

14  precincts wide.

15       Now, Dr. McCartan and Mr. Fairfax tried to suggest

16  that simulations produced by Dr. Voss offered little

17  value, leaving aside quibbles about additional

18  considerations that Dr. Voss might have taken into

19  account, considerations that Dr. Voss in his testimony

20  offered good reasons to omit, and that Dr. McCartan

21  himself ignored in his own ALARM simulations.  The one

22  consistent complaint about the Voss analysis, if you

23  listen to Dr. McCartan, is that he didn't push hard enough

24  with his simulation method to produce a black district.

25  Well, that's exactly the point of the simulation.  What we

1    are trying to show is that the slash district, District 6,

2    is extreme.  You do have to have race predominating to end

3    up with a map like that.

4          In trying to unite the far-flung communities of

5    Shreveport and Baton Rouge, using bulges and tendrils, in

6    Dr. Voss's words, to rope in African American districts,

7    while using twists and turns -- I think that's how

8    Mr. Hefner said it -- to avoid concentrations of whites in

9    central Louisiana, the Sixth Circuit created by SB8

10   violates traditional redistricting criteria.  The plans

11   for creating two majority black parishes broke apart.

12   Districts broke apart more parishes than necessary, and

13   SB8 splinters them more than any other map analyzed.  All

14   of the plans for creating two majority black districts

15   scooped African American communities out of multiple

16   metropolitan areas also, that SB8 pulls apart Louisiana

17   cities more than any of the other maps analyzed.  And, of

18   course, that makes sense, because they are trying to go to

19   each area and grab out the African American population.

20         Finally, the always considered element of

21   compactness, none of the plans for majority-minority

22   black districts were compact, but SB8 was the worst of

23   those.

24         So that's the circumstantial evidence in a nutshell.

25   Now, again, the other side's argument really tries to say

1    the differences aren't that great and then they turn back

2    to the political conspiracy.  I mean, that is so much of

3    the testimony we heard from people who were talking about

4    politics.  But the problem again is this, the problem is

5    this:  It was all downstream from the initial decision to

6    draw two black districts and, therefore, the

7    black-district decision predominated and that's under

8    controlling law.

9        So, in conclusion, even without expert testimony,

10   this part of the analysis is not a close call.  The

11   Legislature sought to appease the Robinson litigants,

12   perhaps, by meeting their racial target of controlling two

13   districts, while keeping the pen in the hands of the

14   Legislature to decide where the gerrymandering would

15   occur, but it doesn't excuse the gerrymandering.  So long

16   as race was actually a predominant factor, the political

17   goals and schemes, if they existed, just don't matter to

18   us in the first analysis.

19       Now, let's move to strict scrutiny and drill down

20   there.  Did the State have a strong basis in evidence to

21   believe that VRA demanded the map.  Well, on the facts,

22   when the State uses race to draw lines, here is what the

23   Courts say -- this is from the *Cooper* case I mentioned

24   earlier -- it must show to meet the narrowly tailored

25   requirement that it had a strong basis in evidence for

1    concluding that the VRA required its actions.  So the

2    State has to conclude that VRA required its actions.  This

3    analysis is district by district.  There is no such thing

4    under the VRA as ordering the State to create X number of

5    black districts.  That is not an order under the VRA.

6    You can't just say, Come back to me, somewhere, anywhere,

7    I want to see two or three or four black districts.  You

8    cannot do that.  Rather, you have to remedy in a VRA case

9    the injury that was proved by the VRA Plaintiffs in their

10   own region in the district where they proved there should

11   be a second map drawn, a second district drawn.

12       So you've got to show in this case that SB8's

13   district lines are narrowly tailored to remedy an alleged

14   VRA violation.  We get that from what you call *Shaw II*,

15   the *Shaw v. Hunt* case from 1996, the *LULAC* case,

16   *LULAC v. Perry*, 2006, which I cited earlier.  As we said

17   in our brief over and over again, the fear of a VRA

18   violation somewhere does not allow the State to

19   gerrymander just anywhere.

20       Now, can the State look back in time and say,

21   Well, hypothetically, there was evidence by which the

22   Legislature could have concluded this or must the

23   gerrymandering be the justification -- I'm sorry -- or

24   must the VRA be the justification the State actually

25   relied on.  And, again, we get this from *Bethune-Hill*.

1    It says actual considerations that provided the essential

2    basis for the lines rather than, quote, "post hoc

3    justifications the Legislature in theory could have used,

4    but in reality did not," closed quote, matter.  So we've

5    got to look at the actual considerations.

6         Now, what quality of evidence has to be shown?

7    One of the most important cases is pretty recent from

8    Wisconsin.  I don't have my citation here, but it's -- I

9    believe it's Wisconsin Legislature.  It may be versus

10   Wisconsin Supreme Court.  I may have that wrong, but we

11   cited it in our briefs.  That talks -- in fact, there it

12   was the Wisconsin Supreme Court that had drafted the map.

13   So we have the U.S. Supreme Court treating the Wisconsin

14   Supreme Court as the mapmaker.  It's an interesting case.

15   And they criticize the Wisconsin Supreme Court.  Because

16   the Wisconsin Supreme Court's analysis was full of "may."

17   We think that there is a good argument that the VRA may

18   require this, and it actually at least went into evidence.

19   But here is the kind of evidence you're supposed to be

20   citing.  You're not supposed to be citing that, Well, we

21   think this Judge is against us.  We think she is going to

22   rule against us.  You're supposed to say, well, here are

23   the turnout rates in the different districts and the

24   results are recent contested elections.  Here is our RBV

25   analysis.  Here is our statistical evidence of racial

 1    block voting.  *Abbott v. Perez* from 2018 talks about that.

 2    You've got to come in and say -- and *Abbott* also says

 3    where you're going to rely on good reasons, you've got to

 4    say the State made a strong showing of a pre-enactment

 5    analysis with justifiable conclusions.  And certainly

 6    you've got to go through and establish the three *Gingles'*

 7    preconditions.  There is not a single witness who came up

 8    who purported to say what the Legislature was thinking and

 9    said yes, we walked through the *Gingles'* factors.  We

10    looked at expert reports.  We didn't have hear any of

11    that.  The challenge was laid down for the State to come

12    in and talk about that.  And the witnesses that you would

13    expect to have supported the State here were unable to do

14    that and seemed to have only a very rough familiarity with

15    the Voting Rights Act.

16         Here is another principle:  A pure error of law by

17    the Legislature is never okay.  I mean, there is breathing

18    room.  We've all read the cases that say there is

19    breathing room.  You can make a reasonable mistake, but

20    you can't make a pure error of law.  And that's from the

21    *Cooper* case.  And in this case, the legislators were told

22    by A.G. Murrill, race can't predominate.  Now, it's

23    confusing.  It's understandable.  But she told that to the

24    legislators, and what do we see right around the same

25    time, race is predominating, and the legislators are

1    saying we have to draw these two majority-minority

2    districts.

3         Let's talk a little bit about the facts.  I've sort

4    of been doing this throughout, but I'll focus on that now.

5    Again, a proper showing would have established that the

6    map-drawer here reviewed analyses of the three *Gingles'*

7    factors for people living in the area of SB8.  We need to

8    see what?  We need to see sufficiently large and compact

9    black population in the new SB8 territory.  We need to see

10   the black voters in the SB8 territory can actually elect

11   their own candidates, the candidates that they prefer.

12   We've got to see white voters generally defeating black

13   voters in the SB8 territory.  And in the totality of

14   circumstances, after those three prongs, we've got to see

15   that SB8 actually performs.  This wasn't our burden to

16   disprove.  This was the State's burden to prove and not

17   just that this exists, but that the Legislature did this

18   the work.

19        Now, remember, the Robinson intervenors affirmatively

20   tried to block any such evidence from actually coming in.

21   There was actually a motion in limine saying there can't

22   be argument or evidence on this point at the same time

23   that they're trying to admit all the record evidence from

24   the prior case.  That can't be correct, and that motion

25   wasn't renewed before the close of trial.  In fact, the

1    effort to admit those exhibits was abandoned.

2        At any rate, we saw what the debate in the

3    Legislature was about.  It was not about those factors

4    even for the Robinson maps.  Rather than a hearing about

5    VRA factors, you hear about over and over again, Judge

6    Dick, the desire to draft the majority-minority district

7    instead of Judge Dick and other strategic factors.  That

8    is political strategy and not -- or may be legal strategy

9    and not a VRA analysis.

10        If we could, just for a second, there is a part of

11    the AG's testimony we have not heard but that's in

12    evidence.  Let's just listen for a moment to the way --

13            (The following excerpt played:)

14            ATTORNEY GENERAL:  You have an opportunity now

15    to go back and draw a map again, and I think that it is

16    not an easy task, because the United States Supreme Court

17    has not made it an easy task.  They have given you some

18    directives that seem to be -- to not give you a lot of

19    clear lines for doing your job.  I apologize on their

20    behalf, but, you know, we tried.  I mean, I am defending

21    that map.  And so you won't hear me say that I believe

22    that that map violated the redistricting criteria.  I am

23    defending that map.  You have an opportunity now to go

24    back --

25            (End of excerpt.)

1              MR. GREIM:  Let's stop there.  So you won't hear

2    me say -- you won't hear me say that that map violates the

3    redistricting criteria.  Well, the evidence needs to have

4    been the opposite.  The Attorney General needs to have

5    come in and said we have concluded that it does violate

6    the redistricting criteria, but the Legislature heard

7    exactly the opposite from the Attorney General.

8         Just to save time, I won't put up the other -- we had

9    some other slides that we'll show later.  But, you know,

10   other claims made by the Attorney General was that the

11   litigation did not lead to a fair or reliable result.

12   There was much discussion about how fast the process went,

13   that there was evidence that wasn't put in.  And then,

14   ultimately, there was continued statements that the

15   question presented was really one of strategy, because the

16   Attorney General was willing to continue to defend the

17   map, but then talked about what would happen if an appeal

18   drug out over time.

19        So that's what the evidence actually shows and,

20   again, on strict scrutiny, we really could end there.  I

21   do want to show the quote from Senator Pressly, though,

22   that I think encapsulates this.  And I mean I just asked

23   and we heard it, but I said, "Did the Attorney General

24   actually state that she believed the VRA required two

25   majority-minority districts?"  "Answer:  I don't recall

1    her ever saying that."  We have seen the transcript.  She

2    doesn't say that.

3         Interestingly, if you go back to the opening that the

4    State made in this case -- let's pull that slide up.  The

5    opening that we heard from the State used very interesting

6    language that we haven't even seen before.  So the State

7    tried to recast its burden in this case, not as analyzing

8    the SB8 districts under the VRA, but instead as, quote,

9    "Predicting how federal courts might review the maps."

10        The Legislature did not hire an expert to address the

11   VRA issue.  Here we go.  This is the State's -- this is

12   what the State said in the opening.  So although the

13   Legislature did not specifically hire an expert during the

14   special session, its drafting of the SB8 map was informed

15   by the most definitive experts whose opinions matter more

16   than any others, the federal courts.

17        Well, that's the problem.  The showing cannot be

18   predicting what the federal courts will do.  The showing

19   has to be about the VRA itself.  Now, what were some of

20   the objections by the other side.  What have we heard from

21   them?  We have heard them say, Well, but there was this

22   earlier preliminary injunction decision that was vacated,

23   but it wasn't vacated on the merits.  We still had a very

24   good sense of where the federal district court judge was

25   going and we've heard different characterizations how the

1   Fifth Circuit treated that.  And I think, rather than

2   going through all that, the Fifth Circuit decisions speak

3   for themselves.  But at no point did the Fifth Circuit

4   order Louisiana to go draw a two majority-minority map.

5   That is untrue.  You will not find that in the Fifth

6   Circuit decisions.

7        But what you will hear, though, is that, well, a

8   remedial map in a VRA case doesn't have to be the exact

9   illustrative map that was presented by the plaintiffs and

10  there is case law that says that that's very true, but it

11  does have to be a map that actually addresses the facts

12  presented in that case.  And so you can't wriggle out of

13  the VRA inapplicability by just saying, well, any old map

14  will do.  Any old map will not do.  You've got to make a

15  showing on SB8.

16       I will turn just for a second to the Fifth Circuit

17  cases.  They only apply clear error reasoning on the facts

18  as they had to.  They expressed some discomfort with the

19  state of the record and the argument.  They recognize the

20  State might want to completely alter its defense after the

21  *Merrill* case from Alabama.  And an important piece also is

22  that the State never set out to prove what we would be

23  doing in a remedial phase here if it occurs, that these

24  other maps are actually going to perform under the

25  totality of the circumstances test.  The *Merrill* types of

1    arguments that were raised initially and that went away

2    after the Supreme Court case, that was the State's

3    strategy.  We did not see the second sort of analysis,

4    which is, even though you're over 50 percent BVAP, are

5    those voters going to turn out, and is crossover voting

6    going to put them over the top to actually elect

7    candidates, that's the analysis that needed to have been

8    done and it could be done here.

9         Now, I'll address an issue that the Court asked us

10   about earlier.  I'm running out of time, but I can briefly

11   cover it.  There are reasons to be concerned with Judge

12   Dick's jurisdiction to decide Equal Protection issues.

13   First of all, Judge Dick did not truly reach the issue of

14   equal protection because Judge Dick found that the

15   question there was the map-drawers who were not State

16   actors.  But for a different reason, it would have been

17   inappropriate to reach it because there was no case or

18   controversy.  There was no injured party that was actually

19   challenging state action, so that was the wrong case, and

20   especially in a single-judge court to address equal

21   protection.

22        As soon as anyone actually brings an equal protection

23   claim, where you have standing as an injured party and you

24   can get a remedy against the person you have sued, then

25   Section 2284 applies and that requires the use of a

1    three-judge panel.  That's not a complete answer, but I

2    want to make sure I say something about it here in my

3    opening.

4        In conclusion, as the State first suggested in the

5    very first conference with the Court, this case largely

6    does turn on the law once one hears a legislative record.

7    That's true.  The Intervenors claimed they need to be here

8    to fully develop the record, but their hours of witnesses

9    exceeded only nibbling at the edges of Plaintiffs'

10   circumstantial evidence.  Expert testimony confirms what

11   we already know from looking at the legislative record.

12   Here, the State did engage in an odious practice of

13   segregating citizens into districts based on race and for

14   some, based on what proportionality, which you can't do

15   under the VRA, it is not less odious because some

16   legislators wanted to achieve political goals after they

17   decided to achieve a racial goal.  Indeed, that sort of

18   opportunism and the lack of honesty to admitting what the

19   set out to do makes the gerrymander worse.

20       We're ultimately here because of a strategic decision

21   by the Robinsons to bring a naked VRA claim in a

22   single-judge court.  Now it falls to this Court to finally

23   consider Louisianan's equal protection rights, invalidate

24   SB8, and after taking evidence and considering all of the

25   applicable law, enter an interim remedial map.  Thank you.

1            MR. NAIFEH:  Good morning, Your Honors.  May it

2    please the Court.

3        Your Honors, Plaintiffs in this case, who have been

4    entirely absent from these proceedings, ask this Court to

5    overturn an act of the elected representatives of the

6    people by which they sought to fulfill their duty to

7    establish congressional districts while complying with the

8    mandates of federal law and the federal courts.

9        In these circumstances, the Supreme Court has said

10   the Legislature must be given breathing room to navigate

11   the competing demands of the Equal Protection Clause and

12   the Voting Rights Act.  The courts in -- the district

13   court in Robinson and the Fifth Circuit gave the

14   Legislature that breathing room when they provided an

15   opportunity to remedy the likely Section 2 violation those

16   courts had found before facing the prospect of a

17   court-imposed map.

18       Mr. Greim's theory of the case would hold that any

19   time a state draws a map to comply with the Voting Rights

20   Act, even when it is directed to do so by a court, it

21   necessarily engages in racial gerrymandering.  In effect,

22   he is saying that Section 2 is unconstitutional, and just

23   last term the Supreme Court in *Allen v. Milligan* rejected

24   an identical argument.

25       Plaintiffs would also require the Legislature to defy

1   the federal courts unless the Attorney General herself

2   agrees with those Court's rulings or the Legislature.

3   The record here at trial makes clear that the Legislature

4   balanced appropriate consideration of race against other

5   primarily political considerations and that race did not

6   predominant in the enactment of SB8.  Plaintiffs have

7   failed to meet their burden.

8        Plaintiffs' case is premised on a fundamental

9   misunderstanding of the law applicable to both parts of

10  the *Shaw* standard.  As a result, the factual record

11  assembled by the Plaintiffs fails to meet their burden to

12  show that race predominated in the creation of SB8 and

13  fails to rebut the not just strong, but overwhelming basis

14  for the Legislature's race-conscious redistricting to

15  comply with the mandates of Section 2 of the Voting

16  Rights Act.

17       First, Plaintiff suggests that the mere fact that the

18  Legislature set out in the January special session called

19  by Governor Landry to create a congressional plan with two

20  majority-minority districts is enough to meet their

21  burden.  They say that decides the case on its own.  They

22  offered the bare statements of legislators during special

23  session in which SB8 was adopted, acknowledging that the

24  task given to them by the Courts in the Robinson

25  litigation.  But the Supreme Court has been clear that the

1    intentional creation of majority-minority districts

2    without more is not sufficient to establish racial

3    predominance or trigger strict scrutiny and that's from

4    *Bush v. Vera*.  And that the Courts must exercise, quote,

5    extraordinary caution in adjudicating claims that a state

6    has drawn district lines on the basis of race, and that's

7    from the *Easley v. Cromartie* case.

8        Plaintiffs must show more that race was simply a

9    motivation for the drawing of a majority-minority

10   district.  They must show that race predominated over all

11   other considerations.  Meeting this standard is demanding

12   and Plaintiffs have not met it here.  Over the last three

13   days, the Court heard testimony from legislators involved

14   in the enactment of SB8.  That political goals were at the

15   center of SB8's final shape.  Representative Mandie Landry

16   and Senator Royce Duplessis testified that from the start,

17   they understood that SB8 was Governor Jeff Landry's map

18   and that Republican Congressman Garret Graves was chosen

19   as the incumbent that would be placed in the new majority

20   black district.  Plaintiffs' own legislative witness,

21   Senator Pressly, agreed that the central challenge in

22   creating SB8 was how the Legislature would create a second

23   majority black district, quote, in a way to ensure that

24   they were not getting rid of the speaker of the House, the

25   majority leader, end quote, and while also protecting

 1   Congresswoman Julia Letlow.  And Senator Womack, SB8

 2   sponsor, stated when introducing the bill SB8 was the only

 3   map he had seen that could achieve both of those goals.

 4        The testimony of plaintiffs' experts is divorced

 5   from this political reality and does not move the needle.

 6   Mr. Hefner conceded that some consideration of race is

 7   required every time the Legislature creates a

 8   majority-minority district and as evidence that SB8's new

 9   majority-minority district, CD-6, included more majority

10   black precincts than majority white ones, shows nothing

11   more than that the Legislature drew a majority black

12   district.

13        Dr. Voss's simulations analysis also fails to show

14   that race predominated.  As Dr. Cory McCartan explained,

15   the simulations were flawed in design and execution and

16   were not suited to answering the question that he sought

17   to answer, which was whether it was possible to draw a

18   reasonably configured majority black congressional

19   district outside of the New Orleans area.  Dr. Voss's

20   conclusion that Representative Letlow and Speaker Johnson

21   could have been protected without creating a second

22   majority black district is irrelevant and misses the

23   point.  As Senator Pressly explained, the question for the

24   Republican caucus in the State was how to do both.

25   While it is not the preference of our clients, the

1    Robinson intervenors, that politics dominated this

2    decision-making process behind the enactment of SB8, it is

3    the reality.  The Legislature could have enacted our

4    client's map, remedial map, which was before the

5    Legislature in the form of Senate Bill 4.  SB4 was more

6    compact, split fewer parishes and municipalities and

7    better protected communities of interest based on common

8    socioeconomic indicators than either HB1 or SB8.  But as

9    Senator Womack stated, it did not meet the political goals

10    he prioritized.  The difference is that simple.  The

11    overriding consideration in the choice of SB8 over more

12    compact options that also satisfied the Voting Rights Act

13    was politics, not race.  Plaintiffs have not proven that

14    race predominated over all other considerations that drove

15    the configuration of SB8 and they cannot prove that

16    because it is not true.  Even if the Plaintiffs had met

17    their burden of establishing racial predominance, they

18    failed to grasp the legal principles that apply to the

19    second part of the *Shaw* analysis.  You heard Mr. Greim

20    assert that there is no evidence that anyone in the

21    Legislature actually believed they were required to create

22    a majority black district, but that is not the test.  A

23    strong basis in evidence only requires that the

24    Legislature have good reasons to believe that they would

25    run afoul of the Voting Rights Act if they did not engage

1    in race-conscious districting.  It does not require an

2    inquiry into the legislator's personal legal positions and

3    it does not require the Legislature to engage in a

4    full-blown *Gingles*' analysis or pursue every avenue of

5    judicial relief, especially when a federal judge has

6    already ruled that the *Gingles*' standard has been

7    satisfied.

8        Plaintiffs here ask this court to conclude that a

9    recent decision in favor of our clients offered by a pure

10   Federal District Court after a five-day evidentiary

11   hearing and approved in substance by the Fifth Circuit,

12   after a failed effort to invoke Supreme Court review, did

13   not provide the Legislature with a reasonable basis to

14   conclude that if they did not act, they would face

15   liability for violating the VRA.

16       Your Honors, Robinson intervenors are nine

17   individual black voters and two civic organizations who

18   worked with communities and voters across the State to

19   ensure that Louisianans can realize the power of their

20   voice and vote.  The Court heard from some of them in

21   these proceedings.  As Ashley Shelton testified on behalf

22   of Power Coalition and the communities it works with

23   taking away SB8 would make her job much harder.  What we

24   know is that apathy is driven by voters not feeling like

25   they have a voice, she said.  We know that if they don't

1    feel like they can actually elect a candidate's choice,

2    that drives voter apathy.  The impact of taking away SB8

3    is real for the Robinson intervenors.  It is relief they

4    have sought over two years of litigation and many, many

5    more years of fighting for a fair future for their state.

6         Let's talk about who we haven't heard from in these

7    proceedings.  In contrast to the Robinson intervenors, not

8    one Callais plaintiff has taken the stand to articulate

9    any injury they face through the enactment of SB8.  Not

10   one plaintiff has shared their view on whether or not

11   SB8 honors the communities of interests they occupy.  Not

12   a single plaintiff has lent their story nor defended their

13   position on cross-examination.  I will close by

14   highlighting that the process of redistricting following

15   the 2020 census has now lasted for years.  It is time for

16   finality for all Louisianans.  A decision by this court,

17   striking down SB8 will only prolong the uncertainty and

18   aggravate the conflicting demands that the Legislature has

19   had to navigate in adopting SB8.  The district court in

20   Robinson called for the Legislature to remedy the

21   egregious Voting Rights Act violations shown by our

22   clients and rather than continue to fight a losing battle,

23   the Legislature heeded that call.  SB8 is the remedy that

24   the district court demanded.  It is the law enacted by the

25   Legislature, elected by the voters of this state, and it

1    is not a racial gerrymander.  Accordingly, this court

2    should deny plaintiffs' motion for preliminary injunction

3    and enter judgment in favor of the defendants and the

4    Robinson intervenors on the merits.  Thank you.

5              MR. ENSIGN:  Good afternoon, Your Honors.

6    Drew Ensign on behalf of the State of Louisiana.

7        SB8 here passes constitutional muster here for two

8    overarching reasons.  First, race did not predominate the

9    drawing of its contours.  As the Supreme Court has

10   explained, race predominance only exists, quote, when

11   race-neutral considerations come into play only after the

12   race-based decision has been made and that's from

13   *Milligan*.

14       Here, three other factors motivated the Legislature

15   to act rather than race.  First, a desire to comply with

16   federal court orders as to what the VRA likely requires

17   and, thereby, forego expensive and protracted litigation;

18   second, a desire to preserve assemblance of the State's

19   sovereign prerogative to draw maps itself; and, third,

20   political considerations such as preserving incumbents and

21   avoid pitting them against each other and in particular

22   protecting Representative Letlow.

23       That race did predominate is further demonstrated by

24   the chronology here.  The State initially enacted HB1

25   which maintain Louisiana's long history of having a

1    single majority black district that had prevailed for over

2    40 years.  This was the Legislature's first preference,

3    and, absent the Robinson litigation, it is undisputed that

4    it would be the map in place here.

5        But the evidence shows that the Legislature was

6    compelled against that express preference in the drawing

7    of a second majority black district.  That sequence shows

8    that race was not the Legislature's predominant intent

9    here.  Without Federal Court's effectively mandating that

10   they do so, it would not have done so.  You know, put

11   simply, the Robinson court decisions are the but-for cause

12   that led to SB8 and not race.

13       Second, even assuming the Plaintiffs have satisfied

14   their burden of showing racial predominance, Plaintiffs'

15   constitutional claims still fail because SB8 satisfies

16   strict scrutiny.  As to compelling interest, Plaintiffs do

17   not appear to even genuinely contest that complying with

18   the VRA and further complying with decisions construing

19   the VRA is a compelling state interest.  And even if they

20   had contested that, here it's even more compelling than

21   just merely complying with the VRA because you have the

22   additional factor of both the Middle District and the

23   Fifth Circuit holding that it was likely a violation of

24   the VRA to fail to draw a second majority black district.

25       The State also satisfies the strong basis in evidence

1    test the Supreme Court initially set forth in the

2    *Alabama Legislative Black Caucus* and then reiterated it

3    again in *Cooper* and *Bethune-Hill*.  That test, quote,

4    insists only that the legislature have a strong basis in

5    evidence in support of the race-based choice it has made

6    and that's from *Bethune-Hill*.  Here the State readily

7    satisfies that standard.

8        The State had exceptionally strong evidence in the

9    form of federal court decisions including a precedential

10   decision of its regional circuit affirming a legal

11   determination that the lack of a majority -- a second

12   majority black district likely violated VRA which the

13   Fifth Circuit declined to hear in en banc without even

14   holding a vote.

15       It's true that the Robinson cases did not squarely

16   hold that the failure to draw a second majority black

17   district would violate the VRA.  Only that they would

18   likely do so.  But the strong basis in evidence standard

19   expressly give the states, "breathing room," to navigate,

20   "the competing hazards of liability under the Voting

21   Rights Act and the Equal Protection Clause," and that's

22   from *Bethune-Hill*.  Here that breathing room should

23   include reading the thirdly obvious writing on the wall.

24   Under the district court's opinion, it was clear to the

25   State that prevailing at trial on HB1 was incredibly

1    unlikely and the consequence of making that likely futile

2    attempt would be that a map would be imposed on the State

3    and it would lose its opportunity to draw districts

4    whatsoever and it would be imposed on the State whole

5    cloth by the Middle District.  And so, within that

6    breathing room, the State exercised, you know, the

7    remaining semblance of its sovereign prerogative to draw

8    its maps, and that's what have here.

9        And for that reason it was also not necessary for the

10   legislators to parse the nuances of expert reports

11   themselves.  The reason to consult experts is to make

12   predictive judgments as to how federal courts are likely

13   to rule as to, you know, whether or not a map or a

14   particular challenge practice would violate the VRA.

15   But here, there is no need to do so because we have that

16   information from the horse's mouth themselves.  Here we

17   have federal courts specifically holding that the failure

18   to draw a second majority black district likely violated

19   the VRA and it did so based on that weighing of all the

20   *Gingles*' factors.  So there is no need for the

21   Legislature to engage in doing that *Gingles*' analysis

22   itself when the Courts have already done so for it and

23   have done so in a precedential decision that will bind

24   future proceedings.

25       Those actual rulings of federal courts readily supply

1   the strong basis and evidence here.  You know, and,

2   finally, I would add a quick note about Plaintiffs'

3   Arlington Heights' claim, which we haven't heard much

4   about, but is is nonetheless part of this case.  You know,

5   the Arlington Heights' standard here is subsumed within

6   the *Shaw/Bethune-Hill* predominance inquiry which is a more

7   refined test specifically applicable for the redistricting

8   context.

9        But even if it had any separate application here, it

10  would do Plaintiffs little good.  Even if Plaintiffs could

11  satisfy the Arlington Heights' factors, that would only

12  get them to strict scrutiny, and for the reasons that

13  we've already discussed previously, SB8 is constitutional

14  under that strict scrutiny analysis.  And I'm happy to

15  answer any questions, if the Court has any otherwise.

16            JUDGE JOSEPH:  Thank you, Mr. Ensign.

17            MR. ENSIGN:  Thank you, Your Honors.

18            MR. STRACH:  Your Honor, nothing from the

19  Secretary.  We had yielded our time to the other parties

20  on our side of the V.

21            JUDGE JOSEPH:  Ms. LaCombe, I don't think the

22  Plaintiffs have any more time for rebuttal, do they?

23            MS. LACOMBE:  No, sir.

24            JUDGE JOSEPH:  I do note that Mr. Greim wore an

25  LSU tie today, it looks like, to make up for his

1    pronunciation of Tensas Parish yesterday.  All right.

2              (Off the record.)

3              JUDGE JOSEPH:  Well, I think that brings our

4    proceeding to a conclusion.  Again, post-trial briefings

5    will be due next Wednesday by close of business.  Is there

6    anything else we need to talk about before we go into

7    recess?

8              JUDGE STEWART:  I just want to make a comment

9    before we adjourn and that's to say I'll take the liberty

10   of saying it on behalf of the panel.  As you know,

11   three-judge panels are, like this configuration, are rare.

12   Of course, I do them on a regular basis, but that's with

13   the Fifth Circuit.  This is very rare.

14       The point is, I think we have like 20 lawyers, at

15   least, in the case, in the trial, et cetera.  A lot of you

16   are not here.  All Judges appreciate the highest of

17   professional, ethical conduct in conducting business.

18   This is an extremely sensitive, important complex case and

19   the panel richly appreciates the extremely high

20   professionalism, civility, cooperation, between the

21   parties, among the parties.  I am sure there was some

22   after-hours work, to put it mildly, to put the case

23   together.  Whatever way we end up at the end of it, it's

24   not to be understated the appreciation, because we know

25   from experience, all cases don't go that way.  Even the

1    objections were handled very fluidly, very professionally,

2    and that's much appreciated by the Bench, commendations to

3    all of you.  Even if you were a lawyer that didn't come to

4    the podium, nonetheless our job is to make easier, not to

5    be confused with easy, when we have the highest of

6    professional and ethical conduct on behalf of it.

7         And the second is to give commendations to the court

8    reporters and to the staff who had to endure faster

9    speaking than even New York people, seemingly, everybody

10   talked fast here, and so my heart goes out, all of ours to

11   them, to only interrupt you when they really had to, to

12   get it right, but to do that trying to take it in.

13        And, thirdly, we all had some apprehensions about

14   using this technology, you know, stuff tends to go wrong.

15   And so you all kind of nimbly navigated to it.  So even

16   that was well done.

17        In short, a few very complex, very important trial,

18   but ably conducted by extremely professional, high caliber

19   lawyers and nothing makes judges more satisfied than to

20   have that kind of engagement.  If more people in the

21   American public saw that and really were tuned into how

22   things worked, they would have less sort of negative

23   appreciations on the caliber of lawyers.  So my hat and

24   commendations to everybody for your actions in the trial.

25             JUDGE JOSEPH:  I, wholeheartedly, agree.  I was

1    very impressed with the conduct of counsel as well as the

2    efficacy of counsel during this trial and greatly

3    appreciate how counsel worked together and this is really

4    exemplar of how litigation should work.  So I appreciate

5    that.

6         JUDGE SUMMERHAYS:  And I agree with all the

7    comments above.  I thank you.

8         JUDGE JOSEPH:  All right.  Court's adjourned.

9         (Proceedings concluded at 12:31 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, DIANA CAVENAH, RPR, Federal Official Court

4     Reporter, in and for the United States District Court for

5     the Western District of Louisiana, DO HEREBY CERTIFY that

6     pursuant to Section 753, Title 28, United States Code,

7     that the foregoing is a true and correct transcript of the

8     stenographically-reported proceedings held in the

9     above-entitled matter and that the transcript page format

10    is in conformance with the regulations of the Judicial

11    Conference of the United States.

12

13

                         /s/ Diana Cavenah
14                       DIANA CAVENAH, RPR
                         Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25