**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION**

| | |
|---|---|
| PHILLIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, | Civil Action No. 3:24-cv-00122 |
| *Plaintiffs*, | Judge David C. Joseph |
| v. | Circuit Judge Carl E. Stewart |
| NANCY LANDRY, in her official capacity as Secretary of State for Louisiana, | Judge Robert R. Summerhays |
| *Defendant*. | |

**_ROBINSON_ INTERVENORS' POST-TRIAL MEMORANDUM**

1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT .................................................................................................... 4

I.  Plaintiffs Failed to Prove Race Predominated in the Enactment of SB8 ........................... 4

    A.  Intentionally Drawing Districts to Satisfy the VRA, Without More, Does Not Show That Race Predominated ................................................................... 4

    B.  Plaintiffs' Other Evidence of Racial Predominance Fails to Meet Their Burden ................................................................................................... 5

    C.  Plaintiffs' Argument that a Reasonably Compact Majority-Minority District is Impossible Is Irrelevant and Unsupported ........................... 11

    D.  Congressional District 6 Preserves Communities of Interest ................. 14

    E.  Comparisons to *Hays* are a Red Herring............................................. 15

II.  The Consideration of Race in the Enactment of SB8 Was Narrowly Tailored ............... 16

    A.  The Legislature Had a Strong Basis in Evidence to Believe a Map with Two Black Opportunity Districts was Required by the VRA............................... 17

    B.  The Use of Race in the Creation of SB8 was Narrowly Tailored to Satisfy the VRA ........................................................................................... 19

III.  Plaintiffs Failed to Establish Intentional Discrimination at Trial ..................................... 21

IV.  The Middle District and Fifth Circuit Validly Held That It Is Possible to Draw Two Majority-Black Congressional Districts Consistent with the Equal Protection Clause .............................................................................................................. 22

CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott* v. *Perez*,
    585 U.S. 579 (2018)........................................................................18

*Addy* v. *Newton Cnty., Miss.*,
    2 F. Supp. 2d 861 (S.D. Miss. 1997)..............................................20

*Alabama Legislative Black Caucus* v. *Alabama*,
    575 U.S. 254 (2015)..............................................3, 10, 17, 21

*Aldinger* v. *Howard*,
    427 U.S. 1 (1976).........................................................................24

*Alpha Phi Alpha Fraternity Inc.* v. *Raffensperger*,
    587 F. Supp. 3d 1222 (N.D. Ga. 2022)..........................................25

*Ardoin* v. *Robinson*,
    143 S. Ct. 2654 (2023)...................................................................1

*Bethune-Hill* v. *Va. St. Bd. of Elec.*,
    580 U.S. 178 (2017)........................................................ *passim*

*Caster* v. *Merrill*,
    2022 WL 264819 (N.D. Ala. Jan. 24, 2022)...................................25

*Chestnut* v. *Merrill*,
    356 F. Supp. 3d 1351 (N.D. Ala. 2019)..........................................25

*Cooper* v. *Harris*,
    581 U.S. 285 (2017)..............................................................10, 11

*DeWitt* v. *Wilson*,
    856 F. Supp. 1409 (E.D. Cal. 1994)................................................5

*Easley* v. *Cromartie*,
    532 U.S. 234 (2001)........................................................ *passim*

*Fed. Bureau of Investigation* v. *Fikre*,
    144 S. Ct. 771 (2024).....................................................................24

*Fusilier* v. *Landry*,
    963 F.3d 447 (5th Cir. 2020) ........................................................22

*Hays* v. *State*,
   936 F. Supp. 360 (W.D. La. 1996).......................................................................16

*United States* v. *Hays*,
   515 U.S. 737 (1995)....................................................................................5, 22

*League of United Latin Am. Citizens* v. *Perry*,
   548 U.S. 399 (2006)..........................................................................14, 15, 20, 21

*Miller* v. *Johnson*,
   515 U.S. 900 (1995)...........................................................................................4

*Robinson* v. *Ardoin*,
   37 F.4th 208 (5th Cir. 2022) .........................................................................1, 23

*Robinson* v. *Ardoin*,
   605 F. Supp. 3d 759 (M.D. La. 2022) ........................................................... *passim*

*Robinson* v. *Ardoin*,
   86 F.4th 574 (5th Cir. 2023) ....................................................................... *passim*

*Shaw* v. *Reno*,
   509 U.S. 630 (1993)........................................................................................3, 10

*Theriot* v. *Par. of Jefferson*,
   185 F.3d 477 (5th Cir. 1999) ....................................................................... *passim*

*Theriot* v. *Par. of Jefferson*,
   1996 WL 637762 (E.D. La. Nov. 1, 1996) ...........................................................18

*Thomas* v. *Bryant*,
   919 F.3d 298 (5th Cir. 2019) ..............................................................................24

*Thornburg* v. *Gingles*,
   478 U.S. 30 (1986).............................................................................................22

*Wygant* v. *Jackson Bd. of Ed.*,
   476 U.S. 267, 291 (1986).....................................................................................17

**Statutes**

28 U.S.C. § 1291(a)(1)..............................................................................................25

28 U.S.C. § 1331......................................................................................................23

28 U.S.C § 2284(a) ..................................................................................................24

Voting Rights Act ........................................................................................... *passim*

**Other Authorities**

*Pendent Claims and Supplemental Jurisdiction*, 20 Fed. Prac. & Proc. Deskbook
§ 20 (2d ed.) ..................................................................................................................24

Fourteenth Amendment ...................................................................................2, 11, 19

## PRELIMINARY STATEMENT

In January 2024—after losing a preliminary injunction that enjoined the congressional plan enacted in 2022 ("HB1") for violating § 2 of the Voting Rights Act of 1965 ("VRA"); losing a motion for a stay pending appeal in a decision in which the Fifth Circuit largely agreed with the district court on the merits; receiving an adverse decision on the merits from another Fifth Circuit panel; and exhausting attempts at en banc and Supreme Court review—the State of Louisiana adopted a new congressional plan ("SB8") with two majority-Black districts. *See Robinson* v. *Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022) ("*Robinson I*"); *Robinson* v. *Ardoin*, 37 F.4th 208 (5th Cir. 2022) ("*Robinson II*"); *Robinson* v. *Ardoin*, 86 F.4th 574 (5th Cir. 2023) ("*Robinson III*"); *Ardoin* v. *Robinson*, 143 S. Ct. 2654 (2023); Order, *Robinson* v. *Ardoin*, No. 22-30333, ECF 363 (5th Cir. Dec. 15, 2023); *see also* JE-14. The Louisiana Legislature acted because, based on the advice of Governor Jeff Landry and Attorney General Elizabeth Murrill—both of whom served as counsel for the State in the *Robinson* litigation—they understood that if they failed to create a plan that satisfied the VRA and the multiple federal court rulings, the State would face a trial it would likely lose, and the *Robinson* district court would impose a plan. FOF ¶ 116. Rather than cede control of the process to the federal courts, the Legislature and the Governor came together to produce a map that balanced satisfying the VRA with achieving their political objectives. *Id.* SB8 was chosen over other plans with two majority-Black districts that were more compact and split fewer parishes and municipalities because those plans failed to achieve the overriding goal of protecting the seats of House Speaker Mike Johnson, Majority Leader Steve Scalise, and Representative Julia Letlow at the expense of Representative Garret Graves. FOF ¶ 135–142.

Plaintiffs ask this Court to blind itself to this history and context and to review SB8 as if it had been enacted in a vacuum. They ignore and minimize the court decisions in *Robinson* as well as the timeline—puzzlingly labeling those rulings a "post hoc" justification for SB8,

4/10 Tr. 594:21–23, 595:7–9; they call the acknowledged political considerations of the legislature a "political conspiracy" theory, 4/10 Tr. 603:1–2; and yet they wholly fail to offer any alternative rationale for the Legislature's choice of SB8 over more compact VRA-compliant maps. In Plaintiffs' context-free telling, the Republican-controlled Legislature came into session at the behest of Louisiana's Republican Governor and, on the advice of the State's Republican Attorney General, threw out a map with five safe Republican seats in favor of a non-compact plan with an additional majority-Black district that they acknowledged would likely elect a Democrat. And they did so—according to Plaintiffs' theory of the case—for no reason other than a desire to assign Louisianians to congressional districts on the basis of race. Plaintiffs' version of the genesis of SB8 is implausible because it is not what happened.

Let there be no mistake: if Plaintiffs prevail, it will place states and local governments in an impossible position. It is precisely to preclude cases such as this one that the Supreme Court long ago established the principle that government actors must be given "breathing room" to comply with the VRA when they have good reason to believe they must, without facing liability under the Fourteenth Amendment. *Bethune-Hill* v. *Va. St. Bd. of Elec.*, 580 U.S. 178, 196 (2017). Plaintiffs would squeeze all the air out of that breathing room, leaving states "trapped between the competing hazards of liability under the Voting Rights Act and the Equal Protection Clause." *Id.* at 196 (cleaned up). According to Plaintiffs, states faced with potential liability for § 2 violations must defy decisions of "merely a single judge," 4/10 Tr. 595:4–7; they must litigate § 2 cases to a final judgment and exhaust all appeals, *id.* at 609:8–18; and when one legal strategy is rejected by the Supreme Court, the state must try another, *id.* at 611:25–612:3. Only then, say Plaintiffs, may the state conclude that the Fourteenth Amendment permits consideration of race to remedy a VRA violation; and even then, a legislatively drawn plan may not depart, even for non-racial reasons,

from the illustrative plan considered by the court. *Id.* at 603:19–604:11. And when engaging in that remedial process, Plaintiffs urge, the state may not rely on a court's rulings but must carry out its own full-blown *Gingles* analysis to determine the precise racial makeup of the district, no more and no less, needed to provide the opportunity §2 demands. *Id.* at 605:19–606:9, 607:6–15.

That is not the law. Consideration of race to remedy an identified VRA violation "does not lead inevitably to impermissible race discrimination." *Shaw* v. *Reno*, 509 U.S. 630, 646 (1993) ("*Shaw I*"). And even where race predominates, strict scrutiny requires only that the state have "good reasons" to believe that the VRA requires race-conscious districting. *Alabama Legislative Black Caucus* v. *Alabama*, 575 U.S. 254, 278 (2015) ("*ALBC*"). When such good reasons exist, the state need not draw a perfect district. *Id.* It need not engage in the complex analysis involving "evaluation of controverted claims about voting behavior," *id.*, required to prove or disprove a VRA violation or "show that its action was actually . . . necessary to avoid a statutory violation," *Bethune-Hill*, 580 U.S. at 193–94; *accord Theriot* v. *Par. of Jefferson*, 185 F.3d 477, 490 (5th Cir. 1999) ("*Theriot II*") ("Once a litigant has demonstrated vote dilution and the court has directed redress, the litigant need not prove vote dilution once again before a court can assess the merits of the proposed remedy.").

This Court should reject Plaintiffs' attempts to remake the law and decline their invitation to disregard the political and practical background against which SB8 was adopted. When the evidence of that context is considered in light of the law as it actually exists, it is clear Plaintiffs have not come close to satisfying their demanding burden to establish that race predominated in the construction of SB8. The evidence viewed under the applicable legal standard also demonstrates that the state had much more than the necessary strong basis in evidence for believing a plan with two majority-Black districts was required and that its choice of SB8 achieved that goal

as well as other lawful legislative objectives with no greater consideration of race than necessary. The Court should affirm that the State has lawfully remedied the violation of the Voting Rights Act and should put an end to years of uncertainty for the benefit of all Louisiana voters. It should deny Plaintiffs' motion for a preliminary injunction and enter judgment in favor of Defendants and the *Robinson* Intervenors.

## ARGUMENT

### I.    Plaintiffs Failed to Prove Race Predominated in the Enactment of SB8

Courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Easley* v. *Cromartie*, 532 U.S. 234, 242 (2001). To prevail on their claim, Plaintiffs "must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller* v. *Johnson*, 515 U.S. 900, 916 (1995). Plaintiffs must show more than that race was simply "*a* motivation for the drawing of a majority-minority district"; they must show it was "the *predominant* factor motivating the legislature's districting decision." *Cromartie*, 532 U.S. at 242 (emphasis in original; cleaned up). "The ultimate object of the inquiry . . . is the legislature's predominant motive for the design of the district as a whole." *Bethune-Hill*, 580 U.S. at 192. Where, as here, a district's shape can be explained by non-racial factors such as politics, it carries little to no weight as evidence of racial predominance. *Cromartie*, 532 U.S. at 243–53.

Plaintiffs' evidence falls far short of the demanding showing required to prove that race predominated in the drawing of SB8.

### A.    Intentionally Drawing Districts to Satisfy the VRA, Without More, Does Not Show That Race Predominated

Plaintiffs first offer what they call "direct evidence" that race was the predominant purpose. Plaintiffs contend that the mere fact that the Legislature set out in the January special session called

by Governor Landry to create a congressional plan with two majority-minority districts is proof of racial predominance. Legislators acknowledged the task given to them by the courts in the *Robinson* litigation to draw a map with two Black opportunity districts or face a trial that would likely result in a court-drawn map. *See, e.g.*, FOF ¶ 120. Plaintiffs contend—incorrectly—that this evidence alone is the beginning and ending of the racial predominance inquiry.

Contrary to Plaintiffs' argument, merely "showing [that] redistricting maps were designed to establish two majority-black districts . . . does not automatically constitute racial predominance." *Robinson* v. *Ardoin*, 86 F.4th 574, 592–94 (5th Cir. 2023); *see also United States* v. *Hays*, 515 U.S. 737, 746 (1995) ("We have never held that the racial composition of a particular voting district, without more, can violate the Constitution."). The Supreme Court has long been clear that "intentional creation of majority-minority districts," without more, is not sufficient to establish racial predominance or trigger strict scrutiny. *Bush* v. *Vera*, 517 U.S. at 958, 962 (1996) (evidence that State was "committed from the outset to creating majority-minority districts" was not "independently sufficient to require strict scrutiny"). In *Bethune Hill*, the Court explained that the use of a target in drawing district lines is just one part of a holistic inquiry into the "legislature's predominant motive for the design of the district," not the entire inquiry as Plaintiffs would have it. 580 U.S. at 191–92. Just last term in *Allen* v. *Milligan*, Chief Justice Roberts reaffirmed this principle and rejected the argument that simply attempting to satisfy the VRA constitutes *per se* racial predominance. 599 U.S. 1, 32 (2023) (plurality); *see also id.* at 34 n.7; *accord DeWitt* v. *Wilson*, 856 F. Supp. 1409 (E.D. Cal. 1994) (declining to apply strict scrutiny to an intentionally created majority-minority district), *aff'd*, 515 U.S. 1170 (1995). Accordingly, Plaintiffs' purported direct evidence of legislative intent does not satisfy their burden of proving racial predominance.

**B.    Plaintiffs' Other Evidence of Racial Predominance Fails to Meet Their Burden**

Plaintiffs attempt to buttress their case with testimony from two expert witnesses, which

they claim provides circumstantial evidence of racial predominance. Neither expert moves the needle. Both offer opinions on features of the plan that they say depart from traditional redistricting principles in ways only explainable by race. But neither expert engages with the evidence showing other explanations for SB8's configuration and the overt political calculus of the Governor and the Legislature. Nor do they attempt to show how race explains the choice of one redistricting plan with two majority-Black districts over other more compact plans that also have two such districts. Their analysis is divorced from the reality that animated the enactment of SB8 and does not assist the Court in evaluating the question of racial predominance.

### 1.    *Plaintiffs' Experts Made No Effort to Disentangle Race and Politics*

The factual evidence is undisputed that political considerations were the predominant reason for the Legislature's choice of SB8 over other maps. Every legislator who testified explained that choice by emphasizing the importance of protecting Speaker Johnson, Majority Leader Scalise, and Representative Letlow. FOF ¶ 137. As Senator Pressly explained, in creating SB8, the Legislature sought to comply with the VRA by creating a second majority-Black district "in a way to ensure that [they] were not getting rid of the Speaker of the House, the Majority Leader," and were protecting Representative Letlow. *Id.* As SB8's sponsor, Senator Womack, stated when he introduced the bill, SB8 was the only plan with two majority-Black districts that achieved these political goals. FOF ¶ 100. Senator Duplessis and Representative Landry testified that it was common knowledge that SB8 was the Governor's map and that one of the Governor's reasons for preferring SB8 was that it would likely unseat Representative Graves. FOF ¶¶ 100–102, 139. Intervenor Davante Lewis, a longtime participant in Louisiana politics, corroborated that view of the political dynamics behind SB8 and put them in a historical context. FOF ¶¶ 139, 142.

Plaintiffs likewise do not seriously dispute that other congressional plans with two majority-Black districts that more closely adhered to traditional redistricting principles were before

the Legislature in January 2024, including SB4 (known as the Price-Marcelle plan). *See* RI-24–RI-46. Indeed, Dr. Voss included a comparison of SB8 to some of those plans, which showed that they outperformed not only SB8 on traditional metrics, but also HB1. RI-295–297.

Yet neither of Plaintiffs' experts made any meaningful effort to separate the effect of the Legislature's political considerations from race in analyzing the reasons that the Legislature adopted SB8 over the alternative maps that included two majority-Black districts. Plaintiffs speculate SB8 may have been chosen for its slightly higher BVAP in CD6, 4/10 Tr. 599:19–25, but there was no evidence that legislators were influenced by that difference. On the contrary, the Legislature rejected an amendment that would have further increased the BVAP. FOF ¶¶ 211–213.

Mr. Hefner conceded that political considerations frequently come into play in redistricting, including whether to favor a particular incumbent. FOF ¶ 164.  But although he was generally aware of the political dynamics surrounding SB8, his analysis did not take them into account. *Id.*; *see also* 4/9 Tr. 321:21–322:5. In addition, Mr. Hefner acknowledged that he had not reviewed other plans introduced in the 2024 session that included two majority-Black districts and could offer no opinion on their adherence to traditional redistricting principles or why they were rejected in favor of SB8. FOF ¶ 159.  Mr. Hefner's opinion that SB8's low scores on compactness and splits relative to HB1 were the product of racial considerations is unreliable. By his own account, he made no attempt to account for the political factors that undisputedly drove the Legislature in configuring a second majority-Black district.

Dr. Voss likewise made no effort to include political considerations in his simulation analyses and was able to offer no opinions on the relative importance of racial and political considerations in the configuration of SB8. *See Cromartie*, 532 U.S. at 253–54 (evidence that race was considered among other factors "says little or nothing about whether race played a

*predominant* role comparatively speaking"). Instead, he offered the opinion that "If you're not trying to draw a second Black majority district, it is very easy to protect Representative Julia Letlow." 4/8 Tr. 108:17–19. That observation misses the point: The question legislators confronted, as Senator Pressly explained, was how to achieve the Legislature's and the Governor's political goals while *also* creating a second majority-Black district to satisfy the VRA and the courts. 4/8 Tr. 81:17–82:1. Of the plans before the legislature, only SB8 accomplished both goals. FOF ¶¶ 101–106; 135–143; 206–15.

Dr. Voss's opinion that it was possible to "pull[] [Rep. Graves] into the second majority-Black district" and to "get [Rep. Letlow] into a heavily Republican, heavily white district" 4/8 Tr. 111:17–19; 112:7–12, without drawing SB8 or having "much effect on the compactness of districts" does not advance Plaintiffs' case for two reasons. 4/8 Tr. 167:5–10. First, Dr. Voss offers no opinion that those two goals could be easily accomplished at the same time or without putting another favored incumbent at risk. 4/8 Tr. 140:10-19 (Dr. Voss conceding that some of his simulations paired Letlow and Speaker Johnson and some put Scalise in danger). Second, insofar as Dr. Voss is offering an opinion that a second majority-Black district could have easily been drawn that targeted Rep. Graves without sacrificing compactness, he seriously undermines his own claim that a plan that includes two compact majority-Black districts in which race does not predominate is difficult or impossible to draw.

The failure to even acknowledge, much less account for, the role of politics in the configuration of SB8 precludes Plaintiffs from meeting their burden to establish that race, not political considerations, predominantly explains the Legislature's choice of SB8 or the specific districting decisions that went into it. *See Cromartie*, 532 U.S. at 257–58.

### 2. The Experts' Other Analysis Misses the Mark

Rather than engage with the legislative decision-making that led to SB8, Plaintiffs' experts

myopically focus on specific ways in which SB8 departs from traditional redistricting principles and assert that they see no reason other than race that accounts for them. But that is only because they looked for no other reason. As the Supreme Court explained in *Bethune Hill*, however, "the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." 580 U.S. at 191. That inquiry requires a holistic analysis and cannot be confined to specific lines that allegedly conflict with traditional redistricting principles. *Id.* ("[E]ven where a challenger alleges a conflict, or succeeds in showing one, the court should not confine its analysis to the conflicting portions of the lines").

First, Mr. Hefner offered an opinion that in creating CD6, the Legislature included more precincts with significant or majority-Black populations than it excluded. FOF ¶ 170. But on cross-examination, Mr. Hefner conceded that every majority-Black district by definition must include more Black population than population of other racial groups. *Id.* And a majority-Black district cannot be created from whole precincts that are not predominantly majority-Black in turn. Mr. Hefner's precinct analysis thus shows nothing more than that the Legislature created a majority-Black district—a fact that, as explained above, is not in dispute and does not on its own show racial predominance. *Vera*, 517 U.S. at 958.

Plaintiffs have pointed to cases in which courts have given weight to evidence of disparities in the populations moved into and out of a district, but these cases arose where the state denied that race was a factor, *e.g.*, *Cromartie*, 532 U.S. at 242, or used a mechanical racial target that lacked a basis in evidence, *e.g.*, *ALBC*, 575 U.S. at 267, *Cooper* v. *Harris*, 581 U.S. 285, 300 (2017). Here, in contrast, there is no dispute that race was a consideration—it had to be for the State to comply with the VRA and avoid a trial that it was likely to lose and that would result in a court-drawn map—and Plaintiffs can point to no evidence that the Legislature relied on a

mechanical target. Consideration of race does not automatically doom a redistricting plan to an equal protection violation. *Shaw I*, 509 U.S. at 646 ("[R]race consciousness does not lead inevitably to impermissible race discrimination").

Mr. Hefner focuses on a single additional parish split in SB8 compared to HB1, but he fails to account for how that additional parish split came about. As the legislative record reveals, Senator Heather Cloud offered an amendment that took part of Avoyelles Parish out of CD6 and placed it back in District 5, adding an additional parish split. FOF ¶ 217. In advocating for the amendment, Senator Cloud explained that its purpose was to further protect Representative Letlow. *Id.* Failing to account for the reason for this split critically undermines the reliability of Mr. Hefner's opinion. *Cf. Theriot II*, 185 F.3d. at 483 (no racial gerrymander where "the Parish was not unaccustomed to splitting districts in order to achieve political goals."). Moreover, Mr. Fairfax explained that SB8 also more equitably distributed parish and municipal splits among districts, with the number of parish splits affecting each district ranging from three to six in SB8 in comparison to a range of one to 11 in HB1 and a similar reduction in the spread of split municipalities among districts. 4/9 Tr. 385:11–386:9; 389:2:21.

Likewise, Mr. Hefner observes that the districts drawn in SB8 were on average less compact mathematically than the districts in HB1. FOF ¶¶ 161–164. He asserts that only race accounts for this purported deficiency, but he fails even to acknowledge that that the Legislature chose SB8 over other more compact options that also included a second majority-Black district, much less tries to account for that choice. Dr. Voss, on the other hand, observes that SB8 was the least compact of all the maps with two majority-Black districts he reviewed, but he offers no view that race can explain the choice of SB8 over those other plans and no view on whether those other plans are or are not consistent with traditional redistricting principles. FOF ¶¶ 173–81, 188.

Where, as here, Defendants have raised politics as a defense, evidence of non-compactness "loses much of its value . . . because a bizarre shape . . . can arise from a 'political motivation' as well as a racial one," *Cooper*, 581 U.S. at 308, "[a]nd crucially, political and racial reasons are capable of yielding similar oddities in a district's boundaries." *Id.* In looking at these aspects of SB8 in isolation, divorced from the reality in which SB8 was adopted—particularly the political backdrop and the availability of alternative plans—Plaintiffs' experts have failed to engage in the holistic analysis the Supreme Court requires before racial predominance can be found. *Bethune-Hill*, 580 U.S. at 192.

**C.      Plaintiffs' Argument that a Reasonably Compact Majority-Minority District is Impossible Is Irrelevant and Unsupported**

Failing to account for the choice of SB8 over other VRA-compliant plans or to explain away SB8's sponsors political motivations, Plaintiffs suggest these facts don't matter because *any* congressional plan in Louisiana that includes two majority-Black districts would violate the Fourteenth Amendment. Plaintiffs' attempt to demonstrate that it is impossible to create a compact second majority-Black district provides the wrong answer to the wrong question. The question before this Court is whether SB8's CD6 is explicable predominantly on racial, as opposed to political, grounds. Plaintiffs' efforts to show a second majority Black district is not possible are a diversion and are contradicted by the evidence in this case and the findings of the *Robinson* district court and Fifth Circuit.

Plaintiffs have not and indeed cannot demonstrate that a compact second majority-Black congressional district is impossible to create in Louisiana. Although Mr. Hefner initially offered the opinion that "you can't create a second majority-minority district and still adhere to traditional redistricting criteria," 4/9 Tr. 271:20–22, on cross examination, he abandoned that categorical assertion. He disclaimed any opinion on whether other plans with two majority-Black districts the

Legislature in 2024 were or were not consistent with traditional principles. *Id.* at 319:11–16. When asked whether he had a basis to assert that "it's impossible to create a congressional plan with two majority-Black districts that perform well on traditional redistricting principles," Mr. Hefner responded, "I can't offer an opinion on that." *Id.* at 320:1–5.

Dr. Voss's simulations analysis also failed to show that that a plan with two majority-Black districts is impossible without what he calls "egregious racial gerrymandering." 4/8 Tr. 91:10–13. As Dr. McCartan explained and Dr. Voss conceded, "simulations can't prove something is possible or isn't," but rather are designed to answer questions about what is typical. *Id.* at 196:13–23. Thus, in attempting to use simulations to answer the question about the possibility of creating a district with two reasonably compact majority-Black districts, Dr. Voss was using the wrong tool. Moreover, due to errors in design and execution, the simulations Dr. Voss conducted failed to answer even the narrower question whether plans with two majority-Black districts are "typical." *E.g.*, FOF ¶¶ 173–74, 183–88. With respect to his "race-neutral" simulations, the Supreme Court has considered and rejected the proposition that race-neutral simulations offer meaningful insight into whether race predominated in a map drawn to comply with the VRA because race-neutrality is not the relevant benchmark. *Milligan*, 599 U.S. at 34–35. As for Dr. Voss's purportedly "race conscious" simulations, as Dr. McCartan explained, all but one of his efforts to include consideration of race in his simulations failed to actually do so. Instead, his race constraints— because of flaws in their design—dropped out of the picture so early in the simulation process that they had no effect on the resulting simulated plans. FOF ¶¶ 191–196. And the one simulation that included sufficient racial information to have any impact on the results had so little racial information that it could not possibly support the conclusion that only "egregious racial gerrymandering" would allow a second majority-Black district. FOF ¶¶ 197–201.

On cross-examination of Dr. McCartan, Plaintiffs made much of the failure of a separate research project designed to evaluate the effect of partisanship on Louisiana's congressional map to produce two majority-minority districts. But as Dr. McCartan explained, that project, known as ALARM, was not designed to test whether maps with two majority-minority districts were possible or typical. FOF ¶¶ 202–203. Instead, it was constrained to try to draw the same number of majority-minority districts as in the State's existing congressional plan, which at the time was one. FOF ¶¶ 203–205. Even with that status quo constraint, the simulation occasionally produced two majority-minority districts. FOF ¶ 205.

Plaintiffs flawed evidence on the *possibility* of creating a reasonably configured congressional plan with two majority-Black districts thus does not establish that race predominated in SB8. Moreover, Plaintiffs' suggestion that such a plan is impossible based on inferences drawn from faulty simulations and limited analysis of only a few plans requires ignoring the unrebutted evidence that the Legislature considered numerous plans that contained two majority-Black districts and performed far better than either SB8 or HB1 on the traditional metrics Mr. Hefner and Mr. Voss considered important. *See* FOF ¶¶ 160–161; FOF ¶ 36 (Sen. Duplessis describing the numerous plans before the 2022 legislature that included two majority-Black districts); FOF ¶ 124 (describing Mr. Fairfax's 2022 plan HB12); FOF ¶¶ 125–134 (describing SB4).

Plaintiffs' position would also require this Court to disregard the conclusions of the district court in *Robinson* that Plaintiffs there "put forth several illustrative maps which show that two congressional districts with a BVAP of greater than 50% are easily achieved," that this population is "sufficiently 'geographically compact,'" and that there was "*no factual evidence* that race predominated in the creation of the illustrative maps." *Robinson I*, 605 F.Supp.3d at 821–22, 838. In upholding the District Court's findings, the Fifth Circuit concluded that "race was properly

considered by the Plaintiff experts when drawing their several illustrative maps" and that the district court "did not clearly err in its factual findings that the illustrative maps were not racial gerrymanders." *Robinson III*, 86 F.4th at 595.

**D.      Congressional District 6 Preserves Communities of Interest**

Plaintiffs suggest that SB8's CD6 does not respect communities of interest and that it cannot be justified on that ground. Once again, Plaintiffs ignore the legislative record and their experts fail to engage with communities that CD6 does include.

The legislative record and testimony from multiple fact witnesses demonstrates that CD6 reflects communities defined by shared needs and interests, owing to similarities in "socio-economic status, education, employment, health, and other characteristics." *League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399, 424 (2006) ("*LULAC*") (citation omitted); *Theriot II*, 185 F.3d at 486–87 (accepting evidence of communities of interest not explicitly mentioned in the legislative record). The Legislature emphasized that CD6 tied together communities with shared interests along the Red River and I-49 corridor, including shared economic and agricultural ties, as well as common education, healthcare, and infrastructure interests. FOF ¶ 144. Testimony at the roadshows the Legislature conducted around the state in 2021–2022 confirm the shared interests of communities throughout CD6. FOF ¶ 27–34. Testimony from Mayor Cedric Glover of Shreveport and Pastor Steven Harris of Natchitoches, both lifelong residents of cities in CD6, corroborated these ties, highlighting nonracial commonalities such as faith connections, economic needs, educational institutions and hospital systems, and a distinct shared culture within the district. 4/9 Tr. 457:17–458:18; 486:18–487:18; 467:20–468:14; 4/10 Tr. 578:14–579:6.

Mr. Hefner's contrary testimony that SB8 divides communities of interest is unreliable and unpersuasive. He bases that opinion largely on an analysis of parish and municipal splits, which he also treats as a separate metric. FOF ¶ 167. He offers opinions about communities of interest

based on a parish level map of agricultural GDP in absolute dollars, but he conceded that this map does not provide sufficient information to assess the specific agricultural communities in or out of CD6 or the relative importance of an agricultural economy to those communities. FOF ¶ 168. Finally, he cited a map of Louisiana Folklife Regions, but Plaintiffs did not enter that map into the record and Mr. Hefner conceded that it was not intended for use in redistricting. FOF ¶ 169. He could not offer any comparative analysis of the treatment of those regions among alternative plans, and specifically between SB8 and HB1. *Id.* His conclusions should be given little or no weight.

That CD6 may include more than one community of interest is not a violation of traditional redistricting principles or evidence of racial predominance. As Senator Seabaugh testified, even his much smaller state senate district includes multiple communities of interest. 4/8 Tr. 53:7–54:4. Thus, unlike the district in *LULAC*, CD6 unites communities defined by tangible shared characteristics, needs, and interests.

### E.      Comparisons to *Hays* are a Red Herring

Although Plaintiffs ask this Court to ignore the recent history leading up to the special session and SB8, they offer a flawed analogy to even older history they say is outcome-determinative. Plaintiffs suggest the Court should strike down SB8 because another three-judge court struck down a map with two majority-Black districts 30 years ago in the *Hays* litigation. But the "invocation of *Hays* is a red herring." *Robinson I* at 834, 852 (rejecting similar assertions by the State that the "*Hays* maps [were] instructive, applicable or otherwise persuasive" or "useful comparators"). The *Hays* court never held that two majority-Black districts are *per se* invalid or could never be required by the VRA. Evidence at trial confirms the findings of the *Robinson* court that a second majority-Black district was easily drawn in Louisiana consistent with traditional redistricting criteria. 4/9 Tr. 380:4–383:12; 396:22–397:15.

Contrary to Plaintiffs' suggestion, the superficial resemblance of portions of the *Hays* map

to SB8 is not dispositive or even particularly relevant. What is relevant in analyzing racial predominance is the reason lines are drawn, not supposed bizarreness *per se*. In *Hays*, the court concluded that race predominated because the cartographer admitted that he "concentrated virtually exclusively on racial demographics and *considered essentially no other factor* except the ubiquitous constitutional 'one person-one vote' requirement." *Hays* v. *State*, 936 F. Supp. 360, 368 (W.D. La. 1996) (emphasis added). The court also found the proffered justifications for the district's shape to be "patently post-hoc rationalizations," explaining that "neither the Red River nor socio-economic factors were relied on by legislators at the time of the drawing of the district." *Id.* at 369. Here, in contrast, the legislative record illustrated that political considerations were paramount and that economic and other commonalities provided a rationale for the district's configuration at the time it was enacted. FOF ¶¶ 136–144; *see Cromartie*, 532 U.S. at 257; *Theriot II*, 185 F.3d at 483 (no racial gerrymander where "political incumbency 'drove the pencil'").

Moreover, even the shape and configuration of the districts in SB8 and *Hays* differ materially. Plaintiffs' own demographer conceded that SB8's CD6 only shares 70% of the same population as the district struck down in *Hays*. 4/9 Tr. 308:5–7. The difference of geography and population would require the Plaintiffs to engage in a specific analysis of SB8 because "racial gerrymandering as a claim [requires a showing] that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *ALBC*, 575 U.S. at 263 (emphasis in original); *see also Cromartie*, 532 U.S. at 237 (upholding a politically driven map against a racial gerrymandering claim when a similar district was previously struck down). *Hays* does not control the outcome here or relieve the Plaintiffs of their burden of proving that race predominated in SB8.

## II.    <u>The Consideration of Race in the Enactment of SB8 Was Narrowly Tailored</u>

Even if race had predominated in the creation of SB8, the Legislature's use of race in the plan was narrowly tailored to comply with the VRA. *Bethune-Hill*, 580 U.S. at 193.

16

**A.      The Legislature Had a Strong Basis in Evidence to Believe a Map with Two Black Opportunity Districts was Required by the VRA**

The evidence at trial makes clear that the Legislature had the requisite strong basis in evidence to conclude that the VRA required it to adopt a plan with two majority-Black Congressional districts. A strong basis in evidence "does not demand that a State's actions actually be necessary to achieve a compelling state interest in order to be constitutionally valid." *ALBC*, 575 U.S. at 278 (2015). Defendants need only demonstrate the Legislature has "'*good reasons* to believe' it must use race in order to satisfy the Voting Rights Act." *Bethune-Hill*, 580 U.S. at 194 (emphasis in original); *see also Wygant* v. *Jackson Bd. of Ed.*, 476 U.S. 267, 291 (1986) (O'Connor, J., concurring in part and concurring in judgment). A legislature is not required to wait for a court decision on a VRA violation before it may take race-conscious remedial action. *ALBC*, 575 U.S. at 278 (a strong basis in evidence exists "even if a court does not find that the actions were necessary for statutory compliance."); *Bethune-Hill*, 580 U.S. at 194 (same).

Here, of course, the Legislature was presented with the rare circumstance in which a court—indeed multiple courts—did find that the VRA would likely be violated absent the enactment of a congressional map containing two majority-Black districts. The district court in *Robinson*, based on evidence presented during a five-day hearing and after hearing from 14 experts, concluded in a 152-page opinion that the plaintiffs were substantially likely to establish each of the *Gingles* preconditions and, in light of the totality of the circumstances, a violation of the Voting Rights Act. *See Robinson I*, 605 F. Supp. 3d at 766. Two unanimous panels of the Fifth Circuit—first, denying the State's motion to stay pending appeal, *see Robinson II*, and second, by the full merits panel, *see Robinson III* at 600–601—agreed with the district court's findings. Those proceedings were at the center of the 2024 Special Session.

Plaintiffs concede that the Special Session was convened by Governor Landry to preempt

trial in *Robinson*. In calling the session, Landry expressly referenced his role in contesting the *Robinson* litigation, stating he had "exhausted all legal remedies" and it was time to "heed the instructions of the Court" and "make the adjustments necessary" to comply with the VRA. JE-35 at 11. Plaintiffs also do not contest—indeed they emphasize—that Judge Dick's ruling was a focal point of the legislative testimony. *E.g.*, FOF ¶¶ 117–121; JE28 at 54:15–56:5; 4/10 Tr. 597:3–8.

Plaintiffs point to no authority that a judicial decision may not constitute a strong basis in evidence. And where on-point judicial decisions are available, courts have held the opposite. *E.g.*, *Theriot* v. *Par. of Jefferson*, 1996 WL 637762, at *1 (E.D. La. Nov. 1, 1996) ("copious litigation and appeals" finding that each *Gingles* precondition was satisfied provided the state with "a strong basis in evidence to believe a black-majority district was reasonably necessary to comply with Section 2 and thus provided a compelling interest in drawing [an additional] majority-minority district") (internal quotations omitted); *cf. Abbott* v. *Perez*, 585 U.S. 579, 616 (2018) (where legislature adopted new districting map to resolve VRA litigation, evidence from litigation record could provide "good reasons" to use race in remedial map); *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1408 (5th Cir. 1996) (holding that there was a strong basis in evidence for concluding a VRA-compliant map was necessary where court had "already found that the three *Gingles* preconditions exist[ed] [t]here").

None of Plaintiffs' counterarguments have merit. In their Reply Brief in support of their Motion for Preliminary Injunction, Plaintiffs argue that the decisions of the Middle District and Fifth Circuit cannot provide a strong basis in evidence to the Legislature "[b]ecause neither . . . *finally* concluded that Louisiana requires two majority-minority districts." ECF 101 at 11 (emphasis added). But the law requires "good reasons," not certainty, on the part of the legislators.

Plaintiffs' more aggressive formulation of their proposed rule goes even farther. Under that

formulation, individual legislators must undertake an independent analysis of things like "turnout rates," "results of recent contested elections," "[RPV] analysis," and "statistical evidence of racial blo[c] voting," 4/10 Tr. 605:22–606:1. Such a rule would exclude even *final* judicial determinations from constituting "good reasons" to adopt a VRA-compliant map. Indeed, even a final judgment by the Supreme Court would not protect a legislature from a racial gerrymandering challenge unless the legislature engaged in its own independent expert work. In effect, Plaintiffs' rule would demand that legislators defy court decisions or face liability under the Fourteenth Amendment unless they subjectively agree with the court's legal analysis and independently verify the evidentiary basis of its decision. That is not and cannot be the law.

**B.      The Use of Race in the Creation of SB8 was Narrowly Tailored to Satisfy the VRA**

The Legislature's use of race in crafting SB8 was narrowly tailored to satisfy the State's legal obligation to comply with Section 2 of the VRA. *Bethune-Hill*, 580 U.S. at 193 ("When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the Voting Rights Act, the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made.") (cleaned up).

Courts have consistently held that a map is narrowly tailored so long as it "does not 'subordinate traditional districting principles to race substantially more than is 'reasonably necessary to avoid § 2 liability.'" *Clark*, 88 F.3d at 1407 (quoting *Vera*, 517 U.S. at 979). States are accorded "leeway" in seeking to comply with the VRA. *Vera*, 517 U.S. at 977. The Legislature exercised that leeway to enact SB8, which substantially addresses the likely Section 2 violation found in *Robinson* because it includes two districts in which the BVAP is no higher than necessary to create the electoral opportunities § 2 requires.

The record at trial confirms that the Legislature did not "subordinate traditional districting principles *to race* substantially more than is reasonably necessary to avoid § 2 liability.'" *Clark*,

88 F.3d at 1407 (emphasis added). To the contrary, to the extent SB8 departs from traditional redistricting principles, the evidence shows that those principles were subordinated to political considerations, not race. *See supra*. In any event, the Constitution does not mandate that congressional maps may *never* deviate from the bounds of traditional restricting principles. The Supreme Court has instructed that "Section 2 does not forbid the creation of a noncompact majority-minority district." *LULAC*, 548 U.S. at 430; *see also Addy* v. *Newton Cnty., Miss.*, 2 F. Supp. 2d 861, 862–64 (S.D. Miss. 1997) (finding "no equal protection violation since the decision as to where to place the district lines was driven by politics, not race"); *Theriot II*, 185 F.3d at 490 ("[T]o the extent the current District 3 exceeds the benchmark [BVAP percentage], political incumbency and other political concerns were the driving force."). The fact that the districts in SB8 are not as compact as the prior plan and that it splits an additional parish is simply not evidence that its use of race is insufficiently narrowly tailored. *See Vera*, 517 U.S. at 977 ("We thus reject, as impossibly stringent, the District Court's view of the narrow tailoring requirement, that 'a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria.'") (cleaned up).

Plaintiffs further argue that SB8 was insufficiently tied to the compelling interest of § 2 compliance because there was no evidence that it would provide Black voters with an opportunity to elect candidates of choice. The record, however, belies that assertion. Senator Womack, SB8's sponsor, responded to questions about performance by explaining that he had seen a partisan performance analysis that showed CD6 would reliably elect Democrats. FOF ¶ 207. This proxy for racial performance was sufficient to meet the narrow tailoring requirement. In addition, both Sen. Duplessis testified he believed based on the data they had seen, including racial demographics and voter registration data, that CD6 constituted a functional majority-Black district. FOF ¶¶ 126,

207. Once again, the Legislature was not required to get the BVAP exactly right. *Cf. ALBC*, 575 U.S., at 278 ("The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5 demands.").

Plaintiffs also argue that "you have to remedy in a VRA case the injury that was proved by the VRA plaintiffs in their own region, in the district where they prove there should be a second map drawn, a second district drawn." 4/10 Tr. 604:8–11. But there is no requirement for the State to show that the VRA requires the *specific* map the Legislature adopts. The district court in *Robinson* found a likely violation of Section 2 based on an illustrative map that included the cities of Baton Rouge, Lafayette, and Alexandria, which are also included in the new majority-Black district in SB8. *Robinson I*, 605 F. Supp. 3d at 766. The *Robinson* record also included evidence of racial polarization throughout the state, including in CD4, which includes Caddo, DeSoto, and Natchitoches Parishes. *Id.* at 802–03. The State thus had reason to believe that a new majority-Black district uniting these areas was sufficiently tied to the demonstrated Section 2 violation to be within the leeway the Constitution affords. *Cf. LULAC*, 548 U.S. at 430 (where a state must choose among voters "with a § 2 right" because all cannot be drawn into majority-minority districts, it cannot be faulted for its choices).

## III.    Plaintiffs Failed to Establish Intentional Discrimination at Trial

Plaintiffs fail to establish that they have standing to assert their claim of intentional discrimination.[1] To establish an intentional discrimination claim, Plaintiffs must show that they were discriminated against based upon their race, but the trial record is devoid of any evidence of Plaintiffs' race. *See Fusilier* v. *Landry*, 963 F.3d 447, 463 (5th Cir. 2020) (discrimination must be

---

[1] Plaintiffs Caissie, McCollister, Peavy, Johnson, Odell, LaCour, Whitney, and Weir likewise lack standing with respect to racial gerrymandering because they do not reside in CD6. *See Hays*, 515 U.S. at 745-46 (holding that plaintiffs who reside outside of an allegedly racially gerrymandered district lack standing); *Shaw II*, 517 U.S. at 904.

against an "identifiable group"). Plaintiffs have also failed to offer evidence of the essential elements of an intentional discrimination claim. Plaintiffs have offered no evidence that SB8 had a discriminatory effect on them based on their race and, even if it had, no evidence of discriminatory intent—that the Legislature acted "because of" not "in spite of" the discriminatory effect of its actions. *See id.* at 466.

**IV.** **The Middle District and Fifth Circuit Validly Held That It Is Possible to Draw Two Majority-Black Congressional Districts Consistent with the Equal Protection Clause**

We respond here to Judge Joseph's questions on the first day of trial whether the district court in *Robinson* evaluated whether two majority-Black congressional districts are possible without violating the Equal Protection Clause, and whether the district court and the Fifth Circuit had statutory authority to decide that question. The answer to these questions is yes.

In *Robinson*, the district court and the Fifth Circuit properly decided the plaintiffs' Section 2 claim and addressed the constitutional arguments that the State raised in defense. To satisfy *Gingles* I, the plaintiffs submitted illustrative plans demonstrating that it was possible to create a second majority-Black district that was reasonably configured and respected traditional redistricting principles. *See Thornburg* v. *Gingles*, 478 U.S. 30, 46–51 (1986); *Milligan*, 599 U.S. at 18 (reaffirming *Gingles* framework). The defendants argued that "race was the predominant factor in configuring a second majority-BVAP congressional district in the illustrative plans," and they therefore failed to satisfy *Gingles*. *See Robinson I* at 823.

The district court considered and rejected defendants' arguments, concluding that the *Robinson* illustrative plans demonstrated that two majority-Black districts had been drawn with respect for traditional redistricting principles and without predominant consideration of race. *See Robinson I* at 831–38. In reaching that conclusion, the court analyzed the standards for determining claims of racial gerrymandering under the principal cases on which plaintiffs rely here, including

22

*Bethune-Hill* and *Shaw. Id.* at 770, 835–38. Applying those standards, the court concluded that there was "*no factual evidence* that race predominated in the creation of the illustrative maps" and that "the record d[id] not support a finding that race predominated in the illustrative map-making." *Id.* at 838 (emphasis in original). Both Fifth Circuit panels concurred with the district court's analysis. *Robinson II* at 222–24; *Robinson III* at 592–596.

Judge Dick's recent order denying plaintiffs' motion to apply the first filed rule does not change the analysis. *See Robinson I*, ECF No. 370. Her observation that "[t]he Western District confronts constitutional questions that were not before this Court in the captioned matter," simply acknowledges that there was no racial gerrymandering or intentional discrimination challenge to SB8 or any other state-enacted map in *Robinson. Id.* at 6. The order does not suggest that the court did not address whether the illustrative plans were drawn without race as the predominant factor or whether a map with two majority-Black districts could be drawn without race predominating. Those questions had been answered in the affirmative in the *Robinson* preliminary injunction, and those findings were affirmed on appeal.

The district court's jurisdiction in *Robinson* under 28 U.S.C. § 1331 empowered the court, and the Fifth Circuit on appeal, to resolve all issues properly presented in the litigation, including the Equal Protection argument asserted by defendants. *See Fed. Bureau of Investigation* v. *Fikre*, 144 S. Ct. 771, 777 (2024) ("A court with jurisdiction has a 'virtually unflagging obligation' to hear and resolve questions properly before it.") (citation omitted); *Aldinger* v. *Howard*, 427 U.S. 1, 7 (1976) ("[W]here federal jurisdiction is properly based on a colorable federal claim, the court has the 'right to decide all the questions in the case.'") (citation omitted). No party or any of the six Fifth Circuit judges on the motions and merits panels, nor the Fifth Circuit considering a request

for rehearing en banc, nor the Supreme Court upon granting and vacating a stay, questioned the district court's statutory authority to address that issue.

The three-judge court statute calls for convening a panel based on the claims asserted by a plaintiff. 28 U.S.C § 2284(a). Nothing in the statute permits the appointment of a three-judge panel based on a *defense* asserted to a statutory claim or purports to preclude a single-judge district court from determining constitutional issues raised as a defense to a statutory claim. Such an a-textual reading would hamstring the ability of the federal courts to resolve § 2 cases. *See* Wright & Kane, *Pendent Claims and Supplemental Jurisdiction*, 20 Fed. Prac. & Proc. Deskbook § 20 (2d ed.) ("[A] court of original jurisdiction could not function, as [Chief Justice] Marshall recognized, unless it had power to decide all the questions that the case presents."). If a defendant could redefine jurisdiction by raising a constitutional defense, then either the defendant would be precluded from raising the defense in a single-judge VRA court or the court would be unable to fully resolve the plaintiff's claims. Nothing in the statute suggests that Congress intended such an impractical and wasteful result, and no court has ever so held. *Cf. Thomas* v. *Bryant*, 919 F.3d 298, 308 (5th Cir. 2019) (recognizing "the longstanding principle that 'congressional enactments providing for the convening of three-judge courts must be strictly construed'") (citation omitted).

Indeed, multiple single-judge district courts deciding statutory § 2 claims have ruled on constitutional defenses to statutory claims similar to those asserted by the defendants in *Robinson*. *See, e.g.*, *Caster* v. *Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *80 (N.D. Ala. Jan. 24, 2022); *Alpha Phi Alpha Fraternity Inc.* v. *Raffensperger*, 587 F. Supp. 3d 1222, 1282 (N.D. Ga. 2022); *Chestnut* v. *Merrill*, 356 F. Supp. 3d 1351, 1357 (N.D. Ala. 2019). In *Milligan*, the Supreme Court passed on a near-identical racial gerrymandering defense raised in *Caster* in defense to a § 2 plaintiff's illustrative plans, and no justice expressed a concern about the district

court's jurisdiction or authority to decide the issue. *See Milligan*, 599 U.S. at 32; *id.* at 59 (Thomas, J., dissenting). Intervenors have identified no case in which the jurisdiction of the district court to address and rule upon such a defense has been called into question.

Because the Middle District had jurisdiction of the *Robinson* plaintiffs' § 2 claim, the Fifth Circuit had jurisdiction of the appeal of the preliminary injunction under 28 U.S.C. § 1291(a)(1). Therefore, the Fifth Circuit validly affirmed the Middle District's analysis of the racial gerrymandering defense on appeal.

## **CONCLUSION**

Plaintiffs have failed to meet their burden of proving racial predominance in SB8, a map drawn to comply with court rulings that HB1, the prior congressional map, violated the VRA. And in any event, the State had a strong—indeed the strongest—basis in evidence to believe it must create a second majority-Black congressional district and its choice for political reasons of a map that scored lower on traditional redistricting principles than available VRA-compliant alternatives does not defeat the narrow tailoring required to survive strict scrutiny. In addition, Plaintiffs have offered essentially no evidence of key elements of their intentional discrimination claim. This Court should deny Plaintiffs request for a preliminary injunction and enter judgment in favor of the Defendant and the Intervenor-Defendants.

DATED: April 17, 2024

Respectfully submitted,

By: /s/ *Tracie L. Washington*
Tracie L. Washington
LA. Bar No. 25925
Louisiana Justice Institute
8004 Belfast Street
New Orleans, LA 70125
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

By: /s/ *Stuart Naifeh*
Stuart Naifeh (admitted pro hac vice)
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
snaifeh@naacpldf.org

*Counsel for Robinson Intervenors Dorothy Nairne, Martha Davis, Clee Earnest Lowe, and Rene Soule*

*Counsel for the Robinson Intervenors*

Kathryn Sadasivan*
Victoria Wenger*
Colin Burke*
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
ksadasivan@naacpldf.org
vwenger@naacpldf.org
cburke@naacpldf.org

R. Jared Evans
LA. Bar No. 34537
I. Sara Rohani*
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Sarah Brannon*
Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org
mkeenan@aclu.org

Nora Ahmed
NY Bar No. 5092374 (pro hac vice forthcoming)
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

John Adcock
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Tel: (504) 233-3125
jnadcock@gmail.com

Robert A. Atkins*
Yahonnes Cleary*
Jonathan H. Hurwitz*
Amitav Chakraborty*
Adam P. Savitt*
Arielle B. McTootle*
Robert Klein*
Neil Chitrao*
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com
amctootle@paulweiss.com
rklein@paulweiss.com
nchitrao@paulweiss.com

Sophia Lin Lakin*
Garrett Muscatel*
Dayton Campbell-Harris (pro hac vice
forthcoming)**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org
gmuscatel@aclu.org
dcampbell-harris@aclu.org

T. Alora Thomas-Lundborg*
Daniel Hessel*
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

*Additional counsel for the Robinson Intervenors*

*  Admitted pro hac vice.
**Practice is limited to federal court.*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which provides electronic notice of filing to all counsel of record, on this 17th day of April, 2024.

<u>/s/ *Stuart Naifeh*</u>
Stuart Naifeh