**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION**

PHILLIP CALLAIS, LLOYD PRICE,
BRUCE ODELL, ELIZABETH ERSOFF,
ALBERT CAISSIE, DANIEL WEIR,
JOYCE LACOUR, CANDY CARROLL
PEAVY, TANYA WHITNEY, MIKE
JOHNSON, GROVER JOSEPH REES,
ROLFE MCCOLLISTER,

     *Plaintiffs*,

     v.

NANCY LANDRY, in her official capacity
as Secretary of State for Louisiana,

     *Defendant*.

Civil Action No. 3:24-cv-00122

Judge David C. Joseph

Circuit Judge Carl E. Stewart

Judge Robert R. Summerhays

**_ROBINSON_ INTERVENORS PROPOSED FINDINGS OF FACT**

# TABLE OF CONTENTS

I.  The Parties ............................................................................................................... 2

    A.  Plaintiffs ........................................................................................................ 2

    B.  Defendant ....................................................................................................... 3

    C.  Intervenor-Defendant the State of Louisiana ................................................ 4

    D.  Robinson-Intervenor Defendants .................................................................. 4

II.  Louisiana's Long History of Disenfranchising and Discriminating against Black Voters. ..................................................................................................................... 5

III.  2020 Census and 2022 Redistricting ...................................................................... 6

    A.  2020 Census ................................................................................................... 6

    B.  Roadshows and legislative hearings (2021–2022) ....................................... 6

    C.  Proposed maps presented to the Legislature with two majority-Black districts .......................................................................................................... 7

    D.  Legislature rejects proposed plans with two majority-Black congressional districts and  instead enacts HB1 over then-Governor Edwards's veto ................. 8

IV.  The *Robinson* Litigation ........................................................................................ 9

    A.  *Robinson I*: Judge Dick found on the basis of an extensive evidentiary record that HB1 likely violated Section 2 and that the appropriate remedy was a new plan with two majority-Black congressional districts ...................... 9

    B.  The Legislature reconvenes in Special Session in light of Judge Dick's ruling but again fails to adopt new plan with two majority-Black districts, although once again proposed plans with two such districts are presented .......... 13

    C.  *Robinson* II: A unanimous panel of the Fifth Circuit denies defendants' motion for a stay pending appeal ................................................................ 14

    D.  Supreme Court grants cert before judgment and orders case held in abeyance pending a ruling in *Milligan*, eventually vacating the stay in June 2023 .............................................................................................................. 15

    E.  *Robinson III*: The merits panel of the Fifth Circuit unanimously endorses Judge Dick's reasoning and factual findings, and vacates the PI solely for timing reasons ............................................................................................ 16

V.  2024 Special Session .............................................................................................. 19

    A.  Governor Landry calls the Special Session to address redistricting, and urges the Legislature to adopt a plan with two majority-Black districts that will satisfy the Voting Rights Act ................................................................ 19

    B.  Multiple maps with two majority-Black districts are presented to the Legislature, including maps closely resembling the *Robinson* Plaintiffs' remedial maps ................................................................................................ 20

C.      Legislature instead adopts SB8 ................................................................ 21

VI.     This Case ................................................................................................................ 22

VII.    Plaintiffs Have Not Established That Race Predominated in the Drawing and Adoption of SB 8 .................................................................................................. 23

A.      The evidence did not show that race predominated in the drafting of SB8 .......... 23

B.      The Legislature sought to comply with the federal courts' rulings in *Robinson* ................................................................................................................ 23

C.      The Legislature was aware that a congressional district plan in Louisiana can be drawn with two majority-Black districts consistent with traditional redistricting principles ........................................................................................... 25

D.      In drawing and selecting SB8 rather than one of the alternative maps presented, the Legislature sought to further the political interests of the State, the Governor, and the legislative majority of protecting Speaker Johnson, Majority Leader Scalise, and Representative Letlow, and in retaliating against Representative Graves ................................................................ 28

E.      The Legislature respected legitimate communities of interest in the drawing of CD6 in SB8 .......................................................................................... 30

F.      The opinions of plaintiffs' experts are not reliable and the experts do not show that SB8 was predominantly driven by race or that it is impossible to draw a congressional district plan in Louisiana with two majority-Black districts consistent with TRPs .................................................................................. 35

        1.      Overholt ...................................................................................... 35

        2.      Hefner ......................................................................................... 35

        3.      Voss ............................................................................................. 40

                a)      Dr. Voss' "race-neutral" simulations ............................ 41

                b)      Dr. Voss' "race-conscious" simulations ........................ 45

                c)      ALARM Project ............................................................. 47

VIII.   SB8 Was Enacted to Further the State's Compelling Interest in Complying with Section 2 of the VRA ........................................................................................ 48

A.      The evidence available to the Legislature supports the conclusion that a second majority-Black district was required by Section 2 of the VRA. ............... 48

IX.     SB8 is Narrowly Tailored to Achieve the Compelling State Interest in Complying with the VRA ......................................................................................... 50

A.      SB8 does not take account of race more than necessary to comply with the VRA .................................................................................................................... 50

B.      Demographic conditions have changed since the *Hays* litigation ........................ 51

X.      Plaintiffs have not established that SB 8 has a discriminatory effect or was enacted with a discriminatory purpose .............................................................. 52

## CITATION GLOSSARY

| Party | Exhibit Designation |
|-------|---------------------|
| Plaintiffs | PE-## |
| Robinson Intervenors | RI-## |
| Joint Parties | JE-## |

## TRANSCRIPT INDEX

| Date | Citation Format |
|------|-----------------|
| Monday, April 8, 2024 | 4/8 Tr. ##:##-##:## |
| Tuesday, April 9, 2024 | 4/9 Tr. ##:##-##:## |
| Wednesday, April 10, 2024 | 4/10 Tr. ##:##-##:## |

**INTRODUCTION**

*Robinson*-Intervenor Defendants respectfully submit the following proposed findings of fact. The evidence at trial showed that race did not predominate in the Legislature's decision to enact SB8. "[I]ntentional creation of majority-minority districts" without more is not sufficient to establish racial predominance or trigger strict scrutiny. *Bush* v. *Vera*, 517 U.S. 952, 958 (1996). Plaintiffs must show more than that race was simply "*a* motivation for the drawing of a majority-minority district"; they must show it was "the predominant factor motivating the legislature's districting decision." *Easley* v. *Cromartie*, 532 U.S. 234, 241 (2001) (emphasis in original; cleaned up). Plaintiffs did not present evidence to satisfying these standards.

No witness disputes that the Legislature selected a plan that included two majority-Black districts in an effort to comply with the *Robinson* court rulings and the Voting Rights Act. The undisputed evidence also shows that the configuration of SB8 chosen by the Legislature was designed to further the political interests of the State, the Governor, and the majority of legislators. Plaintiffs' own legislative witness Senator Thomas Pressly agreed that SB8 created a second majority-Black district "in a way to ensure that [they] were not getting rid of the Speaker of the House, the Majority Leader," and also protected Congresswoman Julia Letlow. 4/8 Tr. at 72:3–7.

The testimony of Plaintiffs' experts likewise does not show racial predominance—much less that *any* Congressional district map in Louisiana with two majority-Black districts is necessarily a racial gerrymander. Neither expert adequately accounted for the political motives established by the legislative record and consistently attested to by the legislators and other fact witnesses who testified.

The evidence also shows that SB8 reflects the Legislature's reasonable judgments that the new majority-Black CD6 preserved communities of interests in central Louisiana.

- 1 -

Furthermore, the evidence at trial showed that the Legislature had a strong—compelling—basis in evidence to conclude that the VRA required the State to adopt a plan with two majority-Black Congressional districts. The courts' rulings in the *Robinson* case that the plaintiffs were substantially likely to establish each of the *Gingles* preconditions and, in light of the totality of the circumstances, a violation of the Voting Rights Act were issued over nearly two years of litigation. And during this litigation, the courts, including two unanimous panels of the Fifth Circuit, squarely rejected the State's central defenses. The courts in *Robinson* engaged in a comprehensive analysis of the relevant factors across the State.

SB8 was narrowly tailored to satisfy the VRA. It includes two majority-Black districts, as Judge Dick held was the appropriate remedy, and the Black voting-age population in both districts is slightly above 50%. The Legislature rejected an amendment that would have increased the BVAP in both districts. That SB8 is not as compact as other alternative maps the Legislature considered and splits more parishes than those other maps is immaterial, because the configuration of the majority-Black districts was driven by political rather than racial reasons. And, as the Supreme Court has repeatedly held, legislatures retain broad discretion in drawing districts to comply Section 2, and are not required to draw the same district that a court would impose.

Plaintiffs' motion for a preliminary injunction should be denied and judgment should be entered in favor of defendants and the Robinson Intervenors.

## I.     The Parties

### A.     Plaintiffs

1.     Plaintiff Philip Callais is a registered voter of District 6. PE-39 ¶ 1. Their race was not established in evidence.

2.     Plaintiff Albert Caissie, Jr. is a registered voter of District 5. PE-39 ¶ 2. Their race was not established in evidence.

3.      Plaintiff Elizabeth Ersoff is a registered voter of District 6. PE-39 ¶ 3. Their race was not established in evidence.

4.      Plaintiff Grover Joseph Rees is a registered voter of District 6. PE-39 ¶ 4. Their race was not established in evidence.

5.      Plaintiff Lloyd Price is a registered voter of District 6. PE-39 ¶ 5. Their race was not established in evidence.

6.      Plaintiff Rolfe McCollister is a registered voter of District 5. PE-39 ¶ 6. Their race was not established in evidence.

7.      Plaintiff Candy Carroll Peavy is a registered voter of District 4. PE-39 ¶ 7. Their race was not established in evidence.

8.      Plaintiff Mike Johnson is a registered voter of District 4. PE-39 ¶ 8. Their race was not established in evidence.

9.      Plaintiff Bruce Odell is a registered voter of District 3. PE-39 ¶ 9. Their race was not established in evidence.

10.     Plaintiff Joyce LaCour is a registered voter of District 2. PE-39 ¶ 10. Their race was not established in evidence.

11.     Plaintiff Tanya Whitney is a registered voter of District 1. PE-39 ¶ 11. Their race was not established in evidence.

12.     Plaintiff Danny Weir, Jr. is a registered voter of District 1. PE-39 ¶ 12. Their race was not established in evidence.

### B.      Defendant

13.     Defendant Secretary of State Nancy Landry is "the chief election officer of the state." La. Const. art. 4, § 7; La. R.S. § 18:421. The State Constitution requires her to "prepare and certify the ballots for all elections, promulgate all election returns, and administer the election

- 3 -

laws, except those relating to voter registration and custody of voting machines." La. Const. art. 4, § 7. Her oversight of elections extends to federal congressional elections. La. R.S. §§ 18:452, 18:462.  PE-39 ¶ 13.

### C.      Intervenor-Defendant the State of Louisiana

14.      Intervenor-Defendant the State of Louisiana is represented by Attorney General Elizabeth Murrill. As Attorney General, she is Louisiana's "chief legal officer," is charged with "the assertion and protection of the rights and interests" of the State of Louisiana, and has a sworn duty to uphold the State's Constitution and laws. La. Const. art. IV., § 8. PE-39 ¶ 14.

### D.      Robinson-Intervenor Defendants

15.      Robinson Intervenor-Defendants are Black Louisiana voters and civil rights organizations. They were Plaintiffs in *Robinson* v. *Landry*, No. 3:22-cv-02111-SDD-SDJ (M.D. La.), which challenged Louisiana's congressional map as a violation of Section 2 of the Voting Rights Act. PE-39 ¶ 15.

16.      *Robinson* Intervenor-Defendant National Association for the Advancement of Colored People Louisiana State Conference has members who live in every parish in Louisiana and in each of the six congressional districts in HB1.  *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759, 817 (M.D. La. 2022) ("*Robinson I*").

17.      *Robinson* Intervenor-Defendant Davante Lewis is a Black resident of Baton Rouge, Louisiana, who is registered to vote and intends to vote in future congressional elections. Mr. Lewis lives in Congressional District 6 under S.B. 8, 4/10 Tr. 567:23–568:1, and currently represents the third district of the Louisiana Public Service Commission. *Id.* at 542:22–543:2. Commissioner Lewis was actively involved as an advocate in the redistricting processes in Louisiana following the 2020 census, including being present at the Capitol during all of the legislative session. *Id.* at 548:12–15.

18.     Commissioner Lewis is Black. *Id.* at 542:14–15. Commissioner Lewis has worked in Louisiana politics for the duration of his adult life and has closely followed redistricting efforts for decades.

19.     *Robinson* Intervenor-Defendant Power Coalition for Equity and Justice ("Power Coalition") is a coalition of groups from across Louisiana whose mission is to organize, educate, and turn out voters, and fight for policies that create a more equitable and just system in Louisiana. 4/9 Tr. 475:20–477:8.

20.     Ashley Shelton is the Founder, President and CEO of Power Coalition. *Id.* at 474:18–21. Power Coalition was a plaintiff in *Robinson* v. *Landry* and an Intervenor-Defendant in the present action. *Id*. at 475:7–8; PE-39 ¶ 15. Power Coalition is a "nonpartisan 501(c)(3)" that works "to create pathways to power for historically disenfranchised communities."   4/9 Tr. 474:22–475:6. They have been heavily involved in the redistricting process since the start of Census and throughout the special session this past January. *Id*. at 475:17–477:8.

## II.     Louisiana's Long History of Disenfranchising and Discriminating against Black Voters.

21.     As the *Robinson* district court found, "[t]here is no sincere dispute" about "Louisiana's long and ongoing history of voting-related discrimination." *Robinson I*, 605 F. Supp. 3d at 848.

22.     Although nearly one-third of Louisiana's voting-age citizens are Black, the State's congressional districting maps included no majority-Black districts until the 1980s. Only after a federal court held that the State's prior congressional district map violated the VRA did the State adopt a map with one majority-Black district. *See Major* v. *Treen*, 574 F. Supp. 325 (E.D. La. 1983).

- 5 -

23.     As the *Robinson* court also found, voting in Louisiana is starkly polarized by race, and, except in majority-Black districts, white voters in Louisiana have consistently voted as a bloc to defeat the candidates preferred by Black voters. *Robinson I*, 605 F. Supp. 3d at 839–844.

24.     No Black candidate has been elected to statewide office since Reconstruction; Louisiana has never elected a Black candidate to Congress from a non-majority-Black district; and Black Louisianians are substantially underrepresented in both houses of the State legislature. *Id.* at 845–46.

### III.     2020 Census and 2022 Redistricting

#### A.     2020 Census

25.     Per the results of the 2020 Census, Black Louisianans represent approximately 33.1% of the State's total population and 31.2% of its voting age population. *Robinson I*, 605 F. Supp. 3d at 851.

26.     The results of the 2020 Census were delivered to Louisiana in April 2021 and under the new numbers, Louisiana's congressional apportionment remained six seats in the U.S. House of Representatives. *Robinson I*, 605 F. Supp. 3d at 767.

#### B.     Roadshows and legislative hearings (2021–2022)

27.     Consistent with its constitutional obligation to ensure that its congressional districts are as equal in population as possible, the State undertook its decennial redistricting process to redraw its district maps. *Id.* at 769–70.

28.     Prior to the start of the legislative session on redistricting, members of the Legislature traveled across the state conducting public hearings, or roadshows, to give the public the opportunity to voice their interests in the redistricting process. *See* JE-3; *see also* 4/10 Tr. 513:14–514:17. The roadshows were "designed to share information about redistricting and solicit public comment and testimony." *Robinson I*, 605 F. Supp. 3d at 767.

29.     The court found that lawmakers described this Roadshow process as "absolutely vital." *Id.* The Senate Governmental Affairs and House Governmental Affairs conducted ten hearings as part of the roadshow across the state. 4/9 Tr. 476:18–25; 4/10 Tr. 513:18–514:7.

30.     The roadshows were held by the Senate and House Governmental Affairs Committees after the Census and before the redistricting session. 4/9 Tr. 476:18–25. Citizens could provide testimony on their redistricting preferences. *Id.*

31.     Senator Royce Duplessis, who served as Vice Chair of the House and Governmental Affairs Committee at the time, attended the roadshows and testified that "the purpose of the road shows was to give the public the opportunity to share their thoughts and what they wanted to see in redistricting." 4/10 Tr. 514:8–17.

32.     *Robinson*-Intervenor Power Coalition organized citizens to attend all of the roadshow stops and provide testimony at these hearings. 4/9 Tr. 476:18–477:8.

33.     During the roadshows in 2021, a number of maps were presented to the Legislature for consideration, including a map drawn by Mr. Anthony Fairfax that looked similar to SB 8.  Ex. RI-294; 4/9 Tr. 381:8–383:12.

34.     The Legislature convened a special session in February 2022 to enact a Congressional map. *Robinson I*, 605 F. Supp. 3d at 767–68.

### C.     Proposed maps presented to the Legislature with two majority-Black districts

35.      The House and Governmental Affairs Committee was the Committee charged with vetting all the redistricting bills that filed during each legislative session. 4/10 Tr. 514:19–23.

36.     Senator Duplessis testified that he attended every House and Governmental Affairs Committee because of his role as Vice Chair. During the first redistricting legislative session, he

recalled numerous bills for congressional plans that included two majority-Black districts. *Id.* at 515:17–20.

37.     Mr. Lewis testified that more than six bills were introduced during the first extraordinary session of 2022 with congressional maps containing two majority-Black congressional districts. *Id.* at 548:16–21.

> **D.     Legislature rejects proposed plans with two majority-Black congressional districts and   instead enacts HB1 over then-Governor Edwards's veto**

38.     Senator Duplessis testified that none of the proposed congressional plans with two majority-Black districts made it out of his Committee. *Id.* at 515:21–23.

39.     HB1 included only one majority-Black district despite the many calls for fair and equitable maps. 4/9 Tr. 480:10–17.

40.     The Legislature rejected these plans and adopted HB1. Like its predecessors, HB1 had one majority-Black district stretching from New Orleans to Baton Rouge. HB1 also provided for five districts with large white voting age majorities. *Robinson I*, 605 F. Supp. 3d at 768–69.

41.     On February 18, 2022, HB1 and SB5, the bills setting forth new maps for the 2022 election cycle, passed the Legislature. *Id.* at 768–69. The congressional map enacted by these bills contained only one majority-Black congressional district. *Id.*

42.     Then-Governor John Bel Edwards vetoed HB1 and SB5 on March 9, 2022. *Id.*

43.     The Legislature then voted to override the Governor's veto on March 30, 2022.  *Id.*; 4/10 Tr. 516:8–16, 551:15–19.

IV.     **The *Robinson* Litigation**

A.     ***Robinson I*: Judge Dick found on the basis of an extensive evidentiary record that HB1 likely violated Section 2 and that the appropriate remedy was a new plan with two majority-Black congressional districts**

44.     Immediately after the veto override, the *Robinson* Intervenors commenced actions in the U.S. District Court for the Middle District of Louisiana against the Secretary of State challenging HB1 on the ground that it diluted the voting strength of the state's Black voters in violation of Section 2 and moved for preliminary injunctions against the plan's implementation. *Robinson I*, 605 F. Supp. 3d at 768–69.

45.     The Attorney General and the leaders of both houses of the Legislature intervened as defendants, and the Legislative Black Caucus intervened as a plaintiff. *Id.*

46.     In May 2022, the district court held a five-day evidentiary hearing on the plaintiffs' preliminary injunction motions. *Id.* The parties presented testimony from seven fact witnesses and fourteen experts and made extensive pre- and post-hearing written submissions. *See generally Robinson I*, ECF Nos. 152, 154–55, 158–59, 161–64, 167–68.

47.     On June 6, 2022, Judge Dick issued a 152-page Ruling and Order granting plaintiffs' motion for a preliminary injunction. *Id.* at 766. The court concluded that the plaintiffs were substantially likely to prevail on each of the preconditions for establishing Section 2 liability under *Thornburg* v. *Gingles*, 478 U.S. 30 (1986), and, as *Gingles* also requires, with regard to the totality of the circumstances. *Robinson I*, 605 F. Supp. 3d at 820–51.

48.     The court considered and rejected arguments by defendants that the first *Gingles* precondition (*Gingles* I) cannot be established. *Id.* at 820–39.

49.     The court found that the Black population in Louisiana is sufficiently large and geographically compact to constitute a majority in a single member district that is reasonably

compact and drawn in conformity with traditional redistricting principles. *Id.* at 820–21. It found that "the relevant question is whether the population is sufficiently compact to make up a second majority-minority congressional district in a certain area of the state. The fact that Plaintiffs' illustrative maps feature districts with 50% + BVAP while scoring well on statistical measures of compactness is the best evidence of compactness." *Id.* at 826.

50.     The court next analyzed plaintiffs' illustrative plans for compliance with the Legislature's stated criteria in Joint Rule 21, finding the illustrative plans complied with the Joint Rule 21 better than the enacted plan. *Id.* at 828–30. The court emphasized, however, that "there is no need to show that the illustrative maps would 'defeat [a] rival compact district[]' in a 'beauty contest[]'. The relevant question is whether, taking into account traditional redistricting principles including communities of interest, a reasonably compact and regular majority-Black district can be drawn." *Id.* at 829 (citations omitted and alterations in original). Because "[p]laintiffs' maps protect incumbents, reflect communities of interest, and respect political subdivisions, splitting fewer parishes than the enacted map" the court found that "the illustrative plans developed by [p]laintiffs' experts satisfy the reasonable compactness requirement of *Gingles* I." *Id.* at 831.

51.     While the illustrative plans presented by plaintiffs included majority-Black districts between New Orleans and Baton Rouge (CD 2) and in the Delta, River, and Florida Parishes and parts of East Baton Rouge Parish (CD 5), nothing in the court's discussion of *Gingles* I reflects any finding that the Black population in parts of the State outside of those areas was not sufficiently compact to enable a majority-Black district to be created consistent with TRPs. *See id.* at 820–39 (findings of fact regarding *Gingles* I precondition).

52.     The court considered and rejected the defendants' arguments that (a) it is impossible to create a second majority-Black district consistent with traditional redistricting

principles, *id.* at 820–31 and (b) plaintiffs' illustrative maps were unconstitutional racial gerrymanders, *id.* at 831–39, esp. 834–38 (rejecting defendants' argument that because "drawing two majority-minority districts was 'non-negotiable'" and that "race was 'the overriding reason for choosing one map over others,' . . . [plaintiffs'] illustrative plans are unconstitutional" (citations omitted)).

53.     The court credited testimony by expert demographers Anthony Fairfax and William Cooper that race did not predominate in their illustrative plans. *Id.* at 838. The court emphasized Mr. Fairfax's use of socioeconomic data and endorsed his preliminary use of racial data to understand where BVAP in the state is located, finding "that 'race consciousness' is not prohibited during the drawing of illustrative maps." *Id.* at 838–39.  The court likewise credited testimony by Mr. Cooper that, although he was asked to draw a plan with two majority-minority districts, race did not predominate in the drawing of his plans.  *Id.* at 838.

54.     The court found that the *Hays* cases from the 1990s were a "distinguishable and inapplicable" "red herring" and did not preclude enactment of a congressional map with two majority-Black districts. *Id.* at 834. The court noted that "[b]y every measure, the Black population in Louisiana has increased significantly since the 1990 census that informed the *Hays* map."  *Id.* The court found that "*Hays*, decided on census data and demographics 30 years ago, is not a magical incantation with the power to freeze Louisiana's congressional maps in perpetuity." *Id.*

55.     The court's decision was not focused on any particular part of the State but on the State as a whole. The plaintiffs in Robinson alleged that HB1 violated Section 2 of the VRA statewide—that is, "by 'packing' large numbers of Black voters into a single majority-Black congressional district . . . and 'cracking' the remaining Black voters among the other five districts, where . . . they are sufficiently outnumbered to ensure that they are unable to participate equally

in the electoral process." *Id.* at 768 (citations omitted). While the plaintiffs' illustrative maps showed a second majority-Black district in East Baton Rouge and the Delta, River, and Florida parishes, the court's analysis and findings regarding racially polarized voting, the inability of Black voters to elect their representatives of choice, and the Senate factors applied across the State. *See e.g.*, *id.* at 797–804 (summary of plaintiffs' evidence regarding *Gingles* II and III preconditions); *id.* at 806–815 (discussion of plaintiffs' evidence regarding Senate factors); *id.* at 839–44 (findings regarding *Gingles* II and III preconditions); *id.* at 844–851 (findings regarding Senate factors).

56.     Among other things, the court credited testimony by plaintiffs' experts that in both Statewide elections and in congressional elections across the State, voting in Louisiana is starkly racially polarized and white voters consistently vote as a bloc to defeat candidates preferred by Black voters, and that Black voters would not have an opportunity to elect their candidates of choice in any district in HB1 other than the sole majority-Black district CD 2.  *Id.* at 797–804, 839–44.

57.     The court found that all the congressional elections evaluated in Congressional Districts 3, 4, 5 and 6 were "quite racially polarized" and that none of the Congressional District in H.B.1 other than Congressional District 2 provided Black voters an opportunity to elect the candidate of their choice. *Id.* at 801, 803–04.

58.     The court considered and rejected the defendants' arguments that (a) it is impossible to create a second majority-Black district consistent with traditional redistricting principles, *id.* at 820–31; and (b) plaintiffs' illustrative maps were unconstitutional racial gerrymanders, *id.* at 831–39, esp. 834–38 (rejecting defendants' argument that because "drawing two majority-minority districts was 'non-negotiable'" and that "race was 'the overriding reason

for choosing one map over others,' . . . [plaintiffs'] illustrative plans are unconstitutional" (citations omitted)).

59.     In granting the preliminary injunction, the court provided the Louisiana Legislature an opportunity to adopt a remedial plan that included two majority-Black districts. *Id.* at 766. The court emphasized the Supreme Court's direction that "[s]tates retain broad discretion in drawing districts to comply with the mandate of § 2," and that the State is not required to "draw the precise compact district that a court would impose in a successful § 2 challenge." *Id.* at 857 (quoting *Shaw* v. *Hunt*, 517 U.S. 899, 917 n.9 (1996), and *Bush* v. *Vera*, 517 U.S. 952, 978 (1996)); see also *id.* at 857–58 (noting that "deference is due to [the States'] reasonable fears of, and to their reasonable efforts to avoid, § 2 liability") (quoting *Vera*, 517 U.S. at 978).

60.     Governor Landry (then the State Attorney General) and Attorney General Murrill (then the State Solicitor General) were actively involved throughout the *Robinson* litigation representing the State. *See id.* at 768; *Robinson* v. *Ardoin*, 37 F.4th 208, 214 (5th Cir. 2022) ("*Robinson II*") (listing counsel); *Robinson* v. *Ardoin*, 86 F.4th 574, 582 (5th Cir. 2023) ("*Robinson III*") (listing counsel).

> **B.     The Legislature reconvenes in Special Session in light of Judge Dick's ruling but again fails to adopt new plan with two majority-Black districts, although once again proposed plans with two such districts are presented**

61.     After Judge Dick gave the Legislature the opportunity to produce a map with two majority-Black districts, the Governor called a Special Session to begin on June 15, 2022. *Robinson II*, at 216 & n.1; 4/10 Tr. 517:3–7.

62.     There were maps proposed during this June 2022 special session with two majority-Black districts, but none passed. 4/10 Tr. 517:16–21. For instance, Senator Duplessis proposed a

congressional map with two majority-Black districts that complied with traditional redistricting principles and the Voting Rights Act, but his map was not adopted. *Id.* at 517:25–518:4.

63.     The special session in June 2022 did not result in the adoption of a new map, leaving HB1 in place. *Id.* at 517:4–15.

    C.     ***Robinson* II: A unanimous panel of the Fifth Circuit denies defendants' motion for a stay pending appeal**

64.     The defendants in *Robinson*—two of which, the State and the Secretary of State, are Defendants here—filed notices of appeal and moved for a stay pending appeal. *Robinson II*, 37 F.4th at 216.

65.     On June 12, 2022, a Fifth Circuit motions panel unanimously denied the *Robinson* defendants' motion, concluding that the defendants had "not met their burden of making a strong showing of likely success on the merits." *Id.* at 215.

66.     The panel rejected defendants' arguments that "complying with the district court's order [to adopt a plan with two majority-Black districts] would require the Legislature to adopt a predominant racial purpose." *Id.* at 222–24; *see also id.* at 215 (noting that the district court's order on appeal "requires the Louisiana Legislature to enact a new congressional map with a second black-majority district"); *id.* at 223 ("[T]he defendants have not overcome the district court's factual findings indicating that the [plaintiffs'] illustrative maps are not racial gerrymanders.").

67.     The panel concluded that defendants did not meet "their burden of making a strong showing of likely success on the merits." *Id.* at 215.

68.     The panel concluded that the district court did not err in finding that the population of Black voters in Louisiana is sufficiently large and compact to form a majority in a second district.  *Id.* at 216–22. The court noted that "plaintiffs' evidence of compactness [is] largely uncontested." *Id.* at 218. The court held that testimony by defendants' expert that the plaintiffs'

illustrative districts divided communities of interest "is outweighed by the plaintiffs' direct testimony that the black populations in CD 5 are culturally compact." *Id.* at 220.  The court also gave little weight to testimony from another defense expert challenging the plaintiffs' *Gingles* I showing based on simulations of redistricting in Louisiana.  The expert testified that he "ran 10,000 simulations of redistricting in Louisiana and concluded that his simulated districts never had a majority of black voters and were more compact than those in the illustrative plans." *Id.* The court held that this testimony was properly discounted because the expert "did not take communities of interest, previous district boundaries, or municipal boundaries into account when programming his simulations." *Id.*

69.    The panel also rejected defendants' argument that "plaintiffs' maps prioritized race so highly as to commit racial gerrymandering," or that adopting a plan with two majority-Black districts "would require the Legislature to adopt a predominant racial purpose." *Id.* at 222; s*ee also id.* at 223 (concluding that defendants "have not overcome the district court's factual findings indicating that [plaintiffs'] illustrative maps are not racial gerrymanders").

70.    The panel also emphasized that in adopting a remedial districting plan, the "Legislature will be free to consider all those proposals [presented by plaintiffs or previously considered by the Legislature] or come up with new ones and to weigh whatever factors it chooses alongside the requirements of *Gingles*. The task will no doubt be difficult, but the Legislature will benefit from a strong presumption that it acts in good faith." *Id.* at 223–24 (citing *Miller*, 515 U.S. at 915).

> **D.    Supreme Court grants cert before judgment and orders case held in abeyance pending a ruling in *Milligan*, eventually vacating the stay in June 2023**

71.    Following the Fifth Circuit's denial of a stay, the Supreme Court ordered that the case be "held in abeyance pending this Court's decision" in *Allen* v. *Milligan* (then named *Merrill*

v. *Milligan*), a case involving a challenge to Alabama's congressional district map under Section 2 of the VRA. *See Ardoin* v. *Robinson*, 142 S. Ct. 2892 (2022).

72.     On June 8, 2023, the Court issued its decision in *Milligan*, upholding the lower court's preliminary injunction against the Alabama map and strongly reaffirming the *Gingles* framework. See *Allen* v. *Milligan*, 599 U.S. 1, 17–19 (2023).

73.     The Supreme Court rejected the State's argument that Alabama's congressional district map "cannot have violated § 2 because none of plaintiffs' two million odd maps [generated by a computer simulation program] contained more than one majority-minority district." *Id.* at 36–37.

74.     The plurality rejected defendants' argument that the plaintiffs' illustrative maps were racial gerrymanders because they were produced with an "express racial target." *Id.* at 32–33.

75.     The Supreme Court thereafter lifted the stay in *Robinson* and remanded "for review in the ordinary course and in advance of the 2024 congressional elections in Louisiana." *Ardoin* v. *Robinson*, 143 S. Ct. 2654 (2023).

>       **E.**      ***Robinson III*: The merits panel of the Fifth Circuit unanimously endorses Judge Dick's reasoning and factual findings, and vacates the PI solely for timing reasons**

76.     On November 10, 2023, the merits panel of the Fifth Circuit issued a unanimous opinion endorsing the *Robinson* district court's ruling that plaintiffs were likely to succeed on the merits of their Section 2 claim. *Robinson* v. *Ardoin*, 86 F.4th 574, 583 (5th Cir. 2023) ("*Robinson III*").

77.     The court concluded that a redistricting objective to establish two majority-Black districts "does not automatically constitute racial predominance." *Id.* at 594 (citing *Milligan*, 599 U.S. at 32–33).

78.     The court rejected the defendants' argument that, because the plaintiffs' proposed illustrative maps were "designed with the goal of achieving a second majority-minority district of at least 50 percent [Black Voting Age Population]," they were impermissible racial gerrymanders. *Id.* at 593. The court reasoned that "[a]ttempting to reach the needed 50 percent threshold does not automatically amount to racial gerrymandering." *Id.* at 594. The court characterized *Milligan* as holding that "expert testimony showing redistricting maps [that] were designed to establish two majority-black districts . . . does not automatically constitute racial predominance," and that "an express racial target is just one consideration in a traditional redistricting analysis under *Gingles*." *Id.* at 594 (citing *Milligan*, 599 U.S. at 32–33). In *Robinson III*, the court held, the "target of reaching a 50 percent BVAP was considered alongside and subordinate to the other race-neutral traditional redistricting criteria *Gingles* requires," including consideration of "communities of interest, political subdivisions, parish lines, culture, religion, etc." *Id.* at 595. The court found that the "high bar" the Supreme Court has implemented to racial gerrymandering challenges "was not met on this record." *Id.*

79.     The court concluded that "[t]he district court's preliminary injunction . . . was valid when it was issued." *Id.* at 599.

80.     The Fifth Circuit vacated the preliminary injunction solely on the ground that "[f]or the 2024 Louisiana elections calendar . . . there is no imminent deadline," and because a trial on the merits could be held before that election, a preliminary injunction "is no longer required to prevent the alleged elections violation." *Id.* at 600.

81.     The Firth Circuit allowed the Legislature until January 15, 2024, to enact a new congressional redistricting plan and directed that "[i]f no new plan is adopted, then the district

- 17 -

court is to conduct a trial and any other necessary proceedings to decide the validity of the H.B. 1 map, and, if necessary, to adopt a different districting plan for the 2024 election." *Id.* at 601–02.

82.    The district court subsequently extended that deadline, at the defendants' request, to January 30, 2024. *Robinson I*, ECF No. 315.

83.    The Fifth Circuit denied the defendants' motion for reconsideration en banc, with no member of the court recorded as having voted for reconsideration. *Robinson III*, ECF No. 363.

84.    Members of the Legislature understood the courts' rulings as meaning HB1 was "not . . . in compliance with the Voting Rights Act" and that "after a lot of litigation [the Court] ordered . . . the [l]egislature to draw a map that was compliant with the Voting Rights Act." 4/10 Tr. 516:21–517:2.

85.    Senator Duplessis testified that "based on litigation that was going on at the U.S. Supreme Court, litigation at the U.S. Fifth Circuit Court of Appeals, that . . . we had to draw a map that was compliant with the Voting Rights Act, and that is what basically forced members who previously did not support that, and may not still want to see that, but they knew we had to comply with the Voting Rights Act." *Id.* at 528:24 – 529:6. Senator Duplessis further testified to his understanding of the *Robinson* litigation: "[p]laintiffs filed suit contesting the original map that was adopted, that it was not compliant with the Voting Rights Act. And then we were ordered by the Court to go back and draw a fair map that was compliant with the Voting Rights Act, a map that had two majority-Black districts and a map that gave Black voters in the State of Louisiana the opportunity to elect their candidate of choice." *Id.* at 537:4–11.

86.    Senator Alan Seabaugh testified that "Judge Dick has signaled through some preliminary proceedings . . . [and] she has kind of told everybody how she was going to rule and ordered us to draw a second majority-minority district or she was going to do it." 4/8 Tr. 62:17–

21. Senator Thomas Pressly testified to his understanding that the outcome of these court proceedings was that the Legislature had to draw a congressional map with two Black majority districts. "[A]ll indications seemed to be that, again, we would have two majority-minority districts, and it would be drawn as the judge wished to do so." *Id.* at 81:24–82:1.

### V.    2024 Special Session

#### A.    Governor Landry calls the Special Session to address redistricting, and urges the Legislature to adopt a plan with two majority-Black districts that will satisfy the Voting Rights Act

87.    Louisiana Governor Jeff Landry released the call for the 2024 First Extraordinary Session among his first actions after inauguration on Monday, January 8, 2024. JE-8. The call directed the Legislature to "legislate relative to the redistricting of the Congressional districts of Louisiana," among fourteen legislative items related to redistricting and elections. *Id.*

88.    The Legislature convened starting on Martin Luther King Jr. Day, January 15, 2024, one week after the Governor's call—the earliest time permitted under the Louisiana Constitution. *See id.*; *see also* La. Const. Art. III, § 2(B).

89.    On the first day of session, Governor Landry addressed the joint chambers. After detailing his extensive efforts in *Robinson* to defend the congressional map enacted in 2022, he stated: "We have exhausted all legal remedies and we have labored with this issue for far too long." JE-35 at 11.

90.    "[N]ow, once and for all," he continued, "I think it's time that we put this to bed. Let us make the necessary adjustments to heed the instructions of the court. Take the pen out of the hand of a non-elected judge and place it in your hands. In the hands of the people. It's really that simple. I would beg you, help me make this a reality in this special session, for this special purpose, on this special day." *Id.*

91.     Legislators understood the Governor's goal to be to pass a plan to end the litigation. 4/9 Tr. 367:9–368:12 (Landry); 4/10 Tr. 519:16–23 (Duplessis).

92.     Senator Duplessis attended Governor Landry's address to the Legislature to convene the 2024 special session. 4/10 Tr. 519:16–18. He testified that he understood that the Governor's goal was "to put an end to the litigation and adopt a map that was complaint with the judge's order." *Id.* at 519:22–23. Representative Mandie Landry also attended that address. She testified of her impression that the Governor wanted "[t]o make sure we passed a new congressional bill that would be accepted by the courts." 4/9 Tr. 367:3-12.

93.     Senator Duplessis explained that Governor Landry "clearly expressed that he was going to support a map to resolve the litigation." *Id.* at 525:1–3. None of Plaintiffs' witnesses disputed Senator Duplessis's characterization of the Governor's address.

94.     Senator Pressly testified that "Judge Dick is the one that ultimately told the Legislature" that two majority-Black districts were required and that "Governor Landry stated that when he opened . . . the special session and we heard it from Attorney General Murrill as well." 4/8 Tr. 70:6–9.

95.     The Governor and Republican leadership sought to avoid a court-drawn map that might be less politically advantageous than one they drew themselves. 4/9 Tr. 368:6–12 (Landry).

96.     The community was very involved in the special sessions and advocated for fair and equitable maps. *Id.* at 477:12–20; 480:12–17; 483:18–24.

> **B.     Multiple maps with two majority-Black districts are presented to the Legislature, including maps closely resembling the *Robinson* Plaintiffs' remedial maps**

97.     Six congressional maps were filed across both chambers by the end of the day on January 15, 2024. RI-26; RI-27; RI-28; RI-29; RI-30; RI-31. Five included two majority-Black

districts, including the Governor's preferred map, SB8, 4/9 Tr. 368:13–19, and the *Robinson* Plaintiffs' preferred map, SB4. *Id.* at 481:14–25; 4/10 Tr. 63:14–24.

98.    SB4 closely mirrored maps filed throughout the earlier redistricting process and in the *Robinson* litigation. *See, e.g.,* 4/10 Tr. 553:17–22.

99.    SB4 created an additional majority-Black district in District 5, currently represented by Congresswoman Julia Letlow. *See* RI-30; *see also* 4/10 Tr. 560:19–21. SB4 was the preferred map of the *Robinson* Defendant-Intervenors. 4/9 Tr. 481:14–25.

100.    Senator Duplessis, who co-authored SB4, believed SB4 was compliant with the Voting Rights Act and "met the proper redistricting principles" and "would put an end to the litigation that we were ordered . . . by the [c]ourt to comply with." 4/10 Tr. 521:5–10; *see also* RI-30. But, as Senator Duplessis testified, "SB4 was voted down in committee." *Id.* at 523:14–16.

### C.    Legislature instead adopts SB8

101.    SB8 was filed by Senator Glen Womack. *See* JE-11. Senator Womack stated that SB8 was the only map he reviewed that "accomplished the political goals" he found important. JE-29 at 3, 4:2–8.

102.    It was clear to the Legislators that voted for SB8 that it was Governor Landry's preferred map, 4/9 Tr. 368:13–16 (Landry), and the "one Bill [legislators] all understood was going to go through," *id.* at 370:3–6 (Landry).

103.    Legislators understood that Governor Landry preferred the map because it would result in unseating Garret Graves. There were "hundreds, if not more" conversations to that effect during the special session. *Id.* at 371:16–19 (Landry). These conversations involved both Republicans and Democrats. 4/9 Tr. 374:21–375:9 (Landry).

104.    Power Coalition supported SB8 because it met traditional redistricting principles while creating a second majority-Black district. 4/9 Tr. 275:6-15. Power Coalition did not support

maps that would have increased BVAP in majority-Black districts but made the map less compact. 4/9 Tr. 275:16-276:2.

105.    SB8 was the only congressional map to advance out of committee and through the legislative process. The map was passed on Friday, January 19 and signed by the Governor as Act 2 on January 22, 2024. JE-10.

106.    SB8 split zero precincts. SB8 split 16 parishes total. JE-15. SB8 had an overall deviation of 87 people between the largest and smallest district. JE-11.

**VI.    This Case**

107.    *Callais* Plaintiffs filed suit challenging SB8 as an unconstitutional racial gerrymander on January 31, 2024. ECF No. 1.

108.    *Robinson* Intervenor-Defendants moved to intervene on February 7, 2024. ECF No. 18.

109.    On February 21, 2024, the Court entered a Scheduling Order calling for a preliminary injunction hearing consolidated with the trial on the merits commencing on April 8, 2024. ECF No. 63.

110.    On February 26, 2024, the Court entered an Order granting *Robinson* Intervenor-Defendants' motion to intervene but limited only to the remedial phase, if one is needed. ECF No. 79.

111.    On March 9, 2024, *Robinson* Intervenor-Defendants moved for reconsideration of the Court's denial of their request to participate in the merits phase of the case. ECF No. 103.

112.    On March 15, 2024, *Robinson* Intervenor-Defendants were granted leave to intervene for the merits phase on the issues of: (1) whether race was the predominant factor in the creation of SB 8; and (2) if so, whether SB 8 can pass strict scrutiny review. ECF No. 114.

113.    *Robinson* Intervenor-Defendants were denied any opportunity to depose Plaintiffs or question them on the injuries they allegedly faced. ECF No. 161–2 ¶¶ 6, 9.

114.    On April 6, 2024, *Robinson* Intervenor-Defendants moved for a continuance of the trial. ECF No. 161. The Court denied the motion on the record on the first day of trial. 4/8 Tr. 7:17–19.

115.    None of the *Callais* Plaintiffs testified at trial. Thus, none of them appeared to explain to the Court why they brought this case or to support their claims that they have been deprived of their rights to equal protection or that their rights to vote have been abridged, or to subject themselves to cross-examination.

**VII.    Plaintiffs Have Not Established That Race Predominated in the Drawing and Adoption of SB 8**

**A.    The evidence did not show that race predominated in the drafting of SB8**

116.    In introducing SB8, Senator Womack was clear that race was considered to comply with the orders of the *Robinson* courts and was balanced with other redistricting criteria and the political preferences of state leadership. *See, e.g.*, JE-29 at 2–3. Direct and circumstantial evidence supports the same. The evidence at trial did not establish that considerations of race predominated in the Legislatures adoption of SB 8.

**B.    The Legislature sought to comply with the federal courts' rulings in *Robinson***

117.    At the start of the 2024 First Extraordinary Session, Governor Landry and Attorney General Murrill, who were both involved in the *Robinson* litigation in their prior roles as Attorney General and Solicitor General, respectively, emphasized to legislators that the passage of a new map was the necessary path forward to bring the litigation to an end. *See e.g.*, JE-35 at 10–11; 4/10 Tr. at 590:10–23 (Governor Landry: "As Attorney General, I did everything I could to dispose of

this litigation. . . .[But w]e have exhausted all legal remedies."); *see also* 4/10 Tr. at 588:4–16 (Attorney General Murrill: "Judge Dick has put us in a—in a position—and the Fifth Circuit, the panel that reviewed that decision, and the whole court, when I asked them to go en banc, by declining to go en banc, have put us in a position of where we are today, where we -- we need to draw a map. So I'm here to tell—I'm not here to tell you don't draw a map. I mean, I think we do have to draw a map.").

118.    Senator Womack and other legislators made clear that they endeavored to comply with the federal courts' orders under the Voting Rights Act in advancing SB8. *See, e.g*., JE-29 at 3, 4:9–16 (Senator Womack: "I firmly submit the congressional voting boundaries represented in this bill best achieve the goals of protecting Congresswoman Letlow's seat, maintaining strong districts for Speaker Johnson and  Majority Leader Scalise, ensuring four Republican  districts, *and adhering to the command of the federal court in the Middle District of Louisiana*." (emphasis added)); JE-33 at 5, 11:5–8 (Chairman Beaullieu: "We're under a federal judge's mandate, and this bill is our best attempt to comply with her decision. So, members, I ask you to support me in voting for this map.").

119.    Senator Duplessis testified that he went into the 2024 redistricting session seeking to "adopt a map that was compliant with the Voting Rights Act, to adopt a map that was fair and to finally put an end to [the *Robinson*] litigation." 4/10 Tr. 519:1–5. The Court finds Senator Duplessis to be credible and persuasive and credits his testimony as evidence that members of the Legislature sought to comply with the VRA and the federal court rulings in *Robinson*.

120.    Senator Seabaugh offered no amendments to SB8, 4/8 Tr. 56:2–4, did not testify in the Senate and Governmental Affairs Committee, *id.* at 56:8–10, and has never voted in favor of a

plan that created two majority-Black congressional districts in his two decades in the Louisiana state house. *Id.* at 57:9–59:16.

121.    Senator Pressly testified, "I certainly think that this was the one last chance prior to having trial where all indications seemed to be that, again, we would have two majority-minority districts, and it would be drawn as the judge wished to do so." *Id.* at 81:17–82:1. Senator Pressly also understood that legislators "were given one last chance to try to cure the defect that was being alleged against us." *Id.* at 83:2–9.

### C.    The Legislature was aware that a congressional district plan in Louisiana can be drawn with two majority-Black districts consistent with traditional redistricting principles

122.    In the years since the 2020 Census, the Legislature has been presented with congressional map options that contained two majority-Black districts and complied with redistricting principles. *See, e.g.*, 4/10 Tr. 515:17–23; 517:16–21; *see also* RI-275 at 3 (citing H.B. 4, 1st Spec. Sess. (La. 2022); H.B. 5, 1st Spec. Sess. (La. 2022); H.B. 7, 1st Spec. Sess. (La. 2022); H.B. 8, 1st Spec. Sess. (La. 2022); H.B. 9, 1st Spec. Sess. (La. 2022); H.B. 12, 1st Spec. Sess. (La. 2022); S.B. 2, 1st Spec. Sess. (La. 2022); S.B. 4, 1st Spec. Sess. (La. 2022); S.B. 6, 1st Spec. Sess. (La. 2022); S.B. 9, 1st Spec. Sess. (La. 2022); S.B. 10, 1st Spec. Sess. (La. 2022); S.B. 11, 1st Spec. Sess. (La. 2022); S.B. 16, 1st Spec. Sess. (La. 2022); S.B. 18, 1st Spec. Sess. (La. 2022); Amendment #88 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #99 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #153 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #62 to S.B. 2, 1st Spec. Sess. (La. 2022); Amendment #116 to S.B. 5, 1st Spec. Sess. (La. 2022); Amendment #91 to S.B. 5, 1st Spec. Sess. (La. 2022)).

123.    All but two Senators charged with redistricting the map in 2024 had been legislators during the redistricting sessions following the Census—including the entire membership of the

Committee on Senate and Governmental Affairs. *See* 4/10 Tr. 519:6–15; 544:20–545:24; 562:3–15.

124.    During the 2024 special session, legislators were presented with maps that were substantially similar to the illustrative maps in *Robinson,* including SB4. *See* JE-36 at 6; 4/10 Tr. 553:13–23 (Lewis); 4/9 Tr. 382:18–383:12 (Fairfax). The Legislature considered a plan referred to as the Marcelle Price plan during the 2024 legislative session that created two majority-Black congressional districts and that was similar to the plan offered by the *Robinson* plaintiffs. 4/9 Tr. 382:18–383:12. Mr. Fairfax also created a plan submitted to the state legislature in 2021 that created a second majority-Black Congressional district in the "river region" of the state, connecting Shreveport and Baton Rouge, and it was considered by the legislature in the form of HB 12. *Id*. at 381:14–382:1; 382:18–383:6; 456:3–8.

125.    SB4 created two majority-Black districts and was the preferred map of the *Robinson* Plaintiffs, who submitted written testimony in support of the bill and testified during the 2024 special session. *See generally* RI-276; *see also* 4/9 Tr. 481:14–482:2; 4/10 Tr. 553:13–561:18; JE-36 at 18–21.

126.    Senator Duplessis' map, SB4 (like the illustrative plans in *Robinson*), contained a second majority-Black district that went from "Baton Rouge up to northeast Louisiana, the Monroe area." 4/10 Tr. 524:10–17. Senator Duplessis testified that the "geographic design" was the main distinction between his map and SB8 but that the "numbers," including the "information on parishes, precincts, race, gender, party registration" were "very similar."  *Id*. at 524:3–17. Given Senator Duplessis' prior experience as Vice Chair of the House and Governmental Affairs Committee and his experience throughout the 2020 redistricting cycle, the Court credits his testimony about SB4.

- 26 -

127.    In introducing SB4 alongside sponsors Senators Price and Duplessis, counsel for the *Robinson* Plaintiffs provided extensive briefing to legislators on the features of the map. *See* JE-36 at 6 ("The map we present here mirrors the map submitted by plaintiffs in multiple phases of our case . . . This map builds off of previous versions that were presented in this committee two years ago during the roadshow. The first redistricting session. The second special redistricting session and amendments that were filed again throughout this process.").

128.    First, SB4 was updated from similar versions of maps submitted in the *Robinson* litigation to "utilize the most up-to-date precinct lines." *Id.*

129.    SB4 "perform[ed] equal to or better than the states enacted maps from both 2022 and 2011 in adhering to traditional and state redistricting criteria, including those embodied in the Legislature's Joint Rule 21." *Id.*

130.    SB4 had "fewer [parish] splits than the enacted map, with only 11 compared to 15," did not split any precincts, and split "fewer municipalities than the enacted map." *Id.*

131.    SB4 achieved "better scores on three quantitative measures of compactness, most accepted by the courts, Reock, Convex Hull, Polsby-Popper." *Id.*

132.    SB4 had "less instances of fracking where two or more noncontiguous pieces of a parish are within the same district than the [2022] enacted map and alternatives [in 2024]." *Id.*

133.    In sum SB4 was "a better map when graded on the rubric that [the Louisiana] legislature wrote for itself in Joint Rule 21 and the redistricting criteria accepted for decades by the federal courts." *Id.*

134.    The sponsors of SB4 and counsel for the *Robinson* Plaintiffs also fielded questions from legislators regarding how the majority-Black districts would perform for Black voters. Senator Price confirmed the districts would perform, and *Robinson* counsel cited expert findings

from the Robinson litigation that demonstrated that Black voters were able to successfully elect their candidates of choice in 100% of recompiled election results in District 2 and 77.8%–86.7% of elections analyzed for District 5. JE-36 at 9–11.

> **D.    In drawing and selecting SB8 rather than one of the alternative maps presented, the Legislature sought to further the political interests of the State, the Governor, and the legislative majority of protecting Speaker Johnson, Majority Leader Scalise, and Representative Letlow, and in retaliating against Representative Graves**

135.    The evidence at trial shows that the Legislature's adoption of SB8 rather than SB4 or any of the alternative maps it considered was driven by politics and other race-neutral factors, not race.

136.    Senator Womack was clear about the driving force behind the configuration of districts in SB8, stating that "politics drove this map." JE-29 at 3. Race, he said, was a "secondary consideration." *Id.*

137.    Senator Womack and SB8 supporters specifically endeavored to protect "four safe Republic seats" and the political futures of Representative Julia Letlow, Speaker of the House Johnson, and U.S. House Majority Leader Steve Scalise, especially. JE-29 at 1–3.

138.    It is undisputed that legislators understood that any new map could have a negative impact on some incumbents and that it therefore was important to protect certain incumbents. *See* 4/10 Tr. 525:20–24  (Senator Duplessis testifying that drawing a map is like "playing musical chairs" and as such "[t]here's going to be someone who's negatively impacted from an incumbency standpoint"); 4/8 Tr. 71:11–18, 79:1–4 (Senator Pressly testifying that "[w]e certainly wanted to protect Speaker Johnson . . . We wanted to make sure that we protected Steve Scalise. Julia Letlow is on Appropriations. That was also very important that we try to keep her seat as well" and that "[c]ertainly it would be important to keep our leadership in Washington and our power base for the state in Washington"); *id.* at 72:3–7 (Senator Pressly testifying that the question

was how to draw maps in a way to ensure that "we're not getting rid of the Speaker of the House, the Majority Leader, and . . . Julia Letlow as well."); *id.* at 60:8–61:15 (Senator Seabaugh testified that it is "kind of a big deal" that Speaker and the Majority Leader of the U.S. House of Representatives are from Louisiana and that protecting Speaker Johnson, Majority Leader Scalise and Representative Letlow was "an important consideration when drawing a congressional map").

139.    As Senator Duplessis stated on the Senate floor when voting in favor of SB8, the Legislature had "heard a lot from Chairman Womack and [his] colleague, Senator Stine, about the importance of protecting certain elected officials." JE-30 at 7, 20:9–21.

140.    Governor Landry and Congressman Garret Graves were known political rivals. 4/10 Tr. 568:21–569:5.  Multiple witnesses directly involved in the passage of SB8 or close to the process understood SB8 to be a direct effort by the Governor to undermine Representative Graves' political future. *Id.* (Lewis: "Congressman Graves had flirted with running openly against Governor Landry, did not endorse Governor Landry after he decided not to run for the race, and there was known tension between supporters of Congressman Graves and Governor Landry that this just seemed to be a traditional Louisiana tactic that, once you got some power, you went after your enemies"); *Id.* at 527:11–19 (Duplessis: a "political decision was made to protect certain members of Congress and to not protect on member of Congress, and it was clear that that members was going to Congressman Garret Graves"); 4/9 Tr. 368:8 – 12, 369:13–17 (Landry testifying that "Republicans were afraid that if they didn't [pass a map], that the Court would draw one that wouldn't be as politically advantageous for them. They kind of wanted to put this to rest and the Governor wanted Congressman Graves out," and explaining that it was well known within the Capitol at the time that this was one of the goals of the bill).

141.    Beyond protecting Representatives Letlow, Scalise, and Johnson, legislators understood that Senator Womack proposed SB8 because of Governor Landry's political interest in retaliating against Representative Graves.

142.    Senator Duplessis was clear that one of the primary political objectives for SB8 was to retaliate against Congressman Garrett Graves.  He testified it was clear that there was "the political decision . . . made to protect certain members of Congress and to not protect one member of Congress, and it was clear that that member was going to be Congressman Garrett Graves." *Id.* at 527:11–19. None of Plaintiffs' witnesses disputed this evidence and the Court credits Senator Duplessis' testimony about the political motivations underlying the passage of SB8.

143.    The Governor's effort to utilize SB8 as a vehicle to undercut Representative Graves' political future was so widely known among legislators and others that it was the subject of a skit by members of the Capital Press Association at their annual Gridiron Dinner following the enactment of the map. *Id.* at 577:1–578:7. The skit was viewed by multiple members of Louisiana's political elite including Representative Graves himself, who nodded his head and laughed in reaction. *Id.*

### E.    The Legislature respected legitimate communities of interest in the drawing of CD6 in SB8

144.    The Legislature also reasonably concluded that CD6 in SB8 tied together communities of interest along the Red River and I-49 corridor, including shared economic and agricultural ties, as well as educational and healthcare infrastructure. *See, e.g.*, JE-30 at 3, 5:4–17 (Womack: "The corridor that you see on the map that—that you have on your—your table, if you'll notice the map runs up Red River, which is barge traffic, commerce. It also has I-49, which. . . goes from Lafayette to Shreveport, which is also a corridor for our state that is very important to our commerce. We have a college. We have education along that corridor. We have a presence

with ag[riculture] with our row crop, as well as our cattle industry all up along Red River in those parishes. A lot of people from that area, the Natchitoches Parish, as well as Alexandria, use Alexandria…for their healthcare, their hospitals, and so forth in that area."); *see also* JE-31 at 7–8 (exchange between Representative Larvadain and Senator Womack).

145.    The significance of these community ties was echoed in testimony at trial. Mayor Cedric Glover, Ashley Shelton, Pastor Steven Harris, and Commissioner Davante Lewis testified to shared needs and interests in areas within the district, like Baton Rouge, Alexandria, Monroe, Lafayette, and Shreveport. 4/9 Tr. 457:15–459:5, 486:5–487:18, 466:20–468:14; 4/10 Tr. 578:8–579:20.

146.    Commissioner Lewis, who lives in CD6 in SB8, stated that as a voter he felt "comfortable having commonality with people elsewhere in the district," naming several factors including shared economies, civic organizations, faith traditions, university programs, energy production, manufacturing, and music. 4/10 Tr. Tr. 578:8–579:6. From his perspective as a Public Service Commissioner, he testified that almost the entirety of CD6 in SB8 shares a common investor-owned utility model ("IOU"), unlike municipality-run electric systems or electric co-ops like those run in more rural places. *Id*. at 579:7–581:22. He explained that this common interest has direct relevance to congressional representation when it comes to the engagement around transmission planning, generation buildup, the energy transition, and appropriations. *Id.*

147.    Commissioner Lewis testified that he was pleased with the passage of SB8 because it accomplished the goals he wanted to see met, namely, "complying with the rule of law as well as creating a second Black-majority district." 4/10 Tr. 576:12–18. Commissioner Lewis testified that he is afraid that if the new map is overturned, it would only enhance "divisiveness" in state

politics and enhance division among class, among race, among regions, among political affiliations, and continue to "toxic our environment." *Id.* at 584:3–7.

148.   Mayor Cedric Glover, who lives in CD6 in SB8, is a longtime public servant who was twice elected to the Shreveport City Council, served two terms as the Mayor of Shreveport, and served five terms in the Louisiana House of Representatives. 4/9 Tr. 454:12–20. Mayor Glover testified to several factors uniting the district, including geography and shared economic, educational, and hospital systems. He testified that the location of I-49 "essentially makes Shreveport, Mansfield, Natchitoches, all one general commuting area." *Id.* at 457:17–458:4. He described the "series of lock and dams, five of them between [Shreveport] and where the Red River flows into the Mississippi. That essentially mirrors the eastern side of [the] district." *Id.* at 457:23–458:1. Mayor Glover discussed the Shreveport-based Louisiana Economic Partnership, an "entity that is in partnership with economic leaders from south of us all the way down to Natchitoches working to retain and grow jobs." *Id.* at 458:23–459: 4. And just last week, the organization announced a "huge job announcement down in DeSoto Parish." *Id.* at 458:23–25. Mayor Glover described the shared healthcare systems of the district, "a series of hospitals between Willis-Knighton, the CHRISTUS system, but more specifically the Ochsner/LSU system, which has a presence here in Shreveport, Natchitoches, and even has a residency program that's in Alexandria." *Id.* at 458:11–16. Mayor Glover also discussed "the higher education connections," including campuses of Northwestern State University both in Shreveport and in Natchitoches, and "campuses in southern Shreveport and Southern University Baton Rouge" as connecting factors. *Id.* at 458:4–10.

149.   Pastor Steven Harris, a full-time pastor who has served on the Natchitoches School Board for three terms, testified to the shared culture in the district. *Id.* at 463:5–10. Throughout his

28 years performing his duties as a pastor in Natchitoches, he regularly travels to Shreveport, Alexandria, Lafayette, and Baton Rouge. *Id.* at 463:15–465:20. He testified that he travels four to five times a week to hospitals in Shreveport and Alexandria to visit sick parishioners in hospitals and other medical facilities. *Id.* at 463:21–464:19. He described the shared culture of areas within the district as compared to New Orleans, "[t]he culture is different, much different. Foods are different than we eat. Even the music . . . is different. In New Orleans, the food is mostly cayenne pepper, and in Baton Rouge and Alexandria and Natchitoches, we do more brown gravy." *Id.* at 467:21–468:3. "[A]nd I have, in my engagement in even the music. In Baton Rouge and in Natchitoches and things, we play more of a bottom bass line. In the area of New Orleans, it's more of a house party kind of atmosphere." *Id.* at 468:10–14. Pastor Harris also spoke of the sense of community and shared interests that exist among the Protestant pastors in the district. He testified that he has relationships and connections with pastors in Shreveport, Alexandria, Lafayette, and Baton Rouge and that he is frequently invited to preach in those areas. *Id.* at 467:6–9; 469:17–470:8. He spoke to cultural institutions and events that unite communities in CD6, such as the State Fairs in Baton Rouge and Alexandria. *Id.* at 471:12–20. He also described connected educational systems, describing how students from Northwestern State University and LSU-Shreveport, where his youngest daughter is a student, regularly attend services at his church. *Id.* at 467:13–16. Pastor Harris testified to driving the I-49 highway when performing services in Natchitoches, Shreveport, Alexandria, and Baton Rouge. *Id.* at 469:7–16. He also described the significance of the Red River in the region, which comes into the Natchitoches port and is how residents of CD6 (in Shreveport and elsewhere) get their materials to build roads and infrastructure. *Id.* at 468:15–469:4.

150.    The Power Coalition organizes in communities throughout the newly enacted CD 6. *Id.* at 485:8–17.  Ashley Shelton testified that SB8 reflects communities of interest because it

"actually centered communities that have never been centered in any of the current congressional districts that they are within." *Id.* at 483:6–8. Power Coalition works throughout CD 6 as configured in SB 8 and Ms. Shelton knows first-hand that these communities share commonalities, such as "living in poverty, hav[ing] poor health outcomes, lack of access to economic opportunity, similar hospitals, similar sized airports" *Id.* at 483:8–12; *see also id.* at 484:20–486:2; 487:5–18.

151.    Mr. Fairfax testified that his maps demonstrated that CD6 of SB8 could be explained by socioeconomic commonalities not considered by Dr. Voss. *Id.* at 398:6–9; 399:2–9. In Baton Rouge, for example, the six socioeconomic factors Mr. Fairfax considered in drawing the Robinson illustrative maps followed the configuration of CD6 of SB8. RI-299; 4/9 Tr. 399:2–9. Likewise, looking at census places together like the location of the city of Central and the majority of LSU Baton Rouge also could have explained the boundary lines of CD6 of SB8 in the Baton Rouge area. RI-299; 4/9 Tr. 399:2–400:7. Mr. Hefner did not consider these socioeconomic commonalities together, which "doesn't present all of the picture," which is why Mr. Fairfax as a demographer overlays these factors together to "show[ ] a commonality of all these six different socioeconomic aspects." 4/9 Tr. 400:15–22.

152.    Senators Seabaugh and Pressly did not provide any evidence addressing communities of interest that was contrary to the evidence presented by the *Robinson* Intervenor-Defendants.

153.    Senator Pressly testified, "I have looked at a lot of maps on this issue," 4/8 Tr. 76:8–11, but did not specifically recall seeing alternative proposals that would have kept all of northwest Louisiana in one congressional district, while also maintaining two majority-Black congressional districts, as SB4 would have done. *Id.* at 75:8–17. He also did not "recall specifically" seeing a

- 34 -

map that would have placed Representative Letlow in a majority-Black district, as SB4 would have done. *Id.* at 75:18–22.

154.    Senator Pressly did not testify that SB8 was selected over the alternative maps for racial reasons.  He ultimately "did not publicly support any of the alternatives" and was of the view that "we should keep the map that was put forth in 2022." *Id.* at 77:6–8.

155.    The Court therefore finds that Senator Pressly's testimony does not support that SB8 was selected over SB4 and other alternative proposals for race-predominant reasons.

156.    Senator Seabaugh testified that his own senate district, District 31, which includes portions of Bossier, Caddo, DeSoto, Natchitoches, Rapides, Red River, Sabine, Webster and Winn parishes, was "not particularly" a community of interest. *Id.* at 54:22–23. Senator Seabaugh offered no amendments to SB8, *id.* at 56:2–4, did not testify in the Senate and Governmental Affairs Committee, 4/8 Tr. 63:12–1, and has never voted in favor of a plan that created two majority-Black congressional districts during his two decades in the Louisiana state house. *Id.* at 57:9–58:23.

> ### F.    The opinions of plaintiffs' experts are not reliable and the experts do not show that SB8 was predominantly driven by race or that it is impossible to draw a congressional district plan in Louisiana with two majority-Black districts consistent with TRPs

### 1.    Overholt

157.    Plaintiffs promised in their opening statement to present testimony by Dr. Overholt that "SB8's ugly shape helps it to include more Black voters and perform better than the competing two minority maps." *See id.* at 17:18–22. But plaintiffs ultimately chose not to call Dr. Overholt.

### 2.    Hefner

158.    The Court gives no weight to the testimony of Mr. Hefner. As a preliminary matter, Mr. Hefner has a long history of both technical and legal errors that undermine the reliability of his opinions. *See* 4/9 Tr. 263:9–266:20 (Lafayette Parish sued as a result of a discrepancy solely

- 35 -

due to Hefner's admitted error in failing to use the correct maps when drafting the textual descriptions); *Kishbaugh* v. *City of Lafayette Gov't*, 275 So.3d 471, 477 (La. App. 3d. 2019) ("The textual descriptions adopted by the Lafayette City-Parish Council, however, did not match these maps due solely to Mr. Hefner's admitted error in failing to use the correct maps when drafting the textual descriptions" which resulted in the City being sued); 4/9 Tr. 267:18–268:8  (DeSoto Parish Police Jury threatened with litigation as a result of Hefner's redistricting plans' non-compliance with the constitutional requirement and traditional districting criteria of equal population); *id.* at 269:14–22 (Court described Hefner's recommendations to the DeSoto Parish Police Jury as "constitutionally suspect").

159.     In this case, Mr. Hefner offered the opinion that the Black population in Louisiana was geographically distributed and concentrated in such a way that it is impossible to create a second majority-Black district without sacrificing traditional districting criteria. *Id.* at 271:11–22. On cross-examination, however, Mr. Hefner abandoned this opinion, stating that he could offer "no opinion on" whether it was possible to draw a congressional redistricting plan with two majority-Black districts that was consistent with traditional redistricting principles. *Id.* at 320:1–5.

160.     Mr. Hefner did not review any redistricting plans with two majority-Black districts that were considered by the Legislature during the 2024 redistricting session nor any amendments to SB 8. *Id.* at 318:2–8. Instead, his analysis of the impossibility of creating a second majority-Black district in Louisiana was based solely on his limited analysis of HB 1, Plaintiff's Illustrative plan, SB8 and what he called his "own edification and in exploring," which he did not describe. *Id.* at 318:9–25. On cross-examination, he admitted that he actually could not "offer an opinion

about" whether the plans the Legislature considered in 2024 with a second majority-Black congressional district complied with traditional redistricting criteria. *Id.* at 319:11–16.

161.    Mr. Hefner drew no map which created a second majority-Black congressional district in Louisiana in this case.  Yet as Mr. Fairfax testified, in assessing whether the Black population is distributed in such a way that you could create a second majority-Black district and comply with traditional redistricting principles, as a demographer, "you attempt to develop a plan, a plan that follows or adheres to either their redistricting criteria that's established by the State." *Id.* at 396:22–397:15. And Mr. Fairfax in fact developed several districting plans that created two majority-Black districts and adhered to traditional redistricting criteria, neither of which Mr. Hefner considered. RI-300; 4/9 Tr. 396:22–397:15. Mr. Hefner's opinion on the impossibility of creating a second majority-Black congressional district that conforms to traditional redistricting principles is unsupported, contrary to his concession that he could offer no opinion about whether plans with two majority-Black districts considered by the Legislature conformed to traditional redistricting principles, and entitled to no weight.

162.    Mr. Hefner also offered the opinion that "race predominated in the drafting of Senate Bill 8" as "evidenced by the lack of compactness" and "deviation from the traditional core districts." 4/9 Tr. 271:23–272:14. Mr. Hefner admitted, however, he did not consider incumbency in his analysis of the compactness of SB 8. *Id.* at 272:9. Mr. Hefner did not consider the Court's order in the Robinson litigation nor that core retention is largely irrelevant when a state is seeking to comply with Section 2. Indeed, all he looked at "were the districts themselves," "[t]he political boundaries generally," "compactness, core districts, and communities of interest." *Id.* at 294:7–15.

163.    Mr. Hefner's testimony that race predominated in the drawing of SB8 because the plan does not conform to traditional redistricting principles was superficial and misleading.

164.     With respect to compactness, Mr. Hefner offered the opinion that because CD6 of SB8 may stretch 251 miles, "it's not compact" and "if it was compact, it would be far less distance from one side of the district to the other." *Id.* at 48:2–12. Yet, Mr. Hefner "didn't run the comparisons [of district length] on HB1," and he was forced to admit that he had no basis to opine whether a district that spans 250 miles was unusual. JE-16; 4/9 Tr. 101:25–102:12.

165.     Map makers, unlike Dr. Voss and Mr. Hefner in their analysis for this case, traditionally also take account of "political considerations" in their map drawing process as well as "assets" that are desirable in any district such as "a college or university, military bases" and of course "incumbent locations." 4/8 Tr. 160:8–19. Dr. Voss and Mr. Hefner did not provide any accounting of these considerations in their testimony.

166.     In terms of parish splits, Mr. Fairfax testified that the SB8 plan and the HB1 plan split a similar number of parishes, and that SB8 "more evenly split" those parishes "across the plan." *Id.* at 161:5–18. Mr. Hefner acknowledged on cross-examination that he did not consider that SB8, as originally introduced, split 15 parishes, the same number of split parishes as in the HB1 plan, and that it did not split Avoyelles Parish. JE-11; 4/9 Tr. 86:14–23. Nor did Mr. Hefner review any of the legislative testimony regarding the amendment that introduced the split to Avoyelles Parish nor whether the split had any effect on the Black population of CD 6. 4/9 Tr. at 86:24–87:12. Mr. Fairfax was unable to agree that the parish splits in the SB8 plan and the limited analysis offered by Dr. Voss and Mr. Hefner supported a conclusion that race predominated over the preservation of parishes in the SB8 plan. 4/8 Tr. 164:11–23.

167.     Mr. Hefner's analysis of census places, which he termed "municipalities" similarly did not show that race predominated over their preservation. *Id.* at 166:4–20. The SB8 plan split 42 "municipalities" and HB 1 split 32. 4/8 Tr. 165:7–12. As Mr. Fairfax testified, "42 and 32 is

not a significant difference when you consider that you have 488 municipalities or census places" and "[o]nce again, you have a more evenly spread of splits across the plan; and the largest congressional district in the HB1 plan splits 19; in the SB 8 plan, it splits only 15." *Id.* at 165:16–22. Dr. Voss included no evidence about the role of municipality preservation in his analysis, which misses a critical component of any analysis necessary to determining whether race predominated over other considerations in the configuration of CD6 of SB8. *Id.* at 166:9–15.

168.    In terms of racial predominance and communities of interest, Mr. Hefner testified that "[a]griculture is generally going to be one of the main economic activities" defining communities of interest in many parts of Louisiana; thus, he looked at "gross domestic product" ("GDP") in Louisiana from agriculture, which is collected by the Bureau of Economic Analysis and only available at the parish level. 4/9 Tr. 59:9–22. Mr. Hefner's map showed 2021 GDP for forestry, agriculture, fishing and hunting at the parish level overlayed on Louisiana parishes. PE-20; 4/9 Tr. 89:19–24. On cross-examination, Mr. Hefner acknowledged that analysis of this map does not provide a basis to know whether particular communities within the parishes are more dependent on agriculture than other communities. 4/9 Tr. 90:16–22. The map also combined fishing, agriculture, forestry and hunting into a single figure, so it is not possible to determine whether the parishes in the map are dependent, for example, on forestry versus agriculture. *Id.* at 90:23–91:5. Mr. Hefner also acknowledged that his map showed total GDP, and not as a percent of GDP for the parish, so ultimately his map would not help anyone determine whether a map drew or excluded agricultural economic communities of interest together or not. PE-20; 4/9 Tr. 92:2–93:7.

169.    Mr. Hefner also considered the Louisiana Regional Folklife Program areas, and how the SB 8 plan split those five regions. 4/9 Tr. 74:24–77:5, offering the opinion that because

CD 6 of SB8 split three Folklife regions, the map did not preserve communities of interest. *Id.* Yet on cross-examination, he admitted that the Louisiana Folklife map was not created for redistricting purposes, and his report offered no opinions on how many Folklife regions were split between the districts in the HB1 plan. *Id.* at 105:2–16. He thus could offer no opinion whether CD 4 and CD 5 of HB1, covering the entire northern half of the state of Louisiana, each split the same number of Folklife regions as CD6 in SB8. PE-20; 4/9 Tr. 105:10–16; 106:6–15.

170.    Mr. Hefner offered an opinion that in creating CD6, the Legislature included more precincts with significant or majority-Black populations than it excluded. 4/9 Tr. 289:6–290:21. On cross-examination, Mr. Hefner conceded that every majority-Black district by definition must include more Black population than population of other racial groups. 4/9 Tr. 332:9–333:9; 334:4–14. The court does not credit Mr. Hefner's testimony because a majority-Black district cannot be created from whole precincts that are not predominantly majority-Black in turn. Mr. Hefner's precinct analysis thus shows nothing more than that the Legislature created a majority-Black district.

### 3.    Voss

171.    Plaintiffs' expert Dr. Stephen Voss relied on the REDIST package developed by Robinson Intervenors' expert Dr. Cory McCartan to generate map simulations of Louisiana's congressional districts. 4/8 Tr. 135:11–14; 162:3–6. Dr. Voss relied on these simulations to develop analyses to assess two questions: (1) is SB8 s a racial gerrymander and (2) is it possible to draw two majority-Black districts while conforming with traditional redistricting principles. *Id.* at 101:2–20. But his simulation analyses do not aid the Court in assessing these questions and Plaintiffs' claims. 4/8 Tr. 213:15–215:9. To begin, he admitted that he is unaware of any peer-reviewed articles in his professional field about the propriety of using REDIST map simulation

techniques to assess whether a particular map is a racial gerrymander and whether such techniques have been applied in the racial gerrymandering context altogether. *Id.* at 164:8–165:4.

172.    Dr. Voss offers two conclusions, (1) Louisiana's Black population is too dispersed to comprise a compactly drawn congressional district (based on "race-neutral" simulations) and (2) it is not possible to draw two majority-Black districts (based on what he calls "race-conscious" simulations). *Id.* at 195:20–196:8.  Dr. Cory McCartan, the creator of both the REDIST software and Sequential Monte Carlo, one of the main algorithms it uses, persuasively testified that these conclusions are fundamentally flawed in both design and execution. *Id.* 212:25–213:17.

### a)    Dr. Voss' "race-neutral" simulations

173.    Dr. Voss admitted that his "race-neutral" simulations were not "100 percent race-neutral because some of the things that on the surface are race neutral aren't necessarily in practice." *Id.* at 130:14–18.

174.    As Dr. McCartan testified, the simulation analyses conducted by Dr. Voss do not and cannot show whether it is impossible to draw a second majority-Black district that complies with traditional redistricting principles. *Id.* at 196:13–23. Dr. McCartan explained that simulations are not suited to determine what is or is not possible; instead, they can demonstrate what is typical or average resulting from the simulation constraints applied. *Id.* Dr. Voss even conceded that "proving that something is impossible is not something you really can do with quantitative analysis." *Id.* at 108:4–9.

175.    Indeed, as Dr. Voss conceded, the number of potential simulations that the algorithm can generate for Louisiana's congressional map is close to infinite. *Id.* at 151:6–10; 200:22–201:2 (In a state like Louisiana, "the number of plans that meet all those criteria is probably bigger than the number of atoms in the entire universe…you really prove impossibility"). None of

Dr. Voss' "race-neutral" analyses reflect the considerations that real mapmakers consider when drawing maps.

176.    Dr. Voss conceded that his maps were not representative of "what an actual legislature may consider," but rather "representative criteria that come up with the range of maps designed to meet with the constraints" that he had chosen to program into the simulation. *Id*. at 176:18–177:2. But as Dr. McCartan testified, this is not what simulations are designed to do. The purpose of simulations are to try "to simulate what might have happened or what would have come out of a map-drawing process that followed certain criteria or constraints provided by the analyst." *Id*. at 189:4–11.

177.    Dr. Voss admitted that changing the simulation constraints used (or changing the weight of existing constraints are applied) would necessarily result in different sets of maps. *Id.* at 151:23–152:11; *See id*. at 191:5–17.

178.    Dr. Voss admitted that "the population tolerances required from real maps without splitting precincts," a requirement of Joint Rule 21, "may not be achievable with a simulation method" and "in many cases" may "not be feasible maps." *Id*. at 152:23–153:10.

179.    Dr. Voss also conceded that balancing redistricting criteria in the real-life mapdrawing process may require tradeoffs between one criterion and another. *Id.* at 144:15–20.

180.    Dr. Voss admitted that he has no understanding of how the Legislature and its mapmakers applied redistricting factors when developing SB8 and the other maps introduced during the Special Session, including how they chose to balance redistricting criteria in creating those maps. *Id.* at 144:16–147:20.

181.    Dr. Voss conceded that his simulations constraints did not include most of the redistricting criteria that the Legislature outlined in Joint Rule 21, including, but not limited to, the

consideration of *any* communities of interest, except to the extent captured indirectly within his inclusion of parish splits and Metropolitan Statistical Area ("MSA") splits simulation constraints. *Id.* at 154:5–156:23; RI-301. As just one example, his simulations, would therefore not account for communities of interest articulated by the legislators who supported SB8. *Id*. at 156:12–157:5.

182.    Even Dr. Voss' decision to include parish and MSA splits as constraints further illustrates the limited utility simulations offer to reflect information about the real-life balancing of redistricting criteria that actual mapmakers must engage in, given that mapmakers sometimes split MSAs and parishes to protect communities of interest. *Id*. at 158:2–159:1.

183.    Dr. Voss' ability to assess compactness is further limited by his decision to not include criteria such as municipal splits and following natural geographic boundaries as constraints —both of which directly affect compactness. *Id*. at 199:22–200:8; 154:5–156:23. And as Dr. McCartan testified, "if you're missing certain factors that we know are likely to affect compactness and you're also basing a judgment about the role of race on, for example, differences in compactness…you can't tease out how much of this is race and how much of that is failing to include these other considerations." *Id*. at 200:7–200:19.

184.    Dr. Voss' failure to include certain criteria that affect compactness render the simulations a "much less useful benchmark or comparator against SB8." 4/8 Tr. 218:20–219:4.

185.    Dr. Voss' simulations do not reflect many other factors that the Legislature may have considered in crafting SB8 beyond Joint Rule 21, such as socioeconomic and educational differences between populations or political considerations made by the Legislature.  *Id*. at 160:18–161:11; 193:6–194:23.

186.    Moreover, the simulation constraints that Dr. Voss did apply are not instructive in determining whether race predominated or whether two majority-Black districts are possible.

187.    As Dr. McCartan demonstrated, while Dr. Voss did apply compactness pressure as a simulation constraint, the degree to which he applied that compactness pressure resulted in simulated plans that were far more compact than any of the maps that the Legislature enacted. *Id.* at 202:4–203:6; RI-302.

188.    As a result of these errors, his simulations do not provide a useful benchmark or comparator against SB8. *Id.* at 200:11–21; 198:9–24 ("[T]he simulations are useful for answering a question on the role of race only to the extent that the difference between the enacted and the submitted plans only involve race. Other factors are also changing, then it can't be sure whether the differences are because of racial differences or whether they're because of these other factors.").

189.    Similarly, Dr. Voss' application of a parish split constraint does not reflect choices that actual mapmakers have historically made about parish splits in creating Louisiana maps. *Id.* at 203:21–205:13; RI-303.  The degree to which Dr. Voss applied this parish constraint resulted in most of his map simulations containing either more than 29 splits or fewer than five splits.  *Id.* at 205:19–206:3; RI-303. Dr. Voss admitted that neither of these ranges reflect the ranges of parish splits in prior redistricting plans considered or enacted by the Legislature. *Id.* at 161:24–162:14; RI-303; RI-306.

190.    As Dr. McCartan explained, comparing Dr. Voss' simulations to SB8 is "not an apples-to-apples comparison" because his simulations do not account for the relevant redistricting criteria and factors that the Legislature considered during the map drawing process. *Id.* at 216:21–217:3; 176:24–177:25; 222:2–224:20; RI-301. Therefore, the conclusions he draws from those "race-neutral" simulations are not useful for assessing the question he seeks to answer.

### b) Dr. Voss' "race-conscious" simulations

191.     Dr. Voss claims he also conducted "race-conscious" simulations. *Id*. at 169:5–22 Dr. Voss admitted that the analyses he utilized in these "race-conscious" simulations have not been peer reviewed nor ever used by any legislature. *Id*. at 171:4–16.

192.     Because Dr. Voss' "race-conscious" simulations do not accurately incorporate racial information, they cannot determine whether it is impossible to draw two majority-Black districts while adhering to traditional redistricting principles. *Id*. at 196:4–7; 196:24–197:12 ("There's a very big difference between saying that a simulation that uses a tiny bit of racial information doesn't produce black districts, and then extrapolating from there to say that if you produce two black districts, it must be racial gerrymandering.")

193.     As Dr. McCartan explained, while some of Dr. Voss' analyses include "some racial information," in "some cases the amount of racial information provided is basically zero". *Id*. at 206:9–17. Three of Dr. Voss' "race-conscious" simulations "use the same overall strategy" to define the majority-Black precincts in the state and then "instruct the algorithm to avoid splitting those more than once or twice." *Id*. at 206:21–207:4; RI-306 (Simulations 4, 5, and 6).

194.     For example, in Simulations 5–1 and 5–2, Dr. Voss attempts to assign all the majority-Black precincts in the state to the *same* district. But it is impossible to put all majority-Black precincts of Louisiana in the same district. Even putting that impracticality aside, the way Dr. Voss put that instruction into the algorithm "meant that if you couldn't satisfy that constraint" the constraint was then "turned off." *Id*. at 207:4–19; RI-306 (Simulations 5–1 and 5–2). Thus, the set of statewide Black population simulations "functionally had very little, if any, racial information." *Id*. at 207:19–21.

195.     Similarly, in Simulations 4 and 6, Dr. Voss designed the simulations to discourage certain groups of parishes from being split. But as Dr. McCartan testified, "[t]he only way racial

information possibly enters is in how these groupings are defined." And again, once the groupings are violated more than twice, that encouragement was turned off. *Id*. at 207:22–208:3; RI-306 (Simulations 4 and 6).

196.    These simulations are "race-conscious" in name only. *Id.* at 227:5–228:1. Due to their flawed design, which resulted in the racial constraints being disregarded early in the process, Dr. Voss' constraints had little to no effect on the BVAP share of the resulting simulated plans, evident from his own tables. *Id*. at 208:4–23; 225:9–228:1; RI-304 (showing effect of simulated plans on BVAP share); RI-306.

197.    As his final "race-conscious" analysis, Dr. Voss claimed he "protect[ed] enacted cores" or tried to "avoid breaking apart" the two majority-Black districts in SB8. Id. *at* 130:24–132-11. Dr. Voss testified that these simulations designed to "protect enacted cores" best encapsulated his conclusions, rather than the other analyses. *Id*. at 138:17–139:26; 211:15–21; RI-306 (Simulation 7–1).

198.    The purpose of this simulation is to "encourage" core protection in the areas where the districts are being drawn "with the intention of being majority-Black." *Id*. at 245:16–246:7. .

199.    Dr. Voss professed to use the method "that Professor McCartan's team had used" to encourage core protection. *Id*. at 131:11–14. But Dr. McCartan testified that Dr. Voss' simulations did not, in fact, encourage protection of cores, because again, Dr. Voss did not properly conduct the simulation. At a base level, Dr. Voss defined no cores within the district and did not even instruct the algorithm to even "try to keep those regions together" in the two majority-Black districts. *Id*. at 245:4–246:7; 209:7–23; RI-305 (demonstrating lack of defined core areas).

200.     Dr. Voss' failure to define any core demonstrates that the simulations did not use any, if at all, racial information, rendering his analyses useless. *Id*. at 211:22–12; 232:11–233:17; 267:12–19.

201.     Based on the design and execution flaws in Dr. Voss' analyses, this Court should not credit his testimony that (1) Louisiana's Black population is too dispersed to comprise a compactly drawn congressional district and (2) it is not possible to draw two majority-Black congressional districts.

### c)     ALARM Project

202.     Dr. Cory McCartan helped lead the ALARM project, an academic research project designed to evaluate the impact of partisan considerations on congressional maps in 50 states, including Louisiana. *Id*. at 242:21–244:5.

203.     The ALARM project was not designed to test whether two majority-Black districts could be created in Louisiana consistent with traditional redistricting principles. *Id*. at 244:6–14.

204.     The simulations of the ALARM project were constrained to recreate the same number of majority-minority districts as existed in the State's existing congressional plan, which when the research was conducted was one. *Id*.

205.     Even with the constraint to draw the same number of majority-minority districts as existed in the State's congressional plan, Dr. McCartan testified that the simulation sometimes produced two majority-minority districts. *Id*. at 237:2–8.

VIII.   **SB8 Was Enacted to Further the State's Compelling Interest in Complying with Section 2 of the VRA**

A.      **The evidence available to the Legislature supports the conclusion that a second majority-Black district was required by Section 2 of the VRA.**

206.    The Legislature properly relied on the *Robinson* decisions in concluding that they were required to draw two majority-Black districts. *See supra* ¶¶ 117–21.

207.    Senator Womack stated on the record that he had reviewed performance data online and SB8 "does perform very well," JE-31 at 6–7. In response to questions from legislators about performance, Senator Womack also explained that he had seen partisan performance analysis that showed that CD6 would reliably elect Democrats and that the performance "appears to be positive for the minority district." JE-29 at 6. Other legislators, like House and Governmental Affair Vice Chair Rodney Lyons, confirmed their confidence that SB8 performed for Black voters. JE-31 at 5–6. Senator Duplessis testified that he reviewed "information" and "data" including voter registration and racial demographic data to determine that SB8 would allow Black voters the opportunity to elect their candidate of choice. 4/10 Tr. 524:3–17, 527:22–528:10, 529:11–530:8; *see also* JE-11.

208.    Both Governor Landry and Attorney General Murrill advised members of the Legislature that despite their intensive efforts to defend the map enacted in 2022, passing a new map was a necessary step forward to dispose of the *Robinson* litigation. *See supra* ¶¶ 93–116. The Legislature had reason to believe their advice, as the two lead attorneys defending the map as the former and current Attorney General.

209.    In addition to the guidance of the Governor and Attorney General, legislators also received briefing on the requirements of redistricting and the Voting Rights Act from well-experienced committee staff. *See* JE-28 at 3–11; *see also* 4/10 Tr. Tr. 62:22–63:11.

210.     Legislators believed that the VRA required a second majority Black district. 4/9 Tr. 368:20–24.  Senator Duplessis testified that his understanding of the *Robinson* litigation was the court held that a map with two majority-Black districts was required by the VRA.  4/10 Tr. 536:18–537:11. Senator Alan Seabaugh testified that he understood that Judge Dick has ordered a map with a second majority-minority district. 4/8 Tr. 47:22–48:1.   Senator Thomas Pressly testified to his understanding that the court has ordered the Legislature to draw a congressional map with two Black majority districts. *Id*. at 81:17–82:1.

211.     Senator Duplessis believed that SB8 would comply with the Voting Rights Act and his belief was informed in part by his prior experience as the Vice Chair of the House and Governmental Affairs Committee and his "understanding of what [he] was able to learn about the Voting Rights Act [and] what was required under Section 2." 4/10 Tr. 529:11–530:8.

212.     As Senator Duplessis explained, the Legislature, which had failed to pass maps with two majority-Black districts during the two previous redistricting sessions in January and June 2022, finally accepted that it had to "come to the end of the road," and that the *Robinson* litigation had "basically forced members who previously did not support [maps with two majority-Black districts], and may not still want to see that," to realize that "we had to comply with the Voting Rights Act." *Id*. at 528:10–529:6. The Court credits Senator Duplessis' testimony given his prior experience as Vice Chair of the House and Governmental Affairs Committee and throughout the 2020 redistricting cycle.

213.     Legislators also received letters from civil rights organizations and the *Robinson* plaintiffs reiterating the findings of the *Robinson* courts and establishing that the Legislature must pass a new map with two majority-Black districts to remedy the Voting Rights Act violation. *See generally* RI-275; RI-276. Counsel for the *Robinson* plaintiffs and Intervenor-Defendants also

directly briefed legislators on elements of the cases and application to bills presented during the January 2024 session. *See* JE-36 at 4; *see also* JE-31 at 17–21.

214.    Plaintiffs' contention that the State was unable to put on its full case in the litigation, 4/8 Tr. 14:16–17, ignores the extensive evidentiary record in the case as reflected in Judge Dick's decision and contrary to the statements by the Governor and the State Attorney General that the State had come to the end of the road in the litigation.

215.    Plaintiffs put on no evidence in this case about the State's litigation strategy in the *Robinson* litigation, or any evidence showing what, if anything, the State could have presented in that case that it did not.  Indeed, the State successfully objected to the *Robinson* Intervenor's request to put the record in the *Robinson* case in the record here.

### IX.    SB8 is Narrowly Tailored to Achieve the Compelling State Interest in Complying with the VRA

#### A.    SB8 does not take account of race more than necessary to comply with the VRA

216.    SB8 includes two majority-Black districts, and the BVAP in both such districts is only slightly above 50 percent and remaining less than 55 percent. *See* JE-15.

217.    SB8 as enacted reflects only one amendment made during the legislative process. The amendment, supported by Senator Heather Cloud, was adopted for the express non-racial purpose of moving her constituents into Representative Letlow's district. *See* R42; *see also* JE-29 at 5–6; 4/10 Tr. 564:13–564:21. The amendment added a single parish split, bringing the total to sixteen (one more than the map enacted in 2022). *Id*.

218.    The second proposed amendment to SB8 was adopted in committee but removed in a floor vote. *See* RI-45; RI-46. Specifically, the Committee for House and Governmental Affairs voted to adopt an amendment offered by Representative Farnum. RI-45; *see also* JE-31 at 9–21; 4/10 Tr. 571:10–575:20.. While Representative Farnum represented that his intention for the

amendment was to keep Calcasieu Parish whole, he admitted that other legislators, including Senator Carter, were involved in negotiations regarding additional changes that would have increased the BVAP in Districts 2 and 6, resulting in multiple splits of East Baton Rouge Parish. *Id*.

219.    *Robinson* Plaintiff Commissioner Davante Lewis actively lobbied against the amendment because of his perception that it was "a direct push by some to make both districts Blacker." 4/10 Tr. 574:4–575:20. Commissioner Lewis reached out to "just about every member" that he "personally knew or could" as well as members of the Governor's staff in opposition to the Amendment. *Id*.

220.    The House of Representatives voted to remove the Farnum Amendment from SB8 on the House Floor in a resounding bipartisan vote, 84–16, before advancing SB8 for final passage. *See* RI-46; RI-35; *see also* JE-33 at 3. The earlier amendment supported by Senator Cloud was thus the only alteration to SB8 upon final passage as compared to the original version of the bill filed.

221.    As discussed above, the fact that SB8 is not as compact as other alternatives and that it splits more parishes was driven by political, not racial, reasons.

### B.    Demographic conditions have changed since the *Hays* litigation

222.    Since the *Hays* litigation, the demographic conditions have changed such that a Red River map is feasible consistent with traditional redistricting principles.

223.    There has been an increase in the Black population in Louisiana since the 1990s, and since Hurricane Katrina, the State's Black population has shifted out of the New Orleans area into other areas of the state.  4/9 Tr. 339:7–340:15; *Id*. at 392:13–393:20.; *see also Robinson I*, 605 F. Supp. 3d at 834 ("By every measure, the Black population in Louisiana has increased significantly since the 1990 census that informed the *Hays* map.").

224.    Plaintiffs' own demographer conceded that in population SB8 is not a carbon copy of the *Hays* map. 4/9 Tr. 308:5–9 (Mr. Hefner testifying that SB8 CD 6 only shares 70% of the same population as the district struck down in *Hays*).

### X.    Plaintiffs have not established that SB 8 has a discriminatory effect or was enacted with a discriminatory purpose

225.    Plaintiffs did not testify at trial. The only information about Plaintiffs in the trial record is the agreed upon stipulated facts which does not include their racial identification. PE-39. Plaintiffs cannot without a racial identification assert they were discriminated against on account of their race.

226.    Plaintiffs did not put on any evidence of discriminatory effect. Plaintiffs did not put on any evidence to show that their voting potential is minimized or cancelled out or that their political strength has been adversely affected. The evidence at trial was contrary that Plaintiffs living in North Louisiana could benefit from having two congressional representatives. Mayor Glover testified that "it was necessary to ensure that we ended up with a fair and balanced representation throughout the State, but especially, if possible, through—for Northwest Louisiana. The idea of ending up with a set of circumstances where you could have two members of congress, based from this area, ending up representing not just a fair distribution of congressional districts throughout the State, but an opportunity to be able to really elevate and advance this particular region." 4/9 Tr. 459:19–460:6.

227.    Further Plaintiffs put on no evidence that bloc voting occurs along racial lines; that the Plaintiffs' group is excluded from the political process; that voter registration is low among the Plaintiffs' group; that elected officials are unresponsive to the needs of the group; nor that the group occupies depressed socioeconomic status because of inferior education or employment and housing discrimination.

228.    Last, Plaintiffs fail to establish that the act was taken in part to discriminate against their group.  The decision to enact SB8 was to meet the requirements of the district court and the Fifth Circuit and for political reasons. *See supra*. The procedure followed was that of a special session which is necessary for mid-cycle redistricting.

Dated: April 17, 2024

Respectfully submitted,

/s/ Tracie L. Washington
_____

/s/ Stuart Naifeh
_____

Tracie L. Washington
LA. Bar No. 25925
Louisiana Justice Institute
8004 Belfast Street
New Orleans, LA 70125
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

Stuart Naifeh*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
snaifeh@naacpldf.org

*Counsel for* Robinson *Intervenors Dorothy Nairne, Martha Davis, Clee Earnest Lowe, and Rene Soule*

*Counsel for* Robinson *Intervenors*

Stuart Naifeh*
Kathryn Sadasivan*
Victoria Wenger*
Colin Burke*
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
vwenger@naacpldf.org
cburke@naacpldf.org

R. Jared Evans
LA. Bar No. 34537
I. Sara Rohani*
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Sarah Brannon*
Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org
mkeenan@aclu.org

Nora Ahmed
NY Bar No. 5092374 (pro hac vice
forthcoming)
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

Robert A. Atkins*
Yahonnes Cleary*
Jonathan H. Hurwitz*
Amitav Chakraborty*
Adam P. Savitt*
Arielle B. McTootle*
Robert Klein*
Neil Chitrao*
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com
amctootle@paulweiss.com
rklein@paulweiss.com
nchitrao@paulweiss.com

Sophia Lin Lakin*
Garrett Muscatel*
Dayton Campbell-Harris (pro hac vice
forthcoming)**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org
gmuscatel@aclu.org
dcampbell-harris@aclu.org

T. Alora Thomas-Lundborg*
Daniel Hessel*
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

*Additional counsel for* Robinson *Intervenors*

\* Admitted pro hac vice.
\*\*Practice is limited to federal court.