**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION**

| | | |
|---|---|---|
| PHILIP CALLAIS, LLOYD PRICE, | ) | |
| BRUCE ODELL, ELIZABETH ERSOFF, | ) | |
| ALBERT CAISSIE, DANIEL WEIR, | ) | |
| JOYCE LACOUR, CANDY CARROLL | ) | |
| PEAVY, TANYA WHITNEY, MIKE | ) | |
| JOHNSON, GROVER JOSEPH REES, | ) | |
| ROLFE MCCOLLISTER, | ) | |
| | ) | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | District Judge  David C. Joseph |
| | ) | Circuit Judge Carl E. Stewart |
| NANCY LANDRY, IN HER OFFICIAL | ) | District Judge  Robert R. Summerhays |
| CAPACITY AS LOUISIANA | ) | |
| SECRETARY OF STATE, | ) | Magistrate Judge Kayla D. McClusky |
| | ) | |
| Defendant. | ) | |

**<u>PLAINTIFFS' POST-TRIAL BRIEF</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iv

I.      Introduction ............................................................................................. 1

II.     Legal Standard ......................................................................................... 3

III.    Race Predominated in the Legislature's Drawing of District Lines in SB8 ......... 3

        a.   Race was the one factor that could not be compromised ........................ 4

        b.   The decision to create two majority-Black districts was made first
             and any other considerations followed ............................................. 6

        c.   Even without direct evidence of intent, it was not possible to draw
             SB8 without focusing predominantly on race ..................................... 8

             i.    Bizarre shape of District 6 reveals racial predominance ............... 9

             ii.   Dramatic changes in racial demographics show racial
                   predominance ................................................................... 10

             iii.  Subordination of traditional criteria proves racial predominance ... 11

IV.     SB8 Fails Strict Scrutiny ........................................................................ 13

        a.   Compliance with the VRA was not a compelling interest on this record ..... 14

        b.   SB8's districts were not narrowly tailored to advance any State interest
             in complying with the VRA ......................................................... 15

             i.    The State has conducted no pre-enactment analysis ................. 17

             ii.   The State's reliance on the *Robinson* litigation is misplaced ........ 17

             iii.  The State has neither performed nor reviewed analysis of
                   whether SB8's districts are narrowly tailored to remedy a
                   VRA wrong .................................................................... 20

             iv.   Even if the State performed pre-enactment analysis,
                   it would fail .................................................................... 21

V.      This Court, and no other Court, has jurisdiction to reach every
        issue in this case .................................................................................... 22

VI.     Remedy ................................................................................................ 24

CONCLUSION .......................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) .................................................................... 16, 17, 23

*Allen v. Milligan,*
    599 U.S. 1 (2023) ........................................................................ 11, 19, 20

*Armour v. State of Ohio,*
    925 F.2d 987 (6th Cir. 1991) ..................................................... 24

*Bethune-Hill v. Va. State Bd. of Elecs.,*
    580 U.S. 178 (2017) ........................................... 3-9, 11, 13, 14, 23

*Bush v. Vera,*
    517 U.S. 952 (1996) .................................................................... *passim*

*Chen v. City of Houston,*
    206 F.3d 502 (5th Cir. 2000) ..................................................... 7, 9

*Cooper v. Harris,*
    581 U.S. 285 (2017) .................................................................... *passim*

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
    76 F.4th 425 (5th Cir. 2023) ...................................................... 3

*Easley v. Cromartie,*
    532 U.S. 234, 245 (2001) ............................................................ 6, 8

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ....................................................... 3, 16, 20, 21

*Harris v. Ariz. Indep. Redistricting Comm'n,*
    578 U.S. 253 (2016) .................................................................... 23

*Hays v Louisiana,*
    936 F. Supp. 360 (W.D. La. 1996) ............................................. 1, 16, 18

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) .................................................................... 7, 8

*Kalson v. Patterson,*
    542 F.3d 281 (2d Cir. 2008) ....................................................... 24

*Leavitt v. Jane L.*,
    518 U.S. 137 (1996) ................................................................................. 25

*LULAC v. Perry*,
    548 U.S. 399 (2006) ................................................ 9, 15, 16, 17, 20, 21

*LULAC v. Texas*,
    318 F. App'x 261 (5th Cir. 2009) .......................................................... 23

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................................... 1

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................... 3

*Perry v. Perez*,
    565 U.S. 388 (2012) ................................................................................. 25

*Robinson v. Ardoin*,
    37 F.4th 208, 215 (5th Cir. 2022) ......................................................... 19

*Robinson v. Ardoin*,
    86 F.4th 574 (5th Cir. 2023) ................................................................. 19

*Robinson v. Ardoin*,
    605 F. Supp. 3d 759 (M.D. La. 2022) ......................................... *passim*

*Robinson v. Ardoin*,
    No. 22-CV-211-SDD-SDJ (M.D. La. Apr. 16, 2024) ........................ 24

*Shapiro v. McManus*,
    577 U.S. 39 (2015) ............................................................................ 22, 23

*Shaw v. Hunt (Shaw II)*,
    517 U.S. 899 (1996) ............................................. 4, 5, 15, 16, 18, 20

*Shaw v. Reno* (Shaw I),
    509 U.S. 630 (1993) ........................................... 1, 4, 9, 13, 11

*Thomas v. Bryant*,
    919 F.3d 298 (5th Cir. 2019) ............................................................ 23, 24

*United States v. Hays*,
    515 U.S. 737 (1995) ................................................................................. 22

*Upham v. Seamon,*
    456 U.S. 37 (1982) ..................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..................................................................... 3

*Wis. Legislature v. Wis. Elecs. Comm'n,*
    595 U.S. 398 (2022) ........................................................... 14-18, 20, 21

## Other Authorities

28 U.S.C. § 2284 .......................................................................... 22, 23

U.S. Const. art. III, § 2 ................................................................. 22

## I.      Introduction

Racial gerrymanders are "odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno*, 509 U.S. 630, 657 (1993) (*Shaw I*). Plaintiffs bring this case because, "[w]hen the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller v. Johnson*, 515 U.S. 900, 911-912 (citing *Shaw I*, 509 U.S. at 647). *Voters of all races suffer this injury every time race is predominantly used to sort them into districts*, even if the mapmaker sees race as only a tool to achieve some non-racial goal. It is the stereotyping that offends, and that is what happened here. It happened in Louisiana before, thirty years ago. Here is what the offending district did:

> The District thinly links minority neighborhoods of several municipalities from Shreveport in the northwest to Baton Rouge in the southeast (with intermittent stops along the way at Alexandria, Lafayette, and other municipalities), thereby artificially fusing numerous and diverse cultures, each with its unique identity, history, economy, religious preference, and other such interests.

*Hays v Louisiana*, 936 F. Supp. 360, 377 (W.D. La. 1996). Thirty years later, there is no better summation of the evidence in this case, as SB8's District 6—which shares most of the geography and 82% of the Black population of the *Hays* district—does all of these things and more. Indeed, it leaps beyond *Hays*: it racially gerrymanders to intentionally give one race super-proportionality, a higher percentage of seats than its proportion of the voting age population.

Yet the Court could blind itself to all of this and still decide the case based on the words of the legislators themselves. SB8 author Sen. Womack and other legislators repeatedly declared that the Legislature "must" reach a certain BVAP in two congressional districts and it "had to draw two districts" with a majority BVAP. **JE33, 7:14; JE29, 3:12-13; JE30, 6:8-9, 8:2-4; JE31, 7:16, 11:3-5, 75:24-76:21**. They said that was "the only reason" the Legislature was drawing new maps.

1

**Trial Tr. 1, 47:22, 12-13, 48:17-21, 49:24-50:2; JE31, 121:21-22** (Sen. Womack: "[W]e all know why we're here. We were ordered to draw a new black district, and that's what I've done."). Rep. Lyons, Vice Chairman of the House and Governmental Affairs Committee, in support of SB8, stated that the "*mission* that we have here is that we *have* to create two majority-Black districts." **JE31, at 75:25-76:1** (emphasis added). Rep. Carlson, in support of SB8, stated that "the overarching argument that I've heard from nearly everyone over the last four days has been race first" and that "race seems to be, at least based on the conversations, the driving force" behind the redistricting plan. **JE31, 97:18-19, 21-24**. Sen. Pressly too remarked that the district lines were "based purely on race." **JE30, 23:23**. And Sen. Morris said "[i]t looks to me we primarily considered race." **JE34, 7:2-3**. Other legislators, including SB8 sponsor Rep. Beaullieu disavowed, even in support of SB8, that politics were the predominant force behind the plan. **JE31, 84:21-89:5** (Beaullieu); **JE31, 94:16-95:5, 98:18-20** (Carlson).

The Legislature clearly enacted SB8 to jump ahead of a court decision it feared would be unfavorable. But in doing so, it never determined that the Voting Rights Act ("VRA") actually required a second majority-Black district. And in fact, the State's own chief legal officer and advisor, Attorney General Murrill, advised the Legislature that it did not. **JE28, 36:24-37:1**. She told legislators that the map was defensible. **JE28, 42:23, 46:3-4**. She told legislators that the litigation had not led to a fair or reliable result. **JE28, 61:20-62:1-12, 62:24-63:1-3, 63:6-17**. And she told legislators that they were not under a court order or bound to draw a map. **JE28, 67:17-20, 76:12-22**. Nonetheless, she determined, and the State reiterated in its statements to this Court, that the best decision was to draw a new map out of fear of an eventual adverse judgment. But court-watching and strategic maneuvering have never been sufficient compelling interests.

Moreover, even if the State properly raised the VRA as a compelling interest, it would fail at the second step of strict scrutiny—narrow tailoring. The fear of violating the VRA somewhere does not allow the State to racially gerrymander just anywhere. The State must instead conduct a pre-enactment, local analysis of whether the *Gingles* factors and totality of the circumstances *demand* the remedial district in the precise place of the district. But the State never conducted any analysis for District 6—a majority-Black district that ran across the State from Southeastern Baton Rouge to Northwestern Shreveport that was unseen in *Robinson*. The State and Intervenors' sweeping references to the *Robinson* opinions as providing the requisite strong basis in evidence to satisfy strict scrutiny are unavailing. The *Robinson* court opinions never touched, analyzed, or even mentioned the population encompassed in District 6 or illustrative maps that partially resembled SB8. The remedy here is not narrowly tailored to remedy an alleged VRA violation.

Therefore, Plaintiffs respectfully ask that the Court declare Sections 1 and 3 of SB8 unconstitutional, issue findings of fact, and order a remedial phase for purposes of preparing an interim congressional districting plan to control the remainder of the 2024 election cycle.

## II.    Legal Standard

To obtain injunctive relief, Plaintiffs must demonstrate by a preponderance of the evidence (1) either actual or likely success on the merits; (2) they are likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023). The third and fourth factors merge here since the State is an opposing party. *See Nken v. Holder*, 556 U.S. 418, 420 (2009).

## III.    Race Predominated in the Legislature's Drawing of District Lines in SB8

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va.*

*State Bd. of Elecs.*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). It "prohibits unjustified racial classifications." *Id*. at 189. To trigger its protection, Plaintiffs must show "race was the predominant factor motivating the legislature's decision to place a significant number of voters *within or without a particular district*." *Id*. at 187 (emphasis added). This analysis is district-by-district. *Id*. at 187, 191-92. "[A]ctual considerations that provided the essential basis for the lines" rather than "*post hoc* justifications the legislature in theory could have used but in reality did not" matter. *Id*. at 189-90. Racial predominance exists even "when a reapportionment plan respects traditional principles . . . if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only *after* the race-based decision had been made.'" *Id*. at 189 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*) (emphasis added)). Critically, reliance on a court case or purported goodwill does not escape strict scrutiny. "Racial gerrymandering, even for remedial purposes" is still subject to strict scrutiny. *Shaw I*, 509 U.S. at 657. Plaintiffs can show racial predominance either through direct or circumstantial evidence. *Miller*, 515 U.S. at 916. Here, both types of evidence proliferate in abundance. Racial predominance is not a close call.

### a. Race was the one factor that could not be compromised.

First, the direct evidence shows that "[r]ace was the criterion that, in the State's view, could not be compromised." *Bethune-Hill*, 580 U.S. at 189 (quotation omitted). The transcripts from the 2024 First Extraordinary Legislative Session and the trial testimony from legislators themselves demonstrate that the Legislature established an unlawful racial target, the Legislature regarded that target as the most important consideration in redistricting, and the Legislature subordinated traditional criteria to reach that target. *Cooper v. Harris*, 581 U.S. 285, 299-301 (2017).

First, the Legislature "purposefully established a racial target: African-Americans should make up no less than a majority of the voting-age population" in Districts 2 and 6. *Id.* at 299; *see*

*also Bethune-Hill*, 580 U.S. at 192 (racial predominance where evidence shows "use of an express racial target"); *Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality) (racial predominance where State had "commit[ment] from the outset to creating majority-minority districts"). SB8 author Sen. Womack, sponsor Rep. Beaullieu, and backers in the Legislature "repeatedly told their colleagues that [two districts] had to be majority-minority." *Id*. They repeatedly cited and used a "50%-plus racial target." *Id*. at 300; **JE29, 3:6-25, 4:1-2** (Womack); **JE30, 6:3-23** (same), **JE31**, **7:10-25, 8:1-5** (same); **JE33, 7:4-25, 8:1-5, 9:2-8** (Beaullieu).

Not only did the Legislature create a racial target, it relentlessly hewed to it as the overriding, nonnegotiable criterion for SB8. *Cooper*, 581 U.S. at 300; *Bethune-Hill*, 580 U.S. at 189; *Shaw II*, 517 U.S. at 906-07; *see, e.g.*, **Trial Tr. 1, 48:17-21, 49:24-50:2, 49:11-25, 68:7-10, 69:16-19, 79:7-16,  80:8-11**. Sen. Womack and others repeatedly declared that the State "must reach a certain BVAP in two districts and "had to draw two districts" with a majority BVAP. **JE33, 7:14; JE29 3:12-13; JE30 6:8-9, 8:2-4; JE31 7:16, 11:3-5, 75:24-76:21**. That was "the only reason" the Legislature was drawing new maps. **Trial Tr. 1, 47:22, 12-13, 48:17-21, 49:24-50:2; JE31, 121:21-22** (Sen. Womack: "[W]e all know why we're here. We were ordered to draw a new black district, and that's what I've done.").

And the Legislature acknowledged that race was its driving force. Rep. Carlson stated, even in backing SB8, that "the overarching argument that I've heard from nearly everyone over the last four days has been race first" and that "race seems to be, at least based on the conversations, the driving force" behind the redistricting plan. **JE31, 97:18-19, 21-24**. For Sen. Pressly, district lines were "based purely on race." **JE30, 23:23**. As Sen. Morris said, "[i]t looks to me we primarily considered race." **JE34, 7:2-3**. Such evidence proves racial predominance. *Cooper*, 581 U.S. at 300; *Bethune-Hill*, 580 U.S. at 189; *Shaw II*, 517 U.S. at 906-07.

Finally, while a violation of traditional redistricting criteria is not necessary to show racial predominance, *Bethune-Hill*, 580 U.S. at 190; *Bush*, 517 U.S. at 963 (finding racial predominance where "[t]raditional districting criteria were not *entirely* neglected"), there is ample direct evidence that the Legislature sacrificed traditional redistricting criteria in its mission to create two majority-Black districts, **JE30, 7:24-25, 8:1-6, 8:21-9:8** (Womack); **JE34, 5:24-25, 6:1-6, 7:2-3** (Morris); **JE34**, **10:1-9** (Luneau). The Legislature believed it "needed to have two majority-minority districts, and any other redistricting guidelines were secondary to that." **Trial Tr. 1, 68:7-10;** *id.* **69:16-19** ("Certainly the racial component in making sure that we had two performing African American districts was the fundamental tenet that we were looking at. Everything else was secondary to that discussion."). It believed it had to "draw a second majority-minority district prior to any other consideration." **Trial Tr. 1, 80:8-11**. Without more, this evidence alone is sufficient to show racial predominance. *Cooper*, 581 U.S. at 301.

**b. The decision to create two majority-Black districts was made first and any other considerations followed.**

The direct evidence also shows that "race-neutral considerations came into play only after the race-based decision had been made." *Bethune-Hill*, 580 U.S. at 189 (quotation omitted). Any other considerations—political or otherwise—were applied after the initial, core decision to create two majority-Black districts. **Trial Tr. 1, 49:5-7** (Sen. Seabaugh: agreeing that no legislator "advocate[d] for losing a Republican seat without drawing a majority-minority district"), **68:7-10** (Sen. Pressly: noting that race was fundamental and political considerations were secondary), **69:16-19** (same), **79:8-16** (same).

In this case—unlike others where the "district was the result of a *political* gerrymander— an effort to engineer mostly 'without regard to race,' a safe Democratic seat," *Cooper*, 581 U.S. at 294 (quoting *Easley v. Cromartie*, 532 U.S. 234, 245 (2001) (*Cromartie II*) and citing *Hunt v.*

*Cromartie*, 526 U.S. 541 (1999) (*Cromartie I*))—race motivated the decisions to create Districts 2 and District 6 with over 50% BVAP. Downstream political goals to protect incumbents only came *after* those initial race-based decisions. **Trial Tr. 1, 48:17-49:8, 71:23-72:7, 79:7-16**. As Sen. Pressly testified, incumbent protection was "secondary" to the Legislature's "fundamental" choice to "create two minority districts." **Trial Tr. 1 79:7-16**. Naturally, at least one Republican incumbent would be disadvantaged once the decision was made to make one more district majority-Black. **Trial Tr. 1, 48:24-49:8**. Discussion of such downstream concerns after the initial, nonnegotiable race-based decision to draw two majority-Black districts does nothing to undermine the conclusion of racial predominance, and in fact only supports that race predominated given that multiple legislators expressed their grief over the political consequences of SB8. *See, e.g.*, **JE31, 84:21-89:5** (Beaullieu); **JE31, 94:16-95:5, 98:18-20** (Carlson).

Even were this not true, no evidence reveals an overriding political goal in drawing Districts 2 or 6. *See Bethune-Hill*, 580 U.S. at 191 (noting that "the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district"). While incumbents in other districts were discussed in legislative debate, any mention of incumbents or politics in Districts 2 and 6 was noticeably absent. Those discussions about other districts cannot be imputed to Districts 2 and 6. *Id*. at 191-92; *see also, e.g.*, *Bush*, 517 U.S. at 965-76 (scrutinizing "each challenged district" to determine whether race predominated for each one).

Finally, if politics had been SB8's main goal, the Legislature had far easier paths than dragging District 6 out of its traditional Southeastern Louisiana abode to stretch hundreds of miles into the heart of Shreveport, the old heart of District 4. *See Chen v. City of Houston*, 206 F.3d 502, 507 (5th Cir. 2000) (noting "some highly bizarre districts give rise to inference that race predominated more strongly than the inference that factors such as politics created the distortion"

7

(citing *Cromartie I*, 526 U.S. at 547 n.3)). Unrebutted expert testimony shows that even if the Legislature had a political goal to oust Garret Graves, it could have accomplished this political goal through multiple other means apart from enacting SB8. **Trial Tr. 1, 110:15-22, 112:2-14**. The Legislature also could have secured the political future of the four other Republican incumbents through multiple alternatives apart from enacting SB8. **Trial Tr. 1, 108:16-21, 110:15-22**. And no evidence supports that the predominantly Republican Louisiana Legislature wanted to oust Garret Graves, destroy a potential Republican congressional seat, or endanger the slim Republican majority in Congress independent of its belief that it had to create two majority-Black districts. As Rep. Carlson stated in his reluctant support of SB8:

> Look, I'm – certainly wish that we're in a different position in the House of Representatives with more than just a one-vote majority . . . and that this wasn't looked at as a 'we're going to lose the majority or not' kind of decision. But unfortunately, that's the position that we find ourselves in. I can assure you of this: that we are not – that we're not here today because we're caving to any kind of political pressure. The fact of the matter is, like it or not, Judge Dick has said, "Either you do your job and draw the map, or I'll draw the map for you," period.

**JE31, 94:16-95:5**. It begs credulity to assert that the Louisiana Legislature, in its desire to protect Speaker of the House Mike Johnson and Majority Leader Steve Scalise, would willingly threaten the Republican majority in Congress and thus the leadership positions of these congressmen. Thus, this other evidence only compounds the inevitable conclusion that race, not politics, predominated. *Cooper*, 581 U.S. at 320 (citing *Cromartie II*, 532 U.S. at 257-58).

### c. Even without direct evidence of intent, it was not possible to draw SB8 without focusing predominantly on race.

Circumstantial evidence also establishes clear racial predominance. *Miller*, 515 U.S. at 916. Plaintiffs can rely on "circumstantial evidence of a district's shape and demographics" to show race was the predominant factor behind the Legislature's districting decisions. *Bethune-Hill*, 580 U.S. at 187. They can also present evidence that a Legislature "subordinated traditional race-

neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916. But Plaintiffs do not need to present a specific type of circumstantial evidence. *Cooper*, 581 U.S. at 319 n.4. Here, the evidence abounds.

### i. Bizarre shape of District 6 reveals racial predominance.

First, the odd shape of District 6 alone demonstrates an unlawful "racial quota." *Bush*, 517 U.S. at 976 (quotation omitted); *Bethune-Hill*, 580 U.S. at 187; *Chen*, 206 F.3d at 507 ("The shape alone of some districts may be so bizarre and irregular that their creation may only be interpreted as 'an effort to segregate the races for purposes of voting, without regard for traditional districting principles.'" (quoting *Shaw I*, 509 U.S. at 642)). Mr. Hefner's review and unrebutted testimony about the "awkward and bizarre shape" of District 6 points toward racial predominance over traditional redistricting criteria. **Trial Tr. 2, 304:23-305:14**. District 6 is "very elongated," "contorted," and extremely narrow at points, even dwindling down to 1.3 miles at a connection point. **Trial Tr. 2, 305:2-6, 286:7-13**. In other areas, it is very wide. **Trial Tr. 2, 285:20-286:8**.

Mr. Hefner's dot density map, **PE17**, reveals why. District 6 is shaped like a barbell because its entire purpose is to link one dense Black population in Baton Rouge with a completely different, but similarly dense, Black population in Shreveport, 250 miles away. This is a difficult but not unprecedented redistricting tactic. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 432-435 (2006) (Hispanic-opportunity district drawn to link two disparate minority populations 300 miles apart, in Austin and the Rio Grande Valley, was not sufficiently compact to qualify as a VRA remedy to substitute for the failure to draw a different VRA district elsewhere).

The barbell strategy requires a high degree of skill. No stray white voters can be allowed into the Baton Rouge "weight," as this will cause the district to hit its ideal size long before

reaching Shreveport. For the same reason, on the way up to Shreveport, the population must remain as "thin" as possible. In high population regions in this "thin" zone, District 6 narrows or grows tendrils to include as many Black voters as possible and exclude as many white voters as possible. **PE17; Trial Tr. 2 286:7-13**. In low population regions, in contrast, District 6 can significantly widen because there is an insufficient concentration of voters to "spend down" the ideal population allotment or reduce the BVAP. **PE17; Trial Tr. 2, 285:20-286:8**. The mapmaker was very precise in selecting majority Black precincts to include in its boundaries and excluding majority non-Black precincts from its boundaries. **PE15, PE16, PE17, PE18, PE19**. Likewise, the heat map shows that the goal was to narrowly trace around areas where Black populations were the most concentrated. **PE16**. On rebuttal, Mr. Fairfax provided no evidence of statewide analyses of alternatives to race that could have predominated in the drawing of SB8's lines. **Trial Tr. 2, 398:22-402:12**.[1] And in Mr. Hefner's statewide analysis he saw no patterns apart from race emerge. **Trial Tr. 2, 298:16-299:12**. The plan of District 6 was, simply, a barbell of race.

Dr. Voss's independent analysis also revealed that SB8's District 6 reaches into far-flung areas of the State just to include Black communities while avoiding communities with large numbers of white voters. **Trial Tr. 1, 94:18-95:10, 96:7-16; PE3; PE4**. This undisputed evidence across the State clearly shows racial predominance.

## ii. Dramatic changes in racial demographics show racial predominance.

Second, the changes to the racial demographics of the districts show racial predominance. The changes in District 6 were the most dramatic, swinging from a non-Black majority district to

---

[1] Rather, Mr. Fairfax's incomplete analysis of municipal divisions and socio-economic factors in East Baton Rouge alone provided the entire bases of his conclusion that he "saw other aspects that could configure the district or allow the district to be configured in a manner other than race." **Trial Tr. 2, 398:22-402:12**. And even the evidence he cited points to race as the primary criterion behind District 6's lines. **Trial Tr. 2, 300:5-301:17 (municipality divisions); Trial Tr. 2, 298:22-299:12 (socio-economic data)**.

a Black majority district by increasing BVAP by 30%. **JE5, at 7** (HB1 CD6 BVAP at 23.861%); **JE15, at 3** (SB8 CD6 BVAP at 53.990%). This 30% increase on the same census numbers was over *four times greater* than the "sizable jump" of 7% BVAP observed by the Supreme Court as indicative of racial predominance in *Cooper v. Harris*. 581 U.S. at 311. In District 2, the Black population decreased but held the majority at 51%. **JE5, at 2** (HB1 CD2 BVAP at 58.650%); **JE15, at 1** (SB8 CD2 BVAP at 51.007%). Both Sen. Carter and Sen. Duplessis noted that this 51% BVAP was low and potentially posed performance issues, but nonetheless SB8 garnered their support since it created a second majority-Black district. **JE 30, 15:14-16:4** (Carter); **JE 30, 21:15-22:4** (Duplessis). This choice was deliberate and demonstrates racial gerrymandering. *Cf. Cooper*, 581 U.S. at 311 (noting State's deliberate decision to create bare majority BVAP indicated racial gerrymandering).

### iii.  Subordination of traditional criteria proves racial predominance.

The neglect of traditional criteria to unite the State's dispersed Black population also shows racial predominance. *Bethune-Hill*, 580 U.S. at 190-91; *Allen v. Milligan*, 599 U.S. 1, 28 (2023). Plaintiffs' experts analyzed whether SB8 abided by traditional criteria, such as compactness, contiguity, preservation of core districts, and respect for political subdivisions or communities of interest, *Miller*, 515 U.S. at 906, 916, and they concluded that SB8 did not score well.

For one, SB8's districts, especially District 6, are not compact. **Trial Tr. 1, 107:5-21** (Voss); **Trial Tr. 2, 302:16-17, 305:2-14** (Hefner). SB8 and in particular District 6 scored extremely low on both the Polsby-Popper and Reock scales. **PE21; Trial Tr. 2, 303:13-25; Trial Tr. 1, 106:17-24, 107:5-21**. District 6, for example, received a score of 0.05 for Polsby-Popper, which indicates it is "not compact at all." **Trial Tr. 2, 302:16-17; PE21**. In fact, this was the lowest and "worst" score for any district in HB1 or SB8. **Trial Tr. 1, 107:8-11; Trial Tr. 2, 302:14-15;**

**PE21**. Moreover, Dr. Voss concluded, after evaluating tens of thousands of simulations, that the non-compact features of SB8 are attributable to racial considerations. **Trial Tr. 1, 139:17-23**.

Likewise, the districts divide communities of interests, parishes, and municipalities in violation of traditional redistricting criteria. SB8 split more parishes and municipalities in its effort to increase the BVAPs of Districts 2 and 6 than other congressional plans. **Trial Tr. 1, 97:19-99:11** (Voss)**; Trial Tr. 2, 295:7-8, 295:19-296:6** (Hefner). Mr. Hefner's analysis revealed the parishes in District 6 are split predominantly along racial lines. **PE19**. These unwarranted splits violate traditional redistricting criteria. *Miller*, 515 U.S. at 916; *Bush*, 517 U.S. at 974; *Cooper*, 581 U.S. at 301 n.3 (finding a "conflict with traditional redistricting principles" from "split[] numerous counties and precincts"). Similarly, the four largest cities in District 6—Baton Rouge, Shreveport, Lafayette, and Alexandria—are all split or carved out of their home parishes based on race. **Trial Tr. 2, 283:17-285:1; PE18; PE19**.

SB8, especially District 6, also divides other communities and unites disparate ones. *Miller*, 515 U.S. at 908-09 (noting that one district "centered around four discrete, widely spaced urban centers that ha[d] absolutely nothing to do with each other, and stretch[ed] the district hundreds of miles across rural counties and narrow swamp corridors" was a geographic "monstrosity"). The undisputed testimony from Mr. Hefner revealed how divergent the various cultural regions in District 6 are. Areas as diverse as Acadiana, the Florida Parishes, and Northwest Louisiana with their own cultures, histories, and traditions, now share one representative solely due to large pockets of Black voters in these regions. **Trial Tr. 2, 296:18-297:11, 311:4-312:24**. The mapmaker extracted core cities of these regions and paired them with cities hundreds of miles away. **Trial Tr. 2 283:10-285:1, 304:16-20**. Additionally, the economic, agricultural, and lobbying interests of the Northwest and Southeast portions of District 6 dramatically diverge. **Trial**

**Tr. 2, 297:12-298:5, 313:17-314:18**. Finally, no common educational or socio-economic interests run across District 6. **Trial Tr. 2, 298:14-299:12**.

The Robinson Intervenors belatedly claimed District 6's narrowness reflected an "I-49 corridor" community, forgetting that precisely this tactic—the creation of a fictional "I-85 corridor" in a notorious North Carolina gerrymander, was central to the bedrock precedent for Plaintiffs' claim. *See Shaw I*, 509 U.S. at 635-36. Further, such reasoning is a mere *post-hoc* justification. *Bethune-Hill*, 580 U.S. at 190.

Third, District 6 may be contiguous, but it is "barely contiguous" in its effort to include primarily Black voters and exclude others. **Trial Tr. 2, 293:22-294:4**.

Fourth, SB8 does not preserve core districts. **Trial Tr. 2, 272:4-9, 305:15-306:13**. The only time District 6 reached Northwestern Louisiana prior to SB8 was when the State attempted to enact a map in the 1990s that was struck down by the Western District of Louisiana as an unconstitutional racial gerrymander. **Trial Tr. 2, 306:10-308:18**.

This "body of evidence—showing an announced racial target that subordinated other districting criteria and produced boundaries amplifying divisions between blacks and whites" clearly shows that race predominated. *Cooper*, 581 U.S. at 300-01.

## IV.     SB8 Fails Strict Scrutiny

Once Plaintiffs show that race predominated in the drawing of SB8, the burden shifts to the State to satisfy strict scrutiny. Districting maps that sort voters by race "are by their very nature odious." *Shaw I*, 509 U.S. at 643. That is why courts subject these schemes to strict scrutiny, the "most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920. The State can only meet this "rigorous and exacting standard" if it can prove both that it has a compelling interest in segregating voters based on race and that its racially drawn map is narrowly tailored to achieve that interest. *Id.* The State cannot.

**a. Compliance with the VRA was not a compelling interest on this record.**

First, the State has not shown it had a compelling interest in this scheme. Though the State argues in the abstract that the Legislature had a strong basis in evidence for concluding that the VRA necessitated its action, the State stops short of arguing that its Legislature actually held that belief. While the Supreme Court has assumed without deciding that VRA compliance is a compelling interest, *Wis. Legislature v. Wis. Elecs. Comm'n*, 595 U.S. 398, 401 (2022) (per curiam), the Legislature did not rely on VRA compliance for this action. Any leeway afforded to the State "does not allow a State to adopt a racial gerrymander that the State does not, at the time of imposition, 'judg[e] necessary under a proper interpretation of the VRA.'" *Id.* at 404 (quoting *Cooper*, 581 U.S. at 406). The Legislature's (and State's) repeated citations to the *Robinson* litigation—which was another case, with another legal challenge, another state statute, and at best, a hurried, vacated, non-final preliminary injunction without a full record—as the basis for this decision rather than to the VRA itself cannot supply a compelling interest sufficient to overcome strict scrutiny's demanding standard.

In both its opening and closing at trial, the State never relied on the VRA as a compelling interest. Instead, the State admitted that the Attorney General made a calculated guess on how the Middle District would rule, rather than an analysis of HB1's performance under the VRA. **Trial. Tr. 1, 25:16-26:10; Trial Tr. 3, 624:5-24**. With that "predictive judgment[] as to how  federal courts are likely to rule," the State's analysis ended there. **Trial Tr. 3, 624:12-13.** But pretrial court-watching has never been a compelling interest to justify race-based line drawing.

And even if properly invoked by the State in this litigation, the VRA is a mere "*post-hoc* justification[]" by the State to avoid liability rather than an actual consideration of the Legislature. *Bethune-Hill*, 580 U.S. at 190. Before or during the legislative session, there is no evidence that

14

the Attorney General ever told the Legislature that the Voting Rights Act required two majority-Black districts. **Trial Tr. 1, 83:10-14**. And she continued to reiterate the opposite when providing legal advice to the Legislature. *See, e.g.*, **JE28, 36:24-37:1**. She told legislators that the map was defensible. **JE28, 42:23, 46:3-4**. She told legislators that the litigation had not led to a fair or reliable result. **JE28, 61:20-62:1-12, 62:24-63:1-3, 63:6-17**. She told legislators that they were not under a court order or bound to draw a map. **JE28, 67:17-20, 76:12-22**. And the legislators knew as much. **JE34, 5:19-21; Trial Tr. 1, 52:22-25, 59:4-5, 62:17, 83:2-7**. But the Attorney General promised the legislators that if they drew a map, and if the plaintiffs accepted it, "the whole case should be over." **JE28, 67:20-24**. The State's desire to escape litigation is not the same as VRA compliance, and it cannot provide a compelling interest to satisfy strict scrutiny.

> **b. SB8's districts were not narrowly tailored to advance any State interest in complying with the VRA.**

Additionally, even if the State properly invoked the VRA and can show it had a compelling interest in race-based districting, the State is not home free. It must show that the alleged remedy—SB8—was narrowly tailored to satisfy that compelling interest of compliance with the VRA. This is a narrow constitutional needle to thread. First, the State must present a "strong basis in evidence" for believing that the VRA "required" such racial sorting. *LULAC*, 548 U.S at 426. Mere belief that "the VRA *might* support race-based districting—not that the statute required it" is insufficient. *Wis. Legislature v. Wis. Elecs. Comm'n*, 595 U.S. 398, 403 (2022) (per curiam). In other words, the State must have good reasons to believe the VRA "*demanded* such steps." *Id*. (quoting *Cooper*, 581 U.S. at 301). Timing also matters. The State "that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was *necessary*, '*before* it embarks on an affirmative-action program.'" *Id*. at 404 (quoting *Shaw II*, 517 U.S. at 910).

This requires at a minimum a "strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott v. Perez*, 585 U.S. 579, 621 (2018). As part of this analysis, the State must "carefully evaluate" whether the *Gingles* preconditions are met based on "evidence at the district level"; it cannot reduce the *Gingles* totality-of-circumstances analysis to a "single factor," like proportionality. *Wis. Legislature*, 595 U.S. at 404-405. The State may not "improperly rel[y] on generalizations to reach the conclusion that the preconditions were satisfied." *Id*. at 404. Rather, the "relevant" question is "local" one—*i.e.* "whether the preconditions would be satisfied as to each district." *Id*. (quotation omitted).

Importantly, the State cannot outsource this inquiry by relying on third party analysis, whether that is a non-final judicial factfinding at an expedited hearing or a well-supported letter after months of analysis by experts at the U.S. Department of Justice Civil Rights Division, Voting Section. *Shaw II*, 517 U.S. at 918 (DOJ letter insufficient; State made a factual showing); *Miller*, 515 U.S. at 923-24 (same); *Hays v. State of La*., 936 F. Supp. 360, 372 (W.D. La. 1996) (same).

And still, that is not enough. Even if the State has a strong basis in evidence to believe there is a VRA violation somewhere, the State may not create a majority-Black district just anywhere. *LULAC*, 548 U.S. at 431; *Bush*, 517 U.S. at 979; *Shaw II*, 517 U.S. at 916-17. Rather, an intentionally created majority-Black district must remedy the alleged wrong. *Shaw II*, 517 U.S. at 916-17. After all, the *Gingles* question is a local one. *Wis. Legislature*, 595 U.S. at 404. And a remedial district that does not contain a "geographically compact" population cannot satisfy *Gingles* 1. *Id*. at 916; *LULAC*, 548 U.S. at 430-31. Nor can it satisfy strict scrutiny. *Shaw II*, 517 U.S. at 916 (holding that unless "the district contains a 'geographically compact' population" of the racial group, "where that district sits, 'there neither has been a wrong nor can be a remedy'"

(quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993))); *LULAC*, 548 U.S. at 430-31 ("A State cannot remedy a § 2 violation through the creation of a noncompact district.").

Finally, traditional redistricting principles matter here too. A state legislature must always satisfy traditional redistricting principles to comply with the VRA. *Milligan*, 599 U.S. at 30; *LULAC*, 548 U.S. at 431; *Bush*, 517 U.S. at 979. Thus, some earlier law's purported VRA noncompliance cannot justify a new, non-compact district. *Bush*, 517 U.S. at 979.

States do have "leeway," but the leeway afforded States only allows for "reasonable compliance measures" once the State meets each of these requirements. *Cooper*, 581 U.S. at 293; *Wis. Legislature*, 595 U.S. at 404. The State cannot, however, meet those requirements.

### i. The State has conducted no pre-enactment analysis.

First, the State has conducted no independent pre-enactment analysis of whether the VRA requires these race-based steps. The State readily admitted this fact to the Court in its opening and closing statements. **Trial Tr. 1, 25:8-26:10** (opening); **Trial Tr. 3, 624:5-625:1** (closing). For this reason alone, it has failed to satisfy strict scrutiny. *Abbott*, 585 U.S. at 621.

### ii. The State's reliance on the *Robinson* litigation is misplaced.

Instead, the State wholly relies on the analysis from the *Robinson* litigation, but such reliance does not satisfy strict scrutiny for at least three reasons.

First, the State abandoned its argument that it relied on any expert reports in the *Robinson* litigation. **Trial Tr. 3, 624:9-11** (arguing that it "was also not necessary for the legislators to parse the nuances of the expert reports themselves"). Instead, it claimed it relied solely on the "rulings" of the courts "to supply the strong basis in evidence." **Trial Tr. 3, 624:25-625:1**. Accordingly, not even expert opinion provides the basis for its conclusion.

Second, reliance on the court opinions from the *Robinson* litigation to provide a strong basis in evidence is misguided. For one, the State has consistently failed to demonstrate that any particular portion of the *Robinson* litigation was relevant in the legislative process. It has withheld even a citation to a court opinion. Its sweeping gesture in the direction of the *Robinson* litigation, writ large, does not satisfy strict scrutiny. *Wis. Legislature*, 595 U.S. at 404 ("Rather than carefully evaluating evidence at the district level, the court improperly relied on generalizations to reach the conclusion that the preconditions were satisfied."). And these opinions alone do not automatically give the State a safe harbor. *Shaw II*, 517 U.S. at 918; *Miller*, 515 U.S. at 923-24; *Hays*, 936 F. Supp. at 372.

Furthermore, the content of the *Robinson* opinions cannot support the weight the State puts on them. *Robinson* involved a non-final vacated preliminary injunction of HB1 under the Voting Rights Act without regard for racial gerrymandering. The Middle District of Louisiana's findings were based entirely on the illustrative plans presented by then-Robinson Plaintiffs, none of which created majority-Black districts in the Northwest, but instead "connect[ed] the Baton Rouge area to the Delta Parishes along the Louisiana-Mississippi border." *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 785 (M.D. La. 2022), *vacated by*, 86 F.4th 574 (5th Cir. 2023) (*Robinson I*). Throughout its opinion, the Middle District reiterated the failure of the State to meaningfully contest, challenge, or even present evidence in response to Plaintiffs' evidence. *Id*. at 823. And the court's holding boiled down to what the VRA "likely" required based on this limited evidentiary showing, not what the VRA actually required. *Id*. at 766.

The Fifth Circuit reviewed the case for clear error and cautioned that plaintiffs had yet to prove their case: "The Plaintiffs have prevailed at this preliminary stage given the record as the parties have developed it and the arguments presented (and not presented). But they have *much* to

18

prove when the merits are ultimately decided." *Robinson v. Ardoin*, 37 F.4th 208, 215 (5th Cir. 2022) (*Robinson II*) (emphasis added). It also emphasized that "the State put all their eggs" in one basket, which proved to be a strategic misstep. *Id*. at 217. The Fifth Circuit reiterated its wariness after concluding the district court had erred in its compactness analysis. *Id*. at 222.

The Fifth Circuit merits panel again focused solely on the illustrative maps—each of which "connect[ed] the Baton Rouge area and St. Landry Parish with the Delta Parishes far to the north along the Mississippi River"—without venturing into analysis of other parts of the State. *Robinson v. Ardoin*, 86 F.4th 574, 590 (5th Cir. 2023) (*Robinson III*). The Court also emphasized the limited nature of its clear error review, the State's failure to present evidence in response to Plaintiffs, and the lack of a trial on the merits. *Id*. at 592. The Fifth Circuit emphasized that the State failed to provide evidence or meaningfully refute or challenge the Plaintiffs' evidence, and that the Supreme Court's decision in *Allen v. Milligan* "largely rejected" the "State's initial approach." *Id*. at 592. The Fifth Circuit encouraged the State to recognize that its failure in addressing the VRA issues during the preliminary injunction stage did not bind the State in subsequent proceedings and at trial. *Id*. The Fifth Circuit never ordered the State to create two majority-Black districts, and it vacated any order that may have been imposed by the Middle District. *Id*. at 602. There was no court order or mandate to enact SB8 or even repeal HB1 in January 2024.

The State cannot claim these opinions gave it unfettered license to enact this unconstitutional scheme, **Trial Tr. 1, 23:24-24:3; Trial Tr. 3, 622:5-12**, when that scheme fell squarely outside the scope, reasoning, and case or controversy before the *Robinson* courts. These decisions cannot serve as a "strong basis" to support the State's action, and such reliance is nothing more than an "error of law" that cannot satisfy strict scrutiny. *Cooper*, 581 U.S. at 287-88.

### iii.   The State has neither performed nor reviewed analysis of whether SB8's districts are narrowly tailored to remedy a VRA wrong.

SB8 is also not narrowly tailored because it does not remedy any alleged VRA violation. *Shaw II*, 517 U.S. at 916. The State did not try to defend Districts 2 and 6. Instead, it repeatedly argued before this Court that it had to draw two majority-Black districts, writ large. **Trial Tr. 1, 23:24-24:3, 24:23-25:2, 26:4-9, 26:19-22** (opening); **Trial Tr. 3, 622:5-7, 624:16-20** (closing). But the VRA does not compel remedial action on a statewide basis or set a floor for a certain number of majority-Black districts. *Bush*, 517 U.S. at 979. Such proportionate dividing by the Legislature is per se unlawful. *Allen v. Milligan*, 599 U.S. 1, 28 (2023) ("Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing § 2.").[2] The State cannot gerrymander a district anywhere because it fears a VRA violation elsewhere or has a sufficient statewide minority population. *LULAC*, 548 U.S. at 431; *Bush*, 517 U.S. at 979; *Shaw II*, 517 U.S. at 916; *Allen*, 599 U.S. at 28. The State had no strong basis in evidence to believe, much less a stated basis to believe, that the VRA was violated in traditional District 4 in the Northwest region of the State and the VRA required it to draw a district reaching hundreds of miles into the far recesses of the Northwest corner of the State. The *Robinson* opinions nowhere mention any potential violation in this region of the State and any discussion of majority-Black districts or the *Gingles* factors is directly tied to illustrative maps that create majority-Black districts in New Orleans and the Florida parishes. *See supra*, Part IV.b.ii. The necessary local analysis of these two majority-Black districts is wholly amiss. *Wis. Legislature*, 595 U.S. at 404. Accordingly, the districts are not narrowly tailored to remedy any harm.

---

[2] Nonetheless, legislators still blatantly appealed to raw proportionality as the basis to create a second-majority-Black district. **JE28, 44:22-25, 45:1-24 (Marcelle); JE31, 101:11-17 (Marcelle); JE31, 89:10-13 (Newell) JE28, 56:19-22, 57:11-14 (Boyd); JE30, 21:8-22:1 (Duplessis)**.

#### iv.   Even if the State performed pre-enactment analysis, it would fail.

Finally, the evidence presented by Plaintiffs at trial would rebut any showing that the State or Intervenors could have made if they had actually performed the required analysis. Again, the State has the burden to satisfy the *Gingles* factors, totality of circumstances, and traditional redistricting criteria to engage in race-based line drawing. *Wis. Legislature*, 595 U.S. at 404; *Bush*, 517 U.S. at 979. While not Plaintiffs' burden, Plaintiffs' evidence shows that the State cannot.

First, if the State had carried out its duty to perform a pre-enactment analysis of SB8, SB8 would fall at the first prong of *Gingles*. As part of a State's analysis of whether a strong basis in evidence exists to "adopt a racial gerrymander" in compliance with the VRA, the State must conduct a localized *Gingles* 1 analysis for the proposed majority-Black districts. *Wis. Legislature*, 595 U.S. at 404. "The relevant question is whether the population is sufficiently compact to make up a second majority-minority congressional district *in a certain area of the state*." *Robinson I*, 605 F. Supp. 3d at 826. Mr. Hefner's unrebutted testimony was that the Black population in Louisiana is highly dispersed across the State and is concentrated in specific urban areas, such as New Orleans, Baton Rouge, Alexandria, Lafayette, and Shreveport. **Trial Tr. 2, 281:7-15; 283:19-285:1; 339:20-340:4; PE 15; PE 16**. This dispersion, especially outside New Orleans and East Baton Rouge, and integration of racial groups have significantly reduced the geographic compactness of the Black population and made it impossible to draw a second majority-Black district in any given area of the State without violating *Gingles* 1. **Trial Tr. 2, 282:21-283:6**.

Second, if the State had carried out its responsibility to perform a pre-enactment analysis, it would fail because the State unnecessarily subordinated traditional redistricting principles to race. *Bush*, 517 U.S. at 979. A state legislature must always satisfy traditional redistricting principles to comply with the VRA. *Milligan*, 599 U.S. at 30; *LULAC*, 548 U.S. at 431. Thus, some earlier law's purported VRA noncompliance cannot justify a new, non-compact district. *Bush*, 517

U.S. at 979. Here, as attested by legislators themselves and demonstrated by expert testimony, traditional redistricting principles were subordinated to create two majority-Black districts. *See supra*, Parts III.a, III.c. Thus, the map does not pass strict scrutiny.

**V.      This Court, and no other Court, has jurisdiction to reach every issue in this case.**

This Court is the only one that has statutory authority to reach the constitutional and VRA issues at stake in this case under 28 U.S.C. § 2284. The Fourteenth Amendment Equal Protection claim at issue here was not decided, nor could it have been decided, in the *Robinson* litigation, which proceeded before a single judge. That's for several reasons.

First, the relevant case or controversy was not before the *Robinson* courts. Federal courts only have authority to decide the cases or controversies before them. U.S. Const. art. III, § 2. And parties can only raise Fourteenth Amendment challenges to redistricting schemes when they have suffered an injury from the redistricting traceable to the government action and redressable by a court. *United States v. Hays*, 515 U.S. 737, 743 (1995). No one in *Robinson* alleged that they had suffered a constitutional injury from racial gerrymandering. The Robinson Plaintiffs there, unlike the Callais Plaintiffs here, never raised a Fourteenth Amendment claim. And the State could not raise a Fourteenth Amendment challenge to Robinson Plaintiffs' illustrative maps because the State had not been personally injured by the maps and could not bring a "generalized grievance[]." *Id*. at 743. Not only was the Fourteenth Amendment absent from the case or controversy before the Middle District, so too was SB8, the relevant state action challenged here. Thus, the current case or controversy was not presented to and could not be decided by that court.

Second, a single-judge court could not reach the issue because three-judge courts have exclusive authority to decide Fourteenth Amendment equal protection redistricting challenges. 28 U.S.C. § 2284; *Shapiro v. McManus*, 577 U.S. 39, 43 (2015). 28 U.S.C. § 2284 says a "district

court of three judges *shall* be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a) (emphasis added). As the Supreme Court has held:

> That text's initial prescription could not be clearer: "A district court of three judges *shall be convened* ... when an action is filed challenging the constitutionality of the apportionment of congressional districts...." 28 U.S.C. § 2284(a) (emphasis added). Nobody disputes that the present suit is "an action ... challenging the constitutionality of the apportionment of congressional districts." It follows that the district judge was *required* to refer the case to a three-judge court, for § 2284(a) admits of no exception, and "the mandatory 'shall' ... normally creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *see also National Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661–662 (2007) (same).

*Shapiro*, 577 U.S. at 43. There is absolutely no "grant of discretion to the district judge to ignore § 2284(a)." *Id*. "Congress intended a *three-judge court*, and *not a single district judge*, to enter *all* final judgments in cases satisfying the criteria of § 2284(a)." *Id.* at 44 (emphasis added). This is an "explicit command" of Congress. *Id.* at 44. "[T]he mandatory 'shall' . . . creates an obligation impervious to judicial discretion." *Id*. at 43. Therefore, it would plainly violate the express command of Congress, and the separation of powers principle, for a single judge to adjudicate constitutional claims that meet the "low bar" of § 2284. *Id*. at 46. This mandate is consistently followed and affirmed across the Supreme Court's redistricting cases.[3]

The Fifth Circuit has also determined that this is a jurisdictional issue in *Thomas v. Bryant*, 919 F.3d 298, 304 (5th Cir. 2019) and *LULAC v. Texas*, 318 F. App'x 261, 264 (5th Cir. 2009)

---

[3] *Abbott*, 585 U.S. at 584 (holding in a case where plaintiffs brought constitutional and VRA claims that "some of the districts in the new plans were racial gerrymanders, some were based on intentional vote dilution, and some had the effect of depriving minorities of the equal opportunity to elect the candidates of their choice . . . was assigned to a three-judge court, *as required* by 28 U.S.C. § 2284(a)"); *Bethune-Hill*, 580 U.S. at 185("Because the claims 'challeng[ed] the constitutionality of the appropriation of [a] statewide legislative body,' the case was heard by a three-judge District Court." (quoting 28 U.S.C. § 2284(a))); *Cooper*, 581 U.S. at 293 n.2 ("Challenges to the constitutionality of congressional districts are heard by three-judge district courts, with a right of direct appeal to this Court."); *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 257 (2016) (noting that 28 U.S.C. § 2284(a) "provid[es] for the convention of such a court *whenever* an action is filed challenging the constitutionality of apportionment of legislative districts" (emphasis added))).

and recognized the "consensus in the caselaw" among the other Circuits on this point, *see Thomas*, 919 F.3d at 304. The Second, Third, and Sixth Circuits have also held that this is a jurisdictional matter. *See Kalson v. Patterson*, 542 F.3d 281, 287 (2d Cir. 2008); *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001); *Armour v. State of Ohio*, 925 F.2d 987 (6th Cir. 1991).

Accordingly, since the single-judge Middle District Court lacked statutory authority to decide Plaintiffs' Equal Protection claim at the outset, the Fifth Circuit Court of Appeals did, too.

Finally, even if the Middle District had such authority, it never pretended to exercise it. Had there been any question, the Middle District answered it in its April 16, 2024, order:

> Moreover, this Court declined to address the constitutional question that the defendants attempted to put before it in *Nairne*. In its refusal, the Court explained that the racial-gerrymandering context "is materially different" from the racial vote-dilution context, because "racial gerrymandering claims require proof of intent." The *Callais* Plaintiffs have alleged that Louisiana created gerrymandered districts and "intentionally discriminated" against voters who are non-African American. The Western District confronts constitutional questions that were not before this Court in the captioned matter. The appointment of the three judge panel in *Callais* pursuant to § 2284 to reach such questions is a stark indicator that these cases are distinguished.

*Robinson v. Ardoin*, No. 22-CV-211-SDD-SDJ, at 6 (M.D. La. Apr. 16, 2024) (order denying motion to apply the first-filed rule) (citation omitted). The Court went on to note: "Moreover, the Plaintiffs in this case challenge H.B. 1 and the *Callais* Plaintiffs are challenging S.B. 8. The congressional maps, which are the core issue in each case and thus the primary subject of any potential evidence, are different." *Id*. at 6-7. Accordingly, the Middle District never reached the constitutional questions of racial gerrymandering presented here and recognized that it lacked such authority under § 2284. This Court alone can decide the constitutional and VRA issues presented.

## VI.   Remedy

Finally, we reach the remedy for this unconstitutional law. Plaintiffs request that the Court declare Sections 1 and 3 of SB8 unconstitutional. The parties' evidence and briefing pertain to the

constitutionality of Sections 1 and 3, which enacted SB8—not Section 2, which merely repealed HB1. Thus, the constitutionality of the repeal, standing alone, is not before this Court.

The Court can leave the repeal in place under Louisiana's severability doctrine. LSA-R.S. 24:175 ("Unless otherwise specifically provided therein, the provisions of each act of the legislature are severable, whether or not a provision to that effect is included in the act. If any provision or item of an act, or the application thereof, is held invalid, such invalidity shall not affect other provisions, items, or applications of the act which can be given effect without the invalid provision, item, or application."); *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) (holding that the severability of state laws is a matter of state law). The presumption of severability applies here because the repeal under Section 2 of SB8 can be given effect even if other provisions are deemed invalid and because the statute is silent on severability. LSA-R.S. 24:175.

The Court is therefore free, in preparing a remedy, to work from a benchmark that best approximates the Legislature's intent, scrubbed of its impermissible racial targeting in fixing a two-majority-Black district quota (especially for a minority voting population that does not equal one-third of the electorate). *Perry v. Perez*, 565 U.S. 388, 398 (2012); *Upham v. Seamon*, 456 U.S. 37, 41-43 (1982). Plaintiffs' Illustrative Map is one such plan, but it may not be the only possible plan. **PE14**. The Plaintiffs urge the Court to implement a new map that respects the Legislature's policy objectives without imposing a new majority-Black-district quota.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should issue findings of fact and order a remedial phase for purposes of preparing an interim congressional districting plan to control the remainder of the 2024 election cycle.

Dated this 17th day of April, 2024

Respectfully submitted,

PAUL LOY HURD, APLC
*/s/ Paul Loy Hurd*
Paul Loy Hurd
Louisiana Bar No. 13909
Paul Loy Hurd, APLC
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com
*Attorney for Plaintiffs*

GRAVES GARRETT GREIM LLC
*/s/  Edward  D.  Greim*
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
Jackson Tyler
Missouri Bar No. 73115
*Admitted Pro Hac Vice*
Matthew Mueller
Missouri Bar No. 70263
*Admitted Pro Hac Vice*
Katherine Graves
Missouri Bar No. 74671
*Admitted Pro Hac Vice*
A. Bradley Bodamer
Missouri Bar No. 28676
*Admitted Pro Hace Vice*
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
jtyler@gravesgarrett.com
mmueller@gravesgarrett.com
kgraves@gravesgarrett.com
bbodamer@gravesgarrett.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that, on this 17th day of April, 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

<u>*/s/ Edward D. Greim*</u>
Edward D. Greim
*Attorney for Plaintiffs*
