**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION**

| | | |
|---|---|---|
| PHILIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:24-cv-00122 |
| NANCY LANDRY, IN HER OFFICIAL CAPACITY AS LOUISIANA SECRETARY OF STATE, | ) ) ) ) ) | |
| Defendant. | ) | |

<u>**PLAINTIFFS' PROPOSED FINDINGS OF FACT**</u>

Following the bench trial held by this Court on April 8-10, 2024, Plaintiffs Philip Callais,

et al., respectfully submit these proposed findings of fact supporting judgment in Plaintiffs' favor.

**PAUL LOY HURD, APLC**
*/s/ Paul Loy Hurd*
Paul Loy Hurd
Louisiana Bar No. 13909
Paul Loy Hurd, APLC
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com

*Counsel for Plaintiffs*

**GRAVES GARRETT GREIM LLC**
*/s/ Edward D. Greim*
Edward D. Greim,* Mo. Bar No. 54034
A. Bradley Bodamer,* Mo. Bar No. 28676
Matthew Mueller*, Mo. Bar No. 70263
Jackson Tyler,* Mo. Bar No. 73115
Katherine Graves,* Mo. Bar No. 74671
*Admitted Pro Hac Vice*
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
bbodamer@gravesgarrett.com
mmueller@gravesgarrett.com
jtyler@gravesgarrett.com
kgraves@gravesgarrett.com

I.     **Legislative and Historical Background**

*The Census and Initial Legislative Attempts*

1.     After the 2020 Census, Louisiana was reported to have 4,657,757 people and 3,570,548 people in the voting age population ("VAP"). **JE15, at 3; JE6**. This meant it qualified for six congressional districts, the same number it was allotted after the 2010 Census. **JE15**. Although there is some dispute over the most suitable population categories to use, under the Census measure most generous to the Black population, Louisiana's any part Black voting age population was 1,115,769 people, or 31.249% of the total VAP. **JE15, at 3; JE6**.

2.     Louisiana first enacted a new congressional map, HB1, on March 31, 2022. **JE1**. Like Louisiana's 2011 congressional map, HB1 had one majority-Black district. A majority-Black district must have over a 50% Black voting-age population that is sufficiently compact in the relevant geographic area, that Black population must vote cohesively, and the majority must vote sufficiently as a bloc to defeat the Black candidate of choice (the *Gingles* preconditions), and under the totality of circumstances, among other things, it must generally elect the Black candidate of choice. *Bartlett v. Strickland*, 566 U.S. 1, 11-12 (2009) (Kennedy, J.)

3.     Just before HB1 was passed, on or about March 30, 2022, several groups of plaintiffs filed a complaint in the Middle District of Louisiana, alleging that HB1 violated Section 2 of the Voting Rights Act. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 766, 768 (M.D. La. 2022), *vacated*, 86 F.4th 574 (5th Cir. 2023) ("*Robinson*"). By early January 2024, that case was on track for trial.

*The Passage of SB8*

4.     On January 22, 2024, the Legislature repealed HB1 and enacted SB8. SB8 made two of Louisiana's six congressional districts into Black-majority districts. **JE10.** All the Robinson plaintiffs represented to the Robinson court that they were satisfied that SB8 resolved their VRA

claims. There is currently no trial date and there are currently no live claims in that case, although no order has been entered dismissing the case.

5.      Because Louisiana has just six districts, SB8 is the State's first legislatively enacted map to have allocated one-third of the State's congressional seats as Black-majority districts.

*SB8's Similarity to 1990s-era racial gerrymanders*

6.      Louisiana last approached—but did not actually reach—SB8's one-third proportion of Black-majority districts thirty years ago, in 1994. *Hays v Louisiana*, 936 F. Supp. 360, 377 (W.D. La. 1996). After the 1990 Census, the United States Department of Justice, Civil Rights Division had interposed an interjection to preclearance of Louisiana's one-majority-Black district redistricting plan, compelling it under the Voting Rights Act. to make two of its seven districts (that is, approximately 28.57% of its districts) majority-Black districts. *Hays*, 936 F.Supp. at 363. The letter included a detailed analysis regarding voting patterns and other factors the Department of Justice found should compel Louisiana to create a second majority-minority district under the Voting Rights Act. *Hays*, 936 F.Supp. at 363. At that time, Louisiana's population was 4,219,973, with 2,257,376 registered voters, of which 27.86% were Black registered voters, and 71.21% were white registered voters.[1] *Hays*, 936 F. Supp. at 377.

7.      In enacting the 1994 congressional redistricting map, Louisiana cited the demand from the Department of Justice. *Hays*, 936 F. Supp at 368-69. Based on the DOJ analysis, Louisiana asserted—as the Robinson plaintiffs do now—that the Voting Rights Act required two Black-majority districts. *Hays*, 936 F. Supp at 368-69.

---

[1] The Court notes that the data in *Hays* were state registration data for voters who identified as Black, rather than Census data. Today, Census data allows respondents to choose more than one racial category or even to choose "some other race," https://www.census.gov/quickfacts/fact/note/US/RHI625222, and so 2020 Census racial data are not directly comparable to either state registration data by race, or 1990s Census racial data.

8.      This Court tested Louisiana's Voting Rights Act argument in *Hays v Louisiana*, 936 F. Supp. 360, 377 (W.D. La. 1996). In *Hays*, this Court found that the State's two-Black-majority district plan was an unconstitutional racial gerrymander. *Id*. at 362. The Court found that notwithstanding Louisiana's receipt of the Department of Justice's letter compelling it to create two Black-majority districts under the Voting Rights Act, Louisiana had not met its burden to provide a strong basis that two such districts were actually required under the Voting Rights Act. *Id*. at 370-71. In particular, the Court found that "outside New Orleans, the black population of Louisiana is so widely and evenly dispersed that, to create a Congressional district that meets the one-person-one-vote criterion and has even a simple majority black population, resort must be had to graphic design that constitutes racial Rorschach-ism. The threshold compactness requirement of Gingles has not been met and cannot be met, so §2 of the VRA—like §5—cannot be relied on as a compelling governmental interest to justify the enactment of Act. 1." *Id*. at 370. Until SB8, the State had relied on *Hays* in crafting congressional maps that have one Black-majority district. **Trial Tr. 1, 20:7-13 (the State).**

9.      The district the Court invalidated in *Hays* is represented in **PE22**. This Court in *Hays* described the district as follows:

> The District thinly links minority neighborhoods of several municipalities from Shreveport in the northwest to Baton Rouge in the southeast (with intermittent stops along the way at Alexandria, Lafayette, and other municipalities), thereby artificially fusing numerous and diverse cultures, each with its unique identity, history, economy, religious preference, and other such interests.

*Hays*, 936 F.Supp. at 368.

10.     Plaintiffs' expert, Michael Hefner, testified that CD6-SB8 basically replicates the district that the *Hays* court considered and struck down as an unconstitutional racial gerrymander. **Trial Tr. 2, 306:10-308:18 (Hefner)**. The two districts are almost parallel and very closely aligned,

not only from a geographical perspective but also from a population perspective. **Trial Tr. 2, 306:10-308:18 (Hefner)**; **PE30**. The geographical boundaries are very similar, and the population distribution is very similar. **Trial Tr. 2, 307:24-308:14 (Hefner)**. CD6 shares 70% of the total population, and 82% of the Black population, of the unconstitutional district in *Hays*. **Trial Tr. 2, Trial Tr. 2, 308:5-9 (Hefner)**; **PE30**.

11.     The percentage of Louisiana's voting age population that is Black has changed little since 1996. **Trial Tr. 2, 339:11-16 (Hefner).** Today, Louisiana's Black voting age population remains somewhat less than 33%. **JE15, at 3**.

*The Parties*

12.     The Plaintiffs, Philip Callais, Lloyd Price, Bruce Odell, Elizabeth Ersoff, Albert Caissie, Daniel Weir, Joyce LaCour, Candy Carroll Peavy, Tanya Whitney, Mike Johnson, Grover Joseph Rees, and Rolfe McCollister, challenge SB8. **Doc. 156**. They assert that, by trying to meet an express target of reaching two Black-majority districts, the State has impermissibly divided them into districts based on their race. **Doc. 156**.

13.     The State Defendants are Secretary of State Nancy Landry, in her official capacity, and the State of Louisiana is represented by Attorney General Elizabeth Murrill. **Doc. 156**.

14.     The State intervened on February 26, 2024. **Doc. 79**.

15.     The Robinson Intervenors are Black Louisiana voters and civil rights organizations. **Doc. 156**. They were Plaintiffs in *Robinson, et al. v. Landry*, No. 3:22-cv-02111-SDD- SDJ (M.D. La.). **Doc. 156**. They intervened permissively in the remedial phase of this litigation on February 26, 2024, and permissively in the liability phase on March 15, 2024. **Doc. 79, 114**.

**II.     SB8's districts were drawn predominantly based on race**

16.     SB8 was passed in a legislative special session called by Governor Jeff Landry on January 15, 2024. **JE10**. The law was passed in just a few days, on January 22, 2024. **JE10**. The

parties presented for this Court's consideration the entire legislative record, including the following proceedings: the January 15 Joint Session, the January 15 House and Governmental Affairs Committee hearing, the January 16 Senate and Governmental Affairs Committee hearing, the January 17 Senate floor debate, the January 17 House and Governmental Affairs Committee hearing, the January 18 House floor hearing, the January 18 House and Governmental Affairs Committee hearing, the January 19 House of Representatives floor debate, and the January 19 Senate floor debate. **PE23-29**.

17.     As the Court finds in further detail below, the statements made during the legislative session as well as legislators' testimony during trial provide direct evidence that race was the one criterion the legislature would not compromise. Drawing a second Black-majority district was an absolute requirement, and for that reason, race predominated in the drawing of the district lines of SB8. But even without this direct evidence, Plaintiffs' circumstantial evidence compels the same conclusion.

### A.  Direct Evidence

18.     There is no real dispute among credible witnesses that SB8 was drafted specifically to include two Black-majority districts. ***See generally*, PE41**.

19.     The transcripts from the Special Legislative Session compel this conclusion.

20.     Senator Glen Womack, the Senate sponsor of SB8, stated at the legislative session that redistricting must occur because of the litigation occurring in the Middle District of Louisiana. **PE41, at 18**. Specifically because of that litigation, Sen. Womack conceded that "we had to draw two majority minority districts." **PE41, at 20**.

21.     Later in the special session, Sen. Womack, forced to address the odd shape of CD6 in SB8, admitted that creating two Black-majority districts is "the reason why District 2 is drawn

around the Orleans Parish and why District 6 includes the Black population of East Baton Rouge Parish and travels up I-49 corridor to include Black population in Shreveport." **PE41, at 26**.

22.     Representative Beaullieu repeated the entirety of Senator Womack's statement regarding SB8 during the January 19, 2024 Floor Session of the House of Representatives. **PE41, at 35-36**.

23.     When Rep. Beaullieu was asked during his presentation of SB8 by Representative Amedee, "Is this bill intended to create another Black district?," Rep Beaullieu responded, "Yes, ma'am, and to comply with the judge's order." **JE33, 9:3-8**.

24.     Sen. Womack also professed: "[W]e all know why we're here. We were ordered to draw a new black district, and that's what I've done." **JE31, 121:21-22**.

25.     Rep. Carlson stated, even in his support of SB8, that "the overarching argument that I've heard from nearly everyone over the last four days has been race first" and that "race seems to be, at least based on the conversations, the driving force" behind the redistricting plan. **JE31, 97:18-19, 21-24**. Rep. Carlson went on to state that this was "a shame . . . when we do not live in a … segregated society or nearly as segregated as it once was 40, 50 years ago." **JE31, 97:22-98:1**. And he acknowledged that integration made drawing a second majority-African American district difficult:

> And so the reason why this is so difficult is because we are moving in the right direction. We don't have concentrated populations of -- of certain minorities or populations of White folks in certain areas. It is spread out throughout the state. Compared to Alabama, Alabama has 17 counties that are minority-majority, and they're all contiguous. Louisiana has seven parishes that are minority-majority and only three are contiguous. That's why this process is so difficult, but here we are without any other options to move forward.

**JE31, 98:2-12**.

26.     Rep. Lyons, Vice Chairman of the House and Governmental Affairs Committee, stated that the "mission that we have here is that we have to create two majority-Black districts." **JE31, at 75:24-76:1**.

27.     Sen. Pressly too remarked that the district lines were "based purely on race." **JE30, 23:23**.

28.     Sen. Morris also remarked that "[i]t looks to me we primarily considered race." **JE34, 7:2-3**.

29.     Legislators, including SB8 sponsor Rep. Beaullieu disavowed, even in support of SB8, that politics were the predominant force behind the plan. **JE31, 84:21-89:5** (Beaullieu); **JE31, 94:16-95:5, 98:18-20** (Carlson). As Representative Carlson stated in his reluctant support of SB8:

> Look, I'm – certainly wish that we're in a different position in the House of Representatives with more than just a one-vote majority . . . and that this wasn't looked at as a 'we're going to lose the majority or not' kind of decision. But unfortunately, that's the position that we find ourselves in. I can assure you of this: that we are not – that we're not here today because we're caving to any kind of political pressure. The fact of the matter is, like it or not, Judge Dick has said, "Either you do your job and draw the map, or I'll draw the map for you," period.

**JE31, 94:16-95:5**.

30.     Senator Carter pointed out on the Senate floor, even in his support of SB8, that the bill's author testified that "no sort of performance analysis had been conducted to determine whether or not District Two continues to consistently perform as an African American district." **JE30, 15:20-23**. The State provided no pre-enactment analysis whatsoever.

31.     Senator Carter went on to express his support for SB8 and read a statement from Congressman Troy Carter on the Senate floor:

> My dear friends and colleagues, as I said on the steps of the capital, I will work with anyone who wants to create two majority-minority districts. I am not married

to any one map. I have worked tirelessly to help create two majority-minority districts that perform. That's how I know that there may be better ways to create -- to craft both of these districts. There are multiple maps that haven't been reviewed at all. However, the Womack map creates two majority-minority districts, and therefore I am supportive of it. And I urge my former colleagues and friends to vote for it while trying to make both districts stronger with appropriate amendment. We do not want to jeopardize this rare opportunity to give African American voters the equal representation they rightly deserve.

**JE30, 16:10-25**.

32.     The Legislative Record also indicates that a driving factor for the Legislature was to enact a map that maximized the mathematically possible number of majority-Black districts— a purpose contrary to the VRA. 52 U.S.C. § 10301(b) ("nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population"). Given that the Black voting age percentage of population of Louisiana is by any measure less than one-third, this two-seat quota actually enforced super-proportionality.

33.     For example, Representative Marcelle indicated that it was important for the State to consider that "a third" of its population was African American when dividing the six congressional districts, and Attorney General Murrill responded that it was unlawful to engage in "proportionate dividing." **JE28, 44:22-25, 45:1-24 (Marcelle, Murrill)**. In a Committee Hearing later in the week, Rep. Marcelle said, "we do deserve two Black congressional seats because where I went to school - it was a Black school, though, Capitol High School - when you divide six into a third, a third into sixth, you get two. And so we deserve two seats, and that's what we deserve. We didn't -- we're not begging for something that we don't deserve. That's what we deserve." **JE31, 101:11-17 (Marcelle)**.

34.     Similarly, Representative Newell asserted that "[t]his is a process by which the other 30 percent of the people in this state are trying to get the representation that their population and numbers deserve in Congress." **JE31, 89:10-13 (Newell)**.

35.     Rep. Boyd said: "It's just common sense. If you got a third of the population that is African American and -- and -- and 33 -- over 33 percent, did you look at those -- those figures?" **JE56, 56:19-22 (Boyd).** "So while I agree that the -- your representation that race is not the -- the sole factor, the -- the fact is you got to have six divided equally, okay?" **JE28, 57:11-14 (Boyd)**.

36.     Finally, Senator Duplessis, a witness for the Robinson Intervenors at trial, summed up this proportionality goal during the January 17, 2024 Floor Debate of SB8:

> This is about the people of this state, and one-third of that state, 33 percent, to be exact, being underrepresented. So I think it's important that we keep the focus on why we're here today. None of us want to be here today. We've been at this for well over two years, and all of us have a level of reluctancy with the maps that are before us. Just like Senator Carter, I'm not thrilled about what's happening to send it to Congressional District Two, and the way that it's lowering the numbers. Senator Price and I, we coauthored a bill that we felt performed better, but we too are going to support this map.

**JE30, 21:8-22:1 (Duplessis)**.

37.     In addition to presenting substantial evidence from the legislative record itself, Plaintiffs elicited testimony from Senator Alan Seabaugh and Senator Thomas Pressly. They provided credible testimony as Senators who have served for several years through the redistricting process. Senator Seabaugh has served in multiple decennial redistricting cycles. **Trial Tr. 1, 43:24-44:2; 43:24-44:2 (Seabaugh)**. Senator Pressly served in the Senate during the 2022 redistricting session. **Trial Tr. 1, 66:5-10 (Pressley)**.

*Sen. Alan Seabaugh*

38.     Senator Alan Seabaugh represents a Senate district which covers the northwestern reaches of SB8-District 6, including the more urban portions of Shreveport and Bossier City as well as the towns of Many and Mansfield which are extremely rural. **Trial Tr. 1, 42:19-21; 53:16-54:4 (Seabaugh)**. The Court finds Senator Seabaugh's testimony credible.

39.     Senator Seabaugh testified that in the Special Session, Legislators only introduced congressional redistricting maps with two Black-majority districts. **Trial Tr. 1, 48:14-21 (Seabaugh)**. The Legislature was only there, he testified, to draw a second Black-majority district; absent the *Robinson* litigation, the Legislature would have kept the prior plan, HB1, in place. **Trial Tr. 1, 47:18-48:1, 48:14-21 (Seabaugh)**.

40.     For this reason, Senator Seabaugh testified, there was no reason to submit anything other than a two-Black-majority district plan. **Trial Tr. 1, 48:17-21 (Seabaugh).** The Legislature specifically knew it had to create a second majority-Black district; those who tried to create a second district that attained a majority only when combining several groups of minorities—including Blacks and other races—were told, "no." **Trial Tr. 1, 49:11-23 (Seabaugh)**.

41.     Even in the amendment process, Sen. Seabaugh testified, the Legislature knew that the new Black-majority district could not fall below a certain BVAP quota. **Trial Tr. 1, 52:2-18 (Seabaugh).** Plans were rejected that fell below that threshold. *Id*.

42.     Senator Seabaugh testified that drawing a second majority-minority district was the criterion that, in the Legislature's view, could not be compromised during the special session. **Trial Tr. 1, 48:17-21 (Seabaugh)**. The creation of a second majority-Black district was the one thing that could not be compromised in SB8—it was the entire reason for the special session. **Trial Tr. 1, 49:24-50:2 (Seabaugh)**.

43.     Senator Seabaugh testified that no one in the Legislature advocated for losing a Republican seat—the discussion about who would theoretically lose a Republican seat was a downstream decision from the initial, uncompromisable decision to create a second Black-majority district. **Trial Tr. 1, 49:5-8 (Seabaugh)**.

*Senator Thomas Pressly*

44.     Senator Pressly represents Northwest Louisiana, including a large portion of the City of Shreveport and DeSoto Parish, and testified that this area is its own community of interest and unique from southern areas of the State. **Trial Tr. 1, 72:22-74:7 (Pressly)**.

45.     Senator Pressly voiced his opposition on the Senate Floor and shared his objections with Senator Womack, SB8 author. **Trial Tr. 1, 68:19-20, 68:25-69:8 (Pressly).**

46.     Like Senator Seabaugh, Senator Pressly testified that the Legislature believed that it "needed to have two majority-minority districts, and any other redistricting guidelines were secondary to that." **Trial Tr. 1, 68:7-10 (Pressly)**. "Everything else was secondary" to the Legislature's focus on race and the creation of two majority-Black districts. **Trial Tr. 1, 69:16-19 (Pressly)**.

47.     The creation of a second majority-minority district, Senator Pressly testified, was "fundamental." **Trial Tr. 1, 79:7-16 (Pressly)**.

48.     Senator Pressly explained that the Legislature believed it was "told that essentially we were being forced to draw a second majority-minority district prior to any other consideration." **Trial Tr. 1, 80:9-11 (Pressly)**.

49.     Senator Pressly also addressed the role of politics in SB8. Political concerns were secondary to racial considerations, he testified, and any political decisions about which incumbent seats to protect were downstream from the initial decision to draw the districts on race-based lines. **Trial Tr. 1, 71:19-72:7 (Pressly)**. The Legislature first set out to draw a second Black-majority seat, and then, after the resulting loss of an expected Republican seat, the Legislature considered which incumbents to protect. **Trial Tr. 1, 72:1-7, 79:7-18 (Pressly)**.

*Sen. Duplessis Testimony*

50.     The Robinson Intervenors called Sen. Duplessis, a prominent Democratic legislator. Sen. Duplessis understood the Governor's goal in calling the special session to be to put an end to the litigation and adopt a map that was compliant with the judge's vacated order in *Robinson*. **Trial Tr. 3, 519:16-23 (Duplessis).**

51.     Sen. Duplessis testified that because the Louisiana legislature first decided it was going to enact a map with two Black-majority districts, the decision had to be made to protect certain members of Congress and to not protect one Republican member of Congress, (**Trial Tr. 3, 527:13-19 (Duplessis)),** and it was clear to Sen. Duplessis that once the decision had been made to enact a map with two Black-majority districts, Representative Garrett Graves would not be protected. **Trial Tr. 3, 527:15-19 (Duplessis).**

52.     Senator Duplessis believed that enacting a map with two Black-majority districts was a "major component" of why the legislature was sent to redraw the congressional maps. **Trial Tr. 3, 530:15-19 (Duplessis).**

53.     Senator Duplessis did not recognize Robinson Intervenors' Exhibit 275, a letter from various advocacy groups. **Trial Tr. 3, 531:18-532:10 (Duplessis).**

54.     Senator Duplessis is not aware of any court's process for evaluating a congressional map for compliance with the Voting Rights Act. **Trial Tr. 3, 537:4-15 (Duplessis).**

55.     Even during the legislative session, Sen. Duplessis stated that SB8 was about race and did not even mention other factors. **PE41, at 21**. Sen. Duplessis actually co-authored a bill of his own that he preferred over SB8 that also had two Black-majority districts. **PE41, at 21**.

*Rep. Mandie Landry*

56.     Representative Mandie Landry was also called by the Robinson Intervenors. She testified that she understood Governor Landry's goal in calling the special session was to pass a new congressional bill that would be accepted by the courts. **Trial Tr. 2, 367:9-12 (Landry)**.

57.     Rep. Landry testified that the legislature did not consider any plans that did not include two Black-majority districts, and knew from the beginning of the Special Legislative Session that it would pass SB8, which had two majority-minority districts. **Trial Tr. 2, 368:20-24 (Landry).**

58.     Though Representative Landry made passing references to the Voting Rights Act during her testimony (***see e.g.*, Trial Tr. 2, 145:8:11**), she did not testify that the legislature had a strong basis in evidence to believe it was required to draw two Black-majority districts, or testify to her knowledge or reliance on anything that would provide such a strong basis.

59.     Representative Landry also testified that the legislature believed Senate Bill 8 would bring an end to the redistricting litigation in Louisiana. **Trial Tr. 2, 373:25-374:2 (Landry)**.

60.     Representative Landry testified that she supported SB8 because it had two Black-majority districts, and was hoping all along for a map with two Black-majority districts. **Trial Tr. 2, 373:17-374:13 (Landry)**.

61.     Representative Landry testified regarding some political motivations counseling in favor of SB8 as opposed to other two-Black-majority-district maps, but did not testify that those motivations superseded racial considerations, and, even so, Representative Landry did not speak directly to Republican leadership regarding this topic during the special session. **Trial Tr. 2, 147:9-14**.

62.     To the extent Rep. Landry's testimony departs from the legislative record, Attorney General Murrill, or Sens. Seabaugh or Pressly, the Court finds Rep. Landry's testimony to be less probative. Rep. Landry had little interaction with Republican leadership, and Democratic legislators had little say in what map was going to be enacted. **Trial Tr. 2, 374:5-13 (Landry)**. The Democrats' lack of political influence during the special session is evidenced by the fact that Democratic legislators preferred other maps, namely SB4, over SB8. **Trial Tr. 2, 374:5-13 (Landry)**.

63.     Similarly, Davante Lewis also testified regarding what he believed was a political motivation in the passing of SB8. Mr. Lewis cited various historical "instances . . . when co-partisans have put their partisan ties aside for the purposes of political retribution." **Trial Tr. 3, 569:14-570:18 (Lewis).** The Court does not find this testimony especially helpful, however, because there has been no testimony by actual legislators that political retribution was the predominant purpose in drawing the map enacted by SB8. Mr. Lewis's opinion, as a lay non-legislator observer, provides this Court with little substance in the face of overwhelming evidence that race was the predominant factor, and political considerations (retribution or otherwise) came later.

*Attorney General Murrill's Testimony*

64.     Louisiana Attorney General Liz Murrill testified at length in the January 15 House and Governmental Affairs Committee hearing, and her remarks are part of the trial record through the parties' designations of the legislative record. General Murrill advised the Legislature regarding the Robinson litigation and its role in redistricting. **PE41, 7-16.** Like the legislative record and the legislators' trial testimony, General Murrill's legislative testimony also supports the conclusion that the legislature's overriding goal was racial.

15

65.     General Murrill told the legislature that if it did not draw a new map including two Black-majority districts, the Middle District (in the pending Robinson case) would draw a map for them. **PE41, at 9, 14**. In response to this claim, Representative Les Farnum posed the following rhetorical question to General Murrill: "Isn't that the only reason we're here right now . . . isn't that the predominant reason?" **PE41, at 9**. Rep. Farnum was expressly stating what General Murrill would not: that forcing a second majority-Black district was a race-based consideration, and it was the predominant driver of the Special Session.

66.     Other legislators drew the same conclusion. Senator Pressly testified that in his view, Attorney General Murrill told the Legislature that they had to have two performing Black districts and race "was the main tenet" that the Legislature had to account for when drawing the maps. **Trial Tr. 1, 69:24-70:4 (Pressly)**.

67.     The Court notes that at times, legislators loosely referred to being under an "order" from the Middle District to create a second Black-majority district. However, at no point did the Attorney General testify that the Legislature was under such an order. The Legislature certainly knew that there had yet to be a trial on the merits in the Middle District case; that there was still an opportunity to try the case; and that the Legislature was not bound by an order from the Middle District of Louisiana. **Trial Tr. 1, 81:23-25, 52:22-25 (Pressly).** The Legislature knew that it was not under an order from Judge Dick to draw the two Black-majority districts. **Trial Tr. 1, 82:2-5 (Pressly)**.

68.     Instead, legislators may have been motivated by a fear that the Middle District would enact a remedial two-Black-majority district map that would do maximum damage to Republican interests, potentially targeting senior Republican leadership in the United States House of Representatives. ***See* PE41, at 19; Trial Tr. 2, 367:21-368:10 (Landry)**. Such attempted

prediction of a Court's future decision—fair or unfair—is not the same as awareness of being under an order to craft a specific remedy.

69.     On top of this, Louisiana Attorney General Murrill also gave the legislators advice during the Special Session.

70.     For example, she told them that HB1 was a defensible map, and it was not unlawful. **JE28, 36:24-37:1 ("I am defending that map, and so you won't hear me say that I believe that that map violated the redistricting criteria."), 42:23 ("I am defending it now."), 46:3-4 ("I am defending what I believe to have been a -- a defensible map."), 53:2 ("I'm defending the map.").**

71.     She also informed legislators that the Robinson litigation had not led to a fair or reliable result. **JE28, 61:20-62:12, 62:24-63:3, 63:6-17**.

72.     In conclusion, the Court finds that the legislative record shows that race predominated in the legislative debate. Even when the discussion directly turned to ongoing litigation in federal court, the focus remained on a perceived desire to draw two Black-majority districts as a means of jumping ahead of the district court, rather than as something that was required as a remedy after an analysis of the legal elements of the VRA. Even had the legislative debates turned on the elements of the VRA, this Court would still find that race predominated in the drawing of SB8, as even a racially required remedy is still racial predominance for purposes of a *Shaw* claim.

*Communities of Interest*

73.     The Robinson Intervenors also put on evidence regarding communities of interest in an attempt to show that the legislature considered such communities, rather than race, in drawing

17

SB8. That evidence is primarily a post-hoc rationalization, however, and is belied by the legislative record which demonstrates what the Legislature actually did consider and discuss.

74.     Most directly, Sen. Womack, the sponsor of SB8, stated during the legislative session that communities of interest were not considered when drafting SB8. **PE41, at 19**. Additionally, Sen. Womack conceded that there is no heart of CD6, defending the district's odd shape by simply stating, "it had to start somewhere." **JE30, 8:21-9:8 (Morris, Womack)**.

75.     Senator Morris stated with apparent sarcasm: "We're all supposed to do it and consider political subdivisions and communities of interest. So now, by everyone's account, I live in Northeast Louisiana, and now I'm in the same district as Lake Charles. Louisiana Tech, Grambling, and University of Louisiana, Monroe are now in different congressional districts. They're all only 30 miles apart." **JE34, 6:1-6 (Morris)**.

76.     Likewise, Rep. Bayham spoke against the splitting of communities of interest, stating "I am here to stand up for my community. St. Bernard has never been split into two congressional districts," **JE33, 9:19-21 (Bayham)**; "I cannot in good conscience vote for this bill that divides my community, and I will stand by that for my community." **JE33, 10:18-20 (Bayham)**.

77.     Senator Luneau lamented: "And now this map, yet again, has Rapides Parish divided in half." **JE34, 10:1-2 (Leneau)**.

78.     Additionally, when questioned by the Robinson Intervenors, their own expert, Dr. Cory McCartan, even stated (with respect to CD2 and CD6) that, "[t]here's no core, to speak of, with those districts." **Trial Tr. 1, 236:5-7 (McCartan)**.

79.     These concessions, and Dr. McCartan's own analysis, cut sharply against any finding that the legislature crafted SB8 around communities of interest.

80.    Even so, the Robinson Intervenors presented multiple witnesses to testify regarding communities of interest. Though the Court will address those witnesses' testimony, the Court notes that evidence that SB8 *incidentally* protects communities of interest would not provide a "strong basis in evidence" absent evidence that the Legislature actually relied on that evidence when crafting SB8. Further, the record does not provide any evidence that any person advocated for an "I-49 corridor" community of interest district before SB8 was adopted. The evidence of the existence of an alleged I-49 community is therefore *post-hoc* rationalization. The concept is analogous to North Carolina's invalidated "I-85" corridor district in the original *Shaw* case, which recognized the concept of racial gerrymanders. *See Shaw v. Reno*, 509 U.S. 630, 635-636.

81.    Mayor Cedric Glover testified for the Robinson Intervenors regarding the various communities of interest that he believes exist in CD6. **Trial Tr. 2, 244:9-246:1**. But Mayor Glover did not present any economic or demographic analysis regarding these areas. Instead, his testimony was wholly anecdotal.

82.    Mayor Glover testified that the Red River and I-49 corridor are communities of interest. **Trial Tr. 2, 244:9-23**. Yet he provided no detailed description to support his opinion.

83.    What is more, though Mayor Glover testified that his views were articulated during the redistricting process (**Trial Tr. 2, 246:2-247:20**), he did not testify as to whom those views were articulated, and there is no evidence any legislator relied on his articulation of those views.

84.    Likewise, the Robinson Intervenors called Pastor Steven Harris Sr.  Pastor Harris testified that there are many similarities between the sections of Baton Rouge included in CD6 and Shreveport. **Trial Tr. 2, 254:16-255:15**. But the basis for Pastor Harris's opinion was incredibly vague, citing food ingredients (cayenne pepper and brown gravy) (**Trial Tr. 2, 256:20-22**), and music (more of a "bottom bass line" in some areas) (**Trial Tr. 2, 257:6-8**). The Court does not find

this to be credible evidence regarding a joint community of interest linking Baton Rouge and Shreveport.

85.    Ashley Shelton testified for the Robinson Intervenors regarding her role engaging the public during the redistricting process. **Trial Tr. 2, 266:4-267:23.**

86.    Mrs. Shelton also testified regarding some of the similarities between areas now included in CD6, but provided no data or other analysis to back up her own conclusions. **Trial Tr. 2, 274:16-277:3**. For example, Mrs. Shelton asserted, without support or analysis, which communities in her opinion Baton Rouge has more "in common" with. **Trial Tr. 2, 278:18-279:4.** When asked by Robinson Intervenors' counsel about why she gave those answers, Mrs. Shelton again provided her own conclusions without analysis or data. **Trial Tr. 2, 279.5-21.**

87.    Davante Lewis testified for the Robinson Intervenors regarding his role during the redistricting process, including lobbying, speaking at legislative hearings, and letter writing. **Trial Tr. 3, 554:6-559:9 (Lewis).**

88.    Mr. Lewis testified, without analysis or support, that SB8 kept together communities of interest that had previously been together. **Trial Tr. 3, 554:6-14 (Lewis).**

89.    Though Mr. Lewis claimed that his views on the redistricting session were "clear" **(Trial Tr. 3, 575:13-15 (Lewis)),** there is no evidence that any legislator actually relied on his views or testimony during the special session.

90.    Mr. Lewis, a Public Service Commissioner for the 3rd district in Louisiana testified that his entire PSC district is a community of interest, yet on cross-examination, conceded that SB8's CD6 passes through sections of four out of five Public Service Commission Districts. **Trial Tr. 3, 585:4-13 (Lewis).**

91.     Further rebutting this testimony and supporting the fact that the legislature did not actually seek to protect communities of interest when crafting SB8, is the testimony of Sen. Seabaugh that his state-congressional district does not share a community of interest with Lafayette or Baton Rouge—all communities included in CD6. **Trial Tr. 1, 53:11-54:9 (Seabaugh)**. Senator Pressly, whose state-congressional district is largely made up of Caddo Parish, also testified that his district does not share a community of interest with Lafayette or Baton Rouge. **Trial Tr. 1, 73:10-74:7 (Pressly).**

92.     Given the credible testimony of the legislators, the Court finds that the Legislature did not draw SB8 to protect communities of interest.

*Conclusion*

93.     In conclusion, the Court finds that there is overwhelming direct evidence to prove that race was the predominating factor in drawing the district lines of SB8. No witness testified that politics motivated the Republican state legislative majority to purposely eliminate one seat in the party's narrow Congressional majority, and then to only secondarily note that the "lost" Republican seat had turned into a second Black-majority district. Instead, it was the reverse. The decision to create a second Black-majority district caused the loss of an expected Republican seat. This, in turn, would necessarily impact one Republican incumbent more than his or her colleagues. Choosing which Republican incumbent would be most affected by that lost seat was a political decision that was the direct and logical consequence of allowing race-based targets to predominate, and was therefore subordinate to race. Finally, though there was testimony regarding various communities of interest, the Court found that much of the testimony was either a post-hoc rationalization unsupported by the legislative record, or was simply not credible or persuasive. In

short, the direct evidence leaves no question that race predominated in drawing the district lines of SB8.

**B.** **Circumstantial evidence**

94.     Circumstantial evidence also supports the Court's finding that race predominated in the drafting of SB8.

95.     Plaintiffs proffered two experts, Dr. Stephen Voss and Mr. Michael Hefner. The Robinson Intervenors' experts repeatedly declined to offer evidence of their own, and instead insisted that they were simply critiquing the analysis of Dr. Voss and Mr. Hefner and, in the process, showing that Dr. Voss and Mr. Hefner could not exclude factors other than race as having shaped SB8's districts. For the reasons discussed below, the Court concludes that Dr. Voss and Mr. Hefner did indeed provide circumstantial evidence that race was the predominant factor in the drawing of SB8's districts, and in particular District 6.

*Dr. Stephen Voss*

96.     Plaintiffs retained Dr. Stephen Voss to answer three questions: (1) whether Senate Bill 8 represents an egregious racial gerrymander, where race was the predominant factor in the drawing of district lines; (2) whether SB8 sacrificed traditional redistricting criteria in order to create two majority-minority districts; and (3) whether the African American population in Louisiana is sufficiently large and compact to support two majority-minority districts that conform to traditional redistricting criteria. **Trial Tr. 1, 91:3-25 (Voss)**.

97.     Dr. Voss is an expert in the areas of political methodology and quantitative analysis. **Trial Tr. 1, 87:19-23 (Voss)**. He grew up in Louisiana and attended college at Louisiana State University before working as a reporter covering Louisiana politics and as an assistant in the legislature. He obtained his doctorate in Government from Harvard University and has since conducted studies using Louisiana election data. **Trial Tr. 1, 87:8-15, 88:21-91:2 (Voss)**.

98.     Dr. Voss compared the districts created by SB8 to past enacted congressional maps in Louisiana and other proposals that the legislature considered during the First 2024 special session. **Trial Tr. 1, 97:19-98:2 (Voss)**.

99.     He opined, and the Court agrees and finds, that CD6 in SB8 contains the far-flung areas, including Lafayette and East Baton Rouge, just to include Black communities while avoiding communities with large numbers of white voters. **Trial Tr. 1, 94:18-95:10 (Voss)**. The lines of CD6 track specifically in a way to pull into that district the heavily Black-populated cities while leaving in CD6's neighboring districts the much more white-populated areas. **Trial Tr. 1, 96:7-16 (Voss); PE3; PE4**.

100.    Dr. Voss testified that other metrics indirectly show that District 6 is an outlier. Compared to other maps proposed during the special session and other past congressional maps, SB 8 split more parishes than most. **Trial Tr. 1, 197:19-99:11 (Voss)**. SB8 also had the highest percentage of individuals affected by parish splits. **Trial Tr. 1, 98:3-99:11 (Voss); PE6**.

101.    Dr. Voss also compared the compactness of SB8 to other real-life maps enacted and considered by the Louisiana Legislature. **Trial Tr. 1, 99:12-18 (Voss); PE6**. Dr. Voss considered three metrics: (1) Reock Score; (2) Polsby-Popper score; and (3) Know it when you see it ("KIWYSI"). **Trial Tr. 1, 100:22-103:5 (Voss)**. A district's "Reock score" quantifies the compactness of a district by measuring how close the district is to being a circle. **Trial Tr. 1, 100:23-6 (Voss)**. A district's Polsby-Popper score is intended to capture compactness taking into account a district's jagged edges and "tendrils." **Trial Tr. 1, 101:25-102:19 (Voss)**.

102.    The Know It When You See It method uses a metric derived by panels of judges and lawyers and a representative sample of people looking at the shape of a district and giving their quantification of compactness. **Trial Tr. 1, 102:20-104:2 (Voss).** The Know it When You See

23

it method originated from individuals' subjective judgments, but the metric itself is standardized and uses specific software to compute a numerical figure representing compactness. **Trial Tr. 1, 103:15-104:2 (Voss)**.

103.    Dr. Voss found that across all three measures of compactness, SB8 performed worse than either HB1 (the map that was active in 2022) or the map that HB1 replaced from the previous decade. **Trial Tr. 1, 104:25-105:4 (Voss); PE7**. SB8 did not produce compact maps when judged in comparison to other real-life congressional maps of Louisiana. **Trial Tr. 1, 107:16-21 (Voss)**.

104.    Dr. Voss also found that SB8's majority-black districts were especially non-compact compared to even other plans that also included two majority-minority districts. **Trial Tr. 1, 106:17-24 (Voss).** In particular, SB8 CD6 scored worse on the Polsby-Popper test than the second majority-black districts in other plans that created a second majority-black district. **Trial Tr. 1, 106:17-24 (Voss)**.

105.    Dr. Voss testified that SB8's and CD6's uniquely poor compactness was not necessary merely to accomplish political goals. If the legislature were just trying to protect Julia Letlow's congressional seat, he testified, enacting a compact map would have been relatively easy. **Trial Tr. 1, 108:16-21 (Voss)**. Additionally, the legislature did not need to enact a map with two majority-minority districts in order to protect Representative Letlow's congressional seat. **Trial Tr. 1, 111:10-19 (Voss)**.

106.    Dr. Voss also testified that the legislature did not need to enact a second majority-minority district in order to put Representative Garrett Graves in a majority black district. **Trial Tr. 1, 112:2-16 (Voss).**

107.    He concluded that neither the goal of protecting Representative Letlow's district, nor the goal of targeting Representative Graves, would have been hard to accomplish while still retaining compact districts. **Trial Tr. 1, 110:15-22 (Voss)**.

108.    Dr. Voss also provided testimony on a simulation technique that, while newer than some other forms of technical analysis, can aid courts in understanding the degree to which a given map is an outlier among all of the possible maps that can be created by mapmakers. To perform the analysis, he used the Redist simulation package ("Redist") to analyze the statistical probability of the legislature creating SB8 without race predominating their action. **Trial Tr. 1, 113:14-115:6 (Voss)**.

109.    Redist uses Sequential Monte Carlo ("SMC") simulation in order to generate a representative sample of districts that could have been drawn under certain parameters. **Trial Tr. 1, 113:8-114:10 (Voss)**.

110.    Using Redist, Dr. Voss compared these "lab-grown" simulations to SB8 in order to analyze the decisions the legislature made during the redistricting process. **Trial Tr. 1, 114:2-23 (Voss)**. He used the simulations to judge whether the parameters or constraints under which he created the simulations could explain the deviations evident in SB8. **Trial Tr. 1, 118:15-23 (Voss).**

111.    To determine whether egregious racial gerrymandering occurred, Dr. Voss compared the racial makeup of the districts of maps created under known constraints to the map enacted by SB8. **Trial Tr. 1, 118:24-119:8 (Voss)**.

112.    In simulating Louisiana congressional districts, Dr. Voss used a compactness constraint of 1. That is the same compactness constraint used in another Redist simulation of congressional districts in Louisiana performed by a project called ALARM, led by the Robinson Intervenors' expert, Dr. Cory McCartan. **Trial Tr. 1, 128:21-129:1 (Voss); 231:11-16**

**(McCartan).** Both Dr. Voss and Dr. McCartan generated results that were more compact than those recently passed by the Louisiana legislature. **Trial Tr. 1, 138:17-139:23 (Voss).** However, Dr. Voss testified that the degree of compactness recently used by the legislature is a poor baseline for determining whether SB8 is an outlier or for determining whether Louisiana's Black population is sufficiently compact to form a second majority-minority district. That is because the legislature's prior maps may themselves reflect impermissible or extraordinary considerations that are inconsistent with the law and with the true baseline. **Trial Tr. 1, 159:2-21 (Voss).**

113.     Dr. Voss used both "race-conscious" and "race-neutral" simulations to form an opinion of what would emerge from a redistricting process that considered various levels of racial information. **Trial Tr. 1, 129:16-130:14 (Voss); PE9.** The "race-neutral" simulations included no racial data, so they were not in any way directly based on race. **Trial Tr. 1, 130:7-14 (Voss).** In contrast, Dr. Voss's "race-conscious" simulations were encouraged to try not to break apart certain Black populations. **Trial Tr. 1, 130:22-131:3 (Voss).** For example, Dr. Voss specifically told his simulations not to split or "crack" majority black parishes in order to keep those communities together. **Trial Tr. 1, 170:6-18 (Voss).**

114.     Among his race-conscious simulations, Dr. Voss ran simulations to try to "protect" the districts created by the 2022 map. The purpose of this experiment was to judge the probability of forming two majority-minority districts when trying to protect Julia Letlow, Mike Johnson, and Steve Scalise's districts. **Trial Tr. 1, 131:4-132:11 (Voss).**

115.     Dr. Voss ran the diagnostics on his simulations that are recommended by the software developers and also compared them to the diagnostic scores of Dr. McCartan's Louisiana simulations. Dr. Voss's simulations' scores met both standards. **Trial Tr. 1, 133:3-12 (Voss).**

116.    As Dr. Voss added constraints to his simulations, it became more difficult for the simulation to generate legitimate maps that are contiguous, have equal populations, and are compact. **Trial Tr. 1, 135:15-136:4 (Voss)**. For example, Dr. Voss did not include municipal lines in his simulations, but the inclusion of municipal lines would have only made it harder to create a second majority-minority district. **Trial Tr. 1, 172:16-24 (Voss)**. Similarly, Dr. Voss testified that instructing his simulations to protect incumbents would have made it harder, not easier, to produce two majority African American districts. **Trial Tr. 1, 175:16-19 (Voss)**.

117.    Using race-neutral constraints, Dr. Voss showed that it was almost impossible to create two majority-minority districts in Louisiana. **Trial Tr. 1, 136:5-12 (Voss)**.

118.    Dr. Voss did not run any simulations directly considering political factors. **Trial Tr. 1, 138:9-11 (Voss)**. Still, none of Dr. Voss's tens of thousands of simulations randomly produced a map with two Democratic districts. **Trial Tr. 1, 138:9-14 (Voss).** Dr. Voss viewed this as a significant confirmation of his results, as a second majority-minority district would almost certainly be a Democratic district. **Trial Tr. 1, 137:11-138:14 (Voss).**

119.    Dr. Voss concluded, after considering tens of thousands of simulations, that the non-compact features of SB8 are predominantly explained by racial considerations. **Trial Tr. 1, 139:17-23 (Voss)**.

120.    The testimony of the Robinson Intervenors' expert, Dr. Cory McCartan, not only did not undermine Dr. Voss's testimony, it supported some of his key conclusions.

121.    Though Dr. McCartan criticized Dr. Voss's simulations, he did not run any simulations of his own in this case. **Trial Tr. 1, 215:18-21 (McCartan)**. Dr. McCartan testified that he had not before considered what factors should be used to detect racial gerrymandering, and did not know what racial gerrymandering was. **Trial Tr. 1, 223:20-224:1 (McCartan).**

122.    Dr. McCartan at times suggested that simulations may not be efficacious for detecting racial gerrymandering. This Court finds this suggestion to be unsupported. The first problem is Dr. McCartan's own prior work. He was the lead author of a paper detailing the work he had led for the ALARM team. Dr. McCartan's own paper states that simulations are well-suited to assess what types of racial outcomes could have happened under alternative plans in a given state. **Trial Tr. 1, 227:9-21 (McCartan).** Further, Dr. McCartan himself used the ALARM project to detect another form of gerrymandering: partisan gerrymandering. Dr. Voss testified that there was no reason the SMC should be able to detect partisan, but not racial, gerrymandering. **Trial Tr. 1, 117:19-118:6 (Voss).** Given that the SMC method is intended to draw conclusions by comparing real-life maps against simulations generated through SMC under various constraints, it is not clear why the method would be appropriate for detecting the influence of one type of motivation (politics) but not another (race). If that is so, Dr. McCartan never explained why. In fact, on cross examination, Dr. Voss testified that Dr. Imai, who helped develop the Redist software, applied these same simulation techniques in the racial gerrymandering context. **Trial Tr. 1, 150:18-151:1 (Voss).** This Court concludes that Dr. McCartan's criticism lacks credibility.

123.    Dr. McCartan next criticized Dr. Voss for not imposing a constraint in his simulations for natural or geographic boundaries. Yet in his work with ALARM to generate Louisiana congressional map simulations, Dr. McCartan's team did not impose any kind of requirement for natural or geographic boundaries. **Trial Tr. 1, 230:24-231:1 (McCartan).** Dr. McCartan never testified that failing to add this constraint definitively impacted Dr. Voss's conclusions. Dr. McCartan's mere suggestion that Dr. Voss should have taken a step that his own team did not find necessary is simply not a reason to discount Dr. Voss's analysis.

124.    Dr. McCartan criticized Dr. Voss for not adding incumbent protection as a constraint in the simulations, but when pressed, could not testify that this extra constraint would trigger the creation of a second majority-minority district. **Trial Tr. 1, 238:11-16 (McCartan).** Indeed, as Dr. Voss testified, adding additional constraints tended to reduce the number of possible maps, making majority-minority districts harder rather than easier to draw. **Trial Tr. 1, 135:15-136:4 (Voss).**

125.    The same problem underlies Dr. McCartan's other criticisms of Dr. Voss's work. To begin, Dr. McCartan did not even review his own team's Louisiana-specific constraints or simulations before critiquing Dr. Voss's simulations. **Trial Tr. 1, 237:9-18 (McCartan).** Dr. McCartan did not review his ALARM team's Louisiana simulation diagnostics before critiquing Dr. Voss's analysis. **Trial Tr. 1, 237:13-18 (McCartan).** And Dr. McCartan could not give a convincing reason why it was appropriate for his own team to use a compactness constraint of 1.0, while this same criterion made Dr. Voss's simulations unrepresentative. **Trial Tr. 1, 231:5-16 (McCartan)**. In contrast, Dr. Voss explained why adjustments to the compactness criterion actually made the simulation results less reliable. **Trial Tr. 1, 162:22-24, 163:21-165:19 (Voss).**

126.    Finally, Dr. McCartan's own recent experience running simulations on Louisiana congressional maps seems to support rather than undermine Dr. Voss's opinions. As with Dr. Voss's simulations, the enacted version of SB8 was far off from the Polsby-Popper compactness scores of Dr. McCartan's simulated Louisiana congressional maps. **Trial Tr. 1, 233:20-24 (McCartan).** More importantly, despite the breadth of his own team's simulation work, Dr. McCartan has not drawn a map with two majority-minority districts in Louisiana. **Trial Tr. 1, 215:13-21 (McCartan).** Finally, Dr. McCartan's supposedly well-designed simulations yielded no more than 10 out of 5,000 maps with a second Democratic seat. **Trial Tr. 1, 235:4-236:12 (McCartan).** For the same reason Dr. Voss testified that this partisan measure is highly suggestive that a second

majority-minority seat cannot emerge without overwhelming effort, Dr. McCartan's analysis tends to support Plaintiffs' position.

127.    The Court finds Dr. Voss's testimony to be credible circumstantial evidence that race was the predominant factor in crafting SB8. Though Dr. McCartan provided some insight into the uses of simulations in detecting the presence of racial gerrymandering, his testimony indicated that his own team had performed simulations under conditions not unlike Dr. Voss's, and with conclusions that supported Dr. Voss. Dr. McCartan's other criticisms of Dr. Voss were either not well-founded or completely rebutted. In conclusion, Dr. Voss provided credible circumstantial evidence of racial predominance.

*Michael Hefner and the Anthony Fairfax Response*

128.    Michael Hefner testified for the Plaintiffs as a demographer and the Court found his education and experience to be compelling regarding the issues in this case.

129.    Mr. Hefner has extensive experience as a demographer in Louisiana. Unlike either of the Robinson Intervenors' experts, he is from Louisiana and has lived his whole life in various parts of the State. **PE13; Trial Tr. 2, 258:3-6 (Hefner)**. He has worked in the field of demography for 34 years—since 1990. **PE13; Trial Tr. 2, 257:23-25 (Hefner)**. Most of his work consists of creating redistricting plans for governmental entities, including municipalities and school boards, throughout the State of Louisiana after decennial censuses; conducting precinct management work for Louisiana parish governments; working on school desegregation cases in Louisiana; and conducting site-location analyses in Louisiana. **PE13 Trial Tr. 2, 257:9-22 (Hefner)**. His extensive experience across the State of Louisiana at various levels of government gives him a deep understanding of Louisiana's demographics and redistricting specifically in Louisiana. **Trial Tr. 2, 257:9-248:6, 261:18-21 (Hefner)**.

130.    Mr. Hefner has been qualified to testify as an expert in redistricting three times, and no Court has ever disqualified Mr. Hefner from testifying as an expert in redistricting. **Trial Tr. 2, 260:15-21 (Hefner)**.

131.    Mr. Hefner testified that he came to the following conclusions during his analysis for this case: (1) that given the geographic distribution and concentration of the African-American population in Louisiana, it is impossible to create a second majority-minority district and still adhere to traditional redistricting criteria **(Trial Tr. 2, 271:11-22, 282:21-283:6 (Hefner))**; and (2) that race predominated in the drafting of SB8 **Trial Tr. 2, 271:23-272:14 (Hefner)**.

132.    Anthony Fairfax, an expert for the Robinson Intervenors, testified solely to rebut Mr. Hefner's conclusions. In doing so, however, Mr. Fairfax contradicted earlier testimony and did not provide a credible answer to Mr. Hefner's findings or analysis. Mr. Fairfax admitted he was not offering an opinion on whether race predominated in the drawing of SB8. **Trial Tr. 2, 379:20-380:3 (Fairfax).** And perhaps most importantly, as discussed below, a key part of Mr. Fairfax's analysis was his claim that, contrary to Mr. Hefner's conclusion, traditional redistricting principles could be used to create maps with a second Black-majority district. But Mr. Fairfax was forced to admit that in actuality, the maps he had drawn to illustrate this conclusion were far from compliant with traditional principles: when he drew his illustrative plans, he looked at "50 percent BVAP "as a minimum threshold." **Trial Tr. 2, 410:7-8 (Fairfax).**

133.    Finally, before turning in more detail to the witnesses' specific disputes, the Court notes that Mr. Hefner's experience with redistricting in Louisiana as a lifelong resident of Louisiana who has worked in redistricting in Louisiana since 1990, *see* **PE14**, is far more extensive than Mr. Fairfax's. **Trial Tr. 2, 430:7-15 (Fairfax).**

*(a) Hefner/Fairfax: Dispersal of Black population*

134.     As to his first conclusion, Mr. Hefner testified that the Black population in Louisiana is highly dispersed across the State and is concentrated in specific urban areas, such as New Orleans, Baton Rouge, Alexandria, Lafayette, and Shreveport. **Trial Tr. 2, 281:7-15; 283:19-285:1; 339:20-340:4 (Hefner);** ***see also*** **Mr. Hefner's Heat Map, PE15; PE16.** The highest concentration of African American voters is in New Orleans; the second highest concentration is in East Baton Rouge; the third highest concentration is in Shreveport. **Trial Tr. 2, 281:4-15 (Hefner)**.

135.     Outside the New Orleans and East Baton Rouge areas, Mr. Hefner testified that the population is highly dispersed across the State. **Trial Tr. 2, 281:4-15 (Hefner).**

136.     Mr. Hefner created a heat map based on data of the African American voting age population across the State from the 2020 census. **Trial Tr. 2, 279:13-21 (Hefner); PE15**. On the heat map, the highest concentrations of African American voters are displayed in red. **Trial Tr. 2, 280:23-281:3 (Hefner)**. Purple represents the lowest concentration of African American voters. ***Id***. Blue and yellow represent a middle ground between the low-end (represented by purple) and the high-end (represented by red) concentrations. **Trial Tr. 2, 39:16-25; 280:23-281:3 (Hefner)**.

137.     To rebut Mr. Hefner's testimony, Mr. Fairfax testified that his parish-by-parish map of BVAP percentages was more accurate than Mr. Hefner's various maps for purpose of understanding Black voter distribution throughout the State. Yet as became apparent on cross-examination, Mr. Fairfax's analysis did not take into account the widely varying populations of individual parishes. **Trial Tr. 2, 292:13-24 (Hefner)**. Under Mr. Fairfax's analysis, a parish that his map shows as deep "red," having 50% BVAP of the total parish VAP, could have any raw number of BVAP. **Trial Tr. 2, 292:13-24 (Hefner)**.

138.     The parishes that Mr. Fairfax highlighted in his map and in his testimony as having a majority Black population—East Carroll, Madison, and Tensas—are all parishes with extremely low overall populations. **Trial Tr. 2, 407:4-408:8 (Fairfax)**. Mr. Fairfax admitted that his map did not account for the actual size of the population in each parish. **Trial Tr. 2, 407:4-7 (Fairfax)**. He also admitted that he did not know the size of the Black populations in East Carroll, Madison, and Tensas Parish, and he did not account for those actual numbers when providing his testimony. **Trial Tr. 2, 407:4-7, 408:5-8 (Fairfax)**. So Mr. Fairfax's map is not representative of where large percentages of Black voters actually reside. Raw numbers, not merely percentages of parish VAP, are critical for understanding BVAP across parishes and across the State. **Trial Tr. 2, 292:13-293:3 (Hefner)**.

139.     Mr. Hefner testified that, given the dispersion of African American voters across the State of Louisiana and concentration of those voters in certain parts of the State, it is impossible to draw a second majority-minority congressional district without violating traditional redistricting criteria. **Trial Tr. 2, 282:22-283:6 (Hefner)**.

140.     In rebuttal, Mr. Fairfax's map also fails to take account of where Black voters are located in each parish, even though CD6 splits many parishes. Mr. Fairfax admitted that the map did not account for where people lived in those parishes. **Trial Tr. 2, 407:8-10 (Fairfax)**. Therefore, unlike Mr. Hefner's heat and dot density maps, Mr. Fairfax's map provides no aid in determining where the high populations of Black voters are actually located in Louisiana. **Trial Tr. 2, 292:13-293:3 (Hefner).** And Mr. Fairfax's map tells the Court nothing about whether CD6 specifically targeted those pockets of high populations of Black voters. **Trial Tr. 2, 292:13-293:3 (Hefner).**

141.    Mr. Fairfax admitted that he could draw a plan to include the three parishes in Northeast Louisiana to create a second majority-minority district without factoring in the fact that the total population in those areas was very low, revealing his inexperience in the State of Louisiana. **Trial Tr. 2, 408:15-409:10 (Fairfax).**

142.    To bolster his conclusion, Mr. Hefner explained that the larger concentrations of Black populations are not as prevalent as they were several years ago because racial populations have become more integrated in Louisiana due to a wide variety of programs, such as the Fair Housing Act, the Community Reinvestment Act, and school desegregation cases, which have significantly advanced and encouraged integration in Louisiana. **Trial Tr. 2, 339:20-340:4 (Hefner).** So overall, the population of Louisiana has not changed significantly. But the degree of concentration of Black populations has declined with integration. **Trial Tr. 2, 340:2-4 (Hefner).**

143.    Mr. Hefner explained that negative events have also contributed to a dispersion of Black voters across the State. Hurricane Katrina, for example, significantly accelerated the dispersion of Black voters from Southeastern Louisiana to other areas. **Trial Tr. 2, 340:5-15 (Hefner).**

144.    Mr. Hefner testified that CD2 has traditionally encompassed the Black population along the river corridor between Baton Rouge and New Orleans. **Trial Tr. 2, 340:19-21 (Hefner).** The percentage of Black concentrated in that region has been dropping for each census because of the dispersion of Black across the State. **Trial Tr. 2, 340:21-25 (Hefner).**

145.    The Court finds Mr. Hefner's testimony and methods to be credible. The Court has considered but gives less weight to the testimony of Mr. Fairfax because of some irregularity in his methods. For example, he insisted on using a population percentage map which failed to take into account the actual populations of parishes with high BVAP; it is unclear why he criticized Mr.

Hefner for trying to use methods that made actual population numbers and density available to the Court. Given the breadth of Mr. Hefner's analysis, the Court finds that the Black population in Louisiana is not sufficiently compact to support a second Black-majority district.

*(b) Hefner-Fairfax: SB8 boundaries tracing racial groupings*

146.   Next, Mr. Hefner testified that SB8 is drawn to trace the other areas of the State with a high Black voting age population to create a second majority-minority district. **Trial Tr. 2, 283:15-285:1 (Hefner)**.   Specifically, the mapmaker traced District 6's lines to include the concentrated African American population in East Baton Rouge, Alexandria, Opelousas, Alexandria, Natchitoches, Mansfield, Stonewall, and up to Shreveport. **Trial Tr. 2, 283:15-285:1 (Hefner)**.

147.   Mr. Hefner explained that the demographics of these areas show that the mapmaker narrowly traced areas with high Black populations and carved concentrated precincts out of the remainder of the parishes to avoid picking up too much population in each precinct or picking up areas with concentrations of non-Black voters. **Trial Tr. 2, 283:15-285:1 (Hefner)**. For example, in Lafayette Parish, only the northeast part of Lafayette Parish, where the precincts are predominantly African American, was included in District 6. **Trial Tr. 2, 283:22-284:4 (Hefner)**. The remainder of the Lafayette and Lafayette Parish that is not predominantly African American was excluded. **Trial Tr. 2, 283:22-284:4 (Hefner)**. Likewise in Rapides Parish, District 6 split Rapides Parish to carve out Alexandria where there is a high concentration of African American voters for the purpose of including the overall Black Voting Age Population in the District. **Trial Tr. 2, 284:4-8 (Hefner)**. Mr. Hefner testified that he believed the mapmaker tried to connect the two largest populations of African Americans outside of New Orleans in East Baton Rouge and Shreveport and tried to pick up as much African American populations in municipalities along the

way, without including too much total population, which could threaten the one-person, one-vote requirement. **Trial Tr. 2, 283:15-285:1 (Hefner)**.

148.     Mr. Hefner also created a dot density map, **PE17**, which shows the distribution of the voting age population across the State by race overlaid on Senate Bill 8's district lines. **Trial Tr. 2, 285:13-286:13 (Hefner)**. This map illustrates  that the mapmaker tried to include as many Black voters (represented by red dots) as possible in District 6 while excluding as many voters of other races (represented by white dots for white voters and green dots for voters of all other races) as possible in District 6. **Trial Tr. 2, 285:13-286:13 (Hefner)**.

149.     In areas of high population between Baton Rouge and Shreveport, District 6 became significantly narrower so as to include as many Black voters as possible and exclude as many white voters as possible. **Trial Tr. 2, 286:5-13 (Hefner)**. In areas of low population between Baton Rouge and Shreveport, District 6 was drawn significantly wider because those areas of the State did not include large swaths of voters that would threaten to raise the total population of District 6 beyond its ideal district size. **Trial Tr. 2, 286:5-13 (Hefner)**. Therefore, even though District 6 may appear wide at times, it is only wide because there are very few people in those relatively empty, rural areas of the District. In one area District 6 narrows to only 1.3 miles wide in connecting various parts of the District because there is a high concentration of voters in that area. **Trial Tr. 2, 286:5-13 (Hefner)**. The mapmaker was very precise in selecting the populations that it included and excluded from District 6 and intentionally chose to include Blacks and exclude non-Blacks. **Trial Tr. 2, 286:5-13 (Hefner)**.

150.     For example, in the very Northwest end of CD6 in Shreveport, the mapmaker precisely traced precincts with 61% to 100% Black VAP to include in CD6 and excluded areas

with lower percentages of Black VAP in order to increase the BVAP for CD6. **Trial Tr. 2, 287:16-288:2 (Hefner)**.

151.    CD6 stretches 251 miles from its Northwest point in Shreveport to its Southeast point in East Baton Rouge. **Trial Tr. 2, 287:16-288:5 (Hefner)**. This large distance between the two ends of CD6 in a State the size of Louisiana shows that the congressional district is not compact. **Trial Tr. 2, 288:3-10 (Hefner)**.

152.    In rebuttal, Mr. Fairfax provided no evidence of state-wide analyses of alternatives to race that could have predominated in the drawing of SB8's lines. **Trial Tr. 2, 398:22-402:12 (Fairfax)**. His incomplete analysis of municipal divisions and socio-economic factors in East Baton Rouge alone provided the entire basis of his conclusion that he "saw other aspects that could configure the district or allow the district to be configured in a manner other than race." **Trial Tr. 2, 398:22-402:12 (Fairfax).** Further, Mr. Fairfax claimed that, contrary to Mr. Hefner, traditional redistricting principles could be used to create maps with a second Black-majority district. But Mr. Fairfax was forced to admit that in actuality, the illustrative maps he had drawn to demonstrate this principle were far from compliant with traditional principles: when he drew his illustrative plans, he consciously looked at "50 percent BVAP "as a minimum threshold." **Trial Tr. 2, 410:7-8 (Fairfax).**

153.    Mr. Fairfax alleges that he used traditional redistricting criteria to analyze SB8. **Trial Tr. 2, 382:18-383:20 (Fairfax).** But he did not testify about the compactness of the districts or preservation of core districts, nor did he criticize Mr. Hefner's compactness or preservation of core districts analysis. The only traditional criterion he actually discussed was preservation of communities of interest. **Trial Tr. 2, 385:14-18; 389:5-9 (Fairfax).** And in discussing preservation of communities of interests, parishes, and municipalities, he agreed with Mr. Hefner that SB8 split

more parishes and municipalities than HB1. **Trial Tr. 2, 385:14-18; 389:5-9 (Fairfax).** Mr. Fairfax did not analyze Plaintiffs' illustrative map 1. **Trial Tr. 2, 382:18-402:15 (Fairfax).** Mr. Fairfax also did not conduct his own analysis of the cultural, economic, or agricultural regions of the State of Louisiana and the impact of SB8 on those regions like Mr. Hefner did. **Trial Tr. 2, 382:18-402:15 (Fairfax).**

154. Based on the evidence presented, the Court finds that CD6 was very carefully crafted to bring in as many majority-Black VAP precincts into CD6 as possible while excluding precincts in the same parishes that did not have high Black VAP. **Trial Tr. 2, 290:18-21 (Hefner).** Among the parishes CD6 split, CD6 specifically included the precincts of those parishes with high BVAPs while excluding precincts with low BVAPs. **Trial Tr. 2, 289:18-290:21 (Hefner).** The evidence shows that the mapmaker made these choices to specifically increase the BVAP in CD6. **Trial Tr. 2, 289:18-290:21 (Hefner).** For example, twelve of the precincts in Avoyelles Parish have 40% or more any part Black VAP. **Trial Tr. 2, 289:11-17 (Hefner).** Of those twelve, eight were assigned to CD6—or 67% of the 40% or higher Black VAP precincts in Avoyelles Parish. **Trial Tr. 2, 289:6-23 (Hefner).** Likewise, in East Baton Rouge, 115 precincts have 40% or higher any part Black VAP. **Trial Tr. 2, 289:18-23 (Hefner).** Of those 115 precincts, 112 were assigned to CD6—or 97% of the 40% or higher Black VAP precincts in EBR Parish. **Trial Tr. 2, 289:21-23 (Hefner).**

*(c) Hefner/Fairfax: changes in BVAP*

155. Mr. Hefner testified that these race-based changes dramatically altered District 6, swinging from a non-Black majority district to a Black majority district by increasing BVAP by 30%. **JE5, at 7** (HB1 BVAP at 23.861%); **JE15, at 3** (SB8 BVAP at 53.990%). This 30% increase on the same census numbers was over four times greater than the "sizable jump" of 7% BVAP

observed by the Supreme Court as indicative of racial predominance in *Cooper v. Harris*, 581 U.S. at 311. In District 2, the Black population decreased but held the majority at 51%. **JE5, at 2** (HB1 BVAP at 58.650%); **JE15, at 1** (SB8 BVAP at 51.007%).

156.    In District 2, the Black population decreased but held the majority at 51%, a number that both Sen. Carter and Sen. Duplessis noted as low but nonetheless sufficient to garner their support since it created a second majority Black district. **JE30**, **15:14-16:4 (Carter); JE30, 21:15-22:4 (Duplessis).**

157.    In all four majority non-Black districts, racial disparities grew more dramatic. ***CF.* JE5, JE15**. For example, in District 4, the percentage of non-Black voters shot up 13% and the percentage of Black voters decreased proportionally, creating a severe gap between non-Black and Black voters. The gap between Black and non-Black voters also grew in Districts 1, 3, and 5. ***CF.* JE5, JE15.** Now all four majority-non-Black districts are super-majority districts, with non-Black voters holding roughly 87%, 79%, 77%, and 73% of the VAP in every single one, and Black voters comprising only 12%, 22%, 20% and 27% of those districts. ***CF.* JE5, JE15.**

158.    This Court finds Mr. Hefner's analysis of the changes in BVAP percent in each district persuasive. Clearly, SB8 carefully manipulates percentages to barely move two districts over 50% BVAP while creating new non-Black supermajorities in all other districts. This, too, is circumstantial evidence of racial gerrymandering.

> *(d) Hefner/Fairfax: Shape, compactness, contiguity, and parish and municipality splits*

159.    Mr. Hefner testified that SB8's compactness score is extremely small. CD6 scores so low on the Polsby-Popper and Reock metrics that it is almost not compact at all. **PE21**; **Trial Tr. 2, 302:21-303:2 (Hefner).** Specifically, CD6 had a score of 0.05 on the Polsby-Popper scale, where no compactness is 0 and total compactness is 1. **Trial Tr. 2, 303:13-20 (Hefner).** Thus, CD6

was extremely low and extremely strung out. **Trial Tr. 2, 303:18-20 (Hefner).** On average, SB8 scored lower than HB1 under both Polsby-Popper and Reock. **PE21**; **Trial Tr. 2, 302:16-303:25 (Hefner)**. Plaintiffs' illustrative plan scored far better than both. **Trial Tr. 2, 302:16-303:25 (Hefner).**

160.     Mr. Hefner testified that in his opinion CD6 under SB8 is not reasonably compact. **Trial Tr. 2, 304:11-14 (Hefner).**

161.     The shape of CD6 is also very awkward and bizarre. **Trial Tr. 2, 304:23-305:6 (Hefner).** It is extremely narrow at points. **Trial Tr. 2, 305:18-306:2 (Hefner)**. The shape of CD6 itself, even apart from the low scores, shows that CD6 is not compact at all. **Trial Tr. 2, 305:2-14 (Hefner).**

162.     The shape of CD6 alone reveals that there was something driving the creation of this plan other than traditional redistricting criteria. **Trial Tr. 2, 305:6-14 (Hefner).**

163.     Mr. Hefner testified that SB8's contiguity is very tenuous. **Trial Tr. 2, 293:23-24 (Hefner).** In CD6's narrow line from its Southeastern end in Baton Rouge to its Northwestern end 251 miles away in Shreveport, it is only 1.3 miles across in some places and 54 miles across in other places, and uses small connectors in many places. **Trial Tr. 2, 293:25-294:3 (Hefner).** So while it may be contiguous technically, it is *barely* contiguous. **Trial Tr. 2, 293:22-294:6 (Hefner).**

164.     CD6 split many parishes, which are communities of interest. **Trial Tr. 2, 295:7-8 (Hefner).** In doing so, SB8 divides many communities of interest so that the strength of the voice of the people in those parishes is weakened. **Trial Tr. 2, 295:9-18 (Hefner).** People in split parishes do not have a united voice or ear of their representative that they would if the whole parish was not split and had one representative. **Trial Tr. 2, 295:16-18 (Hefner).**

165.    Even Mr. Fairfax admitted that SB8 split more parishes and municipalities than the previously enacted plan, even when he examined census places rather than traditional municipalities. **Trial Tr. 2, 385:11-15; 389:2-9 (Fairfax).**

166.    Mr. Hefner also testified that SB8 splits the four biggest parishes in CD6: Caddo, Rapides, Lafayette, and East Baton Rouge. But none of the parishes split in CD6 have sufficiently numerous populations that they must be split into two congressional districts to comply with the one-person, one-vote principle. **Trial Tr. 2, 314:19-25; 315:13-316:6 (Hefner)**. A mapmaker could draw congressional districts while keeping the parishes split in CD6 whole. **Trial Tr. 2, 314:19-25; 315:13-316:6 (Hefner).** The parish splits in CD6 are entirely unnecessary to comply with traditional redistricting criteria.

167.    CD6 also split numerous municipalities. **Trial Tr. 2, 395:19-20 (Hefner).** Municipalities are also communities of interest. **Trial Tr. 2, 295:22-23 (Hefner).** Municipalities are formed by citizens who share ideals in a community of interest and therefore reflect communities of interest. **Trial Tr. 2, 295:20-296:6 (Hefner).**

168.    CD6 also did not follow municipal boundaries, and its lines cannot be explained as an attempt to preserve municipalities or landmarks. On Mr. Fairfax's own illustrative map, CD6 split Louisiana State University, which he identifies as the only relevant preserved landmark. ***See* RE 298**. But even this landmark was not preserved. Mr. Fairfax himself admits that only a "majority of LSU" was included in CD5. The rest of the campus was in CD6. **Trial Tr. 2, 399:21-22 (Fairfax).** So there is no evidence that preservation of landmarks played a role in constructing these boundaries.

169.    Additionally, Mr. Fairfax's map identifies municipal boundaries that were supposedly preserved in East Baton Rouge Parish. But as Mr. Hefner testified, Mr. Fairfax fails to

consider that municipalities excluded from CD6 in East Baton Rouge Parish, such as Central and Shenandoah, are super-majority-white-VAP municipalities. **Trial Tr. 2, 299:25-301:17 (Hefner).** Central is the second largest city in East Baton Rouge, and it has a super-majority white VAP population—which is why it was excluded from CD6. **Trial Tr. 2, 300:5-13 (Hefner).** Shenandoah and other municipalities Mr. Fairfax cites that were excluded from CD6 also have large white populations. **Trial Tr. 2, 300:5-17 (Hefner).** If the mapmaker had included those majority-white municipalities, the district will have exceeded the ideal district size long before it reached the minority population in Shreveport that was necessary for the district to be majority-Black. **Trial Tr. 2, 301:8-17 (Hefner).** Even Mr. Fairfax's map shows that the mapmaker was very careful to draw CD6's lines in East Baton Rouge based on race. **Trial Tr. 2, 301:8-17 (Hefner).**

170.    This Court finds that the drawing of district lines along municipal lines, where it occurred, was itself race-based. It is clear that the SB8 mapmaker faced the task of uniting a concentration of Black voters in East Baton Rouge with another concentration in Shreveport that was hundreds of miles away. To unite these two barbells on opposite ends of the district, absolute precision was required: first to ensure that not too many non-Black voters were included at either end, which would have caused the district to hit its ideal district size before the connection to the opposite end of the state could be made; and second to carefully and narrowly thread through low-population areas in the middle of the state, picking up pockets of Black voters wherever possible but at all times ensuring that the other mass of Black voters was reached.

*(e) Hefner/Fairfax: communities of interest*

171.    Mr. Hefner further testified that SB8 brought together disparate communities of interest with their own conflicting ideas, issues, cultures, and histories. **Trial Tr. 2, 296:12-14 (Hefner).** This unification of disparate communities in a district makes it more difficult for a

district for that district to speak as one voice to its representative and for the representative to represent the interests of those people. **Trial Tr. 2, 296:15-18 (Hefner).**

172.    For example, East Baton Rouge and Shreveport are very different communities; they have different issues, cultures, and backgrounds. **Trial Tr. 2, 296:18-297:2 (Hefner).** The unification of both in a single district makes it difficult for CD6's representative to adequately represent both. **Trial Tr. 2, 296:24-297:2 (Hefner).**

173.    CD6 includes very diverse communities from across the State. **Trial Tr. 2, 297:7 (Hefner).** From a demographer's perspective, it makes no sense to unite Shreveport and Baton Rouge in a single district. **Trial Tr. 2, 297:7-11 (Hefner).**

174.    Mr. Hefner also analyzed the agricultural and economic interests of the various communities included in CD6 and found they do not share common economic or agricultural interests that would show that CD6 unites far-flung regions of the State based on agriculture or economic activity. **Trial Tr. 2, 297:19-298:5 (Hefner).**

175.    Mr. Hefner testified that SB6's population does not have a common level or degree of educational attainment, a factor which could have shown that CD6 was intended to unite communities of interest based on residents' shared educational attainment. **Trial Tr. 2, 298:10-13 (Hefner).**

176.    Mr. Hefner explained that CD6 does not have common socio-economic patterns that would show that CD6 unites communities of interest based on socio-economic activity. **Trial Tr. 2, 298:14-299:3 (Hefner).** Mr. Fairfax focused on East Baton Rouge to determine socio-economic patterns, but as Mr. Hefner testified and as this Court finds, Mr. Fairfax provides no insight into the patterns across CD6. Mr. Hefner rightly looked at the same data as Mr. Fairfax at the statewide level. **Trial Tr. 2, 298:22-299:3 (Hefner).** When examined at the state-wide level,

there are no patterns of socio-economic activity that emerge across CD6. **Trial Tr. 2, 299:8-12 (Hefner).** And even Mr. Fairfax's analysis of East Baton Rouge alone does not reveal a pattern of socio-economic activity as the boundaries for CD6. **Trial Tr. 2, 298:22-299:3 (Hefner).**

177.    CD6 includes diverse cultural regions and splits otherwise unified cultural regions of the State. **Trial Tr. 2, 311:4-313:16 (Hefner).** CD6 splits three of the five regions outlined in the Louisiana Regional Folklife Program, which is a collaborative project of various universities in Louisiana and the best quantitative analysis of the cultural regions across Louisiana. **Trial Tr. 2, 311:4-313:16 (Hefner).** CD6 splits and includes parts of Cajun Country or Acadiana, parts of the Florida Parishes, and parts of the Northwest region of the State. Each has their own unique cultures, histories, traditions, and settlement patterns. **Trial Tr. 2, 311:4-313:16 (Hefner).** For example, Acadiana, and specifically Lafayette, is the heart of the Cajun culture, with a large French heritage. The Florida Parishes or Feliciana, which includes East Baton Rouge, for example, was its own republic for a period so it too has a unique culture. That area has traditionally been a melting pot of many different cultures, including Italian, Hungarian, British, American, and Indian, as well as French and Spanish cultures. Shreveport is part of an entirely different region that was an area of dispute between the French and Spanish and the United States for a prolonged period, so it too has its own history, traditions, and culture. **Trial Tr. 2, 311:4-313:16 (Hefner).**

178.    CD6 also encompasses both North and South Louisiana even though these are very different areas of the State. **Trial Tr. 2, 313:17-21 (Hefner).** These areas have very different agricultural industries given their differing topography. The northern and western portions of Louisiana, such as Caddo Parish, produce more timber. **Trial Tr. 2, 78:1-5**. The other crops produced in those regions of Louisiana are soybeans and cotton. **Trial Tr. 2, 314:8-12 (Hefner).** The southern and eastern portions of the State, such as in the Florida Parishes, produce more rice

and sugar cane. **Trial Tr. 2, 313:21-24 (Hefner).** Northern Louisiana above the 31st parallel is higher ground. **Trial Tr. 2, 313:17-21 (Hefner).**

179.     These agricultural industries have their own lobbying groups, which informs why it is important for northern and southern Louisiana to have distinct representatives in Congress. **Trial Tr. 2, 314:16-18 (Hefner).**

180.     Mr. Hefner analyzed agricultural disparities across the state at the smallest level of data available statewide. **Trial Tr. 2, 325:23-326:11 (Hefner).** SB8 also does not preserve core districts, which is another traditional redistricting criterion that demographers account for when redistricting. **Trial Tr. 2, 305:15-306:13 (Hefner).**

181.     The only time CD6 has ever reached into northwestern Louisiana was when the State attempted to enact a map in the 1990s that was struck down by the Western District of Louisiana as an unconstitutional racial gerrymander. **Trial Tr. 2, 305:15-307:12 (Hefner).**

182.     Other evidence supported Mr. Hefner's analysis. Senator Pressly, as a resident and Representative of Northwest Louisiana who regularly represents this area in the State Legislature, testified that northern and southern Louisiana are very different. With natural disasters, Northern Louisiana is largely concerned with tornados and ice storms; Southern Louisiana is largely concerned with hurricanes. **Trial Tr. 1, 73:12-23 (Pressly)**.

183.     Sen. Pressly also testified that the educational needs and universities of Northern and Southern Louisiana are different. **Trial Tr. 1, 73:12-23 (Pressly)**. Lafayette in the South and Shreveport in the Northwest are very different. **Trial Tr. 1, 73:12-23 (Pressly).** Likewise, Baton Rouge in the Southeast and Shreveport in the Northwest are very different—the least of which is the 250 mile distance between the two locations. **Trial Tr. 1, 74:2-7 (Pressly).**

184.   In conclusion, the Court finds that communities of interest simply cannot explain the shape or lines of District 6. The district splits communities of interest, and is itself composed of parts of multiple communities of interest.

*(f)  Hefner/Fairfax: Conclusion*

185.   In conclusion, the testimony of Mr. Hefner and Mr. Fairfax, as corroborated by the testimony of other witnesses, confirms that that given the geographic distribution and concentration of the African-American population in Louisiana, it is impossible to create a second majority-minority district and still adhere to traditional redistricting criteria. It also confirms that race predominated in the drafting of SB8.

*Politics*

186.   Before concluding its review of the circumstantial evidence, the Court turns to suggestions that District 6 was compelled by politics. There was no evidence that SB8 makes sense as a predominantly politically-driven map. It does not maximize political prospects for any Republican incumbent unless it is first assumed that Republicans would lose one of the five seats they controlled under HB1. Put another way, incumbents were generally worse off under SB8 than they had been under HB1. For example, under SB8, Congresswoman Julia Letlow resides in a district that puts her at a disadvantage from her district in HB1, given that the majority of her voters now reside in Baton Rouge and the southern portion of her district. **Trial Tr. 1, 76:15-21 (Pressly)**. At the very least, her district in SB8 is very different than it was during the 2022 congressional election. **Trial Tr. 1, 76:15-21 (Pressly).**

187.   On the other hand, evidence showed that SB8 does make sense as a racially-driven map. It had a higher percentage of Black Voting Age Population—and therefore was more likely

to elect Black candidates, all else equal—than any of the other considered plans. **Trial Tr. 3, 540:23-541:8; 530:5-8 (Duplessis).**

*Conclusion*

188.    In conclusion, the circumstantial evidence clearly supports the Court's finding from the direct evidence that race predominated in drawing SB8, particularly District 6.

**III.    <u>SB8 was not narrowly tailored to meet a compelling state interest.</u>**

189.    The Court has considered the testimony of various legislative witnesses called by both the Robinson Intervenors and Plaintiffs, as well as statements made by numerous legislators during the redistricting session. As discussed in detail below, this testimony shows that SB8 was not based upon any Voting Rights Act analysis. Instead, it was motivated by a desire to stay one step ahead of the Middle District's presumed preferences. Even for those few legislators who *may* have acted under a belief that the Voting Rights Act actually requires two majority-minority districts, there is no evidence those legislators conducted or reviewed any analysis, including performance analysis of the districts produced by SB8 which would serve as the foundation for a "strong basis in evidence" as required by law.

190.    During closing arguments, the State admitted that its only goal was to stay one step ahead of the federal court's predicted course in drawing maps—not to comply with the VRA. **Trial Tr. 3, 624:5-16 (the State).** Further, the State admitted that it did not actually think it needed to repeal the HB1 map. **Trial Tr. 3, 622:2-4 (the State).** The State concedes that it did not believe that the VRA actually requires a second majority-Black district in general. **Trial Tr. 1, 26:24-27:2 (the State).**

191.    There was no evidence that the legislature performed any analysis of SB8, including District 6, or of any other map it considered, and admits that the federal court only analyzed what the VRA "likely requires," not what the VRA actually demands. **Trial Tr. 3, 621:15-17 (the State).**

192.    There was no evidence that the legislature considered any particular expert report, testimony, or record materials from the Robinson litigation.

193.    The State conceded that it did not conduct any VRA analysis of SB8 prior to enacting it. **Trial Tr. 1, 25:16-26:4 (the State).** The State hired no experts. **Trial Tr. 1, 25:16-26:4 (the State).** Instead, the State wholly relied on references to the litigation in *Robinson*, even though those decisions did not evaluate the lawfulness of SB8. The State wrongly assumed that "federal courts would be adjudicating the map's VRA compliance based on expert reports filed in [the *Robinson*] case" and determined that no additional analysis, although required by law, was necessary. **Trial Tr. 1, 25:16-26:4 (the State).** The State offered no evidence to show that SB8 was in fact narrowly tailored to remedy an alleged VRA violation.

194.    The State admits that it did not consult any experts or expert reports in drawing the SB8 districts. **Trial Tr. 3, 624:9-14 (the State).**

195.    The State acknowledges that SB8 does not resemble the Robinson remedial map that was considered by the Middle District of Louisiana. **Trial Tr. 1, 22:15-18, 23:14-19 (the State).**

196.    The State nonetheless rests its entire rationale for SB8 on the opinions of the Middle District and Fifth Circuit, writ large. **Trial Tr. 1, 26:19-24 (the State).**

197.    The State claims, for example, that "[t]o the extent that race played a role in the fact that the SB8 map has a second majority-Black district, that decision was made by the federal courts." **Trial Tr. 1, 23:24-24:3 (the State).** The State is advancing a point of law, not of fact, by arguing that the "Court's decision"—even though the State alone decided to repeal HB1 and enact SB8 and the Court itself did not make a final decision in this matter—"cannot be imputed to the State." **Trial Tr. 1, 23:24-24:3 (the State).**

198.    The State also claims that "no one seriously disputes that the State enacted the SB8 map to comply with those Court decisions. The Governor said as much when he convened the special session." **Trial Tr. 1, 24:13-16 (the State).**

199.    As the Court has already found, however, the Legislature knew when it entered the Special Session in January 2024 that the Middle District had not actually ordered it to draw a new map with two Black-majority districts.

200.    The Legislature knew that the Fifth Circuit had vacated any injunction of HB1, so the law remained in effect until the State repealed it. **Trial Tr. 1, 21:2-4(the State).**

201.    The State knew that it had the option to go to a trial on the merits to defend its map and that the Middle District of Louisiana had issued no final holding. **Trial Tr. 1, 21:4-8 (The State).** The State knew that it was under no order or obligation to create a second majority-Black district. **Trial Tr. 1, 21:4-8 (The State).**

202.    The Legislative record made clear that despite extensive questioning, the Attorney General, who was litigating Robinson, declined to advise the Legislature that HB1 violated the VRA. ***See*** **PE41, at 10 ("I mean, I'm defending the map.").**

203.    Rather than opining on the requirements of the VRA, the Attorney General criticized the conduct of the Robinson case for requiring the Legislature to enact a new map before a full record could be presented in a trial on the merits. **PE41, at 9.**

204.    The Attorney General predicted a loss before the District Court judge, but pointedly refused to state that the prediction was based on the State's own belief that HB1 actually violated the VRA. **PE41, at 10.**

205.    The Attorney General never told the Legislature that the State actually believed that the Voting Rights Act required two Black-majority districts. **Trial Tr. 1, 83:10-14 (Pressly).**

206.    The Attorney General admitted at trial, both in opening and closing, that the Legislature performed no Voting Rights Act analysis. **Trial Tr. 3, 624:16-24 (the State).**

207.    Instead, the State admits that the Attorney General performed a prediction of how the Middle District would rule, rather than an analysis of HB1's performance under the VRA. **Trial Tr. 1, 25:11-25:23 (the State)**.

208.    Further, the Attorney General appeared to advise the Legislature to attempt to prepare a new map before the District Judge did so. The Attorney General tried to suggest that race could not predominate when the Legislature performed that task, but simultaneously suggested that this task might be impossible. **PE41, at 10.**

209.    The Robinson Intervenors added no material facts to the State's showing.

210.    They, too, failed to identify any *Gingles* analysis of SB8. **Trial Tr. 3, 619:1-7 (Robinson Intervenors).**

211.    The Robinson Intervenors did contribute an admission that the map that was litigated in Robinson "was more compact, split fewer parishes and municipalities, and better protected communities of interest" than SB8. **Trial Tr. 3, 618:3-10 (Robinson Intervenors).** Otherwise, the Court finds that the Robinson Intervenors' factual submission did not show that SB8 was narrowly tailored to address any State interest in compliance with the VRA.

212.    In conclusion, considering all of the parties' factual showings, the Court finds that the Legislature did not actually consider at the time SB8 was enacted whether that statute was necessary to comply with the VRA, and the Legislature did not form any belief on that point.

213.    Even if the State had made this showing, neither the State nor the Robinson Intervenors proffered any evidence on whether SB8, and in particular its District 6, was necessary to remedy a VRA violation in central to northwest Louisiana.

214. The evidence, in fact, tended to show the contrary. Plaintiffs' experts showed that there was insufficient Black population in either southeast Louisiana or northwest Louisiana to create a second Black-majority district. Instead, a long, narrow link was necessary to connect these disparate populations and communities. ***See* Hefner; Trial Tr. 2, 282:22-283:6; 281:4-15; 339:20- 340:4 (Hefner); PE15-16;** *see also* **Senator Womack and Beau Beaullieu's own statements:** "Given the state's current demographics, there is not enough high Black population in the southeast portion of Louisiana to create two majority Black districts, and to also comply with the US Constitution one person, one vote requirement. That is the reason why District Two is drawn around Orleans Parish, while District Six includes the Black population of East Baton Rouge Parish and travels up the I-49 quarter to include Black population in Shreveport." **PE41, at 26, 36.**

215. Although no Defendant expressly argued that the Robinson Intervenors' proffered evidence on communities of interest (which was actually proffered on the question of racial predominance) should be considered on strict scrutiny, the Court now considers it. As previously addressed, the Robinson Intervenors elicited testimony from various lay witnesses regarding what they believe to be communities of interest (*see, supra*, **¶¶73-92**), but there was no evidence that any legislator considered communities of interest when voting for or drafting SB8. Instead, the evidence tends to illustrate the opposite, that communities of interest were at the very least ignored (*see* **¶74**) or nonetheless divided (*see* **¶91**).

216. None of the Robinson Intervenors' evidence shows that, in fact, there is a sufficiently compact Black population that can be united across the territory of District 6 consistent with traditional redistricting principles.

217. In conclusion, the Court finds that the lack of evidence regarding any substantial analysis of SB8, and the lack of evidence regarding SB8's actual necessity under the Voting Rights

Act or any other state interest, establishes that SB8 is not narrowly tailored to satisfy a compelling government interest.

Dated this 17th day of April, 2024          Respectfully submitted,

**PAUL LOY HURD, APLC**          **GRAVES GARRETT GREIM LLC**

*/s/ Paul Loy Hurd*          */s/  Edward  D.  Greim*
Paul Loy Hurd          Missouri Bar No. 54034
Louisiana Bar No. 13909          *Admitted Pro Hac Vice*
Paul Loy Hurd, APLC          Jackson Tyler
1896 Hudson Circle, Suite 5          Missouri Bar No. 73115
Monroe, Louisiana 71201          *Admitted Pro Hac Vice*
Tel.: (318) 323-3838          Matthew Mueller
paul@paulhurdlawoffice.com          Missouri Bar No. 70263
*Attorney for Plaintiffs*          *Admitted Pro Hac Vice*
          Katherine Graves
          Missouri Bar No. 74671
          *Admitted Pro Hac Vice*
          A. Bradley Bodamer
          Missouri Bar No. 28676
          *Admitted Pro Hace Vice*
          GRAVES GARRETT GREIM LLC
          1100 Main Street, Suite 2700
          Kansas City, Missouri 64105
          Tel.: (816) 256-3181
          Fax: (816) 256-5958
          edgreim@gravesgarrett.com
          jtyler@gravesgarrett.com
          mmueller@gravesgarrett.com
          kgraves@gravesgarrett.com
          bbodamer@gravesgarrett.com
          *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I do hereby certify that, on this 17th day of April, 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

/s/ *Edward D. Greim*
Edward D. Greim