IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA—MONROE DIVISION

| | |
|---|---|
| PHILLIP CALLAIS, LLOYD PRICE, BRUCE ODELL, ELIZABETH ERSOFF, ALBERT CAISSIE, DANIEL WEIR, JOYCE LACOUR, CANDY CARROLL PEAVY, TANYA WHITNEY, MIKE JOHNSON, GROVER JOSEPH REES, ROLFE MCCOLLISTER, | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| *Plaintiffs,* | District Judge David C. Joseph Circuit Judge Carl E. Stewart District Judge Robert R. Summerhays |
| v. | Magistrate Judge Kayla D. McClusky |
| NANCY LANDRY, in her official capacity as Secretary of State of Louisiana, | |
| *Defendant.* | |

**STATE OF LOUISIANA'S POST-TRIAL BRIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. i

INTRODUCTION ............................................................................................ 1

LEGAL STANDARD......................................................................................... 3

ARGUMENT .................................................................................................. 4

    I.   Plaintiffs' Fourteenth Amendment Claims Fail. ............................................ 4

       A.   Race Was Not the Predominant Factor Motivating the Legislature's Enactment of S.B. 8.......................................................................... 4

       B.   In All Events, S.B. 8 Satisfies Strict Scrutiny. ............................................ 8

          1.   *Compliance with Court Orders Articulating VRA Requirements Is a Compelling Interest.* .................................................................... 8

          2.   *The State Had a "Strong Basis in Evidence" to Support S.B. 8.* .............. 9

       C.   Plaintiffs' Alternative *Arlington Heights* Argument Fails. .......................... 13

    II.   If the Court Determines That S.B. 8 Violates the Constitution, It Should Schedule A Status Conference To Discuss A Remedial Phase....................... 14

CONCLUSION............................................................................................... 15

CERTIFICATE OF SERVICE ............................................................................. 17

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ala. Legis. Black Caucus v. Alabama*,
    575 U.S. 254 (2015) ........................................................................... 8

*Allen v. Milligan*,
    143 S. Ct. 1487 (2023) ...................................................................... 9

*Bethune-Hill v. Va. State Bd. of Elections*,
    580 U.S. 178 (2017) ................................................................ 2, 3, 8–13

*City of Holyoke Gas & Elec. Dep't v. FERC*,
    954 F.2d 740 (D.C. Cir. 1992) ....................................................... 12

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ................................................................... 11

*Doe v. Lower Merion Sch. Dist.*,
    665 F.3d 524 (3d Cir. 2011) .......................................................... 14

*Cooper v. Harris*,
    581 U.S. 285 (2017) .............................................................. 3, 4, 7, 13

*Hays v. Louisiana (Hays I)*,
    839 F. Supp. 1188 (W.D. La. 1993) ............................................... 9

*Hays v. Louisiana (Hays III)*,
    936 F. Supp. 360 (W.D. La. 1996) ............................................... 1, 9

*In re Landry*,
    83 F.4th 303 (5th Cir. 2023) ......................................................... 14

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ........................................................................ 1

*Lewis v. Ascension Par. Sch. Bd.*,
    806 F.3d 344 (5th Cir. 2015) ......................................................... 14

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ....................................................... 12

*Miller v. Johnson*,
    515 U.S. 900 (1995) .............................................................. 4, 5, 7, 8

*Robinson v. Ardoin*,
    86 F.4th 574 (5th Cir. 2023) ...................................................... 1, 10

*Robinson v. Ardoin*,
    605 F. Supp. 3d 759 (M.D. La. 2022) .............................................................. 1, 10

*Robinson v. Ardoin*,
    2023 U.S. App. LEXIS 34113 (5th Cir. 2023) ........................................ 9

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ....................................................................... 8

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013) ....................................................................... 9

*Valeria v. Davis*,
    320 F.3d 1014 (9th Cir. 2003) .......................................................... 14

## INTRODUCTION

The trial record in this case confirms what federal court opinions and the legislative record already suggested: S.B. 8 is constitutional. The Louisiana Legislature did not wake up in a special legislative session in January and randomly decide to redraw Louisiana's congressional maps by adding a second majority-Black district. After all, this Court had previously rejected such an attempt as unconstitutional nearly 30 years ago in *Hays v. Louisiana* (*Hays III*), 936 F. Supp. 360 (W.D. La. 1996)—and the State had spent the better part of 2022 and 2023 vigorously defending against a claim that Section 2 of the Voting Rights Act ("VRA") requires a second majority-Black district in Louisiana. There is thus no serious claim that the Legislature was engaged in the "sordid business" of "divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part and dissenting in part).

But the federal courts altered Louisiana's story and forced its hand. First, the Middle District held that the State's failure to adopt a second majority-Black district likely violated the VRA. *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 766 (M.D. La. 2022). Second, the Fifth Circuit unanimously affirmed that finding. *Robinson v. Ardoin*, 86 F.4th 574, 583 (5th Cir. 2023). So, the State had a choice: (a) draw a map that added a second majority-Black district, or (b) go to trial on H.B. 1—the original one majority-Black district map—before a district court that had already expressed her view that the State was likely to lose at trial. The State chose the former, using the courts' two

majority-Black district mandate as a baseline for S.B. 8 and rooting the map itself in textbook political calculations.

Given this unique context, S.B. 8 is unquestionably constitutional. That is principally so because Plaintiffs failed to carry their burden to prove that race was the predominant factor motivating the Legislature's enactment of S.B. 8. Specifically, the courts, not the Legislature, made the race-based decision to mandate two majority-Black districts. As the trial record reflects, legislator after legislator acknowledged that the courts had already made the race-based decision for the Legislature. The question for the Legislature was thus not whether a map would have a second majority-Black district; it was what a two majority-Black district map would look like—a question that the legislators answered through classic political calculations. Plaintiffs' case thus does not get past the starting gate since race was not the predominant factor motivating the Legislature's decision to adopt S.B. 8.

Even if race predominated, moreover, S.B. 8 easily satisfies strict scrutiny. Plaintiffs do not seriously contest that complying with the VRA is a compelling state interest—and that compelling interest is even stronger here because the Legislature sought to obey *federal courts'* commands that themselves dictated what the VRA likely requires. In addition, the State undisputedly had "a strong basis in evidence" to support S.B. 8. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 193 (2017). Indeed, what could be stronger than dual layers of federal court decisions holding that the VRA likely requires the Legislature to adopt a second majority-Black district? The entire point of *Bethune-Hill*'s "strong basis in evidence" standard is to

give States "breathing room" to navigate the "'competing hazards of liability' under the Voting Rights Act and the Equal Protection Clause." *Id.* at 196 (citation omitted). But if the Legislature's good-faith enactment of S.B. 8 to comply with the *Robinson* decisions (and the VRA) itself violates the Fourteenth Amendment, then that "breathing room" is a coffin six feet underground. It would create a legally untenable situation for the State. The only way to avoid that absurd result is to hold that S.B. 8 is constitutional in light of the unique factual circumstances presented by this case. The Court should thus enter judgment for the State.

## LEGAL STANDARD

Courts undertake a "two-step analysis" to determine whether a map constitutes an impermissible racial gerrymander in violation of the Fourteenth Amendment. *Cooper v. Harris*, 581 U.S. 285, 291 (2017). The first step requires the plaintiff to "prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* (citations omitted). The second step requires that, "if racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Id.* at 292. At this step, the State bears the burden to demonstrate that "its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Id.* (citations omitted). Courts have consistently presumed that complying with the VRA constitutes a "compelling interest." *Id.* And to satisfy the "narrowly tailored" requirement, the State need only show "that it had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (citations omitted).

3

## ARGUMENT

I.    **PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS FAIL.**

### A.    Race Was Not the Predominant Factor Motivating the Legislature's Enactment of S.B. 8.

Plaintiffs' claims fail first at the threshold requirement that they prove "'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district'"—*i.e.*, that "the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Id.* at 291 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Plaintiffs have not carried, and cannot carry, their burden to prove that the Louisiana Legislature considered (to the subordination of all other criteria) race when it adopted S.B. 8.

For good reason: The predominant factor motivating the Legislature's decision was an order from the Middle District of Louisiana, followed by an affirmance from a unanimous Fifth Circuit panel, each holding that, unless two of the State's six Congressional districts are majority-Black, the State will likely violate Section 2 of the VRA. Race was thus not a motivating factor for the Legislature at all. It was *the Middle District* that made a race-based decision by requiring two majority-Black districts, and it was *the Fifth Circuit* that affirmed that decision. The Legislature— at whom that decision was directed—had no say in the decision and, in fact, vigorously *opposed* the consideration of race throughout the *Robinson* litigation. All considerations of race, therefore, stem from the federal court decisions that impelled S.B. 8—not the Legislature. The legislators debating S.B. 8 themselves emphasized

4

this point when explaining that their task proceeded from a court-ordered premise: that two majority-Black districts are legally required.[1] And because Plaintiffs' burden here is to prove that "'race was the predominant factor motivating *the legislature's* decision,'" *id.* (quoting *Miller*, 515 U. S. at 916) (emphasis added), Plaintiffs' case does not get past step one of the analysis.

That is especially so given the other two expressly non-racial motivations behind S.B. 8. *First*, the Governor and the Legislature made a political judgment to reclaim the State's sovereign right to draw congressional maps rather than cede that responsibility to the federal courts. Governor Landry made this point crystal clear when he called the special Legislative Session:

> These maps will satisfy the court and ensure that the congressional districts of our State are made right here in this Legislature and not by some heavy-handed federal judge. We do not need a federal judge to do for us what the people of Louisiana have elected you to do for them. You are the voice of the people, and it is time that you use that voice . . . . [T]he people of this State expect us to operate government efficiently and to act within the compliance of the laws of our nation and of our courts, even when we disagree with both of them . . . .

ECF No. 181-8 at 10–11.[2] And that reclamation of sovereign responsibility echoed throughout the Legislative Session.[3] Indeed, even Plaintiffs' own witnesses here—

---

[1]  *See, e.g.*, ECF No. 181-9 at 4 (Senator Prince introducing S.B. 4: "We all know that we've been ordered by the court that we draw congressional district with two minority districts. This map will comply with the order of both the Fifth Circuit Court of Appeal and the district court. They have said that the legislature must pass a map that has two majority black districts.")

[2]  For citations to transcripts of the legislative record, the State uses the transcript's page and line numbers, not the ECF page numbers. Because most of the transcripts are in quadrants, this seemed the most accurate way to provide the Court with pinpoint citations for the legislative proceedings.

[3]  *See* Trial Tr. vol. III, 591:3–7, April 10, 2024 (Governor Landry: "Let us make the necessary adjustments to heed the instructions of the Court, take the pen out of the hand of a nonelected judge and place it in your hands. In the hands of the people. It's really that simple."); ECF No. 181-8 at 11 (same); *see also* Trial Tr. vol. III, 589:1–3, April 10, 2024 (Attorney General Murrill: "The Courts, never

including legislators who opposed S.B. 8—recognized the Legislature's predicament: draw its own two majority-Black district map or let the federal courts do it.[4] The Legislature reasonably chose the former.

*Second*, the contours of the S.B. 8 map were themselves motivated by serious political calculations.[5] As the legislative record makes clear, chief among those calculations were (a) avoiding pitting incumbents against each other and (b) preserving the incumbency of Speaker Johnson, Majority Leader Scalise, and Representative Letlow—the only congresswoman from Louisiana and a member of the powerful Appropriations Committee.[6] Again, the Legislature reasonably chose to elevate these considerations above others in adopting S.B. 8.

---

the less, [sic] have told us to draw a new map. And they have indicated that we have a deadline to do that or Judge Dick will draw the map for us."); ECF No. 181-1 at 36:14–17 (same); ECF No. 181-9 at 33 (Senator Price: "Regardless of what you heard, we are on a court order and we need to move forward. We would not be here if we were not under a court order to get this done."); ECF No. 181-9 at 1 (Senator Fields: "[B]oth the district and the appeals court have said we need to do something before the next congressional elections."); ECF No. 181-4 at 26:12–24 (Chairman Beaullieu: "Senator Womack, why are we here today? What -- what brought us all to this special session as it -- as it relates to, you know, what we're discussing here today?"; Senator Womack: "The middle courts of the district courts brought us here from the Middle District, and said, 'Draw a map, or I'll draw a map.'"; Chairman Beaullieu: "Okay."; Senator Womack: "So that's what we've done."; Chairman Beaullieu: "And -- and were you -- does -- does this map achieve that middle court's orders?"; Senator Womack: "It does.").

[4] *See, e.g.,* Trial Tr. vol. I, 47:22–48:1, April 8, 2024 (Senator Seabaugh: "[R]eally, the only reason we were there was because of the other litigation; and Judge Dick saying that she -- if we didn't draw the second minority district, she was going to. I think that's the only reason we were there."); Trial Tr. vol. I, 69:24–70:4, April 8, 2024 (Senator Pressly: "We were told that we had to have two performing African American districts. And that we were – that that was the main tenet that we needed to look at and ensure that we were able to draw the court -- draw the maps; otherwise, the court was going to draw the maps for us."); Trial Tr. vol. I, 174:18–19, April 8, 2024 (Dr. Voss: "I understood that the Robinson court was the catalyst for the whole process, yes.").

[5] *See* ECF No. 181-4 at 24:25–25:2 (Representative Larvadain: "So this is more of a political map"; Senator Womack: "Exactly."); ECF No. 181-4 at 11:18–22 (Representative Marcelle: "So in your opinion, your map does two things. It satisfies the Court, and it also protects the politics, or our congressional members. Is that -- is that. . ."; Senator Womack: "Yes, ma'am.").

[6] *See* ECF No. 181-2 at 1:21–25 (Senator Womack: "The boundaries in this bill I'm proposing ensure that Congresswoman Letlow remains both unimpaired with any other incumbents and in a congressional district that should continue to elect a Republican to Congress for the remainder of this

6

Each of these undisputed facts combines to defeat Plaintiffs' case at the outset: (a) the federal courts, not the Legislature, made the race-based decision that established the two majority-Black district baseline for S.B. 8; (b) S.B.8 was motivated by the Governor's and the Legislature's intent to reclaim the State's redistricting authority from the federal courts; and (c) S.B. 8 was especially motivated by political calculations regarding incumbency that quite literally had nothing to do with race. As S.B. 8's sponsor summed it up:

> I firmly submit that the congressional voting boundaries represented in this bill best achieve the goals of protecting Congresswoman Letlow's seat, maintaining strong districts for Speaker Johnson and Majority Leader Scalise, ensuring four Republican districts, and adhering to the command of the federal court in the Middle District of Louisiana.

ECF No. 181-6 at 8:14–20 (Representative Beaullieu); *see also* 5:7–8:10. Given this record, race simply was not "'the predominant factor motivating *the legislature's*

---

decade."); ECF No. 181-6 at 5:10–23 (Representative Beaullieu: same); *see also* ECF No. 181-3 at 14:16–15:6 (Senator Stine: "This map . . . safeguards the positions of pivotal figures, the United States Speaker of the House, the majority leader, and notably, the sole female member of our congressional delegation. Her role is not merely symbolic. She is a lynchpin in the appropriations, education, and workforce committees which are vital to the prosperity and well-being of our state. . . . It's about ensuring our state's continued influence in the halls of power where decisions are made that affect every citizen we represent."); ECF No. 181-2 at 12:13–13:1 (Senator Cloud: "As a Republican woman, I want to stand here -- or sit here, rather, and offer my support for the amendment to the map, which I believe further protects Congresswoman Julia Letlow. She is the only woman in the Louisiana's congressional district. She is a member of the Appropriations Committee in the US House, as Senator Womack stated, and also a member of the Agricultural Committee in the US House. It's -- it's important to me and all of the other residents of our area that -- to have these two representatives from our crucial region in our state. I think that politically, this map does a great job protecting Speaker Johnson and Congresswoman Julia Letlow as well as Majority Leader Scalise."); ECF No. 181-2 at 2:6–20 (Senator Womack: "[T]he map and the proposed bill ensures that four of our safe Republican seats, Louisiana Republican presence in the United States Congress has contributed tremendously to the national discourse. And I'm very proud of both Speaker of the US House of Representatives Mike Johnson and US House Majority Leader Steve Scalise are both from our great state. This map ensures that the two of them will have solidly Republican districts at home so that they can focus on the national leadership that we need in Washington, DC."); ECF No. 181-6 at 5:24–6:14 (Representative Beaullieu: same); ECF No. 181-4 at 11:18–22, 121:19–122:1; ECF No. 181-2 at 5:3–6:7, 13:9–14:3.

decision," *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U. S. at 916) (emphasis added), to adopt S.B. 8. That consideration came from the federal courts. As a result, Plaintiffs' *Shaw* claims fail.

## B.     In All Events, S.B. 8 Satisfies Strict Scrutiny.

Even if Plaintiffs had proved racial predominance, Plaintiffs' claims would still fail because S.B. 8 satisfies strict scrutiny. "Where a challenger succeeds in establishing racial predominance, the burden shifts to the State to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'" *Bethune-Hill*, 580 U.S. at 193 (quoting *Miller*, 515 U.S. at 920). And the State easily satisfies both prongs of strict scrutiny here.

### 1.     Compliance with Court Orders Articulating VRA Requirements Is a Compelling Interest.

Take first the compelling-interest prong. The Supreme Court has repeatedly assumed that complying with the VRA is a compelling governmental interest. *Id.*; *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 275–79 (2015); *Shaw v. Hunt*, 517 U.S. 899, 915 (1996). And here, Plaintiffs have never actually argued otherwise. *See generally* ECF Nos. 17, 101. But the State's case here is even stronger than the ordinary case. That is because, unlike States in other cases, the State here did not seek to comply with the VRA in the abstract; it sought to comply with Middle District and Fifth Circuit *decisions* that themselves established what (in the courts' view) VRA compliance requires—namely, two majority-Black districts. If VRA

compliance itself is a compelling interest, then compliance with court orders telling a State how to comply with the VRA necessarily is a compelling interest, too.[7]

> ## 2.  The State Had a "Strong Basis in Evidence" to Support S.B. 8.

The narrow-tailoring inquiry is just as straightforward. In this context, "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." *Bethune-Hill*, 580 U.S. at 193. This flexible standard is by design—to give States "breathing room" to

---

[7]  The State argued in *Robinson* that the intensive use of race to compel the State to draw two majority-Black districts was no longer "justified by current needs.'" *Shelby Cnty. v. Holder*, 570 U.S. 529, 536 (2013). The question of whether "current needs" can justify the drawing of additional minority-majority districts was one explicitly left open by *Milligan*, as Justice Kavanaugh expressly observed. *See Allen v. Milligan*, 143 S. Ct. 1487, 1519 (2023) (Kavanaugh, J., concurring) ("Alabama did not raise that temporal argument in this Court, and [the Court] therefore [did] not consider it at this time.").

That argument was initially raised by the State in its post-*Milligan* briefing, arguing that the "district court's race-based reading of §2 'lacks a logical end point,' and thereby violates the principle that 'the authority to conduct race-based redistricting cannot extend indefinitely into the future.'" Louisiana Supp. Br. at 36–37, *Robinson*, No. 22-30333 (5th Cir. Aug. 6, 2023), ECF No. 260-1 (quoting *Milligan*, 143 S. Ct. at 1519 (Kavanaugh, J., concurring)). But the *Robinson* panel did not acknowledge this argument, let alone decide it. The State then renewed that argument at length in its petition for rehearing en banc. *See* Louisiana Pet. Reh'g En Banc at 20–26, *Robinson*, No. 22-30333 (5th Cir. Dec. 1, 2023), ECF No. 353. But the Fifth Circuit neither acknowledged nor resolved that argument. *Robinson v. Ardoin*, 2023 U.S. App. LEXIS 34113, at *3 (5th Cir. 2023). More recently, the Middle District in denying a first-to-file motion by *Robinson* Intervenors reiterated yesterday that the "Western District [in *Callais*] confronts constitutional questions that were not before this Court in the captioned matter." *Robinson v. Ardoin*, No. 22-CV-00211-SDD-SDJ, at 6 (M.D. La. Apr. 16, 2024) (ECF No. 370).

Although the State opted to comply with the *Robinson* courts' decisions, the State does not waive its view that the *Robinson* courts' interpretation of the VRA as likely requiring a second majority-Black district is not constitutional under present circumstances. Federal courts already held that the use of race to draw two majority-Black districts in the 1990s violated the Equal Protection Clause. *See Hays v. Louisiana (Hays I)*, 839 F. Supp. 1188 (W.D. La. 1993), *vacated as moot*, 512 U.S. 1230 (1994) (mem.); *Hays III*, 936 F. Supp. 360 (not appealed). Since then, as the *Robinson* Plaintiffs' (Intervenors here) own experts recognized, cross-over voting by white voters has increased so much that minority candidates can be elected in districts with Black Voting Age Population ("BVAP") percentages in the 40s. *See Robinson* ROA.6370–72; 6247–48; *see also* ROA.1854; ROA.1858; ROA.1865–66. The demography of the State has continued to change, making African-American population even more dispersed. *See, e.g.*, Trial Tr. Vol. II, 339:11–341:3, April 9, 2024 (Plaintiffs' expert, Mr. Hefner, explaining that advancements in racial integration, and events such as Hurricane Katrina, have contributed to Baton Rouge's previously more-concentrated Black population dispersing throughout the state, even though Louisiana's total Black population has remained fairly constant since the 1990s).

navigate "the 'competing hazards of liability' under the Voting Rights Act and the Equal Protection Clause." *Id.* at 196 (citation omitted).

That standard is easily satisfied here. In particular, the Middle District expressly held that H.B. 1's failure to include a second majority-Black district likely violated the VRA. *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 766 (M.D. La. 2022). And the Fifth Circuit affirmed that analysis, holding that the Middle District "did not clearly err in its necessary fact-findings nor commit legal error in its conclusions that the Plaintiffs were likely to succeed on their claim" that H.B. 1 violated Section 2. *Robinson*, 86 F.4th at 583. And the legislative record and trial testimony make amply clear that the Legislature was aware of the federal courts' holdings that the VRA likely required two majority-Black districts.[8] If that is not the *strongest* basis in evidence to support S.B. 8, then it is difficult to imagine what would be.

It is, of course, true that the Middle District and the Fifth Circuit did not issue final judgments holding that the Legislature's failure to adopt a second majority-Black district violated the VRA. But the narrow-tailoring requirement "does not

---

[8] *See, e.g.*, ECF No. 181-8 at 10–11 (Governor Landry detailing the Robinson litigation that precipitated the 2024 First Extraordinary Session); ECF No. 181-1 at 35:24–54:6, 60:13–70:15, 75:17–78:13 (Attorney General Murrill explaining in detail—and fielding questions for legislators—about the *Robinson* litigation, the VRA, and the Fourteenth Amendment); ECF No. 181-7 at 11:3–7 (Senator Carter: "[W]e came together in a effort to comply with a federal judge's order that Louisiana provide equal representation to the African Americans in the State of Louisiana, and we have an opportunity to do that."); ECF No. 181-9 at 4 (Senator Price: "We all know that we've been ordered by the court that we draw congressional district with two minority districts."); ECF No. 181-9 at 1 (Senator Fields: "We're here pursuing to Proposition No. 1. Special session called by the governor as a result of a map that was passed by this legislature and challenged in court. And both the district and the appeals court have said we need to do something before the next congressional elections."); ECF No. 181-6 at 5:1–7 (Representative Beaullieu: "As Senator Stine said earlier in this week, 'It's with a heavy heart that I present to you this other map,' but we have to. It's that clear. A federal judge has ordered us to draw an additional minority seat in the state of Louisiana. We have the -- the federal Voting Rights Act litigation is still going on in the US District Court in the Middle District of Louisiana."); ECF No. 181-4 at 11:18–22; ECF No. 181-4 at 26:12–24; ECF No. 181-4 at 95:3–96:4; *see also supra* at nn. 1, 3, & 4.

require the State to show that its action was actually . . . necessary to avoid a statutory violation, so that, but for its use of race, the State *would have lost in court*." *Bethune-Hill*, 580 U.S. at 194 (emphasis added) (internal quotation marks and citation omitted). Indeed, it is sufficient that the Legislature had "*good reasons* to believe it must use race in order to satisfy the Voting Rights Act." *Id.* (emphasis in original) (cleaned up). And here, the *Robinson* courts' explicit pronouncements that the State was *likely* to lose under Section 2 of the VRA is a very "*good reason[]* to believe it must use race in order to satisfy the Voting Rights Act." *Id.*

That is especially so given that, to the State's knowledge, no federal court has ever considered these sorts of judicial pronouncements in this context, let alone found them insufficient to meet the "strong basis in evidence" standard. And in all candor, had the State opted to go to trial on H.B. 1 on the belief that it had a realistic chance of prevailing before a factfinder who had already made her views abundantly clear, that belief would have required the State to "exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted). The law did not require that exercise in futility.

Plaintiffs also have complained that the Legislature relied on the federal courts' analysis of what the VRA requires, rather than parsing the VRA's legal requirements for themselves. *See, e.g.*, Trial Tr. vol. III, 594:15–25, April 10, 2024 ("[The State] argue[s] that the materials from the *Robinson* case, coupled with Judge Dick's vacated decision of the Fifth Circuit's failure to find clear error in Her [sic] factual findings, met their evidentiary burden here. But that strategy must fail under

the law. . . . Instead, it must show that it actually performed a VRA analysis on the proposed legislation on SB8 and on District 6.").

That is a nonsense objection. It is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). So, why *wouldn't* the Legislature rely on federal courts as the final word about what federal law requires? Moreover, the Legislature relied not just on an opinion from the Middle District, but also on an affirmance on likelihood of success on the merits from the Fifth Circuit—dual layers of unanimous opinions that any reasonable person would follow. And more still, the whole reason legislators in other cases often consult experts is to make predictive judgments about how federal courts would likely rule if future plaintiffs sue to enjoin a map under the VRA. But here, no such speculation was necessary *because two federal courts had already told the State how they likely would rule. Supra* at 1. Nothing in the "strong basis in evidence" standard prevented the Legislature from factoring in these decisions and making a commonsense judgment about how to proceed. Nor is this an APA case where agencies must "abide by the injunction of the arithmetic teacher: Show your work!" *City of Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 743 (D.C. Cir. 1992); *cf. Bethune-Hill*, 580 U.S. at 195 (easily rejecting argument that Virginia's District 75 failed the narrow-tailoring inquiry because the legislators' analysis "was not memorialized in writing").

One final note: If the Court were to find that the Legislature does not meet the "strong basis in evidence" standard here, that would collapse the Supreme Court's

precedents on the State. Remember that the reason for this standard is to give States "breathing room" between the demands of the Fourteenth Amendment and the VRA. But if the State is deemed to have violated the Fourteenth Amendment through S.B. 8—after being told by the Middle District and the Fifth Circuit that the VRA likely requires a second majority-Black district—then that "breathing room" is a coffin six feet underground. It is quite literally a legally impossible situation for the State. If the strict-scrutiny analysis means anything, therefore, it surely means that the State prevails here.[9]

## C.    Plaintiffs' Alternative *Arlington Heights* Argument Fails.

To the extent Plaintiffs invoke *Arlington Heights*, it bears noting that such reliance is misplaced. The *Arlington Heights* factors are intended to ascertain whether the relevant government decisionmaker considered race in a manner that triggers strict scrutiny. But in the redistricting context, the more specific predominance test from *Cooper/Bethune Hill* prevails over the general *Arlington Heights* standard. *See, e.g., Cooper*, 581 U.S. at 291–92; *Bethune-Hill*, 580 U.S. at 187–88.

---

[9] The Supreme Court has never directly considered whether racial gerrymandering standards of the *Shaw* cases and their progeny apply in this context. That is thus potentially an open question. The Supreme Court in *Bethune-Hill*, however, explained that "the narrow tailoring requirement insists *only* that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." *Bethune-Hill*, 580 U.S. at 193 (emphasis added). The use of "only" fairly suggests that the strong basis in evidence to justify the race-based choice is all that is required—*i.e.*, that "only" in fact means "only." But to the extent that the narrow tailoring inquiry also demands consideration of the contours of the district drawn, the evidence presented here demonstrated that it was not possible to draw a second majority-Black district without it spanning much of the State—*i.e.*, from Baton Rouge either up to Shreveport or Monroe and the Delta Parishes. *See, e.g.*, Trial Tr. Vol. II, 341:4–21, April 9, 2024 (Plaintiffs' expert, Mr. Hefner, acknowledging that even Plaintiffs' Illustrative Plan 1 contains a district spanning roughly 230 miles from Washington Parish up to Monroe). That is a distinction without a constitutional difference. Thus, even if some additional tailoring requirement applies, the State has satisfied it here.

Even if *Arlington Heights* applied, moreover, Plaintiffs' argument would fail for substantially the same reasons that their predominance arguments fail. *See supra* § I.A. And even if Plaintiffs could satisfy the *Arlington Heights* factors, that would only get them to strict scrutiny—but, as explained above, *supra* § I.B, S.B. 8 easily satisfies strict scrutiny, which thus moots this issue. *See, e.g., Lewis v. Ascension Par. Sch. Bd.,* 806 F.3d 344, 354 (5th Cir. 2015); *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 551 (3d Cir. 2011); *Valeria v. Davis*, 320 F.3d 1014, 1020 (9th Cir. 2003).

## II.  IF THE COURT DETERMINES THAT S.B. 8 VIOLATES THE CONSTITUTION, IT SHOULD SCHEDULE A STATUS CONFERENCE TO DISCUSS A REMEDIAL PHASE.

Although the State firmly believes that S.B. 8 survives constitutional scrutiny, out of an abundance of caution the State respectfully requests that the Court set a status conference for a remedial phrase in the event that the Court concludes that S.B. 8 violates the Equal Protection Clause.

This litigation has effectively proceeded in bifurcated fashion—beginning first with a liability trial, while postponing any consideration of a remedy (if necessary). *See, e.g.*, ECF No. 79 at 9 (allowing *Robinson* Intervenors, initially, to participate only in a "remedial phase, if one is needed, later in this suit"). And as the Secretary has indicated, May 15 is the deadline for entering any new maps into the State's electoral systems for this year's elections. ECF No. 82 at 3. The adoption of yet another map for the 2024 election cycle (the third such map in 2024 alone) would thus implicate both (a) significant *Purcell* and equitable concerns and (b) the Louisiana Legislature's sovereign right to attempt to draw a remedial map in the first instance. *See In re Landr*y, 83 F.4th 300, 303–05 (5th Cir. 2023).

To address these issues and to establish an orderly remedial process (again, if one is necessary at all), the State respectfully requests that this Court set a status conference shortly after any finding of a constitutional violation.

## CONCLUSION

For the foregoing reasons and those presented previously and at trial, this Court should enter judgment for Defendants, holding that S.B. 8 does not violate the Fourteenth Amendment.

Dated: April 17, 2024                                    Respectfully submitted,

Jason B. Torchinsky (DC Bar No. 976033)*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, NW
Suite 643A
Washington, DC 20037
Tel: 202-737-8808
Email: jtorchinsky@holtzmanvogel.com

Zachary D. Henson (NY Bar No. 5907340)*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: zhenson@holtzmanvogel.com

*/s/ Morgan Brungard*
Morgan Brungard (LSBA No. 40298)
    *Deputy Solicitor General*

Carey Tom Jones (LSBA No. 07474)
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
BrungardM@ag.louisiana.gov
JonesCar@ag.louisiana.gov

*Counsel for Intervenor-Defendant State of Louisiana*

Drew C. Ensign (AZ Bar No. 025463)*
Brennan A.R. Bowen (AZ Bar No. 036639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2575 East Camelback Rd, Ste 860
Phoenix, AZ 85016
602-388-1262
Email:  densign@ holtzmanvogel.com
            bbowen@holtzmanvogel.com

* admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I do hereby certify that, on this 17th day of April 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

*/s/ Morgan Brungard*
Morgan Brungard