## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

PHILLIP CALLAIS, *et al.*,

       Plaintiffs,

    vs.

NANCY LANDRY, in her official
capacity as Louisiana Secretary of
State,

      Defendant.

Case No. 3:24-cv-00122-DCJ-CES-RRS

Three-Judge Court

## BRIEF *AMICI CURIAE* IN SUPPORT OF NEITHER PARTY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF THE *AMICI CURIAE* ................................................. 1

SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ..................................................................................... 3

I.    THE COURT SHOULD ORDER A REMEDIAL CONGRESSIONAL MAP FOR THE 2024 ELECTION CYCLE. .......................................... 3

II.   THE *AMICUS* MAP, FEATURING TWO CROSSOVER DISTRICTS, COULD BE HELPFUL AS THE COURT CONSIDERS REMEDIAL OPTIONS. ................. 5

III.  THE *AMICUS* MAP FULLY CURES THE VRA DEFECT, AVOIDS EXCESSIVE CONSIDERATION OF RACE, AND COMPLIES WITH ALL OTHER LEGAL REQUIREMENTS ........................................................................ 9

    A.    THE *AMICUS* MAP FULLY CURES THE VRA VIOLATION IN THE 2022 PLAN .................................................................... 11

    B.    THE *AMICUS* MAP IS NOT OVERLY RACE-CONSCIOUS. ................ 15

        1.    GENERAL CRITERIA ............................................... 17

        2.    GEOGRAPHIC COMPACTNESS.................................... 18

        3.    RESPECT FOR POLITICAL SUBDIVISIONS ................... 19

        4.    RESPECT FOR COMMUNITIES OF INTEREST ............... 20

    C.    THE *AMICUS* MAP COMPLIES WITH ALL OTHER LEGAL REQUIREMENTS. ................................................... 22

        1.    POPULATION EQUALITY .......................................... 22

        2.    PARTISAN FAIRNESS .............................................. 23

        3.    AVOIDING NEEDLESS CHANGES ............................... 24

CONCLUSION ................................................................................. 26

ADDENDUM ............................................................................... A-1

    THE *AMICUS* MAP—STATEWIDE ............................................ A-1

i

THE *AMICUS* MAP'S NEW ORLEANS-BASED DISTRICT 2 ......................................... A-2

THE *AMICUS* MAP'S BATON ROUGE-BASED DISTRICT 6 ......................................... A-3

THE *AMICUS* MAP'S CONGRESSIONAL-DISTRICT COMPONENTS ............................ A-4

# TABLE OF AUTHORITIES

CASES

*Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) ...................................................21

*Allen v. Milligan*, 599 U.S. 1 (2023) .................................................................8, 10

*Ardoin v. Robinson*, 143 S. Ct. 2654 (2023) .......................................................3

*Baltimore County Branch of the NAACP v. Baltimore County*, No. 21-cv-3232, 2022 WL 888419 (D. Md. Mar. 25, 2022)............................................6

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ..................................................5, 6, 7, 15

*Bush v. Vera*, 517 U.S. 952 (1996) ......................................................................18

*Carter v. Chapman*, 270 A.3d 444 (Pa. 2022) ....................................................24

*Caster v. Allen*, No. 2:21-cv-1536, 2023 WL 6005545 (N.D. Ala. Sept. 5, 2023) ..............................................................................................................4

*Clarke v. Wisconsin Elections Commission*, 998 N.W.2d 370 (Wis. 2023) ........24

*Cooper v. Harris*, 581 U.S. 285 (2017) ..............................................................6

*Essex v. Kobach*, 874 F. Supp. 2d 1069 (D. Kan. 2012) ....................................24

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) ..............................................6

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ......................................................24

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ...............................................14, 15

*Karcher v. Daggett*, 462 U.S. 725 (1983).........................................................23

*League of United Latin America Citizens v. Perry*, 548 U.S. 399 (2006)..........18

*League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ..............................................................................................4

*Maestas v. Hall*, 274 P.3d 66 (N.M. 2012) .......................................................24

*Major v. Treen*, 574 F. Supp. 325 (E.D. La. 1983) .......................................17, 18

*Miller v. Johnson*, 515 U.S. 900 (1995).............................................................20

*Reynolds v. Sims*, 377 U.S. 533 (1964) ..............................................................3

*Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022) .........................................3, 4, 7, 10

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022)...........................................................4, 7, 10

*Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023)......................................................................2

*Rucho v. Common Cause*, 588 U.S. 684 (2019) .......................................................................23

*Singleton v. Allen*, No. 2:21-cv-1291, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023) ...............................................................................................................................8

## Constitutional Provisions and Statutes

52 U.S.C. § 10301 .......................................................................................................................1, 3

52 U.S.C. § 10301(b) ..................................................................................................................6, 8

La. Const. art. I, § 3 ..................................................................................................................24

La. R.S. 18:1276 (2023) ................................................................................................................9

La. R.S. 18:1276.1 (2024) ............................................................................................................9

HCR 90, 2021 R.S. (effective June 11, 2021) ........................................................................17

## Other Authorities

Amariah Becker, Moon Duchin, Dara Gold & Sam Hirsch, *Computational Redistricting and the Voting Rights Act*, 20 Election L.J. 407 (2021).......................16

U.S. Census Bureau, About [Metropolitan and Micropolitan], https://www.census.gov/programs-surveys/metro-micro/about.html (last revised July 25, 2023).....................................................................................................20

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* Michael Mislove, Lisa J. Fauci, Robert Lipton, and Nicholas Mattei are professors of mathematics and computer science at Louisiana State University and Tulane University.  On three occasions, the U.S. District Court for the Middle District of Louisiana in *Robinson v. Ardoin* granted *amici* leave to file briefs in support of neither party, to show that computational redistricting—using high-performance computers to help draw maps that attempt to optimize multiple redistricting criteria—could produce a map that fully remedies any violation of Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301, while simultaneously complying with the United States Constitution, all other legal requirements, and traditional redistricting principles (M.D. La. No. 3:22-cv-211, Rec. Doc. Nos. 96, 97, 210, 220, 277, 284).

Amici believe that the map they previously offered in *Robinson*—the "*Amicus* Map"— created with the assistance of computational redistricting, could prove helpful to this Court as it considers appropriate remedies for the unconstitutional racial gerrymandering that it found in Senate Bill 8 ("SB 8" or the "2024 Plan").  *See* Doc. 198.

## SUMMARY OF ARGUMENT

This Court will soon face two issues:  first, whether this Court should order a remedial congressional districting map into effect for the 2024 election cycle given that the Legislature's March 2022 plan was enjoined for violating Section 2 of the Voting Rights Act and the Legislature's January 2024 plan was enjoined for violating the Equal Protection Clause, leaving the State without a lawful plan for the 2024 elections; and

second, whether the Court can find a remedial map that complies with all federal and state legal requirements, properly respects traditional districting criteria, and walks the fine line between paying too little attention to race and violating the VRA and paying too much attention to race and violating the Constitution.

*Amici* believe the answer to both questions is Yes.  The *Amicus* Map, which *amici* first presented to the *Robinson* court in April 2022, contains two "crossover districts"— one based in New Orleans, the other based in Baton Rouge, with neither extending to North Louisiana—where Black adults constitute less than half of each district's voting-age population yet would have a realistic possibility of electing their preferred candidates to Congress with limited, but predictable, crossover support from other voters.  These crossover districts fully comply with the VRA without risking running afoul of the Equal Protection Clause.

Both districts, like all other districts in the *Amicus* Map, are contiguous, geographically compact, respectful of parishes and municipalities, and respectful of other communities of interest.  The *Amicus* Map adheres to the "one person, one vote" doctrine more closely than any congressional plan in Louisiana history.  And the map respects the legitimate policy choices made by the Governor and Legislature, particularly with respect to incumbents.

The *Amicus* Map therefore could be an excellent option as the Court considers a remedial congressional redistricting plan.  *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 856 & n.441 (M.D. La. 2022) (citing the *Amicus* Map).

ARGUMENT

I.   **The Court Should Order a Remedial Congressional Map for the 2024 Election Cycle.**

The Court should order a remedial congressional map into effect for the 2024 election cycle.  Earlier this week, the Court found that the Legislature's January 2024 congressional plan violates the Equal Protection Clause as an impermissible racial gerrymander and enjoined the State of Louisiana from using it for any election.  Doc. 198.

Likewise, in *Robinson*, the Legislature's March 2022 congressional plan was enjoined by the District Court for the Middle District of Louisiana for violating Section 2 of the VRA, 52 U.S.C. § 10301, and the Fifth Circuit "affirmed the district court's conclusion" that the *Robinson* plaintiffs "were likely to succeed" on the merits of their VRA claim, expressly concluded that the injunction had been "valid," and held that "the underlying controversy is not moot" because Black voters would suffer "a continuing and live injury … [and] ongoing and irreparable harm … in the 2024 elections" unless the 2022 Plan were replaced with a lawful plan.  *Robinson v. Ardoin*, 86 F.4th 574, 583, 599–601 (5th Cir. 2023).  All of this comported with the U.S. Supreme Court's remand order instructing the Fifth Circuit to proceed with, and presumably resolve, *Robinson* "in advance of the 2024 congressional elections in Louisiana." *Ardoin v. Robinson*, 143 S. Ct. 2654 (2023).

As the Supreme Court has noted, where—as here—a districting plan is found to be unlawful, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).  That is because "restrictions on

3

fundamental voting rights [constitute] irreparable injury" and "discriminatory voting procedures in particular are the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (internal quotation marks omitted). A remedial districting plan is necessary to prevent the irreparable injury that would occur if voters were forced to vote under an unlawful plan in 2024. *See, e.g., Caster v. Allen*, No. 2:21-cv-1536, 2023 WL 6005545, at *74 (N.D. Ala. Sept. 5, 2023) (initiating process for court-ordered remedial congressional districting plan after "find[ing] that the Plaintiffs will suffer irreparable harm if they must vote in the 2024 congressional elections based on a likely unlawful redistricting plan").

There is ample time for a remedial process here. Louisiana has the latest congressional-election schedule of any State, with primary elections scheduled more than six months from today. And the Secretary of State previously represented to the Fifth Circuit that maps identified by May 30, 2024, could be implemented without difficulty. *See Robinson*, 86 F.4th at 584. Moreover, a Fifth Circuit motions panel previously rejected the State's argument that a late-June deadline for a remedial map would "confuse voters, unduly burden election administrators, or otherwise sow chaos or distrust in the electoral process" in violation of the *Purcell* principle. *See Robinson v. Ardoin*, 37 F.4th 208, 228–30 (5th Cir. 2022). This Court has both the duty and the time to implement a remedial map, to avoid irreparable injury to Louisiana voters.

4

## II.   The *Amicus* Map, Featuring Two Crossover Districts, Could Be Helpful as the Court Considers Remedial Options.

The *Amicus* Map is offered, not in support of any party, but rather as one potential solution to the dilemma facing the Court.  Given the need for the Court to adopt a remedial plan in advance of the 2024 elections, and given the complexity of vindicating minority citizens' rights under the VRA while avoiding excessive race-consciousness and complying with all other federal and state legal requirements, as well as respecting the legitimate policy choices that the Louisiana Legislature embedded in the 2022 and 2024 Plans, *amici* believe that their *Amicus* Map, generated with the assistance of computational redistricting, could be helpful to the Court as it considers remedial options.

Although this case appears to have proceeded thus far largely on the premise that two **majority**-Black districts are necessary to remedy the VRA violation in the 2022 Map, a central feature of the *Amicus* Map is its use of two "crossover" districts, where Black citizens would have the potential to elect a representative of their choice even though they constitute less than half the district's population.  Unlike an "illustrative" district presented by plaintiffs at the liability phase of a VRA case—which must comply with the requirement of *Bartlett v. Strickland*, 556 U.S. 1 (2009), that members of the plaintiffs' minority group constitute a majority of the voting-age population in the additional district—in a **remedial** plan, members of that minority group need not constitute a majority of the voting-age population in the additional district.  Rather, the additional district must be one where minority voters will have a fair opportunity to elect their preferred representative.  After all, the harm unlawfully inflicted on VRA plaintiffs is not that they reside in a district with the "wrong" demographic composition, but rather

that they reside and vote in a district where they will be deprived the "opportunity … to elect representatives of their choice," 52 U.S.C. § 10301(b), as their preferred candidates will routinely lose to nonminority voters' preferred candidates.

The Supreme Court explained this distinction in *Bartlett v. Strickland*. The plurality there held, on the one hand, that VRA ***plaintiffs*** must show that their minority group is sufficiently large and geographically compact to constitute a literal, numerical majority in an additional, reasonably configured district. But it further held that VRA ***defendants*** can prevail by pointing to what the Court called "crossover" districts. In a crossover district, minority adults, though outnumbered, can elect their preferred candidates with limited, but predictable, crossover support from other voters. *Compare Strickland*, 556 U.S. at 12–14, 18–19, 26 (plurality op.) (requiring plaintiffs to meet the 50% threshold to satisfy the first prong of the *Gingles* test), *with id.* at 23–24 (encouraging defendants to rely on "crossover voting patterns and … effective crossover districts"); *see also Cooper v. Harris*, 581 U.S. 285, 305 (2017) (explaining that the VRA can "be ***satisfied by*** crossover districts"); *Baltimore Cnty. Branch of the NAACP v. Baltimore Cnty.*, No. 21-cv-3232, 2022 WL 888419, at *1–6 (D. Md. Mar. 25, 2022) (approving defendant's proposed remedial plan, with a reconfigured district in which Black voters would not constitute a numerical majority but would have an opportunity to elect a representative of their choice); *Fusilier v. Landry*, 963 F.3d 447, 456 n.7 (5th Cir. 2020) (distinguishing district court's remedial map from plaintiffs' "*Gingles* step one" map).

Indeed, the Fifth Circuit in *Robinson* recognized that crossover districts create meaningful electoral opportunities for minority citizens: "If a minority group can … elect

its preferred candidates, it does not matter whether that ability accrues in a majority-minority or a performing crossover district." *Robinson*, 37 F.4th at 227; *see also id.* at 225 (affirming the Middle District's consideration of crossover voting "to answer the right question: whether black voters' preferred candidates could ***win*** the proposed district"). The Fifth Circuit also expressly rejected the State of Louisiana's argument that racially polarized voting was not "legally significant," and thus could not support a winning VRA claim, wherever "an effective crossover district" "***could*** be drawn." *Robinson*, 86 F.4th at 595–97. So the availability of effective crossover congressional districts in Louisiana—such as the New Orleans and Baton Rouge districts in the *Amicus* Map—in no way suggests that Louisiana's 2022 Map did not violate the VRA. *See id.*

The availability of effective crossover districts can, however, make it easier to remedy a VRA violation without running any risk of violating the Equal Protection Clause. As the *Bartlett v. Strickland* plurality recognized, "crossover districts" where Black adults lack a numerical majority but nonetheless have the potential to elect representatives of their choice may be less vulnerable to claims of racial gerrymandering. *Strickland*, 556 U.S. at 23. These districts can enhance "minority voting strength" while "diminish[ing] the significance and influence of race" and "encouraging minority and majority voters to work together" toward common goals. *Id.* The Court found that these districts "can lead to less racial isolation." *Id.* Moreover, these districts (by definition) are not the product of intentionally creating a particular number of majority-minority districts or of drawing districts to maintain an arbitrary numerical minority percentage or meet a mechanical racial target. Rather, crossover districts are the product of

applying traditional districting principles while considering race where necessary to afford all members of the electorate an equal "opportunity ... to elect representatives of their choice."  52 U.S.C. § 10301(b).

That effective crossover districts can be used to remedy a VRA violation while simultaneously avoiding any potential claim of racial gerrymandering is well illustrated by the recent remand proceedings following the Supreme Court's decision in *Allen v. Milligan*, 599 U.S. 1 (2023).  On remand from the Supreme Court's holding that Alabama's congressional districting plan violated the VRA, the three-judge court in *Singleton v. Allen*, No. 2:21-cv-1291, 2023 WL 6567895, at *16–17 (N.D. Ala. Oct. 5, 2023), unanimously ordered a remedial plan containing a new district that "is not majority-Black," with a "Black voting-age population [of] 48.7%," but that the court found nonetheless presented "Black voters ... an opportunity to elect a candidate of their choice."  *Id.* at *16.  The Alabama Democratic Caucus (ADC) objected because the remedial plan did "not contain two ***majority***-Black districts" and thus "white voters could theoretically still retain an 'effective veto' over Black voters' choices."  *Id.* at *17 (citation omitted; emphasis added). The court rejected ADC's objection, noting that "[VRA] Section Two ensures only equal opportunity, not a guaranteed result for any group.  Sustaining the ADC's objection would cause us to run afoul of controlling precedent and the text of Section Two itself." *Id.* (citations omitted).  Thus, it is clear that a VRA violation can be remedied with effective crossover districts and that majority-minority districts are not the ***only*** remedial option.

### III. The *Amicus* Map Fully Cures the VRA Defect, Avoids Excessive Consideration of Race, and Complies with All Other Legal Requirements.

Like the three-judge court in Alabama, this Court should consider a remedial congressional districting plan with effective crossover districts. The *Amicus* Map is an example of such a plan. As shown below, the *Amicus* Map:

- contains two Black crossover districts—one based in New Orleans, the other in Baton Rouge—that can elect congressional candidates preferred by Black voters and thus fully cures the VRA violation in the Louisiana Legislature's March 2022 congressional plan, LA. R.S. 18:1276 (2023) ("the 2022 Plan");

- avoids being overly race-conscious by not attempting to hit racial targets or subordinating traditional districting criteria to racial considerations and thus fully cures the Equal Protection violation this Court held was present in the Louisiana Legislature's January 2024 congressional plan, LA. R.S. 18:1276.1 (2024) ("the 2024 Plan"); and

- complies with all other federal and state legal requirements while respecting the legislative policy judgments that the 2022 and 2024 Plans embodied, including by not pairing any incumbent Representatives in the same district and not unduly jeopardizing the reelection prospects of powerful members of Louisiana's congressional delegation, such as Speaker Mike Johnson, Majority Leader Steve Scalise, or Appropriations Committee member Julia Letlow.

The *Amicus* Map is also visually compact—its districts do not contain "any 'tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find' them sufficiently compact." *Allen v. Milligan*, 599 U.S. at 20 (citation omitted).  This can be seen in the color version of the map, as well as color blowups of the New Orleans- and Baton Rouge-based districts (Districts 2 and 6, respectively), which can be found alongside a legal description of all six districts in the Addendum to this brief.  *See Robinson*, 37 F.4th at 218, 222 (assessing compactness after "examin[ing] the shape of proposed districts" and concluding that plaintiffs had showed that their districts were sufficiently compact); *Robinson*, 86 F.4th at 589–95 (similar).[1]

---

[1] *Amici* provided comma-delimited block-equivalency files and a set of shapefiles for the *Amicus* Map to counsel for all parties in *Robinson* so that they could more easily analyze the map themselves.  *Amici* would be happy to supply the same files to the Court and litigants in this case upon request.

# The *Amicus* Map



©2021 CALIPER

*Amici* offer their map for the Court's consideration.  As discussed below, it meets all the criteria for a federal court-imposed remedial plan.

### A.    The *Amicus* Map Fully Cures the VRA Violation in the 2022 Plan.

The *Amicus* Map fully cures the 2022 Plan's VRA violation by including two crossover districts in which Black voters have a fair opportunity to elect their candidates

11

of choice—the New Orleans-based District 2 and the Baton Rouge-based District 6. The effectiveness of both Black crossover districts is evident from the precinct-level results of recent statewide elections, which correlate tightly with congressional-election results. *See Robinson*, M.D. La. No. 3:22-cv-211, Rec. Doc. No. 97, at 19–22 (explaining methodology and correlations).

The following Table One shows the 19 most recent statewide elections in which one candidate is estimated to have received at least 85 percent of the Black vote and received more than one-third of the total vote. The elections are listed in order by the candidate's estimated level of statewide Black support, starting with President Obama, who was preferred by more than 95 percent of all Louisiana Black voters.

TABLE ONE

| Election Month and Year ("p" = primary election) | Office(s) | Candidate(s) Preferred by Black Voters (*italics* indicates Black candidate) | Estimated Percentage Support for Candidate(s) | | 2022 Plan Districts Carried by Black-Preferred Candidate(s) | 2024 Plan Districts Carried by Black-Preferred Candidate(s) | *Amicus* Map Districts Carried by Black-Preferred Candidate(s) |
|---|---|---|---|---|---|---|---|
| | | | Black Voters | White Voters | | | |
| 11/12 | President/VP | *Obama/Biden* | 95 | 12 | 2 | 2, 6 | 2, 6 |
| 12/14 | U.S. Senator | Landrieu | 95 | 17 | 2 | 2, 6 | 2, 6 |
| 11/15 | Governor | J.B. Edwards | 95 | 37 | 2, 3, 4, 5, 6 | 2, 5, 6 | 2, 4, 5, 6 |
| 11/19 | Governor | J.B. Edwards | 95 | 28 | 2 | 2, 6 | 2, 6 |
| 11/16 | President/VP | Clinton/Kaine | 94 | 12 | 2 | 2, 6 | 2, 6 |
| 12/16 | U.S. Senator | Campbell | 94 | 14 | 2 | 2, 6 | 2, 6 |
| 11/19 | Sec'y of State | *Collins-Greenup* | 93 | 15 | 2 | 2, 6 | 2, 6 |
| 11/15 | Lt. Governor | *Holden* | 93 | 22 | 2 | 2, 6 | 2, 6 |
| 11/14p | U.S. Senator | Landrieu | 92 | 20 | 2 | 2, 6 | 2, 6 |
| 10/19p | Governor | J.B. Edwards | 92 | 27 | 1, 2, 3, 4, 5, 6 | 2, 3, 4, 6 | 2, 3, 4, 6 |
| 11/20 | President/VP | *Biden/Harris* | 91 | 14 | 2 | 2, 6 | 2, 6 |
| 10/15p | Sec'y of State | *Tyson* | 91 | 16 | 2 | 2, 6 | 2 |
| 10/19p | Treasurer | *D. Edwards* | 91 | 12 | 2 | 2, 6 | 2 |
| 12/18 | Sec'y of State | *Collins-Greenup* | 90 | 14 | 2 | 2, 6 | 2, 6 |
| 10/19p | Att'y General | *Jackson* | 90 | 11 | 2 | 2, 6 | 2 |
| 11/17 | Treasurer | *D. Edwards* | 90 | 19 | 2 | 2, 6 | 2 |
| 10/19p | Lt. Governor | *Jones* | 89 | 10 | 2 | 2 | 2 |
| 10/19p | Sec'y of State | *Collins-Greenup* | 88 | 12 | 2 | 2, 6 | 2, 6 |
| 10/15p | Governor | J.B. Edwards | 85 | 21 | 2, 4, 5, 6 | 2, 4, 5, 6 | 2, 4, 5, 6 |

13

Table One shows that, under the 2022 Plan, every Black-preferred candidate carried District 2; but none of the candidates, other than Governor Edwards, carried any of the other five districts.  By contrast, under the *Amicus* Map, the Black-preferred candidate would have prevailed not only in the New Orleans-based District 2 in ***all 19 elections*** but also in the Baton Rouge-based District 6 in ***14 of the 19 elections***, including the 11 elections in which the candidate attracted the strongest levels of Black support.  It is telling that each of the last three Democratic presidential tickets lost statewide by nearly 20 points but handily carried the *Amicus* Map's District 2 ***and*** District 6.  In four of the five elections in Table One in which the Black-preferred candidate failed to carry the *Amicus* Map's District 6, the candidate was severely underfunded, received less than 38 percent of the vote statewide, and thus lost in a landslide—a circumstance that would be unlikely in a ***congressional*** election confined to District 6, which in this map is a competitive district likely to attract strong, well-funded candidates.

In any event, the mere fact that Black-preferred statewide candidates have occasionally failed to carry District 6 does not prevent it from fully curing the VRA violation here.  As the Supreme Court has explained, the Act's "ultimate right … is equality of opportunity, not a guarantee of electoral success." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).  "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1017.

Table One also demonstrates one of the two main reasons why the *Amicus* Map's Districts 2 and 6 are effective for Black voters even though their voting-age populations

are not majority-Black:  Although white voters are cohesive in voting against Black-preferred candidates, they are not as cohesive as Black voters are in supporting those same candidates.  On average in these contests, Black voters statewide split about 92 to 8 percent, while white voters split about 85 to 15 percent in the opposite direction.  Beyond this greater cohesion of Black voters, there is also the fact that Louisiana voters who identify as neither Black nor white, including substantial numbers of Latino and Asian-American citizens, consistently vote for Black-preferred candidates.  The latter point is especially salient in the *Amicus* Map's New Orleans-based District 2, where 10 percent of all registered voters identify as neither white nor Black.[2]

As noted earlier (*see supra* Part II), the Supreme Court has expressly encouraged the creation of crossover districts like the *Amicus* Map's Districts 2 and 6, which foster cross-racial coalition-building.  *See Strickland*, 556 U.S. at 23–24.  "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics."  *De Grandy*, 512 U.S. at 1020.

## B.    The *Amicus* Map Is Not Overly Race Conscious.

As this Court has held, the excessive and unjustified consideration of race and racial data can render a district invalid under the Equal Protection Clause if the

---

[2] In November 2020, in the *Amicus* Map's Baton Rouge-based District 6, Joe Biden and Kamala Harris won the Black vote by about 92 percentage points (*i.e.*, about 96% to 4% among major-party voters) and won the non-Black minority vote by about 70 points, but lost the white vote by about 79 points.  In the *Amicus* Map's New Orleans-based District 2, they won the Black vote by about 93 percentage points and won the non-Black minority vote by about 61 points, but lost the white vote by about 30 points.

mapmaker allowed race to predominate over traditional districting criteria such as contiguity, compactness, respect for political subdivisions, and respect for communities of interest. Creating a map—like the *Amicus* Map—with the assistance of computational redistricting can aid in curing a VRA violation without the risk of engaging in excessive race-consciousness, because rather than setting out to create a particular number of majority-Black districts or to hit a particular demographic threshold, computational redistricting instead uses precinct-specific election returns to evaluate actual electoral opportunity for Black voters. When algorithmically drawing a map, the computer performs real-time calculations of returns from recent elections in order to generate and evaluate districts that can provide such opportunity. *See generally* Amariah Becker, Moon Duchin, Dara Gold & Sam Hirsch, *Computational Redistricting and the Voting Rights Act*, 20 ELECTION L.J. 407 (2021).

With the assistance of computational redistricting, the *Amicus* Map's New Orleans-based District 2 and Baton Rouge-based District 6 achieve electoral opportunity for Black voters without attempting to hit any demographic threshold or target, such as being 50 percent or 55 percent Black in voting-age population, or VAP. Table Two presents the relevant figures:

TABLE TWO

| Metric for Black Percentage | *Amicus* Map District 2 Greater New Orleans | *Amicus* Map District 6 Greater Baton Rouge |
|---|---|---|
| Voting-Age Population (2020) | 41.5 | 42.9 |
| Registered Voters (2021) | 42.4 | 44.2 |
| Total Population (2020) | 43.8 | 45.3 |

16

Moreover, it is clear that Louisiana's traditional districting criteria—not race—predominated in crafting the *Amicus* Map generally and Districts 2 and 6 specifically.  As discussed below, the *Amicus* Map fully complies with each of the six criteria the Louisiana Legislature adopted in Joint Rule No. 21:  (1) each congressional district must be "composed of contiguous geography"; (2) the plan must "provide for single-member districts"; (3) each district must "have a population as nearly equal to the ideal district population as practicable"; (4) the plan must "be a whole plan which assigns all of the geography of the state"; (5) "[t]o the extent practicable, each district … [must] contain whole election precincts"; and (6) the plan must "respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable," although "this criterion is subordinate to and shall not be used to undermine the maintenance of communities of interest within the same district to the extent practicable."  HCR 90, 2021 R.S. (effective June 11, 2021); *see also Major v. Treen*, 574 F. Supp. 325, 330–31 (E.D. La. 1983) (three-judge court) (listing traditional districting principles).

## 1.  General Criteria

The *Amicus* Map easily complies with the first five criteria from Joint Rule No. 21:  The Map is a whole plan that assigns all of Louisiana's geography to one of six single-member congressional districts, each of which is composed of contiguous geography and contains whole election precincts and has a population as nearly equal to the ideal district population as practicable (given adherence to the whole-precinct criterion).

### 2.  Geographic Compactness

Although Joint Rule No. 21 does not expressly list geographic compactness as a criterion, it is a traditional redistricting principle in Louisiana and may be inferred from the Joint Rule's references to political subdivisions and communities of interest (discussed in more detail below).  *See Major v. Treen*, 574 F. Supp. at 330–31, 353 n.34. And compactness is a prominent traditional redistricting criterion in the Supreme Court's caselaw on racial gerrymandering.  *See*, *e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 432–33 (2006); *Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality op.). As shown above in the color map, all six districts in the *Amicus* Map are geographically compact—and that is certainly true for Districts 2 and 6.

When evaluating the compactness of a remedial map, the compactness of the 2022 Plan's districts may serve as a useful benchmark for comparison.  Table Three reports three standard mathematical measures of district compactness for the 2022 Plan, the 2024 Plan, and the *Amicus* Map, breaking out the districts with larger Black populations (including both Districts 2 and District 6 in the *Amicus* Map).  For each compactness measure, the scores range from a low near zero, for a dramatically bizarre shape, to a high of one, for a perfect circle.  Table Three shows that the *Amicus* Map's districts are generally more compact than the 2022 or 2024 Plan's—and this is especially true when one focuses on the districts with the greatest Black electoral opportunity.  So it is clear that race did not predominate over the traditional redistricting principle of compactness in drawing the *Amicus* Map's Districts 2 and 6.

**TABLE THREE**

| Compactness Score[3] (higher is better) | All Districts | | | Minority Districts | | |
|---|---|---|---|---|---|---|
| | 2022 Plan | 2024 Plan | *Amicus* Map | 2022 Plan | 2024 Plan | *Amicus* Map |
| Average Polsby-Popper Score | 0.140 | 0.109 | 0.241 | 0.058 | 0.080 | 0.324 |
| Average Reock Score | 0.350 | 0.300 | 0.436 | 0.155 | 0.161 | 0.550 |
| Average Convex Hull Score | 0.621 | 0.608 | 0.738 | 0.383 | 0.502 | 0.767 |

### 3. Respect for Political Subdivisions

The *Amicus* Map is highly respectful of political subdivisions such as Louisiana's 64 parishes and 304 municipalities (cities, towns, and villages). Specifically, the *Amicus* Map splits only 7 parishes and 6 municipalities. And 4 of the 6 split municipalities are divided because a district line follows a parish line and the municipality thus falls into two parishes. The *Amicus* Map thus divides only two municipalities within a single parish: Tangipahoa Parish's Hammond, which the 2022 and 2024 Plans also split, and Lafourche Parish's Lockport.

Significantly, the *Amicus* Map does not split New Orleans, Baton Rouge, Shreveport, Lafayette, Lake Charles, Bossier City, Monroe, Alexandria, Natchitoches, Opelousas, or any other major city.

---

[3] The Polsby-Popper measure focuses on a shape's jaggedness, which would penalize a district shaped like a gear; the Reock measure focuses on elongation, penalizing a district shaped like a string bean; and the Convex Hull measure focuses on concaveness, penalizing a district shaped like a crescent moon.

Furthermore, while the 2022 Plan's majority-Black District 2 divided 9 of the 10 parishes it touched, and the 2024 Plan's two majority-Black districts divided 12 of the 20 precincts they touched, the *Amicus* Map's Districts 2 and 6 divide only 4 of the 16 parishes they touch.  There is not a single parish or municipality that is divided by the *Amicus* Map's District 2 or District 6 that was not already divided in the 2022 Plan.  Thus, race did not predominate over respect for political subdivisions in the *Amicus* Map's districts.

### 4.   Respect for Communities of Interest

The Supreme Court has also noted that a racial-gerrymandering claim can fail if districts were drawn to respect "communities defined by actual shared interests."  *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  Often, a combination of respect for parishes (or, in other States, counties) and municipalities, respect for precincts, and geographic compactness serves as a reasonable proxy for respecting communities of interest.

However, it can also be helpful to understand which parishes should sensibly "go together" in a given congressional district.  Here, "metropolitan statistical areas," or MSAs, are helpful.  "The United States Office of Management and Budget (OMB) delineates [MSAs] according to published standards that are applied to Census Bureau data.  The general concept … is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."[4]

---

[4] *See* U.S. CENSUS BUREAU, ABOUT [METROPOLITAN AND MICROPOLITAN], https://www.census.gov/programs-surveys/metro-micro/about.html (last revised July 25, 2023).

District 2 in the *Amicus* Map contains the core area of Louisiana's largest city, New Orleans, in its entirety, plus all parts of the New Orleans MSA that lie to the core's east or south, including all of Orleans, St. Bernard, and Plaquemines Parishes, and most of Jefferson Parish.  The district largely tracks area code 504.  The Jefferson Parish portion of District 2 covers the entire West Bank and the part of East Bank that abuts New Orleans; so it includes the parish seat, Gretna, the city of Westwego, and unincorporated places such as Marrero, Terrytown, Harvey, Estelle, and the bulk of Metairie.  District 2 thus encompasses every Jefferson Parish suburb that is linked to New Orleans in Louisiana Supreme Court District Seven.  *See Allen v. Louisiana*, 14 F.4th 366, 368 (5th Cir. 2021) (map).  The *Amicus* Map's District 2 contains no territory outside the New Orleans MSA; and more than 88 percent of the remainder of the MSA's population resides in District 1, mostly in St. Tammany, Livingston, and northern Jefferson Parishes.

District 6 in the *Amicus* Map is based in Louisiana's second-largest city, Baton Rouge, which is kept intact.  District 6 contains about 8½ of the 10 parishes that constitute the Baton Rouge MSA, including the Parishes of East Baton Rouge and West Baton Rouge.[5]  More than 85 percent of District 6's residents live in the Baton Rouge MSA.  And almost the entirety of area code 225 falls into this district.

---

[5] The Baton Rouge metropolitan area's population is too large for one congressional district.  Livingston Parish, the one Baton Rouge MSA parish wholly excluded from the *Amicus* Map's District 6, has given each of the last three Democratic presidential tickets less than 15% of the total vote.

The *Amicus* Map's other districts also follow natural communities and MSAs. District 3 contains almost all of Louisiana's Gulf Coast, stretching from Lafourche and Terrebonne Parishes west to the Texas border, and including the entire Lafayette MSA (in Acadiana's Cajun Heartland) in between.  District 4 takes in western Louisiana, from Lake Charles through DeRidder and Fort Johnson (formerly Fort Polk), up to Shreveport and Bossier City (another intact MSA).  And the rest of North Louisiana falls in District 5, a heavily rural and agricultural district that also contains the entirety of the Monroe and Alexandria MSAs.

Overall, the *Amicus* Map is highly respectful of communities defined by actual shared interests.  This is no accident: The algorithm used to help create the *Amicus* Map expressly considered a full hierarchy of socially meaningful geographic areas, from precincts to municipalities to parishes to MSAs.

### C.   The *Amicus* Map Complies with All Other Legal Requirements.

Computational redistricting also helped ensure that the *Amicus* Map complies with all other federal and state legal requirements, including the "one person, one vote" population-equality doctrine and the constitutional limitations on partisanship that constrain court-ordered districting maps.  And the *Amicus* Map generally respects the legitimate policy choices made by the Governor and the Legislature, particularly with respect to incumbent Representatives.

### 1.   Population Equality

The *Amicus* Map complies with the "one person, one vote" principle embodied in Article I, Section 2 of the U.S. Constitution.  That provision does not require that

congressional districts be drawn with "[p]recise mathematical equality," but does require a showing that population differences between districts that could have been, but were not, avoided "were necessary to achieve some legitimate state objective." *Karcher v. Daggett*, 462 U.S. 725, 730, 740 (1983).

The *Amicus* Map has a total deviation of less than 0.008% of the population of an ideal, or average, district—with a difference of only 61 persons between the Map's smallest and largest districts (776,257 residents in District 6 and 776,318 residents in District 4, respectively). The total population deviation in the *Amicus* Map is thus lower than that in the 2024 Plan (87 persons), the 2022 Plan (65 persons), or apparently any congressional plan in the history of Louisiana. Moreover, the *Amicus* Map's deviation is fully justified under the Louisiana Legislature's longstanding policy of keeping all 3,000-plus precincts intact when redrawing congressional lines.[6]

### 2.    Partisan Fairness

Although the Supreme Court has held that partisan-gerrymandering claims are no longer justiciable in federal court, it has also concluded that extreme partisan gerrymanders are "incompatible with democratic principles" and violate the Federal Constitution. *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019) (quotation marks omitted); *see id.* at 730–33 (Kagan, J., dissenting). A court adopting a remedial congressional redistricting plan therefore should avoid any map that is excessively

---

[6] After the 2022 and *Amicus* maps were created, but before the Legislature enacted the 2024 Plan, Vernon Parish merged Precinct 5-1A (in *Amicus* Map's District 5) into Precinct 5-1 (in *Amicus* Map's District 4). For purposes of this brief, *amici* assume that Vernon Parish's 2022 precincts still apply.

partisan.  *See, e.g., Clarke v. Wis. Elections Comm'n*, 998 N.W.2d 370, 399–400 (Wis. 2023) (explaining that courts must "consider partisan impact," to avoid inadvertently selecting remedial maps that "advantage one political party over another"); *Carter v. Chapman*, 270 A.3d 444, 470 (Pa. 2022) (adopting a remedial congressional plan that reflected "statewide partisan preferences" (internal quotation marks omitted)); *Maestas v. Hall*, 274 P.3d 66, 80 (N.M. 2012) (court-ordered plan should "avoid … political advantage to one political party and disadvantage to the other"); *Essex v. Kobach*, 874 F. Supp. 2d 1069, 1090–91 (D. Kan. 2012) (rejecting proposed maps that "appear to be motivated in part by political considerations that do not merit consideration by the Court"); *see also Gaffney v. Cummings*, 412 U.S. 735, 736, 752 (1973) (approving a plan intended to "achieve 'political fairness' between the political parties").  And this is especially true here in Louisiana, where the state constitution expressly forbids arbitrary, capricious, and unreasonable discrimination based on "political ideas or affiliations."  LA. CONST. art. I, § 3.

The *Amicus* Map easily satisfies any reasonable standard for partisan fairness.  In a state where the last four Democratic presidential candidates all received between 38 and 41 percent of the total vote and their Republican counterparts all received between 57 and 59 percent, it is eminently reasonable for a six-district plan to contain two districts that lean Democratic and four districts that lean Republican.

### 3.   Avoiding Needless Changes

Though it makes adjustments to comply with the Equal Protection Clause and the VRA, the *Amicus* Map otherwise leaves untouched many features from the 2022 and 2024

24

Plans and the legitimate legislative policy choices undergirding them.  As already noted, the *Amicus* Map is highly respectful of the traditional redistricting criteria that the Louisiana Legislature expressly adopted in 2021, including population equality, contiguity, parish integrity, municipal integrity, and maintenance of communities of interest.

Furthermore, the *Amicus* Map keeps the vast majority of Louisianans—more than 3 million residents—in the same congressional district in which they resided for the 2022 elections, with their current Representative chosen under the 2022 Plan.  Not surprisingly, District 6 and its neighbor, District 1, retain less of their prior cores than do the other districts.  But even District 6 retains more than 57 percent of its constituents. And the New Orleans-based District 2 retains nearly two-thirds of its constituents.  In the western part of the state, where the impact of replacing one minority-electoral-opportunity district with two is muted, Districts 3, 4, and 5 each keep almost three-quarters of their constituents in the same district as under the 2022 Plan.

Significantly, none of the *Amicus* Map's districts contains the residences of more than one U.S. Representative.  So, like the 2022 and 2024 Plans, the *Amicus* Map would avoid pitting two sitting Members of Congress against each other in the 2024 elections. And, consistent with the expressed wishes of the Legislature and the Governor, the *Amicus* Map does not unduly jeopardize the reelection prospects of powerful members of Louisiana's congressional delegation, such as Speaker Mike Johnson, Majority Leader Steve Scalise, or Appropriations Committee member Julia Letlow.  With the exception

of Congressman Garret Graves, each Republican incumbent would reside in a district where President Trump prevailed in 2020 by a margin of at least 25 points.

### CONCLUSION

*Amici curiae* offer their *Amicus* Map, generated with the assistance of computational redistricting, for the Court's consideration in this remedial process. Counsel for *amici* stand ready, should the Court so request, to participate in the upcoming status conference regarding this case's remedial stage and in any other proceedings where *amici* can be helpful to the Court.

Dated: May 3, 2024                          Respectfully submitted,

**JENNER & BLOCK LLP**                **BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.**

                                             */s/ Judy Y. Barrasso*
Sam Hirsch*                                Judy Y. Barrasso (La. Bar No. 2814)
Jessica Ring Amunson*                      Mithun B. Kamath (La. Bar No. 35504)
Sophia W. Montgomery*                      BARRASSO USDIN KUPPERMAN
JENNER & BLOCK LLP                           FREEMAN & SARVER, L.L.C.
1099 New York Avenue, NW,                  909 Poydras Street, Suite 2350
  Suite 900                                New Orleans, LA 70112
Washington, D.C. 20001                     Tel: (504) 589-9700
(202) 639-6000                             Fax: (504) 589-9701
shirsch@jenner.com                         jbarrasso@barrassousdin.com
jamunson@jenner.com                        mkamath@barrassousdin.com
smontgomery@jenner.com

* *Pro hac vice pending*

                                           *Counsel for Amici*

ADDENDUM

The *Amicus* Map—Statewide



©2021 CALIPER

The *Amicus* Map's New Orleans-Based District 2



The *Amicus* Map's Baton Rouge-Based District 6



### The *Amicus* Map's Congressional-District Components

The *Amicus* Map divides the State of Louisiana into six congressional districts:

District 1 is composed of Precincts 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 25, 26, 27, 33, 35, 41, 72, 76, 77, and 78 of Ascension Parish; Precincts 1, 1-H, 1-K, 2, 2-H, 2-K, 3-H, 3-K, 4-H, 4-K, 5-H, 5-K, 6-H, 6-KA, 6-KB, 7, 7-H, 7-KA, 7-KB, 8-H, 8-K, 9-H, 9-K, 10-K, 11-K, 12-K, 13-KA, 13-KB, 14-K, 15-K, 16-K, 17-K, 18-K, 19-K, 20-K, 21-K, 22-K, 23-K, 24-K, 25-K, 26-K, 27-K, 28-K, 29-K, 30-K, 31-K, 33-K, 34-K, 35-K, 51, 52, 53, 54, 55, 56, 57, 104, 105, 108, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125A, 125B, 126, and 130 of Jefferson Parish; Precincts 8-1, 9-1, 9-2, 10-1, 10-2, and 10-15 of Lafourche Parish; Livingston Parish; St. Charles Parish; Precincts 4-13, 5-1, and 5-4 of St. John the Baptist Parish; St. Tammany Parish; Precincts 44, 70, 70A, 71, 72, 72A, 73, 74, 102, 104, 104A, 106, 106A, 108, 110, 112, 114, 116, 118, 120, 120A, 120B, 122, 122A, 122B, 124, 124A, 137, 137A, 137B, 137C, 137D, 139, 141, 141A, 143, 143A, 145, 147, 149, 149A, and 151 of Tangipahoa Parish; and Washington Parish.

District 2 is composed of the Precincts of Jefferson Parish that are not located in District 1; Orleans Parish; Plaquemines Parish; and St. Bernard Parish.

District 3 is composed of Acadia Parish; Precincts 260, 261, 262, 800, 801, 860S, and 861E of Calcasieu Parish; Cameron Parish; Iberia Parish; Jefferson Davis Parish; Lafayette Parish; the Precincts of Lafourche Parish that are not located in District 1; St. Martin Parish; St. Mary Parish; Terrebonne Parish; and Vermilion Parish.

District 4 is composed of Beauregard Parish; Bienville Parish; Bossier Parish; Caddo Parish; the Precincts of Calcasieu Parish that are not located in District 3;

Claiborne Parish; De Soto Parish; Red River Parish; Sabine Parish; the Precincts of Vernon Parish that are not located in District 5; and Webster Parish.

District 5 is composed of Allen Parish; Avoyelles Parish; Caldwell Parish; Catahoula Parish; Concordia Parish; East Carroll Parish; Evangeline Parish; Franklin Parish; Grant Parish; Jackson Parish; LaSalle Parish; Lincoln Parish; Madison Parish; Morehouse Parish; Natchitoches Parish; Ouachita Parish; Rapides Parish; Richland Parish; St. Landry Parish; Tensas Parish; Union Parish; Precincts 5-1A, 6-1, 6-3, 8-2, and 8-3 of Vernon Parish; West Carroll Parish; and Winn Parish.

District 6 is composed of the Precincts of Ascension Parish that are not located in District 1; Assumption Parish; East Baton Rouge Parish; East Feliciana Parish; Iberville Parish; Pointe Coupee Parish; St. Helena Parish; St. James Parish; the Precincts of St. John the Baptist Parish that are not located in District 1; the Precincts of Tangipahoa Parish that are not located in District 1; West Baton Rouge Parish; and West Feliciana Parish.

The precincts listed here are the precincts that the Legislature used in Act 5 of the Veto Session of 2022 (the "2022 Plan"), which generally track the precincts it used in Act 2 of the First Extraordinary Session of 2024 (the "2024 Plan").