**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

PHILLIP CALLAIS, et al.,

        *Plaintiffs*,

    v.

NANCY LANDRY, in her official capacity as
Secretary of State of Louisiana,

        *Defendant*.

Civil Action No.: 3:24-cv-00122-DCJ-CES-RRS

**BRIEF FOR THE PROJECT ON FAIR REPRESENTATION
AS *AMICUS CURIAE* REGARDING REMEDIES**

R. Chaz Coleman (Bar No. 38165)
AYRES, SHELTON, WILLIAMS,
BENSON & PAINE, LLC
333 Texas Street (71101)
P.O. Box 1764
Shreveport, LA 71166
(318) 227-3305
ChazColeman@arklatexlaw.com

Christopher E. Mills*
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law
**Pro hac vice* admission pending

# TABLE OF CONTENTS

Table of Authorities .............................................................................................................. ii

Introduction ........................................................................................................................... 1

Interest of *Amicus Curiae* ................................................................................................... 3

Argument ............................................................................................................................... 4

    I.    A remedial map should reflect the realities of multi-racial neighborhoods...................... 4

        A.   Proportional representation is not the norm in single-member districts. .................... 4

        B.   Forcing proportional representation results in racial discrimination........................... 6

    II.   Statutory fears are irrelevant to a constitutional remedy. .................................................. 9

        A.   The Reconstruction Amendments give Congress power to stop States' discrimination—they do not give States power to keep discriminating. ........................... 9

        B.   Judicial remedies receive no deference of the kind that might be afforded States.... 14

Conclusion ........................................................................................................................... 18

# TABLE OF AUTHORITIES

CASES

*Abrams v. Johnson*, 521 U.S. 74 (1997) ................................................................. 11

*Allen v. Milligan*, 599 U.S. 1 (2023) ................................................................. 6, 7

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) ........................................... 17

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................................. 18

*Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178 (2017)................................................... 15, 16

*Bush v. Vera*, 517 U.S. 952 (1996) ............................................... 3, 7, 13, 14, 17

*Callais v. Landry*, No. 3:24-CV-00122, 2024 WL 1903930 (W.D. La. Apr. 30, 2024) ........... 2, 4

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................................................. 12

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ................................................ 8, 13

*Cooper v. Harris*, 581 U.S. 285 (2017) ................................................................. 15

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ................................................................. 15

*Easley v. Cromartie*, 532 U.S. 234 (2001)................................................................. 15

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) ................................................................. 18

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ................................................................. 2

*Gregory v. Ashcroft*, 539 U.S. 461 (2003) ................................................................. 18

*Hays v. Louisiana*, 862 F. Supp. 119 (W.D. La. 1994) ................................................................. 6

*Hirabayashi v. United States*, 320 U.S. 81 (1943)................................................................. 7

*Holder v. Hall*, 512 U.S. 874 (1994)................................................................. 9

*Johnson v. De Grandy*, 512 U.S. 997 (1994)................................................................. 8

*Korematsu v. United States*, 323 U.S. 214 (1944)................................................................. 13

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ................................... 7, 17

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ................................................................. 18

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................................................. 11, 12

*Miller v. Johnson*, 515 U.S. 900 (1995)................................................... 7, 8, 15, 16

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................................. 16

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ........... 14, 16, 17

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ................................................................. 7

*Robinson v. Ardoin*, No. 22-CV-211-SDD-SDJ, 2024 WL 1812141
    (M.D. La. Apr. 25, 2024)................................................................. 10

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ................................................................. 4

*Shaw v. Reno*, 509 U.S. 630 (1993) ................................................................. 8, 9, 18

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ...................................................... 11, 13

*Simon & Schuster, Inc.* v. *Members of New York State Crime Victims Bd.*,
   502 U.S. 105 (1991) ......................................................................................... 16

*Sole v. Wyner*, 551 U.S. 74 (2007) ............................................................................ 14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
   600 U.S. 181 (2023) ........................................................................... 7, 8, 11, 12

*United States v. Georgia*, 546 U.S. 151 (2006) ........................................................ 10

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) .................................................. 15

*Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........ 15

*Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398 (2022) ............ 8

*Wright v. Rockefeller*, 376 U.S. 52 (1964) ................................................................. 8

**STATUTES**

52 U.S.C. § 10301 ...................................................................................................... 11

Civil Rights Act of 1866 § 1, 14 Stat. 27 ................................................................... 12

**OTHER AUTHORITIES**

*2022: ACS 1-Year Estimates Data Profiles*, U.S. Census Bureau, https://data.census.gov/table/
   ACSDP1Y2022.DP05?g=040XX00US12 (last visited May 14, 2024) (providing data for
   Floridian population) ......................................................................................... 5

Amar, *The Lawfulness of Section 5—and Thus of Section 5*,
   126 Harv. L. Rev. F. 109 (2013) .................................................................. 11, 12

Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801 (2010) ........................... 12

Chen & Stephanopoulos, *The Race-Blind Future of Voting Rights*, 130 Yale L.J. 862 (2021) ..... 6

Cong. Globe, 39th Cong., 1st Sess. (1866) ............................................................... 12

Duchin & Spencer, *Models, Race, and the Law*, 130 Yale L.J.F. 744 (2021) ............... 6

Duchin et al., *Locating the Representational Baseline: Republicans in Massachusetts*, 18
   Election L.J. 388 (2019) ..................................................................................... 4

Fernandez, *The Constitutionality of the Fourteenth Amendment*,
   39 S. Cal. L. Rev. 378 (1966) ............................................................................. 11

*Florida 11th Congressional District Demographics*, BiggestUSCities.com (Mar. 1, 2022),
   https://www.biggestuscities.com/demographics/fl/11th-congressional-district ........................ 5

Goldstein, *The Birth and Rebirth of Civil Rights in America*, 50 Tulsa L. Rev. 317 (2015) ........ 12

*Gramercy Town, Louisiana*, United States Census Bureau, https://tinyurl.com/2m6hmhd7 (last
   visited May 14, 2024) ......................................................................................... 6

Lash, *Enforcing the Rights of Due Process: The Original Relationship between the Fourteenth
   Amendment and the 1866 Civil Rights Act*, 106 Geo. L.J. 1389 (2018) .................................. 11

*Louisiana: 2020 Census*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/louisiana-population-change-between-census-decade.html ...................................................................................... 5

*Quick Facts*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/US/RHI225222#RHI225222 (last visited May 14, 2024) ................................. 5

*QuickFacts: St. James Parish, Louisiana*, United States Census Bureau https://tinyurl.com/mwr47bvv (last visited May 14, 2024) ...................................... 6

*Race and Ethnicity in the United States: 2010 Census and 2020 Census*, U.S. Department of Commerce: U.S. Census Bureau, https://tinyurl.com/bp5zn23h (last visited May 13, 2024) ...................................................................... 5, 6

*Rich, Poor, Young, Old: Congressional Districts at a Glance*, Bloomberg Government (Sep. 15, 2017), https://about.bgov.com/news/rich-poor-young-old-congressional-districts-glance/ ....... 5

Tsesis, *Enforcement of the Reconstruction Amendments*, 78 Wash. & Lee L. Rev. 849 (2021) .. 12

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ................................................................... 2, 7, 9, 13, 16

U.S. Const. amend. XIV, § 5 ............................................................................... 10

U.S. Const. amend. XV, § 2 ................................................................................. 10

U.S. Const. art. VI, cl. 2 ...................................................................................... 16

## INTRODUCTION

All too often, Voting Rights Act litigation in the last 40 years has led to voters being cobbled together by race. Even as societal racial segregation wanes and our neighborhoods better reflect the diversity of America, some States wield the VRA to force us backwards, splitting apart multi-racial and multi-ethnic neighborhoods to create racially homogeneous voting districts. To be sure, sometimes this state action comes after pressure from litigants or courts. But no matter its impetus, treating citizens differently based on their race violates the Constitution.

Here, pressured by a VRA suit, Louisiana voluntarily enacted a new congressional map in an extraordinary legislative session with a singular purpose: to separate citizens by race and create another majority-minority district. Of course, as with every state action, Louisiana had secondary purposes too, including protecting incumbents and satisfying other redistricting criteria. But it is undeniable that SB8 would not exist absent a dominating intent to draw another majority-minority district—thereby providing less than proportional representation to Louisiana's non-black voters. That was the point of SB8's expedited proceedings, which lasted just eight days from introduction to signature into law.

Unfortunately, this situation exemplifies the mismatch between the VRA's original goal—to enfranchise black voters—and its applications today. Not only have racial attitudes dramatically changed for the better since the VRA's passage in 1965, but three developments in the last 40 years have turned the VRA on its head. The first was the development of powerful and affordable microprocessors and software that facilitated the creation of voting districts constructed with extremely small units of race-specific geography strung together over disparate land areas—in other words, racial gerrymandering. The second was the acceleration of suburban population

growth throughout the nation in multi-racial neighborhoods. The third was the development of jurisprudence geared toward "fair representation" of racial groups instead of individual rights.

Today, black and Hispanic candidates, like white candidates, almost always succeed or fail based on their partisan affiliation, and very rarely because of their race.[1] Yet thanks to the developments just discussed, modern applications of the VRA tend to engineer election outcomes in which minority voters elect minority candidates in proportion to their percentage of the population, free from the hassles of forming multi-racial coalitions. The quest to achieve racially proportional representation thus results in racially gerrymandered voting districts.

That's what happened here. On a quest to draw a second majority-minority district, Louisiana subordinated other considerations to race and divided neighborhoods up, block by block, to ensure sufficient racial segregation in its congressional map. In the process, Louisiana "fenc[ed] [non-black] citizens out of" districts so that black voters could have super-proportional representation. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960). The result was a convoluted map that never would've existed without making race the main consideration.

This Court already correctly held "that SB8 violates the Equal Protection Clause as an impermissible racial gerrymander." *Callais v. Landry*, No. 3:24-CV-00122, 2024 WL 1903930, at *24 (W.D. La. Apr. 30, 2024). The Fourteenth and Fifteenth Amendments "nullif[y] sophisticated as well as simple-minded modes of discrimination." *Gomillion*, 364 U.S. at 342 (cleaned up). This brief offers two arguments for the Court's consideration as it analyzes potential remedial maps. First, the Court should consider Louisiana's demographically diverse neighborhoods and prioritize *maintaining* those neighborhoods—rather than segregating them block-by-block, as the State did

---

[1] *See* Borelli, *Americans differ over how important it is for political candidates they support to share their personal traits*, Pew Research Center (Oct. 3, 2023), https://tinyurl.com/35av7ryj.

in SB8, in pursuit of an artificial proportional (or more) representation for a particular racial group. Second, any tentative findings of the district court in *Robinson* about the VRA are irrelevant to this Court's duty to fully remedy the State's constitutional violation. The Reconstruction Amendments' extraordinary authority, including the power to enforce the Fourteenth Amendment's guarantee of equal protection, was given to Congress to combat continued state efforts to discriminate based on race. Louisiana's map is an *example* of state racial discrimination, so the State cannot claim refuge in the VRA—nor can any party use the VRA to perpetuate unconstitutional discrimination. This Court has no leeway to depart from the Constitution.

As Justice O'Connor explained, "At the same time that we combat the symptoms of racial polarization in politics, we must strive to eliminate unnecessary race-based state action that appears to endorse the disease." *Bush v. Vera*, 517 U.S. 952, 993 (1996) (concurring opinion). Louisiana's SB8 manifests discrimination that the Constitution bars, and the Court should fully remedy that discrimination.

## INTEREST OF *AMICUS CURIAE*

The Project on Fair Representation is a public-interest organization committed to the principle that racial and ethnic classifications are unconstitutional, unfair, and harmful. It works to advance race-neutral rules in education, government action, and voting. The Project pursues these goals through education and advocacy and has been involved in several cases before the Supreme Court involving these important issues. The Project opposes racial gerrymandering of all kinds. Eliminating racial sorting in districting is not only what our Constitution requires, but it is also a needed remedy for our Nation's increasingly polarized and racialized politics. Because SB8 structures elections based on citizens' races, the Project has a direct interest in this case.

## ARGUMENT

**I.    A remedial map should reflect the realities of multi-racial neighborhoods.**

When considering remedial maps, the Court should consider the realities of Louisiana's multi-ethnic and multi-racial neighborhoods dispersed throughout the State—and prioritize keeping those neighborhoods together. The Court should not segregate those neighborhoods in pursuit of misplaced notions about proportional representation.

**A.    Proportional representation is not the norm in single-member districts.**

As Louisiana legislators repeatedly explained, the fundamental point of SB8 was "to draw a second majority-minority seat." *Callais*, 2024 WL 1903930, at *8. The legislators worked backwards from that assumption of a need for "proportional" representation for black voters. But this assumption of proportional representation turns out to be far less defensible than it appears. That is because "the representational baseline for single-member districts is strongly dictated by the specific political geography of each time and place." Duchin et al., *Locating the Representational Baseline: Republicans in Massachusetts*, 18 Election L.J. 388, 392 (2019). And Louisiana features a widely-dispersed black population, with citizens of every race mingling in neighborhoods throughout the State. That dispersion means that proportional representation is not the norm: it can be achieved only through intentional racial division.

Many examples from elsewhere prove the general point. In Massachusetts, for instance, Republican voters are 35 percent of the population but because of their uniform distribution throughout the state, "1/3 of the vote prov[es] insufficient to secure any representation." *Id.* at 389 (emphasis omitted); *cf. Rucho v. Common Cause*, 588 U.S. 684, 705 (2019) (noting that in 1840, the Whigs in Alabama "garnered 43 percent of the statewide vote, yet did not receive a single seat" in the House of Representatives). Likewise, even though the population of the United States is

about 14% black,[2] no U.S. Senate district (a State) is majority black. Twenty-one percent of Floridians are at least 65 years old, but they do not have a majority in any of the State's 27 U.S. House districts—even in District 11, the U.S. congressional district with the highest percentage of citizens 65 and older.[3] At the extreme, take a hypothetical ten-district state with 100 voters per district, in which a group constituting only 50 percent of the population (500 voters) could form a majority in nine districts if their geographic dispersion was such that those districts each contained 51 group members. The point is that political geography matters.

What is true nationally is true in Louisiana. Fifty-three of Louisiana's 64 parishes are majority white, and only five are majority black.[4] Louisiana's "Black populations" are "very dispersed" "in virtually every parish in the state."[5] Black Louisianians live in majority-white places like Gramercy (St. James Parish, 47.2% black) and Vidalia (Concordia Parish, 39.2% black), exemplifying the fact that "the entire state has noteworthy local areas of statistically significant clusters," "and the Black voting age population clusters are often not close together."[6] That trend

---

[2] *See Quick Facts*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/US/RHI225222#RHI225222 (last visited May 14, 2024).

[3] *See 2022: ACS 1-Year Estimates Data Profiles*, U.S. Census Bureau, https://data.census.gov/table/ACSDP1Y2022.DP05?g=040XX00US12 (last visited May 14, 2024) (providing data for Floridian population); *Florida 11th Congressional District Demographics,* BiggestUSCities.com (Mar. 1, 2022), https://www.biggestuscities.com/demographics/fl/11th-congressional-district (providing data for Eleventh District); *Rich, Poor, Young, Old: Congressional Districts at a Glance*, Bloomberg Government (Sep. 15, 2017), https://about.bgov.com/news/rich-poor-young-old-congressional-districts-glance/ (same).

[4] *Race and Ethnicity in the United States: 2010 Census and 2020 Census*, U.S. Department of Commerce: U.S. Census Bureau, https://tinyurl.com/bp5zn23h (last visited May 13, 2024).

[5] Defendants' Amended Joint Proposed Findings of Fact and Conclusions of Law 43, *Robinson v. Landry*, No. 22-cv-00211, Doc. 166 (M.D. La. May 23, 2022). Cites hereinafter to this *Robinson* docket are listed as "*Robinson* Doc."

[6] Expert Report of Dr. Alan Murray 5, 25, *Robinson* Doc. 169-12; *see Louisiana: 2020 Census*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/louisiana-population-change-between-census-decade.html; *QuickFacts: St. James Parish, Louisiana*, United States Census Bureau https://tinyurl.com/mwr47bvv (last visited May 14,

has only increased in recent years. For instance, Hurricane Katrina "significantly accelerated the dispersion of Black voters from Southeastern Louisiana to other areas."[7] Every Louisiana parish became more diverse from 2010 to 2020, making a compact district composed mostly of one racial group all the more unlikely.[8] Thus, as a matter of political geography, Louisiana's longstanding single majority-minority district comes as no surprise: "demographic distribution is simply too diffuse to generate a majority voting age population in any district outside of the Orleans Parish region." *Hays v. Louisiana*, 862 F. Supp. 119, 124 n.4 (W.D. La. 1994) (*Hays II*).

### B.    Forcing proportional representation results in racial discrimination.

As the Supreme Court recently explained, "as residential segregation decreases—as it has sharply done since the 1970s—satisfying traditional districting criteria such as the compactness requirement becomes more difficult" in designing maps that purport to provide "proportional representation." *Allen v. Milligan*, 599 U.S. 1, 28–29 (2023) (cleaned up). That is another way of saying that drawing proportional maps increasingly requires subordinating traditional districting criteria to race. "In most states, it seems, minority voters are geographically distributed in such a way that a proportional share of reasonable-looking opportunity districts cannot be drawn." Chen & Stephanopoulos, *The Race-Blind Future of Voting Rights*, 130 Yale L.J. 862, 921 (2021).

Using computer models, experts have drawn "two million maps made for Louisiana's congressional delegation" that are compact and contiguous (and the proper size), and "just six districting plans included [*one*] majority-Black district." Duchin & Spencer, *Models, Race, and the Law*, 130 Yale L.J.F. 744, 796 n.75 (2021) (emphases altered). "The remaining 1,999,994 plans

---

2024); *Gramercy Town, Louisiana*, United States Census Bureau, https://tinyurl.com/2m6hmhd7 (last visited May 14, 2024).
[7] Doc. 191 ¶¶ 142–43.
[8] *Racial and Ethnic Diversity in the United States*, *supra* note 4.

had *zero* majority-minority districts." *Id.* (emphasis added). Drawing *two* here meant making race the non-negotiable operating principle.

When the government "intentionally creates a majority-minority district, race is necessarily its predominant motivation." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 517 (2006) (Scalia, J., concurring in judgment in part and dissenting in part, joined by Roberts, C.J., and Thomas & Alito, JJ.); *see Vera*, 517 U.S. at 1001 (Thomas, J., concurring in judgment) (a map that "would not have existed but for the express use of racial classifications" "must be viewed as a racial gerrymander"). And the Supreme Court recently reiterated that "[f]orcing proportional representation is unlawful." *Allen*, 599 U.S. at 28.

Forcing proportional representation inevitably means segregating citizens based on their race. But "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 208 (2023) (cleaned up). "For that reason," official "classification or discrimination based on race" is "a denial of equal protection." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up); *see Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting) ("The law" "takes no account of" a citizen's "color when his civil rights as guaranteed by the supreme law of the land are involved.").

Voting laws that prescribe differential treatment for citizens based on their race are not "excepted from standard equal protection precepts." *Miller*, 515 U.S. at 914. "Under the Equal Protection Clause, districting [laws] that sort voters on the basis of race 'are by their very nature

odious.'" *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 401 (2022) (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993)). These laws "tend[] to sustain the existence of ghettos by promoting the notion that political clout is to be gained or maintained by marshaling particular racial, ethnic, or religious groups in enclaves." *Johnson v. De Grandy*, 512 U.S. 997, 1030 (1994) (Kennedy, J., concurring in part and in judgment) (cleaned up).

Recognizing the danger of artificial proportional representation is no mere technicality. "When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." *Miller*, 515 U.S. at 911–12 (cleaned up). "In doing so, the [State] furthers stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Students for Fair Admissions*, 600 U.S. at 221 (cleaned up). These classifications necessarily "promote notions of racial inferiority and lead to a politics of racial hostility." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion). When racial lines are drawn, "the multiracial . . . communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race . . . rather than to political issues are generated; communities seek not the best representative but the best racial . . . partisan." *Reno*, 509 U.S. at 648 (quoting *Wright v. Rockefeller*, 376 U.S. 52, 67 (1964) (Douglas, J., dissenting)).

When considering remedies, the Court should consider these foundational principles and judge proposed maps accordingly. Proportional representation should not be considered a standard or prerequisite—or even significant—in devising an appropriate remedy. That is because, in a state with Louisiana's multi-racial neighborhoods, proportional representation is largely impossible

8

*apart* from intentional race discrimination. Those neighborhoods should be celebrated, recognized as units, and encouraged to stand together in democratic representation. One way to achieve that goal is to rely on elementary school attendance zones, which are drawn using connected neighborhoods. Neighborhoods should *not* be split apart by block to divide citizens based on their race. "[S]ystematically dividing the country into electoral districts along racial lines" is "nothing short of a system of 'political apartheid.'" *Holder v. Hall*, 512 U.S. 874, 905 (1994) (Thomas, J., concurring in judgment) (quoting *Reno*, 509 U.S. at 647).

## II.    Statutory fears are irrelevant to a constitutional remedy.

Several parties and *amici* will argue that in devising an appropriate remedy, the Court should try to balance some tension between the VRA and the Constitution. *See, e.g.*, Doc. 224-1 at 2-3. That should not be a primary consideration, for many reasons. The constitutional violation here was of the Fourteenth Amendment, so this Court's only imperative is to remedy that denial of equal protection based on race. The VRA is essentially irrelevant, particularly since no court reached any final determination about the VRA and the prior law, HB1. Incorporating a State's fears about the VRA into the constitutional remedial analysis would invert the text and history of the Reconstruction Amendments, which sought to prohibit state discrimination—not permit it. Even if Louisiana had limited leeway to adopt a map that deprived citizens of equal protection because of its VRA liability fears, this Court does not. It must follow the Constitution.

### A.    The Reconstruction Amendments give Congress power to stop States' discrimination—they do not give States power to keep discriminating.

The VRA will inevitably be wielded by parties here to support what they see as an appropriate proportional representation. Intervenors, for instance, have already insisted that "the conclusions from the *Robinson* case should be given effect in any remedial plan." Doc. 224-1 at 3. But the only final adjudication against Louisiana was that SB8 violated the Equal Protection

Clause. That violation is what must be remedied. The State's excuse for that violation—a VRA preliminary interpretation with which it disagrees—is irrelevant. Letting that excuse influence the remedial map would contradict the very constitutional provisions that justified the VRA.

Before turning to those provisions and their history, widespread misunderstandings about *Robinson* should be corrected. The State's post-trial brief insisted that "compliance with court orders telling a State how to comply with the VRA necessarily is a compelling interest." Doc. 192 at 9; *see also* Doc. 224-1 at 3 (intervenors invoking "the *Robinson* courts' holdings regarding § 2"). No such order existed: no decision in *Robinson* (that was not vacated) *ordered* the State to do *anything*. As the State previously explained, SB8 "[wa]s not a 'remedial map.'" *Robinson* Doc. 352-1 at 8. Though the old map (HB1) had been subject to legal challenges, "there was *no* judgment or finding of a violation" of the VRA. *Id.* at 9. "[A] trial on the merits had yet to occur when the State passed" SB8. *Id.* Instead of defending HB1 at trial, "the Legislature voluntarily discontinued the challenged practice." *Robinson v. Ardoin*, No. 22-CV-211-SDD-SDJ, 2024 WL 1812141, at *3 (M.D. La. Apr. 25, 2024); *see* Doc. 192 at 1 (State's post-trial brief noting that it "chose" to draw a discriminatory map instead of "go[ing] to trial").

Correcting this misunderstanding lays bare the problem with trying to somehow balance the VRA and the Constitution in this remedial phase. Congress's authority to enact the VRA came from the Fourteenth and Fifteenth Amendments, which permit Congress to "enforce" those amendments' substantive provisions "by appropriate legislation." U.S. Const. amend. XIV, § 5; *id.* amend. XV, § 2. Congress may enforce them "by creating private remedies against the States for actual violations." *United States v. Georgia*, 546 U.S. 151, 158 (2006) (emphasis omitted). In other words, the Reconstruction Amendments sought to give Congress the power to *stop* States from discriminating based on race, not to enable that discrimination.

10

"On its face, [VRA] § 2 does not apply to a court-ordered remedial redistricting plan." *Abrams v. Johnson*, 521 U.S. 74, 90 (1997) ("assum[ing]" without deciding that courts could consider the section in equity). A court-ordered plan is not a "standard, practice, or procedure" "*imposed or applied by any State or political subdivision*." 52 U.S.C. § 10301(a) (emphasis added); *contra* Doc. 224-1 at 2 (intervenors asserting otherwise, without textual or precedential support). Thus, the Court should not use the VRA as a reason to offer any halfway remedy to the racial discrimination in this case. "Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions*, 600 U.S. at 206.

Letting States like Louisiana *continue* discriminating even in part based on race would turn the Reconstruction Amendments on their head. Those amendments conferred "extraordinary" power on Congress to *remedy* racial discrimination—not power on States to propound it. *Shelby Cnty. v. Holder*, 570 U.S. 529, 546 (2013). The history of the Reconstruction Amendments confirms this lesson. In the wake of the Civil War, Congress recognized that the role of rebuilding had to be placed "in the hands of men who would be loyal to the Union." Fernandez, *The Constitutionality of the Fourteenth Amendment*, 39 S. Cal. L. Rev. 378, 385 (1966). The Reconstruction Congress understood that this responsibility could not be left to the States: Northern states denied black people the right to vote, ex-Confederate soldiers threatened to disarm and murder freedmen, and the South was implementing the Black Codes. *See McDonald v. City of Chicago*, 561 U.S. 742, 772 (2010); Amar, *The Lawfulness of Section 5—and Thus of Section 5*, 126 Harv. L. Rev. F. 109, 113 (2013); Lash, *Enforcing the Rights of Due Process: The Original Relationship between the Fourteenth Amendment and the 1866 Civil Rights Act*, 106 Geo. L.J. 1389, 1396 (2018). Congressional Republicans, heeding the lessons of the Civil War, understood that the restoration of the Union required a strong federal government and protection of civil rights.

11

*See Students for Fair Admissions*, 600 U.S. at 239 (Thomas, J., concurring); Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801, 1807, 1810 (2010). The job of reconstructing the Union fell to the federal government.

Faced with the responsibility of stabilizing a wounded nation, the federal government sought to exercise greater power. Using the Republican Guarantee Clause, Congress forced southern States to adopt new constitutions that "establish[ed] a race-neutral voting system" and "promise[d] to maintain this race-neutral suffrage regime forever thereafter." Amar, *supra*, at 111. Congress also passed the Civil Rights Act of 1866 to outlaw slavery, guarantee equal protection, and expand citizenship to all those born on U.S. soil regardless of race. § 1, 14 Stat. 27.

But some questioned whether Congress had authority to enforce the Civil Rights Act. In his veto message to Congress, President Johnson wrote that the provisions of the Act "destroy our federative system of limited powers and break down the barriers which preserve the rights of the States." Cong. Globe, 39th Cong., 1st Sess. 1681 (1866). Even Representative John Bingham, a zealous supporter of civil rights and key framer of the Fourteenth Amendment, viewed the Civil Rights Acts as exceeding congressional authority. Goldstein, *The Birth and Rebirth of Civil Rights in America*, 50 Tulsa L. Rev. 317, 321 (2015).

To remedy this problem and "provide a constitutional basis for protecting the rights set out in the Civil Rights Act of 1866," Congress passed the Reconstruction Amendments. *McDonald*, 561 U.S. at 775. These amendments included enforcement clauses "drafted to give Congress the power to act against state racial discrimination." Tsesis, *Enforcement of the Reconstruction Amendments*, 78 Wash. & Lee L. Rev. 849, 904 (2021). These amendments enabled the federal government to "intrude[] into legislative spheres of autonomy previously reserved to the States." *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (cleaned up). And they

12

enabled the federal government to use remedies like the VRA's, all thanks to "the authority of Congress under the Reconstruction Amendments." *Vera*, 517 U.S. at 992 (O'Connor, J., concurring). The federal VRA was "part of the apparatus chosen by Congress to effectuate this Nation's commitment to confront its conscience and fulfill the guarantee of the Constitution with respect to equality in voting." *Id.* (cleaned up). Congress considered the VRA "necessary and appropriate to ensure full protection of the Fourteenth and Fifteenth Amendments rights." *Id.* (cleaned up).

States do not share those same congressional prerogatives under the Reconstruction Amendments. Of course, federalism did not end with the passage of the Fourteenth Amendment, and states "retain broad autonomy in structuring their governments and pursuing legislative objectives," including "the power to regulate elections." *Shelby County*, 570 U.S. at 543 (cleaned up). Louisiana can adopt laws that expand the protections available to voters. But it must not violate citizens' rights under the Fourteenth Amendment. Race-based laws, by their very nature, entail discrimination: one group receives preferential treatment. When it comes to laws that require governments to divide citizens based on race, the Fourteenth Amendment made clear that "[n]o State shall" "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

In sum, letting a State's (or other parties') VRA excuses or litigating tactics limit a constitutional remedy in this case gets the text, history, and context of the Reconstruction Amendments backwards. No matter how necessary Louisiana might have thought its law, "[t]he history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." *J.A. Croson*, 488 U.S. at 501 (citing *Korematsu v. United States*, 323 U.S. 214, 235–240 (1944) (Murphy, J.,

dissenting)). "[W]orking backward to achieve a particular type of racial balance" "is a fatal flaw." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729 (2007) (plurality opinion). Speculation about the VRA should not place any significant role in this Court's remedy.

  **B.**  **Judicial remedies receive no deference of the kind that might be afforded States.**

  Another problem with devising some halfway remedy between SB8's discriminatory map and what the Constitution commands is that the Court does not have any leeway like States purportedly have to depart from equal protection principles. Louisiana's post-trial brief asserted that "S.B. 8 is unquestionably constitutional" because the "State chose" to redraw its maps using "two majority-Black district[s]" "as a baseline" instead of defending HB1—because of its perception that one judge would rule against it. Doc. 192 at 1–2. The Supreme Court has assumed that compliance with the VRA is a compelling interest under strict scrutiny, and suggested that "deference is due to [States'] reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." *Vera*, 517 U.S. at 978. But any such "flexibility" is one "that federal courts . . . lack." *Id.* So even if States may use fear of a statutory violation to excuse a constitutional one—a highly dubious proposition, as discussed first below—this Court has an obligation to the Constitution.

  To begin, a State cannot show that legislating out of fear of what one judge's preliminary injunction—which had been vacated on appeal—might portend in a future trial is a narrowly tailored way to advance an interest of the highest order. "At the preliminary injunction stage, the court is called upon to assess the probability of the plaintiff's ultimate success on the merits." *Sole v. Wyner*, 551 U.S. 74, 84 (2007). It is "only the parties' opening engagement," and any "provisional relief granted" is "tentative," "in view of the continuation of the litigation to definitively resolve the controversy." *Id.* "[F]he findings of fact and conclusions of law made by a

court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

The scope of appellate review of a preliminary injunction is similarly circumscribed, as the court asks merely "whether the District Court had abused its discretion in issuing a preliminary injunction," an inquiry that is "significantly different" from "a final resolution of the merits." *Id.* at 393. Because of the limited "extent of [the] appellate inquiry," the Fifth Circuit necessarily "intimate[d] no view as to the ultimate merits of [the *Robinson* Plaintiffs'] contentions." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 934 (1975) (cleaned up). To read the *Robinson* decisions otherwise is to assign those courts authority that they did not have. And it defies logic to excuse a State's constitutional violation on the ground that it had "good reason to believe" a § 2 violation existed *when it did not in fact believe that. Cooper v. Harris*, 581 U.S. 285, 302 (2017). "[D]eferring to a State's belief that" someone else might think "it has good reasons to use race—is 'strict' in name only." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 202 (2017) (Thomas, J., concurring in judgment in part and dissenting in part).[9]

More generally, the underlying assumption that compliance with the VRA can justify a constitutional violation is wrong as a matter of first principles. In other words, even assuming passing SB8 was necessary to comply with the VRA, it makes no sense to characterize compliance

---

[9] Of course, *amicus* agrees that it is past time for the Supreme Court to consider the constitutionality of modern misapplications of the VRA § 2. For instance, in almost all other contexts, an "invidious discriminatory purpose" may not be even "a motivating factor." *Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Only here does the Court appear to excuse a State's racial discrimination if it is merely "*a* motivation" rather than "the *predominant* factor." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (cleaned up); *id.* at 257 (permitting "racial considerations" that are not "dominant and controlling"); *but see Miller*, 515 U.S. at 914 ("districting cases" are not "excepted from standard equal protection precepts"). Regardless, SB8's predominant motivation was racial, as this Court correctly found. *See* Doc. 192 at 1–2 (the State explaining that "two majority-Black district[s]" were the "baseline for S.B. 8").

with a *statute* as justifying a violation of the *Constitution*. *See* U.S. Const. art. VI, cl. 2 (Supremacy Clause). This assumption "take[s] the effect of the statute and posit[s] that effect as the [government's] interest." *Simon & Schuster, Inc.* v. *Members of New York State Crime Victims Bd.*, 502 U.S. 105, 120 (1991). "If accepted, this sort of circular defense [would] sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored." *Id.* Congress does not have "the power to determine what are and what are not 'compelling state interests' for equal protection purposes." *Oregon v. Mitchell*, 400 U.S. 112, 295 (1970) (Stewart, J., concurring in part and dissenting in part).

"Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it" compliance with the VRA. *Parents Involved*, 551 U.S. at 732 (plurality opinion). "History should teach" that courts cannot "distinguish good from harmful governmental uses of racial criteria." *Id.* at 742. Any such distinction "reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable." *Id. That* conclusion, in turn, hinges on "the very stereotypical assumptions the Equal Protection Clause forbids." *Miller*, 515 U.S. at 914. Here, it is "based on the demeaning notion that members of the defined racial groups ascribe to certain 'minority views' that must be different from those of other citizens." *Id.* This is "the precise use of race as a proxy the Constitution prohibits." *Id.*

In no other context would courts "assume[] away part of the State's burden to justify its intentional use of race." *Bethune-Hill*, 580 U.S. at 200 (Thomas, J., concurring in judgment in part and dissenting in part). It might have once made sense to assume a compelling interest in complying with § 5 of the VRA, when it was "a proper exercise of Congress's authority" and "remed[ied] identified past discrimination" in "jurisdictions with a history of official

discrimination." *LULAC*, 548 U.S. at 518–19 (Scalia, J., concurring in judgment in part and dissenting in part). As discussed, that does not describe how VRA § 2 is now used. Assuming *now* that compliance with § 2 is a compelling interest absent identifiable (and intentional) past discrimination inverts our constitutional order and the history of the Reconstruction Amendments.

In all events, the only ground on which such a lax "strict scrutiny" application has been justified is deference to States. *See Vera*, 517 U.S. at 978. Regardless of whether that ground is right, it does not apply to Article III courts like this one. Federal courts "lack" the "flexibility" that some cases suggest "the States [have] retain[ed]." *Id.* Leaving "equal protection jurisprudence" to "the mercy of elected government officials"—either state legislatures or Congress—"would be to abdicate [the Court's] constitutional responsibilities." *Parents Involved*, 551 U.S. at 766 (Thomas, J., concurring). The Court should fulfill those responsibilities here by setting aside competing views of the VRA—views that are, incidentally and as is true of practically all modern § 2 litigation, based on partisanship—and fully vindicate the constitutional command of equal protection of the laws.

*          *          *

This Court need not try to accommodate the tentative findings of another court about a law that does not exist in a case that never went to trial and has been dismissed as moot—findings that the State still appears to disagree with yet nonetheless invoked as a shield against complying with the Constitution. This Court's role is to remedy the unconstitutionality of SB8, no more. If the State wishes to ask the Supreme Court to resolve what it views as an impossible command to discriminate based on race while not discriminating based on race, it should do so. Meanwhile, this Court should—must—side with the Constitution. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 n.8 (2020) (plurality opinion) (The judicial authority under Article III

"amounts to little more than the negative power to disregard an unconstitutional enactment." (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).

## CONCLUSION

"[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society." *Fullilove v. Klutznick*, 448 U.S. 448, 548 n.21 (1980) (Stevens, J., dissenting) (cleaned up). "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (plurality opinion) (quoting *Reno*, 509 U.S. at 657). The Court should fully remedy the racial balkanization perpetuated in this case, and thereby "encourage the transition to a society where race no longer matters: a society where integration and color-blindness are not just qualities to be proud of, but are simple facts of life." *Gregory v. Ashcroft*, 539 U.S. 461, 490–91 (2003).

Respectfully submitted,

/s/   R. Chaz Coleman                          /s/   Christopher E. Mills
R. Chaz Coleman (Bar No. 38165)          Christopher E. Mills*
AYRES, SHELTON, WILLIAMS,                  SPERO LAW LLC
BENSON & PAINE, LLC                          557 East Bay St. #22251
333 Texas Street (71101)                       Charleston, SC 29413
P.O. Box 1764                                       (843) 606-0640
Shreveport, LA 71166                            cmills@spero.law
(318) 227-3305                                     *Pro hac vice admission pending
ChazColeman@arklatexlaw.com

May 15, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, I presented the foregoing to the Clerk of Court by filing and uploading to the CM/ECF system, which will send notification of such filing to all parties.

/s/   *R. Chaz Coleman*
R. Chaz Coleman (Bar No. 38165)
Ayres, Shelton, Williams,
Benson & Paine, LLC
333 Texas Street (71101)
P.O. Box 1764
Shreveport, LA 71166
(318) 227-3305
ChazColeman@arklatexlaw.com