| From: | Reply@lawd.uscourts.gov |
|---|---|
| To: | Clerk@lawddb.lawd.gtwy.dcn |
| Subject: | Activity in Case 3:24-cv-00122-DCJ-CES-RRS Callais et al v. Landry Order on Motion for Leave to File |
| Date: | Friday, April 19, 2024 2:28:51 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Western District of Louisiana

### Notice of Electronic Filing

The following transaction was entered on 4/19/2024 at 2:27 PM CDT and filed on 4/19/2024

| | |
|---|---|
| **Case Name:** | Callais et al v. Landry |
| **Case Number:** | 3:24-cv-00122-DCJ-CES-RRS |
| **Filer:** | |
| **Document Number:** | 196(No document attached) |

**Docket Text:**
**ELECTRONIC ORDER: GRANTING [188] Motion for Leave to File Post-Trial Amicus Brief by Edward Galmon, Sr, Ciara Hart, Norris Henderson, Tramelle Howard, Ross Williams. Signed by Circuit Judge Carl E. Stewart, District Judges Robert R. Summerhays and David C Joseph. (crt,LaCombe, L)**

**3:24-cv-00122-DCJ-CES-RRS Notice has been electronically mailed to:**

Carey T Jones      jonescar@ag.louisiana.gov

Paul L Hurd      paul@paulhurdlawoffice.com

Joseph E Cullens, Jr      cullens@lawbr.net, krojas@lawbr.net

Tracie L Washington      tracie.washington.esq@gmail.com

John N Adcock      jnadcock@gmail.com, adcocklawparalegal1@gmail.com

John Carroll Walsh      john@scwllp.com, kimk@scwllp.com

Morgan Elizabeth Brungard      brungardm@ag.louisiana.gov, ecfnotices@ag.louisiana.gov, nelsone@ag.louisiana.gov

Drew C Ensign     densign@holtzmanvogel.com

Phillip J Strach     phil.strach@nelsonmullins.com

Alyssa M Riggins     alyssa.riggins@nelsonmullins.com

Cassie A Holt     cassie.holt@nelsonmullins.com, madison.marlowe@nelsonmullins.com

Jason Brett Torchinsky     jtorchinsky@holtzmanvogel.com, kacres@holtzmanvogel.com

Phillip Michael Gordon     pgordon@holtzmanvogel.com, kacres@holtzmanvogel.com, zhenson@holtzmanvogel.com

Matthew R Mueller     mmueller@gravesgarrett.com, ecf@gravesgarrett.com

Jackson Tyler     jtyler@gravesgarrett.com, ecf@gravesgarrett.com

Daniel Cohen     dcohen@elias.law, daniel-cohen-3121@ecf.pacerpro.com

Qizhou Ge     age@elias.law, alison-qizhou-ge-6711@ecf.pacerpro.com

Abha Khanna     akhanna@elias.law, abha-khanna-6291@ecf.pacerpro.com, docketingelg@elias.law

Lalitha Madduri     lmadduri@elias.law, lalitha-madduri-0956@ecf.pacerpro.com

Jacob D Shelly     jshelly@elias.law, jacob-shelly-1794@ecf.pacerpro.com

Edward D Greim     edgreim@gravesgarrett.com, ecf@gravesgarrett.com

Robert A Atkins     ratkins@paulweiss.com

Amitav Chakraborty     achakraborty@paulweiss.com

Neil Chitrao     nchitrao@paulweiss.com, mao_fednational@paulweiss.com

Yahonnes Cleary     ycleary@paulweiss.com

Jonathan Hurwitz     jhurwitz@paulweiss.com

Robert Klein     rklein@paulweiss.com

Arielle B McTootle     amctootle@paulweiss.com

Adam P Savitt     asavitt@paulweiss.com

Stuart Naifeh     snaifeh@naacpldf.org

I Sara Rohani     srohani@naacpldf.org

Kathryn C Sadasivan     ksadasivan@naacpldf.org

Victoria Wenger     vwenger@naacpldf.org

Daniel Hessel     dhessel@law.harvard.edu

Sarah E Brannon     sbrannon@aclu.org

Megan C Keenan     mkeenan@aclu.org

T Alora Thomas     tthomaslundborg@law.harvard.edu

Colin Burke     cburke@naacpldf.org

Katherine Graves     kgraves@gravesgarrett.com, ecf@gravesgarrett.com

Brennan A R Bowen     bbowen@holtzmanvogel.com

Zachary D Henson     zhenson@holtzmanvogel.com

Ronnie Jared Evans     jevans@naacpldf.org

Garrett Muscatel     gmuscatel@aclu.org, garrmusc@recap.email

A Bradley Bodamer     bbodamer@gravesgarrett.com, ecf@gravesgarrett.com

Sophia Lakin     slakin@aclu.org

**3:24-cv-00122-DCJ-CES-RRS Notice will not be electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **PHILLIP CALLAIS,** *et al.*, | |
| **Plaintiffs,** | |
| **vs.** | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| **NANCY LANDRY, in her official capacity as Louisiana Secretary of State,** | |
| **Defendant.** | |

*GALMON* **AMICI'S POST-TRIAL AMICUS BRIEF**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I. The Middle District and the Fifth Circuit properly determined that a second majority-minority district could be drawn in Louisiana without violating the Equal Protection Clause. ................................................................................................................. 2

    A. The Middle District and Fifth Circuit determined that a second majority-minority district could be drawn without violating the Equal Protection Clause. ................. 2

    B. The Middle District litigation was properly before a single judge. ........................... 4

II. Plaintiffs' racial gerrymandering arguments are meritless. ................................. 8

CONCLUSION .................................................................................................................. 13

CERTIFICATE OF SERVICE ........................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
599 U.S. 1 (2023)......................................................................................7, 8, 9

*Ardoin v. Robinson*,
143 S. Ct. 2654 (2023).....................................................................................11

*Arena v. Graybar Elec. Co., Inc.*,
669 F.3d 214 (5th Cir. 2012) ...........................................................................5

*Armour v. Ohio*,
925 F.2d 987 (6th Cir. 1991) ...........................................................................7

*Bethune-Hill v. Va. State Bd. of Elections*,
580 U.S. 178 (2017)........................................................................................11

*Castañon v. United States*,
444 F. Supp. 3d 118 (D.D.C. 2020) .................................................................6

*Caster v. Merrill*,
No. 2:21-cv-1536-AMM, 2022 WL 264819
 (N.D. Ala. Jan. 24, 2022) ................................................................................8

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987).......................................................................................6, 7

*Chestnut v. Merrill*,
356 F. Supp. 3d 1351 (N.D. Ala. 2019).............................................................5

*Cooper v. Harris*,
581 U.S. 285 (2017).........................................................................................10

*Easley v. Cromartie*,
532 U.S. 234 (2001).........................................................................................10

*Johnson v. Ardoin*,
No. CV 18-625-SDD-EWD, 2019 WL 4318487
(M.D. La. Sept. 12, 2019) .................................................................................5

*Kontrick v. Ryan*,
540 U.S. 443 (2004)...........................................................................................6

iii

*In re Landry*,
  83 F.4th 300 (5th Cir. 2023) ............................................................................10

*Merrell Dow Pharms. Inc. v. Thompson*,
  478 U.S. 804 (1986).............................................................................................6

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022)...........................................................................................8

*Milligan v. Allen*,
  No. 2:21-cv-1530-AMM
  (N.D. Ala. Sept. 5, 2023), ECF No. 272 .........................................................11

*Nixon v. Richey*,
  513 F.2d 430 (D.C. Cir. 1975) ...........................................................................6

*Robinson v. Ardoin*,
  37 F.4th 208 (5th Cir. 2022) ...............................................................................3

*Robinson v. Ardoin*,
  605 F. Supp. 3d 759 (M.D. La. 2022).....................................................2, 3, 10, 12

*Robinson v. Ardoin*,
  86 F.4th 574 (5th Cir. 2023) .......................................................................1, 4, 10

*Sands v. Wainwright*,
  491 F.2d 417 (5th Cir. 1973) ...............................................................................6

*Singleton v. Merrill*,
  No. 2:21-cv-01291-AMM
  (N.D. Ala. Nov. 23, 2021), ECF No. 45 .............................................................8

*The Fair v. Kohler Die & Specialty Co.*,
  228 U.S. 22 (1913)...............................................................................................7

*Theriot v. Parish of Jefferson*,
  185 F.3d 477 (5th Cir. 1999) ............................................................9, 10, 11, 13

*Thomas v. Bryant*,
  919 F.3d 298 (5th Cir. 2019) ...............................................................................5

*Thomas v. Reeves*,
  961 F.3d 800 (5th Cir. 2020) ...........................................................................4, 5

*United States v. Ron Pair Enters., Inc.*,
  489 U.S. 235 (1989).............................................................................................4

*United States v. Texas*,
  523 F. Supp. 703 (E.D. Tex. 1981) ..........................................................................6

*Wilson v. Gooding*,
  431 F.2d 855 (5th Cir. 1970) ...................................................................................6

**Statutes**

28 U.S.C. § 2284(a) ...................................................................................................4, 5

## INTRODUCTION

Plaintiffs' arguments have been rejected or otherwise foreclosed several times over by the Fifth Circuit's decision in *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023). There, the court affirmed the Middle District of Louisiana's conclusion that the Legislature's failure to create a second majority-minority congressional district likely violated Section 2, *notwithstanding* the State's primary defense that any map with two majority-minority districts would run afoul of the Constitution's prohibitions on racial gerrymandering. *See id.* at 583. The Fifth Circuit's rejection of that argument was explicit, *see id.* at 592–95; it was necessary to the court's ultimate holding greenlighting remedial proceedings, *see id.* at 601–02; and it was plainly within the scope of the court's jurisdiction. Federal law required the Section 2 claim to be heard by a single-judge district court, with any injunction appealable to the Fifth Circuit, and those courts' exercise of their ordinary obligation to review defendants' defenses and to order remedies that comply with the Constitution was not beyond their jurisdiction. Accordingly, Plaintiffs' ahistorical effort to scrub the Fifth Circuit's rejection of a racial gerrymandering defense, and their atextual effort to radically expand the narrow statutory requirement for three-judge district courts, should be soundly rejected.

The Fifth Circuit ultimately vacated the preliminary injunction of the then-existing congressional map so that the Legislature could "take advantage of an opportunity to consider a new map now that we have affirmed the district court's conclusion that the Plaintiffs have a likelihood of success on the merits" of their Section 2 claim. *Id.* at 601. That is, the court invited the political branches to decide—free from judicial interference—where to locate the second majority-minority congressional district that federal law compels. Plaintiffs would recast that invitation as a trap: had the Legislature failed to create a second majority-minority district, it would have forfeited its redistricting prerogative to the Middle District; but the Legislature having

1

discharged its obligation, Plaintiffs now say that it forfeited its redistricting prerogative to the

Western District. That is not the law of redistricting. Because the Legislature had good reason to

believe that a second majority-minority district was required, its enactment was lawful. Plaintiffs'

requested injunction should be denied.

## ARGUMENT

I.      **The Middle District and the Fifth Circuit properly determined that a second
        majority-minority district could be drawn in Louisiana without violating the Equal
        Protection Clause.**

At the start of trial, the Court asked (i) whether the Middle District and the Fifth Circuit

determined that two majority-minority congressional districts could be drawn in Louisiana without

violating the Equal Protection Clause and (ii) whether those courts had the statutory authority to

make such a determination. Tr. 36:16–23, ECF No. 184. The answer to both questions is

unequivocally yes.

A.      **The Middle District and Fifth Circuit determined that a second majority-
        minority district could be drawn without violating the Equal Protection Clause.**

Defendants in the Middle District proceedings raised as their primary defense the same

argument that Plaintiffs advance here: that drawing a second majority-minority congressional

district in Louisiana is not possible without violating the Equal Protection Clause. *See, e.g.*,

Combined Opp. to Pls.' Mtn. for Preliminary Injunction at 13, *Robinson v. Ardoin*, No. 3:22-cv-

00211-SDD-SDJ (M.D. La. Apr. 29, 2022), ECF No. 108 ("Plaintiffs' proposed exemplar maps

show that no constitutional second majority-minority congressional district is possible in

Louisiana."). During preliminary injunction proceedings, the Section 2 plaintiffs introduced seven

different illustrative maps demonstrating districting configurations with two majority-minority

districts, all of which the "[d]efendants insist[ed] . . . [we]re racial gerrymanders as a matter of

law" *because* of their second majority-minority district. *Robinson v. Ardoin*, 605 F. Supp. 3d 759,

831 (M.D. La. 2022), *vacated on other grounds and remanded*, 86 F.4th 574 (5th Cir. 2023).

Indeed, Plaintiffs here repeatedly point to Defendants' argument in the Middle District as

conclusive evidence that their views on racial gerrymandering must be true. *See, e.g.*, ECF No. 17-

1 at 4–5, 26 ("The State thereby admitted that it could not create two majority-minority districts

without violating the Constitution."). But there is one glaring fact that Plaintiffs overlook: The

Middle District *rejected* that argument "for both legal and factual reasons," finding "*no factual*

*evidence* that race predominated in the creation of the illustrative maps in this case," and holding

that "all Defendants have demonstrated is that the mapdrawers considered race after they were

asked to consider race. . . . This does not offend the Constitution." 605 F. Supp. 3d at 834–39; *see*

*also id.* at 838 ("Race consciousness does not lead inevitably to impermissible race discrimination."

(quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993))).

Both a motions panel and a merits panel of the Fifth Circuit unanimously agreed with the

Middle District's ruling. The Fifth Circuit motions panel denied the defendants' motion to stay the

preliminary injunction and, in so doing, rejected defendants' racial gerrymandering defense to

Section 2 compliance. *See Robinson v. Ardoin*, 37 F.4th 208, 217 (5th Cir. 2022) (holding that

defendants failed to demonstrate likelihood of success on the merits of their appeal where they had

"put all their eggs in the basket of racial gerrymandering"). The motions panel explained:

> Race was undoubtedly a factor in the drawing of the illustrative maps. But, as the
> district court noted, racial consciousness in the drawing of illustrative maps does
> not defeat a *Gingles* claim. And even if it did, the defendants have not shown that
> the plaintiffs' maps prioritized race so highly as to commit racial gerrymandering,
> **or that complying with the district court's order would require the Legislature**
> **to adopt a predominant racial purpose**.

*Id.* at 222 (emphasis added). The Fifth Circuit merits panel subsequently confirmed that

intentionally drawing maps with two majority-Black districts "does not automatically constitute

racial predominance," *Robinson*, 86 F.4th at 594, and affirmed the district court's "factual findings that the illustrative maps were not racial gerrymanders." *Id.* at 595.

In short, over the last two years, seven federal judges have unanimously held that the illustrative maps provided by the Middle District plaintiffs were not racial gerrymanders, confirming that it is possible to draw two majority-minority congressional districts in Louisiana without offending the Equal Protection Clause.

### B. The Middle District litigation was properly before a single judge.

Not only did the single-judge Middle District court properly exercise jurisdiction over the parties' Section 2 claims and constitutional defenses, but a three-judge court would have been statutorily barred from adjudicating that case. "The three-judge district court statute traces back more than a century. In its long history, no court has applied the statute unless confronted with a challenge to a law's constitutionality." *Thomas v. Reeves*, 961 F.3d 800, 801 (5th Cir. 2020) (en banc) (Costa, J., concurring). This Court should not be the first to suggest otherwise.

The plain language of 28 U.S.C. § 2284(a) provides that "[a] district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed *challenging the constitutionality* of the apportionment of congressional districts or the apportionment of any statewide legislative body" (emphasis added). The text of the statute leaves no room for ambiguity: three-judge courts are convened only where plaintiffs raise constitutional claims. *See, e.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." (citation omitted)). The plaintiffs in the Middle District litigation challenged Louisiana's 2022 congressional plan under Section 2 of the Voting Rights Act, thus raising only statutory—not constitutional—claims. *See* Compl. ¶¶ 164–68, *Robinson v. Ardoin*, No. 3:22-cv-211-SDD-SDJ (M.D. La. Mar. 30, 2022), ECF No. 1; Compl. ¶¶ 93–100, *Galmon v. Ardoin*, No. 3:22-cv-

00214-BAJ-RLB (M.D. La. Mar. 30, 2022), ECF No. 1. Because the plaintiffs in the Middle District litigation do not "challeng[e] the constitutionality of the apportionment of congressional districts," 28 U.S.C. § 2284(a), those cases fall outside the scope of the three-judge court provision.

Fifth Circuit precedent forecloses any argument that a standalone Section 2 claim triggers jurisdiction before a three-judge court. All eleven Fifth Circuit judges who addressed the issue en banc were unanimous that § 2284 does not allow for a three-judge court to hear purely *statutory* challenges to *congressional* maps. *See Reeves*, 961 F.3d at 802 (Costa, J., concurring) (concluding on behalf of six judges that § 2284 "require[s] a three-judge court only for constitutional challenges" to both state legislative and congressional maps); *id.* at 811 (Willett, J., concurring) (concluding on behalf of five judges that § 2284 may require a three-judge court for statutory challenges to state legislative maps but agreeing that "only *constitutional* challenges to *federal* maps require three judges"). Previously, a Fifth Circuit motions panel rejected the proposed invocation of a three-judge court for a Section 2 claim, noting that "no reported case has ever used a three-judge panel for a case challenging district lines only under Section 2 of the Voting Rights Act." *Thomas v. Bryant*, 919 F.3d 298, 304 (5th Cir. 2019); *see also Johnson v. Ardoin*, No. CV 18-625-SDD-EWD, 2019 WL 4318487, at *3 (M.D. La. Sept. 12, 2019) (citing decisions from the Fifth Circuit and district courts in Louisiana, Mississippi, and Alabama to demonstrate that there's no "substantial ground for difference of opinion" on this question); *Chestnut v. Merrill*, 356 F. Supp. 3d 1351, 1354 (N.D. Ala. 2019) ("A claim solely alleging a Section 2 violation falls outside a plain reading of § 2284.").

Section 2284's limitations, moreover, are jurisdictional, and thus not subject to waiver by the parties or discretion by the courts. *See Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 223 (5th Cir. 2012) (holding federal courts "must consider jurisdiction *sua sponte* if not raised by the

parties"). Statutes "delineating the classes of cases . . . falling within a court's adjudicatory authority" serve as limits on federal courts' "subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004). That is just what § 2284 does in defining which cases a three-judge court may hear. As a result, where a case falls outside the three-judge court statute, "there is no . . . jurisdiction" for a three-judge court to hear the case. *Wilson v. Gooding*, 431 F.2d 855, 858 (5th Cir. 1970); *see also Castañon v. United States*, 444 F. Supp. 3d 118, 128 (D.D.C. 2020) (referring to § 2284 as the three-judge court's "statutory jurisdictional grant").[1]

This unwavering jurisdictional limitation applies even where defendants raise a constitutional defense to a Section 2 claim. It is blackletter law that "the plaintiff [is] the master of the claim," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987), and "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced," *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 809 n.6 (1986)). In *Caterpillar*, the Supreme Court rejected the notion that a defendant may invoke federal court jurisdiction by raising a federal defense to a state law claim. *See* 482 U.S. at 393 ("Thus, it is now settled law that a case may *not* be removed to federal court on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue."). So too here. A defendant cannot "transform" an action into a constitutional case "merely by injecting" a constitutional defense to a statutory claim, "thereby selecting the forum in which the claim shall

---

[1] Consistent with this command, the Fifth Circuit has made clear that the three-judge court requirement is "'a serious drain upon the federal judicial system'" and must "be narrowly construed." *Sands v. Wainwright*, 491 F.2d 417, 421 (5th Cir. 1973) (quoting *Phillips v. United States*, 312 U.S. 246, 250 (1941)). Three-judge courts therefore may be "convened only where compelled by the express terms of the statute," *United States v. Texas*, 523 F. Supp. 703, 725 (E.D. Tex. 1981), not at the preference of a litigant or a court. *See also Nixon v. Richey*, 513 F.2d 430, 446 (D.C. Cir. 1975) ("[T]he three-judge apparatus is not to be utilized freely, but only and strictly as Congress has prescribed.").

be litigated." *Id.* at 399; *see also The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) (holding that jurisdiction for a claim "cannot depend upon the answer, and accordingly jurisdiction cannot be conferred by the defense"); *cf. Armour v. Ohio*, 925 F.2d 987, 989 (6th Cir. 1991) ("[T]he sufficiency of the complaint for three-judge jurisdictional purposes must be determined by the claims stated in the complaint and not by the way the facts turn out."). In determining whether a lawsuit triggers a three-judge court, therefore, courts look only to the actual claims asserted in the complaint, regardless of whether the defenses to those claims raise constitutional issues.

Indeed, Section 2 defendants routinely raise the specter of racial gerrymandering to ward off Section 2 claims, yet no purely Section 2 claim has ever triggered three-judge court jurisdiction. In *Thomas*, for instance, the defendants argued that granting relief for the plaintiffs' Section 2 claim would "run[] squarely into the prohibition of using race as the predominant factor in devising legislative districts[.]" Defs.' Mem. In Supp. of Mot. for J. as a Matter of L. at 7, *Thomas v. Bryant*, No. 3:18-cv-00441-CWR-FKB (S.D. Miss. Feb. 6, 2019), ECF No. 54; *see also* Answer to Pls.' Am. Compl. & Affirmative Defs. at ¶ 102, *Johnson v. Ardoin*, No. 3:18-cv-625-SDD-EWD (M.D. La. Sept. 23, 2019), ECF No. 106 (defendants asserting the affirmative defense: "The Fourteenth and Fifteenth Amendments . . . barred the State of Louisiana from drawing two majority-minority districts in Louisiana."); Answer to Am. Compl. at 19 ¶ 4, *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Aug. 6, 2018), ECF No. 17 (defendant asserting affirmative defense: "To the extent that Section 2 would require a racial gerrymander to create a second majority-minority district, it is unconstitutional.").

Just last year, the U.S. Supreme Court affirmed a single-judge district court's holding in a Section 2 case that "race did not predominate" in the creation of illustrative maps including an additional majority-minority district in Alabama. *Allen v. Milligan*, 599 U.S. 1, 32 (2023). In

*Caster v. Merrill*, plaintiffs brought a Section 2 claim before a single district judge, "challeng[ing] the congressional map on statutory grounds only." No. 2:21-cv-1536-AMM, <u>2022 WL 264819</u>, at *1 (N.D. Ala. Jan. 24, 2022). A three-judge panel denied a request to consolidate or join *Caster* with other cases asserting constitutional claims in part because doing so "could exceed the limited jurisdiction of this court under [§ 2284]." Order at 7, *Singleton v. Merrill*, No. 2:21-cv-01291-AMM (N.D. Ala. Nov. 23, 2021), ECF No. 45. Defendants in *Caster* argued that the plaintiffs' illustrative maps were unconstitutional racial gerrymanders, but the single district judge rejected that argument, noting its "flawed factual premise" because the maps "prioritized race only as necessary" to determine whether it was "possible to draw two reasonably compact majority-Black congressional districts," as well as its "flawed legal premise" because "a rule that rejects as unconstitutional a remedial plan for attempting to satisfy *Gingles* I would preclude any plaintiff from ever stating a Section Two claim." *Caster*, <u>2022 WL 264819</u>, at *79–80. The Supreme Court heard the *Caster* case on certiorari review, *see Merrill v. Milligan*, <u>142 S. Ct. 879</u> (2022), and affirmed the "judgment[] of the District Court for the Northern District of Alabama in the *Caster* case." *Allen*, <u>599 U.S. at 42</u>; *see also id.* at 16 (noting that the "*Singleton* and *Milligan* actions were consolidated before the three-judge Court for purposes of preliminary injunction proceedings, while *Caster* proceeded before [a single district judge] on a parallel track").

In sum, the plain language of the three-judge court statute, along with the governing case law, is clear: The Middle District and Fifth Circuit acted within their authority in adjudicating—and rejecting—the defense that map-drawers necessarily violate the Equal Protection Clause by creating a second majority-minority district in Louisiana.

## II. Plaintiffs' racial gerrymandering arguments are meritless.

The rulings from the Middle District litigation are plainly relevant here. Not only did that litigation squarely refute Plaintiffs' contention here that intentionally drawing a majority-Black

district in Louisiana to comply with the Voting Rights Act automatically triggers (let alone fails) constitutional scrutiny, it also supplied the Louisiana Legislature with "good reasons" to believe that a second majority-Black district is required by federal law, which independently defeats Plaintiffs' racial gerrymandering claim. To the extent Plaintiffs contend that the Middle District litigation provided "good reasons" to warrant only a remedial map similar to the illustrative maps evaluated in that case, then the proper remedy is the adoption of such a map—not a wholesale restart of the redistricting process—to ensure compliance with both the Voting Rights Act and the Constitution.

*First*, Plaintiffs' assertion that race predominates any time a legislature sets out to create a new majority-minority district, *see* Tr. 603:4–8, ECF No. 186, is wrong—both on the law and the facts. The Fifth Circuit has explained that race is "inherently a consideration" when a legislature must remedy a Section 2 violation, but "strict scrutiny does not apply to all cases involving the intentional creation of majority-minority districts." *Theriot v. Parish of Jefferson*, 185 F.3d 477, 488 (5th Cir. 1999) (quoting *Clark v. Calhoun County*, 88 F.3d 1393, 1404 (5th Cir. 1996)). Instead, as the Supreme Court recently affirmed, "[t]he line that [courts] have long drawn is between [race] consciousness and [racial] predominance." *Allen*, 599 U.S. at 33; *cf. id.* (rejecting notion that "racial predominance plagues *every single illustrative map ever adduced* at the first step of *Gingles*" just because "those maps were created with an express [racial] target in mind"). The Middle District litigation applied this well-established rule to find that a second majority-Black district could be drawn in Louisiana in service of Section 2 without race predominating. *See supra* I.A. Accordingly, the Fifth Circuit has already rejected Plaintiffs' theory of the case—under which "no court could find or ever require any jurisdiction to address a Section 2 violation because race

emerges as a relevant issue," *Theriot*, <u>185 F.3d at 488</u> n.23—both as a matter of law, *see id.* at 488, and in the context of Louisiana's congressional map specifically, *Robinson*, <u>86 F.4th at 594</u>.[2]

    *Second*, even if Plaintiffs could satisfy their "demanding burden of proof to show that [S.B. 8] is unexplainable on grounds other than race," *Easley v. Cromartie*, <u>532 U.S. 234, 235</u> (2001) (cleaned up), *but see* ECF No. 85–1 at 19–24 (explaining why Plaintiffs cannot satisfy this burden), S.B. 8 satisfies strict scrutiny because the Legislature had "good reasons" to believe that race-based redistricting was required to comply with the Voting Rights Act. *Cooper v. Harris*, <u>581 U.S. 285, 293</u> (2017); *see also id.* at 292–93 ("When a State invokes the VRA to justify race-based districting, it must show . . . that it had 'a strong basis in evidence' for concluding that the statute required its action." (quoting *Ala. Legis. Black Caucus v. Alabama*, <u>575 U.S. 254, 278</u> (2015))). The Middle District litigation provided those "good reasons" here. The district court's meticulous 152-page order—following a five-day hearing with 20 testifying witnesses—detailed the "a strong basis in evidence" to conclude that plaintiffs were "substantially likely to prevail on the merits of their claims brought under Section 2 of the Voting Rights Act" and that "[t]he appropriate remedy . . . is a remedial congressional redistricting plan that includes an additional majority-Black congressional district." *Robinson*, <u>605 F. Supp. 3d at 766</u>. And the Middle District's conclusion was affirmed or otherwise undisturbed in multiple subsequent challenges before three Fifth Circuit panels and the Supreme Court, in which not a single judge or justice ever indicated that the district court's Section 2 holding was likely in error. *See supra* I.A; *In re Landry*, <u>83 F.4th 300, 307</u> (5th Cir. 2023) (Fifth Circuit panel issuing mandamus to "afford[] the Louisiana legislature the first opportunity to comply with [the district court's] ruling" requiring second

---

[2] To the extent Plaintiffs were concerned that the Section 2 litigation would compel a remedy in tension with their views of the Equal Protection Clause, they could have sought intervention in that case to assert their position in tandem with the other defendants.

majority-minority district); *Ardoin v. Robinson*, 143 S. Ct. 2654 (2023). If the unanimous voices of multiple federal judges in multiple postures over multiple years does not provide "good reasons" for a legislature to believe it needed to draw a second majority-Black district to comply with the Voting Rights Act, nothing would satisfy this standard. *See Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 195–96 (2017) ("Holding otherwise would afford state legislatures too little breathing room, leaving them trapped between the competing hazards of liability under the Voting Rights Act and the Equal Protection Clause." (quotation marks omitted)).

Plaintiffs' suggestion that the Legislature needed to conduct its own duplicative analysis to demonstrate a Section 2 violation before enacting a remedial map containing a second majority-Black district, Tr. 610:10–19, ECF No. 186, is entirely baseless. Where federal courts have found a likely Section 2 violation, nothing in the law requires litigants to "prove a Section 2 violation all over again" in fashioning a remedy. *Theriot*, 185 F.3d at 490; *see also id.* ("We decline to impose such a requirement."). Here, the legislature had more than "good reasons" to "heed the instructions of the Court" by enacting a VRA-compliant map, not only based on the judicial findings in the Middle District and Fifth Circuit, but also based on the example provided in neighboring Alabama, where—just months earlier—the legislature refused to draw a second minority-opportunity district in response to the courts' finding of a likely Section 2 violation and thus forfeited its map-drawing prerogative to the court. *See* Injunction, Opinion, & Order at 5–7, *Milligan v. Allen*, No. 2:21-cv-1530-AMM (N.D. Ala. Sept. 5, 2023), ECF No. 272 (concluding that the legislature's new plan "does not remedy the likely Section Two violation that we found and the Supreme Court affirmed" because it "does not include an additional opportunity district" and directing special master to "commence work forthwith on a remedial map"); *see also id.* at 7 ("We are three years into a ten-year redistricting cycle, and the Legislature has had ample opportunity to draw a lawful map.").

*Third*, to the extent Plaintiffs contend that the Middle District litigation provided the legislature a "strong basis in evidence" to draw a remedial district only in the precise locations where the illustrative maps in that case proposed, *see* Tr. 13:13–22, ECF No. 184; Tr. 611:10–15, ECF No. 186; ECF No. 17–1 at 24–26, the appropriate course of action is to order the adoption of such a remedy, not to ignore Section 2 and the Middle District litigation altogether. *See* ECF No. 17–1 at 33 (Plaintiffs asking Court to strike S.B. 8 and adopt "Illustrative Plan 1," which has only one majority-Black district). Thus, even if this Court agrees with Plaintiffs' concern that S.B. 8 is not "narrowly tailored to redress the wrong found in the VRA," Tr. 14:4–5, ECF No. 184, that concern is addressed by tailoring the remedy to the wrong found in the Middle District litigation. *See Robinson*, 605 F. Supp. 3d at 822, 832 (finding that plaintiffs "are substantially likely to prove that Black voters are sufficiently 'geographically compact' to constitute a majority in a second congressional district" with illustrative plans that "draw a second majority-Black district by connecting parts of East Baton Rouge Parish with the Delta Parishes in their proposed CD 5").

This approach would not only satisfy Plaintiffs' concerns, *see* Tr. 13:13–15, ECF No. 184 (arguing that "[t]he fear of violating the VRA somewhere does not allow the State to draw a racially gerrymandered district anywhere"), but also would conserve judicial resources and ensure that the end result of the years-long battle over Louisiana's congressional districts in federal court actually complies with both the Voting Rights Act and the Constitution. Prior to the enactment of S.B. 8, the Middle District was prepared to proceed to trial on the Section 2 claim and adjudicate the appropriate remedy to the likely Section 2 violation affirmed by the Fifth Circuit. *See* Minute Entry at 2, *Robinson*, No. 3:22-cv-00211-SDD-SDJ (M.D. La. Nov. 27, 2023), ECF No. 315 ("This matter is scheduled for a remedial hearing on the preliminary injunction set to commence on February 5, 2024. Pursuant to the Fifth Circuit's most recent ruling in this case the remaining

12

procedure will be converted to a trial on the merits."). There is no reason that remedial process could not pick up where it left off—either in this Court or that one—with the participation of Plaintiffs here. Proceeding to a remedy in this case without regard to the findings in the Middle District case, by contrast, would only further embroil the State in indefinite litigation and make it "conceivable that courts may never reach the merits" of a proper remedy under the Voting Rights Act. *Theriot*, 185 F.3d at 490; *cf. id.* at 488 n.23 ("Indeed, much of Appellants' argument appears designed collaterally to attack this court's previous finding of a Section 2 violation.").

In sum, as the Middle District litigation has demonstrated, Louisiana need not choose between compliance with the Voting Rights Act and compliance with the Constitution. The law and the facts demonstrate that S.B. 8 complies with both. But if the Court is not persuaded that the legislature's chosen configuration of the additional majority-Black district is justified by the Middle District's findings, it should remedy the problem by ordering a map that more closely aligns with the well-documented conclusions of the Middle District and Fifth Circuit, thereby curing any constitutional violation while ensuring compliance with the Voting Rights Act.

## CONCLUSION

The Court should deny Plaintiffs' motion and enter judgment for Intervenor-Defendants.

Respectfully submitted this April 17, 2024.

_s/ J.E. Cullens, Jr._                                    _s/ Abha Khanna_

J. E. Cullens, Jr. (LA # 23011)                Abha Khanna* (# 917978)
Andrée Matherne Cullens (LA # 23212)           ELIAS LAW GROUP LLP
Stephen Layne Lee (LA # 17689)                 1700 Seventh Ave., Suite 2100
WALTERS, THOMAS, CULLENS, LLC                  Seattle, WA 98101
12345 Perkins Road, Bldg. One                  (206) 656-0177
Baton Rouge, LA 70810                          akhanna@elias.law
(225) 236-3636
cullens@lawbr.net                              Lalitha D. Madduri* (# 917979)
acullens@lawbr.net                             Jacob D. Shelly* (# 917980)
laynelee@lawbr.net                             Daniel Cohen* (# 917976)
                                               Qizhou Ge* (# 917977)
                                               ELIAS LAW GROUP LLP
                                               250 Massachusetts Ave. NW, Suite 400
                                               Washington, DC 20001
                                               (202) 968-4490
                                               lmadduri@elias.law
                                               jshelly@elias.law
                                               dcohen@elias.law
                                               age@elias.law

                                               * Admitted _pro hac vice_

                                               Counsel for Proposed Amici

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2024, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and that service will be provided through the CM/ECF system.

*/s/Abha Khanna*
Abha Khanna

Counsel for *Proposed Amici*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

**PHILLIP CALLAIS, ET AL**            **CIVIL DOCKET NO. 3:24-CV-00122**
                                      **DCJ-CES-RRS**

**VERSUS**                            **THREE-JUDGE COURT**

**NANCY LANDRY, in her official
capacity as Louisiana Secretary of
State**

### INJUNCTION AND REASONS FOR JUDGMENT

*Opinion of the Court by David C. Joseph and Robert R. Summerhays, District Judges.*

The present case involves a challenge to the current congressional redistricting map enacted in Louisiana on the grounds that one of the congressional districts created by the Louisiana State Legislature — District 6 — is an impermissible racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment. This challenge reflects the tension between Section 2 of the Voting Rights Act and the Equal Protection Clause. The Voting Rights Act protects minority voters against dilution resulting from redistricting maps that "crack" or "pack" a large and "geographically compact" minority population. On the other hand, the Equal Protection Clause applies strict scrutiny to redistricting that is grounded predominately on race.

The challenged Louisiana redistricting scheme originated in response to litigation brought under Section 2 of the Voting Rights Act in a separate suit filed in the United States District Court for the Middle District of Louisiana, challenging Louisiana's prior redistricting scheme under Section 2 of the Voting Rights Act.

*Robinson, et al v. Ardoin*, No. 3:22-cv-211; consolidated with *Galmon et al v. Ardoin*, No. 3:22-cv-214 (M.D. La.) ("*Robinson* Docket"). There, the district court concluded that the *Robinson* plaintiffs were likely to succeed on the merits of their claim that Louisiana's prior redistricting plan violated Section 2 of the Voting Rights Act. In response, the Legislature adopted the present redistricting map (created by Senate Bill 8) ("SB8"), which established a second majority–Black congressional district to resolve the *Robinson* litigation. The plaintiffs here then filed the present case challenging this new congressional map on the grounds that the second majority–Black district created by the Legislature violates the Equal Protection Clause.

This matter was tried before the three-judge panel from April 8-10, 2024. Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, we conclude that District 6 of SB8 violates the Equal Protection Clause. Accordingly, the State is enjoined from using SB8 in any future elections. The Court's Opinion below constitutes its findings of fact and conclusions of law. The Court sets a status conference with all parties to discuss the appropriate remedy.

# I.
## PROCEDURAL AND HISTORICAL BACKGROUND

### A.    The *Hays* Litigation

> "Those that fail to learn from history are doomed to repeat it."
> -   Winston Churchill

Following the 1990 census, the Louisiana State Legislature (the "Legislature") enacted Act 42 of 1992, which created a new congressional voting map. Prior to the Act 42 map, Louisiana had seven congressional districts, one of which included a majority-Black voting population. Act 42 created a second majority-Black district.

The existing majority-Black district encircled New Orleans, and the other, new one, "[l]ike the fictional swordsman Zorro, when making his signature mark, ... slash[ed] a giant but somewhat shaky 'Z' across the state." *Hays v. State of La.*, 839 F. Supp. 1188, 1199 (W.D. La. 1993), *vacated sub nom. Louisiana v. Hays*, 512 U.S. 1230, 114 S. Ct. 2731, 129 L.Ed.2d 853 (1994) ("*Hays I*").

Several voters challenged the scheme. After a trial, a three-judge panel of the Western District of Louisiana concluded that Act 42's plan violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and accordingly enjoined the use of that plan in any future elections. *Id.* In 1993, while an appeal of the district court's findings in *Hays I* was pending before the Supreme Court of the United States, the Legislature repealed Act 42 and passed Act 1, creating a new map. *Hays v. State of La.*, 862 F. Supp. 119, 125 (W.D. La. 1994), *aff'd sub nom. St. Cyr v. Hays*, 513 U.S. 1054, 115 S. Ct. 687, 130 L.Ed.2d 595 (1994), *and vacated sub nom. United States v. Hays*, 515 U.S. 737, 115 S. Ct. 2431, 132 L.Ed.2d 635 (1995) ("*Hays II*").

The 1993 map, like the 1992 map, had two majority-African American districts. *Id.* One encircled New Orleans, while the other was long and narrow and slashed 250 miles in a southeasterly direction from Shreveport down to Baton Rouge. This district was described as resembling "an inkblot which has spread indiscriminately across the Louisiana map." *Id.*



(Act 1)

PE22 (Map from *Hays II*).

The Supreme Court vacated *Hays I* and remanded the case for further proceedings in light of the passage of Act 1. *See Louisiana v. Hays*, <u>512 U.S. 1230</u>, <u>114 S. Ct. 2731</u>, <u>129 L.Ed.2d 853</u> (1994). The panel of our colleagues making up that three-judge court determined that the Legislature had once again allowed race to predominant in the map's creation and declared Act 1 unconstitutional. *Hays II* at 121. The case was again appealed to the Supreme Court. Without addressing the merits of the case, the Supreme Court determined that the plaintiffs lacked standing to challenge Act 1 as they did not reside in the challenged district. *United States v. Hays*, <u>515 U.S. 737</u>, <u>115 S. Ct. 2431</u>, <u>132 L.Ed.2d 635</u> (1995).

On remand, the three-judge panel permitted an amended complaint to address the standing issue. The court then reiterated its findings from *Hays II* that Act 1

constituted a racial gerrymander and was not narrowly tailored to further a compelling state interest. The court therefore found that Act 1 violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and ordered the state to implement a redistricting plan drawn by the court. *Hays v. Louisiana*, 936 F. Supp. 360 (W.D. La. 1996) ("*Hays III*").

**B.    2020 Census and Events Leading up to the *Robinson* Litigation**

Based on the 2020 Census, Louisiana's population stood at 4,657,757 with a voting-age population of 3,570,548. JE6; JE15. As a result, the state qualified for six congressional districts — one less district than it had during the *Hays* litigation, but the same number it was allotted after the 2010 Census. JE15. Prior to the start of the legislative session on redistricting, members of the Legislature traveled across the state conducting public hearings, called "roadshows," to give the public the opportunity to voice their views on the redistricting process. *See* JE-3; *see also* Tr., Vol. III, 513:14–514:17. The roadshows were "designed to share information about redistricting and solicit public comment and testimony." *Robinson v. Ardoin*, 605 F.Supp.3d 759, 767 (M.D. La. 2022), *cert. granted before judgment,* 142 S. Ct. 2892, 213 L.Ed.2d 1107 (2022), *and cert. dismissed as improvidently granted,* 143 S. Ct. 2654, 216 L.Ed.2d 1233 (2023), *and vacated and remanded,* 86 F.4th 574 (5th Cir. 2023) ("*Robinson* Injunction Ruling").

The Louisiana Senate Governmental Affairs and House Governmental Affairs conducted ten hearings as part of the roadshow across the state. Tr., Vol. II, 476:18–25; Tr., Vol. III, 513:18–514:7. These hearings allowed citizens to testify on their redistricting preferences. *Id.* Senator Royce Duplessis, who served as Vice Chair of

the House and Governmental Affairs Committee at the time, attended the roadshows and testified that "the purpose of the road shows was to give the public the opportunity to share their thoughts and what they wanted to see in redistricting." Tr., Vol. III, 514:8–17.

Louisiana ultimately enacted a new congressional map, created by House Bill 1 ("HB1"), on March 31, 2022. JE1. As with Louisiana's prior congressional map, HB1 had one majority-Black district. Louisiana Governor John Bel Edwards vetoed HB1, but the Legislature overrode that veto. *Robinson* Injunction Ruling *at* 767.



2022 Enacted Map (JE16).

## C.     The *Robinson* Litigation

On the same day that HB1 was enacted, a group of plaintiffs led by Press Robinson[1] (the "*Robinson* Plaintiffs"), and a second group of plaintiffs led by Edward Galmon, Sr.[2] (the "*Galmon* Plaintiffs"), filed suit against the Louisiana Secretary of State in the United States District Court for the Middle District of Louisiana. *Robinson* Injunction Ruling at 768.  The Middle District consolidated the *Robinson* and *Galmon* suits and allowed intervention by the President of the Louisiana State Senate, the Speaker of the Louisiana House of Representatives, and the Louisiana Attorney General.  *Id.* at 768-69.

The *Robinson* and *Galmon* Plaintiffs alleged that the congressional map created by HB1 diluted the votes of Black Louisianians in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.  *Robinson* Injunction Ruling at 768.  This dilution was purportedly accomplished through "'packing' large numbers of Black voters into a single majority-Black congressional district…and 'cracking' the remaining Black voters among the other five districts…to ensure they [would be] unable to participate equally in the electoral process."  *Id.* at 768.  Both sets of plaintiffs sought a preliminary injunction that would prohibit the Secretary of State from using the HB1 map in the 2022 congressional elections, give the Legislature a deadline to enact a map that complied with the Voting Rights Act, and order the use

---

[1]     Press Robinson, Edgar Cage, Dorothy Nairne, Edwin Rene Soule, Alice Washington, Clee Earnest Lowe, Davante Lewis, Martha Davis, Ambrose Sims, National Association for the Advancement of Colored People ("NAACP") Louisiana State Conference, and Power Coalition for Equity and Justice.

[2]     Edward Galmon, Sr., Ciara Hart, Norris Henderson, and Tramelle Howard.

of a map proposed by the plaintiffs in the event the Legislature failed to enact a compliant map. *Id.* at 769.

The Middle District held an evidentiary hearing in the *Robinson* matter, beginning May 9, 2022. *Robinson* Injunction Ruling at 769. On June 6, 2022, the court issued a preliminary injunction finding that the *Robinson* and *Galmon* Plaintiffs were likely to prevail on their Section 2 vote dilution claims. *Id.* at 851-52. The Middle District further determined that a new compliant voting map could be drawn without disrupting the 2022 election. *Id.* at 856.

Accordingly, the Middle District entered an order enjoining the Secretary of State from conducting elections using the HB1 map, ordered the Legislature to enact a new voting map that included a second majority-Black voting district by June 20, 2022, and stayed the state's nominating petition deadline until July 8, 2022. *Robinson* Injunction Ruling at 858. In the event the Legislature failed to enact a new map before the deadline, the Middle District set an evidentiary hearing for June 29, 2022, regarding which map should be used in its place. *Robinson* Docket, [Doc. 206].

On June 9, 2022, the Middle District denied a motion to stay the injunction pending appeal. *Robinson v. Ardoin*, No. CV 22-211-SDD-SDJ, 2022 WL 2092551 (M.D. La. June 9, 2022). While the United States Court of Appeals for the Fifth Circuit initially stayed the injunction review on the same day, *Robinson v. Ardoin*, No. 22-30333, 2022 WL 2092862 (5th Cir. June 9, 2022), it vacated the stay a few days later. *Robinson v. Ardoin*, 37 F.4th 208, 232 (5th Cir. 2022). On June 28, 2022, the Supreme Court of the United States again stayed the Middle District's injunction. *Ardoin v. Robinson*, 142 S. Ct. 2892, 213 L.Ed.2d 1107 (2022). On June 26, 2023,

after the Supreme Court issued its decision in *Alabama v Milligan*, 599 U.S. 1, 143 S. Ct. 1487, 216 L.Ed.2d 60 (2023), the court vacated the stay in *Robinson* as improvidently granted, allowing review of the matter to continue before the Fifth Circuit. *Ardoin v. Robinson*, 143 S. Ct. 2654, 216 L.Ed.2d 1233 (2023).

In response to the Supreme Court's action in vacating the stay, the Middle District reset the remedial evidentiary hearing to begin October 3, 2023. *Robinson* Docket, [Doc. 250]. The Louisiana Attorney General sought mandamus from the Fifth Circuit, which vacated the evidentiary hearing. *In re Landry*, 83 F.4th 300, 308 (5th Cir. 2023).

On November 10, 2023, the Fifth Circuit issued its decision on the Secretary of State's appeal of the Middle District's preliminary injunction. *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) ("*Robinson* Appeal Ruling"). Although noting that the *Robinson* Plaintiffs' arguments were "not without weaknesses," the Circuit Court found no clear error with the Middle District's factual findings, nor with its conclusion that the HB1 map likely violated Section 2, and held that the preliminary injunction was valid when it was issued. *Robinson* Appeal Ruling at 599. However, because the 2022 election had already occurred and because the Legislature had time to enact a new map without disrupting the 2024 election, the Fifth Circuit concluded that the district court's preliminary injunction was no longer necessary. *Id*. Accordingly, the Fifth Circuit vacated the injunction to give the Legislature the opportunity, if it desired, to enact a new redistricting plan before January 15, 2024. *Id*. at 601. The Fifth Circuit opinion did not provide any parameters or specific direction as to how the Legislature was to accomplish this task. *Id*. If no new re-districting plan was

enacted before January 15, 2024, the Fifth Circuit directed the district court, "to conduct a trial and any other necessary proceedings to decide the validity of the HB1 map, and, if necessary, to adopt a different districting plan for the 2024 elections." *Id.*

The Middle District thereafter set a remedial evidentiary hearing for February 5, 2024. Prior to that date, and as detailed below, the Legislature enacted SB8, creating a new congressional districting map. Upon notice of SB8's enactment, the Middle District cancelled the remedial hearing. *Robinson* Docket, [Doc. 343].

**D. Legislative Response**

Among the first actions of newly inaugurated Governor Jeff Landry was to call the 2024 First Extraordinary Session on Monday, January 8, 2024 (the "Special Session"). JE8. This call directed the Legislature to, among other things, "legislate relative to the redistricting of the Congressional districts of Louisiana." *Id.* On the first day of the Special Session, Governor Landry addressed the joint chambers. After detailing his extensive efforts in *Robinson* to defend the congressional map enacted in 2022, he stated: "we have exhausted all legal remedies and we have labored with this issue for far too long." JE35 at 11. "[N]ow, once and for all," he continued, "I think it's time that we put this to bed. Let us make the necessary adjustments to heed the instructions of the court. Take the pen out of the hand of a non-elected judge and place it in your hands. In the hands of the people. It's really that simple. I would beg you, help me make this a reality in this special session, for this special purpose, on this special day." *Id.*

The product of the Special Session was SB8, which was passed on January 22, 2024. JE10. The Court has reviewed the entire legislative record, including the January 15 Joint Session, the January 15 House and Governmental Affairs Committee hearing, the January 16 Senate and Governmental Affairs Committee hearing, the January 17 Senate floor debate, the January 17 House and Governmental Affairs Committee hearing, the January 18 House floor hearing, the January 18 House and Governmental Affairs Committee hearing, the January 19 House of Representatives floor debate, and the January 19 Senate floor debate. PE23-29. Numerous comments during the Special Session highlight the intent of the Legislature in passing SB8.

Senator Glen Womack, the Senate sponsor of SB8, stated at the legislative session that redistricting must occur because of the litigation occurring in the Middle District of Louisiana. PE41, at 18. Specifically because of that litigation, Senator Womack opined that "we had to draw two majority minority districts." PE41, at 20. Later in the Special Session, Senator Womack, in addressing the odd shape of SB8's District 6 (shown below), admitted that creating two majority-Black districts is "the reason why District 2 is drawn around the Orleans Parish and why District 6 includes the Black population of East Baton Rouge Parish and travels up I-49 corridor to include Black population in Shreveport." PE41, at 26. Senator Womack also professed: "we all know why we're here. We were ordered to draw a new black district, and that's what I've done." JE31, 121:21-22

Likewise, in the House of Representatives, Representative Beau Beaullieu was asked during his presentation of SB8 by Representative Beryl Amedee, "is this bill

intended to create another Black district?" and Representative Beaullieu responded, "yes, ma'am, and to comply with the judge's order." JE33, 9:3-8. . Representative Josh Carlson stated, even in his support of SB8, that "the overarching argument that I've heard from nearly everyone over the last four days has been race first" and that "race seems to be, at least based on the conversations, the driving force" behind the redistricting plan. *Id.* at 97:18-19, 21-24.

But, Representative Carlson acknowledged that racial integration made drawing a second majority-Black district difficult:

> And so the reason why this is so difficult is because we are moving in the right direction. We don't have concentrated populations of – of certain minorities or populations of white folks in certain areas. It is spread out throughout the state. Compared to Alabama, Alabama has 17 counties that are minority-majority, and they're all contiguous. Louisiana has seven parishes that are minority-majority and only three are contiguous. That's why this process is so difficult, but here we are without any other options to move forward.

*Id.* at 98:2-12.

Representative Rodney Lyons, Vice Chairman of the House and Governmental Affairs Committee, stated that the "mission that we have here is that we have to create two majority-Black districts." JE31, 75:24-76:1. Senator Jay Morris also remarked that "[i]t looks to me we primarily considered race." JE34, 7:2-3. Senator Gary Carter went on to express his support for SB8 and read a statement from Congressman Troy Carter on the Senate floor:

> My dear friends and colleagues, as I said on the steps of the capital, I will work with anyone who wants to create two majority-minority districts. I am not married to any one map. I have worked tirelessly to help create two majority-minority districts that perform. That's how I know that there may be better ways to create – to craft both of these districts. There are multiple maps that haven't been reviewed at all.

However, the Womack map creates two majority-minority districts, and therefore I am supportive of it. And I urge my former colleagues and friends to vote for it while trying to make both districts stronger with appropriate amendment. We do not want to jeopardize this rare opportunity to give African American voters the equal representation they rightly deserve.

JE30, 16:10-25.

Louisiana Attorney General Murrill also gave the legislators advice during the Special Session. She told them that the 2022 enacted map, HB1, was a defensible and lawful map. JE28, 36:24-37:1. She stated, "I am defending that map, and so you won't hear me say that I believe that that map violated the redistricting criteria," *Id.* at 42:23, and "I am defending it now." *Id.* at 46:3-4. She further declared "I am defending what I believe to have been a defensible map." *Id.* at 53:2. She also informed legislators that the *Robinson* litigation had not led to a fair or reliable result. *Id.* at 61:20-62:12, 62:24-63:3, 63:6-17.

SB8 was the only congressional map to advance out of committee and through the legislative process. The map was passed on Friday, January 19, 2024, and signed by the Governor as Act 2 on January 22, 2024. JE10. SB8's second majority-minority district, District 6, stretches some 250 miles from Shreveport in the northwest corner of the state to Baton Rouge in southeast Louisiana, slicing through metropolitan areas to scoop up pockets of predominantly Black populations from Shreveport, Alexandria, Lafayette, and Baton Rouge. The figure below, which shows the map enacted by SB8, demonstrates the highly irregular shape of Congressional District 6.



PE14.

When converted to a black and white map and placed next to the *Hays II* map, the similarities of the two maps become obvious.



Black and White Version of PE14 (left) and PE22 (right).

## E.    The Parties and Their Claims

The Plaintiffs, Philip Callais, Lloyd Price, Bruce Odell, Elizabeth Ersoff, Albert Caissie, Daniel Weir, Joyce LaCour, Candy Carroll Peavy, Tanya Whitney, Mike Johnson, Grover Joseph Rees, and Rolfe McCollister, challenge SB8. [Doc. 156]. Plaintiff Philip Callais is a registered voter of District 6. *Id.* Plaintiff Albert Caissie, Jr. is a registered voter of District 5. *Id.* Plaintiff Elizabeth Ersoff is a registered voter of District 6. *Id.* Plaintiff Grover Joseph Rees is a registered voter of District 6. *Id.* Plaintiff Lloyd Price is a registered voter of District 6. *Id.* Plaintiff Rolfe McCollister is a registered voter of District 5. *Id.* Plaintiff Candy Carroll Peavy is a registered voter of District 4. *Id.* Plaintiff Mike Johnson is a registered voter of District 4. *Id.* Plaintiff Bruce Odell is a registered voter of District 3. *Id.* Plaintiff Joyce LaCour is a registered voter of District 2. *Id.* Plaintiff Tanya Whitney is a registered voter of in District 1. *Id.* Plaintiff Danny Weir, Jr., is a registered voter of District 1. *Id.* Each of the Plaintiffs is described as a "non-Black voter." [Doc. 1].

The State Defendants are Secretary of State Nancy Landry, in her official capacity, and the State of Louisiana, represented by Attorney General Elizabeth Murrill. [Doc. 156]. The State intervened as a defendant on February 26, 2024. [Doc. 79].

Press Robinson, Edgar Cage, Dorothy Nairne, Edwin Rene Soule, Alice Washington, Clee Earnest Lowe, Davante Lewis, Martha Davis, Ambrose Sims, National Association for the Advancement of Colored People Louisiana State Conference, and Power Coalition for Equity and Justice (collectively "*Robinson* Intervenors") are African American Louisiana voters and civil rights organizations.

[Doc. 156]. They were Plaintiffs in *Robinson, et al v. Landry*, No. 3:22-cv-0211-SDD-SDJ (M.D. La.) and intervened here as defendants to defend SB8. [Doc. 156]. They intervened permissively in the remedial phase of this litigation on February 26, 2024, and permissively in the liability phase on March 15, 2024. [Docs. 79, 114]. Davante Lewis lives in District 6. Tr., Vol. III, 567:23–568:1. The voting districts for the other individual *Robinson* Intervenors was not established in the record.

Plaintiffs assert that: (1) the State has violated the Equal Protection Clause of the Fourteenth Amendment by enacting a racially gerrymandered district; and (2) the State has violated the Fourteenth and Fifteenth Amendments by intentionally discriminating against voters and abridging their votes based on racial classifications across the State of Louisiana. [Doc. 1, ¶ 5]. The Plaintiffs request that the Court issue a declaratory judgment that SB8 is unconstitutional under the Fourteenth and Fifteenth Amendments, issue an injunction barring the State of Louisiana from using SB8's map of congressional districts for any election, and institute a congressional districting map that remedies these violations. *Id.*, p. 31.

## F. The Three-Judge Panel and Trial

On February 2, 2024, Priscilla Richman, the Chief Judge of the Fifth Circuit Court of Appeals, issued an Order Constituting Three-Judge Court. [Doc. 5]. Chief Judge Richman designated Judge Carl E. Stewart, of the Fifth Circuit Court of Appeals, Judge Robert R. Summerhays, of the Western District of Louisiana, and Judge David C. Joseph, of the Western District of Louisiana, to serve on the three-judge district court convened under 28 U.S.C. § 2284. *Id.* On February 17, 2024, Plaintiffs filed a Motion for Preliminary Injunction. [Doc. 17]. On February 21, 2024,

the Court issued a Scheduling Order setting the hearing on the Preliminary Injunction—consolidated with trial on the merits—to commence on April 8, 2024, in Shreveport, Louisiana. [Doc. 63]. The hearing commenced on April 8, 2024, and ended on April 10, 2024. Collectively, the parties introduced thirteen (13) witnesses and one hundred ten (110) exhibits.

## II.
### EVIDENTIARY RECORD

A.    **Fact Witnesses**

1.    **Legislators**

a.    **Alan Seabaugh**

Alan Thomas Seabaugh is a Louisiana State Senator for District 31, located in northwest Louisiana. Senator Seabaugh took office in January 2024. He had previously served as a Louisiana State Representative for thirteen years. Tr. Vol. I, 42:16-17. Senator Seabaugh testified that the only reason the Legislature was attempting to pass a redistricting plan during the Special Session was the litigation pending in the Middle District of Louisiana, and specifically "Judge Dick saying that she – if we didn't draw the second minority district, she was going to. I think that's the only reason we were there." *Id.* at 47:22-48:1. When asked if having a second majority-Black district was the one thing that could not be compromised in the plans being considered, Senator Seabaugh testified "that's why we were there." *Id.* at 50:2. Senator Seabaugh ultimately voted no to SB8 and indicated that he believed the 2022 map (HB1) was a good map. *Id.* at 52:19-22. On cross examination, Senator Seabaugh acknowledged that, in determining how to draw the new districts,

protecting the districts of Mike Johnson and Stephen Scalise – two of Louisiana's representatives in the United States House of Representatives, serving as Speaker and Majority Leader, respectively – were important considerations.  *Id.* at 60:8-20.

### b. Thomas Pressly

Thomas Pressly is a Louisiana State Senator for District 38, which is located in the northwest corner of Louisiana.  Senator Pressly took office in January 2024. He had previously served as a Louisiana State Representative for four years.  Tr., Vol. I, 66:1-6.  Senator Pressly testified that during the Special Session, "the racial component in making sure that we had two performing African American districts was the fundamental tenet that we were looking at.  Everything else was secondary to that discussion."  *Id.* at 69:16-19.  Senator Pressly acknowledged that political considerations were also factored into the ultimate redistricting plan, stating:

> [t]he conversation was that we would – that we were being told we had to draw a second majority-minority seat.  And the question then was, okay, who – how do we do this in a way to ensure that we're not getting rid of the Speaker of the House, the Majority Leader, and Senator Womack spoke on the floor about wanting to protect Julia Letlow as well.

*Id.* at 72:1-7.  Senator Pressly testified that he did not believe that his district in the northwest corner of Louisiana shares a community of interest with either Lafayette or Baton Rouge, both located in the southern half of Louisiana, based on either natural disaster concerns or educational needs.  *Id.* at 73:1-23.  Senator Pressly spoke against SB8 during the Special Session and testified that he believed the 2022 map should be retained.  *Id.* at 77:6-8.

### c.  Mandie Landry

Mandie Landry is a Louisiana State Representative for House District 91, located in New Orleans.  She took office in January 2020.  Tr., Vol. II, 366:2-3. Representative Landry testified that the Special Session was convened because the Republicans were afraid that if they did not draw a map which satisfied the court, then the court would draw a map that would not be as politically advantageous for them.  *Id.* at 368:8-10.  Representative Landry indicated that she understood Governor Jeff Landry to favor the map created by SB8, in part because he believed the map would resolve the *Robinson* litigation in the Middle District, and in part because the new map would cause Congressman Garrett Graves – a Republican incumbent with whom Landry was believed to have a contentious relationship – to lose his seat.  *Id.* at 369:10-15.

### d.  Royce Duplessis

Royce Duplessis is a Louisiana State Senator representing Senate District 5, which is located in the New Orleans area.  He took office in December 2022 and previously served as a Louisiana State Representative for over four years.  Tr. Vol. III, 512:21-24.  Senator Duplessis testified that his understanding of the reason for the Special Session was "to put an end to the litigation and adopt a map that was compliant with the Judge's order."  *Id.* at 519:22-23.  Though he was not a member of the Senate's redistricting committee, Senator Duplessis co-sponsored a separate bill during the Special Session, namely SB4, which also created two majority-Black districts.  *Id.* at 521:1-2.  SB4 was ultimately voted down in committee in favor of SB8.  *Id.* at 523:14-23.  Senator Duplessis testified that he believed SB8 passed

because Governor Landry supported SB8 for political reasons. *Id.* at 525:1-7. Senator Duplessis voted in favor of SB8 because he believed it complied with the Voting Rights Act, it met the criteria ordered by the court, and was a fair map which would satisfy the people of Louisiana. *Id.* at 527:23 -528:9. Senator Duplessis testified that he was very proud of the passage of SB8 because:

> It was always very clear that a map with two majority black districts was the right thing. It wasn't the only thing, but it was a major component to why we were sent there to redraw a map.

*Id.* at 530:15-19.

### 2. Community Members

#### a. Cedric Bradford Glover

Cedric Bradford Glover is a resident of Shreveport, Louisiana, who previously served a total of five terms in the Louisiana House of Representatives, and two terms as mayor of Shreveport. Tr., Vol. II, 454:12-20. Mayor Glover testified that he believes SB8's District 6 reflects common communities of interest, specifically the I-49 corridor, the communities along the Red River, higher education campuses, healthcare systems, and areas of economic development. *Id.* at 457:17–458:21.

#### b. Pastor Steven Harris, Sr.

Steven Harris, Sr. resides in Natchitoches, Louisiana, where he serves as a full-time pastor and a member of the Natchitoches Parish School Board. Tr., Vol. II, 463:5-6. Pastor Harris' ministerial duties require him to travel to Alexandria, Shreveport, Lafayette, Baton Rouge, and places in between. *Id.* at 463:18-20. Pastor Harris, who lives and works in District 6, testified that there are communities of interest among the areas in which he regularly travels, specifically churches and

educational institutions. *Id.* at 466:24 – 467:16. Pastor Harris testified that he believes Baton Rouge has more in common with Alexandria and Shreveport than with New Orleans, due to the different culture, foods, and music. *Id.* at 467:20-468:14.

### c. Ashley Kennedy Shelton

Ashley Kennedy Shelton resides in Baton Rouge and founded and runs the Power Coalition for Equity and Justice (the "Coalition"), one of the *Robinson* Intervenors. Tr., Vol. II, p. 474:8-11. The Coalition is a 501(c)(3) civic engagement organization which seeks to create "pathways to power for historically disenfranchised communities." *Id.* at 474:24-475:1. She testified that the Coalition has been involved with the redistricting process since the 2020 census by educating the community about the redistricting process, as well as encouraging community involvement in that process. *Id.* at 475:21. Ms. Shelton initially supported SB4, another map offered in the Special Session which also contained two majority-minority districts, but that map did not move out of committee. *Id.* at 482:1-2. Ms. Shelton, along with the Coalition, went on to support SB8 because it:

> centered communities that have never been centered in any of the current congressional districts that they are within. And so when you look at the district that's created in SB8, the communities across that district are living in poverty, have poor health outcomes, lack of access to economic opportunity, similar hospitals, similar size airports. Like there is this – there is this opportunity to really center these communities in a way that they have not had the attention in the current districts that they exist within.

*Id.* at 483:6-15.

### d. Davante Lewis

Davante Lewis, one of the *Robinson* Intervenors, is a resident of Baton Rouge, Louisiana, and currently serves as a commissioner for the Louisiana Public Service Commission and chief strategy officer of Invest in Louisiana. Tr., Vol. III, 542:23-25. Commissioner Lewis testified that he has been involved in politics since he was a teenager and has taken part in the redistricting process on numerous occasions as a lobbyist. *Id.* at 548:3-15. During the Special Session, Commissioner Lewis initially supported SB4, another bill which also included two majority-minority districts but failed to pass out of committee. *Id.* at 553:15-22. Commissioner Lewis, who is now a resident in District 6, testified that he was happy with the passage of SB8 because "it accomplishes the goals that I wanted to see which was complying with the rule of law as well as creating a second [B]lack-majority district." *Id.* at 576:16-18. Commissioner Lewis believes that he shares common interests with voters living in other areas within District 6, namely economies, civic organizations, religious organizations, educational systems, and agriculture. *Id.* at 578:14-25. On cross-examination, Commissioner Lewis admitted that District 6 intersects four of the five public service commission districts in the state.

### B. Expert Witnesses

#### a. Dr. Stephen Voss

The Court accepted Plaintiffs' witness Dr. Stephen Voss as an expert in the fields of: (i) racial gerrymandering; (ii) compactness; and (iii) simulations.[3] Tr., Vol.

---

[3]     Plaintiffs retained Dr. Stephen Voss to answer three questions: (1) whether SB8 represents an impermissible racial gerrymander, where race was the predominant factor in

I, 92:13-25; 93:1-19; 111:6-7; 123:7-9.  Dr. Voss was born in Louisiana, lived most of his life in Jefferson Parish, and earned his Ph.D. in political science at Harvard University, where his field of focus was quantitative analysis of political methodology. *Id.* at 85:12-13; 87:8-21.

Dr. Voss began his testimony by comparing the districts created by SB8 to past enacted congressional maps in Louisiana and other proposals that the Legislature considered during the Special Session.  Tr., Vol. I, 97:19-98:2.  Dr. Voss described District 6 as a district:

> that stretches, or I guess the term is "slashes," across the state of Louisiana to target four metropolitan areas, which is the majority of the larger cities in the state.  It then scoops out from each of those predominant – the majority black and predominantly black precincts from each of those cities.

*Id.* at 93:25; 94:1-5.  Dr. Voss explained that the borders of District 6, which include portions of the distant parishes of Lafayette and East Baton Rouge, track along Black communities, including precincts with larger Black population percentages while avoiding communities with large numbers of white voters.  *Id.* at 94:18-95:10.  Dr. Voss reiterated that the boundaries of District 6 were drawn specifically to contain heavily Black-populated portions of cities while leaving more white-populated areas in the neighboring districts.  *Id.* at 96:7-16; PE3; PE4.  Dr. Voss also testified that, compared to other maps proposed during the Special Session and other past congressional maps, SB8 split a total of 18 of Louisiana's 64 parishes, Tr., Vol. I,

---

the drawing of district lines; (2) whether SB8 sacrificed traditional redistricting criteria in order to create two majority-minority districts; and (3) whether the Black population in Louisiana is sufficiently large and compact to support two majority-minority districts that conform to traditional redistricting criteria.  Tr., Vol. I, 91:3-25 (Voss).

97:19-99:11, and, at 62.9 percent of Louisiana's population, had the highest percentage of individuals affected by parish splits. *Id.* 98:3-99:11; PE6.

Dr. Voss also studied the compactness of SB8 under three generally accepted metrics: (i) Reock Score; (ii) Polsby-Popper score; and (iii) Know It When You See It ("KIWYSI").[4] Tr., Vol. I, 100:22-103:5. Dr. Voss found that across all three measures of compactness, SB8 performed worse than either HB1 (the map that was enacted in 2022) or the map that HB1 replaced from the previous decade. *Id.* at 104:25-105:4; PE7. Thus, SB8 did not produce compact maps when judged in comparison to other real-life congressional maps of Louisiana. Tr., Vol. I, 107:16-21. Dr. Voss also found that SB8's majority-Black districts were especially non-compact compared to other plans that also included two majority-minority districts. *Id.* at 106:17-24. According to Dr. Voss, SB8's District 6 scored worse on the Polsby-Popper test than the second majority-Black districts in other proposed plans that created a second majority-Black district. *Id.* at 106:17-24.

Dr. Voss further testified that SB8's and District 6's uniquely poor compactness was not necessary if the goal was to accomplish purely political goals. "If you're not trying to draw a second black majority district, it is very easy to protect Representative Julia Letlow. Even if you are, it's not super difficult to protect

---

[4]     According to Dr. Voss, a district's "Reock score" quantifies its compactness by measuring how close the district is to being a circle. Tr., Vol. 1, 100:23-6. A district's "Polsby-Popper" score is intended to take into account a district's jagged edges and "tendrils." *Id.*, 101:25-102:19. Finally, the "Know It When You See It" method uses a metric derived by panels of judges and lawyers and a representative sample of people looking at the shape of a district and giving their quantification of compactness. *Id.*, 102:20-104:2. The KIWYSI method originated from individuals' subjective judgments, but the metric itself is standardized and uses specific software to compute a numerical figure representing compactness. *Id.*, 103:15-104:2.

Representative Julia Letlow," he testified. Tr., Vol. I, 108:17-21. Additionally, according to Dr. Voss, the Legislature did not need to enact a map with two majority-minority districts in order to protect Representative Letlow's congressional seat: "[Representative Letlow] is in what historically is called the Macon Ridge…[a]nd given where she is located, it is not hard to get her into a heavily Republican, heavily white district." *Id.* at 111:15-23. Dr. Voss testified similarly with respect to Representative Garrett Graves, concluding that the Legislature did not need to enact a second majority-minority district in order to put Representative Garrett Graves in a majority-Black district. *Id.* at 112:2-16. Thus, Dr. Voss concluded that neither the goal of protecting Representative Letlow's district, nor the goal of targeting Representative Graves, would have been difficult to accomplish while still retaining compact districts. *Id.* at 110:15-22.

Dr. Voss testified extensively about simulations, explaining that he used the Redist simulation package ("Redist") to analyze the statistical probability of the Legislature creating SB8 without race predominating its action.[5] *Id.* at 113:14-115:6. Using Redist, Dr. Voss compared "lab-grown" simulations of possible maps to SB8 in order to analyze the decisions the Legislature made during the redistricting process, *Id.* at 114:2-23, so that he could judge whether the parameters or constraints under which he created the simulations could explain the deviations evident in SB8. *Id.* at 118:15-23. Dr. Voss testified that he performed tens of thousands of both "race-

---

[5] According to Dr. Voss, Redist uses Sequential Monte Carlo ("SMC") simulation in order to generate a representative sample of districts that could have been drawn under certain parameters. *Id.*, 113:8-114:10.

conscious" and "race-neutral" simulations, and that none of these simulations randomly produced a map with two Democratic districts. *Id.* at 138:9-14. On that basis, Dr. Voss opined that the non-compact features of SB8 are predominantly explained by racial considerations. *Id.* at 139:17-23.

Concluding that District 6 performs worse on the Polsby-Popper score than the second majority-Black district in the other plans; worse on the Reock score than the other plans that created a second majority-Black district, with a very low score; and worse on the KIWYSI method than the other plans and the majority-Black districts they proposed, *Id.* at 106:18-24, Dr. Voss ultimately opined that SB8 represents an impermissible racial gerrymander. *Id.* at 92:23-24.

### b. Dr. Cory McCartan

Dr. Cory McCartan was proffered by the *Robinson* Intervenors in rebuttal to Dr. Voss and was qualified by the Court as an expert in the fields of redistricting and the use of simulations. Tr., Vol. I, 187:5-14. Though Dr. McCartan criticized Dr. Voss for a number of his methodologies, the Court notes that Dr. McCartan conducted no tests or simulations of his own, *Id.* at 215:18-21, and his testimony was often undercut by his own previous analysis.

First, Dr. McCartan criticized Dr. Voss's simulations on grounds that Dr. Voss did not incorporate the relevant redistricting criteria used by actual mapmakers. *Id.* at 198:10-24. Dr. McCartan also questioned the efficacy of simulations in detecting racial gerrymandering. *Id.* at 196:13-25; 197:1-12. Yet Dr. McCartan had previously led the Algorithm Assisted Redistricting Methodology ("ALARM") Project team, which traversed the country simulating multiple districts in multiple states,

including Louisiana, and authored a paper which declared that simulations are well-suited to assess what types of racial outcomes could have happened under alternative plans in a given state. *Id.* at 227:9-21. Dr. McCartan also testified that he himself used the ALARM project to detect partisan, or political gerrymandering – ultimately finding that Louisiana had only one plausible district favoring the Democratic party. *Id.* at 216:23-25. And on cross-examination, Dr. Voss confirmed that Professor Kosuke Imai, who helped develop the Redist software, applied these same simulation techniques in the racial gerrymandering context. *Id.* at 150:18-151:1. On this point, therefore, the Court finds Dr. McCartan's testimony unpersuasive.

Dr. McCartan also criticized Dr. Voss for not imposing a constraint in his simulations for natural or geographic boundaries. *Id.* at 200:1-6. Yet Dr. McCartan acknowledged that in his work with ALARM to generate Louisiana congressional map simulations, his team did not impose any kind of requirement for natural or geographic boundaries. *Id.* at 230:24-231:1. Dr. McCartan also criticized Dr. Voss for not adding incumbent protection as a constraint in the simulations, but when pressed, could not testify that this extra constraint would trigger the creation of a second majority-minority district. *Id.* at 238:11-16 (McCartan).

Similarly, Dr. McCartan could not give a convincing reason why it was appropriate for his own team to use a compactness constraint of 1.0, while testifying that this same criterion made Dr. Voss's simulations unrepresentative. *Id.* at 231:5-16. Dr. Voss, on the other hand, explained why adjustments to the compactness criterion made the simulation results less reliable. *Id.* at 162:22-24, 163:21-165:19. Finally, Dr. McCartan confirmed that both his simulations on Louisiana

congressional maps and Dr. Voss's simulations generated plans that were more compact than the enacted version of SB8, which was far worse than the Polsby-Popper compactness scores of both Dr. McCartan's and Dr. Voss's simulations. *Id.* at 233:20-24 (McCartan). Dr. McCartan also acknowledged that his own partisan gerrymandering simulations yielded no more than 10 out of 5,000 maps with a second Democratic seat. *Id.* at 235:4-236:12.

In evaluating the testimony of Dr. Voss and Dr. McCartan, the Court finds Dr. Voss's testimony to be credible circumstantial evidence that race was the predominant factor in crafting SB8. Though Dr. McCartan provided some insight into the uses of simulations in detecting the presence of racial gerrymandering, his testimony indicated that his own team had performed simulations under conditions not unlike Dr. Voss's, and with conclusions that supported Dr. Voss. Dr. McCartan's other criticisms of Dr. Voss were either not well-founded or rebutted.

### c. Michael Hefner

Plaintiffs proffered Michael Hefner as an expert demographer, and he was qualified by the Court as such. Tr., Vol. II, 270:23-15; 271:1-5. Mr. Hefner is from Louisiana and has lived his whole life in various parts of the state. *Id.* at 258:3-6; [Doc. 182-8]. Having worked in the field of demography for 34 years, most of Mr. Hefner's work consists of creating redistricting plans for governmental entities, including municipalities and school boards, throughout the State of Louisiana after decennial censuses; conducting precinct management work for Louisiana parish governments; working on school desegregation cases in Louisiana; and conducting site-location analyses in Louisiana. Tr., Vol. II, 257:9-22; Doc. 182-8. Mr. Hefner

testified that he came to the following conclusions during his analysis for this case: (1) given the geographic distribution and concentration of the Black population in Louisiana, it is impossible to create a second majority-minority district and still adhere to traditional redistricting criteria, Tr., Vol. II, 271:11-22, 282:21-283:6; and (2) race predominated in the drafting of SB8. *Id.* at 271:23; 272:1-14.

Mr. Hefner explained that the Black population in Louisiana is highly dispersed across the State and is concentrated in specific urban areas, including New Orleans, Baton Rouge, Alexandria, Lafayette, and Shreveport.[6] Tr., Vol. II, 281:7-15; 283:19-285:1; 339:20-340:4 (Hefner); *see also* Mr. Hefner's Heat Map, [Docs. 182-9, 182-10]. Using a heat map he created based on data representing the Black voting age population ("BVAP") across the State from the 2020 census, Mr. Hefner testified that outside the New Orleans and East Baton Rouge areas, the Black population is highly dispersed across the state. Tr., Vol. II, 281:4-15. Mr. Hefner opined that, given this dispersion, it is impossible to draw a second majority-minority congressional district without violating traditional redistricting criteria. *Id.* at 282:22-283:6.

Focusing on SB8, Mr. Hefner testified that SB8 is drawn to trace the areas of the state with a high BVAP to create a second majority-minority district, Tr., Vol. II, 283:15-285:1, echoing the testimony of Dr. Voss. Specifically, Mr. Hefner stated that District 6's borders include the concentrated Black populations in East Baton Rouge, Alexandria, Opelousas, Natchitoches, Mansfield, Stonewall, and up to Shreveport, *Id.*

---

[6]     According to Mr. Hefner, the highest concentration of African American voters is in New Orleans; the second highest concentration is in East Baton Rouge; and the third highest concentration is in Shreveport. Tr., Vol. II, 281:4-15.

at 283:15-285:1, but carved concentrated precincts out of the remainder of the parishes to avoid picking up too much population of non-Black voters. *Id.* at 283:15-285:1. Taking Lafayette Parish as an example, Mr. Hefner testified that District 6 includes the northeast part of the parish, where voting precincts contain a majority of Black voters, while excluding the remainder of the parish, in which the precincts are not inhabited by predominantly Black voters. *Id.* at 283:22-284:4. Likewise, in Rapides Parish, District 6 splits Rapides Parish to include only the precincts in which there is a high concentration of Black voters, for the purpose of including the overall BVAP in the district. *Id.* at 284:4-8.

Mr. Hefner also testified that SB8's compactness score is extremely small. In fact, it is so low on the Polsby-Popper and Reock metrics that it is almost not compact at all.[7] *Id.* at 302:21-303:2; PE21. Explaining that District 6 is extremely long and extremely strung out, Tr., Vol. II, 303:18-20, Mr. Hefner testified that SB8 scored lower than HB1 on both the Polsby-Popper and Reock tests. *Id.* at 302:16-303:25; PE21. Mr. Hefner testified that District 6 is not reasonably compact, Tr., Vol. II, 304:11-14; its shape is awkward and bizarre, *Id.* at 304:23-305:6; it is extremely narrow at points, *Id.* at 305:18-306:2; its contiguity is tenuous, *Id.* at 293:23-24; and it splits many parishes and municipalities, including four of the largest parishes in the State (Caddo, Rapides, Lafayette, and East Baton Rouge), each of which are communities of interest. *Id.* at 295:7-8. Finally, Mr. Hefner testified that the Plaintiffs' redistricting plan, introduced as Illustrative Plan 1, was a reasonable plan

---

[7]     The Polsby-Popper scale goes from 0 (no compactness) to 1 (total compactness). Mr. Hefner testified that District 6 had a Polsby-Popper score of 0.05. *Id.,* 303:13-20.

that can be drawn in a race-neutral manner; adheres to the use of traditional redistricting principles; preserves more communities of interest; provides more compact election districts; preserves the core election districts; and balances the population within each district. *Id.* at 272:17-25; 273:1-2.

### a. Anthony Fairfax

Mr. Anthony Fairfax testified on behalf of the *Robinson* Intervenors to rebut the testimony of Mr. Hefner, and was qualified by the Court as an expert in redistricting and demography. Tr., Vol. II, 379:6-15. Contradicting Mr. Hefner, Mr. Fairfax testified that traditional redistricting principles could be used to create maps with a second majority-Black district. *Id.* at 381-383:24. But on rebuttal, Mr. Fairfax admitted that the map he used did not account for where people lived within parishes, and his map therefore failed to take account of where Black voters are located in each parish. *Id.* at 407:4-125; 408:1-12. Therefore, on the issue of parish splitting, Mr. Fairfax's testimony was unpersuasive. Rather, as Mr. Hefner testified, Fairfax's analysis fails to show the Court whether District 6 specifically targeted those pockets of high populations of Black voters. *Id.* at 292:13-293:3. Tellingly, in discussing preservation of communities of interests, parishes, and municipalities, Mr. Fairfax agreed with Mr. Hefner that SB8 split more parishes and municipalities than HB1, *Id.* at 385:14-18; 389:5-9, and that SB8 split more parishes and municipalities than the previously enacted plan. *Id.* at 385:11-15; 389:2-9.

# III.
## APPLICABLE LAW

To obtain permanent injunctive relief, the plaintiffs must establish by a preponderance of the evidence: "(1) actual success on the merits; (2) that it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tip in that party's favor; and (4) that an injunction is in the public interest."[8] *Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*, 76 F.4th 425, 441 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 820 (2024); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 32, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008).

The Equal Protection Clause of the Fourteenth Amendment provides that: "[N]o state shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. The intent of the provision is "to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642, 113 S. Ct. 2816, 2824, 125 L.Ed.2d 511 (1993) ("*Shaw I*"). As applied to redistricting, the Equal Protection Clause bars "a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race." *Bethune–Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187, 137 S. Ct. 788, 797, 197 L.Ed.2d 85 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 911, 115 S. Ct. 2475, 132 L.Ed.2d 762 (1995)). Thus, the Equal Protection Clause prohibits the creation and implementation of districting plans that include racial gerrymanders, with few exceptions. "A racial gerrymander [is] the

---

[8]     The Court consolidated the preliminary injunction hearing with the full trial on the merits. *See* [Doc. 63].

deliberate and arbitrary distortion of district boundaries … for [racial] purposes."
*Shaw I*, 509 U.S. at 640 (citing *Davis v. Bandemer*, 478 U.S. 109, 164, 106 S. Ct. 2797,
2826, 92 L.Ed.2d 85 (1986) (Powell, J. concurring in part and dissenting in part),
*abrogated on other grounds by Rucho v. Common Cause*, 588 U.S. 684, 139 S. Ct.
2484, 204 L.Ed.2d 931 (2019)).  Courts analyze racial gerrymandering challenges
under a two-part burden-shifting framework.

First, a plaintiff bears the burden to prove that "race was the predominant
factor motivating the legislature's decision to place a significant number of voters
within or without a particular district."  *Miller,* 515 U.S. at 916.  This requires a
plaintiff to show that "the legislature 'subordinated' other factors – compactness,
respect for political subdivisions, partisan advantage, what have you – to 'racial
considerations.'"  *Cooper v. Harris*, 581 U.S. 285, 291, 137 S. Ct. 1455, 1464, 197
L.Ed.2d 837 (2017) (citing *Miller*, 515 U.S. at 916).  The plaintiff may make the
requisite showing "either through circumstantial evidence of a district's shape and
demographics or more direct evidence going to legislative purpose, that race was the
predominant factor motivating the legislature's decision…."  *Alabama Legislative
Black Caucus v. Alabama*, 575 U.S. 254, 267, 135 S. Ct. 1257, 1267, 191 L.Ed.2d 314
(2015) (citing *Miller*, 515 U.S. at 916).

If Plaintiff meets the burden of showing race played the predominant factor in
the design of a district, the district must then survive strict scrutiny.  *Cooper*, 581
U.S. at 292.  At this point, the burden of proof "shifts to the State to prove that its
race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to
that end."  *Cooper*, 581 U.S. at 285 (citing *Bethune-Hill,* 580 U.S. at 193).  "Racial

gerrymandering, even for remedial purposes" is still subject to strict scrutiny. *Shaw I*, 509 U.S. at 657. Where the state seeks to draw a congressional district by race for remedial purposes under Section 2, the state must have a "strong basis in evidence" for "finding that the threshold conditions for section 2 liability are present" under *Gingles*. And, to survive strict scrutiny, "the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." *Bush v. Vera*, 517 U.S. 952, 979, 116 S. Ct. 1941, 1961, 135 L.Ed.2d 248 (1996).

## IV.
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.     Racial Predominance

The Court first addresses whether Plaintiffs have met their burden of showing that race predominated in drawing District 6. Racial *awareness* in redistricting does not necessarily mean that race *predominated* in the Legislature's decision to create a second majority-minority district. *Shaw I*, 509 U.S. at 646. When redistricting, a legislature may be aware of race when it draws district lines, just as it is aware of other demographic information such as age, economic status, religion, and political affiliation. *Shaw I*, 509 U.S. at 646. Race consciousness, on its own, does not make a district an unconstitutional racial gerrymander or an act of impermissible race discrimination. *Id.* But while districts may be drawn for remedial purposes, Section 2 of the Voting Rights "never require[s] adoption of districts that violate traditional redistricting principles." *Allen v. Milligan*, 599 U.S. 1, 29 – 30, 143 S. Ct. 1487, 1492, 216 L.Ed.2d 60 (2023) (internal citations omitted). Indeed, to survive strict scrutiny,

"the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." *Vera*, <u>517 U.S. at 979</u>. As discussed above, racial predominance may be shown through either circumstantial evidence, direct evidence, or both. *Ala. Legis. Black Caucus*, <u>135 S. Ct. at 1267</u>.

Here, the *Robinson* Intervenors and the State argue that political considerations predominated in drawing the boundaries of District 6. They argue that the State had to create a second majority-minority district based on the district court's ruling in the *Robinson* litigation and that District 6 was drawn with the primary purpose of protecting key Republican incumbents, such as Speaker Mike Johnson, Majority Leader Steve Scalise, and Representative Julia Letlow. It is clear from the record and undisputed that political considerations – the protection of incumbents – played a role in how District 6 was drawn. Plaintiffs, however, contend that considerations of race played a qualitatively greater role in how the State drew the contours of District 6 than these political considerations.

### 1. Circumstantial Evidence

In the redistricting realm, appearances matter. A district's shape can provide circumstantial evidence of a racial gerrymander. *Shaw I*, <u>509 U.S. at 647</u>. In the past, the Supreme Court has relied on irregular district shapes and demographic data to find racial gerrymandering.[9] *See Shaw v. Hunt*, <u>517 U.S. 899, 910-16</u> (1996) ("*Shaw II*"); *Miller*, <u>515 U.S. 900</u>; *Vera*, <u>517 U.S. 952</u>.

---

[9] Significantly, "[s]hape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be

Here, as described by Dr. Voss, District 6 " 'slashes' across the state of Louisiana" and includes portions of four disparate metropolitan areas. But – critical to our analysis – District 6 only encompasses the parts of those cities that are inhabited by majority-Black voting populations, while excluding neighboring non-minority voting populations. Tr., Vol. I, 93:25; 94:1-5; 94:18-95:10; 96:7-16; PE3; PE4. His description encapsulates what the following maps show on their face:



Baton Rouge Close Up of 2024 Enacted Map (JE17).

---

persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Miller*, 515 U.S. at 912-913; *See Shaw v. Hunt*, 861 F. Supp. 408, 431 (E.D.N.C. 1994); *Hays I*; but see *DeWitt v. Wilson*, 856 F. Supp. 1409, 1413 (E.D. Cal.1994). Thus, a district's bizarre shape is not the only type of circumstantial evidence on which parties may rely. *Id.*



Lafayette Close Up of 2024 Enacted Map (JE17).



Alexandria Close Up of 2024 Enacted Map (JE17).



Shreveport Close Up of 2024 Enacted Map (JE17).

Like *Shaw II* and *Vera*, this case presents evidence of "mixed motives" in creating District 6 – motives based on race and political considerations. Unlike a single motive case, any circumstantial evidence tending to show neglect of traditional districting principles, such as compactness and respect for parish lines, caused District 6's bizarre shape could seemingly arise from a "political motivation as well as a racial one." *Cooper v. Harris*, 581 U.S. at 308 (citing *Hunt v. Cromartie*, 526 U.S. 541, 547 n.3, 119 S. Ct. 1545, 1549, 143 L.Ed.2d 731 (1999)). In mixed motive cases such as this one, the Supreme Court has noted that "political and racial reasons are capable of yielding similar oddities in a district's boundaries." *Id.* Accordingly, this Court faces "a formidable task: It must make 'a sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the plaintiffs have

managed to disentangle race from politics and prove that the former drove a district's lines." *Id.*

Turning to the record, Mr. Hefner's "heat map" is particularly helpful as circumstantial evidence of the motives driving the decisions as to where to draw the boundaries of District 6. The "heat map" shows that outside of the New Orleans and East Baton Rouge areas, the state's Black population is highly dispersed across the state. Tr., Vol. II 281:4-15. Mr. Hefner opined that District 6 was designed as such to collect these highly dispersed BVAP areas in order to create a second majority-minority district. *Id.*, 283:15-285:1.

**Map 15 – SB 8 Plan with African American Populations**



PE 16.

When Mr. Hefner's heat map is superimposed on SB8, the "story of racial gerrymandering" becomes evident. *See Miller*, <u>515 U.S. at 917</u> ("… when [the district's] shape is considered in conjunction with its racial and population densities, the story of racial gerrymandering … becomes much clearer"). That exhibit shows that District 6 sweeps across the state to include the heavily concentrated Black population neighborhoods in East Baton Rouge, Alexandria, Opelousas, Natchitoches, and Mansfield. Most telling, District 6 juts up at its northern end to carve out the Black neighborhoods of Shreveport and separates those neighborhoods from the majority white neighborhoods of Shreveport and Bossier City ("Shreveport-Bossier"). Tr., Vol. II, 283:15-285:1.

Map 21 – Shreveport Area in Caddo Parish



PE 18.

District 6 also dips down from its northwest trajectory and splits the majority of Black neighborhoods of Lafayette from the rest of the city and parish. Specifically, District 6 includes Lafayette's northeast neighborhoods, which contain a predominantly Black population, while leaving the rest of the city and parish in neighboring District 3. *Id.* at 283:22-284:4. In sum, the "heat maps" and demographic data in evidence tell the true story – that race was the predominate factor driving decisions made by the State in drawing the contours of District 6. This evidence shows that the unusual shape of the district reflects an effort to incorporate as much of the dispersed Black population as was necessary to create a majority-Black district.

### 2. Direct Evidence

The Court next looks to the direct evidence of the Legislature's motive in creating District 6 – in other words, what was actually said by the individuals who had a hand in promulgating, drafting, and voting on SB8. The direct evidence buttresses the Court's conclusion that race was the predominant factor the legislators relied upon in drawing District 6.

The record includes audio and video recordings, as well as transcripts, of statements made by key political figures such as the Governor of Louisiana, the Louisiana Attorney General, and Louisiana legislators, all of whom expressed that the primary purpose guiding SB8 was to create a second majority-Black district due to the *Robinson* litigation. As discussed *supra*, the Middle District, after the preliminary injunction hearing in *Robinson*, found a likelihood of success on the merits of the *Robinson* Plaintiffs' claim that a second majority-minority district was required by Section 2 of the Voting Rights. Although the preliminary injunction was

vacated by the Fifth Circuit to allow the Legislature to enact a new map, legislators chose to draw a map with a second majority-Black district in order to avoid a trial on the merits in the *Robinson* litigation. *See, e.g.,* Tr. Vol. III, 588:11-17 ("Judge Dick has put us in a position and the Fifth Circuit, the panel that reviewed that decision, and the whole court, when I asked them to go *en banc*, by declining to go on *en banc*, have put us in a position pus [sic] of where we are today where we need to draw a map."); JE28, 46:5-101 (same); *see also* Tr. Vol. III, 589:1-3 ("The courts, never the less, have told us to draw a new map. And they have indicated that we have a deadline to do that or Judge Dick will draw the map for us."); JE28 at 36:14-17 (same); JE36 at 33 (Senator Price: "Regardless of what you heard, we are on a court order and we need to move forward. We would not be here if we were not under a court order to get this done."); JE36 at 1 (Senator Fields: "[B]oth the district and the appeals court have said we need to do something before the next congressional elections."); JE31, 26:12–24 (Chairman Beaullieu: "Senator Womack, why are we here today? What – what brought us all to this special session as it – as it relates to, you know, what we're discussing here today?"; Senator Womack: "The middle courts of the district courts brought us here from the Middle District, and said, 'Draw a map, or I'll draw a map.'"; Chairman Beaullieu: "Okay."; Senator Womack: "So that's what we've done."; Chairman Beaullieu: "And – and were you – does – does this map achieve that middle court's orders?"; Senator Womack: "It does."); PE41, 75:24-76:2 (Representative Lyons, Chairman of the House and Governmental Affairs Committee, stating "[T]he mission we have here is that we have to create two majority-Black districts."); PE41, 121:19–22 (Senator Womack stating that "… we all know why we're here. We were

ordered to – to draw a new Black district, and that's what I've done."); PE41, 9:3-8 (Representative Amedee: "Is this bill intended to create another black district?" Representative Beaullieu: "Yes, ma'am, and to comply with the judge's order."); JE31, 97:17-19, 21-24 (Representative Carlson: "the overarching argument that I've heard from nearly everyone over the last four days has been race first … race seems to be, at least based on the conversations, the driving force…."). SB 8's sponsor, Senator Womack, also explicitly admitted that creating two majority-Black districts was "the reason why District 2 is drawn around the Orleans Parish and why District 6 includes the Black population of East Baton Rouge Parish and travels up the I-49 corridor to include Black population in Shreveport." PE41 at 26.

The Court also acknowledges that the record includes evidence that race-neutral considerations factored into the Legislature's decisions, such as the protection of incumbent representatives. *See* JE29 at 2-3 (Senator Womack discussing that SB8 protects Congresswoman Julia Letlow, U.S. Speaker of the House Mike Johnson, and U.S. House Majority Leader Steve Scalise); Tr. Vol. I, 71:11-18, 79:1-4 (Senator Pressley testifying that "[w]e certainly wanted to protect Speaker Johnson … We wanted to make sure that we protected Steve Scalise. Julia Letlow is on Appropriations. That was also very important that we try to keep her seat as well."); *Id.* at 60:8-61:15 (Senator Seabaugh testifying that the fact that the Speaker and Majority Leader are from Louisiana is "kind of a big deal" and that protecting Speaker

Johnson, Majority Leader Scalise, and Representative Letlow was "an important consideration when drawing a congressional map.").[10]

However, considering the circumstantial and the direct evidence of motive in the creation of District 6, the Court finds that "racially motivated gerrymandering had a qualitatively greater influence on the drawing of the district lines than politically motivated gerrymandering." *Vera*, 517 U.S. at 953. As in *Shaw II* and *Vera*, the State first made the decision to create a majority-Black district and, only then, did political considerations factor into the State's creation of District 6. The predominate role of race in the State's decisions is reflected in the statements of legislative decision-makers, the division of cities and parishes along racial lines, the unusual shape of the district, and the evidence that the contours of the district were drawn to absorb sufficient numbers of Black-majority neighborhoods to achieve the goal of a functioning majority-Black district. If the State's primary goal was to protect congressional incumbents, the evidence in the record does not show that District 6 in its current form was the only way to achieve that objective. As explained by the Supreme Court:

---

[10]     At bottom, it is not credible that Louisiana's majority-Republican Legislature would choose to draw a map that eliminated a Republican-performing district for predominantly political purposes. The Defendants highlight the purported animosity between Governor Jeff Landry and Representative Garrett Graves to support their contention that political considerations served as the predominant motivating factor behind SB8. However, given the slim majority Republicans hold in the United States House of Representatives, even if such personal or intra-party animosity did or does exist, it is difficult to fathom that Louisiana Republicans would intentionally concede a seat to a Democratic candidate on those bases. Rather, the Court finds that District 6 was drawn primarily to create a second majority-Black district that they predicted would be ordered in the Robinson litigation after a trial on the merits. Thus, it is clear that race was the driving force and predominant factor behind the creation of District 6.

> One, often highly persuasive way to disprove a States contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district. If you were really sorting by political behavior instead of skin color (so the argument goes) you would have done – or, at least, could just as well have done – this. Such would-have, could-have, and (to round out the set) should-have arguments are a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground.

*Cooper*, 581 U.S. at 317. In the present case, the record reflects that the State could have achieved its political goals in ways other than by carving up and sorting by race the citizens of Baton Rouge, Lafayette, Alexandria, and Shreveport. Put another way, the Legislature's decision to increase the BVAP of District 6 to over 50 percent was not required to protect incumbents and supports the Plaintiffs' contention that race was the predominate factor in drawing the district's boundaries. In sum, Plaintiffs have met their initial burden, and the burden now shifts to the State to prove that District 6 survives strict scrutiny.

## B.    Strict Scrutiny

When a Plaintiff succeeds in proving racial predominance, the burden shifts to the State to "demonstrate that its districting legislation [was] narrowly tailored to achieve a compelling interest." *Bethune-Hill*, 580 U.S. at 193 (citing *Miller*, 515 U.S. at 920).

### 1.    Compelling State Interest

The State argues that compliance with Section 2 of the Voting Rights Act is a compelling state interest. The Supreme Court has repeatedly assumed without deciding that compliance with the Voting Rights Act is a compelling interest. *See Shaw II*, 517 U.S. at 915; *Cooper*, 581 U.S. at 292; *Bethune-Hill*, 580 U.S. at 193. To

show that the districting legislation satisfies the "narrow tailoring" requirement "the state must establish that it had 'good reasons' to think that it would transgress the act if it did not draw race-based district lines." This "strong basis (or 'good reasons') standard" provides "breathing room" to the State "to adopt *reasonable* compliance measures that may prove, in perfect hindsight not to have been needed." *Cooper*, 581 U.S. at 293 (quoting *Bethune–Hill*, 581 U.S. at 293) (emphasis added). Moreover, the Supreme Court has often remarked that "redistricting is primarily the duty and responsibility of the State," not of the courts. *Abbott v. Perez*, 585 U.S. 579, 603, 138 S. Ct. 2305, 2324, 201 L.Ed.2d 714 (2018) (citing *Miller*, 515 U.S. at 915).

Turning to the present case, the State argues that it had a "strong basis" in evidence to believe that the district court for the Middle District was likely, after a trial on the merits in *Robinson*, to rule that Louisiana's congressional map violated Section 2 of the Voting Rights Act and order the creation of a second majority-Black district. *See Robinson* Appeal Ruling at 583 (vacating the district court's preliminary injunction and granting the Legislature the opportunity to draw a new map instead of advancing to a trial on the merits of HB1); *See also Robinson* Docket, [Doc. 315] ("If the Defendant/Intervenors fail to produce a new enacted map on or before [January 30, 2024], this matter will proceed to a trial on the merits on [February 5, 2024], which shall continue daily until complete"); *see, e.g.,* JE36 at 4 (Senator Price: "We all know that we've been ordered by the court that we draw congressional districts with two minority districts. This map will comply with the order of both the Fifth Circuit Court of Appeals and the district court. They have said that the Legislature must pass a map that has two majority black districts."); JE33, 5:1-7

(Representative Beaullieu: "As Senator Stine said earlier in this week, 'It's with a heavy heart that I present to you this other map,' but we have to. It's that clear. A federal judge has ordered us to draw an additional minority seat in the State of Louisiana."); JE34, 11:3–7 (Senator Carter: "[W]e came together in an effort to comply with a federal judge's order that Louisiana provide equal representation to the African Americans in the State of Louisiana, and we have an opportunity to do that."); JE36 at 18 (Representative Marcelle: "Let's not let Judge Dick have to do what our job is, which is to create a second minority-majority district."); JE30, 20:22–21:4 (Senator Duplessis: "It's about a federal law called the Voting Rights Act that has not been interpreted just by one judge in the Middle District of Louisiana who was appointed by former president Barack Obama, but also a U.S. Fifth Circuit Court of Appeals that's made up of judges that were appointed by predominantly Republican presidents, and a United States Supreme Court that has already made rulings."); Tr. Vol. I, 47:22-48:1 (Senator Seabaugh: "Well, the – really, the only reason we were there was because of the other litigation; and Judge Dick saying that she – if we didn't draw the second minority district, she was going to. I think that's the only reason we were there."); Tr. Vol. I, 69:24-70:4 (Senator Pressly: "We were told that we had to have two performing African American districts. And that we were – that that was the main tenet that we needed to look at and ensure that we were able to draw the court – draw the maps; otherwise, the Court was going to draw the maps for us").

The Court assumes, without deciding, that compliance with Section 2 was a compelling interest for the State to attempt to create a second majority-Black district in the present case. However, even assuming that the Voting Rights Act is a

compelling state interest in this case, that compelling interest does not support the
creation of a district that does not comply with the factors set forth in *Gingles* or
traditional districting principles. *See e.g., Shaw II*, 517 U.S. at 915 ("We assume,
arguendo, for the purpose of resolving this suit, that compliance with Section 2 could
be a compelling interest" but hold that the remedy is not narrowly tailored to the
asserted end); *Vera*, 517 U.S. at 977 (plurality opinion) ("[W]e assume without
deciding that compliance with [the Voting Rights Act], as interpreted by our
precedents, can be a compelling state interest" but hold that the districts at issue are
not "narrowly tailored" to achieve that interest (citation omitted)); *Ala. Legis. Black
Caucus*, 575 U.S. at 279 ("[W]e do not here decide whether … continued compliance
with § 5 [of the Voting Rights Act] remains a compelling interest" because "we
conclude that the District Court and the legislature asked the wrong question with
respect to narrow tailoring.").

Indeed, the Supreme Court has made clear that, in the context of a
constitutional challenge to a districting scheme, "unless each of the three *Gingles*
prerequisites is established, " 'there neither has been a wrong nor can be a remedy'"
and the districting scheme does not pass muster under strict scrutiny. *Cooper v.
Harris*, 581 U.S. at 306 (quoting *Growe v. Emison*, 507 U.S. 25, 41, 113 S. Ct. 1075,
1084, 122 L.Ed.2d 388 (1993)). With respect to traditional districting requirements,
the Supreme Court has consistently warned that, "§ 2 never require[s] adoption of
districts that violate traditional redistricting principles. Its exacting requirements,
instead, limit judicial intervention to 'those instances of intensive racial politics'
where the 'excessive role [of race] in the electoral process ... den[ies] minority voters

equal opportunity to participate.'" *Allen v. Milligan*, 599 U.S. at 29–30 (internal citations omitted).[11] Accordingly, whether District 6, as drawn, is "narrowly tailored" requires the Court to address the *Gingles* factors as well as traditional districting criteria.

### a.    Consideration of the *Gingles* Factors

The Supreme Court in *Gingles* set out how courts must evaluate claims alleging a Section 2 violation of the Voting Rights Act. *Gingles* involved a challenge to North Carolina's districting scheme, which purportedly diluted the vote of its Black citizens. *Gingles*, 478 U.S. at 34–36.

*Gingles* emphasized precisely what Section 2 guards against. "The essence of a § 2 claim," the Court explained, "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters." *Id.* at 47. This inequality occurs where an "electoral structure operates to minimize or cancel out" minority voters' "ability to elect their preferred candidates." *Id.* at 48. This risk is greatest "where minority and majority voters consistently prefer different candidates" and where minority voters are submerged in a majority voting population that "regularly defeat[s]" their choices. *Ibid.*

---

[11]    The concern that Section 2 may impermissibly elevate race in the allocation of political power within the states is, of course, not new. *See, e.g., Shaw I*, 509 U.S. at 657 ("Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters."); *Allen v. Milligan*, 599 U.S. at 41–42. To ensure that *Gingles* does not improperly morph into a proportionality mandate, courts must rigorously apply the "geographically compact" and "reasonably configured" requirements. *Id.* at 44 (Kavanaugh concurrence, n. 2).

But Section 2 of the Voting Rights Act explicitly states that, "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301. And the Supreme Court has repeatedly admonished that *Gingles* does not mandate a proportional number of majority-minority districts. Indeed, "[i]f *Gingles* demanded a proportional number of majority-minority districts, States would be forced to group together geographically dispersed minority voters into unusually shaped districts, without concern for traditional districting criteria such as county, city, and town lines. But *Gingles* and this Court's later decisions have flatly rejected that approach." *Allen v. Milligan*, 599 U.S. at 43–44 (Kavanaugh concurring) (citing *Abbott*, 585 U.S. at 615; *Vera*, 517 U.S. at 979; *Gingles*, 478 U.S. at 50; *Miller*, 515 U.S. at 917–920; and *Shaw I*, 509 U.S. at 644–649).

Instead, *Gingles* requires the creation of a majority-minority district only when, among other things: (i) a State's redistricting map cracks or packs a large and "geographically compact" minority population and (ii) a plaintiff's proposed alternative map and proposed majority-minority district are "reasonably configured" – namely, by respecting compactness principles and other traditional districting criteria such as county, city, and town lines. *Allen v. Milligan*, 599 U.S. at 43 (Kavanaugh concurring) (citing *Cooper*, 581 U.S. at 301–302; *Voinovich v. Quilter*, 507 U.S. 146, 153–154, 113 S. Ct. 1149, 122 L.Ed.2d 500 (1993)).

In order to succeed in proving a Section 2 violation under *Gingles*, Plaintiffs must satisfy three specific "preconditions." *Gingles*, 478 U.S. at 50. First, the "minority group must be sufficiently large and [geographically] compact to constitute

a majority in a reasonably configured district." *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 402, 142 S. Ct. 1245, 1248, 212 L.Ed.2d 251 (2022) (per curiam) (citing *Gingles*, 478 U.S. at 46–51). Case law explains that a district will be reasonably configured if it comports with traditional districting criteria, such as being contiguous and reasonably compact. *See Ala. Legis. Black Caucus*, 575 U.S. at 272. "Second, the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U.S. at 51. Third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." *Ibid.* Finally, a plaintiff who demonstrates the three preconditions must also show, under the "totality of circumstances," that the political process is not "equally open" to minority voters. *Id.* at 38-38 and 45-46 (identifying several factors relevant to the totality of circumstances inquiry, including "the extent of any history of official discrimination in the state ... that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.").

Each of the three *Gingles* preconditions serves a different purpose. The first, which focused on geographical compactness and numerosity, is "needed to establish that the minority has the potential to elect a representative of its own choice in some [reasonably configured] single-member district." *Growe*, 507 U.S. at 40. The second, which concerns the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected. *Ibid*. The third precondition, which focuses on racially polarized voting, "establish[es] that the challenged districting thwarts a distinctive minority vote" at least plausibly on account of race.

*Ibid.*  Finally, the totality of circumstances inquiry recognizes that application of the *Gingles* factors is "peculiarly dependent upon the facts of each case." <u>478 U.S. at 79</u>. Before a court can find a violation of Section 2, therefore, they must conduct "an intensely local appraisal" of the electoral mechanism at issue, as well as "searching practical evaluation of the 'past and present reality.'" *Ibid.*

In the present case, the State simply has not met its burden of showing that District 6 satisfies the first *Gingles* factor – that the "minority group [is] sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district."  The record reflects that, outside of southeast Louisiana, the State's Black population is dispersed.  That required the State to draw District 6 as a "bizarre" 250-mile-long slash-shaped district that functions as a majority-minority district only because it severs and absorbs majority-minority neighborhoods from cities and parishes all the way from Baton Rouge to Shreveport.  As discussed below, this fails to comport with traditional districting principles.

### b.    Traditional Districting Principles

The first *Gingles* factor requires that a minority population be "[geographically] compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, <u>599 U.S. at 18</u> (quoting *Wisconsin*, <u>595 U.S. at 402</u>).  This requires consideration of traditional districting principles.

Traditional districting principles consist of six criteria that arose from case law.  The first three are geographic in nature and are as follows: (1) compactness, (2) contiguity, and (3) preservation of parishes and respect for political subdivisions. *Shaw I*, <u>509 U.S. at 647</u>.  The Supreme Court has emphasized that "these criteria are

important not because they are constitutionally required – they are not, *cf. Gaffney v. Cummings*, 412 U.S. 735, 752, n. 18, 93 S. Ct. 2321, 2331, n. 18, 37 L.Ed.2d 298 (1973) – but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." *Id.*  The other three include preservation of communities of interest, preservation of cores of prior districts, and protection of incumbents. *See Miller*, 515 U.S. at 916; *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).

Joint Rule 21 – enacted by the Legislature in 2021 – contains criteria that must be satisfied by any redistricting plan created by the Legislature, separate and apart from compliance with the Voting Rights Act and Equal Protection Clause. JE2. Joint Rule 21 states, relevantly, that "each district within a redistricting plan … shall contain whole election precincts as those are represented as Voting Districts (VTDs)" and "[i]f a VTD must be divided, it shall be divided into as few districts as possible." *Id.* at (G)(1)-(2).  Joint Rule 21 further requires the Legislature to "respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable." *Id.* at (H).  However, this requirement does not take precedence over the preservation of communities of interest and "shall not be used to undermine the maintenance of communities of interest within the same district to the extent practicable." *Id.*

The Supreme Court case of *Miller v. Johnson* demonstrates how traditional districting criteria applies to a racial gerrymandering claim.  515 U.S. at 910–911. There, the Supreme Court upheld a district court's finding that one of Georgia's ten congressional districts was the product of an impermissible racial gerrymander.  *Id.*

At the time, Georgia's BVAP was 27 percent, but there was only one majority-minority district. *Id.* at 906. To comply with the Voting Rights Act, Georgia's government thought it necessary to create two more majority-minority districts – thereby achieving proportionality. *Id.* at 920–921. But like North Carolina in *Shaw I*, Georgia could not create the districts without flouting traditional criteria. Instead, the unconstitutional district "centered around four discrete, widely spaced urban centers that ha[d] absolutely nothing to do with each other, and stretch[ed] the district hundreds of miles across rural counties and narrow swamp corridors." *Miller*, 515 U.S. at 908. The Court called the district a geographic "monstrosity." *Allen v. Milligan*, 599 U.S. at 27–28 (citing *Miller*, 515 U.S. at 909).

### c.     Communities of Interest

Perhaps more than any other state of its size, the State of Louisiana is fortunate to have a rich cultural heritage, including diverse ethnicities, customs, economic drivers, types of agriculture, and religious affiliations. While the Court is not bound by the decisions in the *Hays* litigation – made some thirty years ago and involving a different though similar map, and different Census numbers – much of the "local appraisal" analysis from *Hays I* remains relevant to an analysis of SB8. There, the *Hays* court concluded that the distinct and diverse economic interests encapsulated in the challenged district, namely

> cotton and soybean plantations, centers of petrochemical production, urban manufacturing complexes, timberlands, sawmills and paper mills, river barge depots, and rice and sugarcane fields are strung together to form the eclectic and incoherent industrial base of District 4. These diverse segments of the State economy have little in common. Indeed, their interests more often conflict than harmonize.

*Hays I*, <u>839 F. Supp. at 1201</u>.  Though this was written 30 years ago, the same is true today.  And like the predecessor districts drawn in *Hays*, it is readily apparent to anyone familiar with Louisiana history and culture that Congressional District 6 also

> violates the traditional north-south ethno-religious division of the State. Along its circuitous route, this new district combines English–Scotch–Irish, mainline Protestants, traditional rural Black Protestants, South Louisiana Black Catholics, Continental French–Spanish–German Roman Catholics, sui generis Creoles, and thoroughly mixed polyglots, each from an historically discrete and distinctive region of Louisiana, as never heretofore so extensively agglomerated.

*Id.*

Indeed as succinctly stated by the *Hays* court, the differences between North Louisiana, Baton Rouge, and Acadiana in term of culture, economic drivers, types of agriculture, and religious affiliations are pronounced.[12]  This is so well known that

---

[12]    Among other strong cultural and ethnic groups divided by SB8, the French Acadian ("Cajun") and Creole communities in Southwest Louisiana have a strong identity and a shared history of adversity.  The Acadians, for their part, were expelled from Nova Scotia by the British and Anglo-Americans during the French and Indian War, and some settled into the southwestern parishes of Louisiana ("Acadiana").  See Carl A. Brasseaux, *The Founding of New Acadia: The Beginning of Acadian Life in Louisiana, 1765-1803* (Chapter 5) (Louisiana State University Press 1987).  This historical event is well-known in Louisiana and referred to as *Le Grand Dérangement*.  *See* William Faulker Rushton, *The Cajuns From Acadia to Louisiana* (Farrar Straus Giroux 1979).  The Acadian refugees made their homes in the foreign swamps and bayous of southern Louisiana and from there, built a rich and persisting culture – marked by their distinct dialect of French, and their cuisine, music, folklore, and Catholic faith.  *See* Brasseaux, *The Founding of New Acadia*.

In 1921, Louisiana's Constitution eliminated any reference to the French language and instead required only English to be taught, used, and spoken in Louisiana schools, which detrimentally affected the continuation of Cajun French.  Roger K. Ward, The French Language in Louisiana Law and Legal Education: A Requiem, 57 La. L. Rev. 1299 (1997).  https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?article=5694&context=lalrev.

Remarkably, after years of cultural suppression, the late 1960s/early 1970s witnessed collective activism to revive Cajun French and culture in the area.  *Id.* at 1299; *see also* https://www.nationalgeographic.com/culture/article/reviving-the-cajun-dialect.  Thankfully, Louisiana's 1974 Constitution safeguarded efforts by Cajun cultural groups to "ensure [their] preservation and proliferation."  *Id.* at 1300.  To this day, Acadiana celebrates its

any Louisiana politician seeking statewide office must first develop a strategy to bridge the regional cultural and religious differences in Louisiana.[13]

There is no doubt that District 6 divides some established communities of interest from one another while collecting parts of disparate communities of interest into one voting district. Among other things, District 6 in SB8 splits six of the ten parishes that it touches. As the Court succinctly states in *Hays*, "there is no more fundamental unit of societal organization in the history of Louisiana than the parish." *Hays I*, 839 F. Supp. at 1200.

District 6 also divides the four largest cities and metropolitan areas in its path along clearly racial lines. Among these are three of the four largest cities in Louisiana — *i.e.*, Baton Rouge, Lafayette, and Shreveport. And the maps in the record are clear that the division of these communities is based predominantly on the location of majority-Black voting precincts. Indeed, SB8, just like the congressional districts in *Hays I*, "violates the boundaries of nearly all major municipalities in the State." *Hays*

---

Francophone ties with festivals such as Festival International de Louisiane, which features Francophone musicians and artisans from around the world, and Festival Acadiens and Créoles, the largest Cajun and Creole festival in the world. Further, to preserve the language, organizations such as CODOFIL support the preservation of the French language in Louisiana, and on a smaller scale, many community members form "French tables" where only French is allowed to be spoken. The unique community of Acadiana, among many others in Louisiana, with a deep connection and awareness of its past, certainly constitutes a community of interest. Race predominating, SB8 fails to take into account Louisiana's diverse cultural, religious, and social landscape in any meaningful way.

[13] Attempting to bridge the north-south religious divide, one of Louisiana's most famous politicians, Huey Long, began his stump speech by claiming, that, "when I was a boy, I would get up at six o'clock in the morning on Sunday, and I would take my Catholic grandparents to mass. I would bring them home, and at ten o'clock I would hitch the old horse up again, and I would take my Baptist parents to church." A colleague later said, "I didn't know you had any Catholic grandparents." To which he replied, "Don't be a damned fool. We didn't even have a horse."

*I*, 839 F. Supp. at 1201. The law is crystal clear on this point. As the Supreme Court held in *Allen v. Milligan*, it is unlawful to "concentrate[] a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions," reaffirming that "[a] reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise separated by geographical and political boundaries," raises serious constitutional concerns. 599 U.S. at 27 (citing *Shaw I*, 509 U.S. at 647). Based upon the foregoing, the Court finds that SB8's District 6 does not satisfy the "geographically compact" and "reasonably configured" *Gingles* requirement.

### d. Respect for Political Subdivisions and Natural Boundaries

Nor does SB8 take into account natural boundaries such as the Atchafalaya Basin, the Mississippi River, or the Red River. Just as in *Miller*, District 6 of SB8 "centers around four discrete, widely spaced urban centers that have absolutely nothing to do with each other, and stretches the district hundreds of miles across rural counties and narrow swamp corridors." 515 U.S. at 908; *Allen v. Milligan*, 599 U.S. at 27–28 (citing *Miller v. Johnson*). Specifically, District 6's population centers around the widely-spaced urban centers of Shreveport, Alexandria, Lafayette, and Baton Rouge – each of which is an independent metropolitan area – and are connected to one another only by rural parishes having relatively low populations. Importantly, none of these four cities or the parishes in which they are located are, by themselves, large enough to require that they be divided to comply with the "one person, one vote"

requirement of the Fourteenth Amendment. *Reynolds v. Sims*, <u>377 U.S. 533, 566</u>, <u>84 S. Ct. 1362, 1384</u>, <u>12 L.Ed.2d 506</u> (1964).

  e.  **Compactness**

  The record also includes statistical evidence showing that District 6 is not "compact" as required by traditional districting principles. Specifically, Dr. Voss testified that, based on three measures of compactness — (i) the Reock Score; (ii) the Polsby-Popper score; and (iii) the Know It When You See It ("KIWYSI") score — the current form of District 6 in SB8 performs worse than the districts in either HB1 (the map that was enacted in 2022) or the map that HB1 replaced from the previous decade. Tr., Vol. I, 100:22-103:5; 104:25-105:4; PE7. Thus, SB8 does not produce compact maps when judged in comparison to other real-life congressional maps of Louisiana. Tr., Vol. I, 107:16-21. Dr. Voss also opined that SB8's majority-Black districts were especially non-compact compared to other plans that also included two majority-minority districts. *Id.* at 106:17-24. According to Dr. Voss, SB8's District 6 scored worse on the Polsby-Popper test than the second majority-Black districts in other proposed plans that created a second majority-Black district. *Id.* at 106:17-24.

  In sum, District 6 does not satisfy the first *Gingles* precondition nor does it comply with traditional districting principles. Accordingly, SB8 and, more specifically, District 6 cannot withstand strict scrutiny. That being said, while the record is clear that Louisiana's Black population has become more dispersed and integrated in the thirty years since the *Hays* litigation (and Louisiana now has only six rather than the seven Congressional districts it had at that time), this Court does not decide on the record before us whether it is feasible to create a second majority-

Black district in Louisiana that would comply with the Equal Protection Clause of the Fourteenth Amendment. However, we do emphasize that Section 2 of the Voting Rights Act never requires race to predominate in drawing Congressional districts at the sacrifice of traditional districting principles. *Allen v. Milligan*, 599 U.S. at 29–30 (internal citations omitted).

## V.
### REMEDIAL PHASE

The Court will hold a status conference to discuss the remedial stage of this trial on May 6, 2024, at 10:30 a.m. CST.

## VI.
### CONCLUSION

As our colleagues so elegantly stated in *Hays II*, the long struggle for civil rights and equal protection under the law that has taken place in Louisiana and throughout our country, includes:

> countless towns across the South, at schools and lunch counters, at voter registrar's offices. They stood there, black and white, certain in the knowledge that the Dream was coming; determined that no threat, no spittle, no blow, no gun, no noose, no law could separate us because of the color of our skin. To say now: "Separate!" "Divide!" "Segregate!" is to negate their sacrifice, mock their dream, deny that self-evident truth that all men are created equal and that no government may deny them the equal protection of its laws.

*Hays II* at 125. The Court agrees and finds that SB8 violates the Equal Protection Clause as an impermissible racial gerrymander.

In light of the foregoing, the Court GRANTS PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF. The State of Louisiana is prohibited from using SB8's map of congressional districts for any election.

A status conference is hereby set on **May 6, 2024, at 10:30 a.m. CST** to discuss the remedial stage of this trial. Representatives for each party must attend.

THUS, DONE AND SIGNED on this 30th day of April 2024.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE
WESTERN DISTRICT OF LOUISIANA

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE
WESTERN DISTRICT OF LOUISIANA

Carl E. Stewart, *Circuit Judge*, dissenting:

Contrary to my panel colleagues, I am not persuaded that Plaintiffs have met their burden of establishing that S.B. 8 is an unconstitutional racial gerrymander. The totality of the record demonstrates that the Louisiana Legislature weighed various political concerns—including protecting of particular incumbents—alongside race, with no factor predominating over the other. The panel majority's determination that S.B. 8 is unconstitutional is incredibly striking where, as here, Plaintiffs did not even attempt to address or disentangle the various political currents that motivated District 6's lines in S.B. 8.[1] While this inquiry should end at racial predominance, I would further hold that S.B. 8 satisfies strict scrutiny because the Supreme Court has never imposed the aggressive incursion on state sovereignty that the panel majority advocates for here. Indeed, the panel majority's requirements for permissible electoral map trades in the substantial "breathing room" afforded state legislatures in reapportionment for a tightly wrapped straight-jacket. Therefore, I respectfully dissent.

## I. Factual Background

The Supreme Court has undoubtedly recognized that in a "more usual case," alleging racial gerrymandering, a trial court "can make real headway by exploring the challenged district's conformity to traditional districting principles, such as compactness and respect for county lines."

---

[1] Notably, none of the plaintiffs in this case demonstrated that S.B. 8 had a discriminatory effect on them based on their race. None of them testified or otherwise entered any evidence into the record of their racial identity, which conflicts with the well-recognized principle that actionable intentional discrimination must be against an "identifiable group." *See Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020). As an aside, nearly all of the plaintiffs in this case lack standing to allege this racial gerrymandering claim because they do not reside in District 6. *See United States v. Hays*, 515 U.S. 737, 744–45 (1996).

*Cooper v. Harris*, 581 U.S. 285, 308 (2017). Notably, the panel majority has proceeded full steam ahead in this direction without proper regard for the atypical nature of this case and trial record. Because of this, the panel majority has mis-stepped with regard to their approach, resulting in numerous errors and omissions in both their reasoning and holding.

One such omission derives from the fact that none of the prior redistricting cases arrive from the same genesis as this one. This case involves important distinctions, worth noting, that make it anything but a "usual" racial gerrymandering case. *See Cooper*, 581 U.S. at 308. First, the State has made no concessions to racial predominance.[2] Second, the State affirmatively invokes a political motivation defense.[3] Third, the State constructively points—not to a Justice Department demand letter as "a strong basis in evidence" but—to the findings of an Article III judge.[4] The panel majority has failed to adequately grapple with each of these relevant factors, I will address them herein.

I start with the 2020 Census because understanding the setting is necessary in deciding this nuanced and context-specific case. The Supreme Court has said as much. It has held that the "historical background of the decision is one evidentiary source, particularly if it reveals a series of official

---

[2] *See Miller v. Johnson*, 515 U.S. 900, 918 (1995) ("The court supported its conclusion not just with the testimony . . . but also with the State's own concessions.").

[3] *E.g.*, *Cooper*, 581 U.S. at 308 (2017) (citing *Hunt v. Cromartie*, 526 U.S. 541, 547 n.3 (1999) ("*Cromartie I*")) (emphasizing the importance of inquiries into asserted political or partisanship defenses since bizarrely shaped districts "can arise from a 'political motivation' as well as a racial one").

[4] *See Miller*, 515 U.S. at 918 ("Hence the trial court had little difficulty concluding that the Justice Department spent months demanding purely race-based revisions to Georgia's redistricting plans, and that Georgia spent months attempting to comply.") (internal citation and quotation marks omitted).

2

actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (internal citations omitted). Effectually, it is a mistake to view this case in a vacuum—as if the Louisiana Legislature's redistricting efforts and duties burgeon in January 2024. Instead, viewing the case within the lens of the appropriate backdrop—the United States and Louisiana Constitutions, *Robinson v. Ardoin*,[5] and Governor Landry's call to open the 2024 Extraordinary Legislative Session—the Legislature had an obligation to reapportion.

The U.S. Constitution sets out that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." It further vests state legislatures with the primary responsibility to craft federal congressional districts, namely through the Election Clause. U.S. Const. art. I, § 4, cl. 1. Article III, § 6 of the Louisiana Constitution charges the Louisiana Legislature with the duty to reapportion the single-member districts for the U.S. House of Representatives after each decennial census. La. Const. art. III, § 6. In April 2021, the results of the 2020 Census were delivered to Louisiana and the state's congressional apportionment remained six seats in the U.S. House of Representatives. Robinson Interv. FOF, ECF 189-1, 11 (citing *Robinson I*, 605 F. Supp. 3d 767). The 2020 Census data would drive the state of Louisiana's redistricting process. *See* La. Const. art. III, § 6; *Robinson I*, 605 F. Supp. 3d at 767.

---

[5] *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 767 (M.D. La. 2022) ("*Robinson I*"), *cert. granted before judgment*, 142 S. Ct. 2892 (2022), and *cert. dismissed as improvidently granted*, 143 S. Ct. 2654 (2023), and *vacated and remanded*, 86 F.4th 574 (5th Cir. 2023).

"Leading up to their redistricting session, legislators held a series of 'roadshow' meetings across the state, designed to share information about redistricting and solicit public comment and testimony, which lawmakers described as absolutely vital to this process." *Id.* "The drawing of new maps was guided in part by Joint Rule No. 21, passed by the Louisiana Legislature in 2021 to establish criteria that would 'promote the development of constitutionally and legally acceptable redistricting plans.'" *Robinson I*, 605 F. Supp. 3d at 767. "The Legislature convened on February 1, 2022 to begin the redistricting process; on February 18, 2022, H.B. 1 and S.B. 5, the bills setting forth new maps for the 2022 election cycle, passed the Legislature." *Id.* at 767–68.

Following the promulgation of H.B. 1, a select group of Black voters brought a claim under § 2 of the Voting Rights Act of 1965 ("VRA") to invalidate the congressional maps. *See id.* at 760. The events of that litigation as it proceeded through in the Middle District of Louisiana and the Fifth Circuit propelled the newly elected Governor Jeff Landry to call an Extraordinary Legislative Session in January 2024. *See* JE 35 at 10–14. Ultimately, S.B. 8 "was chosen over other plans with two majority-Black districts that were more compact and split fewer parishes and municipalities because those plans failed to achieve the overriding goal of protecting the seats of United States House Speaker Mike Johnson, Majority Leader Steve Scalise, and Representative Julia Letlow at the expense of Representative Garret Graves." Robinson Interv. Post-trial Memo, ECF 189 at 1; Robinson Interv. FOF, ECF 189-1, at 33–35, ¶¶ 135–142.

While the panel majority repeatedly concedes that the *Hays* litigation is three decades old and relies on now-antiquated data, its opinion nevertheless presses forward by drawing parallels and making conclusions that are devoid of crucial context. The panel majority avers that "much of

the 'local appraisal' analysis from *Hays I* remains relevant to an analysis of S.B.8," claiming that S.B. 8's District 6 succumbs to the same violations of the "traditional north-south ethno-religious division of the State." Majority Op. 53-54. Unlike *Hays*, where the cartographer tasked with drawing the map *conceded* that he "concentrated virtually exclusively on racial demographics and considered essentially no other factor except the ubiquitous constitutional 'one person-one vote' requirement,"[6] the record before this court is filled with evidence that political factors were paramount in the drawing of S.B. 8. Additionally, the racial makeup of the state has changed *drastically* over the past three decades. As the Middle District of Louisiana adeptly concluded:

> By every measure, the Black population in Louisiana has increased significantly since the 1990 census that informed the *Hays* map. According to the Census Bureau, the Black population of Louisiana in 1990 was 1,299,281.285. At the time, the Census Bureau did not provide an option to identify as more than one race. The 2020 Census results indicate a current Black population in Louisiana of 1,464,023 using the single-race Black metric, and 1,542,119 using the Any Part Black metric. So, by the Court's calculations, the Black population in Louisiana has increased by at least 164,742 and as many as 242,838 since the *Hays* litigation. Hays, decided on census data and demographics 30 years ago, is not a magical incantation with the power to freeze Louisiana's congressional maps in perpetuity. *Hays* is distinguishable and inapplicable.

*Robinson I*, 605 F. Supp. 3d at 834. Given this pivotal context, I deem it a grievous error for the panel majority to place the *Hays* map and S.B. 8 map

---

[6] *Hays v. State*, 936 F. Supp. 360, 368 (W.D. La. 1996).

side-by-side and imply that the similarities in district shape alone are dispositive. The panel majority is correct, however, that "[this] Court is not bound by the decisions in the *Hays* litigation." Majority Op. 53.

## II. Racial Predominance

Because of the interminable interplay between satisfying the Fourteenth Amendment and complying with § 2 of the VRA, it is axiomatic that electoral districting involves some racial awareness. Redistricting violates the Equal Protection Clause of the Fourteenth Amendment when race is the "predominant" consideration in deciding "to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 913, 916. However, the Supreme Court has highlighted that:

> [Electoral] districting differs from other kinds of state decision-making in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.

*Shaw v. Reno*, 509 U.S. 630, 646 (1993) ("*Shaw I*"); *see also Miller*, 515 U.S. at 915–16 ("Redistricting legislatures will . . . almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."). The Court again reemphasized in *Easley v. Cromartie* that "race must not simply have been a motivation for the drawing of a majority-minority district but the predominant factor motivating the legislature's districting decision." 532 U.S. 234, 241 (2001) ("*Cromartie II*") (internal citations and quotation marks omitted). Consequently, in my view, the panel majority has not properly assessed "predominance" under the relevant caselaw.

Specifically, the Supreme Court has directed "courts, in assessing the sufficiency of a challenge to a districting plan, [to] be sensitive to the

complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, 515 U.S. at 915–16. This sensitive inquiry requires a careful balancing of the legislative record and evidence adduced at trial to unpack the motivations behind the lines on the map. The Court in *Miller* explained that:

> The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.

*Id.* at 916. The Supreme Court in *Alabama Legislative Black Caucus v. Alabama* reaffirmed the characterizations of "predominance" and the associated burden of proof. 575 U.S. 254, 272 (2015) Plainly, "a plaintiff pursuing a racial gerrymandering claim must show that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id*. (quoting *Miller*, 515 U.S. at 916) (internal quotation marks omitted). Here, Plaintiffs have shown racial awareness—to be sure. But identifying awareness is not the end of the inquiry.

To prove racial predominance, a "plaintiff must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916. The relevant "traditional race-neutral districting principles," which the Court has listed many times, include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests," incumbency protection, and political affiliation. *Miller*, 515 U.S. at 901; *Bush v. Vera*, 517 U.S. 952, 964, 968 (1996). A plaintiff's burden in a racial gerrymandering case is "to show, either through circumstantial evidence of a district's shape and

demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision." *Miller*, 515 U.S. at 916. Plaintiffs have failed to show racial predominance through either direct or circumstantial evidence or any combination thereof.

    *A. Circumstantial Evidence*

Like the plaintiffs in *Cromartie I*, Plaintiffs here seek to prove their racial gerrymandering claim through circumstantial evidence—*e.g.*, maps showing the district's size, shape, an alleged lack of continuity, and statistical and demographic evidence. *See* 526 U.S. at 541–43. In their post-trial memorandum, Plaintiffs maintain that the "bizarre shape of District 6 reveals racial predominance." ECF 190 at 15. In opposition, the State raises its "political motivation" defense by alleging that: (1) "the Governor and the Legislature made a political judgment to reclaim the State's sovereign right to draw congressional maps rather than cede that responsibility to the federal courts" and (2) "the contours of the S.B. 8 map were themselves motivated by serious political calculations." State's Post Trial Memo at 5–6. Because "political and racial reasons are capable of yielding similar oddities in a district's boundaries," the Court in *Cooper* entrusted trial courts with "a formidable task: [to] make 'a sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 581 U.S. at 308 (quoting *Cromartie I*, 526 U.S. at 546). Here, the trial record underscores that Plaintiffs have made no effort to disentangle race consciousness from the political factors motivating District 6's precise lines. Therefore, the panel majority cannot undertake the "sensitive inquiry" required. Because Plaintiffs have fallen short, the panel majority takes a myopic view of the record and pieces together slithers of circumstantial evidence without comprehensively analyzing all pieces of evidence to the contrary to craft a "story of racial gerrymandering." *See* Majority Op. at 39 (citing *Miller*, 515 U.S. at 917).

First, I begin by explaining how the panel majority's narrow perspective incorporates no evidence that District 6's lines were drawn solely based on race. Second, I address how Plaintiffs' inconsistent demographic testimony is deficiently limited in scope to support the conclusion that race predominated. Third, I discuss how Plaintiffs' similarly impaired simulation data fails to meet the demanding burden as required by binding precedent.

   *i. The Shape of District 6*

A point of agreement amongst the panel in this case is that "[a] district's shape can provide circumstantial evidence of a racial gerrymander." Majority Op. 35. However, we diverge based on how we apply this significant point, as the panel majority confuses evidence that the Legislature sought to create a second majority-Black district with evidence that race was the "dominant and controlling" factor in the drawing of S.B. 8's contours.

The Supreme Court has acknowledged that notwithstanding the fact that circumstantial evidence—like a district's unusual shape—can give rise to an inference of an "impermissible racial motive," such a bizarre shape "can arise from a 'political motivation' as well as a racial one." *Cooper*, 581 U.S. at 308; *Cromartie I*, 526 U.S. at 547 n.3.[7] As such, the inquiry does not stop at a rudimentary examination of the district's lines in some precincts. In *Cooper*, the Court further clarified this point by articulating that "such evidence [of a 'highly irregular' shape] loses much of its value when the State asserts partisanship as a defense, because a bizarre shape" may be attributed best to political or personal considerations for a legislator instead of racial considerations. *See* 581 U.S. at 308. The panel majority's and Plaintiffs' inability to coherently parse these considerations is particularly striking as there have been several instances in Louisiana "where legislators wanted a precinct in their district because their grandmother lived there." *See, e.g.*, Trial Tr. 177 (testimony of Dr. Voss). Nonetheless, the panel majority ignores this crucial step of the circumstantial evidence analysis, eliding to other "mixed motive" cases. Majority Op. 38.

---

[7] *See also Shaw v. Hunt*, 517 U.S. 899, 905 (1996) ("*Shaw II*") (acknowledging that "serpentine district" was "highly irregular and geographically non-compact by any objective standard"); *Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("Shape is relevant . . . because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.").

However, a closer comparison between the instant case and those prior "mixed motive" cases reveals how inapt these comparisons are. In *Shaw I*, the Court stated that in "exceptional cases," a congressional district may be drawn in a "highly irregular" manner such that it facially cannot be "understood as anything other than an effort to segregate voters on the basis of race." *Shaw I*, 509 U.S. at 646–47 (internal citation and quotation marks omitted); *see also* Richard H. Pildes, Richard Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After* Shaw v. Reno, 92 Mich. L. Rev. 483 (1993). Since that utterance in *Shaw I*, the Court has never struck down a map based on its shape alone. Nonetheless, the panel majority functionally does so here on the basis of severely cabined analyses of select precincts in the metropolitan areas within the district. *See* Plaintiffs' Br. 9–10; Majority Op. 38.

The panel majority cites to *Vera* as a basis for its conclusion that the circumstantial evidence in this case is sufficient to show racial predominance. A closer look at that case demonstrates how inapt that comparison is. In *Vera*, the Court considered a challenge to three districts in Texas's reapportionment plan following the 1990 census. 517 U.S. at 956. There, as here, the Texas Legislature admitted that it intentionally sought to draw three districts "for the purpose of enhancing the opportunity of minority voters to elect minority representatives to Congress." *See Vera v. Richards*, 861 F. Supp. 1304, 1337 (S.D. Tex. 1994). However, the record there was replete with specific, direct evidence that several members of the Texas Legislature were moving around Black neighborhoods and precincts into the new Congressional districts that they then hoped to run for. *Id.* at 1338–40. The Court noted that the Texas Legislature used a computer program called "REDAPPL" to aid in drawing district lines. 517 U.S. at 961. The software incorporated racial composition statistics for the proposed districts as they were drawn on a "block-by-block" level. *Id.* (noting that the "availability and use of block-by-block racial data was unprecedented"). With all of this in mind, the Court then rejected the state's incumbency protection defense because the district court's "findings amply demonstrate[d] that such influences were overwhelmed in the determination of the districts' bizarre shaped *by the State's efforts to maximize racial divisions*." 517 U.S. at 975.

None of that is present in this case. This is not a case like *Vera*, where the political motives of self-interested electoral hopefuls directly attributed to the precise placement of the electoral map lines that comprised those racially gerrymandered districts. There is no § 5 preclearance letter in which the state legislature, speaking with one voice, explains that the odd shapes in the map result solely from "the maximization of minority voting

strength." *See id.* The panel majority is correct in noting that this is a mixed motive case. But to note this and then to subsequently make a conclusory determination as to racial predominance is hard to comprehend. Particularly so where broad swaths of the record are not addressed. In fact, a quick comparison of District 6 (depicted in lime green below) to the "highly irregular" districts from *Vera* (depicted in black outlines) underscores how the district's shape alone is insufficient evidence to prove racial predominance.[8] Simply put, one of these is not like the others.

---

[8] While the following images are not at a 1:1 scale, the striking visible differences between District 6 in S.B. 8 and the districts in *Vera*—which more clearly evince an intent to carve up communities and neighborhoods under the guise of invidious racial segregation—show how just examining a few portions of the district is insufficient to parse out whether race predominated. *See* 861 F. Supp. at 1336 (noting the borders "change from block to block, from one side of the street to the other, and traverse streets, bodies of water, and commercially developed areas in seemingly arbitrary fashion").



District 6's shape is not meaningfully comparable to the series of substantially thinner, sprawling, salamander-like districts that have been deemed impermissible racial gerrymanders. In spite of these glaring differences, the panel majority erroneously concludes that a racial gerrymander occurred here in spite of several inconsistencies in Plaintiffs' expert testimony and a limited review of the legislative and trial records. *See Cromartie II*, 532 U.S. at 242–43. It ignores the Court's explicit determinations that evidence of race-consciousness considered in conjunction with other redistricting principles "says little or nothing about whether race played a *predominant* role" in the reapportionment process. *Id.* at 253–54 (emphasis in original); *Miller*, 515 U.S. at 916 (legislatures "will . . . almost always be aware of racial demographics" in the reapportionment process); *Shaw I*, 509 U.S. at 646 (holding same). It also ignores the well-established principles that "[p]olitics and political considerations *are inseparable* from districting and apportionment . . . [and] that districting inevitably has and is intended to have substantial political consequences." *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973); *see also Vieth v. Jubelirer*, 541 U.S. 267, 285 (2004) (plurality opinion) (acknowledging that districting is "root-and-branch a matter of politics"); Trial Tr. 80 (testimony of Sen. Pressly) (admitting that adjudging political considerations of competing prospective legislative actions are "root and branch"). Where there is a "partisanship" or "political motivation" defense, more is required.

The panel majority errs in its analysis of the metropolitan areas in District 6 because it relies solely on the fact that the Legislature created a second majority-Black district[9] to show racial predominance. In *Shaw I*, the Court declined to adopt the view that the panel majority offers here—that evidence of "the intentional creation of majority-minority districts, without more, always gives rise to an equal protection claim." 509 U.S. at 649 (cleaned up). *Compare id.* (expressing no view as to whether this action constitutes a de facto equal protection violation), *with id.* at 664 (White, J., dissenting) ("[T]hat should not detract attention from the rejection by a majority [of the Court] of the claim that the State's intentional creation of majority-minority districts transgressed constitutional norms."); *see also United Jewish Orgs. of Williamsburgh, Inc. v. Carey* ("*UJO*"), 430 U.S. 144, 165 (1977) ("It is true that New York deliberately increased the nonwhite majorities in certain districts in order to enhance the opportunity for election of nonwhite representatives from those districts. Nevertheless, there was no" equal protection violation); *cf. Vera*, 517 U.S. at 959 ("We thus differ from Justice Thomas, who would apparently hold that it suffices that racial considerations be *a* motivation for the drawing of a majority-minority district" for strict scrutiny to apply) (emphasis in original). In *Bethune-Hill v. Virginia State Board of Elections*, the Court explained that "[e]ven where a challenger alleges a conflict [with traditional redistricting principles], or succeeds in showing one, the court should not confine" its racial predominance "inquiry to the conflicting portions of the lines." 580 U.S. 178, 191 (2017).

---

[9] *Vera*, 517 U.S. at 958.

Here, the panel majority makes the mistake of stopping at the district's contours in the major metropolitan areas in the state without fully considering or crediting the abundance of evidence demonstrating these choices were political. *See* Majority Op. 40 ("In sum, the 'heat maps' and demographic data in evidence tell the true story–that race was the predominate factor driving decisions made by the State in drawing the contours of District" Six). Because the panel majority's plain eye examination loses much of its value in the face of the state's "political motivation" defense, I now will contextualize the relevant circumstantial evidence of legislative intent in this case, including claims of political motivation.

*ii. Expert Testimony*

Plaintiffs' circumstantial evidence elicited through expert testimony fails to demonstrate that race was the Legislature's controlling motive in drawing S.B. 8. The panel majority makes much ado of Mr. Michael Hefner's dot density map[10] and testimony that the districting decisions shaping District 6 in Lafayette, Alexandria, Baton Rouge, and Shreveport could only be explained by racial considerations. While the Court has accepted evidence of a district's shape and demographics to prove racial predominance, it has required the plaintiff to disentangle race from political considerations. *See Cromartie I*, 526 U.S. at 546. Here, Plaintiffs' expert testimony fails to account for several valid, non-racial considerations that explain the district's shape to impermissibly conclude that race predominated. *Cf. Chen v. City of Houston*, 206 F.3d 502, 506 (5th Cir. 2000) ("[T]he plaintiffs' burden in establishing racial predominance is a heavy one.").

Plaintiffs point to the district's low compactness scores and testimony from two experts opining that the Legislature subordinated traditional redistricting criteria to prove their case via circumstantial evidence. Plaintiffs' Br. 8–12. Notwithstanding my own evidentiary determination that several traditional principles of redistricting do explain District 6's shape in S.B. 8,[11] I now explain that Plaintiffs' offered circumstantial evidence is insufficient to prove the predominance of race. *See Chen*, 206 F.3d at 506.

> *a. Demographic Evidence*

---

[10] **Majority Op. 38–39.**

[11] *See infra* Part I.B.i–ii.

The legislative record in this case is inundated with both direct and circumstantial evidence that political considerations predominated in the drafting and passing of S.B. 8.[12] Plaintiffs assert that their demographer, Mr. Hefner, provided testimony that the "awkward and bizarre shape" of the district suggests that race predominated over traditional redistricting criteria. Trial Tr. 304–05. He testified that the district was "very elongated," "contorted," and narrow at points to attach two centers of high BVAP together in one district. Trial Tr. 286. However, Mr. Hefner also acknowledged that incumbency and compliance with the VRA are also important traditional redistricting criteria.[13] Trial Tr. 293. He also explained that political dynamics frequently factor into redistricting. Trial Tr. 321. Ultimately, he concluded that the Louisiana Legislature "can't create a second majority-minority district and still adhere to traditional redistricting criteria" and that "race predominated in the drafting" of S.B. 8. Trial Tr. 271–72. Put another way, no permissible redistricting factor could explain S.B. 8's configuration.

---

[12] *See id.*

[13] Q. Are there additional criteria that can be considered?

A. Yes. Incumbency can be considered as to not putting incumbents against each other. Preservation of political entities. It's similar to communities of interest but some specified as political entries, which would be parishes, precincts, municipalities, those that have political boundaries. Also, too, race plays a factor as well, because that's part of what the Voting Rights Act calls attention to for consideration. *So those are some of the other criteria that we generally take a look at as we're drafting redistricting plans*. **Trial Tr. 293 (emphasis added).**

But there are several logical gaps in Mr. Hefner's testimony. Mr. Hefner limited his examination of S.B. 8 to the factors of communities of interest, compactness, and preservation of core districts. Thus, he "did not review incumbency." Trial Tr. 272. When asked about the importance of incumbency on redistricting, he opined that a legislature should avoid pitting incumbents against each other to prevent very contentious and unproductive political bodies that fail to "serve the needs of the people." Trial Tr. 335. Mr. Hefner's failure to consider the other politically motived incumbency protection rationales provided by S.B. 8's sponsor[14] demonstrates the unreliability of his testimony. He further constrained his analysis to S.B. 8, H.B. 1, and Plaintiffs' Illustrative Plan 1. He did not review any "of the other plans with two majority black districts" proposed in the 2024 redistricting session, nor did he review "any of the amendments that were offered on [S.B. 8] in the 2024 redistricting session." Trial Tr. 317–18.

---

[14] *See supra* Part II.B.i.a.

The gaps in Mr. Hefner's analysis severely undercut his opinion that race predominated over respecting communities of interests and political subdivisions. It strains credulity to say that one factor was controlling over all others while simultaneously ignoring several overriding factors. While Mr. Hefner criticized S.B. 8 for the number of parish and community splits it contained, he did not criticize the other maps he examined for that purpose. For instance, his opinion that race predominated in the drafting of S.B. 8 was based in part on the amount of parish splits and divisions of cultural subdivisions tracked by the Louisiana Folklife Program as compared to prior maps. Trial Tr. 337. However, on cross-examination, Mr. Hefner conceded that a district in H.B. 1 split the same number of folklife areas as District 6 in S.B. 8. Trial Tr. 337–38. Additionally, Intervenors' expert, Mr. Fairfax, provided credible testimony that showed that S.B. 8 distributed its parish and municipal splits amongst the districts more equitably in comparison to H.B. 1. Trial Tr. 385–89. Mr. Hefner did not account for such distinguishing factors, which tended to challenge his broad conclusion that two majority-minority districts could not be drawn in Louisiana while adhering to traditional redistricting principles.

Further inconsistencies persisted in his testimony. Mr. Hefner did not offer the same critiques of the shapes of districts in Plaintiffs' Illustrative Plan 1. In fact, he opined that that map "adhered to traditional redistricting principles."[15] Notwithstanding this point, Mr. Hefner agreed that District 5 of Illustrative Plan 1 spanned approximately 230 miles from end to end.[16] By Mr. Hefner's own calculus, District 5 of the plan is a district that is virtually not compact at all. District 6 of S.B. 8 ranges nearly the same length, but he did not agree that S.B. 8 "adhered to traditional redistricting principles." These shifting goalposts based upon whether Plaintiffs or the Intervenors posited the question further demonstrates that little to no weight can be placed on his testimony. Thus, the obvious tension between his opinions based on which party it benefits substantially diminishes its weight here, but the panel majority erroneously accepts portions of his testimony to justify its conclusion. It does so even though none of Mr. Hefner's testimony attempts to unpack the entanglement of the two factors of race and politics plainly present in this case.

---

[15] Q. Let me just ask it this way. What does Plaintiffs' Illustrative Plan Number 1, Exhibit PE-14, what does that represent?

A. That plan is a congressional plan that preserves District 2 as a traditional majority-minority district. It generally follows what has been in place for the past couple of census cycles. And the division of the rest of the state into districts largely follows. It's somewhat similar to the traditional boundaries that have been used in the past. Some deviations, but generally overall it follows that general configuration.

*Q. Based on your review of this map, does it adhere to traditional redistricting principles?*

*A. In my opinion it does.*

**Trial Tr. 275–76.**

[16] The Plan's District Five contained a district spanning roughly 230 miles from Washington Parish in the Southeastern tip of the state all the way up to the Northern portion of the state, with Ouachita Parish serving as a main population center. ***See* Trial Tr. 341.**

23

Mr. Hefner testified that he did not speak to any legislators from the 2024 session or consult any sources within the Legislature informing him of the legislative imperatives underlying S.B. 8. *See* Trial Tr. 321 ("Q. And do you have any other basis for knowing what any particular legislator thought about the district lines in [S.B. 8] or why they supported them? A. I did see some [television] interviews of some legislators after [S.B. 8] was approved."). Thus, his ultimate conclusion that race predominated over any permissible factor is factually unsupported because he failed to examine several traditionally accepted factors of redistricting. Most glaring is his failure to examine, analyze, or otherwise critique S.B. 8's incumbency protection considerations or the Legislature's rejection of amendments that solely sought to increase BVAP within the district and added additional parish splits. RI 42; Trial Tr. 573–74 (describing how the legislature struck down an amendment "increased the BVAP in both District 2 and District 6" in a bipartisan vote because it added additional parish splits to the map); Trial Tr. 575 (noting the Legislature's bipartisan rejection of efforts to just "mov[e] black precincts around for no particular reason other than to do so").

The legislative history of S.B. 8 demonstrates that the Legislature took great consideration to avoid merely lumping enough Black Voting Age Population ("BVAP") into two districts to satisfy the *Robinson I* court. Mr. Hefner's failure to account for the history of amendments to S.B. 8 demonstrates how his narrative of racial predominance in the Legislature disintegrates upon review of the record. The Legislature rejected amendments that solely sought to increase BVAP in specific districts and were voted down and discouraged by the bill's proponents and author. *See* Trial Tr. 317–18. As the legislative record shows, Senator Heather Cloud of Avoyelles Parish introduced an amendment that introduced an additional split in District 6, increasing the number of parish splits in S.B. 8 to sixteen, one more split than H.B. 1. Although Mr. Hefner criticizes the number of parish splits in S.B. 8 to serve as evidence that the Legislature racially gerrymandered here, he admittedly did not know that Senator Cloud's amendment was offered to further protect Congresswoman Letlow's seat by moving her own constituents into Letlow's district. JE 29 at 5–6. This extra parish split also narrows District 6 before it traverses through Alexandria. It also explains why the district is narrower at that point and— in Mr. Hefner's view—bears tenuous contiguity.[17] *See* Trial Tr. 293–94.

---

[17] On a related note, the legislative record also established that Rapides Parish is accustomed to split representation in a single-member district capacity. Senator Luneau of Rapides Parish noted that in the reapportionment process for State Senate districts, his home parish answered to "six different [state] senators." **JE 34 at 9–10**. Prior jurisprudence demonstrates that further segmentation of parishes accustomed to splitting to achieve partisan goals. In *Theriot v. Parish of Jefferson*, the Fifth Circuit held that no racial gerrymander occurred where "the Parish was not unaccustomed to splitting districts in order to achieve political goals." 185 F.3d 477, 483 (5th Cir. 1999). Thus, the contours of the Rapides Parish area in S.B. 8 cannot seriously be considered to be the product of racial gerrymandering—as Plaintiffs allege—without more evidence than mere conjecture.

Senator Cloud described her amendment at the Senate and Governmental Affairs Committee hearing as an amendment seeking to protect the only Republican Congresswoman in Louisiana's Congressional Delegation. JE 29 at 13–14. Senator Cloud's amendment was the only one made during the legislative process that withstood detailed examination by both houses of the Louisiana Legislature. RE 42; JE 29 at 5–6. The only other amendment that passed in committee was offered by Representative Les Farnum of Calcasieu Parish. Trial Tr. 571–72. Representative Farnum introduced an amendment before the House and Governmental Affairs Committee that sought to make his constituents in Calcasieu Parish in one whole district. Trial Tr. 572. While the amendment advanced out of committee, it was removed from the bill after substantial bipartisan opposition prompted a floor vote to strip the amendment from S.B. 8. Trial Tr. 573–74. Particularly revealing is that S.B. 8's legislative history demonstrates how the Legislature actively sought to prevent the gross contravention of traditional redistricting principles in favor of just getting specific districts to certain BVAP concentrations. *See id.* (detailing the Legislature's denial of amendment to subdivide Baton Rouge into three congressional districts in favor of increasing BVAP in District 2 by some amount).

The history of amendments to the bill do not fit the creative narrative that Mr. Hefner paints in this case to show racial predominance. In the light of all this information publicly available in the legislative record, Mr. Hefner cabined his analysis to just the final enacted version of S.B. 8 and two other maps, without seeking to get the full scope of the legislative environment that created S.B. 8. Notably, the Court said in *Cooper* that where political concerns are raised in defense of a map, evidence of non-compactness "loses much of its value . . . because a bizarre shape . . . can arise from a 'political motivation' as well as a racial one." 581 U.S. at 308. Furthermore, "political and racial reasons are capable of yielding similar oddities in a district's boundaries." *Id.* Here, Senator Glen Womack of Catahoula Parish, the author of S.B. 8, addressed those reasons at numerous points during the legislative session. His intent was clear and consistent. JE 31 at 121–22 (statement of Sen. Womack) ("We were ordered to draw a [second majority-Black] district, and that's what I've done. *At the same time*, I tried to protect Speaker Johnson, Minority Leader Scalise, and my representative Congresswoman Letlow."). He stated that he sought to draw "boundaries in th[e] bill" to "ensure that Congresswoman Letlow remains both unimpaired with any other incumbents and in a congressional district that should continue to elect a Republican to Congress for the remainder of this decade." JE 29 at 2 (Sen. Womack's Remarks Before January 16, 2024 Senate Governmental Affairs Committee Hearing). Based on this strong evidence of legislative will directed at preserving political and personal interests during the redistricting process, I would hold that Plaintiffs' circumstantial demographic evidence cannot be taken in whole or in part to satisfy its burden of showing that race predominated in the drafting of S.B. 8.

   *b. Simulation Evidence*

Neither does Plaintiffs' simulation evidence move the needle for them toward satisfying their stringent burden of proof.. The panel majority likewise credits the marginally relevant testimony of Plaintiffs' other expert, Dr. Stephen Voss. Dr. Voss opined that simulation techniques demonstrate that (1) S.B. 8 constitutes an impermissible racial gerrymander because no other legislative imperatives would create districts in those forms; (2) the Louisiana Legislature "compromised" various "traditional redistricting criteria" in drawing S.B. 8, and; (3) there "is not a sufficiently large and compact African American population to allow [two majority-Black] districts that would conform to traditional redistricting criteria." Trial Tr. 91.

When posed with the question of S.B. 8's political goals, Dr. Voss opined that "[i]f you're not trying to draw a second Black majority district, it is very easy to protect Representative Julia Letlow." Trial Tr. 108. This commentary misses the mark entirely. Neither through simulations nor testimony, Dr. Voss did not demonstrate that it is possible to achieve *all* of S.B. 8's main political goals *and* generate extremely compact districts. On cross-examination, he admitted that he did not "explore" directing the software to prevent "double bunking" or pairing of two specific incumbents. *See* Trial Tr. 175 (cross–examination of Dr. Voss).

28

As such, Dr. Voss's conclusion that only racial considerations account for District 6's shape flies in the face of his testimony that permissible considerations include regional representation, incumbency protection, and various other personally politicized considerations held by legislators in redistricting. *Compare* Trial Tr. 177–78 (admitting that the Legislature's rationales given ordinarily constitute valid reasons justifying a map's shape), *with* Trial Tr. 180 (attempting to distinguish those factors' application in this case). At most, Dr. Voss only measured or weighed two political motives at the same time: (1) "sacrificing" Congressman Graves and (2) protecting Congresswoman Letlow. Trial Tr. 110 (stating that the Legislature could have complied with these two specific goals and presented a map that is less offensive to traditional redistricting principles); Trial Tr. 111–12 (stating same). With the aid of his simulations, he argued that it would be easy to protect Congresswoman Letlow by pulling her westward into a North Louisiana district even if a second majority-Black district stretched up the Mississippi River into Northeast Louisiana. But pulling her district westward draws her closer to the population bases supporting Speaker Johnson's prominence in his district Northwest Louisiana based district.

Dr. Voss neglected to address protecting the Speaker of the House and Majority Leader *at the same time* as protecting Congresswoman Letlow and cutting out Congressman Graves. *See id.* On direct, Dr. Voss stated that out of his 20,000 simulations, he did have difficulty with securing Congresswoman Letlow and Speaker Johnson without risking Majority Leader Scalise's seat. Trial Tr. 140. Then on cross examination, Dr. Voss conceded that his simulations could not consistently guarantee safe seats for Speaker Johnson, Majority Leader Scalise, and Congresswoman Letlow. Trial Tr. 140 (conceding that many simulations jeopardized Scalise's seat and others pitted the Speaker against Letlow). Attempting to rationalize why he could not account for these valid considerations, Dr. Voss testified on redirect that some unknown number of simulations generated plans without two majority-Black districts that also achieved these political goals.

This testimony, while sensible in the abstract, is nonsensical when applied to the appropriate legislative and constitutional context. Article III, § 6 of the Louisiana Constitution specifies that "the legislature shall reapportion the representation in each house as equally as practicable on the basis of population shown by the census." It is indelibly clear— seemingly to everyone except Plaintiffs' experts—that redistricting is a "root-and-branch" political matter. *See Vieth*, 541 U.S. at 285; *Shaw*, 509 U.S. at 662 (White, J., dissenting) ("[D]istricting inevitably is the expression of interest group politics."). We are tasked with evaluating legislation that is the product of the legislative body's choice resulting from a political process. For this reason, failing to evaluate a politically charged defense that frequently yields oddly shaped districts for personal and political goals of the legislators involved cannot be adequate proof that meets the demanding standard required of Plaintiffs.

Numerous current and former elected officials from both major political parties testified that the legislative aims raised in the 2024 session were (1) satisfying the VRA, (2) protecting senior incumbents with influential national positions, and (3) maintaining the sovereign prerogative of the legislature. *See, e.g.*, JE 31 (Rep. Carlson) ("I can assure you this . . . we're not here today because we're caving to any kind of political pressure. The fact of the matter is, like it or not, Judge Dick has said, 'Either you do your job and draw the map, or I'll draw the map for you,' period."); Trial Tr. 47–48 ("[T]he only reason we were there was because of the other litigation; and Judge Dick saying that she — if we didn't" comply with the VRA "she was going to" draw the State's map for them); Trial Tr. 81–82 (testimony of Sen. Pressly) (stating that Judge Dick would draw the maps if the Legislature did not, and would not consider political benefits to any party or persons); Trial Tr. 368. In my view, Intervenor's expert, Dr. Cory McCartan, credibly demonstrated how the limitations of Dr. Voss's purported race-conscious simulations actually failed to account for race in any meaningful manner. Trial Tr. 196–97. Dr. McCartan noted the substantial difference between stating that "a simulation that uses a tiny bit of racial information doesn't produce black districts, and the extrapolating from there to say that if you produce two black districts, it must be extreme racial gerrymandering." Trial Tr. 196–97. The panel majority avoids this potent adverse testimony by distinguishing Dr. McCartan's work with his ALARM team from the present case. Majority Op. 26–28.

The panel majority's brief discussion of the limitations on Dr. Voss's simulation evidence is in tension with the nature of the pivotal inquiry that this panel was convened to undertake: To evaluate whether the *Legislature*— and not a rebuttal witness's own team—had subjugated all traditional redistricting principles to yield a certain result—i.e., the challenged district. Dr. McCartan's testimony credibly shows that simulations cannot prove the "impossibility" that Dr. Voss sought to prove,[18] and that Dr. Voss's simulation methods added additional restraints that in turn stopped generating results which would more closely resemble the factors that the Legislature actually considered in this case. Trial Tr. 196.

---

[18] Dr. Voss even acknowledged this, stating that in Louisiana "the number of plans that meet all [traditional redistricting principles] is probably bigger than the number of atoms in the entire universe." **Trial Tr. 200–201;** *see also* **Trial Tr. 130.**

Setting aside the panel majority's attempts to justify the relevance of Dr. Voss's simulations,[19] the simulation evidence in this case is precisely the type of inconclusive evidence that insufficiently pits S.B. 8 in "endless beauty contests" with other potential maps the Legislature could have drawn but never would have realistically considered for a myriad of reasons other than race. *See Vera*, 517 U.S. at 977. Absent from the panel majority's analysis of Dr. Voss's simulation testimony was his admission that "the population tolerances required from real maps without splitting precincts," as required by Joint Rule 21,[20] "may not be achievable with a simulation method" and likely does not yield "feasible maps" in "many cases." Trial Tr. 152–53. This admission again demonstrates how this evidence fails to encapsulate the pressing factors that the Legislature actually considered. In sum, this evidence does not satisfy Plaintiffs' burden.

---

[19] **Trial Tr. 179 (redirect examination of Dr. Voss); Majority Op. at 28.**

[20] The Louisiana Legislature passed Joint Rule 21 in 2021 to establish criteria that would "promote the development of constitutionally and legally acceptable redistricting plans." Joint Rule 21 (2021), https://www.legis.la.gov/legis/Law.aspx?d=1238755.

Through Voss's and Hefner's testimony, Plaintiffs present a simple syllogism. (A) An unconstitutional racial gerrymander occurs where traditional redistricting criteria and other permissible factors cannot account for the shape of the offending district. (B) District 6's shape in S.B. 8 cannot be explained by any permissible reapportionment factors. (C) Thus, S.B. 8 constitutes an unconstitutional racial gerrymander. The glaring gap in the expert testimony results from the fact that both Voss and Hefner did not account for numerous valid justifications for District 6's shape. Thus, it is disingenuous to conclude that no permissible factors—such as protecting incumbents,[21] eliminating the Governor's political opponents,[22] connected ethno-religious networks,[23] the linkage of the District's communities via the I-49 corridor and Red River Basin,[24] veritable cultural similarities,[25] and shared educational and health resources amongst residents of District 6,[26] among others—justify or explain District 6's shape.

---

[21] Q. And so you mentioned the difference in configuration between your Bill S.B. 4 and S.B. 8. Did you have any impression about any rationale behind those different configurations?

A. So during the whole time I spent in redistricting, you don't have to be a redistricting expert to know that any time a new map is drawn, it's kind of like playing musical chairs. There is going to be someone who is negatively impacted from an incumbency standpoint. And of the six congressional districts, the question was always if there was going to be a second majority black district drawn, who would be negative -- who would be most negatively impacted by this if we are -- again, we have -- a new map has to be drawn. So I believe that ultimately played into what map the Legislature chose to support.

**Trial Tr. 525–26;** *see also* **Trial Tr. 71** (testimony of Sen. Pressly) ("There were certainly discussions on ensuring — you know, we've got leadership in Washington. You have the Speaker of the House that's from the Fourth Congressional District and we certainly wanted to protect Speaker Johnson. The Majority Leader, we wanted to make sure that we protected, Steve Scalise. Julia Letlow is on Appropriations. That was also very important that we tried to keep her seat as well."); **Trial Tr. 79** (testimony of Sen. Pressly); **Trial Tr. 63** (testimony of Sen. Seabaugh) (stating same).

<hr />

[22] *See, e.g.*, **Trial Tr. 527** (testimony of Sen. Duplessis) ("[A]s [redistricting] relates to incumbency, there will be someone who is negatively impacted, so the choice had to be made — *the political decision* was made to protect *certain members of congress* and to *not protect one member of congress* and it was clear that that member was going to be Congressman Garret Graves."); **Trial Tr. 369–71** (testimony of Rep. Landry) (stating same); **Trial Tr. 60–61** (testimony of Sen. Seabaugh) (agreeing that "protecting" Speaker Johnson, Majority Leader Scalise, and Congresswoman Letlow "is an important [political] consideration when drawing a congressional map").

Q. Let me ask that again. Do you have an understanding if one of the current congressional incumbents was drawn out of his or her seat, so to speak, in Senate Bill 8? A. Congressman Graves was targeted in the map, correct. Q. And were you surprised that Congressman Graves was targeted in the map? *A. No. Everyone -- everyone knew that. All the legislators, the media reported it. They have had a long-standing contentious relationship.* Q. And when you say "they," who are you referring to? A. The Governor and Congressman Graves.

**Trial Tr. 369–71** (testimony of Rep. Landry)**.**

[23] **Trial Tr. 466–67** (testimony of Pastor Harris).

[24] Q. So in your experience as an elected official and a community leader, does Congressional District 6 in S.B. 8 reflect common communities of interest?

A. Yes, it does.

Q. And how so?

A. Well, I think the two that come most quickly to mind would be the I-49 corridor and the Red River. Obviously, Shreveport itself was founded by the clearing of the Red River. One of the big things that helped make this area grow was navigation thereof. We had leadership over the course of the last 50 years that's worked very hard towards trying to bring that back. You now have a series of lock and dams, five of them, between here and where the river flows into the Mississippi. That essentially mirrors the eastern side of that district. *When you add to it, the connecting factor of I-49, that essentially makes Shreveport, Mansfield, Natchitoches, all one general commuting area*, all of those are connecting factors.

**Trial Tr. 457–58** (testimony of former Mayor Glover) (emphasis added).

[25] *See, e.g.*, **Trial Tr. 467–68** (testimony of Pastor Harris) (explaining that Baton Rouge, Alexandria, Lafayette, Natchitoches, and Shreveport share far more cultural commonalities than any of those cities and New Orleans).

[26] *See, e.g.*, **Trial Tr. 457–58** (testimony of Mayor Glover) (explaining that the shared Willis-Knighton, Ochsner/LSUS, and Christus medical systems within District 6 provide the bulwark of medical care to the persons of the region).

Plaintiffs' position ignores that the record as a whole establishes that incumbency protection was the most often stated motivating factor[27] behind S.B. 8. Instead, they adhere closely to a minority of voices within the Louisiana Legislature.[28] Respectfully, I strongly disagree with the panel majority's narrow reading of the conflicting demographic and statistical opinions offered to fashion its conclusion that race was "the legislature's *dominant and controlling* rationale in drawing its district lines." *See Miller*, 515 U.S. at 913.

> *iii. Any Allegory to* Hays *or Application of its Outdated Rationales is Misguided*

---

[27] As evidenced by the fact that all other, more compact maps from the 2024 legislative session that also sought to comply with the VRA died in committee. *See, e.g.*, **Trial Tr. 482 (testimony of Ms. Thomas).**

[28] **Trial Tr. 533 (testimony of Sen. Duplessis) ("I think some of the members of the Shreveport delegation may have voted against [S.B. 8], but it passed overwhelmingly.").**

Similarly difficult to comprehend is the panel majority's position that *Hays* provides this court with a helpful allegory to make its determination. In *Hays I* and *Hays II*, the district court invalidated congressional maps with two majority-minority districts as impermissible racial gerrymanders on Equal Protection grounds. *See Hays I*, 839 F. Supp. at 1195; *see also Hays v. Louisiana*, 936 F. Supp. 360, 368 (W.D. La. 1996) (*Hays IV*). In *Hays I*, the district court was confronted with an equal protection challenge to a district bearing similarities to District 6. The panel described the contested district as "an inkblot which has spread indiscriminately across the Louisiana map." 936 F. Supp. at 364. Throughout Mr. Hefner's and Dr. Voss's testimonies, they repeatedly stated, suggested, and opined that Louisiana's configuration of minority populations today does not allow the Legislature to draw a map with two minority-Black districts without violating the Constitution.

But when confronted with these assertions on cross-examination, each quickly equivocated stating that they either "can't offer an opinion on" whether "it's impossible to create a congressional plan with two majority-Black districts that perform well on traditional redistricting principles," Trial Tr. 318–320, or that the simulations could not account for other traditional redistricting principles that the Legislature considered in drafting S.B. 8, Trial Tr. 160–61. Aside from the limited testimony parroting the dated proposition derived from the *Hays* litigation, Plaintiffs ignore the fact that *Hays* does not account for drastic changes in the state's population dynamics that have occurred since the late 1990s.[29] The decennial census has occurred three times since the ink dried on the last iteration of the *Hays* case.

---

[29] *See supra*, p. 4.

It is for this reason, among others, that the Middle District of Louisiana rejected every formulation of the argument that the "*Hays* maps [were] instructive, applicable, or otherwise persuasive." *See* <u>605 F. Supp. 3d 759, 852</u> (M.D. La. 2022); *see also id.* at 834. Not only was this sentiment accepted by the Fifth Circuit,[30] but it was also accepted by the Louisiana Legislature during the 2024 redistricting session. Members of the House and Governmental Affairs Committee repeatedly rejected the assertion that *Hays* preempts S.B. 8's design of District 6. JE 31 at 117–18. During the testimony of Mr. Paul Hurd, counsel for Plaintiffs in this case, Representative Josh Carlson of Lafayette Parish clarified that *Robinson* presented the Legislature with the "complete opposite scenario than [*Hays*] 20 years ago." *See* JE 31 at 117. Despite several attempts to analogize S.B. 8 to the *Hays* cases, no legislator on the committee bought the argument that the State could not draw a map that included two majority-Black districts. *See* JE 31 at 115–18*.*

---

[30] *See* <u>86 F.4th at 597</u> (determining that the Middle District of Louisiana's preliminary injunction holdings were not clearly erroneous).

In response to this repudiation of *Hays*-like rationales to abandon S.B. 8, Plaintiffs' own counsel conceded that a congressional map with two majority-minority districts was constitutionally valid during his testimony during the 2024 legislative session. JE 31 at 118. During that same House and Governmental Affairs Committee meeting, Mr. Hurd testified that "I believe that my districting plan that I've handed in and I did it for an — an example is as close as you can get to a non-racially gerrymandered district and get to two majority-minority districts, and it does." JE 31 at 31 (page 118). He further stated that "[t]here are abilities to draw a [second] compact contiguous majority-minority district" in the State of Louisiana. *Id.* This evidence in the record demonstrates precisely how Plaintiffs' circumstantial case fails to meet their burden. Their case is directly rooted to expert demographic and simulation testimony that merely repackages an outdated and factually unsupported thesis: that any congressional map with two majority-Black districts must be unconstitutional for the reasons derived from data and occurrences from nearly three decades ago. *See Hays I*, 839 F. Supp. at 1195; *Robinson*, 605 F. Supp. 3d at 852. To avoid addressing these inconsistencies apparent from the record, the panel majority blends the circumstantial and direct evidence together to conclude that race played a qualitatively greater role in S.B. 8's drafting. A look at the direct evidence shows how this conclusion is unwarranted based on the totality of the legislative record.

### B. Direct Evidence: Legislators' Intent

The panel majority states that it "acknowledges that the record includes evidence that race-neutral considerations factored into the Legislature's decisions." Majority Op. 43. However, it disregards the mountain of direct evidence showing that the political directives "could not be compromised," as each of the other proposed bills that did not achieve those goals were not seriously considered by the Legislature. *See Bethune-Hill*, 580 U.S. at 189. The panel majority embraces only the quotes from the legislative session that refer to the Legislature's decision to exercise its sovereign prerogative to draw its maps under the Louisiana Constitution following *Robinson I*. Majority Op. 41–42. It cites some language from Senator Womack, the bill's sponsor, stating that he drew the map to create two majority-Black districts as direct evidence of racial predominance. It quotes the statements from select members of the Legislature at functionally every time they mention *Robinson I* and the Governor's decision to place the task of drawing new electoral maps into the hands of the Legislature. [31]

---

[31] Indeed, it is clear that the district court ordered the Legislature to draw a map consisting of two majority-Black districts. As result, Plaintiffs assert that race was not only the predominant factor, but the *only* factor. Assuming arguendo, how then can we reconcile the assertion that race was the only factor considered when drawing S.B. 8 with the existence of several other maps, including S.B. 4 which contained even more compact districts than the adopted map? How is it possible that each proposed map, and the ensuing amendments, resulted in distinct district renderings? Neither Plaintiffs nor the majority broach this issue because they would be forced to confront what is clear: that factors beyond race, including political considerations, went into the drawing of the maps that included two majority-Black districts, including S.B. 8.

These statements—either alone or crammed together with the circumstantial evidence—are insufficient to show racial predominance. The panel majority's conflation of evidence of race consciousness for the purpose of avoiding successive § 2 violations under the VRA with racial predominance is unprecedented. Its decision to do so after it acknowledges that evidence of race consciousness *does not* constitute evidence of racial predominance is also somewhat hard to comprehend. Majority Op. 34 (citing *Shaw I*, 509 U.S. at 646; *Milligan*, 599 U.S. at 29). Through contextualizing the totality of the legislative record, I will show precisely why those statements referencing *Robinson I* do not prove racial predominance.

*i. Legislative Record*

Unlike *Cooper*—which turned on "direct evidence of the General Assembly's intent in creating the [challenged district], including many hours of trial testimony subject to credibility determinations,"[32]—this case involves limited trial testimony regarding legislative intent. Although a "statement from a state official is powerful evidence that the legislature subordinated traditional districting principles to race when it ultimately enacted a plan creating [] majority-black districts," the Court has never expressly accepted statements evincing an intent to create a majority-minority district alone as prima facie evidence that a racial gerrymander occurred. *See Shaw II*, 509 U.S. at 649; *see also Miller*, 515 U.S. at 917–19.

---

[32] *Cooper*, 581 U.S. at 322.

*a. Incumbency Protection*

First and foremost, it strains credulity to relegate the potent evidence of political considerations and incumbency protection to a minor factor in the Legislature's decisions in this case. The trial record emphatically shows that S.B. 8's sponsor, Senator Womack, spoke continuously and fervently about his aims to protect certain incumbents— as well as to encase specific communities of interest within District 6. The record shows that while the Legislature considered race, it only considered it *alongside* other political and geographic considerations. *See Cromartie II*, 532 U.S. at 236. The legislative record reveals that Senator Womack's personal goals necessitated the protection of certain members of Louisiana's Republican delegation in Congress. *See, e.g.*, JE 31 at 25.

On January 16, 2024, the first day of the 2024 legislative session, Senator Womack introduced his bill to the Senate and Governmental Affairs Committee. *See generally* JE 29 (transcript of committee meeting). In his opening statement, Senator Womack averred that "[t]he boundaries in this bill I'm proposing ensure that Congresswoman Letlow remains both unimpaired with any other incumbents and in a congressional district that should continue to elect a Republican to Congress for the remainder of this decade." JE 29 at 1. He continued to assert that the bill ensured four safe Republican seats and a "Louisiana Republican presence in the United States Congress [that] has contributed tremendously to the national discourse." JE 29 at 2. He described the personal pride that resulted from the fact that the state's congressional delegation included the Speaker of the U.S. House of Representatives, Mike Johnson, and House Majority Leader Steve Scalise. *Id.* He went on to state that "[]his map ensures that the two of them will have solidly Republican districts at home so that they can focus on the national leadership that we need in Washington, DC." JE 29 at 2.

After the bill passed to the House and Governmental Affairs Committee for a hearing on January 18, 2024, Senator Womack stated that he sought to protect Representatives "Scalise, as well as Johnson, Letlow," and "Higgins." JE 31 at 25. Senator Womack left one "odd man out" of the delegation. He directly stated that one member of the state's Republican delegation that was not part of the "Republican team." *See id.* And that one member was Congressman Garret Graves. *See id.* Thus, it is convincing to credit Senator Womack's unwavering assertions that these political considerations were the "primary driver[s]" of S.B. 8. *See id.*

In that same committee hearing, the line of questioning shifted to comparing S.B. 8 to the rejected S.B. 4 map proposed by Senator Ed Price of Ascension Parish and Senator Royce Duplessis of Orleans Parish. While comparing his map to S.B. 4, Senator Womack agreed that his bill proposed districts that were less compact than S.B. 4. *Id.* But he attributed the less compact shape of District 4 in S.B. 8—which impacted District 6's compactness—to his attempt to comply with the VRA *while also* protecting Speaker Johnson and Congresswoman Letlow in North Louisiana and Majority Leader Scalise in Southeast Louisiana "[a]t the same time." *See* JE 31 at 22–25; 31. He continued to state that his map diverged from S.B. 4's configuration which he believed to threaten Congresswoman Letlow's chances of remaining in the House of Representatives. *See* JE 31 at 25–26.

This is precisely because S.B. 4 proposed that District Five would constitute a more compact, second majority-minority district that enveloped Congresswoman Letlow's home precinct.[33] Trial Tr. 524 (testimony of Sen. Duplessis) ("The map that I co-authored with Senator Price, the second majority-Black district went from Baton Rouge up to northeast Louisiana, the Monroe area."). Senator Womack agreed with the characterization that while the Legislature's Democratic caucus supported S.B. 4 for a myriad of reasons, he offered this "political map" to protect his personal political interests as well as Louisiana's standing in the national conversation. *See* JE 31 at 26. In an exchange with House and Governmental Affairs Committee Chairman Gerald Beaullieu of Iberia Parish, Senator Womack explained that he sought to protect the national interests of the state's conservative majority leadership through protecting its most established leaders. JE 31 at 26–27. Senator Womack declared that "[i]t's bigger than just us," and that Louisiana's more influential members of Congress should be protected to elevate the state based on his view of the state's "poor position." JE 31 at 27. Before amendments were offered, Senator Womack and Chairman Beaullieu agreed that S.B. 8 was "able to accomplish what the [Middle District of Louisiana] has ordered through [the] map, and also . . . protect[s] the political interest[s]" raised by Senator Womack. *Id.*

---

[33] **Trial Tr. 524** (testimony of Sen. Duplessis) ("I recall the [population] numbers being very similar" between S.B. 4 and S.B. 8, with "[t]he main difference between the two maps . . . [being] just the[ir] geographic design[s]"). Opponents of S.B. 8 suggested that the bill does not actually seek to protect Letlow because it "puts too many votes in the south" or Florida Parishes of District Five. **JE 34 at 6 ("I applaud [Sen. Womack] for having stated that [protecting Congresswoman Letlow] is one of the objectives of this bill, but this bill doesn't do that.")**. These assertions were mere conjecture that: (A) proposed no other reasonable or possible alternative map and sought to risk the probable liability after a full trial in the Middle District of Louisiana; (B) did not consider the fact

The panel majority minimizes the political reasoning behind the map's contours but cites this exact quote from the exchange between Chairman Beaullieu and Senator Womack as direct evidence of racial predominance. Majority Op. 43. The panel majority ignores key pieces of information from the trial record to suggest its conclusion of "racial gerrymandering," where none exists. Regrettably, it subjugates the copious evidence of the overarching political motives in the Legislature. Respectfully, the panel majority ignores wholesale references to partisan politics and incumbent protection in its direct evidence analysis, only to throw it in as an aside before reaching its ultimate conclusion. *See* Majority Op. 43. It "acknowledge[d]" that "race-neutral considerations factored into the Legislature's decisions, such as the protection of incumbent representatives." Majority Op. 43. It then cites trial testimony from Senator Pressly and Senator Seabaugh agreeing that protecting the Republican leadership in Washington played a part in the legislative session. *Id.* (citing Trial Tr. 60, 71, 69).

This narrow examination of the trial record stops short of corroborating whether Plaintiffs actually satisfied their burden of disentangling race from politics. Furthermore, the evidence the panel majority pieces together from trial is far from the only evidence of political motives adduced from the numerous fact witnesses serving in the Legislature.

---

that the alternative maps introduced in the legislative session placed Congresswoman Letlow in far less favorable positions. *See* **Trial Tr. 560** (testimony of Commissioner Lewis) (stating that S.B. 4 and H.B. 5 placed Congresswoman Letlow in the second majority-Black district).

Take for instance the trial testimony of Representative Mandie Landry of Orleans Parish, who testified to the "fear among Republicans that if they" failed to pass a map before the *Robinson I* trial "that the [Middle District of Louisiana] would draw one that wouldn't be as politically advantageous for them." Trial Tr. 367–68. She then said the quiet part out loud—that "everyone knew that" Governor Landry "wanted Congressman Graves out." Trial Tr. 370. Her unrefuted testimony demonstrated that S.B. 8 was "the Governor's bill" and that the Republican delegation's leadership supported it. *See id.* Representative Landry also noted that there were "a couple dozen bills [addressing] other issues that we understood were the Governor's bills," each tracking an item addressed in the Governor's call for a special session.[34] Trial Tr. 371 (explaining that the Legislature was "also discussing the [Louisiana] Supreme Court maps" and a bill to abolish the jungle primary system to move to "closed primaries" limited to registered party voters); *see also* JE 8 at 1–2 (calling for the Legislature to convene to draft new legislation and amendments relative to the election code, Louisiana Supreme Court districts, Congressional districts).

---

[34] The relevance of Governor Landry's involvement in S.B. 8 cannot be overstated and is not even mentioned in a footnote by the majority. The best evidence of his involvement can be gleaned from his remarks to the Legislature at the opening of the 2024 Extraordinary Legislative Session. To assert that the Louisiana Legislature confronted this redistricting issue solely at the behest of the district court is plainly unsupported based on the Governor's statements and contradicts the language of Article III, § 6 of the Louisiana Constitution which states that "the legislature shall reapportion the representation in each house as equally as practicable on the basis of population shown by the census." Governor Landry—a lawyer, a former Congressman of District 3, and the former Attorney General of Louisiana who "did everything [he] could to dispose of [the *Robinson*] litigation," and who was well aware of the redistricting process—seized the initiative and called upon the Legislature to exercise its sovereign prerogative (and the legislative obligation) to draw the map. During his remarks, when he stated that the district court handed down an order, he specified that the order was for the Legislature to "perform our job… our job that our own laws direct us to complete, and our job that

From Representative Landry's time in the House Chamber during prior legislative sessions and the 2024 legislative session, she noted "hundreds" of discussions with House Republicans that made clear that any legislation that contradicted the political dynamics around S.B. 8 were non-starters. Trial Tr. 375. Representative Landry testified that these political discussions "had been going on since the Governor was elected among us and [in] the media" and "increased [in frequency] as we got closer to [the Governor's] inauguration." Trial Tr. 370–71.

---

our individual oaths promise we would perform." **JE 35 at 10.** He continued by asserting that "[w]e do not need a federal judge to do for us what the people of Louisiana have elected you to do for them. You are the voice of the people, and it is time that you use that voice. The people have sent us here to solve problems, not to exacerbate them, to heal divisions, not to widen them." **JE 35 at 11.**

Louisiana Public Service Commissioner Davante Lewis also testified at trial as to the overarching, dominant political objectives of the 2024 legislative redistricting session. With years of experience working in the state capitol as a legislative aide, lobbyist, and elected official, he provided ample evidence of what transpired during the 2024 legislative session. Trial Tr. 562 (stating that he "knew the entire [Senate] committee" because he "had worked with them" in the Legislature for "over eight years"). Commissioner Lewis explained that there were two other redistricting maps that did not advance to the full floor for votes: S.B. 4, sponsored by Senators Price and Duplessis, and H.B. 5, sponsored by Representative Marcelle. Trial Tr. 560. He stated that both of those maps placed Congresswoman Letlow in the second majority-Black congressional district, with Congressman Graves in a safe Republican seat. *See* Trial Tr. 560 ("Q. How many majority black districts were in the map[s]? A. Two. Q. Who currently represents those districts? A. It would be Congressman Carter and *Congresswoman Letlow.*"); Trial Tr. 524 ("The main difference between the two maps . . . was just the geographic design of the map.").

Commissioner Lewis recounted that he testified in favor of S.B. 4 before the Senate and Governmental Affairs Committee on January 16, 2024. Trial Tr. 560–61. He testified that S.B. 4 did not advance out of committee on that day. Trial Tr. 563. He stated that the vote "came down on party lines," and that "[a]ll Republicans voted against it." Trial Tr. 563. From this testimony, it is safe to say that more compact bills that included two majority-Black districts but did not protect the right Republican incumbents were effectively dead on arrival.

A clear example of this sentiment in action in the legislative record comes from Representative Marcelle's statements in front of the House and Governmental Affairs Committee on January 17, 2024. Less than twenty-

four hours after S.B. 4 was shot down in committee on purely partisan lines, Representative Marcelle voluntarily pulled H.B. 5 from consideration. She stated that her reasons for doing so were based on "knowing what the politics are at play." JE 37 at 6. She further stated that any "[b]ill that was very similar" to H.B. 5 and S.B. 4 would "probably never make it to the floor." JE 37 at 6.

Senator Duplessis's trial testimony provides even more context dating back to the initial 2022 legislative redistricting session. As a member of the House and Governmental Affairs for that session, Senator Duplessis "traveled for months across the state and conducted roadshows and listened to the community" to assess what they would like to see in the redistricting process.[35] Trial Tr. 513–14. He witnessed countless perspectives from voters across the state that called for fair maps that would reflect the state's population and comply with the VRA. *See* Trial Tr. 515. Recalling the session that followed the roadshow process, Senator Duplessis explained that legislation featuring an electoral map that included two majority-Black districts were "all voted down" in committee. Trial Tr. 515. In spite of the populace's clear expression for the Legislature to pass fair maps[36] the Legislature ultimately chose H.B. 1. He continued to explain

---

[35] *See, e.g.*, Power Coalition*, Legislative Redistricting Roadshow Comes to Alexandria on Tuesday, November 9, 2021*, (Nov. 9, 2021), https://powercoalition.org/legislative-redistricting-roadshow-comes-to-alexandria-on-tuesday-november-9-2021/.

[36] Indeed, the Legislature's deliberative process was informed by community perspectives that demonstrated the unity of interests behind an electoral map that included two majority-Black districts. This sharply contrasts with the situation in *Vera. See* 861 F. Supp. at 1334 ("The final result seems not one in which the people select their representatives, but in which the representatives have selected the people."). Members of both major political parties in the Legislature attended the nearly dozen roadshows across the state and heard this ubiquitous message.

that the Legislature convened for a special redistricting session in June 2022 after the preliminary injunction decision in *Robinson I*. Trial Tr. 517. He testified that several bills introduced in that special session would have complied with the VRA as ordered by the Middle District of Louisiana and adhered to traditional districting principles. Trial Tr. 518. Ultimately, none were adopted in that session for the same reasons that S.B. 4 and H.B. 5 failed; they were not supported by the Governor and the Republican delegation's leadership.

Senator Duplessis further contended that the Governor's influence over S.B. 8 led to its quick passage in the Legislature. Trial Tr. 525. Noting the Governor's position "coming off an election with no runoff," Senator Duplessis testified that "[the Governor's] support would have a lot of influence on what does and doesn't get passed." Trial Tr. 525. He stated that after Senator Womack's bill was filed "it became clear that that was the map that Governor Landry would support." *Id.* He continued to state that one does not "have to be a redistricting expert to know that any time a new map is drawn," that "[t]here is going to be someone who is negatively impacted from an incumbency standpoint." *Id.* On the floor of the Legislature during the 2024 session, Senator Duplessis noted that Senators Womack and Stine consistently talked about "the importance of protecting certain elected officials." JE 30 at 20; Trial Tr. 527. When questioned about this statement at trial, he stated that "the political decision was made to protect certain members of Congress and to not protect one member of Congress and that it was clear that that member was going to be Congressman Garret Graves." Trial Tr. 527.

After the floor was open to amendments to S.B. 8 in the House and Governmental Affairs Committee, Senator Womack and Representative Michael Johnson of Rapides Parish noted that S.B. 8 was not drafted "in a

vacuum" and that the congressional map would affect people in Senator Womack's own State Senate district. JE 31 at 45–46. Senator Womack accepted that while some Republicans may give him "a lot of heat" for the decision to draw a map that included two majority-minority districts, he agreed with Representative Johnson that S.B. 8 "present[s] a map that achieves all the necessary requirements [of a valid map] and . . . [is] the best instrument that [he] could come up with." JE 31 at 46.

Thus, the legislative record in this case reveals the true "dominant and controlling" factors driving the adopted map's boundaries. *See Miller*, 515 U.S. at 913 One such factor was the need to protect every member of Louisiana's Republican delegation in the U.S. House of Representatives *except for Congressman Graves*. That was the criterion that "could not be compromised." *See Bethune-Hill*, 580 U.S. at 189 (quotation omitted). On this point, not even S.B. 8's detractors—either at trial or during the legislative session—attempted to debunk or attack this offered rationale. *See* Trial Tr. 71 (testimony of Sen. Pressly) ("There were certainly discussions [in the Republican Delegation] on ensuring" that Speaker Johnson, Majority Leader Scalise, and Congresswoman Letlow were protected); Trial Tr. 76–77 (agreeing that a "Republican would be likely to lose in a second majority-Black district" like the other maps proposed in the Legislature); Trial Tr. 61 (testimony of Sen. Seabaugh). With all of this context, it becomes indelibly clear that Governor Landry's and the Republican delegation's decisions to protect Speaker Johnson, Majority Leader Scalise, and Congresswoman Letlow and cut out Congressman Graves shows that political motivations "could not be compromised" during the redistricting process. *See Bethune-Hill*, 580 U.S. at 189. Thus, the overwhelming evidence of the goal of incumbency protection in the legislative record shows that Plaintiffs have

failed to meet their burden to prove racial predominance in this "mixed motive" case, as required by Supreme Court precedent.

*b. Other Traditional Redistricting Principles Respected in S.B. 8*

The evidence in the record as to the communities of interest contained within S.B. 8 substantially undermines the assertion that race predominated in the bill's drafting. The Supreme Court has warned that "where the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls,' it engages in racial stereotyping at odds with equal protection mandates." *Miller*, 515 U.S. at 920. Notably, this record is flush with community of interest evidence that rebuts the allegations of racial stereotyping. *See Theriot*, 185 F.3d at 485.

There are tangible communities of interest spanning District 6. The panel majority cannot plausibly conclude that the evidence compels a determination that there are no tangible communities of interest contained in District 6. Unlike in *Miller* in which the Court was presented with a comprehensive report illustrating the fractured political, social, and economic interests within the district's Black population, this court was only presented with trial testimony subject to credibility determinations. *Miller*, 515 U.S. at 919.

"A district may lack compactness or contiguity—due, for example, to geographic or demographic reasons—yet still serve the traditional districting goal of joining communities of interest." *Cromartie I*, 526 U.S. at 555 n.l (Stevens, J., concurring). A determination that race played a predominant role—over incumbency protection, communities of interest, compactness, and contiguity—is crucial to Plaintiffs' case. However, the Plaintiffs rely on this court solving every conflict of fact in their favor and accepting their inferences in order to hold that they have satisfied their burden of proof. The Court has advised courts that "[w]here there are such conflicting inferences one group of them cannot, be[] labeled as 'prima facie proof.'" *Wright v. Rockefeller*, 376 U.S. 52, 57 (1964). If one inference were to be "treated as conclusive on the fact finder," it would "deprive him of his responsibility to choose among disputed inferences. And this is true whether the conflicting inferences are drawn from evidence offered by the plaintiff or by the defendant or by both." *Id*. The record does not support the panel majority's view that Plaintiffs' evidence has established a prima facie case compelling this panel, despite conflicting inferences which could be drawn from that evidence, to hold that the State drew S.B. 8 solely on the basis of race. *See id.*

The panel majority clings to rationales from *Hays*, averring that its descriptions of cultural divides are still true today. It bears repeating that—considering the long passage of time and trends of cultural integration over the last few decades—it is unreasonable and untenable for this court to conclude "much of the 'local appraisal' analysis from *Hays I* remains relevant to an analysis of S.B.8." *See* Majority Op. at 53–54. Citing the map's divisions of the Acadiana region, the majority contends that S.B. 8 "fails to take into account Louisiana's diverse cultural, religious, and social landscape in any meaningful way." Majority Op. 55 n.11. But the panel majority's narrow view rooted from its cursory consultation of select cultural historical sources and *Hays* sharply conflicts with decades of electoral history.

Several witnesses that testified in this case stated that Louisiana's political subdivisions and geographical and cultural hotspots are routinely split in different electoral districts. Instead of evaluating it based on the evidence in this case, the panel majority condemns S.B. 8 for its multiple divisions of the "strong cultural and ethnic groups" in the Acadiana area.[37] At first glance, the panel majority's aim is noble and sensible. But the complexity of relationships between populations within the Acadiana area, as well as its geographic composition, do not promote one unitary community of interest. In 1971, the Louisiana Legislature passed a resolution officially recognizing and protecting the "traditional twenty-two parish Cajun homeland."[38] The Acadiana Delegation in the Legislature provides the following map of Acadiana and segments the often referred-to Cajun Heartland (in darker red) from the rest of Acadiana.[39]

---

[37] The panel majority also paints with a broad brush to describe the region, but its high-level discussion assumes that two distinctive cultures that have learned how to live harmoniously in a large shared geographic region morphs those distinctive communities into a homogenous, unitary community of interest. Cajun and Creole populations have different histories, languages, food, and music. In my view, the intriguing relationship between Cajuns and Creoles may lend itself to noting that they do not neatly fit into a unitary community of interest. Somewhat respecting this notion, the Legislature has consistently segmented the Acadiana area into multiple congressional districts over the past few decades.

[38] Acadiana Legislative Delegation, (last visited April 29, 2024), https://house.louisiana.gov/acadiana/#:~:text=Acadiana%20often%20is%20applied%20only,sometimes%20also%20Evangeline%20and%20St.

[39] *Id.* ("Acadiana often is applied only to Lafayette Parish and several neighboring parishes, usually Acadia, Iberia, St. Landry, St. Martin, and Vermilion parishes, and sometimes also Evandeling and St. Mary; this eight-parish area, however, is actually the 'Cajun Heartland, USA' district, which makes up only about a third of the entire Acadiana region.").

56



Under the delegation's definition, the Acadiana parishes contain portions of three of the state's five major population centers: Lake Charles, Lafayette, and the outskirts of Baton Rouge.[40] Acadiana stretches from the marsh lands in St. Mary Parish all the way up to Avoyelles Parish in the Red River Basin. Importantly, the majority ignores the fact that the twenty-two parishes that lie within this corner of the state have been segmented into multiple single-member congressional districts since the 1970s.[41]

The following map demonstrates the congressional districts for the majority of the 1970s. Notably it splits Acadiana into three congressional districts:

---

[40] *See id.*

[41] Even if the panel majority restricts its description of Acadiana into the "Cajun Heartland" parishes, *see supra* n.40, it also cannot account for the fact these have been routinely split into multiple congressional districts for decades. The following maps are retrieved from shapefile data compiled and organized by professors from the University of California at Los Angeles. Jeffrey B. Lewis, Brandon DeVine, Lincoln Pitcher, & Kenneth C. Martis, *Digital Boundary Definitions of United States Congressional Districts, 1789-2012* (2013) (datafile and code book generating district overlays), https://cdmaps.polisci.ucla.edu.



Continuing to the 1980s, the Legislature continued to segment Acadiana for another decade:



Even the congressional districts drawn by the *Hays* panel were no different on this front, also splitting up the Acadiana area into multiple districts:[42]



Neither did the congressional districts enacted after the turn of the millennium keep Acadiana whole:[43]



---

[42] 936 F. Supp. 360, 372 (W.D. La. 1996) ("The State of Louisiana is directed to implement the redistricting plan drawn by this court and ordered implemented in *Hays II*."). The judicially created map split Acadiana into districts 3, 5, 6, and 7.

[43] *See* Act 10, H.B. 2 (2001) (splitting Acadiana into four congressional districts).

59

Another decade passes, and the Legislature carves up Acadiana once more. The Legislature continued this trend after the 2010 census. The electoral map enacted in 2011[44] likewise split Acadiana into four districts:



If the majority's formulation is correct, then none of these maps, including H.B. 1 (depicted below),[45] had adequately accounted for Louisiana's diverse cultural landscape in any meaningful way.

---

[44] Act 2, H.B. 6 (2011) (same).

[45] Act 5, H.B. 1 (2022) (dividing Acadiana into four single-member congressional districts).



Thus, dating back decades, it is safe to say Acadiana has been a community that is "not unaccustomed to splitting" in order to achieve a variety of other goals in Congressional reapportionment. *Cf. Theriot*, <u>185 F.3d at 483</u>; *Theriot v. Parish of Jefferson*, <u>966 F. Supp. 1435, 1444</u> (E.D. La. 1997). For this reason, S.B. 8's division of Acadiana cannot persuasively be interpreted to prove that race predominated in its drafting. *See* H.B. 1, Act 5 (2022) (dividing the Acadiana region into four Congressional districts); H.B. 6, Act 2 (2011) (doing the same). Absent from the majority's analysis is discussion of precedent making clear that an electoral map that splits a community of interest is not strong evidence of racial predominance if the community is accustomed to being split into multiple districts. *Cf. Theriot*, <u>185 F.3d at 485</u>. Furthermore, the legislative record in this case shows that the Legislature considered a number of other communities of interest and apportioned them appropriately into single-member districts.[46]

---

[46] *See also supra* notes 21–26.

Here is what the record demonstrates as to the communities of interest factor. In testimony before the House and Governmental Affairs Committee, Senator Womack and numerous other members of the Louisiana House of Representatives noted that District 6 in S.B. 8 contained numerous communities of interest. Representative Larvadain of Rapides Parish noted that District 6 respected regional education and employment interests, noting that Rapides area residents lie within a "community of interest with Natchitoches and Caddo" parishes. JE 31 at 21. He further noted that residents of Point Coupee Parish in District 6, which lies almost midway between Opelousas and Baton Rouge, utilize health systems services and hospitals in Saint Landry Parish's more densely populated seat of Opelousas. JE 31 at 21–22. As another note, S.B. 8's District 4 contains the two major military bases in the state under the watch of the most powerful member of the U.S. House of Representatives, Speaker Johnson. Trial Tr. 384 (noting that assets like military bases, along with colleges or universities are information that legislators and electoral demographers consider as communities of interest).

The majority does not grapple with any of this. Instead, it clings tightly to Mr. Hefner's dot density map and testimony on the contours of the district's lines in certain areas instead of truly examining whether Plaintiffs had disentangled politics and race to prove that the latter drove District 6's lines. *See Cromartie I*, 526 U.S. at 546; *Theriot*, 185 F.3d at 486 ("Our review of the record leads us to conclude that the inclusion or exclusion of communities was inexorably tied to issues of incumbency."). Thus, the majority cannot convincingly hold that Plaintiffs have met their burden of debunking the State's "political motivation" defense.

### III. Strict Scrutiny

In my view, the panel majority adopts an incomplete interpretation of the legislative record and inconsistent circumstantial evidence to hold that S.B. 8 constitutes a racial gerrymander. Following that determination, the panel majority asserts that S.B. 8 fails strict scrutiny. Notwithstanding my writings above that demonstrate that S.B. 8 does not constitute an impermissible racial gerrymander, I now explain how the majority's second major determination also lacks a substantial basis in the record.

*A. Compliance with the VRA is a Compelling State Interest*

To survive an equal protection challenge to an election redistricting plan which considers race as a factor, the state must show that its redistricting plan was enacted in pursuit of a compelling state interest and that the plan's boundaries are narrowly tailored to achieve that compelling interest. *See Vera*, 517 U.S. at 958–59. In my view, it is clear that the State has satisfied its burden in demonstrating that District 6's boundaries in S.B. 8 were created pursuant to a compelling state interest and were narrowly tailored to achieve that interest.

It is axiomatic that "compliance with § 2 of the Voting Rights Act constitutes a compelling governmental interest." *See Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1405 (5th Cir. 1996); *Cooper*, 581 U.S. at 301. Furthermore, the Supreme Court has consistently made clear that "a State indisputably has a compelling interest in preserving the integrity of its election process." *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2347 (2021) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (internal quotation marks omitted)).

In the face of this, Plaintiffs argue that compliance with the VRA is not a compelling governmental interest based on this record. Plaintiffs

categorize the State's decision to settle the *Robinson* matter by calling a
special session to draw new maps as "pretrial court-watching" insufficient
to constitute "a compelling interest to justify race-based line drawing."
Plaintiffs' Br. 14. They contend that the State's reliance on the VRA is based
on the Attorney General's "calculated guess" on how the Middle District
would rule, rather than an independent analysis of H.B. 1's performance
under the VRA. Plaintiffs point to the Attorney General's responses to
questioning during an information session before the 2024 Legislative
Session formally opened in the morning hours of January 16, 2024, to
support the theory that the Legislature did not truly consider VRA
compliance in deciding to promulgate S.B. 8. Plaintiffs' Br. 15. Alternatively,
they assert that the VRA is merely a "*post-hoc* justification[]" offered by the
State to avoid liability. *See Bethune-Hill*, 580 U.S. at 190.

None of these arguments are persuasive. The State has pointed to a
compelling state interest recognized by binding Supreme Court precedent.
*See Cooper*, 581 U.S. at 292, 301; *Shaw II*, 517 U.S. at 915. I now proceed to
address narrow tailoring as the State has sufficiently established a strong
basis in evidence underlying its redistricting decisions.

### B. Strong Basis In Evidence

The State argues that it had good reasons to believe that it had to
draw a majority-minority district to avoid liability for vote dilution under §
2 of the VRA. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278
(2015) (holding that legislators "may have a strong basis in evidence to use
racial classifications in order to comply with a statute when they have good
reasons to believe such use is required, even if a court does not find that
the actions were necessary for statutory compliance"); *Cooper*, 581 U.S. at
287 ("If a State has good reason to think that all three of these [*Gingles*]
conditions are met, then so too it has good reason to believe that § 2

requires drawing a majority-minority district. But if not, then not."). Moreover, the Court has emphasized that as part of the strict scrutiny inquiry "a court's analysis of the narrow tailoring requirement insists only that the legislature have a 'strong basis in evidence' in support of the (race-based) choice that it has made." *Ala. Legis. Black Caucus*, 575 U.S. at 278. In essence, the Court has indicated that the State must establish a strong basis in evidence for concluding that the threshold *Gingles* conditions for § 2 liability are present, namely:

> First, "that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single member district"; second, "that it is politically cohesive"; and third, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

*Vera*, 517 U.S. at 978 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51, (1986)) (internal citation omitted).

The majority errs in asserting that the State has not met its burden here. *See* Majority Op. at 51. Markedly, the majority has incorrectly articulated the State's burden as requiring it to show that the contested district, District 6, satisfies the first *Gingles* factor. The Supreme Court has already directed that the first *Gingles* condition "refers to the compactness of the minority population [in the state], not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("*LULAC*") (quoting *Vera*, 517 U.S. at 997 (Kennedy, J., concurring))). As such, the State's actual burden is to show that the first *Gingles* condition—the Black population is sufficiently large and geographically compact to constitute a majority in a single-member district—is *present* so as to establish that it had a strong basis in evidence for concluding that its remedial action to draw a new map was required.

*Cooper*, 581 U.S. at 287; *Vera*, 517 U.S. at 978. "If a State has good reason to think that all the *Gingles* preconditions are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district." *Cooper*, 581 U.S. at 302 (internal quotation marks omitted).

The Black population's numerosity and reasonable compactness within the state must first be established as required by *Gingles*. *Cooper*, 581 U.S. at 301; *Allen v. Milligan*, 599 U.S. 1, 19 (2023). To satisfy the first *Gingles* precondition, plaintiffs often submit illustrative maps to establish reasonable compactness for purposes of the first *Gingles* requirement. *Milligan*, 599 U.S. at 33 ("Plaintiffs adduced at least one illustrative map that comported with our precedents. They were required to do no more to satisfy the first step of *Gingles*."). As such, courts evaluate whether the illustrative plans demonstrate reasonable compactness when viewed through the lens of "traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC*, 548 U.S. at 433 (internal quotation marks omitted). With respect to the first *Gingles* precondition, in *Robinson I*, the Middle District of Louisiana found both (1) that Black voters could constitute a majority in a second district in Louisiana and (2) that a second district could be reasonably configured in the state. *Robinson I*, 605 F. Supp. 3d at 820–31; *see Milligan*, 599 U.S. at 19. Following *Milligan*'s lead, the *Robinson I* court analyzed example districting maps that Louisiana could enact—each of which contained two majority-Black districts that comported with traditional districting criteria—to conclude that a second majority-minority district could be formulated from Louisiana's demographics. *Robinson I*, 605 F. Supp. 3d at 822–31; *see Milligan*, 599 U.S. at 20.

Because the Middle District of Louisiana had thoroughly conducted a *Gingles* analysis, the State had good reasons to believe (1) that the *Gingles*

threshold conditions for § 2 liability were all present and (2) that it was conceivable to draw two majority-minority congressional districts that satisfy the first prong of *Gingles* while adhering to traditional redistricting principles. The *Robinson I* court's thorough analysis that the plaintiffs were substantially likely to prevail on the merits of their §2 claim provided powerful evidence and analysis supporting the State's strong basis in evidence claim that the VRA requires two majority-Black districts. *Cf. Wisconsin Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 403 (2022) (holding that the Governor failed to carry his burden because he "provided almost no other evidence or analysis supporting his claim that the VRA required the seven majority-black districts that he drew"). The majority points to no precedent requiring the State to reestablish or embark on an independent inquiry regarding the numerosity and reasonable compactness of Louisiana's Black population after an Article III judge has already carefully evaluated that evidence in a preliminary injunction proceeding. *Id*. at 410 (Sotomayor, J., dissenting) ("The Court points to no precedent requiring a court conducting a malapportionment analysis to embark on an independent inquiry into matters that the parties have conceded or not contested, like the *Gingles* preconditions here.").

Notably, both the majority and the *Robinson I* court would agree that where the record reflects that the Black population is dispersed then § 2 does not require a majority-minority district. *Compare* 605 F. Supp. 3d at 826 ("If the minority population is too dispersed to create a reasonably configured majority-minority district, [§ 2] does not require such a district.") (internal citation and quotation marks omitted), *with* Majority Op. at 51 ("The record reflects that, outside of southeast Louisiana, the Black population is dispersed."). But it was the *Robinson I* court that was provided with an extensive record—particularly extensive for a preliminary

injunction proceeding—regarding the numerosity and geographic compactness of Louisiana's Black population. And this court should not deconstruct or revise that finding. Despite the majority's suggestion that the "[instant] record reflects that, outside of southeast Louisiana, the Black population is dispersed," this record makes no such certitude. *See* Majority Op. at 51.

Likewise, the Supreme Court has been clear that compactness in the equal protection context, "which concerns the shape or boundaries of a district, differs from § 2 compactness, which concerns a minority group's compactness." *LULAC*, 548 U.S. at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 111 (1997)). "In the equal protection context, compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines." *Id.* (citing *Miller*, 515 U.S. at 916–17). The inquiry under § 2 is whether "the minority group is geographically compact." *Id.* (quoting *Shaw II*, 517 U.S. at 916) (internal quotation marks omitted).

The instant case is about an asserted equal protection violation. The fully developed trial record substantiates District 6's compactness as it relates to traditional redistricting factors. Conversely, *Robinson I* and its associated record are about a vote dilution violation. In essence, the record in *Robinson I* is replete with evidence concerning the inquiry under § 2 into whether the minority group is geographically compact. *Robinson I*, 605 F. Supp. 3d at 826. The *Robinson I* court correctly determined that "[t]he relevant question is whether the *population* is sufficiently compact to make up a second majority-minority congressional district in a certain area of the state." *Robinson I*, 605 F. Supp. 3d at 826. And that is the determination that the Middle District of Louisiana made. Equipped with expert testimony regarding the numerosity and reasonable compactness of the Black

population in Louisiana, the *Robinson I* court made a finding that the "Black population in Louisiana is heterogeneously distributed." 605 F. Supp. 3d at 826. In *Robinson I*, the court determined that "[p]laintiffs have demonstrated that they are substantially likely to prove that Black voters are sufficiently 'geographically compact' to constitute a majority in a second congressional district." *Robinson I*, 605 F. Supp. 3d at 822. It would be unreasoned and inappropriate for this court—without the benefit of a record relevant to vote dilution—to now *post hoc* suggest that Black voters are not sufficiently "geographically compact" and thus overrule the *Robinson I* court's finding.

After determining that the previously enacted redistricting plan, H.B. 1, likely violated § 2, the Middle District of Louisiana did not impose a particular map or course of action on the State. *Id.* at 857 ("The State . . . is not required to [use one of plaintiffs' illustrative plans], nor must it 'draw the precise compact district that a court would impose in a successful § 2 challenge.'"). Rather, the *Robinson I* court highlighted that the State retained "broad discretion in drawing districts to comply with the mandate of § 2." *Id.* (quoting *Shaw II*, 517 U.S. at 917 n.9). It emphasized the State's numerous options for a path forward, namely that the State could "elect to use one of Plaintiffs' illustrative plans" or "adopt its own remedial map." The State chose the latter. At the same time, the *Robinson I* court cautioned the State to respect its own traditional districting principles and to remain cognizant of the reasonableness of its fears and efforts to avoid § 2 liability. *Id.* (quoting *Vera*, 517 U.S. at 978).

Although District 6 was not present in any of the illustrative maps submitted to satisfy the first *Gingles* factor in *Robinson I*, the State has shown that as a remedial plan District 6 is reasonably compact when viewed through the lens of "traditional districting principles such as maintaining

69

communities of interest and traditional boundaries." *LULAC*, <u>548 U.S. at 433</u> (internal quotation marks omitted).[47] Recall that a "§ 2 district that is reasonably compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless beauty contests." *Vera*, <u>517 U.S. at 977</u>.

Make no mistake—the "special session [called by Governor Landry] was convened as a direct result of [] litigation, *Robinson v. Landry*." JE36 at 6. Certainly, some state legislators colloquially characterized the genesis of the special session by expressing that "we've been ordered by the court that we draw congressional district with two minority districts." JE36 at 4 (Sen. Ed Price). But, while some state legislators conversationally expressed that "we are now in 2024 trying to resolve this matter at the direction of the court," all legislators formally and collectively understood the redistricting process to have begun in the fall of 2021 "where [the Legislature] began [the] process going to every corner of this state on the roadshow, northeast, northwest, southeast, southwest, central Louisiana, all throughout this state." JE36 at 4 (Sen. Royce Duplessis). Most of these senators—with the exception of two newly elected senators—were involved in the redistricting process when it began more than two years before the January 2024 special session, in the fall of 2021. Trial Tr. 545 (noting that except for only two newly-elected state senators to the 2024 Legislature, "the rest of the Senate serv[ed] for the full duration of the redistricting process following the 2020 census").

---

[47] *See supra* Part II.A-B.

70

As mentioned above, the testimony and evidence show that the legislators gave careful thought when identifying and assessing communities of interest; strategizing incumbency protection; calculating how often maps split parishes, census places (or municipalities), and landmarks, and measuring and comparing compactness scores. Although the impetus for the special session was litigation, the record confirms that the legislators considered traditional redistricting criteria in drawing and amending the maps. During the January 2024 special session, the legislators continuously cited "redistricting criteria, including those embodied in the Legislature's Joint Rule 21" as foremost in their minds while promulgating, drafting, and voting on S.B. 8.[48] As discussed, the record illustrates that the legislators balanced all the relevant principles, including those described in Joint Rule 21, without letting any single factor dominate their redistricting process.

To further imprint that the State had a strong basis in evidence for finding that the *Gingles* preconditions for § 2 liability were present, I examine the remainder of the *Gingles* factors. *See Vera*, 517 U.S. at 978. Louisiana electoral history provided evidence to support the remaining *Gingles* prerequisites. The second *Gingles* factor asks whether Black voters are "politically cohesive." The court determines whether Black voters

---

[48] Moreover, Patricia Lowrey-Dufour, Senior Legislative Analyst to the House and Governmental Affairs Committee, presented an oral "101" orientation about the redistricting process. Specifically, she provided an overview of redistricting terms, concepts, and law, redistricting criteria, the 2020 census population and population trends, malapportionment statistics, and illustrative maps. Moreover, Ms. Lowrey-Dufour directed legislators to "a plethora of resources available on the redistricting website of the legislature." In other words, the confection of these redistricting plans did not occur in a vacuum. S.B. 8 was adopted as part of a process that began with the decennial and in which legislators were immensely informed of their duties and responsibilities. **JE28 at 3– 11**.

usually support the same candidate in elections irrespective of the contested district. The third *Gingles* factor requires an inquiry into whether White voters in Louisiana vote "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate." Again, the court makes this determination unrelatedly of the contested district. Relying on a record that established racially polarized voting patterns in the state of Louisiana, the State had a strong basis in evidence for finding that the second and third *Gingles* factors were present.

Further, the Middle District of Louisiana court analyzed "the Senate Factors . . . and then turned to the proportionality issue." *Robinson I*, 605 F. Supp. at 844. By evaluating the Senate Factors,[49] the *Robinson I* court determined that the plaintiffs had "established that they are substantially likely to prevail in showing that the totality of the circumstances weighs in their favor." 605 F. Supp. at 844–51. Lastly, when evaluating the proportionality factor, the Middle District of Louisiana concluded that the "Black representation under the enacted plan is not proportional to the Black share of population in Louisiana . . . Although Black Louisianans make up 33.13% of the total population and 31.25% of the voting age population, they comprise a majority in only 17% of Louisiana's congressional districts." *Id.* at 851. Thus, each of the three *Gingles* prerequisites was sufficiently established.

In sum, not only did the State have a strong basis in evidence for believing that it needed a majority-minority district in order to avoid liability under § 2 but—in drafting the remedial plan—it also ensured that its

---

[49] The Senate Report of the Senate Judiciary Committee—which accompanied the 1982 amendments to the VRA—specifies factors ("Senate Factors") that are typically relevant to a § 2 claim and elaborate on the proof required to establish § 2 violations. *See Gingles*, 478 U.S. at 43–44.

proposed redistricting plan met the traditional redistricting criteria and was geographically compact so as to not offend the VRA. *See Shaw II*, 517 U.S. at 916–17 (rejecting the argument that "once a legislature has a strong basis in evidence for concluding that a § 2 violation exists in the State, it may draw a majority-minority district anywhere, even if the district is in no way coincident with the compact *Gingles* district"). Thus, District 6, as drawn, is "narrowly tailored."

Shaw II recognizes that: (1) the State may not draw a majority-minority district "anywhere [in the state] if there is a strong basis in evidence for concluding that a § 2 violation exists somewhere in the State and (2) "once a violation of the statute is shown[,] States retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw II*, 517 U.S. at 901, 917 n.9. Citing *Shaw II*, the *Robinson I* court made no determination that a district should be drawn *just anywhere* in the state. 605 F. Supp. 3d at 857–58. Nor did the State seek to embark on such an endeavor. Rather, the *Robinson I* court afforded the State "a reasonable opportunity for the legislature to meet [applicable federal legal] requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (citing *Burns v. Richardson*, 384 U.S. 73, 85 (1966)). Because the Supreme Court has emphasized "[t]ime and again" that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court," this three-judge panel should not usurp the State's efforts to narrowly tailor its reapportionment scheme. *See Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). Under the *Burns* rule, "a State's freedom of choice to devise substitutes [or remedial plans] for an apportionment plan [that was] found unconstitutional . . . should not be restricted beyond the clear commands

73

of the Equal Protection Clause." *Lipscomb*, <u>437 U.S. at 536</u>–37; *Burns*, <u>384 U.S. at 85</u>.

Far from a map "drawn anywhere" in the state simply because "there is a strong basis in evidence for concluding that a § 2 violation exists somewhere in the State," District 6 reasonably remedies potential § 2 violations because (1) the Black population was shown to be "geographically compact" to establish § 2 liability, *Gingles*, <u>478 U.S. at 50</u>, and (2) District 6 complies with "traditional districting principles such as compactness, contiguity, and respect for political subdivisions," *See Miller*, <u>515 U.S. at 919</u>. *Shaw II*, <u>517 U.S. at 900</u>. For the foregoing reasons, I would hold that because S.B. 8 is narrowly tailored to further the State's compelling interests in complying with § 2 of the VRA, it survives strict scrutiny and is therefore constitutional.

## IV. Conclusion

The panel's mandate in this case was clear: Plaintiffs needed to prove by a preponderance of the evidence that race predominated in the drawing of the district lines found in S.B. 8. The panel majority, relying on decades-old case law with antiquated observations, and by giving undue disproportionate weight to the testimonies of Plaintiffs' witnesses, concluded that Plaintiffs met their burden. Respectfully, my assessment of the evidence adduced at trial and my complete review of the entire record in this case convinces me that Plaintiffs failed to disentangle the State's political defense from the consideration of race in the formulation of S.B. 8. Not only is the panel majority's decision particularly jarring here, but it also creates an untenable dilemma for the State and eviscerates the semblance of its sovereign prerogative to draw maps.

The Louisiana Legislature conducted roadshows, held floor debates, had the author of the bill and numerous legislators explicitly state the

political impetus for their efforts, and drafted several maps and amend-ments before finally passing S.B. 8. If, after all of that, the majority still found that race predominated in drawing District 6, are we not essentially telling the State that it is incapable of doing the job it is tasked with under the United States and Louisiana constitutions? While the panel majority states that this court does not decide "whether it is feasible to create a second majority-Black district in Louisiana," the context underlying this case in con-junction with its holding functionally answers that question. Majority Op. 58. I worry that the panel majority's decision fails to properly assess the history that led to S.B. 8 and, consequently, dooms us to repeat this cycle. For the foregoing reasons, I would determine that Plaintiffs have failed to meet their burden showing racial predominance in the drafting of S.B. 8. Alternatively, I would hold that S.B. 8 is constitutional because it is narrowly tailored to further the State's compelling interests in complying with § 2 of the VRA.

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

**PHILLIP CALLAIS, ET AL**            **CIVIL DOCKET NO. 3:24-CV-00122 DCJ-CES-RRS**

**VERSUS**                        **THREE-JUDGE COURT**

**NANCY LANDRY, in her official capacity as Louisiana Secretary of State**

### ORDER

The Court *sua sponte* reconsiders its ORDER [Doc. 79] denying the MOTION TO INTERVENE (the "Motion") [Doc. 10] filed by Edward Galmon, Sr., Ciara Hart, Norris Henderson, and Tramelle Howard (collectively, the "*Galmon* Movants"), and now grants the *Galmon* Movants' Motion under Federal Rule of Civil Procedure 24(b) for the purpose of participating in the remedial phase of this trial only.

Accordingly,

IT IS HEREBY ORDERED THAT the *Galmon* Movants' MOTION TO INTERVENE [Doc. 10] is GRANTED as limited to the remedial phase of this trial.

THUS, DONE AND SIGNED in Chambers on this 3rd day of May 2024.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**PHILLIP CALLAIS ET AL**                          **CASE NO.  3:24-CV-00122**

**VERSUS**                                          **CIRCUIT JUDGE CARL E. STEWART,**
                                                    **DISTRICT JUDGES ROBERT R.**
                                                    **SUMMERHAYS AND DAVID C. JOSEPH**
**NANCY LANDRY, ET AL**                             **MAG. JUDGE KAYLA D. MCCLUSKY**

### MINUTES OF COURT:
### STATUS CONFERENCE

| Date: | May 6, 2024 | Presiding: | Judges Carl E. Stewart, Robert R. |
|---|---|---|---|
| | | Summerhays, and David C. Joseph | |
| Court Opened: | 10:31 AM | Courtroom Deputy: | Lisa LaCombe |
| Court Adjourned: | 11:37 AM | Court Reporter: | Jodi Terry |
| Statistical Time: | 1:06 | Courtroom: | Zoom Recording |

### APPEARANCES

| | | |
|---|---|---|
| Paul L Hurd | For | Phillip Callais, All Plaintiffs |
| Edward D Greim | For | Phillip Callais, All Plaintiffs |
| Katherine Graves | For | Phillip Callais, All Plaintiffs |
| Jackson Tyler | For | Phillip Callais, All Plaintiffs |
| Stuart Naifeh | For | Robinson Intervenor Defendants |
| John Adcock | For | Robinson Intervenor Defendants |
| Amitav Chakraborty | For | Robinson Intervenor Defendants |
| Garrett Muscatel | For | Robinson Intervenor Defendants |
| Arielle B McTootle | For | Robinson Intervenor Defendants |
| Jonathan Hurwitz | For | Robinson Intervenor Defendants |
| Robert Klein | For | Robinson Intervenor Defendants |
| Daneil Hessel | For | Robinson Intervenor Defendants |
| Alora Thomas | For | Robinson Intervenor Defendants |
| Sara Rohani | For | Robinson Intervenor Defendants |
| Colin Burke | For | Robinson Intervenor Defendants |
| Victoria Wenger | For | Robinson Intervenor Defendants |
| R. Jared Evans | For | Robinson Intervenor Defendants |
| Morgan D. Brungard | For | Louisiana Attorney General's Office |
| Cary T. Jones | For | Louisiana Attorney General's Office |
| Jason Brett Torchinsky | For | Louisiana Attorney General's Office |
| Brennan A.R. Bowen | For | Louisiana Attorney General's Office |
| Zachary D. Henson | For | Louisiana Attorney General's Office |
| Phillip M. Gordon | For | Louisiana Attorney General's Office |
| Drew Ensign | For | Louisiana Attorney General's Office |

| Phillip J. Strach | For | Nancy Landry, La. Secretary of State |
| Alyssa M. Riggins | For | Nancy Landry, La. Secretary of State |
| John C. Walsh | For | Nancy Landry, La. Secretary of State |
| Abha Khanna | For | Edward Galmon, Sr. Intervenors |
| Qizhou Ge | For | Edward Galmon, Sr. Intervenors |
| Lalitha Madduri | For | Edward Galmon, Sr. Intervenors |
| Jacob D. Shelly | For | Edward Galmon, Sr. Intervenors |
| Sam Hirsch | For | Michael Mislove, Amici |
| Jessica Ring Amunson | For | Michael Mislove, Amici |
| Judy Barrasso | For | Michael Mislove, Amici |

## **PROCEEDINGS**

The Court held a Status Conference via Zoom Video Conference.

The Court requested the parties jointly propose a briefing schedule for the remedial phase of the trial by the close of business tomorrow, May 7, 2024.

The State of Louisiana will file a brief by close of business tomorrow, May 7, 2024, explaining the feasibility of the Louisiana Legislature enacting a new Congressional map in time for the 2024 Congressional election. Among the other items discussed, the brief shall clearly state whether there is a legislative vehicle to enact a new congressional districting map during the 2024 regular session.

Defendant, Nancy Landry, Secretary of State, was directed to file a brief by the end of the day outlining and explaining the applicable deadlines for the upcoming Congressional election.

The Court will consider the briefing and the parties' scheduling proposals and enter a scheduling order forthwith.