# EXHIBIT 1

**NINETEENTH JUDICIAL DISTRICT COURT**
**PARISH OF EAST BATON ROUGE**
**STATE OF LOUISIANA**

CASE NO:                                                    DIVISION:

**NATIONAL COUNCIL OF JEWISH WOMEN – GREATER NEW ORLEANS SECTION, MARY ANN OSTROSKE, GENE GARY OSTROSKE, and SARAH CARTER,**

**VERSUS**

**JEFFREY M. LANDRY, in his official capacity as Louisiana Governor, and NANCY LANDRY, in her official capacity as Louisiana Secretary of State,**

**EMERGENCY PETITION FOR INJUNCTIVE RELIEF AND REQUEST FOR TEMPORARY RESTRAINING ORDER**

Petitioners National Council of Jewish Women – Greater New Orleans Section, Mary Ann Ostroske, Gene Gary Ostroske, and Sarah Carter, by and through their undersigned counsel, file this Petition for Declaratory and Injunctive Relief against Defendants Jeffrey M. Landry, in his official capacity as Louisiana Governor; and Nancy Landry, in her official capacity as Louisiana Secretary of State, and allege as follows:

**NATURE OF THE ACTION**

1.      Under Louisiana law, the legislature, not the Governor or the Secretary of State, sets the state's election schedule. Yet, Governor Jeff Landry, aided by Secretary of State Nancy Landry, has purported to unilaterally cancel Louisiana's 2026 congressional primary election after it has already begun. Ballots were sent to military voters and overseas voters as required by federal law a *month* ago. Mail ballots were sent to other voters entitled to vote by mail under Louisiana law almost a *week* ago. As a result, many voters—including among the Petitioners here—have *already voted*.

2.      The Governor's extraordinary and unlawful assertion of the power to cancel an election midstream is both unprecedented and unjustified. Quite to the contrary, the Supreme Court has historically found that when voting in an election is within *months* of beginning—and, here, *it has already begun*—the state must proceed under the invalidated map, and any infirmities must be corrected for future elections.

3.      The Governor's unilateral and unprecedented action threatens not only Petitioners' voting rights, but the very democratic order. If the Governor is permitted to declare any "emergency" he wishes to justify canceling an election that is already underway, it would set a precedent that would fundamentally and forever subvert the people's ability to trust and rely on an

orderly democratic system. Neither Louisiana nor federal law condones such an unjust outcome, and this Court must step in and make clear that elections may not be canceled by executive fiat.

4.    Contrary to the Governor's erroneous assertions, the Supreme Court's recent decision in *Louisiana v. Callais*, --- S. Ct. ----, Nos. 24-109 & 24-110, 2026 WL 1153054 (U.S. Apr. 29, 2026), does not prevent the election from continuing. And even if the election were properly enjoined, the appropriate vehicle for determining the scope, nature, and timing of relief is remedial proceedings in the federal court action—not an ultra vires proclamation by the Governor that circumvents the courts altogether.

5.    The Supreme Court's *Callais* decision, has *no* immediate effect on Louisiana's elections and thus cannot justify the Governor's declaration of an "emergency." In that case, a federal district court issued an injunction against SB 8—Louisiana's currently operative congressional map—precisely two years ago. But that injunction was stayed by the Supreme Court just days after it was issued and, though the Court has now affirmed the injunction, the stay has not been lifted, as even the *Callais* Plaintiffs have recognized. That is because, under the plain terms of the Court's order, the stay "remain[s] in effect pending the sending down of the judgment of th[e Supreme] Court." *Robinson v. Callais*, 144 S. Ct. 1171 (2024) (mem.). The judgment of the Court has not yet been sent down and, under the Rules of the Supreme Court, it will not be sent down for another 30 days—well after the scheduled May 16 primary election.

6.    But even that is uncertain. The parties in *Callais* have submitted dueling requests for the Supreme Court to adjust the timing of the judgment, which means it is unknown when the district court's injunction will go back into effect. The *Callais* Plaintiffs have asked the Supreme Court to expedite the judgment so that the stay can be lifted sooner and remedial proceedings can begin. The Robinson intervenors in that case have asked the Supreme Court to withhold issuance of the judgment until *after* the 2026 general election, based on the well-worn principle that federal courts should avoid interfering with ongoing state elections at the eleventh hour. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

7.    The intervenors are likely to prevail. "[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Precisely two years ago—almost to

the day—the Supreme Court stayed the very injunction that the *Callais* Plaintiffs now seek to revive. It is at least likely that the Court will take the same approach at this similar point in the election calendar.

8.     But the Governor refused to wait to see how the legal process will play out. Instead, he simply declared that the Supreme Court's *Callais* opinion created a "state of emergency" that empowered him to unilaterally cancel Louisiana's ongoing primary elections. This is not how courts work, and regardless of how the Supreme Court resolves the questions pending before it, there is no "emergency." Though the constitutional issues involved are serious, delaying the election is not necessary "to minimize to whatever degree possible a person's exposure to danger," as Louisiana law requires. La. R.S. 18:401.1(A). Indeed, Louisiana conducted its last election under SB 8 without incident. *Cf. Reynolds*, 377 U.S. at 585.

9.     And when it comes to remedying constitutional harms, the Governor's proclamation unilaterally canceling the election is simply the wrong tool for the job. It is for the Supreme Court and the federal district court to determine whether enjoining an ongoing election is necessary or whether "equitable considerations might justify" "withholding the granting of immediately effective relief," taking into account all the equitable considerations that courts normally do. *Id.* In fact, courts routinely permit, and even order, states to conduct their elections under maps that have been challenged and found to be unlawful. *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879 (2022); *Abbott v. LULAC*, 607 U.S. ----, 146 S. Ct. 418 (2025). Historically, federal courts have found that the equities of delaying the election or introducing a new map so close to an election have counseled in favor of using the old map, despite its infirmities. *See, e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 177 (M.D.N.C. 2016) (finding that postponing elections would "cause significant and undue disruption to North Carolina's election process and create considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials," and allowing election to proceed under maps "despite their unconstitutionality"), *aff'd*, 581 U.S. 1015 (2017). The same is true here: voters have already cast ballots in Louisiana's 2026 primary election, and there is no justification for simply canceling the election at this late date.

10.    The Governor and Secretary of State must be immediately restrained from enforcing the unlawful proclamation, and must conduct the upcoming elections on schedule as specified in Louisiana law. Immediate relief is urgently needed. Ballots were sent to military and

overseas voters on April 1—a month ago. Ballots were then sent to other voters entitled to vote by mail under Louisiana law almost a week ago on April 26, and untold numbers of Louisianans—including some Petitioners here—have *already* voted. In-person early voting for the May 16 primary is set to begin *tomorrow*, May 2. Without this Court's prompt intervention, the Governor and Secretary of State will effectuate an unprecedented injury to free and fair elections and Petitioners will suffer severe and irreparable harm to their voting rights.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over the subject matter of this action pursuant to Article V, Section 16(A) of the Louisiana Constitution because the matter concerns "the right to office or other public position" and "civil or political right[s]."

12.    Venue is proper in this District because the action is filed "against an officer or employee of the state or state agency for conduct arising out of the discharge of his official duties or within the course and scope of his employment." La. R.S. 13:5104(A).

13.    This Court has authority to enter a declaratory judgment in this action under Louisiana Code of Civil Procedure Article 1871. This Court also has the authority to grant injunctive relief under the Louisiana Code of Civil Procedure. *See* La. Code Civ. P. 3601(A).

## PARTIES

14.    Petitioner National Council of Jewish Women, Greater New Orleans Section ("NCJW") is a nonprofit organization that works to improve the quality of life for women, children, and families, and safeguard individual rights and freedoms, consistent with Jewish values. Among those is the right to vote.

15.    NCJW, founded in 1893, has sections (or local chapters) in 34 states and the District of Columbia. The Greater New Orleans Section, founded in 1897, has more than 1,000 dues-paying members. It has worked to advance voting rights since its founding, and that work has also been central to the Greater New Orleans Section's efforts to advance its mission.

16.    Voting holds special significance in the Jewish faith. The Torah, which Jewish people consider the word of God, requires civil engagement, not only within Jewish communities but society at large. Accordingly, many rabbis and sages have described voting as a mitzvah—a commandment or sacred obligation. As a result, members of Jewish organizations like NCJW are dedicated to advancing the right to vote, both as a matter of justice and as an expression of their religious faith.

RETRIEVED FROM DEMOCRACYDOCKET.COM

17.    The Governor's unlawful, unilateral cancellation of the 2026 congressional primaries will irreparably curtail the voting rights of NCJW's members across the Greater New Orleans area. Some of NCJW's members routinely vote by mail. Louisiana sent ballots to military and overseas voters as required by federal law on or around April 1 and began distributing ballots to other voters entitled to vote by mail nearly a week ago on April 26. As a result, some Louisianans have already voted (including among NCJW's membership), but even for those that have not, the Governor's attempt to stop the election after it has already begun will cause extensive voter confusion. Under the Executive Order, these members' already-cast ballots will not be counted in the congressional primary and these voters will be forced to cast new votes under revised procedures. The Executive Order thus imposes burdens on their right to vote and invalidates their ballots cast in reliance on the originally scheduled election. This midstream change will also predictably result in voter confusion and diminish NCJW's members' access to the franchise.

18.    Petitioner Mary Ann Ostroske is a citizen of the United States and the State of Louisiana and a registered voter in Orleans Parish. Ms. Ostroske has already voted in the 2026 primary election for Louisiana's Second District by marking and returning a mail ballot. But, if the Governor's unlawful executive order is not enjoined, Ms. Ostroske's ballot will be discarded along with countless others lawfully cast by Louisiana voters. Even if the election is ultimately rescheduled, Ms. Ostroske will face the significant burden of having to vote twice for the same office—potentially in a new congressional district with unfamiliar candidates.

19.    Petitioner Gene Gary Ostroske is a citizen of the United States and the State of Louisiana and a registered voter in Orleans Parish. Mr. Ostroske has already voted in the 2026 primary election for Louisiana's Second District by marking and returning a mail ballot. But, if the Governor's unlawful executive order is not enjoined, Mr. Ostroske's ballot will be discarded along with countless others lawfully cast by Louisiana voters. Even if the election is ultimately rescheduled, Mr. Ostroske will face the significant burden of having to vote twice for the same office—potentially in a new congressional district with unfamiliar candidates.

20.    Petitioner Sarah Carter is a citizen of the United States and the State of Louisiana and a registered voter in Orleans Parish. Ms. Carter has already voted in the 2026 primary election for Louisiana's Second District by marking and returning a mail ballot. But, if the Governor's unlawful executive order is not enjoined, Ms. Carter's ballot will be discarded along with countless others lawfully cast by Louisiana voters. Even if the election is ultimately rescheduled, Ms. Carter

RETRIEVED FROM DEMOCRACYDOCKET.COM

will face the significant burden of having to vote twice for the same office—potentially in a new congressional district with unfamiliar candidates.

21.     Defendant Jeffrey M. Landry is the Governor of Louisiana. He is the "chief executive" of Louisiana, *Fusilier v. Landry*, 963 F.3d 447, 454 (5th Cir. 2020), and issued the unlawful proclamation that Petitioners seek to enjoin.

22.     Defendant Nancy Landry is the Louisiana Secretary of State. She is the "chief election officer of the state," La. R.S. 18:421(A), and therefore will be "involved in providing, implementing, and/or enforcing whatever injunctive or prospective relief may be granted" to Petitioners. *Hall v. Louisiana*, 974 F. Supp. 2d 978, 993 (M.D. La. 2013).

## FACTUAL ALLEGATIONS

### I.     The underlying *Callais* proceedings.

23.     In 2022, a federal district court held that Louisiana's congressional district map likely violated Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 *et seq.*, because it did not include a second majority-Black district. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *vacated & remanded*, 86 F.4th 574 (2023). In 2024, after various appeals and remedial proceedings, the Louisiana legislature enacted a new map, SB 8. Because of the extensive Section 2 litigation, SB 8 did include a second majority-Black district.

24.     Soon thereafter, a group of self-described "non-Black" voters challenged SB 8 as a racial gerrymander in violation of the Fourteenth Amendment and as intentionally discriminatory in violation of the Fourteenth and Fifteenth Amendments. *Callais v. Landry*, 732 F. Supp. 3d 574, 590 (W.D. La. 2024). The plaintiffs in the *Robinson* action ("Robinson Plaintiffs") were granted intervention in *Callais* to protect their interests in their Section 2 victory.

25.     On April 30, 2024, a divided three-judge district court of the Western District of Louisiana held that SB 8 was an unconstitutional racial gerrymander. *Id.* at 614. Its order granting an injunction concluded that "the State of Louisiana is prohibited from using SB8's map of congressional districts for any election." *Id.*

26.     Both the State of Louisiana and the Robinson Plaintiffs expeditiously sought a stay of that injunction from the United States Supreme Court, citing the "election chaos" that would likely result.[1]

---

[1] *See* Emergency Application for Stay Pending Appeal, *Landry v. Callais*, No. 23A1002 (U.S. May 10, 2024).

RETRIEVED FROM DEMOCRACYDOCKET.COM

27.     The United States Supreme Court granted a stay "pending this Court's action on the appeal" on May 15. *Robinson v. Callais*, 144 S. Ct. at 1171. Its order specified: "If the appeal is dismissed, or the judgment affirmed, this order shall terminate automatically. In the event jurisdiction is noted or postponed, this order will remain in effect pending the sending down of the judgment of this Court." *Id.*

28.     The Supreme Court noted probable jurisdiction on November 4, 2024. *See Robinson v. Callais*, 145 S. Ct. 434 (2024) (mem.). Its May 15 stay order thus "remain[s] in effect pending the sending down of the judgment of th[e Supreme] Court." *Robinson v. Callais*, 144 S. Ct. at 1171.

29.     After initially hearing argument in the *Callais* appeal in March 2025, the Supreme Court set the case for reargument during the following term, *Louisiana v. Callais*, 145 S. Ct. 2608 (2025) (mem.), and ordered the parties to submit supplemental briefs answering: "Whether the State's intentional creation of a second majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U.S. Constitution." *Louisiana v. Callais*, 146 S. Ct. 58 (2025) (mem.). The case was reargued on October 15, 2025.

30.     Two days ago, on April 29, 2026, the Supreme Court affirmed the decision below in *Callais*. *Louisiana v. Callais*, --- S. Ct. ----, 2026 WL 1153054, at *4. It held that the *Robinson* court had misapplied Section 2 of the Voting Rights Act and that "[c]ompliance with § 2 thus could not justify the State's use of race-based redistricting here." *Id.*

31.     Under the Supreme Court Rules, the Clerk of the Court will send a copy of the Court's opinion and a certified copy of the judgment to the clerk of the lower court after 32 days, unless the Court shortens or extends the time. *See* S. Ct. R. 45.3. Until such time as the clerk "send[s] down . . . the judgment," the Supreme Court's stay of the Western District of Louisiana's injunction "will remain in effect." 144 S. Ct. at 1171.

32.     The same day the Supreme Court issued its decision, the *Callais* Plaintiffs filed an "Application for Issuance of a Copy of the Opinion and Certified Copy of the Judgment Forthwith" with the Supreme Court.[2] In that document, the *Callais* Plaintiffs recognize that, absent further action from the Court, the Court's judgment will not be sent down—and thus the stay will not be lifted—until *after* the May 16 primary election.[3] "Because it is for the District Court to either draw

---

[2] *See* Application, *Louisiana v. Callais*, Nos. 24-109 & 24-110 (U.S. Apr. 29, 2026).
[3] *Id.* at 2–3.

an interim remedial map or approve a legislative remedy," the *Callais* Plaintiffs argued, "jurisdiction should be returned to the District Court as soon as possible."[4] The *Callais* Plaintiffs have thus acknowledged that, at present, the federal district court lacks jurisdiction and its April 2024 injunction remains stayed pending the sending down of the Supreme Court's judgment.

33.   The *Callais* Plaintiffs repeated that fact in a "Notice" filed with the three-judge district court attaching their application to the Supreme Court. In that filing, the *Callais* Plaintiffs explained:

> Under Rule 45.3, jurisdiction remains with the Supreme Court until the Clerk of that Court issues a copy of the Court's opinion and a certified copy of the judgment to the Clerk of this Court. Once the Clerk of this Court receives those items from the Clerk of the Supreme Court, this Court can proceed to impose a remedy.

Notice, *Callais v. Landry*, No. 3:24-cv-00122-DCJ-CES-RRS (W.D. La. Apr. 29, 2026), ECF No. 259.

34.   Louisiana did not take a position on the *Callais* Plaintiffs' request, but argued that "one plausible understanding of the Court's May 15, 2024 Order is that the stay has automatically lifted" because the Court "affirmed" the district court's judgment.[5] Louisiana acknowledged, however, that this reading "can be read to conflict" with the following sentence of the Supreme Court's order, which specifies: "[i]n the event jurisdiction is noted or postponed," which it was, "this order will remain in effect *pending the sending down of the judgment of this Court*."[6]

35.   Louisiana further argued that "whether the [stay] Order is already terminated or will be terminated when this Court sends down the judgment, nothing prevents Louisiana from adopting a constitutional map and process consistent with this Court's decision right now."[7] In other words, Louisiana plans to move forward with canceling the May 16 primary *even if* the Supreme Court withholds its judgment and leaves the stay in place.

36.   The *Robinson* Plaintiffs opposed the *Callais* Plaintiffs' request to expedite the sending down of the judgment—and requested instead that the Supreme Court withhold the judgment, and thus leave the stay in place, until after the 2026 general election.[8] The *Robinson* Plaintiffs argued that "[u]nder *Purcell v. Gonzalez*, 549 U.S. 1 (2006), federal courts may not disrupt a state's voting rules, including electoral maps, close to an election, much less when voters

---

[4] *Id.* at 3.

[5] Louisiana's Response to Application for Issuance of Opinion and Judgment Forthwith at 2, *Callais v. Louisiana*, No. 25A1197 (U.S. Apr. 30, 2026).

[6] *Id.* at 2 n.1 (alteration in original) (emphasis added).

[7] *Id.*

[8] *See* Robinson Appellants' Response to Appellees' Application for Issuance of a Copy of the Opinion and Certified Copy of the Judgment Forthwith, *Callais v. Louisiana*, No. 25A1197 (U.S. Apr. 30, 2026).

are already voting."[9] As they noted, the Louisiana Secretary of State raised similar concerns when successfully seeking a stay of the district court's injunction precisely two years ago.

37.    The Supreme Court has not yet ruled on either request.

38.    Later that same day, with the *Callais* Plaintiffs' application pending before the Supreme Court, the *Callais* district court entered an order erroneously stating that, because its ruling was affirmed by the Supreme Court, "the permanent Injunction issued by this Court prohibiting the State of Louisiana 'from using SB8's map of congressional districts for any election' remains in effect."[10] The court further said that the "State of Louisiana will be afforded the opportunity to enact a Constitutionally compliant map consistent with the Supreme Court's opinion" and invited briefing from all parties on how remedial proceedings should proceed. *Id.*

39.    The *Robinson* Plaintiffs soon thereafter moved to vacate the district court's order pending the Supreme Court's sending down of the judgment, explaining the error in the court's interpretation of the Supreme Court's stay order.[11] That motion remains pending.

## II.    Louisiana's 2026 federal primary election is already underway, and votes have been cast.

40.    Through Act No. 1 of the 2024 First Extraordinary Session, the Legislature adopted a closed primary system for U.S. Senate, U.S. House of Representatives, and Louisiana Supreme Court. Pursuant to Louisiana law, each party will hold its own primary in advance of the November general election.

41.    The legislature originally scheduled the State's closed primaries for April 18, 2026, and May 30, 2026, for any runoff elections.

42.    In September 2025, Defendant Secretary Landry represented to the Supreme Court that, "[b]ecause of Louisiana's unique election laws, administration of elections begins well-ahead of the scheduled election day."[12] The Secretary implored the Court to "rule as soon as possible—ideally in December or early January—so that the Secretary can administer the election, and if this Court affirms the decision below, program a new congressional plan for the 2026 elections."[13]

43.    In October 2025, Defendant Governor Landry called a special session to allow the legislature to delay the primary elections by a month. During the session, the legislature passed

---

[9] *Id.* at 2.
[10] Order, *Callais v. Landry*, No. 3:24-cv-00122-DCJ-CES-RRS (W.D. La. Apr. 30, 2026), ECF No. 261.
[11] Robinson Intervenors' Motion to Vacate, *Callais v. Landry*, No. 3:24-cv-00122-DCJ-CES-RRS (W.D. La. Apr. 30, 2026), ECF No. 262.
[12] La. Sec'y of State Supp'l Br. at 44, *Louisiana v. Callais*, No. 24-109 & 24-110 (U.S. Sep. 17, 2025).
[13] *Id.*

SB1 and SB2, delaying the candidate qualifying period from January to February, the primary election to May 16, 2026, and any runoff until June 27, 2026. La. R.S. § 18:419.2.

44.     Defendant Secretary Landry's requested "December or early January" timeline for a Supreme Court ruling came and went without any decision in *Callais.*

45.     Louisianans and candidates alike have spent months preparing for the May 16 primary election. The candidate filing deadline elapsed months ago, on February 13, 2026. There are 28 candidates running in Louisiana's 2026 congressional primaries across the state's six congressional districts.

46.     Voter registration for the primary election has also closed; the deadline to register to vote by mail or in person was Wednesday, April 15, 2026, and the deadline to register online was Saturday, April 25, 2026.

47.     Many Louisiana voters, including several Petitioners, have already cast lawful, timely ballots for the May 16 primary election, including in congressional races.

48.     The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) requires states to send absentee ballots to overseas citizens at least 45 days before federal elections. 52 U.S.C. § 20302(a)(8). Consistent with this requirement, Louisiana sent absentee ballots to citizens covered by UOCAVA on or about April 1. Many service members or citizens abroad have already cast ballots for the 2026 primary, consistent with UOCAVA.

49.     Mail voting is also already well underway. La. R.S. § 18:1303 authorizes several categories of Louisianans to vote by mail under various circumstances, including service members, college students, religious leaders, and Louisianans who expect to be away from the state or their parish on election day, among others. Parishes began issuing mail ballots on a rolling basis in early-to-mid April 2026.[14] Many Louisianans, including Petitioners Mary Ann Ostroske, Gene Gary Ostroske, and Sarah Carter, have already received and cast their mail ballots for the 2026 primary election. *Supra* ¶¶ 18–20.  Each of these Petitioners cast a vote for a candidate in the primary election for Louisiana's second congressional district.

50.     Under Louisiana's election calendar, early voting was scheduled to begin on Saturday, May 2, 2026, at 8:30 a.m., and end on May 9, 2026, at 6:00 p.m.

---

[14] *See* Brenda Teele, *Mail-in Ballots for May 16 Primary to Arrive Soon with Updated Design*, KTBS (Mar. 23, 2026), https://www.ktbs.com/news/mail-in-ballots-for-may-16-primary-to-arrive-soon-with-updated-design/article_67a73faf-3a5e-4f2d-936f-a54ec9451736.html [https://perma.cc/G73A-67QX].

### III. Defendant Landry issued an unlawful executive order canceling the May 16, 2026, congressional primary elections.

51.    Immediately after the Supreme Court's ruling in *Callais* two days ago, Governor Landry told Republican House candidates that he planned to suspend the state's 2026 primary election to allow state legislators an opportunity to redraw the congressional map.[15]

52.    The following day, on April 30, Governor Landry issued a joint statement with Attorney General Liz Murrill announcing—incorrectly—that "the State is currently enjoined from carrying out congressional elections under the current map."[16] They further confirmed that they planned to cancel the May 16 primary election.[17]

53.    Rather than await the Supreme Court's ruling on Louisiana's request to expedite sending down the judgment, and without any court order compelling them to do so, Governor Landry and Secretary Landry acted on their own initiative to cancel Louisiana's ongoing congressional primary election.

54.    On April 30, Governor Landry issued Executive Order Number JML 26-038 (the "Executive Order" or "Order").[18] The Order proclaims—wrongly—that the Supreme Court's *Callais* decision "effectively revives a district court injunction barring Louisiana from conducting any congressional elections under" its current map. Order at 2.

55.    From there, the Order cites the sole provision of Louisiana law that permits the executive, rather than the legislature, to change the date of an election. Section 18:401.1(B) of the election code allows the governor, "upon issuance of an executive order declaring a state of emergency or impending emergency," to "suspend or delay . . . early voting, or elections." To exercise this authority, the secretary of state must "certif[y] . . . that a state of emergency exists."

56.    The Order states that Defendant Secretary Landry certified "that a state of emergency exists that would affect the electoral process." Order at 2.

57.    It then proclaims that Defendant Governor Landry "concur[s] that an emergency exists." Order at 2. To substantiate this purported "emergency," the Governor points only to the

---

[15] Dan Merica & Patrick Marley, *Louisiana Suspends House Primaries as Red States Face Pressure to Redistrict*, Wash. Post (Apr. 30, 2026), https://www.washingtonpost.com/politics/2026/04/29/louisiana-house-primaries-suspend-jeff-landry/ [https://perma.cc/S2Y3-NJRR].

[16] Tara Suter, *Louisiana Will Change Congressional Maps Before Midterms, Governor Says*, The Hill (Apr. 30, 2026), https://thehill.com/homenews/campaign/5856922-louisiana-will-change-congressional-maps-before-midterms-governor-says/.

[17] Piper Hutchinson, *Louisiana Governor Postpones U.S. House Primary Elections After Supreme Court Ruling*, La. Illuminator (Apr. 30, 2026), https://lailluminator.com/2026/04/30/louisiana-governor-ag-says-they-will-postpone-u-s-house-primaries-following-callais-decision/.

[18] *See* Benjamin Swasey, *U.S. House Primaries in Louisiana Are Suspended After Voting Rights Act Ruling*, NPR (Apr. 30, 2026), https://perma.cc/XR9V-B2F4.

still-stayed injunction in *Callais*, even though Louisiana statutes clearly define an "emergency" as an event that involves some significant physical threat to Louisiana citizens. La. R.S. §§ 29:723(6), 29:724.

58.     The Order concludes by "suspend[ing]" the primary elections *only* for "the offices of representative in the United States Congress," until either July 15, 2026 or "such time as determined by the Legislature." Order at 2. Primary elections for other offices, including for United States Senator and the Louisiana Supreme Court, will apparently proceed as scheduled.

59.     Before Defendant Governor Landry, Louisiana chief executives have exercised emergency powers under Section 18:401.1 sparingly, and under entirely different circumstances. For example, Former Governor John Bel Edwards rescheduled primary elections in 2020 in light of the COVID-19 pandemic. *See* Proclamation No. 46 JBE 2020. And with Executive Order No. BJ 08-85, former Governor Bobby Jindal postponed various elections in 2008 as a result of Hurricane Gustav. To the knowledge of undersigned counsel, a Louisiana executive has never attempted to exercise authority under Section 18:401.2 for a purported "emergency" that did not threaten the physical health or safety of Louisiana voters and elections staff.

60.     The Executive Order thrusts Louisiana's primary elections into unprecedented chaos, severely and irreparably injuring Petitioners and countless other Louisianians. Many Louisianans, including Petitioners Mary Ann Ostroske, Gene Gary Ostroske, and Sarah Carter— as well as Louisianians deployed overseas—have already cast ballots for the congressional primary elections. But the Executive Order requires tossing out those votes. Other voters will be casting early votes as soon as *this* Saturday, May 2. The Executive Order effectively precludes these voters from casting a vote for their congressional representatives.

61.     It thus will ultimately require scores of Louisiana primary voters to turn out *twice* to vote—once for U.S. Senate and Louisiana Supreme Court, and once for their congressional representative in any district with a contested primary. And those voters who have already cast their ballots for the congressional primary will be forced to vote twice for the same office. "[T]he burden of voting twice is significant." *Craig v. Simon*, 493 F. Supp. 3d 773, 787 (D. Minn. 2020) (holding plaintiffs were irreparably injured by law that would require them to vote twice), *aff'd*, 980 F.3d 614 (8th Cir. 2020); *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1280 (N.D. Fla. 2021) (finding voters were burdened by a law which required them to request mail-in ballots "twice as often as previously required") (citation omitted). Even for those voters who have not yet

- 12 -

cast their ballots, the Governor's attempt to stop an election that has already started midstream will cause extreme voter confusion, burdening and disenfranchising untold numbers of voters.

62.     Precisely because changes to redistricting plans must be made and implemented well in advance of an election, Defendant Secretary Landry asked the Supreme Court to issue *Callais* several *months* before this point in the election cycle to allow the state adequate time to redo its election procedures, if necessary.[19] Specifically, the Secretary asked the Supreme Court to rule before the candidate qualifying dates, and at least two months before the deadline to mail UOCAVA ballots overseas.[20] And just two years ago, the Secretary urged the Court to stay the district court's injunction *months* before the election.[21] Based on sworn testimony by the Louisiana Commissioner of Elections, the Secretary argued that if Louisiana's congressional map was not settled by May 15, 2024—nearly *six months* before the November 5, 2024, open primary election—the "domino effect" on election administration would "increas[e] costs by hundreds of thousands of dollars and escalat[e] the risk of voter confusion and electoral system breakdowns."[22]

63.     The Secretary's office now decidedly lacks the time she has previously urged was necessary to properly administer an election under a new congressional map—after voting has been underway for weeks and on the eve of in-person early voting. Existing mail ballots, as well as any ballots the state has prepared for early voting starting May 2, will not be bifurcated to omit congressional primaries. There are no procedures in place to notify voters of defective ballots for congressional elections, to reprint and reissue ballots to Louisianans' whose votes are discarded, or to educate voters about any new election deadlines or procedures.

64.     Federal law does not require this outcome. As explained above, *supra* ¶¶ 30–39, the Supreme Court's stay of the injunction in *Callais* remains in effect. And the Court has not yet decided whether to send down the judgment immediately or hold it until after the ongoing election. *Id.* The *Robinson* Plaintiffs have offered the Court compelling reasons to withhold its judgment.[23] And there are good reasons to believe federal law *requires* Louisiana to conduct the 2026 election under the existing map, *Callais* notwithstanding.

RETRIEVED FROM DEMOCRACYDOCKET.COM

---

[19] La. Sec'y of State Supp'l Br., *supra* note 12, at 44.
[20] *Id.*
[21] La. Sec'y of State's Reply in Support of Emergency Application for Stay Pending Appeal, *Landry v. Callais*, No. 23A1002 (May 14, 2026), 2024 WL 2190601.
[22] *Id.* at *2–3.
[23] Robinson Appellants' Response to Appellees' Application for Issuance of a Copy of the Opinion and Certified Copy of the Judgement Forthwith, *supra* n.8.

65.     For one thing, the Supreme Court's canonical decision in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), prohibits federal courts from disrupting states' election rules—including congressional maps—close in time to an election. The Supreme Court has recently invoked this doctrine several times in redistricting cases to avoid interfering with upcoming elections—including where a court has found that a map violates the Constitution. *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025) (granting stay of order finding Texas had racially gerrymandered redrawn congressional map 89 days before primary election); *id.* at 420 (Alito, J., concurring) (explaining states require "certainty" on what maps "will govern the 2026 midterm elections"); *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (mem.) (staying injunction requiring Alabama to redraw congressional districts 97 days before primary election); *cf. Tangipa v. Newsom*, No. 25A839, 2026 WL 291659 (U.S. Feb. 4, 2026) (mem.) (denying stay application of order denying racial gerrymandering claim 118 days before primary election).

66.     This doctrine necessarily carries even more force when an election is not just forthcoming but is, as here, *already underway*. *Abbott*, 146 S. Ct. at 419 (holding, months before UOCAVA voting started, that "[t]he District Court improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections.").

67.     Additionally, Louisianans who have already cast their ballots, including Petitioners, have a long-settled constitutional right to have their votes counted. "[V]oting is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment." *Hoblock v. Albany Cnty. Bd. of Elections*, 341 F. Supp. 2d 169, 176 (N.D.N.Y. 2004), *aff'd*, 422 F.3d 77 (2005). Accordingly, a state violates voters' substantive due process rights when it tells them "one thing before the election and change[s] its policy thereafter." *Scheer v. City of Miami*, 15 F. Supp. 2d 1338, 1344 (S.D. Fla. 1998).

68.     To that end, many courts have held that invalidating cast ballots based on an *ex post facto* change to the rules governing elections violates substantive due process principles. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978) (determining a state "could not, constitutionally, invalidate the absentee . . . ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means"); *Hoblock*, 341 F. Supp. 2d at 176 ("[B]y providing absentee ballots that voters rely upon in good faith to cast their vote, and then invalidating them, the Board has effectively taken away their guaranteed right to vote in the election."); *Griffin v. N.C. State Bd. of Elections*, 781 F. Supp.

- 14 -

3d 411, 417–18, 444 (E.D.N.C. 2025) ("The court finds that retroactive invalidation of overseas military and civilian voters' ballots violates their substantive due process rights."); *cf. Brown v. O'Brien*, 469 F.2d 563, 570 (D.C. Cir. 1972) (holding that the Democratic Party could not, after previously endorsing California's winner-take-all primary system, change the rules after the primary had already been conducted), *vacated on other grounds sub nom. Keane v. Nat'l Democratic Party*, 409 U.S. 816 (1972).

69.     Canceling an election that is already underway presents weighty questions of federal law, threatening Louisianans' most fundamental constitutional rights. Some of these issues are currently pending before the U.S. Supreme Court, on the pending motion to expedite issuing the judgment, and in the Middle District of Louisiana on remand. But through his premature Executive Order, Defendant Governor Landry arrogates this task to himself, circumventing judicial resolution of the significant constitutional questions *Callais* presents with respect to this election. And it forces an outcome that disenfranchises Louisiana voters and wreaks havoc upon election administration both unnecessarily and without statutory authorization.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of Article II, Section 2 of the Louisiana Constitution
### Executive Action in Excess of Constitutional or Statutory Authority

70.     Petitioners reallege and reincorporate by reference all prior paragraphs of this Petition and the paragraphs in the count below as though fully set forth herein.

71.     Separation of powers principles are enshrined in the Louisiana Constitution. Article II, § 1 provides that Louisiana's government is "divided into three separate branches: legislative, executive, and judicial." La. Const., art. II, § 1. Section 2 specifies that "no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others." La. Const., art. II, § 2.

72.     Accordingly, when the Governor issues an executive order that "amount[s] to an unconstitutional violation of the separation of powers doctrine and exceed[s] the lawful scope of [his] authority," injured parties can petition for declaratory and injunctive relief. *Hill v. Jindal*, 2014-1757, p. 3–4 (La. App. 1 Cir. 6/17/15), 175 So.3d 988, 992–93 (affirming order enjoining the Governor from exceeding his constitutional authority), *writ denied*, 2015-1394 (La. 10/23/15), 179 So.3d 600; *see also La. Dep't of Just. v. Edwards*, 2017-0173 (La. App. 1 Cir. 11/1/17), 233 So.3d 76, 78 (similar).

- 15 -

73.     Under Louisiana's constitutional scheme, the legislature—not the executive—is responsible for determining "the conduct of all elections," including the time, place, and manner in which they are held. *See* La. Const., art. XI, § 1; *Voice of Ex-Offender v. State*, 2017-1141, p. 3 (La. App. 1 Cir. 4/13/18), 249 So.3d 857, 860 (noting that "the Louisiana Legislature enacted [the] Election Code as authorized by" the constitution), *writ denied*, 2018-0945 (La. 10/29/18), 255 So.3d 575; *Eames v. Cutno*, 2016-1054, p. 7 (La. App. 1 Cir. 8/11/16), 199 So.3d 1170, 1174 (noting that the Elections Clause of the U.S. Constitution "grants state legislatures the authority to prescribe" congressional elections), *writ denied*, 2016-1551 (La. 8/15/16), 198 So. 3d 122.

74.     The Louisiana legislature has exercised that authority by enacting an Election Code that "regulate[s] the conduct of elections" in the state, and forbids other government entities from adopting any law "relative to elections and the conduct thereof . . . except as otherwise specifically authorized in this code." La. R.S. § 18:1(B). And, as relevant here, the legislature has prescribed a comprehensive scheme for the conduct of party primary elections. *See generally* La. R.S. §§ 18:410.1- .10. Just last year, the legislature enacted a specific statutory provision indicating that "[t]here shall be a spring primary election held on May 16, 2026, for . . . candidates in a party primary election for a party primary office to be elected in that year." *See* La. R.S. § 18:419.2(A)(1).

75.     Importantly, the Election Code affords neither the Governor nor any other executive branch official unilateral authority to regulate the time, place, or manner of congressional elections. Thus, without a specific source of statutory authority, the Governor's order exceeds his constitutional authority and encroaches upon the legislature's authority, thereby violating core separation-of-powers principles. *See* La. Const., art. II, § 2.

76.     In the order, the Governor attempts to evade these limits by invoking Louisiana Revised Statutes § 18:401.1, but that statute does not authorize his action. Section 18:401.1 enables the Governor to suspend or delay elections only in a discrete class of bona fide emergencies in which conducting the election as otherwise mandated by law would put lives at risk. More specifically, the statute the Governor cites provides that the Governor may, "upon issuance of an executive order declaring a state of emergency or impending emergency, suspend or delay any qualifying of candidates, early voting, or elections." La. R.S. § 18:401.1(B).

77.     But Louisiana law does not permit the Governor to "declare a state of emergency"—a necessary precondition to delaying or suspending an election—for just any reason.

- 16 -

Instead, the Governor can declare a state of emergency only as authorized by a separate statutory framework, Louisiana Revised Statutes §§ 29:723 and 29:724, which "set[] forth specific limitations to the governor's power to declare a state of emergency." *State v. Pearson*, 07-332, p. 11 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 653.

78.     Louisiana Revised Statute §§ 29:723.6(a)–(b) define an emergency as any event that falls into one of four categories: (1) a "natural or man-made event which results in an interruption in the delivery of utility services . . . and which affects the safety, health, or welfare of a Louisiana resident"; (2) an instance "in which a utility's property is damaged and such damage creates a dangerous condition to the public"; (3) a "national or state emergency, including acts of terrorism or" a declaration of war; and (4) "[t]he actual or threatened condition which has been or may be created by a disaster." The same statute also defines "disaster" as "the result of a natural or man-made event which causes loss of life, injury, and property damages." *Id*. § 29:723(4). Thus, under Louisiana law, "emergency" has a specific and discrete meaning—it refers to only those events where the lives and physical safety of Louisiana citizens are at risk.

79.     Louisiana Revised Statute § 29:724(B)(1), in turn, identifies the conditions under which the Governor can declare a state of emergency. He may do so, according to the statute, only if "he finds that a disaster or emergency has occurred or the threat thereof is imminent." *Id*. The Governor's power to declare a state of emergency is thus dependent on the statutory definition of "emergency."

80.     Read together, these statutory provisions mean that the Governor can only "suspend or delay" an election if an emergency—i.e., a significant risk to the public's physical safety—has occurred or is imminent. La. R.S. §§ 18:401.1(B); 29:724(B)(1); 29:723(4).

81.     That is plainly not the case here. The Order declares that "an emergency exists" because "electing members to Congress under an unconstitutional map flies in the face of the United States Constitution." Order at 2. But an allegedly unconstitutional election is not a qualifying "emergency" under Louisiana law; the plain language of Louisiana's statutory scheme makes clear that an emergency requires some physical risk to members of the public, which is manifestly absent.

82.     Indeed, Subsection (A) of § 18:401.1 makes clear the limited circumstances under which the statute can apply. "Due to the possibility of an emergency or common disaster occurring before or during a regularly scheduled or special election," the statute states, "to minimize . . . a

- 17 -

person's exposure to danger," it "is hereby found and declared to be necessary to designate a procedure for the emergency suspension or delay and rescheduling of qualifying, early voting, and elections." La. R.S. § 18:401.1(A). The statute applies, in other words, only where a "common disaster" might expose voters to "danger" if they reported to the polling places as usual. *Id*. The handful of historical examples where the Governor has invoked the statute illustrate the sort of circumstances that might qualify as an "emergency": it was invoked during the COVID-19 pandemic, an unprecedented global health crisis, *see In re Matthews*, 2021-01078, p. 1–2 (La. 1/28/22), 333 So.3d 422, 423–24, and in the aftermath of Hurricane Katrina, which resulted in a massive and tragic loss of life in Louisiana, *Ogden v. Gray*, 2012-1314, p. 10 (La. App. 4 Cir. 9/11/12), 99 So.3d 1088, 1095. Holding an election under challenged or even unlawful congressional districts is not the sort of "emergency" the statute contemplates.

83. Because the only authority the Governor cited for the Order was § 18:401.1(A), and he cannot rely on that statute since there was no "emergency," he lacked any basis to "suspend or delay" the 2026 primary elections. Accordingly, the Order blatantly exceeds the Governor's constitutional authority.

84. Louisiana statutes impose a clear, mandatory duty on Defendants, including the Secretary of State—Louisiana's "chief election officer," La. R.S. 18:421(A)—to hold elections on the dates designated by the legislature. As relevant here, Louisiana's Election Code states that "[t]here *shall* be a spring primary election held on May 16, 2026, for . . . candidates in a party primary election for a party primary office to be elected in that year." La. R.S. § 18:419.2(A)(1) (emphasis added). The statute's use of the word "shall" indicates that the statute imposes a "mandatory duty." *Walker v. Rinicker*, 28,179, p. 3 (La. App. 2d Cir. 4/3/96), 671 So. 2d 1267, 1270, *writ denied,* 96-1103 (La. 6/7/96), 674 So. 2d 977. In fact, this state's high court has held that "[u]nder well-established rules of interpretation, the word 'shall' excludes the possibility of being 'optional' or even subject to 'discretion,' but instead means 'imperative'." *Auricchio v. Harriston*, 2020-01167, p. 4 (La. 10/10/21), 332 So. 3d 660, 663.

85. The statute thus leaves no room for discretion: it *requires* the primary election to be held on May 16, full stop. Indeed, the preceding statutory subsection makes the legislature's intent explicit. "Notwithstanding any other provision of law to the contrary," the statute says, "[i]t is the intent of the Legislature of Louisiana that the spring primary election occur on May 16, 2026." La. R.S. § 18:419.1.

86.     There is no legal barrier to Defendants performing their non-discretionary duty to hold the primary on the schedule ordered by the statute. As explained above, there is no valid injunction against holding the election as scheduled—the Supreme Court's stay in *Callais* has not yet been lifted, as evidenced by the pending motions before that Court, due to the period required for motions for reconsideration. *Supra* ¶¶ 30–39. Defendants are thus bound by Louisiana statute—and that statute imposes a clear and unmistakable obligation to hold the primary election as scheduled.

87.     Accordingly, an injunction against implementing the order would leave Defendants' obligations to carry out Louisiana law intact, thereby remedying Petitioners' injuries.

88.     Petitioners are entitled to declaratory and injunctive relief to remedy their injuries stemming from the Order.

## MOTION FOR A TEMPORARY RESTRAINING ORDER

1.     Under Louisiana Code of Civil Procedure art. 3603, "[a] temporary restraining order shall be granted" when it "appears from specific facts shown by a verified petition, by supporting affidavit, or by affirmation . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition" and "[t]he applicant's attorney certifies to the court in writing the efforts that have been made to give notice."

2.     For the reasons explained above, the Order threatens Petitioners with immediate and irreparable injuries—the loss of their right to participate in the May 2026 primary and, for the Petitioners who have already voted, the *ex post facto* cancellation of their duly cast ballots. *Supra* ¶¶ 18–20.

3.     Moreover, as set forth in the affirmation attached to this petition, Petitioners' counsel made reasonable efforts to give notice to Defendants of this petition.

4.     Therefore, the Court should grant a temporary restraining order to prevent the Order from being enforced.

5.     With regard to the security bond required under La. Code Civ. Proc. art 3610, Petitioners respectfully request that the security bond be set at a nominal amount of $500.00 due to the important constitutional issues at stake, and the strong public interest in preserving democratic norms and securing voting rights. Petitioners should not be required to put up a burdensome bond to force Defendants to follow the laws of Louisiana.

RETRIEVED FROM DEMOCRACYDOCKET.COM

**PRAYER FOR RELIEF**

**WHEREFORE,** Petitioners respectfully request that this Court:

a.      Declare that Executive Order Number JML 26-038 was issued in excess of executive authority, in violation of Article II, § 2 of the Louisiana Constitution;

b.      Enter a temporary restraining order to prevent Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to Executive Order Number JML 26-038;

c.      Enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to Executive Order Number JML 26-038;

d.      Grant such other and further relief, including but not limited to all costs of these proceedings as well as any attorneys' fees that may be legally proper under applicable law, as the Court deems just and proper.

Dated: May 1, 2026

**ELIAS LAW GROUP LLP**

Respectfully submitted,

Aria C. Branch*
Lalitha D. Madduri*
Richard A. Medina*
Max C. Accardi*
Nicole E. Wittstein*
Tori A. Shaw*
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Fax: (202) 968-4498
Email: ABranch@elias.law
Email: LMadduri@elias.law
Email: RMedina@elias.law
Email: MAccardi@elias.law
Email: NWittstein@elias.law
Email: TShaw@elias.law

Abha Khanna*
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Fax: (206) 656-0180
Email: AKhanna@elias.law

\*_Pro Hac Vice_ application forthcoming

David Lanser (La. Bar No.  37764)
William Most (La. Bar No. 36914
**Most & Associates LLP**
201 St. Charles Ave, Suite 2500, # 9685
New Orleans, LA 70170
Tel: (504) 509-5023
lanser@mostandassociates.com

RETRIEVED FROM DEMOCRACYDOCKET.COM

- 21 -