IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| PHILLIP CALLAIS, et al., | ) | |
| | ) | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | District Judge  David C. Joseph |
| | ) | Circuit Judge Carl E. Stewart |
| NANCY LANDRY, IN HER OFFICIAL | ) | District Judge Robert R. Summerhays |
| CAPACITY AS LOUISIANA | ) | |
| SECRETARY OF STATE, et al., | ) | Magistrate Judge Kayla D. McClusky |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' BRIEF IN RESPONSE TO THE STATE OF LOUISIANA'S BRIEF**

Plaintiffs appreciate the State's sense of urgency in remedying Plaintiffs' constitutional injuries, recognized by this Court and the U.S. Supreme Court, in advance of the 2026 congressional election. As this Court enters the remedial phase of the case, a process it started but was blocked from finishing two years ago after the State sought a stay in the U.S. Supreme Court and forced the use of SB8 for the 2024 congressional election, Plaintiffs ask this Court to exercise its ongoing jurisdiction to ensure any newly enacted map actually remedies Plaintiffs' injury and bring this case to final judgment. A map that merely substitutes one racial gerrymander for another is no remedy at all. Rather, it will keep Plaintiffs in the same position they have held since January 2024. And it will put them in an eerily similar position to Louisiana voters in the 1990s after the State repealed the "Zorro" racial gerrymander, only to enact the "Slash" racial gerrymander. *See Hays v. Louisiana*, 936 F. Supp. 360, 364 (W.D. La. 1996).

The U.S. Supreme Court has clearly established that this Court has authority to supervise the Legislature's remedial process to guarantee the 2026 congressional map is a valid, constitutional remedy for Plaintiffs' irreparable injury. *See North Carolina v. Covington*, 585 U.S.

969 (2018) (per curiam). Given the history of the 2020 census cycle and the threat of legislation that perpetuates a racial gerrymander, this Court should certainly exercise that authority to bring this dark chapter to a close. Only with a final judgment from this Court will the State, Legislature, candidates, and Louisiana voters, including Plaintiffs and Intervenors, have the predictability and surety of a constitutionally and statutorily compliant map, without the burden of ongoing litigation.

## I.    This Court Has Broad Remedial Authority to Ensure Any Newly Enacted Map Remedies Plaintiffs' Injury.

The U.S. Supreme Court has expressly held that a three-judge district court, empaneled under 28 U.S.C. § 2284, has jurisdiction to verify that a newly enacted map remedies a constitutional gerrymander—even after the State repeals the challenged map. In *North Carolina v. Covington*, 585 U.S. 969 (2018), plaintiffs initially brought a constitutional racial gerrymandering claim under *Shaw v. Reno*, 509 U.S. 630 (1993), alleging "that the General Assembly racially gerrymandered their districts . . . in an ostensible effort to comply with the requirements of the Voting Rights Act of 1965." *Covington*, 585 U.S. at 970-71. After the plaintiffs succeeded on the merits in the district court and U.S. Supreme Court, the district court exercised its remedial authority and "ordered the General Assembly to draw remedial maps . . . and to file those maps in the District Court for approval." *Id*. at 971. The North Carolina General Assembly repealed the offending maps and enacted new ones, which the State submitted to the district court. *Id*. Plaintiffs objected to those maps in the district court in part because they still segregated plaintiffs on the basis of race. *Id*. The district court agreed and ordered the State to adopt the special master's recommended replacement plans. *Id*. at 973-75. The State appealed to the U.S. Supreme Court. *Id*. at 975. On appeal, the State argued that the district court had no authority to enter the remedial order because "plaintiffs' racial gerrymandering claims ceased to exist when the North Carolina

General Assembly enacted remedial plans for the State House and State Senate and repealed the old plans." *Id*. So, the State argued, the case was moot and should have been dismissed. *Id*.

The U.S. Supreme Court disagreed. Its reasoning is directly applicable here because, like the *Covington* plaintiffs, the *Callais* Plaintiffs won racial gerrymandering claims. The *Covington* Court explained that when plaintiffs bring a *Shaw* claim for racial gerrymandering, their injury arises from "segregation" and grouping based on their race. *Id*. at 976. Their injury is not based on "the legislature's line drawing as such." *Id*. This means that simply erasing the offending lines does not erase the injury. The new lines must actually end the race-based segregation and grouping. Thus, *Covington* held that "in the remedial posture in which this case is presented," plaintiffs' claims "did not become moot simply because the General Assembly drew new district lines around them." *Id*. Rather, "[b]ecause the plaintiffs asserted that they remained segregated on the basis of race, their claims remained the subject of a live dispute, and the District Court properly retained jurisdiction." *Id*.

Plaintiffs' claims and remedial posture mirror *Covington*. This Court must "properly retain[] jurisdiction" to determine that the new map does not perpetuate an unlawful racial gerrymander, like the one the U.S. Supreme Court just struck down in *Louisiana v. Callais*, 608 U.S. ___ (2026), and leave Plaintiffs "segregated on the basis of race." *Covington*, 585 U.S. at 976.

District courts, including this one in *United States v. City of West Monroe*, No. 21-cv-00988 (W.D. La. Apr. 15, 2021), and the three-judge district court on remand in *Milligan v. Allen*, No. 2:21-cv-01530-AMM, 2025 WL 2451593 (N.D. Ala. Aug. 7, 2025) (per curiam), have held that they have jurisdiction over *multiple election* (and in the case of Alabama, *census*) cycles to monitor states' compliance with redistricting remedies. *See, e.g.*, *United States v. City of West Monroe*, No.

3

3:21-cv-00988-TAD-KDM, slip op. at 7 (W.D. La. Apr. 15, 2021) ("This Court shall retain jurisdiction over this matter [for over nine years] to enforce the provisions of this Decree and for such further relief as may be appropriate."); *Milligan*, 2025 WL 2451593 at *1 ("[T]he Court **RETAINS JURISDICTION** over this case (and by separate order the related case *Singleton v. Allen*, Case No. 2:21-cv-1291-AMM) until Alabama enacts a congressional districting plan based on 2030 census data."); *id*. at *1 n.1 (noting "Judge Manasco will retain jurisdiction over the other related case, *Caster v. Allen*, Case No. 2:21-cv-1536-AMM, for the same period"); *id*. at *5 n.2 (collecting cases across multiple jurisdictions). As the *Milligan* three-judge court noted, "retaining jurisdiction is a normal result in redistricting cases." 2025 WL 2451593, at *5 (citing *Covington*, 585 U.S. at 976).

Courts have also exercised their authority to retain jurisdiction to bring about the end of racial segregation in other contexts. For example, in a school desegregation case, the U.S. Supreme Court commanded the lower court: "[W]hatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 439 (1968).

And courts have done so in far less egregious circumstances. For example, in a suit against Environmental Protection Agency for failure to comply with the Endangered Species Act, the D.C. Circuit stated:

> EPA is ordered to complete cyantraniliprole's effects determination and replace its previous order with an order consistent with the ESA by September 2023. To add bite to our writ, *we will retain jurisdiction and monitor EPA's progress*. EPA is directed to submit status updates every 60 days between now and September 2023. Should EPA fail to meet its September deadline, petitioners are free to renew their motion for vacatur of cyantraniliprole's registration order.

*In re Ctr. for Biological Diversity*, 53 F.4th 665, 673 (D.C. Cir. 2022) (emphasis added).

4

Here, Plaintiffs request far less. This Court would merely retain jurisdiction to review a map the Legislature is currently crafting, and to ensure it is lawfully enacted to remedy Plaintiffs' irreparable constitutional injury before the 2026 congressional elections in accordance with *Covington*. At worst, if the Legislature fails to enact a true remedy, the Court could impose its own remedial map rather than giving the Legislature a third or fourth "bite at the apple," which would "potentially interfere[e] with the [2026] election cycle." *Covington*, 585 U.S. at 977; *see also Hays*, 936 F. Supp. at 372. But this only requires jurisdiction for several weeks—not several years. The State correctly notes that the Legislature's current session runs until June 1, 2026; that the Senate Governmental Affairs Committee already convened hearings on Friday, May 8, 2026; and that the Legislature has previously produced congressional maps "in as little as seven days." State's Response Brief, Doc. 271 at 3. It now appears the Legislature will be allowed to complete its fast-tracked remedial legislation without delay or interference from bad-faith collateral litigation.

Even more promising is the State's confirmation that it has completely reversed its surprise position in this Court, from 2024, that May is too close to November for anyone to remedy the State's racial gerrymander. This Court will recall that it was the State (followed by the Intervenors) which unnecessarily clamored for emergency relief re-imposing the District 6 racial gerrymander on Plaintiffs and other Louisiana voters for the 2024 elections. This action was unnecessary for securing Supreme Court review. Other than violating Plaintiffs' rights, its only impact was to block this Court from preparing a remedial map in the months before the Supreme Court took jurisdiction. Louisiana voters, the parties, and the judicial system are still coping with the injuries, not to mention the litigation and efficiency costs, of this State-championed stay. It should not happen again. With the State's recent filing having reversed its position on timing and with the

5

Legislature engaged, this Court should not hesitate to use its full remedial jurisdiction to approve or impose a remedial map that eradicates racial segregation in Louisiana congressional elections.[1]

## II.     This Court Must Carefully Review the Legislature's Work.

There is a special need for review here. If the State Legislature successfully enacts a new map, it will be its third enacted map for the 2020 census. Its second map, SB8, was supposed to be a remedial map. But that map only created constitutional injuries that have plagued Louisiana voters for over two years. *See Louisiana v. Callais*, 608 U.S. ___ (2026). Over halfway through the decade, Plaintiffs, and all other Louisiana voters, are entitled to a map that does not segregate them based on race. This Court must ensure that those voters finally realize the promise of *Louisiana v. Callais*, 608 U.S. ___ (2026).

Moreover, at least one of the pending bills referenced by the State in its Response Brief has the same constitutional flaw as SB8: that map would intentionally and uncompromisingly impose two majority-Black districts. *See* State's Response Brief, Doc. 271 at 3 (noting that a new map proposal would "keep[] two majority Black districts" (citation omitted)); Senate Bill No. 407, SLS 26RS-789, 2026 Reg. Sess., https://perma.cc/SF5D-7X8S. The May 8, 2026, hearing on four proposed maps was replete with calls for race-based districts. *See* La. State Senate, *May 2026:*

---

[1] Moments before Plaintiffs filed this Brief, the Robinson and Galmon Intervenors filed a Motion to Stay (Doc. 275) both (i) this Court's injunction against use of the current racial gerrymander in congressional elections, and (ii) their own obligation to meet today's deadline to respond to the State's Brief. Plaintiffs would respond to the Motion as directed by this Court. It is immediately apparent, however, that none of the harms Intervenors allege—even if assumed true and even if they state a claim—can now be remedied. Were this Court to suddenly order Louisiana to reverse course yet again, re-impose this week's primary election deadline, and use its racial gerrymander against the Plaintiffs for yet another cycle, it will not result in an orderly or regular May primary election. Clearly the Legislature must now set new primary election dates—likely the old November jungle primary—and a new map. There is no reason to think it won't do so expeditiously. That will allow for review in this Court. The result will be a final judgment that either imposes the Legislature's remedial map or another one as modified by this Court.

*Archived Video, Senate and Governmental Affairs, May 8, 9:00 AM, Room F,* https://perma.cc/Y4M6-MXDH (videos of hearing). Such insistence on re-imposing particular "majority Black districts" is striking given that even the 2022 configuration is now in significant legal doubt. *See Callais*, 608 U.S. ___, slip op. at 12 (taking note of the "bat-shaped District 2 that includes much of New Orleans").

If the Supreme Court taught anything in *Callais*, it is that race should not be the primary motivating feature of a map. Yet that is how the State describes its pending legislation. That the State touts racial quotas of some maps indicates a serious risk that these maps will, if enacted, perpetuate the unlawful segregation the Supreme Court just struck down. *Callais*, 608 U.S. ___, slip op. at 17 ("In considering whether the Constitution permits the intentional use of race to comply with the Voting Rights Act, we start with the general rule that the Constitution almost never permits the Federal Government or a State to discriminate on the basis of race."); *id*. at 24 ("[I]nterpreting §2 of the Voting Rights Act to outlaw a map solely because it fails to provide a sufficient number of majority-minority districts would create a right that the [Fifteenth] Amendment does not protect. And such an interpretation would run headlong into the Act's express disclaimer against racial proportionality."); *id*. at 33 (noting "Louisiana's enactment of SB8 triggered strict scrutiny because the State's underlying goal was racial" and it "express[ly] acknowledg[ed] that race played a role in the drawing of district lines" (quotation omitted)). As the Supreme Court held, "the State did not need to create a new majority-minority district to comply with the [Voting Rights] Act." *Id*. at 33; *see also id*. at 35 (holding "the Voting Rights Act did not require Louisiana to create an additional majority-minority district" so the map "is an unconstitutional gerrymander, and its use would violate the plaintiffs' constitutional rights"). The Court did not cabin its holding to SB8 District 6's precise location. Accordingly, absent new proof

of intentional racial discrimination in redistricting, *id*. at 26 (holding "§2 imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race"), the State cannot intentionally create a second majority-Black district anywhere without violating the Constitution.[2] And the remedy must also address the configuration of District 2, the suspect "bat-shaped" district. *Id.* at 12.

Thus, this Court could easily confront the same problem the Supreme Court did in *Covington* and the same problem this Court confronted in the 1990s when the State merely replaced the Zorro racial gerrymander with the Slash racial gerrymander. *Hays*, 936 F. Supp. at 364. Accordingly, this Court should carefully review the Legislature's work so Plaintiffs and all Louisiana voters are no longer "segregated on the basis of race." *Covington*, 585 U.S. at 976.

**III.    If this Court Has Jurisdiction Over Federal Claims from Other Cases, It Also Has Supplemental Jurisdiction Over State Law Claims from Those Cases.**

In the past week, multiple plaintiffs, including some represented by Intervenors' counsel, have brought lawsuits in the Middle District of Louisiana to block this Court's remedial authority. These plaintiffs bring a myriad of federal and state law claims all relating to the upcoming Louisiana congressional election and the State's lawful attempts to remedy the gerrymander the Supreme Court just struck down. Their federal and state law claims all arise from "a common nucleus of operative fact," and are "such that [they] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (footnote omitted). The Middle District has already transferred one of these lawsuits to this Court. Ruling and Order, *Garcia v. Landry*, No. 3:26-cv-00471-SDD-RLB (M.D. La. May 8, 2026) (ECF

---

[2] And as Plaintiffs proved at trial through their expert Dr. Stephen Voss, two majority-Black districts can't be drawn without racial gerrymandering. Doc. 191, at 27 (citing Doc. 184, at 136:5-12).

26). As such, if these plaintiffs can satisfy the rigors of Article III standing, this Court also has jurisdiction to hear their state law claims. 28 U.S.C. § 1367; *Gibbs*, 383 U.S. at 725. This Court is the best situated forum to do so to avoid duplicative litigation and competing remedies.

**IV.    A Final Judgment Is in the State and All Parties' Best Interests.**

Finally, this Court should retain jurisdiction to issue a final judgment approving a new map. A final, preclusive judgment that tamps down on further litigation over Louisiana's congressional map and certifies its legitimacy until the next census cycle is in all the parties' best interests. First, it is in the Plaintiffs', Intervenors', and all Louisiana voters' best interests to ensure that they are not forced to vote under a map that violates their constitutional rights. Not only have Louisiana voters faced irreparable harm, but they have also faced unpredictability and confusion with each twist and turn of the 2020 redistricting saga since HB1 was enacted. Considering that this will be the third map for the 2020 cycle, Louisiana voters deserve stability going forward.

Second, the State Legislature equally deserves to have its work approved so it can focus on other pressing matters for the State of Louisiana. It has held multiple redistricting sessions since the 2020 census cycle, including some sessions where it could not reach a resolution.

Finally, the State also claims an interest in ending perpetual litigation over maps based on a census taken six years ago. *See, e.g.*, Brief for Appellant State of Louisiana 54, *Louisiana v. Callais*, No. 24-109 (U.S. Dec. 19, 2024); State Jurisdictional Statement 2-3, *Louisiana v. Callais*, No. 24-109 (U.S. July 30, 2024). But the only way to end the State's woes is a preclusive final judgment that approves the constitutional and statutory viability of the newly enacted map. Otherwise, the State's new map could just as easily be challenged in a new case the same day it is enacted. Given the emergency litigation carefully filed in other district courts by Intervenors' own counsel to collaterally attack this Court's remedial authority, if the State enacts a new map and

then tries to dismiss this case as moot, surely "the State will be sued again." State Jurisdictional

Statement 2. This forum, which is the only one that can hear all the constitutional and statutory

arguments at issue under 28 U.S.C. § 2284, is the place to bring all this litigation to a close.

Accordingly, Plaintiffs respectfully ask this Court to retain jurisdiction over this case—

even if SB8 is repealed and a new map is enacted—to guarantee that any new map affords Plaintiffs

the constitutional protections affirmed by the Supreme Court.

Dated this 11th day of May, 2026

PAUL LOY HURD, APLC
*/s/ Paul Loy Hurd*
Paul Loy Hurd
Louisiana Bar No. 13909
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com
*Attorney for Plaintiffs*

Respectfully submitted,

GRAVES GARRETT GREIM LLC
*/s/  Edward D. Greim*
Edward D. Greim,* Mo. Bar No. 54034
Matthew Mueller,* Mo. Bar No. 70263
Katherine E. Mitra,* Mo. Bar No. 74671
**Admitted Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
kmitra@gravesgarrett.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 11th day of May, 2026, the foregoing was electronically

filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel

of record.

*/s/ Edward D. Greim*
Edward D. Greim
*Attorney for Plaintiffs*

10