## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

PHILLIP CALLAIS, et al.,

      Plaintiffs,

v.

NANCY LANDRY, in her official capacity as Secretary of State of the State of Louisiana.

      Defendant.

Civil Action: 3:24-cv-00122

Hon. Carl E. Stewart
Hon. Robert R. Summerhays
Hon. David C. Joseph

## <u>THE STATE'S MOTION TO RESET DEADLINES</u>

Intervenor-Defendant State of Louisiana respectfully moves to reset the deadlines for briefing and hearing in this matter in light of the Supreme Court's order last night in *Allen v. Milligan*, No. 25A1314, 608 U.S. ___ (2026) (attached as Ex. A).

Since the Supreme Court's decision in *Louisiana v. Callais*, No. 24–109, 2026 WL 1153054 (U.S. Apr. 29, 2026), and follow-on rulings, several states (including Louisiana) have diligently taken action to ensure that their congressional district maps comply with the Constitution and the Supreme Court's guidance. Yesterday, in litigation related to Alabama's congressional maps, the Supreme Court made clear that courts should defer to those efforts, apply a presumption of legislative good faith, and not impose court-drawn maps on the eve of the 2026 congressional elections. *See Allen v. Milligan*, No. 25A1314, 608 U.S. ___ (2026).

In that case, a district court had enjoined Alabama from using its 2023 congressional map. The Supreme Court vacated the injunction after *Callais*, but

1

when Alabama officials sought again to use their 2023 map, the district court again enjoined the use of the map. *See* Ex. A at 2–3. Last night, the Supreme Court stayed that renewed injunction, stating:

> We have repeatedly cautioned that lower federal courts should not alter the election rules on the eve of an election. Here, the District Court interposed itself into Alabama's ongoing efforts to conduct its imminent 2026 congressional elections under maps that its elected representatives selected. Its view that conducting the elections under court-imposed maps would be more convenient for the State was not a valid justification for that intervention. While federal courts should not impose changes close to an election, States are free to decide for themselves whether last-minute changes to an election are in their best interests.

*Id.* at 3–4 (citation modified).

That reasoning directly controls the resolution of this case—at least for the imminent 2026 congressional elections in Louisiana. Following the Supreme Court's affirmance of this Court's decision invalidating S.B. 8, the Louisiana Legislature adopted—and the Governor signed—Act 2. Even before last night's Supreme Court order, it seemed clear that the election timeline explained by the Secretary of State likely means that Act 2 must be used for the 2026 congressional elections. *See* ECF 300 at 2, ¶ 7 (observing that Act 2 likely must "control the 2026 congressional elections" and instead asking the Court to "retain jurisdiction" to review Act 2 "before the 2028 election"). The Supreme Court's subsequent order confirms that any judicial modifications to Act 2 for the 2026 congressional elections likely would be stayed by the Supreme Court.

That is especially so given that the current briefing and hearing schedule directly overlaps with the Secretary of State's multi-week implementation period

2

leading up to early July. *See* ECF 300 at 2, ¶ 4. Indeed, even if the Court ordered the use of a different map for 2026 at the hearing scheduled for June 17-18 or afterward, that order would come too late and would be subject to a stay under the Supreme Court's *Allen* order (and the Supreme Court's stay order in this case, *Robinson v. Callais*, 144 S. Ct. 1171 (U.S.)). *See* ECF 300 at 2, ¶ 5. The upshot is that Act 2 will be used for Louisiana's 2026 congressional elections—and thus, there is no need to rush proceedings to review Act 2 in advance of the 2026 congressional elections.

Out of respect for the Court's (and the parties') time and resources, therefore, the State respectfully moves the Court to reset the briefing and hearing schedule in this case to the following: opening briefs due 60 days from the date of the Court's order, response briefs due 30 days thereafter, and a hearing at the Court's convenience.

Dated: June 3, 2026

Respectfully Submitted,

Elizabeth B. Murrill
Attorney General of Louisiana

*/s/ Carey Tom Jones*
Carey Tom Jones (LA #07474)

Office of the Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
jonescar@ag.louisiana.gov

*Counsel for State of Louisiana*

## CERTIFICATE OF CONFERENCE

The State notified counsel for the parties by email of its intent to file this Motion and sought the parties' positions. Plaintiffs, the *Robinson* Intervenors, and the *Galmon* Intervenors do not oppose. The Secretary of State takes no position. Remedial-stage Intervenor Lauren Jewett opposes.

# Exhibit A

# SUPREME COURT OF THE UNITED STATES

———

No. 25A1314

———

WES ALLEN, ALABAMA SECRETARY OF STATE,
ET AL. *v.* EVAN MILLIGAN, ET AL.

ON APPLICATION FOR STAY

———

No. 25A1315

———

WES ALLEN, ALABAMA SECRETARY OF STATE,
ET AL. *v.* BOBBY SINGLETON, ET AL.

ON APPLICATION FOR STAY

———

No. 25A1316

———

WES ALLEN, ALABAMA SECRETARY OF STATE,
ET AL. *v.* MARCUS CASTER, ET AL.

ON APPLICATION FOR STAY

[June 2, 2026]

PER CURIAM.

In *Louisiana* v. *Callais*, 608 U. S. ___ (2026), to resolve the tension between vote-dilution claims under §2 of the Voting Rights Act of 1965 and our colorblind Constitution, we updated the standards for §2 liability established by *Thornburg* v. *Gingles*, 478 U. S. 30 (1986).

Under *Gingles*, to prove a §2 violation, a plaintiff must first establish three preconditions.  First, the minority group must be large and geographically compact enough to be a majority in a reasonably configured congressional district, meaning that the district "comports with traditional districting criteria."  *Callais*, 608 U. S., at ___ (slip op., at

Per Curiam

8) (internal quotation marks omitted).  Second, the minority group must be politically cohesive.  Third, the majority group must vote enough as a bloc to defeat the minority group's preferred candidate.  *Ibid.*  After establishing those three preconditions, the plaintiff must prove that the political process was not equally open to minority voters based on the totality of the circumstances.  *Ibid.*

*Callais* updated these standards.  As relevant here, we held that for plaintiffs to satisfy the first *Gingles* precondition, a plaintiff's alternative map "must meet *all* the State's legitimate districting objectives" "just as well" as the State's own map.  608 U. S., at ___ (slip op., at 29) (emphasis added).  Those legitimate districting objectives, we held, include "the State's specified political goals" and "any other goal not prohibited by the Constitution."  *Ibid.*  A plaintiff also "cannot use race as a districting criterion" in preparing the alternative map.  *Ibid.*  To prove the second and third preconditions, a plaintiff "must provide an analysis that controls for party affiliation" and "show that voters engage in racial bloc voting that cannot be explained by partisan affiliation."  *Id.*, at ___ (slip op., at 30).  These updates, we held, were necessary to avoid requiring congressional maps under §2 that would be unconstitutional racial gerrymanders.

After *Callais*, we vacated District Court injunctions that prevented the State of Alabama from using a congressional map that it enacted in 2023.  See *Allen* v. *Caster*, 608 U. S. ___ (2026).  The District Court had held that the State's map violated §2 because it had only one district in which black voters were a majority and did not include an additional "[b]lack-opportunity" district.  *Singleton* v. *Allen*, 782 F. Supp. 3d 1092, 1114, 1309 (ND Ala. 2025).  The District Court also concluded that the 2023 map violated the Fourteenth Amendment because it constituted a deliberate "refus[al] to satisfy the remedial requirements" it previously

Per Curiam

imposed and an attempt to avoid a future judgment requiring the same remedy.  *Id.*, at 1355.

Two weeks after we vacated its injunction, the District Court entered another injunction on largely the same grounds.  State officials immediately applied to this Court for a stay of this injunction.

At this preliminary stage, the State has shown that it is entitled to interim relief from the District Court's injunction.  See *Abbott* v. *League of United Latin American Citizens*, 607 U. S. ___, ___–___ (2025) (slip op., at 1–2).  The State is likely to succeed on the merits as to both claims.  As to intentional vote dilution, the District Court did not heed the presumption of legislative good faith, see *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U. S. 1, 10 (2024), because it interpreted the State's legal disagreement with the court's earlier remedial order as proof of discriminatory animus. Cf. *Abbott* v. *Perez*, 585 U. S. 579, 608–609 (2018).  And, as to both claims, the District Court's analysis departed from *Callais*.  Under *Callais*, the District Court was required to deny relief unless the plaintiffs' alternative map performed "just as well" with respect to *all* of the State's constitutionally permissible districting criteria.  608 U. S., at ___ (slip op., at 29).  Yet, the District Court found a violation even though the plaintiffs' alternative map would not perform just as well as to the State's constitutionally permissible criteria of keeping together the Gulf Coast community of interest and avoiding the pairing of incumbents.  The District Court also failed to follow our instruction in *Callais* that the mere fact that voters of different races vote for different parties is not relevant to proving racially polarized voting patterns. See *id.*, at ___ (slip op., at 30).

The State has also made a strong showing of irreparable harm and that the equities and public interest favor it.  We have repeatedly cautioned that lower federal courts should not "alter the election rules on the eve of an election."

4                    ALLEN *v.* MILLIGAN

Per Curiam

*Republican National Committee* v. *Democratic National Committee*, 589 U. S. 423, 424 (2020) (*per curiam*).  Here, the District Court interposed itself into Alabama's ongoing efforts to conduct its imminent 2026 congressional elections under maps that its elected representatives selected.  Its view that conducting the elections under court-imposed maps would be more convenient for the State was not a valid justification for that intervention.  While federal courts should not impose changes close to an election, *ibid.*, States are free to decide for themselves whether last-minute changes to an election are in their best interests.

The applications for stay presented to JUSTICE THOMAS and by him referred to the Court are granted.  The May 26, 2026, order of the United States District Court for the Northern District of Alabama, case Nos. 2:21–cv–1530 and 2:21–cv–1291 is stayed pending the timely docketing of the appeal in this Court.  Should the jurisdictional statement be timely filed, this order shall remain in effect pending this Court's action on the appeal.  If the appeal is dismissed, or the judgment affirmed, this order shall terminate automatically.  In the event jurisdiction is noted or postponed, this order will remain in effect pending the sending down of the judgment of this Court.  The May 26, 2026, order of the United States District Court for the Northern District of Alabama, case No. 2:21–cv–1536, is stayed pending the timely filing of a petition for a writ of certiorari.  Should the petition for a writ of certiorari be denied, this stay shall terminate automatically.  In the event the petition for a writ of certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 25A1314

————

## WES ALLEN, ALABAMA SECRETARY OF STATE, ET AL. *v.* EVAN MILLIGAN, ET AL.

ON APPLICATION FOR STAY

————

No. 25A1315

————

## WES ALLEN, ALABAMA SECRETARY OF STATE, ET AL. *v.* BOBBY SINGLETON, ET AL.

ON APPLICATION FOR STAY

————

No. 25A1316

————

## WES ALLEN, ALABAMA SECRETARY OF STATE, ET AL. *v.* MARCUS CASTER, ET AL.

ON APPLICATION FOR STAY

[June 2, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Before the Court are two paths.  Down one lies an orderly election, held under a tried-and-tested congressional map that protects Black Alabamians' right to vote and with which all voters, elections officials, and candidates alike are familiar.  Down the other lies a chaotic election, held under a never-before-used congressional map that intentionally discriminates against Black Alabamians, that Alabama adopted in unashamed defiance of a prior court order directly affirmed by this Court, and that will require officials to change the voter registrations of hundreds of thousands

SOTOMAYOR, J., dissenting

of voters in just days at best, a task that Alabama previously represented would take months.

The majority chooses the second path and disregards both democratic values and the rule of law.  I respectfully dissent.

I

This is now the third time these cases have come before the Court.  See *Merrill* v. *Milligan*, 595 U. S. ___ (2022); *Allen* v. *Milligan*, 599 U. S. 1 (2023); *Allen* v. *Caster*, 608 U. S. ___ (2026).  Each turn reveals just how unconscionable the Court's action is today.

This saga began in 2021, after Alabama adopted a new congressional map following the 2020 census.  That map had only one majority-Black congressional district.  Black Alabamians challenged this first map, alleging that it violated §2 of the Voting Rights Act, 52 U. S. C. §10301.  A three-judge District Court agreed, holding that the map likely had a racially discriminatory effect and violated the Voting Rights Act by diluting Black Alabamians' voting strength.  It therefore ordered Alabama to adopt "a congressional redistricting plan that include[d] either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice."  *Singleton* v. *Merrill*, 582 F. Supp. 3d 924, 936 (ND Ala. 2022).  The latter is commonly referred to as an "opportunity district."

That injunction prompted the first trip to this Court.  At the time, Alabama claimed to be in a predicament.  The District Court had issued its injunction in January 2022, roughly four months ahead of Alabama's primary election in May 2022.  By Alabama's telling, four months was not enough time to change congressional maps, so it sought a stay of the injunction from this Court, arguing that "this overhaul of Alabama's congressional map at this late hour would require the last-minute reassignment of hundreds of

SOTOMAYOR, J., dissenting

thousands of voters to new districts." Application in *Merrill* v. *Milligan*, O. T. 2021, No. 21A375, p. 38 (*Merrill* Application).  This "chaos," the State argued, would harm "not only the State," but also "voters and candidates across the State." *Ibid.*

This Court granted the stay.  *Merrill*, 595 U. S., at \_\_\_ (slip op., at 1).  It also agreed to review the District Court's order and remedy.  See *ibid.*  Two Members of this Court expressed concern that "[t]he District Court's order would require heroic efforts by . . . state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion." *Id.*, at \_\_\_ (KAVANAUGH, J., joined by ALITO, J., concurring) (slip op., at 3).  Thus, this Court allowed the map that the District Court held unlawful to govern the 2022 election.

Then, 18 months later, after full merits briefing and argument, this Court affirmed the District Court's order and finding of discriminatory effect, concluding that the District Court had "faithfully applied our precedents and correctly determined that" Alabama's congressional map unlawfully discriminated against Black Alabamians.  *Allen*, 599 U. S., at 23.  As to the District Court's ordered remedy, the Court rejected Alabama's objections that drawing a second opportunity district would offend the Constitution, writing that "a faithful application of our precedents and a fair reading of the record before" the Court "d[id] not bear . . . out" the State's objections.  *Id.*, at 42.

On remand, and under the District Court's order that this Court had just affirmed, Alabama was given the opportunity to remedy the Voting Rights Act violation.  Alabama did not rise to the occasion.  Rather than adopt a map with the second district that this Court had just held was required to remedy unlawful racial discrimination, Alabama doubled down, adopting the 2023 Redistricting Plan, which also lacked a second opportunity district.  Plaintiffs then amended their complaints in these cases to challenge the

4                          ALLEN *v.* MILLIGAN

SOTOMAYOR, J., dissenting

2023 Redistricting Plan, and the District Court held an 11-day trial on the legality of the new map.  It heard testimony from 51 witnesses, received almost 800 exhibits, and considered many volumes of written submissions.  At the end of that trial, the District Court concluded once again that Alabama's failure to draw a second opportunity district had a discriminatory effect.  It then found that Alabama had not merely "refuse[d] to satisfy" its prior order to remedy racially discriminatory vote dilution, but in fact had gone out of its way to make it "mathematically impossible" to do so. *Singleton* v. *Allen*, 782 F. Supp. 3d 1092, 1355 (ND Ala. 2025).  "[W]ith great reluctance and dismay and even greater restraint," the District Court concluded that Alabama had violated the Fourteenth Amendment by entrenching racially discriminatory vote dilution and permanently enjoined Alabama's 2023 Redistricting Plan.  *Id.*, at 1118.  The District Court instituted a remedial map drawn without any reference to race.  This map governed the 2024 election.

Alabama then filed its second appeal to this Court.  While that appeal was pending, this Court decided *Louisiana* v. *Callais*, 608 U. S. ___ (2026).  Although *Callais* significantly changed the test for discriminatory-effect vote-dilution claims under §2 of the Voting Rights Act, it also purported not to "overrul[e] *Allen*." *Id.*, at ___ (slip op., at 36).  Nor did *Callais* alter the analysis for intentional-discrimination claims under the Fourteenth Amendment.  Still, the Court vacated the District Court's injunction in these cases and remanded for further consideration in light of *Callais*. *Caster*, 608 U. S., at ___–___ (slip op., at 1–2).  That vacatur restored Alabama's 2023 Redistricting Plan just one week before Alabama's primary election while voting was already under way. *Id.*, at ___ (SOTOMAYOR, J., dissenting) (slip op., at 4).

After this Court's order, Alabama announced that it intended to use the 2023 Redistricting Plan for the upcoming

SOTOMAYOR, J., dissenting

election and took the unusual step of splitting its congressional primary.  In the three congressional districts unaffected by the change in congressional map, the May 19 primary election went ahead as scheduled.  In the other four districts, voters still cast their ballots.  Their votes for Congress, however, did not count.  Instead, Alabama's Legislature passed a law permitting the Governor to call a special primary election in the four congressional districts whose lines changed as a result of this Court's order, and the Governor set that election for August 11.

Back in the District Court, plaintiffs immediately sought an emergency hearing following this Court's order.  The District Court held one, and less than three weeks later, it issued a preliminary injunction after "fully revisit[ing] the merits of each claim" brought by plaintiffs.  \_\_\_ F. Supp. 3d \_\_\_, \_\_\_ (2026), 1 App. 28.  In a thorough 78-page opinion, it explained that its prior decision on intentional racial discrimination was "undisturbed by *Callais*" and that, even after "draw[ing] every inference . . . in the Legislature's favor," the record compelled the conclusion that the State intentionally entrenched the racial discrimination that the District Court previously found and this Court affirmed. *Id*., at 29, 31.  From here, the District Court reinstated the remedial map that this Court vacated.

## II

Alabama has now returned to this Court again, seeking a stay of the District Court's second preliminary injunction in these cases.  The Court should deny Alabama's request.  Alabama has not shown that the District Court erred in holding that plaintiffs were likely to succeed on their Fourteenth Amendment claim.  See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).  Furthermore, the State has no legitimate interest in enforcing an unconstitutional map, while vast harms will likely arise from upending the

6                          ALLEN *v.* MILLIGAN

SOTOMAYOR, J., dissenting

status quo, sowing chaos in Alabama, and rewarding Alabama's gamesmanship.

A

To prevail on their Fourteenth Amendment challenge, plaintiffs were required to show that Alabama enacted the 2023 Redistricting Plan "'as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U. S. 1, 38 (2024) (quoting *Miller* v. *Johnson*, 515 U. S. 900, 911 (1995)).  That claim has two elements: discriminatory effect and discriminatory purpose.  *Alexander*, 602 U. S., at 39.  Alabama has not shown that the District Court erred on either element.[1]

To begin, this Court has already held that the discriminatory-effect element is satisfied in these cases.  Again, following the 2020 census, Alabama drew a congressional map with a single majority-Black district.  The District Court concluded that the map violated §2 of the Voting Rights Act, and this Court "agree[d]." *Allen*, 599 U. S., at 19.  *Callais* later changed the standard for §2 liability, but *Callais* also made clear that it did "not overrul[e] *Allen*."  608 U. S., at ___, ___ (slip op., at 32, 36).  As I have explained, "[t]hese cases are, of course, *Allen*," so if the majority meant what it said in *Callais* and "*Allen* is good law . . . , then it must be good law here." *Caster*, 608 U. S., at ___ (dissenting opinion) (slip op., at 4).  "This Court's finding of racially discriminatory vote dilution is an inextricable, permanent feature of this case," *id*., at ___ (slip op., at 4), and it establishes that, as a matter of law, Alabama's failure to draw a second opportunity district has a discriminatory effect.

―――――――――
[1] Because the District Court held that its post-trial finding of intentional discrimination was "undisturbed by *Callais*," ___ F. Supp. 3d ___, ___ (2026), 1 App. 29, and made substantially similar findings in its preliminary-injunction opinion, I discuss the District Court's post-trial and preliminary-injunction opinions together.

SOTOMAYOR, J., dissenting

Next, the District Court did not clearly err when concluding that Alabama acted with discriminatory purpose.  The plaintiffs were required to demonstrate that race was "a motivating factor" in the adoption of the 2023 Redistricting Plan; they were not required to prove that it was the "sol[e]," "'dominant,'" or even "'primary'" motivation.  *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265–266 (1977); see *Mobile* v. *Bolden*, 446 U. S. 55, 66–74 (1980) (applying *Arlington Heights* to claim for intentional vote dilution).  The District Court's finding of discriminatory intent is reviewed for clear error, meaning that its factual determination "must govern" if it is "'plausible' in light of the full record."  *Cooper* v. *Harris*, 581 U. S. 285, 293 (2017)).

The District Court's account of the evidence here is more than plausible.  The record is bereft of evidence suggesting that Alabama took seriously this Court's finding of discriminatory vote dilution in *Allen*.  Speaker of the Alabama House of Representatives Nathaniel Ledbetter put it bluntly: "'If you think about where we were, the Supreme Court ruling [in *Allen*] was five to four.  So there's just one judge that needed to see something different.'"  *Singleton*, 782 F. Supp. 3d, at 1348.  That admission, the District Court observed, suggests "that Speaker Ledbetter was not focused on trying to remedy likely vote dilution" when the Alabama Legislature passed the 2023 Redistricting Plan.  *Ibid.*

The record instead supports the understanding that Alabama was focused on pulling out all the stops to "entrench" the dilution of Black votes found by the District Court and affirmed by this Court.  *Id.*, at 1345.  Most importantly, the events leading up to the adoption of the 2023 Redistricting Plan were "replete with sharp departures from (and some outright conflicts with) Alabama's traditional districting guidelines," as the State fashioned redistricting criteria from whole cloth that it had never previously employed.

8                    ALLEN *v.* MILLIGAN

*Id.*, at 1343; see *id.*, at 1343–1344.  The State, the District Court found, also conjured legislative findings out of "thin air," *id.*, at 1345, in "the dead of night," *id.*, at 1117, that "exalt[ed]" certain White communities while "remaining silent on the heritage of all other communities of interest in Alabama (including the Black Belt)," *id.*, at 1344.  The District Court observed that this "constellation of departures from the norm," *id.*, at 1345, created a set of redistricting rules that made it "mathematically impossible to create [the] second opportunity district" that Alabama had been ordered to draw, *id.*, at 1340; see *id.*, at 1356–1357.  In short, the record reflects "that Alabama made an intentional choice to . . . entrench, rather than remedy and uproot, the racial discrimination that the District Court had previously found and that this Court had affirmed." *Caster*, 608 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 3).

Furthermore, there is minimal evidence that partisanship entered the calculus.  The State's redistricting criteria omitted any mention of partisanship.  ___ F. Supp. 3d, at ___, 1 App. 45.  Neither of the legislators who led the redistricting process testified that they drew the 2023 redistricting plan for partisan reasons.  *Ibid.*  Neither legislator gave any weight to partisan interests, despite being urged to do so by former Speaker of the House Kevin McCarthy.  *Ibid.*  Moreover, although the State professed to be concerned with protecting incumbents, the only evidence in the record on this point shows that this interest was not partisan, but extended to all incumbents, including Terri Sewell, the State's only incumbent Democrat as of 2023.  *Id.*, at ___, 1 App. 46.  The thin factual record is especially notable given that this round of redistricting took place four years after *Rucho* v. *Common Cause*, 588 U. S. 684 (2019), in which this Court held that federal courts cannot hear challenges to partisan gerrymanders.  *Id.*, at 718.  That means that the Alabama Legislature had every incentive to dress up its

redistricting effort in partisan garb. It is telling that it barely managed a fig leaf.

The District Court also more than adequately accounted for the presumption of legislative good faith. Contra, *ante*, at 3. That principle "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U. S., at 10. In its post-trial opinion, the District Court did just that and more. "[I]n extreme service of the presumption of . . . good faith," the District Court assumed the best of Alabama's Legislature and "discount[ed] [its] concerns about" the "historical background and sequence of events" leading up to the adoption of the 2023 Redistricting Plan. *Singleton*, 782 F. Supp. 3d, at 1346. Similarly, when it reaffirmed its intentional-discrimination holding in its preliminary-injunction order, the District Court "dr[e]w every inference [it could] in the Legislature's favor, [made] no effort to read anyone's mind, and accuse[d] no legislator of racism." ___ F. Supp. 3d, at ___, 1 App. 31. Those were not empty promises: The District Court declined to consider "Alabama's history of discriminating against Black Alabamians," even though it is "well-documented," to "give the Legislature every benefit of the doubt." *Id*., at ___, 1 App. 32. It also gave "no weight" to contemporaneous statements from minority legislators regarding the legislature's intentions. *Id*., at ___, n. 15, 1 App. 40, n. 15.

The reason the District Court found intentional discrimination even after affording such deference to the Alabama Legislature is simple: The record is crystal clear. Even if Alabama may have unintentionally drawn the first racially discriminatory map, when it later adopted redistricting criteria that made it mathematically impossible to remedy racial discrimination, the District Court drew the obvious (and certainly not implausible) inference that Alabama intended to discriminate. If the District Court clearly erred

10                     ALLEN *v.* MILLIGAN

SOTOMAYOR, J., dissenting

by doing so, then there is no realistic case in which the presumption of legislative good faith can ever be rebutted.

The majority's order grapples with virtually none of this. Indeed, it does not even acknowledge that the District Court's discriminatory-intent finding is reviewed for clear error. Much of its reasoning rests on its assertion that, even as to the plaintiffs' Fourteenth Amendment claim, "the District Court's analysis departed from *Callais*." *Ante*, at 3. That is wrong twice over. First, *Callais* "said not a word about the standard for Fourteenth Amendment intentional-discrimination claims." *Caster*, 608 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 4). Instead, *Callais* was focused on changing the Court's law on "exactly what §2 of the Voting Rights Act demands," not what the Constitution demands. 608 U. S., at ___ (slip op., at 19). Second, *Callais* said that its newly fashioned test for §2 disparate-impact claims is not an intent-based test. It acknowledged that §2 "does not demand a finding of intentional discrimination." *Id.*, at ___ (slip op., at 23). It also denied JUSTICE KAGAN's charge that the majority's new test was an intent test in all but name. *Id.*, at ___ (slip op., at 35). It is hard to see how the District Court's finding of discriminatory intent under the Fourteenth Amendment could have departed from an opinion that purported to say nothing about how to find discriminatory intent under the Fourteenth Amendment. The Court's apparently oblivious insistence to the contrary today cannot be squared with what *Callais* said on its face just over one month ago. See *id.*, at ___, n. 5 (KAGAN, J., dissenting) (slip op., at 25, n. 5) ("[T]he majority closes its opinion by suggesting it is *not* requiring a vote-dilution plaintiff to present evidence of 'discriminatory intent.' Which, if true, would be welcome news" (citation omitted)).

SOTOMAYOR, J., dissenting

## B

In addition to being wrong on the merits, the Court's decision inflicts two grave harms on the public.  It debases the democratic process by upending Alabama's entire election in the name of permitting Alabama to discriminate against Black Alabamians.  It also corrodes the rule of law by rewarding Alabama's gamesmanship and outright defiance of court orders.

### 1

First, the Court's decision will cause havoc.  The so-called "*Purcell* principle" "generally holds that, because late-breaking changes to election procedures can cause chaos, federal courts should hesitate before exercising their equitable discretion to alter state election laws close to an election."  *Malliotakis* v. *Williams*, 607 U. S. ___, ___ (2026) (SOTOMAYOR, J., dissenting) (slip op., at 10).  Today's decision tramples on that principle of restraint.

As the District Court explained, the path of least change in Alabama is keeping the District Court's remedial plan in place.  According to Alabama Director of Elections Jeff Elrod, all voters in Alabama are currently assigned in county-level voter rolls to congressional districts based on the remedial map that the District Court previously ordered and that the State used for the 2024 election cycle.  2 App. 135.  To run an election using the remedial map, then, the State need not make any changes to its voter rolls or change the status quo.

To switch to the 2023 Redistricting Plan now, however, county elections officials will have to reassign hundreds of thousands of voters across the State to new congressional districts.  Three of Alabama's counties will be particularly hard hit because they are split across two congressional districts.  2 App. 121–122.  These counties have about 600,000

12                          ALLEN *v.* MILLIGAN

registered voters between them (roughly 15% of the State's total number of registered voters).[2]

Elrod testified below that county elections officials would have to reassign those 600,000 voters manually. "The system," he explained, "is not automatic" and "requires manual input" from elections officials who must "physically manually interface with the system." *Id.*, at 146. Reassigning voters in precincts split across two districts is particularly complicated, he continued, as it "cannot be done with a simple click" and instead requires officials to check street-level data to determine how to assign individual voters. *Id.*, at 156–157. Worse yet, Elrod warned that reassigning voters requires using complicated computer software that officials must be trained to use, as "most of the counties' registrars are not tech savvy" and "registrars are the only ones who can make the changes . . . to a voter's record." *Id.*, at 147–148. This process also requires many prechecks and back-end quality control steps, all of which add to its time-intensive nature. *Id.*, at 140.

Given these complexities, the process for reassigning voters typically takes months. Alabama knows (or at least knew) this. In 2021, at the first preliminary-injunction stage in these cases, Alabama filed a declaration from Elrod's predecessor representing that voter reassignment "can take a county's Board of Registrars 3 to 4 months to accomplish." ECF Doc. 82–7, p. 4.[3] For example, after the Alabama Legislature redrew its state legislative districts in 2017 following litigation, "local election officials struggled to complete the district assignment process in up to 4 months." *Ibid.*

---

[2] Alabama Secretary of State, Voter Registration Statistics—2026, https://www.sos.alabama.gov/sites/default/files/election-data/2026-05/ALVR-2026.xlsx (archived at https://perma.cc/6QHZ-7GFC).

[3] ECF citations are to documents filed in the District Court in *Milligan* v. *Allen*, No. 2:21–cv–1530 (ND Ala.).

Cite as:  608 U. S. ____ (2026)           13

SOTOMAYOR, J., dissenting

Here, county officials do not have four months.  When Alabama filed these applications on May 27, they had just seven days.  Elrod explained that voter rolls were locked throughout the State following the State's May 19 primary election, meaning that county officials could not reassign any voters to their new congressional districts under the 2023 Redistricting Plan for the August 11 special primary election.  ECF Doc. 530–1, p. 17.  The rolls were unlocked on May 27, but they are set to lock again today, June 2, ahead of Alabama's primary runoff election on June 16.  As a result, county officials in the three most heavily impacted counties in Alabama had at best just seven days to reassign 600,000 voters by hand.  The two smaller counties, which are together responsible for reassigning 100,000 voters, each have just three elections officials who can make these changes.  2 App. 122.  Mistakes will inevitably occur, as overworked elections officials sprint around the clock to make all the necessary changes.  Even then, the officials may fall short.  As far as Elrod is aware, no county in Alabama that was split under a redistricting plan has ever managed to complete voter reassignment in just seven days.  See *id*., at 181.[4]

It now appears that county officials have just hours left, if that.  Because the District Court's injunction remained in place while these applications were pending, it is unclear if county officials began reassigning voters or if they were awaiting a decision from this Court.  Indeed, Alabama, while conceding "it is true that time is tight," suggested that

————————

[4] Elrod testified that the voter rolls are locked by a third-party vendor immediately before and during an election.  See 2 App. 136–140.  The rolls remain locked until votes are canvassed seven days after the election unless there is a challenge to the election results.  *Id*., at 206.  As a result, even if the State can require the vendor to unlock the voter rolls when they were otherwise set to be locked, it seems likely that would cause even more confusion and undermine the administration of an active, ongoing election.

14                    ALLEN *v.* MILLIGAN

SOTOMAYOR, J., dissenting

voter reassignment has not yet begun.  Reply 5; see *ibid.*
(noting that reassignment "was set to begin on May 27").  If
in fact reassignment has not begun, then elections officials
may have only a few hours to make all the needed changes.
The Court nonetheless stays the District Court's injunction
and orders the 2023 Redistricting Plan into place, even
though it knows full well that "it will take a chaotic, decen-
tralized, and Herculean effort" to make all the necessary
changes.  ___ F. Supp. 3d, at ___, 1 App. 8.

In response, Alabama asserts that it is the lower court
that violated *Purcell* because it was "*the Legislature's and
the Governor's choice*" to inflict these harms.  Application
for Stay 35.  Alabama's weaponization of *Purcell* ignores
half the story.  Until roughly three weeks ago, the District
Court's remedial plan had governed in Alabama for more
than two years.  Then, this Court vacated the District
Court's injunction and restored the 2023 Redistricting Plan.
Although Alabama chose to use the 2023 Redistricting Plan
for this election following this Court's decision, the fact re-
mains that this Court allowed this change to go forward.
Now, the Court is being presented with a choice.  It can use
its equitable authority to fix the mess it has created, or it
can use that same authority to deepen it further.  The an-
swer is clear: No principle of either law or equity requires
the Court to perpetuate disruption instead of preventing it.

2

Second, the Court should not have rewarded Alabama's
defiance of court orders and blatant gamesmanship
throughout this litigation.  It is long established that "'he
who comes into equity must come with clean hands.'"  *Pre-
cision Instrument Mfg. Co.* v. *Automotive Maintenance Ma-
chinery Co.*, 324 U. S. 806, 814 (1945).  Under this principle,
to obtain equitable relief like a stay pending appeal, a mo-
vant must "have acted fairly and without fraud or deceit as
to the controversy in issue."  *Id.*, at 814–815; see *New*

SOTOMAYOR, J., dissenting

*Hampshire* v. *Maine*, 532 U. S. 742, 749 (2001) ("'[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory'").  Alabama's hands, however, are far from clean.  Instead, it defied the District Court's order in these cases even after this Court affirmed it, and took utterly irreconcilable positions at different stages in these cases to suit its own purposes.

First, Alabama intentionally chose to flout a preliminary injunction that this Court affirmed in *Allen*.  Again, the District Court's preliminary injunction (affirmed by this Court) expressly ordered Alabama to draw a second district in which Black voters would have an opportunity to elect the candidate of their choice.  See *Singleton*, 782 F. Supp. 3d, at 1125; *supra*, at 2.  Yet the State staunchly refused to do so and instead did everything it could to make it impossible to draw such a district.

Of course, Alabama had every right to raise its "legal disagreement," *ante*, at 3, with the District Court's original preliminary injunction through the appellate process or otherwise.  The course of action the State chose here, however, was not the proper way of doing so.  Had Alabama complied with the preliminary injunction and drawn a map with a second opportunity district, it could have relitigated the merits in the ordinary course: first at a trial on the merits, and then on appeal.  At either stage, it could have raised the arguments that the litigants in *Callais* raised and prevailed on, or advanced challenges to the District Court's remedial order.  Instead, Alabama willfully drew a map that flouted the District Court's preliminary injunction and hoped that this Court would eventually see things its way.  After today, it is hard to call Alabama's cynical gambit anything other than a success, and the Court's rewarding of Alabama's behavior anything other than a blow to the rule of law.

16                    ALLEN *v.* MILLIGAN

SOTOMAYOR, J., dissenting

Second, Alabama has taken wildly inconsistent positions on how much time it needs to implement a new redistricting plan throughout these cases, which suggests it is attempting to game this Court's emergency docket through shifting positions on the equities. As noted above, Alabama previously sang a very different tune. In January 2022, it asked the District Court to stay its initial preliminary injunction in these cases. See ECF Doc. 110. In its motion, the State complained that changing its congressional districts four months before Alabama's primary election that year "thr[ew] the [2022] election into chaos" and left "almost no time for maps to be redrawn, hundreds of thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political organizations seeking ballot access." *Id.*, at 20. Alabama continued: "To pull the rug out from . . . candidates and their voters in the run-up to an election requires extraordinary justification," for "'elections are complex to administer, and the public interest is not served by a chaotic, last-minute reordering of districts.'" *Id.*, at 21 (alterations omitted). The State made similar arguments to this Court when it successfully sought a stay following the District Court's denial. See *Merrill* Application 38 (citing "the last-minute reassignment of hundreds of thousands of voters to new districts" as imposing significant "harms not only [on] the State," but also on "voters and candidates").

If all the above was true in 2022, then it is also true in 2026. Alabama, however, no longer seems to think so. What was previously impossible to achieve in four months is suddenly possible to achieve in less than one week, as concerns about the administrative burdens associated with "the last-minute reassignment of hundreds of thousands of voters to new districts," *ibid.*, have apparently melted away. A State that once decried pulling the rug out from under voters, elections officials, and candidates now seems determined to do just that. The Court should not reward

SOTOMAYOR, J., dissenting

such gamesmanship, especially when it accepted Alabama's arguments in granting Alabama a stay in 2022.  See *Merrill*, 595 U. S., at ___ (KAVANAUGH, J., concurring) (slip op., at 3) (noting that "even heroic efforts" by elections officials "likely would not be enough to avoid chaos and confusion").

\* \* \*

Weeks ago, I warned that vacating the District Court's injunction in these cases would "unleash chaos and . . . confuse voters."  *Caster*, 608 U. S., at ___ (dissenting opinion) (slip op., at 4).  Nevertheless, the Court forged ahead.  Now the Court is squarely faced with a record of the turmoil it has caused and the harm it has wrought.  Yet just as Alabama doubled down on racial discrimination, the Court today doubles down on chaos.  Because I choose to defend the rule of law and the right of all Alabamians to participate equally in democracy, I respectfully dissent.