IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| PHILLIP CALLAIS, et al., | ) | |
| | ) | Case No. 3:24-cv-00122-DCJ-CES-RRS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | District Judge  David C. Joseph |
| | ) | Circuit Judge Carl E. Stewart |
| NANCY LANDRY, IN HER OFFICIAL | ) | District Judge  Robert R. Summerhays |
| CAPACITY AS LOUISIANA | ) | |
| SECRETARY OF STATE, et al., | ) | Magistrate Judge Kayla D. McClusky |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
ATTORNEYS' FEES AND BILL OF COSTS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION .............................................................................................1

RELEVANT BACKGROUND ............................................................................1

    I.   After the 2020 Census, Louisiana Enacts HB1 and Faces Immediate Litigation ....1

    II.  Louisiana Then Enacts an Unconstitutional Congressional Map—SB8. .................2

    III. Plaintiffs Successfully Sue to Enjoin Use of SB8 on an Expedited Timeline. ........3

    IV. Plaintiffs Successfully Defend Their Injunction After Two Rounds of Briefing and Oral Argument in the Supreme Court. ......................................................................6

    V.  The State Enacts a Map that Remedies SB8's District 6 in the Remedial Phase. .10

ARGUMENT .................................................................................................12

    I.   Plaintiffs Are the Prevailing Parties. ....................................................................13

    II.  Plaintiffs Should Be Awarded $2,237,151.09 for Their Reasonable Attorneys' Fees and Expenses and an Upward Adjustment of 20% for Their Fees. .............................14

        A.  The hours spent by Plaintiffs' attorneys were reasonable given the nature and complexity of this litigation. ............................................15

        B.  The rates charged by Plaintiffs' attorneys are reasonable given their specialized experience in election law and constitutional litigation. ....17

        C.  Plaintiffs are entitled to an upward adjustment based on the *Johnson* factors. ..........................................................................19

           1.  *Time and labor* ....................................................................20

           2.  *Novelty and difficulty of issues in the case* .............................21

           3.  *The skill requisite to perform the legal services properly* .......23

4. *The preclusion of other employment by the attorney due to acceptance of the case* ............................................................24

5. *The customary fee charged for those services in the relevant community* ..................................................................25

6. *Time limitations imposed by the client or the circumstances* ..27

7. *The results obtained* ................................................28

8. *The experience, reputation, and ability of the attorneys* .........28

9. *Undesirability of the case* .........................................28

10. *Awards in similar cases* ...........................................29

D. Plaintiffs' expenses incurred are reasonable and should be awarded to them..................................................................30

1. *Plaintiffs' taxable costs under FRCP 54* ...............................31

2. *Plaintiffs' non-taxable costs and expenses* ............................31

E. Plaintiffs are entitled to their fees and expenses incurred in preparing and litigating this motion. ....................................................34

CONCLUSION AND PRAYER FOR RELIEF ...........................................35

CERTIFICATE OF SERVICE ......................................................36

iii

## TABLE OF AUTHORITIES

**CASES**                                                                                           **Pages**

*Allen v. Caster*,
    No. 25-243 (U.S. May 11, 2026) ...................................................................................9

*Allen v. Milligan*,
    599 U.S. 1 (2023).................................................................................................22, 30

*Allen v. Milligan*,
    No. 25A1314, 608 U.S. ___ (U.S. June 2, 2026) ........................................................9, 10

*Associated Builders & Contractors of La., Inc. v. Orleans Parish Sch. Bd.*,
    919 F.2d 374 (5th Cir. 1990) ................................................................................12, 31, 33

*Bd. of Elecs. Comm'rs v. NAACP*,
    No. 25-234 (U.S. May 18, 2026) ...................................................................................10

*Blum v. Stenson*,
    465 U.S. 886 (1984)....................................................................................................17

*Callais v. Landry*,
    No. 24-30177 (5th Cir.) ................................................................................................7

*Caster v. Allen*,
    No. 2:21-cv-01536-AMM (N.D. Ala. July 15, 2024)....................................................29, 30

*Charles v. LeBlanc*,
    No. 18-0541, 2025 WL 2627701 (W.D. La. Sept. 11, 2025) ............................................34

*Citizens United v. Fed. Elec. Comm'n*,
    No. 08-205 (U.S. June 29, 2009) ...................................................................................21

*City of Riverside v. Rivera*,
    477 U.S. 561 (1986)....................................................................................................17

*Combs v. City of Huntington, Tex.*,
    829 F.3d 388 (5th Cir. 2016) .......................................................................14, 15, 19, 20

*Cruz v. Hauck*,
    762 F.2d 1230 (5th Cir. 1985) ......................................................................................34

*DeLeon v. Abbott*,
    687 F. App'x 340 (5th Cir. Apr. 18, 2017)......................................................................12

*Energy Mgmt. Corp. v. City of Shreveport*,
  467 F.3d 471 (5th Cir. 2006) ................................................................31

*Galmon v. Callais*,
  No. 24-111 (U.S.)................................................................................7

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)...........................................................................14

*Hubert v. Curren*,
  No. 18-7669, 2018 WL 4963595 (E.D. La. Oct. 15, 2018) ................20

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ........................................................15, 19

*Johnson v. United States*,
  574 U.S. 1069 (2015)..........................................................................21

*Kennedy v. Braidwood Mgmt., Inc.*,
  No. 24-316 (U.S. Apr. 24, 2025) .......................................................21

*Kirchberg v. Feenstra*,
  708 F.2d 991 (5th Cir. 1983) ..............................................................34

*Lackey v. Stinnie*,
  604 U.S. 192 (2025).............................................................................13

*Landry v. Callais*,
  No. 23A1002 (U.S.) .............................................................................7

*Lawson v. Spirit Aerosystems*,
  No. 18-1100-EFM-ADM, 2020 U.S. Dist. LEXIS 201538 (D. Kan. Oct. 29, 2020) ........19

*Louisiana v. Callais*,
  608 U. S. ___ (2026)...............................................................1, 9, 1, 13

*Louisiana v. Callais*,
  No. 24-109 (U.S.).................................................................................7

*LULAC v. Roscoe Indep. Sch. Dist.*,
  119 F.3d 1228 (5th Cir. 1997) ...............................................16, 17, 20

*McClain v. Lufkin Indus., Inc.*,
  649 F.3d 374 (5th Cir. 2011) ...............................................................18

*Miller v. Johnson*,
509 U.S. 630 (1993).....................................................................................................23

*Milligan v. Allen*,
No. 2:21-cv-01530-AMM (N.D. Ala. July 30, 2024)......................................................38

*NAACP v. Button*,
371 U.S. 415 (1963).....................................................................................................28

*Nairne v. Landry*,
No. 24-30115 (5th Cir. May 7, 2026) ............................................................................9, 20

*Nat'l Coalition for Students with Disabilities v. Bush*,
173 F. Supp. 2d 1272 (N.D. Fla. 2001)..........................................................................14

*Newman v. Piggie Park Enters., Inc.*,
390 U.S. 400 (1968).....................................................................................................14

*Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542 (2010).....................................................................................................15

*Perez v. Texas*,
No. SA-11-CV-360-OLG, 2025 WL 3732018 (W.D. Tex. Dec. 8, 2025) ......18, 24, 25, 29

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)..........................................................................................................7, 11

*Riddell v. Nat'l Democratic Party*,
624 F.2d 539 (5th Cir. 1980) .......................................................................................14, 34

*Robinson v. Ardoin*,
No. 3:22-CV-00211-SDD-SDJ (M.D. La. Jan. 3, 2024) ..................................................2

*Robinson v. Callais*,
No. 23A994 (U.S.) ........................................................................................................7

*Robinson v. Callais*,
No. 24-110 (U.S.)...........................................................................................................7, 8

*Rogers v. Kijakazi*,
No. 19-1134-JWL, 2022 U.S. Dist. LEXIS 226180 (D. Kan. Dec. 15, 2022) ..................19

*Sanders v. Russell*,
401 F.2d 241 (5th Cir. 1968) .......................................................................................28

*SBA Towers II, LLC v. Innovative Anchoring Sys., LLC*,
No. 6:15–1798, 2015 WL 5944300 (W.D. La. Oct. 13, 2015)..........................................33

*Shelby County v. Holder*,
570 U.S. 529 (2013)..........................................................................................22

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)..........................................................................................22

*Thornburg v. Gingles*,
478 U.S. 30 (1986)............................................................................................9

*Turtle Mountain Band v. Howe*,
No. 25-253 (U.S. May 18, 2026) ......................................................................10

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020)..........................................................................................21

*Veasey v. Abbott*,
No. 2:13-CV-193, 2020 WL 9888360 (S.D. Tex. May 27, 2020), *affirmed*,
13 F.4th 362 (5th Cir. 2021) .................................................13, 14, 25, 27, 39

*Walker v. U.S. Dept. of Hous. & Urb. Dev.*,
99 F.3d 761 (5th Cir. 1996) ...............................................................................20

*Whitney Nat'l Bank v. Boylston*,
No. 09-0059, 2011 WL 13377569 (W.D. La. Aug. 30, 2011)..........................33

**RULES**

Fed. R. Civ. P. 54...........................................................................................1, 30

Fed. R. Civ. P. 54(d)(1)......................................................................................31

**STATUTES**

28 U.S.C. § 1920...............................................................................................31

42 U.S.C. § 1988.................................................................................14, 30, 31, 33

42 U.S.C. § 1988(b) ..................................................................................1, 12, 13, 31

52 U. S. C. § 10301............................................................................................22

**OTHER AUTHORITIES**

*CPI Inflation Calculator*, U.S. BUREAU OF LAB. STAT., https://perma.cc/U58L-8XCC ...............25

Greg Larose, *Here's what Louisiana will pay a law firm to review state police policy*, LA. ILLUMINATOR (Jan. 14, 2024), https://lailluminator.com/2024/01/14/heres-what-louisiana-will-pay-a-law-firm-to-review-state-police-policy/. ...........................................................26

Meghan Friedman & James Finn, *Louisiana's legal fight against new Black voting districts cost millions. See how much.*, THE ADVOCATE (Jul. 3, 2024), https://perma.cc/6E9Z-J6KX....... ..........................................................................................................................................26

*Roll Call: LA SB8, 2024, 1st Special Session, Vote: House Vote on SB 8 FINAL PASSAGE (#21)*, LegiScan, https://legiscan.com/LA/rollcall/SB8/id/1367130 (last visited June 24, 2026).... ............................................................................................................................................2

*Roll Call: LA SB8, 2024, 1st Special Session, Vote: Senate Vote on SB 8 CONCUR (#20)*, LegiScan, https://legiscan.com/LA/rollcall/SB8/id/1367032 (last visited June 24, 2026) ............................................................................................................................................2

Taylor F. Barras, Comm'r of Admin., Div. of Admin., *State of Louisiana Office of State Procurement, Professional Service Contracts Fiscal Year 2024-2025 Annual Report: Professional, Personal, Consulting and Social Services*, https://perma.cc/LN44-R9M8 ..... ..........................................................................................................................................26

Taylor F. Barras, Comm'r of Admin., Div. of Admin., *State of Louisiana Office of State Procurement, Professional Service Contracts Fiscal Year 2023-2024 Annual Report: Professional, Personal, Consulting and Social Services*, https://perma.cc/NJ83-7VH8...26

## INTRODUCTION

Plaintiffs Callais, et al. ("Plaintiffs") are the prevailing parties and are thereby entitled to their attorneys' fees and expenses under 42 U.S.C. § 1988(b) and Federal Rule of Civil Procedure 54. After a hard-fought battle in this Court and multiple rounds in the U.S. Supreme Court, they prevailed. All their fees and costs to secure this landmark victory are recoverable.

Plaintiffs incurred $2,237,151.09 in litigating this case and defending it in the U.S. Supreme Court, including $2,088,852.75 in attorneys' fees and $148,298.34 in expenses. This amount accounts for reasonable deductions made by Plaintiffs' counsel. Plaintiffs also seek an upward enhancement of 20% of the attorneys' fees. Plaintiffs ask the Court to grant this award.

## RELEVANT BACKGROUND

### I.    After the 2020 Census, Louisiana Enacts HB1 and Faces Immediate Litigation

This case begins over six years ago with the 2020 census, which gave the State six congressional districts. *Louisiana v. Callais*, 608 U.S. ___, slip op. 11 (2026) (beginning the background of the case with the 2020 census). In response to this allocation, in 2022 the State enacted HB1, a congressional redistricting map "that closely resembled its immediate predecessor" and included only one majority-Black district—District 2. *Id*. at 12. Upon passage, the Robinson and Galmon Intervenors immediately challenged HB1 in the Middle District of Louisiana and named the Secretary of State and State as defendants. The Robinsons and Galmons alleged that HB1 violated Section 2 of the Voting Rights Act ("VRA") and sought a preliminary injunction. *Id*. at 12-13. The Middle District granted that preliminary injunction. *Id*. at 13. The case subsequently went up to the Supreme Court, where it was stayed for a year before it was dismissed and remanded to the Fifth Circuit for further proceedings. *Id*. Meanwhile, the Middle District ordered a remedial evidentiary hearing to begin October 3, 2023. Doc. 198 at 9. The State sought

1

mandamus in the Fifth Circuit, which then vacated the Middle District's hearing. *Id*. On November 10, 2023, the Fifth Circuit merits panel, after briefing and oral argument, vacated the preliminary injunction and remanded to the Middle District with instructions to allow the State time to pass a new map before proceeding to a trial. *Id*.; *Callais*, slip op. at 13. On January 3, 2024, the Middle District gave the State that option. *Robinson v. Ardoin*, No. 3:22-CV-00211-SDD-SDJ (M.D. La. Jan. 3, 2024) (ECF 330). It gave the State until January 30, 2024, to enact a new map before it would proceed to a trial on the merits commencing on February 5, 2024. *Id*. at 1-2

## II.      Louisiana Then Enacts an Unconstitutional Congressional Map—SB8.

Just five days after the Middle District's order, on January 8, 2024, the Governor called a special legislative session to draw new congressional districts. Doc. 198 at 10. The session began just one week later on January 15, 2024. In impressively swift action, the Legislature passed and sent SB8 to the Governor's desk within five days of the session's commencement, and the Governor signed SB8 within seven days—on January 22, 2024. In that short week, there were hours and hours of hearings and floor debates in the House and Senate. Doc. 198 at 11 (listing the nine hearings and floor debates that comprised the entire, voluminous legislative record). SB8's quick passage was due largely to its bipartisan support. The Republican Governor urged the Legislature to pass a bill with two majority-Black districts and favored this bill among the ones presented. Doc. 165-7; 165-9; Doc. 185 at 119:9-120:24, 122:1-6; Doc. 184 at 69:24-70:13. And on final passage, 27 Senators voted in favor of SB8, including all 10 present Democrats and 17 Republicans, and only 11 Senators voted against it. Doc. 183-15; *Roll Call: LA SB8, 2024, 1st Special Session, Vote: Senate Vote on SB 8 CONCUR (#20)*, LEGISCAN, https://legiscan.com/LA/rollcall/SB8/id/1367032 (last visited June 24, 2026). Likewise, 86 Representatives voted in favor of SB8, including all 31 present Democrats and 55 Republicans,

2

and only 17 Representatives voted against it on final passage. Doc. 183-11; *Roll Call: LA SB8, 2024, 1st Special Session, Vote: House Vote on SB 8 FINAL PASSAGE (#21)*, LEGISCAN, https://legiscan.com/LA/rollcall/SB8/id/1367130 (last visited June 24, 2026).

SB8 created two majority-Black districts—District 6 and District 2. Numerous comments from legislators and executive officials in the legislative record attested to the State's racially predominant purpose in drawing District 6. Doc. 198 at 11-13. Likewise, the irregular shape of District 6—which stretched 250 miles from Baton Rouge to Shreveport, narrowly carved in predominantly Black precincts, and excluded predominantly White ones—demonstrated the State's uncompromising racial quota. Doc. 198 at 13-14.

**III.    Plaintiffs Successfully Sue to Enjoin Use of SB8 on an Expedited Timeline.**

Twelve Louisiana voters from across the State quickly saw the State's map, and specifically District 6, for what it was: an unconstitutional racial gerrymander. These voters hailed from all six districts, with three residing in SB8's District 6. Doc. 198 at 15. Mere days after SB8's swift enactment, these voters filed a lawsuit alleging that SB8 violated their rights under the Fourteenth and Fifteenth Amendments and seeking declaratory and injunctive relief to stop usage of SB8 in any congressional election. *Id.* at 16; Doc. 1. They moved to empanel a three-judge court, which was ordered.

The rest of the pre-trial litigation moved at breakneck speed. Plaintiffs filed their lengthy motion for a preliminary injunction and supporting suggestions with 44 exhibits, including a lengthy expert report, on February 7, 2024. Doc. 17 – 17-46. On February 6, the Galmons moved to intervene. Doc. 10. The very next day, the Robinsons followed suit and moved to transfer the case to the Middle District, where they were simultaneously urging the single-judge court to seize jurisdiction of the case. Doc. 18. One week later, on February 14, 2024, Plaintiffs provided a

3

fulsome response to these motions to intervene and motion to transfer. Doc. 33 – 33-1. Plaintiffs' counsel met with counsel for the other parties two days later, on February 16, 2024, and subsequently sought a case management conference and expedited schedule. Doc. 43. The Court granted that order for an expedited schedule on February 21, 2024. Doc. 62 – 63. In accordance therewith, the State and Secretary of State filed responses to Plaintiffs' preliminary injunction motion and the Robinsons and Galmons filed opposing amicus briefs on February 27, 2024, and Plaintiffs filed a reply addressing all four responses on March 8, 2024. Doc. 82, 85 – 87-9, 101. At the same time, the Robinsons and Galmons sought motions to reconsider the denial of their intervention in the liability stage and expedited briefing on those motions. Doc. 96 – 96-1, 100 – 100-2, 103 – 103-3. Plaintiffs filed their opposition to those motions on March 11, 2024, and March 13, 2024. Doc. 105 – 105-1, 111 – 111-2. The Court ultimately permitted the Robinsons to participate in the liability stage of the case as Defendants-Intervenors, alongside the State and Secretary of State. Doc. 114. With the Robinsons came their host of 22 attorneys hailing from seven different legal entities, plus the Harvard Law School Election Clinic. Doc. 119 at 12-13 (listing counsel for Robinsons). During trial, they ballooned to 24 attorneys. Doc. 170 at 3-4 (listing counsel for Robinsons). This was added to two in-house attorneys from the State Attorney General's Office, five outside counsel from a coastal election law boutique also hired by the State, one in-house Secretary of State attorney, and one outside counsel also appearing for the Secretary.

While Plaintiffs were responding to this flurry of pre-trial motions and responses, they were also conducting discovery to meet deadlines and prepare for a trial that was only weeks away. Specifically, Plaintiffs had to put together expert designations and send expert reports to the other parties by March 22, 2024; send exhibit and witness lists to the other parties and Court by April 1, 2024; submit edited deposition transcripts to the Court by April 1, 2024, and file all objections to

depositions by then; deliver bench books with all exhibits and objections to the other parties'

exhibits to each of the judges by April 1, 2024; and put together a real time glossary for the Court

by April 1, 2024. Doc. 63 at 1, 139. So during this period Plaintiffs' counsel was hard at work

conducting depositions, defending depositions, reviewing expert reports, putting together witness

and exhibit lists, and propounding objections to the Robinsons' discovery, all while preparing for

the impending trial.

Also simultaneously, the Galmons appealed the denial of their motion to intervene in the

Fifth Circuit on March 20, 2024. Doc. 125. They sought a motion to expedite, which the Fifth

Circuit ultimately denied. Doc. 133.

In the week leading up to trial, Plaintiffs responded to no less than four motions from the

Robinson Intervenors. Plaintiffs' April 1 exhibit and witness designations, Doc. 139, were

followed by objections from the Robinsons, including a motion in limine on April 2 and a motion

to strike one of Plaintiffs' expert's reports on April 3. Doc. 144 – 145-8. Plaintiffs provided a

fulsome response to the motion in limine the very next day, April 3, and a response to the motion

to strike two days later, on Friday, April 5, all while preparing for a trial set to commence the

following Monday, April 8, 2024. Doc. 146, 155. But the Robinsons had a few more last-minute

motions. They filed a motion to reconsider the exclusion of one of their experts late Friday, April

5. Doc. 155 – 155-1. And then they filed a last-minute motion to continue the trial late Saturday,

April 6. Doc. 161. Plaintiffs responded to these motions on April 6 and April 7, respectively, using

their last few precious hours before trial to address these attempts to cause delay. Doc. 158, 163 –

163-4. In addition to their own pre-trial prep, Plaintiffs contemporaneously worked with the other

parties to file a joint exhibit list on April 7, 2024. Doc. 165 – 165-17.

Despite the Robinsons numerous delay tactics, trial proceeded as planned from April 8, 2024, to April 10, 2024. Doc. 198 at 17. The record was extensive: "Collectively, the parties introduced thirteen (13) witnesses and one hundred ten (110) exhibits." *Id*. Plaintiffs appeared through five attorneys (Edward Greim, Paul Hurd, A. Bradley Bodamer, Jackson Tyler, and Katherine Mitra), who put on dozens of exhibits, two expert witnesses, and two fact witnesses, cross-examined multiple expert and fact witnesses, and successfully moved to exclude dozens of exhibits, the testimony of one of the Robinsons' proffered expert witnesses, and part of the testimony of one of their fact witnesses.

But even once trial was complete, Plaintiffs' counsel was not done. Within a week of the conclusion of trial, on April 17, 2024, Plaintiffs filed an extensive post-trial brief and proposed findings of fact and conclusions of law, which collectively was over 80 pages. Doc. 190 – 191.

On April 30, 2026, this Court granted Plaintiffs the relief they requested and issued a permanent injunction in their favor. Doc. 198 at 59. Specifically, the Court concluded "that District 6 of SB8 violates the Equal Protection Clause," and the Court "enjoined" the State "from using SB8 in any future elections." *Id*. at 2; *see also id*. at 59 ("In light of the foregoing, the Court GRANTS PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF. The State of Louisiana is prohibited from using SB8's map of congressional districts for any election."). Barely three months transpired from the time Plaintiffs filed their lawsuit until the Court issued its judgment.

IV.   **Plaintiffs Successfully Defend Their Injunction After Two Rounds of Briefing and Oral Argument in the Supreme Court.**

While the Court enjoined any further use of SB8, it recognized that its work was not yet complete. It noted that it would "hold a status conference to discuss the remedial stage of this trial on May 6, 2024, at 10:30 a.m. CST." Doc. 198 at 59. The day after the Court issued its order, the Robinsons filed an appeal and moved to stay the injunction pending the appeal. Doc. 199 – 201-1.

The next day Plaintiffs responded in opposition. Doc. 203. And the Court denied the motion to stay the next day. Doc. 204. After the status conference, the State also filed a notice of appeal, and the State and Secretary of State filed a joint motion for a stay pending appeal, which the Court denied. Doc. 220 – 223. That same day, May 8, 2024, the Robinsons filed an emergency application for a stay of the injunction in the U.S. Supreme Court. *Robinson v. Callais*, No. 23A994 (U.S.). The State and Secretary of State filed a similar emergency application in the Supreme Court on May 10, 2024. *Landry v. Callais*, No. 23A1002 (U.S.). Plaintiffs filed their response to both emergency applications on May 13, 2024. *Id.*; *Robinson*, No. 23A994. Simultaneously, the Robinsons and Galmons subsequently filed a Motion for Clarification and Reconsideration in this Court on May 9, 2024. Doc. 224. Plaintiffs filed an opposition the very next day. Doc. 225. On May 15, 2024, the Supreme Court granted the applications to stay pending appeal pursuant to *Purcell v. Gonzalez*, 549 U.S. 1 (2006). *Landry*, No. 23A1002; *Robinson*, No. 23A994.

Simultaneously, the Galmons' appeal of the denial of their motion to intervene proceeded in the Fifth Circuit. *Callais v. Landry*, No. 24-30177 (5th Cir.). Specifically, the Galmons filed their brief on April 26, 2024. *Callais*, No. 24-30177 (ECF 67). Plaintiffs filed their response brief on June 17, 2024. *Callais*, No. 24-30177 (ECF 83). The Fifth Circuit dismissed the appeal for lack of jurisdiction on March 27, 2025. *Callais*, No. 24-30177 (ECF 122).

Once past the emergency application stage in the Supreme Court, the parties moved to the jurisdictional statement phase. The State, Robinsons, and Galmons filed their separate jurisdictional statements on July 30, 2024. *Louisiana v. Callais*, No. 24-109 (U.S.); *Robinson v. Callais*, No. 24-110 (U.S.); *Galmon v. Callais*, No. 24-111 (U.S.). Plaintiffs filed three separate motions in response: a motion to dismiss or affirm the State's appeal, a motion to dismiss or affirm the Robinsons' appeal, and a motion to dismiss or affirm the Galmons' appeal. *Louisiana*, No. 24-

7

109; *Robinson*, No. 24-110; *Galmon*, No. 24-111. The Supreme Court granted Plaintiffs' motion to dismiss the Galmons' appeal for want of jurisdiction on October 15, 2024. *Galmon*, No. 24-111. On November 4, 2024, the Supreme Court noted probable jurisdiction over the State's and Robinsons' appeals, consolidated the appeals, and set the case for its first round of merits briefing and oral argument. *Louisiana*, No. 24-109; *Robinson*, No. 24-110. The Galmons moved to intervene, Plaintiffs filed an opposition, and the Supreme Court denied the Galmons' motion. *Louisiana*, No. 24-109. The State and Robinsons (together "Appellants") filed their separate merits briefs on December 19, 2024. *Id*. There were ten amicus briefs filed in support of Appellants. *Id*. Plaintiffs-Appellees filed their brief on January 21, 2025, with only five amicus briefs in support. *Id*. Appellants filed their reply briefs, and the parties participated in oral argument on March 24, 2025. *Id*. Plaintiffs used the same attorneys on appeal; Edward Greim, who was lead counsel at trial, delivered the oral argument at the Supreme Court. *Id*.

On June 27, 2025, the very last day of the Supreme Court's term, the Supreme Court restored the case for a second round of briefing and re-argument in the 2025 term. *Id*. On August 1, 2025, the Supreme Court directed the parties to answer a novel question raised in Plaintiffs-Appellees' first brief when discussing whether the VRA could serve as a compelling interest under the Fourteenth Amendment in this instance—specifically, "[w]hether the State's intentional creation of a second majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U. S. Constitution." *Id*. That question, which had never been previously addressed by the Supreme Court, implicated not only the Supreme Court's Fourteenth Amendment

jurisprudence, as originally briefed by the parties, but also its Fifteenth Amendment and VRA jurisprudence.

The parties proceeded on an expedited timeline. Appellants filed their briefs on August 27, 2025. *Id*. Plaintiffs-Appellees filed their consolidated brief on September 17, 2025. *Id*. Appellants filed replies on October 3, 2025. *Id*. And the parties gave oral argument on October 15, 2025. *Id*. This time there were nineteen amicus briefs filed in favor of Appellants and fifteen filed in favor of Plaintiffs-Appellees. *Id*. And this time, the U.S. Solicitor General weighed in on this important constitutional and statutory question and participated in the oral argument. *Id*. Once again, Plaintiffs appeared by their trial counsel, and Edward Greim delivered the oral argument. *Id*.

On April 29, 2026, almost two years to the date from Plaintiffs' initial victory in this Court, the U.S. Supreme Court affirmed and remanded. *Id*.; *Louisiana v. Callais*, 608 U.S. ___ (2026). In doing so, it concluded that SB8 was an unconstitutional racial gerrymander and upheld this Court's permanent injunction in full. The Court also broke new ground, updating the *Thornburg v. Gingles*, 478 U.S. 30 (1986), factors to account for present day conditions and that Section 2 of the VRA could only serve as a compelling interest to justify a racial gerrymander under the strict scrutiny rubric in very limited circumstances. *Callais*, slip op. at 2-3, 9-11, 17, 26; *see also Allen v. Milligan*, No. 25A1314, 608 U.S. ___, slip op. at 2 (U.S. June 2, 2026) (per curiam) ("In *Louisiana v. Callais*, 608 U. S. ___ (2026), to resolve the tension between vote-dilution claims under §2 of the Voting Rights Act of 1965 and our colorblind Constitution, we updated the standards for §2 liability established by *Thornburg v. Gingles*, 478 U. S. 30 (1986)."). Particularly,

the Court tethered Section 2's remedy to instances of intentional, recent racial discrimination in redistricting, something the Court had refused to do for decades. *Id*. at 23, 26.

As a result of this landmark decision, numerous states across the country—such as Florida, Tennessee, and Alabama—engaged in new redistricting efforts that were previously unavailable to them. And courts across the country vacated prior decisions that prohibited state legislatures, including the Louisiana Legislature in *Nairne v. Landry*, from redistricting according to their policy preferences. *See, e.g.*, *Allen v. Caster*, No. 25-243 (U.S. May 11, 2026) (per curiam) ("The judgment of the United States District Court for the Northern District of Alabama in that case is vacated, and the case is remanded to the United States Court of Appeals for the Eleventh Circuit with instructions to remand to the District Court for further consideration in light of *Louisiana v. Callais*, 608 U. S. ___ (2026). The judgments in No. 25–273 and No. 25–274 are vacated, and the cases are remanded to the United States District Court for the Northern District of Alabama for further consideration in light of *Louisiana v. Callais*, 608 U. S. ___ (2026)."); *Bd. of Elecs. Comm'rs v. NAACP*, No. 25-234 (U.S. May 18, 2026) ("The judgment is vacated, and the case is remanded to the United States District Court for the Southern District of Mississippi for further consideration in light of *Louisiana v. Callais*, 608 U. S. ___ (2026)."); *Turtle Mountain Band v. Howe*, No. 25-253 (U.S. May 18, 2026) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Eighth Circuit for further consideration in light of *Louisiana v. Callais*, 608 U. S. ___ (2026)."); *Nairne v. Landry*, No. 24-30115 (5th Cir. May 7, 2026) (per curiam) (vacating prior opinion and remanding to the district court for consideration in light of *Louisiana v. Callais*). And when the Northern District of Alabama in *Allen v. Milligan* failed to abide by the new standards set forth in *Callais*, the Supreme Court quickly stayed the district court's decision because the State

10

demonstrated that it was likely to succeed on the merits in light of *Callais*. *Allen v. Milligan*, No. 25A1314, 608 U.S. ___, slip op. at 2 (U.S. June 2, 2026) (per curiam).

After the Supreme Court issued the opinion, Plaintiffs immediately filed a motion to expedite the mandate, and over the opposition of the Robinsons, the Supreme Court granted their request and issued the judgment on May 4, 2026. *Louisiana*, No. 24-109.

## V.      The State Enacts a Map that Remedies SB8's District 6 in the Remedial Phase.

This Court issued an order on April 30, 2026, stating that its injunction prohibiting the usage of SB8 in any election remained in effect, affording the State of Louisiana the opportunity to enact a remedial map, and requiring the State to file a brief outlining how it intended to comply with the Supreme Court's opinion and this Court's injunction. Doc. 261.

As the State represented, in response to the Supreme Court's April 29 decision and this Court's April 30 order, "State officials immediately sprung into action." Doc. 271 at 2.

> Hours after this Court issued its April 30 order, the Secretary of State declared an election emergency under Louisiana Revised Statute § 18:401.1(B). . . . And the Governor issued Executive Order JML 26-038 suspending the congressional primaries "until July 15, 2026 or until such time as determined by the Legislature."

*Id*. The Legislature was still in session and was working to repeal SB8 and enact a constitutionally compliant remedial map in accordance with Plaintiffs' hard-won victories in this Court and the Supreme Court. *Id*. at 2-3. As a result of *Callais*, Defendants, who had once racially gerrymandered Plaintiffs, were now "committed to a constitutional congressional election in Louisiana in 2026" and "opened the way for the Legislature to enact a Constitutionally compliant map consistent with the Supreme Court's opinion . . . and this Court's Injunction." *Id*. at 4.

While the Legislature worked to enact a new map, Plaintiffs were still busy defending their victories. Multiple competing actions sprang up in the wake of the Supreme Court's order, challenging this Court's exclusive jurisdiction over the remedy for Plaintiffs' injury. Plaintiffs

11

filed multiple notices of competing actions on May 1, 2026, a response to a motion to intervene from Lauren Jewett on May 6, 2026, and an opposition to the Robinson and Galmon Intervenors motion to stay on May 15, 2026. Doc. 263, 264, 268, 285 – 286-10. Given the Legislature's slow pace to enact a new map and the State's application to stay in May 2024 under the *Purcell* doctrine, Plaintiffs rightly feared that they would be stuck under SB8 once again. So Plaintiffs also filed a response to the State's Brief, a request for a scheduling order, and a response to the Secretary of State's insufficient affidavit to ensure there would be a remedy in advance of the 2026 election. Doc. 279, 294, 300.

Despite its slow timeline, the State eventually passed Act 7, and the Governor signed it into law on May 29, 2026. Doc. 298. Act 7 cures Plaintiffs' racial gerrymandering injury in SB8's District 6.

This Court invited Plaintiffs to file an application for attorneys' fees no later than 21 days after the Court's approval of a remedial plan. Doc. 288. Although that date has not yet come, Plaintiffs file this application now due to the fact that the bulk of their fees were incurred years ago, they have clearly prevailed in a landmark case, at least 11 of the 12 Plaintiffs' racial gerrymandering injuries have been cured, and based on the parties' proposed schedule, this Court will not likely complete the remedial phase of reviewing Act 7 until the early spring of 2027.

**ARGUMENT**

Title 42 United States Code § 1988(b) provides that in any action to enforce a provision of § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." It is well settled that, "under 42 U.S.C. § 1988, a prevailing party may also recover '[a]ll reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone . . . because they are part of the costs normally charged to a fee-

12

paying client.'" *DeLeon v. Abbott*, 687 F. App'x 340, 342 (5th Cir. Apr. 18, 2017) (quoting

*Associated Builders & Contractors of La., Inc. v. Orleans Par. Sch. Bd.*, 919 F.2d 374, 380 (5th

Cir. 1990)).

Plaintiffs were represented by experienced and capable election law and civil rights

litigation counsel, and their fees and costs incurred were reasonable in the context of this case

given that Plaintiffs achieved complete success on all claims. Thus, they are entitled to recover all

of their attorneys' fees and costs reasonably incurred during this litigation.

## I.      Plaintiffs Are the Prevailing Parties.[1]

Plaintiffs are the prevailing parties under 42 U.S.C. § 1988(b). To qualify as a prevailing

party, "a court must conclusively resolve a claim by granting enduring judicial relief on the merits

that materially alters the legal relationship between the parties." *Lackey v. Stinnie*, 604 U.S. 192,

203-04 (2025) (asterisk omitted). A prevailing party is "the party ultimately prevailing when the

matter is finally set at rest." *Id.* (cleaned up) (quoting Black's Law Dictionary 1352). The Fifth

Circuit has established three indicators of prevailing party status: "(1) the plaintiff must achieve

judicially-sanctioned relief, (2) the relief must materially alter the legal relationship between the

parties, and (3) the relief must modify the defendant's behavior in a way that directly benefits the

plaintiff at the time the relief is entered." *Veasey v. Abbott*, 13 F.4th 362, 368 (5th Cir. 2021)

(quotation omitted). A plaintiff can meet these requirements even if there is no "final judgment in

its favor" and even if the plaintiff does not succeed on "the central claim of the case," so long as

the plaintiff's success is not "purely technical or de minimis." *Id.* (quotation omitted). Plaintiffs

may be prevailing parties "by succeeding on any significant issue in litigation which achieves some

of the benefit the parties sought in bringing suit." *Id.* (quotation omitted). And plaintiffs may

---

[1] Plaintiffs' counsel consulted with counsel for the State and Secretary of State, the parties responsible for paying any award. Counsel for the State and Secretary of State oppose.

obtain attorneys' fees prior to "the conclusion of the case"; "a prevailing party is simply one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." *Id.* at 368-69 (quotation omitted).

Plaintiffs challenged SB8 District 6 as an unconstitutional racial gerrymander. They sought and received a permanent injunction and final judgment on the merits from this Court, which was affirmed by the Supreme Court. Doc. 198; *Louisiana v. Callais*, 608 U.S. ___ (2026). Those judgments forbade the State from using SB8 in any election, requiring a new map. As a result, the State repealed SB8 and enacted a new map that eliminated the racially gerrymandered District 6, ending the constitutional injury for 11 of the 12 Plaintiffs and hundreds of thousands of voters. Those judgments were judicially sanctioned relief that altered the relationship between the parties and modified the State's behavior to directly benefit Plaintiffs. *Veasey*, 13 F.4th at 368-70 (holding plaintiffs were the prevailing parties because they obtained an "interim order [that] prohibited the State from enforcing [an election law] and permitted Plaintiffs to vote without" complying with that election law). This makes Plaintiffs the prevailing parties under § 1988. *Id*. at 368-70.

II.    **Plaintiffs Should Be Awarded $2,237,151.09 for Their Reasonable Attorneys' Fees and Expenses and an Upward Adjustment of 20% for Their Fees.**

Under § 1988, a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *see also Nat'l Coalition for Students with Disabilities v. Bush*, 173 F. Supp. 2d 1272, 1276 (N.D. Fla. 2001) ("Although these attorney's fee provisions speak in discretionary terms, a prevailing plaintiff ordinarily is entitled to an award of fees, unless special circumstances would render such an award unjust." (citing *Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402 (1968); *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 543 (5th Cir. 1980))).

14

To determine appropriate fees under § 1988, a "district court should begin by calculating the lodestar: the reasonable hours expended multiplied by a reasonable rate." *Combs v. City of Huntington, Tex.*, 829 F.3d 388, 394 (5th Cir. 2016). This lodestar "provides an objective basis on which to make an initial estimate of the value" of an attorney's services. *Hensley*, 461 U.S. at 433. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on [the] litigation." *Id.* at 435.

"The district court may then determine whether any other considerations counsel in favor of enhancing or decreasing the lodestar." *Combs*, 829 F.3d at 394-95. The base figure of a lodestar calculation should be adjusted upward "where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554-55 (2010). "There is no precise rule or formula" for making such determinations. *Hensley*, 461 U.S. at 436. District courts in the Fifth Circuit look to the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), for guidance. *Combs*, 829 F.3d at 393-95.

### A. The hours spent by Plaintiffs' attorneys were reasonable given the nature and complexity of this litigation.

This Court must begin with the lodestar—specifically, the number of hours reasonably expended. Redistricting litigation generally is complex and requires a deep knowledge of the massive corpus of redistricting caselaw interpreting the Fourteenth Amendment, Fifteenth Amendment, and VRA as well as an understanding of the original and amended VRA and its legislative history. But the work that went into this case far exceeded the norm for redistricting litigation. Plaintiffs' counsel had to first understand the years-long litigation that preceded SB8 in *Robinson v. Ardoin* in the Middle District of Louisiana, including the massive record in that case and the various court opinions, and the legislative history for HB1. Plaintiffs' counsel then had to

15

quickly digest the entire week-long legislative record for SB8. Plaintiffs' counsel filed an extensive complaint and motion for preliminary injunction, conducted discovery, and prepared for trial, all while swatting down the various motions of the Robinsons and Galmons, and facing off against three separately represented sets of defendants and their legions of attorneys. And then after Plaintiffs' counsel went to trial and secured a sweeping victory in this Court, they had to fight through four rounds of briefing in the U.S. Supreme Court (again against multiple sets of defendants and their numerous attorneys) and one round of briefing in the Fifth Circuit against the Galmons, all to ensure that their clients could simply vote under a constitutional map by 2026. The Supreme Court itself acknowledged the unique and difficult nature of this case when it called for supplemental briefing on an issue Plaintiffs' counsel flagged in their initial brief. The Supreme Court recognized that this case uniquely sat at the junction of various fault lines running through its existing Fourteenth Amendment, Fifteenth Amendment, and VRA jurisprudence and used this case as a vehicle to reshape redistricting law.

In addition, Plaintiffs' counsel maintained sufficiently detailed and contemporaneous time records and reviewed such time records before submitting bills. Further, as addressed in his declaration, Attorney Edward Greim regularly monitored the work performed in this matter and where appropriate, eliminated entries that were redundant or excessive, such that Plaintiffs were only billed for time that was reasonable and necessary for the success of this litigation. *See* Ex. A, Greim Dec. ¶¶ 9-11. A second round of cuts was made for this application. *Id*. ¶ 12.

Moreover, "[p]laintiff's counsel . . . is not required to record in great detail how each minute of his time was expended." *Hensley*, 461 U.S. at 437 n.12. Rather, "counsel should identify the general subject matter of his time expenditures." *Id.* Counsel need only submit "records containing the date, the number of hours spent (calculated to a tenth of an hour), and a short but thorough

16

description of the services rendered." *LULAC*, 119 F.3d at 1233. Courts must be "mindful that practical considerations of the daily practice of law in this day and age preclude 'writing a book' to describe in excruciating detail the professional services rendered for each hour or fraction of an hour" and "that, in this era of computerized timekeeping, many data processing programs limit the amount of input for any given hourly or daily entry." *Id*. (quotation omitted). The hours charged by Plaintiffs' counsel clearly comported with these requirements.

### B. The rates charged by Plaintiffs' attorneys are reasonable given their specialized experience in election law and constitutional litigation.

Once the Court determines the reasonableness of the hours requested by Plaintiffs, the next step in the lodestar analysis is to determine "[t]he reasonable hourly rate," which "is based on the 'prevailing market rates in the relevant community.'" *LULAC v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1234 (5th Cir. 1997) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). So long as an attorney's rate "is within the range of hourly fees in the prevailing market, that rate should be considered in setting a reasonable hourly rate." *Id.* (citation omitted). Fee awards must "encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." *City of Riverside v. Rivera*, 477 U.S. 561, 578 (1986). So, for example, "[a]n attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience." *Johnson*, 488 F.2d at 719.

The chart attached to Edward Greim's Declaration (Exhibit A) as Exhibit 2 displays a breakdown of the number of hours worked by each legal professional at Graves Garrett Greim,

17

LLC ("GGG"), the rates billed to Plaintiffs, and the total amount Plaintiffs seek for each legal professional at GGG.

Given the complexity of the issues involved in constitutional and civil rights litigation such as this, clients regularly pay GGG these rates to benefit from GGG's knowledge and experience in this area. *See* Greim Dec., Ex. A. Moreover, under Fifth Circuit precedent, these rates are entirely reasonable, given GGG's expertise. *See Johnson*, 488 F.2d at 719.

Plaintiffs incurred fees amounting to $271,533.75 for services performed by local co-counsel Paul Hurd—who also has extensive experience in redistricting litigation, particularly in Louisiana, where he served as co-counsel in *Hays v. Louisiana* in the 1990s. *See* Ex. B, Hurd Dec. ¶ 12. Mr. Hurd billed 572.55 hours at a rate of $425 per hour, for a total of $271,533.75. *Id.* ¶¶ 13, 26. The fees incurred for the services of Mr. Hurd are reasonable in time and amount. *See* Ex. A, Greim Dec. ¶ 32; Ex. B, Hurd Dec. ¶¶ 13-16. Based on the subject matter involved, the demands of the case, and the prevailing rates in Louisiana, the fees Plaintiffs seek are reasonable. Attorney Hurd's declaration likewise attests that the fees Plaintiffs seek are reasonable. *See* Ex. B, Hurd Dec. ¶¶ 19-24.

These rates are in the approximate range, adjusted for inflation, that other courts in the Fifth Circuit have found reasonable for similarly experienced attorneys in complex redistricting litigation. *See, e.g.*, Order at 12-14, 18, *Perez*, No. SA-11-CV-360-OLG (June 11, 2025) (ECF 1737) (stating that rate of $850/hour for three separate attorneys representing one group of plaintiffs was reasonable); *Perez v. Texas*, No. SA-11-CV-360-OLG, 2025 WL 3732018, at *5 (W.D. Tex. Dec. 8, 2025) (finding rates of Texas Latino Redistricting Task Force reasonable); Texas Latino Redistricting Task Force, et al., Plaintiffs' Motion for Reasonable Attorney's Fees and Costs and Memorandum in Support at 23, *Perez*, No. SA-11-CV-360-OLG (Oct. 1, 2021)

18

(ECF 1697) (stating that rates were $830 for lead counsel and $750 for law firm partner); Order at 12-14, 18, *Perez*, No. SA-11-CV-360-OLG (June 11, 2025) (ECF 1737) (stating that rate of $850/hour for three separate attorneys representing one group of plaintiffs was reasonable).

Finally, even if these rates are on the higher end of typical rates charged in Louisiana, these rates are permissible, given the higher rates in out-of-state markets and the national stakes of this case. While courts usually look to the local market to determine a reasonable fee, the Court can calculate the lodestar based on an out-of-state market if the use of out-of-state counsel was necessary. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 382 (5th Cir. 2011) (holding that where out-of-State counsel was necessary, the out-of-State counsel's "'home' rates should be considered as a starting point for the calculating the lodestar"). While Plaintiffs engaged Paul Hurd, a Louisiana attorney, Mr. Hurd is a solo practitioner and therefore would not have the ability on his own to litigate this complex case against dozens of opposing counsel, which included an expedited trial and two rounds of briefing and oral argument at the Supreme Court, without outside assistance. *Cf. id.* All other parties (including the State, Secretary of State, Robinson Intervenors, and Galmon Intervenors) also engaged out-of-State and outside counsel (and for the Robinson and Galmon Intervenors, numerous out-of-State legal entities), further proving the necessity of out-of-State counsel in this case.  Therefore, because out-of-State counsel GGG's "home" market is Kansas City, Missouri, and GGG's rates reflect the typical rates for that market, the Court can alternatively consider that market as the starting point for the lodestar. These rates are very reasonable for that market.[2] Ex. A, Greim Dec. ¶ 16.

---

[2] For example, in *Lawson v. Spirit Aerosystems*, No. 18-1100-EFM-ADM, 2020 U.S. Dist. LEXIS 201538, at *55 (D. Kan. Oct. 29, 2020). The court found that $625 for a partner and $350 for an associate were reasonable hourly rates based on commensuration with top-tier litigation rates in the Kansas City market. *Id*. at *55. Those rates come out to $804.38 and $450.45 in May 2026 according to the U.S. Bureau of Labor Statistics Inflation Calculator, available at

19

This case was vigorously and successfully litigated. Based on the subject matter involved, the demands of the case, and the prevailing rates in the Louisiana market and nationwide, the fees Plaintiffs seek are reasonable.

### C.  Plaintiffs are entitled to an upward adjustment based on the *Johnson* factors.

Even after the Court calculates the lodestar, it can enhance the fee award based on the factors elucidated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), by 20%. *See Combs*, 829 F.3d at 393-95. "*Johnson* recognizes the common sense proposition that easier and more routine cases take less time to prepare than do cases that present novel questions." *LULAC*, 119 F.3d at 1233 n.3 (citing *Johnson*, 488 F.2d at 717-18). The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues in the case; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Combs*, 829 F.3d at 391 n.1 (citing *Johnson*, 488 F.2d at 717-19). Among the factors, "the court should give special heed to the time and labor involved, the customary fee, the amount involved and result obtained, and the experience, reputation and ability of counsel." *Hubert v. Curren*, No. 18-7669, 2018 WL 4963595, at *2 (E.D. La. Oct. 15, 2018). "The Supreme Court has barred any

---

https://perma.cc/U58L-8XCC. Likewise, in *Rogers v. Kijakazi*, No. 19-1134-JWL, 2022 U.S. Dist. LEXIS 226180 (D. Kan. Dec. 15, 2022), the court found a contingency fee which came out to an hourly rate of $809.07 to be reasonable based upon the success of the litigation and the skill, competence, expertise, and experience of the attorney, who, at the time, had 10 years of experience in the field.

use of the sixth factor." *Walker v. U.S. Dept. of Hous. & Urb. Dev.*, 99 F.3d 761, 772 (5th Cir. 1996) (footnote omitted).

### 1. Time and labor

First, Plaintiffs' victory required significant time and labor. The leadup to trial in this Court stretched Plaintiffs' small legal team to the limit. They had to pour through the voluminous record in *Robinson* and SB8's extensive legislative record to file their challenge just days after SB8 was passed. They fought against dozens of motions from Defendants on issues ranging from jurisdiction and transfer to discovery and expert reports to intervention to reschedule or continue trial—and of course, the merits of the case. They gathered expert testimony, numerous exhibits, and combed through legislative transcripts for evidence to support their claims. They did so while outnumbered 35 to 5 by counsel for Defendants. And they did so in just over two months from filing to trial and then continued to brief this Court until its judgment in late April 2024.

Even after this Court determined that Plaintiffs were entitled to a permanent injunction, Plaintiffs were forced to suffer under the irreparable harm of a racially gerrymandered map for two years while their attorneys fought through four rounds of briefing (first for the emergency application, then for the jurisdictional statements, and twice on the merits) against multiple briefs (the State, Robinsons, and Galmons all filed separate briefs at each stage, and Plaintiffs had to file separate or consolidated briefs in response) and two rounds of oral argument in the Supreme Court. There they were also outnumbered, not only by attorneys, but also by *amici*. And all the while Plaintiffs were fending off the Galmons in the Fifth Circuit. This case had so many moving parts and developed at such a rapid pace that Plaintiffs' attorneys had to work expeditiously every step of the way to ensure a constitutional remedy for their clients.

### 2. Novelty and difficulty of issues in the case

21

This case also stands out due to the novelty and difficulty of the issues presented. Redistricting litigation is notoriously difficult. And this case was far more novel and difficult than the typical redistricting case. This case involved an appeal to the Supreme Court that lasted for almost two years. And the case was so unique and complicated that the Supreme Court called the parties back for a second round of briefing and re-argument on a new constitutional question presented—which the Supreme Court only does "[i]n rare instances." *United States v. Sineneng-Smith*, 590 U.S. 371, 381 (2020) (citing two cases in five years, neither of which implicated redistricting). And often when the Supreme Court has ordered supplemental briefing on a constitutional rather than jurisdictional issue, it is because the case is groundbreaking. *See, e.g.*, *Citizens United v. Fed. Elec. Comm'n*, No. 08-205 (U.S. June 29, 2009) (ordering supplemental briefing and re-argument on broader First Amendment question); *Johnson v. United States*, 574 U.S. 1069 (2015) (ordering supplemental briefing and re-argument on broader question of whether Armed Career Criminal Act's residual clause is unconstitutionally vague); *Kennedy v. Braidwood Mgmt., Inc.*, No. 24-316 (U.S. Apr. 24, 2025) (ordering supplemental letter briefs on broader Article II Appointments Clause question but not re-argument).

And the Supreme Court used *Louisiana v. Callais* to repair the very foundations of its Fourteenth Amendment, Fifteenth Amendment, and VRA jurisprudence. For example, the Court overhauled the *Gingles* framework—a super-precedent which has governed voting rights litigation for the past 40 years—through sweeping updates that rightly make it significantly harder for Section 2 plaintiffs to prosecute their claims. *Callais*, slip op. at 26; *id*. at 47-48, 67, 77 (Kagan, J., dissenting) (noting the majority opinion "transforms" *Gingles* and imposes *"new Callais* requirements"). And the Court made these changes notwithstanding its refusal to do so just three years earlier in *Allen v. Milligan*, 599 U.S. 1 (2023). As the dissent put it, given the recency of

22

*Allen*, this case was "surely the hardest" of the Court's recent redistricting decisions, including *Shelby County v. Holder*, 570 U.S. 529 (2013). *Callais*, slip op. at 49 (Kagan, J., dissenting).

Moreover, at the heart of this case was how to reconcile the longstanding, fraught "tension between §2 and the Constitution"—a tension that developed due to lower court interpretations and Supreme Court precedent, including as recent as *Allen*. *Id*. at 1 ("Section 2 of the Voting Rights Act of 1965, 52 U. S. C. §10301 et seq., was designed to enforce the Constitution— not collide with it. Unfortunately, lower courts have sometimes applied this Court's §2 precedents in a way that forces States to engage in the very race-based discrimination that the Constitution forbids."); *id*. at 2 (noting parties rightly identified "problems in the existing body of §2 caselaw" from Supreme Court). Also at the heart of this case was a tension between the Fourteenth Amendment racial gerrymandering cases and the Supreme Court's other Fourteenth Amendment precedents, such as *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), in the affirmative action context. *Callais*, slip op. at 2, 8-9, 17-19.

To resolve these two tensions, the Court used the case to decide whether Section 2 could serve as a compelling interest for racial gerrymandering under the Fourteenth Amendment, a complex issue the Court has long assumed but never decided since it issued *Miller v. Johnson*, 509 U.S. 630 (1993), over thirty years ago. *Callais*, slip op. at 2-3, 9-11, 17. As the Court put it, the supplemental question presented "necessarily implicated the correctness of our longstanding assumption that compliance with the Voting Rights Act may justify what the Constitution generally condemns: the use of race as a basis for government action." *Id*. at 17. As a result, Plaintiffs had to understand the vast corpus of Fourteenth Amendment, Fifteenth Amendment, and VRA caselaw, as well as the legislative history of the VRA and the 1982 amendments. These tensions and precedential landmines made this a difficult and novel case from start to finish.

23

Finally, the issues in this case were particularly challenging to navigate because Plaintiffs' counsel had to understand the record and arguments in not one case but two. Because the State enacted SB8 in response to the *Robinson* lawsuit (Doc. 198 at 1-2; *Callais*, slip op. at 13, 33), Plaintiffs' success in this case required a fulsome understanding of *Robinson*'s years-long history and record as well as their own. *See Callais*, slip op. at 12-16, 33-35 (relying on record in *Robinson* as background and to determine whether State had a compelling interest in enacting SB8); *id.* at 66 (Kagan, J., dissenting) (noting that *Robinson*'s record was "voluminous" and included "mountains of statistical data and five days of testimony").

### 3. The skill requisite to perform the legal services properly

Due to this matter's complexity, novelty, time, and labor as outlined above, this case required highly specialized knowledge from Plaintiffs' attorneys. In fact, all parties, including the State, Secretary of State, Robinsons, and Galmons, relied on out-of-state counsel and outside counsel to litigate the case. The Robinsons alone relied on no less than 24 attorneys from seven different entities. Those attorneys (alongside the Harvard Election Law Clinic) coupled with seven attorneys for the State (Doc. 176 at 4-5, missing Morgan Brungard) and the four attorneys for the Secretary of State (Doc. 193 at 1-2), meant counsel for Defendants significantly overwhelmed Plaintiffs' five-attorney trial team. Even excluding the Galmons and their eight attorneys (Doc. 197 at 19), by the time of trial, Plaintiffs were outnumbered 3 to 1 by party, and Plaintiffs' counsel were now outnumbered 35-5, with Defendants' counsel spilling over tables on their side of the courtroom, tables on Plaintiffs' side of the courtroom, and the courtroom gallery.

Moreover, Plaintiffs' counsel had no small task given the competing interests of Defendants and the recent litigation between the State and Robinsons. Plaintiffs' counsel had to respond to different, and often conflicting, motions and briefs from these different Defendants beginning at the trial level and continuing all the way up to the Supreme Court. For example, in

24

round 1 of merits briefing at the Supreme Court, the State alongside the Robinsons refused to admit

that SB8 was a racial gerrymander, but the State, unlike the Robinsons, refused to admit that the

VRA required it to draw SB8. But when round 2 came, the State readily admitted that it engaged

in racial gerrymandering, although its position still differed from Plaintiffs'. Specifically, the State

pressed that the VRA was wholesale unconstitutional (and that if this were incorrect, Plaintiffs

should still lose and this Court should still be reversed), while Plaintiffs argued that the VRA could

be constitutionally applied in some instances, and the Robinsons stuck to their original position.

These shifting dynamics and arguments required a high level of skill and understanding of the deep

wealth of caselaw, VRA statute and history, and record.

### 4. *The preclusion of other employment by the attorney due to acceptance of the case.*

Moreover, "[t]here was an extensive amount of legal research and analysis over a long

period of time with extremely compressed deadlines which precluded [the attorneys'] ability to

accept other work." *Perez*, 2025 WL 3732018, at *5. As stated in Mr. Greim's declaration, given

the small size of GGG, which employs 15 attorneys at present, the case was a massive undertaking,

precluded the firm's acceptance of other employment, and required deft deployment of and

division of labor among attorneys. Ex. A, Greim Dec. ¶ 30.

### 5. *The customary fee charged for those services in the relevant community.*

As previously discussed, courts in the Fifth Circuit have affirmed fee awards of voting

rights attorneys that include rates as high as $850/hour, a rate that far exceeds the one charged by

Plaintiffs' counsel. Order at 12-14, 18, *Perez*, No. SA-11-CV-360-OLG (June 11, 2025) (ECF

1737) (stating that rate of $850/hour for three separate attorneys representing one group of

plaintiffs was reasonable); *see also Perez*, 2025 WL 3732018, at *5 (stating rate of $830/hour was

reasonable). Similarly, in 2020, NAACP attorneys, like those representing the Robinsons in this

case, received up to $600/hour in an award approved by the Fifth Circuit. *Veasey v. Abbott*, No. 2:13-CV-193, 2020 WL 9888360, at *31-*32 (S.D. Tex. May 27, 2020), *affirmed* 13 F.4th at 371. When adjusted for inflation, that rate is $784.24 in May 2026. *CPI Inflation Calculator*, U.S. BUREAU OF LAB. STAT., https://perma.cc/U58L-8XCC. The customary fee to obtain experienced counsel given the national importance of this case and the two appeals in the U.S. Supreme Court weigh in favor of a higher award. *Cf.* Order at 15, *Perez*, No. SA-11-CV-360-OLG (June 11, 2025) (ECF 1737) (noting that "the unusual complexity of the case, the time constraints involved, and the unique skills and expertise needed to handle this litigation, which is significantly more complex than the ordinary case in the San Antonio legal market" all justified a higher award); Order at 12, *Perez*, No. SA-11-CV-360-OLG (Oct. 9, 2025) (ECF 1746) ("Plaintiffs' attorneys are highly skill and uniquely qualified to prosecute this type of litigation. . . . It would be unusual for their hourly rates to match those commanded by the average lawyer in San Antonio. Likewise, it would be unusual for the rates requested in this litigation to mirror those requested by counsel in other cases.").

During the course of redistricting litigation over the past few years, the State of Louisiana has also relied on outside counsel. Reports indicate that attorneys at outside firms charged as much as $915/hour for their redistricting work. Meghan Friedman & James Finn, *Louisiana's legal fight against new Black voting districts cost millions. See how much.*, THE ADVOCATE (Jul. 3, 2024), https://perma.cc/6E9Z-J6KX. And the State paid other attorneys $750/hour in another context to review Louisiana policies. Greg Larose, *Here's what Louisiana will pay a law firm to review state police policy*, LA. ILLUMINATOR (Jan. 14, 2024), https://lailluminator.com/2024/01/14/heres-what-louisiana-will-pay-a-law-firm-to-review-state-police-policy/.

26

While the State of Louisiana does not publicly list the rates charged by specific attorneys, it does provide yearly totals. The State, particularly the Attorney General's Office, has utilized the private law firm, Holtzman Vogel Josefiak Torchinsky PLLC, in addition to its own attorneys. In one year alone, from July 1, 2023 to June 30, 2024, the State paid Holtzman Vogel $470,000 for legal services relating to "Voting Rights." Taylor F. Barras, Comm'r of Admin., Div. of Admin., *State of Louisiana Office of State Procurement, Professional Service Contracts Fiscal Year 2023-2024 Annual Report: Professional, Personal, Consulting and Social Services* 40, https://perma.cc/NJ83-7VH8. For the following year, that number climbed to $750,000. Taylor F. Barras, Comm'r of Admin., Div. of Admin., *State of Louisiana Office of State Procurement, Professional Service Contracts Fiscal Year 2024-2025 Annual Report: Professional, Personal, Consulting and Social Services* 27, https://perma.cc/LN44-R9M8. From July 1, 2022 to June 30, 2025, Holtzman Vogel charged $1,500,000 to the Office of the Attorney General for legal services relating to "Voting Rights." *Id*. at 99.

Likewise, the Secretary of State's counsel in this matter, Nelson Mullins Riley & Scarborough and Shows, Cali & Walsh LLP, received $800,000 and $550,000, respectively, for the 2024-25 fiscal year. *Id*. at 98.

### 6. *Time limitations imposed by the client or the circumstances.*

As previously stated, this case had significant time limitations and pressures, given the Legislature's swift passage of SB8 during an election year and the election deadlines for 2024 and 2026. The Middle District afforded the Legislature an opportunity to draw a new map on January 5, 2024, the Governor called the Special Session on January 8, the Legislature convened on January 15, and the Governor signed SB8 into law by January 22. By the end of the month, January 31, 2024, Plaintiffs had their lawsuit on file, and a week later, they had their preliminary injunction on file. These quick maneuvers required review of the week-long legislative record in advance and

27

an understanding of the entire *Robinson v. Ardoin* case, which had been percolating for years. Plaintiffs responded to multiple motions—including a motion to transfer, motions to intervene, a motion to strike their expert, a motion in limine, multiple motions to reconsider, a motion to continue trial, and motions to stay—and responses from multiple Defendants to Plaintiffs' motions within a matter of days, sometimes the very next day. Plaintiffs conducted discovery within a matter of weeks, responded to the discovery requests of other parties, and prosecuted their claims at trial with multiple expert and fact witnesses and dozens of exhibits just over two months after they first filed. Then after trial, Plaintiffs filed a substantive post-trial brief on an expedited timeline.

Even after this Court's judgment in their favor, Plaintiffs' counsel still had to quickly respond to the Defendants' motions to stay in this Court and the U.S. Supreme Court. Up until the Supreme Court's stay of the case and imposition of a normal briefing schedule, this case required breakneck work at every turn. And again, Plaintiffs faced significant time pressures and constraints in responding to multiple briefs during four rounds of briefing at the Supreme Court and the Galmons' appeal in the Fifth Circuit. And then when the Supreme Court finally issued its opinion on April 29, 2026, Plaintiffs moved expeditiously and filed multiple motions (including an application to expedite the mandate that very day in the Supreme Court and motions in this Court) to ensure they had a remedy in advance of the 2026 election before the *Purcell* clock ran out.

### 7.   *The results obtained*

Furthermore, the results Plaintiffs' counsel obtained for their clients in this litigation speak for themselves. This Court granted Plaintiffs' request for a permanent injunction in full. Doc. 198 at 59 ("In light of the foregoing, the Court GRANTS PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF. The State of Louisiana is prohibited from using SB8's map of congressional districts for any election."). And the Supreme Court wholly affirmed that injunction. *Callais*, slip op. at 36.

28

Plaintiffs received the exact relief they sought. Moreover, as a result of Plaintiffs' successful action, the State repealed SB8 and enacted Act 7 for use in the 2026 election, which fully cures the racial gerrymander in SB8's District 6. *Cf. Veasey*, 13 F.4th at 368.

### 8.    *The experience, reputation, and ability of the attorneys*

"An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience." *Johnson*, 488 F.2d at 719. Here, as outlined in the affidavits of Mr. Greim and Mr. Hurd, all attorneys have significant qualifications and relevant experience. Ex. A, Greim Dec. ¶¶ 2-9, 18-23; Ex. B, Hurd Dec. ¶¶ 12-14, 19-24. Given their credentials and talent, they are entitled to an award enhancement.

### 9.    *Undesirability of the case*

Courts have long recognized that "[c]ivil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant." *Johnson*, 488 F.2d at 719 (citing *NAACP v. Button*, 371 U.S. 415, 443 (1963)); *Sanders v. Russell*, 401 F.2d 241 (5th Cir. 1968). "Oftentimes his decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries." *Johnson*, 488 F.2d at 719. Such was the case here.

And even more so than other redistricting cases, this case was especially undesirable given the criticism Plaintiffs and their counsel faced from both sides of the aisle. Ex. A, Greim Dec. ¶ 31. After years of contentious litigation, Louisiana's Republican state leaders and Robinsons and Galmons finally agreed on one thing: SB8. As a result, SB8 received largely bipartisan support in the Legislature and swiftly passed. But this coalescence around SB8 was entirely upended by Plaintiffs and their counsel's lawsuit, which correctly identified the constitutional problems with the law. Even though Plaintiffs and their counsel made the right call, as this Court held and the

29

Supreme Court affirmed, they faced heavy backlash in the press, from the public, and even from allies from the beginning of the case until today. Ex. A, Greim Dec. ¶ 31.

### 10. Awards in similar cases

Awards in similar, recent voting rights cases in the Fifth Circuit also support enhancement. For example, in *Perez v. Texas*, a recent VRA redistricting within the Fifth Circuit, the Court awarded one set of plaintiffs $2,890,956.90 in attorneys' fees. 2025 WL 3732018, at *6. Another set of plaintiffs received $2,750,869.50 in fees, with over $1.8 million for one attorney's work alone. Order, Perez, No. 5:11-CV-00360-OLG (S.D. Tex. June 11, 2025) (ECF 1737). Likewise, in *Veasey v. Abbott*, plaintiffs received $6.79 million for their victory in a voting rights challenge, which included $2,311,158.61 for one set of plaintiffs, $2,433,587.34 for plaintiffs represented by the NAACP, $1,914,863.22 for another set of plaintiffs, $1,004,353.30 for another, and $220,269.29 for the last set. 2020 WL 9888360, at *48, *affirmed* 13 F.4th at 371.

Similarly, in *Caster v. Allen*, a parallel redistricting case just two states away, the parties agreed "that the State of Alabama shall pay to counsel for the *Caster* plaintiffs the sum of $2,250,000 (two million two hundred and fifty thousand dollars) in satisfaction of all claims for costs and attorneys' fees related to this Court's preliminary injunction entered on January 24, 2022, Doc. 101, the appeal of that order, *see Allen v. Milligan*, 599 U.S. 1 (2023), and the proceedings that followed in which the 2023 Plan was preliminarily enjoined and the court-drawn map was created and approved." Unopposed Motion for Entry of Order Concerning Costs and Attorneys' Fees at 1-2, *Caster v. Allen*, No. 2:21-cv-01536-AMM (N.D. Ala. July 15, 2024) (ECF 292). The Court entered this award. Order, *Caster* (July 30, 2024) (ECF 297).

And in *Milligan v. Allen*, which was consolidated with *Caster*, the parties agreed that "the State of Alabama shall pay to counsel for the Milligan plaintiffs the sum of $3,000,000 (three

30

million dollars) in satisfaction of all claims for costs and attorneys' fees related to this Court's preliminary injunction entered on January 24, 2022, Doc. 107, the appeal of that order, *see Allen v. Milligan*, 599 U.S. 1 (2023), and the proceedings that followed in which the 2023 Plan was preliminarily enjoined and the court-drawn map was created and approved." Unopposed Motion for Entry of Order Concerning Costs and Attorneys' Fees at 1-2, *Milligan v. Allen*, No. 2:21-cv-01530-AMM (N.D. Ala. July 30, 2024) (ECF 379). The Court also entered this award. Order, *Milligan* (Aug. 7, 2024) (ECF 383).

So in total, the State of Alabama agreed to settle the claims for well over $5 million. Plaintiffs' attorneys' fees, in actuality, surely would have exceeded that settlement. Notably, in these consolidated cases, the parties only went to the U.S. Supreme Court for *one* round of merits briefing and oral argument before the district court entered the interim fee award. *Id*. at 5-6; Order at 5-6, *Caster* (July 30, 2024) (ECF 297).

### D.  Plaintiffs' expenses incurred are reasonable and should be awarded to them.

Plaintiffs reasonably incurred $148,298.34 in expenses required by this litigation and are entitled to recover those expenses under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

### 1.  Plaintiffs' taxable costs under FRCP 54

Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "A district court has wide discretion whether to award costs to the prevailing party." *Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471, 483 (5th Cir. 2006) (citation omitted) (Stewart, J.). But the Fifth Circuit "recognizes a strong presumption that the district court will likely do so." *Id*. (quotation omitted). As such, "if the court does not award costs to the prevailing party," it must "state its reasons." *Id*. (quotation

31

omitted). Because Plaintiffs are the prevailing parties, as explained above, this Court should award taxable costs, in the amount of $78,845.29.

As outlined in Plaintiffs' attached bill of costs, *see* Ex. C, those amounts include  $1,111.25 in fees of the Clerk; $1,069.83 in fees for service; $33,343.40 in fees for printed or electronically recorded transcripts necessarily obtained for use in the case; $32,927.45 in fees and disbursements for printing; $4,271.66 in expenses for witnesses; and $6,121.70 in fees for copies for necessary use in the case. The itemized bills and spreadsheet attached to the Greim Declaration corroborate these amounts. *See* Ex. A, Exhibits 1, 3, 4. These are all taxable costs under 28 U.S.C. § 1920.

### 2.  *Plaintiffs' non-taxable costs and expenses*

Plaintiffs can recover all other costs under 42 U.S.C. § 1988. *Id.* § 1988(b) (allowing for award of "a reasonable attorney's fee as part of the costs" to the prevailing party). It is well settled that "[a]ll reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone, are plainly recoverable in section 1988 fee awards because they are part of the costs normally charged to a fee-paying client." *Associated Builders & Contractors of La., Inc.*, 919 F.2d at 379 (citation omitted). Plaintiffs' non-taxable expenses amount to $69,453.05 and fall into 3 primary categories: travel, legal research, and miscellaneous.

Plaintiffs incurred $32,131.44 for travel-related expenses. Travel-related expenses include travel to and from Shreveport, Louisiana, subsistence, and lodging for the trial on April 8 to April 10, 2024. They also include travel to and from Washington, D.C., subsistence, and lodging in February 2025 for four attorneys (Edward Greim, Paul Hurd, Jackson Tyler, and Katherine Mitra) to attend an oral argument before the Supreme Court in preparation for oral argument before the Supreme Court in March 2025. And they include travel to and from Washington, D.C., subsistence, and lodging in March 2025 for three attorneys (Edward Greim, Paul Hurd, and Katherine Mitra)

32

to participate in a moot court of attorney Edward Greim before his oral argument. This travel was imperative to prepare for that oral argument. These expenses also include travel to and from Washington, D.C., subsistence, and lodging in March 2025 for four attorneys (Edward Greim, Paul Hurd, Jackson Tyler, and Katherine Mitra) to participate in the first oral argument before the Supreme Court. They include travel to and from Washington, D.C., subsistence, and lodging in October 2025 for three attorneys (Edward Greim, Paul Hurd, and Matthew Mueller) to participate in a moot court in preparation for the second oral argument before the Supreme Court. Likewise, this travel was absolutely necessary for Plaintiffs' success in that second oral argument. These expenses include travel to and from Washington, D.C., subsistence, and lodging in October 2025 for four attorneys (Edward Greim, Paul Hurd, Matthew Mueller, and Katherine Mitra) to participate in the second oral argument before the Supreme Court. Finally, travel included trips for Paul Hurd within the State of Louisiana to visit the courtroom in Shreveport in advance of the April 2024 trial to understand the capacities of the courtroom, to interview a potential witness in May 2024, and to attend legislative hearings on Act 7 in May 2026. All of these trips were essential to Plaintiffs' victory in the case and assurance of a remedy for the 2026 election. Where they could, Plaintiffs' counsel conducted moot courts, depositions, and conferences via zoom or by telephone.

Plaintiffs incurred $17,911.89 in legal research costs, consisting of fees charged by Westlaw and LexisNexis for legal research and fees assessed by PACER to access court dockets in this case and other cases whose filings were relevant to the litigation here. These are recoverable under 42 U.S.C. § 1988. *See Whitney Nat'l Bank v. Boylston*, No. 09-0059, 2011 WL 13377569, at *4 (W.D. La. Aug. 30, 2011); *SBA Towers II, LLC v. Innovative Anchoring Sys., LLC*, No. 6:15–1798, 2015 WL 5944300, at *5 (W.D. La. Oct. 13, 2015).

33

Plaintiffs incurred recoverable miscellaneous expenses. These expenses include $433.04 in telephone conference line fees. *Associated Builders & Contractors of La., Inc.*, 919 F.2d at 379 (allowing recovery of "telephone" costs). They also include $1,470.26 in videos of depositions of the opposing party witnesses, which were necessary for trial preparation in the case; necessary shipping costs of $7,368.29, which included shipping necessary materials from Kansas City to Shreveport for the trial, shipping court filings and other materials to the Plaintiffs, and shipping briefs to the Supreme Court and other parties; hotel conference room fees of $3,083.78, which were necessary to prepare for trial and for oral argument before the Supreme Court; and office supplies of $920.10, used for the trial and preparation for oral argument before the Supreme Court. Finally, these include $6,134.25 in other expenses from Counsel Press, the printing service used to print and submit briefs and other filings to the U.S. Supreme Court and Fifth Circuit. Use of an official printing service is absolutely essential to file appellate briefs, and these charges were all necessary ones incurred.

As addressed in the Greim Declaration (Ex. A), "these costs were reasonable and necessarily incurred. This is especially so given the complexity, length, and nature of this case." *Charles v. LeBlanc*, No. 18-0541, 2025 WL 2627701, at *10 (W.D. La. Sept. 11, 2025). Given the success of Plaintiffs' efforts, they should recover these costs from the State.

### E. Plaintiffs are entitled to their fees and expenses incurred in preparing and litigating this motion.

Plaintiffs are entitled to their reasonable fees and costs incurred in preparing their motion for attorneys' fees, brief in support, bill of costs, and other supporting documentation. *See, e.g.*, *Cruz v. Hauck*, 762 F.2d 1230, 1233-35 (5th Cir. 1985); *Kirchberg v. Feenstra*, 708 F.2d 991, 1001 (5th Cir. 1983); *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 547 (5th Cir. 1980).

34

Plaintiffs' attorneys have accounted for their fees as part of their award, and those fees are separately accounted for in the June invoice, attached as Exhibit 1 to the Greim Declaration.

Plaintiffs reserve their right to supplement this application with additional fees and costs incurred in litigating the fee issue before the Court.

### <u>CONCLUSION AND PRAYER FOR RELIEF</u>

Based on the foregoing authorities and evidence, Plaintiffs respectfully request that the Court grant this application and award them $2,088,852.75 in attorneys' fees and $148,298.34 in expenses incurred by Plaintiffs in litigating this case, which total $2,237,151.09, along with an upward enhancement of 20% for the attorneys' fees.

Dated this 25th day of June, 2026

PAUL LOY HURD, APLC
*/s/ Paul Loy Hurd*
Paul Loy Hurd
Louisiana Bar No. 13909
1896 Hudson Circle, Suite 5
Monroe, Louisiana 71201
Tel.: (318) 323-3838
paul@paulhurdlawoffice.com
*Attorney for Plaintiffs*

Respectfully submitted,

GRAVES GARRETT GREIM LLC
*/s/ Edward D. Greim*
Edward D. Greim,* Mo. Bar No. 54034
Matthew Mueller,* Mo. Bar No. 70263
Katherine E. Mitra,* Mo. Bar No. 74671
Sarah R. Pineau,* Mo. Bar No. 74483
*\*Admitted Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
kmitra@gravesgarrett.com
spineau@gravesgarrett.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 25th day of June, 2026, the foregoing was electronically

filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel

of record.

*/s/ Edward D. Greim*
Edward D. Greim
*Attorney for Plaintiffs*
