UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

PHILLIP CALLAIS, et al., )
) Case No. 3:24-cv-00122-DCJ-CES-RRS
Plaintiffs, )
)
v. ) District Judge  David C. Joseph
) Circuit Judge Carl E. Stewart
NANCY LANDRY, IN HER OFFICIAL ) District Judge  Robert R. Summerhays
CAPACITY AS LOUISIANA )
SECRETARY OF STATE, et al., ) Magistrate Judge Kayla D. McClusky
)
Defendants. )

**PLAINTIFFS' OPPOSITION TO INTERVENORS' MOTION TO DISMISS**

The Robinson and Galmon Intervenors' Motion to Dismiss should be denied because this Court retains jurisdiction to review Act 2 and, if necessary, to impose its own remedy. Litigation is paused only because of the State Defendants' sworn representations that impending election administration deadlines had already made it impossible to use any map other than Act 2 for the 2026 congressional election. *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). But as Plaintiffs pointed out before reluctantly acceding to that pause, Mr. Callais lives in a narrow neck of the new Act 2 District 2 which, on initial review, seems to have reached northwest via some of the same racial grouping and racial line-drawing that the first round of litigation revealed in the southeastern end of the now-repealed SB8 District 6. Act 2 deserves careful study. If indeed it constitutes a racial gerrymander under the Fourteenth Amendment, it is not a complete remedy for Mr. Callais and requires the imposition of a judicial remedy.

Plaintiffs' filing on December 15, 2026, will state their position on the existence of a continuing injury. This Court can then make the necessary determinations in early 2027 under the deadlines agreed to by the parties and set by the Court's Scheduling Order, Doc. 325.

1

## I.     This Court Must Retain Jurisdiction to Review Act 2.

This Court must retain jurisdiction to ensure Act 2 fully remedies all Plaintiffs' injuries and comports with the Constitution. As Plaintiffs explained at length in their May 11, 2026, Response Brief to the State (Doc. 279 at 2-4), *North Carolina v. Covington*, 585 U.S. 969 (2018) (per curiam), instructs that this three-judge Court must "retain[] jurisdiction" throughout the "remedial" phase of the case to ensure Plaintiffs are no longer "segregated on the basis of race." *Id*. at 976. In other words, *Covington* requires this Court to verify that the newly enacted map remedies *all* unconstitutional gerrymanders—even though the State repealed the initially challenged map.

*Covington*'s procedural background bears repeating. There, plaintiffs initially brought a constitutional racial gerrymandering claim under *Shaw v. Reno*, 509 U.S. 630 (1993), alleging "that the General Assembly racially gerrymandered their districts . . . in an ostensible effort to comply with the requirements of the Voting Rights Act of 1965." *Covington*, 585 U.S. at 970-71. After the plaintiffs succeeded on the merits in the district court and the U.S. Supreme Court, the district court exercised its remedial authority and "ordered the General Assembly to draw remedial maps . . . and to file those maps in the District Court for approval." *Id*. at 971. The General Assembly repealed the offending maps and enacted new ones, which the State submitted to the district court. *Id*. The plaintiffs objected to those maps in part because they still segregated plaintiffs based on race. *Id*. The district court agreed and ordered the State to adopt the special master's recommended replacement plans. *Id*. at 973-75. The State appealed to the U.S. Supreme Court. *Id*. at 975. There, it argued that the district court had no authority to enter the remedial order because "plaintiffs' racial gerrymandering claims ceased to exist when the North Carolina General Assembly enacted remedial plans for the State House and State Senate and repealed the old plans." *Id*. So, the State argued, the case was moot and should have been dismissed. *Id*.

2

The U.S. Supreme Court disagreed. Its reasoning is directly applicable here because, like the *Covington* plaintiffs, the *Callais* Plaintiffs won on their *Shaw* claim and the State enacted Act 2 in an effort to remedy the racial gerrymander. The *Covington* Court explained that when plaintiffs bring a *Shaw* claim for racial gerrymandering, their injury arises from "segregation" and grouping based on race. *Id*. at 976. Their injury is not based on "the legislature's line drawing as such." *Id*. This means that simply erasing the offending lines does not erase the injury. The new lines must end all race-based segregation and grouping. Thus, *Covington* held that "in the remedial posture in which this case is presented," plaintiffs' claims "did not become moot simply because the General Assembly drew new district lines around them." *Id*. Rather, "[b]ecause the plaintiffs asserted that they remained segregated on the basis of race, their claims remained the subject of a live dispute, and the District Court properly retained jurisdiction." *Id*.

Plaintiffs' claims and the remedial posture of this case mirror *Covington*. This Court must "properly retain[] jurisdiction" to determine that Act 2 does not perpetuate an unlawful racial gerrymander, like the one the U.S. Supreme Court just struck down in *Louisiana v. Callais*, 608 U.S. ___ (2026), and leave Plaintiffs "segregated on the basis of race." *Covington*, 585 U.S. at 976.

This Court cannot just take the State's word for it. This "District Court ha[s] its own duty to cure illegally gerrymandered districts through an orderly process in advance of elections." *Id.* at 977 (citing *Purcell*, 549 U.S. at 4-5). District courts have repeatedly followed this mandate by retaining jurisdiction for multiple election (and sometimes even census) cycles to ensure states' compliance. *See, e.g.*, *United States v. City of West Monroe*, No. 21-cv-00988, slip op. at 7 (W.D. La. Apr. 15, 2021) ("This Court shall retain jurisdiction over this matter [for over nine years] to enforce the provisions of this Decree and for such further relief as may be appropriate."); *Milligan v. Allen*, No. 2:21-cv-01530-AMM, 2025 WL 2451593, at *1 (N.D. Ala. Aug. 7, 2025) (per curiam)

("[T]he Court **RETAINS JURISDICTION** over this case (and by separate order the related case *Singleton v. Allen*, Case No. 2:21-cv-1291-AMM) until Alabama enacts a congressional districting plan based on 2030 census data."); *id*. at *1 n.1 (noting "Judge Manasco will retain jurisdiction over the other related case, *Caster v. Allen*, Case No. 2:21-cv-1536-AMM, for the same period"); *id*. at *5 n.2 (collecting cases across multiple jurisdictions). As the *Milligan* three-judge court noted, "retaining jurisdiction is a normal result in redistricting cases." 2025 WL 2451593, at *5 (citing *Covington*, 585 U.S. at 976).

**II.      The Controversy Is Live, Notwithstanding Use of Act 2 for the 2026 Election.**

Plaintiffs have not abandoned any arguments about the constitutionality of Act 2 by acceding to the State's *Purcell* concerns for the 2026 election. As discussed, to impose a final plan, this Court must ensure that the map does not violate the Constitution in any way. *Covington*, 585 U.S. at 976-77; *Perry v. Perez*, 565 U.S. 388, 394 (2012); *Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997); *White v. Weiser*, 412 U.S. 783, 793-95 (1973).

But this Court has leeway to allow use of an interim plan necessitated by the press of time. This flexibility emanates from the equitable concerns underlying the *Purcell* doctrine in election cases, such as voter confusion, unwieldy administrative burdens on the State, and election chaos. *Bost v. Ill. State Bd. of Elecs*., 607 U.S. ----, 146 S. Ct. 513, 521 (2026); *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Mem) (Kavanaugh, J., concurring). Courts are reticent to engage in too much late judicial tinkering on the eve of an election and can allow use of a map for one election to avoid these concerns.

For example, in *Bush v. Vera*, 517 U.S. 952 (1996), the Supreme Court struck down three of Texas' congressional districts as unconstitutional. On remand, the three-judge district court faced the question of how to remedy the unlawful map. *Vera v. Bush*, 980 F. Supp. 251, 252 (S.D.

Tex. 1997). The district court concluded that its own interim plan "corrected the basic constitutional infirmities" of those three offending districts, but it was nowhere near "a perfect model of redistricting." *Id*. at 253. The district court nonetheless held that "the interim plan must suffice at this late date," "[c]onsidering that Texas is but two election cycles away from redistricting the state following the year 2000 census," that "[s]tability and continuity in the electoral process as well as the potential for voter confusion all weigh against any further tinkering with Texas's congressional districts," and that the court faced "intense time constraints . . . in crafting the plan." *Id*. As such, the court's *Purcell*-like concerns led it to adopt an interim, albeit imperfect, map.

Plaintiffs did not contest Act 2 for the 2026 election due to the State's sworn representations regarding *Purcell* concerns, the possibility of a repeat of the 2024 stay proceedings in the Supreme Court, and the even more abysmal possibility that the State could revert to SB8 for the 2026 election. Doc. 300, 305. But Plaintiffs' recognition of these practicalities did not forfeit their rights to challenge Act 2 for subsequent elections. Doc. 305 at 1 (explicitly stating that Plaintiffs did not "waive any argument regarding whether Act 2 fully remedies Plaintiffs' injuries and complies with *Louisiana v. Callais*, 608 U.S. ___ (2026)").

Nor did Plaintiffs abandon any challenge to Act 2 or fail to "present evidence and argument on [SB8's District 2] at trial." Doc. 313-1 at 2. Act 2 did not exist then. But just as importantly, *Callais* did not exist then: it was only the Supreme Court's watershed opinion that ensured the State (and Intervenors) could no longer justify the "bat-shaped District 2" by relying on flawed analysis from cases like *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022). *See Callais*, 608 U.S. ___, slip op. at 12 (2026). Plaintiffs need not have originally challenged *SB8's* District 2 to now ensure that *Act 2's* District 2 is part of a remedy that fully follows the Constitution.

Moreover, even though it was not required, Plaintiffs *did* raise a racial gerrymandering challenge to *all districts* in SB8 from the inception of this case, and they prosecuted that claim through trial. Complaint, Doc. 1 at 22-27; Post-Trial Brief, Doc. 190 at 17 (challenging District 2 and SB8 writ large); Post-Trial Proposed Findings of Fact and Conclusions of Law, Doc. 191 at 6, 18, 34, 39 (compiling evidence on District 2's racial features from trial). And they prevailed on that claim. This Court struck down SB8 *wholesale*, not just District 6, and the Supreme Court affirmed. Doc. 198 at 59 ("The Court agrees and finds that SB8 violates the Equal Protection Clause as an impermissible racial gerrymander. In light of the foregoing, the Court GRANTS PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF. The State of Louisiana is prohibited from using SB8's map of congressional districts for any election."). It is wrong for the State to use particular racial maneuvers, such as bundling black voters in East Baton Rouge and connecting them to other groups of black voters for the purpose of making a majority-black district, whether that maneuver leads to a district labeled "District 6" or whether it leads to a district labeled "District 2." If Mr. Callais remains racially gerrymandered using different racial lines, his injury remains. That is precisely the holding of *Covington*, and it defeats Intervenors' assertion. *See supra* Part I.

There also is no judicial estoppel for Plaintiffs to raise these points now in the remedial phase. The post-*Louisiana v. Callais*, 608 U.S. ___ (2026), world is no longer plagued by flawed legal theories that had previously blocked litigants from identifying and challenging some racial gerrymanders. *Cf.* Doc. 313-1 at 12.

Nothing in the briefing leading up to this landmark decision blocks Plaintiffs' objections to Act 2—a new law that has never been challenged in Court. Intervenors cite two brief comments out of context as the basis to do so. The first comes from Plaintiffs' first merits brief in the Supreme Court. But there, Plaintiffs claimed that HB1 was an alternative map under *Alexander v. South*

*Carolina State Conference of the NAACP*, 602 U.S. 1 (2024), to show that State could protect five incumbents without enacting "SB8-6." Appellees' Brief at 31. In that quote, Plaintiffs only commented on District 6—not District 2. *Id*. And they certainly did not comment on Act 2. The other quote involves a remark on the last page of Plaintiffs' brief that an earlier law, HB1, was ostensibly "free from racial gerrymandering" because it "was pre-cleared by the DOJ twice." Appellees' Supp. Brief at 50. Of course, as lower courts and the DOJ applied the Fourteenth Amendment and VRA before *Callais*, District 2 and its sister districts in their HB1 form were not treated as racial gerrymanders. But after *Callais*, a district like District 2 will not survive scrutiny if the lines are drawn based on race, and the State is unable to show the VRA justifies the race-based lines on an updated understanding of *Thornburg v. Gingles*, 478 U.S. 30 (1986). Plaintiffs' comments on other districts under prior law cannot be "plainly inconsistent" with a challenge to the new Act 2 district under new legal principles. *Allen v. C & H Distributors, L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015).

Nor did the Supreme Court rely on, let alone reference, Plaintiffs' tangential remarks in issuing its decision such that "the integrity of the judiciary [would otherwise be] jeopardized." *Cf. id*. at 572-73 (quotation omitted). And finally, no court "adopted the position" that HB1 or Act 2 was without constitutional flaws. *Id*. at 573 (quotation omitted). As such, neither remark compels this Court's discretionary exercise of the extraordinary equitable remedy of judicial estoppel.

Looking forward, Act 2 does away with District 6's racial gerrymander in most of the State and certainly cures the racial gerrymandering injuries for 11 out of 12 Plaintiffs. But even though the map remedies *most* of Plaintiffs' injuries, the map may still be unconstitutional and thereby unavailable as a final remedy. *Cf. Covington*, 585 U.S. at 976-77 (holding that even though "the General Assembly drew new district lines around" plaintiffs, they remained "segregated on the

basis of race," so the court could not accept the legislative map); *Perez*, 565 U.S. at 394 (noting that a "district court [must] appropriately confine[] itself to drawing interim maps that comply with the Constitution and the Voting Rights Act" and a "district court making such use of a State's plan must, of course, take care not to incorporate into the [court-entered] plan any legal defects in the state plan" (citation omitted)); *Abrams*, 521 U.S. at 85-86 (noting that courts must "correct—not follow—constitutional defects in districting plans" (citation omitted)).

Moreover, this Court must retain jurisdiction until it makes this determination, especially given recent history. Act 2 is the State's third enacted map for the 2020 census. *Cf. Covington*, 585 U.S. at 977 (holding that district court did not abuse its discretion in denying the North Carolina General Assembly "a *second* bite at the apple" (quotation omitted) (emphasis added)); *Hays v. Louisiana*, 936 F. Supp. 360, 372 (W.D. La. 1996) (imposing court ordered remedial map after the State drew two unlawful maps for the census cycle). Its second map, SB8, was supposed to be a remedial map. But SB8 only created constitutional injuries that have plagued Louisiana voters for over two years. *See Louisiana v. Callais*, 608 U.S. ___ (2026). Halfway through the decade, Plaintiffs and their fellow voters are entitled to a map that does not segregate them based on race.

With these principles in mind, Plaintiffs continue to evaluate the constitutionality of Act 2 as a remedy in the aftermath of *Louisiana v. Callais*, 608 U.S. ___ (2026). They will present any objections by December 15, 2026, in accordance with the Court's Scheduling Order, Doc. 325.

### III.    Continued Proceedings Should Decide Either that Act 2 Is Constitutional or that Another Remedy Should Be Imposed.

Continued proceedings in early 2027 should conclude with a decision, either that Act 2 remedies Plaintiffs' injuries and is constitutional, or that Act 2 once again allowed a racial gerrymander to persist and that a judicial remedy will be imposed. *Covington*, 585 U.S. at 976.

The December 15, 2026, deadline agreed to by the parties is intended to present a complete roadmap for the rest of the proceedings. If the Plaintiffs have determined that Act 2 perpetuates a racial gerrymandering injury for Mr. Callais or others, their filing will provide the complete basis for that determination, including any briefing, expert report(s), or map required under substantive law. This same burden falls on the Intervenors, who are Defendants in this case only to (1) defend SB8, a position they have now definitively lost; and (2) defend against any remedy (including Act 2) that does not provide them with what they believe is their right to two majority-black districts.[1] If the Intervenors continue to maintain this interest in the remedy, then they necessarily object to Act 2 as a remedy, and must follow through on the representations they made to participate in this case for over two years.

Importantly, it is possible that only the Plaintiffs object to Act 2 and that the Intervenors wish to defend it; it is possible that the Plaintiffs determine Act 2 is not a racial gerrymander, while only the Intervenors decide to object to it. The December 15, 2026, filings will finally determine the positions of the parties, and every other deadline will be used for responses and rebuttals to these opening positions. Plaintiffs believe the parties have committed to ensuring the March 2027 hearing finally disposes of this case, either by approving Act 2 as a remedy for Plaintiffs' injury

---

[1] The Robinsons successfully obtained an order of intervention and participated in this case for over two years by claiming "a strong interest in defending the *Robinson* courts' core factual findings and legal conclusions against the claims in this case that SB8—or any other congressional map with two majority-Black districts—represents an unconstitutional racial gerrymander" and "in the Maintenance of Two Majority-Black Congressional Districts in Louisiana." Doc. 18-1 at 7, 10. Likewise, the Galmons referenced "protectable interests in preserving the second Black-opportunity district that they secured in related litigation, and in the electoral opportunities that their assigned congressional districts provide." Doc. 75 at 5. The Court only allowed them to intervene permissively in the remedial phase on the basis that "[a] remedial phase would implicate the main objective movants fought for in the *Robinson* case, two Black-majority Congressional districts as they allege is required by the Voting Rights Act and provide an opportunity to introduce the same or similar evidence and maps as in that case." Doc. 79 at 6 (allowing Robinsons to intervene); *see also* Doc. 205 (allowing Galmons to intervene without further explanation).

that is otherwise constitutional, or by rejecting it as a persistent racial gerrymander and imposing an interim judicial map to control absent further legislative action.

This procedure should bring the finality desired by the State by resolving Plaintiffs' claims and ensuring the Intervenors and those in privity with them are bound by a judgment and estopped from serial collateral attacks in other courts. This will do more than merely bring persistent litigation over the 2020 cycle of congressional maps to an end. It will also bring Louisiana—and the many other states and jurisdictions who are closely following what happens here—nearer to the reality of the color-blind Constitution promised by the Fourteenth and Fifteenth Amendments: true equal protection under the laws and the end of state interference with the right to vote on account of race.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motion to Dismiss.


Dated this 14th day of July, 2026                    Respectfully submitted,

PAUL LOY HURD, APLC                          GRAVES GARRETT GREIM LLC
*/s/ Paul Loy Hurd*                               */s/ Edward D. Greim*
Paul Loy Hurd                                Edward D. Greim,* Mo. Bar No. 54034
Louisiana Bar No. 13909                      Matthew Mueller,* Mo. Bar No. 70263
1896 Hudson Circle, Suite 5                  Katherine E. Mitra,* Mo. Bar No. 74671
Monroe, Louisiana 71201                      Sarah R. Pineau,* Mo. Bar No. 74483
Tel.: (318) 323-3838                         *Admitted Pro Hac Vice*
paul@paulhurdlawoffice.com                   1100 Main Street, Suite 2700
*Attorney for Plaintiffs*                        Kansas City, Missouri 64105
                                             Tel.: (816) 256-3181
                                             Fax: (816) 256-5958
                                             edgreim@gravesgarrett.com
                                             mmueller@gravesgarrett.com
                                             kmitra@gravesgarrett.com
                                             spineau@gravesgarrett.com
                                             *Attorneys for Plaintiffs*

10

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 14th day of July, 2026, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

/s/ Edward D. Greim
Edward D. Greim
*Attorney for Plaintiffs*