**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **PHILLIP CALLAIS, ET AL.** | **CIV. ACTION NO. 3:24-00122** |
| **VERSUS** | **CIRCUIT JUDGE CARL E. STEWART**<br>**DIST. JUDGE ROBERT R. SUMMERHAYS**<br>**DIST. JUDGE DAVID C. JOSEPH** |
| **NANCY LANDRY, in her official capacity as LOUISIANA SECRETARY OF STATE** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**REPORT AND RECOMMENDATION**

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion for attorneys' fees and expenses [doc. # 322] filed by Plaintiffs Phillip Callais, et al. ("Plaintiffs). The motion is opposed. For reasons set forth below, IT IS RECOMMENDED that the motion be GRANTED IN PART and DENIED IN PART.

Plaintiffs contend that, as prevailing parties in this civil rights action brought pursuant to 42 U.S.C. § 1983, they are entitled to an award of attorneys' fees and expenses under 42 U.S.C. § 1988(b) and Rule 54 of the Federal Rules of Civil Procedure. They seek an award of $2,237,151.09, comprised of $2,088,852.75 in attorneys' fees and $148,298.34 in expenses, for litigating this case and defending it before the United States Supreme Court. They also seek a 20 percent upward enhancement of the attorneys' fees. Intervenor, State of Louisiana, and Defendant, Nancy Landry, Louisiana Secretary of State (hereinafter referred to collectively as the "State," unless otherwise distinguished), oppose the motion.

## **Background**[1]

Pursuant to the last decennial census in 2020, Louisiana's population was sufficient to support its prior allotment of six congressional districts. *Louisiana v. Callais*, 608 U.S. 85, 101 (2026). However, because of population shifts, Louisiana needed to rebalance its districts. *Id.* Accordingly, in 2022, Louisiana enacted HB1, a congressional redistricting map "that closely resembled its immediate predecessor" and "included only one district in which black voters were a majority of the voting-age population." *Id.*

On March 30, 2022, immediately following passage of HB1, two lawsuits were filed in the Middle District of Louisiana, *Robinson v. Ardoin*, Civ. Action No. 22-0211 (M.D. La.), and *Galmon v. Ardoin*, Civ. Action No. 22-0214 (M.D. La.), asserting that the congressional map violated the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, *et seq*., by "'packing' large numbers of Black voters into a single majority-Black congressional district, and 'cracking' the State's remaining Black voters among the five remaining districts, where they constitute an ineffective minority unable to participate equally in the electoral process." *Robinson*, Civ. Action No. 22-0211 (M.D. La.) [doc. # 1]. The Middle District consolidated *Galmon* with *Robinson* and, on June 6, 2022, concluded that HB1 likely violated the VRA by failing to include a second majority-black district. *Callais*, 608 U.S. at 103 (citing *Robinson v. Ardoin*, 605 F.Supp.3d 759, 768 (2022)). Therefore, the Middle District entered a preliminary injunction requiring Louisiana to implement a new map before the 2022 election, which was less than six

[1]The parties and the District Court are well acquainted with the details of this case. Nonetheless, the undersigned finds it necessary to document the genesis and progression of this case because it is relevant to the parties' arguments. To avoid reinventing the wheel, however, the Court will lean heavily upon the histories set forth by the parties, along with the decisions issued by the Supreme Court and the District Court.

months away. *Id*.

Louisiana objected to the *Robinson* decision and promptly appealed. *Id*. The Supreme Court granted certiorari and held *Robinson* in limbo pending disposition of an analogous VRA case from Alabama, which ultimately did not issue until June 2023. *See Allen v. Milligan*, 599 U.S. 1, 143 S.Ct. 1487 (2023). After deciding *Allen*, the Supreme Court dismissed the petition in *Robinson* as improvidently granted and remanded the case to the Fifth Circuit to consider Louisiana's appeal in the ordinary course of business. *Callais*, 608 U.S. at 103. By that time, the 2022 election had passed, and the urgency that had justified the preliminary injunction was no longer present. *Id*. Accordingly, in November 2023, the Fifth Circuit vacated the preliminary injunction in *Robinson* and remanded the case to the Middle District with instructions to accord Louisiana time to draw a new map. If it failed to do so, "the district court [was] to conduct a trial and any other necessary proceedings to decide the validity of the H.B. 1 map, and, if necessary, to adopt a different districting plan for the 2024 elections." *Robinson v. Ardoin*, 86 F.4th 574, 602 (5th Cir. 2023). On January 3, 2024, the Middle District gave Louisiana a deadline of January 30, 2024, to enact a new map before it proceeded to a trial on the merits, set to commence on February 5, 2024. *Robinson v. Ardoin*, Civ. Action No. 22-0211 (M.D. La. Jan. 3, 2024) [doc. # 330].

Five days later, on January 8, 2024, the Governor called a special legislative session to draw new congressional districts. (Injunction [doc. # 198, pg. 10]). The product of the special session was SB8, which was passed on January 19, 2024, and signed into law by the Governor as Act 2 on January 22, 2024. *Id*., pg. 13. SB8 created two majority-Black districts—District 6 and District 2. Numerous comments from legislators and executive officials in the legislative record attested to Louisiana's racially predominant purpose in drawing District 6, which "stretches

some 250 miles from Shreveport in the northwest corner of the state to Baton Rouge in southeast Louisiana, slicing through metropolitan areas to scoop up pockets of predominantly Black populations from Shreveport, Alexandria, Lafayette, and Baton Rouge." [doc. # 198, pgs. 11-13].

On January 31, 2024, Plaintiff Phillip Callais and eleven other voters from across all six of Louisiana's congressional districts, including three from SB8's District 6, filed the instant civil rights action under 42 U.S.C. § 1983 against Louisiana Secretary of State Nancy Landry, in her official capacity, asserting that SB8 violated their rights under the Fourteenth and Fifteenth Amendments and seeking declaratory and injunctive relief to prevent the use of SB8 in any congressional election. [doc. #s 1 & 198, pg. 16]. They further moved to empanel a three-judge court, which was ordered. [doc. # 5]. The panel is comprised of Fifth Circuit Court of Appeals Judge Carl E. Stewart, District Judge Robert R. Summerhays, and District Judge David C. Joseph (hereinafter, the "District Court," "this Court" or "the Court").

On February 6, 2024, the *Galmon* movants filed a motion to intervene in this case. [doc. # 10]. The next day, the *Robinson* movants filed a motion to intervene and sought to transfer the case to the Middle District, where they simultaneously urged the single-judge court to seize jurisdiction of the case. [doc. # 18]. Meanwhile, that same day, Plaintiffs filed a motion for preliminary injunction in this case. [doc. # 17].

On February 14, 2024, Plaintiffs filed a response to the motions to intervene and to transfer venue. [doc. # 33]. On February 19, 2026, Plaintiffs filed a motion to set an expedited briefing schedule, which the Court granted, setting a preliminary injunction hearing that was consolidated with trial on the merits for April 8-9, 2024. [doc. #s 43 & 62-63].

The State of Louisiana, by and through Attorney General Elizabeth Murrill, filed a motion for leave to intervene as a defendant, which the Court granted on February 26, 2024. [doc. #s 53, 79, & 84]. The Court also granted the *Robinson* movants' leave to intervene, but limited their participation to the remedial phase only, if needed. [doc. # 79]. The Court denied the *Galmon* movants' motion to intervene. *Id*.

The *Robinson* and *Galmon* movants filed motions petitioning the Court to reconsider the unfavorable portions of its decision on their motions for intervention and requested expedited consideration of same. *See* doc. #s 96, 100, 103, 105, 111. Over Plaintiffs' objection, the Court ultimately permitted the *Robinson* movants to participate in both the liability and remedial stages of the case as Defendants-Intervenors, alongside the State of Louisiana and Secretary of State, but maintained its prior denial of the *Galmon* movants' motion. (March 15, 2024 order [doc. # 114]).

The *Robinson* intervenors brought a team of twenty-two attorneys to the case, hailing from seven different legal entities, the Harvard Law School Election Clinic, plus two more attorneys for the trial. *See* doc. #s 119, 170. Furthermore, there were two in-house attorneys from the Louisiana Attorney General's Office, five outside counsel from a coastal election law boutique hired by the State of Louisiana, one in-house Secretary of State attorney, and one outside counsel also appearing for the Secretary.

While Plaintiffs were responding to this flurry of pre-trial motions and responses, they were also conducting discovery to meet deadlines and prepare for a trial that was only weeks away. Specifically, Plaintiffs had to put together expert designations and send expert reports to the other parties by March 22, 2024; send exhibit and witness lists to the other parties and the Court by April 1, 2024; submit edited deposition transcripts to the Court by April 1, 2024, and

file all objections to depositions by that date; deliver bench books, with all exhibits and objections to the other parties' exhibits, to each of the judges by April 1, 2024; and compile a real time glossary. *See* doc. # 63.

Meanwhile, on March 20, 2024, the *Galmon* movants lodged an appeal of the denial of their motion to intervene with the Fifth Circuit, which denied expedited consideration. *See* doc. #s 125 & 133.

In the week leading up to trial, the *Robinson* made a number of filings that required Plaintiffs to respond quickly. Plaintiffs submitted their exhibit and witness designations on April 1, 2024, *see* doc. # 139, which were promptly objected to by the *Robinson* intervenors courtesy of a motion in limine and a motion to strike one of Plaintiffs' expert reports. [doc. #s 144-145]. Plaintiffs submitted responses to those motions within two days, all while preparing for a trial set to commence the following Monday, April 8, 2024. [doc. #s 146, 153].

The weekend before trial the *Robinson* intervenors filed a motion to reconsider the exclusion of one of their experts and a last-minute motion to continue the trial. [doc. #s 155, 161]. Plaintiffs responded to these motions on April 6 and April 7, respectively, using their remaining hours before trial to stave off the *Robinson* intervenors' attempts to impede its commencement. *See* doc. #s 158, 163-164.

The trial proceeded as scheduled from April 8-10, 2024. [doc. # 198, pg. 17]. The record was extensive: "[c]ollectively, the parties introduced thirteen (13) witnesses and one hundred ten (110) exhibits." *Id.* Plaintiffs appeared through five attorneys (Edward Greim, Paul Hurd, A. Bradley Bodamer, Jackson Tyler, and Katherine Mitra), who put on dozens of exhibits, two expert witnesses, and two fact witnesses, cross-examined multiple expert and fact witnesses, and

successfully moved to exclude dozens of exhibits, the testimony of one of the *Robinson* intervenors' proffered expert witnesses, and part of the testimony of one of their fact witnesses.

On April 17, 2024, Plaintiffs filed a post-trial brief and proposed findings of fact and conclusions of law, which collectively totaled over 80 pages. [doc. #s 190-191].

On April 30, 2024, the District Court granted Plaintiffs' requested relief and issued a permanent injunction in their favor. [doc. # 198, pg. 59]. Specifically, the District Court concluded "that District 6 of SB8 violates the Equal Protection Clause" and "enjoined" the State "from using SB8 in any future elections." *Id*. at 2; *see also id*. at 59 ("In light of the foregoing, the Court GRANTS PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF. The State of Louisiana is prohibited from using SB8's map of congressional districts for any election."). The District Court added that it would "hold a status conference to discuss the remedial stage of this trial on May 6, 2024 . . ." *Id*.

Before that could happen, however, on May 1, 2024, the *Robinson* intervenors filed an appeal and a motion to stay the injunction pending the appeal. [doc. #s 200-201]. The next day, Plaintiffs filed their opposition to the motion to stay. [doc. # 203]. The Court promptly denied the motion to stay on May 3, 2024. [doc. # 204].

On May 7, 2024, the State of Louisiana and the Secretary of State joined in a notice of appeal. (Amend. Notice of Appeal [doc. # 221]). The next day, the State filed a joint motion to stay pending the appeal, which the Court denied. [doc. #s 222-223].

On May 8, 2024, the *Robinson* intervenors filed an emergency application to stay the injunction in the Supreme Court. *Robinson v. Callais*, No. 23A994 (U.S.). The State filed a similar emergency application in the Supreme Court on May 10, 2024. *Landry v. Callais*, No. 23A1002 (U.S.). Plaintiffs filed their response to both emergency applications on May 13, 2024.

*Id.*; *Robinson*, No. 23A994. On May 15, 2024, the Supreme Court granted the applications to stay pending appeal in accordance with *Purcell v. Gonzalez*, 549 U.S. 1 (2006). *Landry*, No. 23A1002; *Robinson*, No. 23A994.

Meanwhile, the *Galmon* movants' appeal of the denial of their motion to intervene continued apace in the Fifth Circuit, with the filing of their appeal brief on April 26, 2024, and Plaintiffs' response brief on June 17, 2024. *See Callais v. Landry*, No. 24-30177 (5th Cir.). Nine months later, on March 27, 2025, the Fifth Circuit dismissed the appeal for lack of jurisdiction. [doc. # 260].

Back in the Supreme Court, the parties proceeded to the jurisdictional statement phase. The State, the *Robinson* intervenors, and the *Galmon* movants filed separate jurisdictional statements on July 30, 2024. *Louisiana v. Callais*, No. 24-109 (U.S.); *Robinson v. Callais*, No. 24-110 (U.S.); *Galmon v. Callais*, No. 24-111 (U.S.). Plaintiffs filed three separate motions to dismiss or affirm each appeal. *See Louisiana*, No. 24-109; *Robinson*, No. 24-110; *Galmon*, No. 24-111. The Supreme Court granted Plaintiffs' motion to dismiss the *Galmon* movants' appeal for want of jurisdiction on October 15, 2024. *Galmon*, No. 24-111.

On November 4, 2024, the Supreme Court noted probable jurisdiction over the State's and *Robinson* intervenors' appeals, consolidated them, and set the case for its first round of merits briefing and oral argument. *Louisiana*, No. 24-109; *Robinson*, No. 24-110. The *Galmon* movants continued their dogged efforts to join the litigation and filed a motion to intervene in the consolidated appeal, which the Plaintiffs opposed, and the Supreme Court denied. *Louisiana*, No. 24-109.

The State and *Robinson* intervenors (together "Appellants") filed their separate merits briefs on December 19, 2024. *Id.* Ten amicus briefs were filed in support of Appellants. *Id.*

Plaintiffs-Appellees filed their brief on January 21, 2025, with only five supporting amicus briefs. *Id*. Appellants filed their reply briefs, and the parties participated in oral argument on March 24, 2025. *Id*. Plaintiffs used the same attorneys on appeal; Edward Greim, who was lead counsel at trial, delivered the oral argument at the Supreme Court. *Id*.

On June 27, 2025, the Supreme Court restored the case for a second round of briefing and re-argument in the 2025 term. *Id*. On August 1, 2025, the Supreme Court directed the parties to answer a novel question raised in Plaintiffs-Appellees' first brief when discussing whether the VRA could serve as a compelling interest under the Fourteenth Amendment in this instance—specifically, "[w]hether the State's intentional creation of a second majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U. S. Constitution." *Id*. That question implicated not only the Supreme Court's Fourteenth Amendment jurisprudence, as originally briefed by the parties, but also its Fifteenth Amendment and VRA jurisprudence.

The parties proceeded on an expedited basis. Appellants filed their briefs on August 27, 2025. *Id*. Plaintiffs-Appellees filed their consolidated brief on September 17, 2025. *Id*. Appellants filed replies on October 3, 2025. *Id*. Oral argument was held on October 15, 2025. *Id*. This time, nineteen amicus briefs were filed in favor of Appellants and fifteen filed in favor of Plaintiffs-Appellees. *Id*. Once again, Plaintiffs-Appellees appeared by their trial counsel, and Edward Greim delivered the oral argument. *Id*.

On April 29, 2026, a little less than two years after this Court issued its permanent injunction, the U.S. Supreme Court affirmed and remanded for proceedings consistent with its opinion. *Callais*, 608 U.S. at 126. In so doing, the Court concluded that SB8 was an unconstitutional racial gerrymander and that its use would violate Plaintiffs' constitutional rights.

*Id*. The Court also took the opportunity to update the *Thornburg v. Gingles*, 478 U.S. 30 (1986), factors to realign them with the text of § 2 of the VRA and constitutional principles. *Callais*, 608 U.S. at 118-119; *see also Allen v. Milligan,* 608 U.S. 511, 512, 146 S.Ct. 1377, 1380 (2026) ("In *Louisiana v. Callais*, 608 U. S. ___ (2026), to resolve the tension between vote-dilution claims under § 2 of the Voting Rights Act of 1965 and our colorblind Constitution, we updated the standards for § 2 liability established by *Thornburg v. Gingles*, 478 U. S. 30 (1986).").

The next day, on April 30, 2026, the District Court issued an order stating that its permanent injunction prohibiting the State of Louisiana from using SB8 in any election remained in effect, afforded the State of Louisiana the opportunity to enact a remedial map, and required the State of Louisiana to file a brief outlining how it intended to comply with the Supreme Court's opinion and the District Court's injunction. (Order [doc. # 261]). That same day, the *Robinson* intervenors filed a motion to vacate the order because the Supreme Court had yet to issue its judgment in the case. [doc. # 262]. Pursuant to Plaintiffs' motion, however, the Supreme Court expedited its processes and issued judgment on May 4, 2026, which mooted the *Robinson* intervenors' motion. *Callais*, 146 S.Ct. 1111 (2026) [doc. #s 265-266, 269].

On May 7, 2026, the State of Louisiana filed its brief in response to the Court's order, explaining that, mere hours after the Court issued its April 30 order, the Secretary of State had declared an election emergency, and the Governor had "encouraged" the legislature "to enact new Congressional maps and schedule those elections as soon as practical, including laws governing qualification of candidates, in order to conduct the November 3, 2026 election." (State of Louisiana Brief [doc. # 271]). The State of Louisiana concluded, "Defendants are committed to a constitutional congressional election in Louisiana in 2026 and have opened the

way for the Legislature 'to enact a Constitutionally compliant map consistent with the Supreme Court's opinion . . . and this Court's Injunction.'" *Id*

Meanwhile, Plaintiffs were busy defending their victory against competing actions seeking to challenge this Court's jurisdiction over the remedy for their injury. For example, Plaintiffs filed multiple notices of competing actions on May 1, 2026, a response to a motion to intervene from Lauren Jewett on May 6, 2026, and an opposition to the *Robinson* intervenors and *Galmon* movants' motion to stay on May 15, 2026. [doc. #s 263-264, 268, 285-286]. Plaintiffs also filed a response to the State of Louisiana's Brief, a request for a scheduling order, and a response to the Secretary of State's affidavit to ensure that there would be a remedy in advance of the 2026 election. [doc. #s 279, 294, 300].

On May 18, 2026, Plaintiffs successfully petitioned the Court to order that any motion for attorneys' fees be due no earlier than 21 days after the Court's approval of a remedial plan. [doc. # 282 & 288].

In due course, Louisiana passed Act 7, which the Governor signed into law on May 29, 2026. (State of Louisiana's Notice of Enactment [doc. # 298]). Act 7 cures Plaintiffs' racial gerrymandering injury in SB8's District 6.

On June 6, 2026, the *Robinson* intervenors and the *Galmon* movants filed a motion to dismiss Plaintiffs' complaint as moot. (M/Dismiss [doc. # 313]). The State of Louisiana and Plaintiffs filed their responses to the motion on July 14, 2026. [doc. #s 328 & 330].

On June 30, 2026, the Court issued a scheduling order that set the remedial proceedings hearing for March 2-3, 2027. (Sched. Order [doc. # 325]).

Opting not to wait until after remand proceedings have concluded, Plaintiffs filed the instant motion for attorneys' fees and costs on June 25, 2026.

On July 14, 2026, the State of Louisiana filed a Rule 60(b) Motion to Vacate Permanent Injunction and Judgment. [doc. # 329]. The Court set the motion to dismiss and the Rule 60(b) motion for hearing on October 27, 2026. (Aug. 7, 2026 E-M/E [doc. # 334]).

The State of Louisiana and the Secretary of State filed their joint memorandum in opposition to the motion for attorneys' fees on August 17, 2026. (State Opp. Memo. [doc. # 336]).

The *Robinson* intervenors initially filed a statement taking no position regarding the motion. (*Robinson* intervenors' Statement [doc. # 335]). However, the *Robinson* intervenors and *Galmon* movants filed a reply to the State's response, stating that, insofar as the Court was contemplating awarding fees against them, the Court should order additional briefing, so they may respond. (Robinson and Galmon Reply [doc. # 338]).

On September 14, 2026, Plaintiffs filed a reply brief in support of their motion for fees and expenses. (Pls. Reply [doc. # 340]).

On October 8, 2026, the Court ordered the State to supplement its response with additional details regarding the attorneys' time for which it was seeking a reduction. (Order [doc. # 343]). The State filed its response to the order on October 15, 2026. (State Suppl. Response [doc. # 343]). Accordingly, the matter is ripe.

## Law and Analysis

Under the so-called "American Rule," which, as its name suggests, represents the default position in this country, litigants pay for their own attorneys' fees, and the prevailing party is not entitled to collect fees from the loser. *Veasey v. Abbott*, 13 F.4th 362, 367–68 (5th Cir. 2021)

(citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). "Federal courts may depart from this rule only when 'there is express statutory authorization' to do so." *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)).

One such authorization is 42 U.S.C. § 1988(b), which provides that, "'the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs' for private actions brought under 42 U.S.C. § 1983 and other civil rights statutes." *Veasey*, 13 F.4th at 368. However, the Supreme Court has determined that, "in [the court's] discretion" really means that the prevailing party "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89, n.1 (1989) (citations omitted). The Fifth Circuit, in turn, has held that, "in [the] absence of special circumstances a district court not merely 'may' but *must* award fees to the prevailing plaintiff." *Sanchez v. City of Austin*, 774 F.3d 873, 880 (5th Cir. 2014) (quoted source omitted). However, "[b]efore deciding whether an award of attorney's fees is appropriate in a given case . . . a court must determine whether the party seeking fees has prevailed in the litigation." *CRST Van Expedited, Inc. v. E.E.O.C.*, 578 U.S. 419, 422 (2016) (citations omitted).

## I. Prevailing Party Status

In the § 1988(b) context, a "prevailing party" is a legal term of art. *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001). The Supreme Court has defined "prevailing party" broadly as "one who has been awarded some relief by the court . . ." *Id*. The "touchstone of the prevailing party inquiry must be the material

alteration of the legal relationship of the parties." *CRST Van Expedited, Inc.*, 578 U.S. at 422 (quoted source omitted). Thus, "when a plaintiff secures an enforceable judgmen[t] on the merits or a court-ordered consent decre[e], that plaintiff is the prevailing party because he has received a judicially sanctioned change in the legal relationship of the parties." *Id.* (internal quotation marks and quoted source omitted).

Following the Supreme Court's guidance, the Fifth Circuit has distilled three requirements for a plaintiff to demonstrate prevailing party status: "(1) the plaintiff must achieve judicially-sanctioned relief, (2) the relief must materially alter the legal relationship between the parties, and (3) the relief must modify the defendant's behavior in a way that directly benefits the plaintiff at the time the relief is entered." *Veasey*, 13 F.4th at 368 (citations omitted). Further, a plaintiff may satisfy these three requirements without receiving a final judgment in its favor, so long as the plaintiff's success on a claim, i.e., "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit . . .". is not entirely technical or de minimis. *Id.* (citing *Petteway v. Henry*, 738 F.3d 132, 137 (5th Cir. 2013)). "The relief need not be awarded at the conclusion of the case—a prevailing party is simply one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." *Veasey*, 13 F.4th at 368–69 (citations and internal quotation marks omitted).

Plaintiffs contend that they are prevailing parties for purposes of § 1988(b) because they obtained a permanent injunction and "final judgment" on the merits from the District Court, which was affirmed by the Supreme Court. The undersigned agrees. First, this Court not only held a hearing on Plaintiffs' motion for preliminary injunction, but also a consolidated trial on

the merits, following which the Court held that District 6 of SB8 violated the Equal Protection Clause and permanently[2] enjoined the State of Louisiana from using SB8 in any future elections. (April 30, 2024 Injunction and Reasons [doc. # 198]). The Court specifically identified the State Defendants as Secretary of State Nancy Landry, in her official capacity, and the State of Louisiana. *Id*. Thereafter, the Supreme Court affirmed this Court's decision and remanded the case for proceedings consistent with its opinion. *Callais*, 608 U.S. 85, 146 S.Ct. at 1163.

Before ordering its own remedy, the Court afforded the State of Louisiana "the opportunity to enact a Constitutionally compliant map consistent with the Supreme Court's opinion . . . and this Court' Injunction." (April 30, 2026 Order [doc. # 261]). On May 7, 2026, the State of Louisiana confirmed that it was committed to a constitutional congressional election that utilized a "Constitutionally compliant map consistent with the Supreme Court's opinion . . . and this Court's Injunction." (State's Brief [doc. # 271]). Thereafter, the State passed Act 7, which became law on May 29, 2026, and purports to cure Plaintiffs' racial gerrymandering injury in SB8's District 6.

In other words, Plaintiffs obtained judicially sanctioned relief via permanent injunction after a trial on the merits, which was affirmed by the Supreme Court. Further, the order materially altered the parties' legal relationship because, without the order, Plaintiffs would have been required to continue to vote in an unconstitutionally drawn congressional district. *See Veasey*, 13 F.4th at 369 (order materially altered the parties' legal relationship because without it, "Plaintiffs seeking to vote in the November 2016 elections would have been required to present photo ID under SB 14"). Finally, the order modified the State's behavior in a way that

[2] *See* April 30, 2026 Order [doc. # 261] (characterizing the injunction as "permanent.").

resulted in relief which was neither "purely technical" nor "de minimis." *Id*. Plaintiffs obtained relief after the Supreme Court affirmed this Court's order and the injunction became actionable. Thereafter, and in response to the Court's invitation, the State of Louisiana availed itself of the opportunity to re-make its constitutionally infirm congressional map, which, by all accounts, will be used for next month's elections. Thus, the relief obtained by Plaintiffs is neither preliminary, temporary, nor ephemeral.[3] Further, the circumstances of this case are materially indistinguishable from those present in *Veasey* where the Fifth Circuit affirmed the district court's finding that plaintiffs were prevailing parties entitled to attorneys' fees. *See Veasey*, 13 F.4th at 370 (the order issued after a multi-day trial, there was a ruling on the merits, and an *en banc* affirmance).[4]

The State questions whether *Veasey* is still good law after the Supreme Court's decision in *Lackey*, which held that *preliminary* injunctions do not confer prevailing party status under § 1988 because they do not "conclusively resolve the rights of parties on the merits . . ." *Lackey*, 604 U.S. at 200. In this case, however, Plaintiffs obtained a *permanent* injunction, after a *trial on the merits*, that was affirmed by the Supreme Court. Therefore, Plaintiffs' rights were conclusively resolved.

The State further argues that Plaintiffs never obtained any enduring judicial relief in this case because SB8 ceased to exist once the State "voluntarily" enacted Act 2. Relatedly, the State

---

[3] *See Sole v. Wyner*, 551 U.S. 74, 86 (2007) (plaintiff's initial victory proved "ephemeral").

[4] The State contends that *Veasey* is distinguishable because, there, the plaintiffs obtained an order that provided them with actual relief during elections held in 2016 and 2017. *See Veasey*, 13 F.4th at 369. Here, however, Plaintiffs also obtained actual relief for the 2026 election pursuant to the Court's permanent injunction because the State only took action to re-draw its congressional map once the permanent injunction became final.

emphasizes that the Supreme Court has rejected the "catalyst theory," which is the "theory that a plaintiff may receive attorney's fees under § 1988(b) when he achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Lackey*, 604 U.S. at 202 (citing *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001) (internal quotation marks omitted). In *Buckhannon Bd. & Care Home, Inc.*, the Supreme Court further explained that the "catalyst theory . . . allows an award where there is no judicially sanctioned change in the legal relationship of the parties." *Buckhannon Bd. & Care Home, Inc.*, 532 U.S. at 605. Here, in contrast, and at the risk of repetition, there was a judicially sanctioned change in the legal relationship of the parties via the permanent injunction. Furthermore, while this Court allowed the State of Louisiana an opportunity to revise its unconstitutional map before the Court enacted a remedy of its own, the State of Louisiana was not motivated to do so until this Court's permanent injunction was affirmed by the Supreme Court, which changed the parties' legal relationship for the 2026 elections and beyond.

The State also argues that this case is now moot and that the District Court should vacate its injunction. As to the former contention, a determination of mootness does not prevent an award of attorney's fees, which instead turns on whether plaintiffs are a prevailing party(ies). *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 836 (5th Cir. 2023) (citing *Staley v. Harris County*, 485 F.3d 305, 314 (5th Cir. 2007)). As to the latter issue, the Court's order and permanent injunction remain in effect – for now.[5]

In further support of their position, Plaintiffs aptly cite *Kirchberg v. Feenstra*, where,

[5] "Vacatur of the lower court's judgment is warranted only where mootness has occurred through happenstance, rather than through *voluntary action of the losing party.*" *Houston Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 619 (5th Cir. 2007) (citations omitted).

even more compellingly than here, the State of Louisiana argued that plaintiff was not a prevailing party entitled to fees because "the Louisiana Legislature began the process of revising the unconstitutional . . . statutes independent of [plaintiff]'s action, and because her suit had no effect on their eventual repeal . . ." *Kirchberg v. Feenstra*, 708 F.2d 991, 997 (5th Cir. 1983). In rejecting this argument, the Fifth Circuit stated that,

> [t]he fact that the Louisiana Legislature has repealed [the] . . . statutes is quite beside the point. [Plaintiff] prevailed in the most convincing manner possible; she obtained a judgment from this Court, affirmed by the Supreme Court of the United States, that [the statute] was unconstitutional. Louisiana's repeal of the offending statutes affected her not in the slightest, as the nondiscriminatory statutes which replaced them went into effect many years after [she incurred injury].

*Id.*; *see also Houston Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 624 (5th Cir. 2007) (because plaintiffs obtained a permanent injunction of an unconstitutional ordinance, they were prevailing parties entitled to attorney's fees, even though city repealed the ordinance after judgment).

The State further argues that, even if Plaintiffs are prevailing parties, they cannot obtain fees against the State because the State is a prevailing party too. This argument, however, glosses over the inconvenient fact that, in *this* case, the Court concluded that the State's law, SB8, violated the Constitution and enjoined *the State* from utilizing it in any future elections. (Injunction and Reasons for Judgment [doc. # 198]).

Nevertheless, the State claims that the outcome of this litigation represents a vindication of its position that it defended in the *Robinson* litigation. The Court does not doubt this proposition, and there is cause to believe that the State desired the present outcome all along. *See e.g.*, State Opp. Memo., pg. 8 ("Louisiana never wanted S.B. 8 in the first place . . ."). Certainly, if the State believes that it has prevailed in the *Robinson* litigation, it may file a motion

for attorneys' fees against the *Robinson* plaintiffs in *Robinson v. Ardoin*, Civ. Action No. 22-0211 (M.D. La.). Of course, it may find the going rough as, "attorney's fees for prevailing defendants are presumptively unavailable unless a showing is made that the underlying civil rights suit was vexatious, frivolous, or otherwise without merit." *Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001) (citing *inter alia*, *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421 (1978). The Supreme Court has extended the same standard for determining when to award fees against losing intervenors. *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 761 (1989) (attorney's fees should be awarded against losing intervenors only where the intervenors' action was frivolous, unreasonable, or without foundation). Needless to say, no one has argued, let alone established, that the arguments or positions of the *Robinson* intervenors and *Galmon* movants in this litigation surpassed the high bar required to support an award of fees against them.[6]

Of course, the foregoing analysis segues into the State's next argument: that it cannot be cast for fees because it, too, is an intervenor. However, in contrast to most intervenors, the Court found that the State violated Plaintiffs' rights and entered an injunction against the State of Louisiana, together with the named Defendant, the Louisiana Secretary of State. *See Zipes*, 491 U.S. at 762 (losing intervenors ordinarily "have not been found to have violated anyone's civil rights . . ." "[L]iability on the merits and responsibility for fees go hand in hand."). Regardless, the State of Louisiana ultimately is liable for the fee award because Plaintiffs sued the Secretary of State, in her official capacity, and Congress authorized attorneys' fees under § 1988 to

[6] For these same reasons, the undersigned rejects the State's suggestion that any fees award must be borne solely by the *Robinson* intervenors and *Galmon* movants.

prevailing parties in official-capacity actions. *Wyatt v. Cole*, 928 F.2d 718, 722 (5th Cir.1991), *reversed on other grounds,* 504 U.S. 158 (1992).[7]

The State further contends that the circumstances of this litigation are so "extraordinarily unique" that it warrants a finding of "special circumstances" sufficient to render an award unjust. (State's Brief, pg. 11 (citing *Sanchez v. City of Austin*, 774 F.3d 873, 880 (5th Cir. 2014)). "However, the special circumstances exception to the general rule requiring the award of fees is an extremely limited one." *Espino v. Besteiro*, 708 F.2d 1002, 1005 (5th Cir. 1983). There must be "an extremely strong showing of special circumstances to justify a denial of fees." *Kirchberg*, 708 F.2d at 998 (citation omitted).

The State emphasizes that Louisiana found itself in a no-win situation, or a catch-22 if you will, between the *Robinson* litigation on one side and the *Callais* litigation on the other. The State's arguments are unpersuasive. Evidence was adduced at trial to show that the State of Louisiana did not have to draw the congressional districts in SB8 in the tortured, snake-like pattern that it did in order to achieve its professed secondary goal of preserving a preferred incumbent's seat. Moreover, the State of Louisiana plainly saw the writing on the wall in the *Robinson* case and strategically sought to pass new legislation that all but invited a challenge from the opposite direction, likely in a new forum. While the State of Louisiana's apparent strategy was successful, it was not without cost, which is that the State of Louisiana is responsible for the prevailing Plaintiffs' reasonable attorneys' fees.

Ultimately, the State's argument is that Louisiana enacted the unconstitutional SB8 map

[7] The State cited *Nash v. Chandler* where the Fifth Circuit determined that an award of attorneys' fees against Texas was impermissible because Texas only intervened to defend the constitutionality of state statutes. *Nash v. Chandler*, 848 F.2d 567, 574 (5th Cir. 1988). Here, however, the State *and* the Secretary of State, in her official capacity were both enjoined.

in a good faith attempt to comply with its obligations delineated by the *Robinson* litigation. However, enforcement or enactment of a statute in good faith does not constitute a special circumstance exempting the State from liability for fees to the prevailing Plaintiffs. *See Espino,* 708 F.2d at 1005 (good faith is not a special circumstance sufficient to justify the denial of fees under § 1988.); *Ellwest Stereo Theatre, Inc. v. Jackson*, 653 F.2d 954, 955 (5th Cir. 1981) (good faith of government defendants acting in their official capacity is not relevant); *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 545 (5th Cir. 1980).

In *Walker v. City of Mesquite, Tx*, the Fifth Circuit found no special circumstances where the housing authority had argued that it "should not be liable for fees because it was faced with the unattractive choice of either violating the district court's remedial order or obeying the order and exposing itself to potential liability for the fees and expenses of the Homeowners." *Walker v. City of Mesquite, TX*, 313 F.3d 246, 252 (5th Cir. 2002). In other words, as the State argues here, the housing authority asserted that it was in a no-win situation, with no good options. However, the Fifth Circuit was unmoved and reiterated its prior authority that, "a state actor's good faith compliance with an official or legal requirement that is unconstitutional is not a special circumstance that justifies the denial of attorney's fees. *Walker*, 313 F.3d at 252 (citation omitted). The same result follows here.

## II. Attorneys' Fees

"Determining a reasonable attorney's fee is a matter that is committed to the sound discretion of [the] trial judge . . ." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010) (citing 42 U.S.C. § 1988). The legislative history of § 1988 "explains that a reasonable attorney's fee is one that is adequate to attract competent counsel, but . . . [that does] not produce windfalls to attorneys." *Blum v. Stenson*, 465 U.S. 886, 897 1984) (citation and internal

quotation marks omitted).

In the Fifth Circuit, "courts apply a two-step method for determining a reasonable attorney's fee award." *Combs v. City of Huntington, Texas*, 829 F.3d 388, 391–92 (5th Cir. 2016) (citation omitted). The first task is to "calculate the lodestar, which is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work." *Id.* (citation and internal quotation marks omitted). In so doing, "[t]he court should exclude all time that is excessive, duplicative, or inadequately documented." *Id.* (citation omitted).[8]

a) <u>Reasonable Rate</u>

"[R]easonable fees under § 1988 are to be calculated according to the prevailing market rates in the relevant community . . ." *Blum*, 465 U.S. at 895. The relevant legal market is the community where the district court sits. *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002). The reasonable hourly rate for a particular community may be established through affidavits of other attorneys practicing in that community, or by reference to rates awarded in prior cases. *Tab-in-Action, Inc. v. Monroe City Sch. Bd.*, No. 17-0570, 2017 WL 3445652, at *3 (W.D. La. Aug. 10, 2017) (citation omitted). The court also should consider an attorney's

[8] The lodestar method is not intended to be conclusive in all circumstances. *Perdue*, 559 U.S. at 553–54. Instead, there is a strong presumption that the lodestar figure is reasonable, which may be overcome in those rare instances where the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee. *Id*. For example, "an enhancement may be appropriate where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation." *Perdue*, 559 U.S. at 554–55. "Second, an enhancement may be appropriate if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted." *Id*. "Third, there may be extraordinary circumstances in which an attorney's performance involves exceptional delay in the payment of fees." *Perdue*, 559 U.S. at 556.

customary rate when it is within the range of prevailing market rates. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995) (citation omitted). However, "the actual amount paid in fees is not dispositive on the question of reasonable rates." *Id*.

Further, where "abundant and uncontradicted evidence" proves the necessity of employing out-of-district counsel, then that counsel's "home" rate should be considered as a "starting point" for calculating the lodestar amount. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 382 (5th Cir. 2011). Other reasons for resorting to out-of-district counsel include "where local counsel is not willing and/or able to assist or counsel have shown they participate in a market requiring more specialized and sophisticated legal services." *Franciscan Alliance, Inc. v. Becerra*, 681 F.Supp.3d 631, 643 (N.D. Tex. 2023) (citing, *inter alia, McClain*, 649 F.3d at 383).

Ultimately, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 436–37 (1983). In this regard, the applicant is obliged to exercise "billing judgment" with respect to hours worked and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims. *Id*. "The proper remedy when there is no evidence of billing judgment is to reduce the hours awarded by a percentage intended to substitute for the exercise of billing judgment." *Walker v. United States Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 770 (5th Cir. 1996) (reducing award by 15%).

Plaintiffs were/are represented in this matter by Monroe, Louisiana attorney, Paul Hurd, and attorneys from the Kansas City, Missouri law firm of Graves, Garrett, Greim, L.L.C. ("GGG"). They seek attorneys' fees in the amount of $2,088,852.75, which includes fees incurred for the filing of the instant motion. Mr. Edward D. Greim is a partner at GGG, who, among other things, focuses his practice on free speech and election law. (Decl. of Edward

Greim; M/Fees, Exh. A [doc. # 322-2]). In his supporting declaration, Greim explained that GGG's total fees from January 2024 until June 25, 2026 were $1,817,319.00, broken down by legal professional, as follows:

> [a]fter deductions before and after billing, [Mr. **Greim**] spent a total of 1,103 hours litigating this matter and 25.6 hours related to this fee application, for a total fee of $772,193. **Partner Matthew Mueller** spent a total of 187.3 hours litigating this matter and .3 hours related to this fee application, for a total fee of $64,049. **Associate Katherine Mitra** spent a total of 1,357.3 hours litigating this matter and 46.2 hours related to this fee application, for a total fee of $566,138.50. **Associate Jackson Tyler** spent a total of 745.9 hours on this matter, for a total fee of $289,945. **Associate Sarah Pineau** spent a total of 38.1 hours litigating this matter and .5 hours related to the fee application for a total fee of $12,045. **Senior Counsel A. Bradley Bodamer** spent a total of 70.5 hours on this matter for a total fee of $45,472.50. Additionally, **paralegal Nichole Kruger** spent a total of 5.1 hours litigating this matter and 10.7 on the fee application, for a total fee of $4,420; **paralegal Rebekah Badell (nee Smith)** spent a total of 167.9 hours on this matter, for a total fee of $42,169; **paralegal Christina Black** spent 27.6 hours on this matter and 9.1 hours related to preparation of this fee application for a total fee of $9,914.50; and **paralegal Leah Bye** spent 1.4 hours on this matter and 9.1 hours related to preparation of this fee application for a total fee of $3,448.50. Three Graves Garrett Greim **law clerks** also worked on this matter, billing a combined total of 28.5 hours and $7,523.50.

*Id*., pgs. 9-10 (emphasis added).

Mr. Greim further explained that, in the Kansas City market, "partners with more than 20 years' experience in election law litigation typically bill at rates between approximately $600 to $800 per hour. [His] own typical hourly rate for litigation matters was $625 in 2023-2024, $680 in 2024-2025, $725 in 2025-2026, and $765 in 2026-2027." *Id*., pgs. 10-11. Rates at GGG are adjusted annually in March of every year. *Id*. Greim stated that there are not many attorneys that engage in redistricting litigation and even fewer are in private practice. *Id*. The "rates not only reflect the rates of litigators in complex redistricting litigation at the U.S. Supreme Court level but also the rates of litigators in the Kansas City market." *Id*.

Given the small size of GGG (15 employees), the case represented a massive undertaking

that precluded the election law group's ability to accept other employment during the case's active periods. *Id*., pg. 17.[9] Plaintiffs' attorneys also faced significant opposition and bad press for their prosecution of the matter. *Id*. Mr. Greim stated that he regularly reviewed monthly billing statements in this matter and reduced or cut those entries that he believed were excessive or redundant. *Id*., pg. 5. He also included "courtesy discounts" for work that he believed the client should not be charged. *Id*. Mr. Greim further reviewed the bills again for the purpose of this application and cut additional fees in the exercise of billing judgment. *Id*., pgs. 6-8. Plaintiffs' evidence suggests that, in his exercise of billing judgment, Mr. Greim reduced his firm's fees by approximately $59,000,[10] or a little over three percent of the more than $1.8 million's worth of documented time on the case. *See* M/Fees, Exh. EG-2 [doc. # #22-4].

Greim added that,

> counselors with 40 years of experience, such as A. Bradley Bodamer, would reasonably bill at rates between approximately $600 and $800 per hour. Mr. Bodamer's hourly rate for this matter was $645 per hour.
>
> * * *
>
> a partner with nine years of experience, such as Matthew Mueller, would reasonably bill at rates between approximately $400 and $550 per hour. Mr. Mueller's hourly rate for this matter was $420 per hour in 2024, $495 per hour in 2025, and $525 per hour in 2026.
>
> * * *
>
> an associate with three to five years of experience, such as Jackson Tyler, would reasonably bill at rates between $300 and $450 per hour. Mr. Tyler's hourly rate for this matter was $395 per hour.

[9] Mr. Greim acknowledged, however, that he successfully litigated against the United States in two other matters during the pendency of this case. *Id*., pg. 3.

[10] Plaintiffs contend that they have "cut roughly $70,000 prior to filing this fee application." (Pl. Reply Brief, pg. 13).

* * *

> an associate with nine years of experience, such as Sarah Pineau, would reasonably bill at rates between approximately $400 and $500 per hour. Ms. Pineau's hourly rate for this matter was $455 per hour in 2025 and $475 in 2026.
>
> * * *
>
> an associate with two to four years of experience, including a clerkship on the U.S. Court of Appeals for the Fifth Circuit, such as Katherine Mitra (nee Graves), would reasonably bill at rates between approximately $300 and $480 per hour. Mrs. Mitra's hourly rate for this matter was $395 per hour in 2024, $445 in 2025, and $470 in 2026.
>
> * * *
>
> the rates of Graves Garrett Greim's paralegals Nichole Kruger, Rebekah Smith (nee Badell), Christina Black, and Leah Bye of $255 per hour in 2024, $265 per hour in 2025, and $285 per hour in 2026, are in my opinion entirely reasonable in complex redistricting and election law litigation.[11]
>
> * * *
>
> the rates of Graves Garrett Greim's law clerks of $250 per hour in 2025 for Autumn Duncan, and of $285 per hour in 2026 for Matthew Kuckelman and Ben Graves, are in my opinion entirely reasonable in complex redistricting and election law litigation, given their skills and the tasks assigned to them.

*Id*., pgs. 11-17.

Co-counsel, Mr. Paul Hurd expended 572.55 billable hours, at a claimed rate of $425, for a total fee award of $271,533.75, but dividing the fee award by the number of billable hours reflects an hourly rate of $474.25. *See* Decl. of Paul Hurd; M/Fees, Exh. B [doc. # 322-7].[12]

---

[11] The paralegals possess a range of experience from 4 years or less to 25 years.

[12] Furthermore, according to Mr. Hurd's engagement agreement with the organization that funded this litigation, his daily cap on charges was $3,150, which, for an eight-hour work day, equals an hourly rate of $393.75. *See* P. Hurd Engagement Agreement; M/Fees, Exh. PH-1 [doc. # 322-8].

The following chart helps to visualize the Plaintiffs' fees request attributable to GGG:

| Legal Professional | Time Spent | Hourly Rate | Total |
|---|---|---|---|
| **E. Greim** | | | |
| 2024 | 126.6 | $625.00 | $79,125.00 |
| 2024-2025 | 547.0 | $680.00 | $366,008.00[13] |
| 2025-2026 | 335.1 | $725.00 | $235,336.50 |
| 2026 | 119.9 | $765.00 | $91,723.50 |
| **Total:** | **1128.6** | | **$772,193.00** |
| **B. Bodamer** | | | |
| 2024-2025 | **70.5** | $645.00 | **$45,472.50** |
| **K. Mitra** | | | |
| 2024 | 218.3 | $360.00 | $78,588.00 |
| 2024-2025 | 733.4 | $395.00 | $286,888.50 |
| 2025-2026 | 319.6 | $445.00 | $138,528.00 |
| 2026 | 132.2 | $470.00 | $62,134.00 |
| **Total**: | **1403.5** | | **$566,138.50** |
| **J. Tyler** | | | |
| 2024 | 116.3 | $370.00 | $43,031.00 |
| 2024-2025 | 577.1 | $395.00 | $227,757.00 |
| 2025-2026 | 52.5 | $395.00 | $19,157.50 |
| **Total:** | **745.9** | | **$289,945.50** |
| **M. Mueller** | | | |
| 2024 | 25.9 | $385.00 | $5,043.50 |
| 2024-2025 | 15.8 | $420.00 | $4,636.00 |
| 2025-2026 | 136.7 | $495.00 | $49,697.00 |
| 2026 | 8.9 | $525.00 | $4,672.50 |
| **Total:** | **187.3** | | **$64,049.00** |
| **S. Pineau** | | | |
| 2025-2026 | 14.5 | $455.00 | $597.50 |
| 2026 | 24.1 | $475.00 | $11,447.50 |
| **Total:** | **38.6** | | **$12,045.00** |
| **R. Smith** (paralegal) | | | |
| 2024 | 24.3 | $235.00 | $5,710.50 |
| 2024-2025 | 141.0 | $255.00 | $35,955.00 |
| 2025-2026 | 2.6 | $214.00 | $503.50 |
| **Total:** | **167.9** | | **$42,169.00** |
| **N. Kruger** (paralegal) | | | |

[13] The amount of time spent multiplied by the hourly rate does not always equal the total billed for a period where the Firm made fee deductions. *See* Exh. EG-2.

| | | | |
|---|---|---|---|
| 2024-2025 | 1.7 | $255.00 | $433.50 |
| 2025-2026 | 1.6 | $265.00 | $424.00 |
| 2026 | 12.5 | $285.00 | $3,562.50 |
| **Total:** | **15.8** | | **$4,420.00** |
| **C. Black** (paralegal) | | | |
| 2024-2025 | 16.1 | $255.00 | $4,105.50 |
| 2025-2026 | 3.1 | $265.00 | $821.50 |
| 2026 | 17.5 | $285.00 | $4,987.50 |
| **Total:** | **36.7** | | **$9,914.50** |
| **L. Bye** (paralegal) 2026 | **12.1** | $285.00 | **$3,448.50** |
| **L. Hao** (law clerk) 2026 | **8.6** | $265.00 | **$2,279.00** |
| **A. Duncan** (law clerk) 2025-2026 | **12.2** | $250.00 | **$3,050.00** |
| **M. Kuckleman** (L. Clk) 2026 | **7.7** | $285.00 | **$2,194.50** |

**Totals:** **3,835.40** **$1,817,319.00**

*See* M/Fees, Exh. EG-2 [doc. # #22-4].

The State contends that Plaintiffs have failed to demonstrate that it was necessary to hire out-of-district counsel rather than employ a firm in the Western District which could have handled the case. Consequently, the State maintains that counsel's rates should be measured against those commonly charged in the Western District of Louisiana.

The Court observes that, as recently as two months ago, in a § 1983 excessive force case, Chief Judge Doughty concluded that $400 was a reasonable hourly rate for Los Angeles-based attorneys who had obtained a favorable $40 million jury verdict. *Moore v. LaSalle Corrections, Inc.*, Civ. Action No. 16-1007 [doc. # 790] (W.D. La.). In so doing, he rejected counsel's request for a rate of $650 per hour that was typical in the Los Angeles market because the record did not reflect what efforts were made to find other in-district counsel to assist local counsel. *Id.* Chief Judge Doughty further awarded rates between $275 and $350 per hour for other out-of-

state attorneys, who were seeking rates of between $602 and $931 prevalent inside the D.C beltway. *Id*. Chief Judge Doughty also declined to award customary hourly rates of between $615 and $1,275 that reflected the going rate for San Francisco-based attorneys. *Id*. Instead, he cited declarations from local attorneys in Monroe and Shreveport, which supported a rate range between $275 and $425 per hour for the Monroe, Louisiana market for civil rights cases. *Id*. Accordingly, he assigned reasonable rates for the San Francisco-based attorneys that ranged from $275 to $350 per hour, with paralegals compensated at $100 per hour. *Id*.

In a recent ERISA case from this Court's Monroe Division, Chief Judge Doughty again reviewed evidence submitted by the movant showing that attorneys in North Louisiana with over thirty years of experience charged between $300 and $400 per hour. *Clement v. Lumen Health Care Benefit Plan*, Civ. Action No. 24-0104 (W.D. La. Jan. 28, 2026). Ultimately, he set the reasonable attorney fee rate at $350.00 per hour. *Id*.

In a case brought in the Western District's Shreveport Division under the Hague Convention, *see* 22 U.S.C. § 9001, *et seq.*, Chief Judge Doughty determined that an hourly attorney rate of $375.00 for a Shreveport-based attorney was reasonable, as was a $350.00 rate for a partner in New Orleans or Shreveport, given the attorneys' specialized practice, skill, experience, and reputation. *Torres v. Pastor*, Civ. Action No. 25-0252, 2025 WL 2425278, at *2 (W.D. La. Aug. 21, 2025).

In response to the State's argument, Plaintiffs submitted another declaration from Mr. Paul Hurd stating that he has practiced law in Louisiana for 48 years and knows many attorneys who practice elections law. (2nd Decl. of Paul Hurd; Pl. Reply, Exh. B [doc. # 340-2]). Mr. Hurd also participated in the *Hays v. Louisiana*, Civ. Action No. 92-1522 (W.D. La. 1992),

which addressed a remarkably similar racial gerrymandering claim. *Id.*[14] Despite his considerable experience in elections law, Mr. Hurd was unaware of any attorneys in Louisiana who possessed the requisite skill set, manpower, commitment, and availability to prosecute this matter and who did not have a legal or personal conflict. *Id.* In fact, in the *Hays* case, Mr. Hurd ultimately enlisted the assistance of out-of-state counsel, Mr. Kenneth Starr (Kirkland & Ellis). *Id.* In Mr. Hurd's words, GGG was a "constitutional godsend." *Id.* He opined that the rates charged by GGG's attorneys fall "well within the norm of reasonable rates to attract such counsel in this type of litigation." *Id.*

As for attorney rates approved in the Kansas City area, a court, last year, approved a rate of $550 per hour for class counsel asserting claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227. *Ford v. Farha Roofing, LLC*, Civ. Action No. 23-0635, 2025 WL 3769277, at *4 (W.D. Mo. July 29, 2025).

In a civil rights case that achieved limited success, the court reduced St. Louis counsel's requested rates to $475 and $375, before again reducing them by another ten percent. *Rockett, v. Eighmy*, Civ. Action No. 21-3152, 2025 WL 5318601, at *2 (W.D. Mo. Mar. 6, 2025), *aff'd*, No. 25-1664, 2026 WL 3057717 (8th Cir. Oct. 13, 2026).

In a 2021 decision, a Missouri court found that plaintiffs' blended rate of $359.39 and support staff rate of $150.00 was reasonable based on the prevailing rates in the Kansas City community for comparable lawyers of reasonably comparable skills, experience, and reputation. *Romero v. Smithfield Foods, Inc.*, Civ. Action No. 19-0139-BCW, 2021 WL 12311027, at *2 (W.D. Mo. July 13, 2021).

---

[14] Mr. Hurd also has served as lead counsel in a number of cases asserted by voters challenging racially dominant redistricting plans. *See* Decl. of Paul Hurd; M/Fees, Exh. B [doc. # 322-7].

In a 2024 decision, another Missouri district court held that a range of rates from $515 to $655 for one attorney and $485 to $600 for another attorney were reasonable and in line with other fees customarily charged by attorneys in the Kansas City region, given their level of experience and the complexity of the litigation. *Maxus Metro., LLC v. Travelers Prop. Cas. Co. of Am.*, Civ. Action No. 20-0095, 2024 WL 358232, at *6 (W.D. Mo. Jan. 3, 2024), *aff'd in part, vacated in part, remanded,* 148 F.4th 999 (8th Cir.2025), *reh'g granted and opinion vacated,* 2025 WL 3158913 (8th Cir. Nov. 12, 2025), and *on reh'g,* 163 F.4th 441 (8th Cir. 2025), and *aff'd in part, vacated in part, remanded on other grounds,* 163 F.4th 441 (8th Cir. 2025). Another court held that $150 per hour for paralegal work was reasonable. *Ltc Mgmt. Servs., LLC v. Jonathan Steele, Steele Law Firm, LLC*, Civ. Action No. 25-0926, 2026 WL 1602927, at *3 (W.D. Mo. June 4, 2026).

Upon consideration, the Court finds that Plaintiffs have adduced "abundant and uncontradicted evidence" to establish one of the rare instances where it was necessary to employ out-of-district counsel. *McClain*, 649 F.3d at 382. To be sure, Mr. Hurd's bare declaration does not suffice. However, the scales are tipped when his declaration is combined with the unavoidable realization that the State of Louisiana (with its significant resources and experience litigating these issues), the *Robinson* intervenors, and the *Galmon* movants all retained counsel from other jurisdictions.[15] Furthermore, elections law and the constitutionality of legislative districts, in particular, is a niche and specialized area of the law that few practitioners are well-versed in. Consequently, the Court will utilize the bottom of GGG's range of "home" rates as its "starting point" for calculating the lodestar amount. *McClain*, 649 F.3d at 382.

[15] Moreover, the State of Louisiana purportedly felt obliged to pay its outside counsel handsomely. *See* Pls. M/Fees Memo., pgs. 26-27.

The Court also considers many of the *Johnson* factors in its rate determination, including: the time and labor required for the litigation; the novelty and difficulty of the questions presented; the skill required to perform the legal services properly; the time limitations imposed by the client or the circumstances; the amount involved and the result obtained; the experience, reputation, and ability of the attorneys; and customary fees. *Jason D.W. by Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998). The Court specifically recognizes the skill and favorable results obtained by counsel. To be sure, the undersigned did not participate in the merits of these proceedings, and, therefore, does not have firsthand knowledge of counsel's skill. Nonetheless, if the briefing of the instant motion is representative of counsel's overall work, and there is no reason to believe that it is not, then it is clear that counsel is of the highest caliber. Even so, the Court cannot ignore the economic realities regarding the prevailing rates in this district.

As a component of the foregoing considerations, the Court declines to adjust the hourly rates on an annual basis, and instead, assigns a single, reasonable rate for each attorney and law firm staff member for work performed throughout this case: E. Greim - $600; B. Bodamar - $550; M. Mueller - $350; J. Tyler - $250; S. Pineau - $350; K. Mitra - $250; N. Kruger - $100; R. Smith - $100, C. Black - $100, L Bye - $100; A. Duncan - $125; M. Kuckelman - $125; B. Graves - $125; L. Hao - $125; and P. Hurd - $375.

b) <u>Hours Reasonably Expended</u>

The second step in calculating the lodestar amount requires the court to determine the number of hours reasonably expended. *See Hensley*, 461 U.S. at 434. The party requesting fees has the burden of establishing this number. *Id.* at 437. The court may reduce the award if the documentation of hours is inadequate or if the hours are "excessive, redundant, or otherwise

unnecessary." *Id.* at 433-34.

The State challenged Plaintiffs' hours on various grounds and collected the challenged hours in a series of tables and attachments that are set forth in State's Suppl. Exh., Table for Sec. 1-A [doc. # 344] and State Exh. 1-A [doc. # 336-1]. The Court will address the arguments, in turn.

The State contends that Plaintiffs cannot recover fees that are solely attributable to the *Robinson* intervenors and the *Galmon* movants (sometimes referred to collectively as the "private litigants"). No doubt recognizing that a significant percentage of its fees falls within this classification, Plaintiffs vigorously disagree. However, the Court is persuaded that the State has the better side of this contentious issue.

As the Fifth Circuit observed, in *Zipes*, the Supreme Court held that recovery of fees from the intervenor cannot be had unless the intervention is "frivolous, unreasonable, or without foundation." *Hopwood v. State of Texas*, 236 F.3d 256, 280 (5th Cir. 2000) (citations omitted).[16] Other circuits have extended *Zipes* to the award of fees to prevailing plaintiffs from the pockets of losing defendants when the fees are based on interventions. *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 176–78 (4th Cir. 1994); *Bigby v. City of Chicago,* 927 F.2d 1426, 1428–29 (7th Cir. 1991).

In *Rum Creek*, the Fourth Circuit recognized that,

> [a]lthough the Supreme Court in *Zipes* may have left room to argue that intervention-related fees may be shifted under a fee-shifting statute to the

[16] In *Hopwood*, the Fifth Circuit ultimately sidestepped "whether a prevailing plaintiff is absolutely barred from shifting to the defendant the costs associated with defending against an intervention . . ." 236 F.3d at 280.

> defendants, because the only issue there related to an *intervenor's* fee liability, we nevertheless conclude that *Zipes* instructs us not to shift intervention-related expenses to the losing defendant. The *Zipes* Court repeatedly implied that in cases where there are intervention-related expenses, the prevailing party may be required to bear them.

*Rum Creek Coal Sales, Inc*, 31 F.3d at 177. Similarly, in *Bigby*, the Seventh Circuit "agree[d] that the majority opinion in *Zipes* indicates that a Title VII defendant's fee liability does not presumptively extend to cover the fees incurred by plaintiffs in litigating third party interests." *Bigby*, 927 F.2d at 1428–29.

While Plaintiffs cite non-binding authority of their own to support their position, *see, e.g.*, *Nash v. City of Tyler, Tex.*, 736 F. Supp. 733, 734 (E.D. Tex. 1989), the Court is persuaded that *Rum Creek* and *Bigby* represent a more faithful reading of *Zipes*. In so finding, the Court acknowledges that the State, together with the private litigants were nominal allies in defending SB8. But that is as far as it goes. As the State later admitted, it never wanted SB8 in the first place, and, as soon as the Supreme Court signaled that it was interested in revisiting its jurisprudence regarding the interaction between the VRA and the Constitution, the State quickly reversed its position.

Upon review, and as painstakingly recited in the background section above, there is no question that the private litigants are responsible for a very significant amount of the time that Plaintiffs' counsel expended on this case. In the absence of evidence that the State endorsed or ratified the filings and arguments of the private litigants, it is neither logical nor equitable to hold the State responsible for the fees incurred by Plaintiffs in responding to them.[17] *See Hopwood,*

[17] In *Louisiana Power & Light Co. v. Kellstrom*, the Fifth Circuit stated that "[a] prevailing litigant may not recover for hours devoted solely to claims against other parties. But when claims against multiple parties share a common core of facts or related legal theories, a fee applicant may claim all hours reasonably necessary to litigate those issues." *Kellstrom*, 50 F.3d

236 F.3d at 280.[18]

The Court has reviewed sample time entries associated with the State's Table 1-A and agrees that the work appears to have been exclusively or predominantly related to private litigants' tasks. *See* State's Suppl. Exh., Table for Sec. 1-A [doc. # 344] and State Exh. 1-A [doc. # 336-1]. Therefore, the Court will reduce the billed hours as requested in the State's Table 1-A.

The State next petitions the Court to reduce Plaintiffs' fees by 25 percent for work that was partially attributable to private litigants-related tasks, together with another 25 percent discount for block-billed time. *See* State's Suppl. Exh., Table Sec. 1.B [doc. # 344] and State Exh. 1-B [doc. # 336-1]. "Block-billing is a time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *United States, ex rel., Cook-Reska v. Cmty. Health Sys., Inc.*, 641 Fed. App'x. 396, 399 n.7 (5th Cir. 2016) (internal quotation marks and quoted source omitted). "If the applicant's documentation of the hours claimed is 'vague or incomplete,' the district court may reduce or eliminate those hours." *League of United Latin Am. Citizens No. 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1233 (5th Cir. 1997) (citation omitted).

---

at 327 (internal citations and quotation marks omitted). *Kellstrom*, however, was an antitrust case where plaintiff had to demonstrate collusion among multiple *defendants*. *Id*. There is no indication that *Kellstrom* may be extended to hold a defendant liable for fees attributed to an intervenor, which otherwise is liable for fees only if its position was frivolous or the like.

[18] Plaintiffs state that, "if the Court finds the State is not liable for fees for any particular filings, it should hold the Robinsons and Galmons are." (Pls. Reply Memo., pg. 13). Plaintiffs, however, have not alleged or established that the intervenors' filings were frivolous, unreasonable, or without foundation. *See Zipes* 491 U.S. at 761 (attorney's fees should be awarded against losing intervenors only where the intervenors' action was frivolous, unreasonable, or without foundation). Accordingly, it is recommended that their alternative request for relief be denied.

Plaintiffs dispute the necessity for any reduction at all but assert that a proposed reduction of 25 percent on top of 25 percent is grossly inflated. (M/Fees, Memo., pgs. 15-16). Instead, they suggest, at most, a reduction of ten percent. *Id*. (citing *Saizan v. Delta Prods. Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006)); *but see*, *Walker v. United States Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 770 (5th Cir. 1996) (deciding that 15 percent reduction was warranted to substitute for the exercise of billing judgment).

The Court has reviewed sample entries and agrees that, in many instances, Plaintiffs' counsel lumped multiple tasks into one multi-hour billing entry. Furthermore, the entries overlap with work that pertained both to the State and the private litigants. However, rather than a total reduction of 43.75 percent as advocated by the State, the Court will apply a single, 25 percent reduction to the 448.65 hours[19] identified in the State's Suppl. Exh., Table Sec. 1.B.

In another table, the State identified a total of 1,201.80 hours of claimed time performed after the Supreme Court ordered supplemental briefing, i.e., after the State purportedly switched sides. *See* State's Suppl. Exh., Table Sec. 2 [doc. # 344] and State Exh. 1-C [doc. # 336-1]. The State contends that it should not be responsible for these hours, and, therefore, seeks a 100 percent reduction.

However, the State did not seek to dismiss its appeal. Moreover, it filed a motion to vacate the Court's injunction upon remand. Therefore, instead of a 100 reduction of the itemized hours, the Court will reduce the post-supplemental briefing time by 85 percent to reflect that it

[19] The State's table includes 5.4 hours of work performed by Brett Mordecai, which also appears in Plaintiffs' Exh. EG-1, pgs. 56-75. As best as the Court can tell, however, Plaintiffs are not seeking recovery for Mr. Mordecai's time because he is not mentioned in Mr. Greim's declaration.

was overwhelmingly necessitated by the private litigants.[20]

The State further proposes a 25 percent reduction for another 1,543.45 hours of additional block-billed entries that were not included in earlier tables. *See* State's Suppl. Exh., Table Sec. 8 [doc. # 344] and State Exh. 1-I [doc. # 336-1]. The Court has reviewed sample entries, and agrees that, as with other entries, Plaintiffs' counsel frequently grouped multiple tasks into one multi-hour billing entry. Rather than a 25 percent reduction, however, the Court will decrease the hours by 10 percent.

The State next seeks to disallow 54.70 hours that counsel spent on media and public relations. *See* State's Suppl. Exh., Table Sec. 3 [doc. # 344] and State Exh. 1-D [doc. # 336-1]. The Fifth Circuit is "chary about granting requests for media fees." *Hopwood*, 236 F.3d at 280. Plaintiffs respond that there is no categorical rule against these fees, and, in any event, many of the entries reflect attorney work on briefs, case strategy, etc. (Pl. Reply Memo., pg. 14). The Court is not disposed to awarding fees for time spent on media and public relations. However, review of the entries confirms that many were for mixed purposes, including compensable legal work. Accordingly, the Court will reduce the 54.70 hours by 50 percent.

The State also seeks to exclude 48.10 hours of time that it describes as legislative and political strategy events. *See* State's Suppl. Exh., Table Sec. 4 [doc. # 344] and State Exh. 1-E [doc. # 336-1]. The Fifth Circuit has recognized that, "counsel's participation in administrative activities be tied both qualitatively and timely to the lawsuit in order to establish that such work was performed "on the litigation." *Leroy v. City of Houston*, 831 F.2d 576, 582 (5th Cir. 1987).

[20] The State's table includes 3.9 hours of work executed by Salvatore Paris. From what the Court may discern, however, Plaintiffs are not seeking to recover for Mr. Paris's time because he is not included in Mr. Greim's declaration.

Plaintiffs maintain, however, that this work was essential to their success.

Upon review, the Court will deduct only the time spent by Mr. Hurd attending the remedial legislative session in May 2026. The Court is not persuaded that his attendance was necessary. He could have monitored proceedings and made himself available, as needed, from Monroe. Accordingly, the Court will reduce Mr. Hurd's claimed hours by 27.5. Otherwise, the Court makes no other deduction for this category.

The State next seeks to reduce 54.5 hours by 90 percent on the basis that it represents clerical work. *See* State's Suppl. Exh., Table Sec. 5 [doc. # 344] and State Exh. 1-F [doc. # 336-1]. Clerical work includes work that can be accomplished by non-lawyers, and, thus, should be compensated at a different rate from legal work. *Walker*, 99 F.3d at 770. Upon review, however, most of the hours are attributed to paralegals. Moreover, the entries appear more legal in nature than clerical or ministerial. Accordingly, the Court declines to make any reduction for this category.

The State also seeks to deduct 5.2 hours purportedly spent by Matthew Mueller and Paul Hurd on client and business development. *See* State's Suppl. Exh., Table Sec. 6 [doc. # 344] and State Exh. 1-G [doc. # 336-1]. The Court is not persuaded. The entries confirm that counsel were trying to find plaintiffs to prosecute the instant case, as directed by their funding organization. Without sufficient plaintiffs from the affected district(s), they had no standing and no case.

The State further asks the Court to reduce 287.25 hours of Plaintiffs' travel time by half or more in accordance with Fifth Circuit precedent. "The practice in the Fifth Circuit is that travel time is often reduced by 50% of the attorney's rate absent evidence that any legal work was accomplished during travel time." *Cox v. Mignon Faget, Ltd.*, Civ. Action No. 24-1068,

2025 WL 2022669, at *7 (E.D. La. July 18, 2025) (citation and internal quotation marks omitted). Plaintiffs pointed out, however, that Mr. Hurd already reduced his travel time by 50 percent. Therefore, the Court will not reduce Mr. Hurd's hours. Furthermore, after reviewing the entries for travel time "after supplemental briefing was ordered," it appears that the same entries were listed in Table 2, which the Court already has reduced by 85 percent. *See* discussion, *supra*. The Court will not reduce those hours further.

Plaintiffs protest that the hours listed for Ms. Smith reflect time where she was working, not traveling. The Court agrees, and, thus, will not reduce Ms. Smith's time. As for the remaining individuals on the list, Plaintiffs state that the attorneys often worked while traveling. Their time entries confirm same. Accordingly, the Court will reduce the time for the remaining attorneys (before supplemental briefing was ordered) by only 30 percent.

Finally, the State seeks to disallow 122.70 hours that counsel spent preparing the instant fee application. It is manifest, however, that "a prevailing plaintiff is entitled to attorney's fees for the effort entailed in litigating a fee claim and securing compensation." *Cruz v. Hauck*, 762 F.2d 1230, 1233 (5th Cir. 1985); *Kellstrom*, 50 F.3d at 336 ("A district court may award costs and fees for time spent litigating a cost or fee request."). The State alternatively suggests that where, as here, Plaintiffs did not prevail in full on their fee application, their fee for prosecuting the motion should be reduced.

Considering the significant deductions required, the Court agrees. Plaintiffs did not submit their time for preparing their reply brief. However, instead of reducing the time claimed by Plaintiffs on their opening brief, the Court simply will decline to award any fees for Plaintiffs' reply brief.

The following chart summarizes the hours to be reduced by individual for each

corresponding table from the State's Supplemental Exhibit [doc. # 344], as allowed by the Court:[21]

| | 1-A (100%) | 1-B 25%) | 2 85%) | 3 (50%) | 7 (30%) | 8 (10%) | Total |
|---|---|---|---|---|---|---|---|
| **E. Greim** | 72.40 | 38.53 | 294.78 | 19.80 | 3.60 | 51.26 | 480.37 |
| **B. Bodamer** | | 2.35 | | | 5.52 | 3.49 | 11.36 |
| **K. Mitra** | 246.50 | 27.15 | 321.90 | | 22.44 | 52.91 | 670.90 |
| **J. Tyler** | 102.90 | 33.90 | | | 9.78 | 23.03 | 169.61 |
| **M. Mueller** | 8.20 | 0.83 | 95.80 | | | 6.59 | 111.42 |
| **S. Pineau** | .60 | | 31.45 | .20 | | 2.39 | 34.64 |
| **R. Smith** (paralegal) | 13.80 | 5.33 | | | | 5.64 | 24.77 |
| **N. Kruger** (paralegal) | | | 11.56 | | | .08 | 11.64 |
| **C. Black** (paralegal) | 2.00 | 0.75 | 17.51 | | | 1.10 | 21.36 |
| **L. Bye** (paralegal) | .30 | | 10.29 | | | | 10.59 |
| **L. Hao** (law clerk) | | | 7.31 | | | | 7.31 |
| **M. Kuckleman** (L. Clk | | | 6.55 | | | | 6.55 |
| **P. Hurd** | 12.25 | 1.99 | 221.09 | 7.35 | 27.5[22] | 7.14 | 277.32 |

c) <u>The Lodestar Calculated</u>

Subtracting the total sustained time reductions portrayed in the above table, from the time claimed by each attorney or staff member, and multiplying that difference by the applicable hourly rate, the Court calculates the lodestar, as follows:

[21] These figures are derived by applying the applicable percentage reduction to the challenged hours in the respective tables contained in the State's Supplemental Exhibit [doc. # 344]. This assumes that the hours listed in the State's tables reflect claimed time prior to any reduction.

[22] These hours for Mr. Hurd reflect the reduction from Table 4 only (legislative and political strategy).

| | Time Claimed | Time Disallowed | Net Time | Hourly Rate | Fees |
|---|---|---|---|---|---|
| **E. Greim** | 1128.6 | 480.37 | 648.23 | 600.00 | $388,938.00 |
| **B. Bodamer** | 70.5 | 11.36 | 59.14 | 550.00 | $32,527.00 |
| **K. Mitra** | 1403.5 | 670.90 | 732.60 | 250.00 | $183,150.00 |
| **J. Tyler** | 745.9 | 169.61 | 576.29 | 250.00 | $144,072.50 |
| **M. Mueller** | 187.3 | 111.42 | 75.88 | 350.00 | $26,558.00 |
| **S. Pineau** | 38.6 | 34.64 | 3.96 | 350.00 | $1,386.00 |
| **R. Smith** (paralegal) | 167.9 | 24.77 | 143.13 | 100.00 | $14,313.00 |
| **N. Kruger** (paralegal) | 15.8 | 11.64 | 4.16 | 100.00 | $416.00 |
| **C. Black** (paralegal) | 36.7 | 21.36 | 15.34 | 100.00 | $1,534.00 |
| **L. Bye** (paralegal) | 12.1 | 10.59 | 1.51 | 100.00 | $151.00 |
| **L. Hao** (law clerk) | 8.6 | 7.31 | 1.29 | 125.00 | $161.25 |
| **A. Duncan** (law clerk) | 12.2 | 0.0 | 12.20 | 125.00 | $1,525.00 |
| **M. Kuckleman** (L. Clk) | 7.7 | 6.55 | 1.15 | 125.00 | $143.75 |
| **P. Hurd** | 572.55 | 277.32 | 295.23 | 375.00 | $110,711.25 |

**Total:** **$905,586.75**[23]

[23] If, upon further review, the parties uncover an error in the Court's calculations, they shall confer and agree on any necessary corrections in their objections to the report and recommendation.

d) Application of the *Johnson* Factors

The Court now must consider the *Johnson* factors to determine if the lodestar amount should be adjusted:

> (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Jason D.W. by Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998). Although upward adjustments to the lodestar are permitted, "such modifications are proper only in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts." *CEATS, Inc. v. TicketNetwork, Inc.*, No. 24-40230, 2025 WL 2945804, at *12 (5th Cir. Oct. 17, 2025) (citation omitted).

Many of the *Johnson* factors are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate and should not be double-counted. *Jason D.W. by Douglas W.*, 158 F.3d at 209 (citing, *inter alia*, *Shipes v. Trinity Indus.,* 987 F.2d 311, 320 (5th Cir. 1993). For instance, factors one through three and seven through nine are fully reflected in the lodestar amount and, thus, cannot provide independent bases for increasing the basic fee award. *See Walker*, 99 F.3d at 771 (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986), *supplemented,* 483 U.S. 711 (1987)). Also, the Supreme Court has barred use of the sixth factor. *Walker*, 99 F.3d at 772 (citation omitted).

As for the remaining factors, it is clear that this case monopolized counsel's time, which precluded work on other matters (factor four). However, counsel were compensated for their

work in this case. Furthermore, Mr. Greim documented other cases that his firm worked on during the same time frame. *See* E. Greim Decl. [doc. # 322-2]. As for the customary fee (factor five), the Court has considered this factor in its rate determination. *See* discussion, *supra*.

A case's "undesirability" (factor 10) refers to hardships that civil rights attorneys face in their communities because of their desire to help the civil rights litigant. *Johnson*, 488 F.2d at 719. Mr. Greim's statement that he and his clients faced significant criticism is conclusory and unpersuasive. *See* Greim Decl., ¶ 10. Apparently, it was counsel who selected the Plaintiffs in this case, and there is no indication that anyone faced any threats or retaliation because of their participation.

There is also no indication that the nature and length of the professional relationship with the client (factor 11) supports a modification of the lodestar. Finally, for purposes of factor 12, Plaintiffs identified several multi-million-dollar fee awards from other similar cases. (Pls. M/Fees, Memo., pgs. 30-31). However, without knowing the number of hours expended in those cases and the pertinent hourly rates, those awards are not particularly relevant to the outcome here.

In sum, after consideration of the *Johnson* factors, the Court declines to make an adjustment to the lodestar.

## III. Costs and Expenses

Plaintiffs seek an award of $148,298.34 in costs and expenses that they incurred in this litigation in accordance with Rule 54 and 42 U.S.C. § 1988.

The Federal Rules of Civil Procedure provide that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party. . . " FED. R. CIV. P. 54(d)(1). The term "costs" as used in Rule 54(d), is

defined by 28 U.S.C. § 1920. *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 441–42 (1987). Thus, absent explicit statutory or contractual authorization to the contrary, federal courts may award only those costs listed in 28 U.S.C. § 1920.[24] *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1045 (5th Cir. 2010) (citation omitted).

Furthermore, "[a]ll reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone, are plainly recoverable in section 1988 fee awards because they are part of the costs normally charged to a fee-paying client." *Associated Builders & Contractors of Louisiana, Inc. v. Orleans Par. Sch. Bd.*, 919 F.2d 374, 380 (5th Cir. 1990) (citations omitted). Even when expenses fall within the categories that may be awarded to a successful plaintiff, "they must not be awarded when they are extravagant or unnecessary." *Curtis v. Bill Hanna Ford, Inc.*, 822 F.2d 549, 553 (5th Cir. 1987) (citation omitted).

---

[24] Section 1920 provide that a judge or clerk of any court of the United States may tax as costs the following:

**(1)** Fees of the clerk and marshal;
**(2)** Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
**(3)** Fees and disbursements for printing and witnesses;
**(4)** Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
**(5)** Docket fees under section 1923 of this title;
**(6)** Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

Plaintiffs submitted a Bill of Costs totaling $78,845.29, which is comprised of the following items: $1,111.25 in fees of the Clerk; $1,069.83 in fees for service; $33,343.40 in fees for printed or electronically recorded transcripts necessarily obtained for use in the case; $32,927.45 in fees and disbursements for printing; $4,271.66 in expenses for witnesses; and $6,121.70 in fees for copies for necessary use in the case. (M/Fees, Exh. C and itemized bills and spreadsheet attached to the Greim Declaration, Exhs. A-1, 3, & 4 [doc. #s 322-3, 5, 6 & 9]).

Plaintiffs seek to recover their remaining expenses pursuant to § 1988. First, they incurred $32,131.44 in travel-related expenses, which includes expenses for travel to and from Shreveport, Louisiana; subsistence; and lodging for the trial from April 8-10, 2024. They also include travel to and from Washington, D.C.; subsistence; and lodging in February 2025 for four attorneys (Edward Greim, Paul Hurd, Jackson Tyler, and Katherine Mitra) to attend an oral argument before the Supreme Court, in preparation for oral argument before the Supreme Court in March 2025. They also include travel to and from Washington, D.C.; subsistence; and lodging in March 2025 for three attorneys (Edward Greim, Paul Hurd, and Katherine Mitra) to participate in a moot court of attorney Edward Greim before his oral argument. These expenses also include travel to and from Washington, D.C.; subsistence; and lodging in March 2025 for four attorneys (Edward Greim, Paul Hurd, Jackson Tyler, and Katherine Mitra) to participate in the first oral argument before the Supreme Court. They include travel to and from Washington, D.C.; subsistence; and lodging in October 2025 for three attorneys (Edward Greim, Paul Hurd, and Matthew Mueller) to participate in a moot court in preparation for the second oral argument before the Supreme Court. These expenses include travel to and from Washington, D.C.; subsistence; and lodging in October 2025 for four attorneys (Edward Greim, Paul Hurd, Matthew Mueller, and Katherine Mitra) to participate in the second oral argument before the Supreme

Court. Finally, travel included trips for Paul Hurd within the State of Louisiana to visit the courtroom in Shreveport in advance of the April 2024 trial to understand the capacities of the courtroom, to interview a potential witness in May 2024, and to attend legislative hearings on Act 7 in May 2026.

Plaintiffs also incurred $17,911.89 in legal research costs, consisting of fees charged by Westlaw and LexisNexis and fees assessed by PACER to access court dockets in this and other cases to review filings relevant to the litigation here.

Plaintiffs also sustained the following miscellaneous expenditures: $433.04 in telephone conference line fees; $1,470.26 in video depositions of opposing party witnesses for the purpose of trial preparation; shipping costs of $7,368.29, which included shipping necessary materials from Kansas City to Shreveport for the trial, shipping court filings and other materials to the Plaintiffs, and shipping briefs to the Supreme Court and other parties; hotel conference room fees of $3,083.78, which was necessary to prepare for trial and for oral argument before the Supreme Court; office supplies of $920.10, used for the trial and preparation for oral argument before the Supreme Court; and $6,134.25 in other expenses from Counsel Press, the printing service used to print and submit briefs and other filings to the Supreme Court and the Fifth Circuit.

The State challenges several aspects of Plaintiffs' costs and expenses. First, it seeks a reduction of $17,990.46 in costs ($14,857.96 before supplemental briefing was ordered and $3,132.50 afterwards) that it contends Plaintiffs incurred in response to the private litigants. *See* State Opp., Exh. 2 [doc. # 336-2]. Upon review of these entries, the Court agrees, except for the October 21, 2025 charge ($3,132.50) associated with Plaintiffs' supplemental brief. The Court will reduce that charge by 85 percent (instead of the requested 100 percent), consistent with its prior treatment of the challenge to counsel's billing hours. *See* discussion, *supra*. This results in

a $17,520.59 reduction to Plaintiffs' costs. *See* Expenses for Exclusion, Item 1, State Opp., Exh. 2 [doc. # 336-2].

The State also seeks a $198.60 reduction attributable to media fees, specifically a subscription to the Advocate for purposes of research. *See* State Exh. 2-1. Upon review, however, the fees appear to be necessary to access the newspaper's articles for purposes of this litigation. The State's objection is overruled.

The State next contends that the Court should exclude $28,517.56 in expenses that were incurred by Plaintiffs after supplemental briefing was ordered and the State switched sides. *See* State Exhibit 2-B. Upon review of the challenged items, the Court agrees with the State. However, with the exception of Paul Hurd's two hotel stays in Baton Rouge in May 2026 ($239.79), which the Court will disallow entirely as unnecessary, *see* discussion, *supra*, the Court will apply an 85 percent reduction to the remaining expenses, consistent with its prior treatment of the challenge to counsel's billing hours. Accordingly, for the items listed in the State's Exhibit 2-B, this results in a $24,275.89 ($24,036.10 + 239.79) reduction to Plaintiffs' claimed expenses.

Finally, the State challenges $5,504.05 of travel expenses as extravagant. (State Exh. 2-C). The State's exhibit documents what appears to be three hotel nights in D.C. at over $700 per night and three flights from Monroe to D.C. at over $1,000 each. *Id*. The Court agrees that these expenses appear extravagant, and, therefore, will reduce them by 50 percent to $2,752.03.

The State further asserted that Plaintiffs failed to provide proper receipts, invoices, or other documentation for their claimed costs, and, consequently, the State is unable to determine their necessity. However, Plaintiffs provided various breakdowns of their costs and fees, including some invoices. *See* M/Fees, Exhs. EG1, 3-4 and PH-1 [doc. # 322]. Moreover, in the

absence of a challenge or argument pertaining to specific items, the Court cannot review the hundreds, if not thousands, of claimed costs and expenses in a vacuum.

In sum, the Court will reduce Plaintiffs' claimed costs by $17,520.59 and their expenses by $27,027.92 for a net award of $103,749.83.

**Conclusion**

For the foregoing reasons,

IT IS RECOMMENDED that the motion for attorneys' fees and expenses [doc. # 322] filed by Plaintiffs Phillip Callais, et al., be GRANTED IN PART and DENIED IN PART and that Plaintiffs be awarded attorneys' fees in the amount of $905,586.75, plus $103,749.83 in costs and expenses against the State of Louisiana and/or Nancy Landry, in her official capacity as Louisiana Secretary of State.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CIV. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Court at the time of filing. Timely objections will be considered by the District Court before a final ruling is made.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

In Chambers, at Monroe, Louisiana, on this 27th day of October, 2026.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE